**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BELK, INC., *et al.,*[1] | ) | Case No. 21-30630 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF WILLIAM LANGLEY,
CHIEF FINANCIAL OFFICER OF BELK, INC.,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, William Langley, hereby declare under penalty of perjury:

<u>**Introduction**</u>

1.      It would be far from provocative to say retail has changed dramatically over the last several years.  In this multi-screen world where consumers spend more money on personalized experiences rather than goods, adapting to the new normal has been critical for retailers to survive. And then COVID-19 wreaked havoc on all retailers, literally resulting in a complete pause of all in-person shopping.   For Belk—the nation's largest private department store chain, with approximately 17,000 employees across 291 stores primarily in the southeastern United States, which itself was in the process of a turnaround and adapting to the omnichannel world—the COVID-19 pandemic directly resulted in drastic declines in sales, revenue, and liquidity.  Sales were down 32% year-over-year for the period commencing the third week of



---

1       A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/belk.  The location of the Debtors' service address is 2801 West Tyvola Road, Charlotte, North Carolina 28217.

March 2020 through December 2020 and Belk's liquidity in April 2020 had declined approximately 70% year-over-year. Despite proactive steps taken by Belk's board and management team before and during the COVID-19 pandemic to adapt to an evolving retail environment and manage its balance sheet, the massive and ongoing revenue and liquidity declines necessitate a realignment of the capital structure and immediate liquidity infusion.

2.      Appreciating the fate of so many similarly situated retailers that have failed to survive, Belk has focused on consensus and speed. Belk succeeded. Belk stands here today with an actionable and comprehensive solution to its capital structure and liquidity issues. The restructuring support agreement attached hereto as **<u>Exhibit C</u>** (the "<u>Restructuring Support Agreement</u>") provides for a realignment of the capital structure through a deleveraging of $450 million of First and Second Lien Term Loan debt and the infusion of $225 million in new money to fund the business going forward. The Restructuring Support Agreement is supported by holders of approximately 99% of the Debtors' First Lien Term Loans and holders of 100% of the Second Lien Term Loans. It is also supported by the Debtors' Sponsor – the investment fund managed by, and other Affiliates (excluding any of the Debtors or Reorganized Debtors) of Sycamore Partners Management L.P. in their capacity as indirect holders of interests (collectively, ("<u>Sycamore</u>"), whose retention of majority ownership of reorganized Belk was important to the other parties due to Sycamore's valuable multi-channel retail experience and expertise. The Restructuring Support Agreement allows Belk to satisfy all trade, customer, and other non-funded debt obligations in full, maintain its approximately 17,000 workforce, and keep open all 291 stores. Importantly, the Restructuring Support Agreement requires confirmation of the Plan <u>on the Petition Date</u>.

3.      Before executing the Restructuring Support Agreement, the Debtors, with the assistance of their advisors, explored a number of alternatives, including whether it was practicable

or feasible to effectuate an out of-court restructuring transaction. Ultimately, the Debtors determined that their liquidity runway necessitated the selection of a definitive implementation path. Because the Debtors had the support of 75% of the First Lien Term Loan Claims upon execution of the Restructuring Support Agreement (the remaining 24% have signed on through joinders), the Debtors and the other parties agreed to implement the restructuring through this chapter 11 process. Following an appropriate notice period, the Debtors commenced these Chapter 11 Cases to implement this restructuring through their joint prepackaged plan of reorganization (the "Plan").[2] If the Plan is not confirmed on February 24, 2021, the Debtors' lack of material cash or committed interim financing, combined with the resulting termination rights under the Restructuring Support Agreement, would lead to significant disruption and uncertainty, and could potentially result in a liquidation. Because the Plan (a) has been accepted by Holders of approximately 99% of First Lien Term Loan Claims (Class 4), 100% of Second Lien Term Loan Claims (Class 5), and 100% of the equity interests in Debtor Fashion Holdings Intermediate LLC (Class 9) – the voting Class under the Plan, and (b) pays all other non-funded debt claims in full in the ordinary course, a stop in chapter 11 for anything more than 24 hours will serve not one stakeholder's interest. On the contrary, absent confirmation today, the entire enterprise will be at risk, threatening severe damage to the business, the loss of approximately 17,000 jobs, the closing of 291 stores, and the disappearance of a value maximizing—and fully consensual—restructuring.

4.     Belk has provided sufficient notice to obtain confirmation of the Plan today. On January 26, 2021—29 days ago—Belk commenced solicitation of votes on the Plan and provided actual notice of the Plan and the disclosure statement in support of the Plan (including all exhibits and schedules thereto, the "Disclosure Statement"). I understand that the Plan has been

---

[2]   Capitalized terms used but not immediately defined in this declaration shall have the meanings assigned to them elsewhere in this declaration, the Plan, or the Restructuring Support Agreement, as applicable.

accepted by 100% of creditors and shareholders that cast ballots, that no creditor or shareholder has voted to reject the Plan, and that holders of over 99% of claims (by amount) cast ballots. Also on January 26, 2021, Belk mailed the confirmation hearing notice (the "Confirmation Hearing Notice") to more than 90,000 creditors and potential interested parties and posted the Plan, Disclosure Statement, and Confirmation Hearing Notice to Belk's proposed notice and claims agent's website at: https://cases.primeclerk.com/belkballots. The Confirmation Hearing Notice explicitly stated that Belk would request that the Court confirm its Plan at the first day hearing, on February 24, 2021 before either Judge Marvin Isgur or Judge David R. Jones and that the proposed objection deadline for the Plan and Disclosure Statement was February 23, 2021 at 4:00 p.m. prevailing Central Time. Notice was also published in the *New York Times* (national edition) and the *Charlotte Observer* on January 29, 2021.

5.     Notably, the Plan does *not* impair any creditors, other than the parties that have overwhelmingly voted in favor of the Plan. As a result, all general unsecured claims will be paid in the ordinary course of business. All contracts and leases will be assumed. The Debtors have also provided the ability for all Releasing Parties under the Plan to opt out of the releases under the Plan by checking the opt-out box on their applicable ballot or opt-out form.

6.     The Debtors received two objections to the Plan, one of which the Debtors have consensually resolved with the inclusion of language in the proposed Confirmation Order. The Debtors expect to resolve the one remaining objection, asserted by the Louisiana Department of Revenue, prior to the Confirmation Hearing. The Debtors have received informal comments to the Plan from various parties and have resolved these comments through the inclusion of clarifying language in the Plan or the proposed confirmation order.

7.     As further described in **Exhibit A** herein, on the date hereof (the "Petition Date") the Debtors have filed certain motions and pleadings seeking various types of "first-day" relief

(collectively, the "<u>First Day Motions</u>") requesting necessary operational and procedural relief to allow the Debtors to continue to operate their business in the ordinary course.  Although the Debtors anticipate emerging from these Chapter 11 Cases on February 24, 2021 or as soon as possible thereafter, the Debtors have requested approval of certain First Day Motions out of an abundance of caution in the event confirmation or consummation of the Plan is delayed.

8.      Therefore, the Debtors respectfully request that the Court grant the relief requested in the First Day Motions, approve the Disclosure Statement, and confirm the Plan, allowing the Debtors to emerge from these cases in record speed.

## Background

9.      I am the Chief Financial Officer of Belk, Inc. ("<u>Belk</u>" and together with its affiliated debtors and debtors in possession, the "<u>Debtors</u>").  I joined Belk in 2005 and have served as Belk's Chief Financial Officer since April 2020.  Before serving as Belk's Chief Financial Officer, I served in various roles in Belk's accounting department, strategic sourcing department, financial planning and analysis department, and risk management department, ultimately becoming Belk's Treasurer in 2016.  I received bachelor's degrees in accounting and finance and a master's degree in accounting from Appalachian State University.

10.      To effectuate a restructuring, on the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>").  To minimize the adverse effects on their businesses, the Debtors have filed the First Day Motions.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these Chapter 11 Cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

11.     In my capacity as Chief Financial Officer, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

12.     To familiarize the Court with the Debtors' businesses, this declaration has been organized into four sections.  The ***first*** provides background information on the Debtors' businesses and operations.  The ***second*** offers detailed information on the Debtors' corporate and capital structure.  The ***third*** details the events leading to the filing of these Chapter 11 Cases and the Debtors' prepetition restructuring efforts, including the relevant terms of the Debtors' Restructuring Support Agreement.  The ***fourth***, together with **Exhibit A**, summarizes the relief requested in, and the legal and factual basis supporting, the First Day Motions.

**Discussion**

I.      **Background of the Debtors' Businesses and Operations.**

A.      **Belk's History.**

13.      In 1888, William Henry Belk opened a small bargain store named "The New York

Racket" in Monroe, North Carolina.  Three years

later, in 1891, William Henry Belk persuaded his

brother, Dr. John M. Belk, to become a partner in

the renamed business, Belk Brothers, beginning

a  business  association  focused  on  providing

customers with quality products at great prices.

By  1923,  the  Belk  brothers  and  their  partners



**Belk Brothers Store**

operated 20 stores that generated $10 million in total annual sales and by 1943, Belk had opened

its 195th store.

14.      In 1955, William Henry Belk's sons took on leadership positions at Belk, leading

strategic  changes  that  transformed  Belk  from  downtown  bargain  stores  to  modern  fashion

destinations located in shopping centers and malls throughout the Southern United States.  In the

following years, Belk grew from a small bargain store to the nation's largest privately-owned

department store offering quality products, unparalleled service and an unbreakable connection to

its community.  In 1998, a new generation of Belk brothers emerged and under their leadership,

Belk consolidated its legal and organizational structure to centralize logistics, merchandising, and

other operational functions.  The new structure merged 112 Belk stores into one company–Belk,

Inc.  Over the next several years, Belk experienced significant growth, both organically and

through the acquisition of several well-known department stores, including over 90 Proffitt's,

McRae's, and Parisian department stores.  In 2008, Belk re-launched its e-commerce platform,

belk.com, and began offering a significantly expanded assortment of national brands and private label fashion apparel, shoes, accessories, and cosmetics, and home merchandise, as highlighted below.



home décor       women's shoes       fashion jewelry       handbags

men's fashion     kids' graphic tees     juniors' fashion      women's denim

15.     On December 10, 2015, after a series of corporate transactions, Sycamore acquired Belk, Inc. and its subsidiaries for approximately $3 billion, or approximately $68 per share for Belk's then-existing shareholders.

### B.     Belk's Business Operations.

16.     Belk's vision is to reimagine the department store experience for its customers.  Over the past several years, Belk has focused on maximizing its sales opportunities by providing quality merchandise assortments, including a large and exclusive offering of private brands that differentiate its stores from competitors.   Belk's marketing and sales promotional strategies seek to attract customers to shop at Belk by keeping them informed of the latest fashion trends, merchandise offerings, and sales



promotions through a combination of advertising and interactive media, including direct mail, circulars, broadcast media, digital media, social media (including email, Facebook, Instagram, Twitter, Pinterest and YouTube) and in-store and online special events.  Belk uses its proprietary database to communicate directly to key customer constituencies with special offers designed to appeal to those specific audiences.

17.     To ensure Belk is addressing its customers' rapidly changing shopping preferences, Belk has invested in its technology to create an omnichannel offering for its customers.  Following multiple years of focused investments and initiatives, Belk has built a strong omnichannel foundation that includes "Buy Online, Pick Up In-Store," ship-from-store, and curbside pickup capabilities in all stores, a new clienteling system, single use coupons, stackable coupons, subscription replenishment services, and same day delivery.  Investment in these omnichannel tools ensures that Belk is prepared to meet its customers' evolving shopping preferences.  Belk has also improved the customer experience and increased operational efficiencies by making it easier for customers to find and purchase products on belk.com and in the Belk mobile app, enhanced the experience for Belk credit card holders, displayed more store product on belk.com and the Belk mobile app, enhanced fulfillment technology, and deployed a new allocation system.

18.     Belk is a valuable and iconic brand with a large and loyal customer base.  Belk has a longstanding heritage of providing the highest level of service to its customers and Belk has enjoyed excellent long-term relationships with many top apparel and cosmetics suppliers.  Belk stores, belk.com, and the Belk mobile app also offer exclusive private brands that are uniquely tailored to its customer and are valued for their styling, quality and value.  These offerings set Belk apart from its peers, and make Belk less susceptible to competitive threats, while also delivering higher gross margins than third-party brands.  Belk's private brands include Crown & Ivy, New Directions, Kim Rogers, Kaari Blue, Ocean & Coast, Saddlebred, Saddlebred 1888, Belk

Silverworks, Biltmore, Cook's Tools, Madison, True Craft, Wonderly, ZELOS, Lightning Bug, The Limited[3], Belk & Co Fine Jewelry, and Goodness & Grace.

### C.     Critical Components of the Debtors' Cost Structure

#### (a)     Supply Chain

19.     Belk's integrated supply chain, which ensures the uninterrupted flow of merchandise to its brick-and-mortar locations and the fulfillment of orders from its e-commerce platform, is a critical component of Belk's business structure.  Belk currently operates three distribution facilities located in Blythewood, South Carolina, Jonesville, South Carolina, and Jackson, Mississippi that receive and process merchandise to support direct to consumer fulfillment and merchandise replenishment to Belk's stores.  Belk's distribution facilities are linked electronically to its various merchandising teams to facilitate the seamless distribution of goods to Belk's stores.

#### (b)     Employee Compensation and Benefits

20.     The Debtors currently employ approximately 17,000 associates, including approximately 8,000 full time associates and approximately 9,000 part-time associates (collectively, the "Employees").  Because of the seasonal nature of the retail business, the number of Employees fluctuates from time to time and is the highest during the holiday shopping period in November and December.  The Employees serve in many capacities supporting Belk's operations at the corporate office, Belk's' distribution centers, or at the retail store level.  In addition to the Employees, the Debtors also retain, from time-to-time, independent contractors to complete discrete projects, as well as temporary workers to fulfill certain duties, including additional store-level staffing during peak sales seasons.  The Debtors offer their Employees the

---

[3]     Debtor Belk Merchandising LLC is party to a license agreement with The Limited LLC ("The Limited"), a Sycamore Partners portfolio company, which permits the Debtors to sell apparel, shoes, accessories, and related products bearing or incorporating The Limited's trademarks.

ability to participate in a number of insurance and benefits programs, including medical insurance programs, workers' compensation benefits, short and long-term disability coverage, time-off and vacation policies, and certain other benefits that the Debtors have historically provided in the ordinary course.

<div align="center">(c)      <b>Real Estate Obligations</b></div>

21.     The Debtors currently own 64 retail stores in fee simple, 76 ground leases, and two distribution centers.  The Debtors lease all other retail store locations and office space.  The Debtors' estimate that the aggregate occupancy cost for the Debtors' go-forward operations will be approximately $166 million in fiscal year 2021.

**II.     Debtors' Prepetition Corporate and Capital Structure.**

22.     The chart below depicts the Debtors' current corporate structure, which is also attached hereto as **<u>Exhibit B</u>**:



23.      As of January 25, 2021, the Debtors have approximately $1.91 billion of consolidated funded debt obligations, as well as approximately $83.83 million of outstanding capital lease obligations.  The following table depicts the Debtors' prepetition capital structure, exclusive of accrued and unpaid interest and fees:

| Funded Debt | Maturity | Outstanding Principal Amount as of January 25, 2021 |
|---|---|---|
| ABL Facility | August 29, 2024 | $357.5 million[4] |
| First Lien Term Loan (Non-Extended) | December 10, 2022 | $101.5 million |
| First Lien Term Loan (Extended) | July 31, 2025 | $897.9 million |
| Second Lien Term Loan (Non-Extended) | June 10, 2023 | $25.0 million |
| Second Lien Term Loan (Extended) | October 29, 2025 | $525.0 million |
| | Total Funded Debt | $1.9 billion |

### 1. The ABL Facility

24.     Bear Parent Inc., as holdings, Belk, as borrower, Bank of America, N.A., as administrative agent and collateral agent, Wells Fargo Bank, National Association, as syndication agent, and the lenders from time to time party thereto, are each party to the ABL Credit Agreement, dated as of December 10, 2015.  The ABL Facility is guaranteed by each of the Debtors (with the exception of Belk Sourcing LLC, The Belk Center, Inc., Fashion Holdings Intermediate LLC, and Fashion Intermediate Inc.) and is secured by first priority liens (subject to certain permitted liens) on the Debtors' accounts receivable, inventory, and cash (the "ABL Priority Collateral").  The ABL Credit Agreement allows Belk to access up to $900 million in revolving credit commitments depending on the then-applicable borrowing base.  As of the date hereof, approximately $357.5 million remains outstanding under the ABL Facility and approximately $25.5 million is outstanding in letters of credit.  On August 29, 2019, the ABL Credit Agreement was amended to extend the maturity of the ABL Credit Facility from December 10, 2020 to August 29, 2024.

### 2. The First Lien Term Loan Facility

25.     Bear Parent Inc., as holdings, Belk, as borrower, Morgan Stanley Senior Funding, Inc., as administrative agent and collateral agent, and the lenders from time to time party thereto,

---

[4] Exclusive of approximately $25.5 million of outstanding letters of credit.

are each party to the First Lien Term Loan Credit Agreement, dated as of December 10, 2015.  The First Lien Term Loan Facility is guaranteed by each of the Debtors (with the exception of Belk Sourcing LLC, The Belk Center, Inc., Fashion Holdings Intermediate LLC, and Fashion Intermediate Inc.) and is secured by (a) first priority liens (subject to certain permitted liens) on substantially all assets of such Debtors other than the assets securing the ABL Facility, and (b) second priority liens (subject to certain permitted liens) on the ABL Priority Collateral.  As of the date hereof, approximately $999.4 million remains outstanding under the First Lien Term Loan Facility.  On October 29, 2019, the First Lien Term Loan Credit Agreement was amended to extend the maturity of a substantial portion of the First Lien Term Loan Credit Facility from December 10, 2022 to July 31, 2025.

### 3.  The Second Lien Term Loan Facility

26.     Bear Parent Inc., as holdings, Belk, as borrower, Wilmington Trust, National Association., as administrative agent and collateral agent, and the lenders from time to time party thereto, are each party to the Second Lien Term Loan Credit Agreement, dated as of December 10, 2015.  The Second Lien Term Loan Facility is guaranteed by each of the Debtors (with the exception of Belk Sourcing LLC, The Belk Center, Inc., Fashion Holdings Intermediate LLC, and Fashion Intermediate Inc.) and is secured by (a) second priority liens (subject to certain permitted liens) on substantially all assets of such Debtors other than the assets securing the ABL Facility, and (b) third priority liens (subject to certain permitted liens) on the ABL Priority Collateral.  As of the date hereof, approximately $550 million remains outstanding under the Second Lien Term Loan Facility.  On May 7, 2019, the Second Lien Term Loan Credit Agreement was amended to extend the maturity of $525 million in aggregate principal amount of Second Lien Term Loans from June 12, 2023 to June 12, 2025, with the maturity of the residual $25 million in aggregate principal amount of Second Lien Term Loans remaining unchanged.  On October 29, 2019, the

Second Lien Term Loan Credit Agreement was amended again to extend the maturity of the $525 million tranche of Second Lien Term Loans from June 12, 2025 to October 29, 2025.

### III.  Events Leading to the Chapter 11 Filing.

#### A.  The Unprecedented Spread of COVID-19 and Declining Store Traffic

27.  Belk, along with many other retail companies, has faced a challenging commercial environment in recent years brought on by increased competition among retailers and an ongoing shift away from in-store shopping.  Given Belk's sizable store portfolio—with approximately 291 stores across 16 states—and its associated operating expenses, Belk has relied heavily on physical consumer traffic, and resulting sales conversion, to meet sales and profitability goals. Amid these macroeconomic headwinds, Belk has taken proactive measures to remain competitive, including expanding its e-commerce platform, closing underperforming stores, and streamlining its workforce.



Belk's Store Footprint

28.  Before the COVID-19 pandemic, Belk had a manageable liquidity cushion and was proactively taking steps to right-size its operations and further improve the long-term health of its balance sheet, which included an extension of the maturity dates of a substantial portion of the funded debt obligations under the ABL Credit Agreement, First Lien Term Loan Credit Agreement, and Second Lien Term Loan Credit Agreement.  However, on March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic, and national, state, and local governments in the United States and around the world began imposing shelter-in-place and stay at home orders, as well as strict social distancing protocols.

29.     On March 17, 2020, the Debtors temporarily closed all 291 stores to protect the health and safety of Belk's customers and associates. Belk continued to serve its customers through its mobile app and online at belk.com and utilized its fulfilment center and all its stores to fulfill online orders.  Belk began a phased reopening of stores on May 1, 2020, including curbside pick-up, with substantially all its stores reopening by May 22, 2020, and has been operating under reduced hours with appropriate precautions in place as it continues to follow CDC guidelines. Upon reopening its stores, Belk began to bring back its furloughed employees in a phased approach.  In late June 2020, Belk was forced to eliminate a number of positions at its corporate office and its stores.

30.     The restrictions resulting from legally imposed measures, combined with radically altered behavior by consumers, precipitated an unprecedented decline in economic activity. Demand for discretionary retail products has plummeted during the COVID-19 pandemic as consumers prioritize—with good reason—their health and maintaining a source of income.  In this environment, most discretionary retail products are an unnecessary luxury for many consumers. Additionally, online sales are not as profitable as store sales due to the cost of shipping.  The result is that the Debtors' sales have materially declined from forecasts.  The Debtors' top-line sales were down 32% year-over-year for the period commencing the third week of March 2020 through December 2020.  This pandemic has undoubtedly been the primary catalyst for Belk's declining liquidity position and its current inability to satisfy upcoming debt service obligations.

**B.      Prepetition Restructuring Initiatives**

**(i)      The Restructuring Negotiations and Restructuring Support Agreement**

31.     Against the backdrop of COVID-19 and market related challenges, significant cash interest obligations, and declining liquidity, Belk viewed a debt restructuring as the necessary next step to best position Belk for long-term success.  To assist the Debtors' in their restructuring

16

efforts, the Debtors retained Kirkland & Ellis LLP ("Kirkland") as restructuring counsel, Lazard Frères & Co. LLC ("Lazard") as investment banker, and Alvarez and Marsal Holdings, Inc. ("A&M") as restructuring advisor.

