*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| BELK, INC., *et al.*,[1] | § | Case No. 21-[____](___) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

## DISCLOSURE STATEMENT RELATING TO THE
## JOINT PREPACKAGED PLAN OF REORGANIZATION OF BELK, INC., AND ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Kristyn M. Peguero (TX Bar No. 24102776)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:       (713) 752-4200
Facsimile:       (713) 752-4221
Email:       kpeguero@jw.com
            mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini, P.C. (*pro hac vice* admission pending)
Matthew C. Fagen (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:       joshua.sussberg@kirkland.com
            steven.serajeddini@kirkland.com
            matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/belkballots.  The location of the Debtors' service address is 2801 West Tyvola Road, Charlotte, North Carolina 28217.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF BELK, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.   NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE DEBTORS AND CERTAIN HOLDERS OF CLAIMS AND INTERESTS SUPPORT THE PLAN, INCLUDING THE MAJORITY OF BOTH THE AD HOC CROSSOVER GROUP AND THE AD HOC FIRST LIEN TERM LENDER GROUP, AND THE SPONSOR.   THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE EVENT THE DEBTORS COMMENCE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE

DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:

- BUSINESS STRATEGY;

- TECHNOLOGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- RISKS IN CONNECTION WITH ACQUISITIONS;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE**

**DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not yet reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or any securities regulatory authority of any state under any state securities law ("<u>Blue Sky Laws</u>"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offering of the New Common Stock, (the "<u>Securities</u>") prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "<u>Solicitation</u>"). The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

After the Petition Date, the Debtors will still rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance and distribution, if applicable, of the New Common Stock under the Plan. To the extent that section 1145 is either not permitted or not applicable, the Debtors will rely on the exemption set forth in section 4(a)(2) of the Securities act or another exemption thereunder. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that any forward-looking statements in this Disclosure Statement are based on assumptions that are believed to be reasonable, but are subject to a wide range of risks, including risks associated with the following: (a) future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (b) the relationships with and payment terms provided by trade creditors; (c) additional post-restructuring financing requirements; (d) future dispositions and acquisitions; (e) the effect of competitive products, services, or procuring by competitors; (f) changes to the costs of commodities and raw materials; (g) the proposed restructuring and costs associated therewith; (h) the effect of conditions in the local, national, and global economy on the Debtors; (i) the ability to obtain relief from the Bankruptcy Court to facilitate the smooth operation of the Debtors' businesses under chapter 11; (j) the confirmation and consummation of the Plan; (k) the terms and conditions of the New Credit Facilities, the New ABL Facility, and the New Common Stock to be entered into, or issued, as the case may be, pursuant to the Plan; and (l) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, reader cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from

purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Exchange Act or any of its rules and regulations, including Rule 10b-5 promulgated thereunder.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................1

II.     PRELIMINARY STATEMENT...........................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
        AND THE PLAN ...................................................................................................3

        A.  What is chapter 11? ...........................................................................................3
        B.  Why are the Debtors sending me this Disclosure Statement? ...........................3
        C.  Why are votes being solicited prior to Bankruptcy Court approval of the
            Disclosure Statement?........................................................................................4
        D.  Am I entitled to vote on the Plan?......................................................................4
        E.  What will I receive from the Debtors if the Plan is consummated? ...................4
        F.  What will I receive from the Debtors if I hold an Allowed Administrative Claim
            or a Priority Tax Claim?....................................................................................7
        G.  Are any regulatory approvals required to consummate the Plan? .....................9
        H.  What happens to my recovery if the Plan is not confirmed or does not go
            effective? ...........................................................................................................9
        I.  If the Plan provides that I get a distribution, do I get it upon Confirmation or
            when the Plan goes effective, and what is meant by "Confirmation," "Effective
            Date," and "Consummation?"...........................................................................9
        J.  What are the sources of Cash and other consideration required to fund the Plan? ...........9
        K.  Are there risks to owning the New Common Stock upon the Debtors' emergence
            from chapter 11?..............................................................................................10
        L.  Is there potential litigation related to the Plan?..............................................10
        M.  How will the preservation of the Causes of Action impact my recovery under
            the Plan?...........................................................................................................10
        N.  Will there be releases and exculpation granted to parties in interest as part of
            the Plan?...........................................................................................................11
        O.  When is the deadline to vote on the Plan?.......................................................15
        P.  How do I vote on the Plan?..............................................................................15
        Q.  Why is the Bankruptcy Court holding a Confirmation Hearing?....................16
        R.  What is the purpose of the Confirmation Hearing? .........................................16
        S.  What is the effect of the Plan on the Debtors' ongoing businesses?..............16
        T.  Will any party have significant influence over the corporate governance and
            operations of the Reorganized Debtors? .........................................................16
        U.  Who do I contact if I have additional questions with respect to this Disclosure
            Statement or the Plan? ....................................................................................17
        V.  Do the Debtors recommend voting in favor of the Plan?................................17
        W.  Who Supports the Plan? ..................................................................................17

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
        OVERVIEW...........................................................................................................17

        A.  Belk's Corporate History.................................................................................17
        B.  Belk's Business Operations .............................................................................18
        C.  Critical Components of the Debtors' Cost Structure .......................................19
        D.  The Debtors' Prepetition Organizational and Capital Structure ....................20

| V. | EVENTS LEADING TO THE CHAPTER 11 FILINGS | 23 |
|---|---|---|
| A. | The Unprecedented Spread of COVID-19 and Store Closures | 23 |
| B. | Prepetition Restructuring Initiatives | 24 |
| (i) | Appointment of Disinterested Directors | 24 |
| (ii) | The Restructuring Negotiations and RSA | 24 |

| VI. | SUMMARY OF THE PLAN | 25 |
|---|---|---|
| A. | General Settlement of Claims and Interests | 25 |
| B. | Restructuring Transactions | 26 |
| C. | The Reorganized Debtors | 26 |
| D. | Sources of Consideration for Plan Distributions | 26 |
| (i) | New ABL Facility | 26 |
| (ii) | New First Lien Credit Facility | 27 |
| (iii) | New Second Lien Credit Facility | 29 |
| (iv) | New Common Stock | 29 |
| E. | Corporate Existence | 30 |
| F. | Vesting of Assets in the Reorganized Debtors | 30 |
| G. | Cancellation of Existing Agreements and Interests | 30 |
| H. | Corporate Action | 31 |
| I. | New Organizational Documents | 31 |
| J. | Directors and Officers of Reorganized Debtors | 31 |
| K. | Effectuating Documents; Further Transactions | 32 |
| L. | Certain Securities Law Matters | 32 |
| M. | Section 1146 Exemption | 32 |
| N. | Employee Matters | 32 |
| O. | Preservation of Causes of Action | 33 |
| P. | Closing the Chapter 11 Cases | 33 |

| VII. | OTHER KEY ASPECTS OF THE PLAN | 34 |
|---|---|---|
| A. | Treatment of Executory Contracts and Unexpired Leases | 34 |
| B. | Provisions Governing Distributions | 36 |
| C. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | 39 |
| D. | Conditions Precedent to Confirmation and Consummation of the Plan | 41 |
| E. | Modification, Revocation, or Withdrawal of the Plan | 42 |

| VIII. | RISK FACTORS | 43 |
|---|---|---|
| A. | Bankruptcy Law Considerations | 43 |
| B. | Risks Related to Recoveries Under the Plan | 47 |
| C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 48 |

| IX. | SOLICITATION AND VOTING PROCEDURES | 51 |
|---|---|---|
| A. | Holders of Claims Entitled to Vote on the Plan | 51 |
| B. | Votes Required for Acceptance by a Class | 51 |
| C. | Certain Factors to Be Considered Prior to Voting | 52 |
| D. | Solicitation Procedures | 52 |

| X. | CONFIRMATION OF THE PLAN | 53 |
|---|---|---|
| A. | The Confirmation Hearing | 53 |

| | B. | Requirements for Confirmation of the Plan | 53 |
| | C. | Feasibility | 54 |
| | D. | Acceptance by Impaired Classes | 54 |
| | E. | Confirmation without Acceptance by All Impaired Classes | 55 |
| | F. | Liquidation Analysis | 55 |
| **XI.** | | **CERTAIN SECURITIES LAW MATTERS** | **56** |
| | A. | New Common Stock | 56 |
| | B. | Subsequent Transfers | 56 |
| | C. | Resale of New Common Stock Issued Pursuant to Section 4(a)(2) under the Securities Act | 57 |
| **I.** | | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **58** |
| | B. | U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New Term Loans | 67 |
| | C. | U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Common Stock in the Reorganized Parent (including any New Common Stock) | 69 |
| **XII.** | | **RECOMMENDATION** | **76** |

**EXHIBITS[2]**

EXHIBIT A       Plan of Reorganization

EXHIBIT B       RSA

EXHIBIT C       Financial Projections

EXHIBIT D       Liquidation  Analysis

---

[2]    Each Exhibit is incorporated herein by reference.

## I.     INTRODUCTION

Belk, Inc. ("Belk") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Prepackaged Plan of Reorganization of Belk, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), dated January 26, 2021.[3]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS, THE SPONSOR, AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF MORE THAN 75 PERCENT IN PRINCIPAL AMOUNT OF THE FIRST LIEN TERM LOAN CLAIMS AND HOLDERS OF 100 PERCENT IN PRINCIPAL AMOUNT OF THE SECOND LIEN TERM LOAN CLAIMS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

Amidst the challenges facing many in the retail industry, the Debtors commenced these Chapter 11 Cases with a comprehensive pre-negotiated restructuring in hand, together with key creditor support.  After extensive diligence and arms' length negotiations with certain secured term loan lenders, the Debtors reached agreement with the Sponsor and Term Loan Lenders holding more than 75 percent of the outstanding First Lien Term Loan Claims and 100 percent of the outstanding Second Lien Term Loan Claims to fund and support an expedited restructuring that will ensure a viable enterprise and maximize stakeholder recoveries.  The restructuring transactions set forth in the Plan will deleverage the Debtors' balance sheet and provide for an infusion of $225 million in new money.  The proposed implementation process set forth in the RSA facilitates an efficient road to confirmation of the Plan, supported by appropriate due process, and timely emergence from chapter 11.  A prolonged stay in chapter 11 is not only unnecessary but would also result in significantly increased administrative costs and decreased confidence among Belk's customers, employees, and other key stakeholder groups.  The Debtors' proposed path forward maximizes value for the benefit of all parties in interest.

Belk is the nation's largest private department store chain headquartered in Charlotte, North Carolina.  Since opening in 1888 as a single small bargain store in Monroe, North Carolina, the Debtors have strategically grown to 291 stores spread throughout 16 states.  Through multiple business channels, Belk offers a wide assortment of national brands and private-label fashion, shoes, jewelry, and accessories, as well as cosmetics, and home goods.

Even before the emergence of the COVID-19 pandemic, like many other retail companies, the Debtors were under significant pressure from adverse macro-trends, including increased competition among both online retailers and established brick-and-mortar retailers that have less leveraged capital structures and greater economies of scale.  These factors have been greatly compounded by the devastating

---

[3]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

impact of COVID-19 that has caused retailers throughout the country to close their doors. As states across the country ordered all "non-essential" businesses closed, the Debtors temporarily closed all retail locations in March 2020. In May 2020, the Debtors slowly began to reopen stores as states and local jurisdictions began lifting stay-at-home orders. Nevertheless, foot traffic and the demand for department store merchandise has declined significantly compared to pre-COVID levels. As a result of these factors, the Debtors' revenue has declined precipitously from prior years and from pre-COVID forecasts. These unprecedented market developments adversely impacted liquidity and ultimately left the Debtors overleveraged.

As of January 25, 2021, the Debtors have approximately $1.91 billion of funded debt (exclusive of outstanding letters of credit), consisting of:

- $357.50 million outstanding in principal amount under the ABL Facility;

- $999.45 million outstanding in principal amount under the First Lien Term Loan Facility; and

- $550.00 million outstanding in principal amount under the Second Lien Term Loan Facility.

Over the past several years, the Debtors have been proactive in developing structural and strategic transformations to refine the Debtors' operating model to center on key customer segments, implement initiatives designed to optimize product flow through the Debtors' distribution channels, and to optimize its store fleet by reducing the number of underperforming stores and obtaining rent relief. In doing so, the Debtors have realized significant costs savings. In 2019, Belk de-stressed its capital structure through a consensual series of amend-and-extend transactions with respect to the ABL Facility and portions of the First Lien Term Loan Facility, and the Second Lien Term Loan Facility. These extensions afforded Belk meaningful runway and flexibility to implement new business initiatives, such as store renovations and technology enhancements to better serve Belk's customers and communities throughout the country.

Notwithstanding the foregoing, the current operating environment coupled with the Debtors' already highly leveraged balance sheet has accelerated the need for a long-term strategic solution. In April 2020, the Debtors retained Alvarez and Marsal Holdings, Inc. ("A&M") as restructuring advisor to proactively assist the Debtors in monitoring their liquidity needs. In December 2020, the Debtors retained Kirkland & Ellis LLP ("Kirkland") as restructuring counsel and Lazard Frères & Co. LLC ("Lazard") as investment banker to analyze the Debtors' capital structure and various restructuring alternatives related thereto.

The Debtors, with the assistance of their advisors, explored a number of alternatives, including whether it was practicable to effectuate an out of-court deleveraging, refinancing, or other similar transaction that would right size their balance sheet and provide additional liquidity. In November 2020, the Debtors began negotiations with the Sponsor, the Ad Hoc Crossover Lender Group, and the Ad Hoc First Lien Term Lender Group. In order to facilitate due diligence and restructuring negotiations, the Sponsor engaged Latham & Watkins, LLP, as legal advisor, the Ad Hoc Crossover Lender Group engaged Willkie Farr & Gallagher LLP, as legal advisor, and PJT Partners LP, as investment banker, and the Ad Hoc First Lien Term Lender Group engaged O'Melveny & Myers LLP, as legal advisors, and Evercore LLC, as investment banker.

After extensive, arm's-length negotiations, the Consenting Lenders, the Sponsor, and the Debtors arrived at the transactions embodied in the RSA, a copy of which is attached hereto as **Exhibit B**. The RSA and chapter 11 plan term sheet attached as Exhibit B to the RSA (the "Restructuring Term Sheet") contemplate a swift restructuring that is supported by the Sponsor, holders of more than 75 percent of the

outstanding principal amount under the First Lien Term Loan Facility, and 100 percent of the outstanding principal amount under the Second Lien Term Loan Facility.

Given the overwhelming support for the Debtors' restructuring, the Debtors elected to pursue an expedited prepackaged restructuring to maximize value by minimizing both the costs of restructuring and the impact on the Debtors' businesses. The Debtors anticipate commencing the Chapter 11 Cases on or before February 24, 2021, and requesting confirmation of the Plan on the same day, or as soon as reasonably practicable thereafter. The Debtors intend to file motions to avoid the need for schedules of assets and liabilities and statements of financial affairs, which will provide them with significant cost savings. Accordingly, the RSA contains certain milestones, including both securing confirmation of the Plan and the occurrence of the Effective Date by February 26, 2021 and additional milestones as set forth herein. The timeline from the submission of this Disclosure Statement to the anticipated confirmation hearing provides all parties in interest a full and fair opportunity to participate in the process.

Importantly, the restructuring transactions embodied by the Plan and RSA are a significant achievement for the Debtors in the wake of a historically challenging operating environment. Each of the Debtors strongly believes that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time. Given the Debtors' core strengths, including the strategic location of their assets, the Debtors are confident that they can implement the restructuring transaction contemplated by the Plan and RSA to ensure the Debtors' long-term viability. For these reasons, the Debtors strongly recommend that Holders of Claims or Interests entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Chapter 11 Case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the Chapter 11 Case is commenced. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a Chapter 11 Case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

C.      **Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?**

By sending this Disclosure Statement and soliciting votes for the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan on the same day, or as soon as reasonably practicable, after commencing the Chapter 11 Cases. The Debtors will ask the Bankruptcy Court to approve this Disclosure Statement together with Confirmation of the Plan at the same hearing.

D.      **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of January 21, 2021). Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| Class 9 | Interests | Impaired | Entitled to Vote |

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

E.      **What will I receive from the Debtors if the Plan is consummated?**

The following table provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE**

DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims[5] | Estimated % Recovery Under Plan[6] |
| Class 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor: (i) payment in full in Cash of its Allowed Class 1 Claim; (ii) the collateral securing its Allowed Class 1 Claim; (iii) Reinstatement of its Allowed Class 1 Claim; or; (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $83,834,000 | 100% |
| Class 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim. | $14,800,000 | 100% |
| Class 3 | ABL Facility Claims | On the Effective Date, unless otherwise agreed by a Holder of an Allowed ABL Facility Claim, each Holder of an Allowed ABL Facility Claim shall, at the election of such Holder, receive (i) payment in Cash of its Allowed ABL Facility Claim and replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement; or (ii)(x) its Pro Rata share of refinanced loans under the New ABL Facility in an amount equal to the principal amount of ABL Facility Claims held by such Holder as of the Effective Date, and (y) Cash in an amount equal to the accrued but unpaid non-default interest payable to such Holder under the ABL Credit Agreement as of the Effective Date (if any). | $383,000,000 | 100% |

---

[4]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

[5]   The projected amounts of Claims for Classes 4 and 5 reflect the aggregate principal amount outstanding on the Petition Date.

[6]   The estimated recovery percentages for Classes 4 and 5 are based on the face value of new debt consideration and are not inclusive of (a) the proposed treatment of accrued and unpaid interest at the default rate on such principal amount of Claims through the Petition Date, which shall be paid in full in Cash on the Effective Date as set forth in the Plan; and (b) the value of New Common Stock. To the extent the New Common Stock outstanding on the Effective Date is valued at book value, the estimated recovery range for Class 4 Claims would be 55.1% - 86.4% and the estimated recovery range for Class 5 Claims would be 68.9% - 73.7%, in each case, excluding accrued and unpaid interest at the default rate.

| | | | | |
|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | |
| **Class** | **Claim/Interest** | **Treatment of Claim/Interest** | **Projected Amount of Claims[5]** | **Estimated % Recovery Under Plan[6]** |
| Class 4 | First Lien Term Loan Claims | On the Effective Date, each Holder of an Allowed First Lien Term Loan Claim shall receive, in full and final satisfaction of such Claim New FLSO Loans in a principal amount equal to 55.0% of such Holder's Allowed First Lien Term Loan Claim; *provided*, that all accrued and unpaid amortization and interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Effective Date. | $999,400,000 | 55.1% - 81.1% |
| Class 5 | Second Lien Term Loan Claims | On the Effective Date, each Holder of an Allowed Second Lien Term Loan Claim shall receive, in full and final satisfaction of such Claim (i) New FLSO Loans in a principal amount equal to 15.0% of such Holder's Allowed Second Lien Term Loan Claim; (ii) New Second Lien Term Loans in a principal amount equal to 20.0% of such Holder's Allowed Second Lien Term Loan Claim; and (iii) its Pro Rata share of 34.9% of the New Common Stock; *provided*, that all accrued and unpaid interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Effective Date. | $550,000,000 | 35.0% |
| Class 6 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim and at the Debtors' sole discretion, either: (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (A) the Effective Date, or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. | $443,000,000 | 100% |
| Class 7 | Intercompany Claims | Intercompany Claims shall be, at the option the Reorganized Debtors, either: (i) Reinstated; or (ii) distributed, contributed, set off, cancelled and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors. | N/A | 0% / 100% |
| Class 8 | Intercompany Interests | Intercompany Interests shall be, at the option of the Reorganized Debtors, either: (i) Reinstated; or (ii) cancelled and released without any distribution on account of such Interests. | N/A | 0% / 100% |
| Class 9 | Interests[7] | On the Effective Date, all Interests will be Reinstated, subject to dilution on account of the New Common Stock, and the legal, equitable, and contractual rights to which holders of Interests are entitled shall otherwise remain unaltered. | N/A | N/A |

---

[7]   Interests in Fashion Holdings Intermediate LLC.

**F.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**1.    Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:   (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**2.    Professional Fee Claims**

**a.    Final Fee Applications and Payment of Professional Fee Claims**

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

**b.    Professional Fee Escrow Account**

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

### c.      Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

### d.      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.   Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 4.   Payment of Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided, however,* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post- Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

### G.      Are any regulatory approvals required to consummate the Plan?

At this time, there are no known regulatory approvals that are required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**H.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, see Article XI.G of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit D**.

**I.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. *See* Article VIII.E of this Disclosure Statement, entitled "Conditions Precedent to Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**J.     What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) the proceeds of the New First Lien Credit Facility; (2) the New Second Lien Credit Facility; (3) the New ABL Facility; (4) the New Common Stock; and (5) Cash on hand.

**K.     Are there risks to owning the New Common Stock upon the Debtors' emergence from chapter 11?**

Yes. *See* Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**L.     Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article IX.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**M.     How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**N.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Stakeholders in obtaining their support for the Plan pursuant to the terms of the RSA.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE**

**RELEASED PARTIES:   ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT (1) VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN OR (2) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN BY THE PLAN OBJECTION DEADLINE.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained the Plan are copied in pertinent part below.

1.   **Release of Liens**

**Except as otherwise provided in the New Credit Facilities Documents (including to the extent any First Lien Term Loan Documents or Second Lien Term Loan Documents are amended and restated or deemed to be New Credit Facilities Documents, including in connection with any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, as set forth under the New Credit Facilities Documents), the New ABL Facility Documents (including with respect to the ABL Facility, to the extent any ABL Loan Documents are amended and restated or deemed to be New ABL Facility Documents), the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

2.   **Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates**

would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Stakeholders), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### 3. Releases by Holders of Claims and Interests

Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed,

each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement

and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

### 4. Exculpation

Notwithstanding anything contained in the Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 5. Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind

14

**against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**O.      When is the deadline to vote on the Plan?**

The Voting Deadline is February 5, 2021, at 4:00 p.m. (prevailing Central Time).

**P.      How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to holders of Claims that are entitled to vote on the Plan (the "Ballot"). For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent, Prime Clerk LLC (the "Claims and Noticing Agent") **on or before the Voting Deadline, *i.e.* February 5, 2021, at 4:00 p.m., prevailing Central Time**. *See* Article IV of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for additional information.

**Q.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. Upon commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing on February 24, 2021, subject to the Bankruptcy Court's availability. All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

**R.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.      What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect

and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan).  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### T.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the New Organizational Documents and the New Shareholders Agreement.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Shareholders Agreement, and other constituent documents of the Reorganized Debtors.

Assuming that the Effective Date occurs, holders of Allowed Claims and Interests that receive distributions representing a substantial percentage of outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

### U.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Prime Clerk LLC, via one of the following methods:

*By regular mail, hand delivery or overnight mail at:*
Belk, Inc. Ballot Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, New York 10165

*By electronic mail at:*
belkballots@primeclerk.com

*By telephone (toll free) at:*
(347) 919-5765 (domestic) or (877) 329-2058 (international, toll-free) and request to speak with a member of the Solicitation Team.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://cases.primeclerk.com/belk (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

V.      **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which provides for a substantial deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously,  is in the best interest of the Debtors' stakeholders, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

W.      **Who Supports the Plan?**

The Plan is supported by the Debtors, the Consenting Sponsors, and the other Consenting Stakeholders that have executed the RSA, including  Holders of more than 75 percent in principal amount of the First Lien Term Loan Claims and Holders of 100 percent in  principal amount of the Second Lien Term Loan Claims.

IV.     **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

A.      **Belk's Corporate History**

In 1888, William  Henry Belk  opened a small  bargain store named "The New York Racket" in Monroe, North Carolina.  Three years later, in 1891, William  Henry Belk persuaded his brother, Dr. John M. Belk to become a partner, beginning  a business association focused on providing  customers with quality products at great prices.  The two brothers named the company "Belk Brothers Company" and between 1893 and 1895, the Belk brothers opened three stores in South Carolina and one store in Charlotte, North Carolina.  Charlotte, North Carolina became (and still remains today) Belk's principal place of business. By 1923, the Belk brothers and their partners operated 20 stores that generated $10 million  in total annual sales.  In 1943, Belk opened its 195th store and was proclaimed to be "The South's Largest Distributor of Reliable Merchandise."

In 1955, William  Henry Belk's sons took on leadership positions  in Belk, leading strategic changes that transformed Belk from downtown bargain stores to modern fashion destinations  located in shopping centers and malls throughout the Southern United States.  In the following  years, Belk grew from a small bargain store to the nation's largest privately-owned  department store that offered quality products, unparalleled service and an unbreakable connection to its community.   In 1998, a new generation of Belk brothers emerged and under their leadership, Belk consolidated its legal and organizational  structure to centralize logistics, merchandising,  and other operational functions.  The new structure merged 112 Belk stores into one company – Belk, Inc.

Over the next several years, Belk experienced significant  growth, both organically  and through the acquisition  of several well-known department stores, including  over 90 Proffitt's, McRae's, and Parisian department stores from Saks, Inc., giving  Belk a strong foothold in Alabama, Mississippi,  and Tennessee. In 2008, Belk re-lunched its e-commerce platform, belk.com, and began offering a significantly  expanded assortments of national brands and private label fashion apparel, shoes, accessories, and cosmetics, and home merchandise.

The Debtors' existing business operations and capital structure are the product of a 2015 acquisition by investment funds  managed by Sycamore Partners Management, L.P. (collectively,  "Sycamore").  On December 10, 2015, after a series of corporate transactions, Sycamore acquired Belk, Inc. and its subsidiaries for approximately $3 billion,  or approximately  $68 per share for Belk's then-existing shareholders.  In September 2016, Belk paid a $135 million  dividend to its direct and indirect equity holders.  Prior to Belk's issuance of the dividend, Belk and certain of its Debtor and non-Debtor Affiliates

engaged a nationally recognized financial advisory firm (the "Advisory Firm") to perform a solvency analysis. The Advisory Firm delivered a solvency opinion in connection with the dividend.

### B.    Belk's Business Operations

Belk's vision is to reimagine the department store experience for its customers. That includes delivering unexpected trend-right newness balanced by basics customers can count on, leveraging its omnichannel foundation to test new category offerings and expanded assortments, selling merchandise at a value customers deserve, delivering an exceptional level of customer service, and remaining deeply committed to local communities.

Over the past several years, Belk has focused on maximizing its sales opportunities by providing quality merchandise assortments, including a large and exclusive offering of private brands that differentiate its stores from competitors. Belk's marketing and sales promotional strategies seek to attract customers to shop at Belk by keeping them informed of the latest fashion trends, merchandise offerings, and sales promotions through a combination of advertising and interactive media, including direct mail, circulars, broadcast media, digital media, social media (including email, Facebook, Twitter, Pinterest and YouTube) and in-store and online special events. Belk uses its proprietary database to communicate directly to key customer constituencies with special offers designed to appeal to those specific audiences.

To ensure Belk is addressing its customers' rapidly changing shopping preferences, Belk has invested substantially in its technology to create an omnichannel offering for its customers. Following multiple years of focused investments and initiatives, Belk has built a strong omnichannel foundation that includes "Buy Online, Pick Up In-Store", ship-from-store, and curbside pickup capabilities in all stores, a new clienteling system, single use coupons, stackable coupons, subscription replenishment services, and same day delivery. Investment in these omnichannel tools ensures that Belk is prepared to meet its customers' evolving shopping preferences. In addition to prior investments, such as upgrading its e-commerce platform and modernizing its point of sale systems, Belk has also improved the customer experience and increased operational efficiencies by making it easier for customers to find and purchase products on belk.com and in the Belk mobile app, enhanced the experience for Belk credit card holders, exposed more store product on belk.com and the Belk mobile app, enhanced fulfillment technology, and deployed a new allocation system.

Belk currently operates approximately 291 brick-and-mortar retail stores located throughout 16 states, with a strong concentration in the Southern United States. New and renovated stores feature the latest in retail design, including updated exteriors and interiors. The interiors are designed to create an exciting, comfortable and convenient shopping environment for customers. They include the latest lighting and merchandise fixtures, as well as quality decorative floor and wall coverings and other special decor. The store layout is designed for ease of shopping, and store signage is used to help customers identify and locate merchandise. Belk actively seeks ways to optimize its real estate portfolio to more effectively reach and grow its customer base as well as create greater operating efficiencies for the business. Belk will consider replacing stores in markets where more attractive locations become available or closing stores where Belk does not believe there is potential for long-term success. In addition, Belk periodically reviews and adjusts its space requirements within existing stores and explores new store opportunities within its existing footprint and in contiguous markets where Belk can leverage its name and reputation to distinguish its stores from the competition.

Notwithstanding its current financial difficulties, Belk remains a valuable and iconic brand with a large and loyal customer base. Belk has a longstanding heritage of providing the highest level of service to its customers. Belk stores, belk.com, and the Belk mobile app feature relevant national brand and exclusive private brand merchandise in better and moderate price ranges, providing fashion, selection and

value to customers.  The merchandise mix is targeted to upper and middle-income customers shopping for their families and homes, and includes a wide selection of fashion apparel, accessories and shoes for women, men and children, as well as cosmetics, home furnishings, housewares, and jewelry.  The goal is to position Belk as the leader in providing unexpected trend right newness balanced by basics she can count on, available for her to shop in-store and online.

Belk stores, belk.com, and the Belk mobile app offer large assortments of many national brands. Belk has enjoyed excellent long-term relationships with many top apparel and cosmetics suppliers and is often the sole distributor of desirable apparel, accessories and cosmetic lines in its markets.  Belk stores, belk.com, and the Belk mobile app also offer exclusive private brands that are uniquely tailored to its customer and are valued for their styling, quality and value.  They set Belk apart from its peers, and make it less susceptible to competitive threats, while also delivering higher gross margins than third-party brands. Belk's private brands include Crown & Ivy, New Directions, Kim Rogers, Kaari Blue, Ocean & Coast, Saddlebred, Saddlebred 1888, Belk Silverworks, Biltmore, Cook's Tools, Madison, True Craft, Wonderly, ZELOS, Lightning Bug, The Limited, Belk & Co Fine Jewelry, and Goodness & Grace.

### C.    Critical Components of the Debtors' Cost Structure

#### (a)    Supply Chain

A critical component to Belk's business structure is an integrated supply chain aimed at ensuring the uninterrupted flow of merchandise to its brick-and-mortar locations and the fulfillment of orders from its e-commerce platform.  Belk currently operates three distribution facilities located in Blythewood, South Carolina, Jonesville, South Carolina, and Jackson, Mississippi that receive and process merchandise to support direct to consumer fulfillment and merchandise replenishment to Belk's stores.  Belk's distribution facilities are linked electronically to its various merchandising teams to facilitate the seamless distribution of goods to Belk's stores.

#### (b)    Employee Compensation and Benefits

The Debtors currently employ approximately 17,000 associates, including approximately 8,000 full time associates and approximately 9,000 part-time associates (collectively, the "Employees").  Because of the seasonal nature of the retail business, the number of Employees fluctuates from time to time and is the highest during the holiday shopping period in November and December.  The Employees serve in many capacities supporting Belk's operations at the corporate office, Belk's' distribution centers, or at the retail store level.  In addition to the Employees, the Debtors also retain, from time-to-time, independent contractors to complete discrete projects, as well as temporary workers to fulfill certain duties, including additional store-level staffing during peak sales seasons. The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including medical insurance programs, workers' compensation benefits, short and long-term disability coverage, time-off and vacation policies, and certain other benefits that the Debtors have historically provided in the ordinary course.

#### (c)    Real Estate Obligations

The Debtors currently own 64 retail stores in fee simple, 76 ground leases, and two distribution centers.  The Debtors lease all other retail store locations and office space.  The Debtors' estimate that the aggregate occupancy cost for the Debtors' go-forward operations will be approximately $166 million in fiscal year 2021.

### D.    The Debtors' Prepetition Organizational and Capital Structure

A diagram presenting the Debtors' organizational structure as of the Petition Date is presented below:



As of January 25, 2021, the Debtors have approximately $1.91 billion of consolidated funded debt obligations, as well as approximately $83.83 million of outstanding capital lease obligations. The following table depicts the Debtors' prepetition capital structure, exclusive of accrued but unpaid interest and fees:

| Funded Debt | Maturity | Outstanding Principal Amount as of January 25, 2021 |
|---|---|---|
| ABL Facility | August 29, 2024 | $357.5 million[8] |
| First Lien Term Loan (Non-Extended) | December 10, 2022 | $101.5 million |
| First Lien Term Loan (Extended) | July 31, 2025 | $897.9 million |
| Second Lien Term Loan (Non-Extended) | June 10, 2023 | $25.0 million |
| Second Lien Term Loan (Extended) | October 29, 2025 | $525.0 million |
| | Total Funded Debt | $1.9 billion |

### 1. The ABL Facility

Bear Parent Inc., as holdings, Belk, as borrower, Bank of America, N.A., as administrative agent and collateral agent, Wells Fargo Bank, National Association, as syndication agent, and the lenders from time to time party thereto, are each party to the ABL Credit Agreement, dated as of December 10, 2015. The ABL Facility is guaranteed by each of the Debtors (with the exception of Belk Sourcing LLC , Fashion Holdings Intermediate LLC, and Fashion Intermediate Inc.) and is secured by first priority liens (subject to certain permitted liens) on the Debtors' accounts receivable, inventory, and cash (the "ABL Priority Collateral"). The ABL Credit Agreement allows Belk to access up to $900 million in revolving credit commitments depending on the then-applicable borrowing case. As of the date hereof, approximately $357.5 million remains outstanding under the ABL Facility and approximately $25.5 million is outstanding in letters of credit. On August 29, 2019, the ABL Credit Agreement was amended to extend the maturity of the ABL Credit Facility from December 10, 2020 to August 29, 2024.

### 2. The First Lien Term Loan Facility

Bear Parent Inc., as holdings, Belk, as borrower, Morgan Stanley Senior Funding, Inc., as administrative agent and collateral agent, and the lenders from time to time party thereto, are each party to the First Lien Term Loan Credit Agreement, dated as of December 10, 2015. The First Lien Term Loan Facility is guaranteed by each of the Debtors (with the exception of Belk Sourcing LLC, Fashion Holdings Intermediate LLC, and Fashion Intermediate Inc.) and is secured by (a) first priority liens (subject to certain permitted liens) on substantially all assets of such Debtors other than the assets securing the ABL Facility, and (b) second priority liens (subject to certain permitted liens) on the ABL Priority Collateral. As of the date hereof, approximately $999.4 million remains outstanding under the First Lien Term Loan Facility. On October 29, 2019, the First Lien Term Loan Credit Agreement was amended to extend the maturity of a substantial portion of the First Lien Term Loan Credit Facility from December 10, 2022 to July 31, 2025.

### 3. The Second Lien Term Loan Facility

Bear Parent Inc., as holdings, Belk, as borrower, Wilmington Trust, National Association., as administrative agent and collateral agent, and the lenders from time to time party thereto, are each party to the Second Lien Term Loan Credit Agreement, dated as of December 10, 2015. The Second Lien Term

---

[8] Exclusive of approximately $25.5 million of outstanding letters of credit.

Loan Facility is guaranteed by each of the Debtors (with the exception of Belk Sourcing LLC, Fashion Holdings Intermediate LLC, and Fashion Intermediate Inc.) and is secured by (a) second priority liens (subject to certain permitted liens) on substantially all assets of such Debtors other than the assets securing the ABL Facility, and (b) second priority liens (subject to certain permitted liens) on the ABL Priority Collateral. As of the date hereof, approximately $550 million remains outstanding under the Second Lien Term Loan Facility. On May 7, 2019, the Second Lien Term Loan Credit Agreement was amended to extend the maturity of $525 million in aggregate principal amount of Second Lien Term Loans from June 12, 2023 to June 12, 2025, with the maturity of the residual $25 million in aggregate principal amount of Second Lien Term Loans remaining unchanged. On October 29, 2019, the Second Lien Term Loan Credit Agreement was amended again to extend the maturity of the $525 million tranche of Second Lien Term Loans from June 12, 2025 to October 29, 2025.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    The Unprecedented Spread of COVID-19 and Store Closures

Belk, along with many other retail companies, has faced a challenging commercial environment in recent years brought on by increased competition among retailers and an ongoing shift away from in-store shopping. Given Belk's sizable store portfolio—with approximately 291 stores across 16 states—and its associated operating expenses, the business has relied heavily on physical consumer traffic, and resulting sales conversion, to meet sales and profitability goals. Amid these macroeconomic headwinds, Belk has taken proactive measures to remain competitive, including expanding its e-commerce platform, closing underperforming stores, and streamlining its workforce. Additionally, between May 2019 and October 2019, Belk entered into certain amendments to the ABL Credit Agreement, the First Lien Term Loan Credit Agreement, and the Second Lien Term Loan Credit Agreement to extend the maturity date of a substantial portion of the funded debt obligations under the facilities.

Prior to the COVID-19 pandemic, Belk had a manageable liquidity cushion and was proactively taking steps to right-size its operations and further improve the long-term health of its balance sheet. However, on March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic and national, state, and local governments in the United States and around the world began imposing shelter-in-place and stay at home orders, as well as strict social distancing protocols.

On March 17, 2020, the Debtors temporarily closed 291 stores to protect the health and safety of Belk's customers and associates. Belk continued to serve its customers through its mobile app and online at belk.com and utilized its fulfilment center and all its stores to fulfill online orders. Belk began a phased reopening of stores on May 1, 2020, including curbside pick-up, with substantially all its stores reopening by May 22, 2020, and has been operating under reduced hours with appropriate precautions in place as it continues to follow CDC guidelines. With reopening of its stores, Belk returned some furloughed employees in a phased approach. In late June 2020, Belk eliminated a number of positions at its corporate office and its stores.

The restrictions resulting from legally imposed measures, combined with radically altered behavior by consumers, precipitated an unprecedented decline in economic activity. Demand for discretionary retail products has plummeted during the COVID-19 pandemic as consumers prioritize—with good reason—their health and maintaining a source of income. In this environment, most discretionary retail products are an unnecessary luxury for many consumers. Additionally, online sales are not as profitable as store sales due to the cost of shipping. As a result of these and other factors, the Debtors' sales have materially declined from forecasts. The Debtors' top-line sales were down 32 percent year-over-year for the period commencing the third week of March 2020 through December 2020.

While COVID-19 is not the sole cause of Belk's current liquidity crisis, the pandemic has undoubtedly been a catalyst for Belk's declining liquidity position and its current inability to satisfy upcoming debt service obligations.

### B.     Prepetition Restructuring Initiatives

#### (i)     Appointment of Disinterested Directors

To ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the board of directors of Belk, Inc. and the board of directors of Bear Parent Inc. (collectively, the "Boards") appointed two independent and disinterested directors, Jill Frizzley and Steve Panagos (together, the "Special Committee Members") to special committees established by Belk, Inc. and Bear Parent Inc. to decide potential conflicts matters that may arise between the respective company and its equity holders, its affiliates (as applicable), or its directors and officers. The Special Committee Members engaged Quinn Emanuel Urquhart & Sullivan, LLP, as legal counsel, to assist in the discharge of the Special Committee Members' duties.

