**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BELK, INC., *et al.*,[1] | ) | Case No. 21-30630 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
BELK, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE (TECHNICAL MODIFICATIONS)**

> **THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.  THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

Kristhy M. Peguero (TX Bar No. 24102776)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:            kpeguero@jw.com
                      mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini, P.C. (*pro hac vice* admission pending)
Matthew C. Fagen (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com
                      steven.serajeddini@kirkland.com
                      matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

*Dated:  February 23, 2021*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/belk.  The location of the Debtors' service address is 2801 West Tyvola Road, Charlotte, North Carolina 28217.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ....................................................................................... 1
    A.    Defined Terms. ................................................................................................. 1
    B.    Rules of Interpretation. ................................................................................... 15
    C.    Computation of Time. ..................................................................................... 15
    D.    Governing Law. .............................................................................................. 16
    E.    Reference to Monetary Figures......................................................................... 16
    F.    Reference to the Debtors or the Reorganized Debtors...................................... 16
    G.    Controlling Document. .................................................................................... 16
    H.    Consent Rights. ............................................................................................... 16

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES ............................................................................ 16
    A.    Administrative Claims. .................................................................................... 17
    B.    Professional Fee Claims. ................................................................................. 17
    C.    Priority Tax Claims........................................................................................... 18
    D.    Payment of Restructuring Expenses. ............................................................... 18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.................... 18
    A.    Classification of Claims and Interests............................................................ 18
    B.    Treatment of Claims and Interests. ................................................................. 19
    C.    Special Provision Governing Unimpaired Claims. ......................................... 23
    D.    Elimination of Vacant Classes. ....................................................................... 23
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes....................... 23
    F.    Intercompany Interests. ................................................................................... 23
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .............................................................................................................. 23
    H.    Controversy Concerning Impairment. ............................................................ 23
    I.    Subordinated Claims....................................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................... 24
    A.    General Settlement of Claims and Interests.................................................... 24
    B.    Restructuring Transactions. ............................................................................ 24
    C.    The Reorganized Debtors. .............................................................................. 25
    D.    Sources of Consideration for Plan Distributions............................................ 25
    E.    Corporate Existence. ....................................................................................... 28
    F.    Vesting of Assets in the Reorganized Debtors................................................ 29
    G.    Cancellation of Existing Agreements and Interests. ....................................... 29
    H.    Corporate Action. ........................................................................................... 29
    I.    New Organizational Documents. .................................................................... 30
    J.    Directors and Officers of Reorganized Debtors. ............................................ 30
    K.    Effectuating Documents; Further Transactions. ............................................. 30
    L.    Certain Securities Law Matters. ..................................................................... 31
    M.    Section 1146 Exemption. ................................................................................ 31
    N.    Employee Matters. .......................................................................................... 31
    O.    Preservation of Causes of Action. .................................................................. 31
    P.    Closing the Chapter 11 Cases. ....................................................................... 32

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 32
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. .................... 32
    B.    Indemnification Obligations. ......................................................................................... 33
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .................. 33
    D.    Insurance Policies. ........................................................................................................ 34
    E.    Reservation of Rights. ................................................................................................... 34
    F.    Nonoccurrence of Effective Date. ................................................................................. 34
    G.    Contracts and Leases Entered Into After the Petition Date. ........................................... 34

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................... 34
    A.    Timing and Calculation of Amounts to Be Distributed. ................................................ 34
    B.    Disbursing Agent. ......................................................................................................... 35
    C.    Rights and Powers of Disbursing Agent. ...................................................................... 35
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ..................... 35
    E.    Manner of Payment. ...................................................................................................... 36
    F.    Compliance with Tax Requirements. ............................................................................. 36
    G.    Allocations. ................................................................................................................... 36
    H.    No Postpetition Interest on Claims. ............................................................................... 36
    I.    Foreign Currency Exchange Rate. ................................................................................. 37
    J.    Setoffs and Recoupment. ............................................................................................... 37
    K.    Claims Paid or Payable by Third Parties. ...................................................................... 37

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
    DISPUTED CLAIMS ....................................................................................................... 38
    A.    Disputed Claims Process. .............................................................................................. 38
    B.    Allowance of Claims. ................................................................................................... 38
    C.    Claims Administration Responsibilities. ....................................................................... 39
    D.    Adjustment to Claims or Interests without Objection. .................................................... 39
    E.    Disallowance of Claims or Interests. ............................................................................. 39

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............ 40
    A.    Discharge of Claims and Termination of Interests. ....................................................... 40
    **B.**    **Release of Liens.** .......................................................................................................... 40
    **C.**    **Releases by the Debtors.** ............................................................................................. 41
    **D.**    **Releases by Holders of Claims and Interests.** ............................................................ 42
    **E.**    **Exculpation.** ............................................................................................................... 43
    **F.**    **Injunction.** ................................................................................................................. 44
    G.    Setoff and Recoupment Rights Preserved. ..................................................................... 44
    H.    Protections Against Discriminatory Treatment. ............................................................. 44
    I.    Document Retention. ..................................................................................................... 44
    J.    Reimbursement or Contribution. ................................................................................... 45

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...................... 45
    A.    Conditions Precedent to the Effective Date. .................................................................. 45
    B.    Waiver of Conditions. ................................................................................................... 46
    C.    Effect of Failure of Conditions. .................................................................................... 46

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .................... 46
    A.    Modification and Amendments. ..................................................................................... 46
    B.    Effect of Confirmation on Modifications. ...................................................................... 47
    C.    Revocation or Withdrawal of Plan. ............................................................................... 47

ARTICLE XI. RETENTION OF JURISDICTION ................................................................... 47

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................ 49
    A.       Immediate Binding Effect.................................................................................. 49
    B.       Additional Documents. ...................................................................................... 49
    C.       Payment of Statutory Fees. ................................................................................ 50
    D.       Statutory Committee and Cessation of Fee and Expense Payment................... 50
    E.       Reservation of Rights........................................................................................ 50
    F.       Successors and Assigns. .................................................................................... 50
    G.       Notices. .............................................................................................................. 50
    H.       Term of Injunctions or Stays............................................................................. 53
    I.       Entire Agreement. ............................................................................................. 53
    J.       Exhibits. ............................................................................................................ 53
    K.       Nonseverability of Plan Provisions................................................................... 53
    L.       Votes Solicited in Good Faith............................................................................ 53
    M.       Closing of Chapter 11 Cases. ............................................................................ 54
    N.       Waiver or Estoppel. ........................................................................................... 54

**INTRODUCTION**

The Debtors propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

*A.      Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*ABL Agent*" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

2.      "*ABL Credit Agreement*" means that certain ABL Credit Agreement, dated as of December 10, 2015, by and among Bear Parent Inc., Belk, as borrower, the guarantors thereunder, the ABL Agent, Wells Fargo Bank, National Association, as syndication agent, and the ABL Lenders, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

3.      "*ABL Facility*" means the $900 million senior secured asset-based revolving credit facility provided under the ABL Credit Agreement.

4.      "*ABL Facility Claim*" means any and all Claims arising under, derived from, or based upon the ABL Loan Documents including, without limitation, all Obligations (as defined in the ABL Credit Agreement).

5.      "*ABL Lenders*" means those banks, financial institutions, and other lenders party to the ABL Credit Agreement from time to time, in their respective capacities thereunder.

6.      "*ABL Loan Documents*" means, collectively, the ABL Credit Agreement and any certificates, agreements, intercreditor agreements, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the ABL Credit Agreement.

7.      "*Ad Hoc Crossover Lender Group*" means the ad hoc group of Consenting First Lien Term Lenders and Consenting Second Lien Term Lenders represented by Willkie Farr & Gallagher LLP.

8.        "*Ad Hoc First Lien Term Lender Group*" means the ad hoc group of Consenting First Lien Term Lenders represented by O'Melveny & Myers LLP.

9.        "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

10.       "*Affiliate*" means, with respect to any specified Entity, any person or other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.   For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

11.       "*Agents*" means any administrative agent, collateral agent, or similar Entity under any of the ABL Credit Agreement, the First Lien Term Loan Documents, the Second Lien Term Loan Documents, the New Credit Facilities Documents, and the New ABL Facility Documents, including any successors thereto.

12.       "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

13.       "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

14.       "*Backstop Commitment*" means the commitment of each Backstop Party as set forth in the Backstop Commitment Letter.

15.       "*Backstop Commitment Letter*" means that certain backstop commitment letter dated January 26, 2021 (as may be amended or modified from time to time in accordance with the terms thereof), pursuant to which each Backstop Party has agreed to backstop the New FLFO New Money Loans.

16.       "*Backstop Parties*" means, collectively, each of the Lender Backstop Parties and the Sponsor Backstop Party, in their capacity as parties to the Backstop Commitment Letter.

17.       "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

18.       "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

19.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

20.     "*Belk*" means Belk, Inc., a Delaware corporation.

21.     "*Belk Acquiring Entities*" means one or more new entities formed to acquire, directly or indirectly, substantially all of the assets of the Debtors.

22.     "*Blackstone Credit*" means, collectively, GSO Beacon Holdings LP, GSO Credit Alpha Fund LP, and any Affiliate or transferee of any of the foregoing entities that hold Topco Equity Interests.

23.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

25.     "*Causes of Action*" means any claims, cross claims, third-party claims, interests, damages, judgments, remedies, causes of action, controversies, debts, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever (including those of the Debtors, the Reorganized Debtors, or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, pursuant to any other theory of law or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law preferential or fraudulent transfer or similar claim, and (f) any Avoidance Action.

26.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

28.     "*Claims and Noticing Agent*" means Prime Clerk LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

29.     "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

30.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

32. "*Company Parties*" means Belk and each of its Affiliates (other than Sponsor) that are or become parties to the RSA, solely in their capacity as such.

33. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

35. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

36. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to, *inter alia*, section 1129 of the Bankruptcy Code.

37. "*Consenting First Lien Term Lenders*" means the Holders of First Lien Term Loan Claims that are or become parties to the RSA, solely in their capacity as such.

38. "*Consenting Lenders*" means the Consenting First Lien Term Lenders and the Consenting Second Lien Term Lenders.

39. "*Consenting Second Lien Term Lenders*" means the Holders of Second Lien Term Loan Claims that are or become parties to the RSA, solely in their capacity as such.

40. "*Consenting Sponsors*" means, collectively, each investment fund managed by, or other Affiliate (excluding the Debtors or Reorganized Debtors) of, Sycamore Partners Management, L.P. that is or becomes a party to the RSA, solely in their capacity as such.

41. "*Consenting Stakeholders*" means any party (other than the Company Parties) to the RSA, each solely in their capacity as such, including each of the Consenting First Lien Term Lenders, the Consenting Second Lien Term Lenders, and the Consenting Sponsors.

42. "*Consummation*" means the occurrence of the Effective Date.

43. "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

44. "*Debtors*" means, collectively, each of the following:  Belk, Bear Parent Inc., Fashion Holdings Intermediate LLC, Fashion Intermediate Inc., Belk-Simpson Company, Greenville, South Carolina, Belk International, Inc., Belk Stores Services, Inc., Belk Administration Company, Belk Stores of Virginia LLC; Belk Accounts Receivable LLC, Belk Gift Card Company LLC, Belk Merchandising LLC, Belk Sourcing LLC, Belk Department Stores LP, The Belk Center, Inc., Belk Texas Holdings LLC, Belk Ecommerce LLC, and Belk Stores of Mississippi LLC.

45. "*Debtor Release*" means the release set forth in Article VIII.C of this Plan.

46.     "*Definitive Documentation*" means the definitive documents and agreements governing the Restructuring Transactions (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in the Plan (as amended, modified, or supplemented from time to time), which shall each be in form and substance reasonably acceptable to the Required Consenting Stakeholders, including the following: (a) the Plan (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto); (b) the RSA (including the "Definitive Documents" as defined therein and not explicitly so defined herein); (c) any document or agreement that is part of the Plan Supplement; (d) the Disclosure Statement; (e) the New Credit Agreements and the New Credit Facilities Documents; (f) the New Organizational Documents; (g) the Confirmation Order; (h) the Financing Order; (i) the Backstop Commitment Letter; and (j) such other agreements and documentation desired or necessary to consummate and document the transactions contemplated by this Plan and the RSA.

47.     "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

48.     "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan, which Entity shall be reasonably acceptable to the Required Consenting Lenders and the Consenting Sponsors, and may include the Claims and Noticing Agent.

49.     "*Disclosure Statement*" means the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Belk, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

50.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

51.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing or such other date agreed to by the Debtors, the Required Consenting Lenders, and the Consenting Sponsors.

52.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

53.     "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with Article IV.N of the Plan.

54.     "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

55.     "*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

56.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

57.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) each Company Party; (c) each Consenting Stakeholder; (d) any statutory committee appointed in the Chapter 11 Cases and each of their respective members; and (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f).

58.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

59.     "*Fashion Topco*" means Fashion Topco LLC, a Delaware limited liability company.

60.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

61.     "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

62.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, stay, reargument, or rehearing has expired and no appeal, petition for certiorari, or motion for new trial, stay, reargument or rehearing shall then be pending or has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for new trial, stay, reargument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, <u>however</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

63.     "*Financing Order*" means, as applicable, the interim and final orders of the Bankruptcy Court, if any, setting forth the terms of use of cash collateral and any documentation related thereto.

64.     "*First Lien Term Lender*" means any Holder of a First Lien Term Loan Claim.

65.     "*First Lien Term Loan*" means any loan outstanding under the First Lien Term Loan Credit Agreement.

66.     "*First Lien Term Loan Claim*" means any and all Claims arising under, derived from, or based upon the First Lien Term Loan Credit Agreement or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the First Lien Term Loan Credit Agreement) including accrued and unpaid interest on account of such Obligations as of the Effective Date (with interest to be calculated at the applicable rate, including default interest from and after the Petition Date); *provided* that the amount of any such Claim shall first be reduced by (a) the amount of any accrued and unpaid interest and amortization on the principal amount of such Claim that is paid in Cash on the Effective Date; and (b) the amount of any New FLFO Roll-Up Loans received by the Holder of such Claim prior to any distribution of New FLSO Loans on account of such Claim.

67.     "*First Lien Term Loan Credit Agreement*" means that certain first lien credit agreement, dated as of December 10, 2015, by and among Bear Parent Inc., as holdings, Belk, as borrower, certain subsidiaries of Belk, as guarantors, the administrative agent thereunder, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

68.     "*First Lien Term Loan Documents*" means, collectively, the First Lien Term Loan Credit Agreement and all other agreements, documents, and instruments with respect to the First Lien Term Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

69.     "*General Unsecured Claim*" means any Claim that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) a Secured Tax Claim, (d) an Other Secured Claim, (e) a Priority Tax Claim, (f) an Other Priority Claim, (g) an ABL Facility Claim, (h) a First Lien Term Loan Claim, (i) a Second Lien Term Loan Claim, or (j) an Intercompany Claim.

70.     "*GIC*" means Katriona Investment Pte Ltd.

71.     "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

72.     "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

73.     "*Holder*" means an Entity holding a Claim or Interest.

74.     "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

75.     "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place as of the Petition Date, whether in the respective Debtors' bylaws, certificates of incorporation, limited partnership agreements, other formation documents, board resolutions, or contracts for the current and former: members of any Governing Body, directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors.

76.     "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

77.     "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

78.     "*Interest*" means, collectively, (a) any Equity Security, or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity), in any Debtor, (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and (c) any and all Claims that are otherwise determined by the Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest or subject to subordination as an equity interest pursuant to section 510(b) of the Bankruptcy Code.

79.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

80.     "*KKR*" means, collectively, CPS Managers Master Fund L.P., FS KKR Capital Corp, PCOP II Cayman Investors A L.P., Oregon Public Employees Retirement Fund, Prisma SPC Holdings Ltd. – Segregated Portfolio AB, and Prisma SPC Holdings Ltd. – Segregated Portfolio AC.

81.     "*KKR, Blackstone Credit, and GIC Topco Equity Interests*" means, collectively, (a) any and all Topco Equity Interests held by KKR; (b) any and all Topco Equity Interests held by Blackstone Credit; and (c) any and all Topco Equity Interests held by GIC.

82.     "*Lender Backstop Parties*" means those certain First Lien Term Lenders and Second Lien Term Lenders that have committed to backstop the New FLFO New Money Loans and are signatories to the Backstop Commitment Letter.

83.     "*Lender Backstop Commitment Premium*" means Cash equal to 10.00% of the aggregate principal amount of the New FLFO New Money Loans committed by the Lender Backstop Parties pursuant to the terms of the Backstop Commitment Letter.

84.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

85.     "*New ABL Credit Agreement*" means the loan agreement memorializing the New ABL Facility (which may be effectuated through an amendment and restatement of the ABL Credit Agreement), the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Debtors, the Agent thereunder, and the New ABL Facility Lenders, *provided* that any terms of the New ABL Credit Agreement that are materially inconsistent with the ABL Credit Agreement shall be in form and substance reasonably acceptable to the Required Consenting Lenders and the Consenting Sponsors.

86.     "*New ABL Facility*" means the refinanced ABL Facility or a replacement asset-based loan facility to be provided to the Reorganized Debtors in accordance with the terms and conditions set forth in the New ABL Facility Documents.

87.     "*New ABL Facility Agent*" means the administrative agent under the New ABL Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New ABL Credit Agreement.

88.     "*New ABL Facility Documents*" means, collectively, the New ABL Credit Agreement and any other agreements or documents related to or executed in connection with the New ABL Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof, *provided* that any terms of the New ABL Facility Documents that are materially inconsistent with the ABL Credit Agreement shall be in form and substance reasonably acceptable to the Required Consenting Lenders and the Consenting Sponsors; *provided*, *further*, that with the consent of the ABL Agent and unless expressly provided otherwise herein or in the New ABL Facility Documents, all ABL Loan Documents shall be deemed to be New ABL Facility Documents.

89.     "*New ABL Facility Lenders*" means the lenders party to the New ABL Credit Agreement.

90.     "*New Board*" means the board of directors or similar Governing Body of Reorganized Belk Holdings.

91.     "*New Common Stock*" means the common stock, limited liability company membership units, or functional equivalent thereof of Reorganized Belk Holdings.

92.      "*New Credit Agreements*" means, collectively, the New First Lien Credit Agreement and the New Second Lien Credit Agreement.

93.      "*New Credit Facilities*" means, collectively, the New First Lien Credit Facility and the New Second Lien Credit Facility.

94.      "*New Credit Facilities Documents*" means, collectively, the New First Lien Credit Facility Documents and the New Second Lien Credit Facility Documents.

95.      "*New Credit Facility Lenders*" means, collectively, each New First Lien Credit Facility Lender and New Second Lien Credit Facility Lender.

96.      "*New D&O Tail Coverage*" means reasonably sufficient "tail" or "runoff" liability insurance policy coverage that provides (a) coverage for the six-year period following the Effective Date for the benefit of the Reorganized Debtors and all current and former members of any Governing Body, directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors with coverage with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing policies applicable to such Persons upon placement, or (b) such other coverage terms as are otherwise acceptable to the Debtors, the Required Consenting Lenders, and the Consenting Sponsors.

97.      "*New First Lien Credit Agreement*" means the loan agreement memorializing the New First Lien Credit Facility, which shall be entered into by one or more of the Reorganized Debtors, the Agent thereunder, and the New First Lien Credit Facility Lenders, and may be effectuated through an amendment and restatement of the First Lien Term Loan Credit Agreement.

98.      "*New First Lien Credit Facility*" means the new first lien secured term loan facility in the aggregate principal amount of up to $1.12 billion to be provided to the Reorganized Debtors in accordance with the terms and conditions set forth in the New First Lien Credit Facility Documents.

99.      "*New First Lien Credit Facility Agent*" means the administrative agent and collateral agent under the New First Lien Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New First Lien Credit Agreement.

100.     "*New First Lien Credit Facility Documents*" means, collectively, the New First Lien Credit Agreement and any other agreements or documents related to or executed in connection with the New First Lien Credit Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

101.     "*New First Lien Credit Facility Lenders*" means the lenders party to the New First Lien Credit Agreement.

102.     "*New FLFO Loans*" means the "first lien first-out" term loans provided under the New First Lien Credit Facility on the terms and conditions set forth in the New First Lien Credit Facility Documents.

103.     "*New FLFO Loans Commitment Premium*" means New FLSO Loans equal to 25.00% of the principal amount of First Lien Term Loans (as reduced by the amount of New FLFO Roll-Up Loans received by the holder of such First Lien Term Loan Claims) held by each First Lien Term Lender that funds its ratable share of the New FLFO New Money Loans on the Effective Date.

104.     "*New FLFO New Money Loans*" means $225 million of New FLFO Loans provided under the New First Lien Credit Facility on terms and conditions set forth in the New First Lien Credit Facility Documents.

105.     "*New FLFO Roll-Up Loans*" means $75 million of New FLFO Loans provided under the New First Lien Credit Facility on terms and conditions set forth in the New First Lien Credit Facility Documents.

106.     "*New FLSO Loans*" means the "first lien second-out" term loans provided under the New First Lien Credit Facility on the terms and conditions set forth in the New First Lien Credit Facility Documents.

107.     "*New Organizational Documents*" means the documents providing for corporate governance of Reorganized Belk Holdings, Reorganized Belk, and the other Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the RSA (and subject to the consent, approval, and consultation rights set forth therein) and reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

108.     "*New Second Lien Credit Agreement*" means the loan agreement memorializing the New Second Lien Credit Facility, which shall be entered into by one or more of the Reorganized Debtors, the Agent thereunder, and the New Second Lien Credit Facility Lenders, and may be effectuated through an amendment and restatement of the Second Lien Term Loan Credit Agreement.

109.     "*New Second Lien Credit Facility*" means the new second lien secured term loan facility in the aggregate principal amount of $110 million to be provided to the Reorganized Debtors in accordance with the terms and conditions set forth in the New Second Lien Credit Facility Documents.

110.     "*New Second Lien Credit Facility Agent*" means the administrative agent under the New Second Lien Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New Second Lien Credit Agreement.

111.     "*New Second Lien Credit Facility Documents*" means, collectively, the New Second Lien Credit Agreement and any other agreements or documents related to or executed in connection with the New Second Lien Credit Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

112.     "*New Second Lien Credit Facility Lenders*" means the lenders party to the New Second Lien Credit Agreement.

113.     "*New Second Lien Term Loans*" means $110 million of second lien term loans provided under the New Second Lien Credit Facility on the terms and conditions set forth in the New Second Lien Credit Facility Documents.

114.     "*New Shareholders Agreement*" means the shareholders agreement or other applicable agreement (including all annexes, exhibits, and schedules thereto) governing the New Common Stock, which agreement shall be substantially consistent with the applicable term sheet or substantially in the form included in the Plan Supplement and reasonably acceptable to the Debtors, the Consenting Sponsors, and the Required Consenting Lenders.

115.     "*New Term Loans*" means, collectively, the New FLFO Loans, the New FLSO Loans, and the New Second Lien Term Loans.

116.     "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

117.     "*Other Secured Claim*" means any Secured Claim against the Debtors other than an ABL Facility Claim, a First Lien Term Loan Claim, or a Second Lien Term Loan Claim

118.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

119.     "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

120.     "*Plan"* means this *Joint Prepackaged Plan of Reorganization of Belk, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement, which is incorporated herein by reference.

121.     "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

122.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than one (1) Business Day after the Petition Date, including the following, as applicable:  (a) the New Organizational Documents; (b) the identity and members of the New Board and any executive management for the Reorganized Debtors; (c) the Schedule of Retained Causes of Action; (d) the New ABL Credit Agreement; (e) the New Credit Agreements; (f) the Description of Transaction Steps; (g) the New Shareholders Agreement; and (h) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, which shall each be in form and substance reasonably acceptable to the Required Consenting Stakeholders.

123.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

124.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

125.     "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals reasonably estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B of the Plan.

126.     "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

127.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

11

128. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

129. "*Pro Rata*" means, unless otherwise specified, the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

130. "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

131. "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors. For the avoidance of doubt, the current and former members of each Governing Body (and their attorneys and other professionals retained by them in their capacity as members of a Governing Body) are Related Parties of the Debtors.

132. "*Released Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Crossover Lender Group; (e) each member of the Ad Hoc First Lien Term Lender Group; (f) each Company Party; (g) each Agent; (h) each ABL Lender; (i) each First Lien Term Lender; (j) each Second Lien Term Lender; (k) all Holders of Interests; (l) each Backstop Party; (m) each Sponsor; (n) each New Credit Facility Lender; (o) each New ABL Facility Lender; and (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q); and (q) each Related Party of each Entity in clause (a) through this clause (q); provided that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation of the Plan.

133. "*Releasing Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Crossover Lender Group; (e) each member of the Ad Hoc First Lien Term Lender Group; (f) each Company Party; (g) each Agent; (h) each ABL Lender; (i) each First Lien Term Lender; (j) each Second Lien Term Lender; (k) all Holders of Claims; (l) all Holders of Interests; (m) each Sponsor; (n) each Backstop Party; (o) each New Credit Facility Lender; (p) each New ABL Facility Lender; and (q) each current and former Affiliate of each Entity in clause (a) through the following clause (r); and (r) each Related Party of each Entity in clause (a) through this clause (r); provided that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation of the Plan.

134. "*Reorganized Belk*" means Belk, as reorganized pursuant to and in accordance with the Plan, and any successor(s) thereto.

135. "*Reorganized Belk Holdings*" means the parent entity of the Reorganized Debtors, after giving effect to the Restructuring Transactions, which for the avoidance of doubt may be Fashion Holdings Intermediate LLC or a Belk Acquiring Entity.

136.    "*Reorganized Debtors*" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any Belk Acquiring Entities.

137.    "*Required Consenting First Lien Term Lenders*" means, as of the relevant date, Consenting First Lien Term Lenders holding at least 50.1% of the aggregate principal amount of First Lien Term Loans that are held by Consenting First Lien Term Lenders, which, for the avoidance of doubt, shall include (a) Consenting First Lien Term Lenders holding at least 50.1% of the aggregate principal amount of First Lien Term Loans held by Consenting First Lien Term Lenders represented by Willkie Farr & Gallagher LLP; and also (b) Consenting First Lien Term Lenders holding at least 50.1% of the aggregate principal amount of First Lien Term Loans held by Consenting First Lien Term Lenders represented by O'Melveny & Myers LLP.

138.    "*Required Consenting Lenders*" means, collectively, as of the applicable date of determination, the Required Consenting First Lien Term Lenders and the Required Consenting Second Lien Term Lenders.

139.    "*Required Consenting Second Lien Term Lenders*" means, as of the relevant date, Consenting Second Lien Term Lenders holding at least 50.01% of the aggregate outstanding principal amount of Second Lien Term Loans that are held by Consenting Second Lien Term Lenders.

140.    "*Required Consenting Stakeholders*" means, collectively, the Required Consenting Lenders and the Consenting Sponsors.

141.    "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of:  (a) (i) Willkie Farr & Gallagher LLP, as counsel to the Ad Hoc Crossover Lender Group, (ii) any local counsel to the Ad Hoc Crossover Lender Group, and (iii) PJT Partners LP, as investment banker to Willkie Farr & Gallagher LLP in connection with its representation of the Ad Hoc Crossover Lender Group; (b) (i) O'Melveny & Myers LLP, as counsel to the Ad Hoc First Lien Term Lender Group, (ii) any local counsel to the Ad Hoc First Lien Term Lender Group, and (iii) Evercore LLC, as investment banker to O'Melveny & Myers LLP in connection with its representation of the Ad Hoc First Lien Term Lender Group, (c) Latham & Watkins, LLP, as counsel to the Consenting Sponsors; and (d) (i) Morgan, Lewis & Bockius LLP, as counsel to the ABL Agent and (ii) any local counsel to the ABL Agent, in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties or by the applicable Consenting Stakeholders, as the case may be, without further order of, or application to, the Bankruptcy Court by such consultant or professionals.

142.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

143.    "*RSA*" means that certain Restructuring Support Agreement by and among the Debtors and the other parties thereto, as may be amended, modified, or supplemented from time to time in accordance with its terms.

144.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time with the consent of the Required Consenting Lenders, the Consenting Sponsors, and the Debtors (such consent not to be unreasonably withheld).

145.    "*Second Lien Term Lender*" means any Holder of a Second Lien Term Loan Claim.

146.  "*Second Lien Term Loan*" means any loan outstanding under the Second Lien Term Loan Credit Agreement.

147.  "*Second Lien Term Loan Claim*" means any and all Claims arising under, derived from, or based upon the Second Lien Term Loan Credit Agreement or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the Second Lien Term Loan Credit Agreement) including accrued and unpaid interest on account of such Obligations as of the Effective Date (with interest to be calculated at the applicable rate, including default interest from and after the Petition Date); *provided* that the amount of any such Claim shall first be reduced by the amount of any accrued and unpaid interest and amortization on the principal amount of such Claim that is paid in Cash on the Effective Date.

148.  "*Second Lien Term Loan Credit Agreement*" means that certain second lien credit agreement, dated as of December 10, 2015, by and among Bear Parent Inc., as holdings, Belk, as borrower, certain subsidiaries of Belk, as guarantors, the administrative agent and collateral agent thereunder, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

149.  "*Second Lien Term Loan Documents*" means, collectively, the Second Lien Term Loan Credit Agreement and all other agreements, documents, and instruments with respect to the Second Lien Term Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

150.  "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

151.  "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

152.  "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

153.  "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

154.  "*Sponsor Backstop Party*" means the investment funds managed by, or other Affiliates (excluding any of the Debtors or Reorganized Debtors) of, Sycamore Partners Management, L.P., whose name(s) are listed on the signature pages to the Backstop Commitment Letter.

155.  "*Sponsor*" means, collectively, each investment fund managed by, or other Affiliate (excluding any of the Debtors or Reorganized Debtors) of, Sycamore Partners Management, L.P., in each case, in their capacity as indirect holders of Interests.

156.  "*Term Lender*" means each First Lien Term Lender and Second Lien Term Lender.

157.  "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

158.  "*Topco Equity Interests*" means, collectively, (a) any equity or other ownership interest in Fashion Topco; and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights,

restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such equity interest or other ownership interest in Fashion Topco.

159.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

160.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

B.    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents (as defined in the RSA) or any amendments thereto; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, limited liability company agreement, by-law, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur

pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan, and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan or any Plan Supplement document, the Confirmation Order shall control.

H.      *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the RSA set forth in the RSA with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and be fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.     *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.     *Professional Fee Claims.*

1.     Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2.     Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.     Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional

17

does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

    4.   Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.    *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided, however,* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post- Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such

18

Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| Class 9 | Interests | Impaired | Entitled to Vote |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.   Class 1 - Other Secured Claims

(a)   *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

(b)   *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, at the option of the applicable Debtor or Reorganized Debtor, either:

(i)     payment in full in Cash of its Allowed Class 1 Claim;

(ii)    the collateral securing its Allowed Class 1 Claim;

(iii)   Reinstatement of its Allowed Class 1 Claim; or

(iv)    such other treatment rendering its Allowed Class 1 Claim Unimpaired in

accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 - Other Priority Claims</u>

(a)    *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

(b)    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 - ABL Facility Claims</u>

(a)    *Classification*:  Class 3 consists of any ABL Facility Claims against any Debtor.

(b)    *Allowance*:  On the Effective Date, the ABL Facility Claims shall be Allowed in the aggregate principal amount of $383,000,000, plus accrued and unpaid interest on such principal amount through the Petition Date, amounts drawn under existing letters of credit, and fees and other expenses arising under or in connection with the ABL Credit Agreement.

(c)    *Treatment*:  On the Effective Date, unless otherwise agreed by a Holder of an Allowed ABL Facility Claim, each Holder of an Allowed ABL Facility Claim shall, at the election of such Holder, receive (i) payment in Cash of its Allowed ABL Facility Claim and replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement; or (ii)(x) its Pro Rata share of refinanced loans under the New ABL Facility in an amount equal to the principal amount of ABL Facility Claims held by such Holder as of the Effective Date, and (y) Cash in an amount equal to the accrued but unpaid non-default interest payable to such Holder under the ABL Credit Agreement as of the Effective Date (if any).

(d)    *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4. <u>Class 4 - First Lien Term Loan Claims</u>

    (a)    *Classification*:  Class 4 consists of any First Lien Term Loan Claims.

    (b)    *Allowance*:  On the Effective Date, the First Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $999,400,000, plus accrued and unpaid interest on such principal amount through the Effective Date and any fees and other expenses arising under or in connection with the First Lien Term Loan Credit Agreement.

    (c)    *Treatment*:  On the Effective Date, each Holder of an Allowed First Lien Term Loan Claim shall receive, in full and final satisfaction of such Claim, New FLSO Loans in a principal amount equal to 55.0% of such Holder's Allowed First Lien Term Loan Claim; *provided*, that all accrued and unpaid amortization and interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Effective Date.

    (d)    *Voting:*  Class 4 is Impaired under the Plan and Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. <u>Class 5 - Second Lien Term Loan Claims</u>

    (a)    *Classification*:  Class 5 consists of any Second Lien Term Loan Claims.

    (b)    *Allowance*:  On the Effective Date, the Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $550,000,000, plus accrued and unpaid interest on such principal amount through the Effective Date and any fees and other expenses arising under or in connection with the Second Lien Term Loan Credit Agreement.

    (c)    *Treatment*:  On the Effective Date, each Holder of an Allowed Second Lien Term Loan Claim shall receive, in full and final satisfaction of such Claim:  (i) New FLSO Loans in a principal amount equal to 15.0% of such Holder's Allowed Second Lien Term Loan Claim;  (ii) New Second Lien Term Loans in a principal amount equal to 20.0% of such Holder's Allowed Second Lien Term Loan Claim; and (iii) its Pro Rata share of 34.9% of the New Common Stock; *provided*, that all accrued and unpaid interest (at the default rate) on the principal amount of such Claim through the Petition Date shall be paid in full in Cash on the Effective Date.

    (d)    *Voting:*  Class 5 is Impaired under the Plan and Holders of Allowed Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. <u>Class 6 - General Unsecured Claims</u>

    (a)    *Classification*:  Class 6 consists of all General Unsecured Claims.

    (b)    *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim and at the Debtors' sole discretion, either:

(i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or

(ii) payment in full in Cash on (A) the Effective Date, or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(c)   *Voting:*  Class 6 is Unimpaired under the Plan.  Holders of Claims in Class 6 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

7.   Class 7 - Intercompany Claims

(a)   *Classification:*  Class 7 consists of all Intercompany Claims.

(b)   *Treatment:*  Intercompany Claims shall be, at the option the Reorganized Debtors, either:   (i) Reinstated;  or (ii) distributed, contributed, set off, cancelled and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors.

(c)   *Voting:*  Class 7 is Unimpaired if the Class 7 Claims are Reinstated or Impaired if the Class 7 Claims are cancelled.  Holders of Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

8.   Class 8 - Intercompany Interests

(a)   *Classification:*  Class 8 consists of all Intercompany Interests.

(b)   *Treatment:*  Intercompany Interests shall be, at the option of the Reorganized Debtors, either:   (i) Reinstated;  or (ii) cancelled and released without any distribution on account of such Interests.

(c)   *Voting*:  Class 8 is Unimpaired if the Class 8 Interests are Reinstated or Impaired if the Class 8 Interests are cancelled.  Holders of Class 8 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 8 Interests are not entitled to vote to accept or reject the Plan.

9.   Class 9 – Interests

(a)   *Classification:*  Class 9 consists of all Interests in Fashion Holdings Intermediate LLC.

(b)   *Treatment:* On the Effective Date, all Interests will be Reinstated, subject to dilution on account of the New Common Stock, and the legal, equitable, and contractual rights to which holders of Interests are entitled shall otherwise remain unaltered.

       (c)     *Voting*:  Class 9 is Impaired under the Plan and Holders of Allowed Interests in Class 9 are entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.     *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the RSA, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection (as applicable), enforceability, priority or extent of the ABL Facility Claims, the First Lien Term Loan Claims, the Second Lien Term Loan Claims, or the Interests, (2) any claim to avoid, subordinate, or disallow any ABL Facility Claims, First Lien Term Loan Claims, Second Lien Term Loan Claims, or Interests, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction, including those transactions set forth in the Description of Transaction Steps, and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, as applicable, the issuance, transfer, or cancellation of any securities, notes, instruments, certificates, and other documents required to be issued, transferred, or cancelled pursuant to the Plan or any Restructuring Transaction, subject to the terms of the RSA.  Reorganized Belk shall be the borrower under the New Credit Facilities and the New ABL Facility, and Reorganized Belk Holdings shall be the issuer of New Common Stock to the applicable Holders of Claims and Interests as set forth herein and in the applicable Definitive Documentation.  On the Effective Date, 15.0% of the New Common Stock shall also be distributed on a pro rata basis to the First Lien Term Lenders and the Second Lien Term Lenders (based on such First Lien Term Lender's or Second Lien Term Lender's funded amount of the New FLFO New Money Loans as a proportion of $125 million) that participate in the New FLFO New Money Loans.

On the Effective Date, KKR, Blackstone Credit, and GIC shall be deemed to have waived all legal, equitable, and contractual interests in the KKR, Blackstone Credit, and GIC Topco Equity Interests, and

the KKR, Blackstone Credit, and GIC Topco Equity Interests shall be cancelled and released without any distribution on account of such Topco Equity Interests.

The actions to implement the Restructuring Transactions may include, in accordance with the consent rights in the RSA: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.      *The Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents, in each case, in accordance with the terms set forth in the New Shareholders Agreement.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

D.      *Sources of Consideration for Plan Distributions.*

1.      New ABL Facility.

On the Effective Date, the Reorganized Debtors shall enter into the New ABL Facility, the terms of which will be set forth in the New ABL Facility Documents.  Confirmation of the Plan shall be deemed approval of the New ABL Facility and the New ABL Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New ABL Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New ABL Facility.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, extended and/or reaffirmed (including in connection with any ABL Facility Claims that are refinanced by the New ABL Facility) in accordance with the New ABL Facility Documents (a) shall be deemed to be granted, carried forward, continued, amended, extended and/or reaffirmed, (b) shall be continuing, legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New ABL Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New ABL Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order

(it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2. New First Lien Credit Facility.

On the Effective Date, the Reorganized Debtors shall enter into the New First Lien Credit Facility, the terms of which will be set forth in the New First Lien Credit Facility Documents. Confirmation of the Plan shall be deemed approval of the Backstop Commitment Letter, the New First Lien Credit Facility, and the New First Lien Credit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees (including the New FLFO Loans Commitment Premium, the Lender Backstop Commitment Premium, and the other fees and premiums and other consideration described herein and in the Backstop Commitment Letter), indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New First Lien Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New First Lien Credit Facility. For the avoidance of doubt, the New First Lien Credit Agreement may be effectuated through an amendment and restatement of the First Lien Term Loan Credit Agreement. Execution of the New First Lien Credit Agreement by the New First Lien Credit Facility Agent shall be deemed to bind all Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims as if each such Holder had executed the New First Lien Credit Agreement with appropriate authorization.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, or extended in accordance with the New First Lien Credit Facility Documents shall, as applicable, (a) be deemed to be granted, carried forward, continued, amended, or extended to secure the New First Lien Credit Facility, (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Credit Facility Documents, (c) be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New First Lien Credit Facility Documents, and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The New Term Loans to be issued under the New First Lien Credit Facility will consist of (a) New FLFO Loans in the aggregate principal amount of $300 million, consisting of New FLFO New Money Loans and New FLFO Roll-Up Loans; and (b) New FLSO Loans in the aggregate principal amount of up to $822 million. On the Effective Date, the roll-up of First Lien Term Loans with New FLFO Roll-Up Loans shall take place immediately prior to any distribution of New FLSO Loans on account of the First Lien Term Loan Claims.

Each Term Lender may participate in the New FLFO New Money Loans on behalf of some or all funds or accounts managed or advised by such Term Lender, or some or all funds or accounts managed or

advised by the investment manager or advisor of such Term Lender, or any affiliate thereof, and may allocate its participation in the New FLFO New Money Loans among such funds or accounts in its sole discretion.

The Lender Backstop Parties have committed to backstop $125 million in the aggregate principal amount of the New FLFO New Money Loans.  The Sponsor Backstop Party has committed to backstop $100 million in the aggregate principal amount of the New FLFO New Money Loans.  To the extent the total subscriptions by the New Credit Facility Lenders that are First Lien Term Lenders or Second Lien Term Lenders exceed the applicable New FLFO New Money Loan commitments allocated to the applicable group of the New Credit Facility Lenders, the excess amount would first reduce the funding commitments not subscribed by their respective First Lien Term Lender or Second Lien Term Lender group on a dollar for dollar basis (if any), with the remaining excess amount to reduce the New FLFO New Money Loan funding commitments that are backstopped by the Sponsor Backstop Party on a dollar for dollar basis; *provided*, that such oversubscription by First Lien Term Lenders and Second Lien Term Lenders and corresponding reduction of New FLFO New Money Loan commitments will be limited (on a ratable basis) such that the Sponsor Backstop Party's funded aggregate principal amount of New FLFO New Money Loans shall in no event be below $65 million; provided, further that such First Lien Term Lenders or Second Lien Term Lenders may elect to limit any such oversubscription to reduction of the First Lien Term Lenders' and Second Lien Term Lenders' New FLFO New Money Loan commitments.

On the Effective Date, as consideration for the Lender Backstop Parties' respective Backstop Commitments: (a) each Lender Backstop Party shall receive its pro rata share (based on such Lender Backstop Party's proportionate share of the aggregate Backstop Commitments of all of the Lender Backstop Parties) of the Lender Backstop Commitment Premium; and (b) each First Lien Term Lender that is also a Lender Backstop Party shall receive its pro rata share of $30 million of the New FLFO Roll-Up Loans (based on such First Lien Term Lender's proportionate share of the Backstop Commitments in respect of the two-thirds of the $125 million of the New FLFO New Money Loans backstopped by the Lender Backstop Parties that are First Lien Term Lenders).

Each First Lien Term Lender that funds at least its pro rata share of two-thirds of $125 million of the New FLFO New Money Loans shall receive on the Effective Date as consideration for its commitment to fund the New FLFO New Money Loans (a) its pro rata share (based on such First Lien Term Lender's total funding of New FLFO New Money Loans out of two-thirds of $125 million of New FLFO New Money Loans) of $45 million of the New FLFO Roll-Up Loans; and (b) a New FLFO Loans Commitment Premium.[2]  The Reorganized Debtors shall not treat distributions pursuant to the Plan of amounts or loans described in this Article IV.D.2 as giving rise to withholding under section 1441 of the Internal Revenue Code, except (a) as required by a change in applicable law after the date hereof, or (b) with respect to any Holder of a Claim of Interest, if such Holder fails to provide an IRS Form W-9 or W-8 establishing an exemption from withholding under section 1441 of the Internal Revenue Code with respect to payments of interest.

   3.   <u>New Second Lien Credit Facility</u>.

On the Effective Date, the Reorganized Debtors shall enter into the New Second Lien Credit Facility, the terms of which will be set forth in the New Second Lien Credit Facility Documents. Confirmation of the Plan shall be deemed approval of the New Second Lien Credit Facility and the New

---

[2]   In addition to the foregoing, a supplemental fee of $12 million will be paid to and divided between certain Consenting First Lien Term Lenders pursuant to the terms and conditions set forth in the Backstop Commitment Letter.

Second Lien Credit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Second Lien Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Second Lien Credit Facility. For the avoidance of doubt, the New Second Lien Credit Agreement may be effectuated through an amendment and restatement of the Second Lien Term Loan Credit Agreement. Execution of the New Second Lien Credit Agreement by the New Second Lien Credit Facility Agent shall be deemed to bind all Holders of Second Lien Term Loan Claims as if each such Holder had executed the New Second Lien Credit Agreement with appropriate authorization.

On the Effective Date, all of the claims, Liens, and security interests to be granted, carried forward, continued, amended, or extended in accordance with the New Second Lien Credit Facility Documents shall, as applicable, (a) be deemed to be granted, carried forward, continued, amended, or extended to secure the New Second Lien Credit Facility, (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Second Lien Credit Facility Documents, (c) be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Second Lien Credit Facility Documents, and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

4. <u>New Common Stock</u>.

Reorganized Belk Holdings shall be authorized to issue a certain number of shares, units, or other interests of New Common Stock pursuant to its New Organizational Documents and the New Shareholders Agreement. On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan and the applicable Definitive Documentation.

All of the shares, units, or other interests constituting New Common Stock issued pursuant to the Plan, the New Shareholders Agreement, and the Definitive Documentation shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

E. *Corporate Existence.*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in

effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except with respect to the New Credit Facilities, the New ABL Facility, the First Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan), the First Lien Term Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New First Lien Credit Facility or the First Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan)), the Second Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan), the Second Lien Term Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New Second Lien Credit Facility or the Second Lien Term Loan Credit Agreement (if amended and restated in connection with consummation of the Plan)), the ABL Credit Agreement (if amended and restated, refinanced or deemed to be reaffirmed in connection with the New ABL Facility), the ABL Loan Documents (including any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest granted in connection therewith that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, to secure the New ABL Facility or the New ABL Credit Agreement (if amended and restated in connection with consummation of the Plan)), or to the extent otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.

H.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors; (3) the issuance of the New Common Stock and entry into the New Shareholders Agreement; (4) implementation of the Restructuring Transactions; (5) entry into the New Credit Facilities Documents and the New ABL Facility Documents; (6) all other actions contemplated under the Plan (whether to occur before, on, or after

the Effective Date); (7) adoption of the New Organizational Documents; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the New Credit Facilities, the New Credit Facilities Documents, the New ABL Facility, the New ABL Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  Additionally, each recipient of New Common Stock shall execute the New Shareholders Agreement as soon as reasonably practicable, provided, however, that on the Effective Date, each recipient of New Common Stock shall be deemed to be a party to the New Shareholders Agreement without the need for execution of the New Shareholders Agreement by such recipient.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.      *New Organizational Documents.*

        Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the terms set forth in the New Shareholders Agreement and the corporate laws of the respective state, province, or country of incorporation.  The New Organizational Documents will prohibit the issuance of non-voting Equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.

J.      *Directors and Officers of Reorganized Debtors.*

        As of the Effective Date, the term of the current members of the Debtors' respective Governing Bodies shall expire, and the members for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Shareholders Agreement.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Shareholders Agreement, and other constituent documents of the Reorganized Debtors.

K.      *Effectuating Documents; Further Transactions.*

        On and after the Effective Date, the Reorganized Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.      *Certain Securities Law Matters*

The issuance and distribution of the Securities as contemplated by Articles III and IV.D of the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Such Securities will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

M.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the New Credit Facilities or the New ABL Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.      *Employee Matters.*

Unless otherwise provided herein, and subject to Article V of the Plan, the Reorganized Debtors shall assume all employment agreements, indemnification agreements, or other agreements with current and former members of any Governing Body, employees, officers, directors, or managers of the Debtors. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

O.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically

enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

P.      *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and any contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any,

including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.      *Indemnification Obligations.*

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

On or before the Effective Date, the Reorganized Debtors shall and are authorized to procure the New D&O Tail Coverage. For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective. The Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.C, shall**

**be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

E.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

F.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

G.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or

accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent.*

1.  Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.  Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.  Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.  Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3.  Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of

New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding.

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

E.   *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.   *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

G.   *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.   *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and

without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

J.    *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.    *Claims Paid or Payable by Third Parties.*

1.    <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.    <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers

agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.   *Disputed Claims Process*.

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan.  Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty.  **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.   *Allowance of Claims*.

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.     *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.     *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.     *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.    **Release of Liens.**

**Except as otherwise provided in the New Credit Facilities Documents (including to the extent any First Lien Term Loan Documents or Second Lien Term Loan Documents are amended and restated or deemed to be New Credit Facilities Documents, including in connection with any pre-existing mortgage, deed of trust, Lien, pledge, or other security interest that shall be carried forward, continued, amended, or extended with respect to the Reorganized Debtors' assets, as set forth under the New Credit Facilities Documents), the New ABL Facility Documents (including with respect to the ABL Facility, to the extent any ABL Loan Documents are amended and restated or deemed to be New ABL Facility Documents), this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.      *Releases by the Debtors.*

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Stakeholders), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related

provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**D.**     *Releases by Holders of Claims and Interests.*

Notwithstanding anything contained in this Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documentation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the New Credit Facilities, the ABL Facility, the New ABL Facility, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the

foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New Credit Facilities Documents and the New ABL Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

*E.*     *Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or

**regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

F.      *Injunction.*

**Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

G.      *Setoff and Recoupment Rights Preserved.*

Notwithstanding anything to the contrary, nothing shall modify the rights, if any, of any Holder of Claims or any current or former party to an Executory Contract or Unexpired Lease, to assert any right of setoff or recoupment that such party may have under applicable non-bankruptcy law.

H.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

*J.*     *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

*A.*     *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.   the Bankruptcy Court shall have entered the Confirmation Order and such order shall (a) be in form and substance reasonably acceptable to the Debtors, the Required Consenting Stakeholders, and the ABL Agent, and (b) not have been reversed, stayed, dismissed, or vacated;

2.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.   the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent with the RSA and the Plan, and the Definitive Documentation shall have been executed and/or effectuated and contain certain terms, conditions, representations, warranties, and covenants consistent with the terms of the RSA (as applicable) and shall be in a form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders;

4.   all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

5.   the RSA and the Backstop Commitment Letter shall remain in full force and effect;

6.   all fees and premiums payable pursuant to the RSA and the Backstop Commitment Letter shall have been paid;

7.   entry into the New Credit Facilities Documents, and all conditions precedent to the consummation of such New Credit Facilities Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New Credit Facilities Documents shall have occurred;

8.   entry into the New ABL Facility Documents, and all conditions precedent to the consummation of such New ABL Facility Documents, shall have been waived or satisfied in accordance with their terms thereof and the closing of such New ABL Facility Documents shall have occurred;

9.  the New Common Stock shall have been issued by Reorganized Belk Holdings;

10. the Reorganized Debtors shall have procured or become insured under the New D&O Tail Coverage;

11. to the extent invoiced, the payment in cash in full of all Restructuring Expenses;

12. there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory or administrative agency or instrumentality, domestic or foreign, or by any other person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Debtors, the Required Consenting Lenders, and the Consenting Sponsors would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

13. an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall not have been enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors, the Consenting Sponsor, and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions; and

14. the Debtors shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the RSA and the Plan.

B.    *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Lenders and the Consenting Sponsors (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that the conditions relating to the ABL Facility Claims, solely as they relate to the ABL Facility Claims, may only be waived with the consent of the ABL Agent.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Except as otherwise specifically provided in the Plan and to the extent permitted by the RSA, the Debtors reserve the right to modify the Plan with the prior written consent of the Consenting Sponsors and the Required Consenting Lenders (such consent not to be unreasonably withheld), whether such

modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that any modification relating to the ABL Facility Claims, solely as such modifications relate to the ABL Facility Claims, may only be waived with the consent of the ABL Agent.  Subject to those restrictions on modifications set forth in the RSA and the Plan, and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

        Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

        To the extent permitted by the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

        Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

        1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

        2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

        3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor

may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

15.     enter an order concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court; and

23.     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New ABL Facility shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, and subject to and consistent in all respects with the terms of the RSA, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the RSA.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      if to the Debtors, to:

Belk, Inc.
2801 West Tyvola Road
Charlotte, North Carolina 28217
Attention:          Stacy S. Gray, Senior Vice President and General Counsel
E-mail address:     Stacy_Gray@belk.com

*with a copy (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

|           |                               |
|-----------|-------------------------------|
| Attention: | Joshua A. Sussberg, P.C.     |
|           | Steven N. Serajeddini, P.C.   |
|           | Judson A. Oswald, P.C.        |
|           | Matthew Fagen                 |
|           | Yuli Wang                     |
|           | Rachael Bazinski              |
| E-mail address: | joshua.sussberg@kirkland.com |
|           | steven.serajeddini@kirkland.com; |
|           | judson.oswald@kirkland.com;   |
|           | matthew.fagen@kirkland.com;   |
|           | yuli.wang@kirkland.com;       |
|           | rachael.bazinski@kirkland.com |

2.      if to the Ad Hoc First Lien Term Lender Group:

To each member of the Ad Hoc First Lien Term Lender Group at the addresses or e-mail addresses set forth in such member's signature page to the RSA or a joinder thereto, as the case may be.

*with a copy (which shall not constitute notice) to*:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036

|           |                     |
|-----------|---------------------|
| Attention: | Joseph Zujkowski   |
|           | Daniel Shamah       |
|           | Adam P. Haberkorn   |
| E-mail address: | jzujkowski@omm.com |
|           | dshamah@omm.com     |
|           | ahaberkorn@omm.com  |

     -and-

O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

|           |                     |
|-----------|---------------------|
| Attention: | David J. Johnson Jr. |
| E-mail address: | djohnson@omm.com |

3.      if to the Ad Hoc Crossover Lender Group:

To each member of the Ad Hoc Crossover Lender Group at the addresses or e-mail addresses set forth in such member's signature page to the RSA or a joinder thereto, as the case may be.

*with a copy (which shall not constitute notice) to*:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:      Matthew Feldman
               Weston T. Eguchi
               Debra Sinclair
E-mail address:  mfeldman@willkie.com
               weguchi@willkie.com
               dsinclair@willkie.com

4.      if to the Consenting Sponsors, to:

To each Consenting Sponsor at the addresses or e-mail addresses set forth in such Consenting Sponsor's signature page to the RSA or a joinder thereto, as the case may be.

*with a copy (which shall not constitute notice) to*:

Latham & Watkins, LLP
885 3rd Avenue
New York, New York 10022
Attention:      George A. Davis
               Michael W. Benjamin
               Joshua A. Tinkelman
               Ted A. Dillman
               Ebba Gebisa
E-mail address:  george.davis@lw.com
               michael.benjamin@lw.com
               joshua.tinkelman@lw.com
               ted.dillman@lw.com
               ebba.gebisa@lw.com

5.      if to the ABL Agent, to:

Bank of America, N.A.
100 Federal Street
Boston, Massachusetts 02110
Attention:      Christine Hutchinson
E-mail address:  christine.hutchinson@bofa.com

*with a copy (which shall not constitute notice) to*:

Morgan, Lewis & Bockius LLP
One Federal Street
Boston, Massachusetts 02110
Attention:      Julia Frost-Davies
               Marjorie S. Crider
               Christopher L. Carter
E-mail address:  julia.frost-davies@morganlewis.com
               marjorie.crider@morganlewis.com
               christopher.carter@morganlewis.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.     *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.     *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.     *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/belk or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.     *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, *provided*, that any such deletion or modification must be consistent with the RSA; and (3) nonseverable and mutually dependent.

L.     *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the

Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

Promptly after the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  February 23, 2021

BELK, INC.
on behalf of itself and all other Debtors

*/s /William Langley*

William Langley
Authorized Representative
Belk, Inc.