**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BELK, INC., *et al.,*[1] | ) | Case No. 21-30630 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF WILLIAM LANGLEY,
CHIEF FINANCIAL OFFICER OF BELK, INC., IN
SUPPORT OF CONFIRMATION OF THE JOINT PREPACKAGED
PLAN OF REORGANIZATION OF BELK, INC. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, William Langley, hereby declare under penalty of perjury as follows:

<u>**Background and Qualifications**</u>

1.        I am the Chief Financial Officer of Belk, Inc. ("<u>Belk</u>" and together with its affiliated debtors and debtors in possession, the "<u>Debtors</u>").  I joined Belk in 2005 and have served as Belk's Chief Financial Officer since April 2020.  Before serving as Belk's Chief Financial Officer, I served in various roles in Belk's accounting department, strategic sourcing department, financial planning and analysis department, and risk management department before serving as Belk's Treasurer in 2016.  I received bachelor's degrees in accounting and finance and a master's degree in accounting from Appalachian State University.  In my capacity as Chief Financial Officer, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/belk. The location of the Debtors' service address is 2801 West Tyvola Road, Charlotte, North Carolina 28217.

2.      I submit this declaration (this "Declaration") in support of confirmation of the *Joint Prepackaged Plan of Reorganization of Belk, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)*, filed contemporaneously herewith (as modified, amended, or supplemented from time to time, the "Plan").[2]   Except where specifically noted, the statements in this Declaration are based upon:  (a) my personal knowledge of the Debtors' operations, business affairs, financial performance, and restructuring efforts; (b) information learned from my review of relevant documents; and (c) information I have received from other members of the Debtors' management or the Debtors' advisors.

3.      I am authorized to submit this declaration on behalf of the Debtors, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## The Proposed Restructuring

4.      Amid the COVID-19 pandemic and general market-related challenges, significant cash interest obligations, and declining liquidity, the Debtors determined that a comprehensive restructuring was necessary to best position their business for long-term success.   In November 2020, the Debtors entered into negotiations with certain of their prepetition term loan lenders and the Sponsor to explore potential transactions.  These negotiations proved successful: On January 26, 2021, the Debtors, the Sponsor, the Ad Hoc Crossover Group, and the Ad Hoc First Lien Term Lender Group (together, the "Ad Hoc Groups") reached agreement on the terms of a comprehensive restructuring.

5.      The Plan and the RSA provide the Debtors with a clear and viable path to execute an orderly, value-maximizing restructuring on an expedited timeline that will minimize disruptions to the Debtors' business operations.   The restructuring transactions embodied in the Plan will

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

eliminate approximately $450 million of the Debtors' prepetition funded debt obligations, materially reduce the Debtors' go-forward debt service, and provide the Reorganized Debtors with $225 million in new money term loans. Importantly, this will allow the Debtors to satisfy all trade, customer, and other non-funded debt claims in full in the ordinary course of business, continue to employ their approximately 17,000 employees, and keep all 291 store locations open.

### The Debtors' Need to Quickly Emerge From Chapter 11

6.      The Debtors are seeking to confirm the Plan at the first-day hearing. Given the overwhelming support for the Plan and the Debtors' extreme cash shortage, the Debtors and their key stakeholders elected to pursue a prepackaged restructuring on a quick but properly-noticed timeline that significantly benefits all parties by minimizing potential uncertainty, impact on the Debtors' business, and implementation costs.

7.      As of the Petition Date, the Debtors have limited to no cash reserves on hand or committed debtor-in-possession financing. Additionally, the milestones under the RSA require that the Debtors obtain confirmation of the Plan by February 24, 2021. Accordingly, it is imperative that the Debtors obtain confirmation of the Plan at the first-day hearing and that Restructuring Transactions be implemented promptly thereafter. Because the Plan (a) has been accepted by holders of 99% of First Lien Term Loan Claims (Class 4), 100% of Second Lien Term Loan Claims (Class 5) and 100% of the Interests in Debtor Fashion Holdings Intermediate LLC (Class 9); and (b) pays all other non-funded debt claims in full, a prolonged stay in chapter 11 will not only jeopardize the value-maximizing restructuring, but will also put the entire enterprise at significant risk, which could result in the loss of approximately 17,000 jobs and the closing of 291 stores.

**The Debtors Have Provided Sufficient Notice to Obtain Confirmation of Their Plan**

8.       The Debtors have taken all appropriate procedural steps to provide sufficient notice to all stakeholders of the proposed restructuring and the anticipated timeline of these prepackaged chapter 11 cases. Specifically, the Debtors have taken the following actions to provide notice:

- On January 26, 2021, the Debtors launched solicitation of the Plan and distributed the Plan, the Disclosure Statement, and ballots to all members of the voting classes.

- On January 26, 2021, the Debtors posted the Plan, Disclosure Statement, RSA, and a notice of the proposed restructuring, the anticipated case timeline, and related procedural matters (the "Confirmation Hearing Notice") to Prime Clerk's public website.

- On January 26, 2021, the Debtors served the Confirmation Hearing Notice on all reasonably known parties in interest and potential parties in interest, consisting of more than 90,000 parties, directing interested parties to review the Plan and Disclosure Statement on Prime Clerk's public website.

- On January 29, 2021, a short-form version of the Confirmation Hearing Notice was published in the *New York Times (National Edition)* and in the *Charlotte Observer*.

- On February 9, 2021, the Debtors posted proposed forms of certain of the first-day pleadings on Prime Clerk's public website.

- On February 18, 2021, the Debtors posted the Plan Supplement to Prime Clerk's public website; the Debtors also served notice of the posting of the Plan Supplement and the first-day pleadings on the parties in interest.

- On February 22, 2021, the Debtors posted a supplement to the Plan Supplement and proposed forms of the Debtors' confirmation materials to Prime Clerk's public website; the Debtors also served notice of the posting of the supplement to the Plan Supplement and the proposed forms of the confirmation materials on the parties in interest.

**The Plan Enjoys Unanimous Voting Support**

9.       Pursuant to the RSA, the Debtors solicited votes on the prepackaged Plan in advance of the Petition Date, beginning on January 26, 2021.  The Plan enjoys unanimous support among all voting stakeholders.  Holders of approximately 99% in principal amount of First Lien Term Loan Claims (Class 4), Holders of 100% in principal amount of Second Lien Term Loan

Claims (Class 5), and the Holder of 100% of Interests (Class 9) have voted to accept the Plan. The

Debtors did not receive a single vote to reject the Plan, as reflected in the below chart:[3]

| Voting Class | Class Name | Percentage Voting (#) | Percentage Voting ($) | Percentage Accept (#) | Percentage Accept ($) |
|---|---|---|---|---|---|
| 4 | First Lien Term Loan Claims | 96.88% | 99.07% | 100% | 100% |
| 5 | Second Lien Term Loan Claims | 100% | 100% | 100% | 100% |
| 9 | Interests | 100% | 100% | 100% | 100% |

10.     The Debtors received a handful of informal comments on the Plan, all of which have

been resolved in advance of the combined hearing to consider approval of the Disclosure Statement

and confirmation of the Plan (the "Confirmation Hearing").  Contemporaneously herewith, the

Debtors have filed a proposed confirmation order (the "Proposed Confirmation Order") and all

necessary documentation in support of confirmation of the Plan.  The Proposed Confirmation Order

includes all language agreed upon to resolve informal comments on the Plan.  Additionally, the

Debtors received only two objections to the Plan, one of which the Debtors have consensually

resolved with the inclusion of language in the Proposed Confirmation Order.  The Debtors expect

to resolve the one remaining objection, asserted by the Louisiana Department of Revenue, prior to

the Confirmation Hearing.

11.     The Debtors believe the proposed restructuring is fair and equitable, maximizes

stakeholder value, and represents the best path forward for Belk.  And all of the Debtors' principal

---

[3]     *See Declaration of Craig E. Johnson of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Prepackaged Plan of Reorganization of Belk, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (the "Voting Report").

stakeholders share this view.  I believe the Plan is in the best interests of the Debtors and all their stakeholders and that, accordingly, the Court should confirm the Plan.  Additionally, given the extensive and proper notice provided to the Debtors' stakeholders of the proposed restructuring and timeline, the unanimous voting support for the Plan, and the minimal comments and objections submitted by parties in interest, all of which are expected to be resolved before the Confirmation Hearing (if not already resolved), I believe confirmation of the Plan at the first-day hearing is justified.

**The Plan Satisfies the Confirmation Requirements**

12.     For the reasons detailed below and with the assistance of the Debtors' advisors, I believe the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a plan of reorganization.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of other evidence introduced at the Confirmation Hearing.

**I.     THE PLAN FULLY COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE — § 1129(A)(1).**

**A.     Proper Classification of Claims and Interests — § 1122.**

13.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into nine separate classes, with each class differing from the Claims and Interests in each other class in a legal or factual nature or based on other relevant criteria.

14.     Valid business, legal, and factual reasons justify the separate classification of the particular claims or interests into the classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  In particular, Claims on account of the Debtors' secured credit facilities are classified separately from general unsecured claims because

the Debtors' obligations with respect to the former are secured by liens on substantially all assets of the obligors.  In addition, Claims (rights to payment) are classified separately from Interests (representing ownership in the business).

**B.      Designation of Classes of Claims and Equity Interests — § 1123(a)(1).**

15.      It is my testimony that Article III of the Plan properly designates classes of Claims and Interests.  The Plan meets this requirement because the Claims or Interests in each class are substantially similar to the other Claims or Interests in such class.

**C.      Specification of Unimpaired Classes — § 1123(a)(2).**

16.      It is my testimony that the Plan identifies each class in Article III that is Unimpaired.

**D.      Treatment of Impaired Classes — § 1123(a)(3).**

17.      It is my testimony that the Plan sets forth the treatment of each class in Article III that is Impaired.

**E.      Equal Treatment of Similarly Situated Claims and Interests — § 1123(a)(4).**

18.      It is my understanding that Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests in such Holder's respective class.

**F.      Means for Implementation — § 1123(a)(5).**

19.      I believe that the Plan provides adequate means for implementation.  The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provides for the means by which the Plan will be implemented.  Among other things, Article IV of the Plan:

      i.      constitutes a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan;

ii.   authorizes the applicable Debtors or Reorganized Debtors to take all actions necessary or appropriate to effectuate the Plan;

iii.   provides for the Reorganized Debtors' adoption of their respective New Organizational Documents;

iv.   provides for the Reorganized Debtors' entry into the New ABL Facility, the New First Lien Credit Facility, and the New Second Lien Credit Facility;

v.   provides for Reorganized Belk Holdings' issuance of the New Common Stock;

vi.   preserves each Debtor's separate legal existence as of and after the Effective Date;

vii.   provides for the vesting of estate assets in the Reorganized Debtors;

viii.   provides for the cancellation of certain existing securities and agreements (except as otherwise provided therein);

ix.   authorizes and approves all organizational actions contemplated under the Plan without any requirement for further action by the equityholders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable;

x.   provides for the designation and appointment of the New Board in accordance with the terms set forth in the New Shareholders Agreement;

xi.   authorizes the Reorganized Debtors and the New Board to execute and deliver implementing agreements and documents to effectuate the Restructuring Transactions;

xii.   exempts the issuance and distribution of securities as contemplated by the Plan from registration requirements under any applicable securities laws;

xiii.   exempts transfers of property under the Plan or in connection with the Plan's consummation from all taxes and governmental assessments, to the fullest extent permitted by section 1146(a) of the Bankruptcy Code; and

xiv.   provides for the preservation and vesting of certain Causes of Action in the Reorganized Debtors.

20.     The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement.

**G.     Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6).**

21.     I can confirm that Article IV.I of the Plan provides that the Reorganized Debtors' New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code and further, that the New Organizational Documents filed with the Plan Supplement do in fact contain such a prohibition.

**H.     Selection of Officers and Directors — § 1123(a)(7).**

22.     I believe that the Plan is consistent with the interests of all stakeholders with respect to the manner of selection of directors to the New Board.

23.     I can confirm that Article IV.J of the Plan sets forth the structure of the New Board, the initial members of which will be designated and appointed in accordance with the terms set forth in the New Shareholders Agreement.  Additionally, the members of the New Board and the officers of the Reorganized Debtors will be disclosed in advance of the Confirmation Hearing, to the extent known at that time.

**I.     The Debtors Proposed the Plan in Good Faith — § 1129(a)(3).**

24.     I believe that the Plan was proposed in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing business, and to enable the Debtors to reorganize and achieve a fresh start.  It is my testimony that the Plan is the product of extensive arm's-length negotiations among the Debtors, the Ad Hoc Groups, and the Sponsor.  The Plan's unanimous support by the voting classes is strong evidence that the Plan is likely to succeed.

**J.      Payment of Professional Fees and Expenses Are Subject to Court Approval — § 1129(a)(4).**

25.      It is my understanding that section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by a debtor, or by a person receiving distributions of property under the plan, be approved by the Court as reasonable or remain subject to approval by the Court as reasonable.  I can confirm that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code.  Article II.B of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 45 days after the Effective Date, thereby providing an adequate period of time for interested parties' to review such Professional Fee Claims.

**K.      Compliance with Governance Disclosure Requirements — § 1129(a)(5).**

26.      To the best of my knowledge, the Debtors, to the extent reasonably practicable, will make all appropriate disclosures regarding the identities and affiliations of all persons proposed to serve on the New Board as well as those persons that will serve as officers of the Reorganized Debtors, in advance of the Confirmation Hearing, to the extent known at that time.

**L.      Governmental Regulatory Approval of Rate Changes — § 1129(a)(6).**

27.      It is my understanding that Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change (*e.g.*, the price of utility services) provided for in the plan.  No such rate changes are provided for in the Plan.

**M.      Best Interests Test — § 1129)(a)(7).**

28.      It is my understanding that the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each class under the Plan.

The projected recoveries under the Plan as set forth in the Disclosure Statement are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation, and it is therefore my understanding that the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

**N.    Classes Unimpaired Under or Accepting the Plan — § 1129(a)(8).**

29.    I understand that each Impaired class of Claims or Interests entitled to vote on the Plan (Classes 4, 5, and 9) voted to accept the Plan.  Holders of Intercompany Claims in Class 7 and Holders of Intercompany Interests in Class 8 are deemed to have either accepted or rejected the Plan and thus were not entitled to vote.

**O.    Priority Cash Payments — § 1129(a)(9).**

30.    It is my understanding that the Bankruptcy Code generally requires that claims entitled to administrative priority must be repaid in full in cash or receive certain other specified treatment.  I can confirm that the Plan provides that each holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time defined in Article II.A of the Plan.  In addition, no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.  Finally, the Plan specifically provides that each holder of Allowed Priority Tax Claims shall be paid in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**P.    Impaired Accepting Class of Claims — § 1129(a)(10).**

31.    It is my understanding that the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.  I understand that each Impaired class of Claims entitled

to vote on the Plan (Classes 4 and 5) voted overwhelmingly to accept the Plan, independent of any insiders' votes.

**Q.    The Plan Is Feasible — § 1129(a)(11).**

32.    I believe that the Plan will provide the Debtors with a reasonable assurance of commercial viability upon emergence, and will not be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors.  The Plan will reduce the Debtors' funded debt by approximately $450 million and provide the Debtors with $225 million of new money financing.  This deleveraging and infusion of new money will position the Reorganized Debtors for post-emergence success.  Additionally, as set forth in the Disclosure Statement, the Debtors prepared projections of the Debtors' financial performance through January 2024.  I reviewed the Financial Projections while they were being prepared, and I agree with the analysis employed.  The Financial Projections, attached to the Disclosure Statement as Exhibit C, were prepared based on the assumptions that the Effective Date is February 26, 2021, and that the Plan will be implemented in accordance with its stated terms.

33.    In connection with proposing the Plan and presenting the Plan to the Court for Confirmation, the Debtors thoroughly analyzed their ability to meet their respective obligations under the Plan and to continue as a going concern without the need for further financial restructuring.  I believe that the Financial Projections included in the Disclosure Statement demonstrate that the Debtors will be well-positioned when they emerge from chapter 11 to execute their business plan and to service their debt obligations.

**R.    The Plan Provides for Payment of All Fees — § 1129(a)(12).**

34.    It is my testimony that Article XII.C of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter until these chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

II.     **THE PRINCIPAL PURPOSE OF THE PLAN IS NOT THE AVOIDANCE OF TAXES AS REQUIRED UNDER SECTION 1129(D) OF THE BANKRUPTCY CODE.**

35.     The Plan has not been filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended.  Moreover, no party that is a governmental unit, or any other entity, has requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.  Rather, the Debtors filed the Plan to accomplish their objective of efficiently and responsibly reorganizing their capital structure and providing recoveries to their stakeholders.

III.    **THE PLAN APPROPRIATELY INCORPORATES SETTLEMENT OF CLAIMS AND CAUSES OF ACTION.**

36.     The Plan embodies a settlement of certain claims and causes of action between the Debtors and all major parties in interest.  The Plan resolves a host of potential claims and causes of action, which were thoroughly analyzed by the Debtors, the Consenting Stakeholders, and their advisors, all of which are highly uncertain to succeed and could cause extensive delay, cost, and uncertainty in these chapter 11 cases and otherwise.

        A.     **The Debtors' Release and Consensual Third-Party Release Are Appropriate.**

37.     I believe that the Debtors' releases and third-party releases contained in the Plan are appropriate, justified, in the best interests of the stakeholders, and an integral part of the Plan. Article VIII.C of the Plan includes releases of Estate claims and Causes of Action by the Debtors (the "Debtors' Release").   The Debtors' Release releases, among others, each Consenting Stakeholder, each member of the Ad Hoc Crossover Lender Group, each member of the Ad Hoc First Lien Term Lender Group, each Agent, each ABL Lender, each Term Lender, each Backstop Party, each Sponsor, each New Credit Facility Lender, each New ABL Facility Lender, and each

current and former Affiliate and Related Party of any of the foregoing.  The Released Parties made significant concessions and contributions to the chapter 11 cases in exchange for the Debtors' Release.

38.     Moreover, based on the Debtors' analysis, the Debtors' Release greatly benefits the Debtors' Estates, and the probability of success in litigation with respect to claims the Debtors may have against any of the Released Parties is low.  Any potential claims against the Released Parties are exceedingly complex and, even if successful, may be difficult to collect in light of the sophisticated nature of the underlying transactions and certain structural barriers.  Tellingly, all voting classes have overwhelmingly voted in favor of the Plan, which includes the Debtors' Release.  Finally, the Plan, including the Debtors' Release, was heavily negotiated by sophisticated entities that were represented by able advisors.  I believe that the result is a compromise that reflects the give-and-take of a true arm's-length negotiation process.

39.     Further, I believe that the Debtors' Release provides the Debtors and the Released Parties with a substantial level of finality upon which to build a fresh start.  Moreover, the Debtors' Release is a central component of the restructuring and are key to bringing the core parties to the deal.  In return, under the terms of the RSA and the Plan, the Debtors will: (a) eliminate approximately $450 million of prepetition funded debt obligations from the Debtors' balance sheet, (b) receive an infusion of $225 million of new money, and (c) pay all prepetition trade claims in full in the ordinary course.  This result would be impossible without the concessions of the Released Parties embodied in the Plan.  These substantial contributions enabled the successful, expeditious administration of these chapter 11 cases and will facilitate the Debtors' emergence from these chapter 11 cases and avoid potentially costly and time-consuming litigation.

Accordingly, I believe that the Debtors' Release is fair, equitable, and in the best interest of the Debtors and their Estates.

40.     Further, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the boards of directors of Belk, Inc. and Bear Parent Inc. (the "Boards") established special committees (the "Special Committees") and appointed independent and disinterested directors Jill Frizzley and Steven Panagos to each Special Committee.  The Special Committees were delegated sole decision-making authority with respect to potential conflicts matters that might arise between each Debtor entity and its respective equityholders, Affiliates (as applicable), or directors and officers.  The Special Committees engaged Quinn Emanuel Urquhart & Sullivan, LLP, as legal counsel, and M-III Advisory Partners, LP, as financial advisor, to assist in the discharge of their duties.

41.     I understand that the Special Committees and their professionals conducted an extensive prepetition investigation into potential claims against certain parties that would be released by the Debtors pursuant to the Plan.  I also understand that, following the Special Committees' independent investigation, the Special Committees have determined to support the Restructuring Transactions embodied by the RSA and the Plan, including the Debtors' Release.

42.     Article VIII.D of the Plan also contains a third party release provision (the "Third-Party Release").  It provides that each Releasing Party—including all Holders of Claims that do not specifically opt out of their inclusion as a Releasing Party or object to the Third-Party Release—will release any and all Claims and Causes of Action (including a list of specifically enumerated claims) such parties could assert against the Debtors, the Reorganized

Debtors, and the Released Parties.[4]  The Debtors provided ample notice of the Third-Party Release to all parties in interest.  The ballots sent to all stakeholders entitled to vote on the Plan, the Confirmation Hearing Notice transmitted to all parties in interest and published in the *New York Times (National Edition)* and the *Charlotte Observer* on January 29, 2021, and the Non-Voting Status Notice and Opt-Out Form transmitted to all Holders of non-voting Claims or Interests (other than Intercompany Claims and Intercompany Interests) all expressly state in capitalized text that the Plan includes the Third-Party Release and that holders of Claims or Interests that do not opt out of or timely object to the Third-Party Release will be bound by it.  Additionally, the ballots, the Confirmation Hearing Notice, and the Non-Voting Status Notice and Opt-Out Form all contain the full text of the Third-Party Release.

43.    The Third-Party Release is consensual because parties were given the opportunity to opt out and the Debtors have agreed to carve out all parties that specifically and timely objected (whether formally or informally) to their inclusion as a Releasing Party under the Third-Party Release.  The Third-Party Release is integral to the Plan and a condition of the comprehensive settlement embodied therein.  Indeed, the value-maximizing Restructuring Transactions would not be possible without the support and substantial contributions of the Released Parties.  Thus, I believe that the Third-Party Release is in the best interests of the Debtors and their Estates, and it allows the Debtors to obtain the finality they need by minimizing the potential for distracting post-emergence litigation or other disputes.

44.    The releases of the Debtors' officers and Governing Body members are an integral component of the compromises and settlements contained in the Plan.  The Debtors' officers and

---

[4]    The foregoing description is meant as a summary of the operative Plan provisions only.  Certain of the Releasing Parties are defined as such in multiple capacities.  To the extent there is any conflict between the foregoing summary and the definition of "Releasing Party" contained in Article I of the Plan, the Plan will control.

Governing Body members:  (a) made a substantial and valuable contribution to the Debtors' restructuring and the estates; (b) invested significant time and effort to make the restructuring a success and preserve the value of the Debtors' estates in a challenging environment; (c) attended numerous meetings related to the restructuring; (d) met frequently and directed the restructuring negotiations that led to the RSA and the Plan; and (e) are entitled to indemnification from the Debtors under state law, organizational documents, and agreements.  Litigation by the Debtors against the Debtors' officers and Governing Body members would be a distraction to the Debtors' business and would decrease rather than increase the value of the Estates.

45.     The Sponsor and the other Consenting Stakeholders also made substantial contributions to the restructuring process, including by negotiating and entering into the RSA, committing to fund the New FLFO New Money Loans and support the other Restructuring Transactions, supporting the Debtors' efforts to pursue and obtain Confirmation of the Plan, investing significant time and effort to make the Debtors' restructuring a success and preserve the value of the Debtors' Estates in a challenging environment, and, in the Sponsor's case, agreeing to a substantial dilution of Sponsor's indirect holding of Interests.  Additionally, the Sponsor will maintain a majority ownership interest in the reorganized company and will continue to provide the Debtors with valuable retail experience and expertise in the industry.  The releases of the Sponsor and the other Consenting Stakeholders contained in the Plan have the consent of the Debtors and the Releasing Parties and are in the best interest of the Debtors' Estates.

46.     The Third-Party Release was also given for consideration.  Holders of General Unsecured Claims will be paid in full or otherwise unimpaired under the Plan.  The contributions of all of the Released Parties will allow the Debtors to continue their business as a going concern, despite challenging operating conditions, and maximize value to all stakeholders.  The Third-Party

Release contained in the Plan has the consent of the Debtors and the Releasing Parties and is in the best interest of the Debtors' Estates.

**B.      The Exculpation Provision Is Appropriate.**

47.      Article VIII.E of the Plan provides that each Exculpated Party shall be released and exculpated from any Cause of Action arising out of acts or omissions in connection with these Chapter 11 Cases and certain related transactions, except for acts or omissions that are determined to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation Provision").[5]  The Exculpated Parties include the Debtors, each Company Party, each Consenting Stakeholder, any official committees appointed in the Chapter 11 Cases and each of their respective members, and each current and former Affiliate of each of the aforementioned entities.

48.      I understand that, in addition to the Debtors, each of the exculpated Related Parties—including the Governing Body members, officers, and advisors that have acted on the Debtors' behalf in these chapter 11 cases—owe duties in favor of the Debtors' estates.  The Governing Body members, officers, and other agents and advisors have (a) made substantial and valuable contributions to the Debtors' restructuring and the estates, (b) invested significant time and effort to make the restructuring a success and preserve the value of the Debtors' estates in a challenging environment, (c) attended numerous meetings related to the restructuring, (d) met frequently and directed the restructuring negotiations that led to the entry into the RSA and support of the Plan, and (e) are entitled to indemnification from the Debtors under state law, organizational documents, and agreements.  The Governing Body members and officers have also gone to great

---

[5]      The foregoing description is a summary of the operative Plan provisions only.  To the extent there is any conflict between the foregoing summary and the definition of "Exculpated Party" contained in Article I of the Plan, the Plan shall control.

lengths and were integral to ensure that the Debtors' business continued to operate smoothly during the chapter 11 cases, thereby preserving value for the benefit of all stakeholders.

49.     I can confirm that the Exculpation Provision represents an integral piece of the overall settlement embodied by the Plan and is the product of good faith, arm's-length negotiations.  Accordingly, I believe the Exculpation Provision should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 23, 2021                        /s/  *William Langley*
_____
                                                              William Langley
                                                              Chief Financial Officer
                                                              Belk, Inc.