32.     Beginning in November 2020, the Debtors entered into restructuring discussions with Sycamore and two ad hoc groups of term loan lenders separately represented by (a) Willkie Farr & Gallagher LLP and PJT Partners Inc. (the "Ad Hoc Crossover Lender Group"), and (b) O'Melveny and Myers LLP and Evercore Group L.L.C. (the "Ad Hoc First Lien Lender Group" and collectively with the Ad Hoc Crossover Lender Group, the "Ad Hoc Groups").  As discussions amongst the parties continued, it became clear that any viable path forward would need to satisfy the Debtors' immediate cash needs.  Ultimately, the Debtors and their key stakeholders all had the same goal:  to provide Belk with fresh capital while simultaneously deleveraging Belk in an efficient manner to preserve the company as a going concern and maximize value for the benefit of all parties in interest.  All parties agreed that a long, drawn-out process in chapter 11 would be highly problematic.  The Debtors, Sycamore, and the Ad Hoc Groups continued to negotiate a comprehensive restructuring solution based on these objectives through mid-January 2021.

33.     The Debtors' efforts bore fruit.  On January 13, 2021, the Debtors, Sycamore, Holders of approximately 75% of First Lien Term Loan Claims, and Holders of 100% of Second Lien Term Loan Claims reached an agreement-in-principle on the terms of the restructuring transactions, which were formalized in the Restructuring Support Agreement, Plan, and the New Credit Facilities Term Sheet attached as Exhibit 1 to the Restructuring Term Sheet on January 26, 2021.  Since the execution of the Restructuring Support Agreement on January 26, 2021, holders of an additional 24% of First Lien Term Loan Claims have executed joinders to the Restructuring Support Agreement, taking the total support percentage to over 99% of the First Lien Term Loan

Claims and 100% of the Second Lien Term Loan Claims. The level of consensus for this restructuring transaction reflects the efforts undertaken by the Debtors and the parties to the Restructuring Support Agreement and their belief in the Debtors' prospects as a reorganized enterprise. Importantly, the Plan proposes to pay all Allowed General Unsecured Claims in full in the ordinary course or reinstate such Claims, and to refinance the ABL Facility, leaving Holders of Allowed ABL Facility Claims Unimpaired. Sycamore will maintain a majority ownership interest in the reorganized company, which is important to the other parties due to Sycamore's valuable multi-channel retail experience and expertise. The Plan is intended to minimize any potential adverse effects to the Debtors' business, customers, trade partners, employees, and retirees as a result of the restructuring, and to position the Debtors for a prompt emergence from bankruptcy with the entirety of their 17,000 employee base and 291 store footprint intact.

34.     As described in the Scheduling Motion (as defined in <u>Exhibit A</u> attached hereto), the Debtors request that the Court schedule the hearing to approve the adequacy of the Disclosure Statement and confirm the Plan for February 24, 2021, at 8:00 a.m., prevailing Central Time. The Debtors respectfully submit that the proposed confirmation schedule is appropriate—and, indeed, necessary—in light of the unique circumstances of these Chapter 11 Cases, where nearly all funded debt holders have already agreed to support the Plan and the Allowed Claims of all other creditors will ride through the bankruptcy unimpaired. In light of the consensus forged to date, the Debtors' extremely fragile liquidity state, and their lack of committed postpetition financing, any delay would disrupt and jeopardize the proposed value-maximizing transaction and the Debtors' business to the detriment of all parties in interest.

### (ii)     Appointment of Disinterested Directors

35.     In anticipation of the consideration of strategic restructuring alternatives, the board of directors of Belk, Inc. and the board of directors of Bear Parent Inc. (collectively, the "<u>Boards</u>")

established special committees (the "Special Committees") of independent and disinterested directors on December 17, 2020, and delegated to those special committees sole decision-making authority with respect to potential conflict matters. The two independent and disinterested directors, Jill Frizzley and Steve Panagos (together, the "Special Committee Members") engaged Quinn Emanuel Urquhart & Sullivan, LLP, as legal counsel, and M-III Partners, as financial advisor, to assist in the discharge of the Special Committee Members' duties.

36.     The Special Committee Members and the professionals acting at their sole direction commenced an independent investigation into interested-party issues in connection with a potential sale, restructuring, reorganization, or other recapitalization transactions and related financings. The Special Committee Members also conducted inquiries and investigations relating to agreements between Sycamore and Belk and any conflicts matters as the Special Committee Members deemed necessary in their business judgment, including a $135 million dividend issued by Belk to its direct and indirect equity holders in September 2016 (the "Dividend"). Before Belk's issuance of the Dividend, Belk and certain of its Debtor and non-Debtor Affiliates engaged a nationally recognized financial advisory firm (the "Advisory Firm") to perform a solvency analysis. The Advisory Firm delivered a solvency opinion in connection with approval of the Dividend.

37.     Similarly, the Special Committee Members' activities included evaluating and approving or terminating the Restructuring Transactions, participating in consultation with management and advisors, and if necessary, authorizing approval of such restructuring. The Special Committees have determined to support the Restructuring Transactions embodied by the Restructuring Support Agreement and the Plan, including the Debtors' Release.

**IV.      First Day Motions.**

38.      Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and execute a swift and smooth restructuring of the Debtors' balance sheet.  I have reviewed each of the First Day Motions and I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 23, 2021

/s/ *William Langley*
_____

William Langley
Chief Financial Officer
Belk, Inc.

**<u>Exhibit A</u>**

**Evidentiary Support for First Day Motion[5]**

---

[5] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

I.      **Debtors' <u>Emergency</u> Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases ("<u>Joint Administration Motion</u>").**

1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these Chapter 11 Cases.  Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each of the Debtor entities.  The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the Office of the United States Trustee for the Southern District of Texas and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

2.      I believe that the relief requested in the Joint Administration Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates.  If the relief requested in the Joint Administration Motion is not granted, the Debtors' smooth transition into chapter 11 could be jeopardized by increasing the fees and costs associated with duplicative filings and objections.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be approved by the Court.

II.     **Debtors' <u>Emergency</u> Application for Entry of an Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent ("<u>Claims and Noticing Agent Application</u>").**

3.      Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Prime Clerk LLC as the Claims and Noticing Agent for the Debtors in their Chapter 11 Cases to:  (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and other parties in interest; (b) provide claims, objection, solicitation, and

balloting-related services; and (c) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these Chapter 11 Cases.

4.      I believe that the appointment of Prime Clerk LLC will provide the most effective and efficient means of ensuring creditors receive sufficient notice and have their claims adjudicated properly.  The relief requested in the Claims and Noticing Agent Application is necessary to avoid immediate and irreparable harm to the Debtors and their Estates.  I understand that the Debtors' creditor matrix contains more than 90,000 creditors and potential interested parties.  If the relief requested in the Claims and Noticing Agent Application is not granted, I believe that the Debtors may be unable to ensure that their creditors receive sufficient notice and have their claims adjudicated properly.  The appointment of Prime Clerk LLC is in the best interests of both the Debtors' Estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Claims and Noticing Agent Application should be approved by the Court.

III.    **Debtors' <u>Emergency</u> Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors ("<u>Creditor Matrix Motion</u>").**

5.      Pursuant to the Creditor Matrix Motion, the Debtors intend to file (a) a consolidated creditor matrix on the docket of these jointly administered cases, and (b) a consolidated list of the 30 largest unsecured creditors in these Chapter 11 Cases in compliance with Part C of the *Complex Procedures for Chapter 11 Cases in the Southern District of Texas*.  By the Creditors Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to redact certain personal identification information.  The relief requested in the Creditor Matrix Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  If the relief requested in the Creditor Matrix Motion is not granted, the Debtors (a) would be in violation of applicable data privacy law, thereby exposing them to severe monetary penalties that could threaten the Debtors'

operations during this sensitive stage of their restructuring, (b) would unnecessarily render individuals more susceptible to identity theft, and (c) could jeopardize the safety of employees, contract workers, and other individual creditors who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures..  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be approved by the Court.

**IV.    Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Confirmation Hearing Notice, and (V) Waiving the Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtors File Schedules and SOFAs ("<u>Scheduling Motion</u>").**

6.    Pursuant to the Scheduling Motion, the Debtors request entry of an order: (a) scheduling a combined hearing on confirmation of the Debtors' Plan and the adequacy of the Debtors' Disclosure Statement; (b) establishing the Objection Deadline for filing objections to the adequacy of the Disclosure Statement and confirmation of the Plan and approving related procedures; (c) approving the Solicitation Procedures regarding votes to accept or reject the Plan; (d) approving the form and manner of notice of commencement of these Chapter 11 Cases and the Confirmation Hearing and the form and manner of the notice of the Publication Notice; (e) conditionally directing that the U.S. Trustee not convene the Creditors Meeting under section 341 of the Bankruptcy Code, provided that the Plan is confirmed within sixty (60) days of the Petition Date; (f) waiving the requirement that the Debtors file statements of financial affairs and schedules of assets and liabilities, provided that the Plan is confirmed within sixty (60) days of the Petition Date; and (g) allowing the notice period for the Disclosure Statement and Confirmation Hearing to run simultaneously.

7.      In connection with the relief requested in the Scheduling Motion, the Debtors request that the Court approve the following Confirmation Schedule:

| Event | Date |
|---|---|
| Voting Record Date | January 21, 2021 |
| Solicitation Launch | January 26, 2021 |
| Mailing Date | January 26, 2021 |
| Voting Deadline | February 5, 2021, at 4:00 p.m., prevailing Central Time |
| Opt-Out Deadline | February 23, 2021, at 4:00 p.m., prevailing Central Time |
| Objection Deadline | February 23, 2021, at 4:00 p.m., prevailing Central Time |
| Petition Date | February 23, 2021 |
| Confirmation Hearing | February 24, 2021, at 8:00 a.m., prevailing Central Time |

8.      As set forth in the Scheduling Motion, the Debtors have provided full notice of the Plan to all known parties in interest, consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.  On January 26, 2021, I understand that the Debtors distributed the Confirmation Hearing Notice to more than 90,000 creditors and potential interested parties, setting forth the Debtors' intention to proceed with confirmation at the first-day hearing on February 24, 2021.  The Confirmation Hearing Notice provided notice of the Objection Deadline (set 28 days after mailing) and provided detailed instructions as to how parties could object to the Plan or Disclosure Statement.  The Plan and Disclosure Statement were simultaneously posted to the voting creditors on the public data site maintained by the First Lien Term Loan Agent and on the Claims and Noticing Agent's public website.  The Debtors published the Confirmation Hearing Notice in the *New York Times* (national edition) and the *Charlotte Observer* on January 29, 2021. In addition, the Debtors posted the Plan Supplement to the public website on February 18, 2021,

and served a notice of the Plan Supplement on parties in interest. Finally, on February 22, 2021, the Debtors served a notice on parties in interest directing them to review the confirmation pleadings posted to the public website. All parties in interest have been provided a full and fair opportunity to participate in these Chapter 11 Cases.

9.      As of the Petition Date, the Debtors have approximately $7 million in unrestricted cash on hand and no committed debtor-in-possession financing. I believe that the relief requested in the Scheduling Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates. If the relief requested in the Scheduling Motion is not granted, it will result in significantly increased administrative costs and decreased confidence among Belk's customers, employees, and other key stakeholder groups. I further believe that the relief requested in the Scheduling Motion is in the best interests of the Debtors' Estates, their creditors, and all other parties in interest, and will enable the Debtors to minimize any potential adverse effects to the Debtors' businesses as a result of the restructuring, and position the Debtors for a prompt emergence from bankruptcy. Specifically, the Confirmation Schedule reflects milestones that were heavily negotiated as part of the Restructuring Support Agreement and a key inducement factor for creditors' support of these Chapter 11 Cases (which is nearly unanimous). Given the robust noticing procedures described in the Scheduling Motion, I believe that the proposed Confirmation Schedule provides ample time for any interested party to participate in these Chapter 11 Cases and will preserve significant value for the Debtors' estates and their stakeholders, as more fully set forth in the Scheduling Motion. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Scheduling Motion.

V.     **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Maintain Existing Bank Accounts, and (C) Continue to Perform Intercompany Transactions, and (II) Maintain Existing Business Forms ("<u>Cash Management Motion</u>").**

10.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) continue to operate their Cash Management System, (ii) maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, (iii) continue Intercompany Transactions and funding consistent with the Debtors' historical practices (subject to the terms described in the Cash Management Motion), (iv) maintain existing business forms in the ordinary course of business; and (b) granting related relief.

11.     To facilitate the efficient operation of their business, the Debtors operate a complex Cash Management System.  The Debtors use the Cash Management System to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with certain Intercompany Transactions, as described in more detail below.  Additionally, the Debtors' corporate accounting and cash forecasting departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.  The Cash Management System is typical of multi-store retail operations of a similar size and is used to manage the cash flow of operating retail operations in a cost-effective, efficient manner.

A.     **Description of Funds Processing.**

12.     The bulk of the Debtors' cash on hand consists of proceeds from the Debtors' ongoing business operations and the Debtors' $900 million prepetition ABL Facility.  Cash and check revenue from retail operations at the Debtors' physical store locations is collected into

(a) the Store Depository Accounts maintained at Regions, TD, and U.S. Bank, and (b) the Store Concentration Accounts maintained at Wells Fargo and Fifth Third.  Store managers typically deposit cash and checks into the corresponding Store Depository Account or Store Concentration Account one or more times per week.  Funds from the Store Depository Accounts are automatically swept daily into the Store Concentration Account maintained at the corresponding Cash Management Bank.  Funds in the Store Concentration Account maintained at Wells Fargo are automatically swept daily into the Master Concentration Account.  Funds in the other Store Concentration Accounts are generally swept into the Draft Account on a weekly basis via manual ACH transfer and are thereafter automatically swept into the Master Concentration Account.

13.     Credit card sales made at the Debtors' physical store locations or through the Debtors' e-commerce platform are processed by a third-party processor, and the proceeds are deposited, net of fees, chargebacks, and returns, into the Master Concentration Account, the Draft Account, or the A/R Account, depending on the credit card used in the transaction.  Proceeds from credit card sales made using third-party credit cards other than American Express credit cards are deposited directly into the Master Concentration Account.  Proceeds from credit card sales made using American Express credit cards are deposited into the Draft Account, which also receives proceeds from debit card sales and sales settled through online money transfers.  Finally, proceeds from credit card sales made using the Debtors' private-label credit card are deposited into the A/R Account.  Funds in the Draft Account and the A/R Account, respectively, are automatically swept into the Master Concentration Account on a daily basis.

14.     The Debtors request periodic draws on the ABL Facility to fund daily operations and satisfy ordinary-course obligations, as necessary.  The amount that the Debtors are able to draw on the ABL Facility is determined by reference to the then-applicable borrowing base.  The

funded amounts are then transferred directly into the Master Concentration Account. The Master Concentration Account funds all of the Debtors' Disbursement Accounts, which in turn fund disbursements related to the Debtors' ordinary course operations, such as accounts payable, payroll (including benefits), and tax payments.

### B.    Intercompany Transactions.

15.    The Debtors maintain business relationships and have entered into certain agreements with each other resulting in intercompany receivables and payables in the ordinary course of business (collectively, "Intercompany Claims," and the transactions giving rise to Intercompany Claims, "Intercompany Transactions"). The Intercompany Transactions generally do not involve the transfer of funds through direct deposits, but instead include inventory transfers and other non-cash transfers between the Debtor entities. Accordingly, at any given time there may be Intercompany Claims owed by one Debtor to another Debtor. Such Intercompany Transactions typically are conducted pursuant to written agreements between certain of the Debtors as well as informal intercompany arrangement.

16.    Among the Debtors, Intercompany Claims arise regularly as a result of Belk's payment of other Debtors' obligations or receipt of funds payable to other Debtors. These Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the applicable Debtors' accounting systems. Additionally, certain of the Debtors are party to the Intercompany Agreements, which include services agreements, management agreements, and intellectual property licensing agreements. Intercompany Claims on account of the Intercompany Agreements accrue in the ordinary course of business, subject to adjustments for subsequent Intercompany Transactions.

17.     The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

**C.     Bank Accounts and Bank Fees.**

18.     As of the Petition Date, the Cash Management System includes a total of 128 Bank Accounts, which are held at eight Cash Management Banks:  Wells Fargo, Fifth Third, Regions, T D Bank, U.S. Bank, JP Morgan, PNC Bank, and M&F.

19.     The Debtors incur periodic service charges and other fees in connection with their maintenance of the Cash Management System.   On a quarterly basis, the Debtors pay approximately $228,084 in bank fees to the Cash Management Banks.  The Debtors estimate that approximately $60,822 in prepetition bank fees remain outstanding as of the Petition Date.

**D.     Commercial Card Program.**

20.     In the ordinary course of business, the Debtors provide certain of their employees with purchase cards issued by U.S. Bank to be used for approved purchases and business expenses (the "Commercial Cards").  The Commercial Cards are used to purchase goods necessary for the ordinary-course operations of the Debtors' physical store locations.  As of the Petition Date, the Debtors maintain approximately 1,156 Commercial Cards.  Obligations arising from use of the Commercial Cards are paid from the Vendor Payables Account ending in 5379 on a monthly basis. During the twelve-month period ending on December 31, 2020, the Debtors' average monthly spend on account of the Commercial Cards was approximately $1,096,000.  As of the Petition Date, the Debtors estimate that they owe approximately $300,000 on account of the Commercial Card Program.

21.     I believe that the continuation of the Commercial Card Program is essential to the continued operation of the Debtors' business, as the Commercial Cards are used to purchase goods necessary for the ordinary-course operations of the Debtors' physical store locations.

**E.     Business Forms**

22.     As part of the Cash Management System, the Debtors use a variety of preprinted business forms (including checks, letterhead, correspondence forms, invoices, and other business forms) in the ordinary course of business.  The Debtors also maintain books and records to document their financial results and a wide array of operating information.  To avoid a significant disruption to their business operations and to minimize administrative expense to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these Chapter 11 Cases, the Debtors request authorization to continue using all of the Business Forms and Books and Records in a manner consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession.

23.     I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business.  The Cash Management System provides the Debtors with the ability to quickly create status reports on the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Requiring the Debtors to implement changes to the Cash Management System during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  I believe the continuation of the Debtors' Cash Management System is necessary to avoid immediate and irreparable harm to the Debtors and their restructuring efforts.  Accordingly,

on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be approved by the Court.

VI.    Debtors' <u>Emergency</u> Motion Seeking Entry of an Order Authorizing, but not directing, the Debtors to Continue their Prepetition Business Operations, Policies, and Practices and Pay Related Claims in the Ordinary Course of Business on a Postpetition Basis ("<u>Ordinary Course Payments Motion</u>").

24.    Pursuant to the Ordinary Course Payments Motion, the Debtors request (a) authorization to continue their prepetition business operations, policies, and programs and to pay Ordinary Course Claims, on a postpetition basis in the ordinary course of business and (b) authorization of other related relief.  Here, the Plan—which has garnered virtually unanimous support from creditors entitled to vote on the Plan—proposes to pay all non-funded debt claims in full in the ordinary course of business.  Accordingly, I believe that authorizing the Debtors to pay undisputed prepetition Ordinary Course Claims of the Ordinary Course Creditors as such claims become due and payable in the ordinary course of business will minimize any disruption to the Debtors' business, allow for a smooth and expeditious reorganization in these Chapter 11 Cases, and lay the groundwork for an essential element of the Plan, which leaves such claims unimpaired.

A.    Trade Claims.

25.    The Debtors incur a variety of trade obligations in the ordinary course of business, including expenses related to inventory, insurance, surety bonds, and taxes and fees payable to certain Trade Creditors to ensure the continued operation of the Debtors' business.  I understand that certain general unsecured creditors and creditors whose Trade Claims may give rise to liens under certain state and federal laws provide the Debtors with inventory, machinery and other basic business necessities for the operation of the Debtors' businesses.  I further believe that failing to pay certain Trade Claims on account of taxes and fees could materially disrupt the Debtors' business operations.  The taxing authorities could initiate audits, suspend operations, file liens, or

seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process.  Further, unpaid taxes and fees may result in penalties, the accrual of interest, or both, which could negatively affect the Debtors' business.

### B.     Employee Compensation and Benefit Claims.

26.     As of the Petition Date, the Debtors employ approximately 17,000 Employees on a full-time basis or part-time basis, including approximately 1,600 seasonal Employees. Approximately 14,600 Employees are paid on an hourly basis and approximately 2,100 Employees earn a salary.  In addition to the Employees, the Debtors periodically retain specialized individuals as independent contractors, some of whom are sourced from Staffing Agencies to fulfill certain duties on a short-term basis.  The Independent Contractors are an important supplement to the efforts of the Debtors' Employees.  Typically, at any given time, the Debtors retain approximately 300 Independent Contractors, although these numbers fluctuate based on the Debtors' specific needs.

27.     The Employees and Independent Contractors perform a wide variety of functions critical to the Debtors' operations.  In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. Without the continued, uninterrupted services of their Employees and Independent Contractors, the Debtors' reorganization efforts will be threatened.  I believe a significant portion of the value of the Debtors' businesses is tied to their workforce, which cannot be replaced without significant efforts.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I therefore believe payment of the prepetition obligations with respect to the Employee Compensation and Benefits Claims is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees.

28.     Accordingly, as described in the Ordinary Course Payments Motion, I believe that payment of the Ordinary Course Claims is necessary to avoid the immediate and irreparable harm that would result from either (i) the Ordinary Course Creditors taking adverse action that prevents the Debtors from operating in the normal course or (ii) by not providing Employees with compensation and benefits.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should approve the Ordinary Course Payments Motion.

VII.    **Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Customer Programs and (II) Granting Related Relief (the "Customer Programs Motion")**

29.     Pursuant to the Customer Programs Motion, the Debtors seek entry of an order (a) authorizing the Debtors to maintain, administer, and honor prepetition obligations related to their customer-related programs, policies, and practices (collectively, the "Customer Programs"); and (b) granting related relief.  In connection with the Customer Programs, the Debtors provide certain incentives, discounts, promotions, accommodations, and related programs to attract customers and maintain positive customer relationships.  As of the Petition Date, the Debtors estimate that there are approximately $148 million of prepetition obligations outstanding related to Customer Programs.  These obligations include rewards earned through the Debtors' Loyalty Program, accrued credits, adjustments, discounts, prepayments, service fees, or other similar obligations owing to customers and certain third parties.  The vast majority of these obligations, however, ***do not*** entail the expenditure of cash.

30.     The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Indeed, the Debtors' customers expect and rely on the Customer Programs.  Accordingly, I believe that the Debtors' maintenance and uninterrupted administration of the Customer Programs during the pendency of these Chapter 11

Cases is critical to the Debtors' successful reorganization and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.  If the Debtors are unable to continue the Customer Programs postpetition and pay related obligations, the Debtors risk losing customer loyalty and goodwill, which would destroy estate value and harm the go-forward business.   In light of the foregoing, I believe that the relief requested in the Customer Programs Motion is warranted under the circumstances and should be granted.

**<u>Exhibit B</u>**

**Corporate Organizational Structure**



LEGEND
ABL Borrower
1L Term Loan Borrower
2L Term Loan Borrower
ABL Guarantors
1L Term Loan Guarantors
2L Term Loan Guarantors
Fashion Holdings Intermediate LLC (DE)
100%
Fashion Intermediate Inc. (DE)
100%
Bear Parent Inc. (DE)
100%
Belk, Inc. (DE)
Belk-Simpson Company, Greenville, South Carolina (SC)
Belk Stores Services, LLC (NC)
Belk Gift Card Company LLC (NC)
Belk Ecommerce LLC (NC)
Belk Stores of Virginia LLC (NC)
Belk Administration, LLC (NC)
Belk Accounts Receivable LLC (NC)
Belk Texas Holdings LLC (NC)
Belk Sourcing LLC (DE)
99% LP
1% GP
The Belk Center, Inc. (NC) (Inactive)
Belk Stores of Mississippi LLC (MS)
Belk Department Stores LP (NC)
Belk International, Inc. (NC)
Belk Merchandising LLC (NC)

## Exhibit C

**Restructuring Support Agreement**

*Execution Version*

BELK, INC., *ET AL.*,

RESTRUCTURING SUPPORT AGREEMENT

**January 26, 2021**

**THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of January 26, 2021 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, collectively, the "**Parties**"):[1]

i.      Belk, Inc., a Delaware corporation ("**Belk**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.     the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold, First Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Consenting Stakeholders (the Entities in this clause (ii), collectively, the "**Consenting First Lien Term Lenders**");

iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Consenting Stakeholders (the Entities in this clause (iii) collectively, the "**Consenting Second Lien Term Lenders**" and, together with the Consenting First Lien Term Lenders, collectively, the "**Consenting Lenders**"); and

iv.     the undersigned funds or Affiliates of Sycamore that directly or indirectly hold, or are investment advisors, sub-advisors, or managers of discretionary accounts that hold, Equity Interests, that have executed and delivered counterpart signature pages to this Agreement in their capacities as such, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting Sponsors**" and together with the Consenting Lenders, the "**Consenting Stakeholders**").

## RECITALS

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**") and the equity term sheet attached as **Exhibit C** hereto (the "**Equity Term Sheet**" and, such transactions as described in this Agreement, the Restructuring Term Sheet, and the Equity Term Sheet, the "**Restructuring Transactions**");

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 of this Agreement.

**WHEREAS**, the Restructuring Transactions shall be implemented in accordance with the terms set forth in this Agreement through voluntary prepackaged cases commenced under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**      *Definitions and Interpretation.*Definitions.    The following terms shall have the following definitions:

"**Ad Hoc Crossover Lender Group**" means the ad hoc group of Consenting First Lien Term Lenders and Consenting Second Lien Term Lenders represented by Willkie Farr & Gallagher LLP.

"**Ad Hoc First Lien Term Lender Group**" means the ad hoc group of Consenting First Lien Term Lenders represented by O'Melveny & Myers LLP.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

"**Agents**" means, collectively, each of the First Lien Agent and the Second Lien Agent.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Backstop Commitment Letter**" means the backstop commitment letter (as may be amended or modified from time to time in accordance with the terms thereof) pursuant to which the Backstop Commitment Parties have agreed to backstop the New FLFO New Money Loans (as defined in the Restructuring Term Sheet).

"**Backstop Commitment Parties**" means, collectively, each of the Lender Backstop Parties and the Sponsor Backstop Parties (each as defined in the Restructuring Term Sheet).

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bear Parent**" means Bear Parent Inc., a Delaware corporation.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any claims, cross claims, third-party claims, interests, damages, judgments, remedies, causes of action, controversies, debts, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, pursuant to any other theory of law or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Equity Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law preferential or fraudulent transfer or similar claim, and (f) any avoidance action.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Commencement Date**" means the date on which the Company Parties commence the Solicitation.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the First Lien Term Loan Claims, the Second Lien Term Loan Claims, and the Equity Interests.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan pursuant to, *inter alia*, section 1129 of the Bankruptcy Code, which order shall be consistent in all material respects with this Agreement and the Restructuring Term Sheet.

"**Consenting First Lien Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lender Fees and Expenses**" means the reasonable and documented fees and expenses of the following advisors incurred in connection with the Restructuring Transactions (including, without limitation, fees and expenses incurred after the Petition Date, to the extent applicable): (i) Willkie Farr & Gallagher LLP, as counsel to the Ad Hoc Crossover Lender Group, (ii) PJT Partners LP, as investment banker to the Ad Hoc Crossover Lender Group, (iii) one local counsel on behalf of the Ad Hoc Crossover Lender Group, (iv) O'Melveny & Myers LLP, as counsel to the Ad Hoc First Lien Term Lender Group, (v) Evercore LLC, as investment banker to the Ad Hoc First Lien Term Lender Group, and (vi) one local counsel on behalf of the Ad Hoc First Lien Term Lender Group, in each case, consistent with the terms and conditions of their respective engagement letters or other contractual arrangements with the Company Parties.

"**Consenting Second Lien Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sponsor Fees and Expenses**" means the reasonable and documented fees and expenses of Latham & Watkins, LLP, as counsel to the Consenting Sponsors, incurred in connection with the Restructuring Transactions (including, without limitation, fees and expenses incurred after the Petition Date, to the extent applicable), consistent with the terms and conditions of its engagement letter or other contractual arrangement with the Consenting Sponsors.

"**Consenting Sponsors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, which shall be reasonably acceptable to the Required Consenting Stakeholders.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof) of common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits

interests of any Company Party (regardless of whether such interests are held directly or indirectly), and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement and regardless of whether such interests are held directly or indirectly).

"**Equity Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"**First Day Pleadings**" means the first day pleadings that the Company Parties determine are necessary or desirable to file, which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

"**First Lien Agent**" means any administrative agent, collateral agent, or similar Entity under the First Lien Term Loan Documents, including any successors thereto.

"**First Lien Term Loan**" means any loan outstanding under the First Lien Term Loan Credit Agreement.

"**First Lien Term Loan Claim**" means any Claim on account of a First Lien Term Loan.

"**First Lien Term Loan Credit Agreement**" means that certain first lien credit agreement, dated as of December 10, 2015, by and among Bear Parent, as holdings, Belk, as borrower, certain subsidiaries of Belk, as guarantors, the administrative agent thereunder, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

"**First Lien Term Loan Documents**" means, collectively, the First Lien Term Loan Credit Agreement and all other agreements, documents, and instruments with respect to the First Lien Term Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted,

promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the milestones set forth in Section 4 of this Agreement.

"**New First Lien Credit Agreement**" means that certain first lien credit agreement evidencing the New First Lien Credit Facility (including all ancillary documents), which may be documented through an amendment or amendment and restatement of the First Lien Term Loan Credit Agreement, and which shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

"**New First Lien Credit Facility**" means the up to $1,122,000,000 super priority first lien credit facility to be provided to the Company Parties in accordance with the terms, and subject to the conditions, set forth in the New First Lien Credit Agreement.

"**New Second Lien Credit Agreement**" means that certain second lien credit agreement evidencing the New Second Lien Credit Facility (including all ancillary documents), which may be documented through an amendment or amendment and restatement of the Second Lien Term Loan Credit Agreement, and which shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

"**New Second Lien Credit Facility**" means the $110,000,000 second lien credit facility to be provided to the Company Parties in accordance with the terms, and subject to the conditions, set forth in the New Second Lien Credit Agreement.

"**New Term Loan**" means any loan outstanding under the New First Lien Credit Agreement or the New Second Lien Credit Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Participating Claims**" means any Company Claims/Interests now owned or hereafter acquired, in each case that are subject to the terms of this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, which shall be on substantially the same terms set forth in this Agreement and the Restructuring Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting First Lien Term Lenders**" means, as of the relevant date, Consenting First Lien Term Lenders holding at least 50.1% of the aggregate outstanding principal amount of First Lien Term Loans that are held by Consenting First Lien Term Lenders, which, for the avoidance of doubt, shall include (a) Consenting First Lien Term Lenders holding at least 50.1% of the aggregate principal amount of First Lien Term Loans held by Consenting First Lien Term Lenders represented by Willkie Farr & Gallagher LLP and also (b) Consenting First Lien Term Lenders holding at least 50.1% of the aggregate principal amount of First Lien Term Loans held by Consenting First Lien Term Lenders represented by O'Melveny & Myers LLP.

"**Required Consenting Lenders**" means each of the Required Consenting First Lien Term Lenders and the Required Consenting Second Lien Term Lenders.

"**Required Consenting Second Lien Term Lenders**" means, as of the relevant date, Consenting Second Lien Term Lenders holding at least 50.1% of the aggregate outstanding principal amount of Second Lien Term Loans that are held by Consenting Second Lien Term Lenders.

"**Required Consenting Stakeholders**" means each of the Required Consenting Lenders and the Consenting Sponsors.

"**Restructuring**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Agent**" means any administrative agent, collateral agent, or similar Entity under the Second Lien Term Loan Documents, including any successors thereto.

"**Second Lien Term Loan**" means any loan outstanding under the Second Lien Term Loan Credit Agreement.

"**Second Lien Term Loan Claim**" means any Claim on account of a Second Lien Term Loan.

"**Second Lien Term Loan Credit Agreement**" means that certain second lien credit agreement, dated as of December 10, 2015, by and among Bear Parent, as holdings, Belk, as borrower, certain subsidiaries of Belk, as guarantors, the administrative agent and collateral agent thereunder, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

"**Second Lien Term Loan Documents**" means, collectively, the Second Lien Term Loan Credit Agreement and all other agreements, documents, and instruments with respect to the Second Lien Term Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation**" means solicitation of votes in favor of the Plan.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this Agreement, the Restructuring Term Sheet, and the Definitive Documents and shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

"**Sycamore**" means each investment fund managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

1.02.   <u>Interpretation</u>.   For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms

and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not;

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties; and

(k)     any references to dates and times shall be prevailing Eastern Time, unless otherwise noted.

**Section 2.     *Effectiveness of this Agreement.*** This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:each of the Company Parties and the Consenting Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement:

(i)     holders of at least 66.7% of the aggregate outstanding principal amount of First Lien Term Loans; and

(ii)     holders of at least 66.7% of the aggregate outstanding principal amount of Second Lien Term Loans; and

(c)      counsel to the Company Parties shall have given notice to counsel to each Consenting Stakeholder's respective counsel in the manner set forth in Section 14.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.      *Definitive Documents.*** The Definitive Documents governing the Restructuring Transactions and any modifications, amendments or supplements thereto shall each be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders, including, but not limited to: (a) the Plan; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (e) the First Day Pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the New First Lien Credit Agreement, (h) the New Second Lien Credit Agreement; and (i) the Backstop Commitment Letter.

3.02.     The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date and any modifications, amendments or supplements thereto shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders. Notwithstanding any provision in this Agreement to the contrary, each of the Parties to this Agreement acknowledges and agrees that the Restructuring Transactions shall be implemented in accordance with the terms set forth in this Agreement solely through the Chapter 11 Cases.

**Section 4.      *Milestones.*** The following Milestones shall apply to this Agreement unless extended or waived in writing by the Company Parties and the Required Consenting Stakeholders:

(a)      no later than January 26, 2021, the Company Parties shall commence the Solicitation, and shall not, without the prior written consent of the Required Consenting Stakeholders, withdraw or modify the Solicitation prior to 11:59 p.m. on February 5, 2021 (the "Expiration Date");

(b)      no later than February 24, 2021, the Petition Date shall have occurred;

(c)      no later than February 24, 2021, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement; and

(a)      no later than February 26, 2021 (the "Outside Date"), the Plan Effective Date shall have occurred.

**Section 5.** *Commitments of the Consenting Stakeholders.* Affirmative Commitments. During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, subject to the terms and conditions of this Agreement, to:

(a)    subject to its actual receipt of the Solicitation Materials, vote to accept the Plan with respect to each of its Company Claims/Interests by delivering its duly executed and completed ballot by the Expiration Date; provided that upon the occurrence of the Termination Date with respect to any respective Consenting Stakeholder in accordance with the terms hereof, no such Consenting Stakeholder shall be obligated to vote in favor of the Plan (and their respective treatment thereunder), and each such Consenting Stakeholder may, acting individually, withdraw or revoke its tender, consent, election, or vote with respect to the Plan (and upon such revocation, deemed void *ab initio*);

(b)    support and cooperate with the Company Parties to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan, subject in all respects to the *proviso* in clause (a) above;

(c)    support the Restructuring Transactions and promptly vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(d)    agree to the amendments to the existing First Lien Term Loan Credit Agreement and Second Lien Term Loan Credit Agreement (including the priority thereof) on the terms described in the Restructuring Term Sheet, and execute and deliver such documents as may be reasonably requested by the Company Parties to evidence such consent;

(e)    temporarily forbear from exercising any remedies with respect to, any breach, default, or event of default by any Company Party under the First Lien Term Loan Credit Agreement or and Second Lien Term Loan Credit Agreement, as applicable, which shall or may arise as a result of or is related to, directly or indirectly, (i) the commencement of any Chapter 11 Cases or any of the steps, actions or transactions required by, specified or contemplated in and/or implemented by or undertaken pursuant to this Agreement or (ii) the Company Parties' failure to make any payment of principal, amortization, interest, or other amounts due under the First Lien Term Loan Credit Agreement and/or Second Lien Term Loan Credit Agreement, as applicable, to any Agent or Consenting Lender; provided, that all accrued and unpaid (A) interest and amortization on the principal amount of First Lien Term Loan Claims through the Plan Effective Date and (B) interest on the principal amount of Second Lien Term Loan Claims through the Plan Effective Date, shall, in each case, be paid in full in cash on the Plan Effective Date, as set forth in the Restructuring Term Sheet;

(f)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(g)      give any notice, order, instruction, or direction to the First Lien Agent or Second Lien Agent, as applicable, necessary to give effect to the Restructuring Transactions, <u>provided</u>, <u>however</u>, that nothing in this Agreement shall require the Consenting Lenders to commence litigation against the Agents or provide the Agents with any indemnity or incur any similar reimbursement obligation;

(h)      support the Restructuring Transactions and to act in good faith and take any and all actions necessary to consummate the Restructuring Transactions in a timely manner, including by (x) negotiating and consulting in good faith with the Company Parties regarding the terms and conditions of the Definitive Documents to which it is a party, (y) entering into and performing under the terms of each of the Definitive Documents, and (z) agreeing to support any and all release, exculpation, and/or indemnity provision contained within any of the Definitive Documents, including those set forth in the Plan, which shall be substantially consistent with those set forth in the Restructuring Term Sheet; and

(i)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

5.02.   <u>Negative Commitments</u>.   During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, subject to the terms and conditions of this Agreement, that it shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      propose, file, support, or vote for any Alternative Restructuring Proposal that is inconsistent in any material respect with the Restructuring Transactions;

(c)      file with any court (including the Bankruptcy Court) any motion, pleading, or other document (including any modifications or amendments thereto) that, in whole or in part, is not materially consistent with this Agreement (or, if applicable, the Plan);

(d)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(e)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Equity Interests in the Company Parties;

(f)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(g)      encourage or facilitate any person or entity to do any of the foregoing.

13

5.03.   Commitments with Respect to the Chapter 11 Cases.

(a)   During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials and subject to the terms and conditions of this Agreement:

(i)   agree to provide, and to not opt out of or object to, the releases set forth in the Plan, which shall be substantially consistent with those set forth in the Restructuring Term Sheet;

(ii)   support all of the debtor and third-party releases, injunctions, discharge, indemnity, and exculpation provisions provided in the Plan, which shall be substantially consistent with those set forth in the Restructuring Term Sheet;

(iii)   not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any consent or election referred to in clauses 5.01(a) and (ii) above, subject in all respects to the proviso in clause 5.01(a);

(iv)   not directly or indirectly, through any person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal that is inconsistent in any material respect with the Restructuring Transactions or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; and

(v)   support and take all actions reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

(b)   During the Agreement Effective Period, subject to the terms and conditions of this Agreement, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.** *Additional Provisions Regarding the Consenting Stakeholders' Commitments*. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) prevent any Consenting Stakeholder from appearing as a party in interest in any matter arising in the Chapter 11 Cases (to the extent not inconsistent with this Agreement); (b) prohibit any Consenting Lender from taking or directing any action to be taken relating to maintenance, protection, or preservation of any collateral (to the extent not inconsistent with this Agreement); (c) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder or the Company Parties, or, if applicable, any other party in interest in the Chapter 11 Cases (including any official committee appointed in the Chapter 11 Cases and the United States Trustee); (d) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

14

(e) prevent any Consenting Stakeholder from enforcing this Agreement or any Definitive Document entered into in connection with the Restructuring Transactions, or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; and (f) except as otherwise provided in this Agreement, require any Consenting Stakeholder to incur any non-reimbursable expenses, liabilities, or other obligations, or to agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations.

**Section 7.** *Commitments of the Company Parties.* Affirmative Commitments. Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a) commence the Solicitation by 11:59 p.m. on the Commencement Date;

(b) not withdraw or modify the Solicitation prior to 11:59 p.m. on the Expiration Date without the prior written consent of the Required Consenting Lenders and the Consenting Sponsors;

(c) consummate the Restructuring Transactions in accordance with the Definitive Documents by 11:59 p.m. on the Outside Date;

(d) take all actions necessary to consummate the Restructuring Transactions in accordance with the Definitive Documents, and, to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(e) use commercially reasonable efforts to obtain any and all required governmental, regulatory, licensing, Bankruptcy Court, and/or other third-party approvals (including, without limitation, any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions;

(f) negotiate in good faith to execute and deliver the Definitive Documents (which shall be consistent with the requirements contained herein) and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(h) consult in good faith with counsel for the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors, respectively, prior to the Company Parties' entry into, termination of, or modification of any material operational contracts, leases or other arrangements;

(i) act in good faith to respond to the reasonable diligence requests of counsel for the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors, respectively, during the Agreement Effective Period, and shall cause their

management and advisors to meet with the Consenting Stakeholders and their respective counsel at reasonable times upon request of the Consenting Stakeholders;

(j)    provide counsel for the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors, respectively, a review period of (a) at least two (2) Business Days prior to the date when the Company Parties intend to file all First Day Pleadings and all other documents (but excluding monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto) that the Company Parties intend to file with the Bankruptcy Court, and (b) at least 72 hours (or such shorter review period as is necessary under the circumstances) prior to the date when the Company Parties intend to file all declarations and affidavits in support of approval of the Disclosure Statement or confirmation of the Plan, which declarations and/or affidavits provided to counsel for the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors, respectively, shall, for the avoidance of doubt, disclose the identity of the declarant or affiant;

(k)    pay the Consenting Lender Fees and Expenses;

(l)    pay the Consenting Sponsor Fees and Expenses;

(m)    from the date hereof until the Plan Effective Date, (i) operate their business in the ordinary course in a manner that is consistent with past practice and this Agreement, and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties and employees (which shall not prohibit the Company Parties from taking actions outside of the ordinary course of business with the consent of the Required Consenting Stakeholders), taking into account the Restructuring; and (ii) operate the business in the ordinary course, in a manner consistent with applicable law and actions taken by similarly situated companies in the industry in which the Company Parties operate, and maintain good standing (or equivalent status under the laws of its incorporation or organization) under the laws of the jurisdiction in which the Company Parties are incorporated or organized, taking into account the Restructuring;

(n)    notify counsel to the Consenting Stakeholders within one (1) calendar day after obtaining actual knowledge thereof of the happening or existence of any event that shall have made any part of the Restructuring Transactions (including the Restructuring Term Sheet) incapable of being consummated on or prior to the Outside Date;

(o)    as promptly as practicable notify or update counsel to the Consenting First Lien Term Lenders and the Consenting Second Lien Term Lenders, respectively, upon becoming aware of any person or entity challenging the validity or priority of, or seeking to avoid, any lien securing the First Lien Term Loan Claims and/or the Second Lien Term Loan Claims pursuant to a pleading filed with the Bankruptcy Court.

7.02.    Negative Commitments.    Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

16

(b)      enter into any other transaction support agreement related to a partial or total restructuring of the Company Parties' obligations unless such support agreement is not inconsistent with this Agreement and is in form and substance reasonably acceptable to the Required Consenting Stakeholders;

(c)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and/or consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(d)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(e)      file with any court (including the Bankruptcy Court) any motion, pleading, or Definitive Documents (including any modifications or amendments thereto) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(f)      enter into, terminate, or modify any material operational contracts, leases or other arrangements that would, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Company Parties, taken as a whole, without the prior consent of the Required Consenting Stakeholders; or

(g)      encourage or facilitate any person or entity to do any of the foregoing.

**Section 8.**      *Additional Provisions Regarding Company Parties' Commitments.*

8.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, upon advice of external counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction shall not be deemed to constitute a breach of this Agreement; provided that the Company Parties shall promptly provide written notice to the Consenting Stakeholders' respective counsel (and, in any case, within two (2) calendar days) after receiving advice of counsel that termination of this Agreement is reasonably required to comply with applicable law, including its fiduciary duties. To the extent the Required Consenting Lenders or the Consenting Sponsors determine that such action or failure to take such action with respect to the Restructuring Transactions constitutes a breach of this Agreement (without giving effect to the preceding sentence), the Required Consenting Lenders or the Consenting Sponsors, as applicable, shall have the right to terminate this Agreement immediately upon written notice to counsel to the Company Parties.

8.02.   Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate, but not solicit or encourage, Alternative Restructuring Proposals; provided, that the Company Parties must provide copies of any such Alternative Restructuring Proposal received to the financial and legal advisors to the Ad Hoc Crossover Lender Group, the Ad Hoc First Lien Term Lender Group, and the Consenting

Sponsors, respectively, no later than two (2) calendar days following receipt thereof; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity for the purpose of facilitating such Entity's participation in the Restructuring Transactions or such Entity's Alternative Restructuring Proposal; and (c) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee appointed in the Chapter 11 Cases and the United States Trustee), or any other Entity regarding the Restructuring Transactions.

8.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**      *Transfer of Interests and Securities.*

9.01.   During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Participating Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      in the case of any Participating Claims, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act; (iii) an institutional accredited investor (as defined in the Rules); or (iv) a Consenting Stakeholder; and

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties and counsel to the Consenting Stakeholders, respectively, at or before the time of the proposed Transfer, a Transfer Agreement; or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Participating Claims Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

9.02.   Upon compliance with the requirements of this Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such Transferred Participating Claims. Any Transfer in violation of this Section 9.01 shall be void *ab initio*.

9.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed Participating Claims subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders); and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company

Claim/Interest acquired) to counsel to the Company Parties within five Business Days of such acquisition.

9.04.    This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Participating Claims. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Participating Claims with the purpose and intent of acting as a Qualified Marketmaker for such Participating Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Participating Claims if (a) such Qualified Marketmaker subsequently transfers such Participating Claims (by purchase, sale assignment, participation, or otherwise) within five (5) calendar days of its acquisition to a transferee that is an entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 9.01; and (c) the Transfer otherwise is a permitted Transfer under Section 9.01. To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.06.    Notwithstanding Section 9.01, any Consenting Stakeholder may Transfer any of its Participating Claims to an affiliate of such Consenting Stakeholder or one or more of its affiliated funds or an affiliated entity or entities with a common investment advisor or investment manager (in each case, other than portfolio companies); provided that (a) for the avoidance of doubt, any transferee under this Section 9.06 shall be deemed a Consenting Stakeholder for purposes of this Agreement, effective as of the date of the Transfer, (b) any transferor under this Section 9.06 shall remain liable in all respects for any breach of this Agreement by such transferee, and (c) such transferor must provide notice of such Transfer to counsel to the Company Parties within five Business Days of such Transfer.

9.07.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.**    *Representations and Warranties of Consenting Stakeholders.* Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the

Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9);

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)      solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder (or that may be assigned to any of its Affiliates) in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 11.      *Mutual Representations, Warranties, and Covenants.*** Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this

Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

## Section 12.     *Termination Events.*

12.01.   <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated (a) with respect to the Consenting First Lien Term Lenders, by the Required Consenting First Lien Term Lenders, (b) with respect to the Consenting Second Lien Term Lenders, by the Required Consenting Second Lien Term Lenders, (c) with respect to the Consenting Sponsors, by each Consenting Sponsor, and (d) with respect to each Consenting Stakeholder, by any affected Consenting Stakeholder described in paragraph (d) of this Section 12.01 below, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events:

(a)     the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 14.10 hereof detailing any such breach;

(b)     the issuance, promulgation, or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court that has not been stayed), of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     the failure to meet a Milestone that has not been waived or extended in a manner consistent with this Agreement, which failure remains unsatisfied for five (5) Business Days, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement;

(d)     the Restructuring Term Sheet or any Definitive Document is amended, modified, or supplemented in a manner that materially and adversely affects the rights or treatment of any Consenting Stakeholder; <u>provided</u>, that this Section 12.01(d) shall only apply to a Consenting Stakeholder whose rights or treatment are materially and adversely affected by such amendment, modification, or supplement, and, if a Consenting Stakeholder terminates this Agreement in accordance with this Section 12.01 hereof, such Agreement shall otherwise remain in full force and effect with respect to all other Parties;

(e)      any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order, or ten (10) Business Days after there is a change in law, making illegal or otherwise preventing or prohibiting the consummation of the Restructuring Transactions in a way that cannot be reasonably remedied by the Company Parties subject to the reasonable satisfaction of the Required Consenting Stakeholders;

(f)      solely with respect to the Consenting Lenders, the breach in any material respect by any of the Consenting Sponsors of any of the representations, warranties, or covenants of the Consenting Sponsors set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof);

(g)      solely with respect to the Sponsor, the breach in any material respect by any of the Consenting Lenders of any of the representations, warranties, or covenants of such Consenting Lenders set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof) such that the non-breaching Consenting Lenders hold (i) less than 66.7%% of the principal amount of outstanding First Lien Term Loans and (ii) less than 66.7%% of the principal amount of outstanding Second Lien Term Loans;

(h)      the withdrawal of the Plan or Disclosure Statement or the amendment or modification of, or the filing of a motion or pleading by the Company Parties, in each case without the prior written consent of the Required Consenting Stakeholders, that seeks to amend or modify the Plan or the Disclosure Statement or any Definitive Documents, which amendment, modification or filing is (i) inconsistent with this Agreement or the Plan, as applicable or (ii) adverse to any of the Consenting Stakeholders; and such amendment or modification has not been reversed and/or such motion or pleading has not been withdrawn prior to the earlier of (x) five (5) Business Days after the Company Parties receive written notice from the applicable Required Consenting Stakeholders that such amendment, modification, motion or pleading is (i) inconsistent with this Agreement and/or the Plan and (ii) adverse to such Consenting Stakeholders, and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

(i)      the Company Parties (A) withdraw the Plan, (B) execute a definitive written agreement with respect to an Alternative Restructuring Proposal, (C) file, propound or otherwise support any plan of reorganization other than the Plan, or (D) publicly announce their intention to do either of (A), (B) or (C);

(j)      the Company Parties file with the Bankruptcy Court any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Stakeholders;

(k)      the Bankruptcy Court shall enter an order terminating, annulling, modifying or conditioning the automatic stay with respect to any material assets of the Company Parties with a value in excess of $15,000,000 in the aggregate without the prior written consent of the Required Consenting Stakeholders;

(l)      the entry of a Final Order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order terminating exclusivity under Bankruptcy Code section 1121;

(m)      any Company Party files, joins, or supports through a pleading filed with the Bankruptcy Court any motion, application, adversary proceeding or cause of action (A) challenging the validity, enforceability or priority of, or seeking to avoid, disallow, subordinate or otherwise limit the liens on any asset or assets comprising any portion of the collateral securing the First Lien Term Loan Claims or the Second Lien Term Loan Claims, as applicable, (B) seeking to impose liability upon or enjoin the holders of First Lien Term Loan Claims or the holders of Second Lien Term Loan Claims, in their capacity as such, or (C) seeking to restrict the rights of holders of First Lien Term Loan Claims or Second Lien Term Loan Claims, in their capacity as such, in each case without the prior written consent of the Required Consenting Lenders, and in each case to the extent inconsistent with this Agreement;

(n)      any Company Party files, joins, or supports through a pleading filed with the Bankruptcy Court any motion, application, adversary proceeding or cause of action seeking to impose liability upon or enjoin any Consenting Sponsor, in its capacity as such, without the prior written consent of the Consenting Sponsors, and in each case to the extent inconsistent with this Agreement;

(o)      the Company Parties fail to timely make any adequate protection payments (if any) required by order of the Bankruptcy Court to any of the Consenting Lenders which remains uncured for five calendar days;

(p)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fifteen (15) Business Days after entry of such order; or

(q)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by any of the Consenting Lenders of any of the representations, warranties, or covenants of such Consenting Lenders set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof) such that the non-breaching Consenting Lenders hold (i) less than 66.7% of the principal amount of outstanding First Lien Term Loans and (ii) less than 66.7% of the principal amount of outstanding Second Lien Term Loans;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law; or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters a Final Order denying confirmation of the Plan.

12.03.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  the Required Consenting Lenders, the Consenting Sponsors, and each Company Party.

12.04.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

12.05.  Termination Limitation.  Notwithstanding anything to the contrary herein, no Party may terminate this Agreement based on any event that was directly or indirectly caused by or arises out of such Party's breach of this Agreement.

12.06.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 12.06 shall promptly provide written notice of such withdrawal or change to counsel for each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict

(a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder; and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder. No purported termination of this Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b) or Section 12.02(d). Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

**Section 13.**     *Amendments and Waivers.*

13.01. This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

13.02. This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (a) each Company Party, (b) the Required Consenting Lenders, and (c) the Consenting Sponsors; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, or to the treatment of such Company Claims/Interests, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; provided, further, however, that any amendment to this Agreement to the definition of "Required Consenting Lenders," "Consenting Stakeholders," or to this Section 13 shall require the consent of each Consenting Stakeholder and each Company Party.

13.03. Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

13.04. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**     *Miscellaneous*

14.01. Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance

with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.    Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  Further Assurances.    Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  Complete Agreement.    Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH (A) THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF; AND (B) IF THE CHAPTER 11 CASES ARE FILED, THE BANKRUPTCY CODE.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, in courts of (a) if the Chapter 11 Cases are not filed, the State of New York and the United States District Court, in each case, located in the borough of Manhattan in the City of New York (the "Chosen Courts"), or (b) if the Chapter 11 Cases are filed, to the extent possible, the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts and the Bankruptcy Court, as applicable; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and the Bankruptcy Court, as applicable; and (c) waives any objection that any Chosen Court and the Bankruptcy Court, as applicable, is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.  TRIAL BY JURY WAIVER.    EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  Execution of Agreement.    This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing

26

this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity, except as otherwise explicitly provided herein.

14.10. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

        Belk, Inc.
        2801 West Tyvola Road
        Charlotte, North Carolina 28217
        Attention:        Stacy S. Gray, Senior Vice President and General Counsel
        E-mail address: Stacy_Gray@belk.com

        *with a copy (which shall not constitute notice) to*:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, New York 10022
        Attention:        Joshua A. Sussberg, P.C.
                          Steven N. Serajeddini, P.C.
                          Judson A. Oswald, P.C.
                          Matthew Fagen
                          Yuli Wang
                          Rachael Bazinski
        E-mail address: joshua.sussberg@kirkland.com
                          steven.serajeddini@kirkland.com;
                          judson.oswald@kirkland.com;
                          matthew.fagen@kirkland.com;
                          yuli.wang@kirkland.com;
                          rachael.bazinski@kirkland.com

(b)      if to the Ad Hoc First Lien Term Lender Group:

To each member of the Ad Hoc First Lien Term Lender Group at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.

*With a copy (which shall not constitute notice) to*:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
Attention:       Joseph Zujkowski
                 Daniel Shamah
                 Adam P. Haberkorn
E-mail address:  jzujkowski@omm.com
                 dshamah@omm.com
                 ahaberkorn@omm.com

*And with a copy (which shall not constitute notice) to*:

O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Attention:       David J. Johnson Jr.
E-mail address:  djohnson@omm.com

(c)      if to the Ad Hoc Crossover Lender Group:

To each member of the Ad Hoc Crossover Lender Group at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.

*With a copy (which shall not constitute notice) to*:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:       Matthew Feldman
                 Weston T. Eguchi
                 Debra Sinclair
E-mail address:  mfeldman@willkie.com
                 weguchi@willkie.com
                 dsinclair@willkie.com

28

(d)      if to the Consenting Sponsors, to:

To each Consenting Sponsor at the addresses or e-mail addresses set forth in such Consenting Sponsor's signature page to this Agreement or to a Joinder, as the case may be.

*With a copy (which shall not constitute notice) to*:

Latham & Watkins, LLP
885 3rd Ave
New York, New York 10022
Attention:         George A. Davis
                   Michael W. Benjamin
                   Joshua A. Tinkelman
                   Ted A. Dillman
                   Ebba Gebisa
E-mail address: george.davis@lw.com
                   michael.benjamin@lw.com
                   joshua.tinkelman@lw.com
                   ted.dillman@lw.com
                   ebba.gebisa@lw.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11. <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12. <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13. <u>No Waiver of Participation and Preservation of Rights</u>.

(a)      Except as expressly provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its full participation in the Chapter 11 Cases, so long as, in each case, such actions are not inconsistent with the Party's obligations under this Agreement, the Plan, or the other Definitive Documents, respectively. Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement

and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying, or preventing the timely consummation of the Plan.

(b)      If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights, remedies, claims, and defenses.

(c)      This Agreement is part of a proposed settlement of matters that could otherwise be subject to litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14. Specific Performance. It is understood and agreed by the Parties that, without limiting any other remedies available at law or in equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15. No Commitment. No Consenting Stakeholder shall be obligated to fund or otherwise committed to provide funding in connection with the Restructuring Transactions, except pursuant to a separate commitment letter or definitive documentation relating specifically to such funding, if any, that has been (i) executed by such Consenting Stakeholder and (ii) approved by the Bankruptcy Court, as necessary, along with the satisfaction of any conditions precedent to such funding requirements.

14.16. Several, Not Joint, Claims. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.17. Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.18. Remedies Cumulative. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.19. Capacities of Consenting Stakeholders. Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.20.  <u>Survival</u>.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with this Agreement or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 7.01(k), Section 7.01(l), Section 14, and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.21.  <u>Publicity</u>.  Except as may be required by law, none of the Parties, or any individual or entity acting on their behalf, prior to the Petition Date, as applicable, shall issue any press release or make any public statement regarding the Restructuring Transactions, including the existence or contents of this Agreement, other than in a form mutually agreed to by the Parties.

14.22.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties, the Required Consenting First Lien Term Lenders, the Required Consenting Second Lien Term Lenders, or the Consenting Sponsors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

*[Signature pages follow]*

## EXHIBIT A

### Company Parties

**FASHION HOLDINGS INTERMEDIATE LLC**
**FASHION INTERMEDIATE INC.**
**BEAR PARENT INC.**
**BELK, INC.**
**BELK-SIMPSON COMPANY, GREENVILLE, SOUTH CAROLINA**
**BELK INTERNATIONAL, INC.**
**BELK STORES SERVICES, INC.**
**BELK ADMINISTRATION COMPANY**
**BELK STORES OF VIRGINIA LLC**
**BELK ACCOUNTS RECEIVABLE LLC**
**BELK GIFT CARD COMPANY LLC**
**BELK MERCHANDISING LLC**
**BELK TEXAS HOLDINGS LLC**
**BELK SOURCING LLC**
**BELK DEPARTMENT STORES LP**
**THE BELK CENTER, INC.**
**BELK ECOMMERCE LLC**
**BELK STORES OF MISSISSIPPI LLC**

## EXHIBIT B

**Restructuring  Term Sheet**

**BELK, INC.**

**RESTRUCTURING TERM SHEET**

**JANUARY 26, 2021**

THIS TERM SHEET (TOGETHER WITH ALL ANNEXES, SCHEDULES AND EXHIBITS HERETO, THIS "TERM SHEET") DESCRIBES THE PRINCIPAL TERMS AND CONDITIONS OF A RESTRUCTURING TRANSACTION FOR BELK, INC. ("BELK") AND CERTAIN OF ITS AFFILIATES THAT WILL BE EFFECTUATED THROUGH VOLUNTARY PREPACKAGED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "CHAPTER 11 CASES") IN THE BANKRUPTCY COURT, ON THE TERMS, AND SUBJECT TO THE CONDITIONS, SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT (TOGETHER WITH THE EXHIBITS AND SCHEDULES ATTACHED TO SUCH AGREEMENT, INCLUDING THIS TERM SHEET, EACH AS MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "RSA").

THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL COMPLY WITH ALL APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.

CAPITALIZED TERMS USED BUT NOT INITIALLY DEFINED IN THIS TERM SHEET SHALL HAVE THE MEANING HEREINAFTER ASCRIBED TO SUCH TERMS, OR IF NOT DEFINED IN THIS TERM SHEET, SUCH TERMS SHALL HAVE THE MEANING ASCRIBED TO SUCH TERMS IN THE RSA OR THE PLAN.

THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | The Restructuring Transactions shall be implemented through the filing of the Chapter 11 Cases in the Bankruptcy Court.<br><br>As reorganized pursuant to the Restructuring Transactions, the Company Parties shall be referred to herein, collectively, as the "Reorganized Debtors." |
| **Existing Capital Structure** | ABL Facility:  consisting of the $900 million revolving credit facility pursuant to that certain ABL Credit Agreement (as amended, restated, or otherwise modified from time to time, the "ABL Credit Agreement," and the loans thereunder, the "ABL Loans"), dated as of December 10, 2015, by and among Bear Parent Inc. as holdings, and Belk, Inc. as borrower, the guarantors party thereto from time to time, Bank of America, N.A. as the administrative and collateral agent, and the lender parties thereto from time to time.<br><br>First Lien Term Loans: consisting of approximately $999 million in outstanding principal, plus interest, fees and other expenses, pursuant to that certain First Lien Credit Agreement, dated as of December 10, 2015, by and among Bear Parent Inc. as holdings, and Belk, Inc. as borrower, the guarantors party thereto from time to time, Morgan Stanley Senior Funding, Inc. as the administrative and collateral agent, and the lender parties thereto from time to time.<br><br>Second Lien Term Loans:  consisting of approximately $550 million in outstanding principal, plus interest, fees and other expenses, pursuant to that certain Second Lien Credit Agreement, dated as of December 10, 2015, by and among Bear Parent Inc. as holdings, and Belk, Inc. as borrower, the guarantors party thereto from time to time, Wilmington Trust, National Association as the administrative and collateral agent, and the lender parties thereto from time to time. |
| **Reorganized Debtors Capital Structure** | The capital structure of the Reorganized Debtors upon the Plan Effective Date shall consist of the following:<br><br>(i)  a first lien term loan credit facility (the "New First Lien Credit Facility"), which shall be available to be drawn or otherwise made available to the Borrower (as defined in Exhibit 1 hereto) on the Plan Effective Date and shall be comprised of:<br><br>(a)  a $300 million term loan tranche, consisting of (A) $225 million of new money term loans (the "New FLFO New Money Loans") and (B) $75 million of new term loans rolled up from the First Lien Term Loans (the "New FLFO Roll-Up Loans", and together with the New FLFO New Money Loans, the "New FLFO Loans"); and<br><br>(b)  up to $822 million (or to be reduced to $815 million after giving effect to any amortization payments on or prior to the the Plan Effective Date) exchange term loan tranche, secured by a first-priority lien on a "second-out" priority basis ("New FLSO Loans"); |

<table>
<tr>
<td></td>
<td>

(ii) a second lien term loan credit facility (the "<u>New Second Lien Credit Facility</u>", together with the New First Lien Credit Facility, the "<u>New Credit Facilities</u>"), which shall be available to be drawn or otherwise made available to the Borrower on the Plan Effective Date and shall be comprised of a $110 million exchange term loans, secured by a second-priority lien ("<u>New Second Lien Term Loans</u>", together with the New First Lien Term Loans, the "<u>New Term Loans</u>");

(iii) the ABL Facility; and

(iv) new common stock issued by the parent entity of the Reorganized Debtors on the Plan Effective Date, after giving effect to the Restructuring Transactions, which for the avoidance of doubt may be Fashion Holdings Intermediate LLC or a new entity formed to acquire, directly or indirectly, substantially all of the assets of the Company Parties ("<u>Reorganized Belk Holdings</u>", and the new common stock or comparable equity interests issued by Reorganized Belk Holdings, the "<u>New Common Stock</u>"), resulting in the following pro forma ownership percentages: (a) 50.1% held by Fashion Holdings LLC, following the issuance of the New Common Stock to be issued pursuant to clauses (b) and (c) below, (b) 34.9% held by holders of Second Lien Term Loan Claims, and (c) 15% held by Existing Lenders that elect to fund their pro rata share of $125 million of the New FLFO New Money Loans.

</td>
</tr>
<tr>
<td colspan="2" align="center">

**NEW FLFO NEW MONEY LOANS**

</td>
</tr>
<tr>
<td>

**Participation in New FLFO New Money Loans**

</td>
<td>

All existing First Lien Term Lenders (the "<u>Existing First Lien Term Lenders</u>") and all existing Second Lien Term Lenders (the "<u>Existing Second Lien Term Lenders</u>" and together with Existing First Lien Term Lenders, the "<u>Existing Lenders</u>") will be offered the opportunity to participate in the funding of the New FLFO New Money Loans directly as new money loans ("<u>New Money Commitments</u>") on the Plan Effective Date as follows: (i) 1/3 of the Lender Backstop Commitments will be offered to the Existing Second Lien Term Lenders to participate on a pro rata basis based on the Second Lien Term Loans held by such Existing Lender as of the date the Company Parties commence solicitation of votes on the Plan (such date, the "<u>Record Date</u>") and (ii) 2/3 of the Lender Backstop Commitments will be offered to the Existing First Lien Term Lenders to participate on a pro rata basis on the First Lien Term Loans held by such Existing Lender as of the Record Date; <u>provided</u>, that any Existing Lender that wishes to participate in the New FLFO New Money Loans must subscribe to at least its pro rata share of $125 million of the New FLFO New Money Loans.

All Existing Lenders will also be offered the opportunity to subscribe for more than their pro rata share of the New Money Commitments as described above. To the extent the total subscriptions by the Existing First Lien Term Lenders and/or the Existing Second Lien Term Lenders exceed the applicable New Money Commitments allocated to such group of Existing Lenders, the excess

</td>
</tr>
</table>

|  | amount would first reduce the New Money Commitments not subscribed by their respective First Lien or Second Lien group of Existing Lenders on a dollar for dollar basis (if any), with the remaining excess amount to reduce the New Money Commitments that are backstopped by the Sponsor Backstop Commitment (as defined below) on a dollar for dollar basis; provided, that such oversubscription by Existing Lenders and corresponding reduction of New Money Commitments will be limited (on a ratable basis) such that the Sponsor Backstop Commitments shall in no event be below $65 million of New FLFO New Money Loans; provided, further that Existing Lenders may elect to limit any such oversubscription to reduction of the Lender Backstop Commitments.<br><br>Each Existing Lender may participate in the New Money Commitments on behalf of its Related Funds (as defined below) in its sole discretion, and may allocate its New Money Commitment and any related fees or other consideration among itself and any Permitted Assignees (as defined below) in its sole discretion.<br><br>Each Existing First Lien Lender (including, for the avoidance of doubt, any Lender Backstop Party) that (x) commits to fund its pro rata share of 2/3 of the $125 million of New FLFO New Money Loans by executing the New FLFO New Money Commitment Letter attached hereto as **Exhibit 2** and (y) executes a joinder to the RSA, in each case by February 2, 2021 (which date may be extended with the prior written consent of the Company Parties, Required Consenting Lenders, and Consenting Sponsors), shall receive an additional amount equal to 25% of the principal amount of First Lien Term Loan Claims held by such First Lien Term Loan Lender on the Record Date in the form of New FLSO Loans.<br><br>After giving effect to the subscriptions from the Existing Lenders, to the extent any New Money Commitments have not been subscribed for or to the extent any Existing Lender with a New Money Commitment fails to fund its portion of the New FLFO New Money Loans, the applicable backstop party shall fund its relevant portion of the New FLFO New Money Loans. |
| **Backstop for New FLFO New Money Loans** | Certain Consenting First Lien Term Lenders and Consenting Second Lien Term Lenders have executed the Backstop Commitment Letter (collectively, the "Lender Backstop Parties" and the commitments thereof, the "Lender Backstop Commitments") and thereby committed, on a several and not joint basis, (a) to provide their pro rata share of $125 million in aggregate principal amount of New FLFO New Money Loans and (b) to backstop up to $125 million of New Money Commitments that are not subscribed for by the Existing Lenders or funded at closing, in each case in the amount set forth opposite its name on Schedule 1 to the Backstop Commitment Letter.<br><br>The investment funds managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P. whose names are as set forth on Schedule 1 to the Backstop Commitment Letter attached hereto as **Exhibit 3** (collectively, but such entities on a several and not joint basis, the "Sponsor Backstop Parties" (together with the Lender Backstop Parties, the "Backstop Parties"), and the commitments thereof, "Sponsor Backstop Commitments") commit to backstop $100 million of New Money |

| | |
|---|---|
| | Commitments, in each case in the amount opposite its name as set forth on Schedule 1 to the Backstop Commitment Letter, which such amount may be reduced on account of any over-subscriptions by the participating Existing Lenders as described above; provided that such oversubscription and corresponding reduction shall in no event reduce the Sponsor Backstop Commitments below $65 million of New FLFO New Money Loans.<br><br>Notwithstanding the foregoing, each Backstop Party may (1) commit to provide Backstop Commitments on behalf of its Related Funds in its sole discretion and (2) allocate its Backstop Commitment and any related fees or other consideration among itself and/or any Permitted Assignee in its sole discretion. [1]<br><br>As used herein, "Related Funds" means, with respect to any person, any funds or accounts managed or advised by such person or an affiliate of such person, or any funds or accounts managed or advised by the investment manager or advisor of such person or any affiliate of such person.<br><br>As used herein, "Permitted Assignee" means, with respect to any person, (1) such person's Related Funds or (2) any other Lender Backstop Party or its Related Funds. |
| **Backstop Consideration for New FLFO New Money Loans** | Each Consenting First Lien Term Lender that is also a Lender Backstop Party shall receive its pro rata share of $30 million of the New FLFO Roll-Up Loans (based on the amount of Lender Backstop Commitments held by such Consenting First Lien Term Lender as a proportion of 2/3 of the $125 million of New FLFO New Money Loans.<br><br>In exchange for funding their respective Lender Backstop Commitments, each Lender Backstop Party shall receive 10.0% of the amount of the Lender Backstop Commitments held by each such Lender Backstop Party on the date of execution of the Backstop Commitment Letter, payable to such Lender Backstop Party in cash on, and subject to the occurrence of, the Plan Effective Date.[2] |

---

[1]   The Lender Backstop Parties include Apex Credit Partners LLC, Assured, Blackstone Alternative Credit Advisors, LP, First Eagle, FS Global Credit Opportunities Fund / Blair Funding LLC, Greywolf, Guggenheim Partners Investment Management, LLC, Hein Park Capital Management LP, Jefferies Leveraged Credit, KKR Credit Advisors (US) LLC, Katriona Investment Pte Ltd., Davidson Kempner Capital Management LP, MJX, Nuveen Asset Management, LLC, SEIX, and Voya.

[2]   In addition to the foregoing, (i) $2 million shall be paid to Davidson Kempner Capital Management LP in cash on, and subject to the occurrence of, the Plan Effective Date, and (ii) $10 million shall be paid to and divided between Hein Park Capital Management LP, Nuveen Asset Management, LLC, Jefferies Leveraged Credit Products LLC, Greywolf Loan Management LP, Voya Investment Management Co. LLC, and Guggenheim Partners Investment Management, LLC, in cash on, and subject to the occurrence of, the Plan Effective Date.

| | To the extent any Lender Backstop Party fails to fund any New FLFO New Money Loans required to be funded by such person, no backstop fee shall be due and payable to such person. |
|---|---|
| **Participation in New FLFO Roll-Up Loans** | Each Existing First Lien Lender (including, for the avoidance of doubt, any Lender Backstop Party) that (x) commits to fund its pro rata share of 2/3 of the $125 million of New FLFO New Money Loans by executing the New FLFO New Money Commitment Letter and (y) executes a joinder to the RSA, in each case by February 2, 2021 (which date may be extended with the prior written consent of the Company Parties, the Required Consenting Lenders, and the Consenting Sponsors), shall receive its pro rata share of $45 million of the New FLFO Roll-Up Loans (based on the amount of the 2/3 of the $125 million of New FLFO New Money Loans funded by such Consenting First Lien Lender as a proportion of the 2/3 of the $125 million of New FLFO New Money Loans). |
| **New Common Stock for New Money Investors** | Concurrently with the funding of the New FLFO New Money Loans by an Existing Lender or a Lender Backstop Party, such person (or its Permitted Assignee) shall receive a pro rata portion of 15% of the New Common Stock (with such pro rata share based on the proportionate amount of the initial $125 million of New FLFO New Money Loans funded by such person on the Plan Effective Date). |

**TREATMENT OF CLAIMS AND INTERESTS**

| Type of Claim | Treatment | Impairment/ Voting |
|---|---|---|
| **Administrative and Priority Tax Claims** | On the Plan Effective Date, each holder of an allowed administrative claim or priority tax claim shall receive cash equal to the full amount of its claim or such other treatment as required by section 1129(a)(9) of the Bankruptcy Code, unless otherwise agreed to by such holder or permitted by the Bankruptcy Code. | N/A |
| **Other Secured Claims** | On the Plan Effective Date, each holder of an allowed Other Secured Claim, including, but not limited to, secured claims of all equipment lessors, shall receive, in full and final satisfaction of such claims, either (a) payment in full in cash, (b) delivery of the collateral securing such claim, (c) reinstatement of such claim, or (d) such other treatment rendering such claim unimpaired in accordance with section 1124 of the Bankruptcy Code, unless otherwise agreed to by such holder. | Unimpaired; Deemed to Accept. |
| **Other Priority Claims** | On the Plan Effective Date, each holder of an allowed Other Priority Claim shall receive cash in an amount equal to such claim, unless otherwise agreed to by such holder. | Unimpaired; Deemed to Accept. |
| **ABL Facility Claims** | On the Plan Effective Date, unless otherwise agreed by a holder of an Allowed ABL Facility Claim, each holder of an allowed ABL Facility Claim shall, at the election of such | Unimpaired; Deemed to Accept. |

- 6 -

| | | |
|---|---|---|
| | holder, receive (i) payment in Cash of its Allowed ABL Facility Claim and replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement; or (ii)(x) its pro rata share of refinanced loans under the New ABL Facility in an amount equal to the principal amount of ABL Facility Claims held by such holder as of the Plan Effective Date, and (y) Cash in an amount equal to the accrued but unpaid non-default interest payable to such Holder under the ABL Credit Agreement as of the Plan Effective Date (if any). | |
| **First Lien Term Loan Claims** | On the Plan Effective Date, each holder of an allowed First Lien Term Loan Claim will receive, in full and final satisfaction of such First Lien Term Loan Claim, New FLSO Loans in a principal amount equal to 55% of the aggregate principal amount of such holder's allowed First Lien Term Loan Claims; *provided*, that all accrued and unpaid amortization and interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Plan Effective Date.<br><br>Additionally, the Plan shall incorporate or otherwise give effect to the terms set forth in the "New FLFO New Money Loans" section herein. | Impaired; Entitled to Vote |
| **Second Lien Term Loan Claims** | On the Plan Effective Date, each holder of an allowed Second Lien Term Loan Claim will receive, in full and final satisfaction of such Second Lien Term Loan Claim, (i) New FLSO Loans in a principal amount equal to 15% of the aggregate principal amount of such holder's allowed Second Lien Term Loan Claims, (ii) New Second Lien Term Loans in a principal amount equal to 20% of the aggregate principal amount of such holder's allowed Second Lien Term Loan Claims, and (iii) its pro rata share of 34.9% of the New Common Stock; *provided*, that all accrued and unpaid interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Plan Effective Date.<br><br>Additionally, the Plan shall incorporate or otherwise give effect to the terms set forth in the "New FLFO New Money Loans" section herein. | Impaired; Entitled to Vote |
| **General Unsecured Claims** | On the Plan Effective Date, each holder of an allowed General Unsecured Claim shall receive either: (i) reinstatement of such allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in cash on (a) the Plan Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such | Unimpaired; Deemed to Accept. |

| | allowed General Unsecured Claim, unless otherwise agreed to by such holder. | |
|---|---|---|
| **Intercompany Claims** | On the Plan Effective Date, Intercompany Claims[3] shall be, at the option of the Reorganized Debtors, either: (i) reinstated; or (ii) distributed, contributed, set off, cancelled and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors. | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |
| **Intercompany Interests** | On the Plan Effective Date, Intercompany Interests[4] shall be, at the option of the Reorganized Debtors, either: (i) reinstated; or (ii) cancelled and released without any distribution on account of such Equity Interests. | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |
| **Equity Interests** | On the Plan Effective Date, all Equity Interests will be reinstated, subject to dilution on account of the New Common Stock, and the legal, equitable, and contractual rights to which holders of Interests are entitled shall otherwise remain unaltered. | Impaired; Entitled to Vote. |

### SUMMARY OF TERMS OF THE RESTRUCTURING TRANSACTIONS

| | | |
|---|---|---|
| **Cancellation of KKR, Blackstone Credit, and GIC Interests** | On the Plan Effective Date, KKR[5], Blackstone Credit[6], and GIC[7] shall be deemed to have waived all legal, equitable, and contractual interests in the Equity Interests held by KKR, Blackstone Credit, and GIC in Fashion Topco LLC and such Equity Interests shall be cancelled and released without any distribution on account of such Equity Interests. | |
| **Survival of Indemnification Provisions and D&O Insurance** | All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and | |

---

[3]   "**Intercompany Claim**" means any Claim against a Company Party held by another Company Party.

[4]   "**Intercompany Interest**" means an Equity Interest in a Company Party held by another Company Party.

[5]   "**KKR**" means, collectively, Polar Bear Fund L.P., CPS Managers Master Fund L.P., KKR TFO Partners L.P., FS KKR Capital Corp, and PCOP II Cayman Investors A L.P.

[6]   "**Blackstone Credit**" means, collectively, GSO Beacon Holdings LP, GSO Credit Alpha Fund LP, and any Affiliate or transferee of any of the foregoing entities that hold Topco Equity Interests.

[7]   "**GIC**" means Katriona Investment Pte Ltd.

|  | other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Plan Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Plan Effective Date.<br><br>In addition, after the Plan Effective Date, the Company Parties will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |
|---|---|
| **Claims of the Company Parties** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Company Parties pursuant to the release and exculpation provisions outlined in this Term Sheet. |
| **Releases** | The Plan and the Confirmation Order will contain the exculpation provisions and releases set forth in **Annex 1** to this Term Sheet. |
| **Tax Structure** | To the extent practicable, the Restructuring Transactions contemplated by this Term Sheet will be structured so as to obtain the most beneficial tax structure for the Company Parties, as determined by the Company Parties and the Required Consenting Stakeholders. |
| **Exemption from SEC Registration** | If the transaction is consummated pursuant to the Plan, the issuance of all securities under the Plan will be exempt from registration under the Securities Act and applicable law. |
| **Conditions Precedent to the Plan Effective Date** | It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived:<br><br>(i)     the RSA and the Backstop Commitment Letter shall remain in full force and effect;<br><br>(ii)    all fees and premiums payable pursuant to the Backstop Commitment Letter shall have been paid;<br><br>(iii)   there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Company Parties, the Required Consenting |

Lenders, and the Consenting Sponsors would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

(iv) an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall not have been enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Company Parties, the Consenting Sponsor, and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

(v) each document or agreement constituting the Definitive Documents shall have been executed and/or effectuated and shall be in form and substance consistent with the RSA;

(vi) accrued and unpaid interest and amortization in respect of the First Lien Loans and Second Lien Loans as of the Plan Effective Date shall have been paid in full in cash;

(vii) to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Company Parties' professionals, the Consenting Lender Fees and Expenses, and the Consenting Sponsor Fees and Expenses;

(viii) all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date have been placed in the professional fee escrow account;

(ix) the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered;

(x) entry into the New Credit Facilities Documents, and all conditions precedent to the consummation of such New Credit Facilities Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New Credit Facilities Documents shall have occurred;

(xi) entry into the New ABL Facility Documents, and all conditions precedent to the consummation of such New ABL Facility Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New ABL Facility Documents shall have occurred;

(xii) the New Common Stock shall have been issued by Reorganized Belk Holdings;

(xiii) the Reorganized Debtors shall have procured or become insured under new D&O tail coverage; and

| | |
|---|---|
| | (xiv)   the Company Parties shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the RSA and the Plan. |

**ANNEX 1[8]**

**Exculpation and Release Language**

1.      "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) each Company Party; (c) each Consenting Stakeholder; (d) any statutory committee appointed in the Chapter 11 Cases and each of their respective members; and (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f).

2.      "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

3.      "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors. For the avoidance of doubt, the current and former members of each Governing Body (and their attorneys and other professionals retained by them in their capacity as members of a Governing Body) are Related Parties of the Debtors.

4.      "*Released Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Crossover Lender Group; (e) each member of the Ad Hoc First Lien Term Lender Group; (f) each Company Party; (g) each Agent; (h) each ABL Lender; (i) each First Lien Term Lender; (j) each Second Lien Term Lender; (k) all Holders of Interests; (l) each Backstop Party; (m) each Sponsor; (n) each New Credit Facility Lender; (o) each New ABL Facility Lender; and (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q); and (q) each Related Party of each Entity in clause (a) through this clause (q); provided that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation of the Plan.

5.      "*Releasing Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Crossover Lender Group; (e) each member of the Ad Hoc First Lien Term Lender Group; (f) each Company Party; (g) each Agent; (h) each ABL Lender; (i) each First Lien Term Lender; (j) each Second Lien Term Lender; (k) all Holders of Claims; (l) all Holders of Interests; (m) each Sponsor; (n) each Backstop Party; (o) each New Credit Facility Lender; (p) each New ABL Facility Lender; and (q) each current and former Affiliate of each Entity in clause (a) through the following clause (r); and (r) each Related Party of each Entity in clause (a) through this clause (r); provided that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation of the Plan.

---

[8]    Capitalized terms used in this **Annex A** but not otherwise defined shall have the meaning ascribed to such terms in the Plan.

A.  *Releases by the Debtor.*

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action[9], directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Stakeholders), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the

---

[9]  "**Causes of Action**" means any claims, cross claims, third-party claims, interests, damages, judgments, remedies, causes of action, controversies, debts, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever (including those of the Debtors, the Reorganized Debtors, or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, pursuant to any other theory of law or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law preferential or fraudulent transfer or similar claim, and (f) any Avoidance Action.

Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

B. *Releases by the Holders of Claims and Interests.*

Notwithstanding anything contained in this Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring

- 14 -

efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

*Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered

- 15 -

into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Exhibit 1**

**New Credit Facilities Term Sheet**

**BELK, INC.**

**NEW CREDIT FACILITIES TERM SHEET**

**JANUARY 26, 2021**

| | |
|---|---|
| **SUMMARY OF TERMS OF THE NEW CREDIT FACILITIES** | |
| **New Credit Facilities:** | (a) A first lien term loan credit facility (the "New First Lien Credit Facility"), which shall be available to be drawn or otherwise made available to the Borrower on the Plan Effective Date and shall be comprised of: |
| | (i) a $300 million term loan tranche, consisting of (A) $225 million of new money term loans (the "New FLFO New Money Loans") and (B) $75 million of exchange term loans rolled up from the existing First Lien Term Loans (the "New FLFO Roll-Up Loans", and together with the New FLFO New Money Loans, the "New FLFO Loans"), in each case, secured by a first-priority lien on a "first-out" priority basis; and |
| | (ii) up to $822 million (or to be reduced to $815 million after giving effect to any amortization payments on or prior to the Plan Effective Date) exchange term loan tranche, secured by a first-priority lien on a "second-out" priority basis ("New FLSO Loans", together with the New FLFO Loans, the "New First Lien Term Loans"). |
| | (b) A second lien term loan credit facility (the "New Second Lien Credit Facility", together with the New First Lien Credit Facility, the "New Credit Facilities"), which shall be made available to the Borrower on the Plan Effective Date and shall be comprised of a $110 million exchange term loans, secured by a second-priority lien ("New Second Lien Term Loans", together with the New First Lien Term Loans, the "New Term Loans"). |
| **New Credit Facilities Documents:** | The terms and conditions of the New First Lien Credit Facility shall be set forth in an exit credit agreement and related loan documents, the terms of which shall be based on the First Lien Term Loan Credit Agreement (collectively, the "New First Lien Credit Facility Documents"). |
| | The terms and conditions of the New Second Lien Credit Facility shall be set forth in an exit credit agreement and related loan documents, the terms of which shall be based on the Second Lien Term Loan Credit Agreement (collectively, the "New Second Lien Credit Facility Documents"). The New First Lien Credit Facility Documents and the New Second Lien Credit Facility Documents are collectively referred to as the "New Credit Facility Documents". |
| | At the option of the Required Consenting Lenders, the New First Lien Credit Facility Documents shall be documented as amended and restated First Lien Term Loan Credit Agreement and related loan documents and the New Second Lien Credit Facility Documents shall be documented as amended and restated |

|  | Second Lien Term Loan Credit Agreement and related loan documents, and the Confirmation Order (as defined in the RSA) shall provide that that the prepetition collateral documents, including any prepetition mortgages, shall remain in full force and effect and continue to secure the applicable New Credit Facilities.<br><br>The New Credit Facility Documents shall take into account the terms of this Term Sheet, incorporate other terms customary for exit facilities, and be otherwise in form and substance reasonably satisfactory to the Company Parties, the Required Consenting Lenders, and the Consenting Sponsor. |
|---|---|
| **Borrower/Guarantors:** | Belk, Inc. (the "<u>Borrower</u>") and, in addition to the same guarantors under the First Lien Term Loan Credit Agreement, Belk Sourcing LLC (collectively, the "<u>Guarantors</u>"). |
| **Administrative Agent:** | With respect to the New First Lien Credit Facility:  Alter Domus (US) LLC (f/k/a Cortland Capital Market Services LLC) or another agent acceptable to the Required Consenting Lenders and the Borrower.<br><br>With respect to the New Second Lien Credit Facility: Wilmington Trust, N.A., the existing agent under the Second Lien Term Loan Agreement, or another agent reasonably acceptable to the holders of the Second Lien Term Loans and the Borrower. |
| **Use of Proceeds:** | Net cash proceeds from the New FLFO New Money Loans may be used to pay the transaction expenses and for general corporate purposes, including repayment of the borrowings under the ABL Credit Agreement and accrued and unpaid interest or amortization payments under the First Lien Term Loans and/or Second Lien Term Loans. |
| **Maturity:** | With respect to the New First Lien Credit Facility: July 31, 2025.<br><br>With respect to the New Second Lien Credit Facility:  July 31, 2025. |
| **Amortization:** | (i)   <u>New FLFO Loans</u>:  None.<br><br>(ii)  <u>New FLSO Loans</u>: as set forth below and payable on a quarterly basis<br><br>      a.  1.0% for fiscal year ended January 31, 2022<br><br>      b.  2.0% for fiscal year ended January 31, 2023<br><br>      c.  2.5% for fiscal year ended January 31, 2024 and thereafter.<br><br>(iii) <u>New Second Lien Term Loans</u>:  None. |
| **Interest:** | (i)   <u>New FLFO Loans</u>:  LIBOR + 7.50%, paid at least quarterly in cash (with a 1.00% LIBOR floor, LIBOR may be one, two or three months) |

|  | (ii) New FLSO Loans: 10.00% per annum, paid quarterly in cash, subject to adjustment based on the Borrower's exercise of the PIK Toggle (as defined below). |
|---|---|

a. *PIK Toggle*: So long as there is no default or event of default, the Borrower may, at its option, toggle interest to payment-in-kind ("**PIK**," and, the interest payment option, the "**PIK Toggle**"); *provided* that the PIK Toggle will only be available for 8 quarters in total over the life of the New FLSO Loans.

    i. In the event the Borrower opts to exercise the PIK Toggle, the interest rate on the New FLSO Loans will be 5.00% paid quarterly in cash, 8% paid quarterly in-kind.

    ii. No later than 5 days prior to each Interest Payment Date, the Borrower shall provide written notice to the Administrative Agent of whether it is exercising the PIK Toggle for such Interest Payment Date.

(iii) New Second Lien Term Loans: 10.00% per annum, paid quarterly in-kind.

| **Security:** | In addition to all of the collateral granted under the First Lien Term Loan Credit Agreement, to include: (a) all cash and cash equivalents, deposit accounts and securities accounts subject to exclusions substantially the same as the "excluded accounts" under the ABL Facility (other than deposit accounts consisting solely of Term Priority Collateral proceeds); and (b) pledges of 100% of issued and outstanding voting stock of foreign subsidiaries and CFC Holdco (as such term is defined under the First Lien Term Loan Credit Agreement).

Within 30 days (or, with respect to leasehold mortgages, within 90 days) following the Plan Effective Date (or such later date as agreed to by the Administrative Agent in its reasonable discretion), the Borrower shall (i) deliver mortgages for each fee-owned real property that is not subject to a mortgage as of the date hereof and (ii) use its commercially reasonable efforts to deliver mortgages for each ground lease that is not subject to a mortgage as of the date hereof, including the use of commercially reasonable efforts to obtain any required consents of applicable landlords.

The New First Lien Credit Facility shall be secured by a first-priority lien on all existing Term Priority Collateral (as defined in the ABL Intercreditor Agreement) and a second-priority lien on ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), which shall be junior only to the ABL Lenders' security interest in ABL Priority Collateral.

The New Second Lien Credit Facility shall be secured by a second-priority lien on all existing Term Priority Collateral and a third-priority lien on ABL Priority Collateral. |

| | |
|---|---|
| **Priority:** | <u>New FLFO Loans</u>: New FLFO Loans shall have a first-out payment priority with respect to proceeds of, and distributions on or payments in respect of or arising out of the collateral, senior in right of payment to the New FLSO Loans.<br><br><u>New FLSO Loans</u>: New FLSO Loans shall have a second-out payment priority with respect to proceeds of, and distributions on or payments in respect of or arising out of the collateral, junior in right of payment to the New FLSO Loans.<br><br><u>New Second Lien Term Loans</u>: New Second Lien Term Loans shall be junior in lien priority to the lien securing the New First Lien Term Loans pursuant to an intercreditor agreement with terms set forth under the heading "Intercreditor Terms" below. |
| **Mandatory Prepayment:** | <u>With respect to the New First Lien Term Loans</u>:<br><br>Except as set forth below, same as under the First Lien Term Loan Credit Agreement, subject to priority under "Priority".<br><br>**ECF Sweep:**<br><br>In the event that average Liquidity as of each Friday during the months of January, February and March of each year is greater than $75 million (such amount, the "**Liquidity Threshold**"), 100% of the Excess Cash Flow for the most recently ended fiscal year in excess of an amount equal to the Liquidity Threshold, shall be used to mandatorily prepay the New FLSO Loans until New FLSO Loans achieve a repayment rate of 4% per annum for the applicable fiscal year generating such Excess Cash Flow (inclusive of the scheduled amortization set forth above and any voluntary prepayments during such fiscal year) and thereafter, only 50% of the Excess Cash Flow shall be subject to sweep. ECF payment in respect of 50% of Excess Cash Flow may be utilized for open market purchases that are consummated prior to the date such mandatory prepayment is required to be made.<br><br>Any reduction in principal amount of the New FLSO Loans through open market purchases shall not be taken into account to determine the amount of Excess Cash Flow subject to sweep until after the sweep percentage is reduced from 100% to 50%. There shall be no Excess Cash Flow sweep for New FLFO Loans.<br><br>**Asset Sale/Casualty Event Sweep**:<br><br>The proviso set forth in clause (1) of "Net Proceeds" of the First Lien Term Loan Credit Agreement shall be amended as follows:<br><br>"*provided* that (a) subject to clause (b) below, no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds shall exceed $1 million and (b) no such net cash proceeds shall constitute Net Proceeds under this clause (1) in any fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $2 million (and |

|  | thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (1)); and". |
|---|---|
|  | There shall be no re-investment right with respect to any asset sale and in the case of casualty event, such reinvestment right shall be limited to $5 million per fiscal year, with unused amounts permitted to be carried forward to subsequent fiscal years. |
|  | The (a) Net Proceeds realized or received in connection with any asset sale or casualty event or incurrence of non-permitted indebtedness and (b) Specified Sale-Leaseback Net Proceeds, in each case, shall be applied (i) first, to the outstanding New FLFO Loans until paid in full and (ii) second, to the New FLSO Loans until paid in full. |
|  | With respect to the New Second Lien Term Loans: |
|  | The New Second Lien Term Loans shall not have any Excess Cash Flow sweep. The other mandatory prepayment provisions shall be the same as applicable to the New First Lien Term Loans; *provided* that no such mandatory prepayment shall be required to be made until repayment in full of all New First Lien Term Loans and any other debt secured on a senior lien basis to the New Second Lien Term Loans. |
| **Optional Prepayment and Prepayment Premium:** | New First Lien Term Loans: <br><br> The Borrower may make optional prepayments of any tranche of the New First Lien Term Loans at its election. Such optional prepayments, certain mandatory prepayments (*i.e.* in respect of the incurrence of non-permitted debt, Specified Sale-Leaseback Transactions, Asset Sales and Casualty Events) and acceleration for any reason shall each be subject to the following prepayment premium, in each case plus accrued and unpaid interest: <br><br> With respect to New FLFO Loans: |

| Plan Effective Date through the date that is 12 months thereafter | 103.0% |
|---|---|
| 12 months through 24 months | 102.0% |
| 24 months through 36 months | 101.0% |
| 36 months through Maturity Date | 100.0% |

With respect to New FLSO Loans: make-whole payment upon a bankruptcy filing of the Company Parties within three years of the Plan Effective Date in an amount equal to 20% of the total original principal amount of First Lien Term Loans and Second Lien Term Loans exchanged for New FLSO Loans.

| | |
|---|---|
| | New Second Lien Term Loans:<br><br>Optional prepayment of any Second Lien Term Loans shall be subject to availability of restricted payment capacity under the New First Lien Credit Facility Documents but shall not be subject to any prepayment premium. |
| **Representations and Warranties:** | Customary for facilities similar to the New Credit Facilities. |
| **Reporting/ Information Rights:** | Generally consistent with the reporting and information rights under the First Lien Term Loan Credit Agreement, with additional reporting set forth on Schedule 2 and otherwise to be mutually agreed by the Borrower and the Required Consenting Lenders. |
| **Covenants and Events of Default:** | With respect to the New First Lien Credit Facility:<br><br>Generally consistent with the covenants and events of default under the First Lien Term Loan Credit Agreement (as modified by "Exhibit B" to Amendment No. 1 to the First Lien Term Loan Credit Agreement), with the following modifications:<br><br>-   Anti-Priming Debt.  No incurrence of indebtedness that is senior in right of payment or with respect to security to the New First Lien Term Loans or has the benefit of additional guarantors who are not guarantors of the New First Lien Term Loans without the consent of all lenders holding New First Lien Term Loans unless the (a) opportunity to participate in such indebtedness is offered ratably on substantially the same terms (including, without limitation, any fees or other benefits offered in connection with such indebtedness) to all holders of New First Lien Term Loans, (b) the terms of such indebtedness would not reasonably be expected to preclude any holder of New First Lien Term Loans from participating in such indebtedness on a pro rata basis on substantially the same terms as any other holder of New First Lien Term Loans (without regard to any individual investment, compliance or other restrictions that any specific holder may be subject to, including, without limitation, the capacity to make new money loans of the type, size or terms being offered, but excluding restrictions as to, or capacity to make, equity investments) and (c) terms of such indebtedness are approved by Required Lenders.<br><br>-   Anti-Layering.  No incurrence of indebtedness that is subordinated in right of payment to other indebtedness unless such indebtedness is subordinated in right of payment to the New First Lien Term Loans to the same extent and in the same manner (consent to any such layering to be provided by Required Facility Lenders of the tranche(s) being layered).<br><br>-   Incremental New FLFO Loan Capacity.  There shall be no incremental debt capacity to incur additional New FLFO Loans, including after |

<table>
<tr><td></td><td>

repayment of any New FLFO Loans existing on the Plan Effective Date.

- <u>Assignments</u>. Same as the First Lien Term Loan Credit Agreement except that solely with respect to any assignment of the New FLSO Loans, consent of the Borrower shall not be required. No assignment shall be made to any competitor of the Borrower or any affiliate thereof or to any person that is a disqualified lender set forth on a list delivered to the Consenting Lenders on the date of the Restructuring Support Agreement or any other person added to such list on or prior to the Plan Effective Date and acceptable to the Required Consenting Lenders.

<u>With respect to the New Second Lien Credit Facility:</u>

The New Second Lien Credit Facility Documents shall (i) contain covenant and event of default terms that include a 20% cushion with respect to dollar baskets and a 0.25x cushion with respect to ratio baskets under the New First Lien Credit Facility Documents, (ii) shall not include the restrictions in Section 7.08(2) of the Second Lien Term Loan Credit Agreement, (iii) shall include the anti-layering provisions set forth in Section 7.10 of the Second Lien Term Loan Credit Agreement and (iv) shall cross accelerate (instead of cross default) to all debt secured on a senior lien basis to the New Second Lien Term Loans, including the New First Lien Term Loans and the ABL Facility and shall cross default to all other debt above a threshold amount (set at a 20% cushion above the threshold amount under the New First Lien Credit Facility Documents).

</td></tr>
<tr><td>

**Financial Covenants:**

</td><td>

<u>With respect to the New First Lien Credit Facility:</u>

Solely for the benefit of the New FLFO Loans:

**Minimum Liquidity:** Average daily Liquidity for each fiscal quarter ended after the Plan Effective Date (or, in the case of the first fiscal quarter ended after the Plan Effective Date, average daily Liquidity for the period commencing on the Plan Effective Date through the end of the applicable fiscal quarter) shall not be less than $40 million.

"**Liquidity**" means as of the applicable date of determination, all unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries (without duplication of any excess availability resulting from any qualified cash included in the borrowing base and excluding store deposits) plus excess availability under the ABL Facility (excluding (i) any amount of the excess availability that, if drawn, would trigger a breach of the financial covenant under the ABL Facility and (ii) to the extent not already reflected in the excess availability, any reserves or other actual deductions from the borrowing base as of such date that are not reflected in the most recent borrowing base certificate).

**Maximum Leverage Ratio Covenant**: Commencing with the fourth fiscal quarter of fiscal year 2023 (i.e. fiscal year ending January 31, 2023), Total Net Leverage Ratio (defined in a manner substantially the same as the existing First

</td></tr>
</table>

Lien Term Loan Credit Agreement) tested as of the end of any fiscal quarter shall not be greater than the level set forth below:

| | |
|---|---|
| Q4 2023 - Q3 2024 | 10.00x |
| Q4 2024 - Q2 2025 | 8.75x |
| Q3 2025 - Q4 2025 | 8.00x |
| Thereafter | 7.00x |

Solely for the benefit of the New FLSO Loans:

**Maximum Leverage Ratio Covenant**:  Commencing with the fourth fiscal quarter of fiscal year 2023 (i.e. fiscal year ending January 31, 2023), Total Net Leverage Ratio (defined in a manner substantially the same as the existing First Lien Term Loan Credit Agreement) tested as of the end of any fiscal quarter shall not be greater than the level set forth below:

| | |
|---|---|
| Q4 2023 - Q3 2024 | 11.00x |
| Q4 2024 - Q2 2025 | 9.75x |
| Q3 2025 - Q4 2025 | 9.00x |
| Thereafter | 8.00x |

With respect to the New Second Lien Credit Facility: none

| | |
|---|---|
| **Rating:** | The Company Parties will use commercially reasonable efforts (which use of efforts shall not require the Company Parties to change the terms of the New Credit Facilities) to obtain, prior to the Plan Effective Date, at the Company Parties' expense, monitored public corporate credit/family ratings of the Borrower and ratings of the New Credit Facilities from Moody's Investors Service and Standard & Poor's Ratings Group; provided, that no particular ratings shall be required. |
| **Affiliated Lenders:** | Consistent with the existing First Lien Term Loan Credit Agreement, except (a) Affiliated Lender Cap (as defined in the First Lien Term Loan Credit Agreement) to be amended to account for the Consenting Sponsor holding of the New FLFO Loans (if any), (b) provisions treating Debt Fund Affiliates in a different manner than other Affiliated Lenders shall be deleted (including Debt Fund Affiliates shall not be carved out from the defined term "Affiliated Lenders" and shall be subject to the same caps on Term Loan holdings and voting restrictions as Affiliated Lenders), (c) with respect to any matter requiring Required Lender consent or Required Facility Lender consent, all fees |

|  | and other benefits made available to any other consenting lender with New First Lien Term Loans of the same class shall be made available to Affiliated Lenders on a no less than pro rata basis and (d) Affiliated Lenders shall receive all information made available by the Borrower to any lender holding the same tranche of New First Lien Term Loans and shall be entitled to attend all lender meetings with the Borrower that are open to any holder holding the same tranche of New First Lien Term Loans; it being understood and agreed that no provision relating to sacred rights shall be amended to impair or limit the voting rights of Affiliated Lenders in any respect and that Section 10.07(j) will not be amended.<br><br>"Permitted Holders" definition shall be expanded to include Blackstone, KKR and their respective affiliates, and funds or partnerships managed or advised by them or their affiliates, but not including any portfolio company of any of the foregoing.<br><br>"Affiliated Lender" and "Affiliates" definitions shall be amended to provide that no Lender (or its affiliates or permitted transferees) as of the consummation of the Restructuring Transaction (other than the Consenting Sponsor) will be deemed an "Affiliated Lender" or an "Affiliate" of Holdings, the Borrower or any of its Subsidiaries. |
|---|---|
| **Voting:** | <u>With respect to the New First Lien Credit Facility</u>:<br><br>Consistent with the existing First Lien Term Loan Credit Agreement, except that (x) the consent of each lender under the New First Lien Credit Facility adversely affected thereby shall be required with respect to: (A) provisions requiring pro rata payments or pro rata sharing of payments, (B) the payment waterfall in connection with the exercise of remedies or the priority set forth herein, or (C) subordinating the New Term Loans in right of payment or subordinating the liens securing the New Term Loans, in each case of (B) and (C), except as set forth above under the first bullet point (Anti-Priming Debt) under the heading "Covenants and Events of Defaults" and (y) the consent of each lender under the New First Lien Credit Facility shall be required with respect to the addition of any new Unrestricted Subsidiary or any amendment to such defined term.<br><br>"Required Lenders" under the New First Lien Credit Facility Documents shall be defined to mean (i) lenders holding more than 50% of the New FLFO Loans and (ii) lenders holding more than 50% of the New FLSO Loans.<br><br><u>With respect to the New Second Lien Credit Facility</u>:<br><br>Consistent with the existing Second Lien Term Loan Credit Agreement, except that the consent of each lender under the New Second Lien Credit Facility adversely affected thereby shall be required with respect to: (A) provisions requiring pro rata payments or pro rata sharing of payments or (B) the payment waterfall in connection with the exercise of remedies. |

| Intercreditor Terms: | The rights of the holders of the New FLFO Loans and the New FLSO Loans shall be generally consistent with the intercreditor terms provided under the existing first lien/second lien Term Intercreditor Agreement, *mutatis mutandis.*<br><br>The rights of the holders of the New First Lien Term Loans and the New Second Lien Term Loans shall be generally consistent with the intercreditor terms provided under the existing first lien/second lien Term Intercreditor Agreement, with the following modifications:<br><br>(a) The holders of the New Second Lien Term Loans (the "Second Lien Lenders") shall be required to vote, and shall be deemed to have voted, in favor of, any amendment, consent, waiver or other modification of any term under the New Second Lien Credit Facility Documents if the requisite lenders under the New First Lien Credit Facility have voted in favor of a similar amendment, consent, waiver or other modification of any comparable term under the New First Lien Credit Facility Document to incur any indebtedness or grant liens to secure such indebtedness (including indebtedness provided under the New First Lien Credit Facility Documents, indebtedness with priority in right of payment or security that is pari passu or senior to any New First Lien Term Loans or indebtedness incurred by non-guarantor restricted or unrestricted subsidiaries) (provided that the New First Lien Loans and New Second Lien Loans shall be or remain secured by liens on the same collateral) and, in connection therewith, to designate any restricted subsidiary to be an unrestricted subsidiary (provided that such subsidiary is designated an unrestricted subsidiary under the New First Lien Credit Facility Documents), to release liens on assets or property of the Borrower or any guarantor (provided that the New First Lien Loans and New Second Lien Loans shall be or remain secured by liens on the same collateral) or to transfer assets or property of the Borrower or any of its Restricted Subsidiaries to any non-guarantor subsidiary (provided that such non-guarantor subsidiary does not guarantee the New First Lien Loans), or any asset sale that is implemented pursuant to, or is permitted by, the New First Lien Credit Facility as in effect on the Restructuring Effective Date or any amendment, consent, waiver or other modification to the New First Lien Credit Facility approved by the Required Senior Lenders (as defined below) (other than an asset sale to the holders of the New First Lien Loans in exchange for the New First Lien Loans), except for (i) any amendment, consent, waiver or modification that requires the consent of all lenders or each lender affected thereby under the terms of the Second Lien Credit Agreement as in effect on the Restructuring Effective Date and (ii) any such transaction which constitutes an incurrence of indebtedness that is junior in right of payment or with respect to security to the New FLSO Loans and senior with respect to security to the New Second Lien Term Loans.<br><br>(b) Unless otherwise agreed by the Required Senior Lenders, the Second Lien Lenders shall vote in favor of any plan of |
|---|---|

reorganization approved by the Required Senior Lenders that is consistent with the priority terms herein (including those set forth under "Priority") and does not provide for treatment of the New Second Lien Term Loans in a manner that is materially less favorable than other similarly situated claims and shall not propose, pursue or vote in favor of any plan of reorganization unless such plan provides for the payment in full in cash of the New First Lien Term Loans and related obligations.

(c) The Second Lien Lenders shall waive (i) the right to offer or provide any DIP financing that is pari passu with or senior to any New First Lien Term Loans so long as Lenders holding a majority in principal amount of all New First Lien Term Loans in the aggregate have agreed to offer, provide or otherwise consent to such other DIP Financing and (ii) the right to challenge any make-whole payment or prepayment premium (as in effect on the Restructuring Effective Date) paid to the holders of the New First Lien Term Loans.

(d) Following an event of default, the Second Lien Lenders shall have the option to purchase all, but in no event any amount less than all, of the outstanding New First Lien Term Loans in an amount equal to par plus the amount of any premium, make-whole or penalty payments (in each case, under the New First Lien Credit Facility Documents as in effect on the Restructuring Effective Date) that would be due and payable in the event such New First Lien Term Loans were paid or prepaid at such time under the New First Lien Credit Facility Documents.

"Required Senior Lenders" shall have meaning ascribed to the term Required Lenders in the New First Lien Credit Facility Documents.

<u>Schedule 1</u>

<u>Backstop Commitments</u>

Intentionally Omitted

Schedule 2

Additional Reporting and Information Requirements

1.   As soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower, a report setting forth in reasonable detail the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the previous fiscal year (to the extent such information is provided for such previous fiscal year under the New Credit Facility Documents).

2.   As soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a report setting forth in reasonable detail the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the corresponding fiscal quarter of the previous fiscal year (to the extent such information is provided for such previous fiscal quarter under the New Credit Facility Documents) and the corresponding portion of the previous fiscal year (to the extent such information is provided for such period under the New Credit Facility Documents).

3.   Concurrently with the delivery the annual budget required to be delivered under the New Credit Facility Documents, projections of the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, in each case, prepared on a quarterly basis.

4.   Quarterly, at a time to be mutually agreed with the Administrative Agent that is promptly after the delivery of financial statements pursuant to Sections 6.01(1) and (2) of the First Lien Term Loan Credit Agreement (but no earlier than five business days following the delivery of such financial statements), the Borrower (including, without limitation, the chief executive officer and chief financial officer) shall participate in a conference call with Lenders to discuss the financial condition and results of operations of the Borrower and its Subsidiaries for the fiscal quarter or fiscal year, as applicable, with respect to which such financial statements were delivered.

## Exhibit 2

**New FLFO New Money Commitment Letter**

February 2, 2021

PERSONAL AND CONFIDENTIAL

Belk, Inc.
2801 West Tyvola Road
Charlotte, NC 28217
Attention: Will Langley

New First Lien Credit Facility -
Commitment Letter for New FLFO New Money Loans

Ladies and Gentlemen:

Belk, Inc., a Delaware corporation ("Belk") and certain of its subsidiaries (the "Subsidiary Loan
Parties") and Bear Parent Inc., a Delaware corporation and the direct parent of Belk ("Holdings")
and, collectively with Belk and the Subsidiary Loan Parties, the "Loan Parties"), are implementing
a restructuring and recapitalization transaction in accordance with that certain Restructuring
Support Agreement (as may be amended, supplemented, or otherwise modified from time to time
in accordance with the terms thereof, and including the "Restructuring Term Sheet" (as defined
therein), the "New Credit Facilities Term Sheet" attached as Exhibit 1 to the Restructuring Term
Sheet (the "New Credit Facilities Term Sheet") and the other exhibits, schedules, annexes and
supplements thereto, the "RSA"), dated as of January 26, 2021, by and among Holdings, the other
Loan Parties party thereto, the Consenting First Lien Lenders (as defined therein) party thereto,
the Consenting Second Lien Lenders (as defined therein) party thereto and the Consenting
Sponsors (as defined therein), including the investment funds managed by, or other Affiliates
(excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries,
including any of the Company Parties) of, Sycamore Partners Management, L.P. whose name(s)
are listed on the signature pages hereto (the "Sponsor").[1]  Each party that validly executes this
Commitment Letter (as defined below) in accordance with the terms hereof (each, a "Commitment
Party") acknowledges that it has received a copy of the RSA.

Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars.  As used herein,
"Commitment Letter" or this "Letter" refers to this letter together with the exhibits, schedules,
annexes and supplements hereto. For the avoidance of doubt, it is intended that the terms set forth
in this Letter shall be consistent with the terms set forth in the Restructuring Term Sheet and to the
extent any conflict arises, the terms of the Restructuring Term Sheet shall prevail.

In accordance with the terms of the Restructuring Term Sheet, this Commitment Letter is being
executed in connection with Belk's offer to (a) each lender holding a First Lien Term Loan as of
January 21, 2021 (the "Record Date") (each, an "Existing First Lien Lender") the opportunity to
commit to provide New FLFO New Money Loans (as defined in the New Credit Facilities Term
Sheet) under the New First Lien Credit Facility (each such commitment, a "New Money
Commitment" and, collectively with all other such commitments, the "New Money
Commitments") in an amount equal to not less than its pro rata share (based on the principal

---

[1] Capitalized terms used herein without definition shall have the meaning assigned thereto in the RSA.

amount of the First Lien Term Loans held by such Existing First Lien Lender relative to the aggregate principal amount of the First Lien Term Loans outstanding,[2] in each case, as of the Record Date) of $83,333,333.33 in aggregate principal amount of New FLFO New Money Loans (such Existing First Lien Lender's "<u>Minimum First Lien New Money Commitment Amount</u>") and (b) each lender holding a Second Lien Term Loan as of the Record Date (each, an "<u>Existing Second Lien Lender</u>" and together with the Existing First Lien Lenders, the "<u>Existing Lenders</u>") the opportunity to provide a <u>New Money Commitment</u> in an amount equal to not less than its pro rata share (based on the principal amount of the Second Lien Term Loans held by such Existing Second Lien Lender relative to the aggregate principal amount of the Second Lien Term Loans outstanding, in each case, as of the Record Date) of $41,666,666.67 in aggregate principal amount of New FLFO New Money Loans (such Existing Second Lien Lender's "<u>Minimum Second Lien New Money Commitment Amount</u>" and together with its Minimum First Lien New Money Commitment Amount, its "<u>Minimum New Money Commitment Amount</u>").

As used herein, "<u>Related Funds</u>" means, with respect to any person, any funds, accounts or investment vehicles managed or advised by such person or an affiliate of such person, or any funds, accounts or investment vehicles managed or advised by the investment manager or advisor of such person or any affiliate of such person.  As used herein, "<u>Permitted Assignee</u>" means, (1) with respect to any person, such person's Related Funds or (2) any other Commitment Party or its Related Funds. Notwithstanding anything to the contrary herein, each Commitment Party may allocate its New Money Commitment and any related fees or other consideration among itself and/or any Permitted Assignee in its sole discretion.  Notwithstanding anything to the contrary herein, each Existing First Lien Lender and each Commitment Party (a) may elect to participate in the New Money Commitments on behalf of itself or any Related Fund, and (b) may allocate its participation in the New Money Commitments and any related fees or other consideration among itself and/or any Permitted Assignee, in its sole discretion.

Each Existing Lender electing to provide a New Money Commitment and become a Commitment Party hereunder must timely submit the materials set forth below in the section titled "SUBMISSION OF COMMITMENT LETTER"; *provided*, that a Lender Backstop Party (as defined in the Restructuring Term Sheet) shall only be required to execute this Commitment Letter if such Lender Backstop Party wishes to subscribe for an amount of New FLFO New Money Loans in excess of its Minimum First Lien New Money Commitment Amount or its Minimum Second Lien New Money Commitment Amount.

---

[2]     As of the Record Date, the aggregate principal amount of outstanding First Lien Term Loans was $999,446,692.01.

---

**SUBMISSION OF COMMITMENT LETTER:**

**For your Commitment Letter to be valid, you must submit either (A) if you are not a Lender Backstop Party, (i) an executed copy of this Commitment Letter with your completed Schedule 1 hereto and (ii) an executed joinder to the RSA or (B) if you are a Lender Backstop Party, an executed copy of this Commitment Letter with your completed Schedule 2 hereto, in each case, to the following parties via email by no later than February 2, 2021, at 4:00 p.m. prevailing Central Time:**

Kirkland & Ellis LLP:  matthew.fagen@kirkland.com and rachael.bazinski@kirkland.com

Willkie Farr & Gallagher LLP:  mfeldman@willkie.com and dsinclair@willkie.com

Latham & Watkins LLP:  ted.dillman@lw.com and ebba.gebisa@lw.com

O'Melveny & Myers LLP:  jzujkowski@omm.com and djohnson@omm.com

---

By executing this Commitment Letter, each Commitment Party commits, severally and not jointly, on the Plan Effective Date to become a Lender under the New First Lien Credit Facility and to fund its New Money Commitments thereunder in a principal amount calculated in accordance with the terms of the New First Lien Credit Facility Term Sheet (the "New Money Allocation"), which amount shall not exceed the desired participation amount set forth on Schedule 1 hereto (or, if such party is a Lender Backstop Party, its oversubscription amount shall not exceed the amount set forth on Schedule 2 hereto). Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the New Money Allocation.

_____, as a
Commitment Party

By: _____
Name:
Title:

## __SCHEDULE 1__

| Commitment Party | Requested Commitment Amount |
|---|---|
| _____ | $ |

☐     **By checking this box, you hereby elect to subscribe for New FLFO New Money Loans in an amount such that any oversubscription amount reduces _only_ the Lender Backstop Commitment.**

**If the box above has not been checked, you hereby elect to subscribe for New Money FLFO New Money Loans in the full amount set forth the above with oversubscriptions to be applied to reduce both the Lender Backstop Commitment and, if applicable, the Sponsor Backstop Commitment.**

## SCHEDULE 2

| Lender Backstop Party | Requested Oversubscription Amount |
| --- | --- |
| _____ | $ |

☐      **By checking this box, you hereby confirm that you are a Lender Backstop Party who wishes subscribe to the New FLFO New Money Loans in excess of your Minimum New Money Commitment Amount in the amount set forth above.**

☐      **By checking this box, you hereby elect to subscribe for New FLFO New Money Loans in an amount such that any oversubscription amount reduces only the Lender Backstop Commitment.**

**If the box above has not been checked, you hereby elect to subscribe for New Money FLFO New Money Loans in the full amount set forth the above with oversubscriptions to be applied to reduce both the Lender Backstop Commitment and, if applicable, the Sponsor Backstop Commitment.**

**Exhibit 3**

**Backstop Commitment Letter**

Execution Version

January 26, 2021

<u>PERSONAL AND CONFIDENTIAL</u>

Belk, Inc.
2801 West Tyvola Road
Charlotte, NC 28217
Attention: Will Langley

<div align="center">
<u>New First Lien Credit Facility -</u>
<u>Backstop Commitment Letter for New Money First-Out Loans</u>
</div>

Ladies and Gentlemen:

Belk, Inc., a Delaware corporation ("<u>Belk</u>", "you" or "your"), has advised each party listed on the signature pages hereto as a backstop commitment party (each, a "<u>Backstop Commitment Party</u>", and collectively, the "<u>Backstop Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), that Belk, and certain of its subsidiaries (the "<u>Subsidiary Loan Parties</u>") and Bear Parent Inc., a Delaware corporation and the direct parent of Belk ("<u>Holdings</u>" and, collectively with Belk and the Subsidiary Loan Parties, the "<u>Loan Parties</u>"), are considering a restructuring and recapitalization transaction in accordance with that certain Restructuring Support Agreement (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and including the "Restructuring Term Sheet" (as defined therein), the "New Credit Facilities Term Sheet" attached as Exhibit 1 to the Restructuring Term Sheet (the "<u>New Credit Facilities Term Sheet</u>") and the other exhibits, schedules, annexes and supplements thereto, the "<u>RSA</u>") attached hereto as <u>Exhibit A</u>, dated as of January 26, 2021, by and among Holdings, the other Loan Parties party thereto, the Consenting First Lien Lenders (as defined therein) party thereto, the Consenting Second Lien Lenders (as defined therein) party thereto and the Consenting Sponsors (as defined therein), including the investment funds managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P. whose name(s) are listed on the signature pages hereto (the "<u>Sponsor</u>"). Capitalized terms used herein without definition shall have the meaning assigned thereto in the RSA. Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars. As used herein, "<u>Backstop Commitment Letter</u>" or this "<u>Letter</u>" refers to this letter together with the exhibits, schedules, annexes and supplements hereto. For the avoidance of doubt, it is intended that the terms set forth in Sections 1, 2 and 4 of this Letter shall be consistent with the terms set forth in the Restructuring Term Sheet and to the extent any conflict arises, the terms of the Restructuring Term Sheet shall prevail.

In connection with the proposed Restructuring Transactions, you have requested that the Backstop Commitment Parties agree to backstop and commit to provide new money first priority "New FLFO New Money Loans" (as defined in the New Credit Facilities Term Sheet) (the "<u>New Money First-Out Loans</u>") under the New First Lien Credit Facility in an aggregate principal amount equal to $225,000,000 (the "<u>Total Backstop Commitment Amount</u>"), subject to the terms and conditions hereof.

1.   <u>Backstop Commitment</u>.

To provide assurance that the New Money First-Out Loans under the New First Lien Credit Facility shall be available on the terms and conditions set forth herein and in the RSA (as may be modified to incorporate changes necessary to implement the Restructuring Transactions pursuant to the Plan), subject to and in accordance with the terms and conditions set forth herein, each Backstop Commitment Party is pleased to advise Belk of its several (and not joint) commitment (the "<u>Backstop Commitment</u>"), to commit or backstop, as applicable, itself or on behalf of one or more of its Related Funds (as defined below), the New Money First-Out Loans under the New First Lien Credit Facility by:

(a)   with respect to each Backstop Commitment Party that is a Consenting First Lien Lender (each, a "<u>First Lien Lender Backstop Party</u>" and collectively with each other First Lien Lender Backstop Party, the "<u>First Lien Lender Backstop Parties</u>"), electing to commit to provide New Money First-Out Loans in an amount not less than its respective Minimum First Lien New Money Commitment Amount (as defined below) in accordance with the terms set forth in Section 2 hereof;

(b)   with respect to each Backstop Commitment Party that is a Consenting Second Lien Lender (each, a "<u>Second Lien Lender Backstop Party</u>", collectively with each other Second Lien Lender Backstop Party, the "<u>Second Lien Lender Backstop Parties</u>" and collectively with the First Lien Lender Backstop Parties, each a "<u>Lender Backstop Party</u>", and collectively, the "<u>Lender Backstop Parties</u>"), electing to commit to provide New Money First-Out Loans in an amount not less than its respective Minimum Second Lien New Money Commitment Amount (as defined below) in accordance with the terms set forth in Section 2 hereof;

(c)   with respect to the Sponsor as a Backstop Commitment Party, committing to provide to Belk, on the Plan Effective Date, New Money First-Out Loans in an amount up to $100,000,000, subject to Section 2 hereof; and

(d)   with respect to each Lender Backstop Party, committing to provide to Belk, on the Plan Effective Date, its ratable share, based on the applicable "Backstop Commitment Percentage" set forth on Schedule 1 hereto (as may be updated pursuant to Section 7 below), of New Money First-Out Loans not subscribed to by Existing Lenders (as defined below) under Section 2 hereof or not funded by Existing Lenders with New Money Commitments on the Plan Effective Date,

in each case of clauses (a) - (d) above, on the terms set forth in the New First Lien Credit Facility Term Sheet.

As used herein, "<u>Related Funds</u>" means, with respect to any person, any funds, accounts or investment vehicles managed or advised by such person or an affiliate of such person, or any funds, accounts or investment vehicles managed or advised by the investment manager or advisor of such person or any affiliate of such person. As used herein, "<u>Permitted Assignee</u>" means, (1) with respect to any person, such person's Related Funds or (2) any other Lender Backstop Party or its Related Funds. Notwithstanding anything to the contrary herein, each Backstop Commitment Party

may allocate its Backstop Commitment and any related fees or other consideration among itself and/or any Permitted Assignee in its sole discretion.

The Backstop Commitment Parties may, at the election of the Required Backstop Commitment Parties (as defined below), arrange for the definitive documentation for the New First Lien Credit Facility (as defined in in the New First Lien Credit Facility Term Sheet) (the "Amended Credit Agreement"), as applicable, to be executed by one or more financial institutions selected by the Required Backstop Commitment Parties and reasonably acceptable to Belk (the "Fronting Lender(s)"), to act as an initial lender(s) and to fund some or all of the Backstop Commitment Party's Backstop Commitment, in which case the applicable Backstop Commitment Party will acquire its share of the New Money First-Out Loans by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Amended Credit Agreement. Notwithstanding the foregoing, any Backstop Commitment Party acquiring its share of the New Money First-Out Loans by assignment from the Fronting Lender(s) may thereafter provide notice to Belk and the administrative agent under the New First Lien Credit Agreement that such Backstop Commitment Party desires to thereafter hold its New Money First-Out Loans directly, and Belk shall promptly (but in no case in more than five (5) Business Days) direct the administrative agent to permit such an assignment.

"Required Backstop Commitment Parties" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, when taken together, represent a majority (or, in the case of joining additional Backstop Commitment Parties to this Backstop Commitment Letter pursuant to the last paragraph of Section 7, 60%) of the Backstop Commitments of all Backstop Commitment Parties in the aggregate outstanding at such time; provided, that the Required Backstop Commitment Parties must include at all times at least two unaffiliated Backstop Commitment Parties.

2.   New Money First-Out Loan Commitment Allocations.

In accordance with the terms of the Restructuring Term Sheet, Belk shall offer:

(a)      each lender holding a First Lien Term Loan as of the date Belk commences solicitation of votes on the Plan (the "Record Date") (each, an "Existing First Lien Lender") the opportunity to commit to provide New Money First-Out Loans (each such commitment, a "First Lien New Money Commitment" and, collectively with all other such commitments, the "First Lien New Money Commitments") in an amount equal to not less than its pro rata share (based on the principal amount of the First Lien Term Loans held by such Existing First Lien Lender relative to the aggregate principal amount of the First Lien Term Loans outstanding, in each case, as of the Record Date) of $83,333,333.33 in aggregate principal amount of New Money First-Out Loans (such Existing First Lien Lender's "Minimum First Lien New Money Commitment Amount"), and

(b) each lender holding a Second Lien Term Loan as of the Record Date (each, an "Existing Second Lien Lender", and together with each Existing First Lien Lender, the "Existing Lenders") the opportunity to commit to provide New Money First-Out Loans (each such commitment, a "Second Lien New Money Commitment" and, collectively with all other such commitments, the "Second Lien New Money Commitments"; each of the

First Lien New Money Commitments and the Second Lien New Money Commitments are referred to herein as a "New Money Commitment" and, collectively with all other such commitments, the "New Money Commitments") in an amount equal to not less than its pro rata share (based on the principal amount of the Second Lien Term Loans held by such Existing Second Lien Lender relative to the aggregate principal amount of the Second Lien Term Loans outstanding, in each case, as of the Record Date) of $41,666,666.67 in aggregate principal amount of New Money First-Out Loans (such lender's "Minimum Second Lien New Money Commitment Amount").

New Money Commitments of the Existing Lenders (excluding commitments of the Lender Backstop Parties set forth in clauses (a) and (b) of Section 1 above but including commitments from the Lender Backstop Parties in excess of such commitments) will be deemed to be New Money Commitments that are backstopped by the Lender Backstop Parties set forth in clause (d) of Section 1 above before they are deemed to be New Money Commitments that are backstopped by the Sponsor pursuant to clause (c) of Section 1 above. To the extent the total subscriptions by the Existing First Lien Term Lenders and/or the Existing Second Lien Term Lenders exceed the applicable New Money Commitments allocated to such group of Existing Lenders set forth in clause (a) or (b) above of this Section 2, the excess amount would first reduce the New Money Commitments not subscribed by their respective first lien or second lien group of Existing Lenders on a dollar for dollar basis (if any) with the remaining excess amount to reduce the Sponsor's New Money Commitment set forth in clause (c) of Section 1 above on a dollar for dollar basis; provided that, notwithstanding anything to the contrary herein, in no event shall the Sponsor's New Money Commitment that is required to be funded on the Plan Effective Date be reduced to less than $65,000,000; provided, further that such Existing First Lien Term Lenders and/or Existing Second Lien Term Lenders may elect to limit any such oversubscription to reduction of the Existing First Lien Term Lenders' and/or Existing Second Lien Term Lenders' New Money Commitments. In the event that the aggregate amount of First Lien New Money Commitments and Second Lien New Money Commitments exceeds $160,000,000 in aggregate principal amount of New Money First-Out Loans, to ensure that the aggregate amount of New Money First-Out Loans funded on the Plan Effective Date by the Existing Lenders does not exceed such amount, up to $35,000,000 of such oversubscribed commitment amounts shall be allocated among the Existing Lenders who have requested oversubscriptions ratably based on the relative principal amount of the First Lien Term Loans and Second Lien Term Loans held by such oversubscribing Existing Lenders (but in no event greater than the amount of such oversubscribing Existing Lender's requested oversubscription).

Notwithstanding anything to the contrary herein, each Existing Lender and each Backstop Commitment Party (a) may elect to participate in the New Money Commitments on behalf of itself or any Permitted Assignee, and (b) may allocate its participation in the New Money Commitments and any related fees or other consideration among itself and/or any Permitted Assignee, in its sole discretion.

Each Existing Lender electing to participate in the New Money First-Out Loans shall, among other things, be required to, pursuant to the terms of the Restructuring Term Sheet, (i) provide written notification of such Existing Lender's subscription for New Money Commitments, including, its desired participation amount which shall not be less than, as applicable: (A) for each participating Existing First Lien Lender, its Minimum First Lien New Money Commitment Amount and (B) for

each participating Existing Second Lien Lender, its Minimum Second Lien New Money Commitment Amount and (ii) an executed joinder to the RSA;

provided, that, by executing this Backstop Commitment Letter, each Lender Backstop Party shall be deemed to have provided such notice of election to participate in the New Money First-Out Loans in its Minimum First Lien New Money Commitment Amount and Minimum Second Lien New Money Commitment Amount, as applicable, unless it timely elects to participate in an amount greater than such amount in accordance with the terms hereof.

Subject to Section 7 below, any Existing Lender with a New Money Commitment shall become a Lender under the New First Lien Credit Facility and shall fund its New Money Commitments thereunder substantially in accordance with the terms and conditions of the New First Lien Credit Facility Term Sheet (the "New Money Allocation").

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the New Money Allocation.

You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, any Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, any Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Agents are acting as principals and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Agents may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning Belk and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the Agents hereunder; provided, that any such affiliates receiving information concerning Belk and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Backstop Commitment Letter.

3.   Information.

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "Projections") and information of a general economic or industry specific nature) (the "Information") that has been

or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized). You agree that if, at any time prior to the Plan Effective Date, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in material respects. In conducting the transactions hereunder, each of the Backstop Commitment Parties will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof and assumes no responsibility for the accuracy or completeness of the Information or the Projections and assumes no responsibility for the accuracy or completeness of the Information or the Projections.

4.   <u>Fees/Other Consideration</u>.

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder, Belk agrees to pay (or cause to be paid): (a) to each Lender Backstop Party (or, upon written notice to Belk (which may be provided by electronic communication), its Permitted Assignee), a non-refundable backstop fee equal to 10.00% of such Lender Backstop Party's applicable "Maximum Backstop Commitment Amount" as set forth on Schedule 1 hereto (as may be updated pursuant to Section 7 below) (collectively, the "<u>Lender Backstop Commitment Fees</u>") and (b) to the Lender Backstop Parties set forth on Schedule 3 hereto (or, upon written notice to Belk (which may be provided by electronic communication), their respective Permitted Assignees), a non-refundable supplemental backstop fee in an aggregate amount equal to $12,000,000 (such fees, the "<u>Supplemental Backstop Commitment Fees</u>", and together with the Lender Backstop Commitment Fees, collectively, the "<u>Backstop Commitment Fees</u>"). The Backstop Commitment Fees (i) shall be earned on the date hereof and (ii) shall be due and payable in cash on, and subject to the occurrence of, the Plan Effective Date. No Backstop Commitment Fee shall be due and payable to any Backstop Commitment Party that fails to fund any New Money First-Out Loans committed to be funded by such Backstop Commitment Party. The parties hereby acknowledge and agree that the obligation of Belk to pay the Backstop Commitment Fees shall constitute an "Obligation" under the Amended Credit Agreement.

As further consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder, on the Plan Effective Date, each First Lien Lender Backstop Party shall have the right to exchange on a "dollar-for-dollar" basis First Lien Term Loans held by it or its Related Funds in a principal amount equal to its ratable share (based on such First Lien Lender Backstop Party's Lender Backstop Commitments as a proportion of the aggregate amount of all of the Lender Backstop Commitments provided by the First Lien Lender Backstop Parties) of $30,000,000 into an equal principal amount of New FLFO Roll-Up Loans under the New First Lien Credit Facility.

5.  <u>Conditions</u>.

The Backstop Commitment Parties' Backstop Commitments (including its commitments to fund the applicable New Money First-Out Loans under the New First Lien Credit Facility on the Plan Effective Date) and other agreements hereunder in respect of the New First Lien Credit Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth herein and in the "Conditions Precedent to Plan Effective Date" section of the Restructuring Term Sheet and Schedule 2 attached hereto.

6.  <u>Indemnification and Expenses</u>.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party and the Agents, in each case, in their capacity as such, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("<u>Losses</u>") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the New First Lien Credit Facility, the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party in its capacity as such from time to time within five (5) days of receipt of their reasonable demand by presentation of a summary statement, for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with any insolvency proceeding, the New First Lien Credit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the New First Lien Credit Facility, and any ancillary documents and security arrangements in connection therewith; <u>provided</u>, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Loan Parties or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent or Collateral Agent in its capacity or in fulfilling its role as such).

None of you, the Sponsor, the other Loan Parties, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the New First Lien Credit Facility, the enforcement of this Backstop

Commitment Letter, the definitive documentation for the New First Lien Credit Facility, or any ancillary documents and security arrangements in connection therewith; _provided_ that your indemnity and reimbursement obligations under this Section 6 shall not be limited by this sentence.

7.   Assignments, Amendments, Additional Backstop Commitment Parties.

This Backstop Commitment Letter (including any commitments hereunder) shall not be assignable by you or us (except pursuant to the immediate succeeding paragraph below) without the prior written consent of each of the parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 6 and this Section 7, the Agents, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 6 and this Section 7, the Agents. This Backstop Commitment Letter may be amended or any provision hereof may be waived or modified by an instrument in writing signed by you and the Required Backstop Commitment Parties; _provided_ that (1) subject to the last paragraph of this Section 7, the written consent of each Backstop Commitment Party shall be required to effect an amendment, waiver or modification that has the effect of modifying the Backstop Commitment of any Backstop Commitment Party, (2) no Backstop Commitment Party may be disproportionately affected as compared to other Backstop Commitment Parties without its consent, (3) the written consent of each Backstop Commitment Party affected thereby shall be required to effect an amendment, waiver or modification that has the effect of reducing any Backstop Commitment Fee payable to such Backstop Commitment Party hereunder or reducing any Backstop Commitment Party's participation in the New FLFO Roll-up Loans and (4) the written consent of both (a) First Lien Lender Backstop Parties having Backstop Commitments outstanding that, taken together, represent a majority of the Backstop Commitments of all First Lien Lender Backstop Parties in the aggregate outstanding at such time and (b) Second Lien Lender Backstop Parties having Backstop Commitments outstanding that, taken together, represent a majority of the Backstop Commitments of all Second Lien Lender Backstop Parties in the aggregate outstanding at such time shall be required to effect any amendment, waiver or modification of (i) Section 4 hereof or (ii) the allocation of Backstop Commitments or New Money Commitments between lenders holding First Lien Term Loans and lenders holding Second Lien Term Loans.

Notwithstanding anything to the contrary herein, any Backstop Commitment Party may assign this Backstop Commitment Letter (including any commitments, any related fees or other consideration hereunder) to any of its Related Funds or Permitted Assignees, in each case, without the consent of you or any other party hereto; _provided_ that, notwithstanding anything to the contrary herein, (i) subject to the last paragraph of this Section 7 and except in the case of an assignment from a Backstop Commitment Party to another Backstop Commitment Party, no Backstop Commitment Party shall be relieved, released or novated from its obligations pursuant to its Backstop Commitment hereunder (including its obligation to fund the New Credit Facility on the Plan Effective Date on the terms and conditions set forth herein), until after the initial funding of the New Money First-Out Loans has occurred on the Plan Effective Date and (ii) unless you otherwise agree in writing, each Backstop Commitment Party, on behalf of itself and any of its Related Funds with a Backstop Commitment, shall retain exclusive control over all rights and obligations with respect to its Backstop Commitments in respect of the New Credit Facility, including all rights

with respect to consents, modifications, supplements, waivers and amendments, until the Plan Effective Date has occurred.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter. You acknowledge that information and documents relating to the New First Lien Credit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the New First Lien Credit Facility.

Notwithstanding the anything to the contrary herein, at any time prior to the Plan Effective Date, the Required Backstop Commitment Parties may add additional Backstop Commitment Parties to this Backstop Commitment Letter and proportionately reduce the Backstop Commitments of the Lender Backstop Parties by delivering to the other parties hereto (1) an executed counterpart of a signature page to this Backstop Commitment Letter from such additional Backstop Commitment Party (which may be delivered by facsimile or other electronic transmission) and (2) an updated Schedule 1 hereto; provided that in no event shall the Sponsor's Backstop Commitment be reduced other than pursuant to the second paragraph of Section 2.

8.   Governing Law, Etc.; Jurisdiction.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, (A) THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE) AND (B) IF THE CHAPTER 11 CASES ARE FILED, THE BANKRUPTCY CODE.

Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising under or related to this Backstop Commitment Letter, in courts of (a) if the Chapter 11 Cases are not filed, the State of New York and the United States District Court, in each case, located in the borough of Manhattan in the City of New York (the "Chosen Courts"), (b) if the Chapter 11 Cases are filed, to the extent possible, the Bankruptcy Court and (c) if the Bankruptcy Court chooses not to accept jurisdiction or abstains from jurisdiction, the Chosen Courts, and solely in connection with claims arising under this Backstop Commitment Letter: (a) irrevocably submits to the

exclusive jurisdiction of the Chosen Courts and the Bankruptcy Court, as applicable; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and the Bankruptcy Court, as applicable; and (c) waives any objection that any Chosen Court and the Bankruptcy Court, as applicable, is an inconvenient forum or does not have jurisdiction over any Party hereto.

9.   Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.   Confidentiality.

This Backstop Commitment Letter is delivered to Belk on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you, the Sponsor and your and their officers, directors, employees, legal counsel, accountants, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you or the Sponsor, as applicable, of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any ad-hoc or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby, (e) you may disclose the fees contained herein as part of generic disclosure regarding fees and expenses in connection with the disclosure of the RSA and (e) with the written consent of the Required Backstop Commitment Parties and the Sponsor (which may include through electronic means). Your obligations under this paragraph shall terminate will terminate on the earlier of (x) the second anniversary of the date hereof and (y) the one year anniversary following the termination of this Commitment Letter.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you, Holdings or your and its respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this

paragraph), (b) on a confidential basis to any bona fide prospective Permitted Assignee or any prospective Lender, prospective participant or swap counterparty that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Belk promptly in advance thereof), (d) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the New First Lien Credit Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information or (h) with respect to the existence and contents of the Backstop Commitment Letter and the New First Lien Credit Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the New First Lien Credit Facility and to industry trade organizations where such information with respect to the New First Lien Credit Facility is customarily included in league table measurements. The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Amended Credit Agreement upon the effectiveness thereof and, in any event, will terminate on the earlier of (x) the second anniversary of the date hereof and (y) the one year anniversary following the termination of this Commitment Letter.

11. <u>Ratings</u>.

You shall use commercially reasonable efforts to procure, at your expense, prior to the Plan Effective Date, public ratings (but no specific rating) for the New Credit Facilities (the "<u>Facilities Ratings</u>") from each of Standard & Poor's Ratings Services ("<u>S&P</u>") and Moody's Investors Service, Inc. ("<u>Moody's</u>"), and a public corporate credit rating (but no specific rating) and a public corporate family rating (but no specific rating) (collectively, the "<u>Corporate Ratings</u>" and, together with the Facilities Ratings, the "<u>Ratings</u>") in respect of Belk after giving effect to the Restructuring Transactions from each of S&P and Moody's, respectively. For the avoidance of doubt, the failure to receive the Ratings shall not constitute to a condition to the occurrence of the Plan Effective Date.

12. <u>Miscellaneous</u>.

The Backstop Commitment Parties hereby notify Belk that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "<u>PATRIOT Act</u>") and the requirements of 31 C.F.R. §1010.230 (as amended, the "<u>Beneficial Ownership Regulation</u>"), it and its affiliates are required to obtain, verify and record information

that identifies Belk, each other Loan Party, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify Belk and each other Loan Party in accordance with the PATRIOT Act or the Beneficial Ownership Regulation. This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation and is effective for Backstop Commitment Parties and its affiliates.

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the New First Lien Credit Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of the New First Lien Credit Facility is subject to the conditions precedent expressly set forth in Section 5 hereof.

If the foregoing correctly sets forth our agreement, please indicate Belk's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on January 26, 2021. This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence. This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) the Plan Effective Date, (ii) the termination of the RSA and (iii) the Outside Date. Notwithstanding the immediately preceding sentence, the indemnification and expenses, confidentiality, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; _provided_ that your obligations under this Backstop Commitment Letter, other than with respect to confidentiality, shall automatically terminate and be superseded by the applicable provisions in the Amended Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the Plan Effective Date, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

**Schedule 1**

**Backstop Commitments**

Intentionally Omitted

**Schedule 2**

**Conditions  Precedent**

## Schedule 2

## Conditions Precedent[1]

The obligation of each Existing Lender with a New Money Commitment, the Sponsor and the Lender Backstop Parties to make the New Money First-Out Loans is subject to satisfaction (or waiver by the Required Lenders (as defined in the New Credit Facilities Term Sheet) and the Sponsor) of the following conditions precedent:

1.    The Administrative Agent (as defined in the New Credit Facility Term Sheet) shall have received each of the following, each of which shall be .pdf copies unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party and, in the case of clause (a) below, by the Administrative Agent and each Lender with a New Money Commitment, each dated as of the [Closing Date] (or, in the case of certificates of government officials, a recent date before the [Closing Date]) and each in form and substance consistent with the Backstop Commitment Letter and the New Credit Facility Term Sheet and otherwise reasonably satisfactory to the Required Lenders and the Sponsor:

(a)    a Committed Loan Notice;

(b)    executed counterparts of the Amended Credit Agreement, duly executed by the Borrower, the other Loan Parties, the Administrative Agent and each Lender with a New Money Commitment;[2]

(c)    certificates of good standing from the secretary of state of the state of organization of each Loan Party (to the extent such concept exists in such jurisdiction), a certificate from the Borrower and each other Loan Party with appropriate insertions and attachments of resolutions or other actions, evidence or incumbency and the signature of authorized signatories and Organizational Documents, executed by a Responsible Officer and the secretary or any assistant secretary or other authorized representative of such Loan Party;

(d)    each Collateral Document required to be executed on the [Closing Date] under the Amended Credit Agreement, duly executed by each Loan Party thereto, together with:

(i)    certificates, if any, representing the Pledged Equity referred to in the Amended Credit Agreement accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank (or confirmation in lieu thereof that such

---

[1]    Capitalized terms used but not defined in this Schedule 2 or the Backstop Commitment Letter to which this Schedule 2 is attached shall have the meanings ascribed to them in the existing First Lien Term Loan Credit Agreement (as defined in the New Credit Facility Term Sheet), as applicable.

[2]    Confirmation Order will provide that any Lender receiving a distribution of FLSO Loans shall be deemed to have executed the Amended Credit Agreement. Signature pages from such other Lenders will also be sought, but will not be a closing condition.

certificates, powers and instruments have been sent for overnight delivery to the Administrative Agent);

(ii)    evidence that all other actions, recordings and filings required by the Collateral Documents that the Required Lenders may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement (as amended in a manner consistent with the New Credit Facility Term Sheet and otherwise as reasonably acceptable to the Required Lenders) shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Required Lenders;

(iii)    a perfection certificate, duly executed and delivered by the Loan Parties, in form and substance reasonably satisfactory to the Required Lenders; and

(iv)    copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Required Lenders with respect to the Loan Parties;

(e)    a certificate of an officer of the Borrower certifying that the conditions set forth in Paragraphs 2 and 3 have been satisfied;

(f)    a certificate of the chief financial officer (or other comparable officer) of the Borrower certifying the Solvency, after giving effect to the New Money First-Out Loans and the other transactions contemplated by the RSA on the [Closing Date], of the Borrower and its Subsidiaries on a consolidated basis;

(g)    executed legal opinion of (i) Kirkland & Ellis LLP, New York and Delaware counsel to the Borrower and the other Loan Parties, (ii) [●], special South Carolina counsel to certain of the Loan Parties, (iii) [●], special North Carolina counsel to certain of the Loan Parties, and (iv) [●], special Mississippi counsel to certain of the Loan Parties; and

(h)    a solvency certificate from a Financial Officer of the Borrower (after giving effect to the transactions contemplated by the Amended Credit Agreement) substantially in the form of <u>Exhibit I</u> attached to the First Lien Term Loan Credit Agreement;

2.    The representations and warranties of the Loan Parties contained in the Amended Credit Agreement shall be true and correct in all material respects on and as of the [Closing Date]; *provided* that to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

3.     At the time of and immediately after giving effect to the New Money First-Out Loans and the other transactions contemplated by the RSA on the [Closing Date], no Default or Event of Default under the Amended Credit Agreement shall exist;

4.     The Administrative Agent shall have received an executed amended Second Lien Credit Agreement and an executed amended Term Intercreditor Agreement, each in form and substance consistent with the Backstop Commitment Letter and the New Credit Facility Term Sheet and otherwise reasonably satisfactory to the [Required Lenders and [Required Second Lien Lenders]];

5.     The Lender Backstop Commitment Parties shall have received all fees required to be paid pursuant to the Backstop Commitment Letter payable to them to the extent due (which may be offset against the proceeds of the New Money First-Out Loans);

6.     The Administrative Agent, the Ad Hoc Crossover Lender Group, the Ad Hoc First Lien Lender Group and the Consenting Sponsors (each as defined in the RSA) shall have received all fees, expenses and other amounts required to be reimbursed or paid by the Borrower under the RSA or any applicable fee letters executed by the Borrower and such parties or their respective professionals (with respect to amounts incurred, or reasonably estimated to be incurred, on or prior to the [Closing Date]), to the extent invoiced at least one (1) Business Day prior to the [Closing Date];

7.     The Administrative Agent and the Lenders shall have received at least three (3) Business Days prior to the Closing Date (or such later date as the Administrative Agent or such Lender shall reasonably agree) all documentation and other information about the Loan Parties reasonably requested by the Administrative Agent or the Lenders as required by the U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and 31 C.F.R. § 1010.230, that has been reasonably requested in writing (including by email);

8.     The RSA shall remain in full force and effect;

9.     The entry of the Confirmation Order (as defined in the RSA) shall have occurred; and

10.     The Plan Effective Date (as defined in the RSA) shall have occurred.

## Schedule 3

## Supplemental  Backstop Fee

| Lender Backstop Parties | Supplemental Backstop Fee |
|---|---|
| **Midtown Acquisitions L.P. (an entity managed by Davidson Kempner Capital Management LP)** | $2,000,000 |
| **Hein Park Capital Management LP, Nuveen Asset Management, LLC, Jefferies Leveraged Credit Products LLC, Greywolf Loan Management LP, Voya Investment Management Co. LLC and Guggenheim Partners Investment Management, LLC.** | $10,000,000[1] |
| **TOTAL:** | **$12,000,000** |

---

[1] The $10,000,000  shall be paid and divided amongst Hein Park Capital Management LP, Nuveen Asset Management, LLC, Jefferies Leveraged Credit Products LLC, Greywolf Loan Management LP, Voya Investment Management Co. LLC  and Guggenheim Partners Investment Management, LLC as agreed by such parties.

# **<u>EXHIBIT A</u>**

[Restructuring Support Agreement]

Intentionally Omitted

## EXHIBIT C

**Equity Term Sheet**

| | |
|---|---|
| **SUMMARY OF TERMS OF COMMON STOCK[1]** | |
| **Issuer:** | Fashion Holdings Intermediate LLC (which shall be converted to a corporation organized under the Delaware General Corporation Law and treated as a C corporation for federal income tax purposes as of the Plan Effective Date), which, as of the Plan Effective Date, shall constitute the indirect parent of the reorganized Company Parties ("Parent"). |
| **Security:** | Common Stock, par value $0.001 per share, each share of which entitles the holder thereof (each, a "Stockholder", and collectively, the "Stockholders") to one vote on all matters on which Stockholders are entitled to vote. |
| **Board and Committee Composition:** | Subject to the provisions hereof, the business and affairs of Parent and its subsidiaries will be managed by a Board of Directors (the "Board"), constituted as follows: <br><br> • Four designees of investment funds managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P. (the "Sponsor")[2], so long as the Sponsor holds at least 40% of the issued and outstanding Common Stock of Parent, three designees, if the Sponsor holds at least 30% but less than 40% of the issued and outstanding Common Stock of Parent, two designees, if the Sponsor holds at least 20% but less than 30% of the issued and outstanding Common Stock of Parent, and one designee, if the Sponsor holds at least 10% but less than 20% of the issued and outstanding Common Stock of Parent; provided that in the event that the Sponsor elects to fill less than the number of Board seats the Sponsor is entitled to designate, the Board members so designated by the Sponsor shall be entitled to cast votes on behalf of such undesignated Board seats, and this rule shall apply, *mutatis mutandis*, to any Board Committee (as defined below); <br><br> • Two designees of Blackstone Credit[3] so long as Blackstone Credit holds at least 20% of the issued and outstanding Common Stock of |

---

[1]   Capitalized terms not otherwise defined herein have the meanings given to them in the Restructuring Support Agreement.

[2]   Sponsor will include any Affiliate or transferee managed by Sponsor of any of entities managed by Sponsor that hold Parent Equity Interests as of the Plan Effective Date and any Affiliates of the foregoing to which shares of Common Stock are transferred after the Plan Effective Date in accordance with the stockholders' agreement.

[3]   "Blackstone Credit" means, collectively, GSO Beacon Holdings LP and GSO Credit Alpha Fund LP, and any Affiliate or transferee managed by Blackstone Group Inc. or its Affiliates of any of the foregoing entities that hold Parent Equity Interests as of the Plan Effective Date and any Affiliates of

Parent, and one designee, if Blackstone Credit holds at least 10% but less than 20% of the issued and outstanding Common Stock of Parent; and

- One designee of KKR[4] (together with Sponsor and Blackstone Credit, collectively, the "Major Stockholders", and each, a "Major Stockholder"), so long as KKR holds at least 10% of the issued and outstanding Common Stock of Parent.

Quorum requires attendance by (i) at least one of the Sponsor designees (for so long as the Sponsor retains a designation right), (ii) at least one of the Blackstone Credit designees (for so long as Blackstone Credit retains a designation right), and (iii) the KKR designee (for so long as KKR retains a designation right); provided that if the Sponsor designees, the Blackstone Credit designees or the KKR designee have not been present for two consecutive duly called meetings of the Board, such designee(s), as applicable, presence will not be required to establish a quorum at any subsequent meeting relating to the same subject matter until such designee(s), as applicable, have been present at any such subsequent meeting.

Sponsor designees shall represent a majority of the members of each committee of the Board (a "Board Committee"). So long as there is at least one Blackstone Credit designee, a Blackstone Credit designee shall be a member of each Board Committee. So long as there is at least one KKR designee, a KKR designee shall be a member of each Board Committee. Notwithstanding the foregoing, in the case of a transaction or similar special committee established for the purpose of evaluating and negotiating a transaction with a Major Stockholder or any Affiliate thereof, such Major Stockholder shall not be entitled to a designee on such committee.

To the extent that a Major Stockholder designates one or more independent directors (with each Major Stockholder permitted to designate such number of independent directors equal to the total number of directors it is entitled to designate), such independent director will receive compensation commensurate with the market rate for independent directors of similarly situated companies. In addition, each Major Stockholder shall be entitled to appoint one (1) non-voting board observer to the Board in its discretion, which observer shall be entitled to attend all meetings of the Board.

---

the foregoing to which shares of Common Stock are transferred after the Plan Effective Date in accordance with the stockholders' agreement.

[4]    "KKR" means, collectively, Polar Bear Fund L.P., CPS Managers Master Fund L.P., KKR TFO Partners L.P., FS KKR Capital Corp, and PCOP II Cayman Investors A L.P., and any Affiliate or transferee managed by KKR & Co. Inc. or its Affiliates of any of the foregoing entities that hold Parent Equity Interests as of the Plan Effective Date and any Affiliates of the foregoing to which shares of Common Stock are transferred after the Plan Effective Date in accordance with the stockholders' agreement.

| | |
|---|---|
| **Actions Requiring Major Stockholder Approval:** | Parent shall not, and shall cause its subsidiaries not to, directly or indirectly, by merger, consolidation or otherwise, take any of the following actions without the consent of each Major Stockholder (as long as such Major Stockholder holds at least 5% of the issued and outstanding Common Stock of Parent) (the "Requisite Majority"):<br><br>1.  a Parent Sale (as defined below);<br><br>2.  the purchase or sale of assets or other businesses with an aggregate purchase price greater than $10 million, excluding any purchases or sales of assets in the ordinary course of business;<br><br>3.  the issuance of any equity securities other than in accordance with the preemptive rights provisions or issuance of Common Stock (or options therefor) to employees otherwise approved by the Board pursuant to a management incentive equity plan approved pursuant to Item 8 below;<br><br>4.  any redemption or other acquisition by Parent or any of its subsidiaries of any security of Parent, other than (i) on a *pro rata* basis, (ii) the repurchase or redemption of an employee's equity interests upon termination of the employee's employment pursuant to an agreement or plan previously approved by the Board and (iii) the repurchase or redemption of any debt securities in accordance with the terms of their governing agreements;<br><br>5.  any incurrence or re-financing of indebtedness for borrowed money in excess of $15 million (other than intercompany loans solely among Parent and its subsidiaries);<br><br>6.  any change to or exit from the principal business, or entry into any new material line of business, of Parent or any of its subsidiaries;<br><br>7.  any capital expenditures or commitments therefor in excess of $2 million individually, or $8 million in the aggregate, in any fiscal year, except for such capital expenditures or commitments therefor that are reflected in a budget that has been approved by the Board;<br><br>8.  adoption of or material amendment to (including any increase in the size of the pool of) any management incentive equity plan;<br><br>9.  any transactions between Parent or any of its subsidiaries, on the one hand, and Sponsor or any of its affiliates on the other hand, unless on arm's length, commercially reasonable terms and approved by a majority of the disinterested directors on the Board;<br><br>10.  any amendment to the organizational documents of Parent; and<br><br>11.  any non-*pro rata* dividends or non-*pro rata* distributions; provided that this item 11 also requires the approval of a majority of the Stockholders |

| | |
|---|---|
| | other than those Major Stockholders who hold at least 5% of the issued and outstanding Common Stock of Parent. |
| **Transfer Restrictions:** | Stockholders may not transfer any shares of Common Stock except in accordance with relevant securities laws and (a) to Affiliates of such Stockholder that agree to be bound by the stockholders' agreement; (b) to a third party, underline provided that, in the case of any Stockholder that, together with its Affiliates, at the relevant time, owns at least 2.5% of the issued and outstanding Common Stock of Parent, such shares are first offered for sale by the transferring Stockholder to the Major Stockholders on a *pro rata* basis on the same material terms, including the price per share, proposed by the transferring Stockholder; any shares not purchased by the Major Stockholders may be sold to a third party on the same material terms; underline provided that the price per share may be equal to or higher than the price offered to the Major Stockholders; (c) in connection with a sale to a third party of all or substantially all assets of Parent (other than as part of a proceeding under Chapter 11 or Chapter 7 of the U.S. Bankruptcy Code) or sale of all or substantially all of the shares of capital stock of Parent (each, a "underline Parent Sale") and any corresponding drag along right, and (d) to a third party if the Major Stockholders' tag along rights are triggered, and (e) by the Major Stockholders pursuant to such Major Stockholders' tag along rights. |
| **Tag Along Rights:** | Customary tag along rights of each Major Stockholder that, at the relevant time, owns at least 5% of the issued and outstanding Common Stock of Parent, if a Major Stockholder wishes to transfer more than 5% of the issued and outstanding Common Stock of Parent to a third party. |
| **Drag Along Right:** | In the event that a Parent Sale in which all Stockholders will receive the same form of consideration is approved by the Board and, if required, the Requisite Majority, all other Stockholders shall be deemed to have consented to such Parent Sale, waive appraisal rights, if applicable, and be subject, on a several and not joint basis, to the same representations and warranties and *pro rata* share of indemnities, holdback and escrow provisions (on a several, and not joint basis and with the liability of each Stockholder capped at the amount of the net proceeds to be received by such Stockholder), if any; underline provided that no Stockholder will be forced to become subject to any restrictive covenant other than a customary confidentiality provision and any restrictive covenant to which such Stockholder may already be subject prior to such Parent Sale; underline provided, underline further, that, in the event that the consideration to be paid in such Parent Sale includes equity or equity-linked securities, and the receipt thereof by any Stockholder would be restricted or prohibited pursuant to such Stockholder's pre-existing governing documents, the Board will use commercially reasonable efforts to provide such Stockholder with the opportunity to elect (in lieu thereof) either (i) to be paid an amount in cash equal to the fair market value (as determined in good faith by the Board) of the equity or equity-linked securities which such Stockholder would otherwise receive as of the date of issuance of such equity or equity-linked securities (to the extent such cash is then available for such use, in the discretion of the Board), or (ii) |

| | |
|---|---|
| | to dispose of such equity or equity-linked securities to one or more third parties concurrently with the closing of such Parent Sale. |
| **Preemptive Rights:** | Stockholders will have *pro rata* preemptive rights in respect of any future issuances of equity securities and securities convertible into or exchangeable for equity securities, subject to exceptions for customary excluded issuances. Each Stockholder may assign its preemptive rights to one or more Affiliates of such Stockholder. |
| **Registration Rights:** | At or prior to the consummation of an initial public offering, the Stockholders and the issuer in such initial public offering shall enter into a registration rights agreement in customary form providing for registration rights for certain of the holders of shares. |
| **Information Rights:** | Each Stockholder holding at least 5% of the issued and outstanding Common Stock of Parent (other than any Stockholder that is an employee or former employee) will have customary inspection rights and will receive the following information: (a) audited financial statements after the end of each fiscal year, (b) quarterly unaudited financial reports after the end of each quarter, (c) monthly reporting package which is in line with standard internal reporting, (d) forecasts and an annual budget and business plan as approved by the Board, and (e) upon request by such Stockholder, information reasonably required to file tax returns in accordance with applicable tax laws. Items (a) through (d) shall be delivered by Parent at the same time such items are required to be delivered to the lenders under the New Credit Facility; <u>provided</u>, however, that any such items not required to be delivered thereunder shall be delivered as promptly as reasonably practicable after they are available. |
| **Management Incentive Equity:** | New management incentive equity plan to be discussed and approved as promptly as reasonably practicable following the closing of the transaction. |
| **Amendments/Waivers:** | Any amendment to or waiver of a provision of the stockholders' agreement (a) that would alter or change the rights, obligations, powers or preferences of a Stockholder in a disproportionate and adverse manner compared to the other Stockholders shall require the prior written consent of each such affected Stockholder; and (b) in respect of the enumerated actions requiring approval of the Requisite Majority shall require the prior written consent of the Requisite Majority. No waiver of a Stockholder's preemptive or tag along rights, or amendment disproportionately affecting such rights as compared to any other Stockholders, shall be valid unless approved by such Stockholder. |

<div align="center">***</div>

# **EXHIBIT D**

**Form of Transfer Agreement**

## TRANSFER AGREEMENT

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of Participating Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting First Lien Term Lender" or "Consenting Second Lien Term Lender" (as applicable) under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loans | |
| Second Lien Term Loans | |

---

[1] Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT E

**Form of Joinder**

## JOINDER

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders party thereto and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting First Lien Term Lender" or "Consenting Second Lien Term Lender" (as applicable) under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loans | |
| Second Lien Term Loans | |

---

[1]   Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.