The Special Committee Members and the professionals acting at their sole direction have commenced an independent investigation (which remains ongoing as of the date hereof) into interested-party issues in connection with a potential sale, restructuring, reorganization, or other recapitalization transactions and related financings. The Special Committee Members may also conduct inquiries or investigations relating to any conflicts matters as the Special Committee Members deem necessary in their business judgment. Similarly, the Special Committee Members' activities include evaluating a restructuring transaction, approving or terminating the restructuring transaction, participating in consultation with management and advisors, and if necessary, authorizing approval of a restructuring. The Debtors expect that the Special Committee Members will be in a position to make a final recommendation whether the releases contemplated by the Plan are appropriate in advance of the Debtors' proposed confirmation hearing.

#### (ii)     The Restructuring Negotiations and RSA

Against the backdrop of COVID-19 and market related challenges, significant cash interest obligations, and declining liquidity, Belk viewed a comprehensive debt restructuring as the necessary next step to best position Belk for long-term success. Beginning in November 2020, the Debtors entered into restructuring discussions with the Sponsor, the Ad Hoc Crossover Group, and the Ad Hoc First Lien Term Lender Group (collectively, the "Ad Hoc Groups").

In December 2020, the Debtors and their advisors engaged with the Sponsor and members of the Ad Hoc Groups in earnest to facilitate the due diligence process and engage in extensive restructuring discussions to build consensus around a deleveraging solution. Specifically, these prepetition restructuring efforts included, among other things: (a) the provision of a substantial amount of diligence to the Ad Hoc Groups and their respective advisors; (b) ongoing dialogue and communication around the Belk enterprise, its operations, and its prospects; and (c) frequent telephonic meetings to discuss the status of the business and Belk's potential restructuring path, including both in-court and out-of-court restructuring alternatives.

Following several weeks of discussions amongst the parties, and amidst the COVID-19 pandemic, it became clear that any viable path forward would need to provide for the Debtors' immediate cash needs. Ultimately, the Debtors and their key stakeholders all had the same goal: to provide Belk with fresh capital while simultaneously deleveraging Belk in an efficient manner to provide the Debtors' valuable assets and operations an opportunity to move forward as a going concern, and maximize value for the benefit of all parties in interest. As such, the Debtors and the Ad Hoc Groups continued to negotiate a comprehensive restructuring solution through mid-January 2021.

As a result of the Debtors' prepetition restructuring initiatives, the Debtors, the Sponsor, and a majority of holders of First Lien Term Loan Claims and Second Lien Term Loan Claims reached an agreement-in-principle on the restructuring transactions as reflected in the Plan, the RSA, and the New Credit Facilities Term Sheet attached as <u>Exhibit 1</u> to the Restructuring Term Sheet. The level of consensus for this restructuring transaction reflects the efforts undertaken by the Debtors and the parties to the RSA and their belief in the Debtors' prospects as a reorganized enterprise. Importantly, the Plan proposes to pay all Allowed General Unsecured Claims in full or reinstate such claims pursuant to section 1124 of the Bankruptcy Code. In so doing, the Plan is intended to minimize any potential adverse effects to the Debtors' business, customers, and trade partners as a result of the restructuring, and thus positioning the Debtors for a prompt emergence from bankruptcy.

The RSA requires that the Debtors proceed in accordance with the RSA milestones, including securing confirmation of the Plan by February 24, 2021. In light of the Debtors' extensive prepetition restructuring efforts, the Debtors have provided all parties in interest a full and fair opportunity to participate in the process. Following commencement of the Chapter 11 Cases, the Debtors will file a scheduling motion seeking approval of the confirmation schedule based on the anticipated Petition Date and below milestones:

| Event | Date |
|---|---|
| Confirmation Milestone | February 24, 2021 |
| Effective Date Milestone | February 26, 2021 |

## VI.    SUMMARY OF THE PLAN

The Plan contemplates the following key terms, among others described herein and therein:

### A.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection (as applicable), enforceability, priority or extent of the ABL Facility Claims, the First Lien Term Loan Claims, the Second Lien Term Loan Claims, or the Interests, (2) any claim to avoid, subordinate, or disallow any ABL Facility Claims, First Lien Term Loan Claims, Second Lien Term Loan Claims, or Interests, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction, including those transactions set forth in the Description of Transaction Steps, and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, as applicable, the issuance, transfer, or cancellation of any securities, notes, instruments, certificates, and other documents required to be issued, transferred, or cancelled pursuant to the Plan or any Restructuring Transaction, subject to the terms of the RSA. Reorganized Belk shall be the borrower under the New Credit Facilities and the New ABL Facility, and Reorganized Belk Holdings shall be the issuer of New Common Stock to the applicable Holders of Claims and Interests as set forth in the Plan and in the applicable Definitive Documentation.  On the Effective Date, 15.0% of the New Common Stock shall also be distributed on a pro rata basis to the First Lien Term Lenders and the Second Lien Term Lenders (based on such First Lien Term Lender's or Second Lien Term Lender's funded amount of the New FLFO New Money Loans as a proportion of $125 million) that participate in the New FLFO New Money Loans.

On the Effective Date, KKR, Blackstone Credit, and GIC shall be deemed to have waived all legal, equitable, and contractual interests in the KKR, Blackstone Credit, and GIC Topco Equity Interests, and the KKR, Blackstone Credit, and GIC Topco Equity Interests shall be cancelled and released without any distribution on account of such Topco Equity Interests.

The actions to implement the Restructuring Transactions may include, in accordance with the consent rights in the RSA: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

**C.      The Reorganized Debtors**

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents, in each case, in accordance with the terms set forth in the New Shareholders Agreement. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

**D.      Sources of Consideration for Plan Distributions**

**(i)      New ABL Facility**

On the Effective Date, the Reorganized Debtors shall enter into the New ABL Facility, the terms of which will be set forth in the New ABL Facility Documents. Confirmation of the Plan shall be deemed approval of the New ABL Facility and the New ABL Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter

into and execute the New ABL Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New ABL Facility.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, extended and/or reaffirmed (including in connection with any ABL Facility Claims that are refinanced by the New ABL Facility) in accordance with the New ABL Facility Documents (a) shall be deemed to be granted, carried forward, continued, amended, extended, and/or reaffirmed, (b) shall be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New ABL Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New ABL Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### (ii)     New First Lien Credit Facility

On the Effective Date, the Reorganized Debtors shall enter into the New First Lien Credit Facility, the terms of which will be set forth in the New First Lien Credit Facility Documents. Confirmation of the Plan shall be deemed approval of the Backstop Commitment Letter, the New First Lien Credit Facility, and the New First Lien Credit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees (including the New FLFO Loans Commitment Premium, the Lender Backstop Commitment Premium, and the other fees and premiums and other consideration described in the Plan and in the Backstop Commitment Letter), indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New First Lien Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New First Lien Credit Facility. For the avoidance of doubt, the New First Lien Credit Agreement may be effectuated through an amendment and restatement of the First Lien Term Loan Credit Agreement. Execution of the New First Lien Credit Agreement by the New First Lien Credit Facility Agent shall be deemed to bind all Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims as if each such Holder had executed the New First Lien Credit Agreement with appropriate authorization.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, or extended in accordance with the New First Lien Credit Facility Documents shall, as applicable, (a) be deemed to be granted, carried forward, continued, amended, or extended to secure the New First Lien Credit Facility, (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Credit Facility Documents, (c) be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New First Lien Credit Facility Documents, and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security

interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The New Term Loans to be issued under the New First Lien Credit Facility will consist of (a) New FLFO Loans in the aggregate principal amount of $300 million, consisting of New FLFO New Money Loans and New FLFO Roll-Up Loans; and (b) New FLSO Loans in the aggregate principal amount of up to $822 million; and (c) New Second Lien Term Loans in the aggregate amount of $110 million.. On the Effective Date, the roll-up of First Lien Term Loans with New FLFO Roll-Up Loans shall take place immediately prior to any distribution of New FLSO Loans on account of the First Lien Term Loan Claims.

Each Term Lender may participate in the New FLFO New Money Loans on behalf of some or all funds or accounts managed or advised by such Term Lender, or some or all funds or accounts managed or advised by the investment manager or advisor of such Term Lender, or any affiliate thereof, and may allocate its participation in the New FLFO New Money Loans among such funds or accounts in its sole discretion.

The Lender Backstop Parties have committed to backstop $125 million in the aggregate principal amount of the New FLFO New Money Loans. The Sponsor Backstop Party has committed to backstop $100 million in the aggregate principal amount of the New FLFO New Money Loans. To the extent the total subscriptions by the New Credit Facility Lenders that are First Lien Term Lenders or Second Lien Term Lenders exceed the applicable New FLFO New Money Loan commitments allocated to the applicable group of the New Credit Facility Lenders, the excess amount would first reduce the funding commitments not subscribed by their respective First Lien Term Lender or Second Lien Term Lender group on a dollar for dollar basis (if any), with the remaining excess amount to reduce the New FLFO New Money Loan funding commitments that are backstopped by the Sponsor Backstop Party on a dollar for dollar basis; *provided*, that such oversubscription by First Lien Term Lenders and Second Lien Term Lenders and corresponding reduction of New FLFO New Money Loan commitments will be limited (on a ratable basis) such that the Sponsor Backstop Party's funded aggregate principal amount of New FLFO New Money Loans shall in no event be below $65 million; provided, further that such First Lien Term Lenders or Second Lien Term Lenders may elect to limit any such oversubscription to reduction of the First Lien Term Lenders' and Second Lien Term Lenders' New FLFO New Money Loan commitments.

On the Effective Date, as consideration for the Lender Backstop Parties' respective Backstop Commitments: (a) each Lender Backstop Party shall receive its pro rata share (based on such Lender Backstop Party's proportionate share of the aggregate Backstop Commitments of all of the Lender Backstop Parties) of the Lender Backstop Commitment Premium; and (b) each First Lien Term Lender that is also a Lender Backstop Party shall receive its pro rata share of $30 million of the New FLFO Roll-Up Loans (based on such First Lien Term Lender's proportionate share of the Backstop Commitments in respect of the two-thirds of the $125 million of the New FLFO New Money Loans backstopped by the Lender Backstop Parties that are First Lien Term Lenders).

Each First Lien Term Lender that funds at least its pro rata share of two-thirds of $125 million of the New FLFO New Money Loans shall receive on the Effective Date as consideration for its commitment to fund the New FLFO New Money Loans (a) its pro rata share (based on such First Lien Term Lender's total funding of New FLFO New Money Loans out of two-thirds of $125 million of New FLFO New Money

Loans) of $45 million of the New FLFO Roll-Up Loans; and (b) a New FLFO Loans Commitment Premium.[9]

### (iii)     New Second Lien Credit Facility

On the Effective Date, the Reorganized Debtors shall enter into the New Second Lien Credit Facility, the terms of which will be set forth in the New Second Lien Credit Facility Documents. Confirmation of the Plan shall be deemed approval of the New Second Lien Credit Facility and the New Second Lien Credit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Second Lien Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Second Lien Credit Facility. For the avoidance of doubt, the New Second Lien Credit Agreement may be effectuated through an amendment and restatement of the Second Lien Term Loan Credit Agreement. Execution of the New Second Lien Credit Agreement by the New Second Lien Credit Facility Agent shall be deemed to bind all Holders of Second Lien Term Loan Claims as if each such Holder had executed the New Second Lien Credit Agreement with appropriate authorization.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, or extended in accordance with the New Second Lien Credit Facility Documents shall, as applicable, (a) be deemed to be granted, carried forward, continued, amended, or extended to secure the New Second Lien Credit Facility, (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Second Lien Credit Facility Documents, (c) be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Second Lien Credit Facility Documents, and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### (iv)     New Common Stock

Reorganized Belk Holdings shall be authorized to issue a certain number of shares, units, or other interests of New Common Stock pursuant to its New Organizational Documents and the New Shareholders Agreement. On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan and the applicable Definitive Documentation.

All of the shares, units, or other interests constituting New Common Stock issued pursuant to the Plan, the New Shareholders Agreement, and the Definitive Documentation shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan

---

[9]     In addition to the foregoing, a supplemental fee of $12 million will be paid to and divided between certain Consenting First Lien Term Lenders pursuant to the terms and conditions set forth in the Backstop Commitment Letter.

shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**E.      Corporate Existence**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

**F.      Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**G.      Cancellation of Existing Agreements and Interests**

On the Effective Date, except with respect to the New Credit Facilities, the New ABL Facility, the First Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan), the First Lien Term Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New First Lien Credit Facility or the First Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan)), the Second Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan), the Second Lien Term Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New Second Lien Credit Facility or the Second Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan)), the ABL Credit Agreement (if amended and restated, refinanced or deemed to be reaffirmed in connection with the New ABL Facility), the ABL Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New ABL Facility or the New ABL Credit Agreement (if amended and restated in connection with consummation of the Plan)), or to the extent otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments,

securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

**H.      Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors; (3) the issuance of the New Common Stock and entry into the New Shareholders Agreement; (4) implementation of the Restructuring Transactions; (5) entry into the New Credit Facilities Documents and the New ABL Facility Documents; (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the New Organizational Documents; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the New Credit Facilities, the New Credit Facilities Documents, the New ABL Facility, the New ABL Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. Additionally, on the Effective Date, each recipient of New Common Stock shall execute the New Shareholders Agreement. The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**I.      New Organizational Documents**

Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the terms set forth in the New Shareholders Agreement and the corporate laws of the respective state, province, or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting Equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.

**J.      Directors and Officers of Reorganized Debtors**

As of the Effective Date, the term of the current members of the Debtors' respective Governing Bodies shall expire, and the members for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Shareholders Agreement. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Shareholders Agreement, and other constituent documents of the Reorganized Debtors.

### K.   Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### L.   Certain Securities Law Matters

The issuance and distribution of the Securities as contemplated by Articles III and IV.D of the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Such Securities will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

### M.   Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the New Credit Facilities or the New ABL Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### N.   Employee Matters

Unless otherwise provided in the Plan, and subject to Article V of the Plan, the Reorganized Debtors shall assume all employment agreements, indemnification agreements, or other agreements with current and former members of any Governing Body, employees, officers, directors, or managers of the Debtors.

Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**O.      Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**P.      Closing the Chapter 11 Cases**

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and any contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

## VII.   OTHER KEY ASPECTS OF THE PLAN

### A.   Treatment of Executory Contracts and Unexpired Leases

#### 1.   Assumption and Rejection of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

#### 2.   Indemnification Obligations

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

On or before the Effective Date, the Reorganized Debtors shall and are authorized to procure the New D&O Tail Coverage.  For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

#### 3.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory

Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective. The Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

### 4.   Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

### 5.   Reservation of Rights

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

### 6.   Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 7.   Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## B.     Provisions Governing Distributions

### 1.   Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2.   Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

### 3.   Rights and Powers of the Disbursing Agent

#### a.     Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### b.     Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 4.   Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### a.     Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

### b.    Delivery of Distributions in General

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

### c.    Minimum Distributions

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding.

### d.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

### 5.    Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### 7.  Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 8.  No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### 9.  Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

### 10.  Setoffs and Recoupment

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### 11.  Claims Paid or Payable by Third Parties

#### a.  Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable

Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

### b.        Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### c.        Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### C.        Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

#### 1.        Disputed Claims Process

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in the Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided in the Plan, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the**

need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

## 2. Allowance of Claims

After the Effective Date and subject to the terms of the Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

## 3. Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

## 4. Adjustment to Claims or Interests without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

## 5. Disallowance of Claims or Interests

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the

aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### D. Conditions Precedent to Confirmation and Consummation of the Plan

#### 1. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

1. the Bankruptcy Court shall have entered the Confirmation Order and such order shall (a) be in form and substance reasonably acceptable to the Debtors, the Required Consenting Stakeholders, and the ABL Agent, and (b) not have been reversed, stayed, dismissed, or vacated;

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the RSA and the Plan, and the Definitive Documentation shall have been executed and/or effectuated and contain certain terms, conditions, representations, warranties, and covenants consistent with the terms of the RSA (as applicable) and shall be in a form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders;

4. all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

5. the RSA and the Backstop Commitment Letter shall remain in full force and effect;

6. all fees and premiums payable pursuant to the RSA and the Backstop Commitment Letter shall have been paid;

7. entry into the New Credit Facilities Documents, and all conditions precedent to the consummation of such New Credit Facilities Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New Credit Facilities Documents shall have occurred;

8. entry into the New ABL Facility Documents, and all conditions precedent to the consummation of such New ABL Facility Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New ABL Facility Documents shall have occurred;

9. the New Common Stock shall have been issued by Reorganized Belk Holdings;

10. the Reorganized Debtors shall have procured or become insured under the New D&O Tail Coverage;

11. to the extent invoiced, the payment in cash in full of all Restructuring Expenses;

12. there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim or investigation (whether formal or informal) (or there shall not have

been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Debtors, the Required Consenting Lenders, and the Consenting Sponsors would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

13. an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall not have been enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors, the Consenting Sponsor, and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions; and

14. the Debtors shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the RSA and the Plan.

## 2. Waiver of Conditions

The conditions to Confirmation and Consummation set forth in Article IX of the Plan may be waived by the Debtors with the prior written consent of the Required Consenting Lenders and the Consenting Sponsors (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that the conditions relating to the ABL Facility Claims, solely as they relate to the ABL Facility Claims, may only be waived with the consent of the ABL Agent.

## 3. Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

## E.   Modification, Revocation, or Withdrawal of the Plan

## 1. Modification and Amendments

Except as otherwise specifically provided in the Plan and to the extent permitted by the RSA, the Debtors reserve the right to modify the Plan with the prior written consent of the Consenting Sponsors and the Required Consenting Lenders (such consent not to be unreasonably withheld), whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that any modification relating to the ABL Facility Claims, solely as such modifications relate to the ABL Facility Claims, may only be waived with the consent of the ABL Agent. Subject to those restrictions on modifications set forth in the RSA and the Plan, and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or

the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### 2. Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. Revocation or Withdrawal of Plan

To the extent permitted by the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## VIII. RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A. Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to

the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class

(as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.   Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand and increasing expenses. *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.   The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable non-bankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code

provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 8. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover,

the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and the U.S. Trustee and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the financial benefits that they embody.

### B.    Risks Related to Recoveries Under the Plan

#### 1. The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### 2. The New Common Stock is Subject to Dilution

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

#### 3. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of certain Claims.

### 4. The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the New Credit Facilities or the New ABL Facility upon emergence.

#### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately

predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3. **Recent Global Economic Trends, especially in Response to the COVID-19 Outbreak Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption of the Debtors' Retail Stores.**

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services. In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to the Debtors' business may adversely affect the Debtors' customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their days sales outstanding and adversely affect their results of operations.

The outbreak of COVID-19 has significantly disrupted financial markets. This outbreak and the actions taken by federal, state and local governments in response to the outbreak have significantly affected virtually all facets of the U.S. and global economies. Restrictions on and public concern regarding travel and public interaction have materially curtailed retail and hospitality activity. The COVID-19 outbreak resulted in the temporary closure of all of the Debtors' retail stores, almost all of which have since opened. The Debtors' merchandise is manufactured in numerous locations in the United States and in foreign jurisdictions. The timely delivery of merchandise to the Debtors' by their merchandise vendors could be adversely affected by supply chain disruptions and travel restrictions which could, in turn, negatively impact the Debtors' ability to meet customers' demand.

Global financial markets have experienced significant volatility and losses as a result of the recent COVID-19 outbreak. Any resulting economic downturn could negatively impact customer demand and spending in the impacted regions and cause an oversupply of goods that could result in meaningful margin pressure. The Debtors are closely monitoring developments in connection with this outbreak. Restrictions on travel, quarantines and other measures imposed in response to the COVID-19 outbreak, as well as ongoing concern regarding the virus' potential impact, have had and will likely continue to have a negative effect on economies and financial markets, including supply chain shortages and other business disruptions. The Debtors expect the outbreak will materially affect results in the current and potentially future operating periods; however, the duration and extent of potential supply chain, demand and other disruptions is highly uncertain and will depend on future developments with respect to the spread and severity of the virus. An extended period of further economic deterioration could exacerbate the other risks described in the Plan.

Additional effects of the recent conditions in the global economy include higher rates of unemployment, consumer hesitancy, and limited availability of credit, each of which may constrict the Debtors' business operations. These have had an effect on the Debtors' revenue growth and incoming payments, and the impact may continue. If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline and the Debtors cannot reduce costs on a timely basis or at all, the Debtors' operating results may be materially and adversely affected.

4. **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors will be requesting confirmation of the Plan on the same day as the Petition Date, or as soon as reasonably practicable thereafter, but confirmation of the Plan could last considerably longer if, for

example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

Further, so long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 5. Financial Results May Be Volatile and May Not Reflect Historical Trends

The Financial Projections attached hereto as **Exhibit C** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially

from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

### 6. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 7. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot (the "Ballot") to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan.

### A.    Holders of Claims Entitled to Vote on the Plan

The Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims or Interests in Classes 4, 5, and 9 (collectively, the "Voting Classes"). The Holders of Claims or Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan. The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 6, 7, and 8.

### B.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by

a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.      Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article VIII of this Disclosure Statement.

### D.      Solicitation Procedures

#### 1.    Claims and Noticing Agent

The Debtors have retained Prime Clerk LLC to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2.    Solicitation Package

The following materials constitute the solicitation package (collectively, the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- the form of the notice of the combined hearing to consider approval of the adequacy of the Disclosure Statement and confirmation of the Plan;

- the Disclosure Statement (including all exhibits hereto, including the Plan and all exhibits thereto); and

- a customized paper Ballot.

1.   Distribution of the Solicitation Package and Plan Supplement

The Debtors will cause the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on January 26, 2021, which is 10 days before the Voting Deadline (*i.e.*, 4:00 p.m. (prevailing Central Time) on February 5, 2021).

The Solicitation Package (except the Ballots) may also be obtained from the Claims and Noticing Agent by: (i) calling the Debtors' restructuring hotline at (347) 919-5765 (domestic) or (877) 329-2058 (international, toll-free), (ii) emailing belkballots@primeclerk.com and referencing "Belk" in the subject line, and/or (iii) writing to the Claims and Noticing Agent at Belk Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165. The Plan and Disclosure Statement are accessible now, free of charge, on the Debtors' restructuring website, https://cases.primeclerk.com/belkballots. After the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.primeclerk.com/belk, or for a fee via PACER at https://pacer.uscourts.gov/.

The Debtors shall file the Plan Supplement with the Bankruptcy Court no later than one (1) Business Day after the Petition Date. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Noticing Agent by: (i) calling the Claims and Noticing Agent at the telephone numbers set forth above; (ii) visiting the Debtors' restructuring website, https://cases.primeclerk.com/belk; or (iii) writing to Belk Case Information, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232.

## X.   CONFIRMATION OF THE PLAN

### A.   The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtors will request, on the Petition Date, that the Bankruptcy Court approve the Plan and Disclosure Statement. The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan. An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth herein.

### B.   Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[10]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

---

[10]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the Holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the Holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the Holder of such claim or equity interest.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.   Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.   No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.   Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each

impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## XI.    CERTAIN SECURITIES LAW MATTERS

### A.    New Common Stock

As discussed herein, the Restructuring contemplated by the Plan provides for the Reorganized Debtors to distribute the New Common Stock to Holders of Allowed Second Lien Term Loan Claims and Holders of Interests pursuant to Article III of the Plan. The Debtors believe that the New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue Sky Law.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon these exemptions, as well as Section 4(a)(2) under the Securities Act, the Debtors believe that the offer, issuance and distribution under the Plan of the New Common Stock to the Holders of Allowed Claims or Interests entitled to receive the New Common Stock under Article III of the Plan (collectively, the "New Common Stock Holders"), following the filing of the Chapter 11 Cases may be made without registration under the Securities Act or any applicable state securities laws. To the extent that the offer, issuance and distribution of the New Common Stock to the New Common Stock Holders following the filing of the Chapter 11 Cases is covered by section 1145 of the Bankruptcy Code, subject to compliance with the New Organizational Documents, such New Common Stock may be resold without registration under the Securities Act or other federal securities laws, unless such holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such New Common Stock is governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state securities laws pursuant to various exemptions provided by the applicable states; however, the availability of such exemptions cannot be known unless applicable individual state securities laws are examined.

### B.    Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, subject to any restrictions in the New Organizational Documents, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading

transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock, would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and, in turn, whether any Person may freely resell the New Common Stock.

### C. Resale of New Common Stock Issued Pursuant to Section 4(a)(2) under the Securities Act.

Any New Common Stock distributed pursuant to section 4(a)(2) under the Securities Act will be offered, issued and distributed without registration under the Securities Act and applicable state securities laws and in reliance upon the exemption set forth therein. Such issuances will not be exempt under section 1145 of the Bankruptcy Code because those securities are not being issued in exchange for an existing Claim against the Debtors. Therefore, such New Common Stock pursuant to section 4(a)(2) under the Securities Act will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective

registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. The Debtors express no view as to whether any person may freely resell the New Common Stock issued pursuant to Section 4(a)(2) under the Securities Act.

Persons who receive securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under the federal or state securities laws and the circumstances under which securities may be sold in reliance on such laws. The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes. We make no representations concerning, and do not provide, any opinions or advice with respect to the Securities or the bankruptcy matters described in this Disclosure Statement. In light of the uncertainty concerning the availability of exemptions from the relevant provisions of federal and state securities laws, we encourage each recipient of securities and party in interest to consider carefully and consult with its own legal advisors with respect to all such matters. Because of the complex, subjective nature of the question of whether a security is exempt from the registration requirements under the federal or state securities laws or whether a particular recipient of securities may be an underwriter, we make no representation concerning the ability of a person to dispose of the securities issued under the Plan.

## I.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### D.      Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors and certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims and Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, Persons who hold Claims or who will hold the New ABL Facility (if applicable), the New Credit Facilities or New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in

bankruptcy, controlled foreign corporations, passive foreign investment companies, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, and U.S. Holders who prepare "applicable financial statements" (as defined in Section 451 of the Code)). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Code. This summary does not discuss differences in tax consequences to Holders of Claims or Interests that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Code). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims of Interests should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

E.     **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

1.     **In General**

The Debtors currently expect that the Restructuring Transactions will be structured as a recapitalization of the Debtors (a "Recapitalization Transaction") whereby Cash, the New ABL Facility (if applicable), New Common Stock, and New Term Loans will be transferred to Holders in satisfaction of their Claims and Interests.

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations, of which Fashion Holdings Intermediate Inc. is the common parent (Fashion Holdings Intermediate Inc. shall be referred to herein as "Reorganized Parent"). The remainder of this Article XI assumes that, upon Consummation of the Plan, Reorganized Parent will be organized and treated as a C corporation (within the meaning of section 1361 of the Code) for U.S. federal income tax purposes. If Reorganized Parent were instead organized and treated for U.S. federal income tax purposes as a partnership, disregarded entity, or other flow-through entity (each, a "Flow-Through Entity"), then the tax consequences of the Consummation of the Plan to the Debtors, Reorganized Debtors, and applicable Holders of Claims and Interests would be materially different than those described below. As a Flow-Through Entity, Reorganized Parent would not be subject to U.S. federal income tax. Instead, each U.S. Holder of New Common Stock would be required to report on its U.S. federal income tax return, and would be subject to tax with respect to (whether or not distributed), its distributive share of each item of income, gain, loss, deduction and credit of Reorganized Parent (which may include the income, gain, loss, deduction and credit of any Flow-Through Entities in which Reorganized Parent holds an interest).

As of January 31, 2020,[11] the end of the most recent taxable year, the Debtors estimate that they had approximately $146 million of federal net operating losses ("NOLs," together with any capital losses, interest expenses, and certain other tax attributes, collectively, the "Tax Attributes"), prior to carrying back such amount pursuant to the Coronavirus Aid, Relief, and Economic Security Act. In general, NOLs arising in taxable years starting in 2018 may be carried forward indefinitely. Subject to any applicable limitations, NOLs carried to taxable years before 2021 were permitted to offset 100 percent of taxable income and NOLs carried to taxable years starting with 2021 may be used to offset 80 percent of taxable income for any tax year thereafter. The Debtors have further elected to carry back a portion of their 2021 fiscal year NOL. They are expected to generate significant additional Tax Attributes during the 2021 and 2022 fiscal years prior to the Effective Date. Any Tax Attributes remaining upon implementation of the Plan may be available to offset taxable income or directly offset U.S. federal income tax liability in future years, thereby reducing the Debtors' future aggregate tax obligations, subject to the discussion below regarding certain provisions such as section 382 of the Code. As discussed below, the Debtors' Tax Attributes are expected to be significantly reduced upon implementation of the Plan.

### 2.     Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, the Debtors will realize and recognize taxable income upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness (such income, "COD Income"). The amount of COD Income, in general, with respect to the satisfaction of their indebtedness will be the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash, (ii) the fair market value of the New Common Stock, and (iii) the sum of the issue prices of indebtedness, in each case, given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the Code, the Debtors will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, the Debtors must reduce their tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including the amount of gain or loss recognized by the Debtors with respect to the sale of all or a portion of their assets in a Taxable Transaction). In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors

---

[11]   As is common for many retailers, the Debtors utilize a non-calendar fiscal year, which generally ends on January 31.

will remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Carryovers under Section 163(j) of the Code are not subject to reduction under these rules.  Alternatively, the Debtors may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the Code.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income.  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the New Term Loans and the fair market value of the New Common Stock, neither of which can be determined until after the Plan is consummated.

### a.   Limitation on NOLs and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors should succeed to the Debtors' tax attributes (including the Tax Attributes), but the Reorganized Debtors' ability to use any remaining tax attributes post-emergence may be subject to certain limitations under section 382 of the Code.[12]

Under section 382 of the Code, if the Debtors undergo an "ownership change," the amount of the Debtors' Tax Attributes, any net unrealized built in loss in its assets, and certain other attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that are otherwise available to be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.  The Debtors do not expect to have a net unrealized built-in loss on the Effective Date.

The rules of sections 382 of the Code are complicated, but as a general matter, the Debtors do not anticipate that the issuance of New Common Stock in connection with a Recapitalization Transaction will in itself result in an "ownership change" of the Debtors for these purposes.  However, it is quite possible that when combined with transfers that the Reorganized Debtors will have an "ownership change" and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Code applies.  For the remaining part of this discussion, it is assumed that an ownership change will occur.  If for some reason, the issuance of the New Common Stock does not result in an "ownership change," then Reorganized Debtor's Pre-Change Losses will not be subject to the limitations in section 382 as a result of the issuance of the New Common Stock.

---

[12]   Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses.  However, proposed regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that is commenced within 30 days of the publication of the finalized new rules in this area.  Accordingly, the Debtors do not expect the proposed regulations to apply to them or to the Reorganized Debtors.

i.   **General Section 382 Annual Limitation**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, or 1.10 percent for February 2021). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

ii.   **Special Bankruptcy Exceptions**

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, the Reorganized Debtors' Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the Debtors during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock pursuant to the Plan. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the New Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application. However, the Debtors currently believe that the Reorganized Debtors will utilize the Section 382(l)(6) Exception.

b.   **Excess Loss Accounts**

Generally, when corporations are members of an affiliated group filing a consolidated return, a parent corporation's basis in the stock of a subsidiary in such a group is (a) increased by the sum of (i) income of such subsidiary and (ii) contributions to such subsidiary, and (b) reduced by the sum of (i) losses or

deductions of such subsidiary that are used by the affiliated group and (ii) distributions from such subsidiary. In the case that the amount described in clause (b) above exceeds the amount described in clause (a) above, and such excess is greater than the parent corporation's basis in the subsidiary stock before the adjustments specified in clauses (a)-(b) are made, the amount by which such excess is greater than the parent corporation's basis in the subsidiary stock is called an "excess loss account" and is treated as negative basis for U.S. federal income tax purposes. The affiliated group must recognize income equal to the excess loss account in the subsidiary's stock in certain events, including (x) to the extent the subsidiary recognizes COD Income that is excluded from gross income pursuant to section 108 of the Code (as discussed above), and the affiliated group does not reduce its tax attributes by such excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration. It is possible that a Debtor will exclude COD Income in excess of available tax attributes and that there could be an excess loss account in the stock of that Debtor. In that case, the affiliated group will recognize taxable income in the amount of such excess COD Income, but not to exceed the amount of the excess loss account. In selecting the appropriate form and structure of the Restructuring Transactions, the Debtors will consider current and future cash tax costs, including the expected cost of recognizing all or a portion of an excess loss account (if any) as taxable income.

### F.     Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims and Interests

The following discussion assumes that the Debtors will structure the Restructuring Transactions as currently contemplated by the Plan. Importantly, the Debtors may (in connection with the Plan) implement certain Restructuring Transactions that would result in a different entity being the issuer of the New Common Stock than the current obligor on the Claims, which is why the discussion below discusses potential tax consequences where the New Common Stock does not constitute consideration that can be received tax-free. Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences of the Plan to U.S. Holders of certain Claims will depend, in part, on (a) whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes, and (b) whether the Debtor against which such Claims are asserted is the same entity that is issuing the consideration under the Plan (or, otherwise, an entity that is a "party to a reorganization" with the Debtor against which such Claims were asserted). Since it is anticipated that Reorganized Belk will issue the New Term Loans (though not the New Common Stock), it is possible that "recapitalization" treatment (within the meaning of section 368(a)(1)(E) of the Code) will be applicable in a Recapitalization Transaction.

Neither the Code nor the Treasury Regulations promulgated pursuant thereto defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. The Debtors expect that the relevant parties will be able to take the position that the "extended" portions of the First Lien Term Loan Claims and Second Lien Term Loan Claims will be treated as securities. However, due to the inherently factual nature of the determination,

U.S. Holders are urged to consult their tax advisors regarding the status of their Claims as "securities" for U.S. federal income tax purposes. The character of any gain or loss recognized by a U.S. Holder of a Claim as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

3. **Consequences to U.S. Holders of First Lien Term Loan Claims**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 4 First Lien Term Loan Claims, each U.S. Holder thereof will receive, as applicable, (a) its Pro Rata share of New FLSO Loans in a principal amount equal to 55.0% of such Holder's Allowed First Lien Term Loan Claim, and (b) Cash in an amount equal to the accrued and unpaid interest on the principal amount of such Claim through the Effective Date.

If (i) the First Lien Term Loan Claims qualify as a "security" of the Debtor entity that issues the New FLSO Loans (or a "party to the reorganization," in a tax sense, with such issuer), and (ii) if the New FLSO Loans qualifies as a "security," then a U.S. Holder of First Lien Term Loan Claims should be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes pursuant to section 368(a)(1)(E) of the Code. Subject to the rules regarding accrued but untaxed interest, discussed below, a U.S. Holder of such Claim should recognize gain, but not loss, with the amount of recognized gain equal to the lesser of (a) (i) the Cash received, and (b) the difference between (i) the sum of the Cash received and issue price of New FLSO Loans received pursuant to the Plan and (ii) such U.S. Holder's adjusted basis, if any, in such First Lien Term Loan Claim. The U.S. Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the consideration received equal to (A) the tax basis of the First Lien Term Loan Claim surrendered by such U.S. Holder, increased by (B) gain recognized (if any) by such U.S. Holder, decreased by (C) the Cash received. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the New FLSO Loans received should include the holding period for the exchanged First Lien Term Loan Claim exchanged.

If (i) the First Lien Term Loan Claims are not treated as securities, or (ii) the New FLSO Loans do not constitute a security of Reorganized Belk (or a "party to the reorganization," in a tax sense, with such issuer), then the exchange of such Claims should be treated as a taxable exchange pursuant to section 1001 of the Code. A U.S. Holder of a First Lien Term Loan Claim who is subject to this treatment should recognize gain or loss, subject to the discussion below regarding accrued but untaxed interest, equal to (A) the sum of (I) the issue price of the New FLSO Loans received, and (ii) Cash received, minus (b) the Holder's adjusted tax basis in its First Lien Term Loan Claim. Such U.S. Holder should obtain a tax basis in the New FLSO Loans received, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to the consideration's fair market value (or issue price, in the case of the New FLSO Loans) as of the date such consideration is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such consideration.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but untaxed interest, OID or market discount, see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

4. **Consequences to U.S. Holders of Second Lien Term Loans Claims**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 5 Second Lien Term Loan Claims, each U.S. Holder thereof will receive: (a) New FLSO Loans in a principal amount equal to 15.0% of such U.S. Holder's Allowed Second Lien Term Loan Claim, (b) New Second Lien Term Loans in a principal amount equal to 20.0% of such Holder's Allowed Second Lien Term Loan Claim, and (c) its Pro Rata share of 34.9% of the New Common Stock.

If (i) the Second Lien Term Loan Claims qualify as a "security" of the Debtor entity that issues the New FLSO Loans and New Second Lien Term Loans (or a "party to the reorganization," in a tax sense, with such issuer), and (ii) if either the New FLSO Loans or New Second Lien Term Loans qualifies as a "security," then a U.S. Holder of Second Lien Term Loan Claims should be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes pursuant to section 368(a)(1)(E) of the Code. Subject to the rules regarding accrued but untaxed interest, discussed below, a U.S. Holder of such Claim should recognize gain, but not loss, with the amount of recognized gain equal to the lesser of (a) (i) the fair market value of the New Common Stock received[13] and, if not issued by the same entity as the Second Lien Term Loan Claims, then the issue price of the New FLSO Loans or New Second Lien Term Loans received, and (b) the difference between (i) the sum of the fair market value of the New Common Stock received and the issue prices of the New FLSO Loans and New Second Lien Term Loans received, and (ii) such U.S. Holder's adjusted basis, if any, in such Second Lien Term Loan Claim. The U.S. Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the consideration received equal to (A) the tax basis of the Second Lien Term Loan Claim surrendered by such U.S. Holder, increased by (B) gain recognized (if any) by such U.S. Holder, decreased by (C) the fair market value of the New Common Stock received and, if not issued by the same entity as the Second Lien Term Loan Claims, then the issue price of the New FLSO Loans or New Second Lien Term Loans received, allocated between the consideration received in accordance with their respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the New FLSO Loans and/or New Second Lien Term Loans (to the extent issued by the same Debtor entity that issued the Second Lien Term Loans) received should include the holding period for the exchanged Second Lien Term Loan Claim. The holding period for any other property received (if any) should begin on the day following the receipt of such property.

If (i) the Second Lien Term Loan Claims are not treated as securities, or (ii) the New FLSO Loans and New Second Lien Term Loans do not constitute a security of Reorganized Belk (or a "party to the reorganization," in a tax sense, with such issuer), then the exchange of such Claims should be treated as a taxable exchange pursuant to section 1001 of the Code. A U.S. Holder of a Second Lien Term Loan Claim who is subject to this treatment should recognize gain or loss, subject to the discussion below regarding accrued but untaxed interest, equal to (A) the sum of (I) the issue prices of the New FLSO Loans and New Second Lien Term Loans received, and (ii) fair market value of the New Common Stock received, minus (b) the Holder's adjusted tax basis in its Second Lien Term Loan Claim. Such U.S. Holder should obtain a tax basis in the consideration received, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID), and subject to the rules relating to market discount, equal to the consideration's fair market value, in the case of the New Common Stock, and the issue price, in the case of the New FLSO and New Second Lien Term Loans) as of the date such consideration is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such consideration.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but untaxed interest, OID or market discount, see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

---

[13]   The New Common Stock is expected to constitute "boot" assuming it will not be issued by the same entity that is the obligor on the Second Lien Term Loans (or a "party to the reorganization," in a tax sense, with such entity).

5.      **Consequences to U.S. Holders of Class 9 Interests**

Pursuant to the Plan, a U.S. Holder of Class 9 Interests will retain its common stock of Reorganized Parent, which will be diluted to represent 50.1% of the outstanding common stock of the Reorganized Parent.  A U.S. Holder of such an Interest should not recognize gain or loss and its adjusted tax basis in the stock will remain unchanged.  A U.S. Holder's holding period for its interest in the common stock of the Reorganized Parent will remain unchanged.

6.      **Accrued Interest (and OID)**

To the extent that any amount received by a U.S. Holder of an exchanged Claim is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the exchanged Claim, the receipt of such amount should be recognized by the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest previously was recognized by the U.S. Holder but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).  The holding period for such non-Cash consideration should begin on the day following the receipt of such consideration.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on a Claim, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to untaxed interest that accrued on these Claims, if any.  However, the IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan and the U.S. federal income tax treatment of accrued but untaxed interest.

**U.S. HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE PROPER ALLOCATION OF THE CONSIDERATION RECEIVED BY THEM UNDER THE PLAN AND THE U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNTAXED INTEREST.**

7.      **Market Discount**

Under the "market discount" provisions of the Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges such Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a *de minimis* amount (equal to ¼ of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on such Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount. U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

**B.      U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New Term Loans**

*a.   Payments of Qualified Stated Interest*

Payments or accruals of "qualified stated interest" (as defined below) on the New Term Loans will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the New Term Loans, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

*b.   Original Issuance Discount*

Where, as here, certain U.S. Holders of Second Lien Term Loan Claims receiving debt instruments are also receiving other property in exchange for their Claims (*i.e.*, New Common Stock), the "investment unit" rules may apply to the determination of the "issue price" for any debt instrument received in exchange for their Second Lien Term Loan Claims. In such case, the issue price of the New Term Loans will depend, in part, on the issue price of the "investment unit" (*i.e.*, either the New FLSO Loan and the New Common Stock *or* the New Second Lien Term Loan and the New Common Stock), and the respective fair market values of the elements of consideration that compose the investment unit. The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument. As a result, the issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established market (*i.e.*, whether there is trading on an "established securities market" at any time during the 31-day period ending 15 days after the Effective Date). In general, consideration can be treated as being traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes available with respect to the items discussed below. Additionally, when

determining fair market value under these rules, actual trades and firm quotes will generally be dispositive, while it may be possible to refute the application of mere "indicative" quotes if such indicative quotes "materially misrepresent[] the fair market value of the property" being valued.

If none of the components of an investment unit nor the surrendered Second Lien Term Loan Claims are publicly traded on an established market, then the issue price of the applicable New Term Loans would generally be determined under section 1273(b)(4) or 1274 of the Code, as applicable. If none of the components of the investment unit are publicly traded on an established market, but the Second Lien Term Loan Claims are so traded, then the issue price of the investment unit will be determined by the fair market value of such Second Lien Term Loan Claims.

If the investment unit received in exchange for Second Lien Term Loan Claims is considered to be publicly traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit. The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded. In the event that an applicable New Term Loan is publicly traded on an established market but the New Common Stock is not treated as publicly traded on an established market, the determination of the issue price of the loans under the applicable New Term Loan is unclear. Such issue price could be based on (i) in the case where the Second Lien Term Loan Claims are also publicly traded on an established market, on the trading value of such Second Lien Term Loan Claims, allocated as described above, (ii) based on the demonstrated trading price of the applicable New Term Loan, or (iii) the stated redemption price at maturity of the applicable New Term Loan.

If an issue price is determined for the investment unit received in exchange for the Second Lien Term Loan Claims under the above rules, then the issue price of an investment unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the applicable New Term Loan.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

As discussed above, a debt instrument, such as a New Term Loan, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually. Moreover, a New Term Loan could be treated as issued with OID to the extent the allocation rules described above result in the New Term Loan having an issue price that is less than their stated redemption price at maturity.

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the New Term Loan multiplied by the remaining number of complete years to maturity from their original issue date, or if the New Term Loan provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the New Term Loan is issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Term Loan, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the New Term Loan that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the New Term Loans is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the New

Term Loan, and a Pro Rata amount of such *de minimis* OID must be included in income as principal payments are received on the New Term Loan.

### c.   Sale, Taxable Exchange or other Taxable Disposition

Upon the disposition of a New Term Loan by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but untaxed interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the New Term Loan, as applicable. A U.S. Holder's adjusted tax basis in their interest in the New Term Loan will be determined in the manner set forth above. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such New Term Loan for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

**U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### C.   U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Common Stock in the Reorganized Parent (including any New Common Stock)

### a.   Dividends on Common Stock

Any distributions made on account of the common stock of the Reorganized Parent will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Parent as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the common stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

### b.   Sale, Redemption, or Repurchase of Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the common stock in the Reorganized Parent. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the common stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

### 1.   Limitations on Use of Capital Losses

A U.S. Holder of who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns), or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

2. **Medicare Tax**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

G. **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims and Interests**

The following discussion assumes that the Debtors will structure the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex, and each Non-U.S. Holder should consult its tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holders and the ownership and disposition of the New Common Stock and New Term Loans.

1. **Gain Recognition on Exchange of Claims**

Whether a Non-U.S. Holder realizes gain or loss pursuant to the transactions undertaken as part of the Plan and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

To the extent that the Restructuring Transactions are treated as a taxable exchange or otherwise result in the recognition of taxable gain for U.S. federal income tax purposes, any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the U.S. for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met, or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the U.S. ("ECI") (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the U.S.).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. To claim an exemption or reduction of withholding tax under an applicable income tax treaty, the Non-U.S. Holder must provide an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. Non-

U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). To claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.     **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of the New Term Loans**

(a)     *Interest Payments; Accrued Interest (and OID)*

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder may qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in Reorganized Parent (or, in the case of interest received pursuant to the Plan, the Debtors) within the meaning of Section 871(h)(3) of the Code and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Reorganized Parent (or, in the case of interest received pursuant to the Plan, the Debtors), actually or constructively through the ownership rules under Section 864(d)(4) of the Code;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Reorganized Parent (or, as applicable, the Debtors) or Reorganized Parent's (or, as applicable, the Debtors') paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on the New Term Loan paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the New Term Loan or interest paid to a Non-U.S. Holder pursuant to the Plan is treated as ECI to the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply), provided the appropriate statement is provided to Reorganized Parent (or, with respect to interest received pursuant to the Plan, the Debtors) or Reorganized Parent's (or, as applicable, the Debtors') paying agent unless an applicable income tax treaty provides otherwise. To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS

70

Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

(b)     <em>Sale, Taxable Exchange, or Other Disposition of the New Term Loan</em>

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption, or other taxable disposition of the New Term Loan (other than any amount representing accrued but unpaid interest on the loan) unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the New Term Loan under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above. To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable income tax treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

3.     **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock**

(a)     <em>Dividends on New Common Stock</em>

Any distributions made with respect to New Common Stock (other than certain distributions of stock of Reorganized Parent) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Parent, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain). Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or

business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

> (b)     *Sale, Redemption, or Repurchase of New Common Stock of Reorganized Parent*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock of Reorganized Parent unless:

> (1)   such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

> (2)   such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

> (3)   the issuer of such New Common Stock is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act ("FIRPTA"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Stock will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S.

Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period, and (b) such interest is regularly traded on an established securities market.

The Debtors do not believe it is likely that Reorganized Parent will be a USRPHC for U.S. federal income tax purposes upon the Consummation of the Plan. In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Code and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest.

### 4.   FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type that can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019 that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S.-source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### 5.   Information Reporting and Back-Up Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. Additionally, under the backup withholding rules, a U.S. Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that U.S. Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the U.S. Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.   U.S. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR U.S. HOLDER IN LIGHT OF SUCH U.S. HOLDER'S CIRCUMSTANCES AND U.S. FEDERAL INCOME TAX SITUATION. ALL U.S. HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: January 26, 2021                                   BELK, INC.
                                                          on behalf of itself and all other Debtors

                                            By:    /s/  William Langley
                                                          673EDC71FFE54C1...
                                                          William Langley
                                                          Belk, Inc.

### Exhibit A

**Plan of Reorganization**

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BELK, INC., *et al.,*[1] | ) | Case No. 21-[_____] (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

### JOINT PREPACKAGED PLAN OF REORGANIZATION OF BELK, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

Kristhy M. Peguero (TX Bar No. 24102776)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     kpeguero@jw.com
            mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini, P.C. (*pro hac vice* admission pending)
Matthew C. Fagen (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     joshua.sussberg@kirkland.com
            steven.serajeddini@kirkland.com
            matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

*Dated: January 26, 2021*

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/belkballots. The location of the Debtors' service address is 2801 West Tyvola Road, Charlotte, North Carolina 28217.

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
      TIME, AND GOVERNING LAW...................................................................1
    A.     Defined Terms...............................................................................1
    B.     Rules of Interpretation. ...............................................................15
    C.     Computation of Time....................................................................15
    D.     Governing Law.............................................................................16
    E.     Reference to Monetary Figures....................................................16
    F.     Reference to the Debtors or the Reorganized Debtors...................16
    G.     Controlling Document..................................................................16
    H.     Consent Rights. ............................................................................16

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND
      RESTRUCTURING EXPENSES ...........................................................16
    A.     Administrative Claims. ................................................................17
    B.     Professional Fee Claims. ..............................................................17
    C.     Priority Tax Claims......................................................................18
    D.     Payment of Restructuring Expenses. ............................................18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................18
    A.     Classification of Claims and Interests..........................................18
    B.     Treatment of Claims and Interests................................................19
    C.     Special Provision Governing Unimpaired Claims.........................22
    D.     Elimination of Vacant Classes.....................................................23
    E.     Voting Classes; Presumed Acceptance by Non-Voting Classes....................23
    F.     Intercompany Interests.................................................................23
    G.     Confirmation  Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
       Code.............................................................................................23
    H.     Controversy Concerning Impairment............................................23
    I.     Subordinated Claims. ...................................................................23

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN.................................................24
    A.     General Settlement of Claims and Interests..................................24
    B.     Restructuring Transactions. ..........................................................24
    C.     The Reorganized Debtors. ............................................................25
    D.     Sources of Consideration for Plan Distributions. .........................25
    E.     Corporate Existence.....................................................................28
    F.     Vesting of Assets in the Reorganized Debtors..............................28
    G.     Cancellation of Existing Agreements and Interests.......................29
    H.     Corporate Action. ........................................................................29
    I.     New Organizational Documents. ..................................................30
    J.     Directors and Officers of Reorganized Debtors. ..........................30
    K.     Effectuating Documents; Further Transactions.............................30
    L.     Certain Securities Law Matters. ...................................................30
    M.     Section 1146 Exemption. .............................................................30
    N.     Employee Matters. .......................................................................31
    O.     Preservation of Causes of Action. ................................................31
    P.     Closing the Chapter 11 Cases. .....................................................32

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............ 32
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ................... 32
    B.    Indemnification Obligations. ...................................................................... 32
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................. 33
    D.    Insurance Policies. ................................................................................. 33
    E.    Reservation of Rights. ............................................................................ 33
    F.    Nonoccurrence of Effective Date. ............................................................... 34
    G.    Contracts and Leases Entered Into After the Petition Date. ................................... 34

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS........................................... 34
    A.    Timing and Calculation of Amounts to Be Distributed. ....................................... 34
    B.    Disbursing Agent. ................................................................................. 34
    C.    Rights and Powers of Disbursing Agent. ...................................................... 34
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. .................. 35
    E.    Manner of Payment. .............................................................................. 36
    F.    Compliance with Tax Requirements. ........................................................... 36
    G.    Allocations. ........................................................................................ 36
    H.    No Postpetition Interest on Claims. ............................................................. 36
    I.    Foreign Currency Exchange Rate. ............................................................... 36
    J.    Setoffs and Recoupment. ......................................................................... 36
    K.    Claims Paid or Payable by Third Parties. ...................................................... 37

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,
               AND DISPUTED CLAIMS .............................................................. 38
    A.    Disputed Claims Process. ......................................................................... 38
    B.    Allowance of Claims. ............................................................................. 38
    C.    Claims Administration Responsibilities. ....................................................... 38
    D.    Adjustment to Claims or Interests without Objection. ........................................ 39
    E.    Disallowance of Claims or Interests. ............................................................ 39

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
               PROVISIONS ............................................................................. 39
    A.    Discharge of Claims and Termination of Interests............................................. 39
    **B.**    **Release of Liens.** ................................................................................. 40
    **C.**    **Releases by the Debtors.**......................................................................... 40
    **D.**    **Releases by Holders of Claims and Interests.** ............................................... 41
    **E.**    **Exculpation.**...................................................................................... 43
    **F.**    **Injunction.** ........................................................................................ 43
    G.    Protections Against Discriminatory Treatment.................................................. 44
    H.    Document Retention. .............................................................................. 44
    I.    Reimbursement or Contribution. ................................................................ 44

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN....................... 44
    A.    Conditions Precedent to the Effective Date...................................................... 44
    B.    Waiver of Conditions. ............................................................................ 46
    C.    Effect of Failure of Conditions. ................................................................. 46

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ................... 46
    A.    Modification and Amendments.................................................................... 46
    B.    Effect of Confirmation on Modifications. ...................................................... 46
    C.    Revocation or Withdrawal of Plan. ............................................................. 46

ARTICLE XI. RETENTION OF JURISDICTION.................................................................47

ARTICLE XII. MISCELLANEOUS PROVISIONS...............................................................49
    A.      Immediate Binding Effect. ...................................................................49
    B.      Additional Documents. ........................................................................49
    C.      Payment of Statutory Fees...................................................................49
    D.      Statutory Committee and Cessation of Fee and Expense Payment.................49
    E.      Reservation of Rights...........................................................................49
    F.      Successors and Assigns. .......................................................................50
    G.      Notices................................................................................................50
    H.      Term of Injunctions or Stays................................................................52
    I.      Entire Agreement.................................................................................53
    J.      Exhibits. .............................................................................................53
    K.      Nonseverability of Plan Provisions. .....................................................53
    L.      Votes Solicited in Good Faith. .............................................................53
    M.      Closing of Chapter 11 Cases.................................................................53
    N.      Waiver or Estoppel. .............................................................................54

## INTRODUCTION

The Debtors propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.     "*ABL Agent*" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

2.     "*ABL Credit Agreement*" means that certain ABL Credit Agreement, dated as of December 10, 2015, by and among Bear Parent Inc., Belk, as borrower, the guarantors thereunder, the ABL Agent, Wells Fargo Bank, National Association, as syndication agent, and the ABL Lenders, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

3.     "*ABL Facility*" means the $900 million senior secured asset-based revolving credit facility provided under the ABL Credit Agreement.

4.     "*ABL Facility Claim*" means any and all Claims arising under, derived from, or based upon the ABL Loan Documents including, without limitation, all Obligations (as defined in the ABL Credit Agreement).

5.     "*ABL Lenders*" means those banks, financial institutions, and other lenders party to the ABL Credit Agreement from time to time, in their respective capacities thereunder.

6.     "*ABL Loan Documents*" means, collectively, the ABL Credit Agreement and any certificates, agreements, intercreditor agreements, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the ABL Credit Agreement.

7.     "*Ad Hoc Crossover Lender Group*" means the ad hoc group of Consenting First Lien Term Lenders and Consenting Second Lien Term Lenders represented by Willkie Farr & Gallagher LLP.

8.        "*Ad Hoc First Lien Term Lender Group*" means the ad hoc group of Consenting First Lien Term Lenders represented by O'Melveny & Myers LLP.

9.        "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

10.        "*Affiliate*" means, with respect to any specified Entity, any person or other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

11.        "*Agents*" means any administrative agent, collateral agent, or similar Entity under any of the ABL Credit Agreement, the First Lien Term Loan Documents, the Second Lien Term Loan Documents, the New Credit Facilities Documents, and the New ABL Facility Documents, including any successors thereto.

12.        "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

13.        "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

14.        "*Backstop Commitment*" means the commitment of each Backstop Party as set forth in the Backstop Commitment Letter.

15.        "*Backstop Commitment Letter*" means that certain backstop commitment letter dated January 26, 2021 (as may be amended or modified from time to time in accordance with the terms thereof), pursuant to which each Backstop Party has agreed to backstop the New FLFO New Money Loans.

16.        "*Backstop Parties*" means, collectively, each of the Lender Backstop Parties and the Sponsor Backstop Party, in their capacity as parties to the Backstop Commitment Letter.

17.        "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

18.        "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

19.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

20.     "*Belk*" means Belk, Inc., a Delaware corporation.

21.     "*Belk Acquiring Entities*" means one or more new entities formed to acquire, directly or indirectly, substantially all of the assets of the Debtors.

22.     "*Blackstone Credit*" means, collectively, GSO Beacon Holdings LP, GSO Credit Alpha Fund LP, and any Affiliate or transferee of any of the foregoing entities that hold Topco Equity Interests.

23.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

25.     "*Causes of Action*" means any claims, cross claims, third-party claims, interests, damages, judgments, remedies, causes of action, controversies, debts, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever (including those of the Debtors, the Reorganized Debtors, or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, pursuant to any other theory of law or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law preferential or fraudulent transfer or similar claim, and (f) any Avoidance Action.

26.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

28.     "*Claims and Noticing Agent*" means Prime Clerk LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

29.     "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

30.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

32.   "*Company Parties*" means Belk and each of its Affiliates (other than Sponsor) that are or become parties to the RSA, solely in their capacity as such.

33.   "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.   "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

35.   "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

36.   "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to, *inter alia*, section 1129 of the Bankruptcy Code.

37.   "*Consenting First Lien Term Lenders*" means the Holders of First Lien Term Loan Claims that are or become parties to the RSA, solely in their capacity as such.

38.   "*Consenting Lenders*" means the Consenting First Lien Term Lenders and the Consenting Second Lien Term Lenders.

39.   "*Consenting Second Lien Term Lenders*" means the Holders of Second Lien Term Loan Claims that are or become parties to the RSA, solely in their capacity as such.

40.   "*Consenting Sponsors*" means, collectively, each investment fund managed by, or other Affiliate (excluding the Debtors or Reorganized Debtors) of, Sycamore Partners Management, L.P. that is or becomes a party to the RSA, solely in their capacity as such.

41.   "*Consenting Stakeholders*" means any party (other than the Company Parties) to the RSA, each solely in their capacity as such, including each of the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors.

42.   "*Consummation*" means the occurrence of the Effective Date.

43.   "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

44.   "*Debtors*" means, collectively, each of the following:   Belk, Bear Parent Inc., Fashion Holdings Intermediate LLC, Fashion Intermediate Inc., Belk-Simpson Company, Greenville, South Carolina, Belk International, Inc., Belk Stores Services, Inc., Belk Administration Company, Belk Stores of Virginia LLC; Belk Accounts Receivable LLC, Belk Gift Card Company LLC, Belk Merchandising LLC, Belk Sourcing LLC, Belk Department Stores LP, The Belk Center, Inc., Belk Texas Holdings LLC, Belk Ecommerce LLC, and Belk Stores of Mississippi LLC.

45.   "*Debtor Release*" means the release set forth in Article VIII.C of this Plan.

46.    "*Definitive Documentation*" means the definitive documents and agreements governing the Restructuring Transactions (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in the Plan (as amended, modified, or supplemented from time to time), which shall each be in form and substance reasonably acceptable to the Required Consenting Stakeholders, including the following: (a) the Plan (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto); (b) the RSA (including the "Definitive Documents" as defined therein and not explicitly so defined herein); (c) any document or agreement that is part of the Plan Supplement; (d) the Disclosure Statement; (e) the New Credit Agreements and the New Credit Facilities Documents; (f) the New Organizational Documents; (g) the Confirmation Order; (h) the Financing Order; (i) the Backstop Commitment Letter; and (j) such other agreements and documentation desired or necessary to consummate and document the transactions contemplated by this Plan and the RSA.

47.    "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

48.    "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan, which Entity shall be reasonably acceptable to the Required Consenting Lenders and the Consenting Sponsors, and may include the Claims and Noticing Agent.

49.    "*Disclosure Statement*" means the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Belk, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

50.    "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

51.    "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing or such other date agreed to by the Debtors, the Required Consenting Lenders, and the Consenting Sponsors.

52.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

53.    "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with Article IV.N of the Plan.

54.    "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

55.    "*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

56.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

57.     "*Exculpated Partie*s" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) each Company Party; (c) each Consenting Stakeholder; (d) any statutory committee appointed in the Chapter 11 Cases and each of their respective members; and (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f).

58.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

59.     "*Fashion Topco*" means Fashion Topco LLC, a Delaware limited liability company.

60.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

61.     "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. "Filed" and "Filing" shall have correlative meanings.

62.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, stay, reargument, or rehearing has expired and no appeal, petition for certiorari, or motion for new trial, stay, reargument or rehearing shall then be pending or has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for new trial, stay, reargument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

63.     "*Financing Order*" means, as applicable, the interim and final orders of the Bankruptcy Court, if any, setting forth the terms of use of cash collateral and any documentation related thereto.

64.     "*First Lien Term Lender*" means any Holder of a First Lien Term Loan Claim.

65.     "*First Lien Term Loan*" means any loan outstanding under the First Lien Term Loan Credit Agreement.

66.     "*First Lien Term Loan Claim*" means any and all Claims arising under, derived from, or based upon the First Lien Term Loan Credit Agreement or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the First Lien Term Loan Credit Agreement) including accrued and unpaid interest on account of such Obligations as of the Effective Date (with interest to be calculated at the applicable rate, including default interest from and after the Petition Date); *provided* that the amount of any such Claim shall first be reduced by (a) the amount of any accrued and unpaid interest and amortization on the principal amount of such Claim that is paid in Cash on the Effective Date; and (b) the amount of any New FLFO Roll-Up Loans received by the Holder of such Claim prior to any distribution of New FLSO Loans on account of such Claim.

67. "*First Lien Term Loan Credit Agreement*" means that certain first lien credit agreement, dated as of December 10, 2015, by and among Bear Parent Inc., as holdings, Belk, as borrower, certain subsidiaries of Belk, as guarantors, the administrative agent thereunder, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

68. "*First Lien Term Loan Documents*" means, collectively, the First Lien Term Loan Credit Agreement and all other agreements, documents, and instruments with respect to the First Lien Term Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

69. "*General Unsecured Claim*" means any Claim that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) a Secured Tax Claim, (d) an Other Secured Claim, (e) a Priority Tax Claim, (f) an Other Priority Claim, (g) an ABL Facility Claim, (h) a First Lien Term Loan Claim, (i) a Second Lien Term Loan Claim, or (j) an Intercompany Claim.

70. "*GIC*" means Katriona Investment Pte Ltd.

71. "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

72. "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

73. "*Holder*" means an Entity holding a Claim or Interest.

74. "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

75. "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place as of the Petition Date, whether in the respective Debtors' bylaws, certificates of incorporation, limited partnership agreements, other formation documents, board resolutions, or contracts for the current and former: members of any Governing Body, directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors.

76. "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

77. "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

78. "*Interest*" means, collectively, (a) any Equity Security, or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity), in any Debtor, (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and (c) any and all Claims that are otherwise determined by the Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest or subject to subordination as an equity interest pursuant to section 510(b) of the Bankruptcy Code.

79. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

80.     "*KKR*" means, collectively,  Polar Bear Fund L.P., CPS Managers Master Fund L.P., KKR TFO Partners L.P., FS KKR Capital Corp, and PCOP II Cayman Investors A L.P.

81.     "*KKR, Blackstone Credit, and GIC Topco Equity Interests*" means, collectively, (a) any and all Topco Equity  Interests held by KKR; (b) any and all Topco Equity  Interests held by Blackstone Credit; and (c) any and all Topco Equity  Interests held by GIC.

82.     "*Lender Backstop Parties*" means those certain First Lien Term Lenders and Second Lien Term Lenders that have committed to backstop the New FLFO New Money Loans and are signatories to the Backstop Commitment  Letter.

83.     "*Lender Backstop Commitment Premium*" means Cash equal to 10.00% of the aggregate principal amount of the New FLFO New Money Loans committed by the Lender Backstop Parties pursuant to the terms of the Backstop Commitment  Letter.

84.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

85.     "*New ABL Credit Agreement*" means the loan agreement memorializing  the New ABL Facility (which may be effectuated through an amendment and restatement of the ABL Credit Agreement), the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Debtors, the Agent thereunder, and the New ABL Facility Lenders, *provided* that any terms of the New ABL Credit Agreement that are materially inconsistent with the ABL Credit Agreement shall be in form and substance reasonably acceptable to the Required Consenting Lenders and the Consenting  Sponsors.

86.     "*New ABL Facility*" means the refinanced ABL Facility  or a replacement asset-based loan facility to be provided to the Reorganized Debtors in accordance with the terms and conditions  set forth in the New ABL Facility Documents.

87.     "*New ABL Facility Agent*" means the administrative  agent under the New ABL Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New ABL Credit Agreement.

88.     "*New ABL Facility Documents*" means, collectively, the New ABL Credit Agreement and any other agreements or documents related to or executed in connection with the New ABL Facility, including  any amendments, modifications,  supplements thereto in accordance with the terms thereof, *provided* that any terms of the New ABL Facility Documents that are materially inconsistent with the ABL Credit Agreement shall be in form and substance reasonably acceptable to the Required Consenting Lenders and the Consenting Sponsors; *provided*, *further*, that with the consent of the ABL Agent and unless expressly provided otherwise herein or in the New ABL Facility  Documents, all ABL Loan Documents shall be deemed to be New ABL Facility  Documents.

89.     "*New ABL Facility Lenders*" means the lenders party to the New ABL Credit Agreement.

90.     "*New Board*" means the board of directors or similar Governing  Body of Reorganized Belk Holdings.

91.     "*New Common Stock*" means the common stock, limited  liability  company membership units, or functional  equivalent  thereof of Reorganized Belk Holdings.

92.     "*New Credit Agreements*" means, collectively, the New First Lien Credit Agreement and the New Second Lien Credit Agreement.

93.     "*New Credit Facilities*" means, collectively, the New First Lien Credit Facility and the New Second Lien Credit Facility.

94.     "*New Credit Facilities Documents*" means, collectively, the New First Lien Credit Facility Documents and the New Second Lien Credit Facility Documents.

95.     "*New Credit Facility Lenders*" means, collectively, each New First Lien Credit Facility Lender and New Second Lien Credit Facility Lender.

96.     "*New D&O Tail Coverage*" means reasonably sufficient "tail" or "runoff" liability insurance policy coverage that provides (a) coverage for the six-year period following the Effective Date for the benefit of the Reorganized Debtors and all current and former members of any Governing Body, directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors with coverage with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing policies applicable to such Persons upon placement, or (b) such other coverage terms as are otherwise acceptable to the Debtors, the Required Consenting Lenders, and the Consenting Sponsors.

97.     "*New First Lien Credit Agreement*" means the loan agreement memorializing the New First Lien Credit Facility, which shall be entered into by one or more of the Reorganized Debtors, the Agent thereunder, and the New First Lien Credit Facility Lenders, and may be effectuated through an amendment and restatement of the First Lien Term Loan Credit Agreement.

98.     "*New First Lien Credit Facility*" means the new first lien secured term loan facility in the aggregate principal amount of up to $1.12 billion to be provided to the Reorganized Debtors in accordance with the terms and conditions set forth in the New First Lien Credit Facility Documents.

99.     "*New First Lien Credit Facility Agent*" means the administrative agent under the New First Lien Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New First Lien Credit Agreement.

100.    "*New First Lien Credit Facility Documents*" means, collectively, the New First Lien Credit Agreement and any other agreements or documents related to or executed in connection with the New First Lien Credit Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

101.    "*New First Lien Credit Facility Lenders*" means the lenders party to the New First Lien Credit Agreement.

102.    "*New FLFO Loans*" means the "first lien first-out" term loans provided under the New First Lien Credit Facility on the terms and conditions set forth in the New First Lien Credit Facility Documents.

103.    "*New FLFO Loans Commitment Premium*" means New FLSO Loans equal to 25.00% of the principal amount of First Lien Term Loans (as reduced by the amount of New FLFO Roll-Up Loans received by the holder of such First Lien Term Loan Claims) held by each First Lien Term Lender that funds its ratable share of the New FLFO New Money Loans on the Effective Date.

104.  "*New FLFO New Money Loans*" means $225 million of New FLFO Loans provided under the New First Lien Credit Facility on terms and conditions set forth in the New First Lien Credit Facility Documents.

105.  "*New FLFO Roll-Up Loans*" means $75 million of New FLFO Loans provided under the New First Lien Credit Facility on terms and conditions set forth in the New First Lien Credit Facility Documents.

106.  "*New FLSO Loans*" means the "first lien second-out" term loans provided under the New First Lien Credit Facility on the terms and conditions set forth in the New First Lien Credit Facility Documents.

107.  "*New Organizational Documents*" means the documents providing for corporate governance of Reorganized Belk Holdings, Reorganized Belk, and the other Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the RSA (and subject to the consent, approval, and consultation rights set forth therein) and reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

108.  "*New Second Lien Credit Agreement*" means the loan agreement memorializing the New Second Lien Credit Facility, which shall be entered into by one or more of the Reorganized Debtors, the Agent thereunder, and the New Second Lien Credit Facility Lenders, and may be effectuated through an amendment and restatement of the Second Lien Term Loan Credit Agreement.

109.  "*New Second Lien Credit Facility*" means the new second lien secured term loan facility in the aggregate principal amount of $110 million to be provided to the Reorganized Debtors in accordance with the terms and conditions set forth in the New Second Lien Credit Facility Documents.

110.  "*New Second Lien Credit Facility Agent*" means the administrative agent under the New Second Lien Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New Second Lien Credit Agreement.

111.  "*New Second Lien Credit Facility Documents*" means, collectively, the New Second Lien Credit Agreement and any other agreements or documents related to or executed in connection with the New Second Lien Credit Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

112.  "*New Second Lien Credit Facility Lenders*" means the lenders party to the New Second Lien Credit Agreement.

113.  "*New Second Lien Term Loans*" means $110 million of second lien term loans provided under the New Second Lien Credit Facility on the terms and conditions set forth in the New Second Lien Credit Facility Documents.

114.  "*New Shareholders Agreement*" means the shareholders agreement or other applicable agreement (including all annexes, exhibits, and schedules thereto) governing the New Common Stock, which agreement shall be substantially consistent with the applicable term sheet or substantially in the form included in the Plan Supplement and reasonably acceptable to the Debtors, the Consenting Sponsors, and the Required Consenting Lenders.

115.    "*New Term Loans*" means, collectively, the New FLFO Loans, the New FLSO Loans, and the New Second Lien Term Loans.

116.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

117.    "*Other Secured Claim*" means any Secured Claim against the Debtors other than an ABL Facility Claim, a First Lien Term Loan Claim, or a Second Lien Term Loan Claim

118.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

119.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

120.    "*Plan"* means this *Joint Prepackaged Plan of Reorganization of Belk, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement, which is incorporated herein by reference.

121.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

122.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than one (1) Business Day after the Petition Date, including the following, as applicable: (a) the New Organizational Documents; (b) the identity and members of the New Board and any executive management for the Reorganized Debtors; (c) the Schedule of Retained Causes of Action; (d) the New ABL Credit Agreement; (e) the New Credit Agreements; (f) the Description of Transaction Steps; (g) the New Shareholders Agreement; and (h) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, which shall each be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

123.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

124.    "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

125.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals reasonably estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B of the Plan.

126.    "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

127.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

128.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

129.    "*Pro Rata*" means, unless otherwise specified, the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

130.    "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

131.    "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.  For the avoidance of doubt, the current and former members of each Governing Body (and their attorneys and other professionals retained by them in their capacity as members of a Governing Body) are Related Parties of the Debtors.

132.    "*Released Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Crossover Lender Group; (e) each member of the Ad Hoc First Lien Term Lender Group; (f) each Company Party; (g) each Agent; (h) each ABL Lender; (i) each First Lien Term Lender; (j) each Second Lien Term Lender; (k) all Holders of Interests; (l) each Backstop Party; (m) each Sponsor; (n) each New Credit Facility Lender; (o) each New ABL Facility Lender; and (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q); and (q) each Related Party of each Entity in clause (a) through this clause (q); provided that in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation of the Plan.

133.    "*Releasing Party*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Crossover Lender Group; (e) each member of the Ad Hoc First Lien Term Lender Group; (f) each Company Party; (g) each Agent; (h) each ABL Lender; (i) each First Lien Term Lender; (j) each Second Lien Term Lender; (k) all Holders of Claims; (l) all Holders of Interests; (m) each Sponsor; (n) each Backstop Party; (o) each New Credit Facility Lender; (p) each New ABL Facility Lender; and (q) each current and former Affiliate of each Entity in clause (a) through the following clause (r); and (r) each Related Party of each Entity in clause (a) through this clause (r); provided that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation of the Plan.

134.    "*Reorganized Belk*" means Belk, as reorganized pursuant to and in accordance with the Plan, and any successor(s) thereto.

135.    "*Reorganized Belk Holdings*" means the parent entity of the Reorganized Debtors, after giving effect to the Restructuring Transactions, which for the avoidance of doubt may be Fashion Holdings Intermediate LLC or a Belk Acquiring Entity.

136.    "*Reorganized Debtors*" means, collectively,  a Debtor, or any successor or assign thereto, by merger, consolidation,  or otherwise, on and after the Effective Date, including  any Belk Acquiring Entities.

137.    "*Required Consenting First Lien Term Lenders*" means, as of the relevant date, Consenting First Lien Term Lenders holding  at least 50.1% of the aggregate principal amount of First Lien Term Loans that are held by Consenting First Lien Term Lenders, which, for the avoidance of doubt, shall include (a) Consenting First Lien Term Lenders holding  at least 50.1% of the aggregate principal amount of First Lien Term Loans held by Consenting First Lien Term Lenders represented by Willkie  Farr & Gallagher LLP; and also (b) Consenting First Lien Term Lenders holding  at least 50.1% of the aggregate principal amount of First Lien Term Loans held by Consenting First Lien Term Lenders represented by O'Melveny & Myers LLP.

138.    "*Required Consenting Lenders*" means, collectively,  as of the applicable date of determination, the Required Consenting First Lien Term Lenders and the Required Consenting Second Lien Term Lenders.

139.    "*Required Consenting Second Lien Term Lenders*" means, as of the relevant date, Consenting Second Lien Term Lenders holding  at least 50.01% of the aggregate outstanding  principal amount of Second Lien Term Loans that are held by Consenting Second Lien Term Lenders.

140.    "*Required Consenting Stakeholders*" means, collectively,  the Required Consenting Lenders and the Consenting Sponsors.

141.    "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of:  (a) (i) Willkie  Farr & Gallagher LLP, as counsel to the Ad Hoc Crossover Lender Group, (ii) any local counsel to the Ad Hoc Crossover Lender Group, and (iii) PJT Partners LP, as investment banker to Willkie Farr & Gallagher LLP in connection with its representation of the Ad Hoc Crossover Lender Group; (b) (i) O'Melveny & Myers LLP, as counsel to the Ad Hoc First Lien Term Lender Group, (ii) any local counsel to the Ad Hoc First Lien Term Lender Group, and (iii) Evercore LLC, as investment banker to O'Melveny & Myers LLP in connection with its representation of the Ad Hoc First Lien Term Lender Group, (c) Latham & Watkins, LLP, as counsel to the Consenting Sponsors; and (d) (i) Morgan, Lewis & Bockius LLP, as counsel to the ABL Agent and (ii) any local counsel to the ABL Agent, in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties or by the applicable Consenting Stakeholders, as the case may be, without further order of, or application  to, the Bankruptcy Court by such consultant or professionals.

142.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

143.    "*RSA*" means that certain Restructuring Support Agreement by and among the Debtors and the other parties thereto, as may be amended, modified,  or supplemented from time to time in accordance with its terms.

144.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified,  or supplemented from time to time with the consent of the Required Consenting Lenders, the Consenting Sponsors, and the Debtors (such consent not to be unreasonably withheld).

145.    "*Second Lien Term Lender*" means any Holder of a Second Lien Term Loan Claim.

146.     "*Second Lien Term Loan*" means any loan outstanding under the Second Lien Term Loan Credit Agreement.

147.     "*Second Lien Term Loan Claim*" means any and all Claims arising under, derived from, or based upon the Second Lien Term Loan Credit Agreement or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the Second Lien Term Loan Credit Agreement) including accrued and unpaid interest on account of such Obligations as of the Effective Date (with interest to be calculated at the applicable rate, including default interest from and after the Petition Date); *provided* that the amount of any such Claim shall first be reduced by the amount of any accrued and unpaid interest and amortization on the principal amount of such Claim that is paid in Cash on the Effective Date.

148.     "*Second Lien Term Loan Credit Agreement*" means that certain second lien credit agreement, dated as of December 10, 2015, by and among Bear Parent Inc., as holdings, Belk, as borrower, certain subsidiaries of Belk, as guarantors, the administrative agent and collateral agent thereunder, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

149.     "*Second Lien Term Loan Documents*" means, collectively, the Second Lien Term Loan Credit Agreement and all other agreements, documents, and instruments with respect to the Second Lien Term Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

150.     "*Secured Claim*" means a Claim: (a) secured by a valid, perfected and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

151.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

152.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

153.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

154.     "*Sponsor Backstop Party*" means the investment funds managed by, or other Affiliates (excluding any of the Debtors or Reorganized Debtors) of, Sycamore Partners Management, L.P., whose name(s) are listed on the signature pages to the Backstop Commitment Letter.

155.     "*Sponsor*" means, collectively, each investment fund managed by, or other Affiliate (excluding any of the Debtors or Reorganized Debtors) of, Sycamore Partners Management, L.P., in each case, in their capacity as indirect holders of Interests.

156.     "*Term Lender*" means each First Lien Term Lender and Second Lien Term Lender.

157.     "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

158.     "*Topco Equity Interests*" means, collectively, (a) any equity or other ownership interest in Fashion Topco; and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights,

restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such equity interest or other ownership interest in Fashion Topco.

159.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

160.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

B.    *Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents (as defined in the RSA) or any amendments thereto; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, limited liability company agreement, by-law, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur

pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan, and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan or any Plan Supplement document, the Confirmation Order shall control.

H.      *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the RSA set forth in the RSA with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and be fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *Professional Fee Claims.*

1.     Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2.     Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.     Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional

does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

      4.   Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.    *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided, however,* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post- Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such

Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| Class 9 | Interests | Impaired | Entitled to Vote |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.      Class 1 - Other Secured Claims

(a)      *Classification*: Class 1 consists of any Other Secured Claims against any Debtor.

(b)      *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the option of the applicable Debtor or Reorganized Debtor, either:

(i)      payment in full in Cash of its Allowed Class 1 Claim;

(ii)      the collateral securing its Allowed Class 1 Claim;

(iii)      Reinstatement of its Allowed Class 1 Claim; or

(iv)      such other treatment rendering its Allowed Class 1 Claim Unimpaired in

accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 - Other Priority Claims</u>

    (a)    *Classification*: Class 2 consists of any Other Priority Claims against any Debtor.

    (b)    *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim.

    (c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 - ABL Facility Claims</u>

    (a)    *Classification*: Class 3 consists of any ABL Facility Claims against any Debtor.

    (b)    *Allowance*: On the Effective Date, the ABL Facility Claims shall be Allowed in the aggregate principal amount of $383,000,000, plus accrued and unpaid interest on such principal amount through the Petition Date, amounts drawn under existing letters of credit, and fees and other expenses arising under or in connection with the ABL Credit Agreement.

    (c)    *Treatment*: On the Effective Date, unless otherwise agreed by a Holder of an Allowed ABL Facility Claim, each Holder of an Allowed ABL Facility Claim shall, at the election of such Holder, receive (i) payment in Cash of its Allowed ABL Facility Claim and replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement; or (ii)(x) its Pro Rata share of refinanced loans under the New ABL Facility in an amount equal to the principal amount of ABL Facility Claims held by such Holder as of the Effective Date, and (y) Cash in an amount equal to the accrued but unpaid non-default interest payable to such Holder under the ABL Credit Agreement as of the Effective Date (if any).

    (d)    *Voting*: Class 3 is Unimpaired under the Plan. Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4. <u>Class 4 - First Lien Term Loan Claims</u>

    (a)    *Classification*: Class 4 consists of any First Lien Term Loan Claims.

    (b)    *Allowance*: On the Effective Date, the First Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $999,400,000, plus accrued and unpaid interest on such principal amount through the Effective Date and any fees and other expenses arising under or in connection with the First Lien Term Loan Credit Agreement.

    (c)    *Treatment*: On the Effective Date, each Holder of an Allowed First Lien Term Loan Claim shall receive, in full and final satisfaction of such Claim, New FLSO Loans in a principal amount equal to 55.0% of such Holder's Allowed First Lien Term Loan Claim; *provided*, that all accrued and unpaid amortization and interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Effective Date.

    (d)    *Voting:* Class 4 is Impaired under the Plan and Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. <u>Class 5 - Second Lien Term Loan Claims</u>

    (a)    *Classification*: Class 5 consists of any Second Lien Term Loan Claims.

    (b)    *Allowance*: On the Effective Date, the Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $550,000,000, plus accrued and unpaid interest on such principal amount through the Effective Date and any fees and other expenses arising under or in connection with the Second Lien Term Loan Credit Agreement.

    (c)    *Treatment*: On the Effective Date, each Holder of an Allowed Second Lien Term Loan Claim shall receive, in full and final satisfaction of such Claim: (i) New FLSO Loans in a principal amount equal to 15.0% of such Holder's Allowed Second Lien Term Loan Claim; (ii) New Second Lien Term Loans in a principal amount equal to 20.0% of such Holder's Allowed Second Lien Term Loan Claim; and (iii) its Pro Rata share of 34.9% of the New Common Stock; *provided*, that all accrued and unpaid interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Effective Date.

    (d)    *Voting:* Class 5 is Impaired under the Plan and Holders of Allowed Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. <u>Class 6 - General Unsecured Claims</u>

    (a)    *Classification*: Class 6 consists of all General Unsecured Claims.

    (b)    *Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim and at the Debtors' sole discretion, either:

(i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or

(ii) payment in full in Cash on (A) the Effective Date, or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(c)     *Voting*: Class 6 is Unimpaired under the Plan. Holders of Claims in Class 6 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

7.   Class 7 - Intercompany Claims

(a)     *Classification:* Class 7 consists of all Intercompany Claims.

(b)     *Treatment:* Intercompany Claims shall be, at the option the Reorganized Debtors, either: (i) Reinstated; or (ii) distributed, contributed, set off, cancelled and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors.

(c)     *Voting:* Class 7 is Unimpaired if the Class 7 Claims are Reinstated or Impaired if the Class 7 Claims are cancelled. Holders of Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

8.   Class 8 - Intercompany Interests

(a)     *Classification:* Class 8 consists of all Intercompany Interests.

(b)     *Treatment:* Intercompany Interests shall be, at the option of the Reorganized Debtors, either: (i) Reinstated; or (ii) cancelled and released without any distribution on account of such Interests.

(c)     *Voting*: Class 8 is Unimpaired if the Class 8 Interests are Reinstated or Impaired if the Class 8 Interests are cancelled. Holders of Class 8 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 8 Interests are not entitled to vote to accept or reject the Plan.

9.   Class 9 – Interests

(a)     *Classification:* Class 9 consists of all Interests in Fashion Holdings Intermediate LLC.

(b)     *Treatment:* On the Effective Date, all Interests will be Reinstated, subject to dilution on account of the New Common Stock, and the legal, equitable, and contractual rights to which holders of Interests are entitled shall otherwise remain unaltered.

        (c)     *Voting*: Class 9 is Impaired under the Plan and Holders of Allowed Interests in Class 9 are entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.      *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, and subject to the RSA, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection (as applicable), enforceability, priority or extent of the ABL Facility Claims, the First Lien Term Loan Claims, the Second Lien Term Loan Claims, or the Interests, (2) any claim to avoid, subordinate, or disallow any ABL Facility Claims, First Lien Term Loan Claims, Second Lien Term Loan Claims, or Interests, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction, including those transactions set forth in the Description of Transaction Steps, and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, as applicable, the issuance, transfer, or cancellation of any securities, notes, instruments, certificates, and other documents required to be issued, transferred, or cancelled pursuant to the Plan or any Restructuring Transaction, subject to the terms of the RSA. Reorganized Belk shall be the borrower under the New Credit Facilities and the New ABL Facility, and Reorganized Belk Holdings shall be the issuer of New Common Stock to the applicable Holders of Claims and Interests as set forth herein and in the applicable Definitive Documentation. On the Effective Date, 15.0% of the New Common Stock shall also be distributed on a pro rata basis to the First Lien Term Lenders and the Second Lien Term Lenders (based on such First Lien Term Lender's or Second Lien Term Lender's funded amount of the New FLFO New Money Loans as a proportion of $125 million) that participate in the New FLFO New Money Loans.

On the Effective Date, KKR, Blackstone Credit, and GIC shall be deemed to have waived all legal, equitable, and contractual interests in the KKR, Blackstone Credit, and GIC Topco Equity Interests, and

the KKR, Blackstone Credit, and GIC Topco Equity Interests shall be cancelled and released without any distribution on account of such Topco Equity Interests.

The actions to implement the Restructuring Transactions may include, in accordance with the consent rights in the RSA: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.      *The Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents, in each case, in accordance with the terms set forth in the New Shareholders Agreement. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

D.      *Sources of Consideration for Plan Distributions.*

1.   New ABL Facility.

On the Effective Date, the Reorganized Debtors shall enter into the New ABL Facility, the terms of which will be set forth in the New ABL Facility Documents. Confirmation of the Plan shall be deemed approval of the New ABL Facility and the New ABL Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New ABL Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New ABL Facility.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, extended and/or reaffirmed (including in connection with any ABL Facility Claims that are refinanced by the New ABL Facility) in accordance with the New ABL Facility Documents (a) shall be deemed to be granted, carried forward, continued, amended, extended and/or reaffirmed, (b) shall be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New ABL Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New ABL Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order

(it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

    2.   New First Lien Credit Facility.

On the Effective Date, the Reorganized Debtors shall enter into the New First Lien Credit Facility, the terms of which will be set forth in the New First Lien Credit Facility Documents. Confirmation of the Plan shall be deemed approval of the Backstop Commitment Letter, the New First Lien Credit Facility, and the New First Lien Credit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees (including the New FLFO Loans Commitment Premium, the Lender Backstop Commitment Premium, and the other fees and premiums and other consideration described herein and in the Backstop Commitment Letter), indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New First Lien Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New First Lien Credit Facility. For the avoidance of doubt, the New First Lien Credit Agreement may be effectuated through an amendment and restatement of the First Lien Term Loan Credit Agreement. Execution of the New First Lien Credit Agreement by the New First Lien Credit Facility Agent shall be deemed to bind all Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims as if each such Holder had executed the New First Lien Credit Agreement with appropriate authorization.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, or extended in accordance with the New First Lien Credit Facility Documents shall, as applicable, (a) be deemed to be granted, carried forward, continued, amended, or extended to secure the New First Lien Credit Facility, (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Credit Facility Documents, (c) be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New First Lien Credit Facility Documents, and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The New Term Loans to be issued under the New First Lien Credit Facility will consist of (a) New FLFO Loans in the aggregate principal amount of $300 million, consisting of New FLFO New Money Loans and New FLFO Roll-Up Loans; and (b) New FLSO Loans in the aggregate principal amount of up to $822 million. On the Effective Date, the roll-up of First Lien Term Loans with New FLFO Roll-Up Loans shall take place immediately prior to any distribution of New FLSO Loans on account of the First Lien Term Loan Claims.

Each Term Lender may participate in the New FLFO New Money Loans on behalf of some or all funds or accounts managed or advised by such Term Lender, or some or all funds or accounts managed or

advised by the investment manager or advisor of such Term Lender, or any affiliate thereof, and may allocate its participation in the New FLFO New Money Loans among such funds or accounts in its sole discretion.

The Lender Backstop Parties have committed to backstop $125 million in the aggregate principal amount of the New FLFO New Money Loans. The Sponsor Backstop Party has committed to backstop $100 million in the aggregate principal amount of the New FLFO New Money Loans. To the extent the total subscriptions by the New Credit Facility Lenders that are First Lien Term Lenders or Second Lien Term Lenders exceed the applicable New FLFO New Money Loan commitments allocated to the applicable group of the New Credit Facility Lenders, the excess amount would first reduce the funding commitments not subscribed by their respective First Lien Term Lender or Second Lien Term Lender group on a dollar for dollar basis (if any), with the remaining excess amount to reduce the New FLFO New Money Loan funding commitments that are backstopped by the Sponsor Backstop Party on a dollar for dollar basis; *provided*, that such oversubscription by First Lien Term Lenders and Second Lien Term Lenders and corresponding reduction of New FLFO New Money Loan commitments will be limited (on a ratable basis) such that the Sponsor Backstop Party's funded aggregate principal amount of New FLFO New Money Loans shall in no event be below $65 million; provided, further that such First Lien Term Lenders or Second Lien Term Lenders may elect to limit any such oversubscription to reduction of the First Lien Term Lenders' and Second Lien Term Lenders' New FLFO New Money Loan commitments.

On the Effective Date, as consideration for the Lender Backstop Parties' respective Backstop Commitments: (a) each Lender Backstop Party shall receive its pro rata share (based on such Lender Backstop Party's proportionate share of the aggregate Backstop Commitments of all of the Lender Backstop Parties) of the Lender Backstop Commitment Premium; and (b) each First Lien Term Lender that is also a Lender Backstop Party shall receive its pro rata share of $30 million of the New FLFO Roll-Up Loans (based on such First Lien Term Lender's proportionate share of the Backstop Commitments in respect of the two-thirds of the $125 million of the New FLFO New Money Loans backstopped by the Lender Backstop Parties that are First Lien Term Lenders).

Each First Lien Term Lender that funds at least its pro rata share of two-thirds of $125 million of the New FLFO New Money Loans shall receive on the Effective Date as consideration for its commitment to fund the New FLFO New Money Loans (a) its pro rata share (based on such First Lien Term Lender's total funding of New FLFO New Money Loans out of two-thirds of $125 million of New FLFO New Money Loans) of $45 million of the New FLFO Roll-Up Loans; and (b) a New FLFO Loans Commitment Premium.[2]

3.   New Second Lien Credit Facility.

On the Effective Date, the Reorganized Debtors shall enter into the New Second Lien Credit Facility, the terms of which will be set forth in the New Second Lien Credit Facility Documents. Confirmation of the Plan shall be deemed approval of the New Second Lien Credit Facility and the New Second Lien Credit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Second Lien Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by

---

[2]   In addition to the foregoing, a supplemental fee of $12 million will be paid to and divided between certain Consenting First Lien Term Lenders pursuant to the terms and conditions set forth in the Backstop Commitment Letter.

the New Second Lien Credit Facility. For the avoidance of doubt, the New Second Lien Credit Agreement may be effectuated through an amendment and restatement of the Second Lien Term Loan Credit Agreement. Execution of the New Second Lien Credit Agreement by the New Second Lien Credit Facility Agent shall be deemed to bind all Holders of Second Lien Term Loan Claims as if each such Holder had executed the New Second Lien Credit Agreement with appropriate authorization.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, or extended in accordance with the New Second Lien Credit Facility Documents shall, as applicable, (a) be deemed to be granted, carried forward, continued, amended, or extended to secure the New Second Lien Credit Facility, (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Second Lien Credit Facility Documents, (c) be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Second Lien Credit Facility Documents, and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

4.   <u>New Common Stock</u>.

Reorganized Belk Holdings shall be authorized to issue a certain number of shares, units, or other interests of New Common Stock pursuant to its New Organizational Documents and the New Shareholders Agreement. On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan and the applicable Definitive Documentation.

All of the shares, units, or other interests constituting New Common Stock issued pursuant to the Plan, the New Shareholders Agreement, and the Definitive Documentation shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

E.   *Corporate Existence.*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except with respect to the New Credit Facilities, the New ABL Facility, the First Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan), the First Lien Term Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New First Lien Credit Facility or the First Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan)), the Second Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan), the Second Lien Term Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New Second Lien Credit Facility or the Second Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan)), the ABL Credit Agreement (if amended and restated, refinanced or deemed to be reaffirmed in connection with the New ABL Facility), the ABL Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New ABL Facility or the New ABL Credit Agreement (if amended and restated in connection with consummation of the Plan)), or to the extent otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.

H.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors; (3) the issuance of the New Common Stock and entry into the New Shareholders Agreement; (4) implementation of the Restructuring Transactions; (5) entry into the New Credit Facilities Documents and the New ABL Facility Documents; (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the New Organizational Documents; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized

Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the New Credit Facilities, the New Credit Facilities Documents, the New ABL Facility, the New ABL Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  Additionally, on the Effective Date, each recipient of New Common Stock shall execute the New Shareholders Agreement.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.      *New Organizational Documents.*

Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the terms set forth in the New Shareholders Agreement and the corporate laws of the respective state, province, or country of incorporation.  The New Organizational Documents will prohibit the issuance of non-voting Equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.

J.      *Directors and Officers of Reorganized Debtors.*

As of the Effective Date, the term of the current members of the Debtors' respective Governing Bodies shall expire, and the members for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Shareholders Agreement.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Shareholders Agreement, and other constituent documents of the Reorganized Debtors.

K.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.      *Certain Securities Law Matters*

The issuance and distribution of the Securities as contemplated by Articles III and IV.D of the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Such Securities will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11)

of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

M.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the New Credit Facilities or the New ABL Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.      *Employee Matters.*

Unless otherwise provided herein, and subject to Article V of the Plan, the Reorganized Debtors shall assume all employment agreements, indemnification agreements, or other agreements with current and former members of any Governing Body, employees, officers, directors, or managers of the Debtors. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

O.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as**

**any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

P.     *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and any contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.      *Indemnification Obligations.*

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

On or before the Effective Date, the Reorganized Debtors shall and are authorized to procure the New D&O Tail Coverage. For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective. The Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

E.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

F.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

G.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3.      Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number

with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding.

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

E.   *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.   *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

G.   *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.   *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

J.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Claims Paid or Payable by Third Parties.*

1.    Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.   *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.   *Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.   *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or

Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized

Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

**B.      *Release of Liens.***

**Except as otherwise provided in the New Credit Facilities Documents (including to the extent any First Lien Term Loan Documents or Second Lien Term Loan Documents are amended and restated or deemed to be New Credit Facilities Documents, including in connection with any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, as set forth under the New Credit Facilities Documents), the New ABL Facility Documents (including with respect to the ABL Facility, to the extent any ABL Loan Documents are amended and restated or deemed to be New ABL Facility Documents), this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**C.      *Releases by the Debtors.***

**Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing**

Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Stakeholders), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**D.      *Releases by Holders of Claims and Interests.***

　　**Notwithstanding anything contained in this Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.**

　　**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's**

finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

E.    *Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other

proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.  the Bankruptcy Court shall have entered the Confirmation Order and such order shall (a) be in form and substance reasonably acceptable to the Debtors, the Required Consenting Stakeholders, and the ABL Agent, and (b) not have been reversed, stayed, dismissed, or vacated;

2.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.  the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the RSA and the Plan, and the Definitive Documentation shall have been executed and/or effectuated and contain certain terms, conditions, representations, warranties, and covenants consistent with the terms of the RSA (as applicable) and shall be in a form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders;

4.  all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

5.  the RSA and the Backstop Commitment Letter shall remain in full force and effect;

6.  all fees and premiums payable pursuant to the RSA and the Backstop Commitment Letter shall have been paid;

7.  entry into the New Credit Facilities Documents, and all conditions precedent to the consummation of such New Credit Facilities Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New Credit Facilities Documents shall have occurred;

8.  entry into the New ABL Facility Documents, and all conditions precedent to the consummation of such New ABL Facility Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New ABL Facility Documents shall have occurred;

9.  the New Common Stock shall have been issued by Reorganized Belk Holdings;

10. the Reorganized Debtors shall have procured or become insured under the New D&O Tail Coverage;

11. to the extent invoiced, the payment in cash in full of all Restructuring Expenses;

12. there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Debtors, the Required Consenting Lenders, and the Consenting Sponsors would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

13. an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall not have been enacted, entered, issued, promulgated, enforced or deemed applicable by any court or

governmental, regulatory or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors, the Consenting Sponsor, and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions; and

14.   the Debtors shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the RSA and the Plan.

**B.      Waiver of Conditions.**

The conditions to Confirmation and Consummation set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Lenders and the Consenting Sponsors (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that the conditions relating to the ABL Facility Claims, solely as they relate to the ABL Facility Claims, may only be waived with the consent of the ABL Agent.

**C.      Effect of Failure of Conditions.**

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.      Modification and Amendments.**

Except as otherwise specifically provided in the Plan and to the extent permitted by the RSA, the Debtors reserve the right to modify the Plan with the prior written consent of the Consenting Sponsors and the Required Consenting Lenders (such consent not to be unreasonably withheld), whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that any modification relating to the ABL Facility Claims, solely as such modifications relate to the ABL Facility Claims, may only be waived with the consent of the ABL Agent. Subject to those restrictions on modifications set forth in the RSA and the Plan, and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**B.      Effect of Confirmation on Modifications.**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of Plan.*

To the extent permitted by the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XI.
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.       allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.       decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.       resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.       ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.       adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.       adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.     enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.    enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

15.    enter an order concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court; and

23.     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New ABL Facility shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, and subject to and consistent in all respects with the terms of the RSA, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the RSA. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.     *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the

Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      if to the Debtors, to:

Belk, Inc.
2801 West Tyvola Road
Charlotte, North Carolina 28217
Attention:       Stacy S. Gray, Senior Vice President and General Counsel
E-mail address:   Stacy_Gray@belk.com

*with a copy (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:       Joshua A. Sussberg, P.C.
                 Steven N. Serajeddini, P.C.
                 Judson A. Oswald, P.C.
                 Matthew Fagen
                 Yuli Wang
                 Rachael Bazinski
E-mail address:  joshua.sussberg@kirkland.com
                 steven.serajeddini@kirkland.com;
                 judson.oswald@kirkland.com;
                 matthew.fagen@kirkland.com;
                 yuli.wang@kirkland.com;
                 rachael.bazinski@kirkland.com

2.      if to the Ad Hoc First Lien Term Lender Group:

To each member of the Ad Hoc First Lien Term Lender Group at the addresses or e-mail addresses set forth in such member's signature page to the RSA or a joinder thereto, as the case may be.

*with a copy (which shall not constitute notice) to:*

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
Attention:       Joseph Zujkowski
                Daniel Shamah
                Adam P. Haberkorn
E-mail address:  jzujkowski@omm.com
                dshamah@omm.com
                ahaberkorn@omm.com

*-and-*

O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Attention:       David J. Johnson Jr.
E-mail address:  djohnson@omm.com

3.      if to the Ad Hoc Crossover Lender Group:

To each member of the Ad Hoc Crossover Lender Group at the addresses or e-mail addresses set forth in such member's signature page to the RSA or a joinder thereto, as the case may be.

*with a copy (which shall not constitute notice) to:*

Willkie  Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:       Matthew Feldman
                Weston T. Eguchi
                Debra Sinclair
E-mail address:  mfeldman@willkie.com
                weguchi@willkie.com
                dsinclair@willkie.com

4.      if to the Consenting Sponsors, to:

To each Consenting Sponsor at the addresses or e-mail addresses set forth in such Consenting Sponsor's signature page to the RSA or a joinder thereto, as the case may be.

*with a copy (which shall not constitute notice) to*:

Latham & Watkins, LLP
885 3rd Avenue
New York, New York 10022
Attention:     George A. Davis
               Michael W. Benjamin
               Joshua A. Tinkelman
               Ted A. Dillman
               Ebba Gebisa
E-mail address:  george.davis@lw.com
               michael.benjamin@lw.com
               joshua.tinkelman@lw.com
               ted.dillman@lw.com
               ebba.gebisa@lw.com

5.      if to the ABL Agent, to:

Bank of America, N.A.
100 Federal Street
Boston, Massachusetts 02110
Attention:     Christine Hutchinson
E-mail address:  christine.hutchinson@bofa.com

*with a copy (which shall not constitute notice) to*:

Morgan, Lewis & Bockius LLP
One Federal Street
Boston, Massachusetts 02110
Attention:     Julia Frost-Davies
               Marjorie S. Crider
               Christopher L. Carter
E-mail address:  julia.frost-davies@morganlewis.com
               marjorie.crider@morganlewis.com
               christopher.carter@morganlewis.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.     *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/belk or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:   (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, *provided*, that any such deletion or modification must be consistent with the RSA; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

Promptly after the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*N.*      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  January 26, 2021

BELK, INC.
on behalf of itself and all other Debtors

/s/ William Langley

William Langley
Authorized Representative
Belk, Inc.

**Exhibit B**

**RSA**

BELK, INC., *ET AL.*,

RESTRUCTURING SUPPORT AGREEMENT

**January 26, 2021**

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of January 26, 2021 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, collectively, the "**Parties**"):[1]

    i.     Belk, Inc., a Delaware corporation ("**Belk**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.     the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold, First Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Consenting Stakeholders (the Entities in this clause (ii), collectively, the "**Consenting First Lien Term Lenders**");

    iii.     the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Consenting Stakeholders (the Entities in this clause (iii) collectively, the "**Consenting Second Lien Term Lenders**" and, together with the Consenting First Lien Term Lenders, collectively, the "**Consenting Lenders**"); and

    iv.     the undersigned funds or Affiliates of Sycamore that directly or indirectly hold, or are investment advisors, sub-advisors, or managers of discretionary accounts that hold, Equity Interests, that have executed and delivered counterpart signature pages to this Agreement in their capacities as such, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting Sponsors**" and together with the Consenting Lenders, the "**Consenting Stakeholders**").

## RECITALS

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**") and the equity term sheet attached as **Exhibit C** hereto (the "**Equity Term Sheet**" and, such transactions as described in this Agreement, the Restructuring Term Sheet, and the Equity Term Sheet, the "**Restructuring Transactions**");

---

[1]     Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 of this Agreement.

**WHEREAS**, the Restructuring Transactions shall be implemented in accordance with the terms set forth in this Agreement through voluntary prepackaged cases commenced under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.** *Definitions and Interpretation.* Definitions. The following terms shall have the following definitions:

"**Ad Hoc Crossover Lender Group**" means the ad hoc group of Consenting First Lien Term Lenders and Consenting Second Lien Term Lenders represented by Willkie Farr & Gallagher LLP.

"**Ad Hoc First Lien Term Lender Group**" means the ad hoc group of Consenting First Lien Term Lenders represented by O'Melveny & Myers LLP.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

"**Agents**" means, collectively, each of the First Lien Agent and the Second Lien Agent.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Backstop Commitment Letter**" means the backstop commitment letter (as may be amended or modified from time to time in accordance with the terms thereof) pursuant to which the Backstop Commitment Parties have agreed to backstop the New FLFO New Money Loans (as defined in the Restructuring Term Sheet).

"**Backstop Commitment Parties**" means, collectively, each of the Lender Backstop Parties and the Sponsor Backstop Parties (each as defined in the Restructuring Term Sheet).

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bear Parent**" means Bear Parent Inc., a Delaware corporation.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any claims, cross claims, third-party claims, interests, damages, judgments, remedies, causes of action, controversies, debts, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, pursuant to any other theory of law or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Equity Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law preferential or fraudulent transfer or similar claim, and (f) any avoidance action.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Commencement Date**" means the date on which the Company Parties commence the Solicitation.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the First Lien Term Loan Claims, the Second Lien Term Loan Claims, and the Equity Interests.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan pursuant to, *inter alia*, section 1129 of the Bankruptcy Code, which order shall be consistent in all material respects with this Agreement and the Restructuring Term Sheet.

"**Consenting First Lien Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lender Fees and Expenses**" means the reasonable and documented fees and expenses of the following advisors incurred in connection with the Restructuring Transactions (including, without limitation, fees and expenses incurred after the Petition Date, to the extent applicable): (i) Willkie Farr & Gallagher LLP, as counsel to the Ad Hoc Crossover Lender Group, (ii) PJT Partners LP, as investment banker to the Ad Hoc Crossover Lender Group, (iii) one local counsel on behalf of the Ad Hoc Crossover Lender Group, (iv) O'Melveny & Myers LLP, as counsel to the Ad Hoc First Lien Term Lender Group, (v) Evercore LLC, as investment banker to the Ad Hoc First Lien Term Lender Group, and (vi) one local counsel on behalf of the Ad Hoc First Lien Term Lender Group, in each case, consistent with the terms and conditions of their respective engagement letters or other contractual arrangements with the Company Parties.

"**Consenting Second Lien Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sponsor Fees and Expenses**" means the reasonable and documented fees and expenses of Latham & Watkins, LLP, as counsel to the Consenting Sponsors, incurred in connection with the Restructuring Transactions (including, without limitation, fees and expenses incurred after the Petition Date, to the extent applicable), consistent with the terms and conditions of its engagement letter or other contractual arrangement with the Consenting Sponsors.

"**Consenting Sponsors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, which shall be reasonably acceptable to the Required Consenting Stakeholders.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof) of common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits

interests of any Company Party (regardless of whether such interests are held directly or indirectly), and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement and regardless of whether such interests are held directly or indirectly).

"**Equity Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"**First Day Pleadings**" means the first day pleadings that the Company Parties determine are necessary or desirable to file, which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

"**First Lien Agent**" means any administrative agent, collateral agent, or similar Entity under the First Lien Term Loan Documents, including any successors thereto.

"**First Lien Term Loan**" means any loan outstanding under the First Lien Term Loan Credit Agreement.

"**First Lien Term Loan Claim**" means any Claim on account of a First Lien Term Loan.

"**First Lien Term Loan Credit Agreement**" means that certain first lien credit agreement, dated as of December 10, 2015, by and among Bear Parent, as holdings, Belk, as borrower, certain subsidiaries of Belk, as guarantors, the administrative agent thereunder, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

"**First Lien Term Loan Documents**" means, collectively, the First Lien Term Loan Credit Agreement and all other agreements, documents, and instruments with respect to the First Lien Term Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted,

promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the milestones set forth in Section 4 of this Agreement.

"**New First Lien Credit Agreement**" means that certain first lien credit agreement evidencing the New First Lien Credit Facility (including all ancillary documents), which may be documented through an amendment or amendment and restatement of the First Lien Term Loan Credit Agreement, and which shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

"**New First Lien Credit Facility**" means the up to $1,122,000,000 super priority first lien credit facility to be provided to the Company Parties in accordance with the terms, and subject to the conditions, set forth in the New First Lien Credit Agreement.

"**New Second Lien Credit Agreement**" means that certain second lien credit agreement evidencing the New Second Lien Credit Facility (including all ancillary documents), which may be documented through an amendment or amendment and restatement of the Second Lien Term Loan Credit Agreement, and which shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

"**New Second Lien Credit Facility**" means the $110,000,000 second lien credit facility to be provided to the Company Parties in accordance with the terms, and subject to the conditions, set forth in the New Second Lien Credit Agreement.

"**New Term Loan**" means any loan outstanding under the New First Lien Credit Agreement or the New Second Lien Credit Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Participating Claims**" means any Company Claims/Interests now owned or hereafter acquired, in each case that are subject to the terms of this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, which shall be on substantially the same terms set forth in this Agreement and the Restructuring Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting First Lien Term Lenders**" means, as of the relevant date, Consenting First Lien Term Lenders holding at least 50.1% of the aggregate outstanding principal amount of First Lien Term Loans that are held by Consenting First Lien Term Lenders, which, for the avoidance of doubt, shall include (a) Consenting First Lien Term Lenders holding at least 50.1% of the aggregate principal amount of First Lien Term Loans held by Consenting First Lien Term Lenders represented by Willkie Farr & Gallagher LLP and also (b) Consenting First Lien Term Lenders holding at least 50.1% of the aggregate principal amount of First Lien Term Loans held by Consenting First Lien Term Lenders represented by O'Melveny & Myers LLP.

"**Required Consenting Lenders**" means each of the Required Consenting First Lien Term Lenders and the Required Consenting Second Lien Term Lenders.

"**Required Consenting Second Lien Term Lenders**" means, as of the relevant date, Consenting Second Lien Term Lenders holding at least 50.1% of the aggregate outstanding principal amount of Second Lien Term Loans that are held by Consenting Second Lien Term Lenders.

"**Required Consenting Stakeholders**" means each of the Required Consenting Lenders and the Consenting Sponsors.

"**Restructuring**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Agent**" means any administrative agent, collateral agent, or similar Entity under the Second Lien Term Loan Documents, including any successors thereto.

"**Second Lien Term Loan**" means any loan outstanding under the Second Lien Term Loan Credit Agreement.

"**Second Lien Term Loan Claim**" means any Claim on account of a Second Lien Term Loan.

"**Second Lien Term Loan Credit Agreement**" means that certain second lien credit agreement, dated as of December 10, 2015, by and among Bear Parent, as holdings, Belk, as borrower, certain subsidiaries of Belk, as guarantors, the administrative agent and collateral agent thereunder, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

"**Second Lien Term Loan Documents**" means, collectively, the Second Lien Term Loan Credit Agreement and all other agreements, documents, and instruments with respect to the Second Lien Term Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation**" means solicitation of votes in favor of the Plan.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this Agreement, the Restructuring Term Sheet, and the Definitive Documents and shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

"**Sycamore**" means each investment fund managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

1.02.   Interpretation.   For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms

and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)       unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)       unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)       the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)       captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)       references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)       the use of "include" or "including" is without limitation, whether stated or not;

(j)       the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties; and

(k)       any references to dates and times shall be prevailing Eastern Time, unless otherwise noted.

**Section 2.**       *Effectiveness of this Agreement.* This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:each of the Company Parties and the Consenting Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)       the following shall have executed and delivered counterpart signature pages of this Agreement:

(i)       holders of at least 66.7% of the aggregate outstanding principal amount of First Lien Term Loans; and

(ii)      holders of at least 66.7% of the aggregate outstanding principal amount of Second Lien Term Loans; and

(c)      counsel to the Company Parties shall have given notice to counsel to each Consenting Stakeholder's respective counsel in the manner set forth in Section 14.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.      *Definitive Documents.*** The Definitive Documents governing the Restructuring Transactions and any modifications, amendments or supplements thereto shall each be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders, including, but not limited to: (a) the Plan; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the order of the Bankruptcy Court approving the Disclosure Statement and            the            other            Solicitation            Materials; (e) the First Day Pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the New First Lien Credit Agreement, (h) the New Second Lien Credit Agreement; and (i) the Backstop Commitment Letter.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date and any modifications, amendments or supplements thereto shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders. Notwithstanding any provision in this Agreement to the contrary, each of the Parties to this Agreement acknowledges and agrees that the Restructuring Transactions shall be implemented in accordance with the terms set forth in this Agreement solely through the Chapter 11 Cases.

**Section 4.      *Milestones.*** The following Milestones shall apply to this Agreement unless extended or waived in writing by the Company Parties and the Required Consenting Stakeholders:

(a)      no later than January 26, 2021, the Company Parties shall commence the Solicitation, and shall not, without the prior written consent of the Required Consenting Stakeholders, withdraw or modify the Solicitation prior to 11:59 p.m. on February 5, 2021 (the "Expiration Date");

(b)      no later than February 24, 2021, the Petition Date shall have occurred;

(c)      no later than February 24, 2021, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement; and

(a)      no later than February 26, 2021 (the "Outside Date"), the Plan Effective Date shall have occurred.

11

**Section 5.**     ***Commitments of the Consenting Stakeholders.*** <u>Affirmative Commitments</u>. During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, subject to the terms and conditions of this Agreement, to:

(a)     subject to its actual receipt of the Solicitation Materials, vote to accept the Plan with respect to each of its Company Claims/Interests by delivering its duly executed and completed ballot by the Expiration Date; <u>provided</u> that upon the occurrence of the Termination Date with respect to any respective Consenting Stakeholder in accordance with the terms hereof, no such Consenting Stakeholder shall be obligated to vote in favor of the Plan (and their respective treatment thereunder), and each such Consenting Stakeholder may, acting individually, withdraw or revoke its tender, consent, election, or vote with respect to the Plan (and upon such revocation, deemed void *ab initio*);

(b)     support and cooperate with the Company Parties to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan, subject in all respects to the *proviso* in clause (a) above;

(c)     support the Restructuring Transactions and promptly vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(d)     agree to the amendments to the existing First Lien Term Loan Credit Agreement and Second Lien Term Loan Credit Agreement (including the priority thereof) on the terms described in the Restructuring Term Sheet, and execute and deliver such documents as may be reasonably requested by the Company Parties to evidence such consent;

(e)     temporarily forbear from exercising any remedies with respect to, any breach, default, or event of default by any Company Party under the First Lien Term Loan Credit Agreement or and Second Lien Term Loan Credit Agreement, as applicable, which shall or may arise as a result of or is related to, directly or indirectly, (i) the commencement of any Chapter 11 Cases or any of the steps, actions or transactions required by, specified or contemplated in and/or implemented by or undertaken pursuant to this Agreement or (ii) the Company Parties' failure to make any payment of principal, amortization, interest, or other amounts due under the First Lien Term Loan Credit Agreement and/or Second Lien Term Loan Credit Agreement, as applicable, to any Agent or Consenting Lender; <u>provided</u>, that all accrued and unpaid (A) interest and amortization on the principal amount of First Lien Term Loan Claims through the Plan Effective Date and (B) interest on the principal amount of Second Lien Term Loan Claims through the Plan Effective Date, shall, in each case, be paid in full in cash on the Plan Effective Date, as set forth in the Restructuring Term Sheet;

(f)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(g)      give any notice, order, instruction, or direction to the First Lien Agent or Second Lien Agent, as applicable, necessary to give effect to the Restructuring Transactions, provided, however, that nothing in this Agreement shall require the Consenting Lenders to commence litigation against the Agents or provide the Agents with any indemnity or incur any similar reimbursement obligation;

(h)      support the Restructuring Transactions and to act in good faith and take any and all actions necessary to consummate the Restructuring Transactions in a timely manner, including by (x) negotiating and consulting in good faith with the Company Parties regarding the terms and conditions of the Definitive Documents to which it is a party, (y) entering into and performing under the terms of each of the Definitive Documents, and (z) agreeing to support any and all release, exculpation, and/or indemnity provision contained within any of the Definitive Documents, including those set forth in the Plan, which shall be substantially consistent with those set forth in the Restructuring Term Sheet; and

(i)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

5.02.   Negative Commitments.  During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, subject to the terms and conditions of this Agreement, that it shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      propose, file, support, or vote for any Alternative Restructuring Proposal that is inconsistent in any material respect with the Restructuring Transactions;

(c)      file with any court (including the Bankruptcy Court) any motion, pleading, or other document (including any modifications or amendments thereto) that, in whole or in part, is not materially consistent with this Agreement (or, if applicable, the Plan);

(d)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(e)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Equity Interests in the Company Parties;

(f)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(g)      encourage or facilitate any person or entity to do any of the foregoing.

5.03.  Commitments with Respect to the Chapter 11 Cases.

(a)  During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials and subject to the terms and conditions of this Agreement:

(i)  agree to provide, and to not opt out of or object to, the releases set forth in the Plan, which shall be substantially consistent with those set forth in the Restructuring Term Sheet;

(ii)  support all of the debtor and third-party releases, injunctions, discharge, indemnity, and exculpation provisions provided in the Plan, which shall be substantially consistent with those set forth in the Restructuring Term Sheet;

(iii)  not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any consent or election referred to in clauses 5.01(a) and (ii) above, subject in all respects to the proviso in clause 5.01(a);

(iv)  not directly or indirectly, through any person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal that is inconsistent in any material respect with the Restructuring Transactions or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; and

(v)  support and take all actions reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

(b)  During the Agreement Effective Period, subject to the terms and conditions of this Agreement, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.**  *Additional Provisions Regarding the Consenting Stakeholders' Commitments.* Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) prevent any Consenting Stakeholder from appearing as a party in interest in any matter arising in the Chapter 11 Cases (to the extent not inconsistent with this Agreement); (b) prohibit any Consenting Lender from taking or directing any action to be taken relating to maintenance, protection, or preservation of any collateral (to the extent not inconsistent with this Agreement); (c) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder or the Company Parties, or, if applicable, any other party in interest in the Chapter 11 Cases (including any official committee appointed in the Chapter 11 Cases and the United States Trustee); (d) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

14

(e) prevent any Consenting Stakeholder from enforcing this Agreement or any Definitive Document entered into in connection with the Restructuring Transactions, or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; and (f) except as otherwise provided in this Agreement, require any Consenting Stakeholder to incur any non-reimbursable expenses, liabilities, or other obligations, or to agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations.

**Section 7.** *Commitments of the Company Parties.* Affirmative Commitments. Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a) commence the Solicitation by 11:59 p.m. on the Commencement Date;

(b) not withdraw or modify the Solicitation prior to 11:59 p.m. on the Expiration Date without the prior written consent of the Required Consenting Lenders and the Consenting Sponsors;

(c) consummate the Restructuring Transactions in accordance with the Definitive Documents by 11:59 p.m. on the Outside Date;

(d) take all actions necessary to consummate the Restructuring Transactions in accordance with the Definitive Documents, and, to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(e) use commercially reasonable efforts to obtain any and all required governmental, regulatory, licensing, Bankruptcy Court, and/or other third-party approvals (including, without limitation, any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions;

(f) negotiate in good faith to execute and deliver the Definitive Documents (which shall be consistent with the requirements contained herein) and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(h) consult in good faith with counsel for the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors, respectively, prior to the Company Parties' entry into, termination of, or modification of any material operational contracts, leases or other arrangements;

(i) act in good faith to respond to the reasonable diligence requests of counsel for the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors, respectively, during the Agreement Effective Period, and shall cause their

management and advisors to meet with the Consenting Stakeholders and their respective counsel at reasonable times upon request of the Consenting Stakeholders;

(j)     provide counsel for the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors, respectively, a review period of (a) at least two (2) Business Days prior to the date when the Company Parties intend to file all First Day Pleadings and all other documents (but excluding monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto) that the Company Parties intend to file with the Bankruptcy Court, and (b) at least 72 hours (or such shorter review period as is necessary under the circumstances) prior to the date when the Company Parties intend to file all declarations and affidavits in support of approval of the Disclosure Statement or confirmation of the Plan, which declarations and/or affidavits provided to counsel for the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors, respectively, shall, for the avoidance of doubt, disclose the identity of the declarant or affiant;

(k)     pay the Consenting Lender Fees and Expenses;

(l)     pay the Consenting Sponsor Fees and Expenses;

(m)     from the date hereof until the Plan Effective Date, (i) operate their business in the ordinary course in a manner that is consistent with past practice and this Agreement, and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties and employees (which shall not prohibit the Company Parties from taking actions outside of the ordinary course of business with the consent of the Required Consenting Stakeholders), taking into account the Restructuring; and (ii) operate the business in the ordinary course, in a manner consistent with applicable law and actions taken by similarly situated companies in the industry in which the Company Parties operate, and maintain good standing (or equivalent status under the laws of its incorporation or organization) under the laws of the jurisdiction in which the Company Parties are incorporated or organized, taking into account the Restructuring;

(n)     notify counsel to the Consenting Stakeholders within one (1) calendar day after obtaining actual knowledge thereof of the happening or existence of any event that shall have made any part of the Restructuring Transactions (including the Restructuring Term Sheet) incapable of being consummated on or prior to the Outside Date;

(o)     as promptly as practicable notify or update counsel to the Consenting First Lien Term Lenders and the Consenting Second Lien Term Lenders, respectively, upon becoming aware of any person or entity challenging the validity or priority of, or seeking to avoid, any lien securing the First Lien Term Loan Claims and/or the Second Lien Term Loan Claims pursuant to a pleading filed with the Bankruptcy Court.

7.02.   Negative Commitments.   Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     enter into any other transaction support agreement related to a partial or total restructuring of the Company Parties' obligations unless such support agreement is not inconsistent with this Agreement and is in form and substance reasonably acceptable to the Required Consenting Stakeholders;

(c)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and/or consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(d)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(e)     file with any court (including the Bankruptcy Court) any motion, pleading, or Definitive Documents (including any modifications or amendments thereto) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(f)     enter into, terminate, or modify any material operational contracts, leases or other arrangements that would, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Company Parties, taken as a whole, without the prior consent of the Required Consenting Stakeholders; or

(g)     encourage or facilitate any person or entity to do any of the foregoing.

**Section 8.**     *Additional Provisions Regarding Company Parties' Commitments.*

8.01.     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, upon advice of external counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction shall not be deemed to constitute a breach of this Agreement; provided that the Company Parties shall promptly provide written notice to the Consenting Stakeholders' respective counsel (and, in any case, within two (2) calendar days) after receiving advice of counsel that termination of this Agreement is reasonably required to comply with applicable law, including its fiduciary duties. To the extent the Required Consenting Lenders or the Consenting Sponsors determine that such action or failure to take such action with respect to the Restructuring Transactions constitutes a breach of this Agreement (without giving effect to the preceding sentence), the Required Consenting Lenders or the Consenting Sponsors, as applicable, shall have the right to terminate this Agreement immediately upon written notice to counsel to the Company Parties.

8.02.     Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate, but not solicit or encourage, Alternative Restructuring Proposals; provided, that the Company Parties must provide copies of any such Alternative Restructuring Proposal received to the financial and legal advisors to the Ad Hoc Crossover Lender Group, the Ad Hoc First Lien Term Lender Group, and the Consenting

17

Sponsors, respectively, no later than two (2) calendar days following receipt thereof; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity for the purpose of facilitating such Entity's participation in the Restructuring Transactions or such Entity's Alternative Restructuring Proposal; and (c) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee appointed in the Chapter 11 Cases and the United States Trustee), or any other Entity regarding the Restructuring Transactions.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**    *Transfer of Interests and Securities.*

9.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Participating Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    in the case of any Participating Claims, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act; (iii) an institutional accredited investor (as defined in the Rules); or (iv) a Consenting Stakeholder; and

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties and counsel to the Consenting Stakeholders, respectively, at or before the time of the proposed Transfer, a Transfer Agreement; or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Participating Claims Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

9.02.    Upon compliance with the requirements of this Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such Transferred Participating Claims. Any Transfer in violation of this Section 9.01 shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed Participating Claims subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders); and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company

Claim/Interest acquired) to counsel to the Company Parties within five Business Days of such acquisition.

9.04.   This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Participating Claims. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.   Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Participating Claims with the purpose and intent of acting as a Qualified Marketmaker for such Participating Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Participating Claims if (a) such Qualified Marketmaker subsequently transfers such Participating Claims (by purchase, sale assignment, participation, or otherwise) within five (5) calendar days of its acquisition to a transferee that is an entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 9.01; and (c) the Transfer otherwise is a permitted Transfer under Section 9.01. To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.06.   Notwithstanding Section 9.01, any Consenting Stakeholder may Transfer any of its Participating Claims to an affiliate of such Consenting Stakeholder or one or more of its affiliated funds or an affiliated entity or entities with a common investment advisor or investment manager (in each case, other than portfolio companies); provided that (a) for the avoidance of doubt, any transferee under this Section 9.06 shall be deemed a Consenting Stakeholder for purposes of this Agreement, effective as of the date of the Transfer, (b) any transferor under this Section 9.06 shall remain liable in all respects for any breach of this Agreement by such transferee, and (c) such transferor must provide notice of such Transfer to counsel to the Company Parties within five Business Days of such Transfer.

9.07.   Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.**    *Representations and Warranties of Consenting Stakeholders.* Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the

Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9);

(b)     it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)     such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)     solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder (or that may be assigned to any of its Affiliates) in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 11.     *Mutual Representations, Warranties, and Covenants.*** Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this

Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e) except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

## Section 12. *Termination Events.*

12.01. <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated (a) with respect to the Consenting First Lien Term Lenders, by the Required Consenting First Lien Term Lenders, (b) with respect to the Consenting Second Lien Term Lenders, by the Required Consenting Second Lien Term Lenders, (c) with respect to the Consenting Sponsors, by each Consenting Sponsor, and (d) with respect to each Consenting Stakeholder, by any affected Consenting Stakeholder described in paragraph (d) of this Section 12.01 below, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events:

(a) the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 14.10 hereof detailing any such breach;

(b) the issuance, promulgation, or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court that has not been stayed), of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c) the failure to meet a Milestone that has not been waived or extended in a manner consistent with this Agreement, which failure remains unsatisfied for five (5) Business Days, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement;

(d) the Restructuring Term Sheet or any Definitive Document is amended, modified, or supplemented in a manner that materially and adversely affects the rights or treatment of any Consenting Stakeholder; <u>provided</u>, that this Section 12.01(d) shall only apply to a Consenting Stakeholder whose rights or treatment are materially and adversely affected by such amendment, modification, or supplement, and, if a Consenting Stakeholder terminates this Agreement in accordance with this Section 12.01 hereof, such Agreement shall otherwise remain in full force and effect with respect to all other Parties;

(e)      any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order, or ten (10) Business Days after there is a change in law, making illegal or otherwise preventing or prohibiting the consummation of the Restructuring Transactions in a way that cannot be reasonably remedied by the Company Parties subject to the reasonable satisfaction of the Required Consenting Stakeholders;

(f)      solely with respect to the Consenting Lenders, the breach in any material respect by any of the Consenting Sponsors of any of the representations, warranties, or covenants of the Consenting Sponsors set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof);

(g)      solely with respect to the Sponsor, the breach in any material respect by any of the Consenting Lenders of any of the representations, warranties, or covenants of such Consenting Lenders set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof) such that the non-breaching Consenting Lenders hold (i) less than 66.7%% of the principal amount of outstanding First Lien Term Loans and (ii) less than 66.7%% of the principal amount of outstanding Second Lien Term Loans;

(h)      the withdrawal of the Plan or Disclosure Statement or the amendment or modification of, or the filing of a motion or pleading by the Company Parties, in each case without the prior written consent of the Required Consenting Stakeholders, that seeks to amend or modify the Plan or the Disclosure Statement or any Definitive Documents, which amendment, modification or filing is (i) inconsistent with this Agreement or the Plan, as applicable or (ii) adverse to any of the Consenting Stakeholders; and such amendment or modification has not been reversed and/or such motion or pleading has not been withdrawn prior to the earlier of (x) five (5) Business Days after the Company Parties receive written notice from the applicable Required Consenting Stakeholders that such amendment, modification, motion or pleading is (i) inconsistent with this Agreement and/or the Plan and (ii) adverse to such Consenting Stakeholders, and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

(i)      the Company Parties (A) withdraw the Plan, (B) execute a definitive written agreement with respect to an Alternative Restructuring Proposal, (C) file, propound or otherwise support any plan of reorganization other than the Plan, or (D) publicly announce their intention to do either of (A), (B) or (C);

(j)      the Company Parties file with the Bankruptcy Court any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Stakeholders;

(k)      the Bankruptcy Court shall enter an order terminating, annulling, modifying or conditioning the automatic stay with respect to any material assets of the Company Parties with a value in excess of $15,000,000 in the aggregate without the prior written consent of the Required Consenting Stakeholders;

(l)      the entry of a Final Order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order terminating exclusivity under Bankruptcy Code section 1121;

(m)      any Company Party files, joins, or supports through a pleading filed with the Bankruptcy Court any motion, application, adversary proceeding or cause of action (A) challenging the validity, enforceability or priority of, or seeking to avoid, disallow, subordinate or otherwise limit the liens on any asset or assets comprising any portion of the collateral securing the First Lien Term Loan Claims or the Second Lien Term Loan Claims, as applicable, (B) seeking to impose liability upon or enjoin the holders of First Lien Term Loan Claims or the holders of Second Lien Term Loan Claims, in their capacity as such, or (C) seeking to restrict the rights of holders of First Lien Term Loan Claims or Second Lien Term Loan Claims, in their capacity as such, in each case without the prior written consent of the Required Consenting Lenders, and in each case to the extent inconsistent with this Agreement;

(n)      any Company Party files, joins, or supports through a pleading filed with the Bankruptcy Court any motion, application, adversary proceeding or cause of action seeking to impose liability upon or enjoin any Consenting Sponsor, in its capacity as such, without the prior written consent of the Consenting Sponsors, and in each case to the extent inconsistent with this Agreement;

(o)      the Company Parties fail to timely make any adequate protection payments (if any) required by order of the Bankruptcy Court to any of the Consenting Lenders which remains uncured for five calendar days;

(p)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fifteen (15) Business Days after entry of such order; or

(q)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by any of the Consenting Lenders of any of the representations, warranties, or covenants of such Consenting Lenders set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof) such that the non-breaching Consenting Lenders hold (i) less than 66.7% of the principal amount of outstanding First Lien Term Loans and (ii) less than 66.7% of the principal amount of outstanding Second Lien Term Loans;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law; or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters a Final Order denying confirmation of the Plan.

12.03.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  the Required Consenting Lenders, the Consenting Sponsors, and each Company Party.

12.04.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

12.05.  Termination Limitation.  Notwithstanding anything to the contrary herein, no Party may terminate this Agreement based on any event that was directly or indirectly caused by or arises out of such Party's breach of this Agreement.

12.06.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 12.06 shall promptly provide written notice of such withdrawal or change to counsel for each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict

(a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder; and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder. No purported termination of this Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b) or Section 12.02(d). Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

## Section 13.    *Amendments and Waivers.*

13.01. This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

13.02. This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (a) each Company Party, (b) the Required Consenting Lenders, and (c) the Consenting Sponsors; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, or to the treatment of such Company Claims/Interests, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; provided, further, however, that any amendment to this Agreement to the definition of "Required Consenting Lenders," "Consenting Stakeholders," or to this Section 13 shall require the consent of each Consenting Stakeholder and each Company Party.

13.03. Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

13.04. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 14.    *Miscellaneous*

14.01. Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance

with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02. <u>Exhibits Incorporated by Reference; Conflicts</u>.   Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04. <u>Complete Agreement</u>. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH (A) THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF; AND (B) IF THE CHAPTER 11 CASES ARE FILED, THE BANKRUPTCY CODE. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, in courts of (a) if the Chapter 11 Cases are not filed, the State of New York and the United States District Court, in each case, located in the borough of Manhattan in the City of New York (the "<u>Chosen Courts</u>"), or (b) if the Chapter 11 Cases are filed, to the extent possible, the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts and the Bankruptcy Court, as applicable; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and the Bankruptcy Court, as applicable; and (c) waives any objection that any Chosen Court and the Bankruptcy Court, as applicable, is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06. <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing

this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity, except as otherwise explicitly provided herein.

14.10.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Belk, Inc.
2801 West Tyvola Road
Charlotte, North Carolina 28217
Attention:       Stacy S. Gray, Senior Vice President and General Counsel
E-mail address:  Stacy_Gray@belk.com

*with a copy (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:       Joshua A. Sussberg, P.C.
                 Steven N. Serajeddini, P.C.
                 Judson A. Oswald, P.C.
                 Matthew Fagen
                 Yuli Wang
                 Rachael Bazinski
E-mail address:  joshua.sussberg@kirkland.com
                 steven.serajeddini@kirkland.com;
                 judson.oswald@kirkland.com;
                 matthew.fagen@kirkland.com;
                 yuli.wang@kirkland.com;
                 rachael.bazinski@kirkland.com

(b)     if to the Ad Hoc First Lien Term Lender Group:

To each member of the Ad Hoc First Lien Term Lender Group at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.

*With a copy (which shall not constitute notice) to*:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
Attention:          Joseph Zujkowski
                          Daniel Shamah
                          Adam P. Haberkorn
E-mail address:  jzujkowski@omm.com
                          dshamah@omm.com
                          ahaberkorn@omm.com

*And with a copy (which shall not constitute notice) to*:

O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Attention:          David J. Johnson Jr.
E-mail address:  djohnson@omm.com

(c)     if to the Ad Hoc Crossover Lender Group:

To each member of the Ad Hoc Crossover Lender Group at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.

*With a copy (which shall not constitute notice) to*:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:          Matthew Feldman
                          Weston T. Eguchi
                          Debra Sinclair
E-mail address:  mfeldman@willkie.com
                          weguchi@willkie.com
                          dsinclair@willkie.com

(d)      if to the Consenting Sponsors, to:

To each Consenting Sponsor at the addresses or e-mail addresses set forth in such Consenting Sponsor's signature page to this Agreement or to a Joinder, as the case may be.

*With a copy (which shall not constitute notice) to*:

Latham & Watkins, LLP
885 3rd Ave
New York, New York 10022
Attention:          George A. Davis
                         Michael W. Benjamin
                         Joshua A. Tinkelman
                         Ted A. Dillman
                         Ebba Gebisa
E-mail address: george.davis@lw.com
                         michael.benjamin@lw.com
                         joshua.tinkelman@lw.com
                         ted.dillman@lw.com
                         ebba.gebisa@lw.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11. Independent Due Diligence and Decision Making. Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12. Enforceability of Agreement. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13. No Waiver of Participation and Preservation of Rights.

(a)      Except as expressly provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its full participation in the Chapter 11 Cases, so long as, in each case, such actions are not inconsistent with the Party's obligations under this Agreement, the Plan, or the other Definitive Documents, respectively. Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement

and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying, or preventing the timely consummation of the Plan.

(b)     If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights, remedies, claims, and defenses.

(c)     This Agreement is part of a proposed settlement of matters that could otherwise be subject to litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14. <u>Specific Performance</u>.  It is understood and agreed by the Parties that, without limiting any other remedies available at law or in equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15. <u>No Commitment</u>.  No Consenting Stakeholder shall be obligated to fund or otherwise committed to provide funding in connection with the Restructuring Transactions, except pursuant to a separate commitment letter or definitive documentation relating specifically to such funding, if any, that has been (i) executed by such Consenting Stakeholder and (ii) approved by the Bankruptcy Court, as necessary, along with the satisfaction of any conditions precedent to such funding requirements.

14.16. <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.17. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.18. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.19. <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.20.  <u>Survival</u>.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with this Agreement or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 7.01(k), Section 7.01(l), Section 14, and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.21.  <u>Publicity</u>.  Except as may be required by law, none of the Parties, or any individual or entity acting on their behalf, prior to the Petition Date, as applicable, shall issue any press release or make any public statement regarding the Restructuring Transactions, including the existence or contents of this Agreement, other than in a form mutually agreed to by the Parties.

14.22.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties, the Required Consenting First Lien Term Lenders, the Required Consenting Second Lien Term Lenders, or the Consenting Sponsors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

*[Signature pages follow]*

## EXHIBIT A

### Company Parties

**FASHION HOLDINGS INTERMEDIATE LLC**
**FASHION INTERMEDIATE INC.**
**BEAR PARENT INC.**
**BELK, INC.**
**BELK-SIMPSON COMPANY, GREENVILLE, SOUTH CAROLINA**
**BELK INTERNATIONAL, INC.**
**BELK STORES SERVICES, INC.**
**BELK ADMINISTRATION COMPANY**
**BELK STORES OF VIRGINIA LLC**
**BELK ACCOUNTS RECEIVABLE LLC**
**BELK GIFT CARD COMPANY LLC**
**BELK MERCHANDISING LLC**
**BELK TEXAS HOLDINGS LLC**
**BELK SOURCING LLC**
**BELK DEPARTMENT STORES LP**
**THE BELK CENTER, INC.**
**BELK ECOMMERCE LLC**
**BELK STORES OF MISSISSIPPI LLC**

# EXHIBIT B

**Restructuring Term Sheet**

**BELK, INC.**

**RESTRUCTURING TERM SHEET**

**JANUARY 26, 2021**

THIS TERM SHEET (TOGETHER WITH ALL ANNEXES, SCHEDULES AND EXHIBITS HERETO, THIS "TERM SHEET") DESCRIBES THE PRINCIPAL TERMS AND CONDITIONS OF A RESTRUCTURING TRANSACTION FOR BELK, INC. ("BELK") AND CERTAIN OF ITS AFFILIATES THAT WILL BE EFFECTUATED THROUGH VOLUNTARY PREPACKAGED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "CHAPTER 11 CASES") IN THE BANKRUPTCY COURT, ON THE TERMS, AND SUBJECT TO THE CONDITIONS, SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT (TOGETHER WITH THE EXHIBITS AND SCHEDULES ATTACHED TO SUCH AGREEMENT, INCLUDING THIS TERM SHEET, EACH AS MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "RSA").

THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL COMPLY WITH ALL APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.

CAPITALIZED TERMS USED BUT NOT INITIALLY DEFINED IN THIS TERM SHEET SHALL HAVE THE MEANING HEREINAFTER ASCRIBED TO SUCH TERMS, OR IF NOT DEFINED IN THIS TERM SHEET, SUCH TERMS SHALL HAVE THE MEANING ASCRIBED TO SUCH TERMS IN THE RSA OR THE PLAN.

THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | The Restructuring Transactions shall be implemented through the filing of the Chapter 11 Cases in the Bankruptcy Court.<br><br>As reorganized pursuant to the Restructuring Transactions, the Company Parties shall be referred to herein, collectively, as the "Reorganized Debtors." |
| **Existing Capital Structure** | ABL Facility: consisting of the $900 million revolving credit facility pursuant to that certain ABL Credit Agreement (as amended, restated, or otherwise modified from time to time, the "ABL Credit Agreement," and the loans thereunder, the "ABL Loans"), dated as of December 10, 2015, by and among Bear Parent Inc. as holdings, and Belk, Inc. as borrower, the guarantors party thereto from time to time, Bank of America, N.A. as the administrative and collateral agent, and the lender parties thereto from time to time.<br><br>First Lien Term Loans: consisting of approximately $999 million in outstanding principal, plus interest, fees and other expenses, pursuant to that certain First Lien Credit Agreement, dated as of December 10, 2015, by and among Bear Parent Inc. as holdings, and Belk, Inc. as borrower, the guarantors party thereto from time to time, Morgan Stanley Senior Funding, Inc. as the administrative and collateral agent, and the lender parties thereto from time to time.<br><br>Second Lien Term Loans: consisting of approximately $550 million in outstanding principal, plus interest, fees and other expenses, pursuant to that certain Second Lien Credit Agreement, dated as of December 10, 2015, by and among Bear Parent Inc. as holdings, and Belk, Inc. as borrower, the guarantors party thereto from time to time, Wilmington Trust, National Association as the administrative and collateral agent, and the lender parties thereto from time to time. |
| **Reorganized Debtors Capital Structure** | The capital structure of the Reorganized Debtors upon the Plan Effective Date shall consist of the following:<br><br>(i) a first lien term loan credit facility (the "New First Lien Credit Facility"), which shall be available to be drawn or otherwise made available to the Borrower (as defined in Exhibit 1 hereto) on the Plan Effective Date and shall be comprised of:<br><br>(a) a $300 million term loan tranche, consisting of (A) $225 million of new money term loans (the "New FLFO New Money Loans") and (B) $75 million of new term loans rolled up from the First Lien Term Loans (the "New FLFO Roll-Up Loans", and together with the New FLFO New Money Loans, the "New FLFO Loans"); and<br><br>(b) up to $822 million (or to be reduced to $815 million after giving effect to any amortization payments on or prior to the the Plan Effective Date) exchange term loan tranche, secured by a first-priority lien on a "second-out" priority basis ("New FLSO Loans"); |

(ii) a second lien term loan credit facility (the "New Second Lien Credit Facility", together with the New First Lien Credit Facility, the "New Credit Facilities"), which shall be available to be drawn or otherwise made available to the Borrower on the Plan Effective Date and shall be comprised of a $110 million exchange term loans, secured by a second-priority lien ("New Second Lien Term Loans", together with the New First Lien Term Loans, the "New Term Loans");

(iii) the ABL Facility; and

(iv) new common stock issued by the parent entity of the Reorganized Debtors on the Plan Effective Date, after giving effect to the Restructuring Transactions, which for the avoidance of doubt may be Fashion Holdings Intermediate LLC or a new entity formed to acquire, directly or indirectly, substantially all of the assets of the Company Parties ("Reorganized Belk Holdings", and the new common stock or comparable equity interests issued by Reorganized Belk Holdings, the "New Common Stock"), resulting in the following pro forma ownership percentages: (a) 50.1% held by Fashion Holdings LLC, following the issuance of the New Common Stock to be issued pursuant to clauses (b) and (c) below, (b) 34.9% held by holders of Second Lien Term Loan Claims, and (c) 15% held by Existing Lenders that elect to fund their pro rata share of $125 million of the New FLFO New Money Loans.

| | |
|---|---|
| | **NEW FLFO NEW MONEY LOANS** |
| **Participation in New FLFO New Money Loans** | All existing First Lien Term Lenders (the "Existing First Lien Term Lenders") and all existing Second Lien Term Lenders (the "Existing Second Lien Term Lenders" and together with Existing First Lien Term Lenders, the "Existing Lenders") will be offered the opportunity to participate in the funding of the New FLFO New Money Loans directly as new money loans ("New Money Commitments") on the Plan Effective Date as follows: (i) 1/3 of the Lender Backstop Commitments will be offered to the Existing Second Lien Term Lenders to participate on a pro rata basis based on the Second Lien Term Loans held by such Existing Lender as of the date the Company Parties commence solicitation of votes on the Plan (such date, the "Record Date") and (ii) 2/3 of the Lender Backstop Commitments will be offered to the Existing First Lien Term Lenders to participate on a pro rata basis on the First Lien Term Loans held by such Existing Lender as of the Record Date; provided, that any Existing Lender that wishes to participate in the New FLFO New Money Loans must subscribe to at least its pro rata share of $125 million of the New FLFO New Money Loans. <br><br> All Existing Lenders will also be offered the opportunity to subscribe for more than their pro rata share of the New Money Commitments as described above. To the extent the total subscriptions by the Existing First Lien Term Lenders and/or the Existing Second Lien Term Lenders exceed the applicable New Money Commitments allocated to such group of Existing Lenders, the excess |

amount would first reduce the New Money Commitments not subscribed by their respective First Lien or Second Lien group of Existing Lenders on a dollar for dollar basis (if any), with the remaining excess amount to reduce the New Money Commitments that are backstopped by the Sponsor Backstop Commitment (as defined below) on a dollar for dollar basis; provided, that such oversubscription by Existing Lenders and corresponding reduction of New Money Commitments will be limited (on a ratable basis) such that the Sponsor Backstop Commitments shall in no event be below $65 million of New FLFO New Money Loans; provided, further that Existing Lenders may elect to limit any such oversubscription to reduction of the Lender Backstop Commitments.

Each Existing Lender may participate in the New Money Commitments on behalf of its Related Funds (as defined below) in its sole discretion, and may allocate its New Money Commitment and any related fees or other consideration among itself and any Permitted Assignees (as defined below) in its sole discretion.

Each Existing First Lien Lender (including, for the avoidance of doubt, any Lender Backstop Party) that (x) commits to fund its pro rata share of 2/3 of the $125 million of New FLFO New Money Loans by executing the New FLFO New Money Commitment Letter attached hereto as **Exhibit 2** and (y) executes a joinder to the RSA, in each case by February 2, 2021 (which date may be extended with the prior written consent of the Company Parties, Required Consenting Lenders, and Consenting Sponsors), shall receive an additional amount equal to 25% of the principal amount of First Lien Term Loan Claims held by such First Lien Term Loan Lender on the Record Date in the form of New FLSO Loans.

After giving effect to the subscriptions from the Existing Lenders, to the extent any New Money Commitments have not been subscribed for or to the extent any Existing Lender with a New Money Commitment fails to fund its portion of the New FLFO New Money Loans, the applicable backstop party shall fund its relevant portion of the New FLFO New Money Loans.

| | |
|---|---|
| **Backstop for New FLFO New Money Loans** | Certain Consenting First Lien Term Lenders and Consenting Second Lien Term Lenders have executed the Backstop Commitment Letter (collectively, the "Lender Backstop Parties" and the commitments thereof, the "Lender Backstop Commitments") and thereby committed, on a several and not joint basis, (a) to provide their pro rata share of $125 million in aggregate principal amount of New FLFO New Money Loans and (b) to backstop up to $125 million of New Money Commitments that are not subscribed for by the Existing Lenders or funded at closing, in each case in the amount set forth opposite its name on Schedule 1 to the Backstop Commitment Letter.<br><br>The investment funds managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P. whose names are as set forth on Schedule 1 to the Backstop Commitment Letter attached hereto as **Exhibit 3** (collectively, but such entities on a several and not joint basis, the "Sponsor Backstop Parties" (together with the Lender Backstop Parties, the "Backstop Parties"), and the commitments thereof, "Sponsor Backstop Commitments") commit to backstop $100 million of New Money |

|  | Commitments, in each case in the amount opposite its name as set forth on Schedule 1 to the Backstop Commitment Letter, which such amount may be reduced on account of any over-subscriptions by the participating Existing Lenders as described above; provided that such oversubscription and corresponding reduction shall in no event reduce the Sponsor Backstop Commitments below $65 million of New FLFO New Money Loans.

Notwithstanding the foregoing, each Backstop Party may (1) commit to provide Backstop Commitments on behalf of its Related Funds in its sole discretion and (2) allocate its Backstop Commitment and any related fees or other consideration among itself and/or any Permitted Assignee in its sole discretion. [1]

As used herein, "Related Funds" means, with respect to any person, any funds or accounts managed or advised by such person or an affiliate of such person, or any funds or accounts managed or advised by the investment manager or advisor of such person or any affiliate of such person.

As used herein, "Permitted Assignee" means, with respect to any person, (1) such person's Related Funds or (2) any other Lender Backstop Party or its Related Funds. |
|---|---|
| **Backstop Consideration for New FLFO New Money Loans** | Each Consenting First Lien Term Lender that is also a Lender Backstop Party shall receive its pro rata share of $30 million of the New FLFO Roll-Up Loans (based on the amount of Lender Backstop Commitments held by such Consenting First Lien Term Lender as a proportion of 2/3 of the $125 million of New FLFO New Money Loans.

In exchange for funding their respective Lender Backstop Commitments, each Lender Backstop Party shall receive 10.0% of the amount of the Lender Backstop Commitments held by each such Lender Backstop Party on the date of execution of the Backstop Commitment Letter, payable to such Lender Backstop Party in cash on, and subject to the occurrence of, the Plan Effective Date.[2] |

---

[1]   The Lender Backstop Parties include Apex Credit Partners LLC, Assured, Blackstone Alternative Credit Advisors, LP, First Eagle, FS Global Credit Opportunities Fund / Blair Funding LLC, Greywolf, Guggenheim Partners Investment Management, LLC, Hein Park Capital Management LP, Jefferies Leveraged Credit, KKR Credit Advisors (US) LLC, Katriona Investment Pte Ltd., Davidson Kempner Capital Management LP, MJX, Nuveen Asset Management, LLC, SEIX, and Voya.

[2]   In addition to the foregoing, (i) $2 million shall be paid to Davidson Kempner Capital Management LP in cash on, and subject to the occurrence of, the Plan Effective Date, and (ii) $10 million shall be paid to and divided between Hein Park Capital Management LP, Nuveen Asset Management, LLC, Jefferies Leveraged Credit Products LLC, Greywolf Loan Management LP, Voya Investment Management Co. LLC, and Guggenheim Partners Investment Management, LLC, in cash on, and subject to the occurrence of, the Plan Effective Date.

| | To the extent any Lender Backstop Party fails to fund any New FLFO New Money Loans required to be funded by such person, no backstop fee shall be due and payable to such person. |
| **Participation in New FLFO Roll-Up Loans** | Each Existing First Lien Lender (including, for the avoidance of doubt, any Lender Backstop Party) that (x) commits to fund its pro rata share of 2/3 of the $125 million of New FLFO New Money Loans by executing the New FLFO New Money Commitment Letter and (y) executes a joinder to the RSA, in each case by February 2, 2021 (which date may be extended with the prior written consent of the Company Parties, the Required Consenting Lenders, and the Consenting Sponsors), shall receive its pro rata share of $45 million of the New FLFO Roll-Up Loans (based on the amount of the 2/3 of the $125 million of New FLFO New Money Loans funded by such Consenting First Lien Lender as a proportion of the 2/3 of the $125 million of New FLFO New Money Loans). |
| **New Common Stock for New Money Investors** | Concurrently with the funding of the New FLFO New Money Loans by an Existing Lender or a Lender Backstop Party, such person (or its Permitted Assignee) shall receive a pro rata portion of 15% of the New Common Stock (with such pro rata share based on the proportionate amount of the initial $125 million of New FLFO New Money Loans funded by such person on the Plan Effective Date). |

### TREATMENT OF CLAIMS AND INTERESTS

| Type of Claim | Treatment | Impairment/ Voting |
|---|---|---|
| **Administrative and Priority Tax Claims** | On the Plan Effective Date, each holder of an allowed administrative claim or priority tax claim shall receive cash equal to the full amount of its claim or such other treatment as required by section 1129(a)(9) of the Bankruptcy Code, unless otherwise agreed to by such holder or permitted by the Bankruptcy Code. | N/A |
| **Other Secured Claims** | On the Plan Effective Date, each holder of an allowed Other Secured Claim, including, but not limited to, secured claims of all equipment lessors, shall receive, in full and final satisfaction of such claims, either (a) payment in full in cash, (b) delivery of the collateral securing such claim, (c) reinstatement of such claim, or (d) such other treatment rendering such claim unimpaired in accordance with section 1124 of the Bankruptcy Code, unless otherwise agreed to by such holder. | Unimpaired; Deemed to Accept. |
| **Other Priority Claims** | On the Plan Effective Date, each holder of an allowed Other Priority Claim shall receive cash in an amount equal to such claim, unless otherwise agreed to by such holder. | Unimpaired; Deemed to Accept. |
| **ABL Facility Claims** | On the Plan Effective Date, unless otherwise agreed by a holder of an Allowed ABL Facility Claim, each holder of an allowed ABL Facility Claim shall, at the election of such | Unimpaired; Deemed to Accept. |

| | | |
|---|---|---|
| | holder, receive (i) payment in Cash of its Allowed ABL Facility Claim and replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement; or (ii)(x) its pro rata share of refinanced loans under the New ABL Facility in an amount equal to the principal amount of ABL Facility Claims held by such holder as of the Plan Effective Date, and (y) Cash in an amount equal to the accrued but unpaid non-default interest payable to such Holder under the ABL Credit Agreement as of the Plan Effective Date (if any). | |
| **First Lien Term Loan Claims** | On the Plan Effective Date, each holder of an allowed First Lien Term Loan Claim will receive, in full and final satisfaction of such First Lien Term Loan Claim, New FLSO Loans in a principal amount equal to 55% of the aggregate principal amount of such holder's allowed First Lien Term Loan Claims; *provided*, that all accrued and unpaid amortization and interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Plan Effective Date.<br><br>Additionally, the Plan shall incorporate or otherwise give effect to the terms set forth in the "New FLFO New Money Loans" section herein. | Impaired; Entitled to Vote |
| **Second Lien Term Loan Claims** | On the Plan Effective Date, each holder of an allowed Second Lien Term Loan Claim will receive, in full and final satisfaction of such Second Lien Term Loan Claim, (i) New FLSO Loans in a principal amount equal to 15% of the aggregate principal amount of such holder's allowed Second Lien Term Loan Claims, (ii) New Second Lien Term Loans in a principal amount equal to 20% of the aggregate principal amount of such holder's allowed Second Lien Term Loan Claims, and (iii) its pro rata share of 34.9% of the New Common Stock; *provided*, that all accrued and unpaid interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Plan Effective Date.<br><br>Additionally, the Plan shall incorporate or otherwise give effect to the terms set forth in the "New FLFO New Money Loans" section herein. | Impaired; Entitled to Vote |
| **General Unsecured Claims** | On the Plan Effective Date, each holder of an allowed General Unsecured Claim shall receive either: (i) reinstatement of such allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in cash on (a) the Plan Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such | Unimpaired; Deemed to Accept. |

| | allowed General Unsecured Claim, unless otherwise agreed to by such holder. | |
|---|---|---|
| **Intercompany Claims** | On the Plan Effective Date, Intercompany Claims[3] shall be, at the option of the Reorganized Debtors, either: (i) reinstated; or (ii) distributed, contributed, set off, cancelled and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors. | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |
| **Intercompany Interests** | On the Plan Effective Date, Intercompany Interests[4] shall be, at the option of the Reorganized Debtors, either: (i) reinstated; or (ii) cancelled and released without any distribution on account of such Equity Interests. | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |
| **Equity Interests** | On the Plan Effective Date, all Equity Interests will be reinstated, subject to dilution on account of the New Common Stock, and the legal, equitable, and contractual rights to which holders of Interests are entitled shall otherwise remain unaltered. | Impaired; Entitled to Vote. |

| **SUMMARY OF TERMS OF THE RESTRUCTURING TRANSACTIONS** | | |
|---|---|---|
| **Cancellation of KKR, Blackstone Credit, and GIC Interests** | On the Plan Effective Date, KKR[5], Blackstone Credit[6], and GIC[7] shall be deemed to have waived all legal, equitable, and contractual interests in the Equity Interests held by KKR, Blackstone Credit, and GIC in Fashion Topco LLC and such Equity Interests shall be cancelled and released without any distribution on account of such Equity Interests. | |
| **Survival of Indemnification Provisions and D&O Insurance** | All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and | |

---

[3] "**Intercompany Claim**" means any Claim against a Company Party held by another Company Party.

[4] "**Intercompany Interest**" means an Equity Interest in a Company Party held by another Company Party.

[5] "**KKR**" means, collectively, Polar Bear Fund L.P., CPS Managers Master Fund L.P., KKR TFO Partners L.P., FS KKR Capital Corp, and PCOP II Cayman Investors A L.P.

[6] "**Blackstone Credit**" means, collectively, GSO Beacon Holdings LP, GSO Credit Alpha Fund LP, and any Affiliate or transferee of any of the foregoing entities that hold Topco Equity Interests.

[7] "**GIC**" means Katriona Investment Pte Ltd.

|  | other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Plan Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Plan Effective Date.<br><br>In addition, after the Plan Effective Date, the Company Parties will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |
| --- | --- |
| **Claims of the Company Parties** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Company Parties pursuant to the release and exculpation provisions outlined in this Term Sheet. |
| **Releases** | The Plan and the Confirmation Order will contain the exculpation provisions and releases set forth in **Annex 1** to this Term Sheet. |
| **Tax Structure** | To the extent practicable, the Restructuring Transactions contemplated by this Term Sheet will be structured so as to obtain the most beneficial tax structure for the Company Parties, as determined by the Company Parties and the Required Consenting Stakeholders. |
| **Exemption from SEC Registration** | If the transaction is consummated pursuant to the Plan, the issuance of all securities under the Plan will be exempt from registration under the Securities Act and applicable law. |
| **Conditions Precedent to the Plan Effective Date** | It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived:<br><br>(i)      the RSA and the Backstop Commitment Letter shall remain in full force and effect;<br><br>(ii)     all fees and premiums payable pursuant to the Backstop Commitment Letter shall have been paid;<br><br>(iii)    there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Company Parties, the Required Consenting |

Lenders, and the Consenting Sponsors would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

(iv) an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall not have been enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Company Parties, the Consenting Sponsor, and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

(v) each document or agreement constituting the Definitive Documents shall have been executed and/or effectuated and shall be in form and substance consistent with the RSA;

(vi) accrued and unpaid interest and amortization in respect of the First Lien Loans and Second Lien Loans as of the Plan Effective Date shall have been paid in full in cash;

(vii) to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Company Parties' professionals, the Consenting Lender Fees and Expenses, and the Consenting Sponsor Fees and Expenses;

(viii) all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date have been placed in the professional fee escrow account;

(ix) the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered;

(x) entry into the New Credit Facilities Documents, and all conditions precedent to the consummation of such New Credit Facilities Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New Credit Facilities Documents shall have occurred;

(xi) entry into the New ABL Facility Documents, and all conditions precedent to the consummation of such New ABL Facility Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New ABL Facility Documents shall have occurred;

(xii) the New Common Stock shall have been issued by Reorganized Belk Holdings;

(xiii) the Reorganized Debtors shall have procured or become insured under new D&O tail coverage; and

| | |
|---|---|
| | (xiv) the Company Parties shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the RSA and the Plan. |

## ANNEX 1[8]

### Exculpation and Release Language

1.      "*Exculpated Parties*" means, collectively,  and in each case in its capacity as such: (a) the Debtors; (b) each Company Party; (c) each Consenting  Stakeholder;  (d) any statutory committee appointed in the Chapter 11 Cases and each of their respective members; and (e) each current and former Affiliate of each Entity in clause (a) through the following  clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f).

2.      "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar  governing body of any of the Debtors or the Reorganized Debtors, as applicable.

3.      "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly),  affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals,  members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.  For the avoidance of doubt, the current and former members of each Governing Body (and their attorneys and other professionals retained by them in their capacity as members of a Governing Body) are Related Parties of the Debtors.

4.      "*Released Party*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Crossover Lender Group; (e) each member of the Ad Hoc First Lien Term Lender Group; (f) each Company Party; (g) each Agent; (h) each ABL Lender; (i) each First Lien Term Lender; (j) each Second Lien Term Lender; (k) all Holders of Interests; (l) each Backstop Party; (m) each Sponsor; (n) each New Credit Facility Lender; (o) each  New ABL Facility  Lender;  and (p) each current and former  Affiliate  of each Entity  in clause (a) through the following  clause (q); and (q) each Related Party of each Entity in clause (a) through this clause (q); provided that in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection  is not resolved before Confirmation  of the Plan.

5.      "*Releasing Party*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Crossover Lender Group; (e) each member of the Ad Hoc First Lien Term Lender Group; (f) each Company Party; (g) each Agent; (h) each ABL Lender; (i) each First Lien Term Lender; (j) each Second Lien Term Lender; (k) all Holders of Claims; (l)  all Holders of Interests; (m) each Sponsor; (n) each Backstop Party; (o) each New Credit Facility  Lender; (p) each New ABL Facility  Lender; and (q) each current and former Affiliate of each Entity  in clause (a) through the following  clause (r); and (r) each Related Party of each Entity in clause (a) through this clause (r); provided that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely  objects to the releases contained in the Plan and such objection  is not resolved before Confirmation  of the Plan.

---

[8]      Capitalized  terms used in this **Annex A** but not otherwise defined shall have the meaning ascribed to such terms in the Plan.

A. *Releases by the Debtor.*

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action[9], directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Stakeholders), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the

---

[9]   "**Causes of Action**" means any claims, cross claims, third-party claims, interests, damages, judgments, remedies, causes of action, controversies, debts, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever (including those of the Debtors, the Reorganized Debtors, or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, pursuant to any other theory of law or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law preferential or fraudulent transfer or similar claim, and (f) any Avoidance Action.

Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

B.   *Releases by the Holders of Claims and Interests.*

Notwithstanding anything contained in this Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring

- 14 -

efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

*Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered

into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Exhibit 1**

**New Credit Facilities Term Sheet**

**BELK, INC.**

<u>NEW CREDIT FACILITIES TERM SHEET</u>

**JANUARY 26, 2021**

| | |
|---|---|
| **SUMMARY OF TERMS OF THE NEW CREDIT FACILITIES** | |
| **New Credit Facilities:** | (a) A first lien term loan credit facility (the "<u>New First Lien Credit Facility</u>"), which shall be available to be drawn or otherwise made available to the Borrower on the Plan Effective Date and shall be comprised of: |
| | (i)   a $300 million term loan tranche, consisting of (A) $225 million of new money term loans (the "<u>New FLFO New Money Loans</u>") and (B) $75 million of exchange term loans rolled up from the existing First Lien Term Loans (the "<u>New FLFO Roll-Up Loans</u>", and together with the New FLFO New Money Loans, the "<u>New FLFO Loans</u>"), in each case, secured by a first-priority lien on a "first-out" priority basis; and |
| | (ii)   up to $822 million (or to be reduced to $815 million after giving effect to any amortization payments on or prior to the Plan Effective Date) exchange term loan tranche, secured by a first-priority lien on a "second-out" priority basis ("<u>New FLSO Loans</u>", together with the New FLFO Loans, the "<u>New First Lien Term Loans</u>"). |
| | (b) A second lien term loan credit facility (the "<u>New Second Lien Credit Facility</u>", together with the New First Lien Credit Facility, the "<u>New Credit Facilities</u>"), which shall be made available to the Borrower on the Plan Effective Date and shall be comprised of a $110 million exchange term loans, secured by a second-priority lien ("<u>New Second Lien Term Loans</u>", together with the New First Lien Term Loans, the "<u>New Term Loans</u>"). |
| **New Credit Facilities Documents:** | The terms and conditions of the New First Lien Credit Facility shall be set forth in an exit credit agreement and related loan documents, the terms of which shall be based on the First Lien Term Loan Credit Agreement (collectively, the "<u>New First Lien Credit Facility Documents</u>"). |
| | The terms and conditions of the New Second Lien Credit Facility shall be set forth in an exit credit agreement and related loan documents, the terms of which shall be based on the Second Lien Term Loan Credit Agreement (collectively, the "<u>New Second Lien Credit Facility Documents</u>"). The New First Lien Credit Facility Documents and the New Second Lien Credit Facility Documents are collectively referred to as the "<u>New Credit Facility Documents</u>". |
| | At the option of the Required Consenting Lenders, the New First Lien Credit Facility Documents shall be documented as amended and restated First Lien Term Loan Credit Agreement and related loan documents and the New Second Lien Credit Facility Documents shall be documented as amended and restated |

|  | Second Lien Term Loan Credit Agreement and related loan documents, and the Confirmation Order (as defined in the RSA) shall provide that that the prepetition collateral documents, including any prepetition mortgages, shall remain in full force and effect and continue to secure the applicable New Credit Facilities.<br><br>The New Credit Facility Documents shall take into account the terms of this Term Sheet, incorporate other terms customary for exit facilities, and be otherwise in form and substance reasonably satisfactory to the Company Parties, the Required Consenting Lenders, and the Consenting Sponsor. |
|---|---|
| **Borrower/Guarantors:** | Belk, Inc. (the "Borrower") and, in addition to the same guarantors under the First Lien Term Loan Credit Agreement, Belk Sourcing LLC (collectively, the "Guarantors"). |
| **Administrative Agent:** | With respect to the New First Lien Credit Facility:  Alter Domus (US) LLC (f/k/a Cortland Capital Market Services LLC) or another agent acceptable to the Required Consenting Lenders and the Borrower.<br><br>With respect to the New Second Lien Credit Facility: Wilmington Trust, N.A., the existing agent under the Second Lien Term Loan Agreement, or another agent reasonably acceptable to the holders of the Second Lien Term Loans and the Borrower. |
| **Use of Proceeds:** | Net cash proceeds from the New FLFO New Money Loans may be used to pay the transaction expenses and for general corporate purposes, including repayment of the borrowings under the ABL Credit Agreement and accrued and unpaid interest or amortization payments under the First Lien Term Loans and/or Second Lien Term Loans. |
| **Maturity:** | With respect to the New First Lien Credit Facility: July 31, 2025.<br><br>With respect to the New Second Lien Credit Facility: July 31, 2025. |
| **Amortization:** | (i)    New FLFO Loans:  None.<br><br>(ii)   New FLSO Loans: as set forth below and payable on a quarterly basis<br><br>     a.  1.0% for fiscal year ended January 31, 2022<br><br>     b.  2.0% for fiscal year ended January 31, 2023<br><br>     c.  2.5% for fiscal year ended January 31, 2024 and thereafter.<br><br>(iii)  New Second Lien Term Loans:  None. |
| **Interest:** | (i)    New FLFO Loans:  LIBOR + 7.50%, paid at least quarterly in cash (with a 1.00% LIBOR floor, LIBOR may be one, two or three months) |

| | |
|---|---|
| | (ii) <u>New FLSO Loans</u>: 10.00% per annum, paid quarterly in cash, subject to adjustment based on the Borrower's exercise of the PIK Toggle (as defined below).<br><br>    a. *PIK Toggle*: So long as there is no default or event of default, the Borrower may, at its option, toggle interest to payment-in-kind ("**PIK**," and, the interest payment option, the "**PIK Toggle**"); *provided* that the PIK Toggle will only be available for 8 quarters in total over the life of the New FLSO Loans.<br><br>        i. In the event the Borrower opts to exercise the PIK Toggle, the interest rate on the New FLSO Loans will be 5.00% paid quarterly in cash, 8% paid quarterly in-kind.<br><br>        ii. No later than 5 days prior to each Interest Payment Date, the Borrower shall provide written notice to the Administrative Agent of whether it is exercising the PIK Toggle for such Interest Payment Date.<br><br>(iii) <u>New Second Lien Term Loans</u>: 10.00% per annum, paid quarterly in-kind. |
| **Security:** | In addition to all of the collateral granted under the First Lien Term Loan Credit Agreement, to include: (a) all cash and cash equivalents, deposit accounts and securities accounts subject to exclusions substantially the same as the "excluded accounts" under the ABL Facility (other than deposit accounts consisting solely of Term Priority Collateral proceeds); and (b) pledges of 100% of issued and outstanding voting stock of foreign subsidiaries and CFC Holdco (as such term is defined under the First Lien Term Loan Credit Agreement).<br><br>Within 30 days (or, with respect to leasehold mortgages, within 90 days) following the Plan Effective Date (or such later date as agreed to by the Administrative Agent in its reasonable discretion), the Borrower shall (i) deliver mortgages for each fee-owned real property that is not subject to a mortgage as of the date hereof and (ii) use its commercially reasonable efforts to deliver mortgages for each ground lease that is not subject to a mortgage as of the date hereof, including the use of commercially reasonable efforts to obtain any required consents of applicable landlords.<br><br>The New First Lien Credit Facility shall be secured by a first-priority lien on all existing Term Priority Collateral (as defined in the ABL Intercreditor Agreement) and a second-priority lien on ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), which shall be junior only to the ABL Lenders' security interest in ABL Priority Collateral.<br><br>The New Second Lien Credit Facility shall be secured by a second-priority lien on all existing Term Priority Collateral and a third-priority lien on ABL Priority Collateral. |

| | |
|---|---|
| **Priority:** | <u>New FLFO Loans</u>: New FLFO Loans shall have a first-out payment priority with respect to proceeds of, and distributions on or payments in respect of or arising out of the collateral, senior in right of payment to the New FLSO Loans.<br><br><u>New FLSO Loans</u>: New FLSO Loans shall have a second-out payment priority with respect to proceeds of, and distributions on or payments in respect of or arising out of the collateral, junior in right of payment to the New FLSO Loans.<br><br><u>New Second Lien Term Loans</u>: New Second Lien Term Loans shall be junior in lien priority to the lien securing the New First Lien Term Loans pursuant to an intercreditor agreement with terms set forth under the heading "Intercreditor Terms" below. |
| **Mandatory Prepayment:** | <u>With respect to the New First Lien Term Loans:</u><br><br>Except as set forth below, same as under the First Lien Term Loan Credit Agreement, subject to priority under "Priority".<br><br>**ECF Sweep:**<br><br>In the event that average Liquidity as of each Friday during the months of January, February and March of each year is greater than $75 million (such amount, the "**Liquidity Threshold**"), 100% of the Excess Cash Flow for the most recently ended fiscal year in excess of an amount equal to the Liquidity Threshold, shall be used to mandatorily prepay the New FLSO Loans until New FLSO Loans achieve a repayment rate of 4% per annum for the applicable fiscal year generating such Excess Cash Flow (inclusive of the scheduled amortization set forth above and any voluntary prepayments during such fiscal year) and thereafter, only 50% of the Excess Cash Flow shall be subject to sweep. ECF payment in respect of 50% of Excess Cash Flow may be utilized for open market purchases that are consummated prior to the date such mandatory prepayment is required to be made.<br><br>Any reduction in principal amount of the New FLSO Loans through open market purchases shall not be taken into account to determine the amount of Excess Cash Flow subject to sweep until after the sweep percentage is reduced from 100% to 50%. There shall be no Excess Cash Flow sweep for New FLFO Loans.<br><br>**Asset Sale/Casualty Event Sweep**:<br><br>The proviso set forth in clause (1) of "Net Proceeds" of the First Lien Term Loan Credit Agreement shall be amended as follows:<br><br>"*provided* that (a) subject to clause (b) below, no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds shall exceed $1 million and (b) no such net cash proceeds shall constitute Net Proceeds under this clause (1) in any fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $2 million (and |

|  | thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (1)); and".
There shall be no re-investment right with respect to any asset sale and in the case of casualty event, such reinvestment right shall be limited to $5 million per fiscal year, with unused amounts permitted to be carried forward to subsequent fiscal years.
The (a) Net Proceeds realized or received in connection with any asset sale or casualty event or incurrence of non-permitted indebtedness and (b) Specified Sale-Leaseback Net Proceeds, in each case, shall be applied (i) first, to the outstanding New FLFO Loans until paid in full and (ii) second, to the New FLSO Loans until paid in full.
<u>With respect to the New Second Lien Term Loans</u>:
The New Second Lien Term Loans shall not have any Excess Cash Flow sweep. The other mandatory prepayment provisions shall be the same as applicable to the New First Lien Term Loans; *provided* that no such mandatory prepayment shall be required to be made until repayment in full of all New First Lien Term Loans and any other debt secured on a senior lien basis to the New Second Lien Term Loans. |
|---|---|
| **Optional Prepayment and Prepayment Premium:** | <u>New First Lien Term Loans</u>:
The Borrower may make optional prepayments of any tranche of the New First Lien Term Loans at its election. Such optional prepayments, certain mandatory prepayments (*i.e.* in respect of the incurrence of non-permitted debt, Specified Sale-Leaseback Transactions, Asset Sales and Casualty Events) and acceleration for any reason shall each be subject to the following prepayment premium, in each case plus accrued and unpaid interest:
<u>With respect to New FLFO Loans</u>: |

With respect to New FLFO Loans:

| Plan Effective Date through the date that is 12 months thereafter | 103.0% |
|---|---|
| 12 months through 24 months | 102.0% |
| 24 months through 36 months | 101.0% |
| 36 months through Maturity Date | 100.0% |

<u>With respect to New FLSO Loans</u>: make-whole payment upon a bankruptcy filing of the Company Parties within three years of the Plan Effective Date in an amount equal to 20% of the total original principal amount of First Lien Term Loans and Second Lien Term Loans exchanged for New FLSO Loans.

| | |
|---|---|
| | New Second Lien Term Loans: <br><br> Optional prepayment of any Second Lien Term Loans shall be subject to availability of restricted payment capacity under the New First Lien Credit Facility Documents but shall not be subject to any prepayment premium. |
| **Representations and Warranties:** | Customary for facilities similar to the New Credit Facilities. |
| **Reporting/ Information Rights:** | Generally consistent with the reporting and information rights under the First Lien Term Loan Credit Agreement, with additional reporting set forth on Schedule 2 and otherwise to be mutually agreed by the Borrower and the Required Consenting Lenders. |
| **Covenants and Events of Default:** | With respect to the New First Lien Credit Facility: <br><br> Generally consistent with the covenants and events of default under the First Lien Term Loan Credit Agreement (as modified by "Exhibit B" to Amendment No. 1 to the First Lien Term Loan Credit Agreement), with the following modifications: <br><br> - Anti-Priming Debt. No incurrence of indebtedness that is senior in right of payment or with respect to security to the New First Lien Term Loans or has the benefit of additional guarantors who are not guarantors of the New First Lien Term Loans without the consent of all lenders holding New First Lien Term Loans unless the (a) opportunity to participate in such indebtedness is offered ratably on substantially the same terms (including, without limitation, any fees or other benefits offered in connection with such indebtedness) to all holders of New First Lien Term Loans, (b) the terms of such indebtedness would not reasonably be expected to preclude any holder of New First Lien Term Loans from participating in such indebtedness on a pro rata basis on substantially the same terms as any other holder of New First Lien Term Loans (without regard to any individual investment, compliance or other restrictions that any specific holder may be subject to, including, without limitation, the capacity to make new money loans of the type, size or terms being offered, but excluding restrictions as to, or capacity to make, equity investments) and (c) terms of such indebtedness are approved by Required Lenders. <br><br> - Anti-Layering. No incurrence of indebtedness that is subordinated in right of payment to other indebtedness unless such indebtedness is subordinated in right of payment to the New First Lien Term Loans to the same extent and in the same manner (consent to any such layering to be provided by Required Facility Lenders of the tranche(s) being layered). <br><br> - Incremental New FLFO Loan Capacity. There shall be no incremental debt capacity to incur additional New FLFO Loans, including after |

<table>
<tr>
<td></td>
<td>

repayment of any New FLFO Loans existing on the Plan Effective Date.

- <u>Assignments</u>. Same as the First Lien Term Loan Credit Agreement except that solely with respect to any assignment of the New FLSO Loans, consent of the Borrower shall not be required. No assignment shall be made to any competitor of the Borrower or any affiliate thereof or to any person that is a disqualified lender set forth on a list delivered to the Consenting Lenders on the date of the Restructuring Support Agreement or any other person added to such list on or prior to the Plan Effective Date and acceptable to the Required Consenting Lenders.

<u>With respect to the New Second Lien Credit Facility</u>:

The New Second Lien Credit Facility Documents shall (i) contain covenant and event of default terms that include a 20% cushion with respect to dollar baskets and a 0.25x cushion with respect to ratio baskets under the New First Lien Credit Facility Documents, (ii) shall not include the restrictions in Section 7.08(2) of the Second Lien Term Loan Credit Agreement, (iii) shall include the anti-layering provisions set forth in Section 7.10 of the Second Lien Term Loan Credit Agreement and (iv) shall cross accelerate (instead of cross default) to all debt secured on a senior lien basis to the New Second Lien Term Loans, including the New First Lien Term Loans and the ABL Facility and shall cross default to all other debt above a threshold amount (set at a 20% cushion above the threshold amount under the New First Lien Credit Facility Documents).

</td>
</tr>
<tr>
<td>

**Financial Covenants:**

</td>
<td>

<u>With respect to the New First Lien Credit Facility</u>:

Solely for the benefit of the New FLFO Loans:

**Minimum Liquidity:** Average daily Liquidity for each fiscal quarter ended after the Plan Effective Date (or, in the case of the first fiscal quarter ended after the Plan Effective Date, average daily Liquidity for the period commencing on the Plan Effective Date through the end of the applicable fiscal quarter) shall not be less than $40 million.

"**Liquidity**" means as of the applicable date of determination, all unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries (without duplication of any excess availability resulting from any qualified cash included in the borrowing base and excluding store deposits) plus excess availability under the ABL Facility (excluding (i) any amount of the excess availability that, if drawn, would trigger a breach of the financial covenant under the ABL Facility and (ii) to the extent not already reflected in the excess availability, any reserves or other actual deductions from the borrowing base as of such date that are not reflected in the most recent borrowing base certificate).

**Maximum Leverage Ratio Covenant**: Commencing with the fourth fiscal quarter of fiscal year 2023 (i.e. fiscal year ending January 31, 2023), Total Net Leverage Ratio (defined in a manner substantially the same as the existing First

</td>
</tr>
</table>

Lien Term Loan Credit Agreement) tested as of the end of any fiscal quarter shall not be greater than the level set forth below:

| | |
|---|---|
| Q4 2023 - Q3 2024 | 10.00x |
| Q4 2024 - Q2 2025 | 8.75x |
| Q3 2025 - Q4 2025 | 8.00x |
| Thereafter | 7.00x |

Solely for the benefit of the New FLSO Loans:

**Maximum Leverage Ratio Covenant**:  Commencing with the fourth fiscal quarter of fiscal year 2023 (i.e. fiscal year ending January 31, 2023), Total Net Leverage Ratio (defined in a manner substantially the same as the existing First Lien Term Loan Credit Agreement) tested as of the end of any fiscal quarter shall not be greater than the level set forth below:

| | |
|---|---|
| Q4 2023 - Q3 2024 | 11.00x |
| Q4 2024 - Q2 2025 | 9.75x |
| Q3 2025 - Q4 2025 | 9.00x |
| Thereafter | 8.00x |

With respect to the New Second Lien Credit Facility: none

| | |
|---|---|
| **Rating:** | The Company Parties will use commercially reasonable efforts (which use of efforts shall not require the Company Parties to change the terms of the New Credit Facilities) to obtain, prior to the Plan Effective Date, at the Company Parties' expense, monitored public corporate credit/family ratings of the Borrower and ratings of the New Credit Facilities from Moody's Investors Service and Standard & Poor's Ratings Group; provided, that no particular ratings shall be required. |
| **Affiliated Lenders:** | Consistent with the existing First Lien Term Loan Credit Agreement, except (a) Affiliated Lender Cap (as defined in the First Lien Term Loan Credit Agreement) to be amended to account for the Consenting Sponsor holding of the New FLFO Loans (if any), (b) provisions treating Debt Fund Affiliates in a different manner than other Affiliated Lenders shall be deleted (including Debt Fund Affiliates shall not be carved out from the defined term "Affiliated Lenders" and shall be subject to the same caps on Term Loan holdings and voting restrictions as Affiliated Lenders), (c) with respect to any matter requiring Required Lender consent or Required Facility Lender consent, all fees |

and other benefits made available to any other consenting lender with New First Lien Term Loans of the same class shall be made available to Affiliated Lenders on a no less than pro rata basis and (d) Affiliated Lenders shall receive all information made available by the Borrower to any lender holding the same tranche of New First Lien Term Loans and shall be entitled to attend all lender meetings with the Borrower that are open to any holder holding the same tranche of New First Lien Term Loans; it being understood and agreed that no provision relating to sacred rights shall be amended to impair or limit the voting rights of Affiliated Lenders in any respect and that Section 10.07(j) will not be amended.

"Permitted Holders" definition shall be expanded to include Blackstone, KKR and their respective affiliates, and funds or partnerships managed or advised by them or their affiliates, but not including any portfolio company of any of the foregoing.

"Affiliated Lender" and "Affiliates" definitions shall be amended to provide that no Lender (or its affiliates or permitted transferees) as of the consummation of the Restructuring Transaction (other than the Consenting Sponsor) will be deemed an "Affiliated Lender" or an "Affiliate" of Holdings, the Borrower or any of its Subsidiaries.

| | |
|---|---|
| **Voting:** | <u>With respect to the New First Lien Credit Facility:</u><br><br>Consistent with the existing First Lien Term Loan Credit Agreement, except that (x) the consent of each lender under the New First Lien Credit Facility adversely affected thereby shall be required with respect to: (A) provisions requiring pro rata payments or pro rata sharing of payments, (B) the payment waterfall in connection with the exercise of remedies or the priority set forth herein, or (C) subordinating the New Term Loans in right of payment or subordinating the liens securing the New Term Loans, in each case of (B) and (C), except as set forth above under the first bullet point (Anti-Priming Debt) under the heading "Covenants and Events of Defaults" and (y) the consent of each lender under the New First Lien Credit Facility shall be required with respect to the addition of any new Unrestricted Subsidiary or any amendment to such defined term.<br><br>"Required Lenders" under the New First Lien Credit Facility Documents shall be defined to mean (i) lenders holding more than 50% of the New FLFO Loans and (ii) lenders holding more than 50% of the New FLSO Loans.<br><br><u>With respect to the New Second Lien Credit Facility:</u><br><br>Consistent with the existing Second Lien Term Loan Credit Agreement, except that the consent of each lender under the New Second Lien Credit Facility adversely affected thereby shall be required with respect to: (A) provisions requiring pro rata payments or pro rata sharing of payments or (B) the payment waterfall in connection with the exercise of remedies. |

| | |
|---|---|
| **Intercreditor Terms:** | The rights of the holders of the New FLFO Loans and the New FLSO Loans shall be generally consistent with the intercreditor terms provided under the existing first lien/second lien Term Intercreditor Agreement, *mutatis mutandis*. |

The rights of the holders of the New First Lien Term Loans and the New Second Lien Term Loans shall be generally consistent with the intercreditor terms provided under the existing first lien/second lien Term Intercreditor Agreement, with the following modifications:

(a) The holders of the New Second Lien Term Loans (the "Second Lien Lenders") shall be required to vote, and shall be deemed to have voted, in favor of, any amendment, consent, waiver or other modification of any term under the New Second Lien Credit Facility Documents if the requisite lenders under the New First Lien Credit Facility have voted in favor of a similar amendment, consent, waiver or other modification of any comparable term under the New First Lien Credit Facility Document to incur any indebtedness or grant liens to secure such indebtedness (including indebtedness provided under the New First Lien Credit Facility Documents, indebtedness with priority in right of payment or security that is pari passu or senior to any New First Lien Term Loans or indebtedness incurred by non-guarantor restricted or unrestricted subsidiaries) (provided that the New First Lien Loans and New Second Lien Loans shall be or remain secured by liens on the same collateral) and, in connection therewith, to designate any restricted subsidiary to be an unrestricted subsidiary (provided that such subsidiary is designated an unrestricted subsidiary under the New First Lien Credit Facility Documents), to release liens on assets or property of the Borrower or any guarantor (provided that the New First Lien Loans and New Second Lien Loans shall be or remain secured by liens on the same collateral) or to transfer assets or property of the Borrower or any of its Restricted Subsidiaries to any non-guarantor subsidiary (provided that such non-guarantor subsidiary does not guarantee the New First Lien Loans), or any asset sale that is implemented pursuant to, or is permitted by, the New First Lien Credit Facility as in effect on the Restructuring Effective Date or any amendment, consent, waiver or other modification to the New First Lien Credit Facility approved by the Required Senior Lenders (as defined below) (other than an asset sale to the holders of the New First Lien Loans in exchange for the New First Lien Loans), except for (i) any amendment, consent, waiver or modification that requires the consent of all lenders or each lender affected thereby under the terms of the Second Lien Credit Agreement as in effect on the Restructuring Effective Date and (ii) any such transaction which constitutes an incurrence of indebtedness that is junior in right of payment or with respect to security to the New FLSO Loans and senior with respect to security to the New Second Lien Term Loans.

(b) Unless otherwise agreed by the Required Senior Lenders, the Second Lien Lenders shall vote in favor of any plan of

reorganization approved by the Required Senior Lenders that is consistent with the priority terms herein (including those set forth under "Priority") and does not provide for treatment of the New Second Lien Term Loans in a manner that is materially less favorable than other similarly situated claims and shall not propose, pursue or vote in favor of any plan of reorganization unless such plan provides for the payment in full in cash of the New First Lien Term Loans and related obligations.

(c)   The Second Lien Lenders shall waive (i) the right to offer or provide any DIP financing that is pari passu with or senior to any New First Lien Term Loans so long as Lenders holding a majority in principal amount of all New First Lien Term Loans in the aggregate have agreed to offer, provide or otherwise consent to such other DIP Financing and (ii) the right to challenge any make-whole payment or prepayment premium (as in effect on the Restructuring Effective Date) paid to the holders of the New First Lien Term Loans.

(d)   Following an event of default, the Second Lien Lenders shall have the option to purchase all, but in no event any amount less than all, of the outstanding New First Lien Term Loans in an amount equal to par plus the amount of any premium, make-whole or penalty payments (in each case, under the New First Lien Credit Facility Documents as in effect on the Restructuring Effective Date) that would be due and payable in the event such New First Lien Term Loans were paid or prepaid at such time under the New First Lien Credit Facility Documents.

"Required Senior Lenders" shall have meaning ascribed to the term Required Lenders in the New First Lien Credit Facility Documents.

<u>Schedule 1</u>

<u>Backstop Commitments</u>

Intentionally Omitted

Schedule 2

Additional Reporting and Information Requirements

1.   As soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower, a report setting forth in reasonable detail the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the previous fiscal year (to the extent such information is provided for such previous fiscal year under the New Credit Facility Documents).

2.   As soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a report setting forth in reasonable detail the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the corresponding fiscal quarter of the previous fiscal year (to the extent such information is provided for such previous fiscal quarter under the New Credit Facility Documents) and the corresponding portion of the previous fiscal year (to the extent such information is provided for such period under the New Credit Facility Documents).

3.   Concurrently with the delivery the annual budget required to be delivered under the New Credit Facility Documents, projections of the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, in each case, prepared on a quarterly basis.

4.   Quarterly, at a time to be mutually agreed with the Administrative Agent that is promptly after the delivery of financial statements pursuant to Sections 6.01(1) and (2) of the First Lien Term Loan Credit Agreement (but no earlier than five business days following the delivery of such financial statements), the Borrower (including, without limitation, the chief executive officer and chief financial officer) shall participate in a conference call with Lenders to discuss the financial condition and results of operations of the Borrower and its Subsidiaries for the fiscal quarter or fiscal year, as applicable, with respect to which such financial statements were delivered.

**Exhibit 2**

**New FLFO New Money Commitment Letter**

February 2, 2021

<u>PERSONAL AND CONFIDENTIAL</u>

Belk, Inc.
2801 West Tyvola Road
Charlotte, NC 28217
Attention: Will Langley

<u>New First Lien Credit Facility -</u><br>
<u>Commitment Letter for New FLFO New Money Loans</u>

Ladies and Gentlemen:

Belk, Inc., a Delaware corporation ("<u>Belk</u>") and certain of its subsidiaries (the "<u>Subsidiary Loan Parties</u>") and Bear Parent Inc., a Delaware corporation and the direct parent of Belk ("<u>Holdings</u>" and, collectively with Belk and the Subsidiary Loan Parties, the "<u>Loan Parties</u>"), are implementing a restructuring and recapitalization transaction in accordance with that certain Restructuring Support Agreement (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and including the "Restructuring Term Sheet" (as defined therein), the "New Credit Facilities Term Sheet" attached as Exhibit 1 to the Restructuring Term Sheet (the "<u>New Credit Facilities Term Sheet</u>") and the other exhibits, schedules, annexes and supplements thereto, the "<u>RSA</u>"), dated as of January 26, 2021, by and among Holdings, the other Loan Parties party thereto, the Consenting First Lien Lenders (as defined therein) party thereto, the Consenting Second Lien Lenders (as defined therein) party thereto and the Consenting Sponsors (as defined therein), including the investment funds managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P. whose name(s) are listed on the signature pages hereto (the "<u>Sponsor</u>").[1]  Each party that validly executes this Commitment Letter (as defined below) in accordance with the terms hereof (each, a "<u>Commitment Party</u>") acknowledges that it has received a copy of the RSA.

Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars.  As used herein, "<u>Commitment Letter</u>" or this "<u>Letter</u>" refers to this letter together with the exhibits, schedules, annexes and supplements hereto. For the avoidance of doubt, it is intended that the terms set forth in this Letter shall be consistent with the terms set forth in the Restructuring Term Sheet and to the extent any conflict arises, the terms of the Restructuring Term Sheet shall prevail.

In accordance with the terms of the Restructuring Term Sheet, this Commitment Letter is being executed in connection with Belk's offer to (a) each lender holding a First Lien Term Loan as of January 21, 2021 (the "<u>Record Date</u>") (each, an "<u>Existing First Lien Lender</u>") the opportunity to commit to provide New FLFO New Money Loans (as defined in the New Credit Facilities Term Sheet) under the New First Lien Credit Facility (each such commitment, a "<u>New Money Commitment</u>" and, collectively with all other such commitments, the "<u>New Money Commitments</u>") in an amount equal to not less than its pro rata share (based on the principal

---

[1] Capitalized terms used herein without definition shall have the meaning assigned thereto in the RSA.

amount of the First Lien Term Loans held by such Existing First Lien Lender relative to the aggregate principal amount of the First Lien Term Loans outstanding,[2] in each case, as of the Record Date) of $83,333,333.33 in aggregate principal amount of New FLFO New Money Loans (such Existing First Lien Lender's "Minimum First Lien New Money Commitment Amount") and (b) each lender holding a Second Lien Term Loan as of the Record Date (each, an "Existing Second Lien Lender" and together with the Existing First Lien Lenders, the "Existing Lenders") the opportunity to provide a New Money Commitment in an amount equal to not less than its pro rata share (based on the principal amount of the Second Lien Term Loans held by such Existing Second Lien Lender relative to the aggregate principal amount of the Second Lien Term Loans outstanding, in each case, as of the Record Date) of $41,666,666.67 in aggregate principal amount of New FLFO New Money Loans (such Existing Second Lien Lender's "Minimum Second Lien New Money Commitment Amount" and together with its Minimum First Lien New Money Commitment Amount, its "Minimum New Money Commitment Amount").

As used herein, "Related Funds" means, with respect to any person, any funds, accounts or investment vehicles managed or advised by such person or an affiliate of such person, or any funds, accounts or investment vehicles managed or advised by the investment manager or advisor of such person or any affiliate of such person.  As used herein, "Permitted Assignee" means, (1) with respect to any person, such person's Related Funds or (2) any other Commitment Party or its Related Funds. Notwithstanding anything to the contrary herein, each Commitment Party may allocate its New Money Commitment and any related fees or other consideration among itself and/or any Permitted Assignee in its sole discretion.  Notwithstanding anything to the contrary herein, each Existing First Lien Lender and each Commitment Party (a) may elect to participate in the New Money Commitments on behalf of itself or any Related Fund, and (b) may allocate its participation in the New Money Commitments and any related fees or other consideration among itself and/or any Permitted Assignee, in its sole discretion.

Each Existing Lender electing to provide a New Money Commitment and become a Commitment Party hereunder must timely submit the materials set forth below in the section titled "SUBMISSION OF COMMITMENT LETTER"; *provided*, that a Lender Backstop Party (as defined in the Restructuring Term Sheet) shall only be required to execute this Commitment Letter if such Lender Backstop Party wishes to subscribe for an amount of New FLFO New Money Loans in excess of its Minimum First Lien New Money Commitment Amount or its Minimum Second Lien New Money Commitment Amount.

---

[2]     As of the Record Date, the aggregate principal amount of outstanding First Lien Term Loans was $999,446,692.01.

**SUBMISSION OF COMMITMENT LETTER:**

**For your Commitment Letter to be valid, you must submit either (A) if you are not a Lender Backstop Party, (i) an executed copy of this Commitment Letter with your completed Schedule 1 hereto and (ii) an executed joinder to the RSA or (B) if you are a Lender Backstop Party, an executed copy of this Commitment Letter with your completed Schedule 2 hereto, in each case, to the following parties via email by no later than February 2, 2021, at 4:00 p.m. prevailing Central Time:**

Kirkland & Ellis LLP:  matthew.fagen@kirkland.com and rachael.bazinski@kirkland.com

Willkie Farr & Gallagher LLP:  mfeldman@willkie.com and dsinclair@willkie.com

Latham & Watkins LLP:  ted.dillman@lw.com and ebba.gebisa@lw.com

O'Melveny & Myers LLP:  jzujkowski@omm.com and djohnson@omm.com

By executing this Commitment Letter, each Commitment Party commits, severally and not jointly, on the Plan Effective Date to become a Lender under the New First Lien Credit Facility and to fund its New Money Commitments thereunder in a principal amount calculated in accordance with the terms of the New First Lien Credit Facility Term Sheet (the "New Money Allocation"), which amount shall not exceed the desired participation amount set forth on Schedule 1 hereto (or, if such party is a Lender Backstop Party, its oversubscription amount shall not exceed the amount set forth on Schedule 2 hereto).  Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the New Money Allocation.

_____, as a
Commitment Party

By: _____
Name:
Title:

## SCHEDULE 1

| Commitment Party | Requested Commitment Amount |
|---|---|
| _____ | $ |

☐   **By checking this box, you hereby elect to subscribe for New FLFO New Money Loans in an amount such that any oversubscription amount reduces _only_ the Lender Backstop Commitment.**

**If the box above has not been checked, you hereby elect to subscribe for New Money FLFO New Money Loans in the full amount set forth the above with oversubscriptions to be applied to reduce both the Lender Backstop Commitment and, if applicable, the Sponsor Backstop Commitment.**

## SCHEDULE 2

| Lender Backstop Party | Requested Oversubscription Amount |
|---|---|
| _____ | $ |

☐     **By checking this box, you hereby confirm that you are a Lender Backstop Party who wishes subscribe to the New FLFO New Money Loans in excess of your Minimum New Money Commitment Amount in the amount set forth above.**

☐     **By checking this box, you hereby elect to subscribe for New FLFO New Money Loans in an amount such that any oversubscription amount reduces only the Lender Backstop Commitment.**

**If the box above has not been checked, you hereby elect to subscribe for New Money FLFO New Money Loans in the full amount set forth the above with oversubscriptions to be applied to reduce both the Lender Backstop Commitment and, if applicable, the Sponsor Backstop Commitment.**

**Exhibit 3**

**Backstop Commitment Letter**

Execution Version

January 26, 2021

<u>PERSONAL AND CONFIDENTIAL</u>

Belk, Inc.
2801 West Tyvola Road
Charlotte, NC 28217
Attention: Will Langley

New First Lien Credit Facility -
Backstop Commitment Letter for New Money First-Out Loans

Ladies and Gentlemen:

Belk, Inc., a Delaware corporation ("<u>Belk</u>", "you" or "your"), has advised each party listed on the signature pages hereto as a backstop commitment party (each, a "<u>Backstop Commitment Party</u>", and collectively, the "<u>Backstop Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), that Belk, and certain of its subsidiaries (the "<u>Subsidiary Loan Parties</u>") and Bear Parent Inc., a Delaware corporation and the direct parent of Belk ("<u>Holdings</u>" and, collectively with Belk and the Subsidiary Loan Parties, the "<u>Loan Parties</u>"), are considering a restructuring and recapitalization transaction in accordance with that certain Restructuring Support Agreement (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and including the "Restructuring Term Sheet" (as defined therein), the "New Credit Facilities Term Sheet" attached as Exhibit 1 to the Restructuring Term Sheet (the "<u>New Credit Facilities Term Sheet</u>") and the other exhibits, schedules, annexes and supplements thereto, the "<u>RSA</u>") attached hereto as <u>Exhibit A</u>, dated as of January 26, 2021, by and among Holdings, the other Loan Parties party thereto, the Consenting First Lien Lenders (as defined therein) party thereto, the Consenting Second Lien Lenders (as defined therein) party thereto and the Consenting Sponsors (as defined therein), including the investment funds managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P. whose name(s) are listed on the signature pages hereto (the "<u>Sponsor</u>"). Capitalized terms used herein without definition shall have the meaning assigned thereto in the RSA. Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars. As used herein, "<u>Backstop Commitment Letter</u>" or this "<u>Letter</u>" refers to this letter together with the exhibits, schedules, annexes and supplements hereto. For the avoidance of doubt, it is intended that the terms set forth in Sections 1, 2 and 4 of this Letter shall be consistent with the terms set forth in the Restructuring Term Sheet and to the extent any conflict arises, the terms of the Restructuring Term Sheet shall prevail.

In connection with the proposed Restructuring Transactions, you have requested that the Backstop Commitment Parties agree to backstop and commit to provide new money first priority "New FLFO New Money Loans" (as defined in the New Credit Facilities Term Sheet) (the "<u>New Money First-Out Loans</u>") under the New First Lien Credit Facility in an aggregate principal amount equal to $225,000,000 (the "<u>Total Backstop Commitment Amount</u>"), subject to the terms and conditions hereof.

1.  Backstop Commitment.

To provide assurance that the New Money First-Out Loans under the New First Lien Credit Facility shall be available on the terms and conditions set forth herein and in the RSA (as may be modified to incorporate changes necessary to implement the Restructuring Transactions pursuant to the Plan), subject to and in accordance with the terms and conditions set forth herein, each Backstop Commitment Party is pleased to advise Belk of its several (and not joint) commitment (the "Backstop Commitment"), to commit or backstop, as applicable, itself or on behalf of one or more of its Related Funds (as defined below), the New Money First-Out Loans under the New First Lien Credit Facility by:

      (a)    with respect to each Backstop Commitment Party that is a Consenting First Lien Lender (each, a "First Lien Lender Backstop Party" and collectively with each other First Lien Lender Backstop Party, the "First Lien Lender Backstop Parties"), electing to commit to provide New Money First-Out Loans in an amount not less than its respective Minimum First Lien New Money Commitment Amount (as defined below) in accordance with the terms set forth in Section 2 hereof;

      (b)    with respect to each Backstop Commitment Party that is a Consenting Second Lien Lender (each, a "Second Lien Lender Backstop Party", collectively with each other Second Lien Lender Backstop Party, the "Second Lien Lender Backstop Parties" and collectively with the First Lien Lender Backstop Parties, each a "Lender Backstop Party", and collectively, the "Lender Backstop Parties"), electing to commit to provide New Money First-Out Loans in an amount not less than its respective Minimum Second Lien New Money Commitment Amount (as defined below) in accordance with the terms set forth in Section 2 hereof;

      (c)    with respect to the Sponsor as a Backstop Commitment Party, committing to provide to Belk, on the Plan Effective Date, New Money First-Out Loans in an amount up to $100,000,000, subject to Section 2 hereof; and

      (d)    with respect to each Lender Backstop Party, committing to provide to Belk, on the Plan Effective Date, its ratable share, based on the applicable "Backstop Commitment Percentage" set forth on Schedule 1 hereto (as may be updated pursuant to Section 7 below), of New Money First-Out Loans not subscribed to by Existing Lenders (as defined below) under Section 2 hereof or not funded by Existing Lenders with New Money Commitments on the Plan Effective Date,

      in each case of clauses (a) - (d) above, on the terms set forth in the New First Lien Credit Facility Term Sheet.

As used herein, "Related Funds" means, with respect to any person, any funds, accounts or investment vehicles managed or advised by such person or an affiliate of such person, or any funds, accounts or investment vehicles managed or advised by the investment manager or advisor of such person or any affiliate of such person. As used herein, "Permitted Assignee" means, (1) with respect to any person, such person's Related Funds or (2) any other Lender Backstop Party or its Related Funds. Notwithstanding anything to the contrary herein, each Backstop Commitment Party

may allocate its Backstop Commitment and any related fees or other consideration among itself and/or any Permitted Assignee in its sole discretion.

The Backstop Commitment Parties may, at the election of the Required Backstop Commitment Parties (as defined below), arrange for the definitive documentation for the New First Lien Credit Facility (as defined in in the New First Lien Credit Facility Term Sheet) (the "Amended Credit Agreement"), as applicable, to be executed by one or more financial institutions selected by the Required Backstop Commitment Parties and reasonably acceptable to Belk (the "Fronting Lender(s)"), to act as an initial lender(s) and to fund some or all of the Backstop Commitment Party's Backstop Commitment, in which case the applicable Backstop Commitment Party will acquire its share of the New Money First-Out Loans by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Amended Credit Agreement. Notwithstanding the foregoing, any Backstop Commitment Party acquiring its share of the New Money First-Out Loans by assignment from the Fronting Lender(s) may thereafter provide notice to Belk and the administrative agent under the New First Lien Credit Agreement that such Backstop Commitment Party desires to thereafter hold its New Money First-Out Loans directly, and Belk shall promptly (but in no case in more than five (5) Business Days) direct the administrative agent to permit such an assignment.

"Required Backstop Commitment Parties" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, when taken together, represent a majority (or, in the case of joining additional Backstop Commitment Parties to this Backstop Commitment Letter pursuant to the last paragraph of Section 7, 60%) of the Backstop Commitments of all Backstop Commitment Parties in the aggregate outstanding at such time; provided, that the Required Backstop Commitment Parties must include at all times at least two unaffiliated Backstop Commitment Parties.

2.   New Money First-Out Loan Commitment Allocations.

In accordance with the terms of the Restructuring Term Sheet, Belk shall offer:

(a)   each lender holding a First Lien Term Loan as of the date Belk commences solicitation of votes on the Plan (the "Record Date") (each, an "Existing First Lien Lender") the opportunity to commit to provide New Money First-Out Loans (each such commitment, a "First Lien New Money Commitment" and, collectively with all other such commitments, the "First Lien New Money Commitments") in an amount equal to not less than its pro rata share (based on the principal amount of the First Lien Term Loans held by such Existing First Lien Lender relative to the aggregate principal amount of the First Lien Term Loans outstanding, in each case, as of the Record Date) of $83,333,333.33 in aggregate principal amount of New Money First-Out Loans (such Existing First Lien Lender's "Minimum First Lien New Money Commitment Amount"), and

(b) each lender holding a Second Lien Term Loan as of the Record Date (each, an "Existing Second Lien Lender", and together with each Existing First Lien Lender, the "Existing Lenders") the opportunity to commit to provide New Money First-Out Loans (each such commitment, a "Second Lien New Money Commitment" and, collectively with all other such commitments, the "Second Lien New Money Commitments"; each of the

First Lien New Money Commitments and the Second Lien New Money Commitments are referred to herein as a "New Money Commitment" and, collectively with all other such commitments, the "New Money Commitments") in an amount equal to not less than its pro rata share (based on the principal amount of the Second Lien Term Loans held by such Existing Second Lien Lender relative to the aggregate principal amount of the Second Lien Term Loans outstanding, in each case, as of the Record Date) of $41,666,666.67 in aggregate principal amount of New Money First-Out Loans (such lender's "Minimum Second Lien New Money Commitment Amount").

New Money Commitments of the Existing Lenders (excluding commitments of the Lender Backstop Parties set forth in clauses (a) and (b) of Section 1 above but including commitments from the Lender Backstop Parties in excess of such commitments) will be deemed to be New Money Commitments that are backstopped by the Lender Backstop Parties set forth in clause (d) of Section 1 above before they are deemed to be New Money Commitments that are backstopped by the Sponsor pursuant to clause (c) of Section 1 above. To the extent the total subscriptions by the Existing First Lien Term Lenders and/or the Existing Second Lien Term Lenders exceed the applicable New Money Commitments allocated to such group of Existing Lenders set forth in clause (a) or (b) above of this Section 2, the excess amount would first reduce the New Money Commitments not subscribed by their respective first lien or second lien group of Existing Lenders on a dollar for dollar basis (if any) with the remaining excess amount to reduce the Sponsor's New Money Commitment set forth in clause (c) of Section 1 above on a dollar for dollar basis; provided that, notwithstanding anything to the contrary herein, in no event shall the Sponsor's New Money Commitment that is required to be funded on the Plan Effective Date be reduced to less than $65,000,000; provided, further that such Existing First Lien Term Lenders and/or Existing Second Lien Term Lenders may elect to limit any such oversubscription to reduction of the Existing First Lien Term Lenders' and/or Existing Second Lien Term Lenders' New Money Commitments. In the event that the aggregate amount of First Lien New Money Commitments and Second Lien New Money Commitments exceeds $160,000,000 in aggregate principal amount of New Money First-Out Loans, to ensure that the aggregate amount of New Money First-Out Loans funded on the Plan Effective Date by the Existing Lenders does not exceed such amount, up to $35,000,000 of such oversubscribed commitment amounts shall be allocated among the Existing Lenders who have requested oversubscriptions ratably based on the relative principal amount of the First Lien Term Loans and Second Lien Term Loans held by such oversubscribing Existing Lenders (but in no event greater than the amount of such oversubscribing Existing Lender's requested oversubscription).

Notwithstanding anything to the contrary herein, each Existing Lender and each Backstop Commitment Party (a) may elect to participate in the New Money Commitments on behalf of itself or any Permitted Assignee, and (b) may allocate its participation in the New Money Commitments and any related fees or other consideration among itself and/or any Permitted Assignee, in its sole discretion.

Each Existing Lender electing to participate in the New Money First-Out Loans shall, among other things, be required to, pursuant to the terms of the Restructuring Term Sheet, (i) provide written notification of such Existing Lender's subscription for New Money Commitments, including, its desired participation amount which shall not be less than, as applicable: (A) for each participating Existing First Lien Lender, its Minimum First Lien New Money Commitment Amount and (B) for

each participating Existing Second Lien Lender, its Minimum Second Lien New Money Commitment Amount and (ii) an executed joinder to the RSA;

provided, that, by executing this Backstop Commitment Letter, each Lender Backstop Party shall be deemed to have provided such notice of election to participate in the New Money First-Out Loans in its Minimum First Lien New Money Commitment Amount and Minimum Second Lien New Money Commitment Amount, as applicable, unless it timely elects to participate in an amount greater than such amount in accordance with the terms hereof.

Subject to Section 7 below, any Existing Lender with a New Money Commitment shall become a Lender under the New First Lien Credit Facility and shall fund its New Money Commitments thereunder substantially in accordance with the terms and conditions of the New First Lien Credit Facility Term Sheet (the "New Money Allocation").

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the New Money Allocation.

You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, any Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, any Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Agents are acting as principals and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Agents may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning Belk and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the Agents hereunder; provided, that any such affiliates receiving information concerning Belk and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Backstop Commitment Letter.

3.   Information.

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "Projections") and information of a general economic or industry specific nature) (the "Information") that has been

or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized). You agree that if, at any time prior to the Plan Effective Date, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in material respects. In conducting the transactions hereunder, each of the Backstop Commitment Parties will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof and assumes no responsibility for the accuracy or completeness of the Information or the Projections and assumes no responsibility for the accuracy or completeness of the Information or the Projections.

4.   <u>Fees/Other Consideration</u>.

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder, Belk agrees to pay (or cause to be paid): (a) to each Lender Backstop Party (or, upon written notice to Belk (which may be provided by electronic communication), its Permitted Assignee), a non-refundable backstop fee equal to 10.00% of such Lender Backstop Party's applicable "Maximum Backstop Commitment Amount" as set forth on Schedule 1 hereto (as may be updated pursuant to Section 7 below) (collectively, the "<u>Lender Backstop Commitment Fees</u>") and (b) to the Lender Backstop Parties set forth on Schedule 3 hereto (or, upon written notice to Belk (which may be provided by electronic communication), their respective Permitted Assignees), a non-refundable supplemental backstop fee in an aggregate amount equal to $12,000,000 (such fees, the "<u>Supplemental Backstop Commitment Fees</u>", and together with the Lender Backstop Commitment Fees, collectively, the "<u>Backstop Commitment Fees</u>"). The Backstop Commitment Fees (i) shall be earned on the date hereof and (ii) shall be due and payable in cash on, and subject to the occurrence of, the Plan Effective Date. No Backstop Commitment Fee shall be due and payable to any Backstop Commitment Party that fails to fund any New Money First-Out Loans committed to be funded by such Backstop Commitment Party. The parties hereby acknowledge and agree that the obligation of Belk to pay the Backstop Commitment Fees shall constitute an "Obligation" under the Amended Credit Agreement.

As further consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder, on the Plan Effective Date, each First Lien Lender Backstop Party shall have the right to exchange on a "dollar-for-dollar" basis First Lien Term Loans held by it or its Related Funds in a principal amount equal to its ratable share (based on such First Lien Lender Backstop Party's Lender Backstop Commitments as a proportion of the aggregate amount of all of the Lender Backstop Commitments provided by the First Lien Lender Backstop Parties) of $30,000,000 into an equal principal amount of New FLFO Roll-Up Loans under the New First Lien Credit Facility.

5.   <u>Conditions</u>.

The Backstop Commitment Parties' Backstop Commitments (including its commitments to fund the applicable New Money First-Out Loans under the New First Lien Credit Facility on the Plan Effective Date) and other agreements hereunder in respect of the New First Lien Credit Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth herein and in the "Conditions Precedent to Plan Effective Date" section of the Restructuring Term Sheet and Schedule 2 attached hereto.

6.   <u>Indemnification and Expenses</u>.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party and the Agents, in each case, in their capacity as such, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("<u>Losses</u>") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the New First Lien Credit Facility, the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party in its capacity as such from time to time within five (5) days of receipt of their reasonable demand by presentation of a summary statement, for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with any insolvency proceeding, the New First Lien Credit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the New First Lien Credit Facility, and any ancillary documents and security arrangements in connection therewith; <u>provided</u>, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Loan Parties or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent or Collateral Agent in its capacity or in fulfilling its role as such).

None of you, the Sponsor, the other Loan Parties, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the New First Lien Credit Facility, the enforcement of this Backstop

Commitment Letter, the definitive documentation for the New First Lien Credit Facility, or any ancillary documents and security arrangements in connection therewith; <u>provided</u> that your indemnity and reimbursement obligations under this Section 6 shall not be limited by this sentence.

7.    <u>Assignments, Amendments, Additional Backstop Commitment Parties</u>.

This Backstop Commitment Letter (including any commitments hereunder) shall not be assignable by you or us (except pursuant to the immediate succeeding paragraph below) without the prior written consent of each of the parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 6 and this Section 7, the Agents, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 6 and this Section 7, the Agents. This Backstop Commitment Letter may be amended or any provision hereof may be waived or modified by an instrument in writing signed by you and the Required Backstop Commitment Parties; <u>provided</u> that (1) subject to the last paragraph of this Section 7, the written consent of each Backstop Commitment Party shall be required to effect an amendment, waiver or modification that has the effect of modifying the Backstop Commitment of any Backstop Commitment Party, (2) no Backstop Commitment Party may be disproportionately affected as compared to other Backstop Commitment Parties without its consent, (3) the written consent of each Backstop Commitment Party affected thereby shall be required to effect an amendment, waiver or modification that has the effect of reducing any Backstop Commitment Fee payable to such Backstop Commitment Party hereunder or reducing any Backstop Commitment Party's participation in the New FLFO Roll-up Loans and (4) the written consent of both (a) First Lien Lender Backstop Parties having Backstop Commitments outstanding that, taken together, represent a majority of the Backstop Commitments of all First Lien Lender Backstop Parties in the aggregate outstanding at such time and (b) Second Lien Lender Backstop Parties having Backstop Commitments outstanding that, taken together, represent a majority of the Backstop Commitments of all Second Lien Lender Backstop Parties in the aggregate outstanding at such time shall be required to effect any amendment, waiver or modification of (i) Section 4 hereof or (ii) the allocation of Backstop Commitments or New Money Commitments between lenders holding First Lien Term Loans and lenders holding Second Lien Term Loans.

Notwithstanding anything to the contrary herein, any Backstop Commitment Party may assign this Backstop Commitment Letter (including any commitments, any related fees or other consideration hereunder) to any of its Related Funds or Permitted Assignees, in each case, without the consent of you or any other party hereto; <u>provided</u> that, notwithstanding anything to the contrary herein, (i) subject to the last paragraph of this Section 7 and except in the case of an assignment from a Backstop Commitment Party to another Backstop Commitment Party, no Backstop Commitment Party shall be relieved, released or novated from its obligations pursuant to its Backstop Commitment hereunder (including its obligation to fund the New Credit Facility on the Plan Effective Date on the terms and conditions set forth herein), until after the initial funding of the New Money First-Out Loans has occurred on the Plan Effective Date and (ii) unless you otherwise agree in writing, each Backstop Commitment Party, on behalf of itself and any of its Related Funds with a Backstop Commitment, shall retain exclusive control over all rights and obligations with respect to its Backstop Commitments in respect of the New Credit Facility, including all rights

with respect to consents, modifications, supplements, waivers and amendments, until the Plan Effective Date has occurred.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter. You acknowledge that information and documents relating to the New First Lien Credit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the New First Lien Credit Facility.

Notwithstanding the anything to the contrary herein, at any time prior to the Plan Effective Date, the Required Backstop Commitment Parties may add additional Backstop Commitment Parties to this Backstop Commitment Letter and proportionately reduce the Backstop Commitments of the Lender Backstop Parties by delivering to the other parties hereto (1) an executed counterpart of a signature page to this Backstop Commitment Letter from such additional Backstop Commitment Party (which may be delivered by facsimile or other electronic transmission) and (2) an updated Schedule 1 hereto; provided that in no event shall the Sponsor's Backstop Commitment be reduced other than pursuant to the second paragraph of Section 2.

8.  Governing Law, Etc.; Jurisdiction.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, (A) THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE) AND (B) IF THE CHAPTER 11 CASES ARE FILED, THE BANKRUPTCY CODE.

Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising under or related to this Backstop Commitment Letter, in courts of (a) if the Chapter 11 Cases are not filed, the State of New York and the United States District Court, in each case, located in the borough of Manhattan in the City of New York (the "Chosen Courts"), (b) if the Chapter 11 Cases are filed, to the extent possible, the Bankruptcy Court and (c) if the Bankruptcy Court chooses not to accept jurisdiction or abstains from jurisdiction, the Chosen Courts, and solely in connection with claims arising under this Backstop Commitment Letter: (a) irrevocably submits to the

exclusive jurisdiction of the Chosen Courts and the Bankruptcy Court, as applicable; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and the Bankruptcy Court, as applicable; and (c) waives any objection that any Chosen Court and the Bankruptcy Court, as applicable, is an inconvenient forum or does not have jurisdiction over any Party hereto.

9.   <u>Waiver of Jury Trial</u>.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.   <u>Confidentiality</u>.

This Backstop Commitment Letter is delivered to Belk on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you, the Sponsor and your and their officers, directors, employees, legal counsel, accountants, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you or the Sponsor, as applicable, of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any ad-hoc or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby, (e) you may disclose the fees contained herein as part of generic disclosure regarding fees and expenses in connection with the disclosure of the RSA and (e) with the written consent of the Required Backstop Commitment Parties and the Sponsor (which may include through electronic means). Your obligations under this paragraph shall terminate will terminate on the earlier of (x) the second anniversary of the date hereof and (y) the one year anniversary following the termination of this Commitment Letter.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you, Holdings or your and its respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this

paragraph), (b) on a confidential basis to any bona fide prospective Permitted Assignee or any prospective Lender, prospective participant or swap counterparty that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Belk promptly in advance thereof), (d) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the New First Lien Credit Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information or (h) with respect to the existence and contents of the Backstop Commitment Letter and the New First Lien Credit Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the New First Lien Credit Facility and to industry trade organizations where such information with respect to the New First Lien Credit Facility is customarily included in league table measurements. The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Amended Credit Agreement upon the effectiveness thereof and, in any event, will terminate on the earlier of (x) the second anniversary of the date hereof and (y) the one year anniversary following the termination of this Commitment Letter.

11. Ratings.

You shall use commercially reasonable efforts to procure, at your expense, prior to the Plan Effective Date, public ratings (but no specific rating) for the New Credit Facilities (the "Facilities Ratings") from each of Standard & Poor's Ratings Services ("S&P") and Moody's Investors Service, Inc. ("Moody's"), and a public corporate credit rating (but no specific rating) and a public corporate family rating (but no specific rating) (collectively, the "Corporate Ratings" and, together with the Facilities Ratings, the "Ratings") in respect of Belk after giving effect to the Restructuring Transactions from each of S&P and Moody's, respectively. For the avoidance of doubt, the failure to receive the Ratings shall not constitute to a condition to the occurrence of the Plan Effective Date.

12. Miscellaneous.

The Backstop Commitment Parties hereby notify Belk that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act") and the requirements of 31 C.F.R. §1010.230 (as amended, the "Beneficial Ownership Regulation"), it and its affiliates are required to obtain, verify and record information

that identifies Belk, each other Loan Party, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify Belk and each other Loan Party in accordance with the PATRIOT Act or the Beneficial Ownership Regulation. This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation and is effective for Backstop Commitment Parties and its affiliates.

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the New First Lien Credit Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of the New First Lien Credit Facility is subject to the conditions precedent expressly set forth in Section 5 hereof.

If the foregoing correctly sets forth our agreement, please indicate Belk's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on January 26, 2021. This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence. This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) the Plan Effective Date, (ii) the termination of the RSA and (iii) the Outside Date. Notwithstanding the immediately preceding sentence, the indemnification and expenses, confidentiality, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; provided that your obligations under this Backstop Commitment Letter, other than with respect to confidentiality, shall automatically terminate and be superseded by the applicable provisions in the Amended Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the Plan Effective Date, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

**Schedule 1**

**Backstop Commitments**

Intentionally Omitted

## Schedule 2

### Conditions Precedent[1]

The obligation of each Existing Lender with a New Money Commitment, the Sponsor and the Lender Backstop Parties to make the New Money First-Out Loans is subject to satisfaction (or waiver by the Required Lenders (as defined in the New Credit Facilities Term Sheet) and the Sponsor) of the following conditions precedent:

1.      The Administrative Agent (as defined in the New Credit Facility Term Sheet) shall have received each of the following, each of which shall be .pdf copies unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party and, in the case of clause (a) below, by the Administrative Agent and each Lender with a New Money Commitment, each dated as of the [Closing Date] (or, in the case of certificates of government officials, a recent date before the [Closing Date]) and each in form and substance consistent with the Backstop Commitment Letter and the New Credit Facility Term Sheet and otherwise reasonably satisfactory to the Required Lenders and the Sponsor:

(a)      a Committed Loan Notice;

(b)      executed counterparts of the Amended Credit Agreement, duly executed by the Borrower, the other Loan Parties, the Administrative Agent and each Lender with a New Money Commitment;[2]

(c)      certificates of good standing from the secretary of state of the state of organization of each Loan Party (to the extent such concept exists in such jurisdiction), a certificate from the Borrower and each other Loan Party with appropriate insertions and attachments of resolutions or other actions, evidence or incumbency and the signature of authorized signatories and Organizational Documents, executed by a Responsible Officer and the secretary or any assistant secretary or other authorized representative of such Loan Party;

(d)      each Collateral Document required to be executed on the [Closing Date] under the Amended Credit Agreement, duly executed by each Loan Party thereto, together with:

(i)      certificates, if any, representing the Pledged Equity referred to in the Amended Credit Agreement accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank (or confirmation in lieu thereof that such

---

[1]      Capitalized terms used but not defined in this Schedule 2 or the Backstop Commitment Letter to which this Schedule 2 is attached shall have the meanings ascribed to them in the existing First Lien Term Loan Credit Agreement (as defined in the New Credit Facility Term Sheet), as applicable.

[2]      Confirmation Order will provide that any Lender receiving a distribution of FLSO Loans shall be deemed to have executed the Amended Credit Agreement. Signature pages from such other Lenders will also be sought, but will not be a closing condition.

certificates, powers and instruments have been sent for overnight delivery to the Administrative Agent);

(ii)     evidence that all other actions, recordings and filings required by the Collateral Documents that the Required Lenders may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement (as amended in a manner consistent with the New Credit Facility Term Sheet and otherwise as reasonably acceptable to the Required Lenders) shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Required Lenders;

(iii)    a perfection certificate, duly executed and delivered by the Loan Parties, in form and substance reasonably satisfactory to the Required Lenders; and

(iv)    copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Required Lenders with respect to the Loan Parties;

(e)     a certificate of an officer of the Borrower certifying that the conditions set forth in Paragraphs 2 and 3 have been satisfied;

(f)     a certificate of the chief financial officer (or other comparable officer) of the Borrower certifying the Solvency, after giving effect to the New Money First-Out Loans and the other transactions contemplated by the RSA on the [Closing Date], of the Borrower and its Subsidiaries on a consolidated basis;

(g)     executed legal opinion of (i) Kirkland & Ellis LLP, New York and Delaware counsel to the Borrower and the other Loan Parties, (ii) [●], special South Carolina counsel to certain of the Loan Parties, (iii) [●], special North Carolina counsel to certain of the Loan Parties, and (iv) [●], special Mississippi counsel to certain of the Loan Parties; and

(h)     a solvency certificate from a Financial Officer of the Borrower (after giving effect to the transactions contemplated by the Amended Credit Agreement) substantially in the form of Exhibit I attached to the First Lien Term Loan Credit Agreement;

2.     The representations and warranties of the Loan Parties contained in the Amended Credit Agreement shall be true and correct in all material respects on and as of the [Closing Date]; *provided* that to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

3.      At the time of and immediately after giving effect to the New Money First-Out Loans and the other transactions contemplated by the RSA on the [Closing Date], no Default or Event of Default under the Amended Credit Agreement shall exist;

4.      The Administrative Agent shall have received an executed amended Second Lien Credit Agreement and an executed amended Term Intercreditor Agreement, each in form and substance consistent with the Backstop Commitment Letter and the New Credit Facility Term Sheet and otherwise reasonably satisfactory to the [Required Lenders and [Required Second Lien Lenders]];

5.      The Lender Backstop Commitment Parties shall have received all fees required to be paid pursuant to the Backstop Commitment Letter payable to them to the extent due (which may be offset against the proceeds of the New Money First-Out Loans);

6.      The Administrative Agent, the Ad Hoc Crossover Lender Group, the Ad Hoc First Lien Lender Group and the Consenting Sponsors (each as defined in the RSA) shall have received all fees, expenses and other amounts required to be reimbursed or paid by the Borrower under the RSA or any applicable fee letters executed by the Borrower and such parties or their respective professionals (with respect to amounts incurred, or reasonably estimated to be incurred, on or prior to the [Closing Date]), to the extent invoiced at least one (1) Business Day prior to the [Closing Date];

7.      The Administrative Agent and the Lenders shall have received at least three (3) Business Days prior to the Closing Date (or such later date as the Administrative Agent or such Lender shall reasonably agree) all documentation and other information about the Loan Parties reasonably requested by the Administrative Agent or the Lenders as required by the U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and 31 C.F.R. § 1010.230, that has been reasonably requested in writing (including by email);

8.      The RSA shall remain in full force and effect;

9.      The entry of the Confirmation Order (as defined in the RSA) shall have occurred; and

10.     The Plan Effective Date (as defined in the RSA) shall have occurred.

## Schedule 3

## Supplemental Backstop Fee

| Lender Backstop Parties | Supplemental Backstop Fee |
|---|---|
| **Midtown Acquisitions L.P. (an entity managed by Davidson Kempner Capital Management LP)** | $2,000,000 |
| **Hein Park Capital Management LP, Nuveen Asset Management, LLC, Jefferies Leveraged Credit Products LLC, Greywolf Loan Management LP, Voya Investment Management Co. LLC and Guggenheim Partners Investment Management, LLC.** | $10,000,000[1] |
| **TOTAL:** | **$12,000,000** |

---

[1] The $10,000,000 shall be paid and divided amongst Hein Park Capital Management LP, Nuveen Asset Management, LLC, Jefferies Leveraged Credit Products LLC, Greywolf Loan Management LP, Voya Investment Management Co. LLC and Guggenheim Partners Investment Management, LLC as agreed by such parties.

# **<u>EXHIBIT A</u>**

[Restructuring Support Agreement]

Intentionally Omitted

## EXHIBIT C

**Equity Term Sheet**

| SUMMARY OF TERMS OF COMMON STOCK[1] | |
|---|---|
| **Issuer:** | Fashion Holdings Intermediate LLC (which shall be converted to a corporation organized under the Delaware General Corporation Law and treated as a C corporation for federal income tax purposes as of the Plan Effective Date), which, as of the Plan Effective Date, shall constitute the indirect parent of the reorganized Company Parties ("Parent"). |
| **Security:** | Common Stock, par value $0.001 per share, each share of which entitles the holder thereof (each, a "Stockholder", and collectively, the "Stockholders") to one vote on all matters on which Stockholders are entitled to vote. |
| **Board and Committee Composition:** | Subject to the provisions hereof, the business and affairs of Parent and its subsidiaries will be managed by a Board of Directors (the "Board"), constituted as follows:<br><br>• Four designees of investment funds managed by, or other Affiliates (excluding Fashion Holdings Intermediate LLC or any of its direct or indirect subsidiaries, including any of the Company Parties) of, Sycamore Partners Management, L.P. (the "Sponsor")[2], so long as the Sponsor holds at least 40% of the issued and outstanding Common Stock of Parent, three designees, if the Sponsor holds at least 30% but less than 40% of the issued and outstanding Common Stock of Parent, two designees, if the Sponsor holds at least 20% but less than 30% of the issued and outstanding Common Stock of Parent, and one designee, if the Sponsor holds at least 10% but less than 20% of the issued and outstanding Common Stock of Parent; provided that in the event that the Sponsor elects to fill less than the number of Board seats the Sponsor is entitled to designate, the Board members so designated by the Sponsor shall be entitled to cast votes on behalf of such undesignated Board seats, and this rule shall apply, *mutatis mutandis*, to any Board Committee (as defined below);<br><br>• Two designees of Blackstone Credit[3] so long as Blackstone Credit holds at least 20% of the issued and outstanding Common Stock of |

---

[1]  Capitalized terms not otherwise defined herein have the meanings given to them in the Restructuring Support Agreement.

[2]  Sponsor will include any Affiliate or transferee managed by Sponsor of any of entities managed by Sponsor that hold Parent Equity Interests as of the Plan Effective Date and any Affiliates of the foregoing to which shares of Common Stock are transferred after the Plan Effective Date in accordance with the stockholders' agreement.

[3]  "Blackstone Credit" means, collectively, GSO Beacon Holdings LP and GSO Credit Alpha Fund LP, and any Affiliate or transferee managed by Blackstone Group Inc. or its Affiliates of any of the foregoing entities that hold Parent Equity Interests as of the Plan Effective Date and any Affiliates of

Parent, and one designee, if Blackstone Credit holds at least 10% but less than 20% of the issued and outstanding Common Stock of Parent; and

- One designee of KKR[4] (together with Sponsor and Blackstone Credit, collectively, the "Major Stockholders", and each, a "Major Stockholder"), so long as KKR holds at least 10% of the issued and outstanding Common Stock of Parent.

Quorum requires attendance by (i) at least one of the Sponsor designees (for so long as the Sponsor retains a designation right), (ii) at least one of the Blackstone Credit designees (for so long as Blackstone Credit retains a designation right), and (iii) the KKR designee (for so long as KKR retains a designation right); provided that if the Sponsor designees, the Blackstone Credit designees or the KKR designee have not been present for two consecutive duly called meetings of the Board, such designee(s), as applicable, presence will not be required to establish a quorum at any subsequent meeting relating to the same subject matter until such designee(s), as applicable, have been present at any such subsequent meeting.

Sponsor designees shall represent a majority of the members of each committee of the Board (a "Board Committee"). So long as there is at least one Blackstone Credit designee, a Blackstone Credit designee shall be a member of each Board Committee. So long as there is at least one KKR designee, a KKR designee shall be a member of each Board Committee. Notwithstanding the foregoing, in the case of a transaction or similar special committee established for the purpose of evaluating and negotiating a transaction with a Major Stockholder or any Affiliate thereof, such Major Stockholder shall not be entitled to a designee on such committee.

To the extent that a Major Stockholder designates one or more independent directors (with each Major Stockholder permitted to designate such number of independent directors equal to the total number of directors it is entitled to designate), such independent director will receive compensation commensurate with the market rate for independent directors of similarly situated companies. In addition, each Major Stockholder shall be entitled to appoint one (1) non-voting board observer to the Board in its discretion, which observer shall be entitled to attend all meetings of the Board.

---

the foregoing to which shares of Common Stock are transferred after the Plan Effective Date in accordance with the stockholders' agreement.

[4] "KKR" means, collectively, Polar Bear Fund L.P., CPS Managers Master Fund L.P., KKR TFO Partners L.P., FS KKR Capital Corp, and PCOP II Cayman Investors A L.P., and any Affiliate or transferee managed by KKR & Co. Inc. or its Affiliates of any of the foregoing entities that hold Parent Equity Interests as of the Plan Effective Date and any Affiliates of the foregoing to which shares of Common Stock are transferred after the Plan Effective Date in accordance with the stockholders' agreement.

| | |
|---|---|
| **Actions Requiring Major Stockholder Approval:** | Parent shall not, and shall cause its subsidiaries not to, directly or indirectly, by merger, consolidation or otherwise, take any of the following actions without the consent of each Major Stockholder (as long as such Major Stockholder holds at least 5% of the issued and outstanding Common Stock of Parent) (the "Requisite Majority"):<br><br>1. a Parent Sale (as defined below);<br><br>2. the purchase or sale of assets or other businesses with an aggregate purchase price greater than $10 million, excluding any purchases or sales of assets in the ordinary course of business;<br><br>3. the issuance of any equity securities other than in accordance with the preemptive rights provisions or issuance of Common Stock (or options therefor) to employees otherwise approved by the Board pursuant to a management incentive equity plan approved pursuant to Item 8 below;<br><br>4. any redemption or other acquisition by Parent or any of its subsidiaries of any security of Parent, other than (i) on a *pro rata* basis, (ii) the repurchase or redemption of an employee's equity interests upon termination of the employee's employment pursuant to an agreement or plan previously approved by the Board and (iii) the repurchase or redemption of any debt securities in accordance with the terms of their governing agreements;<br><br>5. any incurrence or re-financing of indebtedness for borrowed money in excess of $15 million (other than intercompany loans solely among Parent and its subsidiaries);<br><br>6. any change to or exit from the principal business, or entry into any new material line of business, of Parent or any of its subsidiaries;<br><br>7. any capital expenditures or commitments therefor in excess of $2 million individually, or $8 million in the aggregate, in any fiscal year, except for such capital expenditures or commitments therefor that are reflected in a budget that has been approved by the Board;<br><br>8. adoption of or material amendment to (including any increase in the size of the pool of) any management incentive equity plan;<br><br>9. any transactions between Parent or any of its subsidiaries, on the one hand, and Sponsor or any of its affiliates on the other hand, unless on arm's length, commercially reasonable terms and approved by a majority of the disinterested directors on the Board;<br><br>10. any amendment to the organizational documents of Parent; and<br><br>11. any non-*pro rata* dividends or non-*pro rata* distributions; provided that this item 11 also requires the approval of a majority of the Stockholders |

| | |
|---|---|
| | other than those Major Stockholders who hold at least 5% of the issued and outstanding Common Stock of Parent. |
| **Transfer Restrictions:** | Stockholders may not transfer any shares of Common Stock except in accordance with relevant securities laws and (a) to Affiliates of such Stockholder that agree to be bound by the stockholders' agreement; (b) to a third party, <u>provided</u> that, in the case of any Stockholder that, together with its Affiliates, at the relevant time, owns at least 2.5% of the issued and outstanding Common Stock of Parent, such shares are first offered for sale by the transferring Stockholder to the Major Stockholders on a *pro rata* basis on the same material terms, including the price per share, proposed by the transferring Stockholder; any shares not purchased by the Major Stockholders may be sold to a third party on the same material terms; <u>provided</u> that the price per share may be equal to or higher than the price offered to the Major Stockholders; (c) in connection with a sale to a third party of all or substantially all assets of Parent (other than as part of a proceeding under Chapter 11 or Chapter 7 of the U.S. Bankruptcy Code) or sale of all or substantially all of the shares of capital stock of Parent (each, a "<u>Parent Sale</u>") and any corresponding drag along right, and (d) to a third party if the Major Stockholders' tag along rights are triggered, and (e) by the Major Stockholders pursuant to such Major Stockholders' tag along rights. |
| **Tag Along Rights:** | Customary tag along rights of each Major Stockholder that, at the relevant time, owns at least 5% of the issued and outstanding Common Stock of Parent, if a Major Stockholder wishes to transfer more than 5% of the issued and outstanding Common Stock of Parent to a third party. |
| **Drag Along Right:** | In the event that a Parent Sale in which all Stockholders will receive the same form of consideration is approved by the Board and, if required, the Requisite Majority, all other Stockholders shall be deemed to have consented to such Parent Sale, waive appraisal rights, if applicable, and be subject, on a several and not joint basis, to the same representations and warranties and *pro rata* share of indemnities, holdback and escrow provisions (on a several, and not joint basis and with the liability of each Stockholder capped at the amount of the net proceeds to be received by such Stockholder), if any; <u>provided</u> that no Stockholder will be forced to become subject to any restrictive covenant other than a customary confidentiality provision and any restrictive covenant to which such Stockholder may already be subject prior to such Parent Sale; <u>provided</u>, <u>further</u>, that, in the event that the consideration to be paid in such Parent Sale includes equity or equity-linked securities, and the receipt thereof by any Stockholder would be restricted or prohibited pursuant to such Stockholder's pre-existing governing documents, the Board will use commercially reasonable efforts to provide such Stockholder with the opportunity to elect (in lieu thereof) either (i) to be paid an amount in cash equal to the fair market value (as determined in good faith by the Board) of the equity or equity-linked securities which such Stockholder would otherwise receive as of the date of issuance of such equity or equity-linked securities (to the extent such cash is then available for such use, in the discretion of the Board), or (ii) |

| | |
|---|---|
| | to dispose of such equity or equity-linked securities to one or more third parties concurrently with the closing of such Parent Sale. |
| **Preemptive Rights:** | Stockholders will have *pro rata* preemptive rights in respect of any future issuances of equity securities and securities convertible into or exchangeable for equity securities, subject to exceptions for customary excluded issuances. Each Stockholder may assign its preemptive rights to one or more Affiliates of such Stockholder. |
| **Registration Rights:** | At or prior to the consummation of an initial public offering, the Stockholders and the issuer in such initial public offering shall enter into a registration rights agreement in customary form providing for registration rights for certain of the holders of shares. |
| **Information Rights:** | Each Stockholder holding at least 5% of the issued and outstanding Common Stock of Parent (other than any Stockholder that is an employee or former employee) will have customary inspection rights and will receive the following information: (a) audited financial statements after the end of each fiscal year, (b) quarterly unaudited financial reports after the end of each quarter, (c) monthly reporting package which is in line with standard internal reporting, (d) forecasts and an annual budget and business plan as approved by the Board, and (e) upon request by such Stockholder, information reasonably required to file tax returns in accordance with applicable tax laws. Items (a) through (d) shall be delivered by Parent at the same time such items are required to be delivered to the lenders under the New Credit Facility; provided, however, that any such items not required to be delivered thereunder shall be delivered as promptly as reasonably practicable after they are available. |
| **Management Incentive Equity:** | New management incentive equity plan to be discussed and approved as promptly as reasonably practicable following the closing of the transaction. |
| **Amendments/Waivers:** | Any amendment to or waiver of a provision of the stockholders' agreement (a) that would alter or change the rights, obligations, powers or preferences of a Stockholder in a disproportionate and adverse manner compared to the other Stockholders shall require the prior written consent of each such affected Stockholder; and (b) in respect of the enumerated actions requiring approval of the Requisite Majority shall require the prior written consent of the Requisite Majority. No waiver of a Stockholder's preemptive or tag along rights, or amendment disproportionately affecting such rights as compared to any other Stockholders, shall be valid unless approved by such Stockholder. |

***

## EXHIBIT D

**Form of Transfer Agreement**

## TRANSFER AGREEMENT

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of Participating Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting First Lien Term Lender" or "Consenting Second Lien Term Lender" (as applicable) under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loans | |
| Second Lien Term Loans | |

---

[1] Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT E

### Form of Joinder

# JOINDER

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders party thereto and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting First Lien Term Lender" or "Consenting Second Lien Term Lender" (as applicable) under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loans | |
| Second Lien Term Loans | |

---

[1]   Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.

## Exhibit C

**Financial Projections**

## Overview to Financial Projections

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that entry of a Confirmation Order is not likely to be followed by either a liquidation or the need to further reorganize the Debtors or any successor to the Debtors. In accordance with this condition and in order to assist each holder of a Claim in determining whether to vote to accept or reject the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), the Debtors' management team ("Management"), with the assistance of its restructuring advisor, developed financial projections (the "Financial Projections") to support the feasibility of the Plan, which were prepared as of January 22, 2021.

The Financial Projections were prepared in good faith by Management, with the assistance of its restructuring advisor, and are based on a number of assumptions made by Management, within the bounds of their knowledge of the Debtors' business and operations, with respect to the future performance of the Debtors' operations. In addition, the Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. Forward-looking statements in these projections include the intent, belief, or current expectations of the Debtors and members of its Management with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' strategic business plan, bank financing, debt and equity market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections and from those contemplated by such forward-looking statements. No representations can be made as to the accuracy of the Financial Projections or the Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance. Accordingly, in deciding whether to vote to accept or reject the Plan, creditors should review the Financial Projections in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions and risks described herein, including all relevant qualifications and footnotes.

**AS ILLUSTRATED BY THE FINANCIAL PROJECTIONS, THE DEBTORS BELIEVE IT WILL HAVE SUFFICIENT LIQUIDITY TO PAY AND SERVICE THEIR DEBT OBLIGATIONS, AND TO OPERATE THEIR BUSINESSES. THE DEBTORS BELIEVE THAT CONFIRMATION AND CONSUMMATION ARE NOT LIKELY TO BE FOLLOWED BY THE LIQUIDATION OR FURTHER REORGANIZATION OF THE COMPANY. ACCORDINGLY, THE COMPANY BELIEVES THAT THE PLAN SATISFIES THE FEASIBILITY REQUIREMENT OF SECTION 1129(a)(11) OF THE BANKRUPTCY CODE.**

The Financial Projections were not prepared with a view toward compliance with published rules of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding projections. The Debtors' independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for and denies any association with the prospective financial information.

Accordingly, neither the Debtors nor the reorganized company intend to and disclaim any obligation to: (1) furnish updated Financial Projections to holders of Claims or Equity Interests prior to the Effective Date or to any other party after the Effective Date, except as required by the Plan; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available.

The Debtors do not intend to update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below.

> **THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS.**

*Select Assumptions of the Financial Projections*

The Financial Projections are based on, but not limited to factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, as well as the assumptions detailed below. Many of these factors and assumptions are beyond the control of the Debtors and do not take into account the uncertainty and disruptions of business that may accompany an in-court restructuring. Accordingly, the assumptions should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement.

- **Methodology**: The Financial Projections were developed by Management with the assistance of its restructuring advisor and are presented solely for purposes set forth herein and in the Disclosure Statement to which the Financial Projections are attached as <u>Exhibit E</u>. No representation or warranty, express or implied, is provided in relation to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

- **Plan and Effective Date**: The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by February 26, 2021 (the "<u>Effective Date</u>"). Any significant delay in the Effective Date may have a significant negative effect on the operations and financial performance of the Debtors including, an increased risk or inability to meet sales forecasts, increased risk of supply chain disruption, and the incurrence of higher reorganization expenses. Although the Financial Projections represent the Debtors' best estimates and good faith judgment of the results of future operations, financial position, and cash flows of the Debtors, they are only estimates and actual results may vary considerably from such Financial Projections. Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved.

- **Projection Period:** The Debtors prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of the Debtors using the business plan. Management developed and refined the business plan and prepared consolidated Financial Projections of the Debtors for the fiscal years ending January 2021 (fiscal year ("<u>FY</u>") 2021) through January 2024 (FY 2024) (the "<u>Projection Period</u>").

- **Operating Impacts:** The Financial Projections incorporate multiple operating considerations including, but not limited to:
  - o  Current and projected market conditions in which the Debtors operate;
  - o  No contemplated store closures or any other material changes to existing operations;
  - o  Reflect capital expenditures related to normal course maintenance and renovation capital expenditures related to retail stores and digital platforms;
  - o  The Financial Projections do not consider any potential impact of the application of "fresh start" accounting under Accounting Standards Codification 852, "Reorganizations" ("ASC 852") that may potentially apply upon the Effective Date. If the Debtors determine the need to fully implement fresh start accounting, differences from the depiction presented are anticipated and those differences may be material. If required to apply the provisions of

ASC 852, upon emergence, the Debtors will be required to determine the amount by which its reorganization value as of the Effective Date exceeds, or is less than, the fair value at the time, which may be based on, any event, such valuation, as well as the determination of the fair value of the Debtors' assets and liabilities, will be made as of the Effective Date. The differences between the amounts of any or all of the foregoing items as assumed in the Financial Projections and the actual amounts thereof as of the Effective Date may be material.

**THE INDEPENDENT AUDITOR FOR THE DEBTORS HAS NOT EXAMINED, COMPILED OR OTHERWISE PERFORMED ANY PROCEDURES ON THE FOLLOWING PROSPECTIVE FINANCIAL INFORMATION, AND CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION.**

**BELK, INC.**
**PROJECTED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

| *In $US Millions* | Notes | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Revenue | [1] | $  2,600 | $  3,007 | $  3,310 | $  3,504 |
| Cost of Goods Sold | [2] | 1,713 | 1,803 | 1,983 | 2,097 |
| **Gross Margin** | [2] | $  **887** | $  **1,204** | $  **1,327** | $  **1,407** |
| *Gross Margin %* | | *34.1%* | *40.0%* | *40.1%* | *40.1%* |
| Selling, General, & Administrative | [3] | 957 | 1,044 | 1,096 | 1,156 |
| **Adj. EBITDA** | | $  **(71)** | $  **160** | $  **231** | $  **250** |
| *EBITDA Margin %* | | *-2.7%* | *5.3%* | *7.0%* | *7.1%* |
| Depreciation & Amortization | [4] | 160 | 145 | 130 | 115 |
| **Operating Income** | | $  **(230)** | $  **15** | $  **101** | $  **135** |
| Interest Expense | [5] | 181 | 217 | 194 | 172 |
| Restructuring Expenses | [6] | 7 | 57 | - | - |
| Other Expense / (Income), Net | [7] | (2) | 2 | 2 | 0 |
| **Income / (Loss) before Taxes** | | $  **(420)** | $  **(256)** | $  **(91)** | $  **(36)** |
| Income Tax Expense / (Benefit) | [8] | (145) | - | - | - |
| **Net Income / (Loss)** | | $  **(274)** | $  **(256)** | $  **(91)** | $  **(36)** |

**BELK, INC.**
**PROJECTED CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)** [1]

| *In $US Millions* | Notes | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| **Current Assets:** | | | | | |
| Cash and Cash Equivalents | [9] | $ 90 | $ 20 | $ 20 | $ 20 |
| Accounts Receivable | [10] | 51 | 49 | 50 | 51 |
| Inventory | [11] | 539 | 727 | 763 | 794 |
| Prepaid expenses and other current assets | [12] | 50 | 50 | 50 | 51 |
| **Total Current Assets** | | $ 729 | $ 846 | $ 884 | $ 915 |
| Property and Equipment, net | [13] | 1,337 | 1,231 | 1,156 | 1,095 |
| Goodwill & Other Intangible Assets, net | [14] | 1,046 | 1,042 | 1,037 | 1,033 |
| Other Long-Term Assets | [15] | 41 | 41 | 41 | 41 |
| **Total Assets** | | $ 3,152 | $ 3,159 | $ 3,117 | $ 3,083 |
| **Liabilities & Member Equity** | | | | | |
| **Current Liabilities:** | | | | | |
| Accounts Payable | [16] | 321 | 309 | 343 | 372 |
| Accrued Expenses & Other Current Liabilities | [17] | 314 | 332 | 327 | 323 |
| **Total Current Liabilities** | | $ 635 | $ 641 | $ 670 | $ 695 |
| **Long-Term Liabilities:** | | | | | |
| ABL Facility | [18] | 390 | 398 | 370 | 376 |
| First Lien First Out Term Loan (FLFO) | [19] | - | 300 | 300 | 300 |
| First Lien Second Out Term Loan (FLSO) | [20] | - | 859 | 915 | 890 |
| Second Lien Term Loan | [21] | - | 118 | 131 | 144 |
| First Lien / Second Lien Term Loans | [22] | 1,549 | - | - | - |
| Capital Lease Obligations | [23] | 84 | 71 | 64 | 61 |
| **Total Debt** | | $ 2,024 | $ 1,746 | $ 1,779 | $ 1,771 |
| Other Long-Term Liabilities | [24] | 374 | 359 | 345 | 331 |
| **Total Liabilities** | | $ 3,032 | $ 2,746 | $ 2,795 | $ 2,798 |
| Shareholders' Equity / (Deficit) | [25] | 119 | 413 | 322 | 286 |
| **Total Liabilities and Shareholders' Equity** | | $ 3,152 | $ 3,159 | $ 3,117 | $ 3,083 |

---

[1] These balance sheet projections do not reflect the potential impact of "fresh start" accounting under Accounting Standards Codification 852, "Reorganizations" ("ASC 852") that may need to be applied on the Effective Date. For purposes of these projections, for example: (i) Stockholder's Equity after the Effective Date assumes that book value of Stockholder's Equity prior to Effective Date will be adjusted for the amount of long-term debt extinguished, net of new debt issued in exchange. The total amount of debt extinguished (after netting out the exchange amount) is estimated at approximately $541 million, and this is added to the pre-restructuring book value of Stockholder's Equity to adjust for the transaction. (ii) Book value of Goodwill & Other Intangibles is assumed to remain unimpaired as a result of the transaction. However, if the Debtors do fully implement fresh start accounting, they will be required to determine the reorganization value, which amongst other things could impact the value of proforma Stockholder's Equity and Goodwill & Other Intangibles after the transaction. Differences between the forecasted amounts and the actual value from reorganization could be material.

**BELK, INC.**
**PROJECTED CONSOLIDATED STATEMENT OF CASH FLOWS**
**(UNAUDITED)**

| *In $US Millions* | Notes | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Net Income | | $ (274) | $ (256) | $ (91) | $ (36) |
| (+) Non-cash adjustments | [26] | 100 | 145 | 130 | 115 |
| (+/-) Change in Working Capital | [27] | 256 | (196) | (22) | (20) |
| **Net cash provided / (used) in operating activities** | | **$ 81** | **$ (306)** | **$ 17** | **$ 58** |
| **Investing activities** | | | | | |
| Capital expenditures | [28] | (15) | (35) | (50) | (50) |
| Asset Sales | [29] | 26 | - | - | - |
| **Net cash provided / (used) in investing activities** | | **$ 11** | **$ (35)** | **$ (50)** | **$ (50)** |
| **Financing activities** | | | | | |
| Borrowings / (Paydown) on ABL | [30] | 30 | 8 | (29) | 6 |
| Principal drawdown / (payments) on LT debt | [31] | (47) | (20) | (21) | (46) |
| New Money Investment | [32] | - | 225 | - | - |
| PIK Interest | [33] | - | 58 | 83 | 32 |
| Other Financing Activities | [34] | (11) | - | - | - |
| **Net cash provided / (used) in Financing activities** | | **$ (27)** | **$ 272** | **$ 33** | **$ (8)** |
| **Net Change in Cash Flow** | | **$ 65** | **$ (70)** | **$ (0)** | **$ (0)** |
| **Beginning Cash Balance** | | **25** | **90** | **20** | **20** |
| Net Change in Cash Flow | | 65 | (70) | (0) | (0) |
| **Ending Cash Balance** | | **$ 90** | **$ 20** | **$ 20** | **$ 20** |

## NOTES TO FINANCIAL PROJECTIONS

### Note 1 – Revenue

Revenue primarily reflects the Debtors' integrated store and online sales through the Belk tradename. Consolidated revenue is projected to be approximately $2.6 billion during FY 2021, growing to approximately $3.5 billion during FY 2024, with year-over-year growth of 16%, 10% and 6% during FY 2022, FY 2023 and FY2024, respectively, as retail sales continue to rebound from pandemic-impacted levels seen in FY 2021.

During FY 2020, approximately 18% of the Debtors' total revenue was from online sales. This is expected to grow to approximately 42% of total revenue during FY 2021 due to the shift in customer behavior resulting from the pandemic. The Debtors' anticipate this upward trend in online growth to continue, reaching approximately 46% of total revenue during FY 2024, primarily driven by fulfilment of online orders via its existing store base.

### Note 2 – Cost of Goods Sold / Gross Margin

Cost of Goods Sold primarily includes cost of merchandise purchased, inbound freight and customs duties, and vendor allowances. Consolidated gross margin as a percentage of net sales is projected at approximately 34% during FY 2021, which was significantly impacted from higher promotional activity to drive traffic during the pandemic, as well as lower levels of vendor allowances. From FY 2022 onward, the gross margin rate is projected to rebound to approximately 40%, in line with the Company's historical trends.

### Note 3 – Selling, General, & Administrative

Selling, general, & administrative ("SG&A") costs include all employee-related expenses for all store, distribution center and fulfilment center staff, and eCommerce platforms as well as administrative employees at the Company's corporate headquarters and regional offices. SG&A costs also include rent and other occupancy costs for its stores and other locations, advertising and marketing costs, outbound shipping to customers, information technology and communication costs, supplies for the Company's stores and online business, credit card fees, and all other administrative overhead.

SG&A costs also include an offset for royalty revenue received from use of the Company's private label credit card. As a percent of revenue, SG&A costs are projected to decrease from 37% during FY 2021 to 33% during FY 2024. The improvement is primarily driven by operating cost leverage gained by utilizing the existing store footprint to support the continued expansion of eCommerce and strategic right-sizing of components of the fixed cost structure.

### Note 4 – Depreciation & Amortization

Represents depreciation of property, plant and equipment and amortization of intangible assets.

### Note 5 – Interest Expense

Interest expense over the Projection Period is based upon the Debtors' current (FY 2021) and anticipated (FY 2022 – FY 2024) capital structure immediately before and following the consummation of the Plan. In addition to cash interest, PIK interest, and fees on long-term debt, interest expense also includes payments on various capital lease obligations.

### Note 6 – Restructuring Expenses

Restructuring expenses projected in FY 2021 and FY 2022 are based on estimated restructuring professional costs and closing fees related to consummation of the Plan.

### Note 7 – Other Expense / (Income), Net

Other expense / (income), net primarily includes interest income and other miscellaneous corporate costs.

### Note 8 – Income Tax Expense / (Benefit), Net

For FY 2021, the Company is projecting approximately $145 million in Income Tax Benefit, which has already been booked through the first 10 months of the fiscal year. For FY 2022 and beyond, the Company does not forecast significant Income Tax Expense, since taxable income is projected to be negative after depreciation, amortization and interest expense.

In addition, the Company has a Net Operating Loss carryforward from prior periods, and if any balance is available after emergence from Chapter 11, it could potentially be used to offset taxable income during future years. The projections assume no tax obligation as a result of consummating the Plan. These amounts could vary significantly pending final tax analysis of the transaction.

### Note 9 – Cash and Cash Equivalents

Consolidated cash balance of the Debtors for all entities and subsidiaries, including cash balances from their respective operating and store-level accounts.

### Note 10 – Accounts Receivable

Includes receivables related to multiple items, including, but not limited to:

- Credit card receivables in transit;
- Private label credit card royalty revenue;
- Allowances from vendors and landlords.

### Note 11 – Inventory

Represents the merchandise inventory of the Debtors, including inventory-in-transit.

### Note 12 – Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets primarily consists of prepaid rent, insurance, taxes, and other prepaid operating expenses.

### Note 13 – Property and Equipment, net

Property and equipment ("P&E") is composed primarily of the Debtors' owned and leased store and other locations, furniture, fixtures and equipment, IT hardware and software systems, leasehold improvements, net of accumulated depreciation. The Debtors' book value of P&E is subject to material change based on accounting analysis of the Debtors' financials upon emergence.

### Note 14 – Goodwill & Other Intangible Assets, net

Goodwill & Other Intangible Assets is composed primarily of the Debtors' intangible property, specifically it's tradenames, proprietary technology, and customer relationships.

### Note 15 – Other Long-Term Assets

Other long-term assets are composed primarily of Company-Owned Life Insurance policies, net of loans outstanding against these policies, pension assets, and other miscellaneous long-term deposits with third parties in the normal course of operations.

**Note 16 – Accounts Payable**

Represents outstanding merchandise and non-merchandise payables to third-party trade vendors and service providers.

**Note 17 – Accrued Expenses & Other Current Liabilities**

Includes accrued and unpaid expenses primarily relating to payroll, employee benefits, employee incentives, sales and income taxes, and interest, and other operating expenses, as well as liability on account gift cards (net of accrued breakage) and other loyalty rewards programs.

**Note 18 – Debt – ABL Facility**

The ABL Facility is a $900 million revolving credit facility which was amended August 29, 2019 to extend the maturity to August 2024.

**Note 19 – Debt – First Lien First Out Term Loan (FLFO)**

Debtors' new $300 million First Lien First Out Term Loan (FLFO) maturing July 31, 2025, which includes $225 million in new money and $75 million in take back debt. Interest rate of LIBOR + 750 basis points, subject to a 1% LIBOR floor.

**Note 20 – Debt - First Lien Second Out Term Loan (FLSO)**

Debtors' new $815 million First Lien Second Out Term Loan (FLSO) maturing July 31, 2025. The Financial Projections assume that the Company will exercise the Paid-In-Kind ("PIK") option through the first eight quarters after Effective Date, resulting in a cash interest payment at a rate of 5% per annum and PIK interest rate of 8% per annum during this period. Thereafter, the Company will toggle to a full cash payment at a rate of 10% per annum. Annual amortization is projected to be 1% in FY 2022, 2% in FY 2023 and 2.5% in FY 2024. An additional principal payment of approximately $23.5 million is forecast to be made during April '23 based on projected annual excess cash flow generated during FY 2023.

**Note 21 – Debt - Second Lien Term Loan**

Debtors' new $110 million Second Lien Term Loan maturing July 31, 2025, with a Paid-In-Kind interest rate of 10% per annum.

**Note 22 – Debt - First Lien / Second Lien Term Loans**

Debtors' existing First Lien and Second Lien Term Loans exchanged or extinguished as part of the restructuring transaction.

**Note 23 – Capital Lease Obligations**

Represents obligations related to financing and lease arrangements of property, equipment, and other assets.

**Note 24 – Other Long-Term Liabilities**

Other long-term liabilities are composed primarily of an upfront incentive received from the private label credit card processing bank, which is amortized over the forecast periods, amounts for accounting for unfavorable (and favorable) long-term leases, and various other employee and pension related liabilities, all of which are held constant during the forecast period.

**Note 25 – Shareholders' Equity / (Deficit)**

Represents the Debtors' net book value of shareholders' equity.

**Note 26 – Non-Cash Adjustments**

Represents the addback for non-cash transactions, including depreciation & amortization, non-cash interest and differences between cash rent and rent expense.

**Note 27 – Changes in Working Capital**

Represents the Debtors change in working capital, primarily consisting of changes in inventory, accounts payable, accounts receivable, accrued expenses and deferred taxes.

FY 2022 assumes an increase in working capital, driven by normalization of vendor payables and inventory levels. FY 2023 and FY 2024 project minimal change in working capital on a year-over-year basis.

**Note 28 – Capital Expenditures**

Capital expenditures are primarily driven by a combination of:

- Store renovations / updates,
- Maintenance requirements, and
- Investments in information technology.

**Note 29 – Asset Sales**

Represents sale of Cary, North Carolina store effectuated in December 2020 and other miscellaneous asset sales completed during FY 2021.

**Note 30 – Borrowings / (Paydown) on ABL**

Reflects borrowings and paydowns on the ABL Facility.

**Note 31 - Principal Payments on Long-Term Debt and Capital Lease Obligations**

Represents amortization of existing First Lien Term Loan prior to the restructuring transaction, and projected amortization and excess cash flow payments related to the FLSO term loan through the projection period. Principal payments for Capital Lease Obligations are projected throughout the forecast period.

**Note 32 – New Money Investment**

Represents new capital infusion of $225 million in conjunction with effectuated transaction.

**Note 33 – PIK Interest**

Reflects offset for (i) interest on the FLSO that is not cash paid during the first eight quarters, but Paid-In-Kind and added to the loan balance and (ii) interest on the Second Lien Term Loan that is not cash paid during the projection period.

**Note 34 – Other Financing Activities**

Represents payments on property and equipment through capital financing arrangements, deferred financing costs, and other miscellaneous items during FY 2021.

**EXHIBIT D**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS

## I. INTRODUCTION

Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," requires that a bankruptcy court find, as a condition of confirmation, that the Chapter 11 plan provides, with respect to each class, that each holder of an Allowed Claim either (i) has accepted the plan of reorganization, or (ii) will receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such non-accepting holders would receive or retain if the debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

Accordingly, to demonstrate that the proposed Plan satisfies the "best interest" of creditors test, the Debtors, with assistance from their restructuring advisor, have prepared the following hypothetical liquidation analysis ("Liquidation Analysis"), in connection with the Plan and the Disclosure Statement.[1] The Liquidation Analysis indicates the estimated recoveries that may be obtained by Classes of Claims or Interests assuming a hypothetical liquidation under chapter 7 of the Bankruptcy Code upon disposition of the Debtors' assets as an alternative to the Plan. Accordingly, the values discussed in the Liquidation Analysis may be different from amounts referred to in the Plan. The Liquidation Analysis is based on certain assumptions in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

## II. STATEMENT OF LIMITATIONS

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from certain of their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in *the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Belk, Inc., and Its Debtor affiliates.*

## III. OVERVIEW AND GENERAL ASSUMPTIONS

Hypothetical Chapter 7 recoveries set forth in this Liquidation Analysis were determined through multiple steps, as set forth below. The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of February 28, 2021 (the "Conversion Date") and the net costs to execute the administration of the wind down of the Estates. The Liquidation Analysis assumes that the Debtors would commence a Chapter 7 liquidation on or about the Conversion Date under the supervision of a single court appointed Chapter 7 trustee. The selection of a separate Chapter 7 trustee for one or more of the Estates likely would result in substantially higher administrative expenses associated with the chapter 7 cases from a large duplication of effort by each trustee and his or her professionals. In addition, the selection of separate Chapter 7 trustees likely would give rise to complicated, expensive, and time-consuming disputes regarding certain inter-Debtor issues. The Liquidation Analysis reflects the wind down and liquidation of substantially all the Debtors' remaining assets and the distribution of available proceeds to holders of Allowed Claims during the period after the Conversion Date.

Summary Notes to Liquidation Analysis

1. **Dependence on Assumptions**. The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by the management and the restructuring advisor of the Debtors, the assumptions are inherently subject to significant economic, business, regulatory and competitive uncertainties, and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. **Dependence on a Forecast Balance Sheet**. This Liquidation Analysis contains numerous estimates that are still under review and it remains subject to further legal and accounting analysis.

3. **No DIP facility assumed.** The Liquidation Analysis assumes no DIP facility. The chapter 7 case is assumed to be funded by cash on hand and liquidation of assets.

4. **Chapter 7 liquidation process**. The liquidation of the Debtors' assets is assumed to be completed over a 12-months period inside of a Chapter 7 case managed by the Chapter 7 trustee. The Chapter 7 trustee would manage the bankrupt estates to maximize recovery to creditors as expeditiously as possible and would appoint professionals (attorneys, investment bankers, financial advisors, liquidators, accountants, consultants, appraisers, experts, etc.) to assist in the liquidation and wind down of the Estates. The Chapter 7 trustee would oversee the Debtors' inventory liquidation and collection of outstanding accounts receivable in addition to attempting to sell or otherwise monetize other assets owned by the Debtors to one or multiple buyers. During the first three months, the Debtors would complete going-out-of-business sales for all remaining store inventory, furniture, fixtures, and equipment. At the end of this 3-month period, the Debtors would reject all operating leases immediately, and return the spaces to the landlords in broom swept condition. During the remaining 9-month period, the Debtors would primarily focus on monetizing other assets such as owned real estate, ground leases, intellectual property and other remaining personal property and equipment, as well as administrative activities such as claims reconciliation, distributions to holders of various claims, and other activities necessary to wind down the estates.

5. **Claims Estimates**. In preparing this Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each Class based upon a review of the Debtors' estimated balance sheet. Administrative claims were estimated based on the company's financial projections as of the Conversion Date. Additional Claims were estimated to include certain

Chapter 7 administrative obligations incurred after the Conversion Date. The estimate of all allowed claims in this Liquidation Analysis is based on the estimated book value of those claims, where applicable. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the estimated amounts of Allowed Claims set forth in this Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

## IV. CONCLUSION

THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

## V.  LIQUIDATION ANALYSIS RESULTS

Presented below is a summary of asset recoveries and distributions to various classes of claims resulting from the hypothetical Liquidation Analysis.[2]

**Estimated Proceeds**

*In $US Millions*

| Assets | Note | Nov'20 Book Value | Adjustments | Feb'21 Book Value | Recovery Estimate (%) Low | Mid | High | Recovery Estimate ($) Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds:** | | | | | | | | | | |
| Cash and Cash Equivalents | [1] | $ 66.3 | $ 16.8 | $ 83.1 | 100.0% | 100.0% | 100.0% | $ 83.1 | $ 83.1 | $ 83.1 |
| Accounts Receivable | [2] | 73.7 | (32.6) | 41.1 | 61.9% | 62.0% | 62.2% | 25.4 | 25.5 | 25.5 |
| Merchandise Inventory | [3] | 693.5 | (181.6) | 511.9 | 132.8% | 135.3% | 137.8% | 680.0 | 692.8 | 705.6 |
| Other Current Assets | [4] | 96.5 | (47.2) | 49.3 | 0.0% | 0.0% | 0.0% | - | - | - |
| Property and Equipment, Net | [5] | 1,382.5 | (54.6) | 1,327.9 | 9.7% | 14.9% | 20.3% | 128.8 | 197.8 | 269.6 |
| Goodwill | [6] | 586.2 | (0.0) | 586.2 | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangibles | [7] | 460.7 | (1.1) | 459.6 | 2.4% | 8.1% | 13.7% | 11.1 | 37.1 | 63.0 |
| Other Assets | [8] | 55.0 | (12.9) | 42.0 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets and Estimated Gross Proceeds** | | $ 3,414.5 | $ (313.3) | $ 3,101.1 | | | | $ 928.5 | $ 1,036.2 | $ 1,146.8 |

| Less: Wind-down Costs: | | | | | Percent of Gross Proceeds (%) Low | Mid | High | Expense Estimate ($) Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating Expenses - Inventory | [9] | | | | 27.4% | 23.5% | 20.3% | (254.2) | (243.7) | (233.2) |
| Operating Expenses - Corporate Overhead | [10] | | | | 3.6% | 3.0% | 2.6% | (33.2) | (31.5) | (29.9) |
| Chapter 7 - Professional Fees | [11] | | | | 2.2% | 1.7% | 1.3% | (20.1) | (17.6) | (15.1) |
| Chapter 7 - Trustee Fee | [12] | | | | 1.8% | 2.0% | 2.1% | (17.0) | (20.6) | (24.4) |
| Accrued Payroll and Payroll Taxes | [13] | | | | 0.0% | 0.0% | 0.0% | (8.3) | (8.3) | (8.3) |
| Gift Card Realization | [14] | | | | 5.5% | 4.5% | 3.6% | (51.5) | (46.3) | (41.2) |
| Asset Realization Fees | [15] | | | | 0.8% | 1.1% | 1.5% | (7.0) | (11.7) | (16.6) |
| **Total Estimated Wind-down Costs** | | | | | | | | $ (391.2) | $ (379.8) | $ (368.6) |
| **Net Proceeds Available** | | | | | | | | $ 537.3 | $ 656.4 | $ 778.2 |

**Distribution of Net Liquidation Proceeds to Creditors**

| Liquidation Claims | Note | Class | Balances * | Recovery % Low | Mid | High | Recovery Estimate $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|
| **Capital lease / Other Secured Claims** | [16] | 1 | $ 82.8 | 3.8% | 7.6% | 11.4% | $ 3.2 | $ 6.3 | $ 9.5 |
| Capital lease / Other Secured Claims - Deficiency | | | | | | | 79.7 | 76.5 | 73.4 |
| Remaining Amount Available for Distribution | | | | | | | 534.1 | 650.1 | 768.7 |
| **ABL Facility Claims** | [17] | 3 | $ 414.5 | 100.0% | 100.0% | 100.0% | $ 414.5 | $ 414.5 | $ 414.5 |
| ABL Deficiency | | | | | | | (0.0) | 0.0 | (0.0) |
| Remaining Amount Available | | | | | | | 119.6 | 235.6 | 354.2 |
| **First Lien Term Loan Claims** | [18] | 4 | $ 990.8 | 12.1% | 23.8% | 35.7% | $ 119.6 | $ 235.6 | $ 354.2 |
| First Lien Term Loan Deficiency | | | | | | | 871.2 | 755.2 | 636.6 |
| Remaining Amount Available | | | | | | | - | - | - |
| **Second Lien Term Loan Claims** | [19] | 5 | $ 550.0 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Second Lien Term Loan Deficiency | | | | | | | 550.0 | 550.0 | 550.0 |
| Remaining Amount Available | | | | | | | - | - | - |
| **Administrative and Priority Tax Claims** | [20] | N/A | $ 73.8 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Administrative and Priority Tax Claims Deficiency | | | | | | | 73.8 | 73.8 | 73.8 |
| Remaining Amount Available | | | | | | | - | - | - |
| **General Unsecured Claims [1]** | [21] | 6/7 | $ 2,908.3 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ (0.0) |
| **Remaining Amount Available to Equity** | | | | | | | - | - | 0.0 |

**Notes**

[1]The General Unsecured Claims estimate assumes a mid-point recovery on all assets. If overall asset recoveries are higher (or lower), the deficiency claims
for the Secured Claims holders are expected to be lower (or higher), which will impact the General Unsecured Claims amount.

---

[2] The estimated claim amounts reflected above may differ from the estimated claims included elsewhere in the Disclosure Statement because of differing assumptions between the chapter 11 reorganization plan and this hypothetical chapter 7 liquidation.

## VI. NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### Note [1] – Cash and Cash Equivalents

The Liquidation Analysis assumes 100% recovery for all cash and cash equivalents.

### Note [2] – Accounts Receivable

Accounts receivable consists primarily of receivables from in-store and online credit card sales, private label credit card receivables, receivables from suppliers (i.e. vendors, landlords, insurance, etc.) and other miscellaneous receivables. The Liquidation Analysis assumes credit card receivables recover in full. Vendor and landlord receivables assume no recovery as it is assumed these will be offset against any amounts owed to them. Insurance receivables assume recovery between 45% to 55% of book value. The blended recovery range for all accounts receivable is 62% of estimated book value.

### Note [3] – Merchandise Inventory

The Liquidation Analysis assumes inventory of approximately $512 million as of the Conversion Date. Inventory is assumed to be sold through orderly going-out-of-business sales using all existing stores and the ecommerce channel. Recovery estimates and timelines are based on a third-party appraisal, which assumes three months are needed to sell-through all inventory. Estimated recovery is based on the Gross Orderly Liquidation Value ("GOLV"), which does not account for costs related to selling through the inventory such as occupancy, payroll, liquidation fees, freight, and other general selling expenses. These costs are included elsewhere in the Liquidation Analysis and described further in Note [9]. The blended recovery range on inventory is 133% and 138% of book value.

### Note [4] –Other Current Assets

Other current assets include prepaid expenses related to rent, supplies, insurance, payroll, taxes, and other miscellaneous items. The Liquidation Analysis assumes no recovery on these prepaids items.

### Note [5] – Property and Equipment, Net

Property and equipment assets primarily consist of real estate (buildings, land, leases), leasehold improvements and retail fixtures, distribution center machinery and equipment, and information technology ("IT") equipment and software assets.

Real estate assets consist of company owned and ground leased store properties and distribution centers, as well as traditional commercial leases. The Liquidation Analysis assumes that the Trustee would reject the traditional leases at the conclusion of the three month going-out-of-business sale period in order to minimize the carrying costs of such leases, and attempt to sell or otherwise monetize the remaining owned property and ground leases during the remaining nine-month period. The assumed recovery range is based on the "dark" values presented in a recent third-party appraisal, and range between 50% to 100% of such dark value.

For computer hardware, furniture, fixtures and other equipment held at the distribution centers, recoveries are assumed at 0% to 5% of book value. Software assets are assumed to have no estimated recovery.

Assets financed with capital leases have an estimated recovery between 5% to 15% of book value of these assets. Any recovery on these assets is distributed directly to holders of Other Secured Claims (see

Note [16]).

**Note [6] – Goodwill**

Reflects accounting for the Belk purchase transaction in 2015; the Liquidation Analysis assumes no recoverable value.

**Note [7] – Intangibles**

Intangible Assets primarily consist of certain trade names and private label brands, favorable leases, and customer relationships. The assumed recovery for the tradename and private label brands is based on comparable transactions completed in other recent chapter 11 bankruptcies, and uses a percentage of sales method to assign such recovery values. No recovery value has been assigned to leases, as it is assumed that all leases will be rejected after the going-out-of-business sales are completed, in order to avoid the associated carrying costs. Any such net recovery associated with these commercial leases would be incremental to what is presented in the analysis. Similarly, no recovery has been assigned to customer relationships.

**Note [8] – Other Assets**

Other Assets include prepaid loan expenses, pension assets, and other miscellaneous assets. No recoverable value is assumed in this analysis. In addition, the Company owns life insurance policies for former employees, which are pledged to a loan against those policies. The analysis assumes that any potential value from those assets will flow directly to the lender, and no recovery is assumed for purposes of this analysis.

## II.   WIND-DOWN COSTS

**Note [9] – Operating Expenses - Inventory**

Includes costs to conduct going-out-of-business sales to liquidate inventory, including store and distribution center occupancy and payroll, marketing, advertising, supervision, credit card expenses, liquidation fees, and other miscellaneous expenses.

**Note [10] – Operating Expenses – Corporate Overhead**

Includes all corporate overhead (salaries, wages, benefits, corporate occupancy, IT and other support) during the 12-month period. Higher costs will be incurred during the first three months as additional support will be needed to complete the going-out-of-business sales and store closures. After this period, costs will be minimized to include basic functions such as securing and sale of remaining assets and minimal finance and payroll support to complete the winddown of the estate and facilitate distributions to creditors.

**Note [11] – Chapter 7 - Professional Fees**

Chapter 7 professional fees include costs for restructuring counsel, local counsel, financial advisor, and other professionals.

**Note [12] – Chapter 7 - Trustee Fee**

Consistent with statutory guidelines, the Chapter 7 Trustee fee is estimated at 3% of total distributions to interested parties.

**Note [13] – Accrued Payroll and Payroll Tax**

Accrued payroll and associated taxes are estimates as of the Conversion Date, and are assumed to be

paid in the normal course as part of the wind-down process, as failure to pay these expenses would likely have a destabilizing effect on the orderly wind-down of the Debtor's estate.

### Note [14] – Gift Card Realization

Gift cards are assumed to be accepted during the first 30 days of the going-out-of-business sale period to drive traffic to the stores and online channels. It is assumed that 40% to 50% of outstanding gift card balances will be redeemed in the high and low cases, respectively.

### Note [15] – Asset Realization Fees

Asset realization fees are assumed to be 5% of gross recoveries on all real estate, equipment, and intangible assets. The Liquidation Analysis assumes the Trustee will retain brokers and auctioneers to assist in the marketing and liquidation of these assets.

## III.   SECURED CLAIMS

### Note [16] – Capital Lease/Other Secured Claims

Other Secured Claims are estimated to be $82 million on Conversion Date, and are related to capital leases used to finance a distribution center, four stores, and other miscellaneous equipment. It is assumed that all recoveries from these specific assets will be distributed only to holders of such Other Secured Claims.

### Note [17] – ABL Facility Claims

The ABL claims are estimated to be $415 million, including $26 million in letters of credit. All net recoveries from inventory on hand, cash, and credit card receivables are used to satisfy these claims in full. The Liquidation Analysis estimates a full recovery on the ABL Claims.

### Note [18] - First Lien Term Loan Claims

The First Lien Term Loan has an estimated balance of $990 million as of the Conversion Date. The Liquidation Analysis assumes First Lien Term Loan Claims are asserted in full against each guarantor of the debt. These claims are paid from any excess proceeds after payment of the ABL claims in full, and net realizations on liquidation of real property, equipment and intellectual property. The Liquidation Analysis estimates a recovery between 12% to 36% to holders of First Lien Term Loan Claims.

### Note [19] - Second Lien Term Loan Claims

The Second Lien Term Loan has an estimated balance of $550 million as of the Conversion Date. The Liquidation Analysis assumes Second Lien Term Loan Claims are asserted in full against each guarantor of the debt. These claims are paid from any excess proceeds after payment of the First Lien Term Loan Claims. The Liquidation Analysis estimates no recovery to holder of the Second Lien Term Loan Claims.

## IV.  ADMINISTRATIVE AND PRIORITY CLAIMS

### Note [20] – Administrative and Priority Tax Claims

Administrative and Priority Claims estimates include but are not limited to 503(b)(9) claims, priority tax claims, post-petition accounts payable, and accrued expenses and other administrative claims as of the Conversion Date.

## V. UNSECURED CLAIMS

**Note [21] – General Unsecured Claims**

General Unsecured Claims include estimated trade payables and other accrued expenses, intercompany claims, lease rejection damage claims, deficiency claims from holders of Other Secured Claims, First Lien Term Loan Claims and Second Lien Term Loan Claims, and various other general unsecured claims. The Liquidation Analysis estimates no recovery to holders of General Unsecured Claims.

- **Accounts Payable, Accrued Expenses and Other Current Liabilities** represent estimates as of the Conversion Date.

- **Lease rejection damage claims** were calculated as the greater of (a) one year's rent; or (b) 15% of the remaining lease term, not to exceed 3-years rent.

- **Deficiency claims** were estimated based on assumed recoveries for the First Lien Term Loan, Second Lien Term Loan, and Administrative and Priority Claims (deficiency claims range between $1.3 billion and $1.6 billion).

- **Intercompany Claims** are asserted pari-passu with other general unsecured claims. Intercompany Claims represent intercompany balances between entities.

IT SHOULD BE NOTED THAT NO ORDER OR FINDING HAS BEEN ENTERED OR MADE BY THE BANKRUPTCY COURT ESTIMATING OR OTHERWISE FIXING THE AMOUNT OF CLAIMS AT THE ESTIMATED AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THE LIQUIDATION ANALYSIS. THE ESTIMATE OF THE AMOUNT OF ALLOWED CLAIMS SET FORTH IN THIS LIQUIDATION ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT FROM THE AMOUNT OF CLAIMS ESTIMATED IN THIS LIQUIDATION ANALYSIS.