**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BELK, INC., *et al.*,[1] | ) | Case No. 21-30630 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING FIRST SUPPLEMENT TO PLAN SUPPLEMENT
FOR THE DEBTORS' JOINT PREPACKAGED PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, as contemplated by the *Joint Prepackaged Plan of Reorganization of Belk, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 10] (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan"),[2] on February 23, 2021, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the plan supplement (as may be amended, modified, or supplemented from time to time, the "Original Plan Supplement") with the United States Bankruptcy Court for the Southern District of Texas (the "Court") on February 23, 2021 [Docket No. 38].

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this first supplement to the Original Plan Supplement (the "First Amended Plan Supplement," and together with the Original Plan Supplement, the "Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that the First Amended Plan Supplement includes the following documents:

| | |
|---|---|
| **Exhibit A** | Schedule of Retained Causes of Action |
| **Exhibit C** | Form of New First Lien Credit Facility Documents |
| **Exhibit D** | Form of New ABL Facility Documents |
| **Exhibit E** | Form of Second Lien Credit Facility Documents |
| **Exhibit G** | Form of New Shareholders Agreement |

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan and/or the RSA, to

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/belk. The location of the Debtors' service address is 2801 West Tyvola Road, Charlotte, North Carolina 28217.

[2] Capitalized terms used but not defined in herein have the meanings given to them in the Plan.

alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan and Disclosure Statement are accessible now, free of charge, on the Debtors' restructuring website, https://cases.primeclerk.com/belk.  Copies of the Plan and the Disclosure Statement may also be obtained upon request of the Debtors' proposed co-counsel, Kirkland & Ellis LLP and Jackson Walker LLP, at the respective addresses specified herein.  The Plan and Disclosure Statement are available for inspection for a fee on PACER at www.pacer.gov (account required) and are on file with the Clerk of the Court, 5th Floor, 515 Rusk Street, Houston, Texas 77002, where they will be available for review between the hours of 8:00 a.m. to 5:00 p.m., prevailing Central Time.

Houston, Texas
February 24, 2021

*/s/ Kristhy M. Peguero*

Kristhy M. Peguero (TX Bar No. 24102776)
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          kpeguero@jw.com
                mcavenaugh@jw.com


*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                steven.serajeddini@kirkland.com
                matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**Certificate of Service**

I certify that on February 24, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Kristhy M. Peguero
Kristhy M. Peguero

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BELK, INC., *et al.,*[1] | ) | Case No. 21-30630 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FIRST SUPPLEMENT TO PLAN SUPPLEMENT FOR THE DEBTORS'**
**JOINT PREPACKAGED PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

### Table of Contents

| | |
|---|---|
| **Exhibit A** | Schedule of Retained Causes of Action |
| **Exhibit C** | Form of New First Lien Credit Facility Documents |
| **Exhibit D** | Form of New ABL Facility Documents |
| **Exhibit E** | Form of Second Lien Credit Facility Documents |
| **Exhibit G** | Form of New Shareholders Agreement |

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/belk.   The location of the Debtors' service address is 2801 West Tyvola Road, Charlotte, North Carolina 28217.

## Exhibit A

### Schedule of Retained Causes of Action

Article IV.O of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Article IV.O of the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Causes of Action, including the following types of claims:

**I.        Claims Related to Insurance Policies.**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

**II.       Claims Related to Taxing Authorities.**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all tax obligations to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, including, without limitation, against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or the Reorganized Debtors, regardless of whether such Entity is specifically identified herein.

**III.      Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation.**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto.

**IV.      Claims Related to Contracts and Leases.**

Unless otherwise released by the Plan, the Debtors and Reorganized Debtors, as applicable, expressly reserve Causes of Action based in whole or in part upon any and all contracts and leases and similar instruments, to which any of the Debtors or Reorganized Debtors is a party or pursuant to which any of the Debtors or Reorganized Debtors has any rights whatsoever (regardless of whether such contract or lease is specifically identified in the Plan, this Plan Supplement, or any amendments thereto), including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors. The claims and Causes of Action reserved include, but are not limited to, Causes of Action against vendors, suppliers of goods and services, lessors, lessees, and licensees, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, reimbursement, or setoff; (b) for

wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

## V.      Claims Related to Accounts Receivable and Accounts Payable.

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them. The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

## VI.      Claims Related to Deposits, Adequate Assurance, and Other Collateral Postings.

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein.

**VII.        Claims Related to Liens.**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.

Schedule A-1

Claims Related to Real Estate Leases

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk Department Stores LP | A-L 95 Creekside Town Center, LP | c/o NewQuest Properties<br>8827 W. Sam Houston Parkway N.<br>Houston, Texas 77040 | Creekside Lease |
| Belk Department Stores LP | Alpha Lake, Ltd. | 1700 George Bush Drive East<br>Suite 240<br>College Station, Texas 77840 | River Hills Mall Lease |
| Belk Department Stores LP | ATC Investors, LP | P.O. Box 301501<br>Dallas, Texas 75303-1501 | Alliance Town Center Lease |
| Belk Department Stores LP | Bre Retail Residual Greeneville Commons Owner LLC | c/o Brixmor Property Group<br>420 Lexington Avenue, Floor 13<br>New York, New York 10017 | Greeneville Commons Lease |
| Belk Department Stores LP | BVA Avenue SPE LLC | c/o Big V Properties, LLC<br>162 North Main St., Suite 5<br>Florida, New York 10921 | The Avenue Murfreesboro Lease |
| Belk Department Stores LP | College Square TEI Equities LLC | c/o Time Equities, Inc.<br>55 Fifth Avenue, 15th Floor<br>New York, New York 10003 | College Square Mall Lease |
| Belk Department Stores LP | Cool Springs Mall, LLC | c/o CBL & Associates Management, Inc. CBL Center, Suite 500<br>2030 Hamilton Place Boulevard<br>Chattanooga, Tennessee 37421 | CoolSprings Galleria Lease |
| Belk Department Stores LP | Delplace and Co., G.P. | c/o Fletcher Bright Company<br>537 Market Street Suite 400<br>Chattanooga, Tennessee 37402 | Belk Plaza Lease |
| Belk Department Stores LP | Dunhill Property Management Services, Inc. | 3100 Monticello Avenue, Suite 300<br>Dallas, Texas 75205 | Robertson's Creek Lease |
| Belk Department Stores LP | Foothills Mall Equities LLC | c/o Time Equities, Inc.<br>55 Fifth Avenue, 15th Floor, New York, New York 10003 | Foothills Mall Lease |
| Belk Department Stores LP | Glade Inline 1, LLC | 6723 Weaver Road<br>Suite 108<br>Rockford, Illinois 61114 | Glade Parks Shopping Center Lease |
| Belk Department Stores LP | Glimcher MJC, LLC | c/o Washington Prime Group<br>180 East Broad Street, 21st Street<br>Columbus, Ohio 43215 | The Mall @ Johnson City Lease |
| Belk Department Stores LP | Hamilton Place CMBS LLC | 2100 Hamilton Place Blvd Ste 100<br>Chattanooga, Tennessee 37421 | Hamilton Place Lease |
| Belk Department Stores LP | Hart TC I-III, LLC | c/o Heitman Management, LLC<br>191 North Wacker Dr.<br>Chicago, Illinois 60606 | The Pinnacle at Turkey Creek Lease |
| Belk Department Stores LP | Hart TC IV, LLC | c/o Heitman Capital Management LLC<br>191 North Wacker Dr., 25th Floor<br>Chicago, Illinois 60606 | The Pinnacle at Turkey Creek Lease |
| Belk Department Stores LP | Hixson Mall, LLC | c/o CBL & Associates Management, Inc.<br>Suite 500, CBL Center 2030 Hamilton Place Blvd<br>Chattanooga, Tennessee 37421 | Northgate Mall Lease |
| Belk Department Stores LP | JMCR Sherman, LLC | c/o Lincoln Property Company<br>2000 McKinney Avenu, Suite 1000<br>Dallas, Texas 75201 | Sherman Town Center Lease |
| Belk Department Stores LP | Kingsport Mall LLC | c/o Hull Property Group, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Kingsport Town Center Lease |
| Belk Department Stores LP | Lebcon Associates Ltd. | Hamilton Place CMBS LLC<br>PO Box 5559<br>Carol Stream, Illinois 60197-5559 | Hamilton Place Lease |
| Belk Department Stores LP | MD Ruston Properties | Attn: Amanda Watford<br>16851 Jefferson Highway Ste 9A<br>Baton Rouge, Louisiana 70817 | Bradley Square Mall Lease |
| Belk Department Stores LP | Pinnacle North II, LLC | c/o Pinnacle Partners<br>601 State Street, 6th Floor<br>Bristol, Virginia 24201 | The Palladium Lease |
| Belk Department Stores LP | Ramco Providence Marketplace LLC | c/o RPT Realty, L.P.<br>20750 Civic Center Dr., Suite 310<br>Southfield, Michigan 48076 | Providence MarketPlace Lease |
| Belk Department Stores LP | RPAI Southwest Management LLC | 2021 Spring Road<br>Suite 200<br>Oak Brook, Illinois 60523 | Central Texas MarketPlace Lease |
| Belk Department Stores LP | Shopcore Properties | Two Liberty Place, Suite 3325<br>50 South 16th Street<br>Philadelphia , Pennsylvania 19102 | Plaza at Rockwall Lease |
| Belk Department Stores LP | Shops at Broad, LLC | 3060 Peachtree Road, Suite 1050<br>Atlanta, Georgia 30305 | Shops at Broad Lease |
| Belk Department Stores LP | Tabani Natchez Mall, L.P. | c/o Tabani Group, Inc.<br>16600 Dallas Parkway, Suite 300<br>Dallas, Texas 75248 | Natchez Mall Lease |
| Belk Department Stores LP | TN Oak Ridge Rutgers, LLC | c/o RealtyLink Development<br>201 Riverplace, Suite 400<br>Greenville, South Carolina 29601 | Oak Ridge Mall Lease |
| Belk Department Stores LP | Vicksburg Income Properties, LLC | c/o Weiner Development Corporation<br>1445 North Loop West #625<br>Houston, Texas 77008 | Pemberton Square Mall Lease |
| Belk Department Stores LP | Waxahachie TC Partners, Ltd. | c/o Waxahachie Towne Center, c/o Commercial Management Group<br>418 B Street, Suite 200<br>Santa Rosa, California 95401 | Waxahachie Towne Center Lease |
| Belk Department Stores LP | Weatherford Dunhill, LLC. | c/o Dunhill Property Management Services, Inc.<br>3100 Monticello Ave., Suite 300<br>Dallas, Texas 75205 | Weatherford Ridge Lease |
| Belk Department Stores LP | West Town Mall, LLC | c/o Simon Property Group<br>225 West Washington St.<br>Indianapolis, Indiana 46204 | West Town Mall Lease |
| Belk Department Stores LP | West Town Mall, LLC | c/o Simon Property Group, Inc.<br>225 West Washington Street<br>Indianapolis, Indiana 46204 | West Town Mall Lease |
| Belk Department Stores LP | Whitestone Eldorado Plaza, LLC | Whitestone REIT<br>4144 N. Central Expressway, Suite 610<br>Dallas, Texas 75204 | Eldorado Plaza Lease |
| Belk Stores of Mississippi LLC | American National Insurance Company | c/o Jim Wilson and Associates, Inc.<br>2660 East Chase Lane, Suite 100<br>Montgomery, Alabama 36117 | Edgewater Mall Lease |
| Belk Stores of Mississippi LLC | DDR Crossroads Center LLC | c/o Site Centers Corp.<br>3300 Enterprise Parkway<br>Beachwood, Ohio 44122 | Crossroads Center Lease |

Schedule A-1

**Claims Related to Real Estate Leases**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk Stores of Mississippi LLC | Rockstep Meridian LLC | 1445 North Loop West, Suite 625<br>Houston, Texas 77008 | Bonita Lakes Mall Lease |
| Belk Stores of Mississippi LLC | Singing River, LLC | c/o Morrison Companies<br>P.O. Box 86757 (16851 Jefferson Highway, Set 9A - 70817)<br>Baton Rouge, Louisiana 70879 | Singing River Mall Lease |
| Belk Stores of Mississippi LLC | TUP 130, LLC | c/o Brookfield Properties (U) LLC<br>200 Vesey Street, 25th Floor<br>New York, New York 10281 | Mall at Barnes Crossing Lease |
| Belk Stores of Mississippi LLC | TUP 130, LLC | c/o Brookfield Properties (R) LLC<br>200 Vesey Street, 25th Floor<br>New York, New York 10281 | Mall at Barnes Crossing Lease |
| Belk Stores of Mississippi LLC | Turtle Creek Limited Partnership | c/o CBL and Associates Properties,Inc.<br>2030 Hamilton Place Blvd., Suite 500<br>Chattanooga, Tennessee 37421 | Turtle Creek Mall Lease |
| Belk Stores of Virginia LLC | Hupps Mill Plaza Associates, LLC | 12636 Mayfield Road #5<br>Chardon, Ohio 44024 | Hupps Mill Plaza Lease |
| Belk Stores of Virginia LLC | Longwood Village Shopping Centre, LLC | c/o Bailey & Associates, Inc.<br>405 Western Blvd., Suite D<br>Jacksonville, North Carolina 28546 | Longwood Shopping Center Lease |
| Belk Stores of Virginia LLC | Mayflower Apple Blossom, L.P. | 225 W. Washington St.<br>Indianapolis , Indiana 46204 | Apple Blossom Mall Lease |
| Belk Stores of Virginia LLC | News Company, LLC | c/o CSS Management<br>P.O. Box 31827<br>Raleigh, North Carolina 27622 | WindsorMeade Marketplace Lease |
| Belk Stores of Virginia LLC | River Ridge Mall JV, LLC | Liberty University<br>1971 University Blvd<br>Lynchburg, Virginia 24514 | River Ridge Mall Lease |
| Belk Stores of Virginia LLC | Rockstep Christiansburg LLC | c/o RockStep Management<br>1445 North Loop West, Suite 625<br>Houston, Texas 77008 | New River Valley Mall Lease |
| Belk Stores of Virginia LLC | SDG Macerich Properties, L.P. | 115 West Washington Street<br>Indianapolis, Indiana 46204 | Valley Mall Lease |
| Belk Stores of Virginia LLC | Southampton Shopping Center, LP | c/o Bailey & Associates, Inc.<br>405-D Western Blvd<br>Jacksonville, North Carolina 28546 | Southampton Shopping Center Lease |
| Belk Stores of Virginia LLC | Spotslyvania Mall Company | c/o The Cafaro Company<br>5577 Youngstown-Warren Road<br>Niles, Ohio 44446 | Spotsylvania Mall Lease |
| Belk Stores of Virginia LLC | Staunton EM 2 LLC | PO Box 2020<br>Manakin Sabot, Virginia 23103 | Staunton Plaza Lease |
| Belk Stores of Virginia LLC | Suffolk Shopping Center Associates | c/o S.L. Nusbaum Realty Co.<br>PO Box 2491<br>Norfolk, Virginia 23501 | Suffolk Shopping Center Lease |
| Belk Stores of Virginia LLC | Tanglewood Venture, LLC | c/o Blackwater Resources<br>4420-A Electric Road<br>Roanoke, Virginia 24018 | Tanglewood Mall Lease |
| Belk Stores of Virginia LLC | Temecula's Elite, LLC | c/0 IDS Real Estate Group<br>11828 Rancho Bernardo Road, Suite 201<br>San Diego, California 92128 | Claypool Hill Mall  (Cedar Bluff) Lease |
| Belk Stores of Virginia LLC | The Kroger Co. | 1014 Vine Street<br>Cincinnati, Ohio 45202 | Suffolk Shopping Center -Sublease from Kroger |
| Belk Stores of Virginia LLC | The Woodmont Company (M) | Attention: Kim Welborn<br>2100 W. 7th Street<br>Fort Worth, Texas 76107 | Fashion Square Mall Lease |
| Belk Stores of Virginia LLC | Valley View Mall SPE, LLC | c/o CBL & Associates Management, Inc.<br>2030 Hamilton Place Blvd.,Suite 500<br>Chattanooga, Tennessee 37421 | Valley View Mall Lease |
| Belk Stores of Virginia LLC | WHLR-Village of Martinsville, LLC | c/o Wheeler Real Estate LLC, Riversedge North<br>2529 Virginia Beach Blvd.<br>Virginia Beach, Virginia 23452 | Liberty Fair Mall Lease |
| Belk, Inc. | 2505 S Main Street LLC | 5675 Jimmy Carter Blvd, Suite 127<br>Norcross, Georgia 30071 | Sunset Plaza Shopping Center Lease |
| Belk, Inc. | 8401 Michigan Road LLC | c/o Madison Properties<br>3611 14th Ave., Suite 552<br>Brooklyn , New York 11218 | North Station Shopping Center Lease |
| Belk, Inc. | Ahoskie Center, LLC, c/o Coastal Equities | 1840 Main Street, Suite 204<br>600 Old Country Road Suite, 435<br>Weston, Florida 33326 | Ahoskie Commons Lease |
| Belk, Inc. | Alamance Crossing CMBS, LLC | c/o CBL & Associates Management, Inc.<br>1080 Piper Lane<br>Burlington, North Carolina 27215 | Alamance Crossing Lease |
| Belk, Inc. | Alpha Lake, Ltd. | 1700 George Bush Drive East, Suite 240<br>College Station, Texas 77840 | Mirabeau Square Shopping Center Lease |
| Belk, Inc. | Anchor Columbia 2 LLC | c/o Anchor Commercial Development LLC<br>3035 Rhea County Highway, Suite 150<br>Dayton, Tennessee 37321 | Belk Lease |
| Belk, Inc. | Applewood Shopping Center, GP | c/o Providence Group Management Services<br>1616 Camden Road, Suite 550<br>Charlotte, North Carolina 28203 | Applewood Shopping Center Lease |
| Belk, Inc. | Arbor Place II, LLC | c/o CBL & Associates Management, Inc.<br>6700 Douglas Boulevard<br>Douglasville, Georgia 30135 | Arbor Place Mall Lease |
| Belk, Inc. | ARCP MT Morganton NC, LLC | c/o American Realty Capital Properties<br>2325 East Camelback Road, Suite 1100<br>Phoenix, Arizona 85016 | Morganton Heights Lease |
| Belk, Inc. | Asheboro Mall, LLC | Attn:  James M. Hull<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Randolph Mall Lease |
| Belk, Inc. | At Home Stores LLC | 1600 East Plano Parkway<br>Plano, Texas 75074 | Sublease of The Pinnacle at Tutwiler Farm |
| Belk, Inc. | ATC Glimcher | c/o Glimcher Properties Limited Partnership<br>180 East Broad St. 21st Floor<br>Columbus, Ohio 43215 | Ashland Town Center Lease |
| Belk, Inc. | ATC Glimcher | c/o Washington Prime Group<br>180 East Broad St., 21st Floor<br>Columbus, Ohio 43215 | Ashland Town Center Lease |
| Belk, Inc. | Auburn Mall, LLC | c/o Hull Property Group, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Village Mall Lease |

Schedule A-1

Claims Related to Real Estate Leases

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Bainbridge Mall, LLC | c/o In-Rel Properties North LLC<br>200 Lake Avenue, 2nd Floor<br>Lake Worth Beach, Florida 33460 | Bainbridge Mall Lease |
| Belk, Inc. | Bayer Retail Company, LLC | c/o Bayer Properties, LLC<br>2222 Arlington Avenue<br>Birmingham, Alabama 35205 | The Summit Lease |
| Belk, Inc. | Belk Sandhill Property, LLC | c/o Winbrook Management<br>370 7th Avenue, Suite 1600<br>New York, New York 10001 | Village at Sandhill Lease |
| Belk, Inc. | Belk, Inc. | 2801 West Tyvola Rd.<br>Charlotte, North Carolina 28217-4500 | Wilkesboro Lease |
| Belk, Inc. | Belk, Inc. | 2801 West Tyvola Road<br>Charlotte, North Carolina 28217 | Wilkesboro Lease |
| Belk, Inc. | Belk, Inc. | c/o Aronov Realty Management<br>3500 Eastern Blvd. (PO Box 235000, 36123)<br>Montgomery, Alabama 36116 | Albany Mall Lease |
| Belk, Inc. | Berkeley Mall, LLC | 720 S. Lafayette St.<br>P.O. Box 146<br>Shelby, North Carolina 28151 | Berkeley Mall Lease |
| Belk, Inc. | Biggs Park, Incorporated | P.O. Box 967<br>(3550 E. Elizabethtown Road  28358)<br>Lumberton, North Carolina 28358 | Biggs Park Lease |
| Belk, Inc. | Bill Gardner and Rebecca Gardner | d/b/a Stuttgart Square Shopping Center<br>9901 Kleppel<br>Tomball, Texas 77375 | Stuttgart Square Lease |
| Belk, Inc. | Blue Ridge Mall LLC | C/O Hull Property Group, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Blue Ridge Mall Lease |
| Belk, Inc. | Brice Shannon, LLC | P.O. Box 2819<br>10375 Ford Avenue, Suite 3<br>Richmond Hill, Georgia 31324 | Brice Square Lease |
| Belk, Inc. | Brixmor GA Apollo IV Sub LLC | c/o Brixmor Property Group<br>450 Lexington Avenue, Floor 13<br>New York, New York 10017 | Cordele Square Lease |
| Belk, Inc. | Brixmor GA Coastal Way LLC | c/o Brixmor Property Group<br>450 Lexington Avenue, Floor 13<br>New York, New York 10017 | Coastal Way Shopping Center Lease |
| Belk, Inc. | Brixmor Ridgeview, LLC | c/o Brixmor Property Group<br>450 Lexington Avenue, 13th Floor<br>New York, New York 10170 | Ridgeview Centre Lease |
| Belk, Inc. | BVCV High Point, LLC | 901 Pier View Drive, Suite 201<br>Idaho Falls, Idaho 83402 | High Point Town Center Lease |
| Belk, Inc. | C & J Associates | P.O. Box 366<br>Statesville, North Carolina 28687 | Signal Hill Mall Lease |
| Belk, Inc. | C.F. Smith Properties, Inc. | 1227 Rockingham Road<br>Rockingham, North Carolina 28379 | Richmond Plaza Lease |
| Belk, Inc. | Capital Plaza, Inc. | 2286-3 Wednesday Street<br>Tallahassee, Florida 32308 | Gateway Shopping Center Lease |
| Belk, Inc. | Carolina Mall LLC | c/o Hull Storey Retail Group, LLC<br>d/b/a Hull Storey Gibson Companies, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Carolina Mall Lease |
| Belk, Inc. | Carolina Pines II LLC | c/o Culmen Real Estate Services<br>7777 Washington Village Dr., Suite 120<br>Dayton, 45459 | Belk Distribution - Carolina Pines II Lease |
| Belk, Inc. | Carolina Place LLC | c/o Brookfield Properties<br>350 N. Orleans St., Suite 300<br>Chicago, Illinois 60654-1607 | Carolina Place Mall Lease |
| Belk, Inc. | Cary Towne Center Property LLC | c/o CBL & Associates Management, Inc.<br>Suite 500 - CBL Center, 2030 Hamilton Place Blvd.<br>Chattanooga , Tennessee 37421 | Cary Towne Center Lease |
| Belk, Inc. | Casto-Oakbridge Venture LTD | c/o Casto Southeast Realty Services, LLC<br>5391 Lakewood Ranch Boulevard, Suite 100<br>Sarasota, Florida 34240 | Lakeside Village Lease |
| Belk, Inc. | CBL & Associates Management, Inc. | CBL Center, Suite 500<br>2030 Hamilton Place Boulevard<br>Chattanooga, Tennessee 37421-6000 | Hanes Mall Lease |
| Belk, Inc. | CBL & Associates Management, Inc. | CBL Center, Suite 500<br>2030 Hamilton Place Boulevard<br>Chattanooga, Tennessee 37421-6000 | Northgate Mall Lease |
| Belk, Inc. | CBL-Friendly Center, LLC | Suite 500, CBL Center<br>2030 Hamilton Place Boulevard<br>Chattanooga, Tennessee 37421 | Friendly Center Lease |
| Belk, Inc. | CBL-Offices at Friendly, LLC | c/o Friendly Center<br>600 Green Valley Rd, Suite 300<br>Greensboro, North Carolina 27408-7722 | Friendly Center Lease |
| Belk, Inc. | Century Capital Group, LLC | c/o Midtown at Forest Acres<br>3400 Forest Drive, Suite 2048<br>Columbia, South Carolina 29204 | Richland Mall Lease |
| Belk, Inc. | Cherokee Mainstreet, Inc. | R. H. Ledbetter Properties, Inc.<br>1464 Turner McCall Blvd., SW<br>Rome, Georgia 30161 | Main Street Lease |
| Belk, Inc. | Coastal Grand CMBS, LLC | c/o CBL & Associates Management, Inc.<br>2000 Coastal Grand Circle<br>Myrtle Beach, South Carolina 29577 | Coastal Grand Lease |
| Belk, Inc. | Cole MT Salisbury (Wallace Commons II) NC, LLC | c/o VEREIT, Inc.<br>2325 East Camelback Road, Suite 1100<br>Phoenix, Arizona 85016 | Wallace Crossing Lease |
| Belk, Inc. | Cole/Faison MT Bethlehem GA, LLC | c/o VEREIT, Inc.<br>2325 E. Camelback Road, 9th Floor<br>PHoenix, Arizona 85016 | Barrow Crossing Lease |
| Belk, Inc. | Columbiana Centre, LLC | c/o Brookfield Properties<br>350 N. Orleans St., Suite 300<br>Chicago, Illinois 60606 | Columbiana Center Lease |
| Belk, Inc. | Conway Devco DE, L.L.C. | c/o TKG Management<br>211 N. Stadium Blvd., Suite 201<br>Columbia, Missouri 65203 | Conway Commons Lease |
| Belk, Inc. | CoolSprings Mall, LLC | c/o CBL & Associates Management, Inc.<br>CBL Center, Suite 500<br>Chattanooga, Tennessee 37421 | CoolSprings Galleria Lease |

Schedule A-1

**Claims Related to Real Estate Leases**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | CP Venture Five - AV LLC | c/o Poag Shopping Centers, LLC<br>2650 Thousand Oaks Blvd., Suite 2200<br>Memphis, Tennessee 38118 | The Avenue Viera Lease |
| Belk, Inc. | CPG Finance I, LLC | c/o Simon Property Group, L.P.<br>National City Center 225 West Washington Dtreet<br>Indianapolis, Indiana 46204 | Dare Centre Lease |
| Belk, Inc. | CPI-Phipps Limited Liability Company | c/o Simon Property Group<br>225 West Washington Street<br>Indianapolis, Indiana 46204 | Town Center Mall at Cobb Lease |
| Belk, Inc. | CPT Peachtree Forum I, LLC | c/o Bayer Properties, LLC<br>2222 Arlington Avenue<br>Birmingham, Alabama 35205 | The Forum At Peachtree Parkway Lease |
| Belk, Inc. | CR Mount Pleasant, LLC | c/o Continental Realty Corporation<br>1427 Clarkview Road, Suite 500<br>Baltimore, Maryland 21209 | Mt. Pleasant Town Centre Lease |
| Belk, Inc. | Creekstone/Juban I, LLC | 619 Jefferson Highway<br>Suite 2F<br>Baton Rouge, Louisiana 70806 | Juban Crossing Lease |
| Belk, Inc. | Cross Creek Mall SPE, L.P. | c/o CBL & Associates Management, Inc. Suite 500, CBL Center<br>2030 Hamilton Place Boulevard,<br>Chattanooga, Tennessee 37421 | Cross Creek Mall Lease |
| Belk, Inc. | Crossroads Greenville Properties Limited | 10850 Wilshire Blvd, Suite 1250<br>Los Angeles, California 90024 | Crossroads Mall Lease |
| Belk, Inc. | Crossroads Greenville Properties Limited | c/o Tryar Management<br>12300 North Freeway, Suite 208<br>Houston, TX 77060<br><br>and<br><br>10850 Wilshire Boulevard, Suite 1050<br>Los Angeles, California 90024 | Crossroads Mall Lease |
| Belk, Inc. | CSMC 2007-C1; Pinnacle at Tutwiler | c/o C-III Asset Management LLC<br>5221 N. O'Conner Blvd., Suite 800<br>Irving, Texas 74039 | The Pinnacle at Tutwiler Farm Lease |
| Belk, Inc. | CSMC 2007-C1; Pinnacle at Tutwiler | c/o C-III Asset Management LLC<br>5221 N. O'Conner Blvd., Suite 800<br>Irving, Texas 75039 | The Pinnacle at Tutwiler Farm - Sublease to At Home |
| Belk, Inc. | Cullman Shopping Center, Inc. | c/o Merchants Retail Partners<br>2801 Highway 280 South Suite 345<br>Birmingham, Alabama 35223 | Cullman Shopping Center Lease |
| Belk, Inc. | D Mall, LLC | 621 Northwest Frontage Road, Suite 315<br>(PO Box 211149, 30917)<br>Augusta, Georgia 30907 | Dublin Mall Lease |
| Belk, Inc. | Dalton Mall, LLC | c/o Hull Property Group<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Walnut Square Lease |
| Belk, Inc. | Danville Mall, LLC | c/o Hull Property Group<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Piedmont Mall Lease |
| Belk, Inc. | Dare Center, LLC | c/o Washington Prime Group<br>180 East Broad Street<br>Columbus, Ohio 43215 | Dare Centre Lease |
| Belk, Inc. | DDRM Riverstone Plaza LLC | c/o Site Centers Corp.<br>3300 Enterprise Parkway<br>Beachwood, Ohio 44122 | RiverStone Plaza Lease |
| Belk, Inc. | DDRTC Fayette Pavilion III and IV LLC | c/o Crawford Square Real Estate Advisors<br>1175 Peachtree Street NE, Ste 1000<br>Atlanta, Georgia 30361 | Fayette Pavilion Lease |
| Belk, Inc. | Decatur Mall, LLC, c/o Hull Property Group, LLC | 1190 Interstate Parkway<br>PO Box 204277 (30917)<br>Augusta, Georgia 30909 | Decatur Mall Lease |
| Belk, Inc. | Destin Commons, LP | c/o Turnberry Associates<br>19501 Biscayne Boulevard, Suite 400<br>Aventura, Florida 33180 | Destin Commons Lease |
| Belk, Inc. | Development Associates | P.O. Box 460<br>Lancaster, South Carolina 29720 | Lancaster Square Lease |
| Belk, Inc. | Douglas Associate LP | c/o DVL, Inc.<br>70 E. 55th Street, 7th Floor<br>New York, New York 10022 | Main Store Lease |
| Belk, Inc. | Eastdale Mall Realty, LLC | c/o NAMCO Realty LLC<br>150 Great Neck Road, Suite 304<br>Great Neck, New York 11021 | Eastdate Mall Lease |
| Belk, Inc. | Eastgate Associates, LP | c/o Stirling Properties, Inc.<br>109 Northpark Blvd., Suite 300<br>Covington, Louisiana 70433 | Eastgate Shopping Center Lease |
| Belk, Inc. | Eastridge LP | c/o Security Square Mall Mgt Office<br>6091 Security Boulevard<br>Baltimore, Maryland 21244 | Eastridge Mall Lease |
| Belk, Inc. | Elkin Commons, LLC | c/o The Malachite Group<br>48 East Old Country Road, Suite 203<br>Mineola, New York 11501 | Ridgeview Crossing Lease |
| Belk, Inc. | Ershig Properties, Inc. | P.O. Box 1127<br>Henderson, Kentucky 42419-1127 | Somerset Mall Lease |
| Belk, Inc. | Farallon Capital Management, LLC | One Maritime Plaza, Suite 2100<br>San Francisco, California 94111 | Gadsden Mall Lease |
| Belk, Inc. | Finmarc Wildewood LLC | c/o Finmarc Management, Inc.<br>7200 Wisconsin Avenue, Suite 1100<br>Bethesda, Maryland 20814 | Wildewood Shopping Center Lease |
| Belk, Inc. | Flake & Kelley Northwest, LLC | 4100 Corporate Center Drive, Suite 101<br>Springdale, Arkansas 72762 | Scottsdale Center Lease |
| Belk, Inc. | Four Plus Corporation | c/o Collier International Management - Atlanta, LLC<br>Promenade, Suite 800, 1230 Peachtree Street NE<br>Atlanta, Georgia 30309 | Village Green Lease |
| Belk, Inc. | G&I VIII RCG Valley Park LLC | c/o RCG Ventures, LLC<br>PO Box 53483<br>Atlanta, Georgia 30355 | Valley Park Centre Lease |
| Belk, Inc. | Gaffney Retail Associates | c/o Waters, Incorporated<br>10100 Park Cedar Drive, Suite 190<br>Charlotte, North Carolina 28210 | Peachtree Marketplace Lease |
| Belk, Inc. | Galleria Rock Hill, LLC | c/o Warren Norman Company, LLC<br>PO Box 36518<br>Rock Hill, South Carolina 29732 | Galleria Mall Lease |

Schedule A-1

Claims Related to Real Estate Leases

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Gator Coastal Shopping Centre, LLC | Gator Investments<br>7850 NW 146th St., 4th Floor<br>Miami Lakes, Florida 33016 | Coastal Mall Lease |
| Belk, Inc. | GCTC Holdings LLC | c/o Centrecorp Management Services, LLLP<br>1250 Caroline Street, Suite 220<br>Atlanta, Georgia 30307 | Gulf Coast Town Center Lease |
| Belk, Inc. | GF Valdosta Mall, LLC | c/o Spinoso Real Estate Group DLS, LLC<br>112 Northern Concourse<br>North Syracuse, New York 13212 | Valdosta Mall Lease |
| Belk, Inc. | Gleason Mall, LP | c/o Hull/Storey Acquisitions, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Lake City Mall Lease |
| Belk, Inc. | Glimcher MJC, LLC | c/o Washington Prime Group<br>180 East Broad Street, 21st Street<br>Columbus, Ohio 43215 | The Mall @ Johnson City Lease |
| Belk, Inc. | Goldman Sachs Commercial Mortgage Capital, L.P. | 6011 Connection Drive, Suite 550<br>Irving, Texas 75039 | Parkway Place Mall Lease |
| Belk, Inc. | Govenor's Square Company | 5577 Youngstown-Warren Road<br>Niles, Ohio 44446 | Governor's Square Lease |
| Belk, Inc. | GP Mall, LLC | c/o Glynn Place Mall Management Office<br>219 Mall Blvd.<br>Brunswick, Georgia 31525 | Glynn Place Lease |
| Belk, Inc. | Grand Central Parkersburg LLC | 180 East Broad Street<br>21st Floor<br>Columbus, Ohio 43215 | Belk - Grand Central Mall Lease |
| Belk, Inc. | Greenwood Anchor Acquisition, LLC | 350 N. Orleans St., Suite 300<br>Chicago, Illinois 60654-1607 | Greenwood Mall Lease |
| Belk, Inc. | Gregory T. Maloney, Receiver-Asheville Mall | c/o Jones Lang Lasalle Americas, Inc.<br>6365 Halcyon Way, Ste 970<br>Alpharetta, Georgia 30005 | Asheville Mall Lease |
| Belk, Inc. | H/S Albemarle, LLC | c/o Hull Property Group, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Albemarle Plaza Lease |
| Belk, Inc. | H/S Augustine, LP | c/o Hull Property Group<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Ponce de Leon Mall Lease |
| Belk, Inc. | H/S Florence, LLC | c/o Hull Property Group<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Regency Square Mall Lease |
| Belk, Inc. | H/S Florence, LLC | c/o Hull Storey Gibson Companies, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Regency Square Mall Lease |
| Belk, Inc. | H/S New Bern, LLC | c/o Hull Property Group<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Twin Rivers Mall Lease |
| Belk, Inc. | Habersham County Shopping Center | c/o Mr. Robert P. Ingle<br>P.O. Box 6676<br>Asheville, North Carolina 28806 | Habersham County Shopping Center Lease |
| Belk, Inc. | Hartsville Mall Company | P. O. Box 430<br>120 S. 5th Street<br>Hartsville, South Carolina 29550 | Hartsville Mall Lease |
| Belk, Inc. | Hatcher Square, LLC | c/o Hull Property Group, LLC<br>1190 Interstate Parkway<br>Asheville, Georgia 30909 | Hatcher Square Mall Lease |
| Belk, Inc. | Hawthorne Pinecrest, LLC | 200 Providence Rd, Suite 105<br>Charlotte, North Carolina 28207 | Pinecrest Plaza Lease |
| Belk, Inc. | Hawthorne Pinecrest, LLC | c/o Hawthorne Retail Partners, Inc.<br>200 Providence Road, Suite 105<br>Charlotte, North Carolina 28207 | Pinecrest Plaza Lease |
| Belk, Inc. | HC Lakeshore, LLC | 204-C West Woodlawn Road<br>Charlotte, North Carolina 28217 | Lakeshore Mall Lease |
| Belk, Inc. | HCSM, LLC | c/o Hull Property Group, Inc.<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Greenwood Mall Lease |
| Belk, Inc. | HCW Private Development, LLC | 153 S. Payne Stewart Drive<br>Branson, Missouri 65616 | Branson Landing Lease |
| Belk, Inc. | Hendon Golden East, LLC | c/o Hendon Properties<br>Two Live Oak Center, 3445 Peachtree Road N.E., Suite 465<br>Atlanta, Georgia 30326 | Golden East Crossing Lease |
| Belk, Inc. | HH Conyers Crossroads, LLC | c/o Hendon Properties LLC<br>3445 Peachtree Road NE, Suite 465<br>Atlanta, Georgia 30326 | Conyers Crossroads Lease |
| Belk, Inc. | Hoover Mall Limited, LLC | c/o Brookfield Properties<br>350 N.Orleans St., Suite 300<br>Chicago, Illinois 60654-1607 | Riverchase Galleria Lease |
| Belk, Inc. | IMI Huntsville LLC | c/o Miller Capital Advisory, Inc.<br>5750 Old Orchard Road Suite 400<br>Skokie, Illinois 60077 | Bridge Street Town Center Lease |
| Belk, Inc. | Ingles | P. O. Box 6676<br>Asheville, North Carolina 28816 | Adams Square Lease |
| Belk, Inc. | Ingles Markets, Incorporated | P.O. Box 6676<br>2913 US Highway 70 West, Black Mountain,  28711<br>Asheville, North Carolina 28816 | Ingles Shopping Center Lease |
| Belk, Inc. | Inland American Retail Management, LLC / Bldg. # 75019 | 2901 Butterfield Road<br>Oak Brook, Illinois 60523 | Dogwood Festival Lease |
| Belk, Inc. | Jacksonville Avenues Limited Partnership | Post Office Box 3287<br>Youngstown, Ohio 44513 | The Avenues Lease |
| Belk, Inc. | Jasper Mall Realty Holding, LLC | 1010 Northern Blvd., Suite 212<br>Great Neck, New York 11021 | Jasper Mall Lease |
| Belk, Inc. | Jones Lang LaSalle Americas, Inc. | 6365 Halcyon Way, Ste 970<br>Alpharetta, Georgia 30005 | The Galleria - Warner Robins Lease |
| Belk, Inc. | KDI Athens Mall, LLC | c/o Hendon Properties, LLC<br>3445 Peachtree Road, Suite 465<br>Atlanta, Georgia 30326 | Georgia Square Shopping Center Lease |
| Belk, Inc. | Kin Properties, Inc. | 185 NW Spanish River Boulevard<br>Suite 100<br>Boca Raton, Florida 33431 | Indigo Shopping Center Lease |
| Belk, Inc. | Kir Snellville, L.P. | c/o KIMCO Realty Co.<br>500 North Broadway, Suite 201 ( PO Box 9010)<br>Jericho, New York 11753 | Snellville Pavilion Lease |

Schedule A-1

**Claims Related to Real Estate Leases**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Kir Snellville, L.P. | c/o Kimco Realty Corporation<br>500 North Broadway, Suite 201 (OPO Box 9010)<br>Jericho, New York 11753 | Snellville Pavilion Lease |
| Belk, Inc. | Lakeview Pointe Shopping Center, LLC | c/o Rubenstein Real Estate Co., lc<br>6310 Lamar Ave, Suite 220<br>Oveland Park, Kansas 66202 | Lakeview Pointe Lease |
| Belk, Inc. | Laurens Retail I, LLC | c/o Vanguard Associates, Inc.<br>1810 Water Place, Suite 220<br>Atlanta, Georgia 30339 | East Main Street Lease |
| Belk, Inc. | Lazy B Cattle Venture, Ltd. | c/o The Villages Commercial Property Management<br>3597 Kiessel Road<br>The Villages, Florida 32163 | La Plaza Grande Lease |
| Belk, Inc. | LB -UBS 2006-C1 Triangle Town Boulevard, LLC | c/o Spinoso Real Estate Group DLS, LLC<br>112 Northern Concourse<br>North Syracuse, New York 13212 | Triangle Towne Center Lease |
| Belk, Inc. | Lenoir Retail I, LLC, c/o Vanguard Associates | 1810 Water Place, Suite 220<br>Atlanta, Georgia 30339 | Lenoir Festival Centre Lease |
| Belk, Inc. | Lexington Parkway Plaza, LLC | c/o New South Properties of the Carolains, Inc.<br>1518 E. Third Street, Suite 200<br>Charlotte, North Carolina 28204 | Parkway Plaza Lease |
| Belk, Inc. | Libby Boone Enterprises, LLC | c/o H.L. Libby Corporation<br>803 Commonwealth Drive<br>Warrendale, Pennsylvania 15086 | Boone Mall Lease |
| Belk, Inc. | Libby Henderson Enterprises, LLC | 803 Commonwealth Drive<br>Warrendale, Pennsylvania 15086 | Henderson Square Lease |
| Belk, Inc. | Mall of Georgia, L.L.C. | c/o Simon Property Group<br>225 West Washington Street<br>Indianapolis, Indiana 46204 | Mall of Georgia Lease |
| Belk, Inc. | Mayfaire Retail, LLC | c/o Brody Zimmer, LLC<br>111 Princess Street<br>Wilmington, North Carolina 28401 | Mayfaire Town Center Lease |
| Belk, Inc. | Mercer Mall LLS d/b/a Mercer Mall of Bluefield LLC | c/o Ershig Properties, Inc.<br>PO Box 1127 (1800 N. Elm Street - 49420)<br>Henderson, Kentucky 42419-1127 | Mercer Mall Lease |
| Belk, Inc. | Meyers, Roman, Friedberg & Lewis | 28601 Chagrin Blvd, Ste 600<br>Cleveland, Ohio 44122 | The Shoppes at Bel Air Lease |
| Belk, Inc. | Millan Enterprises, LLC | 126 Main Street, Ste A<br>Clarksville, Tennessee 37040 | Centre Stage Shopping Center Lease |
| Belk, Inc. | Monroe Crossing TEI Funds, LLC, c/o Time Equities Inc. | 55 Fifth Floor, 15th Floor<br>New York, New York 10003 | Monroe Mall Lease |
| Belk, Inc. | Monroe Retail Group LLC | 11701 Bee Caves Road, Suite 262<br>Austin, Texas 78738 | Middlesboro Mall Lease |
| Belk, Inc. | MRW Retail Joint Venture | c/o SouthStar, LLC<br>501 Corporate Centre Drive, Suite 315<br>Franklin, Tennessee 37067 | Cornerstone Market Place Lease |
| Belk, Inc. | Myrtle Beach Mall, LLC | c/o UDC Property Management, LLC<br>250 Miron Drive, Southke Blvd, Suite 110<br>Southlake, Texas 76092 | Myrtle Beach Mall Lease |
| Belk, Inc. | Namdar Realty Group | 150 Great Neck Road, Suite 304<br>Great Neck, New York 11021 | Riverbirch Corner Lease |
| Belk, Inc. | New Market - Cumming LLC | c/o New Market Properties, LLC<br>3284 Northside Parkway, Suite 515<br>Atlanta, Georgia 30327 | Lakeland Plaza Lease |
| Belk, Inc. | North Griffin Square, LLC | c/o Halpern Enterprises, Inc.<br>5200 Roswell Rd., NE<br>Atlanta, Georgia 30342 | North Griffin Square Lease |
| Belk, Inc. | North Main Phase II and III LLC | c/o Childress Klein Properties<br>301 South College Street, Suite 2800<br>Charlotte, North Carolina 28202 | North Main Market Lease |
| Belk, Inc. | Northpark Realty LP | c/o Manager Realty, LLC, c/o Pacific Retail Capital Partners<br>100 N. Supulveda Blvd., Suite 1925<br>El Segundo, California 90245 | Northpark Mall Lease |
| Belk, Inc. | Northwoods Mall CMBS, LLC | c/o CBL & Associates Management, Inc.<br>2150 Northwoods Blvd., #60<br>N. Charleston, South Carolina 29406 | Northwoods Mall Lease |
| Belk, Inc. | Oaks Mall, LLC | c/o Brookfield Properties<br>350 N. Orleans St., Suite 300<br>Chicago, Illinois 60654-1607 | Oaks Mall Lease |
| Belk, Inc. | Oglethorpe Mall L.L.C. | 350 N. Orleans St., Suite 300<br>Chicago, Illinois 60654-1607 | Oglethorpe Mall Lease |
| Belk, Inc. | Old Hickory Mall Venture II, LLC | c/o CBL & Associates Management, Inc.<br>Suite 500 - CBL Center, 2030 Hamilton Place Boulevard<br>Chattanooga, Tennessee 37421 | Old Hickory Plaza Lease |
| Belk, Inc. | Old Milton Big Springs, LLC and Scott Village Big Springs, L.L.C. | c/o Ben F. Kushner Co.<br>19241 Birmingham Highway<br>Alpharetta, Georgia 30004 | Big Springs Village Lease |
| Belk, Inc. | Orange Park Mall LLC | c/o Washington Prime Group Inc.<br>180 East Broad Street<br>Columbus, Ohio 43215 | Orange Park Mall Lease |
| Belk, Inc. | Oxford Galleria, LLC | c/o Trezevant Realty Corporation<br>9063 Corporate Gardens Drive<br>Germantown, Tennessee 38138 | Oxford Galleria Lease |
| Belk, Inc. | Pacific CVM Management, LLC | c/o Pacific Retail Capital Partners<br>100 N. Pacific Coast Highway, Suite  1925<br>El Segundo, California 90245 | Crabtree Valley Mall Lease |
| Belk, Inc. | Pacific Management Group, LLC | 4825 Fulton Industrial Blvd , Suite 102<br>Atlanta, Georgia 30336 | Northcreek Shopping Center Lease |
| Belk, Inc. | Paddock Mall, LLC | c/o Washington Prime Group, Inc.<br>180 East Broad Street<br>Columbus, Ohio 43215 | Paddock Mall Lease |
| Belk, Inc. | PC Sweet Home Bama, LLC, c/o Propst Properties and Gatlin Development Company, Inc. | 1301 Riverplace Blvd., #1900<br>Jacksonville, Florida 32207 | Alabaster Promenade Lease |
| Belk, Inc. | Pecanland Mall, LLC | c/o Brookfield Properties<br>350 N. Orleans St., Suite 300<br>Chicago, Illinois 60654-1607 | Pecanland Lease |
| Belk, Inc. | Pecanland Mall, LLC | c/o Brookfield Properties<br>350 N. Orleans Str, Suite 300<br>Chicago, Illinois 60654-1607 | Pecanland Lease |

Schedule A-1

Claims Related to Real Estate Leases

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Penham Management Group, LLC | PO Box 146<br>244 Saw Mill River Road<br>Hawthorne, New York 10532 | Paragould Lease |
| Belk, Inc. | Pennrose Mall, LLC c/o Malachite Group | 48 East Old Country Road<br>Mineola, New York 11501 | Penrose Mall Lease |
| Belk, Inc. | Pizitz of Dothan, Ltd. | 2140 11th Avenue South, Suite 318<br>Birmingham, Alabama 35205 | Wiregrass Commons Mall Lease |
| Belk, Inc. | Pleasant Ridge Town Center LLC | c/o Schickel Development<br>11601 Pleasant Ridge Road, Suite 300<br>Little Rock, Arkansas 72212 | Pleasant Ridge Town Center Lease |
| Belk, Inc. | PR Jacksonville LP | c/o PREIT Services, LLC<br>One Commerce Square, 2005 Market Street, Suite 1000<br>Philadelphia, Pennsylvania 19103 | Jacksonville Mall Lease |
| Belk, Inc. | PR Magnolia LLC | c/o PREIT Services, LLC<br>One Commerce Square, 2005 Market Street, Suite 1000<br>Philadelphia, Pennsylvania 19103 | Magnolia Mall Lease |
| Belk, Inc. | PR Valley Limited Partnership | 200 South Broad Street, Third Floor<br>Philadelphia, Pennsylvania 19102 | Valley Mall  Lease |
| Belk, Inc. | Prince of Orange, LLC | c/o Hull Property Group<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Prince Of Orange Mall Lease |
| Belk, Inc. | Property Management Support, Inc., c/o Sleiman Enterprises | c/o Sleiman Enterprises, Inc.<br>1 Sleiman Parkway, Suite 200<br>Jacksonville, Florida 32216 | Atlantic North Lease |
| Belk, Inc. | Provest Centre Pointe Plaza LLC | c/o Provest Properties<br>158 Union Turnpike<br>Hudson, New York 12534 | Centre Point Plaza Shopping Center Lease |
| Belk, Inc. | ProVest Lincoln Center, LLC | c/o ProVest Properties<br>158 Union Turnpike<br>Hudson, New York 12534 | Lincoln Plaza Lease |
| Belk, Inc. | ProVest PDQ Springdale LLC | c/o ProVest Properties<br>158 Union Turnpike<br>Hudson, New York 12534 | Springdale Plaza Shopping Center Lease |
| Belk, Inc. | Publix Super Markets, Inc. | P.O. Box 407<br>Lakeland, Florida 33802-0407 | Collier Commons Lease |
| Belk, Inc. | Publix Super Markets, Inc. | PO Box 407<br>(3300 Publix Corporate Pkwy 33811)<br>Lakeland, Florida 33802-0407 | Citrus Tower Village Lease |
| Belk, Inc. | RAE-ME North Carolina II LLC | c/o Foundry Commercial<br>121 West Trade Street, Suite 2500<br>Charlotte, North Carolina 28202 | Premier Landing Lease |
| Belk, Inc. | Rancho Lufkin, L.P. | c/o Pacific Commercial Management<br>4130 La Jolla Village Dr., Ste. 208<br>La Jolla, California 92037 | Belk Lease |
| Belk, Inc. | RCC Martintown Plaza, LLC | c/o NewLink Management Group<br>PO Box 17710<br>Richmond, Virginia 23226 | Martintown Plaza Lease |
| Belk, Inc. | RCG-Dunn, LLC | c/o RCG Ventures IV, LLC<br>3060 Peachtree Road NE, Suite 400<br>Atlanta, Georgia 30355 | Harnett Crossing Lease |
| Belk, Inc. | RCG-Waycross Mall LLC | c/o RCG Ventures I, LLC<br>PO Box 53483<br>Atlanta, Georgia 30355 | The Mall at Waycross Lease |
| Belk, Inc. | RCG-Waycross Mall LLC | c/o RCG Ventures, LLC<br>PO Box 53483<br>Atlanta, Georgia 30355 | Cobblestone Village Lease |
| Belk, Inc. | Richmond Centre - FCA, LLC | c/o FCA Partners LLC<br>201 S. Tryon Street, Suite 900<br>Charlotte, North Carolina 28202 | Richmond Centre Lease |
| Belk, Inc. | River Crossing Shoppes, LLC | c/o Brookfield Properties<br>350 N. Orlans St, Suite 300<br>Chicago, Illinois 60654-1607 | The Shoppes at River Crossing Lease |
| Belk, Inc. | River Place Investors LLC | c/o Colliers International Management - Atlanta, LLC<br>Promenade, Suite 800 1230 Peachtree Street NE<br>Atlanta, Georgia 30309 | River Place Lease |
| Belk, Inc. | Riverbirch Realty LLC | c/o Namdar Realty Group LLC<br>150 Great Neck Road, Suite 304<br>Great Neck, New York 11021 | Riverbirch Corner Lease |
| Belk, Inc. | Riverchase Land Acquisition, LLC | c/o Brookfield Properties<br>350 N. Orleans St, Suite 300<br>Chicago, Illinois 60654-1607 | Riverchase Galleria Lease |
| Belk, Inc. | Roanoke Landing Associates, LLC | 678 Reistertown Road<br>Baltimore, Maryland 21208 | Roanoke Landing Lease |
| Belk, Inc. | Rockstep McComb  LLC | 1445 North Loop West, Suite 625<br>Houston, Texas 77008 | Edgewood Mall Lease |
| Belk, Inc. | Rome Mall, LLC c/o Hull Storey Gibson Companies, LLC | 1190 Interstate Parkway<br>Augusta, Georgia 30909 | Mount Berry Square Lease |
| Belk, Inc. | Rosen McIntosh LLC | c/o The Rosen Group<br>PO Box 334, Lenox Hill Station<br>New  York, New York 10021 | McIntosh Plaza Lease |
| Belk, Inc. | RP Jackson Plaza, LLC | c/o The  Shopping Center Group, LLC<br>300 Galleria Pkwy., 12th Floor<br>Atlanta , Georgia 30339 | Jackson Plaza Lease |
| Belk, Inc. | RP Town n Country, LLC | c/o Providence Group Management<br>300 West Summit Avenue, Suite 250<br>Charlotte , North Carolina 28203 | Town 'N Country Plaza Lease |
| Belk, Inc. | RPAI US Management LLC | 2021 Spring Road<br>Suite 200<br>Oak Brook, Illinois 60523 | Henry Town Center Lease |
| Belk, Inc. | RPI Greenville Mall, LLC | 714 SE Greenville Blvd.<br>Greenville, North Carolina 27858 | Greenville Mall Lease |
| Belk, Inc. | RSE Independence, LLC | Independence Mall Management Office<br>3500 Oleander Drive<br>Wilmington , North Carolina 28403 | Independence Mall Lease |
| Belk, Inc. | S2 Forest Gate Associates, LLC | c/o Collett Management, LLC<br>1111 Metropolitan Ave, Suite 700<br>Charlotte, NC 28204-3424 | Forest Gate Shopping Center Lease |
| Belk, Inc. | Saint Smitty LLC | Tavaco Properties, LLC<br>9229 West Sunset Blvd., Suite 311<br>Los Angeles, California 90069 | Kings Bay Village Lease |

Schedule A-1

Claims Related to Real Estate Leases

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Samonds Legacy LLC | 1595 Chickasaw Road<br>Arnold, Maryland 21012 | SouthPark Mall Lease |
| Belk, Inc. | Sampson Crossing LLLP | 270 W. New England Avenue<br>Winter Park, Florida 32789 | Sampson Crossing Lease |
| Belk, Inc. | Sawmill Square Associates, LP | c/o Sizeler Companies<br>1750 Clearview Parkway, Suite 200<br>Metairie, Louisiana 70001 | Sawmill Square Lease |
| Belk, Inc. | Scotland Crossing Investors, LLC | c/o Coastal Equities<br>1840 Main Street, Suite 204<br>Weston, Florida 33326 | Scotland Crossing Shopping Center Lease |
| Belk, Inc. | SE Aiken, LLC, c/o Southeastern Company | 2743 Perimeter Parkway<br>Building 100. Suite 370<br>Augusta, Georgia 30909 | Aiken Mall Lease |
| Belk, Inc. | Security National Properties Funding, LLC | Post Office Box 1028<br>Eureka, California 95502-1028 | Greenville Mall Lease |
| Belk, Inc. | Selma Mall, LLC | 410 Killington Court<br>Columbia, South Carolina 29212-8681 | Selma Plaza Lease |
| Belk, Inc. | Shallotte Crossing, LLC | c/o Aston Properties, Inc.<br>610 E. Morehead Street, Suite 100<br>Charlotte, North Carolina 28202 | Shallotte Crossing Lease |
| Belk, Inc. | Shelby Mall, LLC | c/o Hull Property Group<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Cleveland Mall Lease |
| Belk, Inc. | Shelter Cove III, LLC | c/o Southeastern Development Associates<br>2743 Perimeter Parkway, Bldg. 100, Suite 370<br>Augusta, South Carolina 30909 | Mall at Shelter Cove Lease |
| Belk, Inc. | Simon Property Group, L.P. | 225 W. Washington St.<br>Indianapolis, Indiana 46204 | Cordova Mall Lease |
| Belk, Inc. | Southgate Shopping Center | c/o Village Properties, Inc.<br>115 West Madison (PO Box 516)<br>Pulaski, Tennessee 38478 | Southgate Shopping Center Lease |
| Belk, Inc. | SouthPark Mall, L.P. | c/o Simon Property Group, L.P.<br>225 West Washington Street<br>Indianapolis, Indiana 46204 | SouthPark Mall Lease |
| Belk, Inc. | SouthPark Mall, L.P. | c/o Simon Property Group, L.P.<br>225 West Washington Street<br>Indianapolis, Indiana 46204 | Southpark Sammons Sublease |
| Belk, Inc. | SouthPoint Mall, LLC | c/o Brookfield Properties<br>350 N. Orleans St. Suite 300<br>Chicago, Illinois 60654-1607 | Streets at Southpoint Lease |
| Belk, Inc. | SPG Anderson Mall, LLC | c/o Washington Prime Management Associates, LLC<br>180 East Broad Street<br>Columbus, Ohio 43215 | Anderson Mall Lease |
| Belk, Inc. | SPG Anderson Mall, LLC | c/o WP Glimcher, Inc.<br>180 East Broad Street<br>Columbus, Ohio 43215 | Anderson Mall Lease |
| Belk, Inc. | Statesboro Mall, LLC | c/o Hull Storey Retail Group, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Statesboro Mall Lease |
| Belk, Inc. | Stirling Bossier Center, L.L.C. | c/o Stirling Properties, L.L.C.<br>109 Northpark Boulevard, Suite 300<br>Covington, Louisiana 70433 | Stirling Bossier Shopping Center Lease |
| Belk, Inc. | Stirling Mandeville, LLC | c/o Stirling Properties, Inc.<br>109 Northpark Blvd., Suite 300<br>Covington, Louisiana 70433 | River Chase Shopping Center Lease |
| Belk, Inc. | Stockbridge Lakeshore,LLC | PO Box 8130<br>Bloomfield Hills, Michigan 48302 | Lakeshore Mall Lease |
| Belk, Inc. | Sumter Mall, LLC | Hull Property Group, LLC<br>1190 Interstate Parkway<br>Augusta, Georgia 30909 | Sumter Mall Lease |
| Belk, Inc. | T Surfside FL, LLC | c/o AZT Corporation<br>16600 Dallas Parkway, Suite 300<br>Dallas, Texas 75248 | The Shops at Surfside Lease |
| Belk, Inc. | Tallahassee Retail Venture LLC | c/o Blackwater Resources, LLC<br>700 Montgomery Highway, Suite 186<br>Birmingham , Alabama 35216 | Tallahassee Mall Lease |
| Belk, Inc. | The Pavilion At Port Orange, LLC | c/o CBL and Associates Properties, Inc.<br>CBL Center, Suite 500, 2030 Hamilton Place Blvd.<br>Chattanooga, Tennessee 37421 | The Pavilion at Port Orange Lease |
| Belk, Inc. | Thomas Enterprises, Inc. | 45 Ansley Drive<br>Newnan, Georgia 30263 | Ashley Park Lease |
| Belk, Inc. | Tifton Plaza Owner, LLC | c/o In-Rel Properties, Inc.<br>2328 10th Avenue North, Suite 401<br>Lake Worth, Florida 33461 | Town & Country Mall Lease |
| Belk, Inc. | TKG Smith Farm, LLC | 211 N. Stadium Boulevard<br>Suite 201<br>Columbia, Missouri 65203 | Smith Farm Marketplace Lease |
| Belk, Inc. | TM Northlake Mall, L.P. | c/o Starwood Retail Property Management, LLC<br>1 E. Wacker Dr., Suite 3700<br>Chicago, Illinois 60601 | Northlake Mall Lease |
| Belk, Inc. | TMP SRE 1 LLC | c/o Citadel Mall Mall Management  Office<br>2070 Sam Rittenberg Blvd., #200<br>Charleston, South Carolina 29407 | Citadel Mall Lease |
| Belk, Inc. | Town Center at Cobb, LLC | c/o Simon Property Group, Inc.<br>225 W. Washington, St.<br>Indianapolis, Indiana 43204 | Town Center Mall at Cobb Lease |
| Belk, Inc. | Towne Mall, LLC | 401 Wilshire Blvd., Suite 700<br>Santa Monica, California 90401 | Towne Mall Lease |
| Belk, Inc. | Triangle East Shopping Center | c/o Bailey and Associates, Inc.<br>Post Office Box 400<br>Jacksonville, North Carolina 28541-0400 | Triangle East Centre Lease |
| Belk, Inc. | Tri-City Mall | 127 East Trade Street<br>Forest City, North Carolina 28043 | Tri City Mall Lease |
| Belk, Inc. | Unison Mooresville, LLC | 177 Huntington Avenue, Suite 1901<br>Boston, Massachusetts 02115 | Mooresville Festival Lease |
| Belk, Inc. | University Mall Realty, Ltd. | c/o Orda Corp.<br>15400 Knoll Trail, Suite 3350<br>Dallas, Texas 75248 | University Mall Lease |
| Belk, Inc. | University Mall, L.L.C. | c/o Aronov Realty Management<br>3500 Eastern Blvd. (PO Box 235000, 36123)<br>Montgomery, Alabama 36116 | University Mall Lease |

Schedule A-1

**Claims Related to Real Estate Leases**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | University Mall, L.L.C. | c/o Aronov Realty Management<br>3500 Eastern Blvd.<br>Montgomery, Alabama 36116 | University Mall Lease |
| Belk, Inc. | USPG Portfolio Eight, LLC | 3665 Fishinger Boulevard<br>Hilliard, Ohio 43026 | Cross Creek Plaza Lease |
| Belk, Inc. | USPG Portfolio Five, LLC | 3665 Fishinger Blvd.<br>Hilliard, Ohio 43026 | Cypress Bay Plaza Lease |
| Belk, Inc. | USPG Portfolio Five, LLC | c/o U.S. Properties Group<br>3665 Fishinger Blvd.<br>Hilliard, Ohio 43026 | Walterboro Plaza Lease |
| Belk, Inc. | Valley Hills Mall LLC | 1960 Highway 70 S.E., Suite 244<br>Hickory, North Carolina 28602 | Valley Hills Mall Lease |
| Belk, Inc. | Vernon Park Mall Holding Corp. | c/o Vernon Park Mall, LLC, c/o World Properties<br>78-08 221st Street<br>Flushing, New York 11364 | Vernon Park Mall Lease |
| Belk, Inc. | VG Venture, LLC | c/o Saunders Management Co., Inc.<br>760 Brooks Avenue, Suite 1<br>Rochester, New York 14619 | Village Green Commons Lease |
| Belk, Inc. | VGEC LLC | c/o The Vireo Group<br>PO Box 1211 (720 St. Sebastian Way, Suite 4)<br>Augusta, Georgia 30903 (30901) | Southgate Place Lease |
| Belk, Inc. | Victory Square LLC | 14328 Lomita's Avenue<br>La Puente, California 91746 | Washington Square Shopping Center Lease |
| Belk, Inc. | West C Street Holdings, LLC | 863 Bellamy Avenue<br>Murells Inlet, South Carolina 29576 | Inlet Square Lease |
| Belk, Inc. | West Georgia Commons Mall, LLC c/o Hull Storey Gibson Properties | 1190 Interstate Parkway<br>Augusta, Georgia 30909 | West Georgia Commons Lease |
| Belk, Inc. | West Volusia Investors, LLC | c/o Victory Real Estate Investments, LLC<br>240 Brookstone Centre Parkway<br>Columbus, Georgia 31904 | West Volusia Regional SC Lease |
| Belk, Inc. | Westgate Mall Limited Partnership | Westgate Mall CMBS, LLC, c/o CBL & Associates Properties, Inc.<br>CBL Center, Suite 500, 2030 Hamilton Place Blvd.<br>Chattanooga, Tennessee 27421 | Westgate Shopping Center Lease |
| Belk, Inc. | Westminster Mall LLC | c/o The Woodmont Company<br>2100 W. 7th Street<br>Fort Worth , Texas 76107 | Town Mall of Westminster Lease |
| Belk, Inc. | White's Crossing Plaza Properties, LLC | c/o Lat Purser & Associates, Inc.<br>5000 Falls of Neuse Road, Suite 400<br>Raleigh, North Carolina 27609 | White's Crossing Lease |
| Belk, Inc. | Winter Haven Citi Centre, LLC, c/o Schmier & Feurring Properties, Inc. | 2200 Butts Road, Suite 300<br>Boca Raton, Florida 33431 | Winter Haven Citi Centre Lease |
| Belk, Inc. | WV Crossroads Realty LLC | WV Crossroads CH LLC; WH Crossroads Hassim LLC;<br>c/o Namdar Realty Group<br>150 Great Neck Road, Suite 304<br>Great Neck, New York 10021 | Crossroads Mall Lease |
| Belk, Inc. | Yale Waynesville, LLC | c/o Yale Realty Services Corp.<br>10 New King Street, Suite 102<br>White Plains, New York 10604 | Waynesville Commons Lease |
| Belk, Inc. | YFP, LLC | Attn: Rick Yager<br>600 Towne Center Blvd., Suite 109<br>Pineville, North Carolina 28134 | The Palladium Lease |
| Belk, Inc. | New Port Richey Development Company LLC | c/o Chase Properties, Ltd.<br>3333 Richmond Road, Suite 320<br>Beachwood, Ohio 44122 | Trade Mart Shop Ctr - Lease |
| Belk, Inc. | Pacific CVM Management, LLC | c/o Pacific Retail Capital Partners<br>100 N. Pacific Coast Highway, Suite  1925<br>El Segundo, California 90245 | Crabtree Valley Mall Lease |
| Belk-Simpson Company, Greenville, South Carolina | Greer Plaza, Inc. | c/o Tate Capital<br>1175 N.E. 125 Street,  Ste 102<br>North Miami, Florida 33161 | Greer Plaza Lease |
| Belk-Simpson Company, Greenville, South Carolina | Lake City SC NG, LLC | c/o Nalley Commercial Properties<br>1919 E. Main Street<br>Easley, South Carolina 29641-1929 | Town & Country Plaza Lease |
| Belk-Simpson Company, Greenville, South Carolina | Milledgeville Associates, L.P. | c/o First Colony FinancialCorporation<br>8100 Roswell Road, Suite 201<br>Atlanta, Georgia 30350 | Fairview Market Lease |
| Belk-Simpson Company, Greenville, South Carolina | Simon Haywood, LLC | Bellwether Properties of South Carolina, LP,<br>c/o Simon Property Group<br>224 West Washington Street<br>Indianapolis, Indiana 46140 | Haywood Mall Lease |

**Schedule A-2**

**Claims Related to Insurance Policies**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|--------|--------------|----------------------|-------------|
| Belk Inc. | Allianz | Po Box 1344<br>Minneapolis, MN 55416-1297 | Aviation |
| Belk Inc. | Allianz | PO Box 1344<br>Minneapolis, MN 55416-1297 | Excess Liability |
| Belk Inc. | Allied World Assurance Company (U.S.) Inc. | 3424 Peachtree Road, NE, Ste. 750<br>Atlanta, GA  30326 | Property |
| Belk Inc. | American Guarantee and Liability Insurance Company | 1400 American Ln<br>Schaumburg, IL 60196-5452 | Excess Liability |
| Belk Inc. | American International Group (AIG) | 175 Water Street<br>New York, NY 10038 | Cyber - 2nd layer |
| Belk Inc. | American International Group (AIG) | 175 Water Street<br>New York, NY 10038 | Employed Lawyers |
| Belk Inc. | American International Group (AIG) | 175 Water Street<br>New York, NY 10038 | Foreign Package |
| Belk Inc. | American International Group (AIG) | 175 Water Street<br>New York, NY 10038 | Kidnap & Ransom |
| Belk Inc. | Arch Specialty Insurance Company | 1125 Sanctuary Pkwy, Ste. 200<br>Alpharetta, GA  30009 | Property |
| Belk Inc. | Aspen Specialty Insurance Company | 175 Capital Blvd<br>Rocky Hill, CT  06067 | Property |
| Belk Inc. | AXA XL | 100 Constitution Plaza<br>17th Floor<br>Hartford, CT 06103 | Cyber - 4th layer |
| Belk Inc. | AXA XL | 100 Constitution Plaza<br>17th Floor<br>Hartford, CT 06103 | Excess Crime |
| Belk Inc. | Axis Surplus Insurance Company | 11680 Great Oaks Way, Ste. 500<br>Alpharetta, GA  30022 | Property |
| Belk Inc. | Beazley Group | 30 Batterson Park Rd<br>Farmington, CT 06032 | Crime |
| Belk Inc. | Beazley Group | 30 Batterson Park Rd<br>Farmington, CT 06032 | Cyber - Primary |
| Belk Inc. | Beazley Lloyd's Syndicate 2623/623 | Beazley  USA Services, Inc.<br>141 Tremont St., Ste. 1200<br>Boston, MA  02111 | Property |
| Belk Inc. | Berkshire Hathaway Specialty Insurance | 500 Northpark Town Center<br>1100 Abernathy Road NE, Ste. 1200<br>Atlanta, GA  30328 | Excess Liability |
| Belk Inc. | Certain Underwriters at Lloyds (THB) | Lloyd's America, Inc.<br>280 Park Avenue<br>East Tower, 25th Floor<br>New York, NY  10017 | Property |
| Belk Inc. | Chubb | Westchester Professional Risk<br>1133 Avenue of the Americas<br>41st Floor<br>New York, NY 10036 | Cargo |
| Belk Inc. | Columbia Casualty Company (CNA) | CNA Financial<br>1521 N Franklin St<br>Chicago, IL  60606-1915 | Property |
| Belk Inc. | Crum & Forster Specialty Insurance Company | 305 Madison Ave<br>Morristown, NJ 07960 | Property |
| Belk Inc. | Endurance American Specialty Insurance Company (Sompo) | Sompo International<br>3780 Mansell Road, Ste. 400<br>Alpharetta, GA  30022 | Property |
| Belk Inc. | Evanston Insurance Company (Markel) | Markel Southeast Region<br>4521 Highwoods Pkwy<br>Glen Allen, VA  23060 | Property |
| Belk Inc. | Everest Indemnity Insurance Company | PO Box 830<br>Liberty Corner, NJ  07938 | Property |
| Belk Inc. | First Specialty Insurance Corporation (SwissRe) | 1200 Main Street, Ste. 800<br>Kansas City, MO  64105 | Property |
| Belk Inc. | Great American Insurance Group | 301 E. Fourth St.<br>Cincinnati, OH 45202 | Umbrella - Lead |

**Schedule A-2**

**Claims Related to Insurance Policies**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk Inc. | Great American Insurance Group (Lead), Various Excess [Berkshire Hathaway, American Guarantee and Liability Insurance Company, Navigators Insurance Co, Liberty Mutual, Allianz] | 301 E. Fourth St.<br>Cincinnati, OH 45202 | Punitive Damages Wrap |
| Belk Inc. | Homeland Insurance Company of New York (Intact) | 605 Highway 169 North, Ste. 800<br>Plymouth, MN  55441 | Property |
| Belk Inc. | Ironshore Insurance Services LLC | 175 Berkeley Street<br>Boston, MA 02116 | Property |
| Belk Inc. | James River Insurance Company | PO Box 27648<br>Richmond, VA  23261-7648 | Property |
| Belk Inc. | Lexington Insurance Company | 99 High St, Floor 24<br>Boston, MA 02110-2378 | Property |
| Belk Inc. | Liberty Mutual | 175 Berkeley Street<br>Boston, MA 02116 | Excess Liability |
| Belk Inc. | Lloyd's Snydicate 33. Administered by Hiscox Inc. d/b/a/ Hiscox Insurance Agency in CA | Hiscos Inc.<br>520 Madison Ave, 32nd Floor<br>New York, NY  10022 | Property |
| Belk Inc. | Lloyd's Snydicate 4000 Managed by Hamilton Managing Agency Limited | Hamilton Managing General Agency Americas, LLC<br>400 Madison Ave, Ste. 16C<br>New York, NY 10017 | Terrorism |
| Belk Inc. | Mitsui Sumitomo Insurance Company of America | 560 Lexington Ave, 20th Floor<br>New York, NY  10022 | Property |
| Belk Inc. | Nationwide | 7 World Trade Center<br>250 Greenwich Street<br>37Th Floor<br>New York, NY 10007 | EPL - Excess |
| Belk Inc. | Navigators Insurance Co | 1 Penn Plaza 32Nd Floor<br>New York, NY 10119 | Excess Liability |
| Belk Inc. | North American Company | One Sammons Plaza<br>Sioux Falls, SD 57193 | Texas Non-Sub |
| Belk Inc. | North American Specialty Insurance Company | PO Box 31817<br>Charlotte, NC  28231-1817 | Surety Bonds |
| Belk Inc. | Princeton Excess & Surplus Lines Ins Co (PESLIC) | 555 College Road East<br>PO Box 5241<br>Princeton, NJ  08543-5241 | Property |
| Belk Inc. | RSUI Indemnity Company | RSUI Group Inc.<br>945 East Paces Ferry Road, Ste. 1800<br>Atlanta, GA  30326-1160 | Property |
| Belk Inc. | Safety National Casualty Corp | 1832 Schuetz Road<br>Saint Louis, MO 63146 | Auto Liability |
| Belk Inc. | Safety National Casualty Corp | 1832 Schuetz Road<br>Saint Louis, MO 63146 | General Liability |
| Belk Inc. | Safety National Casualty Corp | 1832 Schuetz Road<br>Saint Louis, MO 63146 | Workers' Comp |
| Belk Inc. | Scottsdale Insurance Company (Nationwide) | One Nationwide Plaza<br>Columbus, OH  43215 | Property |
| Belk Inc. | Sompo International | US Commercial Management Liability<br>1221 Avenue of the Americas<br>New York, NY 10020 | Cyber - 3rd layer |
| Belk Inc. | Sompo International | US Commercial Management Liability<br>1221 Avenue of the Americas<br>New York, NY 10020 | EPL - Excess |
| Belk Inc. | StarStone Specialty Insurance Company | Harborside 5<br>185 Hudson St., Ste. 2600<br>Jersey City, NJ  07311 | Property |
| Belk Inc. | The Hartford | 690 Asylum Avenue<br>Hartford, CT 06155 | Flood |
| Belk Inc. | Tokio Marine HCC | 8 Forest Park Drive<br>Farmington, CT 06032 | Employment Practices Liability |

**Schedule A-2**

**Claims Related to Insurance Policies**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk Inc. | Tokio Marine HCC (Primary), Various Excess [Sompo International, Nationwide, QBE Insurance Group Limited, Cap Speciality, Chubb, ANV Global Services], Side A [Berkley Select] | D&O Group<br>8 Forest Park Drive<br>Farmington, CT 06032 | Directors & Officers |
| Belk Inc. | Tokio Marine HCC (Primary), Various Excess [Sompo International, Nationwide, QBE Insurance Group Limited, Chubb] | 8 Forest Park Drive<br>Farmington, CT 06032 | Fiduciary Liability |
| Belk Inc. | Travelers | 485 Lexington Ave<br>New York, NY 10017 | ID Fraud |
| Belk Inc. | Travelers Property Casualty Company of America | 485 Lexington Ave<br>New York, NY 10017 | Equipment Breakdown |
| Belk Inc. | Zurich | Corporate Center<br>Austrasse 46<br>Zurich 8045<br>Switzerland | Excess Crime |

Schedule A-3

**Claims Related to Deposits and Collateral**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|--------|--------------|----------------------|-------------|
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279503 - Utility Deposit Bond - Account #205388-105170: $33,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279507 - Utility Deposit Bond: $282,500 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279508 - Utility Deposit Bond: $108,602 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279512 - Utility Deposit Bond - 30500 Highway 181 Spanish Fort, AL: $30,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279513 - Utility Deposit Bond - Store #348: 11655 US Hwy 431, Guntersville, AL: $20,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279514 - Utility Deposit Bond - Store #385: 205 Adams Drive, Weatherford, TX: $20,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279515 - Utility Deposit Bond - Store #396: 2391 Jackson Ave.: $6,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279516 - Utility Deposit Bond: $656,272.6 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279517 - Utility Deposit Bond: $20,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279518 - Utility Deposit Bond - Store #606: 5901 University Dr & Store #423: 455 The Bridge Street: $117,401 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279519 - Utility Deposit Bond - Store #402 2181 Lantern Ridge Rd.: $10,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279520 - Utility Deposit Bond - Store #689: Knoxville, TN: $27,800 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279521 - Utility Deposit Bond - Store #351: Branson, MO: $18,450 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279522 - Contract Unit Surety Bond: $40,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279523 - Utility Deposit Bond - Store #661: $22,900 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279524 - Utility Deposit Bond - 3093 E. Main St., Russeville, AR: $40,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279525 - Utility Deposit Bond - 11525 Cantrell Rd., Little Rock AR: $40,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279526 - Utility Guarantee Bond - 503 North 46th St., Rogers, AR 72756: $8,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279528 - Utility Deposit Bond - US Hwy 31 East & US Hwy 109 East: $9,600 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279529 - Utility Deposit Bond - Gulf Coast Town Center Store #0346: $19,316 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279530 - Utility Deposit Bond - Cobblestone Village Store #0363: $17,302 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279531 - Utility Deposit Bond - Lake City Mall Store #204: $13,662 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279532 - Utility Deposit Bond: $18,600 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279533 - Utility Deposit Bond - 5519 S. Williamson Blvd, Port Orange, FL Store #0392: $15,181 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279534 - Utility Deposit Bond - Hwy 176 & Cedar Grove Rd., Jonesville, SC: $75,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279535 - Utility Deposit Bond - The Avenue Viera Store #0323: $14,997 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279536 - Utility Deposit Bond - Store #246: $15,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279537 - Utility Deposit Bond: $23,500 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279538 - Utility Deposit Bond: $38,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279539 - Utility Deposit Bond - 2550 East Morris Blvd.: $21,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279540 - Utility Deposit Bond - 2800 Hwy 90, Gautier, MS: $25,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279541 - Utility Deposit Bond: $17,800 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279542 - Utility Deposit Bond - 1200 East County Line Rd., Ridgeland, MS: $52,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279543 - Utility Deposit Bond - 1722 Veterans, McComb, MS: $24,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279544 - Utility Deposit Bond - 350 John R. Junkin Dr., Natchez, MS: $36,116 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279546 - Utility Deposit Bond - 1651 Highway 1 South, Greenville, MS: $30,946 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279547 - Utility Deposit Bond - 150 Dogwood Pl., Flowood, MS: $34,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279548 - Utility Deposit Bond - 3505 Pemberton Blvd., Vicksburg, MS: $30,500 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2279549 - Utility Deposit Bond - 4920 Millhaven Road, Monroe, LA - Account No. OPC 07000: $37,157 |

Schedule A-3

**Claims Related to Deposits and Collateral**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304500 - Utility Deposit Bond: $20,335 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304501 - Utility Deposit Bond - 200 Paul Huff Parkway: $14,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304503 - Utility Deposit Bond - 2011 North Roan Street, Johnson City, TN: $100,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304504 - Utility Deposit Bond - 670 Turtle Creek Dr.: $40,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304505 - Utility Deposit Bond - Account No. 349120270: $17,500 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304506 - Utility Deposit Bond - 1704 North Dixie Hwy, Elizabethtown, KY: $9,200 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304507 - Utility Deposit Bond - 3027 Knoxville Center Dr.: $30,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304508 - Utility Deposit Bond: $1,451 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304509 - Utility Deposit Bond: $561 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304510 - Utility Deposit Bond - 7600 Kingston Pike: $50,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304511 - Utility Deposit Bond - 27001 Riverchase Galleria, Hoover, AL: $10,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304512 - Utility Deposit Bond: $618,275 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304513 - Utility Deposit Bond - Stores #141 & 151: $175,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304514 - Utility Deposit Bond - Store #0638 - Greenwood Mall: $22,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304515 - Utility Deposit Bond - 5100 North 9th Ave, Pensacola: $26,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304516 - Utility Deposit Bond - Store #603: 2100 Riverchase Galleria & Store #953: Lakeshore Parkway: $25,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304517 - Utility Deposit Bond - Acct #216-0602.001: $20,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304518 - Utility Deposit Bond - Acct #216-0242.001: $50,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304519 - Utility Deposit Bond - Acct #141-0417.001: $35,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304520 - Utility Deposit Bond - Store #615: 900 Commons Dr.: $40,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304521 - Utility Deposit Bond - Store #345: 270 Citrus Tower Blvd., Clermont, FL: $19,695 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304522 - Utility Deposit Bond - Store #344: 2111 Collier Parkway, Land O'Lakes, FL: $18,825 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304523 - Utility Deposit Bond - Store #563: 1801 Northeast Hwy 19, Crystal River, FL: $18,505 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304524 - Utility Deposit Bond - Store #0636 Mullins Colony: $23,450 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304525 - Utility Deposit Bond - Store #459: 470 Pinnacle Parkway: $80,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304526 - Utility Deposit Bond - Store #388: 2342 Surfside Blvd., Cape Coral, FL: $29,600 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304527 - Utility Deposit Bond - Store #380: 2615 Medical Center Parkway: $44,800 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304528 - Utility Deposit Bond: $16,250 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304529 - Utility Deposit Bond - Store #627: 2415 North Monroe Street: $53,800 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304530 - Utility Deposit Bond - Store #614: 301 Cox Creek Parkway: $37,200 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304531 - Utility Deposit Bond - 1018 Mendel David Dr., Jackson, MS: $14,147 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304532 - Utility Deposit Bond - #114 Coastal Mall, #516 Colonial Mall Mens/Child, #516 Colonial Mall Women, #516 Colonial Mall Sign, #551 Inlet Square Mall: $80,000 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304533 - Utility Deposit Bond: $1,300 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304534 - Utility Deposit Bond - 2261 Town Center Ave.: $19,835 |
| Belk, Inc. | North American Specialty Insurance Company | 650 Elm St #600 Manchester, NH 03101 | Bond Number: 2304542 - Utility contract deposit: $103,770 |
| Belk, Inc. | Various utility providers | Various addresses | Cash utility deposits totaling $136,544.25 in various amounts at various locations |
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: IS000088738U: $4,000,000 |

**Schedule A-3**

**Claims Related to Deposits and Collateral**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|--------|--------------|----------------------|-------------|
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: IS000101453U: $2,000,000 |
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: IS000116914U: $4,700,000 |
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: IS000129225U: $1,000,000 |
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: LC968-133247: $20,000 |
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: SM202485: $36,000 |
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: SM214999: $45,000 |
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: SM218346: $920,000 |
| Belk, Inc. | Wells Fargo Bank, N.A. | 401 N. Research Pkwy, 1st Floor MAC D4004-017 Winston-Salem, NC 27101-4157 | L/C ID: SM238972: $13,875,000 |

Schedule A-4

**Claims Related to Liens**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Bear Parent Inc. | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Bear Parent Inc. | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Bear Parent Inc. | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Accounts Receivable LLC | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Accounts Receivable LLC | GE Money Bank | 170 West Election Drive, Suite 125<br>Draper, UT 84020 | All rights, titles and interests in the collateral connected to the Program Agreement<br>(see Exhibit A to the UCC) |
| Belk Accounts Receivable LLC | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Accounts Receivable LLC | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Administration Company | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Administration Company | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Administration Company | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Department Stores LP | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Department Stores LP | Beauty Gem, Inc. | 15 West 47th Street, Suite 702<br>New York, NY 10036 | Consigned Merchandise<br>(jewelry) |
| Belk Department Stores LP | Beauty Gem, Inc. | 15 West 47th Street, Suite 702<br>New York, NY 10036 | Consigned Merchandise<br>(jewelry) |
| Belk Department Stores LP | GE Money Bank | 170 West Election Drive, Suite 125<br>Draper, UT 84020 | All rights, titles and interests in the collateral connected to the Program Agreement<br>(see Exhibit A to the UCC) |
| Belk Department Stores LP | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Department Stores LP | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Ecommerce LLC | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Ecommerce LLC | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Ecommerce LLC | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Gift Card Company LLC | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Gift Card Company LLC | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Gift Card Company LLC | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk International, Inc. | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk International, Inc. | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk International, Inc. | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Merchandising LLC | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Merchandising LLC | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Merchandising LLC | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Stores of Mississippi LLC | A.V. Jewelry of NY, Ltd. | 62 West 47th Street, Suite 603<br>New York, NY 10036 | Consigned Merchandise<br>(jewelry) |
| Belk Stores of Mississippi LLC | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Stores of Mississippi LLC | Beauty Gem, Inc. | 15 West 47th Street, Suite 702<br>New York, NY 10036 | Consigned Merchandise<br>(jewelry) |
| Belk Stores of Mississippi LLC | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Stores of Mississippi LLC | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Stores of Virginia LLC | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Stores of Virginia LLC | GE Money Bank | 170 West Election Drive, Suite 125<br>Draper, UT 84020 | All rights, titles and interests in the collateral connected to the Program Agreement<br>(see Exhibit A to the UCC) |
| Belk Stores of Virginia LLC | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Stores of Virginia LLC | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Stores Services, Inc. | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Stores Services, Inc. | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Stores Services, Inc. | Tessler & Weiss/Premesco | 2389 Vauxhall Rd<br>Union, NJ 07083 | Consigned Merchandise<br>(jewelry) |
| Belk Stores Services, Inc. | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk Texas Holdings LLC | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street<br>Boston, MA 02110 | All assets |
| Belk Texas Holdings LLC | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk Texas Holdings LLC | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |
| Belk, Inc. | B.H. Multi Com Corp. | 15 West 46th Street<br>New York, NY 10036 | Consigned Merchandise (jewelry) |

Schedule A-4

Claims Related to Liens

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street Boston, MA 02110 | All assets |
| Belk, Inc. | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street Boston, MA 02110 | Removed collateral from 2015 5930028 (Removed equipment described in specific invoices |
| Belk, Inc. | Beauty Gem, Inc. | 15 West 47th Street, Suite 702 New York, NY 10036 | Consigned Merchandise (jewelry) |
| Belk, Inc. | Bulova Corporation | One Bulova Avenue Woodside, NY 11377 | Consigned Merchandise (jewelry bearing the BULOVA and CARAVELLE NEW YORK trademarks) |
| Belk, Inc. | Bulova Corporation | 350 Fifth Avenue New York, NY 10118 | Consigned Merchandise (jewelry bearing the BULOVA , BULOVA ACCUTRON, CARAVELLE NEW YORK, and WITTNAUER trademarks) |
| Belk, Inc. | China Pearl, Inc. | 4250 Pennsylvania Ave. La Crescenta, CA 91214 | Consigned Merchandise (jewelry) |
| Belk, Inc. | CPI Luxury Group | 10220 Norris Ave. Pacoima, CA 91331 | Consigned Merchandise (jewelry) |
| Belk, Inc. | Dasan Inc | 54 West 39th Street New York, NY 10018 | Consigned Merchandise (jewelry) |
| Belk, Inc. | GE Money Bank | 4246 South Riverboat Road, Suite 200 Salt Lake City, UT 84123 | All rights, titles and interests in the collateral connected to the Program Agreement (see Exhibit A to the UCC) |
| Belk, Inc. | GE Money Bank | 170 West Election Drive, Suite 125 Draper, UT 84020 | All rights, titles and interests in the collateral connected to the Program Agreement (see Exhibit A to the UCC) |
| Belk, Inc. | IBM Credit LLC | One North Castle Drive Armonk, NY 10504 | Leased equipment |
| Belk, Inc. | IBM Credit LLC | One North Castle Drive Armonk, NY 10504 | Leased equipment |
| Belk, Inc. | JPMorgan Chase Bank, N.A. | 1111 Polaris Parkway, Suite A-3 Columbus, OH 43240 | Leased equipment |
| Belk, Inc. | Laron Brown (Plaintiff) | Address Unknown | A. Assault / Wrongful Termination B. Discrimination / Harrassment C. Retaliation / Perjury D. Defamation of Character (Plaintiff seeking a judgement of $1 million |
| Belk, Inc. | Le Vian Corp. | 235 Great Neck Road Great Neck, NY 11021 | SP's name changed to: Le Vian Corp. |
| Belk, Inc. | Le Vian Corporation | 235 Great Neck Road Great Neck, NY 11021 | Consigned Merchandise (watches and fine jewelry) |
| Belk, Inc. | Macquarie Equipment Finance, LLC | 2285 Franklin Road Suite 100 Bloomfield Hills, MI 48302 | Leased equipment (computer equipment) |
| Belk, Inc. | Merit Diamond Corporation | 1900 Tyler Street, 3rd Floor Hollywood, FL 33020 | Consigned Merchandise (jewelry) |
| Belk, Inc. | Morgan Stanley Senior Funding, Inc., as collateral agent for the Secured Parties | 1585 Broadway New York, NY 10036 | Fixture filing: 4101 Legendary Way Destin, FL  11901 Atlantic Blvd. Suite 100 Jacksonville, FL |
| Belk, Inc. | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway New York, NY 10036 | All assets |
| Belk, Inc. | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway New York, NY 10036 | Removed collateral from 2015 5928980 (Removed equipment described in specific invoices |
| Belk, Inc. | Peapack Capital Corporation | 500 Hills Drive, Suite 300 Bedminster, NJ 07921 | Leased equipment |
| Belk, Inc. | Ricco M. Hall, Jr., a minor, by and through his Guadian ad Litem, Natashia Reid; and, Natashia Reid, Individually (Plaintiffs) | Address Unknown | Personal Injuries ($10,000.00) |
| Belk, Inc. | Richline Group, Inc. | 1385 Broadway New York, NY 10018 | Consigned Merchandise (jewelry) |
| Belk, Inc. | Richline Group, Inc. | 1385 Broadway New York, NY 10018 | Consigned Merchandise (jewelry) |
| Belk, Inc. | Samuel Aaron, Inc. | 31-00 47th Avenue Long Island City, NY 11101 | Consigned Merchandise (jewelry) |
| Belk, Inc. | Sandeep Diamond Corporation | 20 East 46th Street, Suite 603 New York, NY 10017 | Consigned Merchandise (jewelry) |
| Belk, Inc. | Sandeep Diamond Corporation | 535 5th Avenue, 15th Floor New York, NY 10017 | Consigned Merchandise (jewelry) |
| Belk, Inc. | SEIKO Corporation of America | 1111 Macarthur Boulevard Mahwah, NJ 07430 | Consigned Merchandise (Pulsar-branded timepieces) |
| Belk, Inc. | SEIKO Corporation of America | 1111 Macarthur Boulevard Mahwah, NJ 07430 | Consigned Merchandise (SEIKO-branded timepieces) |
| Belk, Inc. | Seiko Watch of America LLC | 1111 Macarthur Boulevard Mahwah, NJ 07430 | Consigned Merchandise (Pulsar-branded timepieces) |
| Belk, Inc. | Seiko Watch of America LLC | 1111 Macarthur Boulevard Mahwah, NJ 07430 | Consigned Merchandise (SEIKO-branded timepieces) |
| Belk, Inc. | Sigma Equipment Inc | 3001 Maxx Road, None Evansville, IN 47711 | Leased equipment |
| Belk, Inc. | Sterling National Bank | 500 Seventh Avenue New York, NY 10018 | Consigned Merchandise (jewelry) |
| Belk, Inc. | Wilmington Trust, National Association, as Agent | 50 South Sixth Street, Suite 1290 Minneapolis, MN 55402 | Fixture filing: 4101 Legendary Way Destin, FL  11901 Atlantic Blvd. Suite 100 Jacksonville, FL |
| Belk, Inc. | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290 Minneapolis, MN 55402 | All assets |
| Belk, Inc. | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290 Minneapolis, MN 55402 | Removed collateral from 2015 5937437 (Removed equipment described in specific invoices |
| Belk-Simpson Company | Bank of America, N.A., as ABL Collateral Agent | 100 Federal Street Boston, MA 02110 | All assets |

**Schedule A-4**

**Claims Related to Liens**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk-Simpson Company | Beauty Gem, Inc. | 15 West 47th Street, Suite 702<br>New York, NY 10036 | Consigned Merchandise<br>(jewelry) |
| Belk-Simpson Company | GE Money Bank | 170 West Election Drive, Suite 125<br>Draper, UT 84020 | All rights, titles and interests in the collateral connected to the Program Agreement<br>(see Exhibit A to the UCC) |
| Belk-Simpson Company | Morgan Stanley Senior Funding, Inc., as First Lien Collateral Agent | 1585 Broadway<br>New York, NY 10036 | All assets |
| Belk-Simpson Company | Wilmington Trust, National Association, as Collateral Agent | 50 South Sixth Street, Suite 1290<br>Minneapolis, MN 55402 | All assets |

Schedule A-5

**Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk Anderson Mall #19, Simon Property Group, Inc. dba Anderson Mall | Gosnell, Carolyn | Address on File | General Liability Litigation:<br>US District Court<br>District of South Carolina<br>Anderson Division<br>C.A.No. 8:18-cv-03112-BHH |
| Belk at Sandhill Mall | Thompson, Arthur P | Address on File | General Liability Litigation:<br>State of South Carolina<br>County of Richland<br>Case # 2020CP4002160 |
| Belk Department Store | Brady, Mary | Address on File | Workers' Compensation Litigation:<br>SBWC Claim No: 2007-001892 |
| Belk Department Store | Brucke, Kathy | Address on File | General Liability Litigation:<br>State of South Carolina<br>County of Horry<br>Case No.2020CP2602363 |
| Belk Department Store | Lartigue Toland, Susan | Address on File | Workers' Compensation Litigation:<br>OJCC: 19-021675JW |
| Belk Department Store and Corvel Corp | Shook, Donna M | Address on File | Workers' Compensation Litigation:<br>I.C. No.: 19-014455 |
| Belk Department Stores | Hutcherson, Jim | Address on File | Workers' Compensation Litigation:<br>OJCC Case No. 20-001135TWS |
| Belk Department Stores LP | Hernandez, Michael | Address on File | EEOC Charge |
| Belk Department Stores LP | Peeks, Jaime | Address on File | EEOC Charge |
| Belk Department Stores LP | Shops At Broad, LLC (Defendant) | C/O Nixon Jach Hubbard, PLLC<br>Attn: Michael Nixon<br>Jpmorgan International Plaza III<br>14241 Dallas Parkway, Suite 575<br>Dallas, TX 75254 | Real Estate Lawsuit-Belk Plaintiff - 017-318491-20 In the District Court, 17th Judicial District, Tarrant County, TX |
| Belk Department Stores, L.P. | Clark, Barbara | Address on File | General Liability Litigation:<br>Circuit Court of Hamilton County, Tennessee<br>No: 19-C-758 |
| Belk Department Stores, L.P. | Hough, Toni | Address on File | Workers' Compensation Litigation:<br>Circuit Court of Sevier County, Tennessee<br>Docket No. 2006-0240-IV |
| Belk Department Stores, LP | Stockton, Heather | Address on File | General Liability Litigation:<br>US District Court<br>Eastern District of Tennessee<br>At Chattanooga<br>No,1:19-cv-00332-HSM-CHS |
| Belk Departments Stores LP | Hardaway, Laura | Address on File | EEOC Charge |
| Belk Departments Stores LP | Rojas, Cindy | Address on File | EEOC Charge |
| Belk Ecommerce LLC | Johnson, Shanaria | Address on File | EEOC Charge |
| Belk Merchandising LLC | Finzi-Dubois, Sylvia | Address on File | EEOC Charge<br>Demand Letter |
| Belk Stores of Mississippi, LLC, Robert Carson, individually | Koretoff, Nina | Address Unknown | General Liability Litigation:<br>Circuit Court of Lamar Coutny, Mississippi<br>Cause No,. 37CI1:19-cv-139 |
| Belk Stores of Virginia, LLC | Commissioner of Highways | c/o James M. Bowling, IV<br>St. John, Lawrence, & Quagliana, LLP<br>416 Park Street<br>Charlottesville, VA 2202 | Condemnation - Charlottesville, VA<br>Virginia: In the Circuit Court for Albemarle County<br>CL15-212 |
| Belk Stores Services, Inc., now Belk Stores Services, LLC | Department of Labor | Anya Armbrister, Investigator<br>Employee Benefits Security Administration<br>61 Forsyth Street, SW, Suite 7B54<br>Atlanta, GA 30303 | Medical Plan Audit |
| Belk Stores Services, Inc., now Belk Stores Services, LLC | Department of Labor | Niki McConnell, Investigator<br>Employee Benefits Security Administration<br>61 Forsyth Street, SW, Suite 7B54<br>Atlanta, GA 30303<br><br>Jennifer Donald, Senior Investigator<br>US Department of Labor – Employee Benefits Security Administration<br>61 Forsyth Street SW, Suite 7B54<br>Atlanta GA 30303 | Pension Audit |
| Belk Stores Services, Inc., now Belk Stores Services, LLC | The Fashion Exchange LLC | C/O Zarin & Associates P.C.<br>Attn: Scott Zarin<br>One Penn Plaza<br>Suite 4615<br>New York, NY 10119<br><br>Simon Gluck & Kane LLP<br>Same address as Zarin & Associates P.C. | IP Lawsuit - 1:14-cv-01254-JHS<br><br>The Fashion Exchange, LLC v. Hybrid Promotions, LLC, et al., including Belk Stores Services, Inc. |
| Belk, Inc, | Williams, Lafeathura | Address on File | General Liability Litigation:<br>Circuit Court of Jefferson County, Alabama<br>Civil Action No.: 01-CV-2020-902325 |
| Belk, Inc. | Afrin, Sadia | Address on File | General Liability Litigation:<br>US District Court<br>Middle District of Florida<br>Ocala Division<br>Case No:5:20-cv-3-Oc-30PRL |
| Belk, Inc. | Bell, Rosemary | Address on File | Workers' Compensation Litigation:<br>2020-084436 |
| Belk, Inc. | Blash, Doris | Address on File | Workers' Compensation Litigation:<br>WCC File#: TBD |
| Belk, Inc. | Carswell, Kenyatta | Address on File | Employment Demand letter |
| Belk, Inc. | Cascades Branding Innovation LLC | C/O Flachsbart & Greenspoon, LLC<br>Attn: William W. Flachsbart<br>333 N. Michigan Ave, 27th Floor<br>Chicago, IL 60601 | IP Demand Letter |

Schedule A-5

Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Castro, Lilia | Address on File | Workers' Compensation Litigation: IC File#16-738203 |
| Belk, Inc. | Davis, Sandra L | Address on File | General Liability Litigation: District Court Angelina County, Texas 159th Judicial District Cause No. CV-00039-18-01 |
| Belk, Inc. | DeLaCruz, Yesica | Address on File | EEOC Charge |
| Belk, Inc. | Department of Transportation (NC) | Attorney General Transportation Section 1505 Mail Service Center Raleigh, NC 27699 | Easement v Condemnation - Statesville, NC 2020-CVS-1666 Iredell County DOT v Belk |
| Belk, Inc. | Department of Transportation (NC) | c/o Shelby Randall, Right of Way Agent Professional Property Services, Inc. 18335 Old Statesville Road, Unit A Cornelius, NC 28031  Attorney General Transportation Section 1505 Mail Service Center Raleigh, NC 27699 | Condemnation - Mooresville, NC Iredell County Tax Parcel 4647-86-7300 350 West Plaza Drive Proposed NC 150 from East of SR 1840 (Greenwood Road) in Catawba County to US 21 in Iredell County construction project in Iredell County |
| Belk, Inc. | Devos, Constance & Christopher (on behalf of minor) | Address on File | General Liability Litigation: Non-suit |
| Belk, Inc. | Doyle, Joan Ann | Address on File | General Liability Litigation: US District Court Middle District of Florida Ocala Division 5:20-CV-00490-JSM-PRL |
| Belk, Inc. | Durso, Gail as the Personal Representative of the Estate of Glenn David Garton, Deceased | Address on File | General Liability Litigation: Circuit Court of the Sixth Judicial Circuit Pasco County, Florida 2019-CA-000775 |
| Belk, Inc. | Eaton, Victoria | Address on File | General Liability Litigation: US District Court District of South Carolina Charleston Division 2:19-cv-02970-BHH |
| Belk, Inc. | Fairwell, Sandra | Address on File | Workers' Compensation Litigation: WCC File #1720856 |
| Belk, Inc. | Fisher, Diane | Address on File | Workers' Compensation Litigation: OJCC Case No. 20-0291149MAM |
| Belk, Inc. | Fowler, Mary | Address on File | General Liability Litigation: Circuit Court for Knox County, Tennessee No: 2-12-18 |
| Belk, Inc. | Fryman, Elizabeth | Address on File | Workers' Compensation Litigation: IC File# 098806 |
| Belk, Inc. | Gaskins, Shirley Gaskins, Ronnie | Address on File | General Liability Litigation: State Court of Lowndes County State of Georgia Civil Action No. 2019SCV0244 |
| Belk, Inc. | Greene, Aimee | Address on File | Workers' Compensation Litigation: IC File # 20-005050 |
| Belk, Inc. | Harris, Theresa | Address on File | Workers' Compensation Litigation: LC File# 20-709533 |
| Belk, Inc. | Harrison, Annette | Address on File | Workers' Compensation Litigation: WCC File # 0824707 |
| Belk, Inc. | Hill, Michael, as Father and Next of Kin of minor | Address on File | General Liability Litigation: Circuit Court of Jefferson County, Alabama Civil Action No 01-CV-2020-904052.00 |
| Belk, Inc. | Hollis, Nadine | Address on File | Workers' Compensation Litigation: Circuit Court for the 23rd Judicial Circuit of Madison County, Alabama Civil Action: 47-CV-2019-902193-JPS |
| Belk, Inc. | Holmes, Chester | Address on File | Workers' Compensation Litigation: OJCC Case No. 14-022291NSW |
| Belk, Inc. | Humphries, Grace | Address on File | Workers' Compensation Litigation: WCC File No. 0806517 |
| Belk, Inc. | Jennings, Patricia | Address on File | General Liability Litigation: State of Louisana Parish of Ouachita Fourth Judicial District Court Docket Number C-20190746 |
| Belk, Inc. | Jones, Eleanore Jones, Curtis | Address on File | General Liability Litigation: Superior Court of Glynn County State of Georgia Civil Action No CE19-00779 |
| Belk, Inc. | Lacewell, Cecilia | Address on File | Workers' Compensation Litigation: NCIC: 627703 & 636275 |
| Belk, Inc. | Lettley, Charlisa | Address on File | Workers' Compensation Litigation: IC: 18-014876 |
| Belk, Inc. | Liberti, Alexandras | Address on File | Workers' Compensation Litigation: OJCC: 20-027976WWA |
| Belk, Inc. | Little, Judy | Address on File | General Liability Litigation: General Court of Justice Superior Court Division State of North Carolina County of Anson 20-CVS-79 |
| Belk, Inc. | McCarley, Mary | Address on File | Workers' Compensation Litigation: WCC File #2005357 |

Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | McDowell, Tabitha | Address on File | Workers' Compensation Litigation: WCC File #2011496 |
| Belk, Inc. | McWhirter, Brian | Address on File | Workers' Compensation Litigation: WCC File #2008970 |
| Belk, Inc. | Oden, Samantha | Address on File | EEOC Charge |
| Belk, Inc. | Page, Gwendolyn | Address on File | Workers' Compensation Litigation: WCC File No. 2016443 |
| Belk, Inc. | Patterson, Briana | Address on File | Workers' Compensation Litigation: WCC File # 2011444 |
| Belk, Inc. | Rackley, Jared | Address on File | Workers' Compensation Litigation: OJCC# 14-006506JLN |
| Belk, Inc. | Reed, Jonola | Address on File | Workers' Compensation Litigation: Circuit Court of Mobile County, Alabama 02-CV-2020-900999.00 |
| Belk, Inc. | Robinson, Evangelist | Address on File | Workers' Compensation Litigation: WCC File# 0506013 |
| Belk, Inc. | Seale, Caryll | Address on File | Workers' Compensation Litigation: Injury No 19-085531 |
| Belk, Inc. | Seay, Shirley | Address on File | Workers' Compensation Litigation: WCC File #2014331 |
| Belk, Inc. | Sexton, Doris | Address on File | Workers' Compensation Litigation: MWCC No: 1604962 |
| Belk, Inc. | Smallwood, Danita | Address on File | Workers' Compensation Litigation: 2020-112171 |
| Belk, Inc. | Smith, Angela | Address on File | Workers' Compensation Litigation: I.C. No. 20-026647 |
| Belk, Inc. | State of South Carolina, County of Charleston, City of North Charleston (Condemnor) | c/o Bruce A. Berlinksy, Esquire PO Box 206 (29402) One Carriage Lane, Bldg. F Charleston, SC 29407 | Condemnation - North Charleston, SC In the Court of Common Pleas for the Ninth Judicial Circuit 2020-CP-1002667 |
| Belk, Inc. | Strickland, Charllene | Address on File | General Liability Litigation: Superior Court for the County of Columbia State of Georgia Civil Action File No. 2021ECV0002 |
| Belk, Inc. | Studenmund, Sandra | Address on File | Workers' Compensation Litigation: WCC File No.: 06171087 |
| Belk, Inc. | Townsend, Timothy | Address on File | Workers' Compensation Litigation: WCC File No. 1910335 |
| Belk, Inc. | Triangle SC, LLC | C/O K&L Gates, LLC Attn: Marla Tun Reschly 300 South Tryon Street, Suite 1000 Charlotte, NC 28202 | Contract Dispute Letter |
| Belk, Inc. | Vest, Laura | Address on File | Workers' Compensation Litigation: 1090-WC-07-0507709 |
| Belk, Inc. | Visa Inc., Visa Usa, Inc., Visa International Service Association, Mastercard Incorporated and Mastercard International Incorporated (Defendants) | C/O Arnold & Porter Attn: Robert C. Mason 250 West 55th Street New York, NY 10019  C/O Holwell, Shuster And Goldberg Attn: Michael S. Shuster 425 Lexington Avenue New York, NY 10017  C/O Paul Weiss Attn: Gary R. Carney 1285 Avenue Of The Americas New York, NY 10019 | Antitrust Dispute |
| Belk, Inc. | Walker, Mardester | Address on File | Workers' Compensation Litigation: WCC File No. 1912816 |
| Belk, Inc. | Webster, Victoria | Address on File | Workers' Compensation Litigation: WCC File No. 1908101 |
| Belk, Inc. | Weems, Janice | Address on File | Workers' Compensation Litigation: W139006 |
| Belk, Inc. | Bailey, Jacqueline | Address on File | EEOC Charge Demand Letter |
| Belk, Inc. | Coleman, Sharon | Address on File | EEOC Charge |
| Belk, Inc. | Cuyler, Thomas | Address on File | Employment Litigation Thomas Cuyler v. Belk, Inc. (Cathy Halstead, Jo Bickford, Michelle Barton & Paul Ferrier) |
| Belk, Inc. | Gabriel Bros, Inc. | C/O Fross Zelnick Lehrman & Zissu, P.C. Attn: John P. Margiotta, Emily Weiss 4 Times Square 17th Floor New York, NY 10036 | IP Arbitration - 18-cv-07289  Gabriel Bros, Inc. v. Effy Jewelers Corp.; Macy's, Inc.; and Belk, Inc. |
| Belk, Inc. | Klauber Brothers, Inc. | C/O Doniger / Burroughs Attn: Stephen Doniger, Scott Alan Burroughs, Trevor W. Barrett, Justin M. Gomes 603 Rose Avenue Venice, CA 90291 | IP Lawsuit - 2:20-cv-07430  Klauber Brothers, Inc. v. Urban Outfitters, Inc., Free People of PA, LLC, et al., including, Belk, Inc. |
| Belk, Inc. | Lane, Sylvia | Address on File | EEOC Charge |

Schedule A-5

Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Lucey Corporation  and Sean M. Lucey | C/O Lincoln Derr PLLC<br>Attn: Sara Lincoln<br>Capitol Towers (South Tower)<br>4350 Congress Street, Suite 575<br>Charlotte, NC 28209<br><br>C/O Moore & Van Allen<br>Attn: Karin M. Mcginnis<br>100 N. Tryon Street, Suite 4700<br>Charlotte, NC 28202<br><br>C/O Alexander Ricks, PLLC<br>Attn: Alice C. Richey<br>4601 Park Road, Suite 580<br>Charlotte, NC 28209 | Third Party Subpoena |
| Belk, Inc. | No specific party | Address on File | ADEA Directed Charge<br>Employment Investigation |
| Belk, Inc. | Sampson Crossing, LLLP | C/O Offit Kurmann, P.A.<br>Attn:  John H. Capitano<br>301 South College Street<br>Suite 2600<br>Charlotte, NC 28202 | Real Estate Lawsuit - 20-CVS-603<br><br>Sampson Crossing, LLLP v. Belk, Inc. |
| Belk, Inc. | Scott, Sharolyn | Address on File | EEOC Charge |
| Belk, Inc. | Vaughan, Alloysia | Address on File | EEOC Charge |
| Belk, Inc. (DE) | Gurien, Anne M | Address on File | General Liability Litigation:<br>Superior Court of Dougherty County<br>State of Georgia<br>Civil Action No: SUCV2019001272 |
| Belk, Inc. (DE), DBA Belk, Inc.<br>Doe #1, John/Jane<br>Doe#2, John/Jane | Bishop, Linda R<br>Bishop, Buddy | Address on File | General Liability Litigation:<br>Superior Court of Bulloch County<br>State of Georgia<br>Civil Action Number: SUCV2020000052 |
| Belk, Inc. (DE), Lewis, Brandy | Carter, Linda | Address on File | General Liability Litigation:<br>Superior Court of Coffee County<br>State of Georgia<br>Civil Action No: SUV2020000353 |
| Belk, Inc. / Corvel Corp | Pencka, Keli M | Address on File | Workers' Compensation Litigation:<br>OJCC# 20-025564WWA |
| Belk, Inc. and Benhjamin Wesley Muller in<br>his individual capacity and as an employee of<br>Belk, Inc. | Davidson, Zackery | Address on File | General Liability Litigation:<br>Circuit Court of Faulkner County, Arkansas<br>Civil Division<br>Case No. 23CV-20-341 |
| Belk, Inc. and Brandon Bradley | Schaeffer, Rachel | Address on File | General Liability Litigation:<br>State of South Carolin<br>County of Horry<br>Fifteenth Judicial Circuit<br>Civil Action No: 2020-CP-26-00919 |
| Belk, Inc. and CorVel Insurancxe | Elkins, Joanne | Address on File | Workers' Compensation Litigation:<br>Docket #18-01450 |
| Belk, Inc. and Hartford Accident & Indemnity<br>Company c/o Corvel | Guerrero, Teresa | Address on File | Workers' Compensation Litigation:<br>SBWC No. 2019-058703 |
| Belk, Inc. and Hartford Accident & Indemnity<br>Company c/o Corvel | Hardin, Shelly | Address on File | Workers' Compensation Litigation:<br>SBWC No. 2019-087451 |
| Belk, Inc. and Hartford Casualty Ins.<br>Company c/o Corvel Corporation | Fugmann, Bette | Address on File | Workers' Compensation Litigation:<br>IC File No: 19-038821 |
| Belk, Inc. and its affiliates | Digi Portal LLC | C/O IP Edge LLC<br>Attn:  Annette Rathgeber<br>Email: annetteg@ipedge.com, admin@ip-edge.com | IP Demand Letter |
| Belk, Inc. and John Doe | Ophelan, Mary Lou | Address on File | General Liability Litigation:<br>Circuit Court of the 20th Judicial Circuit in and for Lee<br>County, Florida<br>Case No.: 20-CA-1556 |
| Belk, Inc. and Preit-Rubin, Inc. d/b/a<br>Magnolia Mall | Adams, Lillian | Address on File | General Liability Litigation:<br>State of South Carolina<br>County of Florence<br>Civil Action No.: 2020-CP-21-0750 |
| Belk, Inc. and Property and Casualty<br>Insurance Company of Hartford | Hubert, Jolene | Address on File | Workers' Compensation Litigation:<br>MWCC No. 2006510-R-2405 |
| Belk, Inc. and Twin City Fire Insurance<br>Company | Moore, Shernika, individually and as the natural<br>and court appointed tutrix of a minor child | Address on File | General Liability Litigation:<br>US District Court<br>Western District of Louisiana<br>Monroe Division<br>Civil Action No.:3:20-CV-00816 |
| Belk, Inc. d/b/a Belk | Brunson, Roberta L | Address on File | General Liability Litigation:<br>Superior Court of Lowndes County<br>State of Georgia<br>Civil Action No: 2020CV1792 |
| Belk, Inc. d/b/a Belk | Smith, Linda | Address on File | General Liability Litigation:<br>US District Court<br>Middle District of Georgia<br>Valdosta Division<br>Case No.: 7:20-cv-00226-WLS |
| Belk, Inc. d/b/a Belk and Jane Doe | Thompson, Sharon A | Address on File | General Liability Litigation:<br>State of South Carolina<br>County of Richland<br>Case # 2019-CP-40-04364 |
| Belk, Inc., a corporation | Bennett, Carlene | Address on File | General Liability Litigation:<br>US District Court<br>District of South Carolina<br>Anderson Division<br>Case No.: 2020CP0400641 |

Schedule A-5

**Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc., a Delaware Corporation; Belk Department Stores, a corporation; Belk Department Stores, a partnership; Belk Department Stores, a sole proprietorship; Professional Facilities Management, Inc., an Alabama corporation; Albany Mall Management, Inc., an Alabama corporation; Albany Mall, LLC, an Alabama limited liability company; Albany Mall Properties, LLC, an Alabama limited liability company; Aronov Realty Management Inc., an Alabama corporation; Aronov Realty Company, Inc., an Alabama corporation; The Aronov Corporation, an Alabama corporation; Lakeside Project Solutions, LLC; ABC Corporation and/or XYZ Entity | Yancey, Teresa | Address Unknown | General Liability Litigation:<br>Superior Court of Dougherty County<br>State of Georgia<br>Civil Action No: SUCV2019000541 |
| Belk, Inc., A Foreign Profit Corporation, and Schindler Elevator Corporation, A Foreign Profit Corporation | Russell, Brantley S | Address on File | General Liability Litigation:<br>US District Court<br>Middle District of Florida<br>Jacksonville Division<br>Case 3:20-cv-01135 |
| Belk, Inc., and Bronwyn Libeer | Scott, Latoya | Address on File | General Liability Litigation:<br>State of South Carolina<br>County of Richland<br>C.A. No. 2019-CP-40-01195 |
| Belk, Inc., and Preit-Rubin, Inc., d/b/a/ Magnolia Mall | Osean, Justin | Address on File | General Liability Litigation:<br>US District Court<br>District of South Carolina<br>Florence Division<br>CA No.: 4:19-cv-02907-MGL |
| Belk, Inc., Fictitious Parties "1-15" | Holmes, Sanderlin | Address on File | General Liability Litigation:<br>Circuit Court of Jefferson County, Alabama<br>Civil Action No. 01-CV-2020-901180.00 |
| Belk, Inc., Hartford Underwriters Ins Co, Corvel Corporation | Shumate, Ora | Address on File | Workers' Compensation Litigation:<br>Claim No VA00001692134 |
| Belk, Inc., improperly identified as Belk Department Store | Leatherman, Janice E. | Address on File | Miscellaneous Lawsuit 20-cv-M531 then 5:20-cv-00169<br><br>Janice E. Leatherman v. Belk Department Store |
| Belk, Inc., McKnight Properties, Inc., D Mall, LLC, Roofing Professionals, Inc. and John Does 6-8 | Williams, Toshia | Address Unknown | General Liability Litigation:<br>State Court of Gwinnett County<br>State of Georgia<br>Civil Action No: 20-C-03106-S5 |
| Belk, Inc./CorVel Corporation | Barshini, Rowida | Address on File | Workers' Compensation Litigation:<br>OJCC Case No: 20-014036RJH |
| Belk, Inc.; Dona Allen; A-H other unidentified persons and/or entities | Woodall, Irvyll | Address on File | General Liability Litigation:<br>Circuit Court of Lee County, Alabama<br>Civil Action No: 43-CV-2020-900403.00 |
| Belk, Incorporated | Campbell, Barbara | Address on File | General Liability Litigation:<br>Circuit Court of the Fourth Judicial Circuit<br>Duval County Florida<br>Case No: 16-2017-CA-007503<br>Division: CV-B |

Schedule A-6

**Claims Related to Taxing Authorities**

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk Administration Company | North Carolina Department of Revenue | North Carolina Department of Revenue<br>P.O. Box 25000<br>Raleigh, NC 27640-0640 | Franchise Tax Refund |
| Belk Department Stores LP | Internal Revenue Service | Department of the Treasury<br>Internal Revenue Service Center<br>333 W Pershing Rd<br>Kansas City, MO 64108 | CARES Act Employee Retention Credit |
| Belk Department Stores, LP. | Texas State Comptroller | Comptroller of Public Accounts, P.O. Box 149354, Austin, TX 78714-9354 | Sales Tax refund for Q4 of FY2021 |
| Belk Eccommerce, LLC | California Secretary of State | Franchise Tax Board<br>P.O. Box 942857<br>Sacramento, CA 94257-0531 | Income Tax Refund |
| Belk Eccommerce, LLC | Internal Revenue Service | Department of the Treasury<br>Internal Revenue Service Center<br>333 W Pershing Rd<br>Kansas City, MO 64108 | CARES Act Employee Retention Credit |
| Belk Inc. | Middlesboro, KY | City of Middlesboro<br>PO Box 756<br>Middlesboro, KY 40965 | Franchise Tax Refund |
| Belk Inc. | Missouri Department of Revenue | Taxation Division, P.O. Box 840, Jefferson City, MO 65105-0840 | Sales Tax refund for Q1 and Q2 of FY2021 |
| Belk Inc. | Oklahoma Tax Commission | Business Tax Division, P.O. Box 26850, Oklahoma City, OK 73126-0850 | Sales Tax refund for Q1 of FY2021 |
| Belk Inc. | Pulaski County, KY | Pulaski County Tax Administrator<br>PO Box 658<br>Somerset, KY 42502-0658 | Franchise Tax Refund |
| Belk Inc. | Richmond, KY | City of Richmond, KY<br>PO Box 1268<br>Richmond, KY 40476-1268 | Franchise Tax Refund |
| Belk Inc. | Tennessee Department of Revenue | Tennessee Department of Revenue<br>Andrew Jackson State Office Building<br>500 Deaderick Street<br>Nashville, TN 37242 | Franchise Tax Refund |
| Belk Inc. | Texas State Comptroller | Comptroller of Public Accounts, P.O. Box 149354, Austin, TX 78714-9354 | Sales Tax refund for Q4 of FY2021 |
| Belk Inc. | Virginia Department of Taxation | Department of Taxation<br>PO Box 1500<br>Richmond VA 23218-1500 | Income Tax Refund |
| Belk International | North Carolina Department of Revenue | North Carolina Department of Revenue<br>P.O. Box 25000<br>Raleigh, NC 27640-0640 | Franchise Tax Refund |
| Belk Merchandising LLC | Internal Revenue Service | Department of the Treasury<br>Internal Revenue Service Center<br>333 W Pershing Rd<br>Kansas City, MO 64108 | CARES Act Employee Retention Credit |
| Belk Store Services, Inc. | Florida Department of Revenue | Florida Department of Revenue<br>5050 W Tennessee St<br>Tallahasee FL 32399-0135 | Income Tax Refund |
| Belk Store Services, Inc. | Louisiana Department of Revenue | Louisiana Department of Revenue<br>P.O. Box 91011<br>Baton Rouge, LA 70821-9011 | Franchise Tax Refund |
| Belk Stores of Mississippi | Mississippi Department of Revenue | Department of Revenue<br>P.O. Box 23191<br>Jackson, MS 39225-3191 | Franchise Tax Refund |
| Belk Stores of Mississippi, LLC | Internal Revenue Service | Department of the Treasury<br>Internal Revenue Service Center<br>333 W Pershing Rd<br>Kansas City, MO 64108 | CARES Act Employee Retention Credit |
| Belk Stores of VA, LLC. | Virginia Department of Taxation | Virginia Retail Sales and Use Tax, P.O. Box 26627, Richmond, VA 23261-6627 | Sales Tax refund for Q2 of FY2021 |
| Belk Stores of Virginia, LLC | Internal Revenue Service | Department of the Treasury<br>Internal Revenue Service Center<br>333 W Pershing Rd<br>Kansas City, MO 64108 | CARES Act Employee Retention Credit |
| Belk, Inc. | Internal Revenue Service | Department of the Treasury<br>Internal Revenue Service Center<br>333 W Pershing Rd<br>Kansas City, MO 64108 | CARES Act Employee Retention Credit |
| Belk, Inc. | Louisiana Department of Revenue | Louisiana Department of Revenue<br>P.O. Box 91011<br>Baton Rouge, LA 70821-9011 | Franchise Tax Refund |
| Belk, Inc. | South Carolina Department of Revenue | SC Department of Revenue<br>Corporate Taxable<br>P.O. Box 100151<br>Columbia, SC 29202 | Franchise Tax Refund |
| Fashion Holdings Intermediate LLC & Subsidiaries | Internal Revenue Service | Department of the Treasury<br>Internal Revenue Service Center<br>Ogden, UT 84201-0045 | Income Tax Refund |
| Fashion Holdings Intermediate LLC & Subsidiaries | Internal Revenue Service | Department of the Treasury<br>Internal Revenue Service Center<br>Ogden, UT 84201-0045 | Income Tax Refund |

Schedule A-5

Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions

| DEBTOR | COUNTERPARTY | COUNTERPARTY ADDRESS | DESCRIPTION |
|---|---|---|---|
| Belk, Inc. | Castro, Lilia | Address on File | Workers' Compensation Litigation: IC File#16-738203 |
| Belk, Inc. | Davis, Sandra L | Address on File | General Liability Litigation: District Court Angelina County, Texas 159th Judicial District Cause No. CV-00039-18-01 |
| Belk, Inc. | DeLaCruz, Yesica | Address on File | EEOC Charge |
| Belk, Inc. | Department of Transportation (NC) | Attorney General Transportation Section 1505 Mail Service Center Raleigh, NC 27699 | Easement v Condemnation - Statesville, NC 2020-CVS-1666 Iredell County DOT v Belk |
| Belk, Inc. | Department of Transportation (NC) | c/o Shelby Randall, Right of Way Agent Professional Property Services, Inc. 18335 Old Statesville Road, Unit A Cornelius, NC 28031  Attorney General Transportation Section 1505 Mail Service Center Raleigh, NC 27699 | Condemnation - Mooresville, NC Iredell County Tax Parcel 4647-86-7300 350 West Plaza Drive Proposed NC 150 from East of SR 1840 (Greenwood Road) in Catawba County to US 21 in Iredell County construction project in Iredell County |
| Belk, Inc. | Devos, Constance & Christopher (on behalf of minor) | Address on File | General Liability Litigation: Non-suit |
| Belk, Inc. | Doyle, Joan Ann | Address on File | General Liability Litigation: US District Court Middle District of Florida Ocala Division 5:20-CV-00490-JSM-PRL |
| Belk, Inc. | Durso, Gail as the Personal Representative of the Estate of Glenn David Garton, Deceased | Address on File | General Liability Litigation: Circuit Court of the Sixth Judicial Circuit Pasco County, Florida 2019-CA-000775 |
| Belk, Inc. | Eaton, Victoria | Address on File | General Liability Litigation: US District Court District of South Carolina Charleston Division 2:19-cv-02970-BHH |
| Belk, Inc. | Fairwell, Sandra | Address on File | Workers' Compensation Litigation: WCC File #1720856 |
| Belk, Inc. | Fisher, Diane | Address on File | Workers' Compensation Litigation: OJCC Case No. 20-0291149MAM |
| Belk, Inc. | Fowler, Mary | Address on File | General Liability Litigation: Circuit Court for Knox County, Tennessee No: 2-12-18 |
| Belk, Inc. | Fryman, Elizabeth | Address on File | Workers' Compensation Litigation: IC File# 098806 |
| Belk, Inc. | Gaskins, Shirley Gaskins, Ronnie | Address on File | General Liability Litigation: State Court of Lowndes County State of Georgia Civil Action No. 2019SCV0244 |
| Belk, Inc. | Greene, Aimee | Address on File | Workers' Compensation Litigation: IC File # 20-005050 |
| Belk, Inc. | Harris, Theresa | Address on File | Workers' Compensation Litigation: LC File# 20-709533 |
| Belk, Inc. | Harrison, Annette | Address on File | Workers' Compensation Litigation: WCC File # 0824707 |
| Belk, Inc. | Hill, Michael, as Father and Next of Kin of minor | Address on File | General Liability Litigation: Circuit Court of Jefferson County, Alabama Civil Action No 01-CV-2020-904052.00 |
| Belk, Inc. | Hollis, Nadine | Address on File | Workers' Compensation Litigation: Circuit Court for the 23rd Judicial Circuit of Madison County, Alabama Civil Action: 47-CV-2019-902193-JPS |
| Belk, Inc. | Holmes, Chester | Address on File | Workers' Compensation Litigation: OJCC Case No. 14-022291NSW |
| Belk, Inc. | Humphries, Grace | Address on File | Workers' Compensation Litigation: WCC File No. 0806517 |
| Belk, Inc. | Jennings, Patricia | Address on File | General Liability Litigation: State of Louisana Parish of Ouachita Fourth Judicial District Court Docket Number C-20190746 |
| Belk, Inc. | Jones, Eleanore Jones, Curtis | Address on File | General Liability Litigation: Superior Court of Glynn County State of Georgia Civil Action No CE19-00779 |
| Belk, Inc. | Lacewell, Cecilia | Address on File | Workers' Compensation Litigation: NCIC: 627703 & 636275 |
| Belk, Inc. | Lettley, Charlisa | Address on File | Workers' Compensation Litigation: IC: 18-014876 |
| Belk, Inc. | Liberti, Alexandras | Address on File | Workers' Compensation Litigation: OJCC: 20-027976WWA |
| Belk, Inc. | Little, Judy | Address on File | General Liability Litigation: General Court of Justice Superior Court Division State of North Carolina County of Anson 20-CVS-79 |
| Belk, Inc. | McCarley, Mary | Address on File | Workers' Compensation Litigation: WCC File #2005357 |

**<u>Exhibit C</u>**

**Form of New First Lien Credit Facility Documents**

EXECUTION VERSION

## AMENDMENT NO. 2 TO CREDIT AGREEMENT

This AMENDMENT NO. 2 TO CREDIT AGREEMENT, dated as of February 24, 2021 (this "**Agreement**"), is among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation (the "**Borrower**"), the other Guarantors party hereto, Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, including any successor thereto, the "**Agent**") under the Loan Documents, each Lender party to the Existing Credit Agreement (as defined below) (collectively, the "**Existing Lenders**") and the new lenders joining the A&R Credit Agreement (as defined below) (collectively, the "**New Lenders**", and together with the Existing Lenders, collectively, the "**Lenders**").

## PRELIMINARY STATEMENTS

**WHEREAS**, reference is made to that certain First Lien Credit Agreement, dated as of December 10, 2015, as amended by Amendment No. 1 thereto dated as of October 29, 2019 (as amended by such Amendment No. 1 and as in effect immediately prior to the effectiveness of this Agreement, the "**Existing Credit Agreement**"; the Existing Credit Agreement as amended and restated in the form attached as Exhibit A hereto, the "**A&R Credit Agreement**"; capitalized terms used but not defined herein having the meanings provided in the A&R Credit Agreement), among the Borrower, Holdings, the Lenders from time to time party thereto, the Administrative Agent and the Collateral Agent;

**WHEREAS**, the Borrower has requested that (i) the Existing Lenders agree to amend and restate the Existing Credit Agreement as provided for herein and (ii) the New Lenders join the A&R Credit Agreement;

**WHEREAS**, on the date hereof, (i) the Existing Lenders are willing to amend and restate the Existing Credit Agreement on the terms set forth in herein and (ii) the New Lenders are willing to join the A&R Credit Agreement;

**NOW, THEREFORE**, in consideration of the undertakings set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Amendments to the Existing Loan Documents</u>.  Effective as of the Amendment No. 2 Effective Date (as defined below), subject to the satisfaction of the conditions set forth in <u>Section 3</u> hereof, each of the parties hereto agrees that:

(a)    the Existing Credit Agreement (excluding all Exhibits thereto (except as set forth in clause (b) below), but including the Schedules attached to the A&R Credit Agreement on <u>Exhibit A</u> hereto) shall be amended and restated in its entirety and replaced as set forth in the document attached as <u>Exhibit A</u> hereto;

(b)    Exhibit C (Compliance Certificate), Exhibit D-1 (Assignment and Assumption) and Exhibit D-2 (Affiliated Lender Assignment and Assumption are hereby deleted in their entirety and a new Exhibit C, Exhibit D-1 and Exhibit D-2 are substituted in their stead, each as attached hereto as <u>Exhibit B</u>; and

(c)       Exhibit R (PIK Toggle Notice) and Exhibit S (Recognition Agreement) are hereby added to the A&R Credit Agreement as new Exhibits, each as attached hereto as <u>Exhibit C</u>.

2.      <u>Representations and Warranties</u>.  To induce the other parties hereto to enter into this Agreement, each of the Loan Parties represents and warrants to each of the Lenders party hereto and the Agent that, after giving effect to this Agreement:

(a)       the execution, delivery and performance of this Agreement by such Loan Party and the consummation of the transactions contemplated herein are within such Loan Party's corporate or other organizational powers;

(b)       this Agreement has been duly authorized, executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing;

(c)       no Default or Event of Default exists or has occurred and is continuing as of the date hereof; and

(d)       all representations and warranties made in any Loan Document are true and correct in all material respects as if made on the date hereof; provided that to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; <u>provided</u>, <u>further</u>, that to the extent any representation or warranty would not be true or correct solely as a result of customary events or circumstances in connection with the Plan of Reorganization, such representation or warranty shall not be deemed to be untrue or incorrect in any material respect.

3.      <u>Conditions Precedent</u>.  This Agreement and the amendments set forth in <u>Section 1</u> shall become effective on the first date (the "**Amendment No. 2 Effective Date**") that:

i.      The Agent shall have received each of the following, each of which shall be .pdf copies unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party and, if applicable, each of the other parties thereto, each dated as of the Amendment No. 2 Effective Date (or, in the case of certificates of government officials, a recent date before the Amendment No. 2 Effective Date) each in form and substance consistent with the Backstop Commitment Letter (as defined in the RSA) and the New Credit Facilities Term Sheet attached as Exhibit 1 to the Restructuring Term Sheet (as defined in the RSA) (the "**New Credit Facilities Term Sheet**"), and otherwise reasonably satisfactory to the Agent, the Required Lenders and the Sponsor:

(a)       a Committed Loan Notice;

<div align="center">2</div>

(b)      executed counterparts of this Agreement, duly executed by the Borrower, the other Loan Parties, the Agent, and each Lender;

(c)      certificates of good standing from the secretary of state of the state of organization of each Loan Party (to the extent such concept exists in such jurisdiction), a certificate from the Borrower and each other Loan Party with appropriate insertions and attachments of resolutions or other actions, evidence or incumbency and the signature of authorized signatories and Organizational Documents, executed by a Responsible Officer and the secretary or any assistant secretary or other authorized representative of such Loan Party;

(d)      each of the following:

(1) certificates, if any, representing the Pledged Equity referred to in the Security Agreement accompanied by undated stock powers executed in blank and instruments, if any evidencing the Pledged Debt (as defined in the Security Agreement) indorsed in blank (or confirmation in lieu thereof that such certificates, powers and instruments have been sent for overnight delivery to the Collateral Agent);

(2) evidence that all other actions, recordings and filings required by the Collateral Documents that the Required Lenders may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Required Lenders;

(3) a perfection certificate, duly executed and delivered by the Loan Parties, in form and substance reasonably satisfactory to the Required Lenders; and

(4) copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Required Lenders with respect to the Loan Parties;

(e)      a certificate of an officer of the Borrower certifying that the conditions set forth in Paragraphs (ii) and (iii) below have been satisfied;

(f)      a certificate, substantially in the form of Exhibit I to the Existing Credit Agreement, of the chief financial officer (or other comparable officer) of the Borrower certifying the Solvency, after giving effect to the New Money First-Out Loans and the other transactions contemplated hereby and by the RSA on the Amendment No. 2 Effective Date, of the Borrower and its Subsidiaries on a consolidated basis;

(g)      an executed legal opinion of (i) Kirkland & Ellis LLP, counsel to the Borrower and the other Loan Parties, (ii) Moore & Van Allen, special South Carolina and North Carolina counsel to certain of the Loan Parties, and (iii) Butler Snow LLP, special Mississippi counsel to certain of the Loan Parties;

3

(h)    a Supplement No. 1 to the Security Agreement (the "<u>Security Agreement Supplement</u>"), a Supplement No. 1 to the Guaranty (the "<u>Guaranty Supplement</u>"), and a Joinder Agreement to Intercompany Subordination Agreement, in each case, executed by Belk Sourcing LLC;

(i)    the Agent Fee Letter, executed by the Borrower and the Agent;

(j)    a Resignation and Appointment Agreement, executed by the Loan Parties, Morgan Stanley Senior Funding, Inc., as Resigning Administrative Agent and Resigning Collateral Agent, and Alter Domus (US) LLC, as Successor Administrative Agent and Successor Collateral Agent, in the form attached as <u>Exhibit D</u> hereto (the "<u>Resignation and Appointment Agreement</u>"); and

(k)    a Reaffirmation Agreement, executed by the Loan Parties and the Agent, in the form attached as <u>Exhibit E</u> hereto;

ii.    The representations and warranties of the Loan Parties contained in the A&R Credit Agreement shall be true and correct in all material respects on and as of the Amendment No. 2 Effective Date; provided that to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; <u>provided</u>, <u>further</u>, that to the extent any representation or warranty would not be true or correct solely as a result of customary events or circumstances in connection with the Plan of Reorganization, such representation or warranty shall not be deemed to be untrue or incorrect in any material respect;

iii.    At the time of and immediately after giving effect to the New Money First-Out Loans and the other transactions contemplated hereby and by the RSA on the Amendment No. 2 Effective Date, no Default or Event of Default under the A&R Credit Agreement shall exist;

iv.    The Agent shall have received an executed (i) Second Lien Credit Agreement Amendment, (ii) Limited Waiver and Amendment No. 3 to ABL Credit Agreement, (iii) Amended and Restated Term Intercreditor Agreement in the form attached as <u>Exhibit F</u> hereto (the "<u>A&R Term Increditor Agreement</u>"), (iv) First Amendment to Intercreditor Agreement in the form attached as <u>Exhibit G</u> hereto (the "<u>ABL Intercreditor Amendment</u>), each in form and substance consistent with the Backstop Commitment Letter and the New Credit Facilities Term Sheet and otherwise reasonably satisfactory to the Agent, the Required Lenders and the Required Lenders (as defined in the Second Lien Credit Agreement);

v.    The Backstop Commitment Parties (as defined in the Backstop Commitment Letter) shall have received all fees required to be paid pursuant to the Backstop

OMM_US:79432204.10

Commitment Letter payable to them to the extent due (which may be offset against the proceeds of the New Money First-Out Loans);

vi.   Each holder of an allowed First Lien Term Loan Claim (as defined in the RSA) shall have received all accrued and unpaid amortization and interest (at the Default Rate) on the principal amount of such First Lien Term Loan Claim through the Petition Date;

vii.   The Agent, the Ad Hoc Crossover Lender Group, the Ad Hoc First Lien Lender Group and the Consenting Sponsors (each as defined in the RSA) shall have received all fees, expenses and other amounts required to be reimbursed or paid by the Borrower under the A&R Credit Agreement, the RSA, the Agent Fee Letter and any other applicable fee letters executed by the Borrower and such parties or their respective professionals (with respect to amounts incurred, or reasonably estimated to be incurred, on or prior to the Amendment No. 2 Effective Date), to the extent invoiced at least one (1) Business Day prior to the Amendment No. 2 Effective Date;

viii.   The Agent and the Lenders shall have received at least three (3) Business Days prior to the Amendment No. 2 Effective Date (or such later date as the Agent or such Lender shall reasonably agree) all documentation and other information about the Loan Parties that has been reasonably requested in writing (including by email) by the Agent or the Lenders as required by the U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and the Beneficial Ownership Regulation;

ix.   The RSA shall remain in full force and effect;

x.   The entry of the Confirmation Order (as defined in the RSA) shall have occurred; and

xi.   The Plan Effective Date (as defined in the RSA) shall have occurred.

Without limiting the generality of the provisions of Section 10.01(1) of the Existing Credit Agreement, for purposes of determining compliance with the condition specified in this Section 3, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, this Agreement and the other matters required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Amendment No. 2 Effective Date specifying its objection thereto.

4.   New Lenders.  Each New Lender (i) confirms that a copy of the A&R Credit Agreement and the other Loan Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Agreement and provide a Commitment, have been made available to such New Lender, (ii) agrees that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking

OMM_US:79432204.10

action under the A&R Credit Agreement or the other applicable Loan Documents, including this Agreement, (iii) appoints and authorizes each Agent to take such action as administrative agent and collateral agent on its behalf and to exercise such powers under the A&R Credit Agreement and the other Loan Documents as are delegated to such Agent by the terms thereof, together with such powers as are reasonably incidental thereto, and (iv) acknowledges and agrees that upon the Amendment No. 2 Effective Date, such New Lender shall be a "Lender" under, and for all purposes of, the A&R Credit Agreement and the other Loan Documents, and shall be subject to and bound by the terms thereof, and shall perform all the obligations of and shall have all rights of a Lender thereunder.

5.     [Reserved].

6.     <u>Amendment, Modification and Waiver; No Novation</u>.

(a)     This Agreement may not be amended, modified or waived except in accordance with the A&R Credit Agreement. The execution, delivery and effectiveness of this Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or any Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.

(b)     On and after the Amendment No. 2 Effective Date, each reference in the Existing Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement", "thereunder", "thereof" or words of like import referring to the Existing Credit Agreement shall mean and be a reference to the A&R Credit Agreement. Each reference to the applicable Loan Document shall mean and be a reference to such Loan Document, as amended hereby.

(c)     On and after the Amendment No. 2 Effective Date, the A&R Credit Agreement shall supersede and replace the Existing Credit Agreement. Except as specifically amended by this Agreement or the other documents executed in connection herewith, the Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

(d)     The execution and delivery of this Agreement shall not constitute a novation of any indebtedness or other obligations owing to the Lenders under the Existing Credit Agreement based on facts or events occurring or existing prior to the execution and delivery of this Agreement.

7.     <u>Successor Agent</u>. The parties hereto (including each Lender as an Existing Lender) hereby (i) consent to the appointment of Alter Domus (US) LLC as successor Administrative Agent and successor Collateral Agent (in such capacities, the "<u>Successor Agent</u>") under the Loan Documents in accordance with Section 9.11 of the Existing Credit Agreement, (ii) authorize the Successor Agent and Morgan Stanley Senior Funding, Inc., as resigning Administrative Agent and resigning Collateral Agent (in such capacities, the "<u>Resigning Agent</u>") to enter into the Resignation and Appointment Agreement and such other successor agency and assignment documentation (which documentation shall constitute Loan Documents), and take such actions pursuant thereto,

6

as is reasonably acceptable to the Resigning Agent and the Successor Agent, at the Loan Parties' sole cost and expense, in order to give effect to such appointment and to assign such roles (together with the Liens and other rights, powers, privileges, protections, duties, and interests associated therewith) from the Resigning Agent to the Successor Agent, and (iii) waive any inconsistency, requirement (including any notice requirement) or other conflict with the provisions in Section 9.11 of the Existing Credit Agreement with respect to the resignation of the Resigning Agent and and the appointment of the Successor Agent.  The Successor Agent (w) shall bear no responsibility for any actions taken or omitted to be taken by the Resigning Agent under the Loan Documents, or otherwise, or for any other event or action related to the Loan Documents which occurred prior to the Amendment No. 2 Effective Date (including, without limitation, calculations, determinations, or distributions made under the Loan Documents by the Resigning Agent or the Credit Parties on or prior to the Amendment No. 2 Effective Date), (x) shall not be deemed to assume any liability under or related to the Loan Documents that may have arisen or accrued prior to the Amendment No. 2 Effective Date, including any liability arising out of any breach by the Resigning Agent of its obligations under any Loan Document, (y) shall be entitled to conclusively rely upon, and shall not incur any liability for relying upon (including, without limitation, for the purpose of making any calculation, determination, or distribution under the Loan Documents), the records  and other information supplied to it by the Resigning Agent, any Lender, the Borrower or the other Loan Parties, and (z) shall not be deemed to have any knowledge or notice of any Loan Document until it has actually received a copy or notice of such Loan Document.  The parties hereto acknowledge and agree that the Successor Agent has undertaken no analysis of the Loan Documents, the Collateral, or any Liens granted or purported to be granted pursuant to the Loan Documents and shall be entitled to assume that, as of the Amendment No. 2 Effective Date, all Liens purported to be granted and perfected pursuant to the Loan Documents are valid and perfected Liens having the priority intended by the Secured Parties and the Loan Documents.

8.     Direction.  Each of the Lenders party hereto (which collectively constitute all of the Lenders under the Existing Credit Agreement and A&R Credit Agreement) hereby (i) authorizes and directs each Agent to execute and deliver this Amendment, the Reaffirmation Agreement, the Security Agreement Supplement, the Guaranty Supplement, the A&R Term Intercreditor Agreement, and the ABL Intercreditor Amendment, and to take, or forbear from taking, any and all actions as set forth herein and therein, and (ii) acknowledges and agrees that (x) the foregoing directed action constitutes a direction from all of the Lenders under Article IX of each of the Existing Credit Agreement and A&R Credit Agreement, and (y) Sections 9.03, 9.05, 9.08, 10.04, and 10.05 of each of the Existing Credit Agreement and A&R Credit Agreement, and all other rights, protections, privileges, immunities, exculpations, and indemnities afforded to such Agent under the Loan Documents shall apply to any and all actions taken or not taken by such Agent in accordance with such direction.

9.     Loan Document.  This Agreement shall constitute a Loan Document for all purposes of the A&R Credit Agreement and the other Loan Documents.

10.     Governing Law, Etc.  **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. SECTIONS 10.15, 10.16 AND 10.17 OF THE A&R CREDIT AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE, *MUTATIS MUTANDIS.***

OMM_US:79432204.10

11.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

OMM_US:79432204.10

IN WITNESS WHEREOF, each of the undersigned has caused its duly authorized officer to execute and deliver this Agreement as of the date first set forth above.

**ALTER DOMUS (US) LLC,** as Administrative Agent and Collateral Agent


By:
    Name:
    Title:

Amendment No. 2 Signature Page

**BELK, INC.,**
as Borrower


By: _____
    Name:
    Title:


**BEAR PARENT INC.,**
as Holdings


By: _____
    Name:
    Title:

**BELK-SIMPSON COMPANY,**
    **GREENVILLE, SOUTH CAROLINA,**
**BELK INTERNATIONAL, INC.,**
**BELK STORES SERVICES, LLC**
**BELK ADMINISTRATION, LLC**
**BELK STORES OF VIRGINIA LLC,**
**BELK ACCOUNTS RECEIVABLE LLC,**
**BELK GIFT CARD COMPANY LLC,**
**BELK MERCHANDISING LLC,**
**BELK TEXAS HOLDINGS LLC,**
**BELK ECOMMERCE LLC,**
**BELK STORES OF MISSISSIPPI LLC,**
**BELK SOURCING LLC,**
each as a Guarantor


By: _____
    Name:
    Title:


**BELK DEPARTMENT STORES LP**


By: Belk, Inc.
Its: General Partner


By: _____
    Name:
    Title:


Amendment No. 2 Signature Page

**[LENDER]**

By: _____
    Name:
    Title:

OMM_US:79432204.10

**Acknowledged and Agreed with respect to Section 7 of this Agreement:**

**MORGAN STANLEY SENIOR FUNDING, INC.,** as Resigning Agent


By:
    Name:
    Title:

Amendment No. 2 Signature Page

# __EXHIBIT A__

## A&R Credit Agreement

[*See attached.*]

**EXECUTION VERSION**

—————————————————————

AMENDED AND RESTATED
FIRST LIEN CREDIT AGREEMENT

dated as of February 24, 2021

among

BEAR PARENT INC.,
as Holdings,

BELK, INC.,
as Borrower,

ALTER DOMUS (US) LLC,
as Administrative Agent and Collateral Agent,

and

THE OTHER LENDERS PARTY HERETO

—————————————————

# TABLE OF CONTENTS
## (cont'd)

**Page**

## ARTICLE I DEFINITIONS AND ACCOUNTING TERMS

Section 1.01   Defined Terms ....................................................................................1
Section 1.02   Other Interpretive Provisions.................................................................83
Section 1.03   Accounting Terms ..................................................................................84
Section 1.04   Rounding.................................................................................................84
Section 1.05   References to Agreements, Laws, etc......................................................84
Section 1.06   Times of Day and Timing of Payment and Performance ........................84
Section 1.07   Pro Forma and Other Calculations .........................................................85
Section 1.08   Available Amount Transaction................................................................87
Section 1.09   Guaranties of Hedging Obligations ........................................................87
Section 1.10   Currency Generally.................................................................................88
Section 1.11   Divisions .................................................................................................88
Section 1.12   Effect of Benchmark Transition Event ....................................................88

## ARTICLE II THE COMMITMENTS AND BORROWINGS

Section 2.01   The Loans ................................................................................................92
Section 2.02   Borrowings, Conversions and Continuations of Loans ...........................93
Section 2.03   [Reserved]...............................................................................................95
Section 2.04   [Reserved]...............................................................................................95
Section 2.05   Prepayments............................................................................................95
Section 2.06   Termination or Reduction of Commitments...........................................107
Section 2.07   Repayment of Loans ..............................................................................108
Section 2.08   Interest ..................................................................................................108
Section 2.09   Fees .......................................................................................................109
Section 2.10   Computation of Interest and Fees .........................................................109
Section 2.11   Evidence of Indebtedness ......................................................................109
Section 2.12   Payments Generally ..............................................................................110
Section 2.13   Sharing of Payments .............................................................................112
Section 2.14   [Reserved]..............................................................................................112
Section 2.15   Refinancing Amendments .....................................................................112
Section 2.16   Extensions of Loans...............................................................................113
Section 2.17   Defaulting Lenders ................................................................................115
Section 2.18   Prepayment Premium.............................................................................116
Section 2.19   Permitted Debt Exchanges.....................................................................117
Section 2.20   Limitation on Refinancing .....................................................................120

## ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01   Taxes......................................................................................................120
Section 3.02   Illegality.................................................................................................123
Section 3.03   Inability to Determine Rates..................................................................124

# TABLE OF CONTENTS
## (cont'd)

Page

Section 3.04  Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loan.................................................................124
Section 3.05  Funding Losses .................................................................125
Section 3.06  Matters Applicable to All Requests for Compensation ...........126
Section 3.07  Replacement of Lenders under Certain Circumstances...........126
Section 3.08  Survival.............................................................................128

### ARTICLE IV CONDITIONS PRECEDENT TO TERM BORROWINGS

Section 4.01  Conditions to Term Borrowings on Closing Date ...................128

### ARTICLE V REPRESENTATIONS AND WARRANTIES

Section 5.01  Existence, Qualification and Power; Compliance with Laws ................128
Section 5.02  Authorization; No Contravention ..........................................129
Section 5.03  Governmental Authorization ................................................129
Section 5.04  Binding Effect....................................................................130
Section 5.05  Financial Statements; No Material Adverse Effect .................130
Section 5.06  Litigation...........................................................................130
Section 5.07  Labor Matters.....................................................................130
Section 5.08  Real Property Matters .........................................................130
Section 5.09  Environmental Matters ........................................................131
Section 5.10  Taxes.................................................................................132
Section 5.11  ERISA Compliance .............................................................132
Section 5.12  Subsidiaries........................................................................133
Section 5.13  Margin Regulations; Investment Company Act .....................133
Section 5.14  Disclosure ..........................................................................133
Section 5.15  Intellectual Property; Licenses, etc.......................................133
Section 5.16  Solvency ............................................................................134
Section 5.17  USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act ................................................................................134
Section 5.18  Collateral Documents ..........................................................134
Section 5.19  Use of Proceeds ..................................................................134
Section 5.20  Beneficial Ownership Certification ........................................135

### ARTICLE VI AFFIRMATIVE COVENANTS

Section 6.01  Financial Statements............................................................135
Section 6.02  Certificates; Other Information..............................................137
Section 6.03  Notices...............................................................................138
Section 6.04  Payment of Obligations .......................................................139
Section 6.05  Preservation of Existence, etc...............................................139
Section 6.06  Maintenance of Properties ...................................................139

# TABLE OF CONTENTS
## (cont'd)

Page

| | | |
|---|---|---|
| Section 6.07 | Maintenance of Insurance | 139 |
| Section 6.08 | Compliance with Laws | 140 |
| Section 6.09 | Books and Records | 140 |
| Section 6.10 | Inspection Rights | 140 |
| Section 6.11 | Covenant to Guarantee Obligations and Give Security | 141 |
| Section 6.12 | Compliance with Environmental Laws | 144 |
| Section 6.13 | Further Assurances and Post-Closing Covenant | 146 |
| Section 6.14 | Use of Proceeds | 146 |
| Section 6.15 | Maintenance of Ratings | 146 |
| Section 6.16 | Accounting Changes | 146 |
| Section 6.17 | Nature of Business | 146 |
| Section 6.18 | Designation of Subsidiaries | 147 |
| Section 6.19 | Lender Meetings | 147 |

## ARTICLE VII NEGATIVE COVENANTS

| | | |
|---|---|---|
| Section 7.01 | Liens | 147 |
| Section 7.02 | Indebtedness | 147 |
| Section 7.03 | Fundamental Changes | 152 |
| Section 7.04 | Asset Sales | 156 |
| Section 7.05 | Restricted Payments | 157 |
| Section 7.06 | Transactions with Affiliates | 163 |
| Section 7.07 | Burdensome Agreements | 167 |
| Section 7.08 | Modification of Terms of Subordinated Indebtedness | 170 |
| Section 7.09 | Holdings | 170 |
| Section 7.10 | Material Intellectual Property | 172 |
| Section 7.11 | Subsidiaries | 172 |
| Section 7.12 | Minimum Average Liquidity | 172 |
| Section 7.13 | Financial Covenant. | 172 |
| Section 7.14 | Further Priming or Subordination; Anti-Layering. | 173 |
| Section 7.15 | Benefit of Covenants | 174 |

## ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES

| | | |
|---|---|---|
| Section 8.01 | Events of Default | 174 |
| Section 8.02 | Remedies upon Event of Default | 176 |
| Section 8.03 | Application of Funds | 177 |

## ARTICLE IX ADMINISTRATIVE AGENT AND OTHER AGENTS

| | | |
|---|---|---|
| Section 9.01 | Appointment and Authorization of the Administrative Agent | 180 |
| Section 9.02 | Rights as a Lender | 181 |
| Section 9.03 | Exculpatory Provisions | 181 |

# TABLE OF CONTENTS
## (cont'd)

Page

Section 9.04   Lack of Reliance on the Agents ................................................................. 183
Section 9.05   Certain Rights of the Agents ..................................................................... 183
Section 9.06   Reliance by the Agents .............................................................................. 183
Section 9.07   Delegation of Duties .................................................................................. 184
Section 9.08   Indemnification .......................................................................................... 184
Section 9.09   The Administrative Agent in Its Individual Capacity ............................... 185
Section 9.10   [Reserved] .................................................................................................. 185
Section 9.11   Resignation by the Administrative Agent and the Collateral Agent ....... 185
Section 9.12   Collateral Matters ..................................................................................... 186
Section 9.13   [Reserved] .................................................................................................. 187
Section 9.14   Administrative Agent May File Proofs of Claim ..................................... 187
Section 9.15   Appointment of Supplemental Agents ...................................................... 187
Section 9.16   Intercreditor Agreements .......................................................................... 188
Section 9.17   Secured Cash Management Agreements and Secured Hedge
                Agreements ................................................................................................. 189
Section 9.18   Withholding Tax ........................................................................................ 189
Section 9.19   Survival ...................................................................................................... 189

## ARTICLE X MISCELLANEOUS

Section 10.01  Amendments, etc. ...................................................................................... 190
Section 10.02  Notices and Other Communications; Facsimile Copies .......................... 194
Section 10.03  No Waiver; Cumulative Remedies ........................................................... 196
Section 10.04  Costs and Expenses ................................................................................... 196
Section 10.05  Indemnification by the Borrower .............................................................. 197
Section 10.06  Marshaling; Payments Set Aside .............................................................. 198
Section 10.07  Successors and Assigns ............................................................................ 198
Section 10.08  [Reserved] .................................................................................................. 206
Section 10.09  Confidentiality .......................................................................................... 206
Section 10.10  Setoff .......................................................................................................... 207
Section 10.11  Interest Rate Limitation ............................................................................ 208
Section 10.12  Counterparts; Integration; Effectiveness .................................................. 208
Section 10.13  Electronic Execution of Assignments and Certain Other
                Documents .................................................................................................. 208
Section 10.14  Survival of Representations and Warranties .............................................. 208
Section 10.15  Severability ................................................................................................ 208
Section 10.16  GOVERNING LAW .................................................................................. 209
Section 10.17  WAIVER OF RIGHT TO TRIAL BY JURY ........................................... 209
Section 10.18  Binding Effect ............................................................................................ 210
Section 10.19  Lender Action ............................................................................................ 210
Section 10.20  Use of Name, Logo, etc. ........................................................................... 210
Section 10.21  USA PATRIOT Act ................................................................................... 210
Section 10.22  Service of Process ..................................................................................... 210

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

Section 10.23  No Advisory or Fiduciary Responsibility.................................................210
Section 10.24  Release of Collateral and Guarantee Obligations; Subordination of
Liens ......................................................................................................211
Section 10.25  [Reserved]...............................................................................................212
Section 10.26  Judgment Currency..................................................................................212
Section 10.27  Acknowledgement and Consent to Bail-In of EEA Financial
Institutions .............................................................................................213
Section 10.28  Acknowledgement Regarding Any Supported QFCs............................213
Section 10.29  Amendment and Restatement ..................................................................214

SCHEDULES

| 1.01(1) | Closing Date Guarantors |
| 1.01(2) | Existing Mortgaged Properties |
| 1.02 | Closing Date Unrestricted Subsidiaries |
| 2.01 | Commitments |
| 5.06 | Litigation |
| 5.08(2) | Owned Real Property |
| 5.08(3) | Leased Real Property |
| 5.08(4) | Space Leased Property |
| 5.08(5) | Real Estate Proceedings |
| 5.08(6) | Real Property Improvements |
| 5.08(7) | Real Property Violations |
| 5.08(8) | Occupied Real Property |
| 5.12 | Subsidiaries and Other Equity Investments |
| 7.02(3) | Existing Indebtedness |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| A-1 | Committed Loan Notice |
| B-1 | Term Note |
| C | Compliance Certificate |
| D-1 | Assignment and Assumption |
| D-2 | Affiliated Lender Assignment and Assumption |
| E | Guaranty |
| F | Security Agreement |
| G-1 | ABL Intercreditor Agreement |
| G-2 | Term Intercreditor Agreement |
| H | United States Tax Compliance Certificates |
| I | Solvency Certificate |
| J | Discount Range Prepayment Notice |
| K | Discount Range Prepayment Offer |
| L | Solicited Discounted Prepayment Notice |
| M | Acceptance and Prepayment Notice |
| N | Specified Discount Prepayment Notice |
| O | Solicited Discounted Prepayment Offer |
| P | Specified Discount Prepayment Response |
| Q | Intercompany Subordination Agreement |
| R | PIK Toggle Notice |
| S | Recognition Agreement |

ANNEXES

| I | Intercreditor Provisions |

## AMENDED AND RESTATED FIRST LIEN CREDIT AGREEMENT

This AMENDED AND RESTATED FIRST LIEN CREDIT AGREEMENT (this "**Agreement**"), by and among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation and direct subsidiary of Holdings ("**Belk**" or the "**Borrower**"), ALTER DOMUS (US) LLC, as administrative agent ("**Alter Domus**" and, in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**") is attached to the Second Amendment and constitutes the agreement of the parties hereto on and after the Closing Date.

## PRELIMINARY STATEMENTS

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

### Definitions and Accounting Terms

Section 1.01    Defined Terms. As used in this Agreement, the following terms have the meanings set forth below:

"**ABL Commitments**" means "Commitments" as defined in the ABL Facility.

"**ABL Credit Agreement**" means the ABL Credit Agreement dated as of the Original Closing Date (as amended by that certain Amendment No. 1 to ABL Credit Agreement, dated as of August 29, 2019, that certain Amendment No. 2 to the ABL Credit Agreement, dated as of October 30, 2020 and that certain Limited Waiver and Amendment No. 3 to ABL Credit Agreement, dated as of the Closing Date, by and among the Borrower, Holdings, the lenders party thereto and the ABL Facility Administrative Agent), among Holdings, the Borrower, the ABL Facility Administrative Agent and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, supplemented, waived or otherwise modified from time to time, in each case to the extent permitted hereunder and under the ABL Intercreditor Agreement and any Refinancing Indebtedness thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Credit Agreement) in each case to the extent permitted hereunder.

"**ABL Event of Default**" means "Event of Default" as set forth in the ABL Credit Agreement.

"**ABL Facility**" means the collective reference to the ABL Credit Agreement, any ABL Loan Document, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time, or refunded, refinanced, restructured, replaced, renewed, repaid, increased or extended from time to time, in each case to the extent permitted hereunder and under the ABL Intercreditor Agreement and any Refinancing Indebtedness thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Facility).

1

"**ABL Facility Administrative Agent**" means Bank of America, N.A. in its capacity as administrative agent under the ABL Credit Agreement or any successor agent under the ABL Loan Documents.

"**ABL Financial Covenant**" means the covenant set forth in Section 7.10 of the ABL Credit Agreement.

"**ABL Intercreditor Agreement**" means the ABL Intercreditor Agreement substantially in the form of Exhibit G-1 among the Collateral Agent, Wilmington Trust, National Association, as collateral agent under the Second Lien Credit Agreement, Bank of America, N.A., as collateral agent under the ABL Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Lenders**" means "Lenders" under the ABL Credit Agreement.

"**ABL Loan Documents**" means, collectively, (i) the ABL Credit Agreement and (ii) the security documents, intercreditor agreements (including the ABL Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the ABL Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the ABL Facility.

"**ABL Obligations**" means "Obligations" as defined in the ABL Facility.

"**Acceptable Discount**" has the meaning specified in Section 2.05(1)(e)(D)(2).

"**Acceptable Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Acceptance and Prepayment Notice**" means a notice of the Borrower's acceptance of the Acceptable Discount in substantially the form of Exhibit M.

"**Acceptance Date**" has the meaning specified in Section 2.05(1)(e)(D)(2).

"**Acquired Indebtedness**" means, with respect to any specified Person,

(1)     Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person, and

(2)     Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Ad Hoc Group of Term Lenders**" means, collectively, (a) the ad hoc group of Lenders that are represented by (x) Willkie Farr & Gallagher LLP, as legal counsel and (y) PJT Partners LP, as financial advisor and (b) the ad hoc group of Lenders that are represented by (x) O'Melveny & Myers LLP, as legal counsel and (y) Evercore Inc., as financial advisor.

2

"**Additional Lender**" means, at any time, any bank, other financial institution or institutional lender or investor that, in any case, is not an existing Lender and that agrees to provide any portion of any (a) [reserved], (b) Loans pursuant to a Refinancing Amendment in accordance with Section 2.15 or (c) Replacement Loans pursuant to Section 10.01; *provided* that each Additional Lender (other than any Person that is a Lender, an Affiliate of a Lender or an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), in each case solely to the extent that any such consent would be required from the Administrative Agent under Section 10.07(b)(iii)(B) for an assignment of Loans to such Additional Lender.

"**Adjusted EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period:

(1)     increased (without duplication) by the following, in each case (other than clauses (h) and (l)) to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(a)     total interest expense and, to the extent not reflected in such total interest expense, any losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such Hedging Obligations or such derivative instruments, and bank and letter of credit fees and costs of surety bonds in connection with financing activities, together with items excluded from the definition of "Consolidated Interest Expense" pursuant to the definition thereof; *plus*

(b)     provision for taxes based on income, profits, revenue or capital, including federal, foreign and state income, franchise, excise, value added and similar taxes, property taxes and similar taxes, and foreign withholding taxes paid or accrued during such period (including any future taxes or other levies that replace or are intended to be in lieu of taxes, and any penalties and interest related to taxes or arising from tax examinations), and any payments to a Parent Company in respect of such taxes permitted to be made hereunder; *plus*

(c)     Consolidated Depreciation and Amortization Expense for such period; *plus*

(d)     any other non-cash expenses, charges, expenses, losses or items (including any write-offs or write-downs) reducing Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (i) the Borrower may determine not to add back such non-cash charge in the current period and (ii) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Adjusted EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *provided* that the foregoing shall not permit adding back the write-down or reserve of inventory outside the ordinary course of business; *plus*

(e)     minority interest expense, the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any non-wholly-owned Subsidiary deducted (and not added back) in such period to Consolidated Net Income, excluding cash distributions in respect thereof, and the amount of any

3

reductions in arriving at Consolidated Net Income resulting from the application of Accounting Standards Codification Topic No. 810, *Consolidation*; *plus*

(f)        (i) the amount of management, monitoring, consulting, transaction, advisory and other fees (including termination fees) and indemnities and expenses paid or accrued in such period under the Management Services Agreement or otherwise to the extent otherwise permitted under Section 7.06 and (ii) the amount of payments made to option holders of such Person or any Parent Company in connection with, or as a result of, any distribution being made to shareholders of such Person or its Parent Companies, which payments are being made to compensate such option holders as though they were shareholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted hereunder; *plus*

(g)        the amount of loss or discount on sale of receivables, Securitization Assets and related assets to any Securitization Subsidiary in connection with a Qualified Securitization Facility; *plus*

(h)        cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Adjusted EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Adjusted EBITDA pursuant to clause (2) below for any previous period and not added back; *plus*

(i)        any costs or expenses incurred pursuant to any management equity plan, stock option plan or any other management or employee benefit plan, agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of such Person or net cash proceeds of an issuance of Equity Interest of such Person (other than Disqualified Stock); *plus*

(j)        any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of *FASB Accounting Standards Codification Topic 715—Compensation— Retirement Benefits*, and any other items of a similar nature, *plus*

(k)        any net loss from operations expected to be disposed of, abandoned or discontinued within twelve months after the end of such period; *plus*

(l)        (I) pro forma adjustments, including pro forma "run rate" cost savings, operating expense reductions and other synergies (in each case, net of amounts actually realized) related to acquisitions, dispositions and other specified transactions, or related to restructuring initiatives, cost savings initiatives and other initiatives that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are that are expected to be taken within four fiscal quarters after the date of consummation of such acquisition, disposition or other specified transaction or the initiation of such restructuring initiative, cost savings initiative or other initiatives and (II) pro forma "run rate" cost savings, operating expense reductions and synergies (in each case, net of amounts actually realized) related to the Transactions that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to

4

which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within four fiscal quarters after the Closing Date (it is understood and agreed that "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken); *provided* that amounts added back pursuant to this clause (l), together with the amounts added back pursuant to clauses (n) and (o) below and any similar adjustments made in accordance with Section 1.07(3) and add-backs included in clause (1) of the definition of "Consolidated Net Income", shall not exceed 10% of Adjusted EBITDA for such period calculated prior to giving effect to the add-backs set forth in this clause (l), clauses (n) and (o) below and the adjustments made in accordance with Section 1.07(3) and add-backs included in clause (1) of the definition of "Consolidated Net Income", and being calculated on a pro forma basis (the cap in this proviso, the "**Combined Adjusted EBITDA Cap**"); *plus*

(m)      any payments in the nature of compensation or expense reimbursement made to independent board members; *plus*

(n)      costs, charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of cost savings initiatives and operating expense reductions, restructuring and similar charges (including the Transactions), severance, relocation costs, integration and facilities and New Store opening costs and other business optimization expenses, signing costs, retention or completion bonuses, transition costs, costs related to closure/consolidation of facilities, stores and curtailments or modifications to pension and post-retirement employee benefits plans (including any settlement of pension liabilities), subject to the Combined Adjusted EBITDA Cap; *plus*

(o)      the amount of any loss attributable to any New Store, subject to the Combined Adjusted EBITDA Cap; *provided* that the aggregate amounts added back pursuant to this clause (o) shall not exceed $5.0 million for such period; *plus*

(p)      costs and expenses in connection with the implementation of fresh start accounting and all adjustments resulting from the application of fresh start accounting principles;

(2)      decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

(a)      non-cash gains for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Adjusted EBITDA in any prior period other than any such accrual or reserve that has been added back to Consolidated Net Income in calculating Adjusted EBITDA in accordance with this definition), and

(b)      the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any non-wholly owned subsidiary added (and not deducted in such period from Consolidated Net Income).

Adjusted EBITDA of Belk and its Restricted Subsidiaries will be deemed to equal (i) $124,997,000 for the fiscal quarter ended February 1, 2020 (ii) ($67,491,000) for the fiscal quarter ended May 2, 2020, (iii) $1,505,000 for the fiscal quarter ended August 1, 2020 and (iv) ($41,751,000) for the fiscal quarter ended October 31, 2020, in each case and, without duplication, adjusted to reflect any pro forma adjustments

with respect to any relevant Specified Transaction as are appropriate and consistent with the pro forma adjustment provisions set forth in Section 1.07, in each case, occurring or identified after the Closing Date and not otherwise included in the calculation of the foregoing amounts.

"**Adjusted Eurodollar Rate**" means, with respect to any Borrowing of Eurodollar Rate Loans for any Interest Period, an interest rate per annum equal to the Eurodollar Rate based on clause (a) of the definition of "Eurodollar Rate" for such Interest Period multiplied by the Statutory Reserve Rate; *provided* that, notwithstanding the foregoing, the "Adjusted Eurodollar Rate" shall in no event be less than 1.00% per annum with respect to the First-Out Loans. The Adjusted Eurodollar Rate will be adjusted automatically as to all Borrowings of Eurodollar Rate Loans then outstanding as of the effective date of any change in the Statutory Reserve Rate.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement prior to the Closing Date and on and after the Closing Date, means Alter Domus (US) LLC and any successor thereto.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. Notwithstanding the foregoing, other than with respect to Section 7.06, none of Blackstone, KKR, any Agent, any Second Amendment Lender as of the Closing Date (other than the Sponsor) nor any of their respective Affiliates shall be deemed an Affiliate of the Sponsor, Holdings, the Borrower or any of its Subsidiaries.

"**Affiliate Transaction**" has the meaning specified in Section 7.06.

"**Affiliated Lender**" means, at any time, any Lender that is the Sponsor or an Affiliate of the Sponsor or an Affiliate of the Borrower (other than (a) Holdings, the Borrower or any Subsidiary or (b) any natural person) at such time. For the avoidance of doubt, none of Blackstone, KKR, any Agent, any Second Amendment Lender as of the Closing Date nor any of their respective Affiliates or permitted assignees shall be deemed an Affiliated Lender (other than the Sponsor).

"**Affiliated Lender Assignment and Assumption**" has the meaning specified in Section 10.07(h)(v).

"**Affiliated Lender Cap**" has the meaning specified in Section 10.07(h)(iv).

"**After Year-End Payment**" has the mean specified in Section 2.05(2).

"**Agent Fee Letter**" means the Agent Fee Letter, dated as of the Closing Date, between the Borrower and Alter Domus (US) LLC, as Administrative Agent and Collateral Agent.

"**Agent Parties**" has the meaning specified in Section 10.02(4).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, members, managers, employees, agents, representatives, sub-agents, co-agents, attorneys-in-fact, partners, trustees, attorneys, and advisors of such Persons and of such Persons' Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Supplemental Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Agreement, as amended, restated, amended and restated, modified or supplemented from time to time in accordance with the terms hereof.

"**Agreement Currency**" has the meaning specified in Section 10.26.

"**AHYDO Payment**" means any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Code Section 163(i).

"**All-In Yield**" means, with respect to any term loan facility or other term loans, as of any date of determination, the sum of (I) the applicable interest rate ((x) assuming an election to pay in cash and (y) which, in respect of any Eurodollar Rate Loans (or other loans that accrue interest by reference to a similar reference rate), shall equal to the sum of (i) the higher of (A) the Adjusted Eurodollar Rate on such date for a deposit in Dollars with a maturity of one month and (B) the Adjusted Eurodollar rate "floor," if any, with respect thereto as of such date and (ii) the Applicable Rate (or other applicable margin) as of such date for Eurodollar Rate Loans (or other loans that accrue interest by reference to a similar reference rate)) and (II) the amount of original issue discount and upfront fees thereon (converted to yield assuming a four-year average life and without any present value discount), but excluding the effect of any arrangement, structuring, syndication or other fees payable in connection therewith that are not shared with all lenders or holders of such term loan facility or other term loans; provided that the amounts set forth in clauses (I) and (II) above for any term loans that are not incurred under this Agreement shall be based on the stated interest rate basis for such term loans.

"**Applicable Discount**" has the meaning specified in Section 2.05(1)(e)(C)(2).

"**Applicable Intercreditor Agreement**" means (a) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that (i) are intended to rank equal in priority to the Liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the ABL Obligations and (ii) are intended to rank junior in priority to the Liens on the Term Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the Obligations, the ABL Intercreditor Agreement, (b) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank equal in priority to the Liens on the Collateral securing the Obligations (but without regard to control of remedies), each of the ABL Intercreditor Agreement and the Term Intercreditor Agreement, (c) to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank equal in priority to the Liens on the Collateral securing the Junior Priority Debt Obligations (as defined in the Term Intercreditor Agreement), the Term Intercreditor Agreement and the ABL Intercreditor Agreement and (d) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank junior in priority to the Liens securing the Obligations and the Junior Priority Debt Obligations, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent, the

7

Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations and the Junior Priority Debt Obligations (as defined in the Term Intercreditor Agreement).

"**Applicable Rate**" means a percentage per annum equal to:

> (a)      with respect to First-Out Loans, (i) 7.50% for Eurodollar Rate Loans and (ii) 6.50% for Base Rate Loans; and

> (b)      with respect to any Term Loans (other than the Closing Date Term Loans), as specified in the applicable Extension Amendment, Refinancing Amendment or amendment in respect of Replacement Loans.

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Asset Sale**" means:

> (1)      the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions of property or assets of the Borrower or any Restricted Subsidiary (each referred to in this definition as a "**disposition**"); or

> (2)      the issuance or sale of Equity Interests (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 7.02 and directors' qualifying shares or shares or interests required to be held by foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Borrower or another Restricted Subsidiary), whether in a single transaction or a series of related transactions;

in each case, other than:

> (a)      any disposition of:

> (i)      Cash Equivalents or Investment Grade Securities,

> (ii)      obsolete, damaged or worn out property or assets in the ordinary course of business or consistent with industry practice or any disposition of inventory or goods (or other assets) held for sale or no longer used or useful in the ordinary course;

> (iii)      assets no longer economically practicable or commercially reasonable to maintain (as determined in good faith by the management of the Borrower) in an aggregate amount not to exceed $2,000,000 in any fiscal year;

> (iv)      improvements made to leased real property to landlords pursuant to customary terms of leases entered into in the ordinary course of business;

> (v)      assets for purposes of charitable contributions or similar gifts in *de minimis* amounts to the extent consistent with past practices;

8

(b)     the disposition of any assets by the Borrower or any Restricted Subsidiary in a manner permitted pursuant to Section 7.03;

(c)     any disposition in connection with the making of any Restricted Payment that is permitted to be made, and is made, under Section 7.05, any Permitted Investment or any acquisition otherwise permitted under this Agreement;

(d)     [reserved];

(e)     any disposition of property or assets or issuance of securities by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary to the extent otherwise permitted hereunder; *provided* that dispositions by Loan Parties to Non-Loan Parties shall be permitted solely to the extent permitted under Section 7.05;

(f)     to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)     (i) the lease, assignment or sublease, license or sublicense of any real or personal property in the ordinary course of business or consistent with industry practice and (ii) the exercise of termination rights with respect to any lease, sublease, license or sublicense or other agreement;

(h)     the sale of the Knox property pursuant to agreement existing on the Closing Date;

(i)     foreclosures, condemnation, expropriation, eminent domain or any similar action (including for the avoidance of doubt, any Casualty Event) with respect to assets or the granting of Liens not prohibited hereunder;

(j)     sales of accounts receivable, or participations therein, or Securitization Assets or related assets in connection with any Qualified Securitization Facility or the disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with industry practice or in bankruptcy or similar proceedings;

(k)     any financing transaction with respect to property built or acquired by the Borrower or any Restricted Subsidiary after the Closing Date to the extent permitted hereunder, including Qualified Securitization Facilities;

(l)     the sale, lease, assignment, license, sublease or discount of inventory, equipment, accounts receivable, notes receivable or other current assets in the ordinary course of business or consistent with industry practice or the conversion of accounts receivable to notes receivable or other dispositions of accounts receivable in connection with the collection thereof;

(m)     the licensing or sublicensing of IP Rights or other general intangibles in the ordinary course of business or consistent with industry practice;

9

(n)     any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business or consistent with industry practice;

(o)     the unwinding of any Hedging Obligations;

(p)     sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)     the lapse or abandonment of IP Rights, which in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(r)     the granting of a Lien that is permitted under Section 7.01;

(s)     the issuance of directors' qualifying shares and shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable law;

(t)     the disposition of any assets (including Equity Interests) acquired in a transaction permitted hereunder, which assets are not used or useful in the principal business of the Borrower and its Restricted Subsidiaries, so long as such assets do not constitute a material portion of the assets acquired in any individual transaction; or

(u)     dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"**Assumption**" has the meaning specified in Section 10.25.

"**Attorney Costs**" means all reasonable fees, expenses and disbursements of any law firm or other external legal counsel, to the extent documented in reasonable detail and invoiced.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease Obligation of any Person, the amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction Agent**" means (a) the Administrative Agent or (b) any other financial institution or advisor engaged by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to Section 2.05(1)(e); *provided* that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); *provided further* that neither the Borrower nor any of its Affiliates may act as the Auction Agent.

10

"**Available Amount**" means at any time on and after the Closing Date (the "**Available Amount Reference Time**"), an amount (which shall not be less than zero) equal to the sum of:

    (1)    [reserved]; <u>plus</u>

    (2)    the Retained Excess Cash Flow Amount; <u>plus</u>

    (3)    the amount of any common capital contributions received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary other than the amount of any Specified Equity Contribution during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time; *provided* that such amount shall have been applied substantially contemporaneously with the receipt thereof in a permitted Investment in assets that constitute or will constitute Collateral; <u>plus</u>

    (4)    [reserved]; <u>plus</u>

    (5)    [reserved]; <u>plus</u>

    (6)    [reserved]; <u>plus</u>

    (7)    [reserved]; <u>minus</u>

    (8)    the aggregate amount of Restricted Payments made with the Available Amount pursuant to clause (10)(Y) of Section 7.05(b) (net of any return of capital in respect of any Investments or deemed reduction in the amount of such Investment, including the sale, transfer, lease or other disposition of any such Investments), during the period commencing on the Closing Date through and including the Available Amount Reference Time (and, for purposes of this <u>clause (8)</u>, without taking account of the intended usage of the Available Amount at such Available Amount Reference Time).

"**Average ECF Liquidity**" means, with respect to any calendar year, (a) the sum of Liquidity as of each Friday during the months of January, February and March of such calendar year divided by (b) the total number of such Fridays during the months of January, February and March of such calendar year.

"**Average Liquidity**" means (a) with respect to the first fiscal quarter ending after the Closing Date, the sum of Liquidity for each day for the period commencing on the Closing Date through and including the last day of such fiscal quarter, divided by the number of days during such period and (b) with respect to each fiscal quarter ending thereafter, the sum of Liquidity for each day during such fiscal quarter, divided by the number of days in such fiscal quarter.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" has the meaning specified in Section 8.02.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate *plus* 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Wall Street Journal as the "prime rate" and (c) the Eurodollar Rate on such day for an Interest Period of one (1) month *plus* 1.00% (or, if such day is not a Business Day, the immediately preceding Business Day); *provided* that, notwithstanding the foregoing, the "Base Rate" shall in no event be less than 2.00% per annum with respect to the First-Out Loans.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Basket**" means any amount, threshold or other value permitted or prescribed with respect to any Lien, Indebtedness, Asset Sale, Investment, Restricted Payment, transaction value, judgment or other amount under any provision in Articles V, VI, VII or VIII and the definitions related thereto.

"**Belk**" has the meaning specified in the preliminary statements of this Agreement.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Blackstone**" means Blackstone Alternative Credit Advisors LP and any of its respective Affiliates and funds or accounts managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Board of Directors**" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such Board of Directors. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Borrower.

"**Borrower**" means (a) Belk and (b) upon the consummation of any transaction permitted by Section 7.03(4), the Successor Borrower.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrower Offer of Specified Discount Prepayment**" means any offer by any Borrower Party to make a voluntary prepayment of Loans at a specified discount to par pursuant to Section 2.05(1)(e)(B).

"**Borrower Parties**" means the collective reference to Holdings, the Borrower and each Subsidiary of the Borrower and "**Borrower Party**" means any of them.

"**Borrower Solicitation of Discount Range Prepayment Offers**" means the solicitation by any Borrower Party of offers for, and the corresponding acceptance by a Lender of, a voluntary prepayment of Loans at a specified range of discounts to par pursuant to Section 2.05(1)(e)(C).

"**Borrower Solicitation of Discounted Prepayment Offers**" means the solicitation by any Borrower Party of offers for, and the subsequent acceptance, if any, by a Lender of, a voluntary prepayment of Loans at a discount to par pursuant to Section 2.05(1)(e)(D).

"**Borrowing**" means a borrowing consisting of Loans of the same Class and Type made (or deemed made), converted or continued on the same date and, in the case of Eurodollar Rate Loans, having the same Interest Period.

"**Business Day**" means any day that is not a Legal Holiday and, with respect to any interest rate settings as to a Eurodollar Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurodollar Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurodollar Rate Loan, any day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Lease Obligations) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and the Restricted Subsidiaries.

"**Capital Stock**" means:

(1)     in the case of a corporation, corporate stock or shares in the capital of such corporation;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into or exchangeable for Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP as in effect on the Original Closing Date.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"**Captive Insurance Subsidiary**" means any Subsidiary of the Borrower that is subject to regulation as an insurance company (or any Subsidiary thereof).

"**Cash Collateral Account**" means an account held at, and subject to the sole dominion and control of, the Collateral Agent.

13

"**Cash Equivalents**" means:

(1)     Dollars;

(2)     [reserved];

(3)     local currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business or consistent with industry practice;

(4)     readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 36 months or less from the date of acquisition;

(5)     certificates of deposit, time deposits and eurodollar time deposits with maturities of three years or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(6)     repurchase obligations for underlying securities of the types described in clauses (4) and (5) above or clauses (7) and (8) below entered into with any financial institution or recognized securities dealer meeting the qualifications specified in clause (5) above;

(7)     commercial paper and variable or fixed rate notes rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 36 months after the date of acquisition thereof;

(8)     marketable short-term money market and similar liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(9)     securities issued or directly and fully and unconditionally guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority of any such state, commonwealth or territory or any public instrumentality thereof having maturities of not more than 36 months from the date of acquisition thereof;

(10)     readily marketable direct obligations issued or directly and fully and unconditionally guaranteed by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency selected by the Borrower) with maturities of 36 months or less from the date of acquisition;

(11)     Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) with maturities of 24 months or less from the date of acquisition;

(12)    Investments with average maturities of 36 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(13)    investment funds investing substantially all of their assets in securities of the types described in clauses (1) through (12) above; and

(14)    solely with respect to any Captive Insurance Subsidiary, any investment that the Captive Insurance Subsidiary is not prohibited to make in accordance with applicable law.

In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents will also include (i) investments of the type and maturity described in clauses (1) through (13) above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (1) through (13) and in this paragraph.

"**Cash Management Agreement**" means any agreement entered into from time to time by Holdings, the Borrower or any Restricted Subsidiary in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, information reporting services, lockbox services, stop payment services and wire transfer services.

"**Cash Management Bank**" means any Person that is an Agent, a Lender or an Affiliate of an Agent or Lender at the time it entered into a Cash Management Agreement, whether or not such Person subsequently ceases to be an Agent, a Lender or an Affiliate of an Agent or Lender.

"**Cash Management Obligations**" means obligations owed by Holdings, the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"**Cash Management Services**" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automatic clearing house fund transfer services, return items and interstate depository network services), (c) foreign exchange, netting and currency management services and (d) any other demand deposit or operating account relationships or other cash management services, including under any Cash Management Agreements.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"**CFC Holdco**" means a Domestic Subsidiary that has no material assets other than the Equity Interests in or indebtedness of one or more Foreign Subsidiaries that are CFCs, including the indirect ownership of such Equity Interests or indebtedness through one or more CFC Holdcos that have no other material assets.

15

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority. It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111 203, H.R. 4173), all Laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

"**Change of Control**" means the occurrence of any of the following after the Closing Date:

(1)     at any time prior to the consummation of a Qualifying IPO after the Closing Date, the Permitted Holders ceasing to beneficially own (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), in the aggregate, directly or indirectly, at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or any Parent Company; or

(2)     at any time following the consummation of a Qualifying IPO after the Closing Date, (a) any Person (other than a Permitted Holder) or (b) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), becoming the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act) of Equity Interests of the Borrower or such Parent Company representing more than thirty-five percent (35%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or such Parent Company, as applicable, and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of the Borrower or such Parent Company, as applicable, beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders;

(3)     the occurrence of a "Change of Control" (or any comparable term) as defined in each of the Second Lien Credit Agreement or any other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount (other than the ABL Credit Agreement); or

(4)     Holdings shall cease to be the registered owner of 100% of the Equity Interests of the Borrower unless in connection with the consummation of a Qualifying IPO by the Borrower.

unless, in the case of clause (1) or (2) above, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of the Borrower or any Parent Company.

"**Claim**" means any actions, suits or written demands or claims.

"**Class**" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the Type of Loan, Interest Period, upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (e.g., "fungibility")) and (ii) with respect to Lenders, those of such Lenders that

have Commitments or Loans of a particular Class.  The First-Out Loans and the Second-Out Loans shall be treated as constituting two separate Classes.

"**Closing Date**" means the first date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01, and the Closing Date Term Loans were made (or deemed made) to the Borrower pursuant to Sections 2.01(2) and 2.01(3), which date was February 24, 2021.

"**Closing Date Term Loans**" means the First-Out Loans and the Second-Out Loans.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the "Collateral" and "First Lien Collateral" (or equivalent term of each of the foregoing) as defined in any Collateral Document and the Mortgaged Properties.

"**Collateral Agent**" has the meaning specified in the introductory paragraph to this Agreement prior to the Closing Date and on and after the Closing Date, means Alter Domus (US) LLC and any successor thereto.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(1)     the Collateral Agent shall have received each Collateral Document required to be delivered (a) on the Closing Date pursuant to Section 4.01 or (b) pursuant to Section 6.11 or 6.13 at such time required by such Sections to be delivered, in each case, duly executed by each Loan Party that is party thereto;

(2)     all Obligations shall have been unconditionally guaranteed by (a) Holdings (or any successor thereto), (b) each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary), which as of the Closing Date after giving effect to the Assumption shall include those that are listed on Schedule 1.01(1) hereto and (c) any Restricted Subsidiary of the Borrower that Guarantees (or is the borrower or issuer of) any Credit Agreement Refinancing Indebtedness, the Second Lien Facility (and any "Credit Agreement Refinancing Indebtedness" as defined therein), the ABL Facility and/or other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount (the Persons in the preceding clauses (a) through (c) collectively, the "**Guarantors**");

(3)     except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected security interest with the priority set forth in the Applicable Intercreditor Agreement, subject only to Liens permitted by Section 7.01, in

(a)     all the Equity Interests of the Borrower,

(b)     all Equity Interests of each direct, wholly owned Material Domestic Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor and

(c)     100% of the issued and outstanding Equity Interests of each (i) wholly owned Material Domestic Subsidiary that is (a) a CFC Holdco and (b) directly owned by the Borrower or any Subsidiary Guarantor and (ii) Foreign Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor;

(4)    except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01 or under any Collateral Document and in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents, the Obligations and the Guaranty shall have been secured by a security interest in substantially all tangible and intangible personal property of the Borrower and each Guarantor (including accounts other than Securitization Assets), inventory, equipment, investment property, contract rights, applications and registrations of IP Rights filed in the United States, other general intangibles, and proceeds of the foregoing, in each case,

(a)    that has been perfected (to the extent such security interest may be perfected by

(i)    delivering certificated securities, intercompany notes and other instruments in which a security interest can be perfected by physical control, in each case to the extent required hereunder or the Security Agreement;

(ii)    filing financing statements under the Uniform Commercial Code,

(iii)    making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office or

(iv)    filings in the applicable real estate records with respect to Mortgaged Properties (or any fixtures related to Mortgaged Properties) to the extent required by the Collateral Documents and

(b)    with the priority required by the Collateral Documents; *provided* that any such security interests in the Collateral shall be subject to the terms of the Applicable Intercreditor Agreements; and

(5)    with respect to each Real Property other than the Existing Mortgaged Properties, the Collateral Agent shall have received counterparts of a Mortgage, together with the other deliverables described in Section 6.11(2)(b), with respect to each Real Property (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property within the time periods set forth in Sections 6.11(2)(b) and 6.13; *provided* that to the extent any Mortgaged Property is located in a jurisdiction which imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, the relevant Mortgage shall not secure an amount in excess of the fair market value of the Mortgaged Property subject thereto.  Unless requested by the Required Lenders, there will not be any obligation to deliver a new Mortgage with respect to an Existing Mortgaged Property.

(6)    [reserved].

(7)    within sixty (60) days after the Closing Date (or such longer period that the Required Lenders may agree in their reasonable discretion), the Collateral Agent shall have received (i) an amendment, supplement or modification in form reasonably satisfactory to the Collateral Agent and the Required Lenders (the "**Mortgage Amendments**"), with respect to each Existing Mortgaged Property set forth on Schedule 1.01(2), duly executed, acknowledged and delivered and in form suitable for filing and recording in all filing or recording offices that the Required Lenders may reasonably deem necessary to maintain or protect the Lien of the related Mortgage and the priority thereof; (ii) with respect to the real properties subject to the Mortgage Amendments, (x) fully paid title date-down endorsements or modification endorsements (to the

18

extent such date-down endorsements or modification endorsements are available in the applicable jurisdiction at reasonable costs) to the related Mortgage Policies or (y) title searches (to the extent such date-down endorsements are not available at reasonable costs in any such jurisdictions), in each case confirming ownership of the related real property by the applicable Loan Party and showing no Liens of record other than Permitted Liens; (iii) evidence that all filing, documentary, stamp, intangible and recording taxes and fees in respect to such Mortgage Amendments have been paid in connection with the preparation, execution, filing and recordation of the Mortgage Amendments; and (iv) the deliverables described in Sections 6.11(2)(b)(ii) (to the extent required thereunder), (iv), (v), (vi) (to the extent not previously delivered), and (vii) (to the extent requested by the Collateral Agent or the Required Lenders), with respect to any Real Property subject to the Mortgage Amendments.

The foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, the creation, perfection or maintenance of pledges of, or security interests in, Mortgages on, or the obtaining of Mortgage Policies, surveys, abstracts or appraisals or taking other actions with respect to, any Excluded Assets.

The Required Lenders may grant extensions of time for the creation, perfection or maintenance of security interests in, or the execution or delivery of any Mortgage and the obtaining of title insurance, surveys or Opinions of Counsel with respect to, particular assets (including extensions beyond the Closing Date for the creation, perfection or maintenance of security interests in the assets of the Loan Parties on such date) where they reasonably determine, in consultation with the Borrower, that creation or perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)      Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Required Lenders and the Borrower;

(B)      the Collateral and Guarantee Requirement shall not apply to any Excluded Assets;

(C)      no deposit account control agreement, securities account control agreement or other control agreements or control arrangements shall be required with respect to any deposit account, securities account or other asset specifically requiring perfection through control agreements except to the extent such control agreement would or could be required under the ABL Credit Agreement as in effect on the Closing Date, whether or not such ABL Credit Agreement were than actually in effect;

(D)      no actions in any jurisdiction other than the U.S. or that are necessary to comply with the Laws of any jurisdiction other than the U.S. shall be required in order to create any security interests in assets located, titled, registered, applied for, filed, or arising under laws outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the Laws of any jurisdiction other than the U.S.) and there shall be no requirement to deliver landlord lien waivers, estoppels and collateral access letters;

(E)      [reserved]; and

(F)      no perfection steps shall be required with respect to (i) letter of credit rights, except to the extent constituting a support obligation for other Collateral as to which perfection is accomplished solely

19

by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (ii) commercial tort claims with a value of less than $2.5 million, (iii) motor vehicles and other assets subject to certificates of title to the extent a Lien thereon cannot be perfected by the filing of a UCC financing statement, and (iv) promissory notes evidencing debt for borrowed money in a principal amount of less than $2.5 million.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages (if any), each of the collateral assignments, security agreements, pledge agreements, account control agreements or other similar agreements delivered to the Administrative Agent, Collateral Agent or the Lenders pursuant to Sections 4.01, 6.11 or 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Combined Adjusted EBITDA Cap**" has the meaning specified in clause (1)(l) of the definition of "Adjusted EBITDA".

"**Commitment**" means the First-Out Loan Commitments, Second-Out Loan Commitments, Refinancing Commitments or Extended Commitments, or any commitment in respect of Replacement Loans, as the context may require.

"**Committed Loan Notice**" means a notice of (1) a Borrowing with respect to a given Class of Loans, (2) a conversion of Loans of a given Class from one Type to the other or (3) a continuation of Eurodollar Rate Loans of a given Class, pursuant to Section 2.02(1), which shall be substantially in the form of Exhibit A-1.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time and any successor statute.

"**Compensation Period**" has the meaning specified in Section 2.12(3)(b).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of a Financial Officer of the Borrower:

(1)     certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto (in each case, other than any Default with respect to which the Administrative Agent has otherwise obtained notice in accordance with Section 6.03(1));

(2)     in the case of financial statements delivered under Section 6.01(1), setting forth reasonably detailed calculations of (i) Excess Cash Flow for each Excess Cash Flow Period, commencing with the Excess Cash Flow Period ending January 29, 2022, (ii) Average ECF Liquidity (to the extent the Compliance Certificate is delivered after March 31 of the applicable year when such annual Compliance Certificate is due) and (iii) the Net Proceeds and Specified Sale-Leaseback Net Proceeds (as applicable) received during the applicable period by or on behalf of the Borrower or any Restricted Subsidiary in respect of any (x) Asset Sale or Casualty Event subject to prepayment pursuant to Section 2.05(2)(b)(i) and the portion of such Net Proceeds that has been invested or is intended to be reinvested in accordance with Section 2.05(2)(b)(ii) and (y) Specified Sale-Leaseback Transaction subject to prepayment pursuant to Section 2.05(2)(c); and

20

(3)     commencing with the fiscal quarter ending February 3, 2024, setting forth computations in reasonable detail demonstrating compliance with the financial covenants set forth in Section 7.13 hereof.

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and Cash Equivalents, amounts related to current or deferred taxes based on income or profits, assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees, derivative financial instruments and any assets in respect of Hedge Agreements, and excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding (A) the current portion of any Funded Debt and other long-term liabilities, (B) the current portion of interest, (C) accruals for current or deferred taxes based on income or profits, (D) accruals of any costs or expenses related to restructuring reserves or severance, (E) all Indebtedness consisting of Loans (as defined in the ABL Facility), Swing Line Loans (as defined in the ABL Facility) and L/C Obligations (as defined in the ABL Facility) to the extent otherwise included therein or any other revolving loans, swingline loans and letter of credit obligations under any other revolving credit facility, (F) the current portion of any Capitalized Lease Obligation, (G) deferred revenue arising from cash receipts that are earmarked for specific projects, (H) liabilities in respect of unpaid earn-outs, (I) the current portion of any other long-term liabilities, (J) accrued litigation settlement costs and (K) any liabilities in respect of Hedge Agreements, and, furthermore, excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person and its Restricted Subsidiaries, including the amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses and amortization of Capitalized Software Expenditures of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated First Lien Debt**" means as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, (a) Loans under this Agreement, Loans (as defined in the ABL Facility) under the ABL Facility (including any Incremental Revolving Credit Loans (as defined in the ABL Credit Agreement)), Capitalized Lease Obligations and other Consolidated Total Debt secured by Collateral (or any portion thereof) on an equal priority basis (but without regard to the control of remedies) with Liens securing the Obligations or the Liens securing the ABL Obligations minus (b) without duplication, the aggregate amount of unrestricted cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, which aggregate amount of cash and Cash Equivalents shall be determined without giving *pro forma effect* to the proceeds of Indebtedness incurred on such date.

"**Consolidated Interest Expense**" means, with respect to any Person for any period, without duplication, the sum of:

(1)     consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income

(including (a) amortization of original issue discount or premium resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (c) non-cash interest payments, (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate obligations under any Hedge Agreement with respect to Indebtedness); plus

(2)     consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(3)     interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" means, with respect to any Person for any period, the net income (loss) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding (and excluding the effect of), without duplication,

(1)     extraordinary, non-recurring or unusual gains, losses, fees, costs, charges or expenses (including relating to any multi-year strategic initiatives and accruals and reserves in connection with such gains, losses, charges or expenses); restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves, and in each case, whether or not classified as such under GAAP); costs and expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of stores or facilities and fixed assets for alternative uses; Public Company Costs; costs and expenses related to the integration, consolidation, opening, pre-opening and closing of stores or facilities and fixed assets; severance and relocation costs and expenses, one-time compensation costs and expenses, consulting fees, signing, retention or completion bonuses, and executive recruiting costs; costs and expenses incurred in connection with strategic initiatives; transition costs and duplicative running costs; costs and expenses incurred in connection with non-ordinary course product and IP Rights development; costs incurred in connection with acquisitions (or purchases of assets) or the Transactions, in each case, prior to or after the Closing Date (including integration costs); business optimization expenses (including costs and expenses relating to business optimization programs, new systems design, retention charges, system establishment costs and implementation costs and project start-up costs), accruals and reserves; operating expenses attributable to the implementation of cost-savings initiatives; curtailments and modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments); provided that amounts added back pursuant to this clause (1) shall be subject to the Combined Adjusted EBITDA Cap;

(2)     the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period whether effected through a cumulative effect adjustment or a retroactive application, in each case in accordance with GAAP;

(3)     Transaction Expenses;

(4)     any gain (loss) on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business or consistent with industry practice) or income (loss) from discontinued operations (but if such operations are classified as discontinued

due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of);

(5)      the Net Income for such period of any Person that is an Unrestricted Subsidiary and, solely for the purpose of the Available Amount, the Net Income for such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; *provided* that the Consolidated Net Income of a Person will be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents) to such Person or a Restricted Subsidiary thereof in respect of such period;

(6)      solely for the purpose of determining the Available Amount, the Net Income for such period of any Restricted Subsidiary (other than any Guarantor) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived; *provided* that Consolidated Net Income of a Person will be increased by the amount of dividends or other distributions or other payments actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents);

(7)      effects of adjustments (including the effects of such adjustments pushed down to such Person and its Restricted Subsidiaries) related to the application of recapitalization accounting or purchase accounting (including in the inventory, property and equipment, software, goodwill, intangible assets, in process research and development, deferred revenue and debt line items);

(8)      income (loss) from the early extinguishment or conversion of (a) Indebtedness, (b) Hedging Obligations or (c) other derivative instruments;

(9)      any impairment charge or asset write-off or write-down in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP; *provided* that this clause (9) shall not permit the write-down or reserve of inventory outside the ordinary course of business;

(10)      (a) any equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation, equity incentive programs or similar rights, stock options, restricted stock or other rights to, and any cash charges associated with the rollover, acceleration or payout of, Equity Interests by management of such Person or of a Restricted Subsidiary or any Parent Company, (b) noncash compensation expense resulting from the application of Accounting Standards Codification Topic No. 718, *Compensation—Stock Compensation* or Accounting Standards Codification Topic 505-50, *Equity-Based Payments to Non-Employees*, and (c) any income (loss) attributable to deferred compensation plans or trusts;

(11)      any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, disposition, incurrence or repayment of Indebtedness (including such fees, expenses or charges related to the offering and issuance of the Term Notes and the syndication and incurrence of any Facilities), issuance of Equity Interests (including by any direct or indirect parent of the Borrower), recapitalization, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Indebtedness evidenced by this Agreement,

the Second Lien Facility, or the ABL Facility) and including, in each case, any such transaction whether consummated on, after or prior to the Closing Date and any such transaction undertaken but not completed, and any charges or nonrecurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful or consummated (including, for the avoidance of doubt, the effects of expensing all transaction related expenses in accordance with Accounting Standards Codification Topic No. 805, *Business Combinations*);

(12)    accruals and reserves that are established or adjusted in connection with the Transactions, an Investment or an acquisition that are required to be established or adjusted as a result of the Transactions, such Investment or such acquisition, in each case accordance with GAAP;

(13)    any expenses, charges or losses to the extent covered by insurance that are, directly or indirectly, reimbursed or reimbursable by a third party, and any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement;

(14)    any non-cash gain (loss) attributable to the mark to market movement in the valuation of Hedging Obligations or other derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—*Derivatives and Hedging* or mark to market movement of other financial instruments pursuant to FASB Accounting Standards Codification Topic 825—*Financial Instruments*;

(15)    any net unrealized gain or loss (after any offset) resulting in such period from currency transaction or translation gains or losses including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from (a) Hedging Obligations for currency exchange risk and (b) resulting from intercompany indebtedness) and any other foreign currency transaction or translation gains and losses, to the extent such gain or losses are non-cash items;

(16)    any adjustments resulting from the application of Accounting Standards Codification Topic No. 460, *Guarantees*, or any comparable regulation;

(17)    any non-cash rent expense;

(18)    the amount of any management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Investors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 7.06;

(19)    any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures; and

(20)    earn-out and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries, Consolidated Net Income will include the amount of proceeds received or receivable from business interruption insurance, the amount of any expenses or charges incurred by such Person or its Restricted Subsidiaries during such period that are, directly or indirectly, reimbursed or reimbursable by a third party, and amounts that are covered by indemnification or other reimbursement

provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder.

"**Consolidated Secured Debt**" means, as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, the aggregate amount of Consolidated Total Debt that is secured by a Lien on any assets or property of the Borrower or any of its Restricted Subsidiaries.

"**Consolidated Total Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transaction), consisting of Indebtedness for borrowed money, Capitalized Lease Obligations, debt obligations evidenced by notes or similar instruments and Guarantees of Indebtedness listed above minus (b) the aggregate amount of all cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, in each case, subject to control agreements for the benefit of the Obligations (including control agreements entered into by the ABL Facility Administrative Agent for the benefit of, among others, the Obligations hereunder) (but excluding cash and Cash Equivalents which are listed as "Restricted" on such balance sheet), which aggregate amount of cash and Cash Equivalents shall be determined without giving pro forma effect to the proceeds of Indebtedness incurred on such date; provided, Consolidated Total Debt will not include Non-Recourse Indebtedness and Indebtedness in respect of any (1) letter of credit, except to the extent of obligations in respect of drawn standby letters of credit which have not been reimbursed within three (3) Business Days and (2) Hedging Obligations, except any unpaid termination payments thereunder. The Dollar-equivalent principal amount of any Indebtedness denominated in a foreign currency will reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar-equivalent principal amount of such Indebtedness.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities. In measuring any increase or decrease in Consolidated Working Capital for any period, (1) to the extent the Borrower or any Restricted Subsidiary has consummated during such period any one or more acquisitions or dispositions of any Person, then (a) in the case of an acquisition, the Consolidated Working Capital of such acquired Person as of the date of the consummation of such acquisition (after giving effect to the transactions consummated with respect to such acquisition) will be added to the Consolidated Working Capital of the Borrower and its Restricted Subsidiaries as of the first day of such period and (b) in the case of a disposition, the Consolidated Working Capital of the disposed Person as of the date of the disposition of such Person shall be subtracted from the Consolidated Working Capital of the Borrower and its Restricted Subsidiaries as of the first day of such period and (2) the application of recapitalization or purchase accounting as a result of any acquisitions or dispositions completed during such period will be excluded and the application of fresh start accounting in relation to the Transactions shall be disregarded.

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent:

> (1)    to purchase any such primary obligation or any property constituting direct or indirect security therefor;

> (2)    to advance or supply funds:

(a)      for the purchase or payment of any such primary obligation or

(b)      to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)      to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Controlled Investment Affiliate**" means, as to any Person, any other Person, other than any Investor, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower or other companies.

"**Credit Agreement Refinanced Debt**" has the meaning assigned to such term in the definition of "Credit Agreement Refinancing Indebtedness."

"**Credit Agreement Refinancing Indebtedness**" means secured or unsecured Indebtedness of the Borrower or any Guarantor; *provided* that:

(1)      such Indebtedness is incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) to Refinance, in whole or in part, Indebtedness that is either (a) Loans, or (b) other Credit Agreement Refinancing Indebtedness ("**Credit Agreement Refinanced Debt**");

(2)      such Indebtedness is in an original aggregate principal amount not greater than the principal amount of the Credit Agreement Refinanced Debt being Refinanced except to the extent permitted under Section 1.02(10) (*plus* (a) the amount of all unpaid, accrued or capitalized interest, penalties, premiums (including tender premiums), and other similar amounts payable with respect to the Credit Agreement Refinanced Debt and (b) underwriting discounts, fees, commissions, costs, expenses and other similar amounts payable with respect to such refinancing);

(3)      the (a) Weighted Average Life to Maturity of such Indebtedness is equal to or longer than the remaining Weighted Average Life to Maturity of the Credit Agreement Refinanced Debt and (b) final maturity date of such Credit Agreement Refinancing Indebtedness is no earlier than the final maturity date of the Credit Agreement Refinanced Debt;

(4)      any mandatory prepayments of:

(a)      any Permitted Junior Priority Refinancing Debt or any Credit Agreement Refinancing Indebtedness that comprises unsecured notes or loans may not be made except to the extent that prepayments are (i) permitted hereunder and (ii) to the extent required hereunder or pursuant to the terms of any Permitted Equal Priority Refinancing Debt, first made or offered to the Loans and any such Permitted Equal Priority Refinancing Debt; and

(b)      any Permitted Equal Priority Refinancing Debt shall be made in an amount that would not exceed the amount of mandatory prepayments (as a percentage of the

26

principal amount thereof) that would have been received by the Credit Agreement Refinanced Debt (other than pursuant to a refinancing permitted hereunder or with respect to greater than *pro rata* payments to an earlier maturing tranche);

(5)     such Indebtedness is not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Guarantor;

(6)     if such Indebtedness is secured:

(a)     such Indebtedness is not secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not constitute Collateral;

(b)     the security agreements relating to such Indebtedness are substantially similar to or the same as the Collateral Documents (as determined in good faith by a Responsible Officer of the Borrower);

(c)     if such Indebtedness is secured, a Debt Representative acting on behalf of the holders of such Indebtedness has become party to or is otherwise subject to the provisions of the Applicable Intercreditor Agreement;

(7)     to the extent such Credit Agreement Refinancing Indebtedness Refinances Indebtedness that is subordinated (including by way of Section 8.03 or other "waterfall" provisions) to the Obligations in respect of any Class of Term Loans, such Credit Agreement Refinancing Indebtedness is subordinated to such Obligations at least to the same extent as the applicable Refinanced Debt;

(8)     the covenants and events of default applicable to such Indebtedness are substantially identical to, or, taken as a whole, not materially more favorable to the lenders or holders providing such Indebtedness than, those applicable to such Credit Agreement Refinanced Debt, in each case as determined in good faith by a Responsible Officer of the Borrower in its reasonable judgment; *provided* that the Borrower will promptly deliver to the Administrative Agent final copies of the definitive credit documentation relating to such Indebtedness (unless the Borrower is bound by a confidentiality obligation with respect thereto, in which case the Borrower will deliver a reasonably detailed description of the material terms and conditions of such Indebtedness in lieu thereof); *provided further* that this clause (8) will not apply to:

(i)     terms addressed in the preceding clauses (1) through (7),

(ii)     interest rate, fees, funding discounts and other pricing terms,

(iii)     redemption, prepayment or other premiums,

(iv)     optional redemption or prepayment terms and

(v)     covenants and other terms applicable only to periods after the Latest Maturity Date of the Closing Date Term Loans at the time of incurrence of such Indebtedness or added for the benefit of the Lenders hereunder; and

(9)     with respect to the incurrence of any Credit Agreement Refinancing Indebtedness in respect of the Loans of any Class hereunder, the Lenders of the applicable Class of Credit Agreement Refinanced Debt shall be offered the opportunity to provide such Credit Agreement

Refinancing Indebtedness on a pro rata basis based on their ownership of the applicable Credit Agreement Refinanced Debt.

Anything to the contrary notwithstanding (including, for the avoidance of doubt, clause (3) above), Credit Agreement Refinancing Indebtedness will include (1) any Registered Equivalent Notes issued in exchange therefor and (2) any bridge or other interim credit facility intended to be Refinanced with long-term indebtedness (so long as such credit facility includes customary "rollover provisions"), in which case, clause (3) of the first proviso in this definition shall not prohibit the inclusion of customary terms for "bridge" facilities, including customary mandatory prepayment, repurchase or redemption provisions.

For the avoidance of doubt, any voluntary prepayments of Credit Agreement Refinancing Indebtedness may be made on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis with other Loans.

Notwithstanding anything set forth above, (a) if the All-In Yield of any Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations and having the same payment priority as the Second-Out Loans, including such Indebtedness incurred pursuant to a Refinancing Amendment, shall be higher than the All-In Yield of the Closing Date Term Loans that are Second-Out Loans, then the interest rate margins for any such Closing Date Term Loans that are Second-Out Loans shall be increased to the extent necessary so that the All-In Yield for such Closing Date Term Loans is equal to the All-In Yield of such Credit Agreement Refinancing Indebtedness and (b) if the All-In Yield of any Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations and having the same payment priority as the First-Out Loans, including such Indebtedness incurred pursuant to a Refinancing Amendment, shall be higher than the All-In Yield of the Closing Date Term Loans that are First-Out Loans, then (x) the interest rate margins for any such Closing Date Term Loans that are First-Out Loans shall be increased to the extent necessary so that the All-In Yield for such Closing Date Term Loans is equal to the All-In Yield of such Credit Agreement Refinancing Indebtedness; *provided* that any increase in All-In Yield of any First-Out Loans due to the increase in a Eurodollar Rate or Base Rate floor on any Credit Agreement Refinancing Indebtedness shall be effected solely through an increase in any Eurodollar Rate or Base Rate floor applicable to the First-Out Loans, and (y) the interest rate margins for any such Closing Date Term Loans that are Second-Out Loans shall be increased to the extent necessary so that the All-In Yield for such Closing Date Term Loans that are Second-Out Loans is equal to the All-In Yield of such Credit Agreement Refinancing Indebtedness plus 1.50% per annum.

"**Debt Representative**" means, with respect to any series of Indebtedness secured by Liens permitted under clause (21) or (39) of the definition of "Permitted Liens", Liens securing Indebtedness permitted under clauses (2), (14) and (25) of Section 7.02(b), Permitted Equal Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Declined Proceeds**" has the meaning specified in Section 2.05(2)(g).

"**Deemed Consent Provision**" means each of (x) the definitions of "Applicable Intercreditor Agreement", "Collateral and Guarantee Requirement", "Excluded Assets", "Excluded Equity", "Excluded Subsidiaries", "Guarantor", "Landlord Consent and Estoppel", "Material Domestic Subsidiary", "Material

Foreign Subsidiary", "Mortgages", and "Recognition Agreement" and (y) Section 2.20, Section 6.01, Section 6.07, Section 6.11, Section 6.13, Section 6.16, Section 7.03(4)(ii) and Section 7.08.

"**Default**" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"**Default Rate**" means an interest rate (a) in the case of interest, with respect to any Eurodollar Rate Loan or Base Rate Loan, equal to (1) the Base Rate, *plus* (2) the Applicable Rate applicable to Base Rate Loans, *plus* (3) 2.00% per annum, (b) in the case of interest, with respect to any Second-Out Loan, equal to the PIK Rate *plus* 2.00% per annum, (c) in the case of the outstanding principal amount, (x) with respect to any Loan (other than the Second-Out Loans), equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.02(3)), *plus* 2.00% per annum and (y) with respect to any Second-Out Loan, equal to the PIK Rate, *plus* 2.00% per annum, and (d) in all other cases, (1) the Base Rate, *plus* (2) the Applicable Rate applicable to Base Rate Loans, *plus* (3) 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means, subject to Section 2.17(2), any Lender that (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans, within one Business Day of the date required to be funded by it hereunder (if applicable), (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations (if applicable) or (d) has, or has a direct or indirect parent company that has, (i) become or is the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets or a custodian appointed for it or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under this definition shall be conclusive absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Deposit Account**" means any checking or other demand deposit account maintained by the Borrower and any Subsidiary Guarantors, including any "deposit accounts" under Article 9 of the UCC.

"**Designated Preferred Stock**" means Preferred Stock of the Borrower, any Restricted Subsidiary thereof or any Parent Company (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on or promptly after the issuance date thereof, the cash proceeds of which are excluded from the calculation of the Available Amount.

"**Designated Revolving Commitments**" means any commitments to make loans or extend credit on a revolving basis to the Borrower or any Restricted Subsidiary by any Person other than the Borrower or any Restricted Subsidiary that have been designated in an Officer's Certificate delivered to the

Administrative Agent as "Designated Revolving Commitments" until such time as the Borrower subsequently delivers an Officer's Certificate to the Administrative Agent to the effect that such commitments will no longer constitute "Designated Revolving Commitments;" provided that on the date such Designated Revolving Commitments are established, such Designated Revolving Commitments will be deemed an incurrence of Indebtedness on such date and will be deemed outstanding for purposes of calculating the applicable Total Net Leverage Ratio, Senior Secured Leverage Ratio, First Lien Net Leverage Ratio and the availability of any applicable Basket hereunder on such date after giving *pro forma* effect to the incurrence of the entire committed amount of the Indebtedness thereunder (but without netting any cash proceeds thereof), in which case such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with the Total Net Leverage Ratio, Senior Secured Leverage Ratio, First Lien Net Leverage Ratio and the availability of any Baskets hereunder. For the avoidance of doubt, in the case of any Designated Revolving Commitments permitted hereunder, the reference to the "incurrence" of Indebtedness shall refer to the date on which such Designated Revolving Commitments are established.

"**Discharge**" or "**discharge**" means, with respect to any Indebtedness, the repayment, prepayment, repurchase (including pursuant to an offer to purchase), redemption, defeasance or other discharge of such Indebtedness, any such case in whole or in part.

"**Discount Prepayment Accepting Lender**" has the meaning assigned to such term in Section 2.05(1)(e)(B)(2).

"**Discount Range**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Prepayment Amount**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Prepayment Notice**" means a written notice of the Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.05(1)(e)(C)(1) substantially in the form of Exhibit J.

"**Discount Range Prepayment Offer**" means the written offer by a Lender, substantially in the form of Exhibit K, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"**Discount Range Prepayment Response Date**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Proration**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(3).

"**Discounted Prepayment Determination Date**" has the meaning assigned to such term in Section 2.05(1)(e)(D)(3).

"**Discounted Prepayment Effective Date**" means in the case of the Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation of Discounted Prepayment Offer, five (5) Business Days following the Specified Discount Prepayment Response Date, the Discount Range Prepayment Response Date or the Solicited Discounted Prepayment Response Date, as applicable, in accordance with Section 2.05(1)(e)(B), Section 2.05(1)(e)(C) or Section 2.05(1)(e)(D), respectively, unless a shorter period is agreed to between the Borrower and the Auction Agent.

"**Discounted Term Loan Prepayment**" has the meaning assigned to such term in Section 2.05(1)(e)(A).

"**disposition**" has the meaning set forth in the definition of "Asset Sale".

"**Disqualified Institution**" means (a) any competitor of the Borrower or its Subsidiaries (including for purposes of this definition Belk and its Subsidiaries) identified by or on behalf of the Borrower or the Sponsor to the Administrative Agent from time to time, (b) those particular banks, financial institutions, other institutional lenders and other Persons (x) identified by or on behalf of the Borrower or the Sponsor to the Consenting Lenders (as defined in the RSA) prior to January 26, 2021 or (y) otherwise approved in writing by the Required Consenting Lenders (as defined in the RSA) on or prior to the Closing Date and (c) any Affiliate of the entities described in the preceding clauses (a) or (b) (excluding, in the case of clause (a), bona fide debt funds) that are either readily identifiable as such on the basis of their name or are identified as such in writing by or on behalf of the Borrower or the Sponsor to the Administrative Agent from time to time; it being understood and agreed that the identification of any Person as a Disqualified Institution after the Closing Date shall not apply to retroactively disqualify any Person that has previously acquired an assignment or participation interest in any Loan, subject to Section 10.07(n), until such time such Person no longer constitutes a Lender. The identity of Disqualified Institutions shall be posted or distributed to all Lenders and prospective assignees.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date or the date the Loans are no longer outstanding and the Commitments have been terminated; *provided* that if such Capital Stock is issued pursuant to any plan for the benefit of, future, current or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower or its Subsidiaries or any Parent Company or by any such plan to such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof), such Capital Stock will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability; *provided further* any Capital Stock held by any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries, any Parent Company, or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof), in each case pursuant to any equity subscription or equity holders' agreement, management equity plan or stock option plan or any other management or employee benefit plan or agreement will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any Subsidiary or in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability. For the purposes hereof, the aggregate principal amount of Disqualified Stock will be deemed to be equal to the greater of its voluntary or involuntary liquidation preference and maximum fixed repurchase price, determined on a consolidated basis in accordance with GAAP, and the "maximum fixed repurchase price" of any Disqualified Stock that does not have a fixed repurchase price will be calculated in accordance with the terms of such Disqualified Stock

31

as if such Disqualified Stock were purchased on any date on which the Consolidated Total Debt will be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any direct or indirect Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**ECF Liquidity Threshold**" has the meaning specified in Section 2.05(2)(a).

"**ECF Payment**" has the meaning specified in Section 2.05(2)(a).

"**ECF Surplus Amount**" has the meaning specified in Section 2.05(a).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b), *provided* that no Defaulting Lender(s) or Disqualified Institution(s) may be Eligible Assignee(s).

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and sub-surface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, or proceedings with respect to any Environmental Liability or Environmental Law, (hereinafter "Claims"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to pollution or the protection of the Environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) resulting from or relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of

any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, the Capital Stock of such Person and all warrants, options or other rights to acquire Capital Stock of such Person, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock of such Person.

"**Equity Offering**" means any public or private sale of common stock or Preferred Stock of the Borrower or any Parent Company (excluding Disqualified Stock), other than:

(1)     public offerings with respect to the Borrower's or any Parent Company's common stock registered on Form S-4 or Form S-8;

(2)     issuances to any Restricted Subsidiary of the Borrower; and

(3)     any such public or private sale that constitutes an Excluded Contribution.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability or written notification that a Multiemployer Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement in writing of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived; (h) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (i) the imposition of a lien under Section 303(k) of ERISA or Section 412(c) of the Code with respect to any Pension Plan; (j) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); or (k) the occurrence of a nonexempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party or any of their respective ERISA Affiliates

33

(within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Loan Party.

"**Eurodollar Rate**" means:

        (a)      for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to (i) the London interbank offered rate for Eurodollar deposits as displayed on the applicable Bloomberg screen ("**Published LIBOR**") (or such other commercially available source providing quotations of Published LIBOR as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or (ii) if such rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the average rate at which deposits in Dollars for delivery on the first day of such Interest Period in Same Day Funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted and with a term equivalent to such Interest Period would be offered to three (3) major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period; and

        (b)      for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to (i) Published LIBOR, at approximately 11:00 a.m., London time, determined two (2) Business Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the average rate at which deposits in Dollars for delivery on the date of determination in Same Day Funds in the approximate amount of the Base Rate Loan being made or maintained and with a term equal to one month would be offered to three (3) major banks in the London interbank eurodollar market at their request at the date and time of determination;

*provided* that in no event shall the Eurodollar Rate for the First-Out Loans that bear interest at a rate based on clauses (a) and (b) of this definition be less than 1.00%.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on Adjusted Eurodollar Rate.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Cash Flow**" means, for any period, an amount equal to the excess of:

    (1)      the sum, without duplication, of:

        (a)      Consolidated Net Income of the Borrower for such period,

        (b)      an amount equal to the amount of all non-cash charges (including depreciation and amortization) for such period to the extent deducted in arriving at such Consolidated Net Income, but excluding any such non-cash charges representing an accrual or reserve for potential cash items in any future period and excluding amortization of a prepaid cash item that was paid in a prior period,

(c)  decreases in Consolidated Working Capital (except as a result of the reclassification of items from short-term to long-term or vice versa) for such period,

(d)  the amount deducted as tax expense in determining Consolidated Net Income to the extent in excess of cash taxes paid in such period and

(e)  cash receipts in respect of Hedge Agreements during such fiscal year to the extent not otherwise included in such Consolidated Net Income; over

(2)  the sum, without duplication, of:

(a)  an amount equal to the amount of all non-cash credits (including, to the extent constituting non-cash credits, amortization of deferred revenue acquired as a result of any investment permitted hereunder) included in arriving at such Consolidated Net Income (but excluding any non-cash credit to the extent representing the reversal of an accrual or reserve described in clause (1)(b) above) and cash losses, charges (including any reserves or accruals for potential cash charges in any future period), expenses, costs and fees excluded by virtue of clauses (1) through (15) of the definition of "Consolidated Net Income,"

(b)  without duplication of amounts deducted pursuant to clause (j) below in prior fiscal years, the amount of Capital Expenditures, Capitalized Software Expenditures or acquisitions of IP Rights accrued or made in cash during such period, in each case except to the extent financed with the proceeds of Funded Debt of the Borrower or any Restricted Subsidiary (unless such Indebtedness has been repaid) or the proceeds from any Specified Equity Contributions,

(c)  the aggregate amount of all principal payments of Indebtedness of the Borrower and the Restricted Subsidiaries (including (i) the principal component of payments in respect of Capitalized Lease Obligations, (ii) all scheduled principal repayments of Loans and the Second Lien Facility (or any Indebtedness representing Refinancing Indebtedness in respect thereof in accordance with the corresponding provisions of the governing documentation thereof), all repayments under the ABL Facility to the extent there is an equivalent permanent reduction in commitments thereunder (or any Indebtedness representing Refinancing Indebtedness in respect thereof in accordance with the corresponding provisions of the governing documentation thereof) and all scheduled principal repayments under any Credit Agreement Refinancing Indebtedness, in each case to the extent such payments are permitted hereunder and actually made, (iii) the amount of any scheduled repayment of Term Loans pursuant to Section 2.07 and mandatory prepayment of Term Loans pursuant to Section 2.05(2)(b) or 2.05(2)(c), and mandatory prepayment of the Second Lien Facility pursuant to Section 2.05(2)(b) or 2.05(2)(c) of the Second Lien Facility, any mandatory prepayment of the ABL Facility pursuant to Section 2.05(2) of the ABL Credit Agreement to the extent there is an equivalent permanent reduction in commitments thereunder, any mandatory Discharge of Credit Agreement Refinancing Indebtedness pursuant to the corresponding provisions of the governing documentation thereof to the extent required due to an Asset Sale or Casualty Event that resulted in an increase to Consolidated Net Income for such period and not in excess of the amount of such increase and (iv) the amount of any voluntary prepayment or buybacks of First-Out Loans, but excluding (x) all other prepayments of Term Loans or the Second Lien Facility, (y) all prepayments in respect of any revolving credit facility, except to the extent there is an equivalent permanent reduction in commitments thereunder and (z) payments

35

on any Subordinated Indebtedness, except in each case to the extent permitted to be paid pursuant to Section 7.05) made during such period, in each case, except to the extent financed with the proceeds of Funded Debt of the Borrower or any Restricted Subsidiary (unless such Indebtedness has been repaid) or the proceeds from any Specified Equity Contributions,

(d)     increases in Consolidated Working Capital (except as a result of the reclassification of items from short-term to long-term or vice versa) for such period,

(e)     cash payments by the Borrower and the Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and the Restricted Subsidiaries (other than Indebtedness) to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income,

(f)     without duplication of amounts deducted pursuant to clauses (h) and (i) below in prior fiscal years, the amount of cash consideration paid by the Borrower and the Restricted Subsidiaries (on a consolidated basis) in connection with investments (other than intercompany Investments among Holdings and the Restricted Subsidiaries (including the Borrower), Investments in Cash Equivalents or money market instruments in the ordinary course of business) made during such period (including investments constituting Permitted Investments and investments or made pursuant to Section 7.05), except to the extent such investments were financed with the proceeds of Funded Debt of the Borrower or any Restricted Subsidiary (unless such Indebtedness has been repaid) and the proceeds from any Specified Equity Contribution,

(g)     the amount of Restricted Payments paid in cash during such period (other than Restricted Payments made pursuant to Section 7.05(b)(4),(11) and (19)), except to the extent such Restricted Payments were financed with the proceeds of Funded Debt of the Borrower or any Restricted Subsidiary (unless such Indebtedness has been repaid) or the proceeds from any Specified Equity Contribution,

(h)     the aggregate amount of expenditures (to the extent not funded with the proceeds of Funded Debt (unless such Indebtedness has been repaid and cannot be reborrowed) or the proceeds from any Specified Equity Contribution) actually made by the Borrower and the Restricted Subsidiaries in cash during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period or are not deducted in calculating Consolidated Net Income,

(i)     the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by Holdings, the Borrower and the Restricted Subsidiaries during such period that are made in connection with any prepayment or redemption of Indebtedness to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income and such payments reduced Excess Cash Flow pursuant to clause (2)(c) above or reduced the mandatory prepayment required by Section 2.05(2)(a),

(j)     [reserved],

(k)     the amount of cash taxes (including penalties and interest) paid or tax reserves set aside or payable (without duplication) in such period *plus* the amount of

36

distributions with respect to taxes made in such period under Section 7.05(b)(14) to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period,

(l)     cash expenditures in respect of Hedging Obligations during such fiscal year to the extent not deducted in arriving at such Consolidated Net Income, and

(m)     any fees, expenses or charges incurred during such period (including the Transaction Expenses), or any amortization thereof for such period, in connection with any acquisition, investment, disposition, incurrence or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of this Agreement, the other Loan Documents and related documents, any Second Lien Loan Documents and any ABL Loan Documents) and including, in each case, any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed, and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful.

"**Excess Cash Flow Period**" means (i) the three fiscal quarter period beginning May 1, 2021 and ending January 29, 2022 and (ii) each fiscal year of the Borrower ending thereafter.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Exchange First-Out Loan Commitment**" means, with respect to each First-Out Lender, the commitment of such First-Out Lender to convert Prepetition First Lien Term Loans into, and be deemed to make, First-Out Loans in an aggregate amount not to exceed the amount set forth on Schedule 2.01 opposite such First-Out Lender's name under the heading "Exchange First-Out Loan Commitment". The aggregate amount of Exchange First-Out Loan Commitments on the Closing Date is $75,000,000. Once converted and deemed made, the Exchange First-Out Loan Commitments shall be reduced to zero and terminated.

"**Exchange First-Out Loans**" means the Term Loans made (or deemed made) by the applicable Second Amendment Exchanging Lenders on the Closing Date pursuant to Section 2.01(3)(a).

"**Excluded Accounts**" means any Deposit Account of any Loan Party or Restricted Subsidiary (and all cash, Cash Equivalents and other securities or investments credited thereto or deposited therein): (1) that does not have an individual daily balance in excess of $500,000, or in the aggregate with each other account described in this clause (1), in excess of $5,000,000; (2) the balance of which is swept at the end of each Business Day into a Deposit Account subject to a Deposit Account Control Agreement (as defined in the ABL Facility), so long as such daily sweep is not terminated or modified (other than to provide that the balance in such Deposit Account is swept into another Deposit Account subject to a Deposit Account Control Agreement (as defined in the ABL Facility)) without the consent of the ABL Facility Administrative Agent; (3) that is a Trust Account or Specified Segregated Account (as defined in the ABL Facility); (4) [reserved]; (5) any Deposit Account that constitutes a disbursement account of the Borrower or any Restricted Subsidiary the balance of which consists solely of proceeds of Indebtedness, including the proceeds of the loans under the ABL Facility; *provided* that in the case of the proceeds of the loans under the ABL Facility, the aggregate amount that may be maintained in an Excluded Account described in this clause (5) shall not exceed $50.0 million at any one time; or (6) to the extent that it is cash collateral for letters of credit (other than Letters of Credit (as defined in the ABL Facility)) to the extent permitted hereunder.

"**Excluded Assets**" means (i) any Owned Real Property or Leased Real Property, in each case subject to a Specified Sale-Leaseback Transaction and Leased Real Property (a) where the consent or other affirmative action of the applicable landlord is required for Borrower or the applicable Subsidiary to grant a Mortgage, perfect the security interest granted thereby, or otherwise comply with the Collateral and Guarantee Requirement and such consent cannot be obtained after the Borrower or the applicable Subsidiary's use of commercially reasonable efforts to do so (which commercially reasonable efforts, for the avoidance of doubt, shall not require the Borrower or applicable Subsidiary to amend or otherwise modify any of the existing terms or conditions of any agreement with any landlord or pay additional economics to any landlord) or (b) no legal description for the parcel or store leased by the Borrower or the Restricted Subsidiary was provided by such landlord pursuant to the ground lease thereto, (ii) pledges and security interests prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), (iii) Margin Stock, (iv) cash and Cash Equivalents on deposit in Excluded Accounts, (v) any lease, license or other agreements, or any property subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license or agreement, purchase money, Capitalized Lease Obligations or similar arrangement, or create a right of termination in favor of any other party thereto (other than a Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof (the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition), (vi) assets for which a pledge thereof or a security interest therein would result in a material adverse tax consequence as determined by the Borrower and consented to by the Required Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed), (vii) assets for which the Required Lenders and the Borrower have determined in their reasonable judgment and agree in writing that the cost of creating or perfecting such pledges or security interests therein would be excessive in view of the benefits to be obtained by the Lenders therefrom, (viii) any intent-to-use trademark application in the United States prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto with the United States Patent and Trademark Office and (ix) Excluded Equity.

"**Excluded Contribution**" means net cash proceeds or the fair market value of marketable securities or the fair market value of Qualified Proceeds received by the Borrower from:

   (1) contributions to its common equity capital;

   (2) dividends, distributions, fees and other payments from any joint ventures that are not Restricted Subsidiaries; and

   (3) the sale (other than to a Restricted Subsidiary of the Borrower or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Borrower) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Borrower;

in each case designated as Excluded Contributions pursuant to an Officer's Certificate.

"**Excluded Equity**" means Equity Interests (i) [reserved], (ii) [reserved], (iii) [reserved], (iv) of any Subsidiary with respect to which the Required Lenders and the Borrower have determined in their reasonable judgment and agreed in writing that the costs of providing a pledge of such Equity Interests or perfection thereof is excessive in view of the benefits to be obtained by the Secured Parties therefrom, (v) of

any captive insurance companies, not-for-profit Subsidiaries, special purpose entities (including any Securitization Subsidiary), (vi) to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than Holdings, the Borrower or any wholly owned Restricted Subsidiary of the Borrower), under the terms of any applicable Organizational Documents, joint venture agreement or shareholders' agreement,  equity interests in any person other than wholly-owned Restricted Subsidiaries; and (vii) of any Foreign Subsidiary the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers or to the extent that the grant or perfection of a security interest in such Voting Stock would reasonably be expected to result in material adverse tax consequences to any Loan Party, as determined by the Borrower in good faith with the consent of the Required Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed).

"**Excluded Subsidiaries**" means all of the following and "**Excluded Subsidiary**" means any of them:

(1)     any Subsidiary that is a bona fide joint venture with Persons other than Affiliates of the Borrower entered into in the ordinary course of business or a Subsidiary of such bona fide joint venture,

(2)     any Foreign Subsidiary,

(3)     any CFC Holdco,

(4)     any Domestic Subsidiary that is a Subsidiary of any (i) Foreign Subsidiary, (ii) CFC or (iii) CFC Holdco,

(5)     any Subsidiary (including any regulated entity that is subject to net worth or net capital or similar capital and surplus restrictions) that is prohibited or restricted by applicable Law, accounting policies or by Contractual Obligation existing on the Closing Date (or, with respect to any Subsidiary acquired by the Borrower or a Restricted Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired) from providing a Guaranty, or if such Guaranty would require governmental (including regulatory) or third party (other than a Loan Party) consent, approval, license or authorization, unless such consent, approval, license or authorization has been received, or is received after commercially reasonable efforts to obtain the same, which efforts may be requested by the Administrative Agent or the Required Lenders,

(6)     any special purpose securitization vehicle (or similar entity) or any Securitization Subsidiary, to the extent formed for the purpose of consummating a Qualified Securitization Facility permitted hereunder,

(7)     [reserved],

(8)     any Subsidiary that is not a Material Subsidiary,

(9)     any Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the burden or cost (including any adverse tax consequences) of providing the Guaranty is excessive in relation to the benefits to be obtained by the Lenders therefrom,

(10)     [reserved], and

(11)     any Unrestricted Subsidiary.

"**Excluded Swap Obligation**" means, with respect to any Loan Party, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 2.07 of the Guaranty and any other "keepwell, support or other agreement" for the benefit of such Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act) at the time the Guaranty of such Loan Party, or a grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest becomes illegal.

"**Excluded Taxes**" means, with respect to each Agent and each Lender,

(1)     any tax on such Agent or Lender's net income or profits (or franchise tax in lieu of such tax on net income or profits) imposed by a jurisdiction as a result of such Agent or Lender being organized or having its principal office or applicable Lending Office located in such jurisdiction or as a result of any other present or former connection between such Agent or Lender and the jurisdiction (including as a result of such Agent or Lender carrying on a trade or business, having a permanent establishment or being a resident for tax purposes in such jurisdiction, other than a connection arising solely from such Agent or Lender having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or sold or assigned an interest in, any Loan or Loan Document),

(2)     any branch profits tax under Section 884(a) of the Code, or any similar tax, imposed by any other jurisdiction described in clause (1),

(3)     other than with respect to any Lender that becomes a party hereto pursuant to the Borrower's request under Section 3.07, any U.S. federal withholding tax that is imposed on amounts payable with respect to an applicable interest in a Loan or Commitment to a Lender pursuant to a Law in effect at the time such Lender acquires such interest (or designates a new Lending Office) (or where the Lender is a partnership for U.S. federal income tax purposes, pursuant to a law in effect on the later of the date on which such Lender becomes a party hereto or the date on which the affected partner becomes a partner of such Lender or designates a new Lending Office), except, in the case of a Lender or partner that designates a new Lending Office or is an assignee, to the extent that such Lender or partner (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to Section 3.01,

(4)     any withholding tax attributable to a Lender's failure to comply with Section 3.01(3),

(5)     any tax imposed under FATCA and

(6)      any interest, additions to taxes and penalties with respect to any taxes described in clauses (1) through (5) of this definition.

"**Existing Credit Agreement**" means that certain Credit Agreement, dated as of October 22, 2014, by and among Belk, certain affiliates of Belk, the lenders from time to time party thereto, the agents party thereto and Wells Fargo Bank, National Association, as administrative agent, as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Existing Mortgaged Property**" means each Real Property set forth on Schedule 1.01(2) annexed hereto that, as of the Closing Date, is subject to a Mortgage in favor of the Collateral Agent.

"**Extended Commitments**" means the Term Loan Commitments held by an Extending Lender.

"**Extended Loans**" means the Term Loans made pursuant to Extended Commitments.

"**Extending Lender**" means each Lender accepting an Extension Offer.

"**Extension**" has the meaning specified in Section 2.16(1).

"**Extension Amendment**" has the meaning specified in Section 2.16(2).

"**Extension Offer**" has the meaning specified in Section 2.16(1).

"**Facilities**" means the First-Out Loans, the Second-Out Loans, any Extended Loans, any Refinancing Term Loans or any Replacement Loans, as the context may require, and "**Facility**" means any of them.

"**fair market value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code as in effect on the date hereof or any amended or successor version thereof that is substantively comparable and not materially more onerous to comply with (and, in each case, any regulations promulgated thereunder or official interpretations thereof), and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreements (together with any laws, rules, or practices implementing such agreements).

"**FCPA**" has the meaning specified in Section 5.17.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted to the Administrative Agent by three (3) federal funds brokers on such day on such transactions as determined by the Administrative Agent.

"**Financial Officer**" means, with respect to a Person, the chief financial officer, accounting officer, treasurer, controller or other senior financial or accounting officer of such Person, as appropriate.

"**First Lien Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Debt outstanding the last day of such Test Period to (b) Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**First-Out Loan Commitments**" means, collectively, the New Money First-Out Loan Commitment and the Exchange First-Out Loan Commitment.

"**First-Out Lenders**" means the Lenders holding First-Out Loans or First-Out Loan Commitments.

"**First-Out Loans**" means the New Money First-Out Loans and the Exchange First-Out Loans.

"**Flood Hazard Property**" has the meaning specified in Section 6.07(2).

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Flood Insurance Requirements**" has the meaning specified in Section 6.07(2).

"**floor**" means, with respect to any reference rate of interest, any fixed minimum amount specified for such rate.

"**Foreign Asset Sale**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Casualty Event**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Lender**" means a Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Code.

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, the Borrower or any Subsidiary of the Borrower with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Sale-Leaseback**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**Funded Debt**" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders

to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**GAAP**" means generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, as in effect from time to time. At any time after the Closing Date, the Borrower may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP will thereafter be construed to mean IFRS (except as otherwise provided in this Agreement); *provided*, *however*, that any such election, once made, will be irrevocable; *provided further* that any calculation or determination in this Agreement that requires the application of GAAP for periods that include fiscal quarters ended prior to the Borrower's election to apply IFRS will remain as previously calculated or determined in accordance with GAAP. The Borrower will give notice of any such election made in accordance with this definition to the Administrative Agent. Notwithstanding any other provision contained herein the amount of any Indebtedness under GAAP with respect to Capitalized Lease Obligations and Attributable Indebtedness shall be determined in accordance with the definition of Capitalized Lease Obligations and Attributable Indebtedness, respectively.

Notwithstanding the foregoing, if at any time any change occurring after the Closing Date in GAAP (or IFRS) or in the application thereof on the computation of any financial ratio or financial requirement, or compliance with any covenant, set forth in any Loan Document, and the Borrower shall so request (regardless of whether any such request is given before or after such change), the Lenders and the Borrower will negotiate in good faith to amend (subject to the approval of the Required Lenders) such ratio, requirement or covenant to preserve the original intent thereof in light of such change in GAAP (or IFRS); provided further that until so amended, (a) such ratio, requirement or covenant shall continue to be computed in accordance with GAAP (or IFRS) prior to such change therein and (b) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP (or IFRS).

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**guarantee**" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such

43

Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantor**" has the meaning specified in clause (2) of the definition of "Collateral and Guarantee Requirement." For avoidance of doubt, the Borrower may, in its sole discretion, cause any domestic Parent Company or Restricted Subsidiary that is not required to be a Guarantor to Guarantee the Obligations by causing such Parent Company or Restricted Subsidiary to execute a joinder to the Guaranty (substantially in the form provided therein or as the Administrative Agent, the Required Lenders, the Borrower and such Guarantor may otherwise agree), and any such Parent Company or Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"**Guaranty**" means (a) the Guarantee of the Obligations by the Guarantors substantially in the form of Exhibit E, (b) each other Guarantee and Guarantee supplement delivered pursuant to Section 6.11 and (c) each other Guarantee and Guarantee supplement delivered by any Parent Company or Restricted Subsidiary pursuant to the second sentence of the definition of "Guarantor".

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, and all other hazardous or toxic substances or wastes, pollutants and contaminants and chemicals in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, or radon gas and infectious or medical wastes, to the extent any of the foregoing are regulated pursuant to, or can form the basis for liability under, any Environmental Law.

"**Hedge Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedge Bank**" means any Person party to a Hedge Agreement that is an Agent, a Lender, or an Affiliate of any of the foregoing on the Closing Date or at the time it enters into such Hedge Agreement, in its capacity as a party thereto, whether or not such Person subsequently ceases to be an Agent, a Lender or an Affiliate of any of the foregoing.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under any Hedge Agreement.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Identified Participating Lenders**" has the meaning specified in Section 2.05(1)(e)(C)(3).

"**Identified Qualifying Lenders**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**IFRS**" means international financial reporting standards and interpretations issued by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants or any successor to either such Board, or the SEC, as the case may be), as in effect from time to time.

"**Immediate Family Members**" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including, in each case, adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"**Incremental Amounts**" has the meaning specified in clause (1) of the definition of Refinancing Indebtedness.

"**Indebtedness**" means, with respect to any Person, without duplication:

(1)     any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)     in respect of borrowed money;

(b)     evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)     representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations) due more than twelve months after such property is acquired, except (i) any such balance that constitutes an obligation in respect of a commercial letter of credit, a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business or consistent with industry practice, (ii) any earn-out obligations until such obligation is reflected as a liability on the balance sheet (excluding any footnotes thereto) of such Person in accordance with GAAP and is not paid within 60 days after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business; or

45

(d)       representing the net obligations under any Hedging Obligations;

(2)       to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice; and

(3)       to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of such Indebtedness will be the lesser of (i) the fair market value of such asset at such date of determination and (ii) the amount of such Indebtedness of such other Person; *provided* that notwithstanding the foregoing, Indebtedness will be deemed not to include:

(i)       Contingent Obligations incurred in the ordinary course of business or consistent with industry practice,

(ii)       reimbursement obligations under commercial letters of credit (*provided* that unreimbursed amounts under letters of credit will be counted as Indebtedness three (3) Business Days after such amount is drawn),

(iii)       obligations under or in respect of Qualified Securitization Facilities that are non-recourse to the Loan Parties other than any Securitization Repurchase Obligation,

(iv)       accrued expenses,

(v)       deferred or prepaid revenues, and

(vi)       asset retirement obligations and obligations in respect of reclamation and workers compensation (including pensions and retiree medical care);

*provided further* that Indebtedness will be calculated without giving effect to the effects of Accounting Standards Codification Topic No. 815, *Derivatives and Hedging*, and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Assets or Operations**" means, with respect to any Parent Company, that Parent Company's total assets, revenues, income from continuing operations before income taxes and cash flows from operating activities (excluding in each case amounts related to its investment in the Borrower and the Restricted Subsidiaries), determined in accordance with GAAP and as shown on the most recent balance sheet of such Parent Company, is more than 3.0% of such Parent Company's corresponding consolidated amount.

"**Information**" has the meaning specified in Section 10.09.

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means the Intercompany Subordination Agreement, dated as of the Closing Date, substantially in the form of Exhibit Q executed by the Borrower and each Restricted Subsidiary that is party thereto.

"**Intercreditor Provisions**" means the terms set forth on Annex I hereto.

"**Interest Payment Date**" means, (a) as to any Loan of any Class other than a Base Rate Loan or a Second-Out Loan, the last day of each Interest Period applicable to such Loan and the applicable Maturity Date of the Loans of such Class; *provided* that if any Interest Period for a Eurodollar Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan of any Class or any Second-Out Loan, the first Business Day of each February, May, August and November and the applicable Maturity Date of the Loans of such Class.

"**Interest Period**" means, (a) as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one, two or three thereafter, or to the extent consented to by each applicable Lender, twelve months (or such period of less than one month as may be consented to by each applicable Lender), as selected by the Borrower in its Committed Loan Notice; *provided* that:

    (1)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

    (2)    any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

    (3)    no Interest Period shall extend beyond the applicable Maturity Date for the Class of Loans of which such Eurodollar Rate Loan is a part; and

    (b)    as to each Base Rate Loan and each Second-Out Loan, (i) the period commencing on the Closing Date and ending on the first Interest Payment Date after the Closing Date and (ii) thereafter, each period commencing on the first day following each Interest Payment Date and ending on the immediately succeeding Interest Payment Date.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's or BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency selected by the Borrower.

"**Investment Grade Securities**" means:

    (1)    securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or debt instruments constituting loans or advances among the Borrower and its Subsidiaries;

(3) investments in any fund that invests at least 95% of its assets in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"**Investments**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to employees, directors, officers, members of management, manufacturers and consultants, in each case made in the ordinary course of business or consistent with industry practice), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person. For purposes of the definition of "Unrestricted Subsidiary" and Section 7.05,

(1) "Investments" will include the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a) the Borrower's "Investment" in such Subsidiary at the time of such redesignation; *minus*

(b) the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer.

The amount of any Investment outstanding at any time will be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.

"**Investors**" means the Sponsor.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**Judgment Currency**" has the meaning specified in Section 10.26.

"**Junior Debt**" has the meaning specified in Section 7.05(a)(C).

"**KKR**" means KKR Credit Advisors (US) LLC and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Landlord Consent and Estoppel**" means with respect to any Leased Real Property, a letter, certificate or other instrument in writing from the lessor under the related lease, reasonably satisfactory in form and substance to the Collateral Agent and the Required Lenders, pursuant to which such lessor agrees, for the benefit of Collateral Agent, (i) that without any further consent of such lessor or any further action on the part of the Loan Party holding such Leased Real Property, such Leased Real Property may be encumbered pursuant to a Mortgage and may be assigned to the purchaser at a foreclosure sale or in a transfer in lieu of such a sale (and to a subsequent third party assignee if Collateral Agent or its designee so acquires such Leased Real Property), (ii) that such lessor shall not terminate such lease as a result of a default by such Loan Party thereunder without first giving Collateral Agent written notice of such default and at least 60 days (or, if such default cannot reasonably be cured by Collateral Agent or the Required Lenders within such period, such longer period as may reasonably be required) to cure such default and (iii) to such other matters relating to such Leased Real Property as Collateral Agent or the Required Lenders may reasonably request.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any First-Out Loan, Second-Out Loan, Refinancing Term Loan, Replacement Loan or any Extended Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, legally enforceable guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the legally binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Leased Real Property**" means any real property located in the United States and ground leased by any Loan Party, or in which Loan Party acquires a ground leasehold interest after the Closing Date; *provided* that for the avoidance of doubt, Leased Real Property will not include any Excluded Assets.

"**Legal Holiday**" means Saturday, Sunday or a day on which commercial banking institutions are not required to be open in the State of New York or at the place of payment.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender." For the avoidance of doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered a Refinancing Amendment or an amendment in respect of Replacement Loans, as the case may be, and to the extent such Refinancing Amendment or amendment in respect of Replacement Loans shall have become effective in accordance with the terms hereof and thereof, and each Extending Lender shall continue to be a Lender. As of the Closing Date, Schedule 2.01(1) sets forth the name of each First-Out Lender and Schedule 2.01(2) sets forth the name of each Second-Out Lender.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**LIBOR**" has the meaning specified in the definition of "Eurodollar Rate."

"**Lien**" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest and any authorized filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event will an operating lease be deemed to constitute a Lien.

"**Limited Condition Acquisition**" means any investment permitted hereunder by the Borrower or one or more of its Restricted Subsidiaries whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"**Liquidity**" means, at any date of determination, (a) the aggregate amount of cash and Cash Equivalents included in the cash accounts that would be listed on the consolidated balance sheet delivered pursuant to Section 6.01 to the extent such cash is not classified as "restricted" for financial statement purposes (unless so classified solely because of any provision under the Loan Documents or the ABL Facility Documents because they are subject to a Lien securing the Obligations or the ABL Obligations and without duplication of any cash and Cash Equivalents otherwise increasing the amount of ABL Commitments available to be utilized under the ABL Credit Agreement and excluding any cash and Cash Equivalents in store deposit accounts), plus (b) any Excess Availability (as defined in the ABL Credit Agreement) (excluding (i) any amount of the Excess Availability that, if drawn, would trigger a breach of Section 7.10 of the ABL Credit Agreement) and (ii) to the extent not already reflected in the Excess Availability, any Reserves (as defined in the ABL Credit Agreement) or other actual deductions from the Borrowing Base as of such date that are not reflected in the most recent borrowing base certificate).

"**Loan**" means an extension of credit under Article II or the making of Replacement Loans pursuant to Section 10.01 by a Lender to the Borrower in the form of a Term Loan.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) any Refinancing Amendment, Extension Amendment or amendment in respect of Replacement Loans, (d) the Guaranty, (e) the Collateral Documents, (f) the Applicable Intercreditor Agreements, (g) the Agent Fee Letter and (h) any other agreement, document or instrument designated as a "Loan Document" by the Borrower and the Administrative Agent (or the Required Lenders).  Any reference to this Agreement or any other Loan Document shall include all appendices, exhibits, schedules, annexes or attachments thereto.

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each Subsidiary Guarantor.

"**Make-whole Amount**" means $199,662,489.

"**Management Services Agreement**" means the management services agreement or similar agreements among the Sponsor or certain of its respective management companies associated with it or their advisors, if applicable, and the Borrower (or any Parent Company).

"**Management Stockholders**" means the members of management (and their Controlled Investment Affiliates and Immediate Family Members and any permitted transferees thereof) of the Borrower (or a Parent Company) who are holders of Equity Interests of any Permitted Parent or any Parent Company on the Closing Date or that become holders of such Equity Interests thereafter.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Material Adverse Effect**" means a circumstance or condition that would materially and adversely affect (a) the business, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents to which it is a party or (c) the rights and remedies of the Lenders, the Collateral Agent and the Administrative Agent under the Loan Documents, in each case, other than customary events or circumstances in connection with the Plan of Reorganization.

"**Material Domestic Subsidiary**" means, as of the Closing Date and thereafter at any date of determination, each of the Borrower's Domestic Subsidiaries that is a Restricted Subsidiary (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiary at the last day of the most recent Test Period) were equal to or greater than 1.0% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiary for such Test Period) were equal to or greater than 1.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time after the date which is 30 days after the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion), Domestic Subsidiaries that are not Material Domestic Subsidiaries solely because they do not meet the thresholds set forth in the preceding clause (a) or (b) comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiaries at the last day of the most recent Test Period) 2.5% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiaries for such Test Period) 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries that are Restricted Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 with respect to any such Subsidiaries.

"**Material Foreign Subsidiary**" means, as of the Closing Date and thereafter at any date of determination, each of the Borrower's Foreign Subsidiaries that are Restricted Subsidiaries (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiary at the last day of the most recent Test Period) were equal to or greater than 1.0% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the revenues of the Restricted Subsidiaries of such Foreign Subsidiary for such Test Period) were equal to or greater than 1.0% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time after the date which is 30 days after the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion), Foreign Subsidiaries that are not Material Foreign Subsidiaries comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiaries at the last day of the most recent Test Period) 2.5% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period) 2.5% of the consolidated gross

51

revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries that are Restricted Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) (A) with respect to the First-Out Loans, in each case that have not been extended pursuant to Section 2.16 after the Closing Date, July 31, 2025 and (B) with respect to the Second-Out Loans, in each case that have not been extended pursuant to Section 2.16 after the Closing Date, July 31, 2025, (ii) with respect to any tranche of Extended Loans, the final maturity date as specified in the applicable Extension Amendment, (iii) with respect to any Refinancing Term Loans, the final maturity date as specified in the applicable Refinancing Amendment and (iv) with respect to Replacement Loans, the final maturity date as specified in the applicable amendment; *provided* that in each case, if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Rate**" has the meaning specified in Section 10.11.

"**Moody's**" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"**Mortgage Policies**" has the meaning specified in Section 6.11(2)(b)(ii).

"**Mortgaged Properties**" has the meaning specified in paragraph (5) of the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the fee or leasehold, as applicable, deeds of trust, trust deeds, hypothecs, deeds to secure debt and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent for the benefit of the Secured Parties in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, including such modifications as may be required by local laws, pursuant to Section 6.13(2) and any other deeds of trust, trust deeds, hypothecs, deeds to secure debt or mortgages executed and delivered pursuant to Sections 6.11.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"**Net Proceeds**" means:

(1)       with respect to any Asset Sale or any Casualty Event, the aggregate Cash Equivalent proceeds received by the Borrower or any Restricted Subsidiary in respect of such Asset Sale or Casualty Event, net of the costs relating to such Asset Sale or Casualty Event, including legal, accounting and investment banking fees, payments made in order to obtain a necessary consent or required by applicable law, brokerage and sales commissions, all dividends, distributions or other payments required to be made to minority interest holders in Restricted Subsidiaries as a

result of any such Asset Sale or Casualty Event by a Restricted Subsidiary, the amount of any purchase price or similar adjustment claimed by any Person to be owed by the Borrower or any Restricted Subsidiary, until such time as such claim will have been settled or otherwise finally resolved, or paid or payable by the Borrower or any Restricted Subsidiary, in either case in respect of such Asset Sale or Casualty Event, any relocation expenses incurred as a result thereof, costs and expenses in connection with unwinding any Hedging Obligation in connection therewith, other fees and expenses, including title and recordation expenses, taxes paid or payable as a result thereof or any transactions occurring or deemed to occur to effectuate a payment under this Agreement, amounts required to be applied to the repayment of principal, premium, if any, and interest on Indebtedness (other than Subordinated Indebtedness, the ABL Facility or the Second Lien Facility) secured by a Lien on such assets and required (other than required by Section 2.05(2)(b)) to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Borrower or any Restricted Subsidiary as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction; *provided* that (a) subject to clause (b) below, no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds shall exceed $1.0 million and (b) no such net cash proceeds shall constitute Net Proceeds under this clause (1) in any fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $2.0 million (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (1)); and

> (2)    (a) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower or any Parent Company, the excess, if any, of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (ii) all taxes paid or reasonably estimated to be payable, and all fees (including investment banking fees, attorneys' fees, accountants' fees, underwriting fees and discounts), commissions, costs and other out-of-pocket expenses and other customary expenses incurred, in each case by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (b) with respect to any Permitted Equity Issuance by any Parent Company, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower;

*provided* that "Net Proceeds" shall not include, or apply to, the proceeds of the sale component of any Sale-Leaseback Transaction, although proceeds from Specified Sale-Leaseback Transactions shall be governed by the definition of "Specified Sale-Leaseback Net Proceeds".

"**New Money First-Out Loan Commitment**" means, with respect to each First-Out Lender, the commitment of such First-Out Lender to make New Money First-Out Loans in an aggregate amount not to exceed the amount set forth opposite such First-Out Lender's name on Schedule 2.01 opposite such First-Out Lender's name under the heading "New Money First-Out Loan Commitment".  The aggregate amount of New Money First-Out Loan Commitments on the Closing Date is $225,000,000.  Once funded, the New Money First-Out Loan Commitments shall be reduced to zero and terminated.

"**New Money First-Out Loans**" means the Term Loans made by the applicable First-Out Lenders on the Closing Date pursuant to Section 2.01(2).

"**New Store**" means each new store or shopping facility opened or acquired by the Borrower or a Restricted Subsidiary that has been open for commercial operations for less than twelve full calendar months.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Non-Excluded Taxes**" means all Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Non-Extended Lender**" has the meaning specified in Section 2.16.

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Non-Recourse Indebtedness**" means Indebtedness that is non-recourse to the Borrower and the Restricted Subsidiaries.

"**Obligations**" means all

(1)     advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, including the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, premiums (including any Prepayment Premium or Make-whole Amount), Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including principal, interest, reimbursement obligations, charges, expenses, fees, premiums (including any Prepayment Premium or Make-whole Amount), Attorney Costs, indemnities and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding,

(2)     obligations (other than Excluded Swap Obligations) of the Borrower or any Restricted Subsidiary arising under any Secured Hedge Agreement,

(3)     Cash Management Obligations under each Secured Cash Management Agreement and

(4)     the Guaranty in respect of each of the foregoing.

Notwithstanding the foregoing, (a) unless otherwise agreed to by the Borrower and any applicable Hedge Bank or Cash Management Bank, the obligations of Holdings, the Borrower or any Subsidiary under any Secured Hedge Agreement and under any Secured Cash Management Agreement shall be secured and guaranteed pursuant to the Collateral Documents and the Guaranty only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement and any other Loan Document shall not require the consent of the holders of Hedging Obligations under Secured Hedge Agreements or of the holders of Cash Management Obligations under Secured Cash Management Agreements.

"**OFAC**" has the meaning specified in Section 5.17.

54

"**Offered Amount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Offered Discount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Officer's Certificate**" means a certificate signed on behalf of a Person by a Responsible Officer of such Person.

"**OID**" means original issue discount.

"**Opinion of Counsel**" means a written opinion from legal counsel who is reasonably acceptable to the Administrative Agent.  Counsel may be an employee of or counsel to the Borrower or the Administrative Agent.

"**ordinary course of business**" means activity conducted in the ordinary course of business of the Borrower and any Restricted Subsidiary, including the expansion, remodeling, acquisition, modernization, construction, improvement and repair of department stores and other retail centers of Belk operated, or expected to be operated, by the Borrower or a Restricted Subsidiary, and financing transactions in connection therewith, and will include Sale-Leaseback Transactions.

"**Organizational Documents**" means

(1)    with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction);

(2)    with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and

(3)    with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Original Closing Date**" means December 10, 2015.

"**Other Applicable ECF**" means Excess Cash Flow or a comparable measure as determined in accordance with the documentation governing Other Applicable Indebtedness.

"**Other Applicable Indebtedness**" means Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations, together with Refinancing Indebtedness in respect of any of the foregoing that is secured on a *pari passu* basis with the Obligations.

"**Other Applicable Net Proceeds**" means Net Proceeds or a comparable measure as determined in accordance with the documentation governing Other Applicable Indebtedness.

"**Other Taxes**" means any and all present or future stamp, court or documentary Taxes, intangible, recording, filing or similar Taxes arising from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Outstanding Amount**" means on any date, the outstanding principal amount of any Term Loans after giving effect to any borrowings and prepayments or repayments of Term Loans, occurring on such date.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Owned Real Property**" means any fee-owned real property located in the United States and owned on, or acquired after, the Closing Date, by any Loan Party; *provided* that for the avoidance of doubt, Owned Real Property will not include any Excluded Assets.

"**Parent Company**" means any Person so long as such Person directly or indirectly holds 100.0% of the total voting power of the Capital Stock of the Borrower, and at the time such Person acquired such voting power, no Person and no group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any such group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) (other than any Permitted Holder), will have beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), directly or indirectly, of 50.0% or more of the total voting power of the Voting Stock of such Person.  For the avoidance of doubt, Fashion Holdings Intermediate Inc., a Delaware corporation, is a Parent Company of the Borrower.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Participating Lender**" has the meaning specified in Section 2.05(1)(e)(C)(2).

"**Payment in Full**" means, with respect to the Obligations in respect of the Loans or any Class of Loans, the occurrence of all of the following:

(a)   termination or expiration of all commitments to extend credit (or, in the case of Secured Hedge Agreements and Secured Cash Management Obligations or similar Obligations, termination of arrangements giving rise to such debt or entering into other arrangements reasonably satisfactory to the counterparties thereto) that would constitute such Obligations;

(b)   payment in full in cash of the principal of, interest and premium (if any) on, fees and other charges comprising such Obligations that are due and payable (including, in any event, principal, interest, premium (including any Prepayment Premium or Make-whole Amount), fees and other charges that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding); and

(c)   payment in full in cash of all other such Obligations that are outstanding and due and payable at the time the principal of, interest and premium (if any) on, fees and other charges comprising such Obligations are paid in full in cash (other than any obligations for taxes, costs, indemnification, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time) (including, in any event, reimbursement obligations, expenses, Attorney Costs, indemnities and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such

56

proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"**Perfection Certificate**" has the meaning specified in the Security Agreement.

"**Permitted Asset Swap**" means the substantially concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Borrower or any Restricted Subsidiary and another Person; *provided* that any cash or Cash Equivalents received must be applied in accordance with Section 2.05(2)(b)(i).

"**Permitted Debt Exchange**" has the meaning specified in Section 2.19(1).

"**Permitted Debt Exchange Notes**" has the meaning specified in Section 2.19(1).

"**Permitted Debt Exchange Offer**" has the meaning specified in Section 2.19(1).

"**Permitted Equal Priority Refinancing Debt**" means any Credit Agreement Refinancing Indebtedness that is secured on a *pari passu* basis with the Closing Date Term Loans.

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of the Borrower or any Parent Company.

"**Permitted Holder**" means (1) the Investors, KKR, Blackstone and Management Stockholders and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the foregoing are members; *provided* that in the case of such group and without giving effect to the existence of such group or any other group, such Investors, KKR, Blackstone and Management Stockholders, collectively, have beneficial ownership of more than a majority of the total voting power of the Voting Stock of the Borrower or any Permitted Parent, and (2) any Person acting in the capacity of an underwriter (solely to the extent that and for so long as such Person is acting in such capacity) in connection with a public or private offering of Capital Stock of the Borrower or any Permitted Parent.

"**Permitted Indebtedness**" means Indebtedness permitted to be incurred in accordance with Section 7.02.

"**Permitted Investments**" means:

(1)     any Investment (a) in any Loan Party and (b) by any Restricted Subsidiary that is a Non-Loan Party in any other Restricted Subsidiary that is a Non-Loan Party;

(2)     any Investment(s) in Cash Equivalents or Investment Grade Securities and Investments that were Cash Equivalents or Investment Grade Securities when made;

(3)      [reserved];

(4)      any Investment in securities or other assets not constituting Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made in accordance with Section 7.04 or any other disposition of assets not constituting an Asset Sale;

(5)      any Investment existing on the Closing Date or made pursuant to binding commitments in effect on the Closing Date or an Investment consisting of any extension, modification, replacement, renewal or reinvestment of any Investment or binding commitment existing on the Closing Date; *provided* that the amount of any such Investment or binding commitment may be increased, extended, modified, replaced, reinvested or renewed, (a) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities) or (b) as otherwise permitted hereunder;

(6)      any Investment acquired by the Borrower or any Restricted Subsidiary:

(a)      in exchange for any other Investment, accounts receivable or indorsements for collection or deposit held by the Borrower or any Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer);

(b)      in satisfaction of judgments against other Persons;

(c)      as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or

(d)      as a result of the settlement, compromise or resolution of (i) litigation, arbitration or other disputes or (ii) obligations of trade creditors or customers that were incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer;

(7)      Hedging Obligations permitted under Section 7.02(b)(10);

(8)      [reserved];

(9)      Investments the payment for which consists of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company; *provided* that such Equity Interests will not increase the Available Amount;

(10)     (a) guarantees of Indebtedness permitted under Section 7.02, performance guarantees and Contingent Obligations incurred in the ordinary course of business or consistent with industry practice, and (b) the creation of liens on the assets of the Borrower or any Restricted Subsidiary in compliance with Section 7.01;

(11)     any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 7.06(b)(3), (4), (7), (8), (10), (14), (16), (17), (18), (19), (20) and (23);

58

(12)     Investments consisting of purchases and acquisitions of inventory, supplies, material, services or equipment or similar assets or the licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons;

(13)     Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding, not to exceed $50.0 million (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided*, *however*, that if any Investment pursuant to this clause (13) is made in any Person that is not a Restricted Subsidiary (or Subsidiary Guarantor, as applicable) at the date of the making of such Investment and such Person becomes a Restricted Subsidiary (or Subsidiary Guarantor, as applicable) after such date, such Investment will thereafter be deemed to have been made pursuant to clause (1) above (to the extent permitted thereunder) and will cease to have been made pursuant to this clause (13) for so long as such Person continues to be a Restricted Subsidiary (or Subsidiary Guarantor, as applicable); *provided*, *further*, that the Investments made by Loan Parties in Non-Loan Parties pursuant to this clause (13), together with the Investments made pursuant to clause (18), shall not in the aggregate exceed $35.0 million at any time outstanding;

(14)     Investments in a Securitization Subsidiary that, in the good faith determination of the Borrower, are necessary to effect any Qualified Securitization Facility or any repurchase obligation pursuant to a Securitization Repurchase Obligation;

(15)     loans and advances to, or guarantees of Indebtedness of, officers, directors, employees, consultants and members of management, together with the amounts described in clause (16), not in excess of the greater of $10.0 million and 2.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(16)     loans and advances to employees, directors, officers, members of management and consultants for business-related travel expenses, moving expenses, payroll advances and other similar expenses or payroll expenses, in each case incurred in the ordinary course of business or consistent with past practice or consistent with industry practice or to future, present and former employees, directors, officers, members of management and consultants (and their Controlled Investment Affiliates and Immediate Family Members) to fund such Person's purchase of Equity Interests of the Borrower or any Parent Company, together with the amounts described in clause (15), not in excess of the greater of $10.0 million and 2.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(17)     advances, loans or extensions of trade credit or prepayments to suppliers or loans or advances made to distributors, in each case, in the ordinary course of business or consistent with past practice or consistent with industry practice by the Borrower or any Restricted Subsidiary;

(18)     any Investment in any Subsidiary (other than an Unrestricted Subsidiary) or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business or consistent with industry practice; *provided*, that the Investments made by Loan Parties in Non-Loan Parties pursuant to this clause (18), together with the Investments made by Loan Parties in Non-Loan Parties pursuant to clause (13), shall not exceed $35.0 million in the aggregate at any time outstanding;

(19)     Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with industry practice;

(20)     Investments made in the ordinary course of business or consistent with industry practice in connection with obtaining, maintaining or renewing client contacts and loans or advances made to distributors;

(21)     Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business or consistent with industry practice;

(22)     the purchase or other acquisition of any Indebtedness of the Borrower or any Restricted Subsidiary to the extent otherwise permitted hereunder;

(23)     [reserved];

(24)     Investments in the ordinary course of business or consistent with industry practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers;

(25)     any Investment by any Captive Insurance Subsidiary in connection with its provision of insurance to the Borrower or any of its Subsidiaries, which Investment is made in the ordinary course of business or consistent with industry practice of such Captive Insurance Subsidiary, or by reason of applicable law, rule, regulation or order, or that is required or approved by any regulatory authority having jurisdiction over such Captive Insurance Subsidiary or its business, as applicable;

(26)     Investments made as part of, to effect or resulting from the Transactions;

(27)     Investments of assets relating to non-qualified deferred payment plans in the ordinary course of business or consistent with industry practice;

(28)     [reserved];

(29)     acquisitions of obligations of one or more directors, officers or other employees or consultants or independent contractors of any Parent Company, the Borrower, or any Subsidiary of the Borrower in connection with such director's, officer's, employee's consultant's or independent contractor's acquisition of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, to the extent no cash is actually advanced by the Borrower or any Restricted Subsidiary to such directors, officers, employees, consultants or independent contractors in connection with the acquisition of any such obligations;

(30)     Investments constituting promissory notes or other non-cash proceeds of dispositions of assets to the extent permitted under Section 7.04; and

(31)     Investments resulting from pledges and deposits permitted pursuant to the definition of "Permitted Liens".

For purposes of determining compliance with this definition, an Investment need not be incurred solely by reference to one category of Permitted Investments described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption.

"**Permitted Junior Priority Refinancing Debt**" means any Credit Agreement Refinancing Indebtedness that is secured on a junior lien basis to the Closing Date Term Loans.

"**Permitted Liens**" means, with respect to any Person:

(1)      Liens created pursuant to any Loan Document;

(2)      Liens, pledges or deposits made in connection with:

      (a)      workers' compensation laws, unemployment insurance, health, disability or employee benefits, other social security laws or similar legislation or regulations,

      (b)      insurance-related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) securing reimbursement or indemnification obligations of (including obligations in respect of letters of credit, bank guarantees or similar documents or instruments for the benefit of) insurance carriers providing property, casualty or liability insurance or otherwise supporting the payment of items set forth in the foregoing clause (a) or

      (c)      bids, tenders, contracts, statutory obligations, surety, indemnity, warranty, release, appeal or similar bonds, or with regard to other regulatory requirements, completion guarantees, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities, and other obligations of like nature (including those to secure health, safety and environmental obligations) (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for the payment of rent, contested taxes or import duties and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with industry practice;

(3)      Liens imposed by law, such as landlords', carriers', warehousemen's, materialmen's, repairmen's, construction, mechanics' or other similar Liens (a) for sums not yet overdue for a period of more than sixty (60) days or, if more than sixty (60) days overdue, are unfiled and no other action has been taken to enforce such Liens or (b) being contested in good faith by appropriate actions or other Liens arising out of or securing judgments or awards against such Person with respect to which such Person will then be proceeding with an appeal or other proceedings for review if such Liens are adequately bonded or adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)      Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than thirty (30) days or not yet payable or not subject to penalties for nonpayment or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(5)      Liens in favor of issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds, instruments or obligations or with respect to regulatory requirements or

letters of credit or bankers acceptance issued, and completion guarantees provided for, in each ease, issued pursuant to the request of and for the account of such Person in the ordinary course of its business or consistent with past practice or industry practice;

(6)     survey exceptions, encumbrances, ground leases, easements, restrictions, protrusions, encroachments or reservations of, or rights of others for, licenses, rights-of-way, servitudes, sewers, electric lines, drains, telegraph, telephone and cable television lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that were not incurred in connection with Indebtedness and that do not in the aggregate materially impair their use in the operation of the business of such Person and exceptions on title policies insuring liens granted on Mortgaged Properties;

(7)     Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (2), (4), (12), (13), (23) or (25) of Section 7.02(b); *provided* that:

(a)     Liens securing obligations relating to any Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (13) relate only to obligations relating to Refinancing Indebtedness that is secured by Liens on the same assets as the assets securing the Refinanced Debt (as defined in the definition of Refinancing Indebtedness), *plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property, or serves to refund, refinance, extend, replace, renew or defease Indebtedness, Disqualified Stock or Preferred Stock incurred under such clause (4), (12) or (13) of Section 7.02(b);

(b)     Liens securing obligations relating to Indebtedness or Disqualified Stock permitted to be incurred pursuant to such clause (23) extend only to the assets of Subsidiaries that are not Guarantors;

(c)     Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (4) extend only to the assets so purchased, replaced, leased or improved and proceeds and products thereof; *provided further* that individual financings of assets provided by a counterparty may be cross-collateralized to other financings of assets provided by such counterparty;

(d)     In the case of Liens securing Indebtedness for borrowed money, Disqualified Stock or Preferred Stock incurred pursuant to such clause (12), such Indebtedness shall only be secured by the Collateral on a junior basis to the Closing Date Term Loans;

(e)     In the case of Liens securing Indebtedness incurred under clause (2) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement, which shall provide that the Liens securing such Indebtedness rank junior to the Liens securing the Closing Date Term Loans;

(f)     [reserved]; and

(g)     In the case Liens securing Indebtedness incurred under clause (25) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement, which shall provide that (i) the Liens on the ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing such Indebtedness may be pari passu or senior to the Liens on the ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing the Closing Date Term Loans and (ii) the Liens on the Term Priority Collateral (as such term is defined in the ABL Intercreditor Agreement)  securing such Indebtedness shall be junior to the Liens on the Term Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing the Closing Date Term Loans.

(8)     Liens existing, or provided for under binding contracts existing, on the Closing Date (including Liens in effect on the Closing Date securing Indebtedness permitted under Section 7.02(b)(3));

(9)     [reserved];

(10)     Liens on property or other assets at the time the Borrower or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger, amalgamation or consolidation with or into the Borrower or any Restricted Subsidiary; *provided* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition, amalgamation, merger or consolidation; *provided further* that such Liens are limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after acquired-property) that secured the obligations to which such Liens relate;

(11)     Liens securing obligations in respect of Indebtedness or other obligations of a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary permitted to be incurred in accordance with Section 7.02;

(12)     Liens securing (x) Hedging Obligations and (y) obligations in respect of Cash Management Services;

(13)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's accounts payable or similar obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(14)     leases, subleases, licenses or sublicenses (or other agreement under which the Borrower or any Restricted Subsidiary has granted rights to end users to access and use the Borrower's or any Restricted Subsidiary's products, technologies or services) that do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and the customary rights reserved or vested in any Person by the terms of any lease, sublease, license, sublicense, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(15)     Liens arising from Uniform Commercial Code (or equivalent statutes) financing statement filings regarding operating leases, consignments or accounts entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business or consistent with industry practice

or purported Liens evidenced by the filing of precautionary Uniform Commercial Code (or equivalent statutes) financing statements or similar public filings;

(16)    Liens in favor of the Borrower or any Guarantor;

(17)    Liens on equipment or vehicles of the Borrower or any Restricted Subsidiary granted in the ordinary course of business or consistent with industry practice;

(18)    Liens on accounts receivable, Securitization Assets and related assets incurred in connection with a Qualified Securitization Facility;

(19)    Liens to secure any modification, refinancing, refunding, extension, renewal or replacement (or successive modification, refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness, Disqualified Stock or Preferred Stock secured by any Lien referred to in clauses (7), (8) or (10) of this definition; *provided* that: (a) such new Lien will be limited to all or part of the same property (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property) that secured the original Lien (plus improvements and accessions on such property) and proceeds and products thereof and (b) the Indebtedness, Disqualified Stock or Preferred Stock secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clauses (7), (8) or (10) at the time the original Lien became a Permitted Lien hereunder, *plus* (ii) an amount necessary to pay any fees and expenses (including original issue discount, upfront fees, defeasance costs, underwriting discounts or similar fees) and premiums (including tender premiums and accrued and unpaid interest), related to such refinancing, refunding, extension, renewal or replacement;

(20)    deposits made or other security provided to secure liability to insurance brokers, carriers, underwriters or self-insurance arrangements, including Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(21)    other Liens securing obligations in an aggregate principal amount at any one time outstanding not to exceed the greater of (a) $25.0 million and (b) 5.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto; *provided*, that if such Liens secured Indebtedness for borrowed money in an amount in excess of $25.0 million and are secured by the Collateral on a *pari passu* basis with, or junior basis to, the Liens that secure the Closing Date Term Loans, the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement;

(22)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(23)    (a) the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business or consistent with industry practice, (b) Liens arising out of conditional sale, title retention or similar arrangements for the sale of goods in the ordinary course of business or consistent with industry practice and (c) Liens arising by operation of law under Article 2 of the Uniform Commercial Code;

(24)    Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(7);

(25)    Liens (a) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on items in the course of collection, (b) attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business or consistent with industry practice and (c) in favor of banking or other institutions or other electronic payment service providers arising as a matter of law or under general terms and conditions encumbering deposits or margin deposits or other funds maintained with such institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(26)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under this Agreement; *provided* that such Liens do not extend to assets other than those that are subject to such repurchase agreements;

(27)    Liens that are contractual rights of setoff (a) relating to the establishment of depository relations with banks or other deposit-taking financial institutions or other electronic payment service providers and not given in connection with the issuance of Indebtedness, (b) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary or (c) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business or consistent with industry practice;

(28)    Liens on cash proceeds (as defined in Article 9 of the Uniform Commercial Code) of assets sold that were subject to a Lien permitted hereunder;

(29)    any encumbrance or restriction (including put, call arrangements, tag, drag, right of first refusal and similar rights) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(30)    Liens (a) on cash advances or cash earnest money deposits in favor of the seller of any property to be acquired in an Investment permitted under this Agreement to be applied against the purchase price for such Investment and (b) consisting of a letter of intent or an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under Section 7.04 in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(31)    ground leases, leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(32)    Liens in connection with any Specified Sale-Leaseback Transactions;

(33)    Liens on Capital Stock or other securities of an Unrestricted Subsidiary;

(34)    any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business or consistent with industry practice;

(35)    deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business or consistent with industry practice of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

65

(36)     rights of set-off, banker's liens, netting arrangements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(37)     Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; *provided* that such satisfaction or discharge is permitted under this Agreement;

(38)     receipt of progress payments and advances from customers in the ordinary course of business or consistent with industry practice to the extent the same creates a Lien on the related inventory and proceeds thereof;

(39)     [reserved];

(40)     agreements to subordinate any interest of the Borrower or any Restricted Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any Restricted Subsidiary pursuant to an agreement entered into in the ordinary course of business or consistent with industry practice;

(41)     Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act or similar provision of any Environmental Law;

(42)     Liens disclosed by the title insurance policies delivered on or prior to the Closing Date and any replacement, extension or renewal of any such Lien (to the extent the Indebtedness and other obligations secured by such replacement, extension or renewal Liens are permitted by this Agreement); *provided* that such replacement, extension or renewal Liens do not cover any property other than the property that was subject to such Liens prior to such replacement, extension or renewal;

(43)     rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of its Restricted Subsidiaries or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(44)     restrictive covenants affecting the use to which real property may be put; *provided* that the covenants are complied with in all material respects;

(45)     security given to a public utility or any municipality or Governmental Authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business or consistent with industry practice;

(46)     zoning by-laws and other land use restrictions, including site plan agreements, development agreements and contract zoning agreements; and

(47)     Liens on all or any portion of the Collateral (but no other assets) securing (i) [reserved], (ii) Permitted Equal Priority Refinancing Debt or (iii) Permitted Junior Priority Refinancing Debt, and, in each case, Liens securing any Refinancing Indebtedness in respect thereof.

66

For purposes of determining compliance with this definition, a Lien need not be incurred solely by reference to one category of Permitted Liens described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption.

If any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing and if any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by a fixed dollar amount, such fixed dollar Basket will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing.

For purposes of this definition, the term "Indebtedness" will be deemed to include interest on such Indebtedness.

"**Permitted Parent**" means any direct or indirect parent of the Borrower that at the time it became a parent of the Borrower was a Permitted Holder pursuant to clause (1) of the definition thereof.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**PIK Interest**" means, with respect to any Loan, a payment of interest with respect to such Loan in-kind in arrears by increasing the outstanding principal amount of such Loan on the relevant Interest Payment Date by the amount of accrued and unpaid interest due and payable on such date.  Once PIK Interest is capitalized and added to the principal amount of the Loans, such PIK Interest shall thenceforth be considered principal for all purposes hereunder (and shall bear interest in accordance with Section 2.08) from the date on which such PIK Interest has been so added.

"**PIK Rate**" has the meaning specified in Section 2.08(1).

"**PIK Toggle**" has the meaning specified in Section 2.08(4).

"**PIK Toggle Notice**" has the meaning specified in Section 2.08(4).

"**Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established or maintained by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Plan of Reorganization**" means that certain *Joint Prepackaged Plan of Reorganization of Belk, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement (as defined in the Plan of Reorganization).

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Collateral**" has the meaning specified in the Security Agreement.

"**Preferred Stock**" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Prepayment Premium**" means with respect to a repayment, prepayment or acceleration of all or any portion of the First-Out Loans occurring (i) prior to the first anniversary of the Closing Date, an amount equal to three percent (3.00%) of the aggregate principal amount of the First-Out Loans held by such Lender that are being repaid or prepaid or that are accelerated as of such date of determination, (ii) on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date, an amount equal to two percent (2.00%) of the aggregate principal amount of the First-Out Loans held by such Lender that are being repaid or prepaid or that are accelerated as of such date of determination, (iii) on and after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date, one percent (1.00%) of the aggregate principal amount of the First-Out Loans held by such Lender that are being repaid or prepaid or that are accelerated as of such date of determination and (iv) on and after the third anniversary of the Closing Date, zero percent (0.00%).

"**Prepetition First Lien Term Loans**" means "First Lien Term Loans" as defined in the RSA.

"**Prepetition Second Lien Term Loans**" means "Second Lien Term Loans" as defined in the RSA.

"**Priority ECF Amount**" means, with respect to any Excess Cash Flow Period, an amount (if positive) equal to (i) 4.00% of the aggregate original principal amount of Second-Out Loans outstanding on the Closing Date *minus* (ii) the amortization payments made pursuant to Section 2.07(1) in respect of the Second-Out Loans during such Excess Cash Flow Period.

"**Private-Side Information**" means any information with respect to Holdings and its Subsidiaries that is not Public-Side Information.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Term Loan of a given Class of any Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Term Loan Exposure of such Class of such Lender at such time and the denominator of which is the aggregate Term Loan Exposure of such Class of all Lenders at such time.

"**Public Company Costs**" means the initial costs relating to establishing compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the Borrower's or its Restricted Subsidiaries' initial establishment of compliance with the obligations of a reporting company, including costs, fees and expenses (including legal, accounting and other professional fees) relating to compliance with provisions of the Securities Act and the Exchange Act.

"**Public Lender**" means Lenders that do not wish to receive Private-Side Information.

"**Public-Side Information**" means (i) at any time prior to Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that is (a) of a type that would be required by applicable Law to be publicly disclosed in connection with an issuance by Holdings or any of its Subsidiaries of its debt or equity securities pursuant to a registered public offering made at such time or (b) not material to make an investment decision with respect to securities of Holdings or any of its Subsidiaries (for purposes of United States federal, state or other applicable securities laws), and (ii) at any time on or after Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that does not constitute material non-public information (within the meaning of United States federal, state or

other applicable securities laws) with respect to Holdings or any of its Subsidiaries or any of their respective securities.

"**Purchase Money Obligations**" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement or property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10.0 million at the time the relevant Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Stock.

"**Qualified Holding Company Debt**" means unsecured Indebtedness of Holdings that

(1)      is not subject to any Guarantee by any Subsidiary of Holdings (including the Borrower),

(2)      will not mature prior to the date that is six (6) months after the Latest Maturity Date in effect on the date of issuance or incurrence thereof,

(3)      has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (5) below),

(4)      does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the later to occur of (i) the date that is four (4) years from the date of the issuance or incurrence thereof and (ii) the date that is 180 days after the Latest Maturity Date in effect on the date of such issuance or incurrence, and

(5)      has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior discount notes of a holding company);

*provided* that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Event of Default shall have occurred and be continuing.

"**Qualified Proceeds**" means the fair market value of assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business.

"**Qualified Securitization Facility**" means any Securitization Facility (1) constituting a securitization financing facility that meets the following conditions: (a) the Board of Directors will have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the

applicable Restricted Subsidiary or Securitization Subsidiary and (b) all sales or contributions of Securitization Assets and related assets to the applicable Person or Securitization Subsidiary are made at fair market value (as determined in good faith by the Borrower) or (2) constituting a receivables financing facility.

"**Qualifying IPO**" means the issuance by the Borrower, or any Parent Company, of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Qualifying Lender**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Quarterly Financial Statements**" has the meaning specified in Section 5.05(1).

"**Rating Agencies**" means Moody's and S&P, or if Moody's or S&P (or both) are not making ratings on the relevant obligations publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Borrower that will be substituted for Moody's or S&P (or both), as the case may be.

"**Real Property**" means, collectively, all Owned Real Property and all Leased Real Property.

"**Recognition Agreement**" means a recognition agreement in a recordable form substantially in the form of Exhibit S or as otherwise reasonably acceptable to the Collateral Agent and the Required Lenders.

"**Refinance**" has the meaning assigned in the definition of "Refinancing Indebtedness" and "**Refinancing**" and "**Refinanced**" have meanings correlative to the foregoing.

"**Refinanced Debt**" has the meaning assigned to such term in the definition of "Refinancing Indebtedness."

"**Refinancing Amendment**" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent and the Borrower executed by each of (a) the Borrower, (b) the Administrative Agent and (c) each Additional Lender and Lender that agrees to provide any portion of the Refinancing Loans or Refinancing Commitments being incurred or provided pursuant thereto, in accordance with Section 2.15.

"**Refinancing Commitments**" means any Refinancing Term Commitments.

"**Refinancing Indebtedness**" means (x) Indebtedness incurred by the Borrower or any Restricted Subsidiary, (y) Disqualified Stock issued by the Borrower or any Restricted Subsidiary or (z) Preferred Stock issued by any Restricted Subsidiary which, in each case, serves to extend, replace, refund, refinance, renew, exchange for or defease ("**Refinance**") any Indebtedness, Disqualified Stock or Preferred Stock, including any Refinancing Indebtedness, so long as:

>    (1)    (a) the principal amount (or accreted value, if applicable) of such new Indebtedness, the amount of such new Preferred Stock or the liquidation preference of such new Disqualified Stock does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness, the amount of Preferred Stock or the liquidation preference of Disqualified Stock, as applicable, being refinanced except to the extent permitted under Section 1.02(10), *plus* (b) any accrued and unpaid interest on, the Indebtedness, the amount of any accrued and unpaid dividends

on, the Preferred Stock or the liquidation preference of the Disqualified Stock, *plus* any accrued and unpaid dividends on, the Disqualified Stock being so extended, replaced, refunded, refinanced, renewed or defeased (such Indebtedness, Disqualified Stock or Preferred Stock, the "**Refinanced Debt**"), *plus* (c) the amount of any tender premium or penalty or premium required to be paid under the terms of the instrument or documents governing such Refinanced Debt and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness, Preferred Stock or Disqualified Stock or to Refinance such Refinanced Debt (such amounts in clause (b) and (c) the "**Incremental Amounts**");

        (2)     such Refinancing Indebtedness has a:

            (a)     Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred that is not less than the remaining Weighted Average Life to Maturity of the applicable Refinanced Debt; and

            (b)     final scheduled maturity date equal to or later than the final scheduled maturity date of the Refinanced Debt;

        (3)     to the extent such Refinancing Indebtedness Refinances (a) Subordinated Indebtedness, such Refinancing Indebtedness is subordinated in right of payment to the Loans or the Guaranty thereof at least to the same extent as the applicable Refinanced Debt, (b) Indebtedness that is secured by Liens on Collateral that are subordinated to the Liens that secure the Loans or the Guaranty thereof, such Refinancing Indebtedness is (i) unsecured or (ii) secured by Liens that are subordinated to the Liens that secure the Loans or the Guaranty thereof, in each case at least to the same extent as the applicable Refinanced Debt or pursuant to the Applicable Intercreditor Agreement or (c) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively;

        (4)     such Refinancing Indebtedness shall not be guaranteed or borrowed by any Person other than a Person that is so obligated in respect of the Refinanced Debt being Refinanced; and

        (5)     such Refinancing Indebtedness shall not be secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not secure the Refinanced Debt being Refinanced (*plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property); *provided* that Refinancing Indebtedness will not include:

            (a)     Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness or Disqualified Stock of the Borrower;

            (b)     Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

            (c)     Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of an Unrestricted Subsidiary;

*provided further* that (x) clause (2) of this definition will not apply to any Refinancing Indebtedness other than Indebtedness, Disqualified Stock and Preferred Stock incurred under clauses (2), (14), (25), (30) and

(31) of Section 7.02(b) (including any successive Refinancings thereof incurred under clause (13) of Section 7.02(b)) and any Subordinated Indebtedness (other than Subordinated Indebtedness assumed or acquired in an Investment or acquisition and not created in contemplation thereof) and (y) Refinancing Indebtedness may be incurred in the form of a customary "bridge" or other interim credit facility intended to be refinanced or replaced with long-term indebtedness which does not satisfy the requirements of clause (2) above so long as, subject to customary conditions, as determined in good faith by the Borrower, such "bridge" or other interim indebtedness will either be automatically converted into or required to be exchanged for permanent financing which satisfies the requirements of clause (2) of this definition.

"**Refinancing Loans**" means any Refinancing Term Loans.

"**Refinancing Term Commitments**" means one or more Classes of Term Loan commitments hereunder that result from a Refinancing Amendment.

"**Refinancing Term Loans**" means one or more Classes of Term Loans that result from a Refinancing Amendment.

"**Refunding Capital Stock**" has the meaning specified in Section 7.05(b)(2).

"**Register**" has the meaning specified in Section 10.07(c).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Rejection Notice**" has the meaning specified in Section 2.05(2)(g).

"**Related Business Assets**" means assets (other than Cash Equivalents) used or useful in a Similar Business; *provided* that any assets received by the Borrower or a Restricted Subsidiary in exchange for assets transferred by the Borrower or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person is or would become a Restricted Subsidiary.

"**Related Indemnified Person**" of an Indemnitee means (1) the respective directors, officers or employees of such Indemnitee and (2) the respective agents of such Indemnitee, in the case of this clause (2), acting at the instructions of such Indemnitee.

"**Related Person**" means, with respect to any Person, (a) any Affiliate of such Person and (b) the respective officers, directors, members, managers, employees, agents, representatives, sub-agents, co-agents, attorneys-in-fact, partners, trustees, attorneys, and advisors of such Person or any of its Affiliates.

"**Release**" means any release, spill, emission, discharge, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment.

"**Replaced Loans**" has the meaning specified in Section 10.01.

"**Replacement Loans**" has the meaning specified in Section 10.01.

"**Reportable Event**" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Required Facility Lenders**" means, as of any date of determination, with respect to one or more Facilities, Lenders having more than 50% of the sum of the (a) aggregate principal amount of outstanding Loans under such Facility or Facilities and (b) aggregate unused Commitments under such Facility or Facilities; *provided* that (i) to the same extent specified in Section 10.07(i) with respect to determination of Required Lenders, the Loans of any Affiliated Lender shall in each case be excluded for purposes of making a determination of Required Facility Lenders unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on the other Lenders and (ii) the portion of outstanding Loans and the unused Commitments of any such Facility, as applicable, held or deemed held by a Defaulting Lender shall be excluded for purposes of making a determination of Required Facility Lenders.

"**Required Lenders**" means, as of any date of determination, (a) Lenders having more than 50% of the aggregate outstanding principal amount of the First-Out Loans and any other Loans that have the same payment priority with the First-Out Loans and (b) Lenders having more than 50% of the aggregate outstanding principal amount of the Second-Out Loans and any other Loan that have the same payment priority with the Second-Out Loans; *provided* that (i) the aggregate Outstanding Amount of any Loans held by any Defaulting Lender shall be excluded for purposes of making a determination of the "Required Lenders" and (ii) any determination of Required Lenders shall be subject to the limitations set forth in Section 10.07(h) with respect to Affiliated Lenders.

"**Responsible Officer**" means, with respect to a Person, the chief executive officer, chief operating officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer or Person performing similar functions, of such Person. With respect to any document delivered by a Loan Party on the Closing Date, Responsible Officer includes any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"**Restricted Investment**" means any Investment other than any Permitted Investment(s).

"**Restricted Payment**" has the meaning specified in Section 7.05.

"**Restricted Subsidiary**" means, at any time, any direct or indirect Subsidiary of the Borrower (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided* that notwithstanding the foregoing, in no event will (i) any Securitization Subsidiary, or (ii) any special purpose vehicle that borrows mortgage debt secured by department stores or retail centers of Belk and has no other activities be considered a Restricted Subsidiary for purposes of Section 8.01(5) or (7); *provided further* that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary will be included in the definition of "Restricted Subsidiary." Wherever the term "Restricted Subsidiary" is used herein with respect to any Subsidiary of a referenced Person that is not the Borrower, then it will be construed to mean a Person that would be a Restricted Subsidiary of the Borrower on a *pro forma* basis following consummation of one or a series of related transactions involving such referenced Person and the Borrower (but which transactions may include a designation of a Subsidiary of such Person as an Unrestricted Subsidiary on a *pro forma* basis in accordance with this Agreement).

"**Retained Excess Cash Flow Amount**" means, at any date of determination, an amount, no less than zero and determined on a cumulative basis, that is equal to the aggregate cumulative sum of Excess Cash Flow that is not required to be applied to make an ECF Payment under Section 2.05(2) for each Excess Cash Flow Period.

"**RSA**" means that certain Restructuring Support Agreement, dated as of January 26, 2021, by and among Holdings, the other Loan Parties party thereto, the Consenting First Lien Term Lenders (as defined therein), the Consenting Second Lien Term Lenders (as defined therein) and the Consenting Sponsors (as defined therein), as such agreement may be amended, supplemented, waived or otherwise modified from time to time, in each case to the extent permitted thereunder.

"**S&P**" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"**Sale-Leaseback Transaction**" means any arrangement providing for the leasing by the Borrower or any Restricted Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to a Person other than the Borrower or any Restricted Subsidiary in contemplation of such leasing.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Sanctions**" has the meaning specified in Section 5.17.

"**SEC**" means the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Amendment**" means that certain Amendment No. 2 to Credit Agreement, dated as of the Closing Date, among Holdings, the Borrower, the First-Out Lenders party thereto, the Second-Out Lenders party thereto, the Administrative Agent and the Collateral Agent.

"**Second Amendment Exchanging Lenders**" means the Lenders signatory to the Second Amendment.

"**Second Amendment Lenders**" means the First-Out Lenders and the Second-Out Lenders.

"**Second Lien Credit Agreement**" means the Second Lien Term Loan Credit Agreement dated as of the date hereof among Holdings, the Borrower, Wilmington Trust, National Association as administrative agent and collateral agent and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an Second Lien Credit Agreement) in each case to the extent permitted hereunder.

"**Second Lien Credit Agreement Second Amendment**" means that certain Amendment No. 3 to the Second Lien Credit Agreement, dated as of the Closing Date, by and among the Loan Parties party thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent and collateral agent.

"**Second Lien Facility**" means the collective reference to the Second Lien Credit Agreement, the Second Lien Loan Documents, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit

applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not a Second Lien Facility), in each case to the extent permitted hereunder.

"**Second Lien Loan Documents**" means, collectively, (i) the Second Lien Credit Agreement and (ii) the security documents, intercreditor agreements (including the Term Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the Second Lien Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the Second Lien Facility.

"**Second Lien Loans**" means "Loans" as defined in the Second Lien Facility as in effect on the Closing Date.

"**Second Lien Obligations**" means "Obligations" as defined in the Second Lien Facility as in effect on the date hereof.

"**Second-Out Lenders**" means the Lenders holding the Second-Out Loans or Second-Out Loan Commitments.

"**Second-Out Loan Commitment**" means, with respect to each Second-Out Lender, the commitment of such Second-Out Lender to convert Prepetition First Lien Term Loans and/or Prepetition Second Lien Term Loans into, and be deemed to make, Second-Out Loans in an aggregate amount not to exceed the amount set forth on Schedule 2.01 opposite such Second-Out Lender's name under the heading "Second-Out Loan Commitment". The aggregate amount of Second-Out Loan Commitments on the Closing Date is $812,929,968.71. Once converted and deemed made, the Second-Out Loan Commitments shall be reduced to zero and terminated.

"**Second-Out Loans**" means the Term Loans made (or deemed made) by the applicable Second Amendment Exchanging Lenders on the Closing Date pursuant to Section 2.01(3)(b).

"**Secured Cash Management Agreement**" means any Cash Management Agreement that is entered into by and between Holdings, the Borrower or any Restricted Subsidiary and a Cash Management Bank; and designated in writing by the Cash Management Bank and the Borrower to the Administrative Agent as a "Secured Cash Management Agreement."

"**Secured Hedge Agreement**" means any Hedge Agreement with respect to Hedging Obligations permitted under Section 7.02 that is (a) entered into by and between any Loan Party or Restricted Subsidiary and any Hedge Bank and (b) designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "Secured Hedge Agreement."

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, each Hedge Bank party to a Secured Hedge Agreement, each Cash Management Bank party to a Secured Cash Management Agreement, each Supplemental Agent and each co-agent or sub-agent appointed by the Administrative Agent or Collateral Agent from time to time pursuant to Section 9.01(2) or 9.07.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Securitization Assets**" means (a) the accounts receivable, royalty or other revenue streams and other rights to payment and other assets related thereto subject to a Qualified Securitization Facility and the proceeds thereof and (b) contract rights, lockbox accounts and records with respect to such accounts receivable and any other assets customarily transferred together with accounts receivable in a securitization financing.

"**Securitization Facility**" means any transaction or series of securitization financings that may be entered into by the Borrower or any Restricted Subsidiary pursuant to which the Borrower or any such Restricted Subsidiary may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) a Person that is not the Borrower or a Restricted Subsidiary or (b) a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not the Borrower or a Restricted Subsidiary, or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries.

"**Securitization Fees**" means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees and expenses (including reasonable fees and expenses of legal counsel) paid to a Person that is not a Securitization Subsidiary in connection with, any Qualified Securitization Facility.

"**Securitization Repurchase Obligation**" means any obligation of a seller of Securitization Assets in a Qualified Securitization Facility to repurchase Securitization Assets arising as a result of a breach of representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" means any Subsidiary formed for the purpose of, and that solely engages only in one or more Qualified Securitization Facilities and other activities reasonably related thereto.

"**Security Agreement**" means, collectively, the Pledge and Security Agreement executed by the Loan Parties and the Collateral Agent, substantially in the form of Exhibit F, together with supplements or joinders thereto executed and delivered pursuant to Section 6.11.

"**Senior Secured Leverage Ratio**" means, with respect to any Test Period, the ratio of Consolidated Secured Debt outstanding on the last date of such Test Period to Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X of the SEC, as such regulation is in effect on the Closing Date.

"**Similar Business**" means (1) any business conducted or proposed to be conducted by the Borrower or any Restricted Subsidiary on the Closing Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any Permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Restricted Subsidiaries conduct or propose to conduct on the Closing Date.

"**Solicited Discount Proration**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Solicited Discounted Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Solicited Discounted Prepayment Notice**" means a written notice of the Borrower of Solicited Discounted Prepayment Offers made pursuant to Section 2.05(1)(e)(D) substantially in the form of <u>Exhibit L</u>.

"**Solicited Discounted Prepayment Offer**" means the written offer by each Lender, substantially in the form of <u>Exhibit O,</u> submitted following the Administrative Agent's receipt of a Solicited Discounted Prepayment Notice.

"**Solicited Discounted Prepayment Response Date**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date:

(1)    the sum of the liabilities of such Person (including contingent liabilities), on a consolidated basis, does not exceed the present fair saleable value of the present assets of such Person, on a consolidated basis,

(2)    the fair value of the property of such Person, on a consolidated basis, is greater than the total amount of liabilities (including contingent liabilities) of such Person, on a consolidated basis,

(3)    the capital of such Person, on a consolidated basis, is not unreasonably small in relation to its business as contemplated on such date and

(4)    such Person has not incurred and does not intend to incur, or believe that it will incur, debts including current obligations beyond their ability to pay such debts as they become due (whether at maturity or otherwise).

The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances as of such date, would reasonably be expected to become an actual and matured liability.

"**Space Leased Property**" means any real property located in the United States, other than the Leased Real Property and the Owned Real Property, that any Loan Party or any Subsidiary occupies as a tenant, sub-tenant, or licensee.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Discount**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Prepayment Notice**" means a written notice of the Borrower's Offer of Specified Discount Prepayment made pursuant to Section 2.05(1)(e)(B) substantially in the form of <u>Exhibit N</u>.

"**Specified Discount Prepayment Response**" means the written response by each Lender, substantially in the form of Exhibit P, to a Specified Discount Prepayment Notice.

"**Specified Discount Prepayment Response Date**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Proration**" has the meaning specified in Section 2.05(1)(e)(B)(3).

"**Specified Equity Contribution**" has the meaning assigned to it in the ABL Credit Agreement.

"**Specified Sale-Leaseback Net Proceeds**" means with respect to the sale component of any Specified Sale-Leaseback Transaction, the excess, if any, of (i) the sum of cash and Cash Equivalents received as purchase consideration in connection with such Specified Sale-Leaseback Transaction sale component pursuant to the applicable purchase and sale agreement over (ii) the sum of (A) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred or required to be paid by the Borrower or any Restricted Subsidiary on behalf of a purchaser by the Borrower or any Restricted Subsidiary in connection with such Specified Sale-Leaseback Transaction, (B) taxes (including transfer taxes) or distributions made pursuant to clauses (a) and (b) of Section 7.05(b)(14) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Specified Sale-Leaseback Net Proceeds) and (C) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such Specified Sale-Leaseback Transaction, including liabilities related to environmental matters or against any indemnification obligations associated with such Specified Sale-Leaseback Transaction, it being understood that "Specified Sale-Leaseback Net Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (C). The net proceeds of any Sale-Leaseback Transaction will be determined giving effect to transaction expenses and the tax effect of such transactions based on the actual effective tax rate (including taxes incurred and required to be paid or payable as a result of such transactions).

"**Specified Sale-Leaseback Transaction**" means one or more Sale-Leaseback Transactions entered into on an arm's length basis for fair market value as determined by a Responsible Officer of the Borrower in good faith with respect to all or any portion of any Owned Real Property or Leased Real Property of the Borrower or any Restricted Subsidiary owned on, or acquired after, the Closing Date.

"**Specified Transaction**" means:

(1)   solely for the purposes of determining the applicable cash balance, any contribution of capital, including as a result of an Equity Offering, to the Borrower, in each case, in connection with an acquisition or Investment,

(2)   any designation of operations or assets of the Borrower or a Restricted Subsidiary as discontinued operations (as defined under GAAP),

(3)   any Investment that results in a Person becoming a Restricted Subsidiary,

(4)   any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary in compliance with this Agreement,

(5)     any purchase or other acquisition of a business of any Person, of assets constituting a business unit, line of business or division of any Person,

(6)     any Asset Sale (a) that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower or (b) of a business, business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whether by merger, amalgamation, consolidation or otherwise,

(7)     any operational changes identified by the Borrower that have been made by the Borrower or any Restricted Subsidiary during the Test Period, or

(8)     any other transaction that by the terms of this Agreement requires a financial ratio to be calculated on a *pro forma* basis.

"**Sponsor**" means Sycamore Partners Management, L.P. and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Administrative Agent is subject with respect to the Adjusted Eurodollar Rate, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the FRB).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Submitted Amount**" has the meaning specified in Section 2.05(1)(e)(C)(1).

"**Submitted Discount**" has the meaning specified in Section 2.05(1)(e)(C)(1).

"**Subordinated Indebtedness**" means any Indebtedness for borrowed money of any Loan Party that by its terms is subordinated in right of payment to the Obligations of such Loan Party arising under the Loans or the Guaranty (other than the Second-Out Loans).

 "**Subsidiary**" means, with respect to any Person:

(1)     any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2)     any partnership, joint venture, limited liability company or similar entity of which:

(a)     more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries

79

of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and

(b)        such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than Holdings and any other Parent Company.

"**Successor Borrower**" has the meaning specified in Section 7.03(4).

"**Successor Holdings**" has the meaning specified in Section 7.03(5).

"**Supplemental Agent**" and "**Supplemental Agents**" have the meanings specified in Section 9.15(1).

"**Swap Obligation**" has the meaning specified in the definition of "Excluded Swap Obligation."

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"**Tax Group**" has the meaning specified in Section 7.05(b)(14)(b).

"**Tax Indemnitee**" as defined in Section 3.01(5).

"**Term Borrowing**" means a Borrowing of any Term Loans.

"**Term Commitment**" means, as to each Term Lender, its obligation to make a Term Loan to the Borrower hereunder, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Term Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to this Agreement and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Term Lender pursuant to an Assignment and Assumption, (ii) [reserved], (iii) a Refinancing Amendment, (iv) an Extension Amendment or (v) an amendment in respect of Replacement Loans. The initial amount of each Term Lender's Term Commitment is its Closing Date Term Commitment or, otherwise, in the Assignment and Assumption (or Affiliated Lender Assignment and Assumption), Refinancing Amendment, Extension Amendment or amendment in respect of Replacement Loans pursuant to which such Lender shall have assumed its Commitment, as the case may be.

"**Term Facility**" means any Facility consisting of Term Loans or Term Commitments.

"**Term Intercreditor Agreement**" means the Term Intercreditor Agreement substantially in the form of Exhibit G-2 among the Collateral Agent, Wilmington Trust, National Association, as collateral agent under the Second Lien Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**Term Lender**" means, at any time, any Lender that has a Term Commitment or a Term Loan at such time.

"**Term Loan**" means any First-Out Loan, Second-Out Loan, Refinancing Term Loan, Extended Loan or Replacement Loan, as the context may require.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender; *provided* that at any time prior to the making of the Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Commitment.

"**Term Note**" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit B-1 hereto, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from the Term Loans made by such Term Lender.

"**Termination Conditions**" means, the Payment in Full in cash of the Obligations (other than the Obligations under Secured Hedge Agreements and Secured Cash Management Obligations).

"**Test Period**" in effect at any time means the Borrower's most recently ended four consecutive fiscal quarters (taken as one accounting period) for which, subject to Section 1.07(1), financial statements have been delivered pursuant to Section 6.01(1) or (2), as applicable.

"**Threshold Amount**" means $40.0 million.

"**Total Assets**" means, at any time, the total assets of the Borrower and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the then most recent balance sheet of the Borrower or such other Person as may be available (as determined in good faith by the Borrower).

"**Total Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt outstanding as of the last day of such Test Period to (b) Adjusted EBITDA of the Borrower for such Test Period, in each case on a *pro forma* basis with such *pro forma* adjustments as are appropriate and consistent with Section 1.07.

"**Traded Securities**" means any debt or equity securities issued pursuant to a public offering or Rule 144A offering.

"**Transaction Expenses**" means any fees, expenses, costs or charges incurred or paid by Holdings, the Borrower or any Restricted Subsidiary in connection with the Transactions.

"**Transactions**" means (a) the amendment to this Agreement pursuant to the terms of the Second Amendment, (b) the amendment to the Second Lien Credit Agreement pursuant to the Second Lien Credit Agreement Second Amendment, (c) the execution and delivery of the Second Amendment and the Second Lien Credit Agreement Second Amendment, (d) the funding of the New Money First-Out Loans on the Closing Date, (e) the consummation of the transactions contemplated by the Plan of Reorganization, (f) the conversion (and deemed prepayment) of all Prepetition First Lien Term Loans hereunder immediately prior to the effectiveness of the Second Amendment and all Prepetition Second Lien Term Loans to First-Out Loans, Second-Out Loans and Second Lien Loans on the Closing Date, (g) any other transaction contemplated by the RSA, (h) any transaction contemplated by the "Description of Transaction Steps" attached to the Plan Supplement (as defined in the RSA) and (i) the payment of Transaction Expenses.

"**Treasury Capital Stock**" has the meaning assigned to such term in Section 7.05(b)(2)(a).

"**Trust Account**" means any accounts or trusts used solely to hold Trust Funds.

"**Trust Funds**" means cash, Cash Equivalents or other assets comprised of:

(1) funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of such Loan Party's employees;

(2) all taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)); and

(3) any other funds which Holdings, the Borrower or any of its Restricted Subsidiaries holds in trust or as an escrow or fiduciary for another person which is not a Restricted Subsidiary of the Borrower.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning specified in Section 3.01(3)(b)(iii).

"**Unrestricted Subsidiary**" means each of The Belk Center, Inc. and 2801 West Tyvola Condominium Association Inc.

"**U.S. Lender**" means any Lender that is not a Foreign Lender.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Public Law No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1) the sum of the products of the number of years (calculated to the nearest one-twenty fifth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock, *multiplied by* the amount of such payment, *by*

(2) the sum of all such payments; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being Refinanced (the "**Applicable Indebtedness**"), the effects of any amortization or prepayments made on such Applicable Indebtedness prior to the date of the applicable Refinancing will be disregarded.

82

"**wholly owned**" means, with respect to any Subsidiary of any Person, a Subsidiary of such Person one hundred percent (100%) of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable Law) is at the time owned by such Person or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(1)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(2)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(3)    References in this Agreement to an Exhibit, Schedule, Article, Section, Annex, clause or subclause refer (a) to the appropriate Exhibit or Schedule to, or Article, Section, clause or subclause in this Agreement or (b) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears, in each case as such Exhibit, Schedule, Article, Section, Annex, clause or subclause may be amended or supplemented from time to time.

(4)    The term "including" is by way of example and not limitation.

(5)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(6)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(7)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(8)    The word "or" is not intended to be exclusive unless expressly indicated otherwise.

(9)    [Reserved].

(10)    For purposes of determining compliance with any Section of Article VII, in the event that any Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate Transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more of the categories of transactions

permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time, shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time. For purposes of determining compliance with the incurrence of any Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness that restricts the amount of such Indebtedness relative to the amount of Credit Agreement Refinanced Debt or Refinanced Debt, respectively, the Borrower and Restricted Subsidiaries may incur an incremental principal amount of Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness in such refinancing to the extent that the excess portion of the Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness would otherwise be permitted to be incurred in accordance with this Agreement (provided that (1) any additional Indebtedness referenced in this sentence satisfies the other applicable requirements of the definition of Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness, as applicable (with such additional amounts incurred constituting a utilization of the relevant basket or exception contained in Section 7.02(b) pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of Section 7.01).  For purposes of determining compliance with the incurrence of any Indebtedness under Designated Revolving Commitments in reliance on compliance with any ratio or Basket, if on the date such Designated Revolving Commitments are established after giving *pro forma* effect to the incurrence of the entire committed amount of then proposed Indebtedness thereunder, then such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with any ratio.

(11)     For purposes hereof, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

Section 1.03     Accounting Terms. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending on the Saturday closest to each January 31 or fiscal quarter ending April 30, July 31, October 31 or the Saturday ending on the Saturday closest to each January 31 of the Borrower.

Section 1.04     Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05     References to Agreements, Laws, etc.. Unless otherwise expressly provided herein, (1) references to Organizational Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (2) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06     Times of Day and Timing of Payment and Performance. Unless otherwise specified, all references herein to times of day shall be references to New York time (daylight or standard, as applicable). When the payment of any obligation or the performance of any covenant, duty or obligation

is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

Section 1.07    Pro Forma and Other Calculations.

(1)    Notwithstanding anything to the contrary herein, financial ratios and tests, including the First Lien Net Leverage Ratio, Senior Secured Leverage Ratio and the Total Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.07.  In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable.

(2)    For purposes of calculating any financial ratio or test (or Total Assets), Specified Transactions (and, subject to clause (4) below, the incurrence or repayment of any Indebtedness in connection therewith) that have been made (a) during the applicable Test Period or (b) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Adjusted EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Total Assets, on the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.07, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.07 as if such Specified Transaction had occurred at the beginning of the most recently ended Test Period.

(3)    Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and may include, for the avoidance of doubt, the amount of "run-rate" cost savings, synergies and operating expense reductions resulting from or related to any such Specified Transaction (including the Transactions) which is being given *pro forma* effect that have been realized or are expected to be realized and for which the actions necessary to realize such cost savings, operating expense reductions and synergies are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than twelve (12) months after the date of any such Specified Transaction (calculated on a *pro forma* basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions and synergies were realized during the entirety of such period and "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken (including any savings expected to result from the elimination of a public target's compliance costs with public company requirements) net of the amount of actual benefits realized during such period from such actions, and any such adjustments shall be included in the initial *pro forma* calculations of such financial ratios or tests and during any subsequent Test Period in which the effects thereof are expected to be realized) relating to such Specified Transaction; *provided* that (a) such amounts are (i) reasonably identifiable and projected in the good faith judgment of the Borrower to result from such actions and (ii) such actions are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than twelve (12) months after the date of such Specified Transaction, (b) no amounts shall be added to the extent duplicative of any amounts that are otherwise added back in computing Adjusted EBITDA (or any other components thereof), whether through a *pro*

*forma* adjustment or otherwise, with respect to such period and (c) amounts added back pursuant to this clause (3) shall be subject to the Combined Adjusted EBITDA Cap.

(4)     In the event that (a) the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees), issues or repays (including by redemption, repurchase, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit unless such Indebtedness has been permanently repaid and not replaced), (b) the Borrower or any Restricted Subsidiary issues, repurchases or redeems Disqualified Stock, (c) any Restricted Subsidiary issues, repurchases or redeems Preferred Stock or (d) the Borrower or any Restricted Subsidiary establishes or eliminates any Designated Revolving Commitments, in each case included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period (except in the case of the First Lien Net Leverage Ratio, Senior Secured Leverage Ratio or Total Net Leverage Ratio (or similar ratio), in which case such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case will be given effect, as if the same had occurred on the first day of the applicable Test Period) and, in the case of Indebtedness for all purposes as if such Indebtedness in the full amount of any undrawn Designated Revolving Commitments had been incurred thereunder throughout such period in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(5)     If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the First Lien Net Leverage Ratio, Senior Secured Leverage Ratio and/or Total Net Leverage Ratio, is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Financial Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or applicable Restricted Subsidiary may designate.

(6)     Notwithstanding anything to the contrary in this Section 1.07 or in any classification under GAAP of any Person, business, assets or operations in respect of which a definitive agreement for the disposition thereof has been entered into, no *pro forma* effect shall be given to any discontinued operations (and the Adjusted EBITDA attributable to any such Person, business, assets or operations shall not be excluded for any purposes hereunder) until such disposition shall have been consummated.

(7)     Any determination of Total Assets shall be made by reference to the last day of the Test Period most recently ended for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable, on or prior to the relevant date of determination.

(8)     Notwithstanding anything in this Agreement or any Loan Document to the contrary, when (a) calculating any applicable ratio, Consolidated Net Income or Adjusted EBITDA in connection with the making of an Investment, (b) determining compliance with any provision of this Agreement which requires that no Default or Event of Default has occurred, is continuing or would result therefrom, (c) determining

compliance with any provision of this Agreement which requires compliance with any representations and warranties set forth herein or (d) the satisfaction of all other conditions precedent to the making of an Investment, in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or other provisions, determination of whether any Default or Event of Default has occurred, is continuing or would result therefrom, determination of compliance with any representations or warranties or the satisfaction of any other conditions shall, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "**LCA Election**"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "**LCA Test Date**"). If on a *pro forma* basis after giving effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios and other provisions are calculated as if such Limited Condition Acquisition or other transactions had occurred at the beginning of the most recent Test Period ending prior to the LCA Test Date for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable, the Borrower could have taken such action on the relevant LCA Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with.  For the avoidance of doubt, (i) if any of such ratios or other provisions are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in Adjusted EBITDA or other components of such ratio) or other provisions at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Acquisition is permitted hereunder and (ii) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Acquisition or related Specified Transactions. If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or Basket availability with respect to any other Specified Transaction on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or Basket shall be calculated on a *pro forma basis* assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated on the LCA Test Date except that (other than solely with respect to the incurrence test under which such Limited Condition Acquisition is being made) Adjusted EBITDA, assets and Consolidated Net Income of any target of such Limited Condition Acquisition can only be used in the determination of the relevant ratios and Baskets if and when such acquisition has closed.  Notwithstanding anything in this Agreement or any Loan Document to the contrary, if the Borrower or its Restricted Subsidiaries (x) incurs Indebtedness, creates Liens, makes Asset Sales, makes Investments, makes Restricted Payments or repays any Indebtedness in connection with any Limited Condition Acquisition under a ratio-based Basket and (y) incurs Indebtedness, creates Liens, makes Asset Sales, Investments or Restricted Payments or repays any Indebtedness in connection with such Limited Condition Acquisition under a non-ratio-based Basket (which shall occur within five Business Days of the events in clause (x) above), then the applicable ratio will be calculated with respect to any such action under the applicable ratio-based Basket without regard to any such action under such non-ratio-based Basket made in connection with such Limited Condition Acquisition.

Section 1.08    Available Amount Transaction. If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the Available Amount immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously, i.e., each transaction must constitute a permitted use of the Available Amount.

Section 1.09    Guaranties of Hedging Obligations. Notwithstanding anything else to the contrary in any Loan Document, no non-Qualified ECP Guarantor shall be required to guarantee or provide security

for Excluded Swap Obligations, and any reference in any Loan Document with respect to such non-Qualified ECP Guarantor guaranteeing or providing security for the Obligations shall be deemed to be all Obligations other than the Excluded Swap Obligations.

Section 1.10    Currency Generally.

(1)    The Borrower shall determine in good faith the dollar amount of any utilization or other measurement denominated in a currency other than Dollars for purposes of compliance with any Basket. For purposes of determining compliance with any Basket under Article VII or VIII with respect to any amount expressed in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Basket utilization occurs or other Basket measurement is made (so long as such Basket utilization or other measurement, at the time incurred, made or acquired, was permitted hereunder). Except with respect to any ratio calculated under any Basket, any subsequent change in rates of currency exchange with respect to any prior utilization or other measurement of a Basket previously made in reliance on such Basket (as the same may have been reallocated in accordance with this Agreement) shall be disregarded for purposes of determining any unutilized portion under such Basket.

(2)    For purposes of determining the First Lien Net Leverage Ratio, Senior Secured Leverage Ratio and/or the Total Net Leverage Ratio, the amount of Indebtedness and cash and Cash Equivalents shall reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

(3)    For purposes of determining compliance under any Basket under Article VII or VIII, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(1); provided, however, that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness.  For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the Dollar equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.11    Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.12    Effect of Benchmark Transition Event.

(1)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, with respect to each Class of Term Loans hereunder, upon the occurrence of a Benchmark

Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace LIBOR with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective with respect to such Class of Term Loans at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders of such Class and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Facility Lenders of such Class. With respect to each Class of Term Loans hereunder, any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Facility Lenders of such Class have delivered to the Administrative Agent written notice that such Required Facility Lenders accept such amendment. No replacement of LIBOR with a Benchmark Replacement pursuant to this Section 1.12 will occur prior to the applicable Benchmark Transition Start Date.

(2)     Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(3)     Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period.  For the avoidance of doubt, any notice required to be delivered by the Administrative Agent as set forth in this Section titled "Benchmark Replacement Setting" may be provided, at the option of the Administrative Agent (in its sole discretion), in one or more notices and may be delivered together with, or as part of any amendment which implements any Benchmark Replacement or Benchmark Replacement Conforming Changes.  Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section titled "Effect of Benchmark Transition Event," including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 1.12.

Notwithstanding the foregoing, the Administrative Agent does not warrant nor accept any responsibility nor shall the Administrative Agent have any liability with respect to (i) any actions or use of its discretion or other decisions or determinations made with respect to any matters covered by this Section 1.12 including, without limitation, whether or not a Benchmark Transition Event has occurred, the removal or lack thereof of unavailable or non-representative tenors, the implementation or lack thereof of any Benchmark Replacement Conforming Changes, the delivery or non-delivery of any notices required by Section 1.12(3) above or otherwise in accordance herewith, (ii) the administration, submission or any matter relating to the rates in the definition of the Eurodollar Rate or with respect to any rate that is an alternative, comparable or successor rate thereto, or replacement rate thereof (including, without limitation any Benchmark Replacement implemented hereunder), (iii) the composition or characteristics of any such Benchmark Replacement, including whether it is similar to, or produces the same value or economic equivalence to LIBOR (or any other Benchmark) or have the same volume or liquidity as did LIBOR (or any other Benchmark) or (iv) the effect of any of the foregoing.

(4)     <u>Benchmark Unavailability Period</u>. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of the Base Rate based upon the Eurodollar Rate will not be used in any determination of the Base Rate.

(5)     <u>Certain Defined Terms</u>. As used in this Section titled "Effect of Benchmark Transition Event":

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to LIBOR for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 1% per annum, the Benchmark Replacement will be deemed to be 1% per annum for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of LIBOR with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to LIBOR:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein

and (b) the date on which the administrator of LIBOR permanently or indefinitely ceases to provide LIBOR; or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to LIBOR:

(1) a public statement or publication of information by or on behalf of the administrator of LIBOR announcing that such administrator has ceased or will cease to provide LIBOR, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for LIBOR, a resolution authority with jurisdiction over the administrator for LIBOR or a court or an entity with similar insolvency or resolution authority over the administrator for LIBOR, which states that the administrator of LIBOR has ceased or will cease to provide LIBOR permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR; or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR announcing that LIBOR is no longer representative.

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to LIBOR and solely to the extent that LIBOR has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced LIBOR for all purposes hereunder in accordance with the Section titled "Effect of Benchmark Transition Event" and (y) ending at the time that a Benchmark Replacement has replaced LIBOR for all purposes hereunder pursuant to the Section titled "Effect of Benchmark Transition Event."

"**Early Opt-in Election**" means, with respect to each Class of Term Loans, the occurrence of:

(1) (i) a determination by the Administrative Agent or (ii) a notification by the Required Facility Lenders of the applicable Class to the Administrative Agent (with a copy to the Borrower) that the Required Facility Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such

91

time, or that include language similar to that contained in this Section 1.12 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBOR, and

(2) (i) the election by the Administrative Agent or (ii) the election by the Required Facility Lenders of the applicable Class to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Facility Lenders of written notice of such election to the Administrative Agent.

"**Federal Reserve Bank of New York's Website**" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

## ARTICLE II

### The Commitments and Borrowings

Section 2.01    The Loans.

(1)    [Reserved].

(2)    Subject to the terms and conditions set forth herein, each applicable First-Out Lender severally, and not jointly, agrees to make New Money First-Out Loans to the Borrower on the Closing Date in Dollars in a principal amount not to exceed its New Money First-Out Loan Commitment.

(3)    Subject to the terms and conditions set forth herein and in the Plan of Reorganization, on the Closing Date, pursuant to the Plan of Reorganization, the Prepetition First Lien Term Loans and/or certain of the Prepetition Second Lien Term Loans held by the Second Amendment Exchanging Lenders as of such date shall be automatically converted into (and be deemed to be prepaid), and each Second Amendment Exchanging Lender shall be deemed to have made to the Borrower on the Closing Date (a) First-Out Loans in a principal amount equal to its Exchange First-Out Loan Commitment and (b) Second-Out Loans in a principal amount equal to its Second-Out Loan Commitment.

Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.  The First-Out Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein.

Section 2.02       Borrowings, Conversions and Continuations of Loans.

(1)       Each Term Borrowing, each conversion of Term Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice, on behalf of the Borrower, to the Administrative Agent (*provided* that the notice in respect of any Term Borrowing on the Closing Date may be conditioned on the closing of the Transactions (other than any transactions constituting such Term Borrowing)). Each such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, (a) three (3) Business Days prior to the requested date of any Borrowing or continuation of Eurodollar Rate Loans or any conversion of Base Rate Loans to Eurodollar Rate Loans and (b) one (1) Business Day prior to the requested date of any Borrowing of Base Rate Loans; *provided* that the notice referred to in subclause (a) above may be delivered on or prior to the Closing Date in the case of the Closing Date Term Loans. Each notice by the Borrower pursuant to this Section 2.02(1) must be a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Except as provided in Sections 2.15 and 2.16, each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $5.0 million or a whole multiple of $1.0 million in excess thereof. Except as provided in Sections 2.15 and 2.16, each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice shall specify:

(i)       whether the Borrower is requesting a Term Borrowing, a conversion of Term Loans from one Type to the other or a continuation of Eurodollar Rate Loans,

(ii)       the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day),

(iii)       the principal amount of Loans to be borrowed, converted or continued,

(iv)       [reserved],

(v)       the Class and Type of Loans to be borrowed or to which existing Term Loans are to be converted,

(vi)       if applicable, the duration of the Interest Period with respect thereto and

(vii)       wire instructions of the account(s) to which funds are to be disbursed.

If the Borrower fails to specify a Type of Loan to be made in a Committed Loan Notice, then the applicable Loans shall be made as Eurodollar Rate Loans with an Interest Period of one (1) month. If the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made or continued as the same Type of Loan, which if a Eurodollar Rate Loan, shall have a one-month Interest Period. Any such automatic continuation of Eurodollar Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(2)       Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this Agreement of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic continuation of Eurodollar Rate Loans or continuation of Loans described in Section 2.02(1). In the case of

93

each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than, in the case of Borrowing on the Closing Date, 10:00 a.m., New York time, and otherwise 2:00 p.m., New York time, on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.01 for the Borrowing on the Closing Date, the Administrative Agent shall make all funds so received available to the applicable Borrower in like funds as received by the Administrative Agent either by (a) crediting the account(s) of the applicable Borrower on the books of the Administrative Agent with the amount of such funds or (b) wire transfer of such funds, in each case in accordance with instructions provided by the Borrower to (and reasonably acceptable to) the Administrative Agent.

(3)     Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan, unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith. Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent (at the direction of the Required Facility Lenders under the applicable Facility) may require by notice to the Borrower that no Loans under such Facility may be converted to or continued as Eurodollar Rate Loans.

(4)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive in the absence of manifest error. At any time when Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the prime rate used in determining the Base Rate promptly following the public announcement of such change.

(5)     After giving effect to all Term Borrowings, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than six (6) Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent; *provided* that after the establishment of any new Class of Loans pursuant to a Refinancing Amendment, an Extension Amendment or an amendment in respect of Replacement Loans, the number of Interest Periods otherwise permitted by this Section 2.02(5) shall increase by three (3) Interest Periods for each applicable Class so established.

(6)     The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(7)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing, or, in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York time, on the date of such Borrowing, that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (2) above, and the Administrative Agent may (but shall have no obligation to), in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (a) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (b) in the case of such Lender, the Overnight Rate *plus* any administrative, processing or similar fees customarily charged by the

94

Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(7) shall be conclusive in the absence of manifest error. If the Borrower and such Lender shall both pay all or any portion of the principal amount in respect of such Borrowing or interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such Borrowing or interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.03     [Reserved].

Section 2.04     [Reserved].

Section 2.05     Prepayments.

(1)     Optional.

(a)     The Borrower may, upon written notice to the Administrative Agent by the Borrower, at any time or from time to time voluntarily prepay any Class or Classes of Term Loans in whole or in part without premium (except as set forth in Section 2.18) or penalty; *provided* that

(i)     such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) one (1) Business Day prior to the date of prepayment of Base Rate Loans;

(ii)     any partial prepayment of Eurodollar Rate Loans shall be in a principal amount of $2.0 million or a whole multiple of $500,000 in excess thereof or, if less, the entire principal amount thereof then outstanding; and

(iii)     any prepayment of Base Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.

Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment. If such notice is given, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. In the case of each prepayment of the Loans pursuant to this Section 2.05(1), the Borrower may in its sole discretion select the Borrowing or Borrowings (and the order of maturity of principal payments) to be repaid, and such payment shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares or other applicable share provided for under this Agreement.

(b)     [Reserved].

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(1)(a) if such prepayment would

have resulted from a refinancing of all or a portion of the applicable Facility, which refinancing shall not be consummated or shall otherwise be delayed.

(d)   Each prepayment in respect of any Term Loans pursuant to this Section 2.05(1) may be applied to any Class of Term Loans as directed by the Borrower. Voluntary prepayments of any Class of Term Loans (including as to any Extended Loan or otherwise) permitted hereunder shall be applied in a manner determined at the discretion of the Borrower and specified in the notice of prepayment (and absent such direction, in direct order of maturity, including any remaining scheduled installments of principal). For the avoidance of doubt, the Borrower may (i) prepay Term Loans of any Term Loan Class pursuant to this Section 2.05 without any requirement to prepay Extended Loans that were converted or exchanged from such Term Loan Class and (ii) prepay Extended Loans pursuant to this Section 2.05 without any requirement to prepay any Term Loans that were not converted or exchanged for such Extended Loans. In the event that the Borrower does not specify the order in which to apply prepayments to reduce scheduled installments of principal or as between Classes of Term Loans, the Borrower shall be deemed to have elected that such proceeds be applied to reduce the scheduled installments of principal in direct order of maturity on a *pro rata* basis among Term Loan Classes.

(e)   Notwithstanding anything in any Loan Document to the contrary, so long as (x) no Event of Default has occurred and is continuing or shall occur as a result thereof and (y) no proceeds of ABL Loans are used for this purpose, any Borrower Party may (i) purchase outstanding Term Loans on a non-pro rata basis through open market purchases or (ii) prepay the outstanding Term Loans (which Term Loans shall, for the avoidance of doubt, be automatically and permanently canceled immediately upon such purchase or prepayment, and the Borrower shall provide notice of such cancellation to the Administrative Agent), which in the case of clause (ii) only shall be prepaid without premium or penalty on the following basis:

(A)   Any Borrower Party shall have the right to make a voluntary prepayment of Loans at a discount to par pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers (any such prepayment, the "**Discounted Term Loan Prepayment**"), in each case made in accordance with this Section 2.05(1)(e) and without premium or penalty.

(B)   any Borrower Party may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent with five (5) Business Days' notice (or such shorter period as agreed by the Auction Agent) in the form of a Specified Discount Prepayment Notice; *provided* that (I) any such offer shall be made available, at the sole discretion of the applicable Borrower Party, to (x) each Term Lender or (y) each Term Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "**Specified Discount Prepayment Amount**") with respect to each applicable Class, the Class or Classes of Term Loans subject to such offer and the specific percentage discount to par (the "**Specified Discount**") of such Term Loans to be prepaid (it being understood that different Specified Discounts or Specified Discount Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(B)), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) each such offer shall remain outstanding through the Specified Discount Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such

Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Lenders (the "**Specified Discount Prepayment Response Date**").

(1)        Each Term Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its applicable then outstanding Term Loans at the Specified Discount and, if so (such accepting Lender, a "**Discount Prepayment Accepting Lender**"), the amount and the Classes of such Lender's Term Loans to be prepaid at such offered discount. Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable. Any Term Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(2)        If there is at least one Discount Prepayment Accepting Lender, the relevant Borrower Party will make a prepayment of outstanding Term Loans pursuant to this paragraph (B) to each Discount Prepayment Accepting Lender in accordance with the respective Outstanding Amount and Classes of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to subsection (2) above; *provided* that if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made pro rata among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "**Specified Discount Proration**"). The Auction Agent shall promptly, and in any case within three (3) Business Days following the Specified Discount Prepayment Response Date, notify (I) the relevant Borrower Party of the respective Term Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the Classes of Term Loans to be prepaid at the Specified Discount on such date and (III) the Administrative Agent and each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, Class and Type of Term Loans of such Lender to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the applicable Borrower Party and such Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the applicable Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

97

(C)      Subject to the proviso to subsection (A) above, any Borrower Party may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice (or such shorter period as agreed by the Auction Agent) in the form of a Discount Range Prepayment Notice; *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Borrower Party, to (x) each Term Lender or (y) each Term Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "**Discount Range Prepayment Amount**"), the Class or Classes of Term Loans subject to such offer and the maximum and minimum percentage discounts to par (the "**Discount Range**") of the principal amount of such Term Loans with respect to each relevant Class of Term Loans willing to be prepaid by such Borrower Party (it being understood that different Discount Ranges or Discount Range Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(C)), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) unless rescinded, each such solicitation by the applicable Borrower Party shall remain outstanding through the Discount Range Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Lenders (the "**Discount Range Prepayment Response Date**"). Each Term Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "**Submitted Discount**") at which such Lender is willing to allow prepayment of any or all of its then outstanding Term Loans of the applicable Class or Classes and the maximum aggregate principal amount and Classes of such Lender's Term Loans (the "**Submitted Amount**") such Term Lender is willing to have prepaid at the Submitted Discount. Any Term Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(1)      The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Term Loans to be prepaid at such Applicable Discount in accordance with this subsection (C). The relevant Borrower Party agrees to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by the Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "**Applicable Discount**") which yields a Discounted Term Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts. Each Term Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that

is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following subsection (3)) at the Applicable Discount (each such Term Lender, a "**Participating Lender**").

(2)    If there is at least one Participating Lender, the relevant Borrower Party will prepay the respective outstanding Term Loans of each Participating Lender in the aggregate principal amount and of the Classes specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; *provided* that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "**Identified Participating Lenders**") shall be made pro rata among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Discount Range Proration**"). The Auction Agent shall promptly, and in any case within five (5) Business Days following the Discount Range Prepayment Response Date, notify (I) the relevant Borrower Party of the respective Term Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, the aggregate principal amount of the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, the Applicable Discount and the aggregate principal amount and Classes of Term Loans to be prepaid at the Applicable Discount on such date, (III) the Administrative Agent and each Participating Lender of the aggregate principal amount and Classes of such Term Lender to be prepaid at the Applicable Discount on such date and (IV) if applicable, each Identified Participating Lender of the Discount Range Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the relevant Borrower Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the applicable Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(D)    Subject to the proviso to subsection (A) above, any Borrower Party may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice in the form of a Solicited Discounted Prepayment Notice (or such later notice specified therein); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Borrower Party, to (x) each Term Lender or (y) each Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such notice shall specify the maximum aggregate amount of the Term Loans (the "**Solicited Discounted Prepayment Amount**") and the Class or Classes of Term Loans the applicable Borrower Party is willing to prepay at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(D)), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than

$5.0 million and whole increments of $1.0 million in excess thereof and (IV) unless rescinded, each such solicitation by the applicable Borrower Party shall remain outstanding through the Solicited Discounted Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Term Lenders (the "**Solicited Discounted Prepayment Response Date**"). Each Term Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date and (z) specify both a discount to par (the "**Offered Discount**") at which such Term Lender is willing to allow prepayment of its then outstanding Term Loan and the maximum aggregate principal amount and Classes of such Term Loans (the "**Offered Amount**") such Term Lender is willing to have prepaid at the Offered Discount. Any Term Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(1)      The Auction Agent shall promptly provide the relevant Borrower Party with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date. Such Borrower Party shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Term Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the applicable Borrower Party (the "**Acceptable Discount**"), if any. If the applicable Borrower Party elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the third Business Day after the date of receipt by such Borrower Party from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this subsection (2) (the "**Acceptance Date**"), the applicable Borrower Party shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount. If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the applicable Borrower Party by the Acceptance Date, such Borrower Party shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(2)      Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, within three (3) Business Days after receipt of an Acceptance and Prepayment Notice (the "**Discounted Prepayment Determination Date**"), the Auction Agent will determine (in consultation with the consent of such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the Classes of Term Loans (the "**Acceptable Prepayment Amount**") to be prepaid by the relevant Borrower Party at the Acceptable Discount in accordance with this Section 2.05(1)(e)(D). If the applicable Borrower Party elects to accept any Acceptable Discount, then such Borrower Party agrees to accept all Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount. Each Term Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or

equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "**Qualifying Lender**"). The applicable Borrower Party will prepay outstanding Term Loans pursuant to this subsection (D) to each Qualifying Lender in the aggregate principal amount and of the Classes specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; *provided* that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "**Identified Qualifying Lenders**") shall be made pro rata among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Solicited Discount Proration**"). On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the relevant Borrower Party of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Term Loans and the Classes to be prepaid to be prepaid at the Applicable Discount on such date, (III) the Administrative Agent and each Qualifying Lender of the aggregate principal amount and the Classes of such Term Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Borrower Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to such Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(E)     In connection with any Discounted Term Loan Prepayment, the Borrower Parties and the Term Lenders acknowledge and agree that the Auction Agent may require, as a condition to the applicable Discounted Term Loan Prepayment, the payment of customary fees and expenses from a Borrower Party to such Auction Agent for its own account in connection therewith.

(F)     If any Term Loan is prepaid in accordance with subsections (B) through (D) above, a Borrower Party shall prepay such Term Loans on the Discounted Prepayment Effective Date. The relevant Borrower Party shall make such prepayment to the Administrative Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 12:00 p.m., New York time, on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the relevant Class(es) and Lenders as specified by the applicable Borrower Party in the applicable offer. The Term Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the

101

Discounted Prepayment Effective Date. Each prepayment of the outstanding Term Loans pursuant to this Section 2.05(1)(e) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, and shall be applied to the relevant Loans of such Lenders in accordance with their respective applicable share as calculated by the Auction Agent in accordance with this Section 2.05(1)(e). The aggregate principal amount of the Classes and installments of the relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the Classes of Term Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment. In connection with each prepayment pursuant to this Section 2.05(1)(e), the relevant Borrower Party shall make a representation to the assigning or assignee Term Lenders, as applicable, that it does not possess material non-public information with respect to the Borrower and its Subsidiaries or the securities of any of them that has not been disclosed to the Term Lenders generally (other than Term Lenders that have elected not to receive such information) or shall make a statement that such representation cannot be made.

(G)     To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the provisions in this Section 2.05(1)(e), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the applicable Borrower Party.

(H)     Notwithstanding anything in any Loan Document to the contrary, for purposes of this Section 2.05(1)(e), each notice or other communication required to be delivered or otherwise provided to the Auction Agent (or its delegate) shall be deemed to have been given upon Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; *provided* that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next succeeding Business Day.

(I)     Each of the Borrower Parties and the Term Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this Section 2.05(1)(e) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate. The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Term Loan Prepayment provided for in this Section 2.05(1)(e) as well as activities of the Auction Agent.

(J)     Each Borrower Party shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discounted Prepayment Response Date (and if such offer is revoked pursuant to the preceding clauses, any failure by such Borrower Party to make any prepayment to a Lender, as applicable, pursuant to this Section 2.05(1)(e) shall not constitute a Default or Event of Default under Section 8.01 or otherwise).

(K)     The Administrative Agent (i) shall not be required to serve as the Auction Agent or have any other obligations to participate in (other than mechanical administrative

102

duties), or facilitate any Discounted Term Loan Prepayment unless it is reasonably satisfied with the terms and restrictions thereof and (ii) shall not have any obligation to participate in, arrange, sell or otherwise facilitate, and will have no liability in connection with, any open market repurchases by Holdings, the Borrower or any of its Restricted Subsidiaries.

(2)     <u>Mandatory</u>.

(a)     Commencing with the delivery of the financial statements for the fiscal year ending January 29, 2022 and each fiscal year ending thereafter, within five (5) Business Days after the later of (x) the date that financial statements have been delivered pursuant to Section 6.01(1) with respect to such fiscal year and the related Compliance Certificate has been delivered pursuant to Section 6.02(1) and (y) March 31 of the subsequent fiscal year, if the Average ECF Liquidity for three month period ending on March 31 set forth in clause (y) above, as set forth in the applicable Compliance Certificate or such other certificate separately delivered by the Borrower exceeds $75,000,000 ("**ECF Liquidity Threshold**"), the Borrower shall, subject to clause (g) of this Section 2.05(2), prepay, or cause to be prepaid, an aggregate principal amount of Second-Out Loans equal to the sum of (i) an amount (not less than zero) equal to the *lesser* of (x) 100% of the Excess Cash Flow for the applicable Excess Cash Flow Period *minus* the ECF Liquidity Threshold (such excess amount, the "**ECF Surplus Amount**") and (y) the Priority ECF Amount *plus* (ii) if the ECF Surplus Amount exceeds the Priority ECF Amount, 50% of such excess, *minus*

(i)     the sum of all voluntary prepayments of Second-Out Loans made pursuant to Sections 2.05(1)(a) and 2.05(1)(e) (in an amount, in the case of prepayments pursuant to Section 2.05(1)(e), equal to the discounted amount actually paid in respect of the principal amount of such Second-Out Loans and only to the extent that such Second-Out Loans have been cancelled; *provided* that such voluntary prepayments made pursuant to Section 2.05(1)(e) shall only be deducted (a) to the extent the amount set forth in clause (2)(a)(ii) above is a positive amount and (b) in an amount, aggregated with the amount of voluntary prepayments made pursuant to Section 2.05(1)(e) of the Second Lien Credit Agreement, not to exceed 50% of the ECF Payment (calculated prior to giving effect to such deductions)) (including prepayments made after the end of the fiscal year covered by the relevant financial statements but prior to the making of such ECF Payment (such payments, the "**After Year-End Payment**")),

(ii)     the sum of all voluntary prepayments of Credit Agreement Refinancing Indebtedness in respect of the Second-Out Loans to the extent secured in whole or in part on a *pari passu* basis with and not subordinated in right of payment (including pursuant to "waterfall" or similar provisions) to the Second-Out Loans (including, to the extent prepaid pursuant to an After Year-End Payment),

(iii)     the sum of all voluntary prepayments of Second Lien Loans made pursuant to Section 2.05(1)(a) and 2.05(1)(e) of the Second Lien Credit Agreement (in an amount, in the case of prepayments pursuant to Section 2.05(1)(e), equal to the discounted amount actually paid in respect of the principal amount of such Second Lien Loans and only to the extent that such Second Lien Loans have been cancelled; *provided* that such voluntary prepayments made pursuant to Section 2.05(1)(e) of the Second Lien Credit Agreement shall only be deducted (a) to the extent the amount set forth in clause (2)(a)(ii) above is a positive amount and (b) in an amount, when aggregated with the amount of voluntary prepayments made pursuant to Section 2.05(1)(e) of this Agreement, not to exceed 50% of the ECF Payment (calculated prior to giving effect to such deductions)), and Credit Agreement Refinancing Indebtedness (as defined in the Second Lien Credit Agreement) to the extent secured in whole or in part on a *pari passu* basis with the Second

Lien Loans (in each case, including to the extent prepaid pursuant to an After Year-End Payment), and

in the case of each of the immediately preceding clauses (i) - (iii), made during such fiscal year (without duplication of any prepayments in such fiscal year that reduced the amount of Excess Cash Flow required to be repaid pursuant to this Section 2.05(2)(a) for any prior fiscal year) or in connection with an After Year-End Payment, and in each case to the extent such prepayments are not funded with the proceeds of Funded Debt or any Specified Equity Contributions (such amount, the "**ECF Payment**");

*provided* that:

(A)      if at the time that any such prepayment would be required, the Borrower (or any Restricted Subsidiary) is required to Discharge Other Applicable Indebtedness with Other Applicable ECF pursuant to the terms of the documentation governing such Indebtedness, then the Borrower (or any Restricted Subsidiary) may apply such Excess Cash Flow on a *pro rata* basis (determined on the basis of the aggregate outstanding principal amount of the Second-Out Loans and Other Applicable Indebtedness requiring such Discharge at such time);

(B)      the portion of such Excess Cash Flow allocated to the Other Applicable Indebtedness shall not exceed the amount of such Other Applicable ECF required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Excess Cash Flow shall be allocated to the Second-Out Loans in accordance with the terms hereof to the prepayment of the Second-Out Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Second-Out Loans that would have otherwise been required pursuant to this Section 2.05(2)(a) shall be reduced accordingly; and

(C)      to the extent the lenders or holders of Other Applicable Indebtedness decline to have such Indebtedness repurchased or prepaid with such portion of Excess Cash Flow, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Second-Out Loans to the extent required in accordance with the terms of this Section 2.05(2)(a).

(b)   Subject to Section 2.05(2)(f) below, (i) if (x) the Borrower or any Restricted Subsidiary makes an Asset Sale or (y) any Casualty Event occurs, which results in the realization or receipt by the Borrower or such Restricted Subsidiary of Net Proceeds, the Borrower shall prepay, or cause to be prepaid, on or prior to the date which is ten (10) Business Days after the date of the realization or receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds, subject to clause (ii) of this Section 2.05(2)(b) (solely in connection with Net Proceeds realized or received in connection with any Casualty Event) and clauses (2)(g) and (h) of this Section 2.05, an aggregate principal amount of Term Loans equal to 100% of all Net Proceeds realized or received; *provided* that no prepayment shall be required pursuant to this Section 2.05(2)(b)(i) with respect to such portion of such Net Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment to reinvest) in accordance with Section 2.05(2)(b)(ii); *provided further* that

(A)      if at the time that any such prepayment would be required, the Borrower (or any Restricted Subsidiary) is required to Discharge any Other Applicable Indebtedness with Other Applicable Net Proceeds pursuant to the terms of the documentation governing such Indebtedness, then the Borrower (or any Restricted Subsidiary) may apply such Net Proceeds on a *pro rata* basis (determined on the basis of the aggregate outstanding principal

amount of the Term Loans and Other Applicable Indebtedness requiring such Discharge at such time);

(B)    the portion of such Net Proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of such Other Applicable Net Proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Net Proceeds shall be allocated to the Term Loans in accordance with the terms hereof to the prepayment of the Term Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 2.05(2)(b)(i) shall be reduced accordingly; and

(C)    to the extent the holders of Other Applicable Indebtedness decline to have such Indebtedness repurchased or prepaid with such portion of such Net Proceeds, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof; *provided further* that no prepayment shall be required pursuant to this Section 2.05(2)(b)(i) with respect to such portion of such Net Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment to reinvest) in accordance with Section 2.05(2)(b)(ii).

(ii)    With respect to any Net Proceeds realized or received with respect to any Casualty Event, the Borrower or any Restricted Subsidiary, at its option, may reinvest all or any portion of such Net Proceeds in assets (other than Cash Equivalents) used or useful in the business of the Loan Parties (including capital expenditures) within (x) twelve (12) months following receipt of such Net Proceeds or (y) if the Borrower or any Restricted Subsidiary enters into a legally binding commitment to reinvest such Net Proceeds within twelve (12) months following receipt thereof, within the later of (A) twelve (12) months following receipt thereof and (B) one hundred eighty (180) days of the date of such legally binding commitment; *provided* that, (i) the aggregate amount of any such Net Proceeds reinvested pursuant to this Section 2.05(b)(ii) shall not exceed $5.0 million in any fiscal year (with any unused amount being carried over to the next fiscal year, with such carried over amounts being utilized first in any given year) and (ii) if any Net Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, and subject to clauses (g) and (h) of this Section 2.05(2), an amount equal to any such Net Proceeds shall be applied within five (5) Business Days after the Borrower reasonably determines that such Net Proceeds are no longer intended to be or cannot be so reinvested to the prepayment of the Term Loans as set forth in this Section 2.05.

(c)    [Reserved].

(d)    Subject to Section 2.05(2)(f) below, if the Borrower or any Restricted Subsidiary incurs or issues any Indebtedness (A) not expressly permitted to be incurred or issued pursuant to Section 7.02(b) or (B) that constitutes Credit Agreement Refinancing Indebtedness or Refinancing Loans, the Borrower shall prepay, or cause to be prepaid, an aggregate principal amount of Term Loans of any Class or Classes (in each case, as directed by the Borrower) equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds.

(e)    Except as otherwise set forth in any Refinancing Amendment or Extension Amendment (*provided*, in each case, that such amendment may not provide that such Class of Term

105

Loans shall receive a greater than pro rata portion of mandatory prepayments pursuant to Section 2.05(2) than the Class of Term Loans refinanced, converted or extended thereby):

(i)     each prepayment of Term Loans required by Sections 2.05(2)(b) through (d) or (f) shall be applied to pursuant to the following order:

(A)     *first*, to the First-Out Loans then outstanding on a *pro rata* basis until Payment in Full thereof; and

(B)     *second*, to the Second-Out Loans then outstanding until Payment in Full thereof.

(ii)     with respect to each Class of Loans, each prepayment pursuant to clauses (a) through (d) or (f) of Section 2.05(2) shall be applied to remaining scheduled installments of principal thereof following the date of prepayment in direct order of maturity; and

(iii)     each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(f)     If the Borrower or any Restricted Subsidiary enters into a Specified Sale-Leaseback Transaction, which results in the receipt by the Borrower or such Restricted Subsidiary of Specified Sale-Leaseback Net Proceeds, or the Borrower or any Restricted Subsidiary enters into any Qualified Securitization Facility, which results in the receipt by the Borrower or such Restricted Subsidiary of Net Proceeds (in each case, determined after giving effect to the Transactions and without giving effect to the last *proviso* of clause (1) of the definition of "Net Proceeds"), the Borrower shall, within three (3) Business Days after the receipt of such proceeds, prepay the Term Loans in an aggregate principal amount equal to the amount of such proceeds received.

(g)     The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (a) through (d) or (f) of this Section 2.05(2) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower. The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's prepayment notice and of such Appropriate Lender's Pro Rata Share of the prepayment or other applicable share provided for under this Agreement. Each Term Lender may reject all or a portion of its Pro Rata Share, or other applicable share provided for under this Agreement, of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (a) and (b) of this Section 2.05(2) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York time, two (2) Business Days prior to the date of such prepayment. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender. If a Term Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans. Any Declined Proceeds remaining shall be retained by the Borrower (or the applicable Restricted Subsidiary) and may be applied by the Borrower or such Restricted Subsidiary in any manner not prohibited by this Agreement.

(h)     Notwithstanding any other provisions of this Section 2.05(2), (A) to the extent that any or all of the Net Proceeds of any Asset Sale by a Foreign Subsidiary giving rise to a prepayment event pursuant to Section 2.05(2)(b) or (f) (a "**Foreign Asset Sale**"), the Net Proceeds of any Casualty Event

from a Foreign Subsidiary (a "**Foreign Casualty Event**"), the Specified Sale-Leaseback Net Proceeds of any Specified Sale-Leaseback Transaction by a Foreign Subsidiary (a "**Foreign Sale-Leaseback**") or all or a portion of Excess Cash Flow are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in this Section 2.05(2) but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions available under by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow is permitted under the applicable local law such repatriation will be promptly effected and an amount equal to such repatriated Net Proceeds or Excess Cash Flow will be promptly (and in any event not later than two (2) Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to this Section 2.05(2) to the extent otherwise provided herein and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all or the Net Proceeds of any Foreign Asset Sale or Foreign Casualty Event, the Specified Sale-Leaseback Net Proceeds of any Foreign Sale-Leaseback or Excess Cash Flow would have a material adverse tax consequence (taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow, the Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary.

(i) <u>Interest, Funding Losses, etc</u>. All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.05, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under this Section 2.05 prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.05 in respect of any such Eurodollar Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 2.05. Such deposit shall be deemed to be a prepayment of such Loans by the Borrower for all purposes under this Agreement.

Section 2.06     <u>Termination or Reduction of Commitments</u>.

(1)     <u>Optional.</u> The Borrower may, upon written notice by the Borrower to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class, in each case without premium or penalty; *provided* that

(a)   any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, and

(b)   any such partial reduction shall be in an aggregate amount of $5.0 million or any whole multiple of $1.0 million in excess thereof or, if less, the entire amount thereof.

(2)   <u>Mandatory.</u> The New Money First-Out Loan Commitment of each First-Out Lender on the Closing Date shall be automatically and permanently reduced to $0 upon the making of such First-Out Lender's New Money First-Out Loans to the Borrower pursuant to Section 2.01(2).  The Exchange First-Out Loan Commitment of each First-Out Lender and the Second-Out Loan Commitment of each Second-Out Lender, in each case, on the Closing Date shall be automatically and permanently reduced to $0 upon the conversion of such Second Amendment Exchanging Lender's Prepetition First Lien Term Loans and/or Prepetition Second Lien Term Loans into Exchange First-Out Loans and/or Second-Out Loans pursuant to Section 2.01(3) and the Plan of Reorganization.

(3)   <u>Application of Commitment Reductions.</u> Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07).

Section 2.07   <u>Repayment of Loans</u>.  The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders (a) on the Maturity Date for the First-Out Loans, the aggregate principal amount of all First-Out Loans outstanding on such date, (b)(x) on the first Business Day of each May, August and November, commencing with May 3, 2021, ending during the fiscal year ending January 29, 2022, an aggregate principal amount equal to 0.25% of the aggregate principal amount of all Second-Out Loans outstanding on such date (after giving effect to any PIK Toggle exercised with respect to such date) (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05), (y) on the first Business Day of each February, May, August and November ending during the fiscal year ending January 28, 2023, an aggregate principal amount equal to 0.50% of the aggregate principal amount of all Second-Out Loans outstanding on such date (after giving effect to any PIK Toggle exercised with respect to such date) (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (z) on the first Business Day of each February, May, August and November ending thereafter, an aggregate principal amount equal to 0.625% of the aggregate principal amount of all Second-Out Loans outstanding on such date (after giving effect to any PIK Toggle exercised with respect to such date) (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (c) on the Maturity Date for the Second-Out Loans, the aggregate principal amount of all Second-Out Loans outstanding on such date.

Section 2.08   <u>Interest</u>.

(1)   Subject to the provisions of Section 2.08(2), (I) with respect to First-Out Loans, (a) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted Eurodollar Rate for such Interest Period, respectively, *plus* the Applicable Rate and (b) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Base Rate, *plus* the Applicable Rate and (II) each Second-Out Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to (a) so long as the Borrower has not elected to exercise the PIK Toggle for the applicable Interest Period pursuant to Section 2.08(4), 10.00% and (b) if the Borrower has elected to exercise the PIK Toggle for the applicable Interest Period pursuant to Section 2.08(4), 13.00% (consisting of interest payable in Same Day Funds of 5.00% and PIK Interest of 8.00%) (the "**PIK Rate**").

(2)   During the continuance of an Event of Default, the Borrower shall pay interest on past due amounts at a rate per annum at all times equal to the Default Rate to the fullest extent permitted by

applicable Laws; *provided* that, no interest at the Default Rate shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Accrued and unpaid interest based on the Default Rate (including interest on interest) shall be due and payable upon demand.

(3)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(4)     So long as no Default or Event of Default in respect of the Second-Out Loans exists or would result from the exercise of the PIK Toggle, the Borrower may elect, in its sole discretion (such right to elect, the "**PIK Toggle**"), to have interest that accrues on the Second-Out Loans during an Interest Period to be paid (i) partially in the form of PIK Interest at the applicable rate set forth in Section 2.08(1) and (ii) partially in Same Day Funds as described herein at the applicable rate set forth in Section 2.08(1); *provided* that the Borrower may elect to exercise the PIK Toggle with respect to no more than eight (8) Interest Periods in the aggregate.  Such election shall be made by providing irrevocable written notice to the Administrative Agent by a Responsible Officer in the form attached as Exhibit R (each a "**PIK Toggle Notice**"), which shall specify (i) the Interest Payment Date to which the PIK Toggle shall apply and (ii) the number of PIK Toggles which have been exercised up to and including the date of such PIK Toggle Notice (including the PIK Toggle that is the subject of the PIK Toggle Notice).  Each such PIK Toggle Notice must be received by the Administrative Agent not later than 12:00 p.m., New York City time five (5) Business Days prior to the applicable Interest Payment Date, and shall be effective only with respect to such Interest Payment Date.  For the avoidance of doubt, if no PIK Toggle Notice is received with respect to an Interest Payment Date in accordance with this Section 2.08(4), interest shall be payable on the Second-Out Loans on such Interest Payment Date in cash at the applicable rate set forth in Section 2.08(1).

Section 2.09     Fees.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in the Agent Fee Letter in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.10     Computation of Interest and Fees. All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(1), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11     Evidence of Indebtedness.

(1)     The Term Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Term Borrowings made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts

and records of the Administrative Agent, as set forth in the Register, in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Term Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Term Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(2)      [Reserved].

(3)      Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(1), and by each Lender in its account or accounts pursuant to Section 2.11(1), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12      <u>Payments Generally</u>.

(1)      All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m., New York time, on the date specified herein. The Administrative Agent will promptly distribute to each Appropriate Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. Any payments under this Agreement that are made later than 2:00 p.m., New York time, shall be deemed to have been made on the next succeeding Business Day (but the Administrative Agent may extend such deadline for purposes of computing interest and fees (but not beyond the end of such day) in its sole discretion whether or not such payments are in process).

(2)      If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(3)      Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date, or in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York time, on the date of such Borrowing, any payment is required to be made by it to the Administrative Agent hereunder (in the case of the Borrower, for the account of any Lender hereunder or, in the case of the Lenders, for the account of the Borrower hereunder), that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(a)      if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the

date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(b)   if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount, or cause such amount to be paid, to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder. A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(3) shall be conclusive, absent manifest error.

(c)   If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Term Borrowing set forth in Section 4.01 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)   The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan.

(e)   Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)   Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03 (or otherwise expressly set forth herein). If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the sum of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13     Sharing of Payments. Other than as expressly provided elsewhere herein (including with respect to any discounted prepayment of Term Loans pursuant to Section 2.05(2)(e) or 2.05(2)(g)), if any Lender of any Class shall obtain payment in respect of any principal of or interest on account of the Loans of such Class made by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (1) notify the Administrative Agent of such fact, and (2) purchase from the other Lenders such participations in the Loans of such Class made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of any principal of or interest on such Loans of such Class, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (a) the amount of such paying Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.10) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14     [Reserved].

Section 2.15     Refinancing Amendments.

(1)     Refinancing Loans. At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender, Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Term Loans then outstanding under this Agreement, in the form of Refinancing Loans or Refinancing Commitments in each case pursuant to a Refinancing Amendment.

(2)     Refinancing Amendments. The effectiveness of any Refinancing Amendment will be subject only to the satisfaction on the date thereof of such conditions precedent as may be requested by the providers of the applicable Refinancing Loans. The Administrative Agent will promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Refinancing Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.15 and to reflect the existence and terms of the Refinancing Loans incurred pursuant thereto (including any amendments necessary to treat the Term Loans subject thereto as Refinancing Term Loans). A Refinancing Amendment may (a) extend or add "call protection" to any existing Class of Term Loans, including amendments to Section 2.18, (b) amend the schedule of amortization payments relating to any existing tranche of Term Loans, including amendments to Section 2.07 (*provided* that any such amendment shall not decrease the dollar amount of any amortization payment to any Lender that would have otherwise been payable to such Lender prior to the effectiveness of the

applicable Refinancing Amendment) and (c) make other amendments to the terms of any existing Term Loans, in the case of each clause (a), (b) and (c), so that such Refinancing Term Loans and the applicable existing Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the applicable existing Term Lenders (as determined in good faith by the Borrower). Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement and the other Loan Documents, as applicable, will be amended to the extent necessary to reflect the existence and terms of the Refinancing Loans.  At the request of the Administrative Agent, the Borrower shall deliver an Officer's Certificate to the Administrative Agent, certifying that the conditions and requirements with respect to such Refinancing Loans set forth in this Section 2.15 have been met and such Refinancing Amendment is authorized under this Section 2.15 (upon which the Administrative Agent may conclusively rely without independent inquiry).

(3)    Required Consents. Any Refinancing Amendment may, without the consent of any Person other than the Administrative Agent, the Borrower and the Persons providing the applicable Refinancing Loans, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.15. This Section 2.15 supersedes any provision in this Agreement to the contrary (including Section 10.01).

(4)    Providers of Refinancing Loans. Refinancing Loans may be provided by any existing Lender (it being understood that no existing Lender shall have an obligation to make all or any portion of any Refinancing Loan) or by any Additional Lender on terms permitted by this Section 2.15; *provided* that the Administrative Agent shall have consented (in each case, such consent not to be unreasonably withheld, conditioned or delayed) to any such Person's providing Refinancing Loans or Refinancing Commitments if such consent would be required under Section 10.07(b)(iii) for an assignment of Loans or Commitments to such Person. For the avoidance of doubt, any Affiliated Lender that provides any Refinancing Term Loans will be subject to the limitations on Affiliated Lenders set forth in Section 10.07(h) (including the Affiliated Lender Cap).

Section 2.16    Extensions of Loans.

(1)    Extension Offers. Pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date, the Borrower may extend such Maturity Date and otherwise modify the terms of such Loans or Commitments pursuant to the terms set forth in an Extension Offer (each, an "**Extension**," and each group of Loans or Commitments so extended, as well as any Loans of the same Class not so extended, each being a "**tranche**" for purposes of this Section 2.16). Each Extension Offer will specify the minimum amount of Loans or Commitments with respect to which an Extension Offer may be accepted, which will be an integral multiple of $1.0 million and an aggregate principal amount that is not less than $10.0 million, or if less, (a) the aggregate principal amount of such Loans outstanding or (b) such lesser minimum amount as is approved by the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed. Extension Offers will be made on a *pro rata* basis to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date. If the aggregate outstanding principal amount of such Loans (calculated on the face amount thereof) or Commitments in respect of which Lenders have accepted an Extension Offer exceeds the maximum aggregate principal amount of Loans or Commitments offered to be extended pursuant to such Extension Offer, then the Loans or Commitments of such Lenders will be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer. There is no requirement that any Extension Offer or Extension Amendment (defined as follows) be subject to any "most favored nation" pricing provisions, any condition on the non-existence of any Default or Event of Default or any financial ratio tests. The terms of an Extension Offer shall be determined by the Borrower,

and Extension Offers may contain one or more conditions to their effectiveness, including a condition that a minimum amount of Loans or Commitments of any or all applicable tranches be tendered.

(2)     Extension Amendments. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents (each, an "**Extension Amendment**") as may be necessary or appropriate in order to effect the provisions of this Section 2.16, establish new tranches in respect of Extended Loans and Extended Commitments and such amendments as permitted by clause (5) below as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such Extended Loans and Extended Commitments. An Extension Amendment may (a) extend or add "call protection" to any existing Class of Term Loans, including amendments to Section 2.18, (b) amend the schedule of amortization payments relating to any existing tranche of Term Loans, including amendments to Section 2.07 (*provided* that any such amendment shall not decrease the dollar amount of any amortization payment to any Lender that would have otherwise been payable to such Lender prior to the effectiveness of the applicable Extension Amendment) and (c) make other amendments to the terms of any existing Term Loans, in the case of each clause (a), (b) and (c), so that such Extended Loans and the applicable existing Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the existing Term Loan Lenders (as determined in good faith by the Borrower). At the request of the Administrative Agent, the Borrower shall deliver an Officer's Certificate to the Administrative Agent, certifying that the conditions and requirements with respect to such Extension Loans set forth in this Section 2.16 have been met and such Extension Amendment is authorized under this Section 2.16 (upon which the Administrative Agent may conclusively rely without independent inquiry). This Section 2.16 supersedes any provision(s) in Section 2.13 or 10.01 to the contrary. Except as otherwise set forth in an Extension Offer, there will be no conditions to the effectiveness of an Extension Amendment. Extensions will not constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement. Any Lender of an existing Class of Term Loans that elects not to participate in Extended Loans or Extended Commitments of such Class of Term Loans shall be referred to herein as a "**Non-Extended Lender**".

(3)     Terms of Extension Offers and Extension Amendments. The terms of any Extended Loans and Extended Commitments will be set forth in an Extension Offer and as agreed between the Borrower and the Extending Lenders accepting such Extension Offer; *provided* that:

(a)    the final maturity date of such Extended Loans and Extended Commitments will be no earlier than the Latest Maturity Date applicable to the Loans or Commitments subject to such Extension Offer;

(b)    the Weighted Average Life to Maturity of any Extended Loans that are Term Loans will be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans subject to such Extension Offer;

(c)    any Extended Loans that are Term Loans may receive mandatory repayments or prepayments in an amount not more than the amount that would have been received by the applicable Term Loans from which such Extended Loans are converted (in each case, other than pursuant to a refinancing) and may participate on a pro rata basis, greater than pro rata basis or less than pro rata basis in any voluntary prepayments of the Term Loans;

(d)    such Extended Loans and Extended Commitments are not secured by any assets or property that does not constitute Collateral and may not be secured on a senior basis to the existing Term Loans (provided that such Extended Loans and Extended Commitments may be senior in right of payment (including pursuant to any "waterfall") to other Term Loans to the same extent as the applicable Term Loans from which such Extended Loans are converted);

(e)   such Extended Loans and Extended Commitments are not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Guarantor; and

(f)   the covenants and events of default applicable to Extended Loans or Extended Commitments are substantially identical to, or, taken as a whole, no more favorable to the Lenders providing such Extended Loans or Extended Commitments than, those applicable to the Loans subject to such Extension Offer, as determined in good faith by a Responsible Officer of the Borrower in its reasonable judgment; *provided* that this clause (f) will not apply:

(A)   [reserved] or

(B)   to any of the following:

(1)   terms addressed in the preceding clauses (a) through (e),

(2)   interest rate, fees, funding discounts and other pricing terms,

(3)   redemption, prepayment or other premiums,

(4)   optional redemption or prepayment terms and

(5)   covenants and events of default applicable only to periods after the Latest Maturity Date at the time of incurrence of such Indebtedness.

Any Extended Loans will constitute a separate tranche of Term Loans from the Term Loans held by Lenders that did not accept the applicable Extension Offer.

(4)   Required Consents. No consent of any Lender or any other Person will be required to effectuate any Extension, other than the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned), the Borrower and the applicable Extending Lender. The transactions contemplated by this Section 2.16 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Offer) will not require the consent of any other Lender or any other Person, and the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.16 will not apply to any of the transactions effected pursuant to this Section 2.16.

Section 2.17   Defaulting Lenders.

(1)   Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(a)   Waivers and Amendments. That Defaulting Lender's right to approve or disapprove of any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)   Reallocation of Payments. Any payment of principal, interest, fees or other amounts received by any Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise), shall be applied at such time or times as may be determined by such Agent as follows: first, to the payment of any amounts owing by that

115

Defaulting Lender to any Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (i) such payment is a payment of the principal amount of any Loans s in respect of which that Defaulting Lender has not fully funded its appropriate share and (ii) such Loans were made at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender. Any payments, prepayments or other amounts payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(2)     <u>Defaulting Lender Cure.</u> If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders, whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; *provided further* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.18     <u>Prepayment Premium and Make-whole Amount.</u>

(1)     [reserved].

(2)     In the event that all or any portion of the First-Out Loans are repaid, prepaid or accelerated for any reason, including as a result of any mandatory prepayments, voluntary prepayments, payments or acceleration made following the occurrence and during the continuance of an Event of Default, including an Event of Default resulting from the commencement of any proceeding under the Bankruptcy Code in respect of any Loan Party or any Subsidiary thereof, and notwithstanding any acceleration (for any reason) of the Obligations pursuant to the terms hereof (other than (x) mandatory prepayments pursuant to <u>Section 2.05(2)(a)</u> or (y) amortization payments pursuant to <u>Section 2.07</u>), the Borrower shall pay to the Administrative Agent, for the benefit of Lenders holding such First-Out Loans as an inducement for making (or deemed making) the First-Out Loans (and not as a penalty) an amount equal to the Prepayment Premium, which Prepayment Premium shall be fully earned, and due and payable, on the date of such payment or prepayment, or on the date such payment or prepayment is required (or deemed) to be made, as applicable, and non-refundable when made.

(3)     In the event that, on or prior to third (3rd) anniversary of the Closing Date, all or any portion of the Second-Out Loans are accelerated based upon an Event of Default pursuant to Section 8.01(6), and

notwithstanding any acceleration (for any reason) of the Obligations pursuant to the terms hereof, the Borrower shall pay to the Administrative Agent, for the benefit of Lenders holding such Second-Out Loans, as an inducement for making (deemed making) of the Second-Out Loans (and not as a penalty), an amount equal to the Make-whole Amount, which Make-whole Amount shall be fully earned, and due and payable, on the date of such payment or prepayment, or on the date such payment or prepayment is required (or deemed) to be made, as applicable, and non-refundable when made.

(4)     In view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of the Lenders' lost profits as a result thereof, any Prepayment Premium or Make-whole Amount that is due and payable upon an optional or mandatory prepayment of the First-Out Loans, or upon an acceleration of the First-Out Loans or the Second-Out Loans shall in each case be presumed to be the liquidated damages sustained by the Lenders as the result of payment or acceleration, as applicable, and the Borrower and Guarantors agree that the Prepayment Premium and Make-whole Amount is reasonable under the circumstances currently existing.   The Prepayment Premium and Make-whole Amount shall also be payable in the event the applicable Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other similar means.   THE BORROWER AND EACH GUARANTOR EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM OR MAKE-WHOLE AMOUNT IN CONNECTION WITH ANY ACCELERATION OF THE LOANS.  The Borrower and each Guarantor expressly agrees (to the fullest extent that it may lawfully do so) that: (A) the Prepayment Premium and Make-whole Amount is reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the Prepayment Premium and Make-whole Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower and Guarantors giving specific consideration in this transaction for such agreement to pay the Prepayment Premium and the Make-whole Amount; and (D) the Borrower and each Guarantor shall each be estopped hereafter from claiming differently than as agreed to in this paragraph. The Borrower and each Guarantor expressly acknowledges that its agreement to pay the Prepayment Premium and Make-whole Amount to the Lenders as herein described is a material inducement to the Lenders to provide the Commitments and make the Loans.

Section 2.19     Permitted Debt Exchanges.

(1)     Notwithstanding anything to the contrary contained in this Agreement, pursuant to one or more offers (each, a "**Permitted Debt Exchange Offer**") made from time to time by the Borrower to all Lenders (other than, with respect to any Permitted Debt Exchange Offer that constitutes an offering of securities, any Lender that, if requested by the Borrower, is unable to certify that it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (ii) an institutional "accredited investor" (as defined in Rule 501 under the Securities Act) or (iii) not a "U.S. person" (as defined in Rule 902 under the Securities Act)) with outstanding Term Loans of a particular Class, the Borrower may from time to time consummate one or more exchanges of such Term Loans for Indebtedness (in the form of senior secured, senior unsecured, senior subordinated, or subordinated notes or loans) (such Indebtedness, "**Permitted Debt Exchange Notes**" and each such exchange, a "**Permitted Debt Exchange**"), so long as the following conditions are satisfied:

(i)     each such Permitted Debt Exchange Offer shall be made on a pro rata basis to the Lenders (other than, with respect to any Permitted Debt Exchange Offer that constitutes an offering of securities, any Lender that, if requested by the Borrower, is unable to certify that it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (ii) an

117

institutional "accredited investor" (as defined in Rule 501 under the Securities Act) or (iii) not a "U.S. person" (as defined in Rule 902 under the Securities Act)) of each applicable Class based on their respective aggregate principal amounts of outstanding Term Loans under each such Class;

(ii)     the aggregate principal amount (calculated on the face amount thereof) of such Permitted Debt Exchange Notes shall not exceed the aggregate principal amount (calculated on the face amount thereof) of Term Loans so refinanced, except to the extent a different incurrence basket pursuant Section 7.02 is utilized and with respect to an amount equal to any fees, expenses, commissions, underwriting discounts and premiums payable in connection with such Permitted Debt Exchange;

(iii)     the stated final maturity of such Permitted Debt Exchange Notes is not earlier than the latest Maturity Date for the Class or Classes of Term Loans being exchanged, and such stated final maturity is not subject to any conditions that could result in such stated final maturity occurring on a date that precedes such latest maturity date (it being understood that acceleration or mandatory repayment, prepayment, redemption or repurchase of such Permitted Debt Exchange Notes upon the occurrence of an event of default, a change in control, an event of loss or an asset disposition shall not be deemed to constitute a change in the stated final maturity thereof);

(iv)     such Permitted Debt Exchange Notes are not required to be repaid, prepaid, redeemed, repurchased or defeased, whether on one or more fixed dates, upon the occurrence of one or more events or at the option of any holder thereof (except, in each case, upon the occurrence of an event of default, a change in control, an event of loss or an asset disposition) prior to the latest Maturity Date for the Class or Classes of Term Loans being exchanged, provided that, notwithstanding the foregoing, scheduled amortization payments (however denominated, including scheduled offers to repurchase) of such Permitted Debt Exchange Notes shall be permitted so long as the Weighted Average Life to Maturity of such Indebtedness shall be longer than the remaining Weighted Average Life to Maturity of the Class or Classes of Term Loans being exchanged;

(v)     no Restricted Subsidiary is a borrower or guarantor with respect to such Indebtedness unless such Restricted Subsidiary is or substantially concurrently becomes a Loan Party;

(vi)     if such Permitted Debt Exchange Notes are secured, such Permitted Debt Exchange Notes are secured on a pari passu basis or junior priority basis to the Obligations and (A) such Permitted Debt Exchange Notes are not secured by any assets not securing the Obligations unless such assets substantially concurrently secure the Obligations and (B) the beneficiaries thereof (or an agent on their behalf) shall become party to the Applicable Intercreditor Agreement;

(vii)     the terms and conditions of such Permitted Debt Exchange Notes (excluding pricing and optional prepayment or redemption terms or covenants or other provisions applicable only to periods after the Maturity Date of the Class or Classes of Term Loans being exchanged) reflect market terms and conditions at the time of incurrence or issuance; provided that if such Permitted Debt Exchange Notes contain any financial maintenance covenants, such covenants shall not be more restrictive than (or in addition to) those contained in this Agreement (unless such covenants are also added for the benefit of the Lenders under this Agreement, in which case any requirement to so comply shall not require the consent of any Lender or Agent hereunder);

(viii)     all Term Loans exchanged under each applicable Class by the Borrower pursuant to any Permitted Debt Exchange shall automatically be cancelled and retired by the Borrower on date of the settlement thereof (and, if requested by the Administrative Agent, any applicable

exchanging Lender shall execute and deliver to the Administrative Agent an Assignment and Assumption, or such other form as may be reasonably requested by the Administrative Agent, in respect thereof pursuant to which the respective Lender assigns its interest in the Term Loans being exchanged pursuant to the Permitted Debt Exchange to the Borrower for immediate cancellation), and accrued and unpaid interest on such Term Loans shall be paid to the exchanging Lenders on the date of consummation of such Permitted Debt Exchange, or, if agreed to by the Borrower and the Administrative Agent, the next scheduled Interest Payment Date with respect to such Term Loans (with such interest accruing until the date of consummation of such Permitted Debt Exchange);

(ix)    if the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of a given Class tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof of the applicable Class actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of such Class offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans under the relevant Class tendered by such Lenders ratably up to such maximum based on the respective principal amounts so tendered, or, if such Permitted Debt Exchange Offer shall have been made with respect to multiple Classes without specifying a maximum aggregate principal amount offered to be exchanged for each Class, and the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of all Classes tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of all relevant Classes offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans across all Classes subject to such Permitted Debt Exchange Offer tendered by such Lenders ratably up to such maximum amount based on the respective principal amounts so tendered;

(x)    all documentation in respect of such Permitted Debt Exchange shall be consistent with the foregoing, and all written communications generally directed to the Lenders in connection therewith shall be in form and substance consistent with the foregoing and made in consultation with the Borrower and the Administrative Agent; and

(xi)    any applicable Minimum Tender Condition or Maximum Tender Condition, as the case may be, shall be satisfied or waived by the Borrower.

Notwithstanding anything to the contrary herein, no Lender shall have any obligation to agree to have any of its Loans or Term Commitments exchanged pursuant to any Permitted Debt Exchange Offer.

(2)    With respect to all Permitted Debt Exchanges effected by the Borrower pursuant to this Section 2.19, such Permitted Debt Exchange Offer shall be made for not less than $10,000,000 in aggregate principal amount of Term Loans, provided that subject to the foregoing the Borrower may at its election specify (A) as a condition (a "**Minimum Tender Condition**") to consummating any such Permitted Debt Exchange that a minimum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's discretion) of Term Loans of any or all applicable Classes be tendered and/or (B) as a condition (a "**Maximum Tender Condition**") to consummating any such Permitted Debt Exchange that no more than a maximum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's discretion) of Term Loans of any or all applicable Classes will be accepted for exchange.  The Administrative Agent and the Lenders hereby acknowledge and agree that the provisions of Sections 2.05, 2.06, and 2.13 do not apply to the Permitted Debt Exchange and the other

119

transactions contemplated by this Section 2.19 and hereby agree not to assert any Default or Event of Default in connection with the implementation of any such Permitted Debt Exchange or any other transaction contemplated by this Section 2.19.

(3)    In connection with each Permitted Debt Exchange, the Borrower shall provide the Administrative Agent at least five (5) Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and the Borrower and the Administrative Agent, acting reasonably, shall mutually agree to such procedures as may be necessary or advisable to accomplish the purposes of this Section 2.19; provided that the terms of any Permitted Debt Exchange Offer shall provide that the date by which the relevant Lenders are required to indicate their election to participate in such Permitted Debt Exchange shall be not less than five (5) Business Days following the date on which the Permitted Debt Exchange Offer is made.  The Borrower shall provide the final results of such Permitted Debt Exchange to the Administrative Agent no later than three (3) Business Days prior to the proposed date of effectiveness for such Permitted Debt Exchange (or such shorter period agreed to by the Administrative Agent in its sole discretion) and the Administrative Agent shall be entitled to conclusively rely on such results.

(4)    The Borrower shall be responsible for compliance with, and hereby agrees to comply with, all applicable securities and other laws in connection with each Permitted Debt Exchange, it being understood and agreed that (i) neither the Administrative Agent nor any Lender assumes any responsibility in connection with the Borrower's compliance with such laws in connection with any Permitted Debt Exchange and (ii) each Lender shall be solely responsible for its compliance with any applicable "insider trading" laws and regulations to which such Lender may be subject under the Exchange Act.

Section 2.20    Limitation on Refinancing.  Notwithstanding anything to the contrary herein, from and after the Closing Date, no Permitted Debt Exchange Notes, Refinancing Term Loan, Refinancing Loan, Extended Loan, Replacement Loan, Refinancing Indebtedness or other Indebtedness incurred pursuant to Section 7.02 to Refinance any Term Loans may be incurred unless such incurrence is approved by the Required Lenders and complies in all respect with Section 7.14.

## ARTICLE III

## Taxes, Increased Costs Protection and Illegality

Section 3.01    Taxes.

(1)    Except as required by applicable Law, any and all payments by any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes.

(2)    If any Loan Party or any other applicable withholding agent is required by applicable Law (as determined in the good faith discretion of such Loan Party or withholding agent) to make any deduction or withholding on account of any Taxes from any sum paid or payable by any Loan Party to any Lender or Agent under any of the Loan Documents:

(a)    the applicable Loan Party shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as such Loan Party becomes aware of it;

(b)    the applicable Loan Party or other applicable withholding agent shall be entitled to make such deduction or withholding and shall pay any amounts deducted or withheld to the relevant Governmental Authority any such Tax before the date on which penalties attach thereto, such payment

to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on the Lender or Agent) on behalf of and in the name of the Lender or Agent (as applicable);

(c)     if the Tax in question is a Non-Excluded Tax or Other Tax, the sum payable to such Lender or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding for Non-Excluded Taxes or Other Taxes (including any deductions or withholdings for Non-Excluded Taxes or Other Taxes attributable to any payments required to be made under this Section 3.01), such Lender or such Agent (as applicable) receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and

(d)     within thirty days after paying any sum from which it is required by Law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (b) above to pay, the Borrower shall deliver to the Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(3)     Status of Lender.  The Administrative Agent and each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of the Administrative Agent and such Lender, as applicable, to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to the Administrative Agent or such Lender under any Loan Document. In addition, Administrative Agent or any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not the Administrative Agent or such Lender is subject to backup withholding or information reporting requirements. Each such Lender or Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(3)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and Administrative Agent of its inability to do so.

Without limiting the foregoing:

(a)     Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(b)     Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(i)     two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(ii)     two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (A) two properly completed and duly signed certificates substantially in the form of Exhibit H (any such certificate, a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(iv)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed originals of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, Form W-8BEN or W-8BEN-E, as applicable, a United States Tax Compliance Certificate, Form W-9, Form W-8IMY and any other required information (or any successor forms) from each beneficial owner that would be required under this Section 3.01(3) if such beneficial owner were a Lender, as applicable (*provided* that if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such beneficial owner), or

(v)      two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding Tax on any payments to such Lender under the Loan Documents.

(c)   If a payment made to a Lender under any Loan Document would be subject to Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, the term "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(4)     In addition to the payments by a Loan Party required by Section 3.01(2), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law and as soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(5)     The Loan Parties shall, jointly and severally, indemnify a Lender or Agent (each a "**Tax Indemnitee**"), within 10 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee on or attributable to any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes

or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Administrative Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(6)     If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), then such Tax Indemnitee shall pay to the relevant Loan Party the amount of such refund, net of all out-of-pocket expenses of the Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee to the extent the Tax Indemnitee is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (6), in no event will the Tax Indemnitee be required to pay any amount to a Loan Party pursuant to this paragraph (6) the payment of which would place the Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(7)     The agreements in this Section 3.01 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

(8)     For purposes of this Section, the term "Applicable Law" includes FATCA.

Section 3.02    Illegality. If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on written notice thereof by such Lender to the Borrower through the Administrative Agent, (1) any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended, and (2) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be reasonably determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (a) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans and shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate) and (b) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar

Rate component of the Base Rate with respect to any Base Rate Loans, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03    Inability to Determine Rates. If the Required Lenders reasonably determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that

(1)    Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan,

(2)    adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan or in connection with an existing or proposed Base Rate Loan, or

(3)    the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan,

the Required Lenders will promptly notify the Administrative Agent and the Borrower, and upon receipt of such notice, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (i) the obligation of the Lenders to make or maintain Eurodollar Rate Loans, as the case may be, shall be suspended, and (ii) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loan.

(1)    Increased Costs Generally. If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(b)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes or Other Taxes covered by Section 3.01 and any Excluded Taxes); or

(c)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender that is not otherwise accounted for in the definition of "Eurodollar Rate" or this clause (c);

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan the interest on which is determined by reference to the Eurodollar Rate (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(1) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(2)     Capital Requirements. If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it, to a level below that which such Lender or such Lender's holding company, as the case may be, could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(2) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(3)     Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (1) or (2) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

Section 3.05     Funding Losses. Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits or margin) actually incurred by it as a result of:

(1)     any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(2)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurodollar Rate Loan on the date or in the amount notified by the Borrower; or

(3)     any assignment of a Eurodollar Rate Loan on a day prior to the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 3.07; including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or

reemployment of funds obtained by it to maintain such Eurodollar Rate Loan or from fees payable to terminate the deposits from which such funds were obtained.

Notwithstanding the foregoing, no Lender may make any demand under this Section 3.05 with respect to the "floor" specified in the proviso to the definition of "Eurodollar Rate".

Section 3.06     Matters Applicable to All Requests for Compensation.

(1)     Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

(2)     Suspension of Lender Obligations. If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurodollar Rate Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Eurodollar Rate Loans until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(3) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(3)     Conversion of Eurodollar Rate Loans. If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurodollar Rate Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders, as applicable, are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans to the extent necessary so that, after giving effect thereto, all Loans of a given Class held by the Lenders of such Class holding Eurodollar Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

(4)     Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of Sections 3.01 or 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of Section 3.01 or 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event giving rise to such claim and of such Lender's intention to claim compensation therefor (except that, if the circumstance giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.07     Replacement of Lenders under Certain Circumstances. If (1) any Lender requests compensation under Section 3.04 or ceases to make Eurodollar Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (2) the Borrower is required to pay any additional amount to any

Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or 3.04, (3) any Lender is a Non-Consenting Lender or Non-Extended Lender, (4) any Lender becomes a Defaulting Lender or (5) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent:

(a)    require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement (or, with respect to clause (3) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver, or amendment, as applicable) and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(i)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(iv);

(ii)    such Lender shall have received payment of an amount equal to the applicable outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05 and any Prepayment Premium, Make-whole Amount or other amounts due and payable pursuant to Section 2.18 that would otherwise be owed in connection therewith) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)    such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to all, or a portion, as applicable, of such Lender's Commitment and outstanding Loans and (ii) deliver any Term Notes evidencing such Loans to the Borrower (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Term Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Term Notes shall be deemed to be canceled upon such failure;

(iv)    the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans and Commitments, except with respect to indemnification and confidentiality provisions under this Agreement, which shall survive as to such assigning Lender;

(v)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(vi)    such assignment does not conflict with applicable Laws; and

(vii)    the Lender that acts as an Agent cannot be replaced in its capacity as such Agent other than in accordance with Section 9.11, or

(b)    terminate the Commitment of such Lender and in the case of a Lender, repay all Obligations of the Borrower owing to such Lender relating to the Loans held by such Lender as of such termination date (including any "prepayment premium" pursuant to Section 2.18 that would otherwise

be owed in connection therewith); *provided* that in the case of any such termination of the Commitment of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable consent, waiver or amendment of the Loan Documents and such termination shall, with respect to clause (3) above, be in respect of all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans/Commitments and (iii) the Required Lenders or Required Facility Lenders, as applicable, have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 3.08    <u>Survival</u>. All of the Borrower's obligations under this Article III shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

## ARTICLE IV

## Conditions Precedent to Term Borrowings

Section 4.01    <u>Conditions to Term Borrowings on Closing Date</u>. The obligation of each Lender to make the Closing Date Term Loans on the Closing Date is subject to satisfaction (or waiver by the Required Lenders) of the conditions set forth in Section 3 of the Second Amendment.

## ARTICLE V

## Representations and Warranties

The Borrower represents and warrants to the Agents and the Lenders, at the time of each Term Borrowing (solely to the extent required to be true and correct for such Term Borrowing pursuant to Article IV):

Section 5.01    <u>Existence, Qualification and Power; Compliance with Laws</u>. Each Loan Party and each of its respective Restricted Subsidiaries that is a Material Subsidiary:

(1)    is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction),

(2)    has all corporate or other organizational power and authority to (a) own or lease its assets and carry on its business as currently conducted and (b) in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party,

128

(3)      is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business as currently conducted requires such qualification,

(4)      is in compliance with all applicable Laws, orders, writs, injunctions and orders and

(5)      has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted;

except in each case referred to in the preceding clauses (2)(a), (3), (4) or (5), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.02      <u>Authorization; No Contravention</u>.

(1)      The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.

(2)      None of the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party will:

(a)    contravene the terms of any of such Person's Organizational Documents;

(b)    result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 7.01) under (i) any Contractual Obligation in excess of the Threshold Amount to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan party or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject; or

(c)    violate any applicable Law;

except with respect to any breach, contravention or violation (but not creation of Liens) referred to in the preceding clauses (b) and (c), to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.03      <u>Governmental Authorization</u>. No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for:

(1)      filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties,

(2)      the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and

(3)      those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.04      Binding Effect. This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party hereto or thereto, as applicable. Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05      Financial Statements; No Material Adverse Effect.

(1)      The (a) audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as of the fiscal year ended February 2, 2020, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the Borrower and its consolidated Subsidiaries for such fiscal year then ended, and (b) the unaudited quarterly balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries for the fiscal quarter ended October 31, 2020 (the "**Quarterly Financial Statements**"), in each case, fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the date(s) thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (i) except as otherwise expressly noted therein and (ii) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(2)      Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06      Litigation. Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

Section 5.07      Labor Matters. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (1) there are no strikes or other labor disputes against the Borrower or the Restricted Subsidiaries pending or, to the knowledge of the Borrower, overtly threatened in writing and (2) hours worked by and payment made based on hours worked to employees of each of the Borrower or the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

Section 5.08      Real Property Matters.

(1)      Each Loan Party and each of its respective Restricted Subsidiaries has good and valid record title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property and Space Leased Property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(2)      As of the Closing Date, Schedule 5.08(2) annexed hereto contains a true, accurate and complete list of all Owned Real Property.

(3)        As of the Closing Date, Schedule 5.08(3) annexed hereto contains a true, accurate and complete list of all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting any Leased Real Property, including reasonable detail as to lease term, extension options, rental obligations and the counterparties.  Except as specified in Schedule 5.08(3) annexed hereto, each agreement listed on Schedule 5.08(3) is in full force and effect and there is no default by any Loan Party or any Restricted Subsidiary thereunder.  No Loan Party or any Restricted Subsidiary has knowledge of any default by any other party thereto that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(4)        As of the Closing Date, Schedule 5.08(4) annexed hereto contains a true, accurate and complete list of all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting any Space Leased Property, including reasonable detail as to lease term, extension options, rental obligations and the counterparties.  Except as specified in Schedule 5.08(4) annexed hereto, each agreement listed on Schedule 5.08(4) is in full force and effect and there is no default by any Loan Party thereunder.  No Loan Party or any Restricted Subsidiary has knowledge of any default by any other party thereto that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party or each applicable or any Restricted Subsidiary, enforceable against such Loan Party or Restricted Subsidiary in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(5)        As of the Closing Date, other than as set forth on Schedule 5.08(5) annexed hereto, there are no pending condemnation, zoning or other land use proceedings or special assessment proceedings with respect to any Real Property or the use thereof, and no Loan Party or Restricted Subsidiary has received written notice from any Governmental Authority threatening any such proceeding.  No Loan Party or Restricted Subsidiary has entered into any agreements or commitments with Governmental Authorities that (i) materially affect the operations of or the entitlements applicable to such properties, (ii) require the owner of any such property to make improvements to such property or make dedications or off-site improvements for the benefit of adjoining properties, or (iii) make additional expenditures with respect to the operation of the Real Property.

(6)        Other than as forth on Schedule 5.08(6) annexed hereto, there is no construction or tenant improvement work currently underway at any Real Property or Space Leased Property having a total cost of more than $500,000.

(7)        Other than as forth on Schedule 5.08(7) annexed hereto, no Loan Party or Restricted Subsidiary has received written notice from any Governmental Authority asserting a violation of any Law with respect to any Real Property or Space Leased Property.

(8)        Other than as forth on Schedule 5.05(8) attached here, each Loan Party or Subsidiary that owns or leases any Real Property or Space Leased Property is current occupying and conducting business at such Real Property or Space Leased Property.

Section 5.09    Environmental Matters. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) each Loan Party and each of its Restricted Subsidiaries and their respective operations and properties is in compliance with all applicable Environmental Laws; (b) each Loan Party and each of its Restricted Subsidiaries has obtained and

maintained all Environmental Permits required to conduct their operations; (c) none of the Loan Parties or any of their respective Restricted Subsidiaries has become subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim in writing or Environmental Liability; and (d) none of the Loan Parties or any of their respective Restricted Subsidiaries or, to the knowledge of the Borrower, predecessors has treated, stored, transported or Released Hazardous Materials at or from any currently or formerly owned, leased or operated real estate or facility.

Section 5.10    Taxes. Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Loan Party and each of its Restricted Subsidiaries has timely filed all Tax returns and reports required to be filed, and have timely paid all Taxes (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets (whether or not shown in a Tax return), which are due and payable, except those Taxes which are being contested in good faith by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP.

There is no proposed Tax assessment, deficiency or other claim against any Loan Party or any of its Restricted Subsidiaries except (i) those being actively contested by a Loan Party or such Restricted Subsidiary in good faith and by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP or (ii) those which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 5.11    ERISA Compliance.

(1)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(2)    No ERISA Event has occurred or is reasonably expected to occur;

(a)   no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan;

(b)   none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan;

(c)   none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and

(d)   neither any Loan Party nor any ERISA Affiliate has been notified in writing by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent or has been determined to be in endangered or critical status and no such Multiemployer Plan is expected to be insolvent or in endangered or critical status,

except, with respect to each of the foregoing clauses of this Section 5.11(2), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(3)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, (a) each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules,

regulations and orders, and (b) none of Holdings, the Borrower or any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

Section 5.12     Subsidiaries.

(1)     As of the Closing Date, after giving effect to the Transactions all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable, and all Equity Interests owned by Holdings in the Borrower, and by the Borrower or any Subsidiary Guarantor in any of their respective Subsidiaries are owned free and clear of all Liens of any person except (a) those Liens created under the Collateral Documents, the "Collateral Documents" (as defined in the ABL Credit Agreement) and the "Collateral Documents" (as defined in the Second Lien Credit Agreement) and (b) any nonconsensual Lien that is permitted under Section 7.01.

(2)     As of the Closing Date, Schedule 5.12 sets forth:

(a)     the name and jurisdiction of each Subsidiary,

(b)     the ownership interests of Holdings in the Borrower and of the Borrower and any Subsidiary of the Borrower in each Subsidiary, including the percentage of such ownership, and

(c)     the Equity Interests of each Subsidiary described in clause (b) that are required to be pledged on the Closing Date after giving effect to the Transactions pursuant to the Collateral and Guarantee Requirement.

Section 5.13     Margin Regulations; Investment Company Act.

(a)     No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)     No Loan Party is an "investment company" under the Investment Company Act of 1940.

Section 5.14     Disclosure. None of the written information and written data heretofore or contemporaneously furnished in writing by or on behalf of the Borrower or any Subsidiary Guarantor to any Agent or any Lender on or prior to the Closing Date in connection with the Transactions, when taken as a whole, when furnished, contains any material misstatement of fact or omits to state any material fact necessary to make such written information and written data taken as a whole, in the light of the circumstances under which it was delivered, not materially misleading (after giving effect to all modifications and supplements to such written information and written data, in each case, furnished after the date on which such written information or such written data was originally delivered and prior to the Closing Date); it being understood that for purposes of this Section 5.14, such written information and written data shall not include any projections, *pro forma* financial information, financial estimates, forecasts and forward-looking information or information of a general economic or general industry nature.

Section 5.15     Intellectual Property; Licenses, etc.. The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, technology, software, know-how database rights and other intellectual property rights (collectively, "**IP Rights**") that to the knowledge of the Borrower are reasonably

necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any Subsidiary of the Borrower as currently conducted does not infringe upon, dilute, misappropriate or violate any IP Rights held by any Person except for such infringements, dilutions, misappropriations or violations, individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Subsidiary, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.16    Solvency. On the Closing Date after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act. To the extent applicable, Holdings, Borrower and the Restricted Subsidiaries are in compliance, in all material respects, with (i) the USA PATRIOT Act, (ii) the United States Foreign Corrupt Practices Act of 1977 (the "**FCPA**"), and (iii) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto. None of Holdings, Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer or employee of any of Holdings, the Borrower or any of the Restricted Subsidiaries, is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") ("**Sanctions**").  No proceeds of the Loans will be used by Holdings, the Borrower or any Restricted Subsidiary (a) directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business, or to obtain any improper advantage, in violation of the FCPA or (b) for the purpose of financing activities of or with any Person, that, at the time of such financing, is the subject of any Sanctions administered by OFAC.

Section 5.18    Collateral Documents. Except as otherwise contemplated hereby or under any other Loan Documents and subject to limitations set forth in the Collateral and Guarantee Requirement, the provisions of the Collateral Documents, together with such filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Collateral required to be delivered pursuant hereto or the applicable Collateral Documents), are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien (subject to Liens permitted by Section 7.01) with the priority set forth in the Applicable Intercreditor Agreement on all right, title and interest of the respective Loan Parties in the Collateral described therein.

Notwithstanding anything herein (including this Section 5.18) or in any other Loan Document to the contrary, no Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) any Excluded Assets.

Section 5.19    Use of Proceeds. The Borrower has used the proceeds of the Loans issued hereunder only in compliance with (and not in contravention of) each Loan Document.

Section 5.20    Beneficial Ownership Certification. As of the Closing Date, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

## ARTICLE VI

## Affirmative Covenants

From and after the Closing Date, so long as the Termination Conditions have not been satisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

Section 6.01    Financial Statements. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender each of the following:

(1)    as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or, with respect to the fiscal year of the Borrower ended January 30, 2021, one hundred and five (105) days after the end of such fiscal year), commencing with the fiscal year ending January 30, 2021, (I) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, together with related notes thereto and management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, setting forth in each case in comparative form the figures for the previous fiscal year, in reasonable detail and all prepared in accordance with GAAP, audited and accompanied by a report and opinion of any of the "big four" accounting firms or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Required Lenders, which report and opinion (a) will be prepared in accordance with generally accepted auditing standards and (b), other than with respect to the report and opinion for fiscal year ending January 30, 2021, will not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than such a qualification based solely on (i) an upcoming maturity of the Loans under this Agreement, the Second Lien Facility or the ABL Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant hereunder or under the ABL Credit Agreement) and (II) a report setting forth in reasonable detail the portion of revenues and gross margin for such fiscal year derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement);

(2)    as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower commencing with the fiscal quarter ending May 1, 2021, (I) a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (a) condensed consolidated statement of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (b) condensed consolidated statement of cash flows for the portion of the fiscal year then ended, setting forth, in each case of the preceding clauses (a) and (b), in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, accompanied by an Officer's Certificate stating that such financial statements fairly present in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes, together with management's discussion and analysis describing results of operations in the form customarily prepared by management

135

of the Borrower and (II) a report setting forth in reasonable detail the portion of revenues and gross margin for such fiscal quarter and the portion of the fiscal year then ended derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the corresponding fiscal quarter of the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement) and the corresponding portion of the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement);

(3)      within ninety (90) days after the end of each fiscal year of the Borrower (or 120 days after the end of the fiscal year during which the Closing Date occurs), (a) a consolidated budget for the following fiscal year on a quarterly basis as customarily prepared by management of the Borrower for its internal use (including any projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected operations or income, in each case, to the extent prepared by management of the Borrower and included in such consolidated budget) and (b) projections of the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, in each case, prepared on a quarterly basis, which projected financial statements shall be prepared in good faith on the basis of assumptions believed to be reasonable at the time of preparation of such projected financial statements (it being understood by the Secured Parties that any such projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and the Investors and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material);

(4)      simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(1) and 6.01(2), the related unaudited (it being understood that such information may be audited at the option of the Borrower) consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; and

Notwithstanding the foregoing, the obligations referred to in Sections 6.01(1) and 6.01(2) may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any Parent Company or (B) the Borrower's or such Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC (and the public filing of such report with the SEC shall constitute delivery under this Section 6.01); *provided* that with respect to each of the preceding clauses (A) and (B), (1) to the extent such information relates to a parent of the Borrower, if and so long as such Parent Company will have Independent Assets or Operations, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such Parent Company and its Independent Assets or Operations, on the one hand, and the information relating to the Borrower and the consolidated Restricted Subsidiaries on a stand-alone basis, on the other hand and (2) to the extent such information is in lieu of information required to be provided under Section 6.01(1) (it being understood that such information may be audited at the option of the Borrower), such materials are accompanied by a report and opinion of PricewaterhouseCoopers, LLP, KPMG LLP or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Required Lenders, which report and opinion (x) shall be prepared in accordance with generally accepted auditing standards and (y) shall not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than such a qualification based solely on (i) an upcoming maturity of the Loans under this Agreement, the Second Lien Facility or the ABL Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant hereunder).

Any financial statements required to be delivered pursuant to Sections 6.01(1) or 6.01(2) shall not be required to contain all purchase accounting adjustments relating to the Transactions or any other transaction(s) permitted hereunder to the extent it is not practicable to include any such adjustments in such financial statements.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP, or the respective interpretation thereof, and that such restatements will not result in a Default or an Event of Default under the Credit Documents.

Section 6.02    Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender:

(1)    no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(1) and (2), a duly completed Compliance Certificate signed by a Financial Officer of the Borrower;

(2)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(3)    promptly after the furnishing thereof, copies of any notices of default to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the Second Lien Facility and/or the ABL Facility, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount (in each case, other than in connection with any board observer rights) and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(4)    together with the delivery of the Compliance Certificate with respect to the financial statements referred to in Section 6.01(1), (a) a report setting forth the information required by Sections 1(a), (e) and (f) and Section 11 of the Perfection Certificate (or confirming that there has been no change in such information since the latter of the Closing Date or the last such report) and (b) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such list or a confirmation that there is no change in such information since the later of the Closing Date and the last such list;

(5)    commencing with the end of the first fiscal quarter ending after the Closing Date, concurrently with the delivery of the Compliance Certificate for each fiscal quarter, a certificate of a Responsible Officer stating the Average Liquidity in respect of such fiscal quarter, and setting forth computations in reasonable detail demonstrating compliance with the minimum average liquidity covenant under Section 7.12; and

(6)    promptly, such additional information regarding the business and financial affairs of any Loan Party or any Material Subsidiary that is a Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request in writing from time to time.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02(2) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's (or any Parent Company's) website on the Internet at the website address listed on Schedule 10.02 hereto (or as such address may be updated from time to time in accordance with Section 10.02); or (b) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (i) upon written request by the Administrative Agent, the Borrower will deliver paper copies of such documents to the Administrative Agent for further distribution by the Administrative Agent to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents or link and, upon the Administrative Agent's request, provide to the Administrative Agent by electronic mail electronic versions (i.e., pdf copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available to the Lenders materials or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks, DebtDomain, SyndTrak, ClearPar or another similar electronic system chosen by the Administrative Agent to be its electronic transmission system  (the "**Platform**") and (b) certain of the Lenders may have personnel who do not wish to receive any information with respect to the Borrower, its Subsidiaries or their respective securities that is not Public-Side Information, and who may be engaged in investment and other market-related activities with respect to such Person's securities. The Borrower hereby agrees that (i) at the Administrative Agent's request, all Borrower Materials that are to be made available to Public Lenders will be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" will appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower will be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public-Side Information (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they will be treated as set forth in Section 10.09); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information"; and (iv) the Administrative Agent will treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated as "Public Side Information." Notwithstanding the foregoing, (x) the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC" and (y) the following Communications shall be deemed "PUBLIC," unless the Borrower notifies the Administrative Agent promptly in writing that any such document contains material non-public information:  (1) the Loan Documents, and (2) notification of changes in the terms of the Loans.

Anything to the contrary notwithstanding, nothing in this Agreement will require Holdings, the Borrower or any Subsidiary to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.03     Notices. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent of:

(1)     the occurrence of any Default; and

138

(2)      (a) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (b) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or its Subsidiary, or (c) the occurrence of any ERISA Event that, in any such case referred to in clauses (a), (b) or (c) of this Section 6.03(2), has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (a) that such notice is being delivered pursuant to Section 6.03(1) or (2) (as applicable) and (b) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04      Payment of Obligations. Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (1) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (2) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 6.05      Preservation of Existence, etc..

(1)      Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(2)      take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, and IP Rights material to the conduct of its business,

except in the case of clauses (1) or (2) of this Section 6.05 to the extent (other than with respect to the preservation of the existence of the Borrower set forth in clause (1)) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or disposition permitted by Article VII.

Section 6.06      Maintenance of Properties. Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in reasonably good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

Section 6.07      Maintenance of Insurance.

(1)      Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed or with a Captive Insurance Subsidiary, insurance with respect to the Borrower's and the Restricted Subsidiaries' properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Collateral Agent or the Required Lenders, information presented in reasonable detail as to the insurance so carried; provided that notwithstanding the foregoing, in no event will the Borrower or any Restricted Subsidiary be required to obtain or maintain insurance that is more restrictive than what is consistent with past practice. Each such policy of insurance will as appropriate, (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear or (ii) in the case of each

139

casualty insurance policy, contain an additional loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the additional loss payee thereunder; *provided* that to the extent that the requirements of this Section 6.07 are not satisfied on the Closing Date, the Borrower may satisfy such requirements within ninety (90) days of the Closing Date (or such later date as the Required Lenders may agree).

(2)     If any improved portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws (each, a "**Flood Hazard Property**"), then the Borrower will, or will cause each Loan Party to (a) maintain, or cause to be maintained, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (b) deliver to the Collateral Agent (A) evidence as to whether the community in which such Mortgaged Property is located is participating in the National Flood Insurance Program, (B) the Borrower's written acknowledgment as to the fact that such Mortgaged Property is a Flood Hazard Property and as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (C) copies of an application for a flood insurance policy plus proof of premium payment, a declaration page confirming that such flood insurance has been issued, or such other evidence of such flood insurance reasonably satisfactory to the Collateral Agent and the Required Lenders and naming the Collateral Agent as mortgagee and loss payee (the requirements of clauses (a) and (b) being the "**Flood Insurance Requirements**").

Section 6.08     Compliance with Laws. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property (including ERISA, the USA PATRIOT Act, Sanctions, OFAC and FCPA), except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

Section 6.09     Books and Records. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.10     Inspection Rights. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public

140

accountants. For the avoidance of doubt, this Section 6.10 is subject to the last paragraph of Section 6.02. In no event shall the Administrative Agent be required to bear any cost or expense hereunder.

Section 6.11    <u>Covenant to Guarantee Obligations and Give Security</u>. At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent, the Collateral Agent or the Required Lenders to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(1)    (x) upon (i) the formation or acquisition of any new direct or indirect Material Domestic Subsidiary (other than any Excluded Subsidiary) by any Loan Party, (ii) the designation of any existing direct or indirect Material Domestic Subsidiary (other than any Excluded Subsidiary) as a Restricted Subsidiary, (iii) any Subsidiary (other than any Excluded Subsidiary) becoming a Material Domestic Subsidiary or (iv) an Excluded Subsidiary that is a Material Domestic Subsidiary ceasing to be an Excluded Subsidiary but continuing as a Restricted Subsidiary of the Borrower, (y) upon the acquisition of any assets by the Borrower or any Subsidiary Guarantor or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(a)    within sixty (60) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Required Lenders may agree in their reasonable discretion cause such Material Domestic Subsidiary required to become a Guarantor under the Collateral and Guarantee Requirement to execute the Guaranty (or a joinder thereto) and other documentation the Collateral Agent or the Required Lenders may reasonably request from time to time in order to carry out more effectively the purposes of the Guaranty and the Collateral Documents and

(A)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Subsidiary Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent supplements to the Security Agreement, a counterpart signature page to the Intercompany Subordination Agreement, Intellectual Property Security Agreements and other security agreements and documents necessary to satisfy the Collateral and Guarantee Requirement, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting and perfecting Liens required by the Collateral and Guarantee Requirement;

(B)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and a joinder to the Intercompany Subordination Agreement substantially in the form of Annex I thereto with respect to the intercompany Indebtedness held by such Material Domestic Subsidiary;

(C)    within sixty (60) days after such formation, acquisition or designation, take and cause (i) the applicable Material Domestic Subsidiary that is required to become

141

a Guarantor pursuant to the Collateral and Guarantee Requirement and (ii) to the extent applicable, each direct or indirect parent of such applicable Material Domestic Subsidiary, in each case, to take customary action(s) (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be necessary in the reasonable opinion of the Collateral Agent or the Required Lenders to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected (subject to Liens permitted by Section 7.01) Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law); and

(D)     within sixty (60) days after the reasonable request therefor by the Collateral Agent (or such longer period as the Required Lenders may agree in their reasonable discretion), deliver to the Administrative Agent a signed copy of a customary Opinion of Counsel, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Collateral Agent as to such matters set forth in this Section 6.11(1) as the Collateral Agent or the Required Lenders may reasonably request (with such opinion being consistent with the Opinion of Counsel delivered to the Collateral Agent on the Closing Date);

*provided* that actions relating to Liens on Real Property are governed by Section 6.11(2) and not this Section 6.11(1).

(2)     Real Property.

(a)     Notice.

(i)     Within sixty (60) days (or such longer period as the Required Lenders may agree in their reasonable discretion), after the formation, acquisition or designation of a Material Domestic Subsidiary that is required to become a Subsidiary Guarantor under the Collateral and Guarantee Requirement, the Borrower will, or will cause such Material Domestic Subsidiary to, furnish to the Collateral Agent a description of any Real Property owned or leased by such Material Domestic Subsidiary.

(ii)     Within sixty (60) days (or such longer period as the Required Lenders may agree in their reasonable discretion), after the acquisition of any Owned Real Property or Leased Real Property (other than any Excluded Asset(s)) by a Loan Party (other than Holdings), after the Closing Date, the Borrower will, or will cause such Loan Party to, furnish to the Collateral Agent a description of any such Owned Real Property or Leased Real Property.

(b)     Mortgages. The Borrower will, or will cause the applicable Loan Party to, provide the Collateral Agent with a Mortgage with respect to any Real Property acquired after the Closing Date, that is the subject of a notice delivered pursuant to Section 6.11(2)(a), within ninety (90) days of the acquisition, formation or designation of such Material Domestic Subsidiary or the acquisition of such Real Property (or such longer period as the Required Lenders may agree in their reasonable discretion), together with:

(i)     evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Collateral Agent or the Required Lenders may deem reasonably necessary or

142

desirable in order to create, except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, a valid and subsisting perfected Lien on such Real Property, in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Collateral Agent;

(ii)       In the case of a Leased Real Property, to the extent required by the terms of the Lease as a condition to any new Mortgage, Borrower shall use commercially reasonable efforts to obtain a Landlord Consent and Estoppel (for the avoidance of doubt, no Landlord Consent and Estoppel will be required for any Existing Mortgage, unless the terms of the applicable lease require the consent of the landlord or lessor with respect to the proposed Mortgage Amendment), unless otherwise waived by the Required Lenders in their reasonable discretion, such waiver not to be unreasonably withheld; provided that Collateral Agent shall, at the Borrower's expense and the Borrower's reasonable request, and if required by such lessor in order to obtain a Landlord Consent and Estoppel, deliver to such lessor a Recognition Agreement.  Notwithstanding the foregoing, where the consent or other affirmative action of the applicable landlord is required for Borrower or the applicable Subsidiary to deliver the Landlord Consent and Estoppel, and such consent cannot be obtained after the Borrower or the applicable Subsidiary's use of commercially reasonable efforts to do so (which commercially reasonable efforts, for the avoidance of doubt, shall not require the Borrower or applicable Subsidiary to amend or otherwise modify any of the existing terms or conditions of any agreement with any landlord or pay additional economics to any landlord), the delivery of the Landlord Consent and Estoppel by the Borrower shall automatically be deemed waived hereunder for such Leased Real Property, provided that Borrower shall provide Collateral Agent with notice within five (5) business days of Borrower's determination that a Landlord Consent and Estoppel cannot be obtained, as well as a reasonably detailed description of Borrower's efforts to obtain the Landlord Consent and Estoppel;

(iii)      fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in each applicable jurisdiction (the "**Mortgage Policies**") in form and substance, with endorsements, including zoning endorsements, available in the applicable jurisdiction and in amounts, reasonably acceptable to the Required Lenders (not to exceed the fair market value of the real properties or ground leasehold interests covered thereby), issued, coinsured and reinsured (as applicable) by title insurers reasonably acceptable to the Required Lenders, insuring the Mortgages to be valid subsisting Liens on the property or ground leasehold interests described therein, subject only to Liens permitted by Section 7.01 or such other Liens that do not have a material adverse impact on the use or value of the Mortgaged Properties, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Required Lenders may reasonably request and is available in the applicable jurisdiction and with respect to any property located in a state in which a zoning endorsement is not available, a zoning compliance letter from the applicable municipality or a zoning report from Planning and Zoning Resources Corporation (or other similar company reasonably acceptable to the Required Lenders), in each case to be reasonably satisfactory to the Required Lenders;

(iv)      customary Opinions of Counsel for the applicable Loan Parties in states in which such Real Properties are located with respect to the enforceability and perfection of the Mortgage(s) or the Mortgage Amendments, as applicable, and any related fixture filings, the authorization, execution and delivery of the Mortgages or the Mortgage Amendments, as applicable, and such other matters as the Collateral Agent or the Required Lenders may reasonably request, in form and substance reasonably satisfactory to the Collateral Agent;

143

(v)     American Land Title/American Congress on Surveying and Mapping surveys for each Real Property, or existing surveys together with customary no change affidavits, in each case certified to the Collateral Agent if deemed necessary by Collateral Agent or the Required Lenders in their reasonable discretion, sufficient for the title insurance company issuing a Mortgage Policy or any title date-down or modification endorsement with respect to the Existing Mortgages to remove the standard survey exception and issue standard survey related endorsements;

(vi)     a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Real Property, containing improved land addressed to the Collateral Agent and otherwise in compliance with the Flood Insurance Laws, and if any such Real Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, the Borrower's duly executed acknowledgement of special flood hazard area status and flood disaster assistance and evidence of compliance with the Flood Insurance Requirements; and

(vii)     as promptly as practicable after the reasonable request therefor by the Collateral Agent or the Required Lenders, environmental assessment reports and reliance letters (if any) that have been prepared in connection with such acquisition, designation or formation of any Material Domestic Subsidiary or acquisition of any Real Property, or in connection with the Real Property subject to the Mortgage.

(3)     _Additional Deposit Account Control Agreements_.  Following the termination of the ABL Facility and the ABL Intercreditor Agreement, the Borrower shall enter into, within 90 days after the establishment of any new deposit accounts that would be or could be required to be subject to an account control agreement pursuant to the terms of the ABL Credit Agreement if it were not terminated (which, for the avoidance of doubt, shall not include any Excluded Account, deposit account control agreements with each account bank in respect of such deposit accounts in form and substance reasonably satisfactory to the Collateral Agent.

Section 6.12     _Compliance with Environmental Laws_.

(1)     Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (1) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits (including any cleanup, removal or remedial obligations) and (2) obtain and renew all Environmental Permits required to conduct its operations or in connection with its properties.

(2)     The Borrower will, or will cause the applicable Loan Party to, deliver to the Collateral Agent:

(a)     As soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Borrower or any Loan Party or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Real Property which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or with respect to any Environmental Claims which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(b)     Promptly upon the occurrence thereof, written notice describing in reasonable detail (a) any Release required to be reported to any federal, state or local governmental or regulatory

144

agency under any applicable Environmental Laws, and (b) any remedial action taken by Borrower or any Loan Party or any other Person in response to (1) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(c)     As soon as practicable following the sending or receipt thereof by Borrower or any Loan Party, a copy of any and all written communications with respect to (a) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (b) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (c) any request for information from any governmental agency that suggests such agency is investigating whether Borrower or any Loan Party may be potentially responsible for any Hazardous Materials Activity.

(d)     Prompt written notice describing in reasonable detail (a) any proposed acquisition of stock, assets, or property by Borrower or any Loan Party that could reasonably be expected to (1) expose Borrower or any Loan Party to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (2) affect the ability of Borrower or any Loan Party to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (b) any proposed action to be taken by Borrower or any Loan Party to commence manufacturing or other industrial operations or to modify current operations in a manner that could reasonably be expected to subject Borrower or any Loan Party to any material additional obligations or requirements under any Environmental Laws that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     With reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent or the Required Lenders in relation to any matters disclosed pursuant to this subsection 6.12.

(3)     The Borrower will, or will cause the applicable Loan Party to:

(a)     Promptly undertake, and shall cause each of its Subsidiaries promptly to undertake, any and all investigations, studies, sampling, testing, abatement, cleanup, removal, remediation or other response actions necessary to remove, remediate, clean up or abate any Hazardous Materials Activity on, under or about any Real Property that is in violation of any Environmental Laws or that presents a material risk of giving rise to an Environmental Claim.  In the event by Borrower or any Loan Party undertakes any such action with respect to any Hazardous Materials, by Borrower or such Loan Party shall conduct and complete such action in compliance with all applicable Environmental Laws and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, Borrower's or such Loan Party's liability with respect to such Hazardous Materials Activity is being contested in good faith by Borrower or such Loan Party.

(b)     Promptly take any and all actions necessary to (1) cure any material violation of applicable Environmental Laws by Borrower or any Loan Party that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (2) make an appropriate response to any Environmental Claim against Borrower or any Loan Party and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

145

Section 6.13      Further Assurances and Post-Closing Covenant.

(1)      Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Borrower, promptly upon reasonable request from time to time by the Administrative Agent, the Collateral Agent or the Required Lenders or as may be required by applicable Laws (a) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, the Collateral Agent or the Required Lenders may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents and to satisfy the Collateral and Guarantee Requirement.

(2)      As promptly as practicable, and in any event no later than (x) sixty (60) days after the Closing Date with respect to any Owned Real Property that is not an Existing Mortgaged Property and (y) ninety (90) days after the Closing Date with respect to any Leased Real Property that is not an Existing Mortgaged Property (other than Existing Mortgaged Properties where the Administrative Agent or the Required Lenders have requested that a new Mortgage be executed), or, in each case, such later date as the Required Lenders reasonably agree to in writing, including to reasonably accommodate circumstances unforeseen on the Closing Date, deliver the documents or take the actions required pursuant to sub clauses (i) through (vii) of Section 6.11(2)(b) hereof, except to the extent otherwise agreed by the Required Lenders.

Section 6.14      Use of Proceeds.  The proceeds of the New Money First-Out Loans will be used on the Closing Date (a) to pay the Transaction Expenses, (b) to pay accrued and unpaid interest and amortization payments in respect of the Prepetition First Lien Term Loans and Prepetition Second Lien Term Loans that are converted into (and deemed prepaid by) the Closing Date Term Loans on the Closing Date and (c) for general corporate purposes not prohibited by the terms of this Agreement, including repayment of borrowings under the ABL Facility.

Section 6.15      Maintenance of Ratings. Use commercially reasonable efforts to maintain (1) a public corporate credit rating (but not any specific rating) from S&P and a public corporate family rating (but not any specific rating) from Moody's, in each case in respect of the Borrower, and (2) a public rating (but not any specific rating) in respect of each Term Facility as of the Closing Date from each of S&P and Moody's.

Section 6.16      Accounting Changes.   The Borrower shall, and shall cause its Restricted Subsidiaries to, maintain their fiscal year as in effect on the Closing Date; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.17      Nature of Business.  The Borrower shall and shall cause its Restricted Subsidiaries to, engage in material line of business substantially the same as those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business(es) or any other activities that are reasonably similar, ancillary, incidental, complimentary or related to, or a reasonable extension, development or expansion of, the business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries on the Closing Date.

Section 6.18    <u>Designation of Subsidiaries</u>.  On and after the Closing Date, the Borrower shall not designate any Restricted Subsidiaries as Unrestricted Subsidiaries or any Unrestricted Subsidiaries as Restricted Subsidiaries.

Section 6.19    <u>Lender Meetings</u>.  On a quarterly basis, at a time mutually agreed with the Administrative Agent that is promptly after the delivery of the information required pursuant to Section 6.01(1) and Section 6.01(2) (but no earlier than five (5) Business Days following the delivery of such financial statements), the Borrower (including, without limitation, the chief executive officer and chief financial officer of the Borrower) shall and shall cause its Restricted Subsidiaries to participate in a conference call with Lenders to discuss the financial position and results of operations of the Borrower and its Subsidiaries for the most recently ended period for which financial statements have been delivered.

## ARTICLE VII

## <u>Negative Covenants</u>

From and after the Closing Date and so long as the Termination Conditions are not satisfied:

Section 7.01    <u>Liens</u>. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien (except any Permitted Lien(s)) that secures obligations under any Indebtedness or any related guarantee of Indebtedness on any asset or property of the Borrower or any Restricted Subsidiary, or any income or profits therefrom.

The expansion of Liens by virtue of accretion or amortization of original issue discount, the payment of dividends in the form of Indebtedness, and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 7.01.

Section 7.02    <u>Indebtedness</u>.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(i)    create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "**incur**" and collectively, an "**incurrence**") with respect to any Indebtedness (including Acquired Indebtedness), or

(ii)    issue any shares of Disqualified Stock or permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; and

(b)    the foregoing clause (a) shall not apply to the following:

(1)    Indebtedness of the Borrower and of its Restricted Subsidiaries under the Loan Documents (including Refinancing Loans, Extended Loans and Replacement Loans);

(2)    Indebtedness incurred pursuant to the Second Lien Facility in an aggregate principal amount not to exceed the sum of (x) $125.0 million plus interest with respect thereto that is paid in-kind by increasing the outstanding principal amount thereof plus (y) other Second Lien Obligations not constituting principal and, in each case, together with any Refinancing Indebtedness in respect thereof;

(3)      the incurrence of Indebtedness by the Borrower and any Restricted Subsidiary in existence on the Closing Date listed on Schedule 7.02(3) (excluding Indebtedness described in the preceding clauses (1) and (2) and clause (25) below);

(4)      (a) the incurrence of Attributable Indebtedness and (b) Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock incurred or issued by the Borrower or any Restricted Subsidiary and Preferred Stock issued by any Restricted Subsidiary, to finance the purchase, lease, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or other assets, including assets that are used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate principal amount, together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts) and all other Indebtedness, Disqualified Stock or Preferred Stock incurred or issued and outstanding under this clause (4), without regard to any Indebtedness listed on Schedule 7.02(3), at such time not to exceed (x) the greater of $50.0 million and 10.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto and (y) the aggregate principal amount of Attributable Indebtedness and Indebtedness described in clause (b) above, in each case outstanding on the Closing Date and any Refinancing Indebtedness of the Indebtedness referred to in this clause (4) thereof;

(5)      Indebtedness incurred by the Borrower or any Restricted Subsidiary (a) constituting reimbursement obligations with respect to letters of credit, bank guarantees, banker's acceptances, warehouse receipts, or similar instruments issued or entered into, or relating to obligations or liabilities incurred, in the ordinary course of business or consistent with industry practice, including in respect of workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or (b) as an account party in respect of letters of credit, bank guarantees or similar instruments in favor of suppliers, trade creditors or other Persons issued or incurred in the ordinary course of business or consistent with industry practice;

(6)      [reserved];

(7)      the incurrence of Indebtedness of the Borrower to a Subsidiary Guarantor (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Subsidiary Guarantor); *provided* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Subsidiary Guarantor ceasing to be a Subsidiary Guarantor or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Subsidiary Guarantor or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (7);

(8)      the incurrence of Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Restricted Subsidiary) to the extent permitted by Section 7.05; *provided* that any such Indebtedness for borrowed money incurred by a Guarantor and owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Guaranty of the Loans of such Guarantor to the extent permitted by applicable law; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any such subsequent transfer of any such Indebtedness (except to the Borrower or a Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case,

148

to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (8);

(9)     [reserved];

(10)     the incurrence of Hedging Obligations in the ordinary course of business (excluding Hedging Obligations entered into for speculative purposes);

(11)     the incurrence of Indebtedness in respect of self-insurance and Indebtedness in respect of performance, bid, appeal and surety bonds and performance, banker's acceptance facilities and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary or Indebtedness in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with industry practice, including those incurred to secure health, safety and environmental obligations;

(12)     the incurrence of:

(a)     [reserved]

(b)     Indebtedness or Disqualified Stock of the Borrower and Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or any Subsidiary Guarantor in an aggregate principal amount or liquidation preference that, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred or issued, as applicable, pursuant to this clause (12)(b), together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts), does not exceed (i) $50.0 million *plus*, without duplication, (ii) in the event of any extension, replacement, refinancing, renewal or defeasance of any such Indebtedness or Disqualified Stock, an amount equal to the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness or Disqualified Stock and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness or the extension, replacement, refunding, refinancing, renewal or defeasance of such Indebtedness or Disqualified Stock;

(13)     the incurrence by the Borrower of Indebtedness or Disqualified Stock or the incurrence by a Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock that serves to Refinance any Indebtedness permitted under clause (3) above, this clause (13) and clauses (23), (29) and (30), or any successive Refinancing Indebtedness with respect to any of the foregoing;

(14)     [reserved];

(15)     the incurrence of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with industry practice;

(16)     the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary supported by letters of credit or bank guarantees permitted hereunder, in each case, in a principal amount not in excess of the stated amount of such letters of credit or bank guarantees;

(17)     (a) the incurrence of any guarantee by the Borrower or a Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations incurred by the Borrower or such Restricted Subsidiary is permitted by this Agreement, or (b) any co-issuance by the Borrower or any Restricted Subsidiary of any Indebtedness

or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations by the Borrower or such Restricted Subsidiary was permitted hereunder; provided that the incurrence of any such guarantee or co-issuance by a Loan Party of Indebtedness or other obligations of any Non-Loan Party shall be deemed to be an Investment made under the final proviso to clause (13) of the definition of "Permitted Investments" and shall be permitted to be incurred only to the extent of available capacity under such proviso at the time of such incurrence or co-issuance;

(18)    the incurrence of Indebtedness issued by the Borrower or any Restricted Subsidiary to future, present or former employees, directors, officers, members of management and consultants thereof, their respective Controlled Investment Affiliates or Immediate Family Members and permitted transferees thereof, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Company to the extent described in Section 7.05(b)(4);

(19)    customer deposits and advance payments received in the ordinary course of business or consistent with industry practice from customers for goods and services purchased in the ordinary course of business or consistent with industry practice;

(20)    the incurrence of (a) Indebtedness owed to banks and other financial institutions incurred in the ordinary course of business or consistent with industry practice in connection with ordinary banking arrangements to manage cash balances of the Borrower and its Restricted Subsidiaries and (b) Indebtedness in respect of Cash Management Services, including Cash Management Obligations;

(21)    Indebtedness incurred by the Borrower or any Restricted Subsidiary in connection with bankers' acceptances or discounted bills of exchange, in each case incurred or undertaken in the ordinary course of business or consistent with industry practice on arm's-length commercial terms;

(22)    the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business or consistent with industry practice;

(23)    the incurrence of Indebtedness or Disqualified Stock by Restricted Subsidiaries of the Borrower that are not Guarantors in an amount not to exceed and together with any other Indebtedness and Disqualified Stock incurred and outstanding under this clause (23) and any outstanding Indebtedness or Disqualified Stock under clause (13) to Refinance Indebtedness initially incurred in reliance on this clause (23) (excluding any Incremental Amounts) $15.0 million;

(24)    the incurrence of Indebtedness by the Borrower or any Restricted Subsidiary undertaken in connection with cash management (including netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and related or similar services or activities) with respect to the Borrower, any Subsidiaries or any joint venture in the ordinary course of business or consistent with industry practice, including with respect to financial accommodations of the type described in the definition of Cash Management Services;

(25)    Indebtedness incurred pursuant to the ABL Facility in an aggregate principal amount not to exceed the sum of (x) the greater of $900.0 million and the Borrowing Base (as defined in the ABL Facility in effect on the date hereof) plus (y) Incremental Revolving Credit Loans (as defined in the ABL Facility in effect on the date hereof) plus other ABL Obligations in effect on the date hereof not constituting principal and, in each case, together with any Refinancing Indebtedness in respect thereof; *provided* that the Indebtedness under this clause (25) shall not be permitted to contain or include any "last out" or similar tranche or facility nor shall it be permitted to include any term loan or similar Indebtedness;

(26)     guarantees incurred in the ordinary course of business or consistent with industry practice in respect of obligations to suppliers, customers, franchisees, lessors, licensees, sub-licensees and distribution partners;

(27)     the incurrence of Indebtedness attributable to (but not incurred to finance) the exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) with respect to the Transactions or any other acquisition (by merger, consolidation or amalgamation or otherwise) in accordance with the terms hereof;

(28)     the incurrence of Indebtedness representing deferred compensation to employees of any Parent Company, the Borrower or any Restricted Subsidiary, including Indebtedness consisting of obligations under deferred compensation or any other similar arrangements incurred in connection with the Transactions, any investment or any acquisition (by merger, consolidation or amalgamation or otherwise) permitted under this Agreement;

(29)     the incurrence of Indebtedness arising out of any Specified Sale-Leaseback Transaction to the extent such Indebtedness is not incurred in contemplation of such Specified Sale-Leaseback Transaction;

(30)     Permitted Debt Exchange Notes;

(31)     [reserved]; and

(32)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (1) through (31) above.

(c)     For purposes of determining compliance with this Section 7.02:

(1)     [reserved];

(2)     the Borrower is entitled to divide and classify (but, not, for the avoidance of doubt, reclassify) an item of Indebtedness, Disqualified Stock or Preferred Stock in more than one of the types of Indebtedness, Disqualified Stock or Preferred Stock described in Section 7.02(b), *provided* that all Indebtedness incurred under the Loan Documents, the Second Lien Facility and the ABL Facility, and in each case, all Refinancing Indebtedness in respect thereof, will, at all times, be treated as incurred under Section 7.02(b)(1), (2) and (25), respectively;

(3)     the principal amount of Indebtedness outstanding under any clause of this Section 7.02 will be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness;

(4)     [reserved]; and

(5)     guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that are otherwise included in the determination of a particular amount of Indebtedness will not be included in the determination of such amount of Indebtedness; *provided* that the incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was incurred in compliance with this Section 7.02.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock and increases in the amount of Indebtedness outstanding solely as a

result of fluctuations in the exchange rate of currencies, in each case, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 7.02. Any Indebtedness incurred to refinance Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to clauses (2), (3), (4), (12), (13), (23) and (25) of Section 7.02(b) will be permitted to include additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay accrued but unpaid interest and dividends and premiums, defeasance costs and fees and expenses incurred in connection with such refinancing.

For purposes of determining compliance with any Dollar denominated restriction on the incurrence of Indebtedness or issuance of Disqualified Stock or Preferred Stock, the Dollar equivalent principal amount of Indebtedness or Disqualified Stock or Preferred Stock denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness, Disqualified Stock or Preferred Stock was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness, Disqualified Stock or Preferred Stock is issued to Refinance other Indebtedness, Disqualified Stock or Preferred Stock denominated in a foreign currency, and such refinancing would cause the applicable Dollar denominated (or the applicable growth component with respect to such Basket, if greater) restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar denominated restriction will be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness, Disqualified Stock or Preferred Stock does not exceed (i) the principal amount of such Indebtedness, Disqualified Stock or Preferred Stock (as applicable) being refinanced *plus* (ii) the aggregate amount of accrued but unpaid interest, fees, underwriting discounts, defeasance costs, premiums (including tender premiums) and other costs and expenses (including OID, upfront fees or similar fees) incurred in connection with such refinancing.

The principal amount of any Indebtedness, Disqualified Stock or Preferred Stock incurred to refinance other Indebtedness, Disqualified Stock or Preferred Stock, if incurred in a different currency from the Indebtedness, Disqualified Stock or Preferred Stock, as applicable, being refinanced, will be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness or Disqualified Stock or Preferred Stock is denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date will be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.02, if any Indebtedness is refinanced in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Indebtedness does not exceed the sum of (i) the principal amount of such Indebtedness being refinanced, *plus* (ii) the related costs incurred or payable in connection with such refinancing.

Section 7.03   Fundamental Changes. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consolidate, amalgamate or merge with or into or wind up into another Person, or liquidate or dissolve or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), including by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division" under the Delaware Limited Liability Company Act, except that:

(1)     Subject to Section 3.03(a) of the Security Agreement, Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that

(a)     the Borrower shall be the continuing or surviving Person,

(b)     such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and

(c)     in the case of a merger or consolidation of Holdings with and into the Borrower,

(i)     Holdings shall not be an obligor in respect of any Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement,

(ii)     Holdings shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower,

(iii)     no Default or Event of Default exists at such time or after giving effect to such transaction and

(iv)     after giving effect to such transaction, the direct parent of the Borrower will (A) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower, (B) pledge 100% of the Equity Interests of the Borrower to the Collateral Agent as Collateral to secure the Obligations in form reasonably satisfactory to the Collateral Agent and the Borrower and (C) be in compliance with Section 7.09;

(2)     (a)     any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary that is not a Loan Party,

(b)     any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary that is a Loan Party; provided that a Loan Party shall be the continuing or surviving Person;

(c)     any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States will be permitted and

(d)     any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and the Restricted Subsidiaries and is not materially disadvantageous to the Lenders;

*provided* that in the case of clauses (b) through (d) of this Section 7.03(2), (x) no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom and (y) the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor shall be a Loan Party or such disposition shall otherwise be permitted under Section 7.05 or the definition of "Permitted Investments";

(3)      any Restricted Subsidiary may dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (x) the transferee must be a Loan Party or (y) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Restricted Subsidiary which is not a Loan Party in connection with any Investment permitted hereunder;

(4)      so long as no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom, the Borrower may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) the Borrower shall be the continuing or surviving corporation or (b) if the Person formed by or surviving any such merger or consolidation is not the Borrower (or, in connection with a disposition of all or substantially all of the Borrower's assets, is the transferee of such assets) (any such Person, a "**Successor Borrower**"):

(i)      the Successor Borrower will:

(A)      be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(B)      expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower; and

(C)      deliver to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this Section 7.03(4) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Administrative Agent;

(ii)      substantially contemporaneously with such transaction (or at a later date as agreed by the Required Lenders),

(A)      each Guarantor, unless it is the other party to such merger or consolidation, will by a supplement to the Guaranty (or in another form reasonably satisfactory to the Administrative Agent and the Borrower) reaffirm its Guaranty of the Obligations (including the Successor Borrower's obligations under this Agreement),

(B)      each Loan Party, unless it is the other party to such merger or consolidation, will, by a supplement to the Security Agreement (or in another form reasonably satisfactory to the Collateral Agent), confirm its grant or pledge thereunder,

(C)      if reasonably requested by the Collateral Agent or the Required Lenders, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, will, by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Collateral Agent and the Borrower), confirm that

its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement; and

(iii)     after giving *pro forma* effect to such incurrence, the Total Net Leverage Ratio as of the end of the most recently ended Test Period is no greater than 5.00:1.00; and

(iv)     the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Borrower required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided further* that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(5)     so long as no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom, Holdings may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) Holdings will be the continuing or surviving Person or (b) if:

(i)     the Person formed by or surviving any such merger or consolidation is not Holdings,

(ii)     Holdings is not the Person into which the applicable Person has been liquidated or

(iii)     in connection with a disposition of all or substantially all of Holdings' assets, the Person that is the transferee of such assets is not Holdings (any such Person described in the preceding clauses (i) through (iii), a "**Successor Holdings**"), then the Successor Holdings will:

(A)     be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia,

(B)     expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower, and

(C)     (I) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower and (II) pledge 100% of the Equity Interests of the Borrower to the Collateral Agent as Collateral to secure the Obligations in accordance with the Security Agreement or otherwise in form and substance reasonably satisfactory to the Collateral Agent and the Borrower; and

(iv)     the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Holdings required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

*provided further* that if the foregoing are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement;

(6)     any Restricted Subsidiary may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person in order to effect a Permitted Investment or other investment permitted pursuant to Section 7.05; *provided* that solely in the case of a merger or consolidation involving a Loan Party and subject to Section 1.07(8) in the case of a Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom; *provided further*, that the continuing or surviving Person will be (a) the Borrower or (b) a Loan Party, in each case, which together with each of its Restricted Subsidiaries, will have complied with the applicable requirements of Section 6.11;

(7)     a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a disposition permitted pursuant to Section 7.04 (other than under clause (2)(c) of the definition of "Asset Sale");

(8)     subject to Section 3.03(a) of the Security Agreement, the Borrower may (a) convert into a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of the Borrower or the laws of a jurisdiction in the United States and (b) change its name;

(9)     the Loan Parties and the Restricted Subsidiaries may consummate the Transactions; and

(10)    the commencement of any proceedings against any Restricted Subsidiary under Debtor Relief Laws to the extent it shall not constitute an Event of Default under Section 8.01(6).

Section 7.04     Asset Sales. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consummate any Asset Sale unless:

(1)     the Borrower or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise in connection with such Asset Sale) at least equal to the fair market value (measured at the time of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of, and

(2)     except in the case of a Permitted Asset Swap consummated in the ordinary course of business in an amount not to exceed $10.0 million, at least 75.0% of the consideration for such Asset Sale, together with all other Asset Sales since the Closing Date (on a cumulative basis), received by the Borrower or a Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that each of the following will be deemed to be cash or Cash Equivalents for purposes of this clause (2);

(a)     any liabilities (as shown on the Borrower's or any Restricted Subsidiary's most recent balance sheet or in the footnotes thereto or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or a Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet, as determined in good faith by the Borrower) of the Borrower or any Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Obligations, that are (i) assumed by the transferee of any such assets (or a third party in connection with such transfer) or (ii) otherwise cancelled or terminated in connection with the transaction with such transferee (other than intercompany debt owed to the Borrower or a Restricted Subsidiary);

(b)     any securities, notes or other obligations or assets received by the Borrower or any Restricted Subsidiary from such transferee or in connection with such Asset Sale (including earnouts and similar obligations) that are converted by the Borrower or a Restricted Subsidiary into cash or Cash

Equivalents, or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of such Asset Sale;

      (c)   [reserved]; or

      (d)   Indebtedness of any Restricted Subsidiary that ceases to be a Restricted Subsidiary as a result of such Asset Sale (other than intercompany debt owed to the Borrower or a Restricted Subsidiary), to the extent that the Borrower and each other Restricted Subsidiary are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Asset Sale; and

      (3)   the Net Proceeds of such Asset Sale shall be applied and/or reinvested as (and to the extent) required by Sections 2.05(2)(b) and 2.05(2)(f).

To the extent any Collateral is disposed of as expressly permitted by this Section 7.04 to any Person other than a Loan Party, such Collateral shall automatically be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such disposition is permitted by this Agreement, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

In addition, none of the Borrower or any Restricted Subsidiary shall enter into any Specified Sale-Leaseback Transaction unless such Specified Sale-Leaseback Transaction is conducted as an arm's-length basis and is for fair market value of the applicable property as determined by a Responsible Officer of the Borrower in good faith.

Section 7.05   Restricted Payments. (a)      The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

      (A)   declare or pay any dividend or make any payment or distribution on account of the Borrower's or any Restricted Subsidiary's Equity Interests (in each case, solely in such Person's capacity as holder of such Equity Interests), including any dividend or distribution payable in connection with any merger, amalgamation or consolidation, other than:

      (1)   dividends, payments or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or a Parent Company or in options, warrants or other rights to purchase such Equity Interests; or

      (2)   dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a wholly owned Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend, payment or distribution in accordance with its Equity Interests in such class or series of securities or such other amount to which it is entitled pursuant to the terms of such Equity Interest;

      (B)   purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Borrower or any Parent Company, including in connection with any merger, amalgamation or consolidation, in each case held by Persons other than the Borrower or a Restricted Subsidiary;

(C)      make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment or final maturity, any Subordinated Indebtedness, any Indebtedness secured on a junior lien basis to the Obligations (including the Second Lien Loans) or any unsecured Indebtedness for borrowed money (other than any intercompany Indebtedness among the Borrower and its Restricted Subsidiaries), but excluding, for the avoidance of doubt, any Second-Out Loans, in each case in excess of $5.0 million (collectively, "**Junior Debt**"), other than:

(i)      Indebtedness permitted under clauses (7) and (8) of Section 7.02(b); or

(ii)      the Transactions;

(D)      make any Restricted Investment;

(all such payments and other actions set forth in clauses (A) through (D) above being collectively referred to as "**Restricted Payments**");

(b)      The provisions of Section 7.05(a) will not prohibit:

(1)      the payment of any dividend or other distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or other distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or other distribution or redemption payment would have complied with the provisions of this Section 7.05;

(2)      the redemption, repurchase, defeasance, discharge, retirement or other acquisition of (i) any Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company, including any accrued and unpaid dividends thereon ("**Treasury Capital Stock**") or (ii) Junior Debt, in each case, made (x) in exchange for, or out of the proceeds of, a sale or issuance (other than to a Restricted Subsidiary) of Equity Interests of the Borrower or any Parent Company (to the extent such Equity Interests or proceeds therefrom are contributed to the Borrower) (in each case, other than Disqualified Stock) and (y) within 120 days of such sale or issuance ("**Refunding Capital Stock**"),

(a)      the declaration and payment of dividends on Treasury Capital Stock out of the proceeds of a sale or issuance (other than to a Restricted Subsidiary of the Borrower or to an employee stock ownership plan or any trust established by the Borrower or any Restricted Subsidiary) of Refunding Capital Stock made within 120 days of such sale or issuance, and

(b)      [reserved];

(3)      the principal payment on, defeasance, redemption, repurchase, exchange or other acquisition or retirement of:

(a)      Junior Debt of the Borrower or a Subsidiary Guarantor made (i) by exchange for, or out of the proceeds of the sale, issuance or incurrence of, new Junior Debt of the Borrower or a Subsidiary Guarantor or Disqualified Stock of the Borrower or a Subsidiary Guarantor and (ii) within 120 days of such sale, issuance or incurrence;

*provided* such new Junior Debt shall mature no earlier, and not have a shorter weighted average life, than the Junior Debt being refinanced or exchanged,

(b)     Disqualified Stock of the Borrower or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale, issuance or incurrence of Disqualified Stock or Junior Debt of the Borrower or a Subsidiary Guarantor, made within 120 days of such sale, issuance or incurrence,

(c)     Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale or issuance of, Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor, made within 120 days of such sale or issuance that, in each case, is Refinancing Indebtedness incurred or issued, as applicable, in compliance with Section 7.02 and

(d)     any Junior Debt or Disqualified Stock that constitutes Acquired Indebtedness;

(4)     a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) (including related stock appreciation rights or similar securities) of the Borrower or any Parent Company held by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, or any equity subscription or equity holder agreement (including, for the avoidance of doubt, any principal and interest payable on any notes issued by the Borrower or any Parent Company in connection with any such repurchase, retirement or other acquisition), including any Equity Interests rolled over by management of the Borrower, any of its Subsidiaries or any Parent Company in connection with the Transactions; *provided* that the aggregate amount of Restricted Payments made under this clause (4) does not exceed $10.0 million in any fiscal year (increasing to $20.0 million following an underwritten public Equity Offering by the Borrower or any Parent Company) with unused amounts in any calendar year being carried over to the next two succeeding calendar years; *provided further* that each of the amounts in any calendar year under this clause (4) may be increased by an amount not to exceed:

(a)     the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Borrower and, to the extent contributed to the Borrower, the cash proceeds from the sale of Equity Interests of any Parent Company, in each case to any future, present or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to make a Restricted Payment with the Available Amount; *plus*

(b)     the amount of any cash bonuses otherwise payable to members of management, employees, directors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that are foregone in exchange for the receipt of Equity Interests of the Borrower or any Parent Company

159

pursuant to any compensation arrangement, including any deferred compensation plan; *plus*

(c)      the cash proceeds of life insurance policies received by the Borrower or its Restricted Subsidiaries (or by any Parent Company to the extent contributed to the Borrower) after the Closing Date; *minus*

(d)      the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a), (b) and (c) of this clause (4);

*provided* that the Borrower may elect to apply all or any portion of the aggregate increase contemplated by clauses (a), (b) and (c) above in any calendar year; *provided further* that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from any future, present or former employees, directors, officers, members of management, or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary in connection with a repurchase of Equity Interests of the Borrower or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.05 or any other provision of this Agreement;

(5)      [Reserved];

(6)      [Reserved];

(7)      payments made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any Restricted Subsidiary or any Parent Company,

(a)      any repurchases or withholdings of Equity Interests in connection with the exercise of stock options, warrants or similar rights if such Equity Interests represent a portion of the exercise of, or withholding obligations with respect to, such options, warrants or similar rights or required withholding or similar taxes and

(b)      loans or advances to officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Restricted Subsidiary or any Parent Company in connection with such Person's purchase of Equity Interests of the Borrower or any Parent Company; *provided* that no cash is actually advanced pursuant to this clause (c) other than to pay taxes due in connection with such purchase, unless immediately repaid;

(8)      [reserved];

(9)      [reserved];

(10)      Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (10) not to exceed the sum of (X) [reserved] plus (Y) additional Restricted Payments made with the Available Amount; *provided* that if this clause (10) is utilized to make a Restricted Investment, the amount deemed to be utilized under this clause (10) will be the amount of such Restricted Investment at any time outstanding (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent

160

changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided further* that (other than in the case of Restricted Investments made with clause (3) of the definition of Available Amount) no Event of Default shall have occurred and be continuing or would result therefrom; and *provided further* that Restricted Payments made with clause (2) of the definition of Available Amount shall only be permitted to the extent that after giving *pro forma* effect thereto and the application of the net proceeds therefrom, the Total Net Leverage Ratio for the Test Period immediately preceding such Restricted Payment would be no greater than 2.50 to 1.00;

(11)     distributions or payments of Securitization Fees;

(12)     any Restricted Payment made in connection with the Transactions and the fees and expenses related thereto or owed to any Affiliate(s) including any payments to holders of Equity Interests of Belk in connection with, or as a result of, their exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) related to the Transactions;

(13)     [reserved];

(14)     the declaration and payment of dividends or distributions by the Borrower or any Restricted Subsidiary to, or the making of loans or advances to, the Borrower or any Parent Company in amounts required for any Parent Company to pay in each case without duplication:

(a)     franchise, excise and similar taxes and other fees, taxes and expenses required to maintain their corporate or other legal existence;

(b)     for any taxable period for which the Borrower or any of its Restricted Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for U.S. federal or applicable foreign, state or local income tax purposes of which a Parent Company is the common parent (a "**Tax Group**"), to pay the portion of any U.S. federal, foreign, state and local income taxes of such Tax Group for such taxable period that are attributable to the taxable income of the Borrower and its Restricted Subsidiaries and Unrestricted Subsidiaries (net of any payments of such taxes made by the Borrower); *provided* that for each taxable period, (A) the amount of such payments made in respect of such taxable period in the aggregate will not exceed the amount that the Borrower and its Subsidiaries, as applicable, would have been required to pay as stand-alone taxpayers or a stand-alone Tax Group and (B) the amount of such payments made in respect of an Unrestricted Subsidiary will be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary for such purpose;

(c)     salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, employees, directors, officers, members of management and consultants of any Parent Company, and any payroll, social security or similar taxes thereof;

(d)     general corporate or other operating, administrative, compliance and overhead costs and expenses (including expenses relating to auditing and other accounting matters) of any Parent Company attributable to the ownership of the Borrower and its Restricted Subsidiaries;

161

(e)      fees and expenses (including ongoing compliance costs and listing expenses) related to any equity or debt offering of a Parent Company (whether or not consummated);

(f)      amounts that would be permitted to be paid directly by the Borrower or its Restricted Subsidiaries under Section 7.06(b) (other than clause 2(a) thereof);

(g)      [reserved];

(h)      [reserved];

(15)      [reserved];

(16)      cash payments, or loans, advances, dividends or distributions to any Parent Company to make payments, in lieu of issuing fractional shares in connection with share dividends, share splits, reverse share splits, mergers, consolidations, amalgamations or other business combinations and in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company;

(17)      [reserved];

(18)      making payments for the benefit of the Borrower or any Restricted Subsidiary to the extent such payments could have been made by the Borrower or any Restricted Subsidiary because such payments (a) would not otherwise be Restricted Payments and (b) would be permitted by Section 7.06; and

(19)      payments and distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries taken as a whole that complies with the terms of this Agreement or any other transaction that complies with the terms of this Agreement;

*provided* that for purposes of clauses (7) and (14) above, taxes will include all interest and penalties with respect thereto and all additions thereto.

(c)      Notwithstanding anything to the contrary in this Section 7.05, no Investment shall be made in any Unrestricted Subsidiary after the Closing Date.

The amount of all Restricted Payments (other than cash) will be the fair market value on the date the Restricted Payment is made, or at the Borrower's election, the date a commitment is made to make such Restricted Payment, of the assets or securities proposed to be transferred or issued by the Borrower or any Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

For the avoidance of doubt, this Section 7.05 will not restrict the making of any AHYDO Payment with respect to, and required by the terms of, any Indebtedness of the Borrower or any Restricted Subsidiary permitted to be incurred under this Agreement.

Section 7.06    Transactions with Affiliates.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "**Affiliate Transaction**") involving aggregate payments or consideration in excess of $2.0 million, unless (A) such Affiliate Transaction is on terms, taken as a whole, that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained at such time in a comparable transaction by the Borrower or such Restricted Subsidiary with a Person other than an Affiliate of the Borrower on an arm's-length basis or, if in the good faith judgment of the Board of Directors no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to the Borrower or such Restricted Subsidiary from a financial point of view, and (B) the Borrower delivers to the Administrative Agent with respect to any Affiliate Transaction or series of related Affiliate Transactions requiring aggregate payments or consideration in excess of $15.0 million, a resolution adopted by the majority of the Board of Directors approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (A) above.

(b)    The foregoing restriction will not apply to the following:

(1)    (a) transactions between or among the Borrower and one or more Restricted Subsidiaries or between or among Restricted Subsidiaries or, in any case, any entity that becomes a Restricted Subsidiary as a result of such transaction and (b) any merger, consolidation or amalgamation of the Borrower and any Parent Company; *provided* that such merger, consolidation or amalgamation of the Borrower is otherwise in compliance with the terms of this Agreement and effected for a *bona fide* business purpose;

(2)    (a) Restricted Payments permitted by Section 7.05 (including any transaction specifically excluded from the definition of the term "Restricted Payments," including pursuant to the exceptions contained in the definition thereof and the parenthetical exclusions of such definition) and (b) any Permitted Investment(s) or any acquisition otherwise permitted hereunder;

(3)    so long as no Event of Default shall have occurred and be continuing or would result therefrom, the payment of management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses pursuant to the Management Services Agreement (including any unpaid management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses accrued in any prior year) and any termination fees pursuant to the Management Services Agreement, or any amendment thereto or replacement thereof so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders when taken as a whole, as compared to the Management Services Agreement as in effect on the Closing Date,

(a)    the payment of indemnification and similar amounts to, and reimbursement of expenses to, the Investors and its officers, directors, employees and Affiliates, in each case, approved by, or pursuant to arrangements approved by, the Board of Directors,

(b)  payments, loans, advances or guarantees (or cancellation of loans, advances or guarantees) to future, present or former employees, officers, directors, managers, consultants or independent contractors or guarantees in respect thereof for bona fide business purposes or in the ordinary course of business or consistent with industry practice,

(c)  any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company and

(d)  any payment of compensation or other employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company;

(4)  the payment of fees and compensation paid to, and indemnities and reimbursements and employment and severance arrangements provided to, or on behalf of or for the benefit of, present, future or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary;

(5)  [reserved];

(6)  the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any agreement as in effect as of the Closing Date, or any amendment thereto or replacement thereof (so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the applicable agreement as in effect on the Closing Date);

(7)  the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any equity holders agreement or the equivalent (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Closing Date and any amendment thereto and, similar agreements or arrangements that it may enter into thereafter; *provided* that the existence of, or the performance by the Borrower or any Restricted Subsidiary of obligations under any future amendment to any such existing agreement or arrangement or under any similar agreement or arrangement entered into after the Closing Date will be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement or arrangement are not otherwise materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the original agreement or arrangement in effect on the Closing Date;

(8)  the Transactions and the payment of all fees and expenses related to the Transactions, including Transaction Expenses;

(9)     transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business or consistent with industry practice and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10)    the issuance, sale or transfer of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company to any Person and the granting and performing of customary rights (including registration rights) in connection therewith, and any contribution to the capital of the Borrower;

(11)    sales of accounts receivable, or participations therein, or Securitization Assets or related assets in connection with any Qualified Securitization Facility and any other transaction effected in connection with a Qualified Securitization Facility or a financing related thereto and sales and/or other transactions of property in connection with Specified Sale-Leaseback Transactions;

(12)    [reserved];

(13)    payments with respect to Indebtedness, Disqualified Stock and other Equity Interests (and cancellation of any thereof) of the Borrower, any Parent Company and any Restricted Subsidiary and Preferred Stock (and cancellation of any thereof) of any Restricted Subsidiary to any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any equity subscription or equity holder agreement that are, in each case, approved by the Borrower in good faith; and any employment agreements, severance arrangements, stock option plans and other compensatory arrangements (and any successor plans thereto) and any supplemental executive retirement benefit plans or arrangements with any such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) that are, in each case, approved by the Borrower in good faith;

(14)    (a) investments by Affiliates in securities of the Borrower (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Borrower or such Restricted Subsidiary generally to other investors on the same or more favorable terms and (b) payments to Affiliates in respect of securities of the Borrower or any Restricted Subsidiary contemplated in the foregoing subclause (a) or that were acquired from Persons other than the Borrower and the Restricted Subsidiaries, in each case, in accordance with the terms of such securities;

(15)     payments to or from, and transactions with, any joint venture or Unrestricted Subsidiary in the ordinary course of business or consistent with past practice, industry practice or industry norms (including, any cash management activities related thereto);

(16)     payments by the Borrower (and any Parent Company) and its Subsidiaries pursuant to tax sharing agreements among the Borrower (and any Parent Company) and its Subsidiaries; *provided* that in each case the amount of such payments in any taxable year does not exceed the amount that the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amount received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such taxable year were the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any such Parent Company;

(17)     any lease entered into between the Borrower or any Restricted Subsidiary, as lessee and any Affiliate of the Borrower, as lessor, and any transaction(s) pursuant to that lease, which lease is approved by the Board of Directors or senior management of the Borrower in good faith;

(18)     IP Rights licenses in the ordinary course of business or consistent with industry practice;

(19)     the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to equity holders of the Borrower or any Parent Company pursuant to the equity holders agreement or the registration rights agreement entered into on or after the Closing Date;

(20)     transactions permitted by, and complying with, Section 7.03 solely for the purpose of (a) reorganizing to facilitate any initial public offering of securities of the Borrower or any Parent Company, (b) forming a holding company or (c) reincorporating the Borrower in a new jurisdiction;

(21)     transactions undertaken in good faith (as determined by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate) for the purposes of improving the consolidated tax efficiency of the Borrower and its Restricted Subsidiaries and not for the purpose of circumventing Articles VI and VII of this Agreement; so long as such transactions, when taken as a whole, do not result in a material adverse effect on the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, when taken as a whole, in each case, as determined in good faith by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate;

(22)     (a) transactions with a Person that is an Affiliate of the Borrower (other than an Unrestricted Subsidiary) solely because the Borrower or any Restricted Subsidiary owns, directly or indirectly, Equity Interests in such Person and (b) transactions with any Person that is an Affiliate solely because a director or officer of such Person is a director or officer of the Borrower, any Restricted Subsidiary or any Parent Company;

166

(23)    (a) pledges and other transfers of Equity Interests in Unrestricted Subsidiaries and (b) any transactions with an Affiliate in which the consideration paid consists solely of Equity Interests of the Borrower or a Parent Company;

(24)    the sale, issuance or transfer of Equity Interests (other than Disqualified Stock) of the Borrower;

(25)    investments by any Investor or Parent Company in securities of the Borrower; and

(26)    payments in respect of (a) the Obligations (or any Credit Agreement Refinancing Indebtedness) or (b) other Indebtedness of the Borrower and its Subsidiaries held by Affiliates; *provided* that such Obligations were acquired by an Affiliate of the Borrower in compliance herewith.

Section 7.07    Burdensome Agreements.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to, directly or indirectly, create or otherwise cause to exist or become effective any consensual encumbrance or consensual restriction (other than this Agreement or any other Loan Document) on the ability of any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to:

(1)    pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(a)    pay any Indebtedness owed to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(2)    make loans or advances to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(3)    sell, lease or transfer any of its properties or assets to the Borrower or to any Restricted Subsidiary that is a Guarantor; or

(4)    with respect to the Borrower or any Subsidiary Guarantor, (a) Guaranty the Obligations or (b) create, incur or cause to exist or become effective Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents to the extent such Lien is required to be given to the Secured Parties pursuant to the Loan Documents;

*provided* that any dividend or liquidation priority between or among classes or series of Capital Stock, and the subordination of any Obligation (including the application of any remedy bars thereto) to any other Obligation will not be deemed to constitute such an encumbrance or restriction.

(b)    Section 7.07(a) will not apply to any encumbrances or restrictions existing under or by reason of:

(a)     encumbrances or restrictions in effect on the Closing Date, including pursuant to the Loan Documents and any Hedge Agreements, Hedging Obligations and the related documentation and any definitive documentation in respect of the Indebtedness set forth on Schedule 7.02(b)(3);

(b)     the Second Lien Loan Documents and the ABL Loan Documents;

(c)     Purchase Money Obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) above on the property so acquired;

(d)     applicable Law or any applicable rule, regulation or order;

(e)     any agreement or other instrument of a Person, or relating to Indebtedness or Equity Interests of a Person, acquired by or merged, amalgamated or consolidated with and into the Borrower or any Restricted Subsidiary, or any other transaction entered into in connection with any such acquisition, merger, consolidation or amalgamation in existence at the time of such acquisition or at the time it merges, amalgamates or consolidates with or into the Borrower or any Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person so acquired and its Subsidiaries, or the property or assets of the Person so acquired or designated and its Subsidiaries or the property or assets so acquired or designated;

(f)     contracts or agreements for the sale or disposition of assets, including any restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(g)     restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business or consistent with industry practice or arising in connection with any Liens permitted by Section 7.01;

(h)     Indebtedness, Disqualified Stock or Preferred Stock of Restricted Subsidiaries that are not Guarantors permitted to be incurred subsequent to the Closing Date pursuant to Section 7.02;

(i)     provisions in joint venture agreements and other similar agreements (including equity holder agreements) relating to such joint venture or its members or entered into in the ordinary course of business or consistent with industry practice;

(j)     customary provisions contained in leases, sub-leases, licenses, sub-licenses, Equity Interests or similar agreements, including with respect to IP Rights and other agreements;

(k)     restrictions created in connection with any Qualified Securitization Facility that, in the good faith determination of the Board of Directors of the Borrower, are necessary or advisable to effect such Qualified Securitization Facility;

(l)     restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale or other agreement to which the Borrower or any Restricted Subsidiary is a party entered into in the ordinary course of business or consistent with industry practice; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are the subject to such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of another Restricted Subsidiary;

(m)     customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Restricted Subsidiary;

(n)     customary provisions restricting assignment of any agreement;

(o)     restrictions arising in connection with cash or other deposits permitted under Section 7.01; any other agreement or instrument governing any Indebtedness, Disqualified Stock, or Preferred Stock permitted to be incurred or issued pursuant to Section 7.02 entered into after the Closing Date that contains encumbrances and restrictions that either (i) are no more restrictive in any material respect, taken as a whole, with respect to any Restricted Subsidiary than (A) the restrictions contained in the Loan Documents as of the Closing Date or the ABL Loan Documents as of the Closing Date or (B) those encumbrances and other restrictions that are in effect on the Closing Date with respect to that Restricted Subsidiary pursuant to agreements in effect on the Closing Date, (ii) are not materially more disadvantageous, taken as a whole, to the Lenders than is customary in comparable financings for similarly situated issuers or (iii) will not materially impair the Borrower's ability to make payments on the Obligations when due, in each case in the good faith judgment of the Borrower;

(p)     (i) Indebtedness permitted to be incurred pursuant to Section 7.02(b)(4) and any Refinancing Indebtedness in respect of the foregoing and (ii) agreements entered into in connection with any Specified Sale-Leaseback Transaction or any Sale-Leaseback Transaction entered into in the ordinary course of business or consistent with industry practice;

(q)      customary restrictions and conditions contained in documents relating to any Lien so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 7.07;

(r)      [reserved];

(s)      any encumbrances or restrictions of the type referred to in clauses (1), (2) or (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (r) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive in any material respect with respect to such encumbrance and other restrictions, taken as a whole, than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(t)      existing under, by reason of or with respect to Refinancing Indebtedness; *provided* that the encumbrances and restrictions contained in the agreements governing that Refinancing Indebtedness are, in the good faith judgment of the Borrower, not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced; and

(u)      applicable law or any applicable rule, regulation or order in any jurisdiction where Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred pursuant to Section 7.02 is incurred.

Section 7.08      <u>Modification of Terms of Subordinated Indebtedness</u>. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, amend, modify or change in any manner materially adverse to the interests of the Lenders, as determined in good faith by the Borrower (on the basis of such proposed amendments, modifications or changes taken as a whole), any term or condition of any Subordinated Indebtedness having an aggregate outstanding principal amount greater than the Threshold Amount (other than as a result of any Refinancing Indebtedness in respect thereof) without the consent of the Required Lenders (which consent shall not be unreasonably withheld or delayed); *provided*, *however*, that no amendment, modification or change of any term or condition of any Subordinated Indebtedness permitted by any subordination provisions set forth in the applicable Subordinated Indebtedness or any other stand-alone subordination agreement in respect thereof and, in each case consented to by the Required Lenders shall be deemed to be materially adverse to the interests of the Lenders.

Section 7.09      <u>Holdings</u>. Holdings will not conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto):

(1)      the ownership or acquisition of the Capital Stock (other than Disqualified Stock) of any other Successor Holdings or the Borrower,

(2)      the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance,

(3)      to the extent applicable, participating in tax, accounting and other administrative matters as a member of the combined group of Holdings and the Borrower,

(4)      the performance of its obligations under and in connection with, and payments with respect to, the Loan Documents, the ABL Loan Documents, the Second Lien Loan Documents and related documentation in respect of the foregoing and any documents relating to other Indebtedness permitted under Section 7.02 (including, for the avoidance of doubt, the incurrence of Qualified Holding Company Debt),

(5)      any public offering of its common stock or any other issuance or registration of its Capital Stock for sale or resale not prohibited by this Article VII, including the costs, fees and expenses related thereto,

(6)      repurchases of Indebtedness through open market purchases and Dutch auctions (in the case of Loans, to the extent permitted hereunder),

(7)      the incurrence of Qualified Holding Company Debt,

(8)      any transaction that Holdings is permitted to enter into or consummate under this Article VII and any transaction between or among Holdings and the Borrower or any one or more Restricted Subsidiaries permitted under this Article VII, including:

(a)   making any payment(s) or Restricted Payment(s) (i) to the extent otherwise permitted under this Section 7.09 and (ii) with any amounts received pursuant to transactions permitted under Section 7.05 (or the making of a loan to any Parent Company in lieu of any such payment(s) or Restricted Payment(s)) or holding any cash received in connection therewith pending application thereof by Holdings,

(b)   making any Investment to the extent (i) payment therefor is made solely with the Capital Stock of Holdings (other than Disqualified Stock), the proceeds of Restricted Payments received from the Borrower or proceeds of the issuance of, or contribution in respect of the, Capital Stock (other than Disqualified Stock) of Holdings and (ii) any property (including Capital Stock) acquired in connection therewith is contributed to the Borrower or a Subsidiary Guarantor (or, if otherwise permitted by Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary) or the Person formed or acquired in connection therewith is merged with the Borrower or a Subsidiary Guarantor;

(c)   guaranteeing the obligations and granting of Liens of the Borrower and its Subsidiaries to the extent such obligations are not prohibited hereunder;

(d)   incurrence of Indebtedness of Holdings representing deferred compensation to employees, consultants or independent contractors of Holdings and unsecured Indebtedness consisting of promissory notes issued by any Loan Party to future, present or former employees, directors, officers, managers, distributors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any Subsidiary or any Parent Company to finance the retirement, acquisition, repurchase, purchase or redemption of Capital Stock of Holdings,

(e)   incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes,

(f)   providing indemnification to officers and directors and as otherwise permitted in this Article VII,

(g)   activities incidental to the consummation of the Transactions,

(h)   the making of any loan to any officers or directors contemplated by Section 7.05 or constituting a Permitted Investment, the making of any investment in the Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary,

(i)   making contributions to the capital of its Subsidiaries, or

(j)   making Investments in cash and Cash Equivalents.

(9)   activities incidental to the businesses or activities described in clauses (1) through (8) of this Section 7.09.

Section 7.10   <u>Material Intellectual Property</u>. On and after the Closing Date, the Borrower shall not permit any IP Rights owned by the Borrower and its Restricted Subsidiaries and material to their business, taken as a whole, to be owned by any Person that is not a Loan Party.

Section 7.11   <u>Subsidiaries</u>. On and after the Closing Date, the Borrower shall not enter into, nor shall it permit any of its Restricted Subsidiaries to enter into any transaction, the purpose of which is primarily to release any Guaranty of the Closing Date Term Loans (or to structure any transaction to avoid providing a Guaranty of the Closing Date Term Loans by any Restricted Subsidiaries to the extent such Guaranty would have otherwise been required to be provided pursuant to the Collateral and Guaranty Requirements), it being understood and agreed that bona fide joint ventures entered into in the ordinary course of business with Persons other than Affiliates of the Borrower shall be permitted. In addition, neither the Borrower nor its Restricted Subsidiaries shall transfer any assets (by an Asset Sale or otherwise) to an Unrestricted Subsidiary after the Closing Date.

Section 7.12   <u>Minimum Average Liquidity</u>.  Solely, for the benefit of the First-Out Loans, commencing with the last day of the first fiscal quarter following the Closing Date, the Borrower and its Restricted Subsidiaries shall not permit Average Liquidity in respect of any fiscal quarter to be less than $40,000,000.

Section 7.13   <u>Financial Covenant</u>.

(1)   Solely for the benefit of the First-Out Loans and the First-Out Lenders, commencing with the fiscal quarter ending February 3, 2024, the Borrower shall not permit the Total Net Leverage Ratio for the applicable Test Period to exceed the applicable ratio set forth under the heading "Total Net Leverage Ratio" on the chart below which corresponds to such Test Period:

| **Test Period Ending** | **Total Net Leverage Ratio** |
|---|---|
| February 3, 2024 - November 2, 2024 | 10.00:1.00 |
| February 1, 2025 - August 1, 2025 | 8.75:1.00 |
| October 31, 2025 - January 30, 2026 | 8.00:1.00 |

| May 1, 2026 and thereafter | 7.00:1.00 |

(2)     Solely for the benefit of the Second-Out Loans and the Second-Out Lenders, commencing with the fiscal quarter ending February 3, 2024, the Borrower shall not permit the Total Net Leverage Ratio for the applicable Test Period to exceed the applicable ratio set forth under the heading "Total Net Leverage Ratio" on the chart below which corresponds to such Test Period:

| **Test Period Ending** | **Total Net Leverage Ratio** |
| --- | --- |
| February 3, 2024 - November 2, 2024 | 11.00:1.00 |
| February 1, 2025 - August 1, 2025 | 9.75:1.00 |
| October 31, 2025 - January 30, 2026 | 9.00:1.00 |
| May 1, 2026 and thereafter | 8.00:1.00 |

Section 7.14     Further Priming or Subordination; Anti-Layering.

(1)     Except as otherwise permitted by this Agreement or the applicable Loan Documents, in each case, as in effect on the Closing Date, the Borrower and the Subsidiary Guarantors shall not, directly or indirectly, incur Indebtedness that is (a) secured by a Lien on Collateral that is senior to the Liens on such Collateral securing the Obligations (except any Indebtedness with respect to which such subordination is permitted under Section 10.24(c)), (b) contractually prioritized or senior in right of payment (including by way of "waterfall" or application of proceeds) to any Closing Date Term Loan or (c) is guaranteed by any Subsidiary of Holdings that is not a Loan Party hereunder, unless, in each case, both (x) the opportunity to participate in such Indebtedness is offered ratably on substantially the same terms (including, without limitation, any fees or other benefits offered in connection with such indebtedness) to all Lenders, (y) the terms of such Indebtedness would not reasonably be expected to preclude any Lender from participating in such Indebtedness on a pro rata basis on substantially the same terms as any other Lender (without regard to any individual investment, compliance or other restrictions that any specific Lender may be subject to, including, without limitation, the capacity to make new money loans of the type, size or terms being offered, but excluding restrictions as to, or capacity to make, equity investments) and (z) terms of such Indebtedness have been approved in writing by the Required Lenders.

(2)     Without the consent of the Required Facility Lenders in respect of the First-Out Loans, the Borrower and the Subsidiary Guarantors shall not, directly or indirectly, incur Indebtedness that is contractually subordinated or junior in right of payment (including by way of "waterfall" or application of proceeds) to any other Indebtedness of such Person unless such Indebtedness is expressly subordinated in right of payment to the First-Out Loans hereunder to the extent and in the same manner as such Indebtedness is subordinated to other senior Indebtedness of such Person.

(3)     Without the consent of the Required Facility Lenders in respect of the Second-Out Loans, the Borrower and the Subsidiary Guarantors shall not, directly or indirectly, incur Indebtedness that is contractually subordinated or junior in right of payment (including by way of "waterfall" or application of proceeds) to any other Indebtedness of such Person unless such Indebtedness is expressly subordinated in right of payment to the Second-Out Loans hereunder to the extent and in the same manner as such Indebtedness is subordinated to other senior Indebtedness of such Person.

(4)     The parties hereto understand and agree that Indebtedness shall not be considered junior in right of payment solely because it is unsecured or secured by Liens junior in priority to the Liens securing the Loans.

Section 7.15     <u>Benefit of Covenants</u>.  Notwithstanding anything to the contrary herein, (x) the terms set forth in Sections 7.12, 7.13(1) and 7.14(2) are made solely for the benefit of the First-Out Loan Facility and the First-Out Lenders, (y) the terms set forth in Sections 7.13(2) and 7.14(3) are made solely for the benefit of the Second-Out Loan Facility and the Second-Out Lenders, and (z) the other Lenders and the Borrower shall not have any rights as a third-party beneficiary of any such provision.  For the avoidance of doubt, any amendment, waiver or consent with respect to such terms to such terms shall require, and only require, the consent of the Required Facility Lenders with respect to the First-Out Loans or the Second-Out Loans, as applicable.

## ARTICLE VIII

### Events of Default and Remedies

Section 8.01     <u>Events of Default</u>. Subject to the last paragraph hereof, each of the events referred to in clauses (1) through (11) of this Section 8.01 shall constitute an "Event of Default":

(1)     <u>Non-Payment</u>. The Borrower fails to pay (a) when and as required to be paid herein, any amount of principal of any Loan or (b) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(2)     <u>Specific Covenants</u>. The Borrower, any other Loan Party or, in the case of Section 7.09, Holdings, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(1) or 6.05(1) (solely with respect to the Borrower, other than in a transaction permitted under Section 7.03 or 7.04) or Article VII; or

(3)     <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(1) or (2) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(4)     <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by the Borrower or any Subsidiary Guarantor herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(5)     <u>Cross-Default and Cross-Acceleration</u>. Any Loan Party or any Restricted Subsidiary (a) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (b) fails to observe or perform any other agreement or condition relating to any such Indebtedness referred to in the foregoing clause (a), or any other event occurs (other than, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of such Hedging Obligations and not as a result of any default thereunder by the Borrower, or any Subsidiary Guarantor or any Restricted Subsidiary) with respect to such Indebtedness, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such

174

holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that (A) such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02, (B) this clause (5)(b) shall not apply to any Indebtedness if the sole remedy of the holder thereof in the event of the nonpayment of such Indebtedness or the non-payment or non-performance of obligations related thereto is to convert such Indebtedness into Equity Interests (other than Disqualified Stock) and cash in lieu of fractional shares and (C) this clause (5)(b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided further* that an ABL Event of Default under Section 8.01 of the ABL Credit Agreement (other than Section 8.01(1) of the ABL Credit Agreement) shall not constitute an Event of Default hereunder unless and until (I) in the case of an ABL Event of Default under Section 8.01(2)(d) of the ABL Credit Agreement for failure to comply with the ABL Financial Covenant (after giving effect to all applicable grace periods and the ability to make Specified Equity Contributions in accordance with the terms of the ABL Credit Agreement), a majority of the ABL Lenders have actually declared all ABL Obligations to be immediately due and payable in accordance with the terms of the ABL Credit Agreement and such declaration has not been rescinded by a majority of the ABL Lenders on or before such date or (II) in the case of all other such ABL Events of Default the earlier of (1) 60 consecutive calendar days shall have passed since the occurrence of such ABL Event of Default and (2) the date on which a majority of the ABL Lenders have actually declared all ABL Obligations to be immediately due and payable in accordance with the terms of the ABL Credit Agreement and such declaration has not been rescinded by a majority of the ABL Lenders on or before such date; or

(6)     Insolvency Proceedings, etc. Holdings, the Borrower, any Loan Party or any Restricted Subsidiary that is a Significant Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(7)     Judgments. There is entered against any Loan Party or any Restricted Subsidiary a final judgment and order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) calendar days; or

(8)     ERISA. (a) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan, (b) the Borrower or any Subsidiary Guarantor or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan, or (c) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable Law or plan terms, except, with respect to each of the foregoing clauses of this Section 8.01(8), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

175

(9)     <u>Invalidity of Loan Documents</u>. Any material provision of the Loan Documents, taken as a whole, at any time after its execution and delivery and for any reason, other than (a) as expressly permitted by any Loan Documents (including as a result of a transaction permitted under Section 7.03 or 7.04), (b) as a result of acts or omissions by an Agent (it being understood that the foregoing exception shall not impose any obligations on any Agent exculpated under Article IX) or any Lender or (c) due to the satisfaction in full of the Termination Conditions, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or any Loan Party denies in writing that it has any or further liability or obligation under the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or purports in writing to revoke or rescind the Loan Documents, taken as a whole, prior to the satisfaction of the Termination Conditions; or

(10)     <u>Collateral Documents</u>. Any Collateral Document with respect to a material portion of the Collateral after delivery thereof pursuant to Section 4.01, 6.11 or 6.13 for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) ceases to create, a valid and perfected Lien with the priority required by the Applicable Intercreditor Agreement (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of Collateral actually delivered to it and pledged under the Collateral Documents or to file Uniform Commercial Code amendments relating to a Loan Party's change of name or jurisdiction of formation (solely to the extent that the Borrower provides the Collateral Agent written notice thereof in accordance with the Security Agreement, and the Collateral Agent and the Borrower have agreed that the Collateral Agent will be responsible for filing such amendments) and continuation statements or to take any other action primarily within its control with respect to the Collateral and except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage (it being understood that the foregoing exception shall not impose any obligations on any Agent exculpated under Article IX); or

(11)     <u>Change of Control</u>. There occurs any Change of Control.

Notwithstanding anything set forth above, (a) a breach of Sections 7.12, 7.13(1) or 7.14(2) shall not constitute a Default or Event of Default with respect to any other Term Loans hereunder unless and until the First-Out Loans have been accelerated by the Required Facility Lenders in respect of the First-Out Loans (and such acceleration shall not have been rescinded by such Required Facility Lenders) and (b) a breach of Sections 7.13(2) or 7.14(3) shall not constitute a Default or Event of Default with respect to any other Term Loans hereunder unless and until the Second-Out Loans have been accelerated by the Required Facility Lenders in respect of the Second-Out Loans (and such acceleration shall not have been rescinded by such Required Facility Lenders).

Section 8.02     <u>Remedies upon Event of Default</u>. If any Event of Default occurs and is continuing, the Administrative Agent may with the consent of the Required Lenders and shall, at the request of the Required Lenders (or (a) with respect to an Event of Default resulting from a breach of Sections 7.12, 7.13(1) or 7.14(2), at the request of the Required Facility Lenders in respect of the First-Out Loans, take such actions with respect to the First-Out Loans, and (b) with respect to an Event of Default resulting from a breach of Sections 7.13(2) or 7.14(3), at the request of the Required Facility Lenders in respect of the Second-Out Loans, take such actions with respect to the Second-Out Loans), take any or all of the following actions:

(1)     declare the Commitments of each Lender to be terminated, whereupon such Commitments will be terminated;

(2)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under any Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(3)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief, with respect to the Borrower under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"), the Commitments of each Lender will automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid will automatically become due and payable without further act of the Administrative Agent or any Lender.

Section 8.03     Application of Funds.

(1)     Subject to the Applicable Intercreditor Agreements then in effect and except as otherwise expressly provided in this Agreement (as in effect on the Closing Date), including the Intercreditor Provisions, other than with respect to any proceeds of, and distributions on or payments in respect of or arising out of the Collateral or proceeds of the Collateral which shall be applied in accordance with Section 8.03(2), any amounts collected or received on account of the Obligations, whether by the Administrative Agent, the Collateral Agent, any other Agent or any Lender, whether arising from setoff or otherwise (including any payment pursuant to any Applicable Intercreditor Agreement), and whether or not an Event of Default shall have occurred and is continuing, and including any payment or distribution or other amounts received on account of the Obligations (other than any payment, distribution or other amount received on account of the Collateral or proceeds of the Collateral which shall be applied in accordance with Section 8.03(2)) in a proceeding under any Debtor Relief Law, in each case, whether in the form of cash or non-cash assets, will be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III) payable to each Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III), whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, payable to the Second Amendment Exchanging Lenders and the Second Amendment Lenders in connection with any action, litigation or other dispute or proceeding related to the Transactions (including, without limitation, any action, litigation or other dispute or proceeding related to any temporary restraining order, preliminary injunction or any similar request for relief), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term Loans, whether incurred prior to, upon or following

177

commencement of a proceeding under any Debtor Relief Law, ratably among the Term Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans, the other Obligations under Secured Hedge Agreements and Cash Management Obligations, in each case, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the Term Lenders and other applicable Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all Obligations constituting the Prepayment Premium and/or Make-whole Amount in respect of the applicable Term Loans that is due and payable, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, to the applicable Term Lenders in proportion to the respective amounts described in this clause Fifth held by them;

*Sixth*, to the payment of all other Obligations of the Loan Parties in respect of the Term Loans that are due and payable to the Administrative Agent or the applicable Term Lenders on such date, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and such Term Lenders on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

(2)     Subject to the Applicable Intercreditor Agreements then in effect and except as otherwise expressly provided in this Agreement (as in effect on the Closing Date), including the Intercreditor Provisions, any amounts collected or received on account of the Obligations from proceeds of, and distributions on or payments in respect of or arising out of the Collateral, whether by the Administrative Agent, the Collateral Agent, any other Agent or any Lender, whether arising from setoff or otherwise (including any payment pursuant to any Applicable Intercreditor Agreement), and whether or not an Event of Default shall have occurred and is continuing, and including any payment (including, without limitation, any adequate protection payment and any payment from the proceeds of a sale of the Collateral or proceeds of the Collateral under Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization or liquidation) or distribution (including, without limitation, any distribution in respect of secured claims under a plan of reorganization or liquidation or any distribution pursuant to Section 726 of the Bankruptcy Code) or other amounts received on account of the Collateral or proceeds of the Collateral in a proceeding under any Debtor Relief Law, in each case, whether in the form of cash or non-cash assets, will be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III) payable to each Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III), whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law,

178

payable to the Second Amendment Exchanging Lenders and the Second Amendment Lenders in connection with any action, litigation or other dispute or proceeding related to the Transactions (including, without limitation, any action, litigation or other dispute or proceeding related to any temporary restraining order, preliminary injunction or any similar request for relief), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the First-Out Loans, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the First-Out Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the First-Out Loans, the other Obligations under Secured Hedge Agreements and Cash Management Obligations, in each case, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the First-Out Lenders and other applicable Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all Obligations constituting the Prepayment Premium in respect of the First-Out Loans that is due and payable, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, to the applicable First-Out Lenders in proportion to the respective amounts described in this clause Fifth held by them;

*Sixth*, to the payment of all other Obligations of the Loan Parties in respect of the First-Out Loans that are due and payable to the Administrative Agent or the applicable First-Out Lenders on such date, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and such First-Out Lenders on such date;

*Seventh*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Second-Out Loans, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the Second-Out Lenders in proportion to the respective amounts described in this clause Seventh payable to them;

*Eighth*, to payment of that portion of the Obligations constituting unpaid principal of the Second-Out Loans, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the Second-Out Lenders in proportion to the respective amounts described in this clause Eighth held by them;

*Ninth*, to the payment of all Obligations constituting the Make-whole Amount in respect of the Second-Out Loans that is due and payable, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, to the applicable Second-Out Lenders in proportion to the respective amounts described in this clause Ninth held by them;

*Tenth*, to the payment of all other Obligations of the Loan Parties in respect of the Second-Out Loans that are due and payable to the Administrative Agent or the applicable Second-Out Lenders on such date, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and such Second-Out Lenders on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

For the avoidance of doubt, the Loan Parties, the Administrative Agent and the Lenders agree and acknowledge that the provisions set forth in this Section 8.03 and the Intercreditor Provisions constitute a "subordination agreement" as such term is contemplated by, and utilized in, Section 510(a) of the Bankruptcy Code, and, as such, it is their intention that this Section 8.03 and the Intercreditor Provisions would be enforceable for all purposes in any proceeding under any Debtor Relief Law relating to a Loan Party.

## ARTICLE IX

## Administrative Agent and Other Agents

Section 9.01    Appointment and Authorization of the Administrative Agent.

(1)    Each Lender hereby irrevocably appoints Alter Domus (US) LLC, to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX (other than Sections 9.11, 9.12 and 9.16) are solely for the benefit of the Agents and the Lenders, and the Borrower and the other Loan Parties shall not have rights as a third-party beneficiary of any such provision.

(2)    Each of the Secured Parties (including in its capacities as a Lender, a Hedge Bank, and/or Cash Management Bank) hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Secured Party for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. The Collateral Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent), shall be entitled to the benefits of all provisions of this Article IX  and Article X (including Sections 9.08, 10.04 and 10.05), and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent and Collateral Agent under this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, the Lenders, and by accepting the benefits of the Collateral Documents, any other Secured Parties, hereby expressly authorize the Collateral Agent to (i) execute any and all documents (including releases and subordination agreements) with respect to the Collateral (including any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto (including any Applicable Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by the Collateral Agent shall bind the Secured Parties and (ii) negotiate, enforce or settle any claim, action

or proceeding affecting the Secured Parties in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Secured Party.

Section 9.02    <u>Rights as a Lender</u>. Any Lender that is also serving as an Agent (including as Administrative Agent or Collateral Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Lender (if any) serving as an Agent hereunder in its individual capacity. Any such Person serving as an Agent and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.03    <u>Exculpatory Provisions</u>. The Agents and the Ad Hoc Group of Term Lenders shall not have any duties, obligations or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents. Without limiting the generality of the foregoing, an Agent (including the Administrative Agent and Collateral Agent) and the Ad Hoc Group of Term Lenders:

(1)    shall not be subject to any fiduciary or other implied duties or obligations, regardless of whether a Default or Event of Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" or "ad hoc group" herein and in the other Loan Documents with reference to any Agent or the Ad Hoc Group of Term Lenders is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative or representative relationship between independent contracting parties;

(2)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents or as such Agent shall believe in good faith shall be necessary), *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose such Agent to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any requirement of Law relating to bankruptcy, insolvency, reorganization, or relief of debtors; *provided, further,* that if such Agent so requests, it shall first be indemnified and provided with adequate security to its sole satisfaction (including reasonable advances as may be requested by such Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action; *provided, further,* that such Agent may seek clarification or further direction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents or as such Agent shall believe in good faith shall be necessary) prior to taking any such directed action and may refrain from acting until such clarification or further direction has been provided; and

(3)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, the Loan Parties, or any of their Affiliates that is communicated to or obtained by any Person serving as an Agent-Related Person, the Ad Hoc Group of Term Lenders or any of their Affiliates in any capacity.

No Agent-Related Person shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as an Agent shall believe in good faith shall be necessary) (and such consent or request and such action or action not taken pursuant thereto shall be binding upon all the Lenders) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final and non-appealable judgment of a court of competent jurisdiction (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which such Agent-Related Person shall have no liability), in connection with its duties expressly set forth herein. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default and stating that such notice is a "notice of default" is given to such Agent by the Borrower or a Lender.

No Agent-Related Person shall be responsible or liable for or have any duty to ascertain or inquire into or monitor (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the Loans or the occurrence of any Default or Event of Default, (iv) the execution, validity, enforceability, effectiveness, genuineness, collectability or sufficiency of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, preservation, perfection, maintenance or continuation of perfection, or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, (vi) whether the Collateral exists, is owned by any Loan Party, is cared for, protected, or insured or has been encumbered, or meets the eligibility criteria applicable in respect thereof, (vii) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or the inspection of the properties, books or records of any Loan Party or any Affiliate thereof or (viii) the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations. The duties of each Agent shall be mechanical and administrative in nature; no Agent-Related Person shall have by reason of this Agreement or any other Loan Document a fiduciary, principal-agency, or trustee relationship in respect of any Lender, any other Secured Party or the holder of any Term Note; and nothing in this Agreement or in any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agent-Related Person any duties or obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

Nothing herein or in any other Loan Document shall require any Agent-Related Person to expend or risk its own funds or otherwise incur any financial liability in the performance of any duties or in the exercise of any rights or powers hereunder.  No Agent shall be responsible or liable for any failure or delay in the performance of its obligations hereunder or under any other Loan Document, in each case, arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or Governmental Authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

For the avoidance of doubt, and without limiting the other protections set forth in this Article IX, with respect to any determination, designation, or judgment to be made by any Agent herein or in the other Loan Documents, such Agent shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) make or confirm such determination, designation, or judgment.

182

Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, the Ad Hoc Group of Term Lenders is named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Loan Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Ad Hoc Group of Term Lenders shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Section 10.05. Without limitation of the foregoing, the Ad Hoc Group of Term Lenders shall not, solely by reason of this Agreement or any other Loan Documents, have any fiduciary relationship in respect of any Lender or any other Person.

Section 9.04    Lack of Reliance on the Agents. Independently and without reliance upon any Agent-Related Person, each Lender, each other Secured Party, and the holder of each Term Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings, the Borrower and the Restricted Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings, the Borrower and the Restricted Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender, any other Secured Party, or the holder of any Term Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. No Agent-Related Person shall be responsible to any Lender, any other Secured Party, or the holder of any Term Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Loan Document, or the financial condition of the Holdings, the Borrower or any of the Restricted Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of Holdings, the Borrower or any of the Restricted Subsidiaries or the existence or possible existence of any Default or Event of Default. Each Lender, each other Secured Party, and the holder of each Term Note acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent-Related Person hereinafter taken shall be deemed to constitute any representation or warranty by any Agent-Related Person to it.   Each Lender, each other Secured Party, and the holder of each Term Note agrees that it will not assert any claim against any Agent-Related Person based on an alleged breach of fiduciary duty by any Agent in connection with this Agreement, the other Loan Documents, or the transactions contemplated hereby.

Section 9.05    Certain Rights of the Agents. If any Agent requests instructions from the Required Lenders (or such greater percentage of Lenders required or as such Agent shall believe in good faith shall be required) with respect to any determination, designation, judgment, act or action (including failure to act) in connection with this Agreement or any other Loan Document, such Agent shall be entitled to refrain from such determination, designation, judgment, act or taking such action unless and until such Agent shall have received instructions from the Required Lenders (or such greater percentage of Lenders required or as such Agent shall believe in good faith shall be required); and such Agent shall not incur liability to any Lender or other Secured Party by reason of so refraining. Without limiting the foregoing, neither any Lender, any other Secured Party, nor the holder of any Term Note shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders (or such greater percentage of Lenders required or as such Agent shall believe in good faith shall be required).

Section 9.06    Reliance by the Agents. Each Agent shall be entitled to rely upon, shall not incur any liability for and shall be fully protected in relying upon, any note, resolution, notice, statement, certificate, facsimile, order, consent, request, instrument, letter, document or other writing (including any

electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent also may rely, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.07    <u>Delegation of Duties</u>. Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more co-agents, sub-agents and attorneys-in-fact appointed by such Agent. Each Agent and any such co-agents, sub-agents and attorneys-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. All provisions of this Article IX and Article X (including Sections 9.08, 10.04 and 10.05) and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and under the other Loan Documents shall apply to any such co-agent, sub-agent and attorney-in-fact and to the Agent-Related Persons of such Agent and any such co-agent, sub-agent and attorney-in-fact, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent.  No Agent shall be responsible for the negligence or misconduct of any such co-agents, sub-agents and attorneys-in-fact except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents and attorneys-in-fact.

Section 9.08    <u>Indemnification</u>. Whether or not the transactions contemplated hereby are consummated, to the extent any Agent or any other Agent-Related Person (solely to the extent any such other Agent-Related Person was performing services on behalf of such Agent) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify such Agent or any other Agent-Related Person (solely to the extent any such other Agent-Related Person was performing services on behalf of such Agent) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Agent or any other Agent-Related Person (solely to the extent any such other Agent-Related Person was performing services on behalf of such Agent) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; *provided* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's or any other Agent-Related Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.08 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by

or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided further* that the failure of any Lender to indemnify or reimburse such Agent shall not relieve any other Lender of its obligation in respect thereof.

Section 9.09    The Administrative Agent in Its Individual Capacity. If the Administrative Agent is a Lender, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders" or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its individual capacity. The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Loan Party or any Affiliate of any Loan Party (or any Person engaged in a similar business with any Loan Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party or any Affiliate of any Loan Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders. The Lenders and the other Secured Parties acknowledge that, pursuant to such activities, an Agent-Related Person may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent-Related Person shall be under any obligation to provide such information to them.

Section 9.10    [Reserved].

Section 9.11    Resignation by the Administrative Agent and the Collateral Agent. Each of the Administrative Agent and Collateral Agent may resign from the performance of all its respective functions and duties hereunder or under the other Loan Documents at any time by giving 30 days prior written notice to the Lenders and the Borrower. If the Administrative Agent is in material breach of its obligations hereunder as Administrative Agent, then the Administrative Agent may be removed as the Administrative Agent at the reasonable request of the Required Lenders. If the Administrative Agent is a Defaulting Lender, the Borrower may remove the Defaulting Lender from such role upon 15 days prior written notice to the Lenders. Such resignation or removal shall take effect upon the appointment of a successor Administrative Agent or Collateral Agent as provided below.

Upon any such notice of resignation by, or notice of removal of, the Administrative Agent or Collateral Agent, the Required Lenders shall appoint a successor Administrative Agent or Collateral Agent, as applicable, who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (*provided* that the Borrower's approval shall not be required if an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing).

If a successor Administrative Agent or Collateral Agent shall not have been so appointed within such 30 day period, such Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed, *provided* that the Borrower's consent shall not be required if an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing), shall then appoint a successor Administrative Agent or Collateral Agent, as applicable, who shall serve in such capacity until such time, if any, as the Required Lenders appoint a successor as provided above.

If no successor Administrative Agent or Collateral Agent has been appointed pursuant to the foregoing by the 30th day after the date such notice of resignation was given by such Agent or such notice of removal was given by the Required Lenders or the Borrower, as applicable, such Agent's resignation

shall nonetheless become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided above. The retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents  (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section 9.11.

Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.11).

The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent and the Collateral Agent hereunder and the other Loan Documents shall continue in effect for the benefit of such retiring Agent, its co-agents, sub-agents and attorneys-in-fact and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

Upon a resignation of the Administrative Agent pursuant to this Section 9.11, the Administrative Agent shall continue to be subject to Section 10.09.

Section 9.12    Collateral Matters. Each Secured Party (including in its capacities as a Cash Management Bank and a Hedge Bank) irrevocably authorizes and directs the Collateral Agent to take the actions to be taken by them as set forth in Section 7.04 and 10.24.

Each Lender hereby agrees, each other Secured Party (by accepting the benefits of the Security Documents) and each holder of any Term Note (by the acceptance thereof) will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders (or such greater percentage of Lenders required) in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders (or such greater percentage of Lenders required) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Collateral Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Collateral Documents.

Upon request by any Agent at any time, the Lenders will confirm in writing such Agent's authority to release particular types or items of Collateral pursuant to this Section 9.12. In each case as specified in this Section 9.12, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from

the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents, this Section 9.12, and Section 10.24.

The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, maintained, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 9.12, Section 10.24 or in any of the Collateral Documents.

Section 9.13    [Reserved].

Section 9.14    Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent-Related Persons and all other amounts due the Lenders and the Agent-Related Parties under Sections 2.09, 3.01, 10.04, and 10.05) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their Agent-Related Persons, and any other amounts due the Agents and their Agent-Related Persons under the Loan Documents (including all amounts due under Sections 2.09, 3.01, 10.04, and 10.05).

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.15    Appointment of Supplemental Agents.

(1)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent

187

deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent and the Collateral Agent, as applicable, is hereby authorized to appoint an additional individual or institution selected by it in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Agent**" and collectively as "**Supplemental Agents**").  No Agent shall be responsible for the negligence or misconduct of any Supplemental Agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such Supplemental Agent.

(2)     In the event that the Administrative Agent or Collateral Agent appoints a Supplemental Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Agent to the extent, and only to the extent, necessary to enable such Supplemental Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Agent shall run to and be enforceable by such Supplemental Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent and Collateral Agent shall inure to the benefit of such Supplemental Agent and all references therein to the Administrative Agent and/or the Collateral Agent shall be deemed to be references to such Supplemental Agent, as the context may require.

(3)     Should any instrument in writing from any Loan Party be reasonably required by any Supplemental Agent so appointed by the Administrative Agent or Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments reasonably acceptable to it promptly upon request by the Administrative Agent or the Collateral Agent. In case any Supplemental Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent, as applicable, until the appointment of a new Supplemental Agent.

Section 9.16     Intercreditor Agreements.

(1)     Notwithstanding anything to the contrary in this Agreement or in any other Loan Document: (a) the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Loan Documents and the exercise of any right related to any Collateral shall be subject, in each case, to the terms of the Intercreditor Provisions, the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, (b) in the event of any conflict between the express terms and provisions of this Agreement or any other Loan Document, on the one hand, and of the Intercreditor Provisions, the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, on the other hand, the terms and provisions of the Intercreditor Provisions, the ABL Intercreditor Agreement or Term Intercreditor Agreement, as the case may be, shall control and (c) each Lender hereunder agrees to be bound by the terms of the Intercreditor Provisions.

(2)     Each Lender  (and, by its acceptance of the benefits of any Collateral Document, each other Secured Party) authorizes and directs the applicable Agent to enter into, and agrees to be bound by, this Agreement, the Collateral Documents, the other Loan Documents, the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement. Each Lender hereby

acknowledges and agrees that (x) the foregoing instructed actions constitute an instruction from all the Lenders under this Section and (y) this Article IX and Section 9.08 and any other rights, privileges, protections, immunities, and indemnities in favor of any Agent hereunder and under the other Loan Documents apply to any and all actions taken or not taken by such Agent in accordance with such instruction.

Section 9.17    Secured Cash Management Agreements and Secured Hedge Agreements. Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank or Hedge Bank that obtains the benefits of Section 8.03, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Agreement or the other Loan Documents to the contrary, (i) no Agent shall be responsible or have any liability for or in connection with, or have any duty to ascertain, inquire into, monitor, maintain, update or enforce compliance with the provisions hereof relating to Cash Management Agreements or Hedge Agreements, and (ii) no Agent deemed to have notice of any Cash Management Obligations or Hedging Obligations, or be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements, unless such Agent has received written notice thereof, together with such supporting documentation as such Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

Section 9.18    Withholding Tax. To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.18.  The agreements in this Section 9.18 shall survive the resignation, replacement or removal of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

Section 9.19    Survival.  The agreements in this Article IX shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

189

## ARTICLE X

### Miscellaneous

Section 10.01    Amendments, etc.

(1)    Subject to Section 1.12 and Section 7.15 and except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (with a fully-executed copy thereof delivered to the Administrative Agent) (other than with respect to any amendment or waiver contemplated in clause (i) below), which shall only require the consent of the Required Facility Lenders under the applicable Facility or Facilities) (or by the Administrative Agent with the consent of the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)   extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)   postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or 2.08 (other than pursuant to Section 2.08(2)) or any payment of fees or premiums hereunder or under any Loan Document with respect to payments to any Lender without the written consent of such Lender, it being understood that none of the following will constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of principal, interest, fees or premiums: the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans;

(c)   reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (I) of the proviso immediately succeeding clause (i) of this Section 10.01(1)) any fees or other amounts payable hereunder or under any other Loan Document to any Lender without the written consent of such Lender; *provided* that only the consent of (A) the Required Lenders shall be necessary to amend the definition of "Default Rate" and (B) the Required Lenders will be necessary to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)   except as contemplated by clause (C) in the second proviso immediately succeeding clause (i) of this Section 10.01(1), (x) change any provision of this Section 10.01 or the definition of "Required Lenders" or "Required Facility Lenders," or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender and (y) change the definition of "Pro Rata Share" without the written consent of each Lender directly and adversely affected thereby;

(e)   other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(f)   other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

190

(g)    change any provision requiring pro rata payments or pro rata sharing of payments, without the written consent of each Lender directly and adversely affected thereby;

(h)    change any term or provision of Section 7.14(1) without the consent of each Lender directly and adversely affected thereby;

(i)    other than in connection with a transaction permitted by Section 7.14(1), change any term or provision of Section 8.03, without the written consent of each Lender directly and adversely affected thereby;

(j)    amend, waive or otherwise modify any term or provision (including the availability and conditions to funding and the rate of interest applicable thereto) which directly affects Lenders of one Facility and does not directly affect Lenders under any other Facility, in each case, without the written consent of the Required Facility Lenders under such applicable Facility;

(k)    other than in a transaction permitted by Section 7.14(1) and except as permitted under Section 10.24(c), modify or change any provision of this Agreement or the related definitions that could result in subordinating the Liens over the Collateral securing the Obligations to any Lien securing any other Indebtedness or subordinating the Term Loans in right of payment to any other Indebtedness, without the written consent of each Lender directly and adversely affected thereby; or

(l)    change the definition of "Unrestricted Subsidiary" or the addition of any Unrestricted Subsidiaries after the Closing Date, without the written consent of each Lender;

*provided* that:

(I) no amendment, waiver or consent shall, unless in writing and signed by the applicable Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, such Agent under this Agreement or any other Loan Document;

(II)    Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; and

(III)    no amendment, waiver or consent to change any term or provision of Section 8.03 (except any change to the last paragraph of Section 8.03(l) and the second to last paragraph of Section 8.03(2)) or the Intercreditor Provisions shall require the consent of the Borrower or any other Loan Party, except to the extent adversely affected thereby or such amendment imposes additional obligation or liability upon the Borrower or any other Loan Party;

*provided further* that notwithstanding the foregoing:

(A)    no Defaulting Lender shall have any right to approve or disapprove of any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders, the Required Lenders, the Required Facility Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders) (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders);

191

(B)        no Lender consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement (i) that is for the purpose of adding the holders of Credit Agreement Refinancing Indebtedness or any other Permitted Indebtedness that is secured Indebtedness (or a Debt Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of such Applicable Intercreditor Agreement, as applicable (it being understood that any such amendment, modification or supplement may make such other changes to the applicable Applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by any Applicable Intercreditor Agreement; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of, or any fees or other amounts payable to, any Agent hereunder or under any other Loan Document without the prior written consent of such Agent, as applicable;

(C)        this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders;

(D)        any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section 10.01 if such Class of Lenders were the only Class of Lenders hereunder at the time;

(E)        Without limiting the scope of Section 10.01(3) below, any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency (including amendments, supplements or waivers to any of the Collateral Documents, guarantees, intercreditor agreements or related documents executed by any Loan Party or any other Subsidiary in connection with this Agreement if such amendment, supplement or waiver is delivered in order to cause such Collateral Documents, guarantees, intercreditor agreements or related documents to be consistent with this Agreement and the other Loan Documents) so long as, in each case, the Lenders shall have received at least 5 Business Days' prior written notice thereof and the Administrative Agent shall not have received, within 5 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; *provided* that the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any such changes necessary to be made in connection with any borrowing of Refinancing Loans, any Extension or any borrowing of Replacement Loans and otherwise to effect the provisions of Section 2.15 or 2.16 or the immediately succeeding paragraph of this Section 10.01, respectively;

(F)      the Borrower and the Collateral Agent may, without the input or consent of the other Lenders, (i) effect changes to any Mortgage or any other Collateral Document as may be necessary or appropriate in the opinion of the Collateral Agent and (ii) effect changes to this Agreement that are necessary and appropriate to effect the offering process set forth in Section 2.05(1)(e); and

(G)      with respect to the consent of Required Lenders expressly required by any Deemed Consent Provision (but not, for the avoidance of doubt, any amendment or waiver of, or consent to a departure from, any Deemed Consent Provision), the Administrative Agent or the Collateral Agent, as applicable, shall deliver any such request from the Borrower to the Lenders and, if the Lenders shall have received at least 15 Business Days' prior written notice thereof and the Administrative Agent or the Collateral Agent shall not have received, within 15 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such request, then the Required Lenders shall be deemed to have accepted (provided, however, for the avoidance of doubt, this clause (G) shall not alter or be deemed to alter the rights, privileges, protections, immunities and indemnities granted to any Agent under this Agreement, including, without limitation, Article IX above, and the other Loan Documents).

(2)      In addition, notwithstanding anything to the contrary in this Section 10.01, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the Replacement Loans (as defined below) to permit the refinancing of all outstanding Term Loans of any Class ("**Replaced Loans**") with replacement term loans ("**Replacement Loans**") hereunder; *provided* that

(a)      the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of such Replaced Loans, *plus* accrued interest, fees, premiums (if any) and penalties thereon and fees and expenses incurred in connection with such refinancing of Replaced Loans with such Replacement Loans,

(b)      the All-In Yield with respect to such Replacement Loans (or similar interest rate spread applicable to such Replacement Loans) shall not be higher than the All-In Yield for such Replaced Loans (or similar interest rate spread applicable to such Replaced Loans) immediately prior to such refinancing,

(c)      the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Replaced Loans at the time of such refinancing; and

(d)      all other terms (other than with respect to pricing, premiums and optional prepayment or redemption terms) applicable to such Replacement Loans shall be substantially identical to, or no more favorable taken as a whole (in each case as determined by the Borrower in its reasonable judgment) to the Lenders providing such Replacement Loans than, those applicable to such Replaced Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the Latest Maturity Date of the Loans in effect immediately prior to such refinancing (*provided* that an Officer's Certificate delivered to the Administrative Agent at least 5 Business Days prior to the incurrence of such Replacement Loans, together with a reasonably detailed description of the material terms and conditions of such Replacement Loans or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this Section 10.01(2) shall be conclusive evidence that such terms and conditions satisfy such

requirement unless the Administrative Agent notifies the Borrower within such five 5 Business Day period that the Required Lenders disagree with such determination (including a description of the basis upon which the Required Lenders disagree));

*provided further* that each amendment to this Agreement providing for Replacement Loans may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower to effect the provisions of this paragraph, and for the avoidance of doubt, this paragraph shall supersede any other provisions in this Section 10.01 to the contrary.

(3)      In addition, notwithstanding anything to the contrary in this Section 10.01,

(a)      the Guaranty, the Collateral Documents and related documents executed by Holdings, the Borrower or any Restricted Subsidiaries in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause the Guaranty, Collateral Documents or other document to be consistent with this Agreement and the other Loan Documents (including by adding additional parties as contemplated herein or therein) and

(b)      if the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document. Notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective.

Section 10.02   Notices and Other Communications; Facsimile Copies.

(1)      General. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(a)      if to Holdings, the Borrower or the Administrative Agent, to the address, facsimile number or electronic mail address specified for such Person on Schedule 10.02; and

(b)      if to any other Lender, to the address, facsimile number or electronic mail address specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next succeeding Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (2) below shall be effective as provided in such subsection (2).

194

(2)     Electronic Communication. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(3)     Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next succeeding Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(4)     The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall any Agent or any of its Agent-Related Persons (collectively, the "**Agent Parties**") have any liability to any Loan Party, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or such Agent's transmission of Borrower Materials through the Internet or the Platform.  Although the Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Platform is secured through a per-deal authorization method whereby each user may access the Platform only on a deal-by-deal basis, each of the Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agents are not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Platform, and that there are confidentiality and other risks associated with such distribution. Each of the Lenders and the Borrower hereby approves distribution of the Borrower Materials through the Platform and understands and assumes the risks of such distribution.

(5)     Change of Address. Each Loan Party and any Agent may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire

instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private-Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.  In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Loan Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

(6)     Reliance by the Agents. The Agents and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03     No Waiver; Cumulative Remedies. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as such) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 10.10 (subject to the terms of Section 2.13), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided further* that if at any time there is no Person acting as Administrative Agent or Collateral Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent or Collateral Agent, as applicable, pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04     Costs and Expenses. The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse each Agent and Ad Hoc Group of Term Lenders for all reasonable and documented out-of-pocket

costs and expenses of such Agent and the Ad Hoc Group of Term Lenders (with respect to the Ad Hoc Group of Term Lenders, solely to the extent incurred in connection with the Transactions on or prior to the Closing Date) (promptly following a written demand therefor, together with backup documentation supporting such reimbursement request) incurred in connection with the preparation, negotiation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Ropes & Gray LLP, as counsel to the Agents and, if necessary, a single local counsel in each relevant material jurisdiction, and (b) upon presentation of a summary statement, together with any supporting documentation reasonably requested by the Borrower, to pay or reimburse the Agents (taken as a whole) and the Lenders (taken as a whole), promptly following a written demand therefor for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including (i) all Attorney Costs of one counsel to the Agents (and, if necessary, one local counsel in any relevant material jurisdiction) and (ii) all Attorney Costs of one counsel to the Lenders taken as a whole (and, if necessary, one local counsel in any relevant material jurisdiction and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)). The agreements in this Section 10.04 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document. All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05   <u>Indemnification by the Borrower</u>. The Borrower shall indemnify and hold harmless the Agents, each other Lender, the Ad Hoc Group of Term Lenders and their respective Related Persons (collectively, the "**Indemnitees**") from and against any and all losses, claims, actions, judgments, damages, liabilities or expenses (including Attorney Costs and Environmental Liabilities) to which any such Indemnitee may become subject arising out of, resulting from or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of (a) one counsel to the Agents and their Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for the Agents and their Indemnitees taken as a whole in each relevant jurisdiction) and (b) one counsel to all other Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all other Indemnitees taken as a whole in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (i) any actual or threatened claim, litigation, investigation, proceeding or Environmental Liabilities relating to the Transactions or (ii) the execution, delivery, funding, enforcement, performance and administration of this Agreement, the other Loan Documents, the Loans or the use, or proposed use of the proceeds therefrom, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation, investigation or proceeding), and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses resulted from (x) the gross negligence or willful misconduct of such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) other than with respect to the Agents and their Indemnitees, the bad faith of or a material breach of any obligations under any Loan Document by such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling

its role as an administrative agent, collateral agent, or arranger or any similar role under any Loan Document and other than any claims arising out of any act or omission of the Loan Parties or any of their Affiliates) (as determined by a final, non-appealable judgment of a court of competent jurisdiction). To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that they are permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of such Indemnitee), nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party for which such Indemnitee is otherwise entitled to indemnification pursuant to this Section 10.05). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this Section 10.05 shall be paid within 20 Business Days after written demand therefor. The agreements in this Section 10.05 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document. This Section 10.05 shall not apply to Taxes, except any Taxes that represent losses or damages arising from any non-Tax claim. Notwithstanding the foregoing, each Indemnitee shall be obligated to refund and return promptly any and all amounts paid by the Borrower under this Section 10.05 to such Indemnitee for any such fees, expenses or damages to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.

Section 10.06    Marshaling; Payments Set Aside. None of the Agents or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to any Agent upon demand its applicable share of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

Section 10.07    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 7.03, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and

each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder (including to existing Lenders and their Affiliates) except (i) to an Eligible Assignee and (A) in the case of any Eligible Assignee that, immediately prior to or upon giving effect to such assignment, is an Affiliated Lender, in accordance with the provisions of Section 10.07(h) and (B) in the case of any Eligible Assignee that is Holdings, the Borrower or any Subsidiary thereof, in accordance with the provisions of Section 10.07(l), (ii) by way of participation in accordance with the provisions of Section 10.07(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f), or (iv) to an SPC in accordance with the provisions of Section 10.07(g) (and any other attempted assignment or transfer by any party hereto (other than the replacement of the Administrative Agent pursuant to Article IX above) shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d) and, to the extent expressly contemplated hereby, Related Persons of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Assignments by Lenders.</u> Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i) <u>Minimum Amounts.</u>

(A) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B) in any case not described in subsection (b)(i)(A) of this Section 10.07, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1.0 million, unless either (x) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (y) each of the Administrative Agent and the Borrower otherwise consents; *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii) <u>Proportionate Amounts.</u> Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii) <u>Required Consents.</u> No consent shall be required for any assignment except to the extent required by Section 10.07(b)(i)(B) and, in addition:

(A) the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing at the time of such assignment determined as of the date the Assignment and Assumption with respect to

199

such assignment is delivered to the Administrative Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, (2) in respect of an assignment of all or a portion of the Loans, such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund, (3) such assignment is in respect of Second-Out Loans or (4) such assignment is by Jefferies Capital Services LLC, as a fronting Lender to the Lenders set forth on the Schedule attached to the applicable fronting letter; *provided* that the Borrower shall be deemed to have consented to any assignment of all or a portion of the Term Loans unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice of a failure to respond to such request for assignment; *provided further* that no consent of the Borrower shall be required for an assignment of all or a portion of the Loans pursuant to Section 10.07(h) or (l); and

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund with respect to a Lender; *provided* that no consent of the Administrative Agent shall be required for an assignment (i) of all or a portion of the Loans pursuant to Section 10.07(g), (h), or (l).

(iv)     <u>Assignment and Assumption.</u> The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent). Other than in the case of assignments pursuant to Section 10.07(l), the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire. Each assignee Lender shall be required to represent in the Assignment and Assumption that it is not a Disqualified Institution or an Affiliate of a Disqualified Institution.

(v)     <u>No Assignments to Certain Persons.</u> No such assignment shall be made (A) to Holdings, the Borrower or any of its Subsidiaries except as permitted under Section 2.05(1)(e) or Section 10.07(l), (B) subject to Sections 10.07(h) and (l) below, to any Affiliate of the Borrower, (C) to a natural person or (D) to any Disqualified Institution.

This Section 10.07(b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis among such Facilities.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans in accordance with its Pro Rata Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section 10.07 (and, in the case of an Affiliated Lender or a Person that, after giving effect to such assignment, would become an Affiliated Lender, to the requirements of clause (h) of this Section 10.07), from and after the effective date specified in each Assignment and Assumption, other than in connection with an assignment pursuant to Section 10.07(l), (x) the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement and, (y) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment), but shall in any event continue to be subject to Section 10.09. Upon request, and the surrender by the assigning Lender of its Term Note, the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(d).

(c)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, each Affiliated Lender Assignment and Assumption delivered to it, each notice of cancellation of any Loans delivered by the Borrower pursuant to subsections (h) or (l) below, and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans and amounts due under Section 2.03, owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 10.07(3) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations). Notwithstanding the foregoing, in no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is an Affiliated Lender, nor shall the Administrative Agent be obligated to monitor the aggregate amount of the Term Loans held by Affiliated Lenders.

(d)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any Affiliate or Subsidiary of the Borrower or a Disqualified Institution) (each, a "**Participant**") in all or a portion of such Lender's rights or obligations under this Agreement (including all or a portion of its Commitment or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than clauses (d) and (i) thereof)

201

that directly affects such Participant. Subject to subsection (e) of this Section 10.07, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements of Section 3.01 (including subsections (2), (3) and (4), as applicable as though it were a Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.07. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.10 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(e)    <u>Limitations upon Participant Rights.</u> A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and the Borrower shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary; *provided* that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of the Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or other obligations under any Loan Document) to any Person except to the extent such disclosure is necessary to establish that any such commitments, loans, letters of credit or other obligations are in registered form for U.S. federal income tax purposes. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof shall be appropriately reflected in the Participant Register. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with

notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)   Any Lender may at any time, assign all or a portion of its rights and obligations with respect to Loans and Commitments under this Agreement to a Person who is or will become, after such assignment, an Affiliated Lender through (x) Dutch auctions or other offers to purchase or take by assignment open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.05(1)(e) or (y) open market purchase on a non-pro rata basis, in each case subject to the following limitations:

(i)   Affiliated Lenders will not make any challenge to any Agent's or any Lender's attorney-client privilege on the basis of its status as a Lender;

(ii)   each Affiliated Lender that purchases any Loans or Commitments will clearly identify itself as an Affiliated Lender in any Affiliated Lender Assignment and Assumption executed in connection with such purchases or sales and each such Affiliated Lender Assignment and Assumption shall contain customary "big boy" representations but no requirement to make representations as to the absence of any material nonpublic information;

(iii)   as a condition to each assignment pursuant to this subsection (h), the Administrative Agent and the Borrower shall have been provided a notice in connection with each assignment to an Affiliated Lender or a Person that upon effectiveness of such assignment would constitute an Affiliated Lender pursuant to which such Affiliated Lender (in its capacity as such) shall waive any right to bring any action in connection with such Loans and Commitments against any Agent, in its capacity as such;

(iv)   the aggregate principal amount of Term Loans of any Class under this Agreement held by Affiliated Lenders at the time of any such purchase or assignment shall not exceed (I) in the case of the First Out Loans, 33.33% and (II) otherwise, 25%, in each case, of the aggregate principal amount of Term Loans of such Class outstanding at such time under this Agreement (such percentage, the "**Affiliated Lender Cap**"); *provided* that to the extent any assignment to an Affiliated Lender would result in the aggregate principal amount of all Term Loans of any Class held by Affiliated Lenders exceeding the Affiliated Lender Cap (in each case, determined at the time of purchase), the assignment of such excess amount will be void *ab initio*; and

(v)   the assigning Lender and the Affiliated Lender purchasing such Lender's Term Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit D-2 hereto (an "**Affiliated Lender Assignment and Assumption**").

Notwithstanding anything to the contrary contained herein, any Affiliated Lender that has purchased Term Loans pursuant to this subsection (h) may, in its sole discretion, contribute, directly or indirectly, the principal amount of such Term Loans or any portion thereof, *plus* all accrued and unpaid interest thereon, to the Borrower for the purpose of cancelling and extinguishing such Term Loans. Upon the date of such contribution, assignment or transfer, (x) the aggregate outstanding principal amount of Term Loans shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (y) the Borrower shall promptly provide notice to the Administrative Agent of such contribution of

such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register.

Each Affiliated Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it acquires any Person who is also a Lender, and each Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it becomes an Affiliated Lender. The Administrative Agent may conclusively rely upon any notice delivered pursuant to the immediately preceding sentence or pursuant to clause (v) of this subsection (h) and shall not have any liability for any losses suffered by any Person as a result of any purported assignment to or from an Affiliated Lender.

Notwithstanding anything to the contrary contained herein, (x) any Affiliated Lender shall be entitled to (a) receive information made available to any Lender holding the same Class of Term Loans as such Affiliated Lender and (b) attend all lender meetings and participate in any conference calls with the Borrower that are open to any Lender holding the same Class of Term Loans as such Affiliated Lender and (y) with respect to any amendment, modification, waiver, consent or other action that requires the consent of Required Lenders or the consent of Required Facility Lenders, all fees and other benefits made available to any consenting Lenders holding the same Class of Term Loans any Affiliated Lender shall be made available to such Affiliated Lender on a no less than pro rata basis.

(i)     Notwithstanding anything in Section 10.01 or the definition of "Required Lenders," or "Required Facility Lenders" to the contrary, for purposes of determining whether the Required Lenders and Required Facility Lenders (in respect of a Class of Term Loans) have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, or subject to Section 10.07(j), any plan of reorganization pursuant to the Bankruptcy Code, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required any Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, no Affiliated Lender shall have any right to consent (or not consent), otherwise act or direct or require any Agent or any Lender to take (or refrain from taking) any such action and:

(i)     all Term Loans held by any Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders and Required Facility Lenders (in respect of a Class of Term Loans) have taken any actions; and

(ii)     all Term Loans held by Affiliated Lenders shall be deemed to have been voted in the same proportion as non-Affiliated Lenders voting on such matter unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

(j)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliated Lender hereby agrees that, and each Affiliated Lender Assignment and Assumption shall provide a confirmation that, if a proceeding under any Debtor Relief Law shall be commenced by or against the Borrower or any other Loan Party at a time when such Lender is an Affiliated Lender, such Affiliated Lender irrevocably authorizes and empowers the Administrative Agent (at the direction of the Required Lenders) to vote on behalf of such Affiliated Lender with respect to the Term Loans held by such Affiliated Lender in the same proportion as non-Affiliated Lenders voting on such matter, unless the Administrative Agent (at the direction of the Required Lenders) instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Term Loans held by it as the Administrative Agent (at the direction of the Required Lenders) directs; *provided* that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and

204

not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner than the proposed treatment of similar Obligations held by Term Lenders that are not Affiliated Lenders.

(k)     [Reserved].

(l)     Any Lender may, so long as no Event of Default has occurred and is continuing, at any time, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to Holdings, the Borrower or any Subsidiary of the Borrower through (x) Dutch auctions or other offers to purchase open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.05(1)(e) or (y) open market purchases on a non-pro rata basis; *provided* that:

(i)     (x) if the assignee is Holdings or a Subsidiary of the Borrower, upon such assignment, transfer or contribution, the applicable assignee shall automatically be deemed to have contributed or transferred the principal amount of such Term Loans, *plus* all accrued and unpaid interest thereon, to the Borrower; or (y) if the assignee is the Borrower (including through contribution or transfers set forth in clause (x)), (a) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Lenders shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (c) the Borrower shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(ii)     [Reserved]; and

(iii)     purchases of Term Loans pursuant to this subsection (l) may not be funded with the proceeds of ABL Loans.

(m)     Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(n)     Notwithstanding the foregoing, no Disqualified Institution that purports to become a Lender hereunder (notwithstanding the provisions of this Agreement that prohibit Disqualified Institutions from becoming Lenders) shall be entitled to any of the rights or privileges enjoyed by the other Lenders with respect to voting, information and lender meetings. In addition, if any assignment or participation is made to any Disqualified Institution without the Borrower's express prior written consent (which consent shall state expressly that the Borrower acknowledges that the assignee Lender is a Disqualified Institution) in violation of clause (v) of Section 10.07(b), the Borrower may, in addition to

any other rights and remedies that it may have against such Disqualified Institution, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) in the case of outstanding Term Loans held by Disqualified Institutions, purchase or prepay such Term Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in Section 10.07), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

(o) No Agent shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions or otherwise take (or omit to take) any action with respect thereto. Without limiting the generality of the foregoing, no Agent shall (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution.

Section 10.08   [Reserved].

Section 10.09   Confidentiality. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, equity owners, investors or funding sources of Lenders who are Affiliates of Permitted Holders, legal counsel, independent auditors, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, with such Affiliate being responsible for such Person's compliance with this Section 10.09; *provided*, *however*, that such Agent or Lender, as applicable, shall be principally liable to the extent this Section 10.09 is violated by one or more of its Affiliates or any of its or their respective employees, directors or officers), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided*, *however*, that each Agent and each Lender agrees to seek confidential treatment with respect to any such disclosure, (c) to the extent required by applicable laws or regulations or by any subpoena or otherwise as required by applicable Law or regulation or as requested by a Governmental Authority; *provided* that such Agent or such Lender, as applicable, agrees (x) that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (except in connection with any request as part of any audit or regulatory examination) unless such notification is prohibited by law, rule or regulation and (y) to seek confidential treatment with respect to any such disclosure, (d) to any other party hereto, (e) subject to an agreement containing provisions at least as restrictive as those of this Section 10.09, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee (or its agent) invited to be an Additional Lender or (ii) with the prior consent of the Borrower, any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any of their Subsidiaries or any of their respective obligations; *provided* that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, Participant or Eligible Assignee that such Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to the Borrower and the Agents, including as set forth in any confidential information memorandum or other marketing materials) in accordance with the standard syndication process of the

Agents or market standards for dissemination of such type of information which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information, (f) for purposes of establishing a "due diligence" defense, (g) with the consent of the Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach by any Person of this Section 10.09 or any other confidentiality provision in favor of any Loan Party, (y) becomes available to any Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent, such Lender or the applicable Affiliate to be subject to a confidentiality restriction in respect thereof in favor of Holdings, the Borrower or any Affiliate of the Borrower or (z) is independently developed by the Agents, the Lenders or their respective Affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this Section 10.09 or (i) in order to enforce its respective rights under any Loan Document in any action or proceeding.

For purposes of this Section 10.09, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary or Affiliate thereof or their respective businesses, other than any such information that is available to any Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary or Affiliate thereof after the date hereof shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 10.09 shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Agent and each Lender acknowledges that (a) the Information may include trade secrets, protected confidential information, or material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of such information and (c) it will handle such information in accordance with applicable Law, including United States Federal and state securities Laws and to preserve its trade secret or confidential character.

The respective obligations of the Agents and the Lenders under this Section 10.09 shall survive, to the extent applicable to such Person, (x) the payment in full of the Obligations and the termination of this Agreement, (y) any assignment of its rights and obligations under this Agreement and (z) the resignation or removal of any Agent.

Section 10.10    Setoff. If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party then due and payable under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender under this Section 10.10 are in addition to other rights and remedies (including other rights of setoff) that such Lender may have. Each Lender agrees to notify the Borrower

and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.11    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.12    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.13    Electronic Execution of Assignments and Certain Other Documents. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.14    Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Term Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.15    Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.16   <u>GOVERNING LAW</u>.

(a)   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

(b)   THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)   THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION 10.16. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 10.17   <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO

209

ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.17.

Section 10.18    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

Section 10.19    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Required Lenders.

Section 10.20    Use of Name, Logo, etc.. Each Loan Party consents to the publication in the ordinary course by any Agent or the Ad Hoc Group of Term Lenders of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark. Such consent shall remain effective until revoked by such Loan Party in writing to such Agent and Ad Hoc Group of Term Lenders.

Section 10.21    USA PATRIOT Act. Each Lender that is subject to the USA PATRIOT Act and each Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act. The Borrower shall, promptly following a request by any Agent or any Lender, provide all documentation and other information that such Agent or Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 10.22    Service of Process. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.23    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Agents and Ad Hoc Group of Term Lenders and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Agents, the Ad Hoc Group of Term Lenders and the Lenders, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, the Ad Hoc Group of Term Lenders and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents, Ad Hoc Group of Term Lenders nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, Ad Hoc

210

Group of Term Lenders, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Agents, the Ad Hoc Group of Term Lenders nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Agents, the Ad Hoc Group of Term Lenders or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.24    Release of Collateral and Guarantee Obligations; Subordination of Liens.

(a)    The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released (i) in full, as set forth in clause (b) below, (ii) upon the sale or other transfer of such Collateral (including as part of or in connection with any other sale or other transfer permitted hereunder) to any Person other than another Loan Party, to the extent such sale, transfer or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party by a Person that is not a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guaranty (in accordance with the second succeeding sentence), (vi) as required by the Collateral Agent to effect any sale, transfer or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Collateral Documents and (vii) to the extent such Collateral otherwise becomes Excluded Assets. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents.  Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guaranties upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary, or otherwise becoming an Excluded Subsidiary.  The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. The Administrative Agent or the Collateral Agent, as applicable, shall, at the Borrower's expense, upon receipt of an Officer's Certificate from the Borrower certifying that the requested release is permitted under this Section 10.24, release the requested Collateral from the Liens securing the Obligations and provide the Borrower with such additional documentation as the Borrower may reasonably request to evidence such release; *provided* that such release and such additional documentation shall not expose the Administrative Agent or the Collateral Agent to liability and shall be without recourse to or representation or warranty by the Administrative Agent or the Collateral Agent.  Any representation, warranty or covenant contained in any Loan Document relating to any such released Collateral or Guarantor shall no longer be deemed to be repeated.

(b)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent obligations not then due) have been paid in full and all

Commitments have terminated, upon request of the Borrower, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent obligations not then due. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Permitted Lien specified in clause (7) of the definition thereof securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of Section 7.02(b) in any Collateral, and at the Borrower's expense, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to subordinate the Lien on any Collateral to any such Permitted Lien to be senior to the Liens in favor of the Collateral Agent; *provided*, that the Borrower shall have provided the Administrative Agent or Collateral Agent, as applicable, with an Officer's Certificate certifying that such requested subordination and such requested actions are permitted under this Section 10.24; *provided, further*, that such requested actions shall not expose the Administrative Agent or the Collateral Agent to liability and shall be without recourse to or representation or warranty by the Administrative Agent or the Collateral Agent.

(d)    Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrower's assets in a bankruptcy, foreclosure or other similar proceeding, forbear from exercising remedies upon an Event of Default, or in a bankruptcy proceeding, enter into a settlement agreement on behalf of all Lenders.

Section 10.25    [Reserved].

Section 10.26    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the

Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

Section 10.27    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 10.28    Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a) In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were

governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b) As used in this Section 10.28, the following terms have the following meanings:

(1)      "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

(2)      "Covered Entity" means any of the following:

i.      a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

ii.      a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

iii.      a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(3)      "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

(4)      "QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 10.29   Amendment and Restatement.   On the Closing Date, the Existing Credit Agreement shall be amended, restated and superseded in its entirety by this Agreement.  The parties hereto acknowledge and agree that (i) this Agreement and the other documents entered into in connection herewith do not constitute a novation or termination of the "Obligations" (as defined in the Existing Credit Agreement, as applicable) under the Existing Credit Agreement, as applicable, as in effect prior to the Closing Date, (ii) such "Obligations" are in all respects continuing (as amended and restated hereby) as indebtedness and obligations outstanding under this Agreement and (iii) all claims, actions, causes of action, suits, damages and indemnities by any Loan Party or any Agent or Lender on account of any action, breach, non-compliance or default by any Loan Party or any Agent or Lender that occurred, or any inaction by any Loan Party or any Agent or Lender that should have occurred, in each case, on or prior to the Closing Date, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, shall cease to exist and be forever waived, released and discharged to the full extent permitted by law.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.**

[Signature Page to Amended and Restated First Lien Credit Agreement]

# EXHIBIT B

## Amended and Restated Exhibits

# EXHIBIT C

**New Exhibits**

# EXHIBIT D

**Resignation and Appointment Agreement**

OMM_US:79432204.10

# EXHIBIT E

**Reaffirmation Agreement**

# **EXHIBIT F**

**A&R Term Intercreditor Agreement**

# **EXHIBIT G**

**ABL Intercreditor Amendment**

~~DRAFT SUBJECT TO REVISION~~
EXECUTION VERSION

_____

AMENDED AND RESTATED
FIRST LIEN CREDIT AGREEMENT

dated as of February 24, 2021

among

BEAR PARENT INC.,
as Holdings,

BELK, INC.,
as Borrower,

ALTER DOMUS (US) LLC,
as Administrative  Agent and Collateral Agent,

and

THE OTHER LENDERS PARTY HERETO

_____

## TABLE OF CONTENTS
### (cont'd)

**Page**

### ARTICLE I DEFINITIONS AND ACCOUNTING TERMS

Section 1.01  Defined Terms ................................................................. 1
Section 1.02  Other Interpretive Provisions ................................... 83
Section 1.03  Accounting Terms ............................................................ 84
Section 1.04  Rounding ........................................................................... 84
Section 1.05  References to Agreements, Laws, etc. .................................. 84
Section 1.06  Times of Day and Timing of Payment and Performance ......... 84
Section 1.07  Pro Forma and Other Calculations .................................... 85
Section 1.08  Available Amount Transaction ...................................... 87
Section 1.09  Guaranties of Hedging Obligations .............................. 87
Section 1.10  Currency Generally ..................................................... 88
Section 1.11  Divisions ...................................................................... 88
Section 1.12  Effect of Benchmark Transition Event ............................. 88

### ARTICLE II THE COMMITMENTS AND BORROWINGS

Section 2.01  The Loans ..................................................................... 92
Section 2.02  Borrowings, Conversions and Continuations of Loans ........... 93
Section 2.03  [Reserved] ..................................................................... 95
Section 2.04  [Reserved] ..................................................................... 95
Section 2.05  Prepayments ................................................................. 95
Section 2.06  Termination or Reduction of Commitments ........................ 107
Section 2.07  Repayment of Loans ...................................................... 108
Section 2.08  Interest .......................................................................... 108
Section 2.09  Fees ............................................................................... 109
Section 2.10  Computation of Interest and Fees .................................... 109
Section 2.11  Evidence of Indebtedness ............................................... 109
Section 2.12  Payments Generally ...................................................... 110
Section 2.13  Sharing of Payments ..................................................... 112
Section 2.14  [Reserved] ..................................................................... 112
Section 2.15  Refinancing Amendments .............................................. 112
Section 2.16  Extensions of Loans ...................................................... 113
Section 2.17  Defaulting Lenders ........................................................ 115
Section 2.18  Prepayment Premium .................................................... 116
Section 2.19  Permitted Debt Exchanges. ............................................ 117
Section 2.20  Limitation on Refinancing ............................................. 120

### ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01  Taxes ............................................................................. 120
Section 3.02  Illegality ........................................................................ 123
Section 3.03  Inability to Determine Rates .......................................... 124

i

# TABLE OF CONTENTS
## (cont'd)

**Page**

Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loan ........................................................................ 124
Section 3.05    Funding Losses ................................................................................. 125
Section 3.06    Matters Applicable to All Requests for Compensation ...................... 126
Section 3.07    Replacement of Lenders under Certain Circumstances ...................... 126
Section 3.08    Survival .............................................................................................. 128

### ARTICLE IV CONDITIONS PRECEDENT TO TERM BORROWINGS

Section 4.01    Conditions to Term Borrowings on Closing Date .................................. 128

### ARTICLE V REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power; Compliance with Laws ................ 128
Section 5.02    Authorization; No Contravention ........................................................... 129
Section 5.03    Governmental Authorization .................................................................. 129
Section 5.04    Binding Effect ........................................................................................ 130
Section 5.05    Financial Statements; No Material Adverse Effect ................................ 130
Section 5.06    Litigation ............................................................................................... 130
Section 5.07    Labor Matters ........................................................................................ 130
Section 5.08    Real Property Matters ........................................................................... 130
Section 5.09    Environmental Matters ........................................................................... 131
Section 5.10    Taxes .................................................................................................... 132
Section 5.11    ERISA Compliance ............................................................................... 132
Section 5.12    Subsidiaries .......................................................................................... 133
Section 5.13    Margin Regulations; Investment Company Act ..................................... 133
Section 5.14    Disclosure ............................................................................................. 133
Section 5.15    Intellectual Property; Licenses, etc. ...................................................... 133
Section 5.16    Solvency ................................................................................................ 134
Section 5.17    USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act ......................................................................................... 134
Section 5.18    Collateral Documents ............................................................................ 134
Section 5.19    Use of Proceeds .................................................................................... 134
Section 5.20    Beneficial Ownership Certification ........................................................ 135

### ARTICLE VI AFFIRMATIVE COVENANTS

Section 6.01    Financial Statements ............................................................................. 135
Section 6.02    Certificates; Other Information .............................................................. 137
Section 6.03    Notices .................................................................................................. 138
Section 6.04    Payment of Obligations ......................................................................... 139
Section 6.05    Preservation of Existence, etc. ............................................................. 139
Section 6.06    Maintenance of Properties ..................................................................... 139

# TABLE OF CONTENTS
## (cont'd)

**Page**

Section 6.07  Maintenance of Insurance ................................................................... 139
Section 6.08  Compliance with Laws........................................................................ 140
Section 6.09  Books and Records............................................................................. 140
Section 6.10  Inspection Rights................................................................................ 140
Section 6.11  Covenant to Guarantee Obligations and Give Security ........................ 141
Section 6.12  Compliance with Environmental Laws................................................. 144
Section 6.13  Further Assurances and Post-Closing Covenant.................................... 146
Section 6.14  Use of Proceeds.................................................................................. 146
Section 6.15  Maintenance of Ratings ...................................................................... 146
Section 6.16  Accounting Changes ........................................................................... 146
Section 6.17  Nature of Business ............................................................................. 146
Section 6.18  Designation of Subsidiaries ................................................................ 147
Section 6.19  Lender Meetings ................................................................................ 147

## ARTICLE VII NEGATIVE COVENANTS

Section 7.01  Liens.................................................................................................. 147
Section 7.02  Indebtedness....................................................................................... 147
Section 7.03  Fundamental Changes ......................................................................... 152
Section 7.04  Asset Sales ......................................................................................... 156
Section 7.05  Restricted Payments............................................................................ 157
Section 7.06  Transactions with Affiliates ................................................................ 163
Section 7.07  Burdensome Agreements ..................................................................... 167
Section 7.08  Modification of Terms of Subordinated Indebtedness............................ 170
Section 7.09  Holdings............................................................................................. 170
Section 7.10  Material Intellectual Property .............................................................. 172
Section 7.11  Subsidiaries........................................................................................ 172
Section 7.12  Minimum Average Liquidity ............................................................... 172
Section 7.13  Financial Covenant. ............................................................................ 172
Section 7.14  Further Priming or Subordination; Anti-Layering. ................................ 173
Section 7.15  Benefit of Covenants........................................................................... 174

## ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES

Section 8.01  Events of Default ................................................................................ 174
Section 8.02  Remedies upon Event of Default ......................................................... 176
Section 8.03  Application of Funds........................................................................... 177

## ARTICLE IX ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01  Appointment and Authorization of the Administrative Agent ............... 180
Section 9.02  Rights as a Lender............................................................................... 181
Section 9.03  Exculpatory Provisions ....................................................................... 181

# TABLE OF CONTENTS
## (cont'd)

**Page**

Section 9.04  Lack of Reliance on the Agents ............................................................. 183
Section 9.05  Certain Rights of the Agents .................................................................. 183
Section 9.06  Reliance by the Agents .......................................................................... 183
Section 9.07  Delegation of Duties ............................................................................. 184
Section 9.08  Indemnification ..................................................................................... 184
Section 9.09  The Administrative Agent in Its Individual Capacity ........................... 185
Section 9.10  [Reserved] ............................................................................................. 185
Section 9.11  Resignation by the Administrative Agent and the Collateral Agent ...... 185
Section 9.12  Collateral Matters ................................................................................. 186
Section 9.13  [Reserved] ............................................................................................. 187
Section 9.14  Administrative Agent May File Proofs of Claim .................................. 187
Section 9.15  Appointment of Supplemental Agents .................................................. 187
Section 9.16  Intercreditor Agreements ..................................................................... 188
Section 9.17  Secured Cash Management  Agreements  and Secured Hedge
              Agreements ....................................................................................... 189
Section 9.18  Withholding Tax .................................................................................... 189
Section 9.19  Survival .................................................................................................. 189

## ARTICLE X MISCELLANEOUS

Section 10.01  Amendments, etc. ................................................................................. 190
Section 10.02  Notices and Other Communications; Facsimile Copies ....................... 194
Section 10.03  No Waiver; Cumulative Remedies ....................................................... 196
Section 10.04  Costs and Expenses .............................................................................. 196
Section 10.05  Indemnification by the Borrower ......................................................... 197
Section 10.06  Marshaling; Payments Set Aside .......................................................... 198
Section 10.07  Successors and Assigns ........................................................................ 198
Section 10.08  [Reserved] ............................................................................................. 206
Section 10.09  Confidentiality ...................................................................................... 206
Section 10.10  Setoff .................................................................................................... 207
Section 10.11  Interest Rate Limitation ....................................................................... 208
Section 10.12  Counterparts; Integration; Effectiveness .............................................. 208
Section 10.13  Electronic  Execution  of Assignments  and Certain  Other
              Documents ....................................................................................... 208
Section 10.14  Survival of Representations and Warranties ......................................... 208
Section 10.15  Severability ........................................................................................... 208
Section 10.16  GOVERNING LAW ............................................................................. 209
Section 10.17  WAIVER OF RIGHT TO TRIAL BY JURY ....................................... 209
Section 10.18  Binding Effect ...................................................................................... 210
Section 10.19  Lender Action ....................................................................................... 210
Section 10.20  Use of Name, Logo, etc. ...................................................................... 210
Section 10.21  USA PATRIOT Act .............................................................................. 210
Section 10.22  Service of Process ................................................................................ 210

# TABLE OF CONTENTS
## (cont'd)

**Page**

Section 10.23  No Advisory or Fiduciary Responsibility ................................................ 210
Section 10.24  Release of Collateral and Guarantee Obligations; Subordination of
Liens.................................................................................................................... 211
Section 10.25  [Reserved] ................................................................................................. 212
Section 10.26  Judgment Currency ................................................................................... 212
Section 10.27  Acknowledgement  and Consent to Bail-In  of EEA Financial
Institutions.......................................................................................................... 213
Section 10.28  Acknowledgement Regarding Any Supported QFCs ............................. 213
Section 10.29  Amendment and Restatement .................................................................. 214

SCHEDULES

| | |
|---|---|
| 1.01(1) | Closing Date Guarantors |
| 1.01(2) | Existing Mortgaged Properties |
| 1.02 | Closing Date Unrestricted Subsidiaries |
| 2.01 | Commitments |
| 5.06 | Litigation |
| 5.08(2) | Owned Real Property |
| 5.08(3) | Leased Real Property |
| 5.08(4) | Space Leased Property |
| 5.08(5) | Real Estate Proceedings |
| 5.08(6) | Real Property Improvements |
| 5.08(7) | Real Property Violations |
| 5.08(8) | Occupied Real Property |
| 5.12 | Subsidiaries and Other Equity Investments |
| 7.02(3) | Existing Indebtedness |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A-1 | Committed Loan Notice |
| B-1 | Term Note |
| C | Compliance Certificate |
| D-1 | Assignment and Assumption |
| D-2 | Affiliated Lender Assignment and Assumption |
| E | Guaranty |
| F | Security Agreement |
| G-1 | ABL Intercreditor Agreement |
| G-2 | Term Intercreditor Agreement |
| H | United States Tax Compliance Certificates |
| I | Solvency Certificate |
| J | Discount Range Prepayment Notice |
| K | Discount Range Prepayment Offer |
| L | Solicited Discounted Prepayment Notice |
| M | Acceptance and Prepayment Notice |
| N | Specified Discount Prepayment Notice |
| O | Solicited Discounted Prepayment Offer |
| P | Specified Discount Prepayment Response |
| Q | Intercompany Subordination Agreement |
| R | PIK Toggle Notice |
| S | Recognition Agreement |

ANNEXES

| | |
|---|---|
| I | Intercreditor Provisions |

## AMENDED AND RESTATED FIRST LIEN CREDIT AGREEMENT

This AMENDED AND RESTATED FIRST LIEN CREDIT AGREEMENT (this "**Agreement**"), by and among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation and direct subsidiary of Holdings ("**Belk**" or the "**Borrower**"), ALTER DOMUS (US) LLC, as administrative agent ("**Alter Domus**" and, in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**") is attached to the Second Amendment and constitutes the agreement of the parties hereto on and after the Closing Date.

## PRELIMINARY STATEMENTS

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## Definitions and Accounting Terms

Section 1.01      Defined Terms. As used in this Agreement, the following terms have the meanings set forth below:

"**ABL Commitments**" means "Commitments" as defined in the ABL Facility.

"**ABL Credit Agreement**" means the ABL Credit Agreement dated as of the Original Closing Date (as amended by that certain Amendment No. 1 to ABL Credit Agreement, dated as of August 29, 2019, that certain Amendment No. 2 to the ABL Credit Agreement, dated as of October 30, 2020 and that certain Limited Waiver and Amendment No. 3 to ABL Credit Agreement, dated as of the Closing Date, by and among the Borrower, Holdings, the lenders party thereto and the ABL Facility Administrative Agent), among Holdings, the Borrower, the ABL Facility Administrative Agent and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, supplemented, waived or otherwise modified from time to time, in each case to the extent permitted hereunder and under the ABL Intercreditor Agreement and any Refinancing Indebtedness thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Credit Agreement) in each case to the extent permitted hereunder.

"**ABL Event of Default**" means "Event of Default" as set forth in the ABL Credit Agreement.

"**ABL Facility**" means the collective reference to the ABL Credit Agreement, any ABL Loan Document, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time, or refunded, refinanced, restructured, replaced, renewed, repaid, increased or extended from time to time, in each case to the extent permitted hereunder and under the ABL Intercreditor Agreement and any Refinancing Indebtedness thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Facility).

"**ABL Facility Administrative Agent**" means Bank of America, N.A. in its capacity as administrative agent under the ABL Credit Agreement or any successor agent under the ABL Loan Documents.

"**ABL Financial Covenant**" means the covenant set forth in Section 7.10 of the ABL Credit Agreement.

"**ABL Intercreditor Agreement**" means the ABL Intercreditor Agreement substantially in the form of Exhibit G-1 among the Collateral Agent, Wilmington Trust, National Association, as collateral agent under the Second Lien Credit Agreement, Bank of America, N.A., as collateral agent under the ABL Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Lenders**" means "Lenders" under the ABL Credit Agreement.

"**ABL Loan Documents**" means, collectively, (i) the ABL Credit Agreement and (ii) the security documents, intercreditor agreements (including the ABL Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the ABL Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the ABL Facility.

"**ABL Obligations**" means "Obligations" as defined in the ABL Facility.

"**Acceptable Discount**" has the meaning specified in Section 2.05(1)(e)(D)(2).

"**Acceptable Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Acceptance and Prepayment Notice**" means a notice of the Borrower's acceptance of the Acceptable Discount in substantially the form of Exhibit M.

"**Acceptance Date**" has the meaning specified in Section 2.05(1)(e)(D)(2).

"**Acquired Indebtedness**" means, with respect to any specified Person,

(1)     Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person, and

(2)     Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Ad Hoc Group of Term Lenders**" means, collectively, (a) the ad hoc group of Lenders that are represented by (x) Willkie Farr & Gallagher LLP, as legal counsel and (y) PJT Partners LP, as financial advisor and (b) the ad hoc group of Lenders that are represented by (x) O'Melveny & Myers LLP, as legal counsel and (y) Evercore Inc., as financial advisor.

"**Additional Lender**" means, at any time, any bank, other financial institution or institutional lender or investor that, in any case, is not an existing Lender and that agrees to provide any portion of any (a) [reserved], (b) Loans pursuant to a Refinancing Amendment in accordance with Section 2.15 or (c) Replacement Loans pursuant to Section 10.01; *provided* that each Additional Lender (other than any Person that is a Lender, an Affiliate of a Lender or an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), in each case solely to the extent that any such consent would be required from the Administrative Agent under Section 10.07(b)(iii)(B) for an assignment of Loans to such Additional Lender.

"**Adjusted EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period:

      (1)     increased (without duplication) by the following, in each case (other than clauses (h) and (l)) to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

           (a)     total interest expense and, to the extent not reflected in such total interest expense, any losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such Hedging Obligations or such derivative instruments, and bank and letter of credit fees and costs of surety bonds in connection with financing activities, together with items excluded from the definition of "Consolidated Interest Expense" pursuant to the definition thereof; *plus*

           (b)     provision for taxes based on income, profits, revenue or capital, including federal, foreign and state income, franchise, excise, value added and similar taxes, property taxes and similar taxes, and foreign withholding taxes paid or accrued during such period (including any future taxes or other levies that replace or are intended to be in lieu of taxes, and any penalties and interest related to taxes or arising from tax examinations), and any payments to a Parent Company in respect of such taxes permitted to be made hereunder; *plus*

           (c)     Consolidated Depreciation and Amortization Expense for such period; *plus*

           (d)     any other non-cash expenses, charges, expenses, losses or items (including any write-offs or write-downs) reducing Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (i) the Borrower may determine not to add back such non-cash charge in the current period and (ii) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Adjusted EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *provided* that the foregoing shall not permit adding back the write-down or reserve of inventory outside the ordinary course of business; *plus*

           (e)     minority interest expense, the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any non-wholly-owned Subsidiary deducted (and not added back) in such period to Consolidated Net Income, excluding cash distributions in respect thereof, and the amount of any

reductions in arriving at Consolidated Net Income resulting from the application of Accounting Standards Codification Topic No. 810, *Consolidation*; *plus*

(f)    (i) the amount of management, monitoring, consulting, transaction, advisory and other fees (including termination fees) and indemnities and expenses paid or accrued in such period under the Management Services Agreement or otherwise to the extent otherwise permitted under Section 7.06 and (ii) the amount of payments made to option holders of such Person or any Parent Company in connection with, or as a result of, any distribution being made to shareholders of such Person or its Parent Companies, which payments are being made to compensate such option holders as though they were shareholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted hereunder; *plus*

(g)    the amount of loss or discount on sale of receivables, Securitization Assets and related assets to any Securitization Subsidiary in connection with a Qualified Securitization Facility; *plus*

(h)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Adjusted EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Adjusted EBITDA pursuant to clause (2) below for any previous period and not added back; *plus*

(i)    any costs or expenses incurred pursuant to any management equity plan, stock option plan or any other management or employee benefit plan, agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of such Person or net cash proceeds of an issuance of Equity Interest of such Person (other than Disqualified Stock); *plus*

(j)    any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of *FASB Accounting Standards Codification Topic 715—Compensation— Retirement Benefits*, and any other items of a similar nature, *plus*

(k)    any net loss from operations expected to be disposed of, abandoned or discontinued within twelve months after the end of such period; *plus*

(l)    (I) pro forma adjustments, including pro forma "run rate" cost savings, operating expense reductions and other synergies (in each case, net of amounts actually realized) related to acquisitions, dispositions and other specified transactions, or related to restructuring initiatives, cost savings initiatives and other initiatives that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are that are expected to be taken within four fiscal quarters after the date of consummation of such acquisition, disposition or other specified transaction or the initiation of such restructuring initiative, cost savings initiative or other initiatives and (II) pro forma "run rate" cost savings, operating expense reductions and synergies (in each case, net of amounts actually realized) related to the Transactions that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to

4

which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within four fiscal quarters after the Closing Date (it is understood and agreed that "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken); *provided* that amounts added back pursuant to this clause (l), together with the amounts added back pursuant to clauses (n) and (o) below and any similar adjustments made in accordance with Section 1.07(3) and add-backs included in clause (1) of the definition of "Consolidated Net Income", shall not exceed 10% of Adjusted EBITDA for such period calculated prior to giving effect to the add-backs set forth in this clause (l), clauses (n) and (o) below and the adjustments made in accordance with Section 1.07(3) and add-backs included in clause (1) of the definition of "Consolidated Net Income", and being calculated on a pro forma basis (the cap in this proviso, the "**Combined Adjusted EBITDA Cap**"); *plus*

(m)      any payments in the nature of compensation or expense reimbursement made to independent board members; *plus*

(n)      costs, charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of cost savings initiatives and operating expense reductions, restructuring and similar charges (including the Transactions), severance, relocation costs, integration and facilities and New Store opening costs and other business optimization expenses, signing costs, retention or completion bonuses, transition costs, costs related to closure/consolidation of facilities, stores and curtailments or modifications to pension and post-retirement employee benefits plans (including any settlement of pension liabilities), subject to the Combined Adjusted EBITDA Cap; *plus*

(o)      the amount of any loss attributable to any New Store, subject to the Combined Adjusted EBITDA Cap; *provided* that the aggregate amounts added back pursuant to this clause (o) shall not exceed $5.0 million for such period; *plus*

(p)      costs and expenses in connection with the implementation of fresh start accounting and all adjustments resulting from the application of fresh start accounting principles;

(2)      decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

(a)      non-cash gains for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Adjusted EBITDA in any prior period other than any such accrual or reserve that has been added back to Consolidated Net Income in calculating Adjusted EBITDA in accordance with this definition), and

(b)      the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any non-wholly owned subsidiary added (and not deducted in such period from Consolidated Net Income).

Adjusted EBITDA of Belk and its Restricted Subsidiaries will be deemed to equal (i) ~~$[_] million~~$124,997,000 for the fiscal quarter ended February 1, 2020 (ii) ~~$[_] million~~($67,491,000) for the fiscal quarter ended May 2, 2020, (iii) ~~$[_] million~~$1,505,000 for the fiscal quarter ended August 1, 2020 and (iv) ~~$[_] million~~($41,751,000) for the fiscal quarter ended October 31, 2020, in each case and, without

5

duplication, adjusted to reflect any pro forma adjustments with respect to any relevant Specified Transaction as are appropriate and consistent with the pro forma adjustment provisions set forth in Section 1.07, in each case, occurring or identified after the Closing Date and not otherwise included in the calculation of the foregoing amounts.

"**Adjusted Eurodollar Rate**" means, with respect to any Borrowing of Eurodollar Rate Loans for any Interest Period, an interest rate per annum equal to the Eurodollar Rate based on clause (a) of the definition of "Eurodollar Rate" for such Interest Period multiplied by the Statutory Reserve Rate; *provided* that, notwithstanding the foregoing, the "Adjusted Eurodollar Rate" shall in no event be less than 1.00% per annum with respect to the First-Out Loans. The Adjusted Eurodollar Rate will be adjusted automatically as to all Borrowings of Eurodollar Rate Loans then outstanding as of the effective date of any change in the Statutory Reserve Rate.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement prior to the Closing Date and on and after the Closing Date, means Alter Domus (US) LLC and any successor thereto.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. Notwithstanding the foregoing, other than with respect to Section 7.06, none of Blackstone, KKR, any Agent, any Second Amendment Lender as of the Closing Date (other than the Sponsor) nor any of their respective Affiliates shall be deemed an Affiliate of the Sponsor, Holdings, the Borrower or any of its Subsidiaries.

"**Affiliate Transaction**" has the meaning specified in Section 7.06.

"**Affiliated Lender**" means, at any time, any Lender that is the Sponsor or an Affiliate of the Sponsor or an Affiliate of the Borrower (other than (a) Holdings, the Borrower or any Subsidiary or (b) any natural person) at such time. For the avoidance of doubt, none of Blackstone, KKR, any Agent, any Second Amendment Lender as of the Closing Date nor any of their respective Affiliates or permitted assignees shall be deemed an Affiliated Lender (other than the Sponsor).

"**Affiliated Lender Assignment and Assumption**" has the meaning specified in Section 10.07(h)(v).

"**Affiliated Lender Cap**" has the meaning specified in Section 10.07(h)(iv).

"**After Year-End Payment**" has the mean specified in Section 2.05(2).

"**Agent Fee Letter**" means the Agent Fee Letter, dated as of the Closing Date, between the Borrower and Alter Domus (US) LLC, as Administrative Agent and Collateral Agent.

"**Agent Parties**" has the meaning specified in Section 10.02(4).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, members, managers, employees, agents, representatives, sub-agents, co-agents, attorneys-in-fact, partners, trustees, attorneys, and advisors of such Persons and of such Persons' Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Supplemental Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Agreement, as amended, restated, amended and restated, modified or supplemented from time to time in accordance with the terms hereof.

"**Agreement Currency**" has the meaning specified in Section 10.26.

"**AHYDO Payment**" means any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Code Section 163(i).

"**All-In Yield**" means, with respect to any term loan facility or other term loans, as of any date of determination, the sum of (I) the applicable interest rate ((x) assuming an election to pay in cash and (y) which, in respect of any Eurodollar Rate Loans (or other loans that accrue interest by reference to a similar reference rate), shall equal to the sum of (i) the higher of (A) the Adjusted Eurodollar Rate on such date for a deposit in Dollars with a maturity of one month and (B) the Adjusted Eurodollar rate "floor," if any, with respect thereto as of such date and (ii) the Applicable Rate (or other applicable margin) as of such date for Eurodollar Rate Loans (or other loans that accrue interest by reference to a similar reference rate)) and (II) the amount of original issue discount and upfront fees thereon (converted to yield assuming a four-year average life and without any present value discount), but excluding the effect of any arrangement, structuring, syndication or other fees payable in connection therewith that are not shared with all lenders or holders of such term loan facility or other term loans; provided that the amounts set forth in clauses (I) and (II) above for any term loans that are not incurred under this Agreement shall be based on the stated interest rate basis for such term loans.

"**Applicable Discount**" has the meaning specified in Section 2.05(1)(e)(C)(2).

"**Applicable Intercreditor Agreement**" means (a) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that (i) are intended to rank equal in priority to the Liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the ABL Obligations and (ii) are intended to rank junior in priority to the Liens on the Term Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the Obligations, the ABL Intercreditor Agreement, (b) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank equal in priority to the Liens on the Collateral securing the Obligations (but without regard to control of remedies), each of the ABL Intercreditor Agreement and the Term Intercreditor Agreement, (c) to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank equal in priority to the Liens on the Collateral securing the Junior Priority Debt Obligations (as defined in the Term Intercreditor Agreement), the Term Intercreditor Agreement and the ABL Intercreditor Agreement and (d) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank junior in priority to the Liens securing the Obligations and the Junior Priority Debt Obligations, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent, the

Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations and the Junior Priority Debt Obligations (as defined in the Term Intercreditor Agreement).

"**Applicable Rate**" means a percentage per annum equal to:

> (a)      with respect to First-Out Loans, (i) 7.50% for Eurodollar Rate Loans and (ii) 6.50% for Base Rate Loans; and

> (b)      with respect to any Term Loans (other than the Closing Date Term Loans), as specified in the applicable Extension Amendment, Refinancing Amendment or amendment in respect of Replacement Loans.

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Asset Sale**" means:

> (1)      the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions of property or assets of the Borrower or any Restricted Subsidiary (each referred to in this definition as a "**disposition**"); or

> (2)      the issuance or sale of Equity Interests (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 7.02 and directors' qualifying shares or shares or interests required to be held by foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Borrower or another Restricted Subsidiary), whether in a single transaction or a series of related transactions;

in each case, other than:

> (a)      any disposition of:

> (i)      Cash Equivalents or Investment Grade Securities,

> (ii)      obsolete, damaged or worn out property or assets in the ordinary course of business or consistent with industry practice or any disposition of inventory or goods (or other assets) held for sale or no longer used or useful in the ordinary course;

> (iii)      assets no longer economically practicable or commercially reasonable to maintain (as determined in good faith by the management of the Borrower) in an aggregate amount not to exceed $2,000,000 in any fiscal year;

> (iv)      improvements made to leased real property to landlords pursuant to customary terms of leases entered into in the ordinary course of business;

> (v)      assets for purposes of charitable contributions or similar gifts in *de minimis* amounts to the extent consistent with past practices;

(b)     the disposition of any assets by the Borrower or any Restricted Subsidiary in a manner permitted pursuant to Section 7.03;

(c)     any disposition in connection with the making of any Restricted Payment that is permitted to be made, and is made, under Section 7.05, any Permitted Investment or any acquisition otherwise permitted under this Agreement;

(d)     [reserved];

(e)     any disposition of property or assets or issuance of securities by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary to the extent otherwise permitted hereunder; *provided* that dispositions by Loan Parties to Non-Loan Parties shall be permitted solely to the extent permitted under Section 7.05;

(f)     to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)     (i) the lease, assignment or sublease, license or sublicense of any real or personal property in the ordinary course of business or consistent with industry practice and (ii) the exercise of termination rights with respect to any lease, sublease, license or sublicense or other agreement;

(h)     the sale of the Knox property pursuant to agreement existing on the Closing Date;

(i)     foreclosures, condemnation, expropriation, eminent domain or any similar action (including for the avoidance of doubt, any Casualty Event) with respect to assets or the granting of Liens not prohibited hereunder;

(j)     sales of accounts receivable, or participations therein, or Securitization Assets or related assets in connection with any Qualified Securitization Facility or the disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with industry practice or in bankruptcy or similar proceedings;

(k)     any financing transaction with respect to property built or acquired by the Borrower or any Restricted Subsidiary after the Closing Date to the extent permitted hereunder, including Qualified Securitization Facilities;

(l)     the sale, lease, assignment, license, sublease or discount of inventory, equipment, accounts receivable, notes receivable or other current assets in the ordinary course of business or consistent with industry practice or the conversion of accounts receivable to notes receivable or other dispositions of accounts receivable in connection with the collection thereof;

(m)     the licensing or sublicensing of IP Rights or other general intangibles in the ordinary course of business or consistent with industry practice;

9

(n)      any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business or consistent with industry practice;

(o)      the unwinding of any Hedging Obligations;

(p)      sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)      the lapse or abandonment of IP Rights, which in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(r)      the granting of a Lien that is permitted under Section 7.01;

(s)      the issuance of directors' qualifying shares and shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable law;

(t)      the disposition of any assets (including Equity Interests) acquired in a transaction permitted hereunder, which assets are not used or useful in the principal business of the Borrower and its Restricted Subsidiaries, so long as such assets do not constitute a material portion of the assets acquired in any individual transaction; or

(u)      dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"**Assumption**" has the meaning specified in Section 10.25.

"**Attorney Costs**" means all reasonable fees, expenses and disbursements of any law firm or other external legal counsel, to the extent documented in reasonable detail and invoiced.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease Obligation of any Person, the amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction Agent**" means (a) the Administrative Agent or (b) any other financial institution or advisor engaged by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to Section 2.05(1)(e); *provided* that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); *provided further* that neither the Borrower nor any of its Affiliates may act as the Auction Agent.

"**Available Amount**" means at any time on and after the Closing Date (the "**Available Amount Reference Time**"), an amount (which shall not be less than zero) equal to the sum of:

(1) [reserved]; plus

(2) the Retained Excess Cash Flow Amount; plus

(3) the amount of any common capital contributions received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary other than the amount of any Specified Equity Contribution during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time; *provided* that such amount shall have been applied substantially contemporaneously with the receipt thereof in a permitted Investment in assets that constitute or will constitute Collateral; plus

(4) [reserved]; plus

(5) [reserved]; plus

(6) [reserved]; plus

(7) [reserved]; minus

(8) the aggregate amount of Restricted Payments made with the Available Amount pursuant to clause (10)(Y) of Section 7.05(b) (net of any return of capital in respect of any Investments or deemed reduction in the amount of such Investment, including the sale, transfer, lease or other disposition of any such Investments), during the period commencing on the Closing Date through and including the Available Amount Reference Time (and, for purposes of this clause (8), without taking account of the intended usage of the Available Amount at such Available Amount Reference Time).

"**Average ECF Liquidity**" means, with respect to any calendar year, (a) the sum of Liquidity as of each Friday during the months of January, February and March of such calendar year divided by (b) the total number of such Fridays during the months of January, February and March of such calendar year.

"**Average Liquidity**" means (a) with respect to the first fiscal quarter ending after the Closing Date, the sum of Liquidity for each day for the period commencing on the Closing Date through and including the last day of such fiscal quarter, divided by the number of days during such period and (b) with respect to each fiscal quarter ending thereafter, the sum of Liquidity for each day during such fiscal quarter, divided by the number of days in such fiscal quarter.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" has the meaning specified in Section 8.02.

11

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate *plus* 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Wall Street Journal as the "prime rate" and (c) the Eurodollar Rate on such day for an Interest Period of one (1) month *plus* 1.00% (or, if such day is not a Business Day, the immediately preceding Business Day); *provided* that, notwithstanding the foregoing, the "Base Rate" shall in no event be less than 2.00% per annum with respect to the First-Out Loans.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Basket**" means any amount, threshold or other value permitted or prescribed with respect to any Lien, Indebtedness, Asset Sale, Investment, Restricted Payment, transaction value, judgment or other amount under any provision in Articles V, VI, VII or VIII and the definitions related thereto.

"**Belk**" has the meaning specified in the preliminary statements of this Agreement.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Blackstone**" means Blackstone Alternative Credit Advisors LP and any of its respective Affiliates and funds or accounts managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Board of Directors**" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such Board of Directors. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Borrower.

"**Borrower**" means (a) Belk and (b) upon the consummation of any transaction permitted by Section 7.03(4), the Successor Borrower.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrower Offer of Specified Discount Prepayment**" means any offer by any Borrower Party to make a voluntary prepayment of Loans at a specified discount to par pursuant to Section 2.05(1)(e)(B).

"**Borrower Parties**" means the collective reference to Holdings, the Borrower and each Subsidiary of the Borrower and "**Borrower Party**" means any of them.

"**Borrower Solicitation of Discount Range Prepayment Offers**" means the solicitation by any Borrower Party of offers for, and the corresponding acceptance by a Lender of, a voluntary prepayment of Loans at a specified range of discounts to par pursuant to Section 2.05(1)(e)(C).

"**Borrower Solicitation of Discounted Prepayment Offers**" means the solicitation by any Borrower Party of offers for, and the subsequent acceptance, if any, by a Lender of, a voluntary prepayment of Loans at a discount to par pursuant to Section 2.05(1)(e)(D).

"**Borrowing**" means a borrowing consisting of Loans of the same Class and Type made (or deemed made), converted or continued on the same date and, in the case of Eurodollar Rate Loans, having the same Interest Period.

"**Business Day**" means any day that is not a Legal Holiday and, with respect to any interest rate settings as to a Eurodollar Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurodollar Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurodollar Rate Loan, any day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Lease Obligations) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and the Restricted Subsidiaries.

"**Capital Stock**" means:

(1)     in the case of a corporation, corporate stock or shares in the capital of such corporation;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into or exchangeable for Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP as in effect on the Original Closing Date.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"**Captive Insurance Subsidiary**" means any Subsidiary of the Borrower that is subject to regulation as an insurance company (or any Subsidiary thereof).

"**Cash Collateral Account**" means an account held at, and subject to the sole dominion and control of, the Collateral Agent.

"**Cash Equivalents**" means:

(1)      Dollars;

(2)      [reserved];

(3)      local currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business or consistent with industry practice;

(4)      readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 36 months or less from the date of acquisition;

(5)      certificates of deposit, time deposits and eurodollar time deposits with maturities of three years or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(6)      repurchase obligations for underlying securities of the types described in clauses (4) and (5) above or clauses (7) and (8) below entered into with any financial institution or recognized securities dealer meeting the qualifications specified in clause (5) above;

(7)      commercial paper and variable or fixed rate notes rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 36 months after the date of acquisition thereof;

(8)      marketable short-term money market and similar liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(9)      securities issued or directly and fully and unconditionally guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority of any such state, commonwealth or territory or any public instrumentality thereof having maturities of not more than 36 months from the date of acquisition thereof;

(10)      readily marketable direct obligations issued or directly and fully and unconditionally guaranteed by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency selected by the Borrower) with maturities of 36 months or less from the date of acquisition;

(11)      Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) with maturities of 24 months or less from the date of acquisition;

14

(12)     Investments with average maturities of 36 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(13)     investment funds investing substantially all of their assets in securities of the types described in clauses (1) through (12) above; and

(14)     solely with respect to any Captive Insurance Subsidiary, any investment that the Captive Insurance Subsidiary is not prohibited to make in accordance with applicable law.

In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents will also include (i) investments of the type and maturity described in clauses (1) through (13) above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (1) through (13) and in this paragraph.

"**Cash Management Agreement**" means any agreement entered into from time to time by Holdings, the Borrower or any Restricted Subsidiary in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, information reporting services, lockbox services, stop payment services and wire transfer services.

"**Cash Management Bank**" means any Person that is an Agent, a Lender or an Affiliate of an Agent or Lender at the time it entered into a Cash Management Agreement, whether or not such Person subsequently ceases to be an Agent, a Lender or an Affiliate of an Agent or Lender.

"**Cash Management Obligations**" means obligations owed by Holdings, the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"**Cash Management Services**" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automatic clearing house fund transfer services, return items and interstate depository network services), (c) foreign exchange, netting and currency management services and (d) any other demand deposit or operating account relationships or other cash management services, including under any Cash Management Agreements.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"**CFC Holdco**" means a Domestic Subsidiary that has no material assets other than the Equity Interests in or indebtedness of one or more Foreign Subsidiaries that are CFCs, including the indirect ownership of such Equity Interests or indebtedness through one or more CFC Holdcos that have no other material assets.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority. It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111 203, H.R. 4173), all Laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

"**Change of Control**" means the occurrence of any of the following after the Closing Date:

(1) at any time prior to the consummation of a Qualifying IPO after the Closing Date, the Permitted Holders ceasing to beneficially own (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), in the aggregate, directly or indirectly, at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or any Parent Company; or

(2) at any time following the consummation of a Qualifying IPO after the Closing Date, (a) any Person (other than a Permitted Holder) or (b) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), becoming the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act) of Equity Interests of the Borrower or such Parent Company representing more than thirty-five percent (35%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or such Parent Company, as applicable, and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of the Borrower or such Parent Company, as applicable, beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders;

(3) the occurrence of a "Change of Control" (or any comparable term) as defined in each of the Second Lien Credit Agreement or any other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount (other than the ABL Credit Agreement); or

(4) Holdings shall cease to be the registered owner of 100% of the Equity Interests of the Borrower unless in connection with the consummation of a Qualifying IPO by the Borrower.

unless, in the case of clause (1) or (2) above, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of the Borrower or any Parent Company.

"**Claim**" means any actions, suits or written demands or claims.

"**Class**" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the Type of Loan, Interest Period, upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (e.g., "fungibility")) and (ii) with respect to Lenders, those of such Lenders that

16

have Commitments or Loans of a particular Class. The First-Out Loans and the Second-Out Loans shall be treated as constituting two separate Classes.

"**Closing Date**" means the first date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01, and the Closing Date Term Loans were made (or deemed made) to the Borrower pursuant to Sections 2.01(2) and 2.01(3), which date was February 24, 2021.

"**Closing Date Term Loans**" means the First-Out Loans and the Second-Out Loans.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the "Collateral" and "First Lien Collateral" (or equivalent term of each of the foregoing) as defined in any Collateral Document and the Mortgaged Properties.

"**Collateral Agent**" has the meaning specified in the introductory paragraph to this Agreement prior to the Closing Date and on and after the Closing Date, means Alter Domus (US) LLC and any successor thereto.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(1)     the Collateral Agent shall have received each Collateral Document required to be delivered (a) on the Closing Date pursuant to Section 4.01 or (b) pursuant to Section 6.11 or 6.13 at such time required by such Sections to be delivered, in each case, duly executed by each Loan Party that is party thereto;

(2)     all Obligations shall have been unconditionally guaranteed by (a) Holdings (or any successor thereto), (b) each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary), which as of the Closing Date after giving effect to the Assumption shall include those that are listed on Schedule 1.01(1) hereto and (c) any Restricted Subsidiary of the Borrower that Guarantees (or is the borrower or issuer of) any Credit Agreement Refinancing Indebtedness, the Second Lien Facility (and any "Credit Agreement Refinancing Indebtedness" as defined therein), the ABL Facility and/or other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount (the Persons in the preceding clauses (a) through (c) collectively, the "**Guarantors**");

(3)     except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected security interest with the priority set forth in the Applicable Intercreditor Agreement, subject only to Liens permitted by Section 7.01, in

(a)     all the Equity Interests of the Borrower,

(b)     all Equity Interests of each direct, wholly owned Material Domestic Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor and

(c)     100% of the issued and outstanding Equity Interests of each (i) wholly owned Material Domestic Subsidiary that is (a) a CFC Holdco and (b) directly owned by the Borrower or any Subsidiary Guarantor and (ii) Foreign Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor;

(4)      except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01 or under any Collateral Document and in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents, the Obligations and the Guaranty shall have been secured by a security interest in substantially all tangible and intangible personal property of the Borrower and each Guarantor (including accounts other than Securitization Assets), inventory, equipment, investment property, contract rights, applications and registrations of IP Rights filed in the United States, other general intangibles, and proceeds of the foregoing, in each case,

      (a)      that has been perfected (to the extent such security interest may be perfected by

      (i)      delivering certificated securities, intercompany notes and other instruments in which a security interest can be perfected by physical control, in each case to the extent required hereunder or the Security Agreement;

      (ii)      filing financing statements under the Uniform Commercial Code,

      (iii)      making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office or

      (iv)      filings in the applicable real estate records with respect to Mortgaged Properties (or any fixtures related to Mortgaged Properties) to the extent required by the Collateral Documents and

      (b)      with the priority required by the Collateral Documents; *provided* that any such security interests in the Collateral shall be subject to the terms of the Applicable Intercreditor Agreements; and

(5)      with respect to each Real Property other than the Existing Mortgaged Properties, the Collateral Agent shall have received counterparts of a Mortgage, together with the other deliverables described in Section 6.11(2)(b), with respect to each Real Property (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property within the time periods set forth in Sections 6.11(2)(b) and 6.13; *provided* that to the extent any Mortgaged Property is located in a jurisdiction which imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, the relevant Mortgage shall not secure an amount in excess of the fair market value of the Mortgaged Property subject thereto.  Unless requested by the Required Lenders, there will not be any obligation to deliver a new Mortgage with respect to an Existing Mortgaged Property.

(6)      [reserved].

(7)      within sixty (60) days after the Closing Date (or such longer period that the Required Lenders may agree in their reasonable discretion), the Collateral Agent shall have received (i) an amendment, supplement or modification in form reasonably satisfactory to the Collateral Agent and the Required Lenders (the "**Mortgage Amendments**"), with respect to each Existing Mortgaged Property set forth on Schedule 1.01(2), duly executed, acknowledged and delivered and in form suitable for filing and recording in all filing or recording offices that the Required Lenders may reasonably deem necessary to maintain or protect the Lien of the related Mortgage and the priority thereof; (ii) with respect to the real properties subject to the Mortgage Amendments, (x) fully paid title date-down endorsements or modification endorsements (to the

extent such date-down endorsements or modification endorsements are available in the applicable jurisdiction at reasonable costs) to the related Mortgage Policies or (y) title searches (to the extent such date-down endorsements are not available at reasonable costs in any such jurisdictions), in each case confirming ownership of the related real property by the applicable Loan Party and showing no Liens of record other than Permitted Liens; (iii) evidence that all filing, documentary, stamp, intangible and recording taxes and fees in respect to such Mortgage Amendments have been paid in connection with the preparation, execution, filing and recordation of the Mortgage Amendments; and (iv) the deliverables described in Sections 6.11(2)(b)(ii) (to the extent required thereunder), (iv), (v), (vi) (to the extent not previously delivered), and (vii) (to the extent requested by the Collateral Agent or the Required Lenders), with respect to any Real Property subject to the Mortgage Amendments.

The foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, the creation, perfection or maintenance of pledges of, or security interests in, Mortgages on, or the obtaining of Mortgage Policies, surveys, abstracts or appraisals or taking other actions with respect to, any Excluded Assets.

The Required Lenders may grant extensions of time for the creation, perfection or maintenance of security interests in, or the execution or delivery of any Mortgage and the obtaining of title insurance, surveys or Opinions of Counsel with respect to, particular assets (including extensions beyond the Closing Date for the creation, perfection or maintenance of security interests in the assets of the Loan Parties on such date) where they reasonably determine, in consultation with the Borrower, that creation or perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)     Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Required Lenders and the Borrower;

(B)     the Collateral and Guarantee Requirement shall not apply to any Excluded Assets;

(C)     no deposit account control agreement, securities account control agreement or other control agreements or control arrangements shall be required with respect to any deposit account, securities account or other asset specifically requiring perfection through control agreements except to the extent such control agreement would or could be required under the ABL Credit Agreement as in effect on the Closing Date, whether or not such ABL Credit Agreement were than actually in effect;

(D)     no actions in any jurisdiction other than the U.S. or that are necessary to comply with the Laws of any jurisdiction other than the U.S. shall be required in order to create any security interests in assets located, titled, registered, applied for, filed, or arising under laws outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the Laws of any jurisdiction other than the U.S.) and there shall be no requirement to deliver landlord lien waivers, estoppels and collateral access letters;

(E)     [reserved]; and

(F)     no perfection steps shall be required with respect to (i) letter of credit rights, except to the extent constituting a support obligation for other Collateral as to which perfection is accomplished solely

19

by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (ii) commercial tort claims with a value of less than $2.5 million, (iii) motor vehicles and other assets subject to certificates of title to the extent a Lien thereon cannot be perfected by the filing of a UCC financing statement, and (iv) promissory notes evidencing debt for borrowed money in a principal amount of less than $2.5 million.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages (if any), each of the collateral assignments, security agreements, pledge agreements, account control agreements or other similar agreements delivered to the Administrative Agent, Collateral Agent or the Lenders pursuant to Sections 4.01, 6.11 or 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Combined Adjusted EBITDA Cap**" has the meaning specified in clause (1)(l) of the definition of "Adjusted EBITDA".

"**Commitment**" means the First-Out Loan Commitments, Second-Out Loan Commitments, Refinancing Commitments or Extended Commitments, or any commitment in respect of Replacement Loans, as the context may require.

"**Committed Loan Notice**" means a notice of (1) a Borrowing with respect to a given Class of Loans, (2) a conversion of Loans of a given Class from one Type to the other or (3) a continuation of Eurodollar Rate Loans of a given Class, pursuant to Section 2.02(1), which shall be substantially in the form of Exhibit A-1.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time and any successor statute.

"**Compensation Period**" has the meaning specified in Section 2.12(3)(b).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of a Financial Officer of the Borrower:

(1)      certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto (in each case, other than any Default with respect to which the Administrative Agent has otherwise obtained notice in accordance with Section 6.03(1));

(2)      in the case of financial statements delivered under Section 6.01(1), setting forth reasonably detailed calculations of (i) Excess Cash Flow for each Excess Cash Flow Period, commencing with the Excess Cash Flow Period ending January 29, 2022, (ii) Average ECF Liquidity (to the extent the Compliance Certificate is delivered after March 31 of the applicable year when such annual Compliance Certificate is due) and (iii) the Net Proceeds and Specified Sale-Leaseback Net Proceeds (as applicable) received during the applicable period by or on behalf of the Borrower or any Restricted Subsidiary in respect of any (x) Asset Sale or Casualty Event subject to prepayment pursuant to Section 2.05(2)(b)(i) and the portion of such Net Proceeds that has been invested or is intended to be reinvested in accordance with Section 2.05(2)(b)(ii) and (y) Specified Sale-Leaseback Transaction subject to prepayment pursuant to Section 2.05(2)(c); and

(3)      commencing with the fiscal quarter ending February 3, 2024, setting forth computations in reasonable detail demonstrating compliance with the financial covenants set forth in Section 7.13 hereof.

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and Cash Equivalents, amounts related to current or deferred taxes based on income or profits, assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees, derivative financial instruments and any assets in respect of Hedge Agreements, and excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding (A) the current portion of any Funded Debt and other long-term liabilities, (B) the current portion of interest, (C) accruals for current or deferred taxes based on income or profits, (D) accruals of any costs or expenses related to restructuring reserves or severance, (E) all Indebtedness consisting of Loans (as defined in the ABL Facility), Swing Line Loans (as defined in the ABL Facility) and L/C Obligations (as defined in the ABL Facility) to the extent otherwise included therein or any other revolving loans, swingline loans and letter of credit obligations under any other revolving credit facility, (F) the current portion of any Capitalized Lease Obligation, (G) deferred revenue arising from cash receipts that are earmarked for specific projects, (H) liabilities in respect of unpaid earn-outs, (I) the current portion of any other long-term liabilities, (J) accrued litigation settlement costs and (K) any liabilities in respect of Hedge Agreements, and, furthermore, excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person and its Restricted Subsidiaries, including the amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses and amortization of Capitalized Software Expenditures of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated First Lien Debt**" means as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, (a) Loans under this Agreement, Loans (as defined in the ABL Facility) under the ABL Facility (including any Incremental Revolving Credit Loans (as defined in the ABL Credit Agreement)), Capitalized Lease Obligations and other Consolidated Total Debt secured by Collateral (or any portion thereof) on an equal priority basis (but without regard to the control of remedies) with Liens securing the Obligations or the Liens securing the ABL Obligations minus (b) without duplication, the aggregate amount of unrestricted cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, which aggregate amount of cash and Cash Equivalents shall be determined without giving *pro forma effect* to the proceeds of Indebtedness incurred on such date.

"**Consolidated Interest Expense**" means, with respect to any Person for any period, without duplication, the sum of:

(1)      consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income

(including (a) amortization of original issue discount or premium resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (c) non-cash interest payments, (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate obligations under any Hedge Agreement with respect to Indebtedness); plus

(2)     consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(3)     interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" means, with respect to any Person for any period, the net income (loss) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding (and excluding the effect of), without duplication,

(1)     extraordinary, non-recurring or unusual gains, losses, fees, costs, charges or expenses (including relating to any multi-year strategic initiatives and accruals and reserves in connection with such gains, losses, charges or expenses); restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves, and in each case, whether or not classified as such under GAAP); costs and expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of stores or facilities and fixed assets for alternative uses; Public Company Costs; costs and expenses related to the integration, consolidation, opening, pre-opening and closing of stores or facilities and fixed assets; severance and relocation costs and expenses, one-time compensation costs and expenses, consulting fees, signing, retention or completion bonuses, and executive recruiting costs; costs and expenses incurred in connection with strategic initiatives; transition costs and duplicative running costs; costs and expenses incurred in connection with non-ordinary course product and IP Rights development; costs incurred in connection with acquisitions (or purchases of assets) or the Transactions, in each case, prior to or after the Closing Date (including integration costs); business optimization expenses (including costs and expenses relating to business optimization programs, new systems design, retention charges, system establishment costs and implementation costs and project start-up costs), accruals and reserves; operating expenses attributable to the implementation of cost-savings initiatives; curtailments and modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments); provided that amounts added back pursuant to this clause (1) shall be subject to the Combined Adjusted EBITDA Cap;

(2)     the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period whether effected through a cumulative effect adjustment or a retroactive application, in each case in accordance with GAAP;

(3)     Transaction Expenses;

(4)     any gain (loss) on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business or consistent with industry practice) or income (loss) from discontinued operations (but if such operations are classified as discontinued

due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of);

(5)    the Net Income for such period of any Person that is an Unrestricted Subsidiary and, solely for the purpose of the Available Amount, the Net Income for such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; *provided* that the Consolidated Net Income of a Person will be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents) to such Person or a Restricted Subsidiary thereof in respect of such period;

(6)    solely for the purpose of determining the Available Amount, the Net Income for such period of any Restricted Subsidiary (other than any Guarantor) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived; *provided* that Consolidated Net Income of a Person will be increased by the amount of dividends or other distributions or other payments actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents);

(7)    effects of adjustments (including the effects of such adjustments pushed down to such Person and its Restricted Subsidiaries) related to the application of recapitalization accounting or purchase accounting (including in the inventory, property and equipment, software, goodwill, intangible assets, in process research and development, deferred revenue and debt line items);

(8)    income (loss) from the early extinguishment or conversion of (a) Indebtedness, (b) Hedging Obligations or (c) other derivative instruments;

(9)    any impairment charge or asset write-off or write-down in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP; *provided* that this clause (9) shall not permit the write-down or reserve of inventory outside the ordinary course of business;

(10)    (a) any equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation, equity incentive programs or similar rights, stock options, restricted stock or other rights to, and any cash charges associated with the rollover, acceleration or payout of, Equity Interests by management of such Person or of a Restricted Subsidiary or any Parent Company, (b) noncash compensation expense resulting from the application of Accounting Standards Codification Topic No. 718, *Compensation—Stock Compensation* or Accounting Standards Codification Topic 505-50, *Equity-Based Payments to Non-Employees*, and (c) any income (loss) attributable to deferred compensation plans or trusts;

(11)    any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, disposition, incurrence or repayment of Indebtedness (including such fees, expenses or charges related to the offering and issuance of the Term Notes and the syndication and incurrence of any Facilities), issuance of Equity Interests (including by any direct or indirect parent of the Borrower), recapitalization, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Indebtedness evidenced by this Agreement,

the Second Lien Facility, or the ABL Facility) and including, in each case, any such transaction whether consummated on, after or prior to the Closing Date and any such transaction undertaken but not completed, and any charges or nonrecurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful or consummated (including, for the avoidance of doubt, the effects of expensing all transaction related expenses in accordance with Accounting Standards Codification Topic No. 805, *Business Combinations*);

(12)     accruals and reserves that are established or adjusted in connection with the Transactions, an Investment or an acquisition that are required to be established or adjusted as a result of the Transactions, such Investment or such acquisition, in each case accordance with GAAP;

(13)     any expenses, charges or losses to the extent covered by insurance that are, directly or indirectly, reimbursed or reimbursable by a third party, and any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement;

(14)     any non-cash gain (loss) attributable to the mark to market movement in the valuation of Hedging Obligations or other derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—*Derivatives and Hedging* or mark to market movement of other financial instruments pursuant to FASB Accounting Standards Codification Topic 825—*Financial Instruments*;

(15)     any net unrealized gain or loss (after any offset) resulting in such period from currency transaction or translation gains or losses including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from (a) Hedging Obligations for currency exchange risk and (b) resulting from intercompany indebtedness) and any other foreign currency transaction or translation gains and losses, to the extent such gain or losses are non-cash items;

(16)     any adjustments resulting from the application of Accounting Standards Codification Topic No. 460, *Guarantees*, or any comparable regulation;

(17)     any non-cash rent expense;

(18)     the amount of any management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Investors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 7.06;

(19)     any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures; and

(20)     earn-out and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries, Consolidated Net Income will include the amount of proceeds received or receivable from business interruption insurance, the amount of any expenses or charges incurred by such Person or its Restricted Subsidiaries during such period that are, directly or indirectly, reimbursed or reimbursable by a third party, and amounts that are covered by indemnification or other reimbursement

24

provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder.

"**Consolidated Secured Debt**" means, as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, the aggregate amount of Consolidated Total Debt that is secured by a Lien on any assets or property of the Borrower or any of its Restricted Subsidiaries.

"**Consolidated Total Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transaction), consisting of Indebtedness for borrowed money, Capitalized Lease Obligations, debt obligations evidenced by notes or similar instruments and Guarantees of Indebtedness listed above <u>minus</u> (b) the aggregate amount of all cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, in each case, subject to control agreements for the benefit of the Obligations (including control agreements entered into by the ABL Facility Administrative Agent for the benefit of, among others, the Obligations hereunder) (but excluding cash and Cash Equivalents which are listed as "Restricted" on such balance sheet), which aggregate amount of cash and Cash Equivalents shall be determined without giving pro forma effect to the proceeds of Indebtedness incurred on such date; provided, Consolidated Total Debt will not include Non-Recourse Indebtedness and Indebtedness in respect of any (1) letter of credit, except to the extent of obligations in respect of drawn standby letters of credit which have not been reimbursed within three (3) Business Days and (2) Hedging Obligations, except any unpaid termination payments thereunder. The Dollar-equivalent principal amount of any Indebtedness denominated in a foreign currency will reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar-equivalent principal amount of such Indebtedness.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities. In measuring any increase or decrease in Consolidated Working Capital for any period, (1) to the extent the Borrower or any Restricted Subsidiary has consummated during such period any one or more acquisitions or dispositions of any Person, then (a) in the case of an acquisition, the Consolidated Working Capital of such acquired Person as of the date of the consummation of such acquisition (after giving effect to the transactions consummated with respect to such acquisition) will be added to the Consolidated Working Capital of the Borrower and its Restricted Subsidiaries as of the first day of such period and (b) in the case of a disposition, the Consolidated Working Capital of the disposed Person as of the date of the disposition of such Person shall be subtracted from the Consolidated Working Capital of the Borrower and its Restricted Subsidiaries as of the first day of such period and (2) the application of recapitalization or purchase accounting as a result of any acquisitions or dispositions completed during such period will be excluded and the application of fresh start accounting in relation to the Transactions shall be disregarded.

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent:

> (1) to purchase any such primary obligation or any property constituting direct or indirect security therefor;

> (2) to advance or supply funds:

25

      (a)     for the purchase or payment of any such primary obligation  or

      (b)     to maintain  working  capital  or equity  capital  of the primary  obligor  or otherwise to maintain  the net worth or solvency of the primary obligor;  or

      (3)     to purchase property, securities or services primarily  for the purpose of assuring the owner of any such primary obligation  of the ability  of the primary obligor  to make payment of such primary obligation  against loss in respect thereof.

"**Contractual Obligation**" means, as to any Person, any provision  of any security issued by such Person or of any agreement, instrument or other undertaking  to which such Person is a party or by which it or any of its property is bound.

"**Controlled Investment Affiliate**" means, as to any Person, any other Person, other than any Investor, which directly or indirectly  is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling  such Person) primarily  for making direct or indirect equity or debt investments in the Borrower or other companies.

"**Credit Agreement Refinanced Debt**" has the meaning assigned to such term in the definition of "Credit Agreement Refinancing Indebtedness."

"**Credit Agreement Refinancing Indebtedness**" means secured or unsecured Indebtedness of the Borrower or any Guarantor; *provided* that:

      (1)     such Indebtedness is incurred or otherwise obtained (including  by means of the extension or renewal of existing Indebtedness) to Refinance, in whole or in part, Indebtedness that is either (a) Loans, or (b) other Credit Agreement Refinancing Indebtedness ("**Credit Agreement Refinanced Debt**");

      (2)     such Indebtedness is in an original  aggregate principal amount not greater than the principal  amount of the Credit Agreement Refinanced Debt being Refinanced except to the extent permitted under Section 1.02(10) (*plus* (a) the amount of all unpaid, accrued or capitalized interest, penalties, premiums (including  tender premiums), and other similar  amounts payable with respect to the Credit Agreement Refinanced Debt and (b) underwriting discounts, fees, commissions, costs, expenses and other similar  amounts payable with respect to such refinancing);

      (3)     the (a) Weighted Average Life to Maturity of such Indebtedness is equal to or longer than the remaining Weighted Average Life to Maturity of the Credit Agreement Refinanced Debt and (b) final maturity date of such Credit Agreement Refinancing Indebtedness is no earlier than the final maturity date of the Credit Agreement Refinanced Debt;

      (4)     any mandatory prepayments of:

      (a)     any Permitted Junior Priority Refinancing Debt or any Credit Agreement Refinancing Indebtedness that comprises unsecured notes or loans may not be made except to the extent that prepayments are (i) permitted hereunder and (ii) to the extent required hereunder or pursuant to the terms of any Permitted Equal Priority Refinancing Debt, first made or offered to the Loans and any such Permitted Equal Priority Refinancing Debt; and

      (b)     any Permitted Equal Priority Refinancing Debt shall be made in an amount that would not exceed the amount of mandatory prepayments (as a percentage of the

principal amount thereof) that would have been received by the Credit Agreement Refinanced Debt (other than pursuant to a refinancing permitted hereunder or with respect to greater than *pro rata* payments to an earlier maturing tranche);

(5)     such Indebtedness is not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Guarantor;

(6)     if such Indebtedness is secured:

(a)     such Indebtedness is not secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not constitute Collateral;

(b)     the security agreements relating to such Indebtedness are substantially similar to or the same as the Collateral Documents (as determined in good faith by a Responsible Officer of the Borrower);

(c)     if such Indebtedness is secured, a Debt Representative acting on behalf of the holders of such Indebtedness has become party to or is otherwise subject to the provisions of the Applicable Intercreditor Agreement;

(7)     to the extent such Credit Agreement Refinancing Indebtedness Refinances Indebtedness that is subordinated (including by way of Section 8.03 or other "waterfall" provisions) to the Obligations in respect of any Class of Term Loans, such Credit Agreement Refinancing Indebtedness is subordinated to such Obligations at least to the same extent as the applicable Refinanced Debt;

(8)     the covenants and events of default applicable to such Indebtedness are substantially identical to, or, taken as a whole, not materially more favorable to the lenders or holders providing such Indebtedness than, those applicable to such Credit Agreement Refinanced Debt, in each case as determined in good faith by a Responsible Officer of the Borrower in its reasonable judgment; *provided* that the Borrower will promptly deliver to the Administrative Agent final copies of the definitive credit documentation relating to such Indebtedness (unless the Borrower is bound by a confidentiality obligation with respect thereto, in which case the Borrower will deliver a reasonably detailed description of the material terms and conditions of such Indebtedness in lieu thereof); *provided further* that this clause (8) will not apply to:

(i)     terms addressed in the preceding clauses (1) through (7),

(ii)     interest rate, fees, funding discounts and other pricing terms,

(iii)     redemption, prepayment or other premiums,

(iv)     optional redemption or prepayment terms and

(v)     covenants and other terms applicable only to periods after the Latest Maturity Date of the Closing Date Term Loans at the time of incurrence of such Indebtedness or added for the benefit of the Lenders hereunder; and

(9)     with respect to the incurrence of any Credit Agreement Refinancing Indebtedness in respect of the Loans of any Class hereunder, the Lenders of the applicable Class of Credit Agreement Refinanced Debt shall be offered the opportunity to provide such Credit Agreement

Refinancing Indebtedness on a pro rata basis based on their ownership of the applicable Credit Agreement Refinanced Debt.

Anything to the contrary notwithstanding (including, for the avoidance of doubt, clause (3) above), Credit Agreement Refinancing Indebtedness will include (1) any Registered Equivalent Notes issued in exchange therefor and (2) any bridge or other interim credit facility intended to be Refinanced with long-term indebtedness (so long as such credit facility includes customary "rollover provisions"), in which case, clause (3) of the first proviso in this definition shall not prohibit the inclusion of customary terms for "bridge" facilities, including customary mandatory prepayment, repurchase or redemption provisions.

For the avoidance of doubt, any voluntary prepayments of Credit Agreement Refinancing Indebtedness may be made on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis with other Loans.

Notwithstanding anything set forth above, (a) if the All-In Yield of any Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations and having the same payment priority as the Second-Out Loans, including such Indebtedness incurred pursuant to a Refinancing Amendment, shall be higher than the All-In Yield of the Closing Date Term Loans that are Second-Out Loans, then the interest rate margins for any such Closing Date Term Loans that are Second-Out Loans shall be increased to the extent necessary so that the All-In Yield for such Closing Date Term Loans is equal to the All-In Yield of such Credit Agreement Refinancing Indebtedness and (b) if the All-In Yield of any Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations and having the same payment priority as the First-Out Loans, including such Indebtedness incurred pursuant to a Refinancing Amendment, shall be higher than the All-In Yield of the Closing Date Term Loans that are First-Out Loans, then (x) the interest rate margins for any such Closing Date Term Loans that are First-Out Loans shall be increased to the extent necessary so that the All-In Yield for such Closing Date Term Loans is equal to the All-In Yield of such Credit Agreement Refinancing Indebtedness; *provided* that any increase in All-In Yield of any First-Out Loans due to the increase in a Eurodollar Rate or Base Rate floor on any Credit Agreement Refinancing Indebtedness shall be effected solely through an increase in any Eurodollar Rate or Base Rate floor applicable to the First-Out Loans, and (y) the interest rate margins for any such Closing Date Term Loans that are Second-Out Loans shall be increased to the extent necessary so that the All-In Yield for such Closing Date Term Loans that are Second-Out Loans is equal to the All-In Yield of such Credit Agreement Refinancing Indebtedness plus 1.50% per annum.

"**Debt Representative**" means, with respect to any series of Indebtedness secured by Liens permitted under clause (21) or (39) of the definition of "Permitted Liens", Liens securing Indebtedness permitted under clauses (2), (14) and (25) of Section 7.02(b), Permitted Equal Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Declined Proceeds**" has the meaning specified in Section 2.05(2)(g).

"**Deemed Consent Provision**" means each of (x) the definitions of "Applicable Intercreditor Agreement", "Collateral and Guarantee Requirement", "Excluded Assets", "Excluded Equity", "Excluded Subsidiaries", "Guarantor", "Landlord Consent and Estoppel", "Material Domestic Subsidiary", "Material

Foreign Subsidiary", "Mortgages", and "Recognition Agreement" and (y) Section 2.20, Section 6.01, Section 6.07, Section 6.11, Section 6.13, Section 6.16, Section 7.03(4)(ii) and Section 7.08.

"**Default**" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"**Default Rate**" means an interest rate (a) in the case of interest, with respect to any Eurodollar Rate Loan or Base Rate Loan, equal to (1) the Base Rate, *plus* (2) the Applicable Rate applicable to Base Rate Loans, *plus* (3) 2.00% per annum, (b) in the case of interest, with respect to any Second-Out Loan, equal to the PIK Rate *plus* 2.00% per annum, (c) in the case of the outstanding principal amount, (x) with respect to any Loan (other than the Second-Out Loans), equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.02(3)), *plus* 2.00% per annum and (y) with respect to any Second-Out Loan, equal to the PIK Rate, *plus* 2.00% per annum, and (d) in all other cases, (1) the Base Rate, *plus* (2) the Applicable Rate applicable to Base Rate Loans, *plus* (3) 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means, subject to Section 2.17(2), any Lender that (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans, within one Business Day of the date required to be funded by it hereunder (if applicable), (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations (if applicable) or (d) has, or has a direct or indirect parent company that has, (i) become or is the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets or a custodian appointed for it or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under this definition shall be conclusive absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Deposit Account**" means any checking or other demand deposit account maintained by the Borrower and any Subsidiary Guarantors, including any "deposit accounts" under Article 9 of the UCC.

"**Designated Preferred Stock**" means Preferred Stock of the Borrower, any Restricted Subsidiary thereof or any Parent Company (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on or promptly after the issuance date thereof, the cash proceeds of which are excluded from the calculation of the Available Amount.

"**Designated Revolving Commitments**" means any commitments to make loans or extend credit on a revolving basis to the Borrower or any Restricted Subsidiary by any Person other than the Borrower or any Restricted Subsidiary that have been designated in an Officer's Certificate delivered to the

29

Administrative Agent as "Designated Revolving Commitments" until such time as the Borrower subsequently delivers an Officer's Certificate to the Administrative Agent to the effect that such commitments will no longer constitute "Designated Revolving Commitments;" provided that on the date such Designated Revolving Commitments are established, such Designated Revolving Commitments will be deemed an incurrence of Indebtedness on such date and will be deemed outstanding for purposes of calculating the applicable Total Net Leverage Ratio, Senior Secured Leverage Ratio, First Lien Net Leverage Ratio and the availability of any applicable Basket hereunder on such date after giving *pro forma* effect to the incurrence of the entire committed amount of the Indebtedness thereunder (but without netting any cash proceeds thereof), in which case such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with the Total Net Leverage Ratio, Senior Secured Leverage Ratio, First Lien Net Leverage Ratio and the availability of any Baskets hereunder. For the avoidance of doubt, in the case of any Designated Revolving Commitments permitted hereunder, the reference to the "incurrence" of Indebtedness shall refer to the date on which such Designated Revolving Commitments are established.

"**Discharge**" or "**discharge**" means, with respect to any Indebtedness, the repayment, prepayment, repurchase (including pursuant to an offer to purchase), redemption, defeasance or other discharge of such Indebtedness, any such case in whole or in part.

"**Discount Prepayment Accepting Lender**" has the meaning assigned to such term in Section 2.05(1)(e)(B)(2).

"**Discount Range**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Prepayment Amount**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Prepayment Notice**" means a written notice of the Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.05(1)(e)(C)(1) substantially in the form of Exhibit J.

"**Discount Range Prepayment Offer**" means the written offer by a Lender, substantially in the form of Exhibit K, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"**Discount Range Prepayment Response Date**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Proration**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(3).

"**Discounted Prepayment Determination Date**" has the meaning assigned to such term in Section 2.05(1)(e)(D)(3).

"**Discounted Prepayment Effective Date**" means in the case of the Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation of Discounted Prepayment Offer, five (5) Business Days following the Specified Discount Prepayment Response Date, the Discount Range Prepayment Response Date or the Solicited Discounted Prepayment Response Date, as applicable, in accordance with Section 2.05(1)(e)(B), Section 2.05(1)(e)(C) or Section 2.05(1)(e)(D), respectively, unless a shorter period is agreed to between the Borrower and the Auction Agent.

"**Discounted Term Loan Prepayment**" has the meaning assigned to such term in Section 2.05(1)(e)(A).

"**disposition**" has the meaning set forth in the definition of "Asset Sale".

"**Disqualified Institution**" means (a) any competitor of the Borrower or its Subsidiaries (including for purposes of this definition Belk and its Subsidiaries) identified by or on behalf of the Borrower or the Sponsor to the Administrative Agent from time to time, (b) those particular banks, financial institutions, other institutional lenders and other Persons (x) identified by or on behalf of the Borrower or the Sponsor to the Consenting Lenders (as defined in the RSA) prior to January 26, 2021 or (y) otherwise approved in writing by the Required Consenting Lenders (as defined in the RSA) on or prior to the Closing Date and (c) any Affiliate of the entities described in the preceding clauses (a) or (b) (excluding, in the case of clause (a), bona fide debt funds) that are either readily identifiable as such on the basis of their name or are identified as such in writing by or on behalf of the Borrower or the Sponsor to the Administrative Agent from time to time; it being understood and agreed that the identification of any Person as a Disqualified Institution after the Closing Date shall not apply to retroactively disqualify any Person that has previously acquired an assignment or participation interest in any Loan, subject to Section 10.07(n), until such time such Person no longer constitutes a Lender. The identity of Disqualified Institutions shall be posted or distributed to all Lenders and prospective assignees.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date or the date the Loans are no longer outstanding and the Commitments have been terminated; *provided* that if such Capital Stock is issued pursuant to any plan for the benefit of, future, current or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower or its Subsidiaries or any Parent Company or by any such plan to such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof), such Capital Stock will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability; *provided further* any Capital Stock held by any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries, any Parent Company, or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof), in each case pursuant to any equity subscription or equity holders' agreement, management equity plan or stock option plan or any other management or employee benefit plan or agreement will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any Subsidiary or in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability. For the purposes hereof, the aggregate principal amount of Disqualified Stock will be deemed to be equal to the greater of its voluntary or involuntary liquidation preference and maximum fixed repurchase price, determined on a consolidated basis in accordance with GAAP, and the "maximum fixed repurchase price" of any Disqualified Stock that does not have a fixed repurchase price will be calculated in accordance with the terms of such Disqualified Stock

31

as if such Disqualified Stock were purchased on any date on which the Consolidated Total Debt will be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any direct or indirect Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**ECF Liquidity Threshold**" has the meaning specified in Section 2.05(2)(a).

"**ECF Payment**" has the meaning specified in Section 2.05(2)(a).

"**ECF Surplus Amount**" has the meaning specified in Section 2.05(a).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b), *provided* that no Defaulting Lender(s) or Disqualified Institution(s) may be Eligible Assignee(s).

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and sub-surface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, or proceedings with respect to any Environmental Liability or Environmental Law, (hereinafter "Claims"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to pollution or the protection of the Environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) resulting from or relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of

any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, the Capital Stock of such Person and all warrants, options or other rights to acquire Capital Stock of such Person, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock of such Person.

"**Equity Offering**" means any public or private sale of common stock or Preferred Stock of the Borrower or any Parent Company (excluding Disqualified Stock), other than:

(1)   public offerings with respect to the Borrower's or any Parent Company's common stock registered on Form S-4 or Form S-8;

(2)   issuances to any Restricted Subsidiary of the Borrower; and

(3)   any such public or private sale that constitutes an Excluded Contribution.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability or written notification that a Multiemployer Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement in writing of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived; (h) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (i) the imposition of a lien under Section 303(k) of ERISA or Section 412(c) of the Code with respect to any Pension Plan; (j) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); or (k) the occurrence of a nonexempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party or any of their respective ERISA Affiliates

(within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Loan Party.

"**Eurodollar Rate**" means:

(a)    for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to (i) the London interbank offered rate for Eurodollar deposits as displayed on the applicable Bloomberg screen ("**Published LIBOR**") (or such other commercially available source providing quotations of Published LIBOR as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or (ii) if such rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the average rate at which deposits in Dollars for delivery on the first day of such Interest Period in Same Day Funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted and with a term equivalent to such Interest Period would be offered to three (3) major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period; and

(b)    for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to (i) Published LIBOR, at approximately 11:00 a.m., London time, determined two (2) Business Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the average rate at which deposits in Dollars for delivery on the date of determination in Same Day Funds in the approximate amount of the Base Rate Loan being made or maintained and with a term equal to one month would be offered to three (3) major banks in the London interbank eurodollar market at their request at the date and time of determination;

*provided* that in no event shall the Eurodollar Rate for the First-Out Loans that bear interest at a rate based on clauses (a) and (b) of this definition be less than 1.00%.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on Adjusted Eurodollar Rate.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Cash Flow**" means, for any period, an amount equal to the excess of:

(1)    the sum, without duplication, of:

(a)    Consolidated Net Income of the Borrower for such period,

(b)    an amount equal to the amount of all non-cash charges (including depreciation and amortization) for such period to the extent deducted in arriving at such Consolidated Net Income, but excluding any such non-cash charges representing an accrual or reserve for potential cash items in any future period and excluding amortization of a prepaid cash item that was paid in a prior period,

(c)      decreases in Consolidated Working Capital (except as a result of the reclassification of items from short-term to long-term or vice versa) for such period,

(d)      the amount deducted as tax expense in determining Consolidated Net Income to the extent in excess of cash taxes paid in such period and

(e)      cash receipts in respect of Hedge Agreements during such fiscal year to the extent not otherwise included in such Consolidated Net Income; over

(2)      the sum, without duplication, of:

(a)      an amount equal to the amount of all non-cash credits (including, to the extent constituting non-cash credits, amortization of deferred revenue acquired as a result of any investment permitted hereunder) included in arriving at such Consolidated Net Income (but excluding any non-cash credit to the extent representing the reversal of an accrual or reserve described in clause (1)(b) above) and cash losses, charges (including any reserves or accruals for potential cash charges in any future period), expenses, costs and fees excluded by virtue of clauses (1) through (15) of the definition of "Consolidated Net Income,"

(b)      without duplication of amounts deducted pursuant to clause (j) below in prior fiscal years, the amount of Capital Expenditures, Capitalized Software Expenditures or acquisitions of IP Rights accrued or made in cash during such period, in each case except to the extent financed with the proceeds of Funded Debt of the Borrower or any Restricted Subsidiary (unless such Indebtedness has been repaid) or the proceeds from any Specified Equity Contributions,

(c)      the aggregate amount of all principal payments of Indebtedness of the Borrower and the Restricted Subsidiaries (including (i) the principal component of payments in respect of Capitalized Lease Obligations, (ii) all scheduled principal repayments of Loans and the Second Lien Facility (or any Indebtedness representing Refinancing Indebtedness in respect thereof in accordance with the corresponding provisions of the governing documentation thereof), all repayments under the ABL Facility to the extent there is an equivalent permanent reduction in commitments thereunder (or any Indebtedness representing Refinancing Indebtedness in respect thereof in accordance with the corresponding provisions of the governing documentation thereof) and all scheduled principal repayments under any Credit Agreement Refinancing Indebtedness, in each case to the extent such payments are permitted hereunder and actually made, (iii) the amount of any scheduled repayment of Term Loans pursuant to Section 2.07 and mandatory prepayment of Term Loans pursuant to Section 2.05(2)(b) or 2.05(2)(c), and mandatory prepayment of the Second Lien Facility pursuant to Section 2.05(2)(b) or 2.05(2)(c) of the Second Lien Facility, any mandatory prepayment of the ABL Facility pursuant to Section 2.05(2) of the ABL Credit Agreement to the extent there is an equivalent permanent reduction in commitments thereunder, any mandatory Discharge of Credit Agreement Refinancing Indebtedness pursuant to the corresponding provisions of the governing documentation thereof to the extent required due to an Asset Sale or Casualty Event that resulted in an increase to Consolidated Net Income for such period and not in excess of the amount of such increase and (iv) the amount of any voluntary prepayment or buybacks of First-Out Loans, but excluding (x) all other prepayments of Term Loans or the Second Lien Facility, (y) all prepayments in respect of any revolving credit facility, except to the extent there is an equivalent permanent reduction in commitments thereunder and (z) payments

35

on any Subordinated Indebtedness, except in each case to the extent permitted to be paid pursuant to Section 7.05) made during such period, in each case, except to the extent financed with the proceeds of Funded Debt of the Borrower or any Restricted Subsidiary (unless such Indebtedness has been repaid) or the proceeds from any Specified Equity Contributions,

(d)      increases in Consolidated Working Capital (except as a result of the reclassification of items from short-term to long-term or vice versa) for such period,

(e)      cash payments by the Borrower and the Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and the Restricted Subsidiaries (other than Indebtedness) to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income,

(f)      without duplication of amounts deducted pursuant to clauses (h) and (i) below in prior fiscal years, the amount of cash consideration paid by the Borrower and the Restricted Subsidiaries (on a consolidated basis) in connection with investments (other than intercompany Investments among Holdings and the Restricted Subsidiaries (including the Borrower), Investments in Cash Equivalents or money market instruments in the ordinary course of business) made during such period (including investments constituting Permitted Investments and investments or made pursuant to Section 7.05), except to the extent such investments were financed with the proceeds of Funded Debt of the Borrower or any Restricted Subsidiary (unless such Indebtedness has been repaid) and the proceeds from any Specified Equity Contribution,

(g)      the amount of Restricted Payments paid in cash during such period (other than Restricted Payments made pursuant to Section 7.05(b)(4),(11) and (19)), except to the extent such Restricted Payments were financed with the proceeds of Funded Debt of the Borrower or any Restricted Subsidiary (unless such Indebtedness has been repaid) or the proceeds from any Specified Equity Contribution,

(h)      the aggregate amount of expenditures (to the extent not funded with the proceeds of Funded Debt (unless such Indebtedness has been repaid and cannot be reborrowed) or the proceeds from any Specified Equity Contribution) actually made by the Borrower and the Restricted Subsidiaries in cash during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period or are not deducted in calculating Consolidated Net Income,

(i)      the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by Holdings, the Borrower and the Restricted Subsidiaries during such period that are made in connection with any prepayment or redemption of Indebtedness to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income and such payments reduced Excess Cash Flow pursuant to clause (2)(c) above or reduced the mandatory prepayment required by Section 2.05(2)(a),

(j)      [reserved],

(k)      the amount of cash taxes (including penalties and interest) paid or tax reserves set aside or payable (without duplication) in such period *plus* the amount of

distributions with respect to taxes made in such period under Section 7.05(b)(14) to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period,

(l)    cash expenditures in respect of Hedging Obligations during such fiscal year to the extent not deducted in arriving at such Consolidated Net Income, and

(m)    any fees, expenses or charges incurred during such period (including the Transaction Expenses), or any amortization thereof for such period, in connection with any acquisition, investment, disposition, incurrence or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of this Agreement, the other Loan Documents and related documents, any Second Lien Loan Documents and any ABL Loan Documents) and including, in each case, any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed, and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful.

"**Excess Cash Flow Period**" means (i) the three fiscal quarter period beginning May 1, 2021 and ending January 29, 2022 and (ii) each fiscal year of the Borrower ending thereafter.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Exchange First-Out Loan Commitment**" means, with respect to each First-Out Lender, the commitment of such First-Out Lender to convert Prepetition First Lien Term Loans into, and be deemed to make, First-Out Loans in an aggregate amount not to exceed the amount set forth on Schedule ~~III to the Second Amendment~~2.01 opposite such First-Out Lender's name under the heading "Exchange First-Out Loan Commitment". The aggregate amount of Exchange First-Out Loan Commitments on the Closing Date is $75,000,000. Once converted and deemed made, the Exchange First-Out Loan Commitments shall be reduced to zero and terminated.

"**Exchange First-Out Loans**" means the Term Loans made (or deemed made) by the applicable Second Amendment Exchanging Lenders on the Closing Date pursuant to Section 2.01(3)(a).

"**Excluded Accounts**" means any Deposit Account of any Loan Party or Restricted Subsidiary (and all cash, Cash Equivalents and other securities or investments credited thereto or deposited therein): (1) that does not have an individual daily balance in excess of $500,000, or in the aggregate with each other account described in this clause (1), in excess of $5,000,000; (2) the balance of which is swept at the end of each Business Day into a Deposit Account subject to a Deposit Account Control Agreement (as defined in the ABL Facility), so long as such daily sweep is not terminated or modified (other than to provide that the balance in such Deposit Account is swept into another Deposit Account subject to a Deposit Account Control Agreement (as defined in the ABL Facility)) without the consent of the ABL Facility Administrative Agent; (3) that is a Trust Account or Specified Segregated Account (as defined in the ABL Facility); (4) [reserved]; (5) any Deposit Account that constitutes a disbursement account of the Borrower or any Restricted Subsidiary the balance of which consists solely of proceeds of Indebtedness, including the proceeds of the loans under the ABL Facility; *provided* that in the case of the proceeds of the loans under the ABL Facility, the aggregate amount that may be maintained in an Excluded Account described in this clause (5) shall not exceed $50.0 million at any one time; or (6) to the extent that it is cash collateral for letters of credit (other than Letters of Credit (as defined in the ABL Facility)) to the extent permitted hereunder.

"**Excluded Assets**" means (i) any Owned Real Property or Leased Real Property, in each case subject to a Specified Sale-Leaseback Transaction and Leased Real Property (a) where the consent or other affirmative action of the applicable landlord is required for Borrower or the applicable Subsidiary to grant a Mortgage, perfect the security interest granted thereby, or otherwise comply with the Collateral and Guarantee Requirement and such consent cannot be obtained after the Borrower or the applicable Subsidiary's use of commercially reasonable efforts to do so (which commercially reasonable efforts, for the avoidance of doubt, shall not require the Borrower or applicable Subsidiary to amend or otherwise modify any of the existing terms or conditions of any agreement with any landlord or pay additional economics to any landlord) or (b) no legal description for the parcel or store leased by the Borrower or the Restricted Subsidiary was provided by such landlord pursuant to the ground lease thereto, (ii) pledges and security interests prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), (iii) Margin Stock, (iv) cash and Cash Equivalents on deposit in Excluded Accounts, (v) any lease, license or other agreements, or any property subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license or agreement, purchase money, Capitalized Lease Obligations or similar arrangement, or create a right of termination in favor of any other party thereto (other than a Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition, (vi) assets for which a pledge thereof or a security interest therein would result in a material adverse tax consequence as determined by the Borrower and consented to by the Required Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed), (vii) assets for which the Required Lenders and the Borrower have determined in their reasonable judgment and agree in writing that the cost of creating or perfecting such pledges or security interests therein would be excessive in view of the benefits to be obtained by the Lenders therefrom, (viii) any intent-to-use trademark application in the United States prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto with the United States Patent and Trademark Office and (ix) Excluded Equity.

"**Excluded Contribution**" means net cash proceeds or the fair market value of marketable securities or the fair market value of Qualified Proceeds received by the Borrower from:

(1)     contributions to its common equity capital;

(2)     dividends, distributions, fees and other payments from any joint ventures that are not Restricted Subsidiaries; and

(3)     the sale (other than to a Restricted Subsidiary of the Borrower or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Borrower) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Borrower;

in each case designated as Excluded Contributions pursuant to an Officer's Certificate.

"**Excluded Equity**" means Equity Interests (i) [reserved], (ii) [reserved], (iii) [reserved], (iv) of any Subsidiary with respect to which the Required Lenders and the Borrower have determined in their reasonable judgment and agreed in writing that the costs of providing a pledge of such Equity Interests or perfection thereof is excessive in view of the benefits to be obtained by the Secured Parties therefrom, (v) of

any captive insurance companies, not-for-profit Subsidiaries, special purpose entities (including any Securitization Subsidiary), (vi) to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than Holdings, the Borrower or any wholly owned Restricted Subsidiary of the Borrower), under the terms of any applicable Organizational Documents, joint venture agreement or shareholders' agreement, equity interests in any person other than wholly-owned Restricted Subsidiaries; and (vii) of any Foreign Subsidiary the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers or to the extent that the grant or perfection of a security interest in such Voting Stock would reasonably be expected to result in material adverse tax consequences to any Loan Party, as determined by the Borrower in good faith with the consent of the Required Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed).

"**Excluded Subsidiaries**" means all of the following and "**Excluded Subsidiary**" means any of them:

(1)     any Subsidiary that is a bona fide joint venture with Persons other than Affiliates of the Borrower entered into in the ordinary course of business or a Subsidiary of such bona fide joint venture,

(2)     any Foreign Subsidiary,

(3)     any CFC Holdco,

(4)     any Domestic Subsidiary that is a Subsidiary of any (i) Foreign Subsidiary, (ii) CFC or (iii) CFC Holdco,

(5)     any Subsidiary (including any regulated entity that is subject to net worth or net capital or similar capital and surplus restrictions) that is prohibited or restricted by applicable Law, accounting policies or by Contractual Obligation existing on the Closing Date (or, with respect to any Subsidiary acquired by the Borrower or a Restricted Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired) from providing a Guaranty, or if such Guaranty would require governmental (including regulatory) or third party (other than a Loan Party) consent, approval, license or authorization, unless such consent, approval, license or authorization has been received, or is received after commercially reasonable efforts to obtain the same, which efforts may be requested by the Administrative Agent or the Required Lenders,

(6)     any special purpose securitization vehicle (or similar entity) or any Securitization Subsidiary, to the extent formed for the purpose of consummating a Qualified Securitization Facility permitted hereunder,

(7)     [reserved],

(8)     any Subsidiary that is not a Material Subsidiary,

(9)     any Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the burden or cost (including any adverse tax consequences) of providing the Guaranty is excessive in relation to the benefits to be obtained by the Lenders therefrom,

(10)    [reserved], and

(11)    any Unrestricted Subsidiary.

"**Excluded Swap Obligation**" means, with respect to any Loan Party, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 2.07 of the Guaranty and any other "keepwell, support or other agreement" for the benefit of such Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act) at the time the Guaranty of such Loan Party, or a grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest becomes illegal.

"**Excluded Taxes**" means, with respect to each Agent and each Lender,

(1)    any tax on such Agent or Lender's net income or profits (or franchise tax in lieu of such tax on net income or profits) imposed by a jurisdiction as a result of such Agent or Lender being organized or having its principal office or applicable Lending Office located in such jurisdiction or as a result of any other present or former connection between such Agent or Lender and the jurisdiction (including as a result of such Agent or Lender carrying on a trade or business, having a permanent establishment or being a resident for tax purposes in such jurisdiction, other than a connection arising solely from such Agent or Lender having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or sold or assigned an interest in, any Loan or Loan Document),

(2)    any branch profits tax under Section 884(a) of the Code, or any similar tax, imposed by any other jurisdiction described in clause (1),

(3)    other than with respect to any Lender that becomes a party hereto pursuant to the Borrower's request under Section 3.07, any U.S. federal withholding tax that is imposed on amounts payable with respect to an applicable interest in a Loan or Commitment to a Lender pursuant to a Law in effect at the time such Lender acquires such interest (or designates a new Lending Office) (or where the Lender is a partnership for U.S. federal income tax purposes, pursuant to a law in effect on the later of the date on which such Lender becomes a party hereto or the date on which the affected partner becomes a partner of such Lender or designates a new Lending Office), except, in the case of a Lender or partner that designates a new Lending Office or is an assignee, to the extent that such Lender or partner (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to Section 3.01,

(4)    any withholding tax attributable to a Lender's failure to comply with Section 3.01(3),

(5)    any tax imposed under FATCA and

(6)    any interest, additions to taxes and penalties with respect to any taxes described in clauses (1) through (5) of this definition.

"**Existing Credit Agreement**" means that certain Credit Agreement, dated as of October 22, 2014, by and among Belk, certain affiliates of Belk, the lenders from time to time party thereto, the agents party thereto and Wells Fargo Bank, National Association, as administrative agent, as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Existing Mortgaged Property**" means each Real Property set forth on Schedule 1.01(2) annexed hereto that, as of the Closing Date, is subject to a Mortgage in favor of the Collateral Agent.

"**Extended Commitments**" means the Term Loan Commitments held by an Extending Lender.

"**Extended Loans**" means the Term Loans made pursuant to Extended Commitments.

"**Extending Lender**" means each Lender accepting an Extension Offer.

"**Extension**" has the meaning specified in Section 2.16(1).

"**Extension Amendment**" has the meaning specified in Section 2.16(2).

"**Extension Offer**" has the meaning specified in Section 2.16(1).

"**Facilities**" means the First-Out Loans, the Second-Out Loans, any Extended Loans, any Refinancing Term Loans or any Replacement Loans, as the context may require, and "**Facility**" means any of them.

"**fair market value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code as in effect on the date hereof or any amended or successor version thereof that is substantively comparable and not materially more onerous to comply with (and, in each case, any regulations promulgated thereunder or official interpretations thereof), and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreements (together with any laws, rules, or practices implementing such agreements).

"**FCPA**" has the meaning specified in Section 5.17.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted to the Administrative Agent by three (3) federal funds brokers on such day on such transactions as determined by the Administrative Agent.

"**Financial Officer**" means, with respect to a Person, the chief financial officer, accounting officer, treasurer, controller or other senior financial or accounting officer of such Person, as appropriate.

"**First Lien Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Debt outstanding the last day of such Test Period to (b) Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**First-Out Loan Commitments**" means, collectively, the New Money First-Out Loan Commitment and the Exchange First-Out Loan Commitment.

"**First-Out Lenders**" means the Lenders holding First-Out Loans or First-Out Loan Commitments.

"**First-Out Loans**" means the New Money First-Out Loans and the Exchange First-Out Loans.

"**Flood Hazard Property**" has the meaning specified in Section 6.07(2).

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Flood Insurance Requirements**" has the meaning specified in Section 6.07(2).

"**floor**" means, with respect to any reference rate of interest, any fixed minimum amount specified for such rate.

"**Foreign Asset Sale**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Casualty Event**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Lender**" means a Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Code.

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to, by, or entered into with, the Borrower or any Subsidiary of the Borrower with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Sale-Leaseback**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**Funded Debt**" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders

to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**GAAP**" means generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, as in effect from time to time. At any time after the Closing Date, the Borrower may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP will thereafter be construed to mean IFRS (except as otherwise provided in this Agreement); *provided*, *however*, that any such election, once made, will be irrevocable; *provided further* that any calculation or determination in this Agreement that requires the application of GAAP for periods that include fiscal quarters ended prior to the Borrower's election to apply IFRS will remain as previously calculated or determined in accordance with GAAP. The Borrower will give notice of any such election made in accordance with this definition to the Administrative Agent. Notwithstanding any other provision contained herein the amount of any Indebtedness under GAAP with respect to Capitalized Lease Obligations and Attributable Indebtedness shall be determined in accordance with the definition of Capitalized Lease Obligations and Attributable Indebtedness, respectively.

Notwithstanding the foregoing, if at any time any change occurring after the Closing Date in GAAP (or IFRS) or in the application thereof on the computation of any financial ratio or financial requirement, or compliance with any covenant, set forth in any Loan Document, and the Borrower shall so request (regardless of whether any such request is given before or after such change), the Lenders and the Borrower will negotiate in good faith to amend (subject to the approval of the Required Lenders) such ratio, requirement or covenant to preserve the original intent thereof in light of such change in GAAP (or IFRS); provided further that until so amended, (a) such ratio, requirement or covenant shall continue to be computed in accordance with GAAP (or IFRS) prior to such change therein and (b) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP (or IFRS).

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**guarantee**" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such

Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantor**" has the meaning specified in clause (2) of the definition of "Collateral and Guarantee Requirement." For avoidance of doubt, the Borrower may, in its sole discretion, cause any domestic Parent Company or Restricted Subsidiary that is not required to be a Guarantor to Guarantee the Obligations by causing such Parent Company or Restricted Subsidiary to execute a joinder to the Guaranty (substantially in the form provided therein or as the Administrative Agent, the Required Lenders, the Borrower and such Guarantor may otherwise agree), and any such Parent Company or Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"**Guaranty**" means (a) the Guarantee of the Obligations by the Guarantors substantially in the form of Exhibit E, (b) each other Guarantee and Guarantee supplement delivered pursuant to Section 6.11 and (c) each other Guarantee and Guarantee supplement delivered by any Parent Company or Restricted Subsidiary pursuant to the second sentence of the definition of "Guarantor".

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, and all other hazardous or toxic substances or wastes, pollutants and contaminants and chemicals in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, or radon gas and infectious or medical wastes, to the extent any of the foregoing are regulated pursuant to, or can form the basis for liability under, any Environmental Law.

"**Hedge Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedge Bank**" means any Person party to a Hedge Agreement that is an Agent, a Lender, or an Affiliate of any of the foregoing on the Closing Date or at the time it enters into such Hedge Agreement, in its capacity as a party thereto, whether or not such Person subsequently ceases to be an Agent, a Lender or an Affiliate of any of the foregoing.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under any Hedge Agreement.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Identified Participating Lenders**" has the meaning specified in Section 2.05(1)(e)(C)(3).

"**Identified Qualifying Lenders**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**IFRS**" means international financial reporting standards and interpretations issued by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants or any successor to either such Board, or the SEC, as the case may be), as in effect from time to time.

"**Immediate Family Members**" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including, in each case, adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"**Incremental Amounts**" has the meaning specified in clause (1) of the definition of Refinancing Indebtedness.

"**Indebtedness**" means, with respect to any Person, without duplication:

(1)      any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)      in respect of borrowed money;

(b)      evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)      representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations) due more than twelve months after such property is acquired, except (i) any such balance that constitutes an obligation in respect of a commercial letter of credit, a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business or consistent with industry practice, (ii) any earn-out obligations until such obligation is reflected as a liability on the balance sheet (excluding any footnotes thereto) of such Person in accordance with GAAP and is not paid within 60 days after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business; or

(d)        representing the net obligations under any Hedging Obligations;

(2)        to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice; and

(3)        to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of such Indebtedness will be the lesser of (i) the fair market value of such asset at such date of determination and (ii) the amount of such Indebtedness of such other Person; *provided* that notwithstanding the foregoing, Indebtedness will be deemed not to include:

(i)        Contingent Obligations incurred in the ordinary course of business or consistent with industry practice,

(ii)        reimbursement obligations under commercial letters of credit (*provided* that unreimbursed amounts under letters of credit will be counted as Indebtedness three (3) Business Days after such amount is drawn),

(iii)        obligations under or in respect of Qualified Securitization Facilities that are non-recourse to the Loan Parties other than any Securitization Repurchase Obligation,

(iv)        accrued expenses,

(v)        deferred or prepaid revenues, and

(vi)        asset retirement obligations and obligations in respect of reclamation and workers compensation (including pensions and retiree medical care);

*provided further* that Indebtedness will be calculated without giving effect to the effects of Accounting Standards Codification Topic No. 815, *Derivatives and Hedging*, and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Assets or Operations**" means, with respect to any Parent Company, that Parent Company's total assets, revenues, income from continuing operations before income taxes and cash flows from operating activities (excluding in each case amounts related to its investment in the Borrower and the Restricted Subsidiaries), determined in accordance with GAAP and as shown on the most recent balance sheet of such Parent Company, is more than 3.0% of such Parent Company's corresponding consolidated amount.

"**Information**" has the meaning specified in Section 10.09.

46

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means the Intercompany Subordination Agreement, dated as of the Closing Date, substantially in the form of Exhibit Q executed by the Borrower and each Restricted Subsidiary that is party thereto.

"**Intercreditor Provisions**" means the terms set forth on Annex I hereto.

"**Interest Payment Date**" means, (a) as to any Loan of any Class other than a Base Rate Loan or a Second-Out Loan, the last day of each Interest Period applicable to such Loan and the applicable Maturity Date of the Loans of such Class; *provided* that if any Interest Period for a Eurodollar Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan of any Class or any Second-Out Loan, the first Business Day of each February, May, August and November and the applicable Maturity Date of the Loans of such Class.

"**Interest Period**" means, (a) as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one, two or three thereafter, or to the extent consented to by each applicable Lender, twelve months (or such period of less than one month as may be consented to by each applicable Lender), as selected by the Borrower in its Committed Loan Notice; *provided* that:

(1)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(2)     any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(3)     no Interest Period shall extend beyond the applicable Maturity Date for the Class of Loans of which such Eurodollar Rate Loan is a part; and

(b)     as to each Base Rate Loan and each Second-Out Loan, (i) the period commencing on the Closing Date and ending on the first Interest Payment Date after the Closing Date and (ii) thereafter, each period commencing on the first day following each Interest Payment Date and ending on the immediately succeeding Interest Payment Date.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's or BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency selected by the Borrower.

"**Investment Grade Securities**" means:

(1)     securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or debt instruments constituting loans or advances among the Borrower and its Subsidiaries;

(3) investments in any fund that invests at least 95% of its assets in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"**Investments**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to employees, directors, officers, members of management, manufacturers and consultants, in each case made in the ordinary course of business or consistent with industry practice), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person. For purposes of the definition of "Unrestricted Subsidiary" and Section 7.05,

(1) "Investments" will include the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a) the Borrower's "Investment" in such Subsidiary at the time of such redesignation; *minus*

(b) the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer.

The amount of any Investment outstanding at any time will be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.

"**Investors**" means the Sponsor.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**Judgment Currency**" has the meaning specified in Section 10.26.

"**Junior Debt**" has the meaning specified in Section 7.05(a)(C).

48

"**KKR**" means KKR Credit Advisors (US) LLC and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Landlord Consent and Estoppel**" means with respect to any Leased Real Property, a letter, certificate or other instrument in writing from the lessor under the related lease, reasonably satisfactory in form and substance to the Collateral Agent and the Required Lenders, pursuant to which such lessor agrees, for the benefit of Collateral Agent, (i) that without any further consent of such lessor or any further action on the part of the Loan Party holding such Leased Real Property, such Leased Real Property may be encumbered pursuant to a Mortgage and may be assigned to the purchaser at a foreclosure sale or in a transfer in lieu of such a sale (and to a subsequent third party assignee if Collateral Agent or its designee so acquires such Leased Real Property), (ii) that such lessor shall not terminate such lease as a result of a default by such Loan Party thereunder without first giving Collateral Agent written notice of such default and at least 60 days (or, if such default cannot reasonably be cured by Collateral Agent or the Required Lenders within such period, such longer period as may reasonably be required) to cure such default and (iii) to such other matters relating to such Leased Real Property as Collateral Agent or the Required Lenders may reasonably request.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any First-Out Loan, Second-Out Loan, Refinancing Term Loan, Replacement Loan or any Extended Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, legally enforceable guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the legally binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Leased Real Property**" means any real property located in the United States and ground leased by any Loan Party, or in which Loan Party acquires a ground leasehold interest after the Closing Date; *provided* that for the avoidance of doubt, Leased Real Property will not include any Excluded Assets.

"**Legal Holiday**" means Saturday, Sunday or a day on which commercial banking institutions are not required to be open in the State of New York or at the place of payment.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender." For the avoidance of doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered a Refinancing Amendment or an amendment in respect of Replacement Loans, as the case may be, and to the extent such Refinancing Amendment or amendment in respect of Replacement Loans shall have become effective in accordance with the terms hereof and thereof, and each Extending Lender shall continue to be a Lender. As of the Closing Date, Schedule 2.01(1) sets forth the name of each First-Out Lender and Schedule 2.01(2) sets forth the name of each Second-Out Lender.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**LIBOR**" has the meaning specified in the definition of "Eurodollar Rate."

"**Lien**" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest and any authorized filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event will an operating lease be deemed to constitute a Lien.

"**Limited Condition Acquisition**" means any investment permitted hereunder by the Borrower or one or more of its Restricted Subsidiaries whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"**Liquidity**" means, at any date of determination, (a) the aggregate amount of cash and Cash Equivalents included in the cash accounts that would be listed on the consolidated balance sheet delivered pursuant to Section 6.01 to the extent such cash is not classified as "restricted" for financial statement purposes (unless so classified solely because of any provision under the Loan Documents or the ABL Facility Documents because they are subject to a Lien securing the Obligations or the ABL Obligations and without duplication of any cash and Cash Equivalents otherwise increasing the amount of ABL Commitments available to be utilized under the ABL Credit Agreement and excluding any cash and Cash Equivalents in store deposit accounts), plus (b) any Excess Availability (as defined in the ABL Credit Agreement) (excluding (i) any amount of the Excess Availability that, if drawn, would trigger a breach of Section 7.10 of the ABL Credit Agreement) and (ii) to the extent not already reflected in the Excess Availability, any Reserves (as defined in the ABL Credit Agreement) or other actual deductions from the Borrowing Base as of such date that are not reflected in the most recent borrowing base certificate).

"**Loan**" means an extension of credit under Article II or the making of Replacement Loans pursuant to Section 10.01 by a Lender to the Borrower in the form of a Term Loan.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) any Refinancing Amendment, Extension Amendment or amendment in respect of Replacement Loans, (d) the Guaranty, (e) the Collateral Documents, (f) the Applicable Intercreditor Agreements, (g) the Agent Fee Letter and (h) any other agreement, document or instrument designated as a "Loan Document" by the Borrower and the Administrative Agent (or the Required Lenders). Any reference to this Agreement or any other Loan Document shall include all appendices, exhibits, schedules, annexes or attachments thereto.

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each Subsidiary Guarantor.

"~~**Make-whole Amount**~~" ~~means an amount equal to 20% of the aggregate principal amount of Prepetition First Lien Term Loans and Prepetition Second Lien Term Loans that are exchanged into Second-Out Loans pursuant to 2.01(3) on the Closing Date.~~

"**Make-whole Amount**" means $199,662,489.

"**Management Services Agreement**" means the management services agreement or similar agreements among the Sponsor or certain of its respective management companies associated with it or their advisors, if applicable, and the Borrower (or any Parent Company).

"**Management Stockholders**" means the members of management (and their Controlled Investment Affiliates and Immediate Family Members and any permitted transferees thereof) of the

Borrower (or a Parent Company) who are holders of Equity Interests of any Permitted Parent or any Parent Company on the Closing Date or that become holders of such Equity Interests thereafter.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Material Adverse Effect**" means a circumstance or condition that would materially and adversely affect (a) the business, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents to which it is a party or (c) the rights and remedies of the Lenders, the Collateral Agent and the Administrative Agent under the Loan Documents, in each case, other than customary events or circumstances in connection with the Plan of Reorganization.

"**Material Domestic Subsidiary**" means, as of the Closing Date and thereafter at any date of determination, each of the Borrower's Domestic Subsidiaries that is a Restricted Subsidiary (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiary at the last day of the most recent Test Period) were equal to or greater than 1.0% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiary for such Test Period) were equal to or greater than 1.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time after the date which is 30 days after the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion), Domestic Subsidiaries that are not Material Domestic Subsidiaries solely because they do not meet the thresholds set forth in the preceding clause (a) or (b) comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiaries at the last day of the most recent Test Period) 2.5% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiaries for such Test Period) 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries that are Restricted Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 with respect to any such Subsidiaries.

"**Material Foreign Subsidiary**" means, as of the Closing Date and thereafter at any date of determination, each of the Borrower's Foreign Subsidiaries that are Restricted Subsidiaries (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiary at the last day of the most recent Test Period) were equal to or greater than 1.0% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the revenues of the Restricted Subsidiaries of such Foreign Subsidiary for such Test Period) were equal to or greater than 1.0% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time after the date which is 30 days after the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion), Foreign Subsidiaries that are not Material Foreign Subsidiaries comprise

51

in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiaries at the last day of the most recent Test Period) 2.5% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period) 2.5% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries that are Restricted Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) (A) with respect to the First-Out Loans, in each case that have not been extended pursuant to Section 2.16 after the Closing Date, July 31, 2025 and (B) with respect to the Second-Out Loans, in each case that have not been extended pursuant to Section 2.16 after the Closing Date, July 31, 2025, (ii) with respect to any tranche of Extended Loans, the final maturity date as specified in the applicable Extension Amendment, (iii) with respect to any Refinancing Term Loans, the final maturity date as specified in the applicable Refinancing Amendment and (iv) with respect to Replacement Loans, the final maturity date as specified in the applicable amendment; *provided* that in each case, if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Rate**" has the meaning specified in Section 10.11.

"**Moody's**" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"**Mortgage Policies**" has the meaning specified in Section 6.11(2)(b)(ii).

"**Mortgaged Properties**" has the meaning specified in paragraph (5) of the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the fee or leasehold, as applicable, deeds of trust, trust deeds, hypothecs, deeds to secure debt and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent for the benefit of the Secured Parties in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, including such modifications as may be required by local laws, pursuant to Section 6.13(2) and any other deeds of trust, trust deeds, hypothecs, deeds to secure debt or mortgages executed and delivered pursuant to Sections 6.11.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"**Net Proceeds**" means:

(1)     with respect to any Asset Sale or any Casualty Event, the aggregate Cash Equivalent proceeds received by the Borrower or any Restricted Subsidiary in respect of such Asset Sale or Casualty Event, net of the costs relating to such Asset Sale or Casualty Event, including legal, accounting and investment banking fees, payments made in order to obtain a necessary consent or required by applicable law, brokerage and sales commissions, all dividends, distributions or other payments required to be made to minority interest holders in Restricted Subsidiaries as a result of any such Asset Sale or Casualty Event by a Restricted Subsidiary, the amount of any purchase price or similar adjustment claimed by any Person to be owed by the Borrower or any Restricted Subsidiary, until such time as such claim will have been settled or otherwise finally resolved, or paid or payable by the Borrower or any Restricted Subsidiary, in either case in respect of such Asset Sale or Casualty Event, any relocation expenses incurred as a result thereof, costs and expenses in connection with unwinding any Hedging Obligation in connection therewith, other fees and expenses, including title and recordation expenses, taxes paid or payable as a result thereof or any transactions occurring or deemed to occur to effectuate a payment under this Agreement, amounts required to be applied to the repayment of principal, premium, if any, and interest on Indebtedness (other than Subordinated Indebtedness, the ABL Facility or the Second Lien Facility) secured by a Lien on such assets and required (other than required by Section 2.05(2)(b)) to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Borrower or any Restricted Subsidiary as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction; *provided* that (a) subject to clause (b) below, no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds shall exceed $1.0 million and (b) no such net cash proceeds shall constitute Net Proceeds under this clause (1) in any fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $2.0 million (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (1)); and

(2)     (a) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower or any Parent Company, the excess, if any, of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (ii) all taxes paid or reasonably estimated to be payable, and all fees (including investment banking fees, attorneys' fees, accountants' fees, underwriting fees and discounts), commissions, costs and other out-of-pocket expenses and other customary expenses incurred, in each case by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (b) with respect to any Permitted Equity Issuance by any Parent Company, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower;

*provided* that "Net Proceeds" shall not include, or apply to, the proceeds of the sale component of any Sale-Leaseback Transaction, although proceeds from Specified Sale-Leaseback Transactions shall be governed by the definition of "Specified Sale-Leaseback Net Proceeds".

"**New Money First-Out Loan Commitment**" means, with respect to each First-Out Lender, the commitment of such First-Out Lender to make New Money First-Out Loans in an aggregate amount not to exceed the amount set forth opposite such First-Out Lender's name on Schedule ~~1 to the Second Amendment.~~2.01 opposite such First-Out Lender's name under the heading "New Money First-Out Loan

53

Commitment". The aggregate amount of New Money First-Out Loan Commitments on the Closing Date is $225,000,000. Once funded, the New Money First-Out Loan Commitments shall be reduced to zero and terminated.

"**New Money First-Out Loans**" means the Term Loans made by the applicable First-Out Lenders on the Closing Date pursuant to Section 2.01(2)~~(b)~~.

"**New Store**" means each new store or shopping facility opened or acquired by the Borrower or a Restricted Subsidiary that has been open for commercial operations for less than twelve full calendar months.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Non-Excluded Taxes**" means all Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Non-Extended Lender**" has the meaning specified in Section 2.16.

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Non-Recourse Indebtedness**" means Indebtedness that is non-recourse to the Borrower and the Restricted Subsidiaries.

"**Obligations**" means all

(1) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, including the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, premiums (including any Prepayment Premium or Make-whole Amount), Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including principal, interest, reimbursement obligations, charges, expenses, fees, premiums (including any Prepayment Premium or Make-whole Amount), Attorney Costs, indemnities and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding,

(2) obligations (other than Excluded Swap Obligations) of the Borrower or any Restricted Subsidiary arising under any Secured Hedge Agreement,

(3) Cash Management Obligations under each Secured Cash Management Agreement and

(4) the Guaranty in respect of each of the foregoing.

Notwithstanding the foregoing, (a) unless otherwise agreed to by the Borrower and any applicable Hedge Bank or Cash Management Bank, the obligations of Holdings, the Borrower or any Subsidiary under any Secured Hedge Agreement and under any Secured Cash Management Agreement shall be secured and

guaranteed pursuant to the Collateral Documents and the Guaranty only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement and any other Loan Document shall not require the consent of the holders of Hedging Obligations under Secured Hedge Agreements or of the holders of Cash Management Obligations under Secured Cash Management Agreements.

"**OFAC**" has the meaning specified in Section 5.17.

"**Offered Amount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Offered Discount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Officer's Certificate**" means a certificate signed on behalf of a Person by a Responsible Officer of such Person.

"**OID**" means original issue discount.

"**Opinion of Counsel**" means a written opinion from legal counsel who is reasonably acceptable to the Administrative Agent. Counsel may be an employee of or counsel to the Borrower or the Administrative Agent.

"**ordinary course of business**" means activity conducted in the ordinary course of business of the Borrower and any Restricted Subsidiary, including the expansion, remodeling, acquisition, modernization, construction, improvement and repair of department stores and other retail centers of Belk operated, or expected to be operated, by the Borrower or a Restricted Subsidiary, and financing transactions in connection therewith, and will include Sale-Leaseback Transactions.

"**Organizational Documents**" means

    (1)    with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction);

    (2)    with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and

    (3)    with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Original Closing Date**" means December 10, 2015.

"**Other Applicable ECF**" means Excess Cash Flow or a comparable measure as determined in accordance with the documentation governing Other Applicable Indebtedness.

"**Other Applicable Indebtedness**" means Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations, together with Refinancing Indebtedness in respect of any of the foregoing that is secured on a *pari passu* basis with the Obligations.

"**Other Applicable Net Proceeds**" means Net Proceeds or a comparable measure as determined in accordance with the documentation governing Other Applicable Indebtedness.

"**Other Taxes**" means any and all present or future stamp, court or documentary Taxes, intangible, recording, filing or similar Taxes arising from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Outstanding Amount**" means on any date, the outstanding principal amount of any Term Loans after giving effect to any borrowings and prepayments or repayments of Term Loans, occurring on such date.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Owned Real Property**" means any fee-owned real property located in the United States and owned on, or acquired after, the Closing Date, by any Loan Party; *provided* that for the avoidance of doubt, Owned Real Property will not include any Excluded Assets.

"**Parent Company**" means any Person so long as such Person directly or indirectly holds 100.0% of the total voting power of the Capital Stock of the Borrower, and at the time such Person acquired such voting power, no Person and no group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any such group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) (other than any Permitted Holder), will have beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), directly or indirectly, of 50.0% or more of the total voting power of the Voting Stock of such Person. For the avoidance of doubt, Fashion Holdings Intermediate Inc., a Delaware corporation, is a Parent Company of the Borrower.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Participating Lender**" has the meaning specified in Section 2.05(1)(e)(C)(2).

"**Payment in Full**" means, with respect to the Obligations in respect of the Loans or any Class of Loans, the occurrence of all of the following:

(a)    termination or expiration of all commitments to extend credit (or, in the case of Secured Hedge Agreements and Secured Cash Management Obligations or similar Obligations, termination of arrangements giving rise to such debt or entering into other arrangements reasonably satisfactory to the counterparties thereto) that would constitute such Obligations;

(b)    payment in full in cash of the principal of, interest and premium (if any) on, fees and other charges comprising such Obligations that are due and payable (including, in any event, principal, interest, premium (including any Prepayment Premium or Make-whole Amount), fees and other charges that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding); and

(c)   payment in full in cash of all other such Obligations that are outstanding and due and payable at the time the principal of, interest and premium (if any) on, fees and other charges comprising such Obligations are paid in full in cash (other than any obligations for taxes, costs, indemnification, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time) (including, in any event, reimbursement obligations, expenses, Attorney Costs, indemnities and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"**Perfection Certificate**" has the meaning specified in the Security Agreement.

"**Permitted Asset Swap**" means the substantially concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Borrower or any Restricted Subsidiary and another Person; *provided* that any cash or Cash Equivalents received must be applied in accordance with Section 2.05(2)(b)(i).

"**Permitted Debt Exchange**" has the meaning specified in Section 2.19(1).

"**Permitted Debt Exchange Notes**" has the meaning specified in Section 2.19(1).

"**Permitted Debt Exchange Offer**" has the meaning specified in Section 2.19(1).

"**Permitted Equal Priority Refinancing Debt**" means any Credit Agreement Refinancing Indebtedness that is secured on a *pari passu* basis with the Closing Date Term Loans.

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of the Borrower or any Parent Company.

"**Permitted Holder**" means (1) the Investors, KKR, Blackstone and Management Stockholders and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the foregoing are members; *provided* that in the case of such group and without giving effect to the existence of such group or any other group, such Investors, KKR, Blackstone and Management Stockholders, collectively, have beneficial ownership of more than a majority of the total voting power of the Voting Stock of the Borrower or any Permitted Parent, and (2) any Person acting in the capacity of an underwriter (solely to the extent that and for so long as such Person is acting in such capacity) in connection with a public or private offering of Capital Stock of the Borrower or any Permitted Parent.

"**Permitted Indebtedness**" means Indebtedness permitted to be incurred in accordance with Section 7.02.

"**Permitted Investments**" means:

(1)     any Investment (a) in any Loan Party and (b) by any Restricted Subsidiary that is a Non-Loan Party in any other Restricted Subsidiary that is a Non-Loan Party;

(2)     any Investment(s) in Cash Equivalents or Investment Grade Securities and Investments that were Cash Equivalents or Investment Grade Securities when made;

(3)     [reserved];

(4)     any Investment in securities or other assets not constituting Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made in accordance with Section 7.04 or any other disposition of assets not constituting an Asset Sale;

(5)     any Investment existing on the Closing Date or made pursuant to binding commitments in effect on the Closing Date or an Investment consisting of any extension, modification, replacement, renewal or reinvestment of any Investment or binding commitment existing on the Closing Date; *provided* that the amount of any such Investment or binding commitment may be increased, extended, modified, replaced, reinvested or renewed, (a) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities) or (b) as otherwise permitted hereunder;

(6)     any Investment acquired by the Borrower or any Restricted Subsidiary:

(a)     in exchange for any other Investment, accounts receivable or indorsements for collection or deposit held by the Borrower or any Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer);

(b)     in satisfaction of judgments against other Persons;

(c)     as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or

(d)     as a result of the settlement, compromise or resolution of (i) litigation, arbitration or other disputes or (ii) obligations of trade creditors or customers that were incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer;

(7)     Hedging Obligations permitted under Section 7.02(b)(10);

(8)     [reserved];

(9)     Investments the payment for which consists of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company; *provided* that such Equity Interests will not increase the Available Amount;

(10)    (a) guarantees of Indebtedness permitted under Section 7.02, performance guarantees and Contingent Obligations incurred in the ordinary course of business or consistent with industry practice, and (b) the creation of liens on the assets of the Borrower or any Restricted Subsidiary in compliance with Section 7.01;

(11)    any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 7.06(b)(3), (4), (7), (8), (10), (14), (16), (17), (18), (19), (20) and (23);

(12)    Investments consisting of purchases and acquisitions of inventory, supplies, material, services or equipment or similar assets or the licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons;

(13)    Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding, not to exceed $50.0 million (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided, however*, that if any Investment pursuant to this clause (13) is made in any Person that is not a Restricted Subsidiary (or Subsidiary Guarantor, as applicable) at the date of the making of such Investment and such Person becomes a Restricted Subsidiary (or Subsidiary Guarantor, as applicable) after such date, such Investment will thereafter be deemed to have been made pursuant to clause (1) above (to the extent permitted thereunder) and will cease to have been made pursuant to this clause (13) for so long as such Person continues to be a Restricted Subsidiary (or Subsidiary Guarantor, as applicable); *provided, further*, that the Investments made by Loan Parties in Non-Loan Parties pursuant to this clause (13), together with the Investments made pursuant to clause (18), shall not in the aggregate exceed $35.0 million at any time outstanding;

(14)    Investments in a Securitization Subsidiary that, in the good faith determination of the Borrower, are necessary to effect any Qualified Securitization Facility or any repurchase obligation pursuant to a Securitization Repurchase Obligation;

(15)    loans and advances to, or guarantees of Indebtedness of, officers, directors, employees, consultants and members of management, together with the amounts described in clause (16), not in excess of the greater of $10.0 million and 2.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(16)    loans and advances to employees, directors, officers, members of management and consultants for business-related travel expenses, moving expenses, payroll advances and other similar expenses or payroll expenses, in each case incurred in the ordinary course of business or consistent with past practice or consistent with industry practice or to future, present and former employees, directors, officers, members of management and consultants (and their Controlled Investment Affiliates and Immediate Family Members) to fund such Person's purchase of Equity Interests of the Borrower or any Parent Company, together with the amounts described in clause (15), not in excess of the greater of $10.0 million and 2.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(17)    advances, loans or extensions of trade credit or prepayments to suppliers or loans or advances made to distributors, in each case, in the ordinary course of business or consistent with past practice or consistent with industry practice by the Borrower or any Restricted Subsidiary;

(18)     any Investment in any Subsidiary (other than an Unrestricted Subsidiary) or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business or consistent with industry practice; *provided*, that the Investments made by Loan Parties in Non-Loan Parties pursuant to this clause (18), together with the Investments made by Loan Parties in Non-Loan Parties pursuant to clause (13), shall not exceed $35.0 million in the aggregate at any time outstanding;

(19)     Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with industry practice;

(20)     Investments made in the ordinary course of business or consistent with industry practice in connection with obtaining, maintaining or renewing client contacts and loans or advances made to distributors;

(21)     Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business or consistent with industry practice;

(22)     the purchase or other acquisition of any Indebtedness of the Borrower or any Restricted Subsidiary to the extent otherwise permitted hereunder;

(23)     [reserved];

(24)     Investments in the ordinary course of business or consistent with industry practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers;

(25)     any Investment by any Captive Insurance Subsidiary in connection with its provision of insurance to the Borrower or any of its Subsidiaries, which Investment is made in the ordinary course of business or consistent with industry practice of such Captive Insurance Subsidiary, or by reason of applicable law, rule, regulation or order, or that is required or approved by any regulatory authority having jurisdiction over such Captive Insurance Subsidiary or its business, as applicable;

(26)     Investments made as part of, to effect or resulting from the Transactions;

(27)     Investments of assets relating to non-qualified deferred payment plans in the ordinary course of business or consistent with industry practice;

(28)     [reserved];

(29)     acquisitions of obligations of one or more directors, officers or other employees or consultants or independent contractors of any Parent Company, the Borrower, or any Subsidiary of the Borrower in connection with such director's, officer's, employee's consultant's or independent contractor's acquisition of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, to the extent no cash is actually advanced by the Borrower or any Restricted Subsidiary to such directors, officers, employees, consultants or independent contractors in connection with the acquisition of any such obligations;

(30)    Investments constituting promissory notes or other non-cash proceeds of dispositions of assets to the extent permitted under Section 7.04; and

(31)    Investments resulting from pledges and deposits permitted pursuant to the definition of "Permitted Liens".

For purposes of determining compliance with this definition, an Investment need not be incurred solely by reference to one category of Permitted Investments described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption.

"**Permitted Junior Priority Refinancing Debt**" means any Credit Agreement Refinancing Indebtedness that is secured on a junior lien basis to the Closing Date Term Loans.

"**Permitted Liens**" means, with respect to any Person:

(1)    Liens created pursuant to any Loan Document;

(2)    Liens, pledges or deposits made in connection with:

(a)    workers' compensation laws, unemployment insurance, health, disability or employee benefits, other social security laws or similar legislation or regulations,

(b)    insurance-related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) securing reimbursement or indemnification obligations of (including obligations in respect of letters of credit, bank guarantees or similar documents or instruments for the benefit of) insurance carriers providing property, casualty or liability insurance or otherwise supporting the payment of items set forth in the foregoing clause (a) or

(c)    bids, tenders, contracts, statutory obligations, surety, indemnity, warranty, release, appeal or similar bonds, or with regard to other regulatory requirements, completion guarantees, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities, and other obligations of like nature (including those to secure health, safety and environmental obligations) (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for the payment of rent, contested taxes or import duties and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with industry practice;

(3)    Liens imposed by law, such as landlords', carriers', warehousemen's, materialmen's, repairmen's, construction, mechanics' or other similar Liens (a) for sums not yet overdue for a period of more than sixty (60) days or, if more than sixty (60) days overdue, are unfiled and no other action has been taken to enforce such Liens or (b) being contested in good faith by appropriate actions or other Liens arising out of or securing judgments or awards against such Person with respect to which such Person will then be proceeding with an appeal or other proceedings for review if such Liens are adequately bonded or adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)        Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than thirty (30) days or not yet payable or not subject to penalties for nonpayment or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(5)        Liens in favor of issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds, instruments or obligations or with respect to regulatory requirements or letters of credit or bankers acceptance issued, and completion guarantees provided for, in each case, issued pursuant to the request of and for the account of such Person in the ordinary course of its business or consistent with past practice or industry practice;

(6)        survey exceptions, encumbrances, ground leases, easements, restrictions, protrusions, encroachments or reservations of, or rights of others for, licenses, rights-of-way, servitudes, sewers, electric lines, drains, telegraph, telephone and cable television lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that were not incurred in connection with Indebtedness and that do not in the aggregate materially impair their use in the operation of the business of such Person and exceptions on title policies insuring liens granted on Mortgaged Properties;

(7)        Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (2), (4), (12), (13), (23) or (25) of Section 7.02(b); *provided* that:

(a)        Liens securing obligations relating to any Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (13) relate only to obligations relating to Refinancing Indebtedness that is secured by Liens on the same assets as the assets securing the Refinanced Debt (as defined in the definition of Refinancing Indebtedness), *plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property, or serves to refund, refinance, extend, replace, renew or defease Indebtedness, Disqualified Stock or Preferred Stock incurred under such clause (4), (12) or (13) of Section 7.02(b);

(b)        Liens securing obligations relating to Indebtedness or Disqualified Stock permitted to be incurred pursuant to such clause (23) extend only to the assets of Subsidiaries that are not Guarantors;

(c)        Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (4) extend only to the assets so purchased, replaced, leased or improved and proceeds and products thereof; *provided further* that individual financings of assets provided by a counterparty may be cross-collateralized to other financings of assets provided by such counterparty;

(d)        In the case of Liens securing Indebtedness for borrowed money, Disqualified Stock or Preferred Stock incurred pursuant to such clause (12), such Indebtedness shall only be secured by the Collateral on a junior basis to the Closing Date Term Loans;

(e)        In the case of Liens securing Indebtedness incurred under clause (2) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt

Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement, which shall provide that the Liens securing such Indebtedness rank junior to the Liens securing the Closing Date Term Loans;

(f)     [reserved]; and

(g)     In the case Liens securing Indebtedness incurred under clause (25) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement, which shall provide that (i) the Liens on the ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing such Indebtedness may be pari passu or senior to the Liens on the ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing the Closing Date Term Loans and (ii) the Liens on the Term Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing such Indebtedness shall be junior to the Liens on the Term Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing the Closing Date Term Loans.

(8)     Liens existing, or provided for under binding contracts existing, on the Closing Date (including Liens in effect on the Closing Date securing Indebtedness permitted under Section 7.02(b)(3));

(9)     [reserved];

(10)    Liens on property or other assets at the time the Borrower or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger, amalgamation or consolidation with or into the Borrower or any Restricted Subsidiary; *provided* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition, amalgamation, merger or consolidation; *provided further* that such Liens are limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after acquired-property) that secured the obligations to which such Liens relate;

(11)    Liens securing obligations in respect of Indebtedness or other obligations of a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary permitted to be incurred in accordance with Section 7.02;

(12)    Liens securing (x) Hedging Obligations and (y) obligations in respect of Cash Management Services;

(13)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's accounts payable or similar obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(14)    leases, subleases, licenses or sublicenses (or other agreement under which the Borrower or any Restricted Subsidiary has granted rights to end users to access and use the Borrower's or any Restricted Subsidiary's products, technologies or services) that do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and the customary rights reserved or vested in any Person by the terms of any lease, sublease, license,

63

sublicense, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(15)     Liens arising from Uniform Commercial Code (or equivalent statutes) financing statement filings regarding operating leases, consignments or accounts entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business or consistent with industry practice or purported Liens evidenced by the filing of precautionary Uniform Commercial Code (or equivalent statutes) financing statements or similar public filings;

(16)     Liens in favor of the Borrower or any Guarantor;

(17)     Liens on equipment or vehicles of the Borrower or any Restricted Subsidiary granted in the ordinary course of business or consistent with industry practice;

(18)     Liens on accounts receivable, Securitization Assets and related assets incurred in connection with a Qualified Securitization Facility;

(19)     Liens to secure any modification, refinancing, refunding, extension, renewal or replacement (or successive modification, refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness, Disqualified Stock or Preferred Stock secured by any Lien referred to in clauses (7), (8) or (10) of this definition; *provided* that: (a) such new Lien will be limited to all or part of the same property (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property) that secured the original Lien (plus improvements and accessions on such property) and proceeds and products thereof and (b) the Indebtedness, Disqualified Stock or Preferred Stock secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clauses (7), (8) or (10) at the time the original Lien became a Permitted Lien hereunder, *plus* (ii) an amount necessary to pay any fees and expenses (including original issue discount, upfront fees, defeasance costs, underwriting discounts or similar fees) and premiums (including tender premiums and accrued and unpaid interest), related to such refinancing, refunding, extension, renewal or replacement;

(20)     deposits made or other security provided to secure liability to insurance brokers, carriers, underwriters or self-insurance arrangements, including Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(21)     other Liens securing obligations in an aggregate principal amount at any one time outstanding not to exceed the greater of (a) $25.0 million and (b) 5.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto; *provided*, that if such Liens secured Indebtedness for borrowed money in an amount in excess of $25.0 million and are secured by the Collateral on a *pari passu* basis with, or junior basis to, the Liens that secure the Closing Date Term Loans, the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement;

(22)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(23)     (a) the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business or consistent with industry practice, (b) Liens arising out of conditional sale, title retention or similar arrangements for the sale of goods

64

in the ordinary course of business or consistent with industry practice and (c) Liens arising by operation of law under Article 2 of the Uniform Commercial Code;

(24)    Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(7);

(25)    Liens (a) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on items in the course of collection, (b) attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business or consistent with industry practice and (c) in favor of banking or other institutions or other electronic payment service providers arising as a matter of law or under general terms and conditions encumbering deposits or margin deposits or other funds maintained with such institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(26)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under this Agreement; *provided* that such Liens do not extend to assets other than those that are subject to such repurchase agreements;

(27)    Liens that are contractual rights of setoff (a) relating to the establishment of depository relations with banks or other deposit-taking financial institutions or other electronic payment service providers and not given in connection with the issuance of Indebtedness, (b) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary or (c) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business or consistent with industry practice;

(28)    Liens on cash proceeds (as defined in Article 9 of the Uniform Commercial Code) of assets sold that were subject to a Lien permitted hereunder;

(29)    any encumbrance or restriction (including put, call arrangements, tag, drag, right of first refusal and similar rights) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(30)    Liens (a) on cash advances or cash earnest money deposits in favor of the seller of any property to be acquired in an Investment permitted under this Agreement to be applied against the purchase price for such Investment and (b) consisting of a letter of intent or an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under Section 7.04 in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(31)    ground leases, leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(32)    Liens in connection with any Specified Sale-Leaseback Transactions;

(33)    Liens on Capital Stock or other securities of an Unrestricted Subsidiary;

(34)    any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by the

Borrower or any of the Restricted Subsidiaries in the ordinary course of business or consistent with industry practice;

(35)     deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business or consistent with industry practice of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(36)     rights of set-off, banker's liens, netting arrangements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(37)     Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; *provided* that such satisfaction or discharge is permitted under this Agreement;

(38)     receipt of progress payments and advances from customers in the ordinary course of business or consistent with industry practice to the extent the same creates a Lien on the related inventory and proceeds thereof;

(39)     [reserved];

(40)     agreements to subordinate any interest of the Borrower or any Restricted Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any Restricted Subsidiary pursuant to an agreement entered into in the ordinary course of business or consistent with industry practice;

(41)     Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act or similar provision of any Environmental Law;

(42)     Liens disclosed by the title insurance policies delivered on or prior to the Closing Date and any replacement, extension or renewal of any such Lien (to the extent the Indebtedness and other obligations secured by such replacement, extension or renewal Liens are permitted by this Agreement); *provided* that such replacement, extension or renewal Liens do not cover any property other than the property that was subject to such Liens prior to such replacement, extension or renewal;

(43)     rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of its Restricted Subsidiaries or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(44)     restrictive covenants affecting the use to which real property may be put; *provided* that the covenants are complied with in all material respects;

(45)     security given to a public utility or any municipality or Governmental Authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business or consistent with industry practice;

(46)     zoning by-laws and other land use restrictions, including site plan agreements, development agreements and contract zoning agreements; and

(47)     Liens on all or any portion of the Collateral (but no other assets) securing (i) [reserved], (ii) Permitted Equal Priority Refinancing Debt or (iii) Permitted Junior Priority Refinancing Debt, and, in each case, Liens securing any Refinancing Indebtedness in respect thereof.

For purposes of determining compliance with this definition, a Lien need not be incurred solely by reference to one category of Permitted Liens described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption.

If any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing and if any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by a fixed dollar amount, such fixed dollar Basket will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing.

For purposes of this definition, the term "Indebtedness" will be deemed to include interest on such Indebtedness.

"**Permitted Parent**" means any direct or indirect parent of the Borrower that at the time it became a parent of the Borrower was a Permitted Holder pursuant to clause (1) of the definition thereof.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**PIK Interest**" means, with respect to any Loan, a payment of interest with respect to such Loan in-kind in arrears by increasing the outstanding principal amount of such Loan on the relevant Interest Payment Date by the amount of accrued and unpaid interest due and payable on such date. Once PIK Interest is capitalized and added to the principal amount of the Loans, such PIK Interest shall thenceforth be considered principal for all purposes hereunder (and shall bear interest in accordance with ~~this~~ Section 2.08) from the date on which such PIK Interest has been so added.

"**PIK Rate**" has the meaning specified in Section 2.08(1).

"**PIK Toggle**" has the meaning specified in Section 2.08(4).

"**PIK Toggle Notice**" has the meaning specified in Section 2.08(4).

"**Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established or maintained by any Loan Party or, with respect to any

such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Plan of Reorganization**" means that certain *Joint Prepackaged Plan of Reorganization of Belk, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement (as defined in the Plan of Reorganization).

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Collateral**" has the meaning specified in the Security Agreement.

"**Preferred Stock**" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Prepayment Premium**" means with respect to a repayment, prepayment or acceleration of all or any portion of the First-Out Loans occurring (i) prior to the first anniversary of the Closing Date, an amount equal to three percent (3.00%) of the aggregate principal amount of the First-Out Loans held by such Lender that are being repaid or prepaid or that are accelerated as of such date of determination, (ii) on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date, an amount equal to two percent (2.00%) of the aggregate principal amount of the First-Out Loans held by such Lender that are being repaid or prepaid or that are accelerated as of such date of determination, (iii) on and after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date, one percent (1.00%) of the aggregate principal amount of the First-Out Loans held by such Lender that are being repaid or prepaid or that are accelerated as of such date of determination and (iv) on and after the third anniversary of the Closing Date, zero percent (0.00%).

"**Prepetition First Lien Term Loans**" means "First Lien Term Loans" as defined in the RSA.

"**Prepetition Second Lien Term Loans**" means "Second Lien Term Loans" as defined in the RSA.

"**Priority ECF Amount**" means, with respect to any Excess Cash Flow Period, an amount (if positive) equal to (i) 4.00% of the aggregate original principal amount of Second-Out Loans outstanding on the Closing Date *minus* (ii) the amortization payments made pursuant to Section 2.07(1) in respect of the Second-Out Loans during such Excess Cash Flow Period.

"**Private-Side Information**" means any information with respect to Holdings and its Subsidiaries that is not Public-Side Information.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Term Loan of a given Class of any Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Term Loan Exposure of such Class of such Lender at such time and the denominator of which is the aggregate Term Loan Exposure of such Class of all Lenders at such time.

"**Public Company Costs**" means the initial costs relating to establishing compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the Borrower's or its Restricted Subsidiaries' initial establishment of compliance with the obligations of a reporting company, including costs, fees and expenses (including legal, accounting and other professional fees) relating to compliance with provisions of the Securities Act and the Exchange Act.

"**Public Lender**" means Lenders that do not wish to receive Private-Side Information.

"**Public-Side Information**" means (i) at any time prior to Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that is (a) of a type that would be required by applicable Law to be publicly disclosed in connection with an issuance by Holdings or any of its Subsidiaries of its debt or equity securities pursuant to a registered public offering made at such time or (b) not material to make an investment decision with respect to securities of Holdings or any of its Subsidiaries (for purposes of United States federal, state or other applicable securities laws), and (ii) at any time on or after Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that does not constitute material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Holdings or any of its Subsidiaries or any of their respective securities.

"**Purchase Money Obligations**" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement or property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10.0 million at the time the relevant Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Stock.

"**Qualified Holding Company Debt**" means unsecured Indebtedness of Holdings that

(1)      is not subject to any Guarantee by any Subsidiary of Holdings (including the Borrower),

(2)      will not mature prior to the date that is six (6) months after the Latest Maturity Date in effect on the date of issuance or incurrence thereof,

(3)      has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (5) below),

(4)      does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the later to occur of (i) the date that is four (4) years from the date of the issuance or incurrence thereof and (ii) the date that is 180 days after the Latest Maturity Date in effect on the date of such issuance or incurrence, and

(5)      has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior discount notes of a holding company);

*provided* that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Event of Default shall have occurred and be continuing.

"**Qualified Proceeds**" means the fair market value of assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business.

"**Qualified Securitization Facility**" means any Securitization Facility (1) constituting a securitization financing facility that meets the following conditions: (a) the Board of Directors will have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the applicable Restricted Subsidiary or Securitization Subsidiary and (b) all sales or contributions of Securitization Assets and related assets to the applicable Person or Securitization Subsidiary are made at fair market value (as determined in good faith by the Borrower) or (2) constituting a receivables financing facility.

"**Qualifying IPO**" means the issuance by the Borrower, or any Parent Company, of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Qualifying Lender**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Quarterly Financial Statements**" has the meaning specified in Section 5.05(1).

"**Rating Agencies**" means Moody's and S&P, or if Moody's or S&P (or both) are not making ratings on the relevant obligations publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Borrower that will be substituted for Moody's or S&P (or both), as the case may be.

"**Real Property**" means, collectively, all Owned Real Property and all Leased Real Property.

"**Recognition Agreement**" means a recognition agreement in a recordable form substantially in the form of Exhibit S or as otherwise reasonably acceptable to the Collateral Agent and the Required Lenders.

"**Refinance**" has the meaning assigned in the definition of "Refinancing Indebtedness" and "**Refinancing**" and "**Refinanced**" have meanings correlative to the foregoing.

"**Refinanced Debt**" has the meaning assigned to such term in the definition of "Refinancing Indebtedness."

"**Refinancing Amendment**" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent and the Borrower executed by each of (a) the Borrower, (b) the Administrative Agent and (c) each Additional Lender and Lender that agrees to provide any portion of the Refinancing Loans or Refinancing Commitments being incurred or provided pursuant thereto, in accordance with Section 2.15.

"**Refinancing Commitments**" means any Refinancing Term Commitments.

"**Refinancing Indebtedness**" means (x) Indebtedness incurred by the Borrower or any Restricted Subsidiary, (y) Disqualified Stock issued by the Borrower or any Restricted Subsidiary or (z) Preferred Stock issued by any Restricted Subsidiary which, in each case, serves to extend, replace, refund, refinance, renew, exchange for or defease ("**Refinance**") any Indebtedness, Disqualified Stock or Preferred Stock, including any Refinancing Indebtedness, so long as:

(1)    (a) the principal amount (or accreted value, if applicable) of such new Indebtedness, the amount of such new Preferred Stock or the liquidation preference of such new Disqualified Stock does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness, the amount of Preferred Stock or the liquidation preference of Disqualified Stock, as applicable, being refinanced except to the extent permitted under Section 1.02(10), *plus* (b) any accrued and unpaid interest on, the Indebtedness, the amount of any accrued and unpaid dividends on, the Preferred Stock or the liquidation preference of the Disqualified Stock, *plus* any accrued and unpaid dividends on, the Disqualified Stock being so extended, replaced, refunded, refinanced, renewed or defeased (such Indebtedness, Disqualified Stock or Preferred Stock, the "**Refinanced Debt**"), *plus* (c) the amount of any tender premium or penalty or premium required to be paid under the terms of the instrument or documents governing such Refinanced Debt and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness, Preferred Stock or Disqualified Stock or to Refinance such Refinanced Debt (such amounts in clause (b) and (c) the "**Incremental Amounts**");

(2)    such Refinancing Indebtedness has a:

(a)    Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred that is not less than the remaining Weighted Average Life to Maturity of the applicable Refinanced Debt; and

(b)    final scheduled maturity date equal to or later than the final scheduled maturity date of the Refinanced Debt;

(3)    to the extent such Refinancing Indebtedness Refinances (a) Subordinated Indebtedness, such Refinancing Indebtedness is subordinated in right of payment to the Loans or the Guaranty thereof at least to the same extent as the applicable Refinanced Debt, (b) Indebtedness that is secured by Liens on Collateral that are subordinated to the Liens that secure the Loans or the Guaranty thereof, such Refinancing Indebtedness is (i) unsecured or (ii) secured by Liens that are subordinated to the Liens that secure the Loans or the Guaranty thereof, in each case at least to the same extent as the applicable Refinanced Debt or pursuant to the Applicable Intercreditor Agreement or (c) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively;

(4)    such Refinancing Indebtedness shall not be guaranteed or borrowed by any Person other than a Person that is so obligated in respect of the Refinanced Debt being Refinanced; and

(5)    such Refinancing Indebtedness shall not be secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not secure the Refinanced Debt being Refinanced (*plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property); *provided* that Refinancing Indebtedness will not include:

(a)    Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness or Disqualified Stock of the Borrower;

(b)    Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

71

(c)     Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of an Unrestricted Subsidiary;

*provided further* that (x) clause (2) of this definition will not apply to any Refinancing Indebtedness other than Indebtedness, Disqualified Stock and Preferred Stock incurred under clauses (2), (14), (25), (30) and (31) of Section 7.02(b) (including any successive Refinancings thereof incurred under clause (13) of Section 7.02(b)) and any Subordinated Indebtedness (other than Subordinated Indebtedness assumed or acquired in an Investment or acquisition and not created in contemplation thereof) and (y) Refinancing Indebtedness may be incurred in the form of a customary "bridge" or other interim credit facility intended to be refinanced or replaced with long-term indebtedness which does not satisfy the requirements of clause (2) above so long as, subject to customary conditions, as determined in good faith by the Borrower, such "bridge" or other interim indebtedness will either be automatically converted into or required to be exchanged for permanent financing which satisfies the requirements of clause (2) of this definition.

"**Refinancing Loans**" means any Refinancing Term Loans.

"**Refinancing Term Commitments**" means one or more Classes of Term Loan commitments hereunder that result from a Refinancing Amendment.

"**Refinancing Term Loans**" means one or more Classes of Term Loans that result from a Refinancing Amendment.

"**Refunding Capital Stock**" has the meaning specified in Section 7.05(b)(2).

"**Register**" has the meaning specified in Section 10.07(c).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Rejection Notice**" has the meaning specified in Section 2.05(2)(g).

"**Related Business Assets**" means assets (other than Cash Equivalents) used or useful in a Similar Business; *provided* that any assets received by the Borrower or a Restricted Subsidiary in exchange for assets transferred by the Borrower or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person is or would become a Restricted Subsidiary.

"**Related Indemnified Person**" of an Indemnitee means (1) the respective directors, officers or employees of such Indemnitee and (2) the respective agents of such Indemnitee, in the case of this clause (2), acting at the instructions of such Indemnitee.

"**Related Person**" means, with respect to any Person, (a) any Affiliate of such Person and (b) the respective officers, directors, members, managers, employees, agents, representatives, sub-agents, co-agents, attorneys-in-fact, partners, trustees, attorneys, and advisors of such Person or any of its Affiliates.

"**Release**" means any release, spill, emission, discharge, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment.

"**Replaced Loans**" has the meaning specified in Section 10.01.

"**Replacement Loans**" has the meaning specified in Section 10.01.

"**Reportable Event**" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Required Facility Lenders**" means, as of any date of determination, with respect to one or more Facilities, Lenders having more than 50% of the sum of the (a) aggregate principal amount of outstanding Loans under such Facility or Facilities and (b) aggregate unused Commitments under such Facility or Facilities; *provided* that (i) to the same extent specified in Section 10.07(i) with respect to determination of Required Lenders, the Loans of any Affiliated Lender shall in each case be excluded for purposes of making a determination of Required Facility Lenders unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on the other Lenders and (ii) the portion of outstanding Loans and the unused Commitments of any such Facility, as applicable, held or deemed held by a Defaulting Lender shall be excluded for purposes of making a determination of Required Facility Lenders.

"**Required Lenders**" means, as of any date of determination, (a) Lenders having more than 50% of the aggregate outstanding principal amount of the First-Out Loans and any other Loans that have the same payment priority with the First-Out Loans and (b) Lenders having more than 50% of the aggregate outstanding principal amount of the Second-Out Loans and any other Loan that have the same payment priority with the Second-Out Loans; *provided* that (i) the aggregate Outstanding Amount of any Loans held by any Defaulting Lender shall be excluded for purposes of making a determination of the "Required Lenders" and (ii) any determination of Required Lenders shall be subject to the limitations set forth in Section 10.07(h) with respect to Affiliated Lenders.

"**Responsible Officer**" means, with respect to a Person, the chief executive officer, chief operating officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer or Person performing similar functions, of such Person. With respect to any document delivered by a Loan Party on the Closing Date, Responsible Officer includes any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"**Restricted Investment**" means any Investment other than any Permitted Investment(s).

"**Restricted Payment**" has the meaning specified in Section 7.05.

"**Restricted Subsidiary**" means, at any time, any direct or indirect Subsidiary of the Borrower (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided* that notwithstanding the foregoing, in no event will (i) any Securitization Subsidiary, or (ii) any special purpose vehicle that borrows mortgage debt secured by department stores or retail centers of Belk and has no other activities be considered a Restricted Subsidiary for purposes of Section 8.01(5) or (7); *provided further* that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary will be included in the definition of "Restricted Subsidiary." Wherever the term "Restricted Subsidiary" is used herein with respect to any Subsidiary of a referenced Person that is not the Borrower, then it will be construed to mean a Person that would be a Restricted Subsidiary of the Borrower on a *pro forma* basis following consummation of one or a series of related transactions involving such referenced Person and the

Borrower (but which transactions may include a designation of a Subsidiary of such Person as an Unrestricted Subsidiary on a *pro forma* basis in accordance with this Agreement).

"**Retained Excess Cash Flow Amount**" means, at any date of determination, an amount, no less than zero and determined on a cumulative basis, that is equal to the aggregate cumulative sum of Excess Cash Flow that is not required to be applied to make an ECF Payment under Section 2.05(2) for each Excess Cash Flow Period.

"**RSA**" means that certain Restructuring Support Agreement, dated as of January 26, 2021, by and among Holdings, the other Loan Parties party thereto, the Consenting First Lien Term Lenders (as defined therein), the Consenting Second Lien Term Lenders (as defined therein) and the Consenting Sponsors (as defined therein), as such agreement may be amended, supplemented, waived or otherwise modified from time to time, in each case to the extent permitted thereunder.

"**S&P**" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"**Sale-Leaseback Transaction**" means any arrangement providing for the leasing by the Borrower or any Restricted Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to a Person other than the Borrower or any Restricted Subsidiary in contemplation of such leasing.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Sanctions**" has the meaning specified in Section 5.17.

"**SEC**" means the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Amendment**" means that certain Amendment No. 2 to Credit Agreement, dated as of the Closing Date, among Holdings, the Borrower, the First-Out Lenders party thereto, the Second-Out Lenders party thereto, the Administrative Agent and the Collateral Agent.

"**Second Amendment Exchanging Lenders**" means the Lenders signatory to the Second Amendment.

"**Second Amendment Lenders**" means the First-Out Lenders and the Second-Out Lenders.

"~~**Second Amendment Second-Out Loans**~~" ~~means Second-Out Loans deemed made by the Second Amendment Exchanging Lenders on the Closing Date pursuant to Section 2.01(3).~~

"**Second Lien Credit Agreement**" means the Second Lien Term Loan Credit Agreement dated as of the date hereof among Holdings, the Borrower, Wilmington Trust, National Association as administrative agent and collateral agent and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an Second Lien Credit Agreement) in each case to the extent permitted hereunder.

"**Second Lien Credit Agreement Second Amendment**" means that certain Amendment No. 3 to the Second Lien Credit Agreement, dated as of the Closing Date, by and among the Loan Parties party

thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent and collateral agent.

"**Second Lien Facility**" means the collective reference to the Second Lien Credit Agreement, the Second Lien Loan Documents, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not a Second Lien Facility), in each case to the extent permitted hereunder.

"**Second Lien Loan Documents**" means, collectively, (i) the Second Lien Credit Agreement and (ii) the security documents, intercreditor agreements (including the Term Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the Second Lien Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the Second Lien Facility.

"**Second Lien Loans**" means "Loans" as defined in the Second Lien Facility as in effect on the Closing Date.

"**Second Lien Obligations**" means "Obligations" as defined in the Second Lien Facility as in effect on the date hereof.

"**Second-Out Lenders**" means the Lenders holding the Second-Out Loans or Second-Out Loan Commitments.

"**Second-Out Loan Commitment**" means, with respect to each Second-Out Lender, the commitment of such Second-Out Lender to convert Prepetition First Lien Term Loans and/or Prepetition Second Lien Term Loans into, and be deemed to make, Second-Out Loans in an aggregate amount not to exceed the amount set forth on Schedule ~~III to the Second Amendment~~2.01 opposite such Second-Out Lender's name under the heading "Second-Out Loan Commitment". The aggregate amount of Second-Out Loan Commitments on the Closing Date is $~~[●]~~. $812,929,968.71.  Once converted and deemed made, the Second-Out Loan Commitments shall be reduced to zero and terminated.

"**Second-Out Loans**" means the Term Loans made (or deemed made) by the applicable Second Amendment Exchanging Lenders on the Closing Date pursuant to Section 2.01(3)(b).

"**Secured Cash Management Agreement**" means any Cash Management Agreement that is entered into by and between Holdings, the Borrower or any Restricted Subsidiary and a Cash Management Bank; and designated in writing by the Cash Management Bank and the Borrower to the Administrative Agent as a "Secured Cash Management Agreement."

"**Secured Hedge Agreement**" means any Hedge Agreement with respect to Hedging Obligations permitted under Section 7.02 that is (a) entered into by and between any Loan Party or Restricted Subsidiary and any Hedge Bank and (b) designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "Secured Hedge Agreement."

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, each Hedge Bank party to a Secured Hedge Agreement, each Cash Management Bank party to a Secured Cash Management Agreement, each Supplemental Agent and each co-agent or sub-agent appointed by the Administrative Agent or Collateral Agent from time to time pursuant to Section 9.01(2) or 9.07.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Securitization Assets**" means (a) the accounts receivable, royalty or other revenue streams and other rights to payment and other assets related thereto subject to a Qualified Securitization Facility and the proceeds thereof and (b) contract rights, lockbox accounts and records with respect to such accounts receivable and any other assets customarily transferred together with accounts receivable in a securitization financing.

"**Securitization Facility**" means any transaction or series of securitization financings that may be entered into by the Borrower or any Restricted Subsidiary pursuant to which the Borrower or any such Restricted Subsidiary may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) a Person that is not the Borrower or a Restricted Subsidiary or (b) a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not the Borrower or a Restricted Subsidiary, or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries.

"**Securitization Fees**" means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees and expenses (including reasonable fees and expenses of legal counsel) paid to a Person that is not a Securitization Subsidiary in connection with, any Qualified Securitization Facility.

"**Securitization Repurchase Obligation**" means any obligation of a seller of Securitization Assets in a Qualified Securitization Facility to repurchase Securitization Assets arising as a result of a breach of representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" means any Subsidiary formed for the purpose of, and that solely engages only in one or more Qualified Securitization Facilities and other activities reasonably related thereto.

"**Security Agreement**" means, collectively, the Pledge and Security Agreement executed by the Loan Parties and the Collateral Agent, substantially in the form of Exhibit F, together with supplements or joinders thereto executed and delivered pursuant to Section 6.11.

"**Senior Secured Leverage Ratio**" means, with respect to any Test Period, the ratio of Consolidated Secured Debt outstanding on the last date of such Test Period to Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X of the SEC, as such regulation is in effect on the Closing Date.

"**Similar Business**" means (1) any business conducted or proposed to be conducted by the Borrower or any Restricted Subsidiary on the Closing Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any Permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Restricted Subsidiaries conduct or propose to conduct on the Closing Date.

"**Solicited Discount Proration**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Solicited Discounted Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Solicited Discounted Prepayment Notice**" means a written notice of the Borrower of Solicited Discounted Prepayment Offers made pursuant to Section 2.05(1)(e)(D) substantially in the form of Exhibit L.

"**Solicited Discounted Prepayment Offer**" means the written offer by each Lender, substantially in the form of Exhibit O, submitted following the Administrative Agent's receipt of a Solicited Discounted Prepayment Notice.

"**Solicited Discounted Prepayment Response Date**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date:

(1)      the sum of the liabilities of such Person (including contingent liabilities), on a consolidated basis, does not exceed the present fair saleable value of the present assets of such Person, on a consolidated basis,

(2)      the fair value of the property of such Person, on a consolidated basis, is greater than the total amount of liabilities (including contingent liabilities) of such Person, on a consolidated basis,

(3)      the capital of such Person, on a consolidated basis, is not unreasonably small in relation to its business as contemplated on such date and

(4)      such Person has not incurred and does not intend to incur, or believe that it will incur, debts including current obligations beyond their ability to pay such debts as they become due (whether at maturity or otherwise).

The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances as of such date, would reasonably be expected to become an actual and matured liability.

"**Space Leased Property**" means any real property located in the United States, other than the Leased Real Property and the Owned Real Property, that any Loan Party or any Subsidiary occupies as a tenant, sub-tenant, or licensee.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Discount**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Prepayment Notice**" means a written notice of the Borrower's Offer of Specified Discount Prepayment made pursuant to Section 2.05(1)(e)(B) substantially in the form of <u>Exhibit N.</u>

"**Specified Discount Prepayment Response**" means the written response by each Lender, substantially in the form of <u>Exhibit P,</u> to a Specified Discount Prepayment Notice.

"**Specified Discount Prepayment Response Date**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Proration**" has the meaning specified in Section 2.05(1)(e)(B)(3).

"**Specified Equity Contribution**" has the meaning assigned to it in the ABL Credit Agreement.

"**Specified Sale-Leaseback Net Proceeds**" means with respect to the sale component of any Specified Sale-Leaseback Transaction, the excess, if any, of (i) the sum of cash and Cash Equivalents received as purchase consideration in connection with such Specified Sale-Leaseback Transaction sale component pursuant to the applicable purchase and sale agreement over (ii) the sum of (A) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred or required to be paid by the Borrower or any Restricted Subsidiary on behalf of a purchaser by the Borrower or any Restricted Subsidiary in connection with such Specified Sale-Leaseback Transaction, (B) taxes (including transfer taxes) or distributions made pursuant to clauses (a) and (b) of Section 7.05(b)(14) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Specified Sale-Leaseback Net Proceeds) and (C) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such Specified Sale-Leaseback Transaction, including liabilities related to environmental matters or against any indemnification obligations associated with such Specified Sale-Leaseback Transaction, it being understood that "Specified Sale-Leaseback Net Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (C). The net proceeds of any Sale-Leaseback Transaction will be determined giving effect to transaction expenses and the tax effect of such transactions based on the actual effective tax rate (including taxes incurred and required to be paid or payable as a result of such transactions).

"**Specified Sale-Leaseback Transaction**" means one or more Sale-Leaseback Transactions entered into on an arm's length basis for fair market value as determined by a Responsible Officer of the Borrower in good faith with respect to all or any portion of any Owned Real Property or Leased Real Property of the Borrower or any Restricted Subsidiary owned on, or acquired after, the Closing Date.

"**Specified Transaction**" means:

(1) solely for the purposes of determining the applicable cash balance, any contribution of capital, including as a result of an Equity Offering, to the Borrower, in each case, in connection with an acquisition or Investment,

(2)      any designation of operations or assets of the Borrower or a Restricted Subsidiary as discontinued operations (as defined under GAAP),

(3)      any Investment that results in a Person becoming a Restricted Subsidiary,

(4)      any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary in compliance with this Agreement,

(5)      any purchase or other acquisition of a business of any Person, of assets constituting a business unit, line of business or division of any Person,

(6)      any Asset Sale (a) that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower or (b) of a business, business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whether by merger, amalgamation, consolidation or otherwise,

(7)      any operational changes identified by the Borrower that have been made by the Borrower or any Restricted Subsidiary during the Test Period, or

(8)      any other transaction that by the terms of this Agreement requires a financial ratio to be calculated on a *pro forma* basis.

"**Sponsor**" means Sycamore Partners Management, L.P. and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Administrative Agent is subject with respect to the Adjusted Eurodollar Rate, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the FRB). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Submitted Amount**" has the meaning specified in Section 2.05(1)(e)(C)(1).

"**Submitted Discount**" has the meaning specified in Section 2.05(1)(e)(C)(1).

"**Subordinated Indebtedness**" means any Indebtedness for borrowed money of any Loan Party that by its terms is subordinated in right of payment to the Obligations of such Loan Party arising under the Loans or the Guaranty (other than the Second-Out Loans).

"**Subsidiary**" means, with respect to any Person:

(1)      any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of

determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

> (2)     any partnership, joint venture, limited liability company or similar entity of which:

>> (a)     more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and

>> (b)     such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than Holdings and any other Parent Company.

"**Successor Borrower**" has the meaning specified in Section 7.03(4).

"**Successor Holdings**" has the meaning specified in Section 7.03(5).

"**Supplemental Agent**" and "**Supplemental Agents**" have the meanings specified in Section 9.15(1).

"**Swap Obligation**" has the meaning specified in the definition of "Excluded Swap Obligation."

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"**Tax Group**" has the meaning specified in Section 7.05(b)(14)(b).

"**Tax Indemnitee**" as defined in Section 3.01(5).

"**Term Borrowing**" means a Borrowing of any Term Loans.

"**Term Commitment**" means, as to each Term Lender, its obligation to make a Term Loan to the Borrower hereunder, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Term Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to this Agreement and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Term Lender pursuant to an Assignment and Assumption, (ii) [reserved], (iii) a Refinancing Amendment, (iv) an Extension Amendment or (v) an amendment in respect of Replacement Loans. The initial amount of each Term Lender's Term Commitment is its Closing Date Term Commitment or, otherwise, in the Assignment and Assumption (or Affiliated Lender Assignment and Assumption), Refinancing Amendment, Extension Amendment or amendment in respect of Replacement Loans pursuant to which such Lender shall have assumed its Commitment, as the case may be.

"**Term Facility**" means any Facility consisting of Term Loans or Term Commitments.

"**Term Intercreditor Agreement**" means the Term Intercreditor Agreement substantially in the form of Exhibit G-2 among the Collateral Agent, Wilmington Trust, National Association, as collateral agent under the Second Lien Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**Term Lender**" means, at any time, any Lender that has a Term Commitment or a Term Loan at such time.

"**Term Loan**" means any First-Out Loan, Second-Out Loan, Refinancing Term Loan, Extended Loan or Replacement Loan, as the context may require.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender; *provided* that at any time prior to the making of the Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Commitment.

"**Term Note**" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit B-1 hereto, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from the Term Loans made by such Term Lender.

"**Termination Conditions**" means, the Payment in Full in cash of the Obligations (other than the Obligations under Secured Hedge Agreements and Secured Cash Management Obligations).

"**Test Period**" in effect at any time means the Borrower's most recently ended four consecutive fiscal quarters (taken as one accounting period) for which, subject to Section 1.07(1), financial statements have been delivered pursuant to Section 6.01(1) or (2), as applicable.

"**Threshold Amount**" means $40.0 million.

"**Total Assets**" means, at any time, the total assets of the Borrower and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the then most recent balance sheet of the Borrower or such other Person as may be available (as determined in good faith by the Borrower).

"**Total Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt outstanding as of the last day of such Test Period to (b) Adjusted EBITDA of the Borrower for such Test Period, in each case on a *pro forma* basis with such *pro forma* adjustments as are appropriate and consistent with Section 1.07.

"**Traded Securities**" means any debt or equity securities issued pursuant to a public offering or Rule 144A offering.

"**Transaction Expenses**" means any fees, expenses, costs or charges incurred or paid by Holdings, the Borrower or any Restricted Subsidiary in connection with the Transactions.

"**Transactions**" means (a) the amendment to this Agreement pursuant to the terms of the Second Amendment, (b) the amendment to the Second Lien Credit Agreement pursuant to the Second Lien Credit Agreement Second Amendment, (c) the execution and delivery of the Second Amendment and the Second

Lien Credit Agreement Second Amendment, (d) the funding of the New Money First-Out Loans on the Closing Date, (e) the consummation of the transactions contemplated by the Plan of Reorganization, (f) the conversion (and deemed prepayment) of all Prepetition First Lien Term Loans hereunder immediately prior to the effectiveness of the Second Amendment and all Prepetition Second Lien Term Loans to First-Out Loans, Second-Out Loans and Second Lien Loans on the Closing Date, (g) any other transaction contemplated by the RSA, (h) any transaction contemplated by the "Description of Transaction Steps" attached to the Plan Supplement (as defined in the RSA) and (i) the payment of Transaction Expenses.

"**Treasury Capital Stock**" has the meaning assigned to such term in Section 7.05(b)(2)(a).

"**Trust Account**" means any accounts or trusts used solely to hold Trust Funds.

"**Trust Funds**" means cash, Cash Equivalents or other assets comprised of:

(1) funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of such Loan Party's employees;

(2) all taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)); and

(3) any other funds which Holdings, the Borrower or any of its Restricted Subsidiaries holds in trust or as an escrow or fiduciary for another person which is not a Restricted Subsidiary of the Borrower.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning specified in Section 3.01(3)(b)(iii).

"**Unrestricted Subsidiary**" means each of The Belk Center, Inc. and 2801 West Tyvola Condominium Association Inc.

"**U.S. Lender**" means any Lender that is not a Foreign Lender.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Public Law No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1) the sum of the products of the number of years (calculated to the nearest one-twenty fifth) from the date of determination to the date of each successive scheduled principal

payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock, *multiplied by* the amount of such payment, *by*

(2)    the sum of all such payments; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being Refinanced (the "**Applicable Indebtedness**"), the effects of any amortization or prepayments made on such Applicable Indebtedness prior to the date of the applicable Refinancing will be disregarded.

"**wholly owned**" means, with respect to any Subsidiary of any Person, a Subsidiary of such Person one hundred percent (100%) of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable Law) is at the time owned by such Person or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(1)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(2)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(3)    References in this Agreement to an Exhibit, Schedule, Article, Section, Annex, clause or subclause refer (a) to the appropriate Exhibit or Schedule to, or Article, Section, clause or subclause in this Agreement or (b) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears, in each case as such Exhibit, Schedule, Article, Section, Annex, clause or subclause may be amended or supplemented from time to time.

(4)    The term "including" is by way of example and not limitation.

(5)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(6)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(7)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(8)     The word "or" is not intended to be exclusive unless expressly indicated otherwise.

(9)     [Reserved].

(10)    For purposes of determining compliance with any Section of Article VII, in the event that any Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate Transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time, shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time. For purposes of determining compliance with the incurrence of any Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness that restricts the amount of such Indebtedness relative to the amount of Credit Agreement Refinanced Debt or Refinanced Debt, respectively, the Borrower and Restricted Subsidiaries may incur an incremental principal amount of Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness in such refinancing to the extent that the excess portion of the Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness would otherwise be permitted to be incurred in accordance with this Agreement (provided that (1) any additional Indebtedness referenced in this sentence satisfies the other applicable requirements of the definition of Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness, as applicable (with such additional amounts incurred constituting a utilization of the relevant basket or exception contained in Section 7.02(b) pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of Section 7.01). For purposes of determining compliance with the incurrence of any Indebtedness under Designated Revolving Commitments in reliance on compliance with any ratio or Basket, if on the date such Designated Revolving Commitments are established after giving *pro forma* effect to the incurrence of the entire committed amount of then proposed Indebtedness thereunder, then such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with any ratio.

(11)    For purposes hereof, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

Section 1.03   <u>Accounting Terms</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending on the Saturday closest to each January 31 or fiscal quarter ending April 30, July 31, October 31 or the Saturday ending on the Saturday closest to each January 31 of the Borrower.

Section 1.04   <u>Rounding</u>. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05   <u>References to Agreements, Laws, etc.</u>. Unless otherwise expressly provided herein, (1) references to Organizational Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements,

extensions, supplements and other modifications are permitted by any Loan Document; and (2) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    <u>Times of Day and Timing of Payment and Performance</u>. Unless otherwise specified, all references herein to times of day shall be references to New York time (daylight or standard, as applicable). When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

Section 1.07    <u>Pro Forma and Other Calculations</u>.

(1)    Notwithstanding anything to the contrary herein, financial ratios and tests, including the First Lien Net Leverage Ratio, Senior Secured Leverage Ratio and the Total Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.07. In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable.

(2)    For purposes of calculating any financial ratio or test (or Total Assets), Specified Transactions (and, subject to clause (4) below, the incurrence or repayment of any Indebtedness in connection therewith) that have been made (a) during the applicable Test Period or (b) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Adjusted EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Total Assets, on the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.07, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.07 as if such Specified Transaction had occurred at the beginning of the most recently ended Test Period.

(3)    Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and may include, for the avoidance of doubt, the amount of "run-rate" cost savings, synergies and operating expense reductions resulting from or related to any such Specified Transaction (including the Transactions) which is being given *pro forma* effect that have been realized or are expected to be realized and for which the actions necessary to realize such cost savings, operating expense reductions and synergies are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than twelve (12) months after the date of any such Specified Transaction (calculated on a *pro forma* basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions and synergies were realized during the entirety of such period and "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken (including any savings expected to result from the elimination of a public target's compliance costs with public company requirements) net of the amount of actual benefits realized during such period from such actions, and any such adjustments shall be included in the initial *pro forma*

calculations of such financial ratios or tests and during any subsequent Test Period in which the effects thereof are expected to be realized) relating to such Specified Transaction; *provided* that (a) such amounts are (i) reasonably identifiable and projected in the good faith judgment of the Borrower to result from such actions and (ii) such actions are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than twelve (12) months after the date of such Specified Transaction, (b) no amounts shall be added to the extent duplicative of any amounts that are otherwise added back in computing Adjusted EBITDA (or any other components thereof), whether through a *pro forma* adjustment or otherwise, with respect to such period and (c) amounts added back pursuant to this clause (3) shall be subject to the Combined Adjusted EBITDA Cap.

(4)     In the event that (a) the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees), issues or repays (including by redemption, repurchase, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit unless such Indebtedness has been permanently repaid and not replaced), (b) the Borrower or any Restricted Subsidiary issues, repurchases or redeems Disqualified Stock, (c) any Restricted Subsidiary issues, repurchases or redeems Preferred Stock or (d) the Borrower or any Restricted Subsidiary establishes or eliminates any Designated Revolving Commitments, in each case included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period (except in the case of the First Lien Net Leverage Ratio, Senior Secured Leverage Ratio or Total Net Leverage Ratio (or similar ratio), in which case such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case will be given effect, as if the same had occurred on the first day of the applicable Test Period) and, in the case of Indebtedness for all purposes as if such Indebtedness in the full amount of any undrawn Designated Revolving Commitments had been incurred thereunder throughout such period in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(5)     If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the First Lien Net Leverage Ratio, Senior Secured Leverage Ratio and/or Total Net Leverage Ratio, is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Financial Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or applicable Restricted Subsidiary may designate.

(6)     Notwithstanding anything to the contrary in this Section 1.07 or in any classification under GAAP of any Person, business, assets or operations in respect of which a definitive agreement for the disposition thereof has been entered into, no *pro forma* effect shall be given to any discontinued operations (and the Adjusted EBITDA attributable to any such Person, business, assets or operations shall not be excluded for any purposes hereunder) until such disposition shall have been consummated.

(7)     Any determination of Total Assets shall be made by reference to the last day of the Test Period most recently ended for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable, on or prior to the relevant date of determination.

(8)     Notwithstanding anything in this Agreement or any Loan Document to the contrary, when (a) calculating any applicable ratio, Consolidated Net Income or Adjusted EBITDA in connection with the making of an Investment, (b) determining compliance with any provision of this Agreement which requires that no Default or Event of Default has occurred, is continuing or would result therefrom, (c) determining compliance with any provision of this Agreement which requires compliance with any representations and warranties set forth herein or (d) the satisfaction of all other conditions precedent to the making of an Investment, in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or other provisions, determination of whether any Default or Event of Default has occurred, is continuing or would result therefrom, determination of compliance with any representations or warranties or the satisfaction of any other conditions shall, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "**LCA Election**"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "**LCA Test Date**"). If on a *pro forma* basis after giving effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios and other provisions are calculated as if such Limited Condition Acquisition or other transactions had occurred at the beginning of the most recent Test Period ending prior to the LCA Test Date for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable, the Borrower could have taken such action on the relevant LCA Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with. For the avoidance of doubt, (i) if any of such ratios or other provisions are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in Adjusted EBITDA or other components of such ratio) or other provisions at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Acquisition is permitted hereunder and (ii) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Acquisition or related Specified Transactions. If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or Basket availability with respect to any other Specified Transaction on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or Basket shall be calculated on a *pro forma basis* assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated on the LCA Test Date except that (other than solely with respect to the incurrence test under which such Limited Condition Acquisition is being made) Adjusted EBITDA, assets and Consolidated Net Income of any target of such Limited Condition Acquisition can only be used in the determination of the relevant ratios and Baskets if and when such acquisition has closed. Notwithstanding anything in this Agreement or any Loan Document to the contrary, if the Borrower or its Restricted Subsidiaries (x) incurs Indebtedness, creates Liens, makes Asset Sales, makes Investments, makes Restricted Payments or repays any Indebtedness in connection with any Limited Condition Acquisition under a ratio-based Basket and (y) incurs Indebtedness, creates Liens, makes Asset Sales, Investments or Restricted Payments or repays any Indebtedness in connection with such Limited Condition Acquisition under a non-ratio-based Basket (which shall occur within five Business Days of the events in clause (x) above), then the applicable ratio will be calculated with respect to any such action under the applicable ratio-based Basket without regard to any such action under such non-ratio-based Basket made in connection with such Limited Condition Acquisition.

Section 1.08    Available Amount Transaction. If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the Available Amount immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously, i.e., each transaction must constitute a permitted use of the Available Amount.

Section 1.09    Guaranties of Hedging Obligations. Notwithstanding anything else to the contrary in any Loan Document, no non-Qualified ECP Guarantor shall be required to guarantee or provide security for Excluded Swap Obligations, and any reference in any Loan Document with respect to such non-Qualified ECP Guarantor guaranteeing or providing security for the Obligations shall be deemed to be all Obligations other than the Excluded Swap Obligations.

Section 1.10    Currency Generally.

(1)    The Borrower shall determine in good faith the dollar amount of any utilization or other measurement denominated in a currency other than Dollars for purposes of compliance with any Basket. For purposes of determining compliance with any Basket under Article VII or VIII with respect to any amount expressed in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Basket utilization occurs or other Basket measurement is made (so long as such Basket utilization or other measurement, at the time incurred, made or acquired, was permitted hereunder). Except with respect to any ratio calculated under any Basket, any subsequent change in rates of currency exchange with respect to any prior utilization or other measurement of a Basket previously made in reliance on such Basket (as the same may have been reallocated in accordance with this Agreement) shall be disregarded for purposes of determining any unutilized portion under such Basket.

(2)    For purposes of determining the First Lien Net Leverage Ratio, Senior Secured Leverage Ratio and/or the Total Net Leverage Ratio, the amount of Indebtedness and cash and Cash Equivalents shall reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

(3)    For purposes of determining compliance under any Basket under Article VII or VIII, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(1); provided, however, that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness. For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the Dollar equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.11    Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or

liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.12    Effect of Benchmark Transition Event.

(1)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, with respect to each Class of Term Loans hereunder, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace LIBOR with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective with respect to such Class of Term Loans at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders of such Class and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Facility Lenders of such Class. With respect to each Class of Term Loans hereunder, any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Facility Lenders of such Class have delivered to the Administrative Agent written notice that such Required Facility Lenders accept such amendment. No replacement of LIBOR with a Benchmark Replacement pursuant to this Section 1.12 will occur prior to the applicable Benchmark Transition Start Date.

(2)    Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(3)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. For the avoidance of doubt, any notice required to be delivered by the Administrative Agent as set forth in this Section titled "Benchmark Replacement Setting" may be provided, at the option of the Administrative Agent (in its sole discretion), in one or more notices and may be delivered together with, or as part of any amendment which implements any Benchmark Replacement or Benchmark Replacement Conforming Changes. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section titled "Effect of Benchmark Transition Event," including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 1.12.

Notwithstanding the foregoing, the Administrative Agent does not warrant nor accept any responsibility nor shall the Administrative Agent have any liability with respect to (i) any actions or use of its discretion or other decisions or determinations made with respect to any matters covered by this Section 1.12 including, without limitation, whether or not a Benchmark Transition Event has occurred, the removal or lack thereof of unavailable or non-representative tenors, the implementation or lack thereof of any Benchmark Replacement Conforming Changes, the delivery or non-delivery of any notices required by Section 1.12(3) above or otherwise in accordance herewith, (ii) the administration, submission or any matter

relating to the rates in the definition of the Eurodollar Rate or with respect to any rate that is an alternative, comparable or successor rate thereto, or replacement rate thereof (including, without limitation any Benchmark Replacement implemented hereunder), (iii) the composition or characteristics of any such Benchmark Replacement, including whether it is similar to, or produces the same value or economic equivalence of LIBOR (or any other Benchmark) or have the same volume or liquidity as did LIBOR (or any other Benchmark) or (iv) the effect of any of the foregoing.

(4)    Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of the Base Rate based upon the Eurodollar Rate will not be used in any determination of the Base Rate.

(5)    Certain Defined Terms. As used in this Section titled "Effect of Benchmark Transition Event":

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to LIBOR for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 1% per annum, the Benchmark Replacement will be deemed to be 1% per annum for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of LIBOR with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to LIBOR:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of LIBOR permanently or indefinitely ceases to provide LIBOR; or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to LIBOR:

(1) a public statement or publication of information by or on behalf of the administrator of LIBOR announcing that such administrator has ceased or will cease to provide LIBOR, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for LIBOR, a resolution authority with jurisdiction over the administrator for LIBOR or a court or an entity with similar insolvency or resolution authority over the administrator for LIBOR, which states that the administrator of LIBOR has ceased or will cease to provide LIBOR permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR; or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR announcing that LIBOR is no longer representative.

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to LIBOR and solely to the extent that LIBOR has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced LIBOR for all purposes hereunder in accordance with the Section titled "Effect of Benchmark Transition Event" and (y) ending at the time that a Benchmark Replacement has replaced LIBOR for all purposes hereunder pursuant to the Section titled "Effect of Benchmark Transition Event."

"**Early Opt-in Election**" means, with respect to each Class of Term Loans, the occurrence of:

(1) (i) a determination by the Administrative Agent or (ii) a notification by the Required Facility Lenders of the applicable Class to the Administrative Agent (with a copy to the Borrower) that the Required Facility Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in this Section 1.12 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBOR, and

(2) (i) the election by the Administrative Agent or (ii) the election by the Required Facility Lenders of the applicable Class to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Facility Lenders of written notice of such election to the Administrative Agent.

"**Federal Reserve Bank of New York's Website**" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

# ARTICLE II

## The Commitments and Borrowings

Section 2.01     The Loans.

(1)     [Reserved].

(2)     Subject to the terms and conditions set forth herein, each applicable First-Out Lender severally, and not jointly, agrees to make New Money First-Out Loans to the Borrower on the Closing Date in Dollars in a principal amount not to exceed its New Money First-Out Loan Commitment.

(3)     Subject to the terms and conditions set forth herein and in the Plan of Reorganization, on the Closing Date, pursuant to the Plan of Reorganization, the Prepetition First Lien Term Loans and/or certain of the Prepetition Second Lien Term Loans held by the Second Amendment Exchanging Lenders as of such date shall be automatically converted into (and be deemed to be prepaid), and each Second Amendment Exchanging Lender shall be deemed to have made to the Borrower on the Closing Date (a) First-Out Loans in a principal amount equal to its Exchange First-Out Loan Commitment and (b) Second-Out Loans in a principal amount equal to its Second-Out Loan Commitment.

Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed. The First-Out Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein.

Section 2.02        Borrowings, Conversions and Continuations of Loans.

(1)        Each Term Borrowing, each conversion of Term Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice, on behalf of the Borrower, to the Administrative Agent (*provided* that the notice in respect of any Term Borrowing on the Closing Date may be conditioned on the closing of the Transactions (other than any transactions constituting such Term Borrowing)). Each such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, (a) three (3) Business Days prior to the requested date of any Borrowing or continuation of Eurodollar Rate Loans or any conversion of Base Rate Loans to Eurodollar Rate Loans and (b) one (1) Business Day prior to the requested date of any Borrowing of Base Rate Loans; *provided* that the notice referred to in subclause (a) above may be delivered on or prior to the Closing Date in the case of the Closing Date Term Loans. Each notice by the Borrower pursuant to this Section 2.02(1) must be a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Except as provided in Sections 2.14, 2.15 and 2.16, each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $5.0 million or a whole multiple of $1.0 million in excess thereof. Except as provided in Sections 2.14, 2.15 and 2.16, each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice shall specify:

(i)        whether the Borrower is requesting a Term Borrowing, a conversion of Term Loans from one Type to the other or a continuation of Eurodollar Rate Loans,

(ii)        the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day),

(iii)        the principal amount of Loans to be borrowed, converted or continued,

(iv)        [reserved],

(v)        the Class and Type of Loans to be borrowed or to which existing Term Loans are to be converted,

(vi)        if applicable, the duration of the Interest Period with respect thereto and

(vii)        wire instructions of the account(s) to which funds are to be disbursed.

If the Borrower fails to specify a Type of Loan to be made in a Committed Loan Notice, then the applicable Loans shall be made as Eurodollar Rate Loans with an Interest Period of one (1) month. If the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made or continued as the same Type of Loan, which if a Eurodollar Rate Loan, shall have a one-month Interest Period. Any such automatic continuation of Eurodollar Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(2)        Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this

Agreement of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic continuation of Eurodollar Rate Loans or continuation of Loans described in Section 2.02(1). In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than, in the case of Borrowing on the Closing Date, 10:00 a.m., New York time, and otherwise 2:00 p.m., New York time, on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.01 for the Borrowing on the Closing Date, the Administrative Agent shall make all funds so received available to the applicable Borrower in like funds as received by the Administrative Agent either by (a) crediting the account(s) of the applicable Borrower on the books of the Administrative Agent with the amount of such funds or (b) wire transfer of such funds, in each case in accordance with instructions provided by the Borrower to (and reasonably acceptable to) the Administrative Agent.

(3)    Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan, unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith. Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent (at the direction of the Required Facility Lenders under the applicable Facility) may require by notice to the Borrower that no Loans under such Facility may be converted to or continued as Eurodollar Rate Loans.

(4)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive in the absence of manifest error. At any time when Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the prime rate used in determining the Base Rate promptly following the public announcement of such change.

(5)    After giving effect to all Term Borrowings, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than six (6) Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent; *provided* that after the establishment of any new Class of Loans pursuant to a Refinancing Amendment, an Extension Amendment or an amendment in respect of Replacement Loans, the number of Interest Periods otherwise permitted by this Section 2.02(5) shall increase by three (3) Interest Periods for each applicable Class so established.

(6)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(7)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing, or, in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York time, on the date of such Borrowing, that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (2) above, and the Administrative Agent may (but shall have no obligation to), in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower

until the date such amount is repaid to the Administrative Agent at (a) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (b) in the case of such Lender, the Overnight Rate *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(7) shall be conclusive in the absence of manifest error. If the Borrower and such Lender shall both pay all or any portion of the principal amount in respect of such Borrowing or interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such Borrowing or interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.03      [Reserved].

Section 2.04      [Reserved].

Section 2.05      Prepayments.

(1)      Optional.

(a)   The Borrower may, upon written notice to the Administrative Agent by the Borrower, at any time or from time to time voluntarily prepay any Class or Classes of Term Loans in whole or in part without premium (except as set forth in Section 2.18) or penalty; *provided* that

(i)      such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) one (1) Business Day prior to the date of prepayment of Base Rate Loans;

(ii)      any partial prepayment of Eurodollar Rate Loans shall be in a principal amount of $2.0 million or a whole multiple of $500,000 in excess thereof or, if less, the entire principal amount thereof then outstanding; and

(iii)      any prepayment of Base Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.

Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment. If such notice is given, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. In the case of each prepayment of the Loans pursuant to this Section 2.05(1), the Borrower may in its sole discretion select the Borrowing or Borrowings (and the order of maturity of principal payments) to be repaid, and such payment shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares or other applicable share provided for under this Agreement.

(b)   [Reserved].

(c)   Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(1)(a) if such prepayment would have resulted from a refinancing of all or a portion of the applicable Facility, which refinancing shall not be consummated or shall otherwise be delayed.

(d)   Each prepayment in respect of any Term Loans pursuant to this Section 2.05(1) may be applied to any Class of Term Loans as directed by the Borrower. Voluntary prepayments of any Class of Term Loans (including as to any Extended Loan or otherwise) permitted hereunder shall be applied in a manner determined at the discretion of the Borrower and specified in the notice of prepayment (and absent such direction, in direct order of maturity, including any remaining scheduled installments of principal). For the avoidance of doubt, the Borrower may (i) prepay Term Loans of any Term Loan Class pursuant to this Section 2.05 without any requirement to prepay Extended Loans that were converted or exchanged from such Term Loan Class and (ii) prepay Extended Loans pursuant to this Section 2.05 without any requirement to prepay any Term Loans that were not converted or exchanged for such Extended Loans. In the event that the Borrower does not specify the order in which to apply prepayments to reduce scheduled installments of principal or as between Classes of Term Loans, the Borrower shall be deemed to have elected that such proceeds be applied to reduce the scheduled installments of principal in direct order of maturity on a *pro rata* basis among Term Loan Classes.

(e)   Notwithstanding anything in any Loan Document to the contrary, so long as (x) no Event of Default has occurred and is continuing or shall occur as a result thereof and (y) no proceeds of ABL Loans are used for this purpose, any Borrower Party may (i) purchase outstanding Term Loans on a non-pro rata basis through open market purchases or (ii) prepay the outstanding Term Loans (which Term Loans shall, for the avoidance of doubt, be automatically and permanently canceled immediately upon such purchase or prepayment, and the Borrower shall provide notice of such cancellation to the Administrative Agent), which in the case of clause (ii) only shall be prepaid without premium or penalty on the following basis:

(A)   Any Borrower Party shall have the right to make a voluntary prepayment of Loans at a discount to par pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers (any such prepayment, the "**Discounted Term Loan Prepayment**"), in each case made in accordance with this Section 2.05(1)(e) and without premium or penalty.

(B)   any Borrower Party may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent with five (5) Business Days' notice (or such shorter period as agreed by the Auction Agent) in the form of a Specified Discount Prepayment Notice; *provided* that (I) any such offer shall be made available, at the sole discretion of the applicable Borrower Party, to (x) each Term Lender or (y) each Term Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "**Specified Discount Prepayment Amount**") with respect to each applicable Class, the Class or Classes of Term Loans subject to such offer and the specific percentage discount to par (the "**Specified Discount**") of such Term Loans to be prepaid (it being understood that different Specified Discounts or Specified Discount Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(B)), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) each such

offer shall remain outstanding through the Specified Discount Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Lenders (the "**Specified Discount Prepayment Response Date**").

(1)     Each Term Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its applicable then outstanding Term Loans at the Specified Discount and, if so (such accepting Lender, a "**Discount Prepayment Accepting Lender**"), the amount and the Classes of such Lender's Term Loans to be prepaid at such offered discount. Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable. Any Term Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(2)     If there is at least one Discount Prepayment Accepting Lender, the relevant Borrower Party will make a prepayment of outstanding Term Loans pursuant to this paragraph (B) to each Discount Prepayment Accepting Lender in accordance with the respective Outstanding Amount and Classes of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to subsection (2) above*; provided* that if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made pro rata among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "**Specified Discount Proration**"). The Auction Agent shall promptly, and in any case within three (3) Business Days following the Specified Discount Prepayment Response Date, notify (I) the relevant Borrower Party of the respective Term Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the Classes of Term Loans to be prepaid at the Specified Discount on such date and (III) the Administrative Agent and each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, Class and Type of Term Loans of such Lender to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the applicable Borrower Party and such Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the applicable Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

97

(C)      Subject to the proviso to subsection (A) above, any Borrower Party may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice (or such shorter period as agreed by the Auction Agent) in the form of a Discount Range Prepayment Notice; *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Borrower Party, to (x) each Term Lender or (y) each Term Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "**Discount Range Prepayment Amount**"), the Class or Classes of Term Loans subject to such offer and the maximum and minimum percentage discounts to par (the "**Discount Range**") of the principal amount of such Term Loans with respect to each relevant Class of Term Loans willing to be prepaid by such Borrower Party (it being understood that different Discount Ranges or Discount Range Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(C)), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) unless rescinded, each such solicitation by the applicable Borrower Party shall remain outstanding through the Discount Range Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Lenders (the "**Discount Range Prepayment Response Date**"). Each Term Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "**Submitted Discount**") at which such Lender is willing to allow prepayment of any or all of its then outstanding Term Loans of the applicable Class or Classes and the maximum aggregate principal amount and Classes of such Lender's Term Loans (the "**Submitted Amount**") such Term Lender is willing to have prepaid at the Submitted Discount. Any Term Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(1)      The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Term Loans to be prepaid at such Applicable Discount in accordance with this subsection (C). The relevant Borrower Party agrees to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by the Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "**Applicable Discount**") which yields a Discounted Term Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts. Each Term Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that

is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following subsection (3)) at the Applicable Discount (each such Term Lender, a "**Participating Lender**").

(2)     If there is at least one Participating Lender, the relevant Borrower Party will prepay the respective outstanding Term Loans of each Participating Lender in the aggregate principal amount and of the Classes specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; *provided* that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "**Identified Participating Lenders**") shall be made pro rata among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Discount Range Proration**"). The Auction Agent shall promptly, and in any case within five (5) Business Days following the Discount Range Prepayment Response Date, notify (I) the relevant Borrower Party of the respective Term Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, the aggregate principal amount of the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, the Applicable Discount and the aggregate principal amount and Classes of Term Loans to be prepaid at the Applicable Discount on such date, (III) the Administrative Agent and each Participating Lender of the aggregate principal amount and Classes of such Term Lender to be prepaid at the Applicable Discount on such date and (IV) if applicable, each Identified Participating Lender of the Discount Range Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the relevant Borrower Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the applicable Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(D)     Subject to the proviso to subsection (A) above, any Borrower Party may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice in the form of a Solicited Discounted Prepayment Notice (or such later notice specified therein); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Borrower Party, to (x) each Term Lender or (y) each Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such notice shall specify the maximum aggregate amount of the Term Loans (the "**Solicited Discounted Prepayment Amount**") and the Class or Classes of Term Loans the applicable Borrower Party is willing to prepay at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(D)), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than

$5.0 million and whole increments of $1.0 million in excess thereof and (IV) unless rescinded, each such solicitation by the applicable Borrower Party shall remain outstanding through the Solicited Discounted Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Term Lenders (the "**Solicited Discounted Prepayment Response Date**"). Each Term Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date and (z) specify both a discount to par (the "**Offered Discount**") at which such Term Lender is willing to allow prepayment of its then outstanding Term Loan and the maximum aggregate principal amount and Classes of such Term Loans (the "**Offered Amount**") such Term Lender is willing to have prepaid at the Offered Discount. Any Term Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(1)　　　The Auction Agent shall promptly provide the relevant Borrower Party with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date. Such Borrower Party shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Term Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the applicable Borrower Party (the "**Acceptable Discount**"), if any. If the applicable Borrower Party elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the third Business Day after the date of receipt by such Borrower Party from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this subsection (2) (the "**Acceptance Date**"), the applicable Borrower Party shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount. If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the applicable Borrower Party by the Acceptance Date, such Borrower Party shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(2)　　　Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, within three (3) Business Days after receipt of an Acceptance and Prepayment Notice (the "**Discounted Prepayment Determination Date**"), the Auction Agent will determine (in consultation with the consent of such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the Classes of Term Loans (the "**Acceptable Prepayment Amount**") to be prepaid by the relevant Borrower Party at the Acceptable Discount in accordance with this Section 2.05(1)(e)(D). If the applicable Borrower Party elects to accept any Acceptable Discount, then such Borrower Party agrees to accept all Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount. Each Term Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or

equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "**Qualifying Lender**"). The applicable Borrower Party will prepay outstanding Term Loans pursuant to this subsection (D) to each Qualifying Lender in the aggregate principal amount and of the Classes specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; *provided* that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "**Identified Qualifying Lenders**") shall be made pro rata among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Solicited Discount Proration**"). On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the relevant Borrower Party of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Term Loans and the Classes to be prepaid to be prepaid at the Applicable Discount on such date, (III) the Administrative Agent and each Qualifying Lender of the aggregate principal amount and the Classes of such Term Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Borrower Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to such Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(E)      In connection with any Discounted Term Loan Prepayment, the Borrower Parties and the Term Lenders acknowledge and agree that the Auction Agent may require, as a condition to the applicable Discounted Term Loan Prepayment, the payment of customary fees and expenses from a Borrower Party to such Auction Agent for its own account in connection therewith.

(F)      If any Term Loan is prepaid in accordance with subsections (B) through (D) above, a Borrower Party shall prepay such Term Loans on the Discounted Prepayment Effective Date. The relevant Borrower Party shall make such prepayment to the Administrative Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 12:00 p.m., New York time, on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the relevant Class(es) and Lenders as specified by the applicable Borrower Party in the applicable offer. The Term Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the

101

Discounted Prepayment Effective Date. Each prepayment of the outstanding Term Loans pursuant to this Section 2.05(1)(e) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, and shall be applied to the relevant Loans of such Lenders in accordance with their respective applicable share as calculated by the Auction Agent in accordance with this Section 2.05(1)(e). The aggregate principal amount of the Classes and installments of the relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the Classes of Term Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment. In connection with each prepayment pursuant to this Section 2.05(1)(e), the relevant Borrower Party shall make a representation to the assigning or assignee Term Lenders, as applicable, that it does not possess material non-public information with respect to the Borrower and its Subsidiaries or the securities of any of them that has not been disclosed to the Term Lenders generally (other than Term Lenders that have elected not to receive such information) or shall make a statement that such representation cannot be made.

(G)     To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the provisions in this Section 2.05(1)(e), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the applicable Borrower Party.

(H)     Notwithstanding anything in any Loan Document to the contrary, for purposes of this Section 2.05(1)(e), each notice or other communication required to be delivered or otherwise provided to the Auction Agent (or its delegate) shall be deemed to have been given upon Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; *provided* that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next succeeding Business Day.

(I)     Each of the Borrower Parties and the Term Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this Section 2.05(1)(e) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate. The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Term Loan Prepayment provided for in this Section 2.05(1)(e) as well as activities of the Auction Agent.

(J)     Each Borrower Party shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discounted Prepayment Response Date (and if such offer is revoked pursuant to the preceding clauses, any failure by such Borrower Party to make any prepayment to a Lender, as applicable, pursuant to this Section 2.05(1)(e) shall not constitute a Default or Event of Default under Section 8.01 or otherwise).

(K)     The Administrative Agent (i) shall not be required to serve as the Auction Agent or have any other obligations to participate in (other than mechanical administrative

102

duties), or facilitate any Discounted Term Loan Prepayment unless it is reasonably satisfied with the terms and restrictions thereof and (ii) shall not have any obligation to participate in, arrange, sell or otherwise facilitate, and will have no liability in connection with, any open market repurchases by Holdings, the Borrower or any of its Restricted Subsidiaries.

(2)     <u>Mandatory</u>.

(a)     Commencing with the delivery of the financial statements for the fiscal year ending January 29, 2022 and each fiscal year ending thereafter, within five (5) Business Days after the later of (x) the date that financial statements have been delivered pursuant to Section 6.01(1) with respect to such fiscal year and the related Compliance Certificate has been delivered pursuant to Section 6.02(1) and (y) March 31 of the subsequent fiscal year, if the Average ECF Liquidity for three month period ending on March 31 set forth in clause (y) above, as set forth in the applicable Compliance Certificate or such other certificate separately delivered by the Borrower exceeds $75,000,000 ("**ECF Liquidity Threshold**"), the Borrower shall, subject to clause (g) of this Section 2.05(2), prepay, or cause to be prepaid, an aggregate principal amount of Second-Out Loans equal to the sum of (i) an amount (not less than zero) equal to the *lesser* of (x) 100% of the Excess Cash Flow for the applicable Excess Cash Flow Period *minus* the ECF Liquidity Threshold (such excess amount, the "**ECF Surplus Amount**") and (y) the Priority ECF Amount *plus* (ii) if the ECF Surplus Amount exceeds the Priority ECF Amount, 50% of such excess, *minus*

(i)     the sum of all voluntary prepayments of Second-Out Loans made pursuant to Sections 2.05(1)(a) and 2.05(1)(e) (in an amount, in the case of prepayments pursuant to Section 2.05(1)(e), equal to the discounted amount actually paid in respect of the principal amount of such Second-Out Loans and only to the extent that such Second-Out Loans have been cancelled; *provided* that such voluntary prepayments made pursuant to Section 2.05(1)(e) shall only be deducted (a) to the extent the amount set forth in clause (2)(a)(ii) above is a positive amount and (b) in an amount, aggregated with the amount of voluntary prepayments made pursuant to Section 2.05(1)(e) of the Second Lien Credit Agreement, not to exceed 50% of the ECF Payment (calculated prior to giving effect to such deductions)) (including prepayments made after the end of the fiscal year covered by the relevant financial statements but prior to the making of such ECF Payment (such payments, the "**After Year-End Payment**")),

(ii)     the sum of all voluntary prepayments of Credit Agreement Refinancing Indebtedness in respect of the Second-Out Loans to the extent secured in whole or in part on a *pari passu* basis with and not subordinated in right of payment (including pursuant to "waterfall" or similar provisions) to the Second-Out Loans (including, to the extent prepaid pursuant to an After Year-End Payment),

(iii)     the sum of all voluntary prepayments of Second Lien Loans made pursuant to Section 2.05(1)(a) and 2.05(1)(e) of the Second Lien Credit Agreement (in an amount, in the case of prepayments pursuant to Section 2.05(1)(e), equal to the discounted amount actually paid in respect of the principal amount of such Second Lien Loans and only to the extent that such Second Lien Loans have been cancelled; *provided* that such voluntary prepayments made pursuant to Section 2.05(1)(e) of the Second Lien Credit Agreement shall only be deducted (a) to the extent the amount set forth in clause (2)(a)(ii) above is a positive amount and (b) in an amount, when aggregated with the amount of voluntary prepayments made pursuant to Section 2.05(1)(e) of this Agreement, not to exceed 50% of the ECF Payment (calculated prior to giving effect to such deductions)), and Credit Agreement Refinancing Indebtedness (as defined in the Second Lien Credit Agreement) to the extent secured in whole or in part on a *pari passu* basis with the Second

Lien Loans (in each case, including to the extent prepaid pursuant to an After Year-End Payment), and

in the case of each of the immediately preceding clauses (i) - (iii), made during such fiscal year (without duplication of any prepayments in such fiscal year that reduced the amount of Excess Cash Flow required to be repaid pursuant to this Section 2.05(2)(a) for any prior fiscal year) or in connection with an After Year-End Payment, and in each case to the extent such prepayments are not funded with the proceeds of Funded Debt or any Specified Equity Contributions (such amount, the "**ECF Payment**");

*provided* that:

(A)     if at the time that any such prepayment would be required, the Borrower (or any Restricted Subsidiary) is required to Discharge Other Applicable Indebtedness with Other Applicable ECF pursuant to the terms of the documentation governing such Indebtedness, then the Borrower (or any Restricted Subsidiary) may apply such Excess Cash Flow on a *pro rata* basis (determined on the basis of the aggregate outstanding principal amount of the Second-Out Loans and Other Applicable Indebtedness requiring such Discharge at such time);

(B)     the portion of such Excess Cash Flow allocated to the Other Applicable Indebtedness shall not exceed the amount of such Other Applicable ECF required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Excess Cash Flow shall be allocated to the Second-Out Loans in accordance with the terms hereof to the prepayment of the Second-Out Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Second-Out Loans that would have otherwise been required pursuant to this Section 2.05(2)(a) shall be reduced accordingly; and

(C)     to the extent the lenders or holders of Other Applicable Indebtedness decline to have such Indebtedness repurchased or prepaid with such portion of Excess Cash Flow, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Second-Out Loans to the extent required in accordance with the terms of this Section 2.05(2)(a).

(b)     Subject to Section 2.05(2)(f) below, (i) if (x) the Borrower or any Restricted Subsidiary makes an Asset Sale or (y) any Casualty Event occurs, which results in the realization or receipt by the Borrower or such Restricted Subsidiary of Net Proceeds, the Borrower shall prepay, or cause to be prepaid, on or prior to the date which is ten (10) Business Days after the date of the realization or receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds, subject to clause (ii) of this Section 2.05(2)(b) (solely in connection with Net Proceeds realized or received in connection with any Casualty Event) and clauses (2)(g) and (h) of this Section 2.05, an aggregate principal amount of Term Loans equal to 100% of all Net Proceeds realized or received; *provided* that no prepayment shall be required pursuant to this Section 2.05(2)(b)(i) with respect to such portion of such Net Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment to reinvest) in accordance with Section 2.05(2)(b)(ii); *provided further* that

(A)     if at the time that any such prepayment would be required, the Borrower (or any Restricted Subsidiary) is required to Discharge any Other Applicable Indebtedness with Other Applicable Net Proceeds pursuant to the terms of the documentation governing such Indebtedness, then the Borrower (or any Restricted Subsidiary) may apply such Net Proceeds on a *pro rata* basis (determined on the basis of the aggregate outstanding principal

amount of the Term Loans and Other Applicable Indebtedness requiring such Discharge at such time);

(B)     the portion of such Net Proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of such Other Applicable Net Proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Net Proceeds shall be allocated to the Term Loans in accordance with the terms hereof to the prepayment of the Term Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 2.05(2)(b)(i) shall be reduced accordingly; and

(C)     to the extent the holders of Other Applicable Indebtedness decline to have such Indebtedness repurchased or prepaid with such portion of such Net Proceeds, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof; *provided further* that no prepayment shall be required pursuant to this Section 2.05(2)(b)(i) with respect to such portion of such Net Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment to reinvest) in accordance with Section 2.05(2)(b)(ii).

(ii)     With respect to any Net Proceeds realized or received with respect to any Casualty Event, the Borrower or any Restricted Subsidiary, at its option, may reinvest all or any portion of such Net Proceeds in assets (other than Cash Equivalents) used or useful in the business of the Loan Parties (including capital expenditures) within (x) twelve (12) months following receipt of such Net Proceeds or (y) if the Borrower or any Restricted Subsidiary enters into a legally binding commitment to reinvest such Net Proceeds within twelve (12) months following receipt thereof, within the later of (A) twelve (12) months following receipt thereof and (B) one hundred eighty (180) days of the date of such legally binding commitment; *provided* that, (i) the aggregate amount of any such Net Proceeds reinvested pursuant to this Section 2.05(b)(ii) shall not exceed $5.0 million in any fiscal year (with any unused amount being carried over to the next fiscal year, with such carried over amounts being utilized first in any given year) and (ii) if any Net Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, and subject to clauses (g) and (h) of this Section 2.05(2), an amount equal to any such Net Proceeds shall be applied within five (5) Business Days after the Borrower reasonably determines that such Net Proceeds are no longer intended to be or cannot be so reinvested to the prepayment of the Term Loans as set forth in this Section 2.05.

(c)     [Reserved].

(d)     Subject to Section 2.05(2)(f) below, if the Borrower or any Restricted Subsidiary incurs or issues any Indebtedness (A) not expressly permitted to be incurred or issued pursuant to Section 7.02(b) or (B) that constitutes Credit Agreement Refinancing Indebtedness or Refinancing Loans, the Borrower shall prepay, or cause to be prepaid, an aggregate principal amount of Term Loans of any Class or Classes (in each case, as directed by the Borrower) equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds.

(e)     Except as otherwise set forth in any Refinancing Amendment or Extension Amendment (*provided*, in each case, that such amendment may not provide that such Class of Term

105

Loans shall receive a greater than pro rata portion of mandatory prepayments pursuant to Section 2.05(2) than the Class of Term Loans refinanced, converted or extended thereby):

(i)  each prepayment of Term Loans required by Sections 2.05(2)(b) through (d) or (f) shall be applied to pursuant to the following order:

(A)  *first*, to the First-Out Loans then outstanding on a *pro rata* basis until Payment in Full thereof; and

(B)  *second*, to the Second-Out Loans then outstanding until Payment in Full thereof.

(ii)  with respect to each Class of Loans, each prepayment pursuant to clauses (a) through (d) or (f) of Section 2.05(2) shall be applied to remaining scheduled installments of principal thereof following the date of prepayment in direct order of maturity; and

(iii)  each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(f)  If the Borrower or any Restricted Subsidiary enters into a Specified Sale-Leaseback Transaction, which results in the receipt by the Borrower or such Restricted Subsidiary of Specified Sale-Leaseback Net Proceeds, or the Borrower or any Restricted Subsidiary enters into any Qualified Securitization Facility, which results in the receipt by the Borrower or such Restricted Subsidiary of Net Proceeds (in each case, determined after giving effect to the Transactions and without giving effect to the last *proviso* of clause (1) of the definition of "Net Proceeds"), the Borrower shall, within three (3) Business Days after the receipt of such proceeds, prepay the Term Loans in an aggregate principal amount equal to the amount of such proceeds received.

(g)  The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (a) through (d) or (f) of this Section 2.05(2) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower. The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's prepayment notice and of such Appropriate Lender's Pro Rata Share of the prepayment or other applicable share provided for under this Agreement. Each Term Lender may reject all or a portion of its Pro Rata Share, or other applicable share provided for under this Agreement, of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (a) and (b) of this Section 2.05(2) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York time, ~~one (1~~two (2) Business Days prior to the date of such prepayment. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender. If a Term Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans. Any Declined Proceeds remaining shall be retained by the Borrower (or the applicable Restricted Subsidiary) and may be applied by the Borrower or such Restricted Subsidiary in any manner not prohibited by this Agreement.

(h)  Notwithstanding any other provisions of this Section 2.05(2), (A) to the extent that any or all of the Net Proceeds of any Asset Sale by a Foreign Subsidiary giving rise to a prepayment event pursuant to Section 2.05(2)(b) or (f) (a "**Foreign Asset Sale**"), the Net Proceeds of any Casualty Event

106

from a Foreign Subsidiary (a "**Foreign Casualty Event**"), the Specified Sale-Leaseback Net Proceeds of any Specified Sale-Leaseback Transaction by a Foreign Subsidiary (a "**Foreign Sale-Leaseback**") or all or a portion of Excess Cash Flow are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in this Section 2.05(2) but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions available under by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow is permitted under the applicable local law such repatriation will be promptly effected and an amount equal to such repatriated Net Proceeds or Excess Cash Flow will be promptly (and in any event not later than two (2) Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to this Section 2.05(2) to the extent otherwise provided herein and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all or the Net Proceeds of any Foreign Asset Sale or Foreign Casualty Event, the Specified Sale-Leaseback Net Proceeds of any Foreign Sale-Leaseback or Excess Cash Flow would have a material adverse tax consequence (taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow, the Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary.

(i)     _Interest, Funding Losses, etc._ All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.05, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under this Section 2.05 prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.05 in respect of any such Eurodollar Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 2.05. Such deposit shall be deemed to be a prepayment of such Loans by the Borrower for all purposes under this Agreement.

Section 2.06     Termination or Reduction of Commitments.

(1)     Optional. The Borrower may, upon written notice by the Borrower to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class, in each case without premium or penalty; _provided_ that

(a)     any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, and

(b)   any such partial reduction shall be in an aggregate amount of $5.0 million or any whole multiple of $1.0 million in excess thereof or, if less, the entire amount thereof.

(2)   Mandatory. The New Money First-Out Loan Commitment of each First-Out Lender on the Closing Date shall be automatically and permanently reduced to $0 upon the making of such First-Out Lender's New Money First-Out Loans to the Borrower pursuant to Section 2.01(2). The Exchange First-Out Loan Commitment of each First-Out Lender and the Second-Out Loan Commitment of each Second-Out Lender, in each case, on the Closing Date shall be automatically and permanently reduced to $0 upon the conversion of such Second Amendment Exchanging Lender's Prepetition First Lien Term Loans and/or Prepetition Second Lien Term Loans into Exchange First-Out Loans and/or Second-Out Loans pursuant to Section 2.01(3)(a) and the Plan of Reorganization.

(3)   Application of Commitment Reductions. Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07).

Section 2.07   Repayment of Loans. The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders (a) on the Maturity Date for the First-Out Loans, the aggregate principal amount of all First-Out Loans outstanding on such date, (b)(x) on the first Business Day of each May, August and November, commencing with May 3, 2021, ending during the fiscal year ending January 29, 2022, an aggregate principal amount equal to 0.25% of the aggregate principal amount of all Second-Out Loans outstanding on such date (after giving effect to any PIK Toggle exercised with respect to such date) (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05), (y) on the first Business Day of each February, May, August and November ending during the fiscal year ending January 28, 2023, an aggregate principal amount equal to 0.50% of the aggregate principal amount of all Second-Out Loans outstanding on such date (after giving effect to any PIK Toggle exercised with respect to such date) (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (z) on the first Business Day of each February, May, August and November ending thereafter, an aggregate principal amount equal to 0.625% of the aggregate principal amount of all Second-Out Loans outstanding on such date (after giving effect to any PIK Toggle exercised with respect to such date) (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (c) on the Maturity Date for the Second-Out Loans, the aggregate principal amount of all Second-Out Loans outstanding on such date.

Section 2.08   Interest.

(1)   Subject to the provisions of Section 2.08(2), (I) with respect to First-Out Loans, (a) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted Eurodollar Rate for such Interest Period, respectively, *plus* the Applicable Rate and (b) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Base Rate, *plus* the Applicable Rate and (II) each Second-Out Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to (a) so long as the Borrower has not elected to exercise the PIK Toggle for the applicable Interest Period pursuant to Section 2.08(4), 10.00% and (b) if the Borrower has elected to exercise the PIK Toggle for the applicable Interest Period pursuant to Section 2.08(4), 13.00% (consisting of interest payable in Same Day Funds of 5.00% and PIK Interest of 8.00%) (the "**PIK Rate**").

(2)   During the continuance of an Event of Default, the Borrower shall pay interest on past due amounts at a rate per annum at all times equal to the Default Rate to the fullest extent permitted by

applicable Laws; *provided* that, no interest at the Default Rate shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Accrued and unpaid interest based on the Default Rate (including interest on interest) shall be due and payable upon demand.

(3)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(4)     So long as no Default or Event of Default in respect of the Second-Out Loans exists or would result from the exercise of the PIK Toggle, the Borrower may elect, in its sole discretion (such right to elect, the "**PIK Toggle**"), to have interest that accrues on the Second-Out Loans during an Interest Period to be paid (i) partially in the form of PIK Interest at the applicable rate set forth in Section 2.08(1) and (ii) partially in Same Day Funds as described herein at the applicable rate set forth in Section 2.08(1); *provided* that the Borrower may elect to exercise the PIK Toggle with respect to no more than eight (8) Interest Periods in the aggregate. Such election shall be made by providing irrevocable written notice to the Administrative Agent by a Responsible Officer in the form attached as Exhibit R (each a "**PIK Toggle Notice**"), which shall specify (i) the Interest Payment Date to which the PIK Toggle shall apply and (ii) the number of PIK Toggles which have been exercised up to and including the date of such PIK Toggle Notice (including the PIK Toggle that is the subject of the PIK Toggle Notice). Each such PIK Toggle Notice must be received by the Administrative Agent not later than 12:00 p.m., New York City time five (5) Business Days prior to the applicable Interest Payment Date, and shall be effective only with respect to such Interest Payment Date. For the avoidance of doubt, if no PIK Toggle Notice is received with respect to an Interest Payment Date in accordance with this Section 2.08(4), interest shall be payable on the Second-Out Loans on such Interest Payment Date in cash at the applicable rate set forth in Section 2.08(1).

Section 2.09     Fees. The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in the Agent Fee Letter in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.10     Computation of Interest and Fees. All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(1), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11     Evidence of Indebtedness.

(1)     The Term Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Term Borrowings made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts

and records of the Administrative Agent, as set forth in the Register, in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Term Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Term Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(2)     [Reserved].

(3)     Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(1), and by each Lender in its account or accounts pursuant to Section 2.11(1), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12     Payments Generally.

(1)     All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m., New York time, on the date specified herein. The Administrative Agent will promptly distribute to each Appropriate Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. Any payments under this Agreement that are made later than 2:00 p.m., New York time, shall be deemed to have been made on the next succeeding Business Day (but the Administrative Agent may extend such deadline for purposes of computing interest and fees (but not beyond the end of such day) in its sole discretion whether or not such payments are in process).

(2)     If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(3)     Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date, or in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York time, on the date of such Borrowing, any payment is required to be made by it to the Administrative Agent hereunder (in the case of the Borrower, for the account of any Lender hereunder or, in the case of the Lenders, for the account of the Borrower hereunder), that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(a)     if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the

date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(b)   if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount, or cause such amount to be paid, to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder. A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(3) shall be conclusive, absent manifest error.

(c)   If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Term Borrowing set forth in Section 4.01 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)   The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan.

(e)   Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)   Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03 (or otherwise expressly set forth herein). If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the sum of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13    Sharing of Payments. Other than as expressly provided elsewhere herein (including with respect to any discounted prepayment of Term Loans pursuant to Section 2.05(2)(e) or 2.05(2)(g)), if any Lender of any Class shall obtain payment in respect of any principal of or interest on account of the Loans of such Class made by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (1) notify the Administrative Agent of such fact, and (2) purchase from the other Lenders such participations in the Loans of such Class made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of any principal of or interest on such Loans of such Class, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (a) the amount of such paying Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.10) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    [Reserved].

Section 2.15    Refinancing Amendments.

(1)    Refinancing Loans. At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender, Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Term Loans then outstanding under this Agreement, in the form of Refinancing Loans or Refinancing Commitments in each case pursuant to a Refinancing Amendment.

(2)    Refinancing Amendments. The effectiveness of any Refinancing Amendment will be subject only to the satisfaction on the date thereof of such conditions precedent as may be requested by the providers of the applicable Refinancing Loans. The Administrative Agent will promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Refinancing Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.15 and to reflect the existence and terms of the Refinancing Loans incurred pursuant thereto (including any amendments necessary to treat the Term Loans subject thereto as Refinancing Term Loans). A Refinancing Amendment may (a) extend or add "call protection" to any existing Class of Term Loans, including amendments to Section 2.18, (b) amend the schedule of amortization payments relating to any existing tranche of Term Loans, including amendments to Section 2.07 (*provided* that any such amendment shall not decrease the dollar amount of any amortization payment to any Lender that would have otherwise been payable to such Lender prior to the effectiveness of the

applicable Refinancing Amendment) and (c) make other amendments to the terms of any existing Term Loans, in the case of each clause (a), (b) and (c), so that such Refinancing Term Loans and the applicable existing Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the applicable existing Term Lenders (as determined in good faith by the Borrower). Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement and the other Loan Documents, as applicable, will be amended to the extent necessary to reflect the existence and terms of the Refinancing Loans. At the request of the Administrative Agent, the Borrower shall deliver an Officer's Certificate to the Administrative Agent, certifying that the conditions and requirements with respect to such Refinancing Loans set forth in this Section 2.15 have been met and such Refinancing Amendment is authorized under this Section 2.15 (upon which the Administrative Agent may conclusively rely without independent inquiry).

(3)      Required Consents. Any Refinancing Amendment may, without the consent of any Person other than the Administrative Agent, the Borrower and the Persons providing the applicable Refinancing Loans, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.15. This Section 2.15 supersedes any provision in this Agreement to the contrary (including Section 10.01).

(4)      Providers of Refinancing Loans. Refinancing Loans may be provided by any existing Lender (it being understood that no existing Lender shall have an obligation to make all or any portion of any Refinancing Loan) or by any Additional Lender on terms permitted by this Section 2.15; *provided* that the Administrative Agent shall have consented (in each case, such consent not to be unreasonably withheld, conditioned or delayed) to any such Person's providing Refinancing Loans or Refinancing Commitments if such consent would be required under Section 10.07(b)(iii) for an assignment of Loans or Commitments to such Person. For the avoidance of doubt, any Affiliated Lender that provides any Refinancing Term Loans will be subject to the limitations on Affiliated Lenders set forth in Section 10.07(h) (including the Affiliated Lender Cap).

Section 2.16      Extensions of Loans.

(1)      Extension Offers. Pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date, the Borrower may extend such Maturity Date and otherwise modify the terms of such Loans or Commitments pursuant to the terms set forth in an Extension Offer (each, an "**Extension**," and each group of Loans or Commitments so extended, as well as any Loans of the same Class not so extended, each being a "**tranche**" for purposes of this Section 2.16). Each Extension Offer will specify the minimum amount of Loans or Commitments with respect to which an Extension Offer may be accepted, which will be an integral multiple of $1.0 million and an aggregate principal amount that is not less than $10.0 million, or if less, (a) the aggregate principal amount of such Loans outstanding or (b) such lesser minimum amount as is approved by the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed. Extension Offers will be made on a *pro rata* basis to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date. If the aggregate outstanding principal amount of such Loans (calculated on the face amount thereof) or Commitments in respect of which Lenders have accepted an Extension Offer exceeds the maximum aggregate principal amount of Loans or Commitments offered to be extended pursuant to such Extension Offer, then the Loans or Commitments of such Lenders will be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer. There is no requirement that any Extension Offer or Extension Amendment (defined as follows) be subject to any "most favored nation" pricing provisions, any condition on the non-existence of any Default or Event of Default or any financial ratio tests. The terms of an Extension Offer shall be determined by the Borrower,

and Extension Offers may contain one or more conditions to their effectiveness, including a condition that a minimum amount of Loans or Commitments of any or all applicable tranches be tendered.

(2)     Extension Amendments. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents (each, an "**Extension Amendment**") as may be necessary or appropriate in order to effect the provisions of this Section 2.16, establish new tranches in respect of Extended Loans and Extended Commitments and such amendments as permitted by clause (5) below as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such Extended Loans and Extended Commitments. An Extension Amendment may (a) extend or add "call protection" to any existing Class of Term Loans, including amendments to Section 2.18, (b) amend the schedule of amortization payments relating to any existing tranche of Term Loans, including amendments to Section 2.07 (*provided* that any such amendment shall not decrease the dollar amount of any amortization payment to any Lender that would have otherwise been payable to such Lender prior to the effectiveness of the applicable Extension Amendment) and (c) make other amendments to the terms of any existing Term Loans, in the case of each clause (a), (b) and (c), so that such Extended Loans and the applicable existing Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the existing Term Loan Lenders (as determined in good faith by the Borrower). At the request of the Administrative Agent, the Borrower shall deliver an Officer's Certificate to the Administrative Agent, certifying that the conditions and requirements with respect to such Extension Loans set forth in this Section 2.16 have been met and such Extension Amendment is authorized under this Section 2.16 (upon which the Administrative Agent may conclusively rely without independent inquiry). This Section 2.16 supersedes any provision(s) in Section 2.13 or 10.01 to the contrary. Except as otherwise set forth in an Extension Offer, there will be no conditions to the effectiveness of an Extension Amendment. Extensions will not constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement. Any Lender of an existing Class of Term Loans that elects not to participate in Extended Loans or Extended Commitments of such Class of Term Loans shall be referred to herein as a "**Non-Extended Lender**".

(3)     Terms of Extension Offers and Extension Amendments. The terms of any Extended Loans and Extended Commitments will be set forth in an Extension Offer and as agreed between the Borrower and the Extending Lenders accepting such Extension Offer; *provided* that:

(a)     the final maturity date of such Extended Loans and Extended Commitments will be no earlier than the Latest Maturity Date applicable to the Loans or Commitments subject to such Extension Offer;

(b)     the Weighted Average Life to Maturity of any Extended Loans that are Term Loans will be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans subject to such Extension Offer;

(c)     any Extended Loans that are Term Loans may receive mandatory repayments or prepayments in an amount not more than the amount that would have been received by the applicable Term Loans from which such Extended Loans are converted (in each case, other than pursuant to a refinancing) and may participate on a pro rata basis, greater than pro rata basis or less than pro rata basis in any voluntary prepayments of the Term Loans;

(d)     such Extended Loans and Extended Commitments are not secured by any assets or property that does not constitute Collateral and may not be secured on a senior basis to the existing Term Loans (provided that such Extended Loans and Extended Commitments may be senior in right of payment (including pursuant to any "waterfall") to other Term Loans to the same extent as the applicable Term Loans from which such Extended Loans are converted);

114

(e)   such Extended Loans and Extended Commitments are not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Guarantor; and

(f)   the covenants and events of default applicable to Extended Loans or Extended Commitments are substantially identical to, or, taken as a whole, no more favorable to the Lenders providing such Extended Loans or Extended Commitments than, those applicable to the Loans subject to such Extension Offer, as determined in good faith by a Responsible Officer of the Borrower in its reasonable judgment; *provided* that this clause (f) will not apply:

(A)   [reserved] or

(B)   to any of the following:

(1)   terms addressed in the preceding clauses (a) through (e),

(2)   interest rate, fees, funding discounts and other pricing terms,

(3)   redemption, prepayment or other premiums,

(4)   optional redemption or prepayment terms and

(5)   covenants and events of default applicable only to periods after the Latest Maturity Date at the time of incurrence of such Indebtedness.

Any Extended Loans will constitute a separate tranche of Term Loans from the Term Loans held by Lenders that did not accept the applicable Extension Offer.

(4)   Required Consents. No consent of any Lender or any other Person will be required to effectuate any Extension, other than the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned), the Borrower and the applicable Extending Lender. The transactions contemplated by this Section 2.16 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Offer) will not require the consent of any other Lender or any other Person, and the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.16 will not apply to any of the transactions effected pursuant to this Section 2.16.

Section 2.17   Defaulting Lenders.

(1)   Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(a)   Waivers and Amendments. That Defaulting Lender's right to approve or disapprove of any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)   Reallocation of Payments. Any payment of principal, interest, fees or other amounts received by any Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise), shall be applied at such time or times as may be determined by such Agent as follows: first, to the payment of any amounts owing by that

115

Defaulting Lender to any Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (i) such payment is a payment of the principal amount of any Loans s in respect of which that Defaulting Lender has not fully funded its appropriate share and (ii) such Loans were made at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender. Any payments, prepayments or other amounts payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(2)     <u>Defaulting Lender Cure.</u> If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders, whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; *provided further* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.18     <u>Prepayment Premium and Make-whole Amount.</u>

(1)     [reserved].

(2)     In the event that all or any portion of the First-Out Loans are repaid, prepaid or accelerated for any reason, including as a result of any mandatory prepayments, voluntary prepayments, payments or acceleration made following the occurrence and during the continuance of an Event of Default, including an Event of Default resulting from the commencement of any proceeding under the Bankruptcy Code in respect of any Loan Party or any Subsidiary thereof, and notwithstanding any acceleration (for any reason) of the Obligations pursuant to the terms hereof (other than (x) mandatory prepayments pursuant to <u>Section 2.05(2)(a)</u> or (y) amortization payments pursuant to <u>Section 2.07</u>), the Borrower shall pay to the Administrative Agent, for the benefit of Lenders holding such First-Out Loans as an inducement for making (or deemed making) the First-Out Loans (and not as a penalty) an amount equal to the Prepayment Premium, which Prepayment Premium shall be fully earned, and due and payable, on the date of such payment or prepayment, or on the date such payment or prepayment is required (or deemed) to be made, as applicable, and non-refundable when made.

(3)     In the event that, on or prior to third (3rd) anniversary of the Closing Date, all or any portion of the Second-Out Loans are accelerated based upon an Event of Default pursuant to Section 8.01(6), and

notwithstanding any acceleration (for any reason) of the Obligations pursuant to the terms hereof, the Borrower shall pay to the Administrative Agent, for the benefit of Lenders holding such Second-Out Loans, as an inducement for making (deemed making) of the Second-Out Loans (and not as a penalty), an amount equal to the Make-whole Amount, which Make-whole Amount shall be fully earned, and due and payable, on the date of such payment or prepayment, or on the date such payment or prepayment is required (or deemed) to be made, as applicable, and non-refundable when made.

(4)     In view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of the Lenders' lost profits as a result thereof, any Prepayment Premium or Make-whole Amount that is due and payable upon an optional or mandatory prepayment of the First-Out Loans, or upon an acceleration of the First-Out Loans or the Second-Out Loans shall in each case be presumed to be the liquidated damages sustained by the Lenders as the result of payment or acceleration, as applicable, and the Borrower and Guarantors agree that the Prepayment Premium and Make-whole Amount is reasonable under the circumstances currently existing. The Prepayment Premium and Make-whole Amount shall also be payable in the event the applicable Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other similar means. THE BORROWER AND EACH GUARANTOR EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM OR MAKE-WHOLE AMOUNT IN CONNECTION WITH ANY ACCELERATION OF THE LOANS. The Borrower and each Guarantor expressly agrees (to the fullest extent that it may lawfully do so) that: (A) the Prepayment Premium and Make-whole Amount is reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the Prepayment Premium and Make-whole Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower and Guarantors giving specific consideration in this transaction for such agreement to pay the Prepayment Premium and the Make-whole Amount; and (D) the Borrower and each Guarantor shall each be estopped hereafter from claiming differently than as agreed to in this paragraph. The Borrower and each Guarantor expressly acknowledges that its agreement to pay the Prepayment Premium and Make-whole Amount to the Lenders as herein described is a material inducement to the Lenders to provide the Commitments and make the Loans.

Section 2.19     Permitted Debt Exchanges.

(1)     Notwithstanding anything to the contrary contained in this Agreement, pursuant to one or more offers (each, a "**Permitted Debt Exchange Offer**") made from time to time by the Borrower to all Lenders (other than, with respect to any Permitted Debt Exchange Offer that constitutes an offering of securities, any Lender that, if requested by the Borrower, is unable to certify that it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (ii) an institutional "accredited investor" (as defined in Rule 501 under the Securities Act) or (iii) not a "U.S. person" (as defined in Rule 902 under the Securities Act)) with outstanding Term Loans of a particular Class, the Borrower may from time to time consummate one or more exchanges of such Term Loans for Indebtedness (in the form of senior secured, senior unsecured, senior subordinated, or subordinated notes or loans) (such Indebtedness, "**Permitted Debt Exchange Notes**" and each such exchange, a "**Permitted Debt Exchange**"), so long as the following conditions are satisfied:

(i)     each such Permitted Debt Exchange Offer shall be made on a pro rata basis to the Lenders (other than, with respect to any Permitted Debt Exchange Offer that constitutes an offering of securities, any Lender that, if requested by the Borrower, is unable to certify that it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (ii) an

117

institutional "accredited investor" (as defined in Rule 501 under the Securities Act) or (iii) not a "U.S. person" (as defined in Rule 902 under the Securities Act)) of each applicable Class based on their respective aggregate principal amounts of outstanding Term Loans under each such Class;

(ii)      the aggregate principal amount (calculated on the face amount thereof) of such Permitted Debt Exchange Notes shall not exceed the aggregate principal amount (calculated on the face amount thereof) of Term Loans so refinanced, except to the extent a different incurrence basket pursuant Section 7.02 is utilized and with respect to an amount equal to any fees, expenses, commissions, underwriting discounts and premiums payable in connection with such Permitted Debt Exchange;

(iii)      the stated final maturity of such Permitted Debt Exchange Notes is not earlier than the latest Maturity Date for the Class or Classes of Term Loans being exchanged, and such stated final maturity is not subject to any conditions that could result in such stated final maturity occurring on a date that precedes such latest maturity date (it being understood that acceleration or mandatory repayment, prepayment, redemption or repurchase of such Permitted Debt Exchange Notes upon the occurrence of an event of default, a change in control, an event of loss or an asset disposition shall not be deemed to constitute a change in the stated final maturity thereof);

(iv)      such Permitted Debt Exchange Notes are not required to be repaid, prepaid, redeemed, repurchased or defeased, whether on one or more fixed dates, upon the occurrence of one or more events or at the option of any holder thereof (except, in each case, upon the occurrence of an event of default, a change in control, an event of loss or an asset disposition) prior to the latest Maturity Date for the Class or Classes of Term Loans being exchanged, provided that, notwithstanding the foregoing, scheduled amortization payments (however denominated, including scheduled offers to repurchase) of such Permitted Debt Exchange Notes shall be permitted so long as the Weighted Average Life to Maturity of such Indebtedness shall be longer than the remaining Weighted Average Life to Maturity of the Class or Classes of Term Loans being exchanged;

(v)      no Restricted Subsidiary is a borrower or guarantor with respect to such Indebtedness unless such Restricted Subsidiary is or substantially concurrently becomes a Loan Party;

(vi)      if such Permitted Debt Exchange Notes are secured, such Permitted Debt Exchange Notes are secured on a pari passu basis or junior priority basis to the Obligations and (A) such Permitted Debt Exchange Notes are not secured by any assets not securing the Obligations unless such assets substantially concurrently secure the Obligations and (B) the beneficiaries thereof (or an agent on their behalf) shall become party to the Applicable Intercreditor Agreement;

(vii)      the terms and conditions of such Permitted Debt Exchange Notes (excluding pricing and optional prepayment or redemption terms or covenants or other provisions applicable only to periods after the Maturity Date of the Class or Classes of Term Loans being exchanged) reflect market terms and conditions at the time of incurrence or issuance; provided that if such Permitted Debt Exchange Notes contain any financial maintenance covenants, such covenants shall not be more restrictive than (or in addition to) those contained in this Agreement (unless such covenants are also added for the benefit of the Lenders under this Agreement, in which case any requirement to so comply shall not require the consent of any Lender or Agent hereunder);

(viii)      all Term Loans exchanged under each applicable Class by the Borrower pursuant to any Permitted Debt Exchange shall automatically be cancelled and retired by the Borrower on date of the settlement thereof (and, if requested by the Administrative Agent, any applicable

exchanging Lender shall execute and deliver to the Administrative Agent an Assignment and Assumption, or such other form as may be reasonably requested by the Administrative Agent, in respect thereof pursuant to which the respective Lender assigns its interest in the Term Loans being exchanged pursuant to the Permitted Debt Exchange to the Borrower for immediate cancellation), and accrued and unpaid interest on such Term Loans shall be paid to the exchanging Lenders on the date of consummation of such Permitted Debt Exchange, or, if agreed to by the Borrower and the Administrative Agent, the next scheduled Interest Payment Date with respect to such Term Loans (with such interest accruing until the date of consummation of such Permitted Debt Exchange);

(ix)     if the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of a given Class tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof of the applicable Class actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of such Class offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans under the relevant Class tendered by such Lenders ratably up to such maximum based on the respective principal amounts so tendered, or, if such Permitted Debt Exchange Offer shall have been made with respect to multiple Classes without specifying a maximum aggregate principal amount offered to be exchanged for each Class, and the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of all Classes tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of all relevant Classes offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans across all Classes subject to such Permitted Debt Exchange Offer tendered by such Lenders ratably up to such maximum amount based on the respective principal amounts so tendered;

(x)     all documentation in respect of such Permitted Debt Exchange shall be consistent with the foregoing, and all written communications generally directed to the Lenders in connection therewith shall be in form and substance consistent with the foregoing and made in consultation with the Borrower and the Administrative Agent; and

(xi)     any applicable Minimum Tender Condition or Maximum Tender Condition, as the case may be, shall be satisfied or waived by the Borrower.

Notwithstanding anything to the contrary herein, no Lender shall have any obligation to agree to have any of its Loans or Term Commitments exchanged pursuant to any Permitted Debt Exchange Offer.

(2)     With respect to all Permitted Debt Exchanges effected by the Borrower pursuant to this Section 2.19, such Permitted Debt Exchange Offer shall be made for not less than $10,000,000 in aggregate principal amount of Term Loans, provided that subject to the foregoing the Borrower may at its election specify (A) as a condition (a "**Minimum Tender Condition**") to consummating any such Permitted Debt Exchange that a minimum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's discretion) of Term Loans of any or all applicable Classes be tendered and/or (B) as a condition (a "**Maximum Tender Condition**") to consummating any such Permitted Debt Exchange that no more than a maximum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's discretion) of Term Loans of any or all applicable Classes will be accepted for exchange. The Administrative Agent and the Lenders hereby acknowledge and agree that the provisions of Sections 2.05, 2.06, and 2.13 do not apply to the Permitted Debt Exchange and the other

119

transactions contemplated by this Section 2.19 and hereby agree not to assert any Default or Event of Default in connection with the implementation of any such Permitted Debt Exchange or any other transaction contemplated by this Section 2.19.

(3)     In connection with each Permitted Debt Exchange, the Borrower shall provide the Administrative Agent at least five (5) Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and the Borrower and the Administrative Agent, acting reasonably, shall mutually agree to such procedures as may be necessary or advisable to accomplish the purposes of this Section 2.19; provided that the terms of any Permitted Debt Exchange Offer shall provide that the date by which the relevant Lenders are required to indicate their election to participate in such Permitted Debt Exchange shall be not less than five (5) Business Days following the date on which the Permitted Debt Exchange Offer is made. The Borrower shall provide the final results of such Permitted Debt Exchange to the Administrative Agent no later than three (3) Business Days prior to the proposed date of effectiveness for such Permitted Debt Exchange (or such shorter period agreed to by the Administrative Agent in its sole discretion) and the Administrative Agent shall be entitled to conclusively rely on such results.

(4)     The Borrower shall be responsible for compliance with, and hereby agrees to comply with, all applicable securities and other laws in connection with each Permitted Debt Exchange, it being understood and agreed that (i) neither the Administrative Agent nor any Lender assumes any responsibility in connection with the Borrower's compliance with such laws in connection with any Permitted Debt Exchange and (ii) each Lender shall be solely responsible for its compliance with any applicable "insider trading" laws and regulations to which such Lender may be subject under the Exchange Act.

Section 2.20     Limitation on Refinancing.  Notwithstanding anything to the contrary herein, from and after the Closing Date, no Permitted Debt Exchange Notes, Refinancing Term Loan, Refinancing Loan, Extended Loan, Replacement Loan, Refinancing Indebtedness or other Indebtedness incurred pursuant to Section 7.02 to Refinance any Term Loans may be incurred unless such incurrence is approved by the Required Lenders and complies in all respect with Section 7.14.

## ARTICLE III

## Taxes, Increased Costs Protection and Illegality

Section 3.01     Taxes.

(1)     Except as required by applicable Law, any and all payments by any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes.

(2)     If any Loan Party or any other applicable withholding agent is required by applicable Law (as determined in the good faith discretion of such Loan Party or withholding agent) to make any deduction or withholding on account of any Taxes from any sum paid or payable by any Loan Party to any Lender or Agent under any of the Loan Documents:

(a)     the applicable Loan Party shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as such Loan Party becomes aware of it;

(b)     the applicable Loan Party or other applicable withholding agent shall be entitled to make such deduction or withholding and shall pay any amounts deducted or withheld to the relevant Governmental Authority any such Tax before the date on which penalties attach thereto, such payment

to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on the Lender or Agent) on behalf of and in the name of the Lender or Agent (as applicable);

(c)   if the Tax in question is a Non-Excluded Tax or Other Tax, the sum payable to such Lender or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding for Non-Excluded Taxes or Other Taxes (including any deductions or withholdings for Non-Excluded Taxes or Other Taxes attributable to any payments required to be made under this Section 3.01), such Lender or such Agent (as applicable) receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and

(d)   within thirty days after paying any sum from which it is required by Law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (b) above to pay, the Borrower shall deliver to the Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(3)   <u>Status of Lender.</u>  The Administrative Agent and each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of the Administrative Agent and such Lender, as applicable, to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to the Administrative Agent or such Lender under any Loan Document. In addition, Administrative Agent or any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not the Administrative Agent or such Lender is subject to backup withholding or information reporting requirements. Each such Lender or Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(3)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and Administrative Agent of its inability to do so.

Without limiting the foregoing:

(a)   Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(b)   Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(i)   two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(ii)     two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (A) two properly completed and duly signed certificates substantially in the form of Exhibit H (any such certificate, a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(iv)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed originals of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, Form W-8BEN or W-8BEN-E, as applicable, a United States Tax Compliance Certificate, Form W-9, Form W-8IMY and any other required information (or any successor forms) from each beneficial owner that would be required under this Section 3.01(3) if such beneficial owner were a Lender, as applicable (*provided* that if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such beneficial owner), or

(v)     two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding Tax on any payments to such Lender under the Loan Documents.

(c)     If a payment made to a Lender under any Loan Document would be subject to Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, the term "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(4)     In addition to the payments by a Loan Party required by Section 3.01(2), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law and as soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(5)     The Loan Parties shall, jointly and severally, indemnify a Lender or Agent (each a "**Tax Indemnitee**"), within 10 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee on or attributable to any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes

or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Administrative Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(6)     If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), then such Tax Indemnitee shall pay to the relevant Loan Party the amount of such refund, net of all out-of-pocket expenses of the Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee to the extent the Tax Indemnitee is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (6), in no event will the Tax Indemnitee be required to pay any amount to a Loan Party pursuant to this paragraph (6) the payment of which would place the Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(7)     The agreements in this Section 3.01 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

(8)     For purposes of this Section, the term "Applicable Law" includes FATCA.

Section 3.02     Illegality. If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on written notice thereof by such Lender to the Borrower through the Administrative Agent, (1) any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended, and (2) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be reasonably determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (a) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans and shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate) and (b) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar

Rate component of the Base Rate with respect to any Base Rate Loans, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03    Inability to Determine Rates. If the Required Lenders reasonably determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that

(1)    Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan,

(2)    adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan or in connection with an existing or proposed Base Rate Loan, or

(3)    the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan,

the Required Lenders will promptly notify the Administrative Agent and the Borrower, and upon receipt of such notice, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (i) the obligation of the Lenders to make or maintain Eurodollar Rate Loans, as the case may be, shall be suspended, and (ii) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loan.

(1)    Increased Costs Generally. If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(b)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes or Other Taxes covered by Section 3.01 and any Excluded Taxes); or

(c)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender that is not otherwise accounted for in the definition of "Eurodollar Rate" or this clause (c);

124

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan the interest on which is determined by reference to the Eurodollar Rate (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(1) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(2)     Capital Requirements. If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it, to a level below that which such Lender or such Lender's holding company, as the case may be, could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(2) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(3)     Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (1) or (2) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

Section 3.05     Funding Losses. Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits or margin) actually incurred by it as a result of:

(1)     any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(2)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurodollar Rate Loan on the date or in the amount notified by the Borrower; or

(3)     any assignment of a Eurodollar Rate Loan on a day prior to the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 3.07; including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or

125

reemployment of funds obtained by it to maintain such Eurodollar Rate Loan or from fees payable to terminate the deposits from which such funds were obtained.

Notwithstanding the foregoing, no Lender may make any demand under this Section 3.05 with respect to the "floor" specified in the proviso to the definition of "Eurodollar Rate".

Section 3.06    Matters Applicable to All Requests for Compensation.

(1)    Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

(2)    Suspension of Lender Obligations. If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurodollar Rate Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Eurodollar Rate Loans until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(3) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(3)    Conversion of Eurodollar Rate Loans. If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurodollar Rate Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders, as applicable, are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans to the extent necessary so that, after giving effect thereto, all Loans of a given Class held by the Lenders of such Class holding Eurodollar Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

(4)    Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of Sections 3.01 or 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of Section 3.01 or 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event giving rise to such claim and of such Lender's intention to claim compensation therefor (except that, if the circumstance giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.07    Replacement of Lenders under Certain Circumstances. If (1) any Lender requests compensation under Section 3.04 or ceases to make Eurodollar Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (2) the Borrower is required to pay any additional amount to any

Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or 3.04, (3) any Lender is a Non-Consenting Lender or Non-Extended Lender, (4) any Lender becomes a Defaulting Lender or (5) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent:

(a)    require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement (or, with respect to clause (3) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver, or amendment, as applicable) and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(i)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(iv);

(ii)    such Lender shall have received payment of an amount equal to the applicable outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05 and any Prepayment Premium, Make-whole Amount or other amounts due and payable pursuant to Section 2.18 that would otherwise be owed in connection therewith) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)    such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to all, or a portion, as applicable, of such Lender's Commitment and outstanding Loans and (ii) deliver any Term Notes evidencing such Loans to the Borrower (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Term Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Term Notes shall be deemed to be canceled upon such failure;

(iv)    the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans and Commitments, except with respect to indemnification and confidentiality provisions under this Agreement, which shall survive as to such assigning Lender;

(v)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(vi)    such assignment does not conflict with applicable Laws; and

(vii)    the Lender that acts as an Agent cannot be replaced in its capacity as such Agent other than in accordance with Section 9.11, or

(b)    terminate the Commitment of such Lender and in the case of a Lender, repay all Obligations of the Borrower owing to such Lender relating to the Loans held by such Lender as of such termination date (including any "prepayment premium" pursuant to Section 2.18 that would otherwise

be owed in connection therewith); *provided* that in the case of any such termination of the Commitment of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable consent, waiver or amendment of the Loan Documents and such termination shall, with respect to clause (3) above, be in respect of all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans/Commitments and (iii) the Required Lenders or Required Facility Lenders, as applicable, have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 3.08      Survival. All of the Borrower's obligations under this Article III shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

## ARTICLE IV

## Conditions Precedent to Term Borrowings

Section 4.01      Conditions to Term Borrowings on Closing Date. The obligation of each Lender to make the Closing Date Term Loans on the Closing Date is subject to satisfaction (or waiver by the Required Lenders) of the conditions set forth in Section 3 of the Second Amendment.

## ARTICLE V

## Representations and Warranties

The Borrower represents and warrants to the Agents and the Lenders, at the time of each Term Borrowing (solely to the extent required to be true and correct for such Term Borrowing pursuant to Article IV or Section 2.14, as applicable):

Section 5.01      Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each of its respective Restricted Subsidiaries that is a Material Subsidiary:

(1)      is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction),

(2)      has all corporate or other organizational power and authority to (a) own or lease its assets and carry on its business as currently conducted and (b) in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party,

(3)      is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business as currently conducted requires such qualification,

(4)      is in compliance with all applicable Laws, orders, writs, injunctions and orders and

(5)      has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted;

except in each case referred to in the preceding clauses (2)(a), (3), (4) or (5), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.02      Authorization; No Contravention.

(1)      The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.

(2)      None of the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party will:

(a)   contravene the terms of any of such Person's Organizational Documents;

(b)   result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 7.01) under (i) any Contractual Obligation in excess of the Threshold Amount to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan party or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject; or

(c)   violate any applicable Law;

except with respect to any breach, contravention or violation (but not creation of Liens) referred to in the preceding clauses (b) and (c), to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.03      Governmental Authorization.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for:

(1)      filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties,

(2)      the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and

(3)      those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.04      Binding Effect. This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party hereto or thereto, as applicable. Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05      Financial Statements; No Material Adverse Effect.

(1)      The (a) audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as of the fiscal year ended February 2, 2020, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the Borrower and its consolidated Subsidiaries for such fiscal year then ended, and (b) the unaudited quarterly balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries for the fiscal quarter ended October 31, 2020 (the "**Quarterly Financial Statements**"), in each case, fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the date(s) thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (i) except as otherwise expressly noted therein and (ii) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(2)      Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06      Litigation.  Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

Section 5.07      Labor Matters. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (1) there are no strikes or other labor disputes against the Borrower or the Restricted Subsidiaries pending or, to the knowledge of the Borrower, overtly threatened in writing and (2) hours worked by and payment made based on hours worked to employees of each of the Borrower or the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

Section 5.08      Real Property Matters.

(1)      Each Loan Party and each of its respective Restricted Subsidiaries has good and valid record title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property and Space Leased Property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(2)      As of the Closing Date, Schedule 5.08(2) annexed hereto contains a true, accurate and complete list of all Owned Real Property.

(3)      As of the Closing Date, Schedule 5.08(3) annexed hereto contains a true, accurate and complete list of all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting any Leased Real Property, including reasonable detail as to lease term, extension options, rental obligations and the counterparties. Except as specified in Schedule 5.08(3) annexed hereto, each agreement listed on Schedule 5.08(3) is in full force and effect and there is no default by any Loan Party or any Restricted Subsidiary thereunder. No Loan Party or any Restricted Subsidiary has knowledge of any default by any other party thereto that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(4)      As of the Closing Date, Schedule 5.08(4) annexed hereto contains a true, accurate and complete list of all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting any Space Leased Property, including reasonable detail as to lease term, extension options, rental obligations and the counterparties. Except as specified in Schedule 5.08(4) annexed hereto, each agreement listed on Schedule 5.08(4) is in full force and effect and there is no default by any Loan Party thereunder. No Loan Party or any Restricted Subsidiary has knowledge of any default by any other party thereto that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party or each applicable or any Restricted Subsidiary, enforceable against such Loan Party or Restricted Subsidiary in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(5)      As of the Closing Date, other than as set forth on Schedule 5.08(5) annexed hereto, there are no pending condemnation, zoning or other land use proceedings or special assessment proceedings with respect to any Real Property or the use thereof, and no Loan Party or Restricted Subsidiary has received written notice from any Governmental Authority threatening any such proceeding. No Loan Party or Restricted Subsidiary has entered into any agreements or commitments with Governmental Authorities that (i) materially affect the operations of or the entitlements applicable to such properties, (ii) require the owner of any such property to make improvements to such property or make dedications or off-site improvements for the benefit of adjoining properties, or (iii) make additional expenditures with respect to the operation of the Real Property.

(6)      Other than as forth on Schedule 5.08(6) annexed hereto, there is no construction or tenant improvement work currently underway at any Real Property or Space Leased Property having a total cost of more than $500,000.

(7)      Other than as forth on Schedule 5.08(7) annexed hereto, no Loan Party or Restricted Subsidiary has received written notice from any Governmental Authority asserting a violation of any Law with respect to any Real Property or Space Leased Property.

(8)      Other than as forth on Schedule 5.05(8) attached here, each Loan Party or Subsidiary that owns or leases any Real Property or Space Leased Property is current occupying and conducting business at such Real Property or Space Leased Property.

Section 5.09    Environmental Matters. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) each Loan Party and each of its Restricted Subsidiaries and their respective operations and properties is in compliance with all applicable Environmental Laws; (b) each Loan Party and each of its Restricted Subsidiaries has obtained and

maintained all Environmental Permits required to conduct their operations; (c) none of the Loan Parties or any of their respective Restricted Subsidiaries has become subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim in writing or Environmental Liability; and (d) none of the Loan Parties or any of their respective Restricted Subsidiaries or, to the knowledge of the Borrower, predecessors has treated, stored, transported or Released Hazardous Materials at or from any currently or formerly owned, leased or operated real estate or facility.

Section 5.10    Taxes. Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Loan Party and each of its Restricted Subsidiaries has timely filed all Tax returns and reports required to be filed, and have timely paid all Taxes (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets (whether or not shown in a Tax return), which are due and payable, except those Taxes which are being contested in good faith by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP.

There is no proposed Tax assessment, deficiency or other claim against any Loan Party or any of its Restricted Subsidiaries except (i) those being actively contested by a Loan Party or such Restricted Subsidiary in good faith and by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP or (ii) those which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 5.11    ERISA Compliance.

(1)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(2)    No ERISA Event has occurred or is reasonably expected to occur;

(a)    no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan;

(b)    none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan;

(c)    none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and

(d)    neither any Loan Party nor any ERISA Affiliate has been notified in writing by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent or has been determined to be in endangered or critical status and no such Multiemployer Plan is expected to be insolvent or in endangered or critical status,

except, with respect to each of the foregoing clauses of this Section 5.11(2), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(3)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, (a) each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules,

regulations and orders, and (b) none of Holdings, the Borrower or any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

Section 5.12    Subsidiaries.

(1)    As of the Closing Date, after giving effect to the Transactions all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable, and all Equity Interests owned by Holdings in the Borrower, and by the Borrower or any Subsidiary Guarantor in any of their respective Subsidiaries are owned free and clear of all Liens of any person except (a) those Liens created under the Collateral Documents, the "Collateral Documents" (as defined in the ABL Credit Agreement) and the "Collateral Documents" (as defined in the Second Lien Credit Agreement) and (b) any nonconsensual Lien that is permitted under Section 7.01.

(2)    As of the Closing Date, Schedule 5.12 sets forth:

(a)    the name and jurisdiction of each Subsidiary,

(b)    the ownership interests of Holdings in the Borrower and of the Borrower and any Subsidiary of the Borrower in each Subsidiary, including the percentage of such ownership, and

(c)    the Equity Interests of each Subsidiary described in clause (b) that are required to be pledged on the Closing Date after giving effect to the Transactions pursuant to the Collateral and Guarantee Requirement.

Section 5.13    Margin Regulations; Investment Company Act.

(a)    No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)    No Loan Party is an "investment company" under the Investment Company Act of 1940.

Section 5.14    Disclosure. None of the written information and written data heretofore or contemporaneously furnished in writing by or on behalf of the Borrower or any Subsidiary Guarantor to any Agent or any Lender on or prior to the Closing Date in connection with the Transactions, when taken as a whole, when furnished, contains any material misstatement of fact or omits to state any material fact necessary to make such written information and written data taken as a whole, in the light of the circumstances under which it was delivered, not materially misleading (after giving effect to all modifications and supplements to such written information and written data, in each case, furnished after the date on which such written information or such written data was originally delivered and prior to the Closing Date); it being understood that for purposes of this Section 5.14, such written information and written data shall not include any projections, *pro forma* financial information, financial estimates, forecasts and forward-looking information or information of a general economic or general industry nature.

Section 5.15    Intellectual Property; Licenses, etc.. The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, technology, software, know-how database rights and other intellectual property rights (collectively, "**IP Rights**") that to the knowledge of the Borrower are reasonably

necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any Subsidiary of the Borrower as currently conducted does not infringe upon, dilute, misappropriate or violate any IP Rights held by any Person except for such infringements, dilutions, misappropriations or violations, individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Subsidiary, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.16    Solvency. On the Closing Date after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act. To the extent applicable, Holdings, Borrower and the Restricted Subsidiaries are in compliance, in all material respects, with (i) the USA PATRIOT Act, (ii) the United States Foreign Corrupt Practices Act of 1977 (the "**FCPA**"), and (iii) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto. None of Holdings, Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer or employee of any of Holdings, the Borrower or any of the Restricted Subsidiaries, is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") ("**Sanctions**"). No proceeds of the Loans will be used by Holdings, the Borrower or any Restricted Subsidiary (a) directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business, or to obtain any improper advantage, in violation of the FCPA or (b) for the purpose of financing activities of or with any Person, that, at the time of such financing, is the subject of any Sanctions administered by OFAC.

Section 5.18    Collateral Documents. Except as otherwise contemplated hereby or under any other Loan Documents and subject to limitations set forth in the Collateral and Guarantee Requirement, the provisions of the Collateral Documents, together with such filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Collateral required to be delivered pursuant hereto or the applicable Collateral Documents), are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien (subject to Liens permitted by Section 7.01) with the priority set forth in the Applicable Intercreditor Agreement on all right, title and interest of the respective Loan Parties in the Collateral described therein.

Notwithstanding anything herein (including this Section 5.18) or in any other Loan Document to the contrary, no Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) any Excluded Assets.

Section 5.19    Use of Proceeds. The Borrower has used the proceeds of the Loans issued hereunder only in compliance with (and not in contravention of) each Loan Document.

Section 5.20    Beneficial Ownership Certification. As of the Closing Date, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

# ARTICLE VI

## Affirmative Covenants

From and after the Closing Date, so long as the Termination Conditions have not been satisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

Section 6.01    Financial Statements. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender each of the following:

(1)    as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or, with respect to the fiscal year of the Borrower ended January 30, 2021, one hundred and five (105) days after the end of such fiscal year), commencing with the fiscal year ending January 30, 2021, (I) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, together with related notes thereto and management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, setting forth in each case in comparative form the figures for the previous fiscal year, in reasonable detail and all prepared in accordance with GAAP, audited and accompanied by a report and opinion of any of the "big four" accounting firms or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Required Lenders, which report and opinion (a) will be prepared in accordance with generally accepted auditing standards and (b), other than with respect to the report and opinion for fiscal year ending January 30, 2021, will not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than such a qualification based solely on (i) an upcoming maturity of the Loans under this Agreement, the Second Lien Facility or the ABL Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant hereunder or under the ABL Credit Agreement) and (II) a report setting forth in reasonable detail the portion of revenues and gross margin for such fiscal year derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement);

(2)    as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower commencing with the fiscal quarter ending May 1, 2021, (I) a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (a) condensed consolidated statement of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (b) condensed consolidated statement of cash flows for the portion of the fiscal year then ended, setting forth, in each case of the preceding clauses (a) and (b), in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, accompanied by an Officer's Certificate stating that such financial statements fairly present in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes, together with management's discussion and analysis describing results of operations in the form customarily prepared by management

135

of the Borrower and (II) a report setting forth in reasonable detail the portion of revenues and gross margin for such fiscal quarter and the portion of the fiscal year then ended derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the corresponding fiscal quarter of the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement) and the corresponding portion of the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement);

(3)     within ninety (90) days after the end of each fiscal year of the Borrower (or 120 days after the end of the fiscal year during which the Closing Date occurs), (a) a consolidated budget for the following fiscal year on a quarterly basis as customarily prepared by management of the Borrower for its internal use (including any projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected operations or income, in each case, to the extent prepared by management of the Borrower and included in such consolidated budget) and (b) projections of the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, in each case, prepared on a quarterly basis, which projected financial statements shall be prepared in good faith on the basis of assumptions believed to be reasonable at the time of preparation of such projected financial statements (it being understood by the Secured Parties that any such projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and the Investors and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material);

(4)     simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(1) and 6.01(2), the related unaudited (it being understood that such information may be audited at the option of the Borrower) consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; and

Notwithstanding the foregoing, the obligations referred to in Sections 6.01(1) and 6.01(2) may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any Parent Company or (B) the Borrower's or such Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC (and the public filing of such report with the SEC shall constitute delivery under this Section 6.01); *provided* that with respect to each of the preceding clauses (A) and (B), (1) to the extent such information relates to a parent of the Borrower, if and so long as such Parent Company will have Independent Assets or Operations, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such Parent Company and its Independent Assets or Operations, on the one hand, and the information relating to the Borrower and the consolidated Restricted Subsidiaries on a stand-alone basis, on the other hand and (2) to the extent such information is in lieu of information required to be provided under Section 6.01(1) (it being understood that such information may be audited at the option of the Borrower), such materials are accompanied by a report and opinion of PricewaterhouseCoopers, LLP, KPMG LLP or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Required Lenders, which report and opinion (x) shall be prepared in accordance with generally accepted auditing standards and (y) shall not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than such a qualification based solely on (i) an upcoming maturity of the Loans under this Agreement, the Second Lien Facility or the ABL Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant hereunder).

Any financial statements required to be delivered pursuant to Sections 6.01(1) or 6.01(2) shall not be required to contain all purchase accounting adjustments relating to the Transactions or any other transaction(s) permitted hereunder to the extent it is not practicable to include any such adjustments in such financial statements.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP, or the respective interpretation thereof, and that such restatements will not result in a Default or an Event of Default under the Credit Documents.

Section 6.02    Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender:

(1)    no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(1) and (2), a duly completed Compliance Certificate signed by a Financial Officer of the Borrower;

(2)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(3)    promptly after the furnishing thereof, copies of any notices of default to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the Second Lien Facility and/or the ABL Facility, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount (in each case, other than in connection with any board observer rights) and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(4)    together with the delivery of the Compliance Certificate with respect to the financial statements referred to in Section 6.01(1), (a) a report setting forth the information required by Sections 1(a), (e) and (f) and Section 11 of the Perfection Certificate (or confirming that there has been no change in such information since the latter of the Closing Date or the last such report) and (b) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such list or a confirmation that there is no change in such information since the later of the Closing Date and the last such list;

(5)    commencing with the end of the first fiscal quarter ending after the Closing Date, concurrently with the delivery of the Compliance Certificate for each fiscal quarter, a certificate of a Responsible Officer stating the Average Liquidity in respect of such fiscal quarter, and setting forth computations in reasonable detail demonstrating compliance with the minimum average liquidity covenant under Section 7.12; and

(6)    promptly, such additional information regarding the business and financial affairs of any Loan Party or any Material Subsidiary that is a Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request in writing from time to time.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02(2) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's (or any Parent Company's) website on the Internet at the website address listed on Schedule 10.02 hereto (or as such address may be updated from time to time in accordance with Section 10.02); or (b) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (i) upon written request by the Administrative Agent, the Borrower will deliver paper copies of such documents to the Administrative Agent for further distribution by the Administrative Agent to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents or link and, upon the Administrative Agent's request, provide to the Administrative Agent by electronic mail electronic versions (i.e., pdf copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available to the Lenders materials or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks, DebtDomain, SyndTrak, ClearPar or another similar electronic system chosen by the Administrative Agent to be its electronic transmission system (the "**Platform**") and (b) certain of the Lenders may have personnel who do not wish to receive any information with respect to the Borrower, its Subsidiaries or their respective securities that is not Public-Side Information, and who may be engaged in investment and other market-related activities with respect to such Person's securities. The Borrower hereby agrees that (i) at the Administrative Agent's request, all Borrower Materials that are to be made available to Public Lenders will be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" will appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower will be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public-Side Information (*provided, however,* that to the extent such Borrower Materials constitute Information, they will be treated as set forth in Section 10.09); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information"; and (iv) the Administrative Agent will treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated as "Public Side Information." Notwithstanding the foregoing, (x) the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC" and (y) the following Communications shall be deemed "PUBLIC," unless the Borrower notifies the Administrative Agent promptly in writing that any such document contains material non-public information: (1) the Loan Documents, and (2) notification of changes in the terms of the Loans.

Anything to the contrary notwithstanding, nothing in this Agreement will require Holdings, the Borrower or any Subsidiary to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.03      Notices. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent of:

(1)      the occurrence of any Default; and

(2)      (a) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (b) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or its Subsidiary, or (c) the occurrence of any ERISA Event that, in any such case referred to in clauses (a), (b) or (c) of this Section 6.03(2), has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (a) that such notice is being delivered pursuant to Section 6.03(1) or (2) (as applicable) and (b) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04      Payment of Obligations. Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (1) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (2) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 6.05      Preservation of Existence, etc..

(1)      Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(2)      take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, and IP Rights material to the conduct of its business,

except in the case of clauses (1) or (2) of this Section 6.05 to the extent (other than with respect to the preservation of the existence of the Borrower set forth in clause (1)) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or disposition permitted by Article VII.

Section 6.06      Maintenance of Properties. Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in reasonably good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

Section 6.07      Maintenance of Insurance.

(1)      Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed or with a Captive Insurance Subsidiary, insurance with respect to the Borrower's and the Restricted Subsidiaries' properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Collateral Agent or the Required Lenders, information presented in reasonable detail as to the insurance so carried; *provided* that notwithstanding the foregoing, in no event will the Borrower or any Restricted Subsidiary be required to obtain or maintain insurance that is more restrictive than what is consistent with past practice. Each such policy of insurance will as appropriate, (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear or (ii) in the case of each

139

casualty insurance policy, contain an additional loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the additional loss payee thereunder; *provided* that to the extent that the requirements of this Section 6.07 are not satisfied on the Closing Date, the Borrower may satisfy such requirements within ninety (90) days of the Closing Date (or such later date as the Required Lenders may agree).

(2)     If any improved portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws (each, a "**Flood Hazard Property**"), then the Borrower will, or will cause each Loan Party to (a) maintain, or cause to be maintained, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (b) deliver to the Collateral Agent (A) evidence as to whether the community in which such Mortgaged Property is located is participating in the National Flood Insurance Program, (B) the Borrower's written acknowledgment as to the fact that such Mortgaged Property is a Flood Hazard Property and as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (C) copies of an application for a flood insurance policy plus proof of premium payment, a declaration page confirming that such flood insurance has been issued, or such other evidence of such flood insurance reasonably satisfactory to the Collateral Agent and the Required Lenders and naming the Collateral Agent as mortgagee and loss payee (the requirements of clauses (a) and (b) being the "**Flood Insurance Requirements**").

Section 6.08     <u>Compliance with Laws</u>. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property (including ERISA, the USA PATRIOT Act, Sanctions, OFAC and FCPA), except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

Section 6.09     <u>Books and Records</u>. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.10     <u>Inspection Rights</u>. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public

accountants. For the avoidance of doubt, this Section 6.10 is subject to the last paragraph of Section 6.02. In no event shall the Administrative Agent be required to bear any cost or expense hereunder.

Section 6.11     Covenant to Guarantee Obligations and Give Security. At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent, the Collateral Agent or the Required Lenders to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(1)       (x) upon (i) the formation or acquisition of any new direct or indirect Material Domestic Subsidiary (other than any Excluded Subsidiary) by any Loan Party, (ii) the designation of any existing direct or indirect Material Domestic Subsidiary (other than any Excluded Subsidiary) as a Restricted Subsidiary, (iii) any Subsidiary (other than any Excluded Subsidiary) becoming a Material Domestic Subsidiary or (iv) an Excluded Subsidiary that is a Material Domestic Subsidiary ceasing to be an Excluded Subsidiary but continuing as a Restricted Subsidiary of the Borrower, (y) upon the acquisition of any assets by the Borrower or any Subsidiary Guarantor or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(a)   within sixty (60) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Required Lenders may agree in their reasonable discretion cause such Material Domestic Subsidiary required to become a Guarantor under the Collateral and Guarantee Requirement to execute the Guaranty (or a joinder thereto) and other documentation the Collateral Agent or the Required Lenders may reasonably request from time to time in order to carry out more effectively the purposes of the Guaranty and the Collateral Documents and

(A)     within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Subsidiary Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent supplements to the Security Agreement, a counterpart signature page to the Intercompany Subordination Agreement, Intellectual Property Security Agreements and other security agreements and documents necessary to satisfy the Collateral and Guarantee Requirement, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting and perfecting Liens required by the Collateral and Guarantee Requirement;

(B)     within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and a joinder to the Intercompany Subordination Agreement substantially in the form of Annex I thereto with respect to the intercompany Indebtedness held by such Material Domestic Subsidiary;

(C)     within sixty (60) days) after such formation, acquisition or designation, take and cause (i) the applicable Material Domestic Subsidiary that is required to become

141

a Guarantor pursuant to the Collateral and Guarantee Requirement and (ii) to the extent applicable, each direct or indirect parent of such applicable Material Domestic Subsidiary, in each case, to take customary action(s) (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be necessary in the reasonable opinion of the Collateral Agent or the Required Lenders to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected (subject to Liens permitted by Section 7.01) Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law); and

(D)     within sixty (60) days) after the reasonable request therefor by the Collateral Agent (or such longer period as the Required Lenders may agree in their reasonable discretion), deliver to the Administrative Agent a signed copy of a customary Opinion of Counsel, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Collateral Agent as to such matters set forth in this Section 6.11(1) as the Collateral Agent or the Required Lenders may reasonably request (with such opinion being consistent with the Opinion of Counsel delivered to the Collateral Agent on the Closing Date);

*provided* that actions relating to Liens on Real Property are governed by Section 6.11(2) and not this Section 6.11(1).

(2)     Real Property.

(a)     Notice.

(i)     Within sixty (60) days (or such longer period as the Required Lenders may agree in their reasonable discretion), after the formation, acquisition or designation of a Material Domestic Subsidiary that is required to become a Subsidiary Guarantor under the Collateral and Guarantee Requirement, the Borrower will, or will cause such Material Domestic Subsidiary to, furnish to the Collateral Agent a description of any Real Property owned or leased by such Material Domestic Subsidiary.

(ii)     Within sixty (60) days (or such longer period as the Required Lenders may agree in their reasonable discretion), after the acquisition of any Owned Real Property or Leased Real Property (other than any Excluded Asset(s)) by a Loan Party (other than Holdings), after the Closing Date, the Borrower will, or will cause such Loan Party to, furnish to the Collateral Agent a description of any such Owned Real Property or Leased Real Property.

(b)     Mortgages. The Borrower will, or will cause the applicable Loan Party to, provide the Collateral Agent with a Mortgage with respect to any Real Property acquired after the Closing Date, that is the subject of a notice delivered pursuant to Section 6.11(2)(a), within ninety (90) days of the acquisition, formation or designation of such Material Domestic Subsidiary or the acquisition of such Real Property (or such longer period as the Required Lenders may agree in their reasonable discretion), together with:

(i)     evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Collateral Agent or the Required Lenders may deem reasonably necessary or

desirable in order to create, except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, a valid and subsisting perfected Lien on such Real Property, in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Collateral Agent;

(ii)     In the case of a Leased Real Property, to the extent required by the terms of the Lease as a condition to any new Mortgage, Borrower shall use commercially reasonable efforts to obtain a Landlord Consent and Estoppel (for the avoidance of doubt, no Landlord Consent and Estoppel will be required for any Existing Mortgage, unless the terms of the applicable lease require the consent of the landlord or lessor with respect to the proposed Mortgage Amendment), unless otherwise waived by the Required Lenders in their reasonable discretion, such waiver not to be unreasonably withheld; provided that Collateral Agent shall, at the Borrower's expense and the Borrower's reasonable request, and if required by such lessor in order to obtain a Landlord Consent and Estoppel, deliver to such lessor a Recognition Agreement. Notwithstanding the foregoing, where the consent or other affirmative action of the applicable landlord is required for Borrower or the applicable Subsidiary to deliver the Landlord Consent and Estoppel, and such consent cannot be obtained after the Borrower or the applicable Subsidiary's use of commercially reasonable efforts to do so (which commercially reasonable efforts, for the avoidance of doubt, shall not require the Borrower or applicable Subsidiary to amend or otherwise modify any of the existing terms or conditions of any agreement with any landlord or pay additional economics to any landlord), the delivery of the Landlord Consent and Estoppel by the Borrower shall automatically be deemed waived hereunder for such Leased Real Property, provided that Borrower shall provide Collateral Agent with notice within five (5) business days of Borrower's determination that a Landlord Consent and Estoppel cannot be obtained, as well as a reasonably detailed description of Borrower's efforts to obtain the Landlord Consent and Estoppel;

(iii)     fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in each applicable jurisdiction (the "**Mortgage Policies**") in form and substance, with endorsements, including zoning endorsements, available in the applicable jurisdiction and in amounts, reasonably acceptable to the Required Lenders (not to exceed the fair market value of the real properties or ground leasehold interests covered thereby), issued, coinsured and reinsured (as applicable) by title insurers reasonably acceptable to the Required Lenders, insuring the Mortgages to be valid subsisting Liens on the property or ground leasehold interests described therein, subject only to Liens permitted by Section 7.01 or such other Liens that do not have a material adverse impact on the use or value of the Mortgaged Properties, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Required Lenders may reasonably request and is available in the applicable jurisdiction and with respect to any property located in a state in which a zoning endorsement is not available, a zoning compliance letter from the applicable municipality or a zoning report from Planning and Zoning Resources Corporation (or other similar company reasonably acceptable to the Required Lenders), in each case to be reasonably satisfactory to the Required Lenders;

(iv)     customary Opinions of Counsel for the applicable Loan Parties in states in which such Real Properties are located with respect to the enforceability and perfection of the Mortgage(s) or the Mortgage Amendments, as applicable, and any related fixture filings, the authorization, execution and delivery of the Mortgages or the Mortgage Amendments, as applicable, and such other matters as the Collateral Agent or the Required Lenders may reasonably request, in form and substance reasonably satisfactory to the Collateral Agent;

(v)     American Land Title/American Congress on Surveying and Mapping surveys for each Real Property, or existing surveys together with customary no change affidavits, in each case certified to the Collateral Agent if deemed necessary by Collateral Agent or the Required Lenders in their reasonable discretion, sufficient for the title insurance company issuing a Mortgage Policy or any title date-down or modification endorsement with respect to the Existing Mortgages to remove the standard survey exception and issue standard survey related endorsements;

(vi)     a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Real Property, containing improved land addressed to the Collateral Agent and otherwise in compliance with the Flood Insurance Laws, and if any such Real Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, the Borrower's duly executed acknowledgement of special flood hazard area status and flood disaster assistance and evidence of compliance with the Flood Insurance Requirements; and

(vii)     as promptly as practicable after the reasonable request therefor by the Collateral Agent or the Required Lenders, environmental assessment reports and reliance letters (if any) that have been prepared in connection with such acquisition, designation or formation of any Material Domestic Subsidiary or acquisition of any Real Property, or in connection with the Real Property subject to the Mortgage.

(3)     <u>Additional Deposit Account Control Agreements</u>. Following the termination of the ABL Facility and the ABL Intercreditor Agreement, the Borrower shall enter into, within 90 days after the establishment of any new deposit accounts that would be or could be required to be subject to an account control agreement pursuant to the terms of the ABL Credit Agreement if it were not terminated (which, for the avoidance of doubt, shall not include any Excluded Account, deposit account control agreements with each account bank in respect of such deposit accounts in form and substance reasonably satisfactory to the Collateral Agent.

Section 6.12     <u>Compliance with Environmental Laws</u>.

(1)     Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (1) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits (including any cleanup, removal or remedial obligations) and (2) obtain and renew all Environmental Permits required to conduct its operations or in connection with its properties.

(2)     The Borrower will, or will cause the applicable Loan Party to, deliver to the Collateral Agent:

(a)     As soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Borrower or any Loan Party or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Real Property which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or with respect to any Environmental Claims which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(b)     Promptly upon the occurrence thereof, written notice describing in reasonable detail (a) any Release required to be reported to any federal, state or local governmental or regulatory

agency under any applicable Environmental Laws, and (b) any remedial action taken by Borrower or any Loan Party or any other Person in response to (1) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(c)   As soon as practicable following the sending or receipt thereof by Borrower or any Loan Party, a copy of any and all written communications with respect to (a) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (b) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (c) any request for information from any governmental agency that suggests such agency is investigating whether Borrower or any Loan Party may be potentially responsible for any Hazardous Materials Activity.

(d)   Prompt written notice describing in reasonable detail (a) any proposed acquisition of stock, assets, or property by Borrower or any Loan Party that could reasonably be expected to (1) expose Borrower or any Loan Party to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (2) affect the ability of Borrower or any Loan Party to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (b) any proposed action to be taken by Borrower or any Loan Party to commence manufacturing or other industrial operations or to modify current operations in a manner that could reasonably be expected to subject Borrower or any Loan Party to any material additional obligations or requirements under any Environmental Laws that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)   With reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent or the Required Lenders in relation to any matters disclosed pursuant to this subsection 6.12.

(3)   The Borrower will, or will cause the applicable Loan Party to:

(a)   Promptly undertake, and shall cause each of its Subsidiaries promptly to undertake, any and all investigations, studies, sampling, testing, abatement, cleanup, removal, remediation or other response actions necessary to remove, remediate, clean up or abate any Hazardous Materials Activity on, under or about any Real Property that is in violation of any Environmental Laws or that presents a material risk of giving rise to an Environmental Claim.  In the event by Borrower or any Loan Party undertakes any such action with respect to any Hazardous Materials, by Borrower or such Loan Party shall conduct and complete such action in compliance with all applicable Environmental Laws and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, Borrower's or such Loan Party's liability with respect to such Hazardous Materials Activity is being contested in good faith by Borrower or such Loan Party.

(b)   Promptly take any and all actions necessary to (1) cure any material violation of applicable Environmental Laws by Borrower or any Loan Party that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (2) make an appropriate response to any Environmental Claim against Borrower or any Loan Party and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.13    Further Assurances and Post-Closing Covenant.

(1)    Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Borrower, promptly upon reasonable request from time to time by the Administrative Agent, the Collateral Agent or the Required Lenders or as may be required by applicable Laws (a) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, the Collateral Agent or the Required Lenders may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents and to satisfy the Collateral and Guarantee Requirement.

(2)    As promptly as practicable, and in any event no later than (x) sixty (60) days after the Closing Date with respect to any Owned Real Property that is not an Existing Mortgaged Property and (y) ninety (90) days after the Closing Date with respect to any Leased Real Property that is not an Existing Mortgaged Property (other than Existing Mortgaged Properties where the Administrative Agent or the Required Lenders have requested that a new Mortgage be executed), or, in each case, such later date as the Required Lenders reasonably agree to in writing, including to reasonably accommodate circumstances unforeseen on the Closing Date, deliver the documents or take the actions required pursuant to sub clauses (i) through (vii) of Section 6.11(2)(b) hereof, except to the extent otherwise agreed by the Required Lenders.

Section 6.14    Use of Proceeds.  The proceeds of the New Money First-Out Loans will be used on the Closing Date (a) to pay the Transaction Expenses, (b) to pay accrued and unpaid interest and amortization payments in respect of the Prepetition First Lien Term Loans and Prepetition Second Lien Term Loans that are converted into (and deemed prepaid by) the Closing Date Term Loans on the Closing Date and (c) for general corporate purposes not prohibited by the terms of this Agreement, including repayment of borrowings under the ABL Facility.

Section 6.15    Maintenance of Ratings. Use commercially reasonable efforts to maintain (1) a public corporate credit rating (but not any specific rating) from S&P and a public corporate family rating (but not any specific rating) from Moody's, in each case in respect of the Borrower, and (2) a public rating (but not any specific rating) in respect of each Term Facility as of the Closing Date from each of S&P and Moody's.

Section 6.16    Accounting Changes.  The Borrower shall, and shall cause its Restricted Subsidiaries to, maintain their fiscal year as in effect on the Closing Date; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.17    Nature of Business.  The Borrower shall and shall cause its Restricted Subsidiaries to, engage in material line of business substantially the same as those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business(es) or any other activities that are reasonably similar, ancillary, incidental, complimentary or related to, or a reasonable extension, development or expansion of, the business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries on the Closing Date.

Section 6.18     Designation of Subsidiaries.  On and after the Closing Date, the Borrower shall not designate any Restricted Subsidiaries as Unrestricted Subsidiaries or any Unrestricted Subsidiaries as Restricted Subsidiaries.

Section 6.19     Lender Meetings.  On a quarterly basis, at a time mutually agreed with the Administrative Agent that is promptly after the delivery of the information required pursuant to Section 6.01(1) and Section 6.01(2) (but no earlier than five (5) Business Days following the delivery of such financial statements), the Borrower (including, without limitation, the chief executive officer and chief financial officer of the Borrower) shall and shall cause its Restricted Subsidiaries to participate in a conference call with Lenders to discuss the financial position and results of operations of the Borrower and its Subsidiaries for the most recently ended period for which financial statements have been delivered.

## ARTICLE VII

## Negative Covenants

From and after the Closing Date and so long as the Termination Conditions are not satisfied:

Section 7.01     Liens. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien (except any Permitted Lien(s)) that secures obligations under any Indebtedness or any related guarantee of Indebtedness on any asset or property of the Borrower or any Restricted Subsidiary, or any income or profits therefrom.

The expansion of Liens by virtue of accretion or amortization of original issue discount, the payment of dividends in the form of Indebtedness, and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 7.01.

Section 7.02     Indebtedness.

(a)     The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(i)     create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "**incur**" and collectively, an "**incurrence**") with respect to any Indebtedness (including Acquired Indebtedness), or

(ii)     issue any shares of Disqualified Stock or permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; and

(b)     the foregoing clause (a) shall not apply to the following:

(1)     Indebtedness of the Borrower and of its Restricted Subsidiaries under the Loan Documents (including Refinancing Loans, Extended Loans and Replacement Loans);

(2)     Indebtedness incurred pursuant to the Second Lien Facility in an aggregate principal amount not to exceed the sum of (w) $110.0 million  plus (x~~x~~) $125.0 million  plus interest with respect thereto that is paid in-kind by increasing the outstanding principal amount thereof plus (y) other Second Lien Obligations not constituting principal and, in each case, together with any Refinancing Indebtedness in respect thereof;

147

(3)        the incurrence of Indebtedness by the Borrower and any Restricted Subsidiary in existence on the Closing Date listed on Schedule 7.02(3) (excluding Indebtedness described in the preceding clauses (1) and (2) and clause (25) below);

(4)        (a) the incurrence of Attributable Indebtedness and (b) Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock incurred or issued by the Borrower or any Restricted Subsidiary and Preferred Stock issued by any Restricted Subsidiary, to finance the purchase, lease, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or other assets, including assets that are used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate principal amount, together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts) and all other Indebtedness, Disqualified Stock or Preferred Stock incurred or issued and outstanding under this clause (4), without regard to any Indebtedness listed on Schedule 7.02(3), at such time not to exceed (x) the greater of $50.0 million and 10.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto and (y) the aggregate principal amount of Attributable Indebtedness and Indebtedness described in clause (b) above, in each case outstanding on the Closing Date and any Refinancing Indebtedness of the Indebtedness referred to in this clause (4) thereof;

(5)        Indebtedness incurred by the Borrower or any Restricted Subsidiary (a) constituting reimbursement obligations with respect to letters of credit, bank guarantees, banker's acceptances, warehouse receipts, or similar instruments issued or entered into, or relating to obligations or liabilities incurred, in the ordinary course of business or consistent with industry practice, including in respect of workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or (b) as an account party in respect of letters of credit, bank guarantees or similar instruments in favor of suppliers, trade creditors or other Persons issued or incurred in the ordinary course of business or consistent with industry practice;

(6)        [reserved];

(7)        the incurrence of Indebtedness of the Borrower to a Subsidiary Guarantor (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Subsidiary Guarantor); *provided* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Subsidiary Guarantor ceasing to be a Subsidiary Guarantor or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Subsidiary Guarantor or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (7);

(8)        the incurrence of Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Restricted Subsidiary) to the extent permitted by Section 7.05; *provided* that any such Indebtedness for borrowed money incurred by a Guarantor and owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Guaranty of the Loans of such Guarantor to the extent permitted by applicable law; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any such subsequent transfer of any such Indebtedness (except to the Borrower or a Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case,

148

to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (8);

(9)        [reserved];

(10)      the incurrence of Hedging Obligations in the ordinary course of business (excluding Hedging Obligations entered into for speculative purposes);

(11)      the incurrence of Indebtedness in respect of self-insurance and Indebtedness in respect of performance, bid, appeal and surety bonds and performance, banker's acceptance facilities and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary or Indebtedness in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with industry practice, including those incurred to secure health, safety and environmental obligations;

(12)      the incurrence of:

(a)    [reserved]

(b)    Indebtedness or Disqualified Stock of the Borrower and Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or any Subsidiary Guarantor in an aggregate principal amount or liquidation preference that, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred or issued, as applicable, pursuant to this clause (12)(b), together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts), does not exceed (i) $50.0 million *plus*, without duplication, (ii) in the event of any extension, replacement, refinancing, renewal or defeasance of any such Indebtedness or Disqualified Stock, an amount equal to the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness or Disqualified Stock and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness or the extension, replacement, refunding, refinancing, renewal or defeasance of such Indebtedness or Disqualified Stock;

(13)      the incurrence by the Borrower of Indebtedness or Disqualified Stock or the incurrence by a Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock that serves to Refinance any Indebtedness permitted under clause and(3) above, this clause (13) and clauses (23), (29) and (30), or any successive Refinancing Indebtedness with respect to any of the foregoing;

(14)      [reserved];

(15)      the incurrence of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with industry practice;

(16)      the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary supported by letters of credit or bank guarantees permitted hereunder, in each case, in a principal amount not in excess of the stated amount of such letters of credit or bank guarantees;

(17)      (a) the incurrence of any guarantee by the Borrower or a Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations incurred by the Borrower or such Restricted Subsidiary is permitted by this Agreement, or (b) any co-issuance by the Borrower or any Restricted Subsidiary of any Indebtedness

or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations by the Borrower or such Restricted Subsidiary was permitted hereunder; provided that the incurrence of any such guarantee or co-issuance by a Loan Party of Indebtedness or other obligations of any Non-Loan Party shall be deemed to be an Investment made under the final proviso to clause (13) of the definition of "Permitted Investments" and shall be permitted to be incurred only to the extent of available capacity under such proviso at the time of such incurrence or co-issuance;

(18)    the incurrence of Indebtedness issued by the Borrower or any Restricted Subsidiary to future, present or former employees, directors, officers, members of management and consultants thereof, their respective Controlled Investment Affiliates or Immediate Family Members and permitted transferees thereof, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Company to the extent described in Section 7.05(b)(4);

(19)    customer deposits and advance payments received in the ordinary course of business or consistent with industry practice from customers for goods and services purchased in the ordinary course of business or consistent with industry practice;

(20)    the incurrence of (a) Indebtedness owed to banks and other financial institutions incurred in the ordinary course of business or consistent with industry practice in connection with ordinary banking arrangements to manage cash balances of the Borrower and its Restricted Subsidiaries and (b) Indebtedness in respect of Cash Management Services, including Cash Management Obligations;

(21)    Indebtedness incurred by the Borrower or any Restricted Subsidiary in connection with bankers' acceptances or discounted bills of exchange, in each case incurred or undertaken in the ordinary course of business or consistent with industry practice on arm's-length commercial terms;

(22)    the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business or consistent with industry practice;

(23)    the incurrence of Indebtedness or Disqualified Stock by Restricted Subsidiaries of the Borrower that are not Guarantors in an amount not to exceed and together with any other Indebtedness and Disqualified Stock incurred and outstanding under this clause (23) and any outstanding Indebtedness or Disqualified Stock under clause (13) to Refinance Indebtedness initially incurred in reliance on this clause (23) (excluding any Incremental Amounts) $15.0 million;

(24)    the incurrence of Indebtedness by the Borrower or any Restricted Subsidiary undertaken in connection with cash management (including netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and related or similar services or activities) with respect to the Borrower, any Subsidiaries or any joint venture in the ordinary course of business or consistent with industry practice, including with respect to financial accommodations of the type described in the definition of Cash Management Services;

(25)    Indebtedness incurred pursuant to the ABL Facility in an aggregate principal amount not to exceed the sum of (x) the greater of $900.0 million and the Borrowing Base (as defined in the ABL Facility in effect on the date hereof) plus (y) Incremental Revolving Credit Loans (as defined in the ABL Facility in effect on the date hereof) plus other ABL Obligations in effect on the date hereof not constituting principal and, in each case, together with any Refinancing Indebtedness in respect thereof; *provided* that the Indebtedness under this clause (25) shall not be permitted to contain or include any "last out" or similar tranche or facility nor shall it be permitted to include any term loan or similar Indebtedness;

150

(26)     guarantees incurred in the ordinary course of business or consistent with industry practice in respect of obligations to suppliers, customers, franchisees, lessors, licensees, sub-licensees and distribution partners;

(27)     the incurrence of Indebtedness attributable to (but not incurred to finance) the exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) with respect to the Transactions or any other acquisition (by merger, consolidation or amalgamation or otherwise) in accordance with the terms hereof;

(28)     the incurrence of Indebtedness representing deferred compensation to employees of any Parent Company, the Borrower or any Restricted Subsidiary, including Indebtedness consisting of obligations under deferred compensation or any other similar arrangements incurred in connection with the Transactions, any investment or any acquisition (by merger, consolidation or amalgamation or otherwise) permitted under this Agreement;

(29)     the incurrence of Indebtedness arising out of any Specified Sale-Leaseback Transaction to the extent such Indebtedness is not incurred in contemplation of such Specified Sale-Leaseback Transaction;

(30)     Permitted Debt Exchange Notes;

(31)     [reserved]; and

(32)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (1) through (31) above.

(c)     For purposes of determining compliance with this Section 7.02:

(1)     [reserved];

(2)     the Borrower is entitled to divide and classify (but, not, for the avoidance of doubt, reclassify) an item of Indebtedness, Disqualified Stock or Preferred Stock in more than one of the types of Indebtedness, Disqualified Stock or Preferred Stock described in Section 7.02(b), *provided* that all Indebtedness incurred under the Loan Documents, the Second Lien Facility and the ABL Facility, and in each case, all Refinancing Indebtedness in respect thereof, will, at all times, be treated as incurred under Section 7.02(b)(1), (2) and (25), respectively;

(3)     the principal amount of Indebtedness outstanding under any clause of this Section 7.02 will be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness;

(4)     [reserved]; and

(5)     guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that are otherwise included in the determination of a particular amount of Indebtedness will not be included in the determination of such amount of Indebtedness; *provided* that the incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was incurred in compliance with this Section 7.02.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock and increases in the amount of Indebtedness outstanding solely as a

result of fluctuations in the exchange rate of currencies, in each case, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 7.02. Any Indebtedness incurred to refinance Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to clauses (2), (3), (4), (12), (13), (23) and (25) of Section 7.02(b) will be permitted to include additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay accrued but unpaid interest and dividends and premiums, defeasance costs and fees and expenses incurred in connection with such refinancing.

For purposes of determining compliance with any Dollar denominated restriction on the incurrence of Indebtedness or issuance of Disqualified Stock or Preferred Stock, the Dollar equivalent principal amount of Indebtedness or Disqualified Stock or Preferred Stock denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness, Disqualified Stock or Preferred Stock was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness, Disqualified Stock or Preferred Stock is issued to Refinance other Indebtedness, Disqualified Stock or Preferred Stock denominated in a foreign currency, and such refinancing would cause the applicable Dollar denominated (or the applicable growth component with respect to such Basket, if greater) restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar denominated restriction will be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness, Disqualified Stock or Preferred Stock does not exceed (i) the principal amount of such Indebtedness, Disqualified Stock or Preferred Stock (as applicable) being refinanced *plus* (ii) the aggregate amount of accrued but unpaid interest, fees, underwriting discounts, defeasance costs, premiums (including tender premiums) and other costs and expenses (including OID, upfront fees or similar fees) incurred in connection with such refinancing.

The principal amount of any Indebtedness, Disqualified Stock or Preferred Stock incurred to refinance other Indebtedness, Disqualified Stock or Preferred Stock, if incurred in a different currency from the Indebtedness, Disqualified Stock or Preferred Stock, as applicable, being refinanced, will be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness or Disqualified Stock or Preferred Stock is denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date will be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.02, if any Indebtedness is refinanced in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Indebtedness does not exceed the sum of (i) the principal amount of such Indebtedness being refinanced, *plus* (ii) the related costs incurred or payable in connection with such refinancing.

Section 7.03   <u>Fundamental Changes</u>. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consolidate, amalgamate or merge with or into or wind up into another Person, or liquidate or dissolve or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), including by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division" under the Delaware Limited Liability Company Act, except that:

(1)     Subject to Section 3.03(a) of the Security Agreement, Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that

(a)   the Borrower shall be the continuing or surviving Person,

(b)   such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and

(c)   in the case of a merger or consolidation of Holdings with and into the Borrower,

(i)     Holdings shall not be an obligor in respect of any Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement,

(ii)    Holdings shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower,

(iii)   no Default or Event of Default exists at such time or after giving effect to such transaction and

(iv)   after giving effect to such transaction, the direct parent of the Borrower will (A) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower, (B) pledge 100% of the Equity Interests of the Borrower to the Collateral Agent as Collateral to secure the Obligations in form reasonably satisfactory to the Collateral Agent and the Borrower and (C) be in compliance with Section 7.09;

(2)     (a)     any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary that is not a Loan Party,

(b)   any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary that is a Loan Party; provided that a Loan Party shall be the continuing or surviving Person;

(c)   any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States will be permitted and

(d)   any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and the Restricted Subsidiaries and is not materially disadvantageous to the Lenders;

*provided* that in the case of clauses (b) through (d) of this Section 7.03(2), (x) no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom and (y) the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor shall be a Loan Party or such disposition shall otherwise be permitted under Section 7.05 or the definition of "Permitted Investments";

(3)        any Restricted Subsidiary may dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (x) the transferee must be a Loan Party or (y) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Restricted Subsidiary which is not a Loan Party in connection with any Investment permitted hereunder;

(4)        so long as no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom, the Borrower may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) the Borrower shall be the continuing or surviving corporation or (b) if the Person formed by or surviving any such merger or consolidation is not the Borrower (or, in connection with a disposition of all or substantially all of the Borrower's assets, is the transferee of such assets) (any such Person, a "**Successor Borrower**"):

(i)        the Successor Borrower will:

(A)        be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(B)        expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower; and

(C)        deliver to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this Section 7.03(4) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Administrative Agent;

(ii)        substantially contemporaneously with such transaction (or at a later date as agreed by the Required Lenders),

(A)        each Guarantor, unless it is the other party to such merger or consolidation, will by a supplement to the Guaranty (or in another form reasonably satisfactory to the Administrative Agent and the Borrower) reaffirm its Guaranty of the Obligations (including the Successor Borrower's obligations under this Agreement),

(B)        each Loan Party, unless it is the other party to such merger or consolidation, will, by a supplement to the Security Agreement (or in another form reasonably satisfactory to the Collateral Agent), confirm its grant or pledge thereunder,

(C)        if reasonably requested by the Collateral Agent or the Required Lenders, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, will, by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Collateral Agent and the Borrower), confirm that

154

its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement; and

(iii)    after giving *pro forma* effect to such incurrence, the Total Net Leverage Ratio as of the end of the most recently ended Test Period is no greater than 5.00:1.00; and

(iv)    the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Borrower required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided further* that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(5)    so long as no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom, Holdings may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) Holdings will be the continuing or surviving Person or (b) if:

(i)    the Person formed by or surviving any such merger or consolidation is not Holdings,

(ii)    Holdings is not the Person into which the applicable Person has been liquidated or

(iii)    in connection with a disposition of all or substantially all of Holdings' assets, the Person that is the transferee of such assets is not Holdings (any such Person described in the preceding clauses (i) through (iii), a "**Successor Holdings**"), then the Successor Holdings will:

(A)    be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia,

(B)    expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower, and

(C)    (I) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower and (II) pledge 100% of the Equity Interests of the Borrower to the Collateral Agent as Collateral to secure the Obligations in accordance with the Security Agreement or otherwise in form and substance reasonably satisfactory to the Collateral Agent and the Borrower; and

(iv)    the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Holdings required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

*provided further* that if the foregoing are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement;

(6)     any Restricted Subsidiary may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person in order to effect a Permitted Investment or other investment permitted pursuant to Section 7.05; *provided* that solely in the case of a merger or consolidation involving a Loan Party and subject to Section 1.07(8) in the case of a Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom; *provided further*, that the continuing or surviving Person will be (a) the Borrower or (b) a Loan Party, in each case, which together with each of its Restricted Subsidiaries, will have complied with the applicable requirements of Section 6.11;

(7)     a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a disposition permitted pursuant to Section 7.04 (other than under clause (2)(c) of the definition of "Asset Sale");

(8)     subject to Section 3.03(a) of the Security Agreement, the Borrower may (a) convert into a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of the Borrower or the laws of a jurisdiction in the United States and (b) change its name;

(9)     the Loan Parties and the Restricted Subsidiaries may consummate the Transactions; and

(10)     the commencement of any proceedings against any Restricted Subsidiary under Debtor Relief Laws to the extent it shall not constitute an Event of Default under Section 8.01(6).

Section 7.04     Asset Sales. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consummate any Asset Sale unless:

(1)     the Borrower or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise in connection with such Asset Sale) at least equal to the fair market value (measured at the time of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of, and

(2)     except in the case of a Permitted Asset Swap consummated in the ordinary course of business in an amount not to exceed $10.0 million, at least 75.0% of the consideration for such Asset Sale, together with all other Asset Sales since the Closing Date (on a cumulative basis), received by the Borrower or a Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that each of the following will be deemed to be cash or Cash Equivalents for purposes of this clause (2);

(a)     any liabilities (as shown on the Borrower's or any Restricted Subsidiary's most recent balance sheet or in the footnotes thereto or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or a Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet, as determined in good faith by the Borrower) of the Borrower or any Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Obligations, that are (i) assumed by the transferee of any such assets (or a third party in connection with such transfer) or (ii) otherwise cancelled or terminated in connection with the transaction with such transferee (other than intercompany debt owed to the Borrower or a Restricted Subsidiary);

(b)     any securities, notes or other obligations or assets received by the Borrower or any Restricted Subsidiary from such transferee or in connection with such Asset Sale (including earnouts and similar obligations) that are converted by the Borrower or a Restricted Subsidiary into cash or Cash

Equivalents, or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of such Asset Sale;

        (c)   [reserved]; or

        (d)   Indebtedness of any Restricted Subsidiary that ceases to be a Restricted Subsidiary as a result of such Asset Sale (other than intercompany debt owed to the Borrower or a Restricted Subsidiary), to the extent that the Borrower and each other Restricted Subsidiary are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Asset Sale; and

        (3)      the Net Proceeds of such Asset Sale shall be applied and/or reinvested as (and to the extent) required by Sections 2.05(2)(b) and 2.05(2)(f).

To the extent any Collateral is disposed of as expressly permitted by this Section 7.04 to any Person other than a Loan Party, such Collateral shall automatically be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such disposition is permitted by this Agreement, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

In addition, none of the Borrower or any Restricted Subsidiary shall enter into any Specified Sale-Leaseback Transaction unless such Specified Sale-Leaseback Transaction is conducted as an arm's-length basis and is for fair market value of the applicable property as determined by a Responsible Officer of the Borrower in good faith.

Section 7.05    <u>Restricted Payments</u>. (a)      The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

        (A)     declare or pay any dividend or make any payment or distribution on account of the Borrower's or any Restricted Subsidiary's Equity Interests (in each case, solely in such Person's capacity as holder of such Equity Interests), including any dividend or distribution payable in connection with any merger, amalgamation or consolidation, other than:

           (1)     dividends, payments or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or a Parent Company or in options, warrants or other rights to purchase such Equity Interests; or

           (2)     dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a wholly owned Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend, payment or distribution in accordance with its Equity Interests in such class or series of securities or such other amount to which it is entitled pursuant to the terms of such Equity Interest;

        (B)     purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Borrower or any Parent Company, including in connection with any merger, amalgamation or consolidation, in each case held by Persons other than the Borrower or a Restricted Subsidiary;

(C)    make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment or final maturity, any Subordinated Indebtedness, any Indebtedness secured on a junior lien basis to the Obligations (including the Second Lien Loans) or any unsecured Indebtedness for borrowed money (other than any intercompany Indebtedness among the Borrower and its Restricted Subsidiaries), but excluding, for the avoidance of doubt, any Second-Out Loans, in each case in excess of $5.0 million (collectively, "**Junior Debt**"), other than:

(i)    Indebtedness permitted under clauses (7) and (8) of Section 7.02(b); or

(ii)    the Transactions;

(D)    make any Restricted Investment;

(all such payments and other actions set forth in clauses (A) through (D) above being collectively referred to as "**Restricted Payments**");

(b)    The provisions of Section 7.05(a) will not prohibit:

(1)    the payment of any dividend or other distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or other distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or other distribution or redemption payment would have complied with the provisions of this Section 7.05;

(2)    the redemption, repurchase, defeasance, discharge, retirement or other acquisition of (i) any Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company, including any accrued and unpaid dividends thereon ("**Treasury Capital Stock**") or (ii) Junior Debt, in each case, made (x) in exchange for, or out of the proceeds of, a sale or issuance (other than to a Restricted Subsidiary) of Equity Interests of the Borrower or any Parent Company (to the extent such Equity Interests or proceeds therefrom are contributed to the Borrower) (in each case, other than Disqualified Stock) and (y) within 120 days of such sale or issuance ("**Refunding Capital Stock**"),

(a)    the declaration and payment of dividends on Treasury Capital Stock out of the proceeds of a sale or issuance (other than to a Restricted Subsidiary of the Borrower or to an employee stock ownership plan or any trust established by the Borrower or any Restricted Subsidiary) of Refunding Capital Stock made within 120 days of such sale or issuance, and

(b)    [reserved];

(3)    the principal payment on, defeasance, redemption, repurchase, exchange or other acquisition or retirement of:

(a)    Junior Debt of the Borrower or a Subsidiary Guarantor made (i) by exchange for, or out of the proceeds of the sale, issuance or incurrence of, new Junior Debt of the Borrower or a Subsidiary Guarantor or Disqualified Stock of the Borrower or a Subsidiary Guarantor and (ii) within 120 days of such sale, issuance or incurrence;

*provided* such new Junior Debt shall mature no earlier, and not have a shorter weighted average life, than the Junior Debt being refinanced or exchanged,

(b)      Disqualified Stock of the Borrower or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale, issuance or incurrence of Disqualified Stock or Junior Debt of the Borrower or a Subsidiary Guarantor, made within 120 days of such sale, issuance or incurrence,

(c)      Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale or issuance of, Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor, made within 120 days of such sale or issuance that, in each case, is Refinancing Indebtedness incurred or issued, as applicable, in compliance with Section 7.02 and

(d)      any Junior Debt or Disqualified Stock that constitutes Acquired Indebtedness;

(4)      a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) (including related stock appreciation rights or similar securities) of the Borrower or any Parent Company held by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, or any equity subscription or equity holder agreement (including, for the avoidance of doubt, any principal and interest payable on any notes issued by the Borrower or any Parent Company in connection with any such repurchase, retirement or other acquisition), including any Equity Interests rolled over by management of the Borrower, any of its Subsidiaries or any Parent Company in connection with the Transactions; *provided* that the aggregate amount of Restricted Payments made under this clause (4) does not exceed $10.0 million in any fiscal year (increasing to $20.0 million following an underwritten public Equity Offering by the Borrower or any Parent Company) with unused amounts in any calendar year being carried over to the next two succeeding calendar years; *provided further* that each of the amounts in any calendar year under this clause (4) may be increased by an amount not to exceed:

(a)      the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Borrower and, to the extent contributed to the Borrower, the cash proceeds from the sale of Equity Interests of any Parent Company, in each case to any future, present or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to make a Restricted Payment with the Available Amount; *plus*

(b)      the amount of any cash bonuses otherwise payable to members of management, employees, directors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that are foregone in exchange for the receipt of Equity Interests of the Borrower or any Parent Company

159

pursuant to any compensation arrangement, including any deferred compensation plan; *plus*

(c) the cash proceeds of life insurance policies received by the Borrower or its Restricted Subsidiaries (or by any Parent Company to the extent contributed to the Borrower) after the Closing Date; *minus*

(d) the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a), (b) and (c) of this clause (4);

*provided* that the Borrower may elect to apply all or any portion of the aggregate increase contemplated by clauses (a), (b) and (c) above in any calendar year; *provided further* that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from any future, present or former employees, directors, officers, members of management, or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary in connection with a repurchase of Equity Interests of the Borrower or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.05 or any other provision of this Agreement;

(5)   [Reserved];

(6)   [Reserved];

(7)   payments made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any Restricted Subsidiary or any Parent Company,

(a)   any repurchases or withholdings of Equity Interests in connection with the exercise of stock options, warrants or similar rights if such Equity Interests represent a portion of the exercise of, or withholding obligations with respect to, such options, warrants or similar rights or required withholding or similar taxes and

(b)   loans or advances to officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Restricted Subsidiary or any Parent Company in connection with such Person's purchase of Equity Interests of the Borrower or any Parent Company; *provided* that no cash is actually advanced pursuant to this clause (c) other than to pay taxes due in connection with such purchase, unless immediately repaid;

(8)   [reserved];

(9)   [reserved];

(10)   Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (10) not to exceed the sum of (X) [reserved] plus (Y) additional Restricted Payments made with the Available Amount; *provided* that if this clause (10) is utilized to make a Restricted Investment, the amount deemed to be utilized under this clause (10) will be the amount of such Restricted Investment at any time outstanding (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent

160

changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided further* that (other than in the case of Restricted Investments made with clause (3) of the definition of Available Amount) no Event of Default shall have occurred and be continuing or would result therefrom; and *provided further* that Restricted Payments made with clause (2) of the definition of Available Amount shall only be permitted to the extent that after giving *pro forma* effect thereto and the application of the net proceeds therefrom, the Total Net Leverage Ratio for the Test Period immediately preceding such Restricted Payment would be no greater than 2.50 to 1.00;

(11)    distributions or payments of Securitization Fees;

(12)    any Restricted Payment made in connection with the Transactions and the fees and expenses related thereto or owed to any Affiliate(s) including any payments to holders of Equity Interests of Belk in connection with, or as a result of, their exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) related to the Transactions;

(13)    [reserved];

(14)    the declaration and payment of dividends or distributions by the Borrower or any Restricted Subsidiary to, or the making of loans or advances to, the Borrower or any Parent Company in amounts required for any Parent Company to pay in each case without duplication:

(a)    franchise, excise and similar taxes and other fees, taxes and expenses required to maintain their corporate or other legal existence;

(b)    for any taxable period for which the Borrower or any of its Restricted Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for U.S. federal or applicable foreign, state or local income tax purposes of which a Parent Company is the common parent (a "**Tax Group**"), to pay the portion of any U.S. federal, foreign, state and local income taxes of such Tax Group for such taxable period that are attributable to the taxable income of the Borrower and its Restricted Subsidiaries and Unrestricted Subsidiaries (net of any payments of such taxes made by the Borrower); *provided* that for each taxable period, (A) the amount of such payments made in respect of such taxable period in the aggregate will not exceed the amount that the Borrower and its Subsidiaries, as applicable, would have been required to pay as stand-alone taxpayers or a stand-alone Tax Group and (B) the amount of such payments made in respect of an Unrestricted Subsidiary will be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary for such purpose;

(c)    salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, employees, directors, officers, members of management and consultants of any Parent Company, and any payroll, social security or similar taxes thereof;

(d)    general corporate or other operating, administrative, compliance and overhead costs and expenses (including expenses relating to auditing and other accounting matters) of any Parent Company attributable to the ownership of the Borrower and its Restricted Subsidiaries;

161

(e)     fees and expenses (including ongoing compliance costs and listing expenses) related to any equity or debt offering of a Parent Company (whether or not consummated);

(f)     amounts that would be permitted to be paid directly by the Borrower or its Restricted Subsidiaries under Section 7.06(b) (other than clause 2(a) thereof);

(g)     [reserved];

(h)     [reserved];

(15)     [reserved];

(16)     cash payments, or loans, advances, dividends or distributions to any Parent Company to make payments, in lieu of issuing fractional shares in connection with share dividends, share splits, reverse share splits, mergers, consolidations, amalgamations or other business combinations and in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company;

(17)     [reserved];

(18)     making payments for the benefit of the Borrower or any Restricted Subsidiary to the extent such payments could have been made by the Borrower or any Restricted Subsidiary because such payments (a) would not otherwise be Restricted Payments and (b) would be permitted by Section 7.06; and

(19)     payments and distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries taken as a whole that complies with the terms of this Agreement or any other transaction that complies with the terms of this Agreement;

*provided* that for purposes of clauses (7) and (14) above, taxes will include all interest and penalties with respect thereto and all additions thereto.

(c)     Notwithstanding anything to the contrary in this Section 7.05, no Investment shall be made in any Unrestricted Subsidiary after the Closing Date.

The amount of all Restricted Payments (other than cash) will be the fair market value on the date the Restricted Payment is made, or at the Borrower's election, the date a commitment is made to make such Restricted Payment, of the assets or securities proposed to be transferred or issued by the Borrower or any Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

For the avoidance of doubt, this Section 7.05 will not restrict the making of any AHYDO Payment with respect to, and required by the terms of, any Indebtedness of the Borrower or any Restricted Subsidiary permitted to be incurred under this Agreement.

Section 7.06        Transactions with Affiliates.

(a)   The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "**Affiliate Transaction**") involving aggregate payments or consideration in excess of $2.0 million, unless (A) such Affiliate Transaction is on terms, taken as a whole, that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained at such time in a comparable transaction by the Borrower or such Restricted Subsidiary with a Person other than an Affiliate of the Borrower on an arm's-length basis or, if in the good faith judgment of the Board of Directors no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to the Borrower or such Restricted Subsidiary from a financial point of view, and (B) the Borrower delivers to the Administrative Agent with respect to any Affiliate Transaction or series of related Affiliate Transactions requiring aggregate payments or consideration in excess of $15.0 million, a resolution adopted by the majority of the Board of Directors approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (A) above.

(b)   The foregoing restriction will not apply to the following:

(1)        (a) transactions between or among the Borrower and one or more Restricted Subsidiaries or between or among Restricted Subsidiaries or, in any case, any entity that becomes a Restricted Subsidiary as a result of such transaction and (b) any merger, consolidation or amalgamation of the Borrower and any Parent Company; *provided* that such merger, consolidation or amalgamation of the Borrower is otherwise in compliance with the terms of this Agreement and effected for a *bona fide* business purpose;

(2)        (a) Restricted Payments permitted by Section 7.05 (including any transaction specifically excluded from the definition of the term "Restricted Payments," including pursuant to the exceptions contained in the definition thereof and the parenthetical exclusions of such definition) and (b) any Permitted Investment(s) or any acquisition otherwise permitted hereunder;

(3)        so long as no Event of Default shall have occurred and be continuing or would result therefrom, the payment of management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses pursuant to the Management Services Agreement (including any unpaid management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses accrued in any prior year) and any termination fees pursuant to the Management Services Agreement, or any amendment thereto or replacement thereof so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders when taken as a whole, as compared to the Management Services Agreement as in effect on the Closing Date,

(a)   the payment of indemnification and similar amounts to, and reimbursement of expenses to, the Investors and its officers, directors, employees and Affiliates, in each case, approved by, or pursuant to arrangements approved by, the Board of Directors,

163

(b)      payments, loans, advances or guarantees (or cancellation of loans, advances or guarantees) to future, present or former employees, officers, directors, managers, consultants or independent contractors or guarantees in respect thereof for bona fide business purposes or in the ordinary course of business or consistent with industry practice,

(c)      any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company and

(d)      any payment of compensation or other employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company;

(4)      the payment of fees and compensation paid to, and indemnities and reimbursements and employment and severance arrangements provided to, or on behalf of or for the benefit of, present, future or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary;

(5)      [reserved];

(6)      the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any agreement as in effect as of the Closing Date, or any amendment thereto or replacement thereof (so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the applicable agreement as in effect on the Closing Date);

(7)      the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any equity holders agreement or the equivalent (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Closing Date and any amendment thereto and, similar agreements or arrangements that it may enter into thereafter; *provided* that the existence of, or the performance by the Borrower or any Restricted Subsidiary of obligations under any future amendment to any such existing agreement or arrangement or under any similar agreement or arrangement entered into after the Closing Date will be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement or arrangement are not otherwise materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the original agreement or arrangement in effect on the Closing Date;

(8)      the Transactions and the payment of all fees and expenses related to the Transactions, including Transaction Expenses;

(9)       transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business or consistent with industry practice and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10)      the issuance, sale or transfer of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company to any Person and the granting and performing of customary rights (including registration rights) in connection therewith, and any contribution to the capital of the Borrower;

(11)      sales of accounts receivable, or participations therein, or Securitization Assets or related assets in connection with any Qualified Securitization Facility and any other transaction effected in connection with a Qualified Securitization Facility or a financing related thereto and sales and/or other transactions of property in connection with Specified Sale-Leaseback Transactions;

(12)      [reserved];

(13)      payments with respect to Indebtedness, Disqualified Stock and other Equity Interests (and cancellation of any thereof) of the Borrower, any Parent Company and any Restricted Subsidiary and Preferred Stock (and cancellation of any thereof) of any Restricted Subsidiary to any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any equity subscription or equity holder agreement that are, in each case, approved by the Borrower in good faith; and any employment agreements, severance arrangements, stock option plans and other compensatory arrangements (and any successor plans thereto) and any supplemental executive retirement benefit plans or arrangements with any such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) that are, in each case, approved by the Borrower in good faith;

(14)      (a) investments by Affiliates in securities of the Borrower (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Borrower or such Restricted Subsidiary generally to other investors on the same or more favorable terms and (b) payments to Affiliates in respect of securities of the Borrower or any Restricted Subsidiary contemplated in the foregoing subclause (a) or that were acquired from Persons other than the Borrower and the Restricted Subsidiaries, in each case, in accordance with the terms of such securities;

(15)     payments to or from, and transactions with, any joint venture or Unrestricted Subsidiary in the ordinary course of business or consistent with past practice, industry practice or industry norms (including, any cash management activities related thereto);

(16)     payments by the Borrower (and any Parent Company) and its Subsidiaries pursuant to tax sharing agreements among the Borrower (and any Parent Company) and its Subsidiaries; *provided* that in each case the amount of such payments in any taxable year does not exceed the amount that the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amount received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such taxable year were the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any such Parent Company;

(17)     any lease entered into between the Borrower or any Restricted Subsidiary, as lessee and any Affiliate of the Borrower, as lessor, and any transaction(s) pursuant to that lease, which lease is approved by the Board of Directors or senior management of the Borrower in good faith;

(18)     IP Rights licenses in the ordinary course of business or consistent with industry practice;

(19)     the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to equity holders of the Borrower or any Parent Company pursuant to the equity holders agreement or the registration rights agreement entered into on or after the Closing Date;

(20)     transactions permitted by, and complying with, Section 7.03 solely for the purpose of (a) reorganizing to facilitate any initial public offering of securities of the Borrower or any Parent Company, (b) forming a holding company or (c) reincorporating the Borrower in a new jurisdiction;

(21)     transactions undertaken in good faith (as determined by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate) for the purposes of improving the consolidated tax efficiency of the Borrower and its Restricted Subsidiaries and not for the purpose of circumventing Articles VI and VII of this Agreement; so long as such transactions, when taken as a whole, do not result in a material adverse effect on the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, when taken as a whole, in each case, as determined in good faith by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate;

(22)     (a) transactions with a Person that is an Affiliate of the Borrower (other than an Unrestricted Subsidiary) solely because the Borrower or any Restricted Subsidiary owns, directly or indirectly, Equity Interests in such Person and (b) transactions with any Person that is an Affiliate solely because a director or officer of such Person is a director or officer of the Borrower, any Restricted Subsidiary or any Parent Company;

166

(23)      (a) pledges and other transfers of Equity Interests in Unrestricted Subsidiaries and (b) any transactions with an Affiliate in which the consideration paid consists solely of Equity Interests of the Borrower or a Parent Company;

(24)      the sale, issuance or transfer of Equity Interests (other than Disqualified Stock) of the Borrower;

(25)      investments by any Investor or Parent Company in securities of the Borrower; and

(26)      payments in respect of (a) the Obligations (or any Credit Agreement Refinancing Indebtedness) or (b) other Indebtedness of the Borrower and its Subsidiaries held by Affiliates; *provided* that such Obligations were acquired by an Affiliate of the Borrower in compliance herewith.

Section 7.07      Burdensome Agreements.

(a)      The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to, directly or indirectly, create or otherwise cause to exist or become effective any consensual encumbrance or consensual restriction (other than this Agreement or any other Loan Document) on the ability of any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to:

(1)           pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(a)      pay any Indebtedness owed to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(2)      make loans or advances to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(3)      sell, lease or transfer any of its properties or assets to the Borrower or to any Restricted Subsidiary that is a Guarantor; or

(4)      with respect to the Borrower or any Subsidiary Guarantor, (a) Guaranty the Obligations or (b) create, incur or cause to exist or become effective Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents to the extent such Lien is required to be given to the Secured Parties pursuant to the Loan Documents;

*provided* that any dividend or liquidation priority between or among classes or series of Capital Stock, and the subordination of any Obligation (including the application of any remedy bars thereto) to any other Obligation will not be deemed to constitute such an encumbrance or restriction.

(b)      Section 7.07(a) will not apply to any encumbrances or restrictions existing under or by reason of:

(a)      encumbrances or restrictions in effect on the Closing Date, including pursuant to the Loan Documents and any Hedge Agreements, Hedging Obligations and the related documentation and any definitive documentation in respect of the Indebtedness set forth on Schedule 7.02(b)(3);

(b)      the Second Lien Loan Documents and the ABL Loan Documents;

(c)      Purchase Money Obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) above on the property so acquired;

(d)      applicable Law or any applicable rule, regulation or order;

(e)      any agreement or other instrument of a Person, or relating to Indebtedness or Equity Interests of a Person, acquired by or merged, amalgamated or consolidated with and into the Borrower or any Restricted Subsidiary, or any other transaction entered into in connection with any such acquisition, merger, consolidation or amalgamation in existence at the time of such acquisition or at the time it merges, amalgamates or consolidates with or into the Borrower or any Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person so acquired and its Subsidiaries, or the property or assets of the Person so acquired or designated and its Subsidiaries or the property or assets so acquired or designated;

(f)      contracts or agreements for the sale or disposition of assets, including any restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(g)      restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business or consistent with industry practice or arising in connection with any Liens permitted by Section 7.01;

(h)      Indebtedness, Disqualified Stock or Preferred Stock of Restricted Subsidiaries that are not Guarantors permitted to be incurred subsequent to the Closing Date pursuant to Section 7.02;

(i)      provisions in joint venture agreements and other similar agreements (including equity holder agreements) relating to such joint venture or its members or entered into in the ordinary course of business or consistent with industry practice;

(j)     customary provisions contained in leases, sub-leases, licenses, sub-licenses, Equity Interests or similar agreements, including with respect to IP Rights and other agreements;

(k)     restrictions created in connection with any Qualified Securitization Facility that, in the good faith determination of the Board of Directors of the Borrower, are necessary or advisable to effect such Qualified Securitization Facility;

(l)     restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale or other agreement to which the Borrower or any Restricted Subsidiary is a party entered into in the ordinary course of business or consistent with industry practice; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are the subject to such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of another Restricted Subsidiary;

(m)     customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Restricted Subsidiary;

(n)     customary provisions restricting assignment of any agreement;

(o)     restrictions arising in connection with cash or other deposits permitted under Section 7.01; any other agreement or instrument governing any Indebtedness, Disqualified Stock, or Preferred Stock permitted to be incurred or issued pursuant to Section 7.02 entered into after the Closing Date that contains encumbrances and restrictions that either (i) are no more restrictive in any material respect, taken as a whole, with respect to any Restricted Subsidiary than (A) the restrictions contained in the Loan Documents as of the Closing Date or the ABL Loan Documents as of the Closing Date or (B) those encumbrances and other restrictions that are in effect on the Closing Date with respect to that Restricted Subsidiary pursuant to agreements in effect on the Closing Date, (ii) are not materially more disadvantageous, taken as a whole, to the Lenders than is customary in comparable financings for similarly situated issuers or (iii) will not materially impair the Borrower's ability to make payments on the Obligations when due, in each case in the good faith judgment of the Borrower;

(p)     (i) Indebtedness permitted to be incurred pursuant to Section 7.02(b)(4) and any Refinancing Indebtedness in respect of the foregoing and (ii) agreements entered into in connection with any Specified Sale-Leaseback Transaction or any Sale-Leaseback Transaction entered into in the ordinary course of business or consistent with industry practice;

(q)      customary restrictions and conditions contained in documents relating to any Lien so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 7.07;

(r)      [reserved];

(s)      any encumbrances or restrictions of the type referred to in clauses (1), (2) or (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (r) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive in any material respect with respect to such encumbrance and other restrictions, taken as a whole, than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(t)      existing under, by reason of or with respect to Refinancing Indebtedness; *provided* that the encumbrances and restrictions contained in the agreements governing that Refinancing Indebtedness are, in the good faith judgment of the Borrower, not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced; and

(u)      applicable law or any applicable rule, regulation or order in any jurisdiction where Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred pursuant to Section 7.02 is incurred.

Section 7.08      Modification of Terms of Subordinated Indebtedness. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, amend, modify or change in any manner materially adverse to the interests of the Lenders, as determined in good faith by the Borrower (on the basis of such proposed amendments, modifications or changes taken as a whole), any term or condition of any Subordinated Indebtedness having an aggregate outstanding principal amount greater than the Threshold Amount (other than as a result of any Refinancing Indebtedness in respect thereof) without the consent of the Required Lenders (which consent shall not be unreasonably withheld or delayed); *provided, however*, that no amendment, modification or change of any term or condition of any Subordinated Indebtedness permitted by any subordination provisions set forth in the applicable Subordinated Indebtedness or any other stand-alone subordination agreement in respect thereof and, in each case consented to by the Required Lenders shall be deemed to be materially adverse to the interests of the Lenders.

Section 7.09      Holdings. Holdings will not conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto):

(1)      the ownership or acquisition of the Capital Stock (other than Disqualified Stock) of any other Successor Holdings or the Borrower,

170

(2)      the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance,

(3)      to the extent applicable, participating in tax, accounting and other administrative matters as a member of the combined group of Holdings and the Borrower,

(4)      the performance of its obligations under and in connection with, and payments with respect to, the Loan Documents, the ABL Loan Documents, the Second Lien Loan Documents and related documentation in respect of the foregoing and any documents relating to other Indebtedness permitted under Section 7.02 (including, for the avoidance of doubt, the incurrence of Qualified Holding Company Debt),

(5)      any public offering of its common stock or any other issuance or registration of its Capital Stock for sale or resale not prohibited by this Article VII, including the costs, fees and expenses related thereto,

(6)      repurchases of Indebtedness through open market purchases and Dutch auctions (in the case of Loans, to the extent permitted hereunder),

(7)      the incurrence of Qualified Holding Company Debt,

(8)      any transaction that Holdings is permitted to enter into or consummate under this Article VII and any transaction between or among Holdings and the Borrower or any one or more Restricted Subsidiaries permitted under this Article VII, including:

(a)   making any payment(s) or Restricted Payment(s) (i) to the extent otherwise permitted under this Section 7.09 and (ii) with any amounts received pursuant to transactions permitted under Section 7.05 (or the making of a loan to any Parent Company in lieu of any such payment(s) or Restricted Payment(s)) or holding any cash received in connection therewith pending application thereof by Holdings,

(b)   making any Investment to the extent (i) payment therefor is made solely with the Capital Stock of Holdings (other than Disqualified Stock), the proceeds of Restricted Payments received from the Borrower or proceeds of the issuance of, or contribution in respect of the, Capital Stock (other than Disqualified Stock) of Holdings and (ii) any property (including Capital Stock) acquired in connection therewith is contributed to the Borrower or a Subsidiary Guarantor (or, if otherwise permitted by Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary) or the Person formed or acquired in connection therewith is merged with the Borrower or a Subsidiary Guarantor;

(c)   guaranteeing the obligations and granting of Liens of the Borrower and its Subsidiaries to the extent such obligations are not prohibited hereunder;

(d)   incurrence of Indebtedness of Holdings representing deferred compensation to employees, consultants or independent contractors of Holdings and unsecured Indebtedness consisting of promissory notes issued by any Loan Party to future, present or former employees, directors, officers, managers, distributors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any Subsidiary or any Parent Company to finance the retirement, acquisition, repurchase, purchase or redemption of Capital Stock of Holdings,

(e)   incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes,

171

(f)   providing indemnification to officers and directors and as otherwise permitted in this Article VII,

(g)   activities incidental to the consummation of the Transactions,

(h)   the making of any loan to any officers or directors contemplated by Section 7.05 or constituting a Permitted Investment, the making of any investment in the Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary,

(i)   making contributions to the capital of its Subsidiaries, or

(j)   making Investments in cash and Cash Equivalents.

(9)   activities incidental to the businesses or activities described in clauses (1) through (8) of this Section 7.09.

Section 7.10   <u>Material Intellectual Property</u>. On and after the Closing Date, the Borrower shall not permit any IP Rights owned by the Borrower and its Restricted Subsidiaries and material to their business, taken as a whole, to be owned by any Person that is not a Loan Party.

Section 7.11   <u>Subsidiaries</u>. On and after the Closing Date, the Borrower shall not enter into, nor shall it permit any of its Restricted Subsidiaries to enter into any transaction, the purpose of which is primarily to release any Guaranty of the Closing Date Term Loans (or to structure any transaction to avoid providing a Guaranty of the Closing Date Term Loans by any Restricted Subsidiaries to the extent such Guaranty would have otherwise been required to be provided pursuant to the Collateral and Guaranty Requirements), it being understood and agreed that bona fide joint ventures entered into in the ordinary course of business with Persons other than Affiliates of the Borrower shall be permitted. In addition, neither the Borrower nor its Restricted Subsidiaries shall transfer any assets (by an Asset Sale or otherwise) to an Unrestricted Subsidiary after the Closing Date.

Section 7.12   <u>Minimum Average Liquidity</u>.   Solely, for the benefit of the First-Out Loans, commencing with the last day of the first fiscal quarter following the Closing Date, the Borrower and its Restricted Subsidiaries shall not permit Average Liquidity in respect of any fiscal quarter to be less than $40,000,000.

Section 7.13   <u>Financial Covenant</u>.

(1)   Solely for the benefit of the First-Out Loans and the First-Out Lenders, commencing with the fiscal quarter ending February 3, 2024, the Borrower shall not permit the Total Net Leverage Ratio for the applicable Test Period to exceed the applicable ratio set forth under the heading "Total Net Leverage Ratio" on the chart below which corresponds to such Test Period:

| **Test Period Ending** | **Total Net Leverage Ratio** |
|---|---|
| February 3, 2024 - November 2, 2024 | 10.00:1.00 |
| February 1, 2025 - August 1, 2025 | 8.75:1.00 |
| October 31, 2025 - January 30, 2026 | 8.00:1.00 |

| | |
|---|---|
| May 1, 2026 and thereafter | 7.00:1.00 |

(2)     Solely for the benefit of the Second-Out Loans and the Second-Out Lenders, commencing with the fiscal quarter ending February 3, 2024, the Borrower shall not permit the Total Net Leverage Ratio for the applicable Test Period to exceed the applicable ratio set forth under the heading "Total Net Leverage Ratio" on the chart below which corresponds to such Test Period:

| **Test Period Ending** | **Total Net Leverage Ratio** |
|---|---|
| February 3, 2024 - November 2, 2024 | 11.00:1.00 |
| February 1, 2025 - August 1, 2025 | 9.75:1.00 |
| October 31, 2025 - January 30, 2026 | 9.00:1.00 |
| May 1, 2026 and thereafter | 8.00:1.00 |

Section 7.14     Further Priming or Subordination;  Anti-Layering.

(1)     Except as otherwise permitted by this Agreement or the applicable Loan Documents, in each case, as in effect on the Closing Date, the Borrower and the Subsidiary Guarantors shall not, directly or indirectly, incur Indebtedness that is (a) secured by a Lien on Collateral that is senior to the Liens on such Collateral securing the Obligations (except any Indebtedness with respect to which such subordination is permitted under Section 10.24(c)), (b) contractually prioritized  or senior in right of payment (including by way of "waterfall" or application of proceeds) to any Closing Date Term Loan or (c) is guaranteed by any Subsidiary of Holdings that is not a Loan Party hereunder, unless, in each case, both (x) the opportunity to participate in such Indebtedness is offered ratably on substantially the same terms (including,  without limitation,  any fees or other benefits offered in connection with such indebtedness) to all Lenders, (y) the terms of such Indebtedness would not reasonably be expected to preclude any Lender from participating in such Indebtedness on a pro rata basis on substantially the same terms as any other Lender (without regard to any individual  investment, compliance or other restrictions that any specific Lender may be subject to, including,  without limitation,  the capacity to make new money loans of the type, size or terms being offered, but excluding restrictions as to, or capacity to make, equity investments) and (z) terms of such Indebtedness have been approved in writing by the Required Lenders.

(2)     Without the consent of the Required Facility Lenders in respect of the First-Out Loans, the Borrower and the Subsidiary Guarantors shall not, directly or indirectly, incur Indebtedness that is contractually subordinated or junior in right of payment (including  by way of "waterfall" or application of proceeds) to any other Indebtedness of such Person unless such Indebtedness is expressly subordinated in right of payment to the First-Out Loans hereunder to the extent and in the same manner as such Indebtedness is subordinated to other senior Indebtedness of such Person.

(3)     Without the consent of the Required Facility Lenders in respect of the Second-Out Loans, the Borrower and the Subsidiary Guarantors shall not, directly or indirectly, incur Indebtedness that is contractually subordinated or junior in right of payment (including  by way of "waterfall" or application of proceeds) to any other Indebtedness of such Person unless such Indebtedness is expressly subordinated in right of payment to the Second-Out Loans hereunder to the extent and in the same manner as such Indebtedness is subordinated to other senior Indebtedness of such Person.

173

(4)     The parties hereto understand and agree that Indebtedness shall not be considered junior in right of payment solely because it is unsecured or secured by Liens junior in priority to the Liens securing the Loans.

Section 7.15     Benefit of Covenants. Notwithstanding anything to the contrary herein, (x) the terms set forth in Sections 7.12, 7.13(1) and 7.14(2) are made solely for the benefit of the First-Out Loan Facility and the First-Out Lenders, (y) the terms set forth in Sections 7.13(2) and 7.14(3) are made solely for the benefit of the Second-Out Loan Facility and the Second-Out Lenders, and (z) the other Lenders and the Borrower shall not have any rights as a third-party beneficiary of any such provision. For the avoidance of doubt, any amendment, waiver or consent with respect to such terms to such terms shall require, and only require, the consent of the Required Facility Lenders with respect to the First-Out Loans or the Second-Out Loans, as applicable.

## ARTICLE VIII

## Events of Default and Remedies

Section 8.01     Events of Default. Subject to the last paragraph hereof, each of the events referred to in clauses (1) through (11) of this Section 8.01 shall constitute an "Event of Default":

(1)     Non-Payment. The Borrower fails to pay (a) when and as required to be paid herein, any amount of principal of any Loan or (b) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(2)     Specific Covenants. The Borrower, any other Loan Party or, in the case of Section 7.09, Holdings, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(1) or 6.05(1) (solely with respect to the Borrower, other than in a transaction permitted under Section 7.03 or 7.04) or Article VII; or

(3)     Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(1) or (2) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(4)     Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by the Borrower or any Subsidiary Guarantor herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(5)     Cross-Default and Cross-Acceleration. Any Loan Party or any Restricted Subsidiary (a) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (b) fails to observe or perform any other agreement or condition relating to any such Indebtedness referred to in the foregoing clause (a), or any other event occurs (other than, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of such Hedging Obligations and not as a result of any default thereunder by the Borrower, or any Subsidiary Guarantor or any Restricted Subsidiary) with respect to such Indebtedness, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such

holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that (A) such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02, (B) this clause (5)(b) shall not apply to any Indebtedness if the sole remedy of the holder thereof in the event of the nonpayment of such Indebtedness or the non-payment or non-performance of obligations related thereto is to convert such Indebtedness into Equity Interests (other than Disqualified Stock) and cash in lieu of fractional shares and (C) this clause (5)(b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided further* that an ABL Event of Default under Section 8.01 of the ABL Credit Agreement (other than Section 8.01(1) of the ABL Credit Agreement) shall not constitute an Event of Default hereunder unless and until (I) in the case of an ABL Event of Default under Section 8.01(2)(d) of the ABL Credit Agreement for failure to comply with the ABL Financial Covenant (after giving effect to all applicable grace periods and the ability to make Specified Equity Contributions in accordance with the terms of the ABL Credit Agreement), a majority of the ABL Lenders have actually declared all ABL Obligations to be immediately due and payable in accordance with the terms of the ABL Credit Agreement and such declaration has not been rescinded by a majority of the ABL Lenders on or before such date or (II) in the case of all other such ABL Events of Default the earlier of (1) 60 consecutive calendar days shall have passed since the occurrence of such ABL Event of Default and (2) the date on which a majority of the ABL Lenders have actually declared all ABL Obligations to be immediately due and payable in accordance with the terms of the ABL Credit Agreement and such declaration has not been rescinded by a majority of the ABL Lenders on or before such date; or

(6)      Insolvency Proceedings, etc. Holdings, the Borrower, any Loan Party or any Restricted Subsidiary that is a Significant Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(7)      Judgments. There is entered against any Loan Party or any Restricted Subsidiary a final judgment and order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) calendar days; or

(8)      ERISA. (a) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan, (b) the Borrower or any Subsidiary Guarantor or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan, or (c) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable Law or plan terms, except, with respect to each of the foregoing clauses of this Section 8.01(8), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

175

(9)     Invalidity of Loan Documents. Any material provision of the Loan Documents, taken as a whole, at any time after its execution and delivery and for any reason, other than (a) as expressly permitted by any Loan Documents (including as a result of a transaction permitted under Section 7.03 or 7.04), (b) as a result of acts or omissions by an Agent (it being understood that the foregoing exception shall not impose any obligations on any Agent exculpated under Article IX) or any Lender or (c) due to the satisfaction in full of the Termination Conditions, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or any Loan Party denies in writing that it has any or further liability or obligation under the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or purports in writing to revoke or rescind the Loan Documents, taken as a whole, prior to the satisfaction of the Termination Conditions;  or

(10)     Collateral Documents. Any Collateral Document with respect to a material portion of the Collateral after delivery thereof pursuant to Section 4.01, 6.11 or 6.13 for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) ceases to create, a valid and perfected Lien with the priority required by the Applicable Intercreditor Agreement (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of Collateral actually delivered to it and pledged under the Collateral Documents or to file Uniform Commercial Code amendments relating to a Loan Party's change of name or jurisdiction of formation (solely to the extent that the Borrower provides the Collateral Agent written notice thereof in accordance with the Security Agreement, and the Collateral Agent and the Borrower have agreed that the Collateral Agent will be responsible for filing such amendments) and continuation statements or to take any other action primarily within its control with respect to the Collateral and except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage (it being understood that the foregoing exception shall not impose any obligations on any Agent exculpated under Article IX); or

(11)     Change of Control. There occurs any Change of Control.

Notwithstanding anything set forth above, (a) a breach of Sections 7.12, 7.13(1) or 7.14(2) shall not constitute a Default or Event of Default with respect to any other Term Loans hereunder unless and until the First-Out Loans have been accelerated by the Required Facility Lenders in respect of the First-Out Loans (and such acceleration shall not have been rescinded by such Required Facility Lenders) and (b) a breach of Sections 7.13(2) or 7.14(3) shall not constitute a Default or Event of Default with respect to any other Term Loans hereunder unless and until the Second-Out Loans have been accelerated by the Required Facility Lenders in respect of the Second-Out Loans (and such acceleration shall not have been rescinded by such Required Facility Lenders).

Section 8.02     Remedies upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent may with the consent of the Required Lenders and shall, at the request of the Required Lenders (or (a) with respect to an Event of Default resulting from a breach of Sections 7.12, 7.13(1) or 7.14(2), at the request of the Required Facility Lenders in respect of the First-Out Loans, take such actions with respect to the First-Out Loans, and (b) with respect to an Event of Default resulting from a breach of Sections 7.13(2) or 7.14(3), at the request of the Required Facility Lenders in respect of the Second-Out Loans, take such actions with respect to the Second-Out Loans), take any or all of the following actions:

176

(1)      declare the Commitments of each Lender to be terminated, whereupon such Commitments will be terminated;

(2)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under any Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(3)      exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief, with respect to the Borrower under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"), the Commitments of each Lender will automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid will automatically become due and payable without further act of the Administrative Agent or any Lender.

Section 8.03      Application of Funds.

(1)      Subject to the Applicable Intercreditor Agreements then in effect and except as otherwise expressly provided in this Agreement (as in effect on the Closing Date), including the Intercreditor Provisions, other than with respect to any proceeds of, and distributions on or payments in respect of or arising out of the Collateral or proceeds of the Collateral which shall be applied in accordance with Section 8.03(2), any amounts collected or received on account of the Obligations, whether by the Administrative Agent, the Collateral Agent, any other Agent or any Lender, whether arising from setoff or otherwise (including any payment pursuant to any Applicable Intercreditor Agreement), and whether or not an Event of Default shall have occurred and is continuing, and including any payment or distribution or other amounts received on account of the Obligations (other than any payment, distribution or other amount received on account of the Collateral or proceeds of the Collateral which shall be applied in accordance with Section 8.03(2)) in a proceeding under any Debtor Relief Law, in each case, whether in the form of cash or non-cash assets, will be applied by the Administrative Agent in the following order:

> *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III) payable to each Agent in its capacity as such;

> *Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III), whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, payable to the Second Amendment Exchanging Lenders and the Second Amendment Lenders in connection with any action, litigation or other dispute or proceeding related to the Transactions (including, without limitation, any action, litigation or other dispute or proceeding related to any temporary restraining order, preliminary injunction or any similar request for relief), ratably among them in proportion to the amounts described in this clause Second payable to them;

> *Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term Loans, whether incurred prior to, upon or following

commencement of a proceeding under any Debtor Relief Law, ratably among the Term Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans, the other Obligations under Secured Hedge Agreements and Cash Management Obligations, in each case, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the Term Lenders and other applicable Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all Obligations constituting the Prepayment Premium and/or Make-whole Amount in respect of the applicable Term Loans that is due and payable, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, to the applicable Term Lenders in proportion to the respective amounts described in this clause Fifth held by them;

*Sixth*, to the payment of all other Obligations of the Loan Parties in respect of the Term Loans that are due and payable to the Administrative Agent or the applicable Term Lenders on such date, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and such Term Lenders on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

(2)    Subject to the Applicable Intercreditor Agreements then in effect and except as otherwise expressly provided in this Agreement (as in effect on the Closing Date), including the Intercreditor Provisions, any amounts collected or received on account of the Obligations from proceeds of, and distributions on or payments in respect of or arising out of the Collateral, whether by the Administrative Agent, the Collateral Agent, any other Agent or any Lender, whether arising from setoff or otherwise (including any payment pursuant to any Applicable Intercreditor Agreement), and whether or not an Event of Default shall have occurred and is continuing, and including any payment (including, without limitation, any adequate protection payment and any payment from the proceeds of a sale of the Collateral or proceeds of the Collateral under Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization or liquidation) or distribution (including, without limitation, any distribution in respect of secured claims under a plan of reorganization or liquidation or any distribution pursuant to Section 726 of the Bankruptcy Code) or other amounts received on account of the Collateral or proceeds of the Collateral in a proceeding under any Debtor Relief Law, in each case, whether in the form of cash or non-cash assets, will be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III) payable to each Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III), whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law,

payable to the Second Amendment Exchanging Lenders and the Second Amendment Lenders in connection with any action, litigation or other dispute or proceeding related to the Transactions (including, without limitation, any action, litigation or other dispute or proceeding related to any temporary restraining order, preliminary injunction or any similar request for relief), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the First-Out Loans, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the First-Out Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the First-Out Loans, the other Obligations under Secured Hedge Agreements and Cash Management Obligations, in each case, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the First-Out Lenders and other applicable Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all Obligations constituting the Prepayment Premium in respect of the First-Out Loans that is due and payable, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, to the applicable First-Out Lenders in proportion to the respective amounts described in this clause Fifth held by them;

*Sixth*, to the payment of all other Obligations of the Loan Parties in respect of the First-Out Loans that are due and payable to the Administrative Agent or the applicable First-Out Lenders on such date, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and such First-Out Lenders on such date;

*Seventh*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Second-Out Loans, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the Second-Out Lenders in proportion to the respective amounts described in this clause Seventh payable to them;

*Eighth*, to payment of that portion of the Obligations constituting unpaid principal of the Second-Out Loans, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably among the Second-Out Lenders in proportion to the respective amounts described in this clause Eighth held by them;

*Ninth*, to the payment of all Obligations constituting the Make-whole Amount in respect of the Second-Out Loans that is due and payable, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, to the applicable Second-Out Lenders in proportion to the respective amounts described in this clause Ninth held by them;

*Tenth*, to the payment of all other Obligations of the Loan Parties in respect of the Second-Out Loans that are due and payable to the Administrative Agent or the applicable Second-Out Lenders on such date, whether incurred prior to, upon or following commencement of a proceeding under any Debtor Relief Law, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and such Second-Out Lenders on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

For the avoidance of doubt, the Loan Parties, the Administrative Agent and the Lenders agree and acknowledge that the provisions set forth in this Section 8.03 and the Intercreditor Provisions constitute a "subordination agreement" as such term is contemplated by, and utilized in, Section 510(a) of the Bankruptcy Code, and, as such, it is their intention that this Section 8.03 and the Intercreditor Provisions would be enforceable for all purposes in any proceeding under any Debtor Relief Law relating to a Loan Party.

# ARTICLE IX

## Administrative Agent and Other Agents

Section 9.01    Appointment and Authorization of the Administrative Agent.

(1)    Each Lender hereby irrevocably appoints Alter Domus (US) LLC, to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX (other than Sections 9.11, 9.12 and 9.16) are solely for the benefit of the Agents and the Lenders, and the Borrower and the other Loan Parties shall not have rights as a third-party beneficiary of any such provision.

(2)    Each of the Secured Parties (including in its capacities as a Lender, a Hedge Bank, and/or Cash Management Bank) hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Secured Party for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. The Collateral Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent), shall be entitled to the benefits of all provisions of this Article IX and Article X (including Sections 9.08, 10.04 and 10.05), and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent and Collateral Agent under this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, the Lenders, and by accepting the benefits of the Collateral Documents, any other Secured Parties, hereby expressly authorize the Collateral Agent to (i) execute any and all documents (including releases and subordination agreements) with respect to the Collateral (including any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto (including any Applicable Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by the Collateral Agent shall bind the Secured Parties and (ii) negotiate, enforce or settle any claim, action

180

or proceeding affecting the Secured Parties in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Secured Party.

Section 9.02    Rights as a Lender. Any Lender that is also serving as an Agent (including as Administrative Agent or Collateral Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Lender (if any) serving as an Agent hereunder in its individual capacity. Any such Person serving as an Agent and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.03    Exculpatory Provisions. The Agents and the Ad Hoc Group of Term Lenders shall not have any duties, obligations or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents. Without limiting the generality of the foregoing, an Agent (including the Administrative Agent and Collateral Agent) and the Ad Hoc Group of Term Lenders:

(1)    shall not be subject to any fiduciary or other implied duties or obligations, regardless of whether a Default or Event of Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" or "ad hoc group" herein and in the other Loan Documents with reference to any Agent or the Ad Hoc Group of Term Lenders is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative or representative relationship between independent contracting parties;

(2)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents or as such Agent shall believe in good faith shall be necessary), *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose such Agent to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any requirement of Law relating to bankruptcy, insolvency, reorganization, or relief of debtors; *provided, further,* that if such Agent so requests, it shall first be indemnified and provided with adequate security to its sole satisfaction (including reasonable advances as may be requested by such Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action; *provided, further,* that such Agent may seek clarification or further direction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents or as such Agent shall believe in good faith shall be necessary) prior to taking any such directed action and may refrain from acting until such clarification or further direction has been provided; and

(3)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, the Loan Parties, or any of their Affiliates that is communicated to or obtained by any Person serving as an Agent-Related Person, the Ad Hoc Group of Term Lenders or any of their Affiliates in any capacity.

No Agent-Related Person shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as an Agent shall believe in good faith shall be necessary) (and such consent or request and such action or action not taken pursuant thereto shall be binding upon all the Lenders) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final and non-appealable judgment of a court of competent jurisdiction (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which such Agent-Related Person shall have no liability), in connection with its duties expressly set forth herein. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default and stating that such notice is a "notice of default" is given to such Agent by the Borrower or a Lender.

No Agent-Related Person shall be responsible or liable for or have any duty to ascertain or inquire into or monitor (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the Loans or the occurrence of any Default or Event of Default, (iv) the execution, validity, enforceability, effectiveness, genuineness, collectability or sufficiency of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, preservation, perfection, maintenance or continuation of perfection, or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, (vi) whether the Collateral exists, is owned by any Loan Party, is cared for, protected, or insured or has been encumbered, or meets the eligibility criteria applicable in respect thereof, (vii) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or the inspection of the properties, books or records of any Loan Party or any Affiliate thereof or (viii) the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations. The duties of each Agent shall be mechanical and administrative in nature; no Agent-Related Person shall have by reason of this Agreement or any other Loan Document a fiduciary, principal-agency, or trustee relationship in respect of any Lender, any other Secured Party or the holder of any Term Note; and nothing in this Agreement or in any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agent-Related Person any duties or obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

Nothing herein or in any other Loan Document shall require any Agent-Related Person to expend or risk its own funds or otherwise incur any financial liability in the performance of any duties or in the exercise of any rights or powers hereunder. No Agent shall be responsible or liable for any failure or delay in the performance of its obligations hereunder or under any other Loan Document, in each case, arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or Governmental Authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

For the avoidance of doubt, and without limiting the other protections set forth in this Article IX, with respect to any determination, designation, or judgment to be made by any Agent herein or in the other Loan Documents, such Agent shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) make or confirm such determination, designation, or judgment.

Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, the Ad Hoc Group of Term Lenders is named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Loan Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Ad Hoc Group of Term Lenders shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Section 10.05. Without limitation of the foregoing, the Ad Hoc Group of Term Lenders shall not, solely by reason of this Agreement or any other Loan Documents, have any fiduciary relationship in respect of any Lender or any other Person.

Section 9.04    Lack of Reliance on the Agents. Independently and without reliance upon any Agent-Related Person, each Lender, each other Secured Party, and the holder of each Term Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings, the Borrower and the Restricted Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings, the Borrower and the Restricted Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender, any other Secured Party, or the holder of any Term Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. No Agent-Related Person shall be responsible to any Lender, any other Secured Party, or the holder of any Term Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Loan Document, or the financial condition of the Holdings, the Borrower or any of the Restricted Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of Holdings, the Borrower or any of the Restricted Subsidiaries or the existence or possible existence of any Default or Event of Default. Each Lender, each other Secured Party, and the holder of each Term Note acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent-Related Person hereinafter taken shall be deemed to constitute any representation or warranty by any Agent-Related Person to it. Each Lender, each other Secured Party, and the holder of each Term Note agrees that it will not assert any claim against any Agent-Related Person based on an alleged breach of fiduciary duty by any Agent in connection with this Agreement, the other Loan Documents, or the transactions contemplated hereby.

Section 9.05    Certain Rights of the Agents. If any Agent requests instructions from the Required Lenders (or such greater percentage of Lenders required or as such Agent shall believe in good faith shall be required) with respect to any determination, designation, judgment, act or action (including failure to act) in connection with this Agreement or any other Loan Document, such Agent shall be entitled to refrain from such determination, designation, judgment, act or taking such action unless and until such Agent shall have received instructions from the Required Lenders (or such greater percentage of Lenders required or as such Agent shall believe in good faith shall be required); and such Agent shall not incur liability to any Lender or other Secured Party by reason of so refraining. Without limiting the foregoing, neither any Lender, any other Secured Party, nor the holder of any Term Note shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders (or such greater percentage of Lenders required or as such Agent shall believe in good faith shall be required).

Section 9.06    Reliance by the Agents. Each Agent shall be entitled to rely upon, shall not incur any liability for and shall be fully protected in relying upon, any note, resolution, notice, statement, certificate, facsimile, order, consent, request, instrument, letter, document or other writing (including any

electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent also may rely, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.07    <u>Delegation of Duties</u>. Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more co-agents, sub-agents and attorneys-in-fact appointed by such Agent. Each Agent and any such co-agents, sub-agents and attorneys-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. All provisions of this Article IX and Article X (including Sections 9.08, 10.04 and 10.05) and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and under the other Loan Documents shall apply to any such co-agent, sub-agent and attorney-in-fact and to the Agent-Related Persons of such Agent and any such co-agent, sub-agent and attorney-in-fact, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent. No Agent shall be responsible for the negligence or misconduct of any such co-agents, sub-agents and attorneys-in-fact except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents and attorneys-in-fact.

Section 9.08    <u>Indemnification</u>. Whether or not the transactions contemplated hereby are consummated, to the extent any Agent or any other Agent-Related Person (solely to the extent any such other Agent-Related Person was performing services on behalf of such Agent) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify such Agent or any other Agent-Related Person (solely to the extent any such other Agent-Related Person was performing services on behalf of such Agent) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Agent or any other Agent-Related Person (solely to the extent any such other Agent-Related Person was performing services on behalf of such Agent) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; *provided* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's or any other Agent-Related Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.08 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by

or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided further* that the failure of any Lender to indemnify or reimburse such Agent shall not relieve any other Lender of its obligation in respect thereof.

Section 9.09    <u>The Administrative Agent in Its Individual Capacity</u>. If the Administrative Agent is a Lender, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders" or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its individual capacity. The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Loan Party or any Affiliate of any Loan Party (or any Person engaged in a similar business with any Loan Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party or any Affiliate of any Loan Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders. The Lenders and the other Secured Parties acknowledge that, pursuant to such activities, an Agent-Related Person may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent-Related Person shall be under any obligation to provide such information to them.

Section 9.10    [Reserved].

Section 9.11    <u>Resignation by the Administrative Agent and the Collateral Agent</u>. Each of the Administrative Agent and Collateral Agent may resign from the performance of all its respective functions and duties hereunder or under the other Loan Documents at any time by giving 30 days prior written notice to the Lenders and the Borrower. If the Administrative Agent is in material breach of its obligations hereunder as Administrative Agent, then the Administrative Agent may be removed as the Administrative Agent at the reasonable request of the Required Lenders. If the Administrative Agent is a Defaulting Lender, the Borrower may remove the Defaulting Lender from such role upon 15 days prior written notice to the Lenders. Such resignation or removal shall take effect upon the appointment of a successor Administrative Agent or Collateral Agent as provided below.

Upon any such notice of resignation by, or notice of removal of, the Administrative Agent or Collateral Agent, the Required Lenders shall appoint a successor Administrative Agent or Collateral Agent, as applicable, who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (*provided* that the Borrower's approval shall not be required if an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing).

If a successor Administrative Agent or Collateral Agent shall not have been so appointed within such 30 day period, such Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed, *provided* that the Borrower's consent shall not be required if an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing), shall then appoint a successor Administrative Agent or Collateral Agent, as applicable, who shall serve in such capacity until such time, if any, as the Required Lenders appoint a successor as provided above.

If no successor Administrative Agent or Collateral Agent has been appointed pursuant to the foregoing by the 30th day after the date such notice of resignation was given by such Agent or such notice of removal was given by the Required Lenders or the Borrower, as applicable, such Agent's resignation

shall nonetheless become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided above. The retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section 9.11.

Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.11).

The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent and the Collateral Agent hereunder and the other Loan Documents shall continue in effect for the benefit of such retiring Agent, its co-agents, sub-agents and attorneys-in-fact and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

Upon a resignation of the Administrative Agent pursuant to this Section 9.11, the Administrative Agent shall continue to be subject to Section 10.09.

Section 9.12    <u>Collateral Matters</u>. Each Secured Party (including in its capacities as a Cash Management Bank and a Hedge Bank) irrevocably authorizes and directs the Collateral Agent to take the actions to be taken by them as set forth in Section 7.04 and 10.24.

Each Lender hereby agrees, each other Secured Party (by accepting the benefits of the Security Documents) and each holder of any Term Note (by the acceptance thereof) will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders (or such greater percentage of Lenders required) in accordance with the provisions of this Agreement or the Collateral Agreement, and the exercise by the Required Lenders (or such greater percentage of Lenders required) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Collateral Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Collateral Documents.

Upon request by any Agent at any time, the Lenders will confirm in writing such Agent's authority to release particular types or items of Collateral pursuant to this Section 9.12. In each case as specified in this Section 9.12, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from

the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents, this Section 9.12, and Section 10.24.

The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, maintained, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 9.12, Section 10.24 or in any of the Collateral Documents.

Section 9.13     [Reserved].

Section 9.14     Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent-Related Persons and all other amounts due the Lenders and the Agent-Related Parties under Sections 2.09, 3.01, 10.04, and 10.05) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their Agent-Related Persons, and any other amounts due the Agents and their Agent-Related Persons under the Loan Documents (including all amounts due under Sections 2.09, 3.01, 10.04, and 10.05).

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.15     Appointment of Supplemental Agents.

(1)     It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent

187

deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent and the Collateral Agent, as applicable, is hereby authorized to appoint an additional individual or institution selected by it in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individua lly as a "**Supplemental Agent**" and collectively as "**Supplemental Agents**"). No Agent shall be responsible for the negligence or misconduct of any Supplemental Agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such Supplemental Agent.

(2)     In the event that the Administrative Agent or Collateral Agent appoints a Supplemental Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Agent to the extent, and only to the extent, necessary to enable such Supplemental Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Agent shall run to and be enforceable by such Supplemental Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent and Collateral Agent shall inure to the benefit of such Supplemental Agent and all references therein to the Administrative Agent and/or the Collateral Agent shall be deemed to be references to such Supplemental Agent, as the context may require.

(3)     Should any instrument in writing from any Loan Party be reasonably required by any Supplemental Agent so appointed by the Administrative Agent or Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments reasonably acceptable to it promptly upon request by the Administrative Agent or the Collateral Agent. In case any Supplemental Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent, as applicable, until the appointment of a new Supplemental Agent.

Section 9.16     Intercreditor Agreements.

(1)     Notwithstanding anything to the contrary in this Agreement or in any other Loan Document: (a) the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Loan Documents and the exercise of any right related to any Collateral shall be subject, in each case, to the terms of the Intercreditor Provisions, the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, (b) in the event of any conflict between the express terms and provisions of this Agreement or any other Loan Document, on the one hand, and of the Intercreditor Provisions, the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, on the other hand, the terms and provisions of the Intercreditor Provisions, the ABL Intercreditor Agreement or Term Intercreditor Agreement, as the case may be, shall control and (c) each Lender hereunder agrees to be bound by the terms of the Intercreditor Provisions.

(2)     Each Lender (and, by its acceptance of the benefits of any Collateral Document, each other Secured Party) authorizes and directs the applicable Agent to enter into, and agrees to be bound by, this Agreement, the Collateral Documents, the other Loan Documents, the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement. Each Lender hereby

acknowledges and agrees that (x) the foregoing instructed actions constitute an instruction from all the Lenders under this Section and (y) this Article IX and Section 9.08 and any other rights, privileges, protections, immunities, and indemnities in favor of any Agent hereunder and under the other Loan Documents apply to any and all actions taken or not taken by such Agent in accordance with such instruction.

Section 9.17    <u>Secured Cash Management Agreements and Secured Hedge Agreements</u>. Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank or Hedge Bank that obtains the benefits of Section 8.03, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Agreement or the other Loan Documents to the contrary, (i) no Agent shall be responsible or have any liability for or in connection with, or have any duty to ascertain, inquire into, monitor, maintain, update or enforce compliance with the provisions hereof relating to Cash Management Agreements or Hedge Agreements, and (ii) no Agent deemed to have notice of any Cash Management Obligations or Hedging Obligations, or be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements, unless such Agent has received written notice thereof, together with such supporting documentation as such Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

Section 9.18    <u>Withholding Tax</u>. To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.18. The agreements in this Section 9.18 shall survive the resignation, replacement or removal of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

Section 9.19    <u>Survival</u>. The agreements in this Article IX shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

## ARTICLE X

## Miscellaneous

Section 10.01    Amendments, etc.

(1)       Subject to Section 1.12 and Section 7.15 and except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (with a fully-executed copy thereof delivered to the Administrative Agent) (other than with respect to any amendment or waiver contemplated in clause (i) below), which shall only require the consent of the Required Facility Lenders under the applicable Facility or Facilities) (or by the Administrative Agent with the consent of the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)    extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or 2.08 (other than pursuant to Section 2.08(2)) or any payment of fees or premiums hereunder or under any Loan Document with respect to payments to any Lender without the written consent of such Lender, it being understood that none of the following will constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of principal, interest, fees or premiums: the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (I) of the proviso immediately succeeding clause (i) of this Section 10.01(1)) any fees or other amounts payable hereunder or under any other Loan Document to any Lender without the written consent of such Lender; *provided* that only the consent of (A) the Required Lenders shall be necessary to amend the definition of "Default Rate" and (B) the Required Lenders will be necessary to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)    except as contemplated by clause (C) in the second proviso immediately succeeding clause (i) of this Section 10.01(1), (x) change any provision of this Section 10.01 or the definition of "Required Lenders" or "Required Facility Lenders," or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender and (y) change the definition of "Pro Rata Share" without the written consent of each Lender directly and adversely affected thereby;

(e)    other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(f)    other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)   change any provision requiring pro rata payments or pro rata sharing of payments, without the written consent of each Lender directly and adversely affected thereby;

(h)   change any term or provision of Section 7.14(1) without the consent of each Lender directly and adversely affected thereby;

(i)   other than in connection with a transaction permitted by Section 7.14(1), change any term or provision of Section 8.03, without the written consent of each Lender directly and adversely affected thereby;

(j)   amend, waive or otherwise modify any term or provision (including the availability and conditions to funding and the rate of interest applicable thereto) which directly affects Lenders of one Facility and does not directly affect Lenders under any other Facility, in each case, without the written consent of the Required Facility Lenders under such applicable Facility;

(k)   other than in a transaction permitted by Section 7.14(1) and except as permitted under Section 10.24(c), modify or change any provision of this Agreement or the related definitions that could result in subordinating the Liens over the Collateral securing the Obligations to any Lien securing any other Indebtedness or subordinating the Term Loans in right of payment to any other Indebtedness, without the written consent of each Lender directly and adversely affected thereby; or

(l)   change the definition of "Unrestricted Subsidiary" or the addition of any Unrestricted Subsidiaries after the Closing Date, without the written consent of each Lender;

*provided* that:

(I) no amendment, waiver or consent shall, unless in writing and signed by the applicable Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, such Agent under this Agreement or any other Loan Document;

(II)   Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; and

(III)   no amendment, waiver or consent to change any term or provision of Section 8.03 (except any change to the last paragraph of Section 8.03(l) and the second to last paragraph of Section 8.03(2)) or the Intercreditor Provisions shall require the consent of the Borrower or any other Loan Party, except to the extent adversely affected thereby or such amendment imposes additional obligation or liability upon the Borrower or any other Loan Party;

*provided further* that notwithstanding the foregoing:

(A)   no Defaulting Lender shall have any right to approve or disapprove of any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders, the Required Lenders, the Required Facility Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders) (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders);

(B)      no Lender consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement (i) that is for the purpose of adding the holders of Credit Agreement Refinancing Indebtedness or any other Permitted Indebtedness that is secured Indebtedness (or a Debt Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of such Applicable Intercreditor Agreement, as applicable (it being understood that any such amendment, modification or supplement may make such other changes to the applicable Applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by any Applicable Intercreditor Agreement; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of, or any fees or other amounts payable to, any Agent hereunder or under any other Loan Document without the prior written consent of such Agent, as applicable;

(C)      this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders;

(D)      any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section 10.01 if such Class of Lenders were the only Class of Lenders hereunder at the time;

(E)      Without limiting the scope of Section 10.01(3) below, any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency (including amendments, supplements or waivers to any of the Collateral Documents, guarantees, intercreditor agreements or related documents executed by any Loan Party or any other Subsidiary in connection with this Agreement if such amendment, supplement or waiver is delivered in order to cause such Collateral Documents, guarantees, intercreditor agreements or related documents to be consistent with this Agreement and the other Loan Documents) so long as, in each case, the Lenders shall have received at least 5 Business Days' prior written notice thereof and the Administrative Agent shall not have received, within 5 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; *provided* that the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any such changes necessary to be made in connection with any borrowing of Refinancing Loans, any Extension or any borrowing of Replacement Loans and otherwise to effect the provisions of Section 2.15 or 2.16 or the immediately succeeding paragraph of this Section 10.01, respectively;

(F)     the Borrower and the Collateral Agent may, without the input or consent of the other Lenders, (i) effect changes to any Mortgage or any other Collateral Document as may be necessary or appropriate in the opinion of the Collateral Agent and (ii) effect changes to this Agreement that are necessary and appropriate to effect the offering process set forth in Section 2.05(1)(e); and

(G)     with respect to the consent of Required Lenders expressly required by any Deemed Consent Provision, (but not, for the avoidance of doubt, any amendment or waiver of, or consent to a departure from, any Deemed Consent Provision), the Administrative Agent or the Collateral Agent, as applicable, shall deliver any such request from the Borrower to the Lenders and, if the Lenders shall have received at least 15 Business Days' prior written notice thereof and the Administrative Agent or the Collateral Agent shall not have received, within 15 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such request, then the ~~Lenders shall be deemed to have accepted.~~Required Lenders shall be deemed to have accepted (provided, however, for the avoidance of doubt, this clause (G) shall not alter or be deemed to alter the rights, privileges, protections, immunities and indemnities granted to any Agent under this Agreement, including, without limitation, Article IX above, and the other Loan Documents).

(2)     In addition, notwithstanding anything to the contrary in this Section 10.01, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the Replacement Loans (as defined below) to permit the refinancing of all outstanding Term Loans of any Class ("**Replaced Loans**") with replacement term loans ("**Replacement Loans**") hereunder; *provided* that

(a)     the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of such Replaced Loans, *plus* accrued interest, fees, premiums (if any) and penalties thereon and fees and expenses incurred in connection with such refinancing of Replaced Loans with such Replacement Loans,

(b)     the All-In Yield with respect to such Replacement Loans (or similar interest rate spread applicable to such Replacement Loans) shall not be higher than the All-In Yield for such Replaced Loans (or similar interest rate spread applicable to such Replaced Loans) immediately prior to such refinancing,

(c)     the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Replaced Loans at the time of such refinancing; and

(d)     all other terms (other than with respect to pricing, premiums and optional prepayment or redemption terms) applicable to such Replacement Loans shall be substantially identical to, or no more favorable taken as a whole (in each case as determined by the Borrower in its reasonable judgment) to the Lenders providing such Replacement Loans than, those applicable to such Replaced Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the Latest Maturity Date of the Loans in effect immediately prior to such refinancing (*provided* that an Officer's Certificate delivered to the Administrative Agent at least 5 Business Days prior to the incurrence of such Replacement Loans, together with a reasonably detailed description of the material terms and conditions of such Replacement Loans or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this Section 10.01(2) shall be conclusive evidence that such terms and conditions satisfy such

requirement unless the Administrative Agent notifies the Borrower within such five 5 Business Day period that the Required Lenders disagree with such determination (including a description of the basis upon which the Required Lenders disagree));

*provided further* that each amendment to this Agreement providing for Replacement Loans may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower to effect the provisions of this paragraph, and for the avoidance of doubt, this paragraph shall supersede any other provisions in this Section 10.01 to the contrary.

(3)  In addition, notwithstanding anything to the contrary in this Section 10.01,

(a)  the Guaranty, the Collateral Documents and related documents executed by Holdings, the Borrower or any Restricted Subsidiaries in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause the Guaranty, Collateral Documents or other document to be consistent with this Agreement and the other Loan Documents (including by adding additional parties as contemplated herein or therein) and

(b)  if the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document. Notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective.

Section 10.02  Notices and Other Communications; Facsimile Copies.

(1)  General. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(a)  if to Holdings, the Borrower or the Administrative Agent, to the address, facsimile number or electronic mail address specified for such Person on Schedule 10.02; and

(b)  if to any other Lender, to the address, facsimile number or electronic mail address specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next succeeding Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (2) below shall be effective as provided in such subsection (2).

(2)      Electronic Communication. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(3)      Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next succeeding Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(4)      The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall any Agent or any of its Agent-Related Persons (collectively, the "**Agent Parties**") have any liability to any Loan Party, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or such Agent's transmission of Borrower Materials through the Internet or the Platform.  Although the Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Platform is secured through a per-deal authorization method whereby each user may access the Platform only on a deal-by-deal basis, each of the Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agents are not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Platform, and that there are confidentiality and other risks associated with such distribution.  Each of the Lenders and the Borrower hereby approves distribution of the Borrower Materials through the Platform and understands and assumes the risks of such distribution.

(5)      Change of Address. Each Loan Party and any Agent may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire

instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private-Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws. In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Loan Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

(6)     Reliance by the Agents. The Agents and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03    No Waiver; Cumulative Remedies. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as such) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 10.10 (subject to the terms of Section 2.13), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided further* that if at any time there is no Person acting as Administrative Agent or Collateral Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent or Collateral Agent, as applicable, pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04    Costs and Expenses. The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse each Agent and Ad Hoc Group of Term Lenders for all reasonable and documented out-of-pocket

costs and expenses of such Agent and the Ad Hoc Group of Term Lenders (with respect to the Ad Hoc Group of Term Lenders, solely to the extent incurred in connection with the Transactions on or prior to the Closing Date) (promptly following a written demand therefor, together with backup documentation supporting such reimbursement request) incurred in connection with the preparation, negotiation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Ropes & Gray LLP, as counsel to the Agents and, if necessary, a single local counsel in each relevant material jurisdiction, and (b) upon presentation of a summary statement, together with any supporting documentation reasonably requested by the Borrower, to pay or reimburse the Agents (taken as a whole) and the Lenders (taken as a whole), promptly following a written demand therefor for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including (i) all Attorney Costs of one counsel to the Agents (and, if necessary, one local counsel in any relevant material jurisdiction) and (ii) all Attorney Costs of one counsel to the Lenders taken as a whole (and, if necessary, one local counsel in any relevant material jurisdiction and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)). The agreements in this Section 10.04 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document. All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05   <u>Indemnification by the Borrower</u>. The Borrower shall indemnify and hold harmless the Agents, each other Lender, the Ad Hoc Group of Term Lenders and their respective Related Persons (collectively, the "**Indemnitees**") from and against any and all losses, claims, actions, judgments, damages, liabilities or expenses (including Attorney Costs and Environmental Liabilities) to which any such Indemnitee may become subject arising out of, resulting from or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of (a) one counsel to the Agents and their Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for the Agents and their Indemnitees taken as a whole in each relevant jurisdiction) and (b) one counsel to all other Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all other Indemnitees taken as a whole in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) <u>(i)</u> any <del>(i)</del> actual or threatened claim, litigation, investigation, proceeding or Environmental Liabilities relating to the Transactions or (ii) <del>to</del> the execution, delivery<u>, funding</u>, enforcement, performance and administration of this Agreement, the other Loan Documents, the Loans or the use, or proposed use of the proceeds therefrom, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation, investigation or proceeding), and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses resulted from (x) the gross negligence or willful misconduct of such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) other than with respect to the Agents and their Indemnitees, the bad faith of or a material breach of any obligations under any Loan Document by such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling

197

its role as an administrative agent, collateral agent, or arranger or any similar role under any Loan Document and other than any claims arising out of any act or omission of the Loan Parties or any of their Affiliates) (as determined by a final, non-appealable judgment of a court of competent jurisdiction). To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that they are permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of such Indemnitee), nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party for which such Indemnitee is otherwise entitled to indemnification pursuant to this Section 10.05). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this Section 10.05 shall be paid within 20 Business Days after written demand therefor. The agreements in this Section 10.05 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document. This Section 10.05 shall not apply to Taxes, except any Taxes that represent losses or damages arising from any non-Tax claim. Notwithstanding the foregoing, each Indemnitee shall be obligated to refund and return promptly any and all amounts paid by the Borrower under this Section 10.05 to such Indemnitee for any such fees, expenses or damages to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.

Section 10.06    Marshaling; Payments Set Aside. None of the Agents or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to any Agent upon demand its applicable share of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

Section 10.07    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 7.03, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and

each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder (including to existing Lenders and their Affiliates) except (i) to an Eligible Assignee and (A) in the case of any Eligible Assignee that, immediately prior to or upon giving effect to such assignment, is an Affiliated Lender, in accordance with the provisions of Section 10.07(h) and (B) in the case of any Eligible Assignee that is Holdings, the Borrower or any Subsidiary thereof, in accordance with the provisions of Section 10.07(l), (ii) by way of participation in accordance with the provisions of Section 10.07(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f), or (iv) to an SPC in accordance with the provisions of Section 10.07(g) (and any other attempted assignment or transfer by any party hereto (other than the replacement of the Administrative Agent pursuant to Article IX above) shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d) and, to the extent expressly contemplated hereby, Related Persons of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  <u>Assignments by Lenders.</u> Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)  <u>Minimum Amounts.</u>

(A)  in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)  in any case not described in subsection (b)(i)(A) of this Section 10.07, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1.0 million, unless either (x) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (y) each of the Administrative Agent and the Borrower otherwise consents; *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)  <u>Proportionate Amounts.</u> Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)  <u>Required Consents.</u> No consent shall be required for any assignment except to the extent required by Section 10.07(b)(i)(B) and, in addition:

(A)  the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing at the time of such assignment determined as of the date the Assignment and Assumption with respect to

such assignment is delivered to the Administrative Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, (2) in respect of an assignment of all or a portion of the Loans, such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund, (3) such assignment is in respect of Second-Out Loans or (4) such assignment is by [Jefferies Group~~Capital Services~~ LLC]~~,~~ as a fronting Lender to the Lenders set forth on the Schedule attached to the applicable fronting letter; *provided* that the Borrower shall be deemed to have consented to any assignment of all or a portion of the Term Loans unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice of a failure to respond to such request for assignment; *provided further* that no consent of the Borrower shall be required for an assignment of all or a portion of the Loans pursuant to Section 10.07(h) or (l); and

(B) the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund with respect to a Lender; *provided* that no consent of the Administrative Agent shall be required for an assignment (i) of all or a portion of the Loans pursuant to Section 10.07(g), (h), or (l).

(iv)   <u>Assignment and Assumption.</u> The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent). Other than in the case of assignments pursuant to Section 10.07(l), the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire. Each assignee Lender shall be required to represent in the Assignment and Assumption that it is not a Disqualified Institution or an Affiliate of a Disqualified Institution.

(v)   <u>No Assignments to Certain Persons.</u> No such assignment shall be made (A) to Holdings, the Borrower or any of its Subsidiaries except as permitted under Section 2.05(1)(e) or Section 10.07(l), (B) subject to Sections 10.07(h) and (l) below, to any Affiliate of the Borrower, (C) to a natural person or (D) to any Disqualified Institution.

This Section 10.07(b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis among such Facilities.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans in accordance with its Pro Rata Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section 10.07 (and, in the case of an Affiliated Lender or a Person that, after giving effect to such assignment, would become an Affiliated Lender, to the requirements of clause (h) of this Section 10.07), from and after the effective date specified in each Assignment and Assumption, other than in connection with an assignment pursuant to Section 10.07(l), (x) the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (y) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment), but shall in any event continue to be subject to Section 10.09. Upon request, and the surrender by the assigning Lender of its Term Note, the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(d).

(c)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, each Affiliated Lender Assignment and Assumption delivered to it, each notice of cancellation of any Loans delivered by the Borrower pursuant to subsections (h) or (l) below, and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans and amounts due under Section 2.03, owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 10.07(3) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations). Notwithstanding the foregoing, in no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is an Affiliated Lender, nor shall the Administrative Agent be obligated to monitor the aggregate amount of the Term Loans held by Affiliated Lenders.

(d)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any Affiliate or Subsidiary of the Borrower or a Disqualified Institution) (each, a "**Participant**") in all or a portion of such Lender's rights or obligations under this Agreement (including all or a portion of its Commitment or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than clauses (d) and (i) thereof)

that directly affects such Participant. Subject to subsection (e) of this Section 10.07, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements of Section 3.01 (including subsections (2), (3) and (4), as applicable as though it were a Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.07. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.10 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(e)   <u>Limitations upon Participant Rights.</u> A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and the Borrower shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary; *provided* that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of the Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or other obligations under any Loan Document) to any Person except to the extent such disclosure is necessary to establish that any such commitments, loans, letters of credit or other obligations are in registered form for U.S. federal income tax purposes. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)   Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)   Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof shall be appropriately reflected in the Participant Register. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with

notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)   Any Lender may at any time, assign all or a portion of its rights and obligations with respect to Loans and Commitments under this Agreement to a Person who is or will become, after such assignment, an Affiliated Lender through (x) Dutch auctions or other offers to purchase or take by assignment open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.05(1)(e) or (y) open market purchase on a non-pro rata basis, in each case subject to the following limitations:

(i)   Affiliated Lenders will not make any challenge to any Agent's or any Lender's attorney-client privilege on the basis of its status as a Lender;

(ii)   each Affiliated Lender that purchases any Loans or Commitments will clearly identify itself as an Affiliated Lender in any Affiliated Lender Assignment and Assumption executed in connection with such purchases or sales and each such Affiliated Lender Assignment and Assumption shall contain customary "big boy" representations but no requirement to make representations as to the absence of any material nonpublic information;

(iii)   as a condition to each assignment pursuant to this subsection (h), the Administrative Agent and the Borrower shall have been provided a notice in connection with each assignment to an Affiliated Lender or a Person that upon effectiveness of such assignment would constitute an Affiliated Lender pursuant to which such Affiliated Lender (in its capacity as such) shall waive any right to bring any action in connection with such Loans and Commitments against any Agent, in its capacity as such;

(iv)   the aggregate principal amount of Term Loans of any Class under this Agreement held by Affiliated Lenders at the time of any such purchase or assignment shall not exceed (I) in the case of the First Out Loans, 33.33% and (II) otherwise, 25%, in each case, of the aggregate principal amount of Term Loans of such Class outstanding at such time under this Agreement (such percentage, the "**Affiliated Lender Cap**"); *provided* that to the extent any assignment to an Affiliated Lender would result in the aggregate principal amount of all Term Loans of any Class held by Affiliated Lenders exceeding the Affiliated Lender Cap (in each case, determined at the time of purchase), the assignment of such excess amount will be void *ab initio*; and

(v)   the assigning Lender and the Affiliated Lender purchasing such Lender's Term Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit D-2 hereto (an "**Affiliated Lender Assignment and Assumption**").

Notwithstanding anything to the contrary contained herein, any Affiliated Lender that has purchased Term Loans pursuant to this subsection (h) may, in its sole discretion, contribute, directly or indirectly, the principal amount of such Term Loans or any portion thereof, *plus* all accrued and unpaid interest thereon, to the Borrower for the purpose of cancelling and extinguishing such Term Loans. Upon the date of such contribution, assignment or transfer, (x) the aggregate outstanding principal amount of Term Loans shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (y) the Borrower shall promptly provide notice to the Administrative Agent of such contribution of

such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register.

Each Affiliated Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it acquires any Person who is also a Lender, and each Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it becomes an Affiliated Lender. The Administrative Agent may conclusively rely upon any notice delivered pursuant to the immediately preceding sentence or pursuant to clause (v) of this subsection (h) and shall not have any liability for any losses suffered by any Person as a result of any purported assignment to or from an Affiliated Lender.

Notwithstanding anything to the contrary contained herein, (x) any Affiliated Lender shall be entitled to (a) receive information made available to any Lender holding the same Class of Term Loans as such Affiliated Lender and (b) attend all lender meetings and participate in any conference calls with the Borrower that are open to any Lender holding the same Class of Term Loans as such Affiliated Lender and (y) with respect to any amendment, modification, waiver, consent or other action that requires the consent of Required Lenders or the consent of Required Facility Lenders, all fees and other benefits made available to any consenting Lenders holding the same Class of Term Loans any Affiliated Lender shall be made available to such Affiliated Lender on a no less than pro rata basis.

(i)     Notwithstanding anything in Section 10.01 or the definition of "Required Lenders," or "Required Facility Lenders" to the contrary, for purposes of determining whether the Required Lenders and Required Facility Lenders (in respect of a Class of Term Loans) have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, or subject to Section 10.07(j), any plan of reorganization pursuant to the Bankruptcy Code, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required any Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, no Affiliated Lender shall have any right to consent (or not consent), otherwise act or direct or require any Agent or any Lender to take (or refrain from taking) any such action and:

(i)     all Term Loans held by any Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders and Required Facility Lenders (in respect of a Class of Term Loans) have taken any actions; and

(ii)    all Term Loans held by Affiliated Lenders shall be deemed to have been voted in the same proportion as non-Affiliated Lenders voting on such matter unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

(j)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliated Lender hereby agrees that, and each Affiliated Lender Assignment and Assumption shall provide a confirmation that, if a proceeding under any Debtor Relief Law shall be commenced by or against the Borrower or any other Loan Party at a time when such Lender is an Affiliated Lender, such Affiliated Lender irrevocably authorizes and empowers the Administrative Agent (at the direction of the Required Lenders) to vote on behalf of such Affiliated Lender with respect to the Term Loans held by such Affiliated Lender in the same proportion as non-Affiliated Lenders voting on such matter, unless the Administrative Agent (at the direction of the Required Lenders) instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Term Loans held by it as the Administrative Agent (at the direction of the Required Lenders) directs; *provided* that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and

not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner than the proposed treatment of similar Obligations held by Term Lenders that are not Affiliated Lenders.

(k)    [Reserved].

(l)    Any Lender may, so long as no Event of Default has occurred and is continuing, at any time, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to Holdings, the Borrower or any Subsidiary of the Borrower through (x) Dutch auctions or other offers to purchase open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.05(l)(e) or (y) open market purchases on a non-pro rata basis; *provided* that:

(i)    (x) if the assignee is Holdings or a Subsidiary of the Borrower, upon such assignment, transfer or contribution, the applicable assignee shall automatically be deemed to have contributed or transferred the principal amount of such Term Loans, *plus* all accrued and unpaid interest thereon, to the Borrower; or (y) if the assignee is the Borrower (including through contribution or transfers set forth in clause (x)), (a) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Lenders shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (c) the Borrower shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(ii)    [Reserved]; and

(iii)    purchases of Term Loans pursuant to this subsection (l) may not be funded with the proceeds of ABL Loans.

(m)    Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(n)    Notwithstanding the foregoing, no Disqualified Institution that purports to become a Lender hereunder (notwithstanding the provisions of this Agreement that prohibit Disqualified Institutions from becoming Lenders) shall be entitled to any of the rights or privileges enjoyed by the other Lenders with respect to voting, information and lender meetings. In addition, if any assignment or participation is made to any Disqualified Institution without the Borrower's express prior written consent (which consent shall state expressly that the Borrower acknowledges that the assignee Lender is a Disqualified Institution) in violation of clause (v) of Section 10.07(b), the Borrower may, in addition to

205

any other rights and remedies that it may have against such Disqualified Institution, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) in the case of outstanding Term Loans held by Disqualified Institutions, purchase or prepay such Term Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in Section 10.07), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

(o)   No Agent shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions or otherwise take (or omit to take) any action with respect thereto. Without limiting the generality of the foregoing, no Agent shall (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution.

Section 10.08   [Reserved].

Section 10.09   Confidentiality. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, equity owners, investors or funding sources of Lenders who are Affiliates of Permitted Holders, legal counsel, independent auditors, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, with such Affiliate being responsible for such Person's compliance with this Section 10.09; *provided*, *however*, that such Agent or Lender, as applicable, shall be principally liable to the extent this Section 10.09 is violated by one or more of its Affiliates or any of its or their respective employees, directors or officers), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided*, *however*, that each Agent and each Lender agrees to seek confidential treatment with respect to any such disclosure, (c) to the extent required by applicable laws or regulations or by any subpoena or otherwise as required by applicable Law or regulation or as requested by a Governmental Authority; *provided* that such Agent or such Lender, as applicable, agrees (x) that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (except in connection with any request as part of any audit or regulatory examination) unless such notification is prohibited by law, rule or regulation and (y) to seek confidential treatment with respect to any such disclosure, (d) to any other party hereto, (e) subject to an agreement containing provisions at least as restrictive as those of this Section 10.09, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee (or its agent) invited to be an Additional Lender or (ii) with the prior consent of the Borrower, any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any of their Subsidiaries or any of their respective obligations; *provided* that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, Participant or Eligible Assignee that such Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to the Borrower and the Agents, including as set forth in any confidential information memorandum or other marketing materials) in accordance with the standard syndication process of the

Agents or market standards for dissemination of such type of information which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information, (f) for purposes of establishing a "due diligence" defense, (g) with the consent of the Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach by any Person of this Section 10.09 or any other confidentiality provision in favor of any Loan Party, (y) becomes available to any Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent, such Lender or the applicable Affiliate to be subject to a confidentiality restriction in respect thereof in favor of Holdings, the Borrower or any Affiliate of the Borrower or (z) is independently developed by the Agents, the Lenders or their respective Affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this Section 10.09 or (i) in order to enforce its respective rights under any Loan Document in any action or proceeding.

For purposes of this Section 10.09, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary or Affiliate thereof or their respective businesses, other than any such information that is available to any Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary or Affiliate thereof after the date hereof shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 10.09 shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Agent and each Lender acknowledges that (a) the Information may include trade secrets, protected confidential information, or material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of such information and (c) it will handle such information in accordance with applicable Law, including United States Federal and state securities Laws and to preserve its trade secret or confidential character.

The respective obligations of the Agents and the Lenders under this Section 10.09 shall survive, to the extent applicable to such Person, (x) the payment in full of the Obligations and the termination of this Agreement, (y) any assignment of its rights and obligations under this Agreement and (z) the resignation or removal of any Agent.

Section 10.10   Setoff. If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party then due and payable under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender under this Section 10.10 are in addition to other rights and remedies (including other rights of setoff) that such Lender may have. Each Lender agrees to notify the Borrower

and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.11   Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.12   Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.13   Electronic Execution of Assignments and Certain Other Documents. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.14   Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Term Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.15   Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.16   GOVERNING LAW.

(a)   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

(b)   THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)   THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION 10.16. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 10.17   WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO

ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.17.

Section 10.18   Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

Section 10.19   Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Required Lenders.

Section 10.20   Use of Name, Logo, etc.. Each Loan Party consents to the publication in the ordinary course by any Agent or the Ad Hoc Group of Term Lenders of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark. Such consent shall remain effective until revoked by such Loan Party in writing to such Agent and Ad Hoc Group of Term Lenders.

Section 10.21   USA PATRIOT Act. Each Lender that is subject to the USA PATRIOT Act and each Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act. The Borrower shall, promptly following a request by any Agent or any Lender, provide all documentation and other information that such Agent or Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 10.22   Service of Process. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.23   No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Agents and Ad Hoc Group of Term Lenders and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Agents, the Ad Hoc Group of Term Lenders and the Lenders, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, the Ad Hoc Group of Term Lenders and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents, Ad Hoc Group of Term Lenders nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, Ad Hoc

Group of Term Lenders, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Agents, the Ad Hoc Group of Term Lenders nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Agents, the Ad Hoc Group of Term Lenders or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.24   <u>Release of Collateral and Guarantee Obligations; Subordination of Liens.</u>

(a)   The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released (i) in full, as set forth in clause (b) below, (ii) upon the sale or other transfer of such Collateral (including as part of or in connection with any other sale or other transfer permitted hereunder) to any Person other than another Loan Party, to the extent such sale, transfer or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party by a Person that is not a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guaranty (in accordance with the second succeeding sentence), (vi) as required by the Collateral Agent to effect any sale, transfer or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Collateral Documents and (vii) to the extent such Collateral otherwise becomes Excluded Assets. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents. Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guaranties upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary, or otherwise becoming an Excluded Subsidiary. The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. The Administrative Agent or the Collateral Agent, as applicable, shall, at the Borrower's expense, upon receipt of an Officer's Certificate from the Borrower certifying that the requested release is permitted under this Section 10.24, release the requested Collateral from the Liens securing the Obligations and provide the Borrower with such additional documentation as the Borrower may reasonably request to evidence such release; *provided* that such release and such additional documentation shall not expose the Administrative Agent or the Collateral Agent to liability and shall be without recourse to or representation or warranty by the Administrative Agent or the Collateral Agent. Any representation, warranty or covenant contained in any Loan Document relating to any such released Collateral or Guarantor shall no longer be deemed to be repeated.

(b)   Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent obligations not then due) have been paid in full and all

211

Commitments have terminated, upon request of the Borrower, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent obligations not then due. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)   Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Permitted Lien specified in clause (7) of the definition thereof securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of Section 7.02(b) in any Collateral, and at the Borrower's expense, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to subordinate the Lien on any Collateral to any such Permitted Lien to be senior to the Liens in favor of the Collateral Agent; *provided*, that the Borrower shall have provided the Administrative Agent or Collateral Agent, as applicable, with an Officer's Certificate certifying that such requested subordination and such requested actions are permitted under this Section 10.24; *provided, further*, that such requested actions shall not expose the Administrative Agent or the Collateral Agent to liability and shall be without recourse to or representation or warranty by the Administrative Agent or the Collateral Agent.

(d)   Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrower's assets in a bankruptcy, foreclosure or other similar proceeding, forbear from exercising remedies upon an Event of Default, or in a bankruptcy proceeding, enter into a settlement agreement on behalf of all Lenders.

Section 10.25    [Reserved].

Section 10.26    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the

Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

Section 10.27  <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)  the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)  the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 10.28  <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a) In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were

213

governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b) As used in this Section 10.28, the following terms have the following meanings:

(1) "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

(2) "Covered Entity" means any of the following:

i. a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

ii. a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

iii. a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(3) "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

(4) "QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 10.29  Amendment and Restatement.  On the Closing Date, the Existing Credit Agreement shall be amended, restated and superseded in its entirety by this Agreement. The parties hereto acknowledge and agree that (i) this Agreement and the other documents entered into in connection herewith do not constitute a novation or termination of the "Obligations" (as defined in the Existing Credit Agreement, as applicable) under the Existing Credit Agreement, as applicable, as in effect prior to the Closing Date, (ii) such "Obligations" are in all respects continuing (as amended and restated hereby) as indebtedness and obligations outstanding under this Agreement and (iii) all claims, actions, causes of action, suits, damages and indemnities by any Loan Party or any Agent or Lender on account of any action, breach, non-compliance or default by any Loan Party or any Agent or Lender that occurred, or any inaction by any Loan Party or any Agent or Lender that should have occurred, in each case, on or prior to the Closing Date, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, shall cease to exist and be forever waived, released and discharged to the full extent permitted by law.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BELK, INC.,
as the Borrower

By: _____
    Name: _____
    Title: _____

BEAR PARENT INC.,
as Holdings


By: _____
    Name: _____
    Title: _____

2

ALTER DOMUS (US) LLC,
as Administrative  Agent and Collateral Agent

By: _____
      Name: _____
      Title: _____

[_____],
as Lender

By: _____
    Name: _____
    Title: _____

4

[Signature Page to Amended and Restated First Lien Credit Agreement]

## Exhibit D

**New ABL Facility Documents**

[EXECUTION VERSION]

LIMITED WAIVER AND AMENDMENT NO. 3 TO ABL CREDIT AGREEMENT

This LIMITED WAIVER AND AMENDMENT NO. 3 TO ABL CREDIT AGREEMENT, dated as of February 24, 2021 (this "**Agreement**"), is among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation (the "**Borrower**"), BANK OF AMERICA, N.A., as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each Lender party hereto.

## PRELIMINARY STATEMENTS

**WHEREAS**, reference is made to that certain ABL Credit Agreement, dated as of December 10, 2015 (as amended by that certain Amendment No. 1 to ABL Credit Agreement, dated as of August 29, 2019, as further amended by that certain Amendment No. 2 to ABL Credit Agreement, dated as of October 30, 2020, as in effect immediately prior to the effectiveness of this Agreement, the "**Existing Credit Agreement**"; the Existing Credit Agreement as amended by this Agreement, the "**Amended Credit Agreement**"; capitalized terms used but not defined herein having the meanings provided in the Amended Credit Agreement), among the Borrower, Holdings, the Lenders from time to time party thereto, the Administrative Agent and the Collateral Agent;

**WHEREAS**, as of the date hereof the Borrower and certain of its Subsidiaries will commence the Chapter 11 Cases with the United States Bankruptcy Court for the Southern District of Texas. Such commencement of an insolvency proceeding is an Event of Default pursuant to Section 8.01(6) of the Existing Credit Agreement (the "**Insolvency Proceeding Default**").

**WHEREAS**, the Borrower has failed to make that certain payment of Indebtedness due February 1, 2021 pursuant to the terms of the First Lien Credit Agreement. Such missed payment of Indebtedness is an Event of Default pursuant to Section 8.01(5) of the Existing Credit Agreement (the "**Payment Default**", together with the Insolvency Proceeding Default, the "**Specified Defaults**")

**WHEREAS**, the Administrative Agent and each of the Lenders have agreed to (i) waive the Specified Defaults and (ii) modify the Existing Credit Agreement in the manner described in Section 2 herein;

**NOW**, **THEREFORE**, in consideration of the undertakings set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Limited Waiver; No Other Waiver.

(a)    Subject to the terms and conditions herein contained and in reliance upon the representations and warranties of the Loan Parties herein contained, effective upon the Amendment No. 3 Effective Date, the Administrative Agent and the Lenders hereby waive for any and all purposes of the Existing Credit Agreement and the other Loan Documents, the Specified Defaults. The Administrative Agent acknowledges that, to the actual knowledge of any of the officers, representatives, sub-advisors or managers of the Administrative Agent who are actively involved in the negotiation of this Agreement, after giving effect to the transactions contemplated by this Agreement (including the waiver of the Specified Defaults contemplated by this clause (a)), they are not aware of any Default or Event of Default existing on the Amendment No. 3 Effective Date or of any circumstance existing on the Amendment No. 3 Effective Date that could give rise to a Default or an Event of Default.

(b)     No Other Waiver.  Other than the limited waiver set forth in <u>Section 1(a)</u> of this Agreement, nothing contained in this Agreement shall be construed as a waiver by Administrative Agent or any Lender of any covenant or provision of the Existing Credit Agreement, the other Loan Documents, this Agreement, or of any other contract or instrument between Loan Parties and Administrative Agent or any Lender, and the failure of Administrative Agent or any Lender at any time or times hereafter to require strict performance by the Loan Parties of any provision thereof shall not waive, affect or diminish any right of Administrative Agent or the Lenders to thereafter demand strict compliance therewith.  Other than with respect to the limited waiver set forth in <u>Section 1(a)</u> of this Agreement, Administrative Agent and each Lender hereby reserves all rights granted under the Existing Credit Agreement, the other Loan Documents, this Agreement and any other contract or instrument between any of them. The foregoing limited waiver shall be effective only in this specific instance and for the specific purpose for which it is given, and shall not entitle the Loan Parties to any other or further waiver in any similar or other circumstances.

2.     <u>Amendments to the Existing Credit Agreement</u>.  The Lenders and the Borrower hereby agree to amend the Existing Credit Agreement, as of the Amendment No. 3 Effective Date (as defined below), as follows:

(a)     <u>Composite Credit Agreement</u>. The Existing Credit Agreement is hereby amended to delete the bold, stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the bold, double-under lined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages of the Amended Credit Agreement attached as <u>Annex A</u> hereto.

(b)     <u>Schedules to Credit Agreement</u>.  Each of the Schedules to the Existing Credit Agreement are hereby replaced by the corresponding new schedules attached as <u>Annex B</u> hereto.

(c)     <u>Exhibits to Credit Agreement</u>. Exhibit C (Form of Compliance Certificate) and Exhibit J (Form of Borrowing Base Certificate) are hereby deleted in their entirety and a new Exhibit C and Exhibit J are substituted in their stead, each as attached hereto as <u>Annex C</u>.

3.     <u>Representations and Warranties</u>. To induce the other parties hereto to enter into this Agreement, the Borrower and Holdings represent and warrant to each of the Lenders party hereto, the Administrative Agent and the Collateral Agent that, after giving effect to this Agreement:

(a)     the execution, delivery and performance of this Agreement by the Borrower and Holdings, and the consummation of the transactions contemplated herein are within the corporate or other organizational powers of the Borrower or Holdings, as applicable, has been duly authorized by all necessary action on the part of the Borrower or Holdings, as applicable, and does not or will not contravene the terms of any applicable Organizational Documents;

(b)     this Agreement has been duly executed and delivered by Holdings and the Borrower, and this Agreement and the Amended Credit Agreement constitute a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing; and

(c)     all representations and warranties made in any Loan Document are true and correct in all material respects as if made on the date hereof; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that, any representation and warranty

that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

4.     <u>Conditions Precedent</u>.  This Agreement and the amendments set forth in <u>Section 2</u> of this Agreement shall become effective on the first date (the "**Amendment No. 3 Effective Date**") that:

(a)     the Administrative Agent has received counterparts of this Agreement, each of which shall be originals or .pdf copies or other facsimiles, duly executed and delivered by (w) each Lender, (x) Holdings, (y) the Borrower and (z) the Administrative Agent;

(b)     the Administrative Agent has received a Perfection Certificate, dated as of the Amendment No. 3 Effective Date, duly executed and delivered by the Borrower;

(c)     the Administrative Agent has received that certain Borrowing Base Certificate, dated as of the date hereof which reflects the Third Amendment Transactions;

(d)     the Administrative Agent has received (i) certificates of good standing from the secretary of state of the state of organization of each Loan Party (to the extent such concept exists in such jurisdiction), (ii) customary certificates of resolutions or other action, incumbency certificates or other certificates of Responsible Officers of each Loan Party evidencing the authority of each Loan Party to enter into copies this Agreement and applicable Loan Documents and the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Amendment No. 3 Effective Date, and (iii) a certification with respect to each Loan Party that either (A) the Organizational Documents provided in connection with that certain Omnibus Secretary's Certificate, dated as of December 10, 2015 remain in effect as of the Amendment No. 3 Effective Date or (B) attached thereto are the Organizational Documents of such Loan Party, and, in each case, such Organizational Documents have not been amended, modified, or repealed and no proceedings for the amendment, modification or any other related documents has been filed in the office of the Secretary of State of such Loan Party's jurisdiction of organization;

(e)     the Administrative Agent has received a customary legal opinion from Kirkland & Ellis LLP, special counsel to the Loan Parties;

(f)     the Administrative Agent has received a certificate from a Responsible Officer of the Borrower reasonably satisfactory in form and substance to the Administrative Agent, certifying that as of the Amendment No. 3 Effective Date and after giving effect to the Third Amendment Transactions (i) the Borrower and its Subsidiaries, on a consolidated basis, are Solvent, (ii)(x) since the date of the Annual Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect (other than customary events or circumstances which resulted from the commencement of the Chapter 11 Cases), and (y) since the entry of the Confirmation Order, no material adverse change in the ability of the Agents and the Lenders to enforce the Loan Documents and the obligations of the Loan Parties thereunder has occurred and (iii) the representations and warranties made by the Borrower in Section 3 above are true and correct as of the Amendment No. 3 Effective Date and that after giving effect to this Agreement, no Default or Event of Default has occurred and is continuing;

(g)     the Administrative Agent shall have received an amendment of the ABL Intercreditor Agreement, duly executed by the parties thereto and acknowledged and delivered by the Borrower and the other Loan Parties party thereto;

(h)     the Administrative Agent has received (i) that certain Amendment No. 2 to the First Lien Credit Agreement and (ii) that certain Amendment No. 3 to the Second Lien Credit Agreement, in each case, entered into by the Borrower, duly executed by the parties thereto and dated as of the Amendment No. 3 Effective Date;

(i)     the Administrative Agent shall have received the following documents to join Belk Sourcing LLC as a Guarantor (the "New Guarantor"):

     (i)     a supplement to the Security Agreement;

     (ii)     a supplement to the Guaranty Agreement;

     (iii)     a supplement to the Intercompany Subordination Agreement; and

     (iv)     a UCC-1 financing statement in the applicable jurisdiction of the New Guarantor;

(j)     the Confirmation Order, authorizing the Loan Parties to execute, deliver, and perform their obligations under this Agreement (including the payment of all fees with respect hereto), has been entered and is in full force and effect and has not (i) been stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could be reasonably expected to adversely affect the interests of the Administrative Agent or the Lenders or (ii) been the subject of an appeal;

(k)     the Third Amendment Transactions, including the Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Approved Plan, have been (or concurrently with the occurrence of the Amendment No. 3 Effective Date, shall be) substantially consummated in accordance with applicable Law, the Court, and the Bankruptcy Code;

(l)     to the extent requested at least three (3) Business Days prior to the Amendment No. 3 Effective Date, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Borrower shall have delivered to the Administrative Agent (on behalf of each Lender that so requests) a Beneficial Ownership Certification in relation to the Borrower;

(m)     the Administrative Agent has received all reasonable and documented out-of-pocket expenses incurred in connection with this Agreement and required to be paid to the Administrative Agent pursuant to the Amended Credit Agreement, to the extent invoiced no less than three (3) days prior to the proposed Amendment No. 3 Effective Date; and

(n)     the Administrative Agent has received all fees required to be paid to the Administrative Agent pursuant to that certain Third Amendment Fee Letter.

Without limiting the generality of the provisions of Section 10.01(1) of the Amended Credit Agreement, for purposes of determining compliance with the condition specified in this Section 4, each Lender that has signed this Agreement shall be deemed to have consented to, approved, accepted and to be satisfied with this Agreement and other matters required hereunder to be consented to or approved by or acceptable or

satisfactory to such Lender, unless the Administrative Agent shall have received notice from such Lender prior to the Amendment No. 3 Effective Date specifying its objection thereto.

5.    <u>Joinder of New Lenders; Acknowledgment of New Lenders</u>.

(a)    Each of PNC Bank, National Association and Siemens Financial Services, Inc. (together the "<u>New Lenders</u>"), by its signature below, confirms that it has agreed to become a "Lender" under, and as defined in the Amended Credit Agreement holding the Revolving Credit Loans in the amount set forth opposite such New Lender's name on Schedule 2.01 attached hereto under the heading "Commitments", effective on the Amendment No. 3 Effective Date. Each New Lender (i) acknowledges that in connection with it becoming a Lender it has received a copy of the Amended Credit Agreement (including all schedules and exhibits thereto), together with copies of the most recent financial statements delivered by the Borrower pursuant to the Existing Credit Agreement, and such other documents and information as it has deemed appropriate to make its own credit and legal analysis and decision to become a Lender and (ii) agrees that, upon it becoming a Lender on the Amendment No. 3 Effective Date, it will, independently and without reliance on the Administrative Agent, or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit and legal decisions in taking or not taking action under the Amended Credit Agreement. In addition, each New Lender represents and warrants that (x) it has duly authorized and has full power and authority to take, and has taken, all action necessary to execute and deliver this Agreement and to consummate the transaction contemplated hereby and to become a Lender on the Amendment No. 3 Effective Date and (y) no notices to, or consents, authorizations or approvals of, any Person are required (other than any already given or obtained) for its due execution and delivery of this Agreement or the performance of its obligations hereunder or as a Lender under the Amended Credit Agreement as of the date hereof. Each New Lender acknowledges and agrees that, on the Amendment No. 3 Effective Date, such New Lender shall become a Lender and, from and after such date such New Lender will be bound by the terms of the Amended Credit Agreement.

(b)    Each New Lender acknowledges that it has had the opportunity to request and has received such documents and information as it has deemed material or desirable or otherwise appropriate in making its evaluation and credit analysis of the Borrower and the other Loan parties and its decision to become a Lender and make Loans to the Borrower. Each New Lender has carefully reviewed such document and information and, independently and without reliance upon the Administrative Agent, performed its own investigation and credit analysis of the Loans, this Agreement, and the transactions contemplated hereby and the creditworthiness of the Borrower and the other Loan Parties. Each New Lender acknowledges that the Administrative Agent and its affiliates' activities in connection with the Loans, this Agreement, and the transactions contemplated hereby are undertaken by the Administrative Agent or such affiliates as a principal on an arm's-length basis and neither the Administrative Agent nor its affiliate has any fiduciary, advisory, or similar responsibility in favor of such New Lender in connection with the Loan, this Agreement or the transactions contemplated herby or the process related thereto. Each of the New Lenders hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent or any of its affiliates with respect to any breach or alleged breach of agency or fiduciary duty. In connection with all aspects of each transaction contemplated herby, each New Lender acknowledges and agrees that (i) the Administrative Agent and its affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such New Lenders and its affiliates, and neither the Administrative Agent nor its affiliates has any obligation to disclose any of such interest by virtue of any advisory, agency or fiduciary relationship, (ii) neither the Administrative Agent has provided and will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby

and the New Lender has consulted its own legal , accounting, regulatory, and tax advisors to the extent it has deemed appropriate, (iii) neither the Administrative Agent nor any of its affiliates bears any responsibility  (or shall be liable) for the accuracy or completeness (or lack thereof) of any documents or information provided such New Lender in connection with the Loan, this Agreement and the transactions contemplated hereby; no representation regarding such documents or information is made by the Administrative Agent or any of its affiliates; neither the Administrative Agent nor any of its affiliates has made any independent verification as to the accuracy or completeness of any such documents or informational and the Administrative Agent and its affiliates hall have no obligation to update or supplement any such documents or information or otherwise provide additional information. In connection with the transactions contemplated hereby, including its decision to become a Lender and to make Loans to the Borrower, each New Lender acknowledges and agrees that it is not relying upon any representation or warranties made by the Administrative Agent or any of its affiliates or, except as expressly set forth in this Agreement and the other Loan Documents, any other Person.

6.    _Reaffirmation_.  The Borrower (a) confirms its obligations under the Loan Documents, (b) confirms that its obligations under the Existing Credit Agreement as modified hereby are entitled to the benefits of the Liens and pledges set forth in the Loan Documents and remain in full force and effect and (c) agrees that the Existing Credit Agreement as modified hereby is the "Credit Agreement" under and for all purposes of the Loan Documents.  Without limiting the foregoing, the Borrower, on behalf of each Loan Party, (a) consents to this Agreement and agrees that the transactions contemplated by this Agreement shall not limit or diminish the obligations of such Person, or release such Person from any obligations, under any of the Loan Documents to which it is a party, (b) confirms and reaffirms its obligations under each of the Loan Documents to which it is a party and all representations, warranties, and covenants contained therein, (c) agrees that each of the Loan Documents to which it is a party remains in full force and effect and is hereby ratified and confirmed and (d) acknowledges that any and all financing statements filed under the UCC in connection with the Existing Credit Agreement, naming Bank of America, N.A., as administrative agent (or otherwise as a representative for itself and other financial institutions), as secured party, and such Loan Party, as debtor, shall be effective to perfect the Administrative Agent's security interest granted by such Loan Party pursuant to the Security Agreement to the extent such security interest may be perfected by the filing of financing statements under the UCC for the purposes of so perfecting the security interest granted by such Loan Party. The Borrower, on behalf of each Guarantor, hereby acknowledges, confirms and agrees that it shall guarantee all Obligations of the Loan Parties at any time and from time to time outstanding under the Amended Credit Agreement and the other Loan Documents. The Borrower, on behalf of each Loan Party, hereby acknowledges, confirms and agrees that the Security Agreement, the other Collateral Documents and any and all Collateral previously pledged to the Administrative Agent, for the benefit of the Secured Parties, pursuant thereto, shall continue to secure all applicable Obligations (which, for the avoidance of doubt, shall include all Obligations outstanding as of the date hereof) of such Loan Parties at any time and from time to time outstanding under the Amended Credit Agreement and the other Loan Documents, including, in each case, after giving effect to this Agreement.

7.    _Amendment, Modification and Waiver_.  This Agreement may not be amended, modified or waived except in accordance with the Amended Credit Agreement. The execution, delivery and effectiveness of this Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.

8.    _Loan Document_.  This Agreement shall constitute a Loan Document for all purposes of the Amended Credit Agreement and the other Loan Documents.

9.     <u>Governing Law, Etc</u>.  **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.  SECTIONS 10.15, 10.16 AND 10.17 OF THE AMENDED CREDIT AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE, *MUTATIS MUTANDIS*.**

10.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, each of the undersigned has caused its duly authorized officer to execute and deliver this Agreement as of the date first set forth above.

**BELK, INC.,**
as Borrower


By: _____
    Name:
    Title:


**BEAR PARENT INC.,**
as Holdings


By: _____
    Name:
    Title:

[Belk - Amendment No. 3 Signature Page]

**BANK OF AMERICA, N.A.,** as the
Administrative Agent


By: _____
    Name:
    Title:

**BANK OF AMERICA, N.A.,** as a Lender

By: _____
    Name:
    Title:

[Belk - Amendment No. 3 Signature Page]

[_____], as a Lender

By: _____
    Name:
    Title:

[Belk - Amendment No. 3 Signature Page]

**<u>ANNEX A</u>**

<u>Composite Credit Agreement</u>

[see attached]

DB1/ 118915452.11

**ANNEX A TO THIRD AMENDMENT**

---

$900,000,000
ABL CREDIT AGREEMENT

Dated as of December 10, 2015,
as amended on August 29, 2019,
as amended on October 30, 2020,
and as further amended on February 24, 2021

among

BEAR PARENT INC.,
as Holdings,

BELK, INC.,
as Borrower,

BANK OF AMERICA, N.A.,
as Administrative Agent and Collateral Agent,

WELLS FARGO BANK, NATIONAL ASSOCIATION,
CAPITAL ONE, NATIONAL ASSOCIATION, and
PNC BANK, NATIONAL ASSOCIATION
as Syndication Agents,

and

REGIONS BANK,
TD BANK, N.A., and
U.S. BANK, NATIONAL ASSOCIATION
as Documentation Agents

THE OTHER LENDERS PARTY HERETO

---

BANK OF AMERICA, N.A.,
WELLS FARGO BANK, NATIONAL ASSOCIATION,
CAPITAL ONE, NATIONAL ASSOCIATION, and
PNC CAPITAL MARKETS LLC
as Joint Lead Arrangers and Joint Lead Bookrunners

# TABLE OF CONTENTS

**Page**

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Other Interpretive Provisions | 106 |
| Section 1.03 | Accounting Terms | 108 |
| Section 1.04 | Rounding | 109 |
| Section 1.05 | References to Agreements, Laws, etc | 109 |
| Section 1.06 | Times of Day and Timing of Payment and Performance | 109 |
| Section 1.07 | Pro Forma and Other Calculations. | 109 |
| Section 1.08 | Divisions | 114 |
| Section 1.09 | Guaranties of Hedging Obligations | 114 |
| Section 1.10 | Currency Generally | 114 |
| Section 1.11 | Letters of Credit | 115 |
| Section 1.12 | Interest Rates | 115 |

## ARTICLE II

## THE COMMITMENTS AND BORROWINGS

| | | |
|---|---|---|
| Section 2.01 | The Loans | 115 |
| Section 2.02 | Borrowings, Conversions and Continuations of Loans. | 117 |
| Section 2.03 | Letters of Credit. | 119 |
| Section 2.04 | Swing Line Loans. | 130 |
| Section 2.05 | Prepayments | 135 |
| Section 2.06 | Termination or Reduction of Commitments | 137 |
| Section 2.07 | Repayment of Loans. | 137 |
| Section 2.08 | Interest. | 138 |
| Section 2.09 | Fees. | 138 |
| Section 2.10 | Computation of Interest and Fees | 138 |
| Section 2.11 | Evidence of Indebtedness. | 139 |
| Section 2.12 | Payments Generally. | 139 |
| Section 2.13 | Sharing of Payments | 142 |
| Section 2.14 | Incremental Facilities. | 143 |
| Section 2.15 | [Reserved] | 146 |
| Section 2.16 | Extensions of Loans. | 146 |
| Section 2.17 | Defaulting Lenders. | 149 |

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

| | | |
|---|---|---|
| Section 3.01 | Taxes | 150 |
| Section 3.02 | Illegality | 154 |
| Section 3.03 | Inability to Determine Rates. | 154 |

# TABLE OF CONTENTS
## (cont'd)

**Page**

Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loan..................................................................................................158
Section 3.05    Funding Losses ........................................................................................159
Section 3.06    Matters Applicable to All Requests for Compensation. ...............................160
Section 3.07    Replacement of Lenders under Certain Circumstances.................................161
Section 3.08    Survival....................................................................................................163

## ARTICLE IV

## CONDITIONS PRECEDENT TO REVOLVING CREDIT BORROWINGS

Section 4.01    Conditions to Effectiveness of this Agreement on Closing Date ...................163
Section 4.02    Conditions to All Credit Extensions. ..........................................................166

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power; Compliance with Laws .........................167
Section 5.02    Authorization; No Contravention. ...............................................................168
Section 5.03    Governmental Authorization .......................................................................169
Section 5.04    Binding Effect............................................................................................169
Section 5.05    Financial Statements; No Material Adverse Effect. ......................................169
Section 5.06    Litigation ..................................................................................................169
Section 5.07    Labor Matters ...........................................................................................170
Section 5.08    Ownership of Property; Liens......................................................................170
Section 5.09    Environmental Matters ...............................................................................170
Section 5.10    Taxes.........................................................................................................170
Section 5.11    ERISA Compliance. ...................................................................................170
Section 5.12    Subsidiaries...............................................................................................171
Section 5.13    Margin Regulations; Investment Company Act. ..........................................172
Section 5.14    Disclosure .................................................................................................172
Section 5.15    Intellectual Property; Licenses, etc..............................................................172
Section 5.16    Solvency ...................................................................................................173
Section 5.17    USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act .................173
Section 5.18    Collateral Documents .................................................................................173
Section 5.19    Use of Proceeds ........................................................................................174

## ARTICLE VI

## AFFIRMATIVE COVENANTS

Section 6.01    Financial Statements...................................................................................174
Section 6.02    Certificates; Other Information ...................................................................176
Section 6.03    Notices......................................................................................................178
Section 6.04    Payment of Obligations ..............................................................................179
Section 6.05    Preservation of Existence, etc......................................................................179

# TABLE OF CONTENTS
## (cont'd)

**Page**

| | | |
|---|---|---|
| Section 6.06 | Maintenance of Properties | 179 |
| Section 6.07 | Maintenance of Insurance | 179 |
| Section 6.08 | Compliance with Laws | 180 |
| Section 6.09 | Books and Records | 180 |
| Section 6.10 | Inspection Rights | 180 |
| Section 6.11 | Covenant to Guarantee Obligations and Give Security | 180 |
| Section 6.12 | Compliance with Environmental Laws | 182 |
| Section 6.13 | Further Assurances. | 182 |
| Section 6.14 | Use of Proceeds. | 183 |
| Section 6.15 | [Reserved]. | 183 |
| Section 6.16 | Accounting Changes | 183 |
| Section 6.17 | Nature of Business | 183 |
| Section 6.18 | Designation of Subsidiaries. | 184 |
| Section 6.19 | Cash Receipts; Cash Dominion Period. | 184 |
| Section 6.20 | Borrowing Base Certificates. | 186 |
| Section 6.21 | Appraisals and Field Examinations. | 186 |
| Section 6.22 | Beneficial Ownership Certification | 187 |
| Section 6.23 | Agent's Advisor | 187 |

## ARTICLE VII

## NEGATIVE COVENANTS

| | | |
|---|---|---|
| Section 7.01 | Liens | 187 |
| Section 7.02 | Indebtedness. | 187 |
| Section 7.03 | Fundamental Changes | 196 |
| Section 7.04 | Asset Sales | 201 |
| Section 7.05 | Restricted Payments | 202 |
| Section 7.06 | Transactions with Affiliates. | 211 |
| Section 7.07 | Burdensome Agreements | 215 |
| Section 7.08 | Modification of Terms of Specified Indebtedness | 219 |
| Section 7.09 | Holdings. | 219 |
| Section 7.10 | Financial Covenant | 221 |
| Section 7.11 | Excess Cash Amounts | 221 |

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

| | | |
|---|---|---|
| Section 8.01 | Events of Default | 221 |
| Section 8.02 | Remedies upon Event of Default | 224 |
| Section 8.03 | Application of Funds | 224 |
| Section 8.04 | Right to Cure. | 226 |

# TABLE OF CONTENTS
## (cont'd)

**Page**

### ARTICLE IX

### ADMINISTRATIVE AGENT AND OTHER AGENTS

| | | |
|---|---|---|
| Section 9.01 | Appointment and Authorization of the Administrative Agent. | 227 |
| Section 9.02 | Rights as a Lender | 228 |
| Section 9.03 | Exculpatory Provisions | 228 |
| Section 9.04 | Lack of Reliance on the Administrative Agent | 230 |
| Section 9.05 | Certain Rights of the Administrative Agent | 231 |
| Section 9.06 | Reliance by the Administrative Agent | 231 |
| Section 9.07 | Delegation of Duties | 232 |
| Section 9.08 | Indemnification | 232 |
| Section 9.09 | The Administrative Agent in Its Individual Capacity | 233 |
| Section 9.10 | Holders | 233 |
| Section 9.11 | Resignation by the Administrative Agent | 233 |
| Section 9.12 | Collateral Matters | 235 |
| Section 9.13 | [Reserved] | 235 |
| Section 9.14 | Administrative Agent May File Proofs of Claim | 235 |
| Section 9.15 | Appointment of Supplemental Administrative Agents. | 236 |
| Section 9.16 | Intercreditor Agreements | 237 |
| Section 9.17 | Secured Cash Management Agreements and Secured Hedge Agreements | 237 |
| Section 9.18 | Bank Product Providers | 238 |
| Section 9.19 | Withholding Tax | 238 |
| Section 9.20 | Certain ERISA Matters | 238 |

### ARTICLE X

### MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.01 | Amendments, etc. | 240 |
| Section 10.02 | Notices and Other Communications; Facsimile Copies. | 244 |
| Section 10.03 | No Waiver; Cumulative Remedies | 246 |
| Section 10.04 | Costs and Expenses | 247 |
| Section 10.05 | Indemnification by the Borrower | 248 |
| Section 10.06 | Marshaling; Payments Set Aside | 249 |
| Section 10.07 | Successors and Assigns. | 249 |
| Section 10.08 | [Reserved] | 255 |
| Section 10.09 | Confidentiality | 255 |
| Section 10.10 | Setoff. | 257 |
| Section 10.11 | Interest Rate Limitation | 258 |
| Section 10.12 | Counterparts; Integration; Effectiveness | 258 |
| Section 10.13 | Electronic Execution of Assignments and Certain Other Documents | 258 |
| Section 10.14 | Survival of Representations and Warranties | 259 |
| Section 10.15 | Severability | 259 |
| Section 10.16 | GOVERNING LAW. | 260 |
| Section 10.17 | WAIVER OF RIGHT TO TRIAL BY JURY | 260 |

# TABLE OF CONTENTS
## (cont'd)

Page

Section 10.18   Binding Effect.................................................................................261
Section 10.19   Lender Action .................................................................................261
Section 10.20   Use of Name, Logo, etc .................................................................261
Section 10.21   USA PATRIOT Act and other Anti-Terrorism Laws ....................261
Section 10.22   Service of Process...........................................................................261
Section 10.23   No Advisory or Fiduciary Responsibility.......................................262
Section 10.24   Release of Collateral and Guarantee Obligations; Subordination of Liens....................262
Section 10.25   Assumption and Acknowledgment..................................................264
Section 10.26   Judgment Currency ........................................................................264
Section 10.27   Secured Bank Product Agreements, Secured Cash Management Agreements and Secured Hedge Agreements.............................................................264
Section 10.28   Acknowledgement and Consent to Bail-In of Affected Financial Institutions. ............265
Section 10.29   Acknowledgement Regarding Any Supported QFCs.....................265

SCHEDULES

| | |
|---|---|
| 1.01(1) | Guarantors |
| 1.01(3) | Non-U.S. Account Debtors |
| 1.02 | Unrestricted Subsidiaries |
| 2.01 | Commitments |
| 4.01(1)(c) | Certain Collateral Documents |
| 5.06 | Litigation |
| 5.12 | Subsidiaries and Other Equity Investments |
| 6.19 | Deposit and Security Accounts |
| 7.02(3) | Existing Indebtedness |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A-1 | Committed Loan Notice |
| A-2 | Swing Line Loan Notice |
| B-1 | Revolving Credit Note |
| B-2 | Swing Line Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Guaranty |
| F | Security Agreement |
| G-1 | ABL Intercreditor Agreement |
| G-2 | Term Intercreditor Agreement |
| H | United States Tax Compliance Certificates |
| I | Solvency Certificate |
| J | Borrowing Base Certificate |
| K | [Reserved] |
| L | [Reserved] |
| M | [Reserved] |
| N | [Reserved] |
| O | [Reserved] |
| P | [Reserved] |
| Q | Intercompany Subordination Agreement |
| R | Letter of Credit Report |

DB1/ 118926700.9

## CREDIT AGREEMENT

This ABL CREDIT AGREEMENT (this "**Agreement**") is entered into as of December 10, 2015, as amended on August 29, 2019, as amended on October 30, 2020, and as further amended on February 24, 2021 by and among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation ("**Belk**") and direct subsidiary of Holdings ("**Borrower**"), BANK OF AMERICA, N.A., as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**").

## PRELIMINARY STATEMENTS

Pursuant to the Transaction Agreement (such term and any other capitalized but undefined terms used herein are defined in Section 1.01 below), BEAR MERGER SUB INC., a Delaware corporation (the "**Initial Borrower**") merged (the "**Merger**") with and into Belk (the "**Acquired Company**"), which survived the Merger and succeeded to all the rights and obligations of the Initial Borrower under this Agreement and the other Loan Documents.

On February 23, 2021 (the "**Petition Date**"), (i) Belk and certain of its Subsidiaries (collectively, the "**Debtors**" and each individually, a "**Debtor**") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code and their cases are being jointly administered under Case No. 21-30630 (the "**Chapter 11 Cases**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").

On February 24, 2021, the Court entered the Confirmation Order (as hereinafter defined) approving the Debtors' Joint Chapter 11 Plan of Reorganization of Belk, Inc. and its Affiliated Debtors (the "**Approved Plan**").

The Borrower has requested that the Lenders enter into the Third Amendment to provide exit financing to the Debtors in connection with their emergence from the Chapter 11 Cases on the Third Amendment Effective Date, on the terms and conditions set forth herein.

The Lenders have indicated their willingness to lend, and the Issuing Banks have indicated their willingness to issue Letters of Credit, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

### Definitions and Accounting Terms

Section 1.01   Defined Terms.  As used in this Agreement, the following terms have the meanings set forth below:

"**ABL Intercreditor Agreement**" means the ABL Intercreditor Agreement substantially in the form of Exhibit G-1 among the Collateral Agent, Morgan Stanley Senior Funding, Inc., as collateral agent under the First Lien Credit Agreement, Wilmington Trust, National Association, as collateral agent under the Second Lien Credit Agreement and the representatives for purposes thereof for holders of one or more

other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Priority Collateral**" means all the "ABL Priority Collateral" as defined in the Intercreditor Agreement.

 "**Acceptable Appraiser**" means (a) Gordon Brothers and (b) any other experienced and reputable appraiser reasonably acceptable to the Administrative Agent (after consultation with the Borrower).

"**Accounts**" means Accounts Receivable and Credit Card Processor Accounts.

"**Account Receivable**" has the meaning given to the term "Account" in Article 9 of the UCC.

"**Account Debtor**" has the meaning given to the term "Account Debtor" in Article 9 of the UCC.

"**ACH**" means automated clearing house transfers.

"**Acquired Company**" has the meaning specified in the preliminary statements of this Agreement.

"**Acquired Indebtedness**" means, with respect to any specified Person,

(1)      Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person, and

(2)      Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Additional Lender**" means, at any time, any bank, other financial institution or institutional lender or investor that, in any case, is not an existing Lender and that agrees to provide any portion of any Incremental Revolving Credit Loan in accordance with Section 2.14; *provided* that each Additional Lender (other than any Person that is a Lender, an Affiliate of a Lender or an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent, the Swing Line Lender or the Issuing Bank(s) (such approval not to be unreasonably withheld, conditioned or delayed), in each case solely to the extent that any such consent would be required from the Administrative Agent, the Swing Line Lender or the Issuing (s) under Section 10.07(b)(iii) for an assignment of Loans to such Additional Lender.

"**Adjusted EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period:

(1)      increased (without duplication) by the following, in each case (other than clauses (h) and (l)) to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(a)     total interest expense and, to the extent not reflected in such total interest expense, any losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such Hedging Obligations or such derivative instruments, and bank and letter of credit fees and costs of surety bonds in connection with financing activities, together with items excluded from the definition of "Consolidated Interest Expense" pursuant to the definition thereof; *plus*

(b)     provision for taxes based on income, profits, revenue or capital, including federal, foreign and state income, franchise, excise, value added and similar taxes, property taxes and similar taxes, and foreign withholding taxes paid or accrued during such period (including any future taxes or other levies that replace or are intended to be in lieu of taxes, and any penalties and interest related to taxes or arising from tax examinations), and any payments to a Parent Company in respect of such taxes permitted to be made hereunder; *plus*

(c)     Consolidated Depreciation and Amortization Expense for such period; *plus*

(d)     any other non-cash expenses, charges, expenses, losses or items (including any write-offs or write-downs) reducing Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (i) the Borrower may determine not to add back such non-cash charge in the current period and (ii) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Adjusted EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *provided* that the foregoing shall not permit adding back the write-down or reserve of inventory outside the ordinary course of business; *plus*

(e)     minority interest expense, the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any non-wholly-owned Subsidiary deducted (and not added back) in such period to Consolidated Net Income, excluding cash distributions in respect thereof, and the amount of any reductions in arriving at Consolidated Net Income resulting from the application of Accounting Standards Codification Topic No. 810, *Consolidation*; *plus*

(f)     (i) the amount of management, monitoring, consulting, transaction, advisory and other fees (including termination fees) and indemnities and expenses paid or accrued in such period under the Management Services Agreement or otherwise to the extent otherwise permitted under Section 7.06 and (ii) the amount of payments made to option holders of such Person or any Parent Company in connection with, or as a result of, any distribution being made to shareholders of such Person or its Parent Companies, which payments are being made to compensate such option holders as though they were shareholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted hereunder; *plus*

(g)     [reserved]; *plus*

(h)      cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Adjusted EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Adjusted EBITDA pursuant to clause (2) below for any previous period and not added back; *plus*

(i)      any costs or expenses incurred pursuant to any management equity plan, stock option plan or any other management or employee benefit plan, agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of such Person or net cash proceeds of an issuance of Equity Interest of such Person (other than Disqualified Stock); *plus*

(j)      any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of *FASB Accounting Standards Codification Topic 715—Compensation—Retirement Benefits*, and any other items of a similar nature, *plus*

(k)      any net loss from operations expected to be disposed of, abandoned or discontinued within twelve months after the end of such period; provided that amounts added back pursuant to clauses (k) and (l), and together with (i) any Projected Restructuring Adjustments referred to in the proviso of clause (n) below and (ii) any similar adjustments made in accordance with Section 1.07(3), shall not exceed, 10% of Adjusted EBITDA for such period calculated after giving effect to the add-backs set forth in clauses (k) and (l), such Projected Restructuring Adjustments, and the adjustments made in accordance with Section 1.07(3) and being calculated on a pro forma basis; *plus*

(l)      (I) pro forma adjustments, including pro forma "run rate" cost savings, operating expense reductions and other synergies (in each case, net of amounts actually realized) related to acquisitions, dispositions and other specified transactions, or related to restructuring initiatives, cost savings initiatives and other initiatives that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are that are expected to be taken within six fiscal quarters after the date of consummation of such acquisition, disposition or other specified transaction or the initiation of such restructuring initiative, cost savings initiative or other initiatives and (II) pro forma "run rate" cost savings, operating expense reductions and synergies (in each case, net of amounts actually realized) related to the Closing Date Transactions that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within six fiscal quarters after the Closing Date (it is understood and agreed that "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken), in each case, together with reasonable detail with respect to the adjustments taken pursuant to this clause; provided that amounts added back pursuant to clauses (k) and (l), and together with (i) any Projected Restructuring Adjustments referred to in the proviso of clause (n) below and (ii) any similar adjustments made in accordance with Section 1.07(3), shall not exceed, 10% of Adjusted EBITDA for such period calculated after giving effect to the add-backs set forth in clauses (k) and (l), such Projected Restructuring

Adjustments, and the adjustments made in accordance with Section 1.07(3) and being calculated on a pro forma basis; *plus*

(m)     any payments in the nature of compensation or expense reimbursement made to independent board members; *plus*

(n)     one time pro forma costs, charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of cost savings initiatives and operating expense reductions, restructuring and similar charges, severance, relocation costs, integration and facilities and New Store opening costs and other business optimization expenses, signing costs, retention or completion bonuses, transition costs, costs related to closure/consolidation of facilities, stores and curtailments or modifications to pension and post-retirement employee benefits plans (including any settlement of pension liabilities); provided that in the case of pro forma adjustments related to cost savings initiatives and operating expense reductions that are projected to be incurred by the Borrower, in good faith to result from actions that are expected to be taken within six fiscal quarters after the date of such cost savings initiative or operating expense reductions, in each case, together with reasonable detail with respect to the adjustments taken pursuant to this clause (the adjustments in this proviso being referred to as "Projected Restructuring Adjustments"), such Projected Restructuring Adjustments shall not exceed, together with the adjustments in clauses (k) and (l) of the definition of Adjusted EBITDA and Section 1.07(3), 10% of Adjusted EBITDA for such period calculated after giving effect to such add-backs and the adjustments made in accordance with Section 1.07(3) and being calculated on a pro forma basis; *plus*

(o)     the amount of any loss attributable to any New Store; *provided* that the aggregate amounts added back pursuant to this clause (o) shall not exceed $5.0 million for such period,

(p)     costs and expenses in connection with the implementation of fresh start accounting and all adjustments resulting from the application of fresh start accounting principles, in each case, together with reasonable detail with respect to the adjustments taken pursuant to this clause, and

(2)     decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

(a)     non-cash gains for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Adjusted EBITDA in any prior period other than any such accrual or reserve that has been added back to Consolidated Net Income in calculating Adjusted EBITDA in accordance with this definition), and

(b)     the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any non-wholly owned subsidiary added (and not deducted in such period from Consolidated Net Income).

Adjusted EBITDA of Belk and its Restricted Subsidiaries will be deemed to equal (i) $124,997,000 for the fiscal quarter ended February 1, 2020 (ii) ($67,491,000) for the fiscal quarter ended May 2, 2020, (iii) $1,505,000 for the fiscal quarter ended August 1, 2020 and (iv) ($41,751,000) for the fiscal quarter ended October 31, 2020, in each case and, without duplication, adjusted to reflect any pro

forma adjustments with respect to any relevant Specified Transaction as are appropriate and consistent with the pro forma adjustment provisions set forth in Section 1.07, in each case, occurring or identified after the Third Amendment Effective Date and not otherwise included in the calculation of the foregoing amounts.

"**Adjustment Date**" means the first day of each February, May, August and November, as applicable.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affected Financial Institution**" any EEA Financial Institution or UK Financial Institution.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"**Affiliate Transaction**" has the meaning specified in Section 7.06.

"**Agent's Advisor**" has the meaning provided in Section 6.23.

"**Agent Parties**" has the meaning specified in Section 10.02(4).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Supplemental Administrative Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Credit Agreement, as amended, restated, amended and restated, modified or supplemented from time to time in accordance with the terms hereof.

"**Agreement Currency**" has the meaning specified in Section 10.26.

"**AHYDO Payment**" means any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Code Section 163(i).

"**Annual Financial Statements**" means the audited consolidated balance sheets of the Borrower and its Subsidiaries as of the fiscal year ended January 30, 2020, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the Borrower and its Subsidiaries for the fiscal years then ended.

"**Anti-Terrorism Laws**" means any applicable law relating to terrorism, trade sanctions programs and embargoes, money laundering, corruption or bribery, and any regulation, or order promulgated, issued or enforced pursuant to such laws by an applicable Governmental Authority, all as amended, supplemented or replaced from time to time.

"**Applicable Intercreditor Agreement**" means (a) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that (i) are intended to rank junior in priority to the Liens on the ABL Priority Collateral securing the Obligations and (ii) are intended to rank equal or junior in priority to the Liens on the Term Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the First Lien Obligations, the ABL Intercreditor Agreement, and (b) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank junior in priority to the Liens securing the Obligations, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations.

"**Applicable Rate**" means a percentage per annum equal to the following percentages per annum, based upon Average Historical Excess Availability as of the most recent Adjustment Date:

| Average Historical Excess Availability | Applicable Rate for Eurodollar Rate Loans | Applicable Rate for Base Rate Loans |
|---|---|---|
| > 66.7% | 2.00% | 1.00% |
| ≤ 66.7% but ≥ 33.3% | 2.25% | 1.25% |
| < 33.3% | 2.50% | 1.50% |

The Applicable Rate shall be adjusted quarterly in accordance with the table above on each Adjustment Date for the period beginning on such Adjustment Date based upon the Average Historical Excess Availability as the Administrative Agent shall determine in good faith. Any increase or decrease in the Applicable Rate resulting from a change in the Average Historical Excess Availability shall become effective on the Adjustment Date.

"**Applicable Unused Commitment Fee Rate**" means, for any day, a percentage per annum equal to the following percentages per annum, based upon Average Revolving Credit Loan Utilization as of the most recent Adjustment Date:

| Average Revolving Credit Loan Utilization | Unused Commitment Fee |
|---|---|
| < 50% | 0.375% |
| ≥ 50% | 0.250% |

"**Appropriate Lender**" means, at any time, (a) with respect to Loans of any Class, the Lenders of such Class and (b) with respect to Letters of Credit, (i) the relevant Issuing Banks and (ii) the relevant Revolving Credit Lenders.

"**Approved Account Bank**" means a financial institution at which any Borrower or a Subsidiary Guarantor maintains an Approved Deposit Account.

"**Approved Deposit Account**" means each Deposit Account in respect of which a Borrower or any Subsidiary Guarantor shall have entered into a Deposit Account Control Agreement.

"**Approved Plan**" has the meaning specified in the preliminary statements of this Agreement.

"**Approved Securities Account**" means each Securities Account in respect of which any Borrower or any Subsidiary Guarantor shall have entered into a Securities Account Control Agreement.

"**Approved Securities Intermediary**" means a securities intermediary at which any Borrower or a Subsidiary Guarantor maintains an Approved Securities Account.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Arrangers**" means Bank of America, Wells Fargo Bank, National Association and U.S. Bank, National Association.

"**Asset Sale**" means:

(1)     the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, and whether effected pursuant to a Division or otherwise, of property or assets of the Borrower or any Restricted Subsidiary (each referred to in this definition as a "**disposition**"); or

(2)     the issuance or sale of Equity Interests (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 7.02 and directors' qualifying shares or shares or interests required to be held by foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Borrower or another Restricted Subsidiary), whether in a single transaction or a series of related transactions, so long as after giving pro forma effect to any such issuance or sale, no Overadvance would exist or would result therefrom.

in each case, other than:

(a)     any disposition of:

(i)     Cash Equivalents or Investment Grade Securities,

(ii)     obsolete, damaged or worn out property or assets in the ordinary course of business or consistent with industry practice or any disposition of inventory or goods (or other assets) held for sale or no longer used or useful in the ordinary course,

(iii)     assets no longer economically practicable or commercially reasonable to maintain (as determined in good faith by the management of the Borrower),

(iv)     improvements made to leased real property to landlords pursuant to customary terms of leases entered into in the ordinary course of business and

(v)     assets for purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Borrower and its Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b)     the disposition of any assets by the Borrower or any Restricted Subsidiary in a manner permitted pursuant to Section 7.03;

(c)     any disposition in connection with the making of any Restricted Payment that is permitted to be made, and is made, under Section 7.05, any Permitted Investment or any acquisition otherwise permitted under this Agreement;

(d)     any disposition of property or assets or issuance or sale of Equity Interests of any Restricted Subsidiary with an aggregate fair market value of less than (i) $5.0 million for any individual transaction or series of related transactions and (ii) $10.0 million for all such transactions in any fiscal year;

(e)     any disposition of property or assets or issuance of securities by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary to the extent otherwise permitted hereunder;

(f)     to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)     (i) the lease, assignment or sublease, license or sublicense of any real or personal property in the ordinary course of business or consistent with industry practice and (ii) the exercise of termination rights with respect to any lease, sublease, license or sublicense or other agreement;

(h)     any issuance, disposition or sale of Equity Interests in, or Indebtedness, assets or other securities of, an Unrestricted Subsidiary;

(i)     foreclosures, condemnation, expropriation, eminent domain or any similar action (including for the avoidance of doubt, any Casualty Event) with respect to assets or the granting of Liens not prohibited hereunder;

(j)     sales of accounts receivable, or participations therein, or the disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with industry practice or in bankruptcy or similar proceedings;

(k)     any financing transaction with respect to property built or acquired by the Borrower or any Restricted Subsidiary after the Closing Date;

(l)     the sale, lease, assignment, license, sublease or discount of inventory, equipment, accounts receivable, notes receivable or other current assets in the ordinary course of business or consistent with industry practice or the conversion of accounts

receivable to notes receivable or other dispositions of accounts receivable in connection with the collection thereof;

(m)     the licensing or sublicensing of IP Rights or other general intangibles in the ordinary course of business or consistent with industry practice;

(n)     any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business or consistent with industry practice;

(o)     the unwinding of any Hedging Obligations;

(p)     sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)     the lapse or abandonment of IP Rights, which in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(r)     the granting of a Lien that is permitted under Section 7.01;

(s)     the issuance of directors' qualifying shares and shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable law;

(t)     the disposition of any assets (including Equity Interests) (i) acquired in a transaction permitted hereunder, which assets are not used or useful in the principal business of the Borrower and its Restricted Subsidiaries or (ii) made in connection with the approval of any applicable antitrust authority or otherwise necessary or advisable in the good faith determination of the Borrower to consummate any acquisition permitted hereunder;

(u)     dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property;

(v)     dispositions and transfers of property in connection with any Specified Real Estate Financings (other than any Specified Sale Leaseback Transactions);

(w)     the settlement or early termination of any Permitted Bond Hedge Transaction and the settlement or early termination of any related Permitted Warrant Transaction; and

(x)     the sales of property or assets for an aggregate fair market value since the date of this Agreement not to exceed $35.0 million.

; provided that after giving effect to any sale, issuance or other disposition of Equity Interests of a Restricted Subsidiary, no Overadvance shall exist or result therefrom

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"**Assumption**" has the meaning specified in Section 10.25.

"**Attorney Costs**" means all reasonable fees, expenses and disbursements of any law firm or other external legal counsel, to the extent documented in reasonable detail and invoiced.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease Obligation of any Person, the amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auto-Extension Letter of Credit**" has the meaning specified in Section 2.03(2)(c).

"**Availability Model**" means a monthly availability model in substantially the same form as the availability model delivered by the Sponsor to the Administrative Agent prior to the Closing Date.

"**Average Historical Excess Availability**" means, at any Adjustment Date, the average daily Excess Availability for the three-month period immediately preceding such Adjustment Date, divided by the Maximum Borrowing Amount at such time.

"**Average Revolving Credit Loan Utilization**" means, at any Adjustment Date, the average daily aggregate Revolving Credit Exposure (excluding any Revolving Credit Exposure resulting from any outstanding Swing Line Loans) for the three-month period immediately preceding such Adjustment Date, divided by the Aggregate Commitments at such time.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, with respect to (a) any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, or (b) the United Kingdom, Part I of the United Kingdom Banking Act 2009 and any other law applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bank of America**" means Bank of America, N.A.

"**Bank Product**" shall mean any of the following products, services or facilities provided to Holdings, the Borrower or any Restricted Subsidiary: (a) supply chain or trade finance or (b) other banking products or services (other than Letters of Credit and Cash Management Services).

"**Bank Product Agreement**" means any agreement entered into from time to time by Holdings, the Borrower or any Restricted Subsidiary in connection with a Bank Product, designated by the Bank Product Provider and the Borrower in writing to the Administrative Agent as "Bank Product Obligations" under this Agreement (but only if such obligations have not been designated as "Bank Product Obligations" under the First Lien Credit Agreement).

"**Bank Product Provider**" means any Person that is an Agent, an Arranger, a Lender or an Affiliate of an Agent or Lender at the time it entered into a Bank Product Agreement, whether or not such Person subsequently ceases to be an Agent, an Arranger, a Lender or an Affiliate of an Agent or Lender.

"**Bank Product Obligations**" shall mean Indebtedness and other obligations or liabilities of Holdings, the Borrower or any Restricted Subsidiary owed to the provider of a Bank Product.

"**Bankruptcy Code**" has the meaning specified in Section 8.02.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," and (c) the Eurodollar Rate plus 1.00%, subject to the interest rate floors set forth therein; provided that if the Base Rate shall be less than 1.25%, such rate shall be deemed 1.25% for purposes of this Agreement. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change. If the Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then the Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Basket**" means any amount, threshold or other value permitted or prescribed with respect to any Lien, Indebtedness, Asset Sale, Investment, Restricted Payment, transaction value, judgment or other amount under any provision in Articles V, VI, VII or VIII and the definitions related thereto.

"**Belk**" has the meaning specified in the preliminary statements of this Agreement.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Board of Directors**" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such Board of Directors. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Borrower.

"**Borrower**" has the meaning specified in the preliminary statements of this Agreement.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrowing**" means a borrowing consisting of Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurodollar Rate Loans, having the same Interest Period.

"**Borrowing Base**" means, at any time, the sum of:

(1)     90% of the book value of the Eligible Credit Card Receivables held by the Borrower and the Subsidiary Guarantors; *plus*

(2)     85% of the book value of the Eligible Accounts Receivable held by the Borrower and the Subsidiary Guarantors; *plus*

(3)     90% of the Net Orderly Liquidation Value of Eligible Inventory held by the Borrower and the Subsidiary Guarantors, which percentage may increase to 92.5% for each of the Selected Months at the Borrower's option; *less*

(4)     the then-current amount of all Reserves.

In connection with any acquisition or similar Investment (including, in connection with a merger or consolidation of the Borrower permitted pursuant to Section 7.03(4)) (a "**Proposed Acquisition**"), the portion of the Borrowing Base that is attributable to the assets of the target in any such acquisition or other Investment (the "**Proposed Target**") will be limited to, to the extent the applicable field examinations and inventory appraisals are not complete as of such date, not greater than 5% of the Borrowing Base (provided that the portion of the Borrowing Base attributable to acquired Inventory, shall not exceed 90% of the Net Orderly Liquidation Value of any such acquired Inventory which would otherwise constitute Eligible Inventory) until the applicable field examination or inventory appraisal has been delivered; it being understood and agreed that there shall be no Default or Event of Default solely as a result of a failure to complete and deliver such items.

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.20, as adjusted to give effect to Reserves determined in the Permitted Discretion of the Administrative Agent following such delivery. Notwithstanding anything herein to the contrary, Reserves shall not duplicate eligibility criteria contained in the definition of Eligible Accounts Receivable, Eligible Credit Card Receivables, Eligible Inventory or any other Reserve then established.

"**Borrowing Base Certificate**" means a certificate by a Responsible Officer of the Borrower, substantially in the form of Exhibit J (or another form acceptable to the Administrative Agent and the Borrower) setting forth the calculation of the Borrowing Base, including a calculation of each component thereof (including, to the extent the Borrower has received notice of any such Reserve from the Administrative Agent, any of the Reserves included in such calculation), all in such detail as is reasonably satisfactory to the Administrative Agent.  All calculations of the Borrowing Base in connection with the preparation of any Borrowing Base Certificate will be made by the Borrower and certified to the Administrative Agent.

"**Broker-Dealer Regulated Subsidiary**" means any Subsidiary of the Borrower that is registered as a broker-dealer under the Exchange Act or any other applicable Laws requiring such registration.

"**Business Day**" means any day that is not a Legal Holiday and, with respect to any interest rate settings as to a Eurodollar Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurodollar Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurodollar Rate Loan, any day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (paid in cash) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and the Restricted Subsidiaries; *provided, however*, that Capital Expenditures for the Borrower and its Restricted Subsidiaries shall not include:

(1)      expenditures to the extent they are made with (a) the proceeds from the issuance of Equity Interests by any Parent Company (to the extent contributed to the Borrower as common equity) or (b) proceeds of the issuance of Equity Interests of, or a cash capital contribution to, the Borrower after the Closing Date;

(2)      expenditures with proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrower and its Subsidiaries;

(3)      interest capitalized during such period;

(4)      (i) expenditures that are accounted for as capital expenditures of such person and that actually are paid for by a third party (excluding Holdings, the Borrower or any Subsidiary thereof) and for which neither Holdings, the Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period) and (ii) expenditures that are financed with tenant improvement allowances (or similar real estate incentive programs);

(5)      the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (a) used or surplus equipment traded in at the time of such purchase or (b) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business;

(6)      Investments in respect of a Permitted Acquisition; or

(7)      (i) the purchase of property, plant or equipment made within eighteen (18) months of any Asset Sale to the extent purchased with the proceeds of such Asset Sale; and (ii) with respect to any property, plant and equipment that, within twelve months following the purchase or acquisition thereof, is sold pursuant to a sale-leaseback or similar capitalized financing.

"**Capital Stock**" means:

(1)      in the case of a corporation, corporate stock or shares in the capital of such corporation;

(2)        in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)        in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into or exchangeable for Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP as in effect on the Closing Date.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"**Captive Insurance Subsidiary**" means any Subsidiary of the Borrower that is subject to regulation as an insurance company (or any Subsidiary thereof).

"**Cash Collateral**" has the meaning specified in the definition of "Cash Collateralize".

"**Cash Collateral Account**" means an account held at, and subject to the sole dominion and control of, the Collateral Agent.

"**Cash Collateralize**" means, in respect of an Obligation, to provide and pledge cash or deposit account balances in Dollars as collateral, at a location and pursuant to documentation in form and substance satisfactory to Administrative Agent or the Issuing Bank with respect to any Letter of Credit, as applicable (and "**Cash Collateralization**" has a corresponding meaning).

"**Cash Dominion Period**" means (a) each period beginning on the date that Excess Availability shall have been less than the greater of (x) $60,000,000 and (y) 12.5% of the Maximum Borrowing Amount, in either case, for three (3) consecutive Business Days, and ending on the date Excess Availability shall have been at least the greater of (x) $60,000,000 and (y) 12.5% of the Maximum Borrowing Amount, in each case, for twenty (20) consecutive calendar days or (b) upon the occurrence of a Specified Event of Default, the period that such Specified Event of Default shall be continuing.

"**Cash Equivalents**" means:

(1)        Dollars;

(2)        [reserved];

(3)        local currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business or consistent with industry practice;

(4)      readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 36 months or less from the date of acquisition;

(5)      certificates of deposit, time deposits and eurodollar time deposits with maturities of three years or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(6)      repurchase obligations for underlying securities of the types described in clauses (4) and (5) above or clauses (7) and (8) below entered into with any financial institution or recognized securities dealer meeting the qualifications specified in clause (5) above;

(7)      commercial paper and variable or fixed rate notes rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 36 months after the date of acquisition thereof;

(8)      marketable short-term money market and similar liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(9)      securities issued or directly and fully and unconditionally guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority of any such state, commonwealth or territory or any public instrumentality thereof having maturities of not more than 36 months from the date of acquisition thereof;

(10)      readily marketable direct obligations issued or directly and fully and unconditionally guaranteed by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency selected by the Borrower) with maturities of 36 months or less from the date of acquisition;

(11)      Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) with maturities of 24 months or less from the date of acquisition;

(12)      Investments with average maturities of 36 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(13)      investment funds investing substantially all of their assets in securities of the types described in clauses (1) through (12) above; and

(14)    solely with respect to any Captive Insurance Subsidiary, any investment that the Captive Insurance Subsidiary is not prohibited to make in accordance with applicable law.

In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents will also include (i) investments of the type and maturity described in clauses (1) through (13) above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (1) through (13) and in this paragraph.

"**Cash Management Agreement**" means any agreement entered into from time to time by Holdings, the Borrower or any Restricted Subsidiary in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, information reporting services, lockbox services, stop payment services and wire transfer services, designated by the Cash Management Bank and the Borrower in writing to the Administrative Agent as "Cash Management Obligations" under this Agreement (but only if such obligations have not been designated as "Cash Management Obligations" under the First Lien Credit Agreement).

"**Cash Management Bank**" means any Person that is an Agent, an Arranger, a Lender or an Affiliate of an Agent or Lender at the time it entered into a Cash Management Agreement, whether or not such Person subsequently ceases to be an Agent, an Arranger, a Lender or an Affiliate of an Agent or Lender.

"**Cash Management Obligations**" means obligations owed by Holdings, the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"**Cash Management Services**" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automatic clearing house fund transfer services, return items and interstate depository network services), (c) foreign exchange, netting and currency management services and (d) any other demand deposit or operating account relationships or other cash management services, including under any Cash Management Agreements.

"**Cash Receipt**" has the meaning specified in Section 6.19(2).

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CCT**" means Corporate Capital Trust, Inc.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"**CFC Holdco**" means a Domestic Subsidiary that has no material assets other than the Equity Interests in or indebtedness of one or more Foreign Subsidiaries that are CFCs, including the indirect

ownership of such Equity Interests or indebtedness through one or more CFC Holdcos that have no other material assets.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following:  (a) the adoption of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.  It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111 203, H.R. 4173), all Laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

"**Change of Control**" means the occurrence of any of the following after the Closing Date:

(1)     at any time prior to the consummation of a Qualifying IPO after the Closing Date, the Permitted Holders ceasing to beneficially own (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), in the aggregate, directly or indirectly, at least forty percent (40%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or any Parent Company; or

(2)     at any time following the consummation of a Qualifying IPO after the Closing Date, (a) any Person (other than a Permitted Holder) or (b) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), becoming the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Exchange Act) of Equity Interests of the Borrower or such Parent Company representing more than thirty-five percent (35%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or such Parent Company, as applicable, and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of the Borrower or such Parent Company, as applicable, beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders;

(3)     the occurrence of a "Change of Control" (or any comparable term) as defined in each of the First Lien Credit Agreement, the Second Lien Credit Agreement or any other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount; or

(4)     Holdings shall cease to be the registered owner of 100% of the Equity Interests of the Borrower unless in connection with the consummation of a Qualifying IPO by the Borrower.

unless, in the case of clause (1) or (2) above, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of the Borrower or any Parent Company.

"**Chapter 11 Cases**" has the meaning specified in the preliminary statements of this Agreement.

"**Claim**" means any actions, suits or written demands or claims.

"**Class**" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the Type of Loan, Interest Period, upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (e.g., "fungibility")) and (ii) with respect to Lenders, those of such Lenders that have Commitments or Loans of a particular Class.

"**Closing Date**" means December 10, 2015.

"**Closing Date Annual Financial Statements**" means the audited consolidated balance sheets of the Acquired Company as of the fiscal years ended February 2, 2013, February 1, 2014 and January 31, 2015, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the Acquired Company for the fiscal years then ended.

"**Closing Date Quarterly Financial Statements**" means the unaudited quarterly balance sheet and related statements of income and cash flows of the Acquired Company for the most recent fiscal quarter(s) ended after January 31, 2015 and at least 45 days prior to the Closing Date, in each case to the extent delivered to Initial Borrower pursuant to the Acquisition Agreement or otherwise.

"**Closing Date Refinancing**" means (a) the repayment in full of the principal, accrued and unpaid interest, fees and other amounts and the termination of all commitments to extend credit under that certain Credit Agreement, dated as of October 22, 2014, by and among Belk, certain affiliates of Belk, the lenders party thereto, and Wells Fargo Bank, National Association, as agent and (b) the Acquired Company will voluntarily redeem in full the entire unpaid principal amount, along with unpaid interest, fees, premiums and any other amounts owed under each series of Existing Company Notes.

"**Closing Date Transactions**" means, collectively, (a) the consummation of the Equity Contribution, (b) the consummation of the Merger pursuant to the Transaction Agreement and the payment of the Transaction Consideration, (c) the funding of the Revolving Credit Loans borrowed on the Closing Date, (d) the borrowings under the First Lien Facility and the Second Lien Facility on the Closing Date, (e) the execution and delivery of the Loan Documents, the First Lien Loan Documents and the Second Lien Loan Documents, (f) the consummation of the Closing Date Refinancing, (g) the consummation of any other transactions in connection with the foregoing and (h) the payment of Transaction Expenses.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the "Collateral" as defined in any Collateral Documents and all other property of whatever kind or nature pledged or charged as collateral under any Collateral Document.

"**Collateral Access Agreement**" means a landlord waiver or other agreement, in a form as shall be reasonably satisfactory to the Collateral Agent, between the Collateral Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any premises where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"**Collateral Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

      (1)      the Collateral Agent shall have received each Collateral Document required to be delivered (a) on the Closing Date pursuant to Section 4.01(1)(c) or (b) pursuant to Section 6.11 or

6.13 at such time required by such Sections to be delivered, in each case, duly executed by each Loan Party that is party thereto;

(2)     all Obligations shall have been unconditionally guaranteed by (a) Holdings (or any successor thereto), (b) each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary), which shall include those that are listed on Schedule 1.01(1) hereto and (c) any Restricted Subsidiary of the Borrower that Guarantees (or is the borrower or issuer of) the First Lien Facility (including any Permitted Incremental Equivalent Debt (as defined in the First Lien Credit Agreement)) and/or the Second Lien Facility (the Persons in the preceding clauses (a) through (c) collectively, the "**Guarantors**");

(3)     except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected security interest with the priority set forth in the Applicable Intercreditor Agreement, subject only to Liens permitted by Section 7.01, in

(a)     all the Equity Interests of the Borrower,

(b)     all Equity Interests of each direct, wholly owned Material Domestic Subsidiary (other than any CFC Holdco) that is directly owned by the Borrower or any Subsidiary Guarantor; and

(c)     65% of the issued and outstanding voting Equity Interests and 100% of the issued and outstanding Equity Interests that are not voting Equity Interests of each (i) wholly owned Material Domestic Subsidiary that is (a) a CFC Holdco and (b) directly owned by the Borrower or any Subsidiary Guarantor and (ii) Foreign Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor; and

(4)     except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01 or under any Collateral Document and in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents, the Obligations and the Guaranty shall have been secured by a security interest in substantially all tangible and intangible personal property of the Borrower and each Guarantor, inventory, equipment, investment property, contract rights, applications and registrations of IP Rights filed in the United States, Accounts, Credit Card Processor Accounts, Deposit Accounts, Securities Accounts, documents of title, other general intangibles, and proceeds of the foregoing, in each case,

(a)     that has been perfected, to the extent such security interest may be perfected by:

(i)     delivering certificated securities, intercompany notes and other instruments in which a security interest can be perfected by physical control, in each case to the extent required hereunder or the Security Agreement;

(ii)     filing financing statements under the Uniform Commercial Code,

(iii)     making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office, or

(iv)     [reserved], or

(v)     control solely to the extent required by Section 6.19 and

(b)     with the priority required by the Collateral Documents and the Applicable Intercreditor Agreement; *provided* that any such security interests in the Collateral shall be subject to the terms of the Applicable Intercreditor Agreements.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)     Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents;

(B)     the Collateral and Guarantee Requirement shall not apply to any Excluded Assets;

(C)     no deposit account control agreement, securities account control agreement or other control agreements or control arrangements shall be required with respect to any deposit account, securities account or other asset specifically requiring perfection through control agreements except to the extent set forth in Section 6.19;

(D)     no actions in any jurisdiction other than the U.S. or that are necessary to comply with the Laws of any jurisdiction other than the U.S. shall be required in order to create any security interests in assets located, titled, registered, applied for, filed, or arising under laws outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the Laws of any jurisdiction other than the U.S.) and there shall be no requirement to deliver landlord lien waivers, estoppels and collateral access letters;

(E)     no stock certificates Subsidiaries other than Material Subsidiaries shall be required to be delivered to the Collateral Agent; and

(F)     no perfection steps shall be required with respect to (i) motor vehicles and other assets subject to certificates of title to the extent a Lien thereon cannot be perfected by the filing of a UCC financing statement, (ii) letter of credit rights, except to the extent constituting a support obligation for other Collateral as to which perfection is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (iii) commercial tort claims with a value of less than $2.5 million, and (iv) promissory notes evidencing debt for borrowed money in a principal amount of less than $2.5 million.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, each of the collateral assignments, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent, Collateral Agent or the Lenders pursuant to Sections 4.01(1)(c), 6.11 or 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Collateral Test Triggering Event**" means any time on or after the date on which Excess Availability has been less than the greater of (A) $120,000,000 and (B) 17.5% of the Maximum Borrowing Amount for five (5) consecutive Business Days.

"**Commitment**" means, (a) with respect to each Lender (to the extent applicable), such Lender's Revolving Credit Commitment, Extended Revolving Credit Commitment or a Revolving Credit Commitment Increase or any combination thereof (as the context requires) and (b) with respect to the applicable Swing Line Lender, or swingline lender under any Extended Revolving Credit Commitments, its Swing Line Facility or swingline commitment, as applicable.

"**Commitment Letter**" means that certain Amended and Restated Commitment Letter, dated as of September 4, 2015, among the Initial Borrower, Morgan Stanley, Merrill Lynch, Bank of America, Jefferies, Credit Suisse, DB, Nomura, RBC, RBCCM, Wells Fargo, MCS Capital Markets, MCS Lending and CCT, as amended by the Letter Agreement dated November 6, 2015 and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Committed Loan Notice**" means a notice of (1) a Borrowing with respect to a given Class of Loans, (2) a conversion of Loans of a given Class from one Type to the other or (3) a continuation of Eurodollar Rate Loans of a given Class, pursuant to Section 2.02(1), which, if in writing, shall be substantially in the form of Exhibit A-1 (or such other form as shall be reasonably acceptable to the Borrower and the Administrative Agent).

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time and any successor statute.

"**Communication**" has the meaning specified in Section 10.13(b).

"**Company Material Adverse Effect**" has the meaning specified in the Transaction Agreement as in effect on August 23, 2015.

"**Compensation Period**" has the meaning specified in Section 2.12(3)(b).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of a Financial Officer of the Borrower

> (1)     certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto (in each case, other than any Default with respect to which the Administrative Agent has otherwise obtained notice in accordance with Section 6.03(1)), and

> (2)     to the extent that compliance with the financial covenant under Section 7.10 is (or was) required in respect of the period covered by such financial statements, certifying as to (and containing all information and calculations necessary for determining) compliance with such financial covenant as of the last day of the applicable Test Period, and

"**Concentration Account**" has the meaning specified in Section 6.19(2).

"**Confirmation Order**" means the order of the Court confirming the Approved Plan.

"**Consolidated Cash Interest Charges**" means, as of any date for the applicable period ending on such date with respect to Borrower and its Restricted Subsidiaries on a consolidated basis, the Consolidated Interest Expense determined on a cash basis only and solely in respect of Indebtedness of the type described in clause (1) of the definition thereof and excluding, for the avoidance of doubt, (i) any non-cash interest expense, including capitalized interest, whether paid or accrued, (ii) the amortization of

original issue discount resulting from the issuance of Indebtedness at less than par, (iii) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses, (iv) any expenses resulting from discounting of indebtedness in connection with the application of recapitalization accounting or purchase accounting, (v) penalties or interest related to taxes and any other amounts of noncash interest resulting from the effects of acquisition method accounting or pushdown accounting, (vi) the accretion or accrual of, or accrued interest on, discounted liabilities (other than Indebtedness) during such period, (vii) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or other derivative instruments pursuant to FASB Accounting Standards Codification No. 815-Derivatives and Hedging, (viii) any one-time cash costs associated with breakage in respect of Hedge Agreements for interest rates, (ix) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, (viii) all non-recurring interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with GAAP and (ix) expensing of bridge, arrangement, structuring, commitment or other financing fees.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person and its Restricted Subsidiaries, including the amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses and amortization of Capitalized Software Expenditures of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated First Lien Debt**" means as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, (a) Loans under this Agreement (including any Incremental Revolving Credit Loans), Loans (as defined in the First Lien Facility) under the First Lien Facility (including any Incremental Term Loans (as defined in the First Lien Credit Agreement)), Capitalized Lease Obligations and other Consolidated Total Debt secured by Collateral (or any portion thereof) on an equal priority basis (but without regard to the control of remedies) with Liens securing the Obligations or the Liens securing the First Lien Obligations minus (b) without duplication, the aggregate amount of unrestricted cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, which aggregate amount of cash and Cash Equivalents shall be determined without giving *pro forma effect* to the proceeds of Indebtedness incurred on such date.

"**Consolidated Interest Expense**" means, with respect to any Person for any period, without duplication, the sum of:

(1)     consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount or premium resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (c) non-cash interest payments, (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate obligations under any Hedge Agreements with respect to Indebtedness); plus

(2)     consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(3)     interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" means, with respect to any Person for any period, the net income (loss) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding (and excluding the effect of), without duplication,

(1)    extraordinary, non-recurring or unusual gains, losses, fees, costs, charges or expenses (including relating to any multi-year strategic initiatives and accruals and reserves in connection with such gains, losses, charges or expenses); restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves, and in each case, whether or not classified as such under GAAP); costs and expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of stores or facilities and fixed assets for alternative uses; Public Company Costs; costs and expenses related to the integration, consolidation, opening, pre-opening and closing of stores or facilities and fixed assets; severance and relocation costs and expenses, one-time compensation costs and expenses, consulting fees, signing, retention or completion bonuses, and executive recruiting costs; costs and expenses incurred in connection with strategic initiatives; transition costs and duplicative running costs; costs and expenses incurred in connection with non-ordinary course product and IP Rights development; costs incurred in connection with acquisitions (or purchases of assets) prior to or after the Closing Date (including integration costs); business optimization expenses (including costs and expenses relating to business optimization programs, new systems design, retention charges, system establishment costs and implementation costs and project start-up costs), accruals and reserves; operating expenses attributable to the implementation of cost-savings initiatives; curtailments and modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments);

(2)    the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period whether effected through a cumulative effect adjustment or a retroactive application, in each case in accordance with GAAP;

(3)    Transaction Expenses and the Third Amendment Transaction Expenses;

(4)    any gain (loss) on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business or consistent with industry practice) or income (loss) from discontinued operations (but if such operations are classified as discontinued due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of);

(5)    the Net Income for such period of any Person that is an Unrestricted Subsidiary; *provided* that the Consolidated Net Income of a Person will be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents) to such Person or a Restricted Subsidiary thereof in respect of such period;

(6)    [reserved];

(7)     effects of adjustments (including the effects of such adjustments pushed down to such Person and its Restricted Subsidiaries) related to the application of recapitalization accounting or purchase accounting (including in the inventory, property and equipment, software, goodwill, intangible assets, in process research and development, deferred revenue and debt line items);

(8)     income (loss) from the early extinguishment or conversion of (a) Indebtedness, (b) Hedging Obligations or (c) other derivative instruments;

(9)     any impairment charge or asset write-off or write-down in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP;

(10)     (a) any equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation, equity incentive programs or similar rights, stock options, restricted stock or other rights to, and any cash charges associated with the rollover, acceleration or payout of, Equity Interests by management of such Person or of a Restricted Subsidiary or any Parent Company, (b) noncash compensation expense resulting from the application of Accounting Standards Codification Topic No. 718, *Compensation—Stock Compensation* or Accounting Standards Codification Topic 505-50, *Equity-Based Payments to Non-Employees*, and (c) any income (loss) attributable to deferred compensation plans or trusts;

(11)     any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, disposition, incurrence or repayment of Indebtedness (including such fees, expenses or charges related to the offering and issuance of the Revolving Credit Notes and the syndication and incurrence of any Facilities), issuance of Equity Interests (including by any direct or indirect parent of the Borrower), recapitalization, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Indebtedness evidenced by this Agreement, the First Lien Facility or the Second Lien Facility) and including, in each case, any such transaction whether consummated on, after or prior to the Closing Date and any such transaction undertaken but not completed, and any charges or nonrecurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful or consummated (including, for the avoidance of doubt, the effects of expensing all transaction related expenses in accordance with Accounting Standards Codification Topic No. 805, *Business Combinations*);

(12)     accruals and reserves that are established or adjusted in connection with the Closing Date Transactions or the Third Amendment Transactions, an Investment or an acquisition that are required to be established or adjusted as a result of the Closing Date Transactions or the Third Amendment Transactions, such Investment or such acquisition, in each case accordance with GAAP;

(13)     any expenses, charges or losses to the extent covered by insurance that are, directly or indirectly, reimbursed or reimbursable by a third party, and any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement;

(14)     any non-cash gain (loss) attributable to the mark to market movement in the valuation of Hedging Obligations or other derivative instruments pursuant to FASB Accounting

Standards Codification Topic 815—*Derivatives and Hedging* or mark to market movement of other financial instruments pursuant to FASB Accounting Standards Codification Topic 825—*Financial Instruments*;

(15)   any net unrealized gain or loss (after any offset) resulting in such period from currency transaction or translation gains or losses including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from (a) Hedging Obligations for currency exchange risk and (b) resulting from intercompany indebtedness) and any other foreign currency transaction or translation gains and losses, to the extent such gain or losses are non-cash items;

(16)   any adjustments resulting from the application of Accounting Standards Codification Topic No. 460, *Guarantees*, or any comparable regulation;

(17)   any non-cash rent expense;

(18)   the amount of any management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Investors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 7.06;

(19)   any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures; and

(20)   earn-out and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries, Consolidated Net Income will include the amount of proceeds received or receivable from business interruption insurance, the amount of any expenses or charges incurred by such Person or its Restricted Subsidiaries during such period that are, directly or indirectly, reimbursed or reimbursable by a third party, and amounts that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder.

"**Consolidated Secured Debt**" means, as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, the aggregate amount of Consolidated Total Debt that is secured by a Lien on any assets or property of the Borrower or any of its Restricted Subsidiaries.

"**Consolidated Total Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Closing Date Transaction or any Permitted Acquisition), consisting of Indebtedness for borrowed money, Capitalized Lease Obligations, debt obligations evidenced by notes or similar instruments and Guarantees of Indebtedness listed above minus (b) the aggregate amount of all cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date (but excluding cash and Cash Equivalents which are listed as "Restricted" on such balance sheet), which aggregate amount of cash and Cash Equivalents shall be determined without giving pro forma effect to the proceeds of Indebtedness incurred on such date; provided, Consolidated Total Debt will not include Non-Recourse Indebtedness and Indebtedness in respect of any (1) letter of credit, except to the extent of obligations in respect of drawn standby letters of credit which have not been reimbursed within three (3)

Business Days and (2) Hedging Obligations, except any unpaid termination payments thereunder.  The Dollar-equivalent principal amount of any Indebtedness denominated in a foreign currency will reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar-equivalent principal amount of such Indebtedness.

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent:

(1) to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2) to advance or supply funds:

(a) for the purchase or payment of any such primary obligation or

(b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Controlled Investment Affiliate**" means, as to any Person, any other Person, other than any Investor, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower or other companies.

"**Court**" has the meaning specified in the preliminary statements of this Agreement.

"**Convertible Indebtedness**" means Indebtedness of the Borrower (which may be guaranteed by the Guarantors) permitted to be incurred hereunder that is either (a) convertible into common stock of the Borrower (and cash in lieu of fractional shares) or cash (in an amount determined by reference to the price of such common stock) or (b) sold as units with call options, warrants or rights to purchase (or substantially equivalent derivative transactions) that are exercisable for common stock of the Borrower or cash (in an amount determined by reference to the price of such common stock).

"**Covenant Trigger Period**" means any period (a) commencing on the date upon which Specified Excess Availability is less than the greater of (x) $60,000,000 and (y) 10.0% of the Maximum Borrowing Amount and (b) ending on the date upon which Specified Excess Availability shall have been at least the greater of (x) $60,000,000 and (y) 10.0% of the Maximum Borrowing Amount for a period of twenty (20) consecutive calendar days.

"**Covered Entity**" means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**" has the meaning specified in <u>Section 10.29</u>.

"**Credit Card Processor**" means any Person (other than a Loan Party or any Affiliate of any Loan Party) who issues or whose members or Affiliates issue credit or debit cards, including MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Synchrony Financial, Carte Blanche and other non-bank credit or debit cards, including credit or debit cards issued by or through American Express Travel Related Services Company, Inc., or Novus Services, Inc. or any Permitted Replacement Credit Card Program, and any servicing or processing agent or any factor or financial intermediary that facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Loan Party's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards.

"**Credit Card Processor Accounts**" means Accounts owing to the Borrower or a Subsidiary Guarantor from a Credit Card Processor (including any Permitted Replacement Credit Card Program and pursuant to the Synchrony Credit Card Program).

"**Credit Extension**" means each of the following:  (i) a Borrowing and (ii) an L/C Credit Extension.

"**Credit Suisse**" means Credit Suisse Securities and CS, as the context may require.

"**Credit Suisse Securities**" means Credit Suisse Securities (USA) LLC.

"**CS**" means Credit Suite AG (acting through such of its affiliates or branches as it deems appropriate).

"**Cure Amount**" has the meaning specified in Section 8.04(1).

"**Cure Deadline**" has the meaning specified in Section 8.04(1).

"**Cure Right**" has the meaning specified in Section 8.04(1).

"**Customs Broker Agreement**" means an agreement, in form reasonably satisfactory to the Collateral Agent, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Collateral Agent and agrees, upon notice from the Collateral Agent, to hold and dispose of such Inventory solely as directed by the Collateral Agent.

"**DB**" means, collectively, DBNY and DBSI.

"**DBNY**" means Deutsche Bank AG New York Branch.

"**DBSI**" means Deutsche Bank Securities Inc.

"**Debt Representative**" means, with respect to any series of Indebtedness secured by Liens permitted under clause (21) or (39) of the definition of "Permitted Liens" and Liens securing Indebtedness permitted under clauses (2), (14) and (25) of Section 7.02(b), the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning specified in the preliminary statements of this Agreement.

"**Default**" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"**Default Rate**" means an interest rate with respect to any Eurodollar Rate Loan or Base Rate Loan, equal to (1) the Base Rate, *plus* (2) the Applicable Rate applicable to Base Rate Loans, *plus* (3) 2.00% per annum; *provided* that with respect to the outstanding principal amount of any Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.02(3)) *plus* 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable

"**Defaulting Lender**" means, subject to Section 2.17(2), any Lender (including any Issuing Bank) that (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans or participations in respect of L/C Obligations or Swing Line Loans, within one Business Day of the date required to be funded by it hereunder, unless such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular Default, if any) has not been satisfied, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations, *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's receipt of such confirmation in form and substance satisfactory the Lender and the Administrative Agent, or (d) has, or has a direct or indirect parent company that has, (i) become or is the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets or a custodian appointed for it, (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or

such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (iv) become the subject of a Bail-in Action.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under this definition shall be conclusive absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Deposit Account**" means any checking or other demand deposit account maintained by the Borrower and any Subsidiary Guarantors, including any "deposit accounts" under Article 9 of the UCC.  All funds in such Deposit Accounts (other than Excluded Accounts) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Deposit Accounts, subject to this Agreement, the Security Agreement and the ABL Intercreditor Agreement.

"**Deposit Account Control Agreement**" has the meaning assigned to such term in Section 6.19(1).

"**Designated Non-Cash Consideration**" means the fair market value of non-cash consideration received by the Borrower or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-Cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, *less* the amount of cash or Cash Equivalents received in connection with a subsequent sale, redemption or repurchase of or collection or payment on such Designated Non-Cash Consideration.

"**Designated Preferred Stock**" means Preferred Stock of the Borrower, any Restricted Subsidiary thereof or any Parent Company (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on or promptly after the issuance date thereof.

"**Designated Revolving Commitments**" means any commitments to make loans or extend credit on a revolving basis to the Borrower or any Restricted Subsidiary by any Person other than the Borrower or any Restricted Subsidiary that have been designated in an Officer's Certificate delivered to the Administrative Agent as "Designated Revolving Commitments" until such time as the Borrower subsequently delivers an Officer's Certificate to the Administrative Agent to the effect that such commitments will no longer constitute "Designated Revolving Commitments;" provided that on the date such Designated Revolving Commitments are established, such Designated Revolving Commitments will be a deemed an incurrence of Indebtedness on such date and will be deemed outstanding for purposes of calculating the applicable Total Net Leverage Ratio, Senior Secured Leverage Ratio, First Lien Net Leverage Ratio and the availability of any applicable Basket hereunder on such date after giving *pro forma* effect to the incurrence of the entire committed amount of the Indebtedness thereunder (but without netting any cash proceeds thereof), in which case such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with the Total Net Leverage Ratio, Senior Secured Leverage Ratio, First Lien Net Leverage Ratio and the availability of any Baskets hereunder.  For the avoidance of doubt, in the case of any Designated Revolving Commitments permitted hereunder, the reference to the "incurrence" of Indebtedness shall refer to the date on which such Designated Revolving Commitments are established.

"**Discharge**" means, with respect to any Indebtedness, the repayment, prepayment, repurchase (including pursuant to an offer to purchase), redemption, defeasance or other discharge of such Indebtedness, any such case in whole or in part.

"**disposition**" has the meaning set forth in the definition of "Asset Sale".

"**Disqualified Institution**" means (a) any competitor of the Borrower or its Subsidiaries (including for purposes of this definition Belk and its Subsidiaries) identified by or on behalf of the Borrower or the Sponsor to (i) the Arrangers from time to time on or prior to the Closing Date or (ii) the Administrative Agent from time to time after the Closing Date, (b) those particular banks, financial institutions, other institutional lenders and other Persons identified by or on behalf of the Borrower or the Sponsor to the Arrangers prior to August 23, 2015 and (c) any Affiliate of the entities described in the preceding clauses (a) or (b) (excluding, in the case of clause (a), bona fide debt funds) that are either readily identifiable as such on the basis of their name or are identified as such in writing by or on behalf of the Borrower or the Sponsor to (i) the Arrangers on or prior to the Closing Date or (ii) the Administrative Agent from time to time after the Closing Date; it being understood and agreed that the identification of any Person as a Disqualified Institution after the Closing Date shall not apply to retroactively disqualify any Person that has previously acquired an assignment or participation interest in any Loan, subject to Section 10.07(n), until such time such Person no longer constitutes a Lender.  The identity of Disqualified Institutions shall be posted or distributed to all Lenders and prospective assignees.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date or the date the Loans are no longer outstanding and the Commitments have been terminated; *provided* that if such Capital Stock is issued pursuant to any plan for the benefit of, future, current or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower or its Subsidiaries or any Parent Company or by any such plan to such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof), such Capital Stock will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability; *provided further* any Capital Stock held by any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries, any Parent Company, or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof), in each case pursuant to any equity subscription or equity holders' agreement, management equity plan or stock option plan or any other management or employee benefit plan or agreement will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any Subsidiary or in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability.  For the purposes hereof, the aggregate principal amount of Disqualified Stock will be deemed to be equal to the greater of its voluntary or involuntary liquidation preference and maximum fixed repurchase price, determined on a consolidated basis in accordance with GAAP, and the "maximum fixed repurchase price" of any Disqualified Stock that does not have a fixed repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were purchased on any date on which the Consolidated Total Debt will be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock.

"**Dividing Person**" has the meaning assigned to it in the definition of "Division."

"**Division**" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any direct or indirect Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electronic Copy**" has the meaning specified in Section 10.13(b).

"**Electronic Record**" has the meaning specified in Section 10.13.

"**Electronic Signature**" has the meaning specified in Section 10.13.

"**Eligible Accounts Receivable**" means all Accounts Receivable (other than Credit Card Processor Accounts) due to the Borrower and the Subsidiary Guarantors that are reflected in the most recent Borrowing Base Certificate, except any Accounts Receivable with respect to which any of the exclusionary criteria set forth below applies. No Account Receivable will be an Eligible Account Receivable if:

    (1)    such Account Receivable does not arise from the sale of goods or the performance of services by the Borrower or a Guarantor in the ordinary course of its business;

    (2)    the Borrower and the Subsidiary Guarantor's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever (other than the preparation and delivery of an invoice);

    (3)    any defense, counterclaim, set-off or dispute exists as to such Account Receivable, but only to the extent of such defense, counterclaim, set-off or dispute;

    (4)    such Account Receivable is not a true and correct statement of *bona fide* indebtedness incurred in the amount of the Account Receivable for merchandise sold to or services rendered and accepted by the applicable Account Debtor;

(5)      such Account Receivable with respect to which an invoice has not been sent to the applicable Account Debtor on or before the date as of which such Account is first included in the Borrowing Base Certificate or otherwise reported to the Administrative Agent as Collateral;

(6)      such Account Receivable (i) is not owned by the Borrower or a Subsidiary Guarantor or (ii) is not subject to the first priority, valid and perfected security interest and Lien of Collateral Agent, for and on behalf of itself and the Lenders or (iii) is subject to any other Lien (other than Liens permitted under clauses (1), (3), (4), (7), (12), (25), (28), (30), (36), or (37) of the definition of Permitted Liens) (the foregoing clauses (ii) and (iii) not being intended to limit the ability of the Administrative Agent to change, establish or eliminate any Reserves in its Permitted Discretion on account of any such permitted Liens);

(7)      the Account Debtor is also a creditor or supplier of the Borrower or applicable Subsidiary Guarantor that owns such Account, or the Account Debtor has disputed liability with respect to such Account Receivable, or the Account Debtor has made any claim with respect to any other Account Receivable due from such Account Debtor to the Borrower or applicable Subsidiary Guarantor that owns such Account Receivable, or the Account Receivable otherwise is or may become subject to right of setoff by the Account Debtor; provided that any such Account Receivable shall be ineligible under this clause only to the extent of such contract, dispute, claim, setoff or similar right;

(8)      such Account Receivable is the obligation of an Account Debtor that is any Governmental Authority, unless the applicable Loan Party assigns its right to payment of such Account Receivable to the Collateral Agent, in a manner satisfactory to the Administrative Agent, in its Reasonable Credit Judgment, so as to comply with the Assignment of Claims Act of 1940 (31 U.S.C. §3727, 41 U.S.C. §15 et seq., as amended);

(9)      such Account Receivable is reissued in respect of partial payment, including debit memos and chargebacks (it being understood that this clause (9) shall only apply with respect to, and to the extent of, such partial payment);

(10)      [reserved];

(11)      such Account Receivable remains unpaid more than 45 days after the original due date shown on the invoice or more than 90 days after the original invoice date;

(12)      such Account Receivable is the obligation of an Account Debtor from whom 50% or more of the amount of all Accounts owing by that Account Debtor are ineligible under the criteria set forth in this definition;

(13)      such Account Receivable is evidenced by chattel paper or an instrument of any kind, or has been reduced to judgment;

(14)      such Account Receivable, together with all other Accounts owing by such Account Debtor and its Affiliates as of any date of determination, exceeds 50% of all Eligible Accounts Receivable (but, in each case, only to the extent of such excess);

(15)      such Account Receivable is (x) payable in any currency other than Dollars or (y) is owed by an Account Debtor that is not organized under the laws of the United States of America, except to the extent that such Account Receivable is secured or payable by a letter of

credit, credit insurance, guaranty, acceptance or similar terms satisfactory to the Administrative Agent in its Permitted Discretion;

(16)     such Account Receivable has been redated, extended, compromised, settled or otherwise modified or discounted, except discounts or modifications that are granted by the Borrower or a Subsidiary Guarantor in the ordinary course of business and that are reflected in the calculation of the Borrowing Base;

(17)     the Account Debtor is subject to an event of the type described in Section 8.01(6); *provided* that (i) the Administrative Agent may, in its sole discretion, include Accounts from Account Debtors subject to such proceedings if and to the extent that such Accounts are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Administrative Agent not to pose an unreasonable risk of non−collectability;

(18)     such Account Receivable represents a sale on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or other repurchase or return basis;

(19)     the portion, if any, of any Account Receivable that includes a billing for interest, fees or late charges;

(20)     such Account Receivable is governed by the laws of any jurisdiction other than the United States, any State thereof or the District of Columbia; or

(21)     it is an Account Receivable due to the Borrower from major credit card processors, whether or not constituting Eligible Credit Card Receivables.

Any Accounts which are not Eligible Accounts Receivable shall nevertheless be part of the Collateral.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b), *provided* that no Defaulting Lender(s) or Disqualified Institution(s) may be Eligible Assignee(s).

 "**Eligible Credit Card Receivables**" means all Credit Card Processor Accounts (including, for the avoidance of doubt, Credit Card Processor Accounts in the form of deposits in transit from Solutran, Inc. and its Affiliates) that constitute proceeds from the sale or disposition of Inventory or services, in each case, in the ordinary course of business and that are reflected in the most recent Borrowing Base Certificate, except any Credit Card Processor Account with respect to which any of the exclusionary criteria set forth below applies.  No Credit Card Processor Account will be an Eligible Credit Card Receivable if:

(1)     such Credit Card Processor Account has been outstanding for more than five (5) Business Days from the date of sale;

(2)     such Credit Card Processor Account is (a) not subject to the first priority, valid and perfected Lien of the Collateral Agent as to such Credit Card Processor Account or (b) is subject to any other Lien, other than (i) a Lien permitted under clauses (1), (2) and (7) of the definition of "Permitted Liens" or other Permitted Lien arising by operation of law (it being understood that customary offsets to fees and chargebacks in the ordinary course by the credit card or debit card processors will not be deemed violative of this clause (2));

(3)      the Borrower or a Subsidiary Guarantor does not have good, valid and marketable title thereto, free and clear of any Lien (other than (i) Liens granted to the Administrative Agent, for its own benefit and the benefit of the other Secured Parties pursuant to the Collateral Documents, (ii) a junior priority Lien permitted under clauses (2) and (7) of the definition of "Permitted Liens" or other Permitted Lien arising by operation of law or (iii) a lien securing Indebtedness permitted clauses (1) and (7) of the definition of "Permitted Liens");

(4)      such Credit Card Processor Account does not constitute the legal, valid and binding obligation of the applicable Credit Card Processor enforceable in accordance with its terms;

(5)      such Credit Card Processor Account is disputed, or a claim, counterclaim, discount, deduction, reserve, allowance, recoupment, offset or chargeback has been asserted with respect thereto by the applicable Credit Card Processor (but only to the extent of such dispute, claim, counterclaim, discount, deduction, reserve, allowance, recoupment, offset or chargeback);

(6)      such Credit Card Processor Account is owed by a Credit Card Processor that is subject to a bankruptcy proceeding of the type specified in Section 8.01(6) or that is liquidating, dissolving or winding up its affairs or otherwise deemed not creditworthy by the Administrative Agent in its Permitted Discretion;

(7)      the Credit Card Processor is organized or has its principal offices or assets outside the United States;

(8)      such Credit Card Processor Account is evidenced by Chattel Paper or an Instrument (each as defined in the Security Agreement of any kind, or has been reduced to judgment);

(9)      such Credit Card Processor Account includes a billing for interest, fees or late charges, but ineligibility will be limited to the extent thereof; or

(10)      such Credit Card Processor Account is payable in any currency other than Dollars.

Anything contained herein to the contrary notwithstanding, for purposes of determining the amount of Eligible Credit Card Receivable in the Borrowing Base at any time, any Credit Card Processor Account that otherwise meets the requirements for Eligible Credit Card Receivables may be included in such calculation even though the same does not constitute proceeds from the sale or disposition of Inventory; *provided* that such amount will be subject to adjustment as may be required by the Administrative Agent at any time and from time to time to reflect such fact.

"**Eligible Inventory**" means all Inventory reflected in the most recent Borrowing Base Certificate, except any Inventory with respect to which any of the exclusionary criteria set forth below applies.  No Inventory will be an Eligible Inventory if:

(1)      such Inventory is not subject to a first priority perfected Lien in favor of the Collateral Agent;

(2)      such Inventory is subject to any Lien other than (a) a Lien in favor of the Collateral Agent, (b) a Lien permitted under clause (2) of the definition of "Permitted Liens" or

other Permitted Lien arising by operation of law or (c) a Lien securing Indebtedness permitted under clause (7) of the definition of "Permitted Liens";

(3)     such Inventory is slow moving (other than Inventory located at a clearance center that has been appropriately priced consistent with the Borrower or Applicable Subsidiary Guarantor's customary practices), obsolete, unmerchantable, defective, used or unfit for sale;

(4)     such Inventory is not owned only by the Borrower of a Subsidiary Guarantor;

(5)     such Inventory is not finished goods or which constitutes work-in-process, raw materials, packaging and shipping material, supplies, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return (but not held for resale) or repossessed, or which constitutes goods held on consignment or goods which are not of a type held for sale in the ordinary course of business;

(6)     other than Permitted In-Transit Inventory, such Inventory is not located in the United States (excluding territories and possessions of the United States);

(7)     other than Permitted In-Transit Inventory, such Inventory (a) is located at any location (other than a retail store or clearance center) leased or subject to a short-term rental agreement by a Loan Party, unless (x) the lessor has delivered to the Collateral Agent a Collateral Access Agreement as to such location, (y) a Reserve for rent, charges, and other amounts due or to become due with respect to such location has been established by the Administrative Agent in its Permitted Discretion or (z) has an aggregate net book value (together with all such Inventory at such locations) of less than $5.0 million in the aggregate or (b) is located at a retail store or clearance center leased by a Loan Party and such location is in a Landlord Lien State, unless a Reserve for rent, charges, and other amounts due or to become due with respect to such location has been established by the Administrative Agent in its Permitted Discretion;

(8)     other than Permitted In-Transit Inventory, such Inventory is located in any third-party warehouse or is in the possession of a bailee (other than a third-party processor) and is not evidenced by a Document (as defined in Article 9 of the UCC), unless an appropriate Reserve has been established by the Administrative Agent in its Permitted Discretion;

(9)     such Inventory contains or bears any intellectual property rights licensed to the Borrower or any Subsidiary Guarantor by any Person other than the Borrower or any Subsidiary Guarantor unless the Collateral Agent is reasonably satisfied that it may sell or otherwise dispose of such Inventory without (a) infringing the rights of such licensor, (b) violating any contract with such licensor, or (c) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement relating thereto;

(10)     such Inventory is in transit, except that Inventory in transit will not be deemed ineligible if (the following being referred to herein as, "**Permitted In-Transit Inventory**"):

(a)     (i) it has been delivered to a carrier in a foreign port or foreign airport for receipt by the Borrower or a Subsidiary Guarantor in the United States within 60 days, but which has not yet been received by the Borrower or a Subsidiary Guarantor or (ii) it has been delivered to a carrier in the United States for receipt by the Borrower or a Subsidiary Guarantor in the United States within ten (10) Business Days, but which has not yet been received by the Borrower or a Subsidiary Guarantor;

(b)      title and legal ownership and risk of loss thereof has passed to the Borrower or any Subsidiary Guarantor (or is retained by the applicable Loan Party) as evidenced by customary documents of title;

(c)      the bill of lading, waybill, document of title or other shipping documents (which may be in electronic format) (collectively, "**Shipping Documents**") with respect to such Inventory shall be issued in the name of the Borrower as consignee, and if so requested by the Collateral Agent, shall be in negotiable form;

(d)      if the Shipping Documents with respect to such Inventory are in negotiable form, the Collateral Agent shall have received confirmation that the applicable freight forwarder or customs broker has possession of the original Shipping Documents issued in the name of the Borrower, as consignee (or, if so requested by the Collateral Agent, consigned to the order of the Collateral Agent);

(e)      the Collateral Agent has control over the documents of title which evidence ownership of the subject Inventory (including, if requested by the Collateral Agent, by the delivery of a Customs Broker Agreement);

(f)      such Inventory satisfies all of the criteria for Eligible Inventory (other than such Inventory is in-transit); and

(g)      it is insured to the reasonable satisfaction of the Collateral Agent; or

(11)      such Inventory constitutes operating supplies, packaging or shipping materials, cartons, repair parts, labels or miscellaneous spare parts or other such materials not considered for sale in the ordinary course of business.

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and sub-surface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, or proceedings with respect to any Environmental Liability or Environmental Law, (hereinafter "Claims"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to pollution or the protection of the Environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) resulting from or relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Contribution**" means cash equity contributions by the Sponsor and the other Investors to the Borrower (provided that any contributions in a form other than common equity shall be reasonably acceptable to the majority Arrangers), directly or indirectly, in an aggregate amount equal to, when combined with the fair market value of all capital contributions and investments by management and existing equity holders of Belk rolled over or invested in connection with the Closing Date Transactions of at least 22.50% of the sum of (1) (X) the aggregate gross proceeds of the Revolving Credit Loans borrowed on the Closing Date, Closing Date Term Loans (as defined in the First Lien Credit Agreement) and Closing Date Term Loans (as defined in the Second Lien Credit Agreement), in each case borrowed on the Closing Date, excluding the gross proceeds of any loans to fund (A) working capital needs and (B) original issue discount and/or upfront fees in accordance with the "market flex" provisions of the Fee Letter plus (Y) indebtedness in respect of Capitalized Lease Obligations permitted to be outstanding pursuant to the terms of the Transaction Agreement, which will survive the Closing Date plus (Z) the proceeds of any Specified Real Estate Financings (other than Sale Leaseback Transactions) borrowed on the Closing Date, if any and (2) the Equity Contribution on the Closing Date in respect of Holdings and its subsidiaries after giving effect to the Closing Date Transactions; provided that, after giving effect to the Closing Date Transactions, the Sponsor will own and control no less than a majority of the economic and voting Equity Interests of Holdings.

"**Equity Interests**" means, with respect to any Person, the Capital Stock of such Person and all warrants, options or other rights to acquire Capital Stock of such Person, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock of such Person.

"**Equity Offering**" means any public or private sale of common stock or Preferred Stock of the Borrower or any Parent Company (excluding Disqualified Stock), other than:

> (1)     public offerings with respect to the Borrower's or any Parent Company's common stock registered on Form S-4 or Form S-8;

> (2)     issuances to any Restricted Subsidiary of the Borrower; and

> (3)     any such public or private sale that constitutes an Excluded Contribution.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of withdrawal liability or written notification that a Multiemployer Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement in writing of proceedings by the PBGC to

terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived; (h) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (i) the imposition of a lien under Section 303(k) of ERISA or Section 412(c) of the Code with respect to any Pension Plan; (j) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); or (k) the occurrence of a nonexempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party or any of their respective ERISA Affiliates (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Loan Party.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Eurodollar Base Rate**" has the meaning specified in the definition of Eurodollar Rate.

"**Eurodollar Rate**" means the higher of:

(i)       the LIBOR Floor, and

(ii)(a)    for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to the London Interbank Offered Rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for U.S. Dollars) for a period equal in length to such Interest Period ("LIBOR") as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)       for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two London Banking Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Availability**" means, as of any date of determination, the excess, if any, of (a) the Maximum Borrowing Amount at such time, *minus* (b) the aggregate Total Outstandings at such time.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Accounts**" means any Deposit Account of any Loan Party or Restricted Subsidiary (and all cash, Cash Equivalents and other securities or investments credited thereto or deposited therein): (1) that does not have an individual daily balance in excess of $500,000, or in the aggregate with each

other account described in this clause (1), in excess of $5,000,000; (2) the balance of which is swept at the end of each Business Day into a Deposit Account subject to a Deposit Account Control Agreement, so long as such daily sweep is not terminated or modified (other than to provide that the balance in such Deposit Account is swept into another Deposit Account subject to a Deposit Account Control Agreement) without the consent of the Collateral Agent; (3) that is a Trust Account or Specified Segregated Account; (4) any Deposit Account of the Borrower or any Restricted Subsidiary the balance of which consists solely of proceeds of any sale or other disposition of any Term Priority Collateral so long as all amounts on deposit therein constitute Term Priority Collateral; (5) any Deposit Account that constitutes a disbursement account of the Borrower or any Restricted Subsidiary the balance of which consists solely of proceeds of Indebtedness, including the proceeds of the Loans; provided that in the case of the Loans, the aggregate amount that may be maintained in an Excluded Account described in this clause (5) shall not exceed $50.0 million at any one time; or (6) to the extent that it is cash collateral for letters of credit (other than Letters of Credit) to the extent permitted hereunder.

"**Excluded Assets**" means (i) any fee-owned real property or ground leased property and all real property leasehold interests, (ii) pledges and security interests prohibited by applicable Law (including any legally effective requirement to obtain the consent of any governmental authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), (iii) Margin Stock, (iv) cash and Cash Equivalents on deposit in Excluded Accounts, (v) any lease, license or other agreements, or any property subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license or agreement, purchase money, Capitalized Lease Obligations or similar arrangement, or create a right of termination in favor of any other party thereto (other than a Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition, (vi) assets for which a pledge thereof or a security interest therein would result in a material adverse tax consequence as reasonably determined by the Borrower (in consultation with (but without the consent of) the Administrative Agent), (vii) assets for which the Administrative Agent and the Borrower have determined in their reasonable judgment and agree in writing that the cost of creating or perfecting such pledges or security interests therein would be excessive in view of the benefits to be obtained by the Lenders therefrom, (viii) any intent-to-use trademark application in the United States prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto with the United States Patent and Trademark Office and (ix) Excluded Equity.

"**Excluded Contribution**" means net cash proceeds or the fair market value of marketable securities or the fair market value of Qualified Proceeds received by the Borrower from:

contributions to its common equity capital;

(1)     dividends, distributions, fees and other payments from any joint ventures that are not Restricted Subsidiaries; and

(2)     the sale (other than to a Restricted Subsidiary of the Borrower or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Borrower) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Borrower;

in each case designated as Excluded Contributions pursuant to an Officer's Certificate.

"**Excluded Equity**" means Equity Interests (or, in the case of clause (iii) below, Voting Stock) (i) of any Unrestricted Subsidiary, (ii) of any Subsidiary acquired pursuant to a Permitted Acquisition if such Equity Interests are pledged and/or mortgaged as security for any assumed Indebtedness permitted under Section 7.02(b)(14) and if and for so long as the terms of such Indebtedness prohibit the creation of any other Lien on such Equity Interests, (iii) of any Foreign Subsidiary or CFC Holdco, in each case of the Borrower or a Domestic Subsidiary of the Borrower and not otherwise constituting Excluded Equity, in excess of 65% of the issued and outstanding Voting Stock of each such Foreign Subsidiary or CFC Holdco, (iv) of any Subsidiary with respect to which the Administrative Agent and the Borrower have determined in their reasonable judgment and agreed in writing that the costs of providing a pledge of such Equity Interests or perfection thereof is excessive in view of the benefits to be obtained by the Secured Parties therefrom, (v) of any captive insurance companies, not-for-profit Subsidiaries, special purpose entities, (vi) to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than Holdings, the Borrower or any wholly owned Restricted Subsidiary of the Borrower), under the terms of any applicable organizational documents, joint venture agreement or shareholders' agreement, equity interests in any person other than wholly-owned Restricted Subsidiaries; and (vii) of any Subsidiary outside the United States the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers.

"**Excluded Funds**" means all amounts (i) solely for the purpose of payroll, employee wages and benefits and payment of taxes, including when a Credit Extension is not permitted hereunder, (ii) solely for the purpose of trust related activities and (iii) other amounts, not to exceed $2,500,000 in the aggregate.

"**Excluded Subsidiaries**" means all of the following and "**Excluded Subsidiary**" means any of them:

(3)    any Subsidiary that is not a direct, wholly owned Subsidiary of the Borrower or a Subsidiary Guarantor,

(4)    any Foreign Subsidiary,

(5)    any CFC Holdco,

(6)    any Domestic Subsidiary that is a Subsidiary of any (i) Foreign Subsidiary, (ii) CFC or (iii) CFC Holdco,

(7)    any Subsidiary (including any regulated entity that is subject to net worth or net capital or similar capital and surplus restrictions) that is prohibited or restricted by applicable Law, accounting policies or by Contractual Obligation existing on the Closing Date (or, with respect to any Subsidiary acquired by the Borrower or a Restricted Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired) from providing a Guaranty, or if such Guaranty would require governmental (including regulatory) or third party (other than a Loan Party) consent, approval, license or authorization, unless such consent, approval, license or authorization has been received, or is received after commercially reasonable efforts to obtain the same, which efforts may be requested by the Administrative Agent,

(1)    any special purpose securitization vehicle (or similar entity),

(2)    any Captive Insurance Subsidiary or not-for-profit Subsidiary,

(3)	any Subsidiary that is not a Material Subsidiary,

(4)	any Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the burden or cost (including any adverse tax consequences) of providing the Guaranty is excessive in relation to the benefits to be obtained by the Lenders therefrom,

(5)	any special purpose entity formed for the primary purpose to hold a leasehold interest in real property that is subject to a Sale-Leaseback Transaction that and has no other activities other than those incidental to holding such leasehold interest, and any such special purpose tenant entities formed in connection with any Specified Sale-Leaseback Transactions, and

(6)	any Unrestricted Subsidiary.

"**Excluded Swap Obligation**" means, with respect to any Loan Party, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 2.07 of the Guaranty and any other "keepwell, support or other agreement" for the benefit of such Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act) at the time the Guaranty of such Loan Party, or a grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest becomes illegal.

"**Excluded Taxes**" means, with respect to each Agent and each Lender,

(1)	any tax on such Agent or Lender's net income or profits (or franchise tax in lieu of such tax on net income or profits) imposed by a jurisdiction as a result of such Agent or Lender being organized or having its principal office or applicable Lending Office located in such jurisdiction or as a result of any other present or former connection between such Agent or Lender and the jurisdiction (including as a result of such Agent or Lender carrying on a trade or business, having a permanent establishment or being a resident for tax purposes in such jurisdiction, other than a connection arising solely from such Agent or Lender having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or sold or assigned an interest in, any Loan or Loan Document),

(2)	any branch profits tax under Section 884(a) of the Code, or any similar tax, imposed by any other jurisdiction described in clause (1),

(3)	other than with respect to any Lender that becomes a party hereto pursuant to the Borrower's request under Section 3.07, any U.S. federal withholding tax that is imposed on amounts payable with respect to an applicable interest in a Loan or Commitment to a Lender pursuant to a Law in effect at the time such Lender acquires such interest  (or designates a new

Lending Office) (or where the Lender is a partnership for U.S. federal income tax purposes, pursuant to a law in effect on the later of the date on which such Lender becomes a party hereto or the date on which the affected partner becomes a partner of such Lender or designates a new Lending Office), except, in the case of a Lender or partner that designates a new Lending Office or is an assignee, to the extent that such Lender or partner (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to Section 3.01,

(4)     any withholding tax attributable to a Lender's failure to comply with Section 3.01(3),

(5)     any tax imposed under FATCA and

(6)     any interest, additions to taxes and penalties with respect to any taxes described in clauses (1) through (5) of this definition.

"**Existing Company Notes**" means each of the Acquired Company's (x) 5.21% Senior Notes due 2022, (y) 5.70% Senior Notes due 2020 and (z) 6.20% Senior Notes due 2017.

"**Expected Cure Amount**" has the meaning specified in Section 8.04(2).

"**Expiring Credit Commitment**" has the meaning specified in Section 2.04(7).

"**Extended Revolving Credit Commitments**" means the Revolving Credit Commitments held by an Extending Lender.

"**Extended Revolving Credit Loans**" means the Revolving Credit Loans made pursuant to Extended Revolving Credit Commitments.

"**Extending Lender**" means each Lender accepting an Extension Offer.

"**Extension**" has the meaning specified in Section 2.16(1).

"**Extension Amendment**" has the meaning specified in Section 2.16(2).

"**Extension Offer**" has the meaning specified in Section 2.16(1).

"**Facilities**" means the Revolving Credit Loans, the Revolving Credit Facility, the Swing Line Facility, any Extended Revolving Credit Commitments and Extended Revolving Credit Loans or any Incremental Revolving Credit Loan Commitments, as the context may require, and "**Facility**" means any of them.

"**fair market value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices

adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"**FCPA**" has the meaning specified in Section 5.17.

"**Federal Funds Rate**" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Fee Letter**" means that certain Amended and Restated Fee Letter, dated as of September 4, 2015, by and among Initial Borrower, Morgan Stanley, Merrill Lynch, Bank of America, Jefferies, Credit Suisse, DB, Nomura, RBC, RBCCM, Wells Fargo, MCS Capital Markets, MCS Lending and CCT, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**FILO Tranche**" has the meaning specified in Section 2.14(8).

"**Financial Covenant**" means the covenant specified in Section 7.10.

"**Financial Covenant Change Date**" means the date that is eighteen (18) months after the Third Amendment Effective Date.

"**Financial Officer**" means, with respect to a Person, the chief financial officer, accounting officer, treasurer, controller or other senior financial or accounting officer of such Person, as appropriate.

"**Financed Capital Expenditures**" means, with respect to any Person and for any period, Capital Expenditures made by such Person during such period that are financed with the proceeds of Indebtedness (other than Loans) or net proceeds of any Asset Sale, net proceeds of any Casualty Event, any Incurrence of Indebtedness or any issuance of Equity Interests (other than Disqualified Stock or any other issuance of Equity Interests which increases any available basket hereunder).

"**First Amendment**" means that certain Amendment No. 1 to ABL Credit Agreement, dated as of August 29, 2019, among Belk, as the borrower, Holdings, the Administrative Agent and the Lenders party thereto

"**First Amendment Effective Date**" means the "Amendment No. 1 Effective Date", as defined in the First Amendment.

"**First Lien Credit Agreement**" means the First Lien Credit Agreement dated as of the Closing Date among Holdings, the Borrower, Alter Domus (US) LLC, as administrative agent, and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an First Lien Credit Agreement) in each case to the extent permitted hereunder.

"**First Lien Facility**" means the collective reference to the First Lien Credit Agreement, the First Lien Loan Documents, any notes and letters of credit issued pursuant thereto and any guarantee, security

agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not a First Lien Facility), in each case to the extent permitted hereunder.

"**First Lien Loan Documents**" means, collectively, (i) the First Lien Credit Agreement and (ii) the security documents, intercreditor agreements (including the ABL Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the First Lien Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the First Lien Facility.

"**First Lien Obligations**" means "Obligations" as defined in the First Lien Facility as in effect on the Third Amendment Effective Date.

"**First Lien Loans**" means "Loans" as defined in the First Lien Facility as in effect on the Third Amendment Effective Date.

"**First Lien Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Debt outstanding the last day of such Test Period to (b) Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**Fixed Amounts**" has the meaning specified in Section 1.07(9).

"**Fixed Charge Coverage Ratio**" means, for any Test Period, the ratio of (a) Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such period *minus* taxes based on income, profits or capital, including federal, foreign, state, franchise, excise and similar taxes (including in respect of repatriated funds), net of cash refunds received, of the Borrower and its Restricted Subsidiaries paid in cash during such Test Period *minus* Unfinanced Capital Expenditures paid in cash by the Borrower and its Restricted Subsidiaries during such Test Period, to (b) the Fixed Charges of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07. For purposes of calculating the Fixed Charge Coverage Ratio only, the amount of Consolidated Cash Interest Charges: (i) for the period ending on the first full fiscal quarter after the Third Amendment Effective Date, shall be deemed to be the actual dollar amount of such component for the fiscal quarter then ended multiplied by four; (ii) for the period ending on the second full fiscal quarter after the Third Amendment Effective Date shall be deemed to be the actual dollar amount of such component for the two fiscal quarters then ended multiplied by two; and (iii) for the period ending on the third full fiscal quarter after the Third Amendment Effective Date shall be deemed to be the actual dollar amount of such component for the three fiscal quarters then ended multiplied by 4/3.

"**Fixed Charges**" means, for any Test Period, the sum, determined on a consolidated basis, of (a) the Consolidated Cash Interest Charges of the Borrower and its Restricted Subsidiaries for such period *plus* (b) scheduled amortization of the principal amount of Indebtedness for borrowed money of the Borrower and its Restricted Subsidiaries (other than payments by Borrower or any of its Restricted Subsidiaries to Borrower or to any Loan Parties or Restricted Subsidiaries) due and payable in cash during such period *plus* (c) cash dividends on any Designated Preferred Stock of the Borrower for such

45

periods *plus* (d) for the purposes of calculating the Fixed Charge Coverage Ratio when determining compliance with the Payment Conditions for the making of any Restricted Payment, the amount of Restricted Payments previously made in cash during such Test Period.

"**floor**" means, with respect to any reference rate of interest, any fixed minimum amount specified for such rate.

"**Foreign Lender**" means a Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Code.

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, the Borrower or any Subsidiary of the Borrower with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender (a) with respect to an L/C Borrowing, such Defaulting Lender's Pro Rata Share or other applicable share provided under this Agreement of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof and (b) with respect to the Swing Line Lender, such Defaulting Lender's Pro Rata Share or other applicable share provided under this Agreement of Swing Line Loans other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"**Fund**" means any Person (other than a natural person) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, as in effect from time to time.  At any time after the Closing Date, the Borrower may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP will thereafter be construed to mean IFRS (except as otherwise provided in this Agreement); *provided, however*, that any such election, once made, will be irrevocable; *provided further* that any calculation or determination in this Agreement that requires the application of GAAP for periods that include fiscal quarters ended prior to the Borrower's election to apply IFRS will remain as previously calculated or determined in accordance with GAAP.  The Borrower will give notice of any such election made in accordance with this definition to the Administrative Agent.  Notwithstanding any other provision contained herein the amount of any Indebtedness under GAAP with respect to Capitalized Lease Obligations and Attributable Indebtedness shall be determined in accordance with the definition of Capitalized Lease Obligations and Attributable Indebtedness, respectively.

Notwithstanding the foregoing, if at any time any change occurring after the Closing Date in GAAP (or IFRS) or in the application thereof on the computation of any financial ratio or financial

requirement, or compliance with any covenant, set forth in any Loan Document, and the Borrower shall so request (regardless of whether any such request is given before or after such change), the Administrative Agent, the Lenders and the Borrower will negotiate in good faith to amend (subject to the approval of the Required Lenders) such ratio, requirement or covenant to preserve the original intent thereof in light of such change in GAAP (or IFRS); provided further that until so amended, (a) such ratio, requirement or covenant shall continue to be computed in accordance with GAAP (or IFRS) prior to such change therein and (b) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP (or IFRS).

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**guarantee**" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantor**" has the meaning specified in clause (2) of the definition of "Collateral and Guarantee Requirement." For avoidance of doubt, the Borrower may, in its sole discretion, cause any

domestic Parent Company or Restricted Subsidiary that is not required to be a Guarantor to Guarantee the Obligations by causing such Parent Company or Restricted Subsidiary to execute a joinder to the Guaranty (substantially in the form provided therein or as the Administrative Agent, the Borrower and such Guarantor may otherwise agree), and any such Parent Company or Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"**Guaranty**" means (a) the Guarantee of the Obligations by the Guarantors substantially in the form of Exhibit E, (b) each other Guarantee and Guarantee supplement delivered pursuant to Section 6.11 and (c) each other Guarantee and Guarantee supplement delivered by any Parent Company or Restricted Subsidiary pursuant to the second sentence of the definition of "Guarantor".

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, and all other hazardous or toxic substances or wastes, pollutants and contaminants and chemicals in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, or radon gas and infectious or medical wastes, to the extent any of the foregoing are regulated pursuant to, or can form the basis for liability under, any Environmental Law.

"**Hedge Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedge Bank**" means any Person party to a Hedge Agreement that is an Agent, a Lender, an Arranger or an Affiliate of any of the foregoing on the Closing Date or at the time it enters into such Hedge Agreement, in its capacity as a party thereto, whether or not such Person subsequently ceases to be an Agent, a Lender, an Arranger or an Affiliate of any of the foregoing.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under any Hedge Agreement. For the avoidance of doubt, any Permitted Convertible Indebtedness Call Transaction will not constitute Hedging Obligations.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Honor Date**" has the meaning specified in Section 2.03(3)(a).

"**IFRS**" means international financial reporting standards and interpretations issued by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants or any successor to either such Board, or the SEC, as the case may be), as in effect from time to time.

"**Immediate Family Members**" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including, in each case, adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"**Impacted Loans**" has the meaning specified in Section 3.03(a).

"**Increased Reporting Period**" means (a) each period beginning on the date that Excess Availability shall have been less than the greater of (x) $100,000,000 and (y) 12.5% of the Maximum Borrowing Amount, in either case, for three (3) consecutive Business Days, and ending on the date Excess Availability shall have been at least the greater of (x) $100,000,000 and (y) 12.5% of the Maximum Borrowing Amount, in each case, for twenty (20) consecutive calendar days or (b) upon the occurrence and continuance of a Specified Event of Default, the period that such Specified Event of Default shall be continuing.

"**Incremental Amendment**" has the meaning specified in Section 2.14(5).

"**Incremental Amounts**" has the meaning specified in clause (1) of the definition of Refinancing Indebtedness.

"**Incremental Revolving Credit Facility**" means, at any time, the aggregate amount of the Incremental Revolving Credit Lenders' Incremental Revolving Credit Commitments and Incremental Revolving Credit Loans and participations in Letters of Credit and Swing Line Loans with respect thereto at such time.

"**Incremental Revolving Credit Lender**" has the meaning specified in Section 2.14(10)(a).

"**Incremental Revolving Credit Loan**" has the meaning specified in Section 2.14(1).

"**Incremental Revolving Credit Loan Commitment**" means the commitment of a Lender to make or otherwise fund an Incremental Revolving Credit Loan and "Incremental Revolving Credit Loan Commitments" means such commitments of all Lenders in the aggregate.

"**Incurrence Based Amounts**" has the meaning specified in Section 1.07(9).

"**Indebtedness**" means, with respect to any Person, without duplication:

(1)     any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)     in respect of borrowed money;

(b)     evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)     representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations) due more than twelve months after

such property is acquired, except (i) any such balance that constitutes an obligation in respect of a commercial letter of credit, a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business or consistent with industry practice, (ii) any earn-out obligations until such obligation is reflected as a liability on the balance sheet (excluding any footnotes thereto) of such Person in accordance with GAAP and is not paid within 60 days after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business; or

        (d)        representing the net obligations under any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than obligations in respect of letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP; *provided* that Indebtedness of any Parent Company appearing upon the balance sheet of the Borrower solely by reason of push-down accounting under GAAP will be excluded;

        (2)        to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice; and

        (3)        to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of such Indebtedness will be the lesser of (i) the fair market value of such asset at such date of determination and (ii) the amount of such Indebtedness of such other Person; *provided* that notwithstanding the foregoing, Indebtedness will be deemed not to include:

        (i)        Contingent Obligations incurred in the ordinary course of business or consistent with industry practice,

        (ii)        reimbursement obligations under commercial letters of credit (provided that unreimbursed amounts under letters of credit will be counted as Indebtedness three (3) Business Days after such amount is drawn),

        (iii)        [reserved],

        (iv)        accrued expenses,

        (v)        deferred or prepaid revenues, and

        (vi)        asset retirement obligations and obligations in respect of reclamation and workers compensation (including pensions and retiree medical care);

*provided further* that Indebtedness will be calculated without giving effect to the effects of Accounting Standards Codification Topic No. 815, *Derivatives and Hedging*, and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this

Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Assets or Operations**" means, with respect to any Parent Company, that Parent Company's total assets, revenues, income from continuing operations before income taxes and cash flows from operating activities (excluding in each case amounts related to its investment in the Borrower and the Restricted Subsidiaries), determined in accordance with GAAP and as shown on the most recent balance sheet of such Parent Company, is more than 3.0% of such Parent Company's corresponding consolidated amount.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that, in the good faith judgment of the Borrower, is qualified to perform the task for which it has been engaged.

"**Information**" has the meaning specified in Section 10.09.

"**Initial Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means the Intercompany Subordination Agreement, dated as of the Closing Date, substantially in the form of Exhibit Q executed by the Borrower and each Restricted Subsidiary that is party thereto.

"**Interest Payment Date**" means, (a) as to any Loan of any Class other than a Base Rate Loan (other than any Swing Line Loan), the last day of each Interest Period applicable to such Loan and the applicable Maturity Date of the Loans of such Class; *provided* that if any Interest Period for a Eurodollar Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any Base Rate Loan (other than any Swing Line Loan) of any Class, the first calendar day of each February, May, August and November and the applicable Maturity Date of the Loans of such Class; and (c) as to any Swing Line Loan, the first calendar day of each February, May, August and November or, if any Event of Default has occurred and is continuing, upon demand of the Swing Line Lender.

"**Interest Period**" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one, two, three or six months thereafter, or to the extent consented to by each applicable Lender, twelve months (or such period of less than one month as may be consented to by each applicable Lender), as selected by the Borrower in its Committed Loan Notice; *provided* that:

> (1)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

51

(2)      any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(3)      no Interest Period shall extend beyond the applicable Maturity Date for the Class of Loans of which such Eurodollar Rate Loan is a part.

"**Inventory**" means, with respect to a Person, all of such Person's now owned and hereafter acquired inventory (as defined in the UCC), goods and merchandise, wherever located, in each case, to be furnished under any contract of service or held for sale or lease, all returned goods, raw materials, work-in-process, finished goods (including embedded software), other materials, and supplies of any kind, nature or description which are used or consumed in such Person's business or used in connection with the packing, shipping, advertising, selling, or finishing of such goods, merchandise and other property, and all documents of title or other documents representing the foregoing.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's or BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency selected by the Borrower.

"**Investment Grade Securities**" means:

(1)      securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2)      debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or debt instruments constituting loans or advances among the Borrower and its Subsidiaries;

(3)      investments in any fund that invests at least 95% of its assets in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4)      corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"**Investments**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to employees, directors, officers, members of management, manufacturers and consultants, in each case made in the ordinary course of business or consistent with industry practice), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person.  For purposes of the definition of "Unrestricted Subsidiary" and Section 7.05,

(1)      "Investments" will include the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)    the Borrower's "Investment" in such Subsidiary at the time of such redesignation; *minus*

(b)    the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer.

The amount of any Investment outstanding at any time will be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.

"**Investors**" means the Sponsor.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**ISDA Definitions**" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"**Issuing Bank**" means (i) Bank of America, in its capacity as an issuer of Letters of Credit hereunder, together with its permitted successors and assigns, (ii) Wells Fargo Bank, National Association, together with its permitted successors and assigns, and (iii) any other Revolving Credit Lender that becomes an Issuing Bank in accordance with Section 2.03(12).

"**Issuing Bank Document**" means with respect to any Letter of Credit, the L/C Application, and any other document, agreement and instrument entered into by any Issuing Bank and the Borrower (or any of its Subsidiaries) or in favor of such Issuing Bank and relating to such Letter of Credit.

"**Judgment Currency**" has the meaning specified in Section 10.26.

"**Junior Lien Debt**" has the meaning specified in clause (39) of the definition of Permitted Liens.

"**L/C Advance**" means, with respect to each Revolving Credit Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Pro Rata Share or other applicable share provided for under this Agreement.

"**L/C Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the relevant Issuing Bank.

"**L/C Borrowing**" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Revolving Credit Borrowing.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"**L/C Expiration Date**" means the day that is five (5) Business Days prior to the scheduled Maturity Date then in effect for the applicable Revolving Credit Facility (or, if such day is not a Business Day, the next preceding Business Day).

"**L/C Obligations**" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit *plus* the aggregate of all Unreimbursed Amounts, including all L/C Borrowings.  For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be the stated amount thereof in effect at such time.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**L/C Sublimit**" means an amount equal to the lesser of (a) $100.0 million and (b) the aggregate amount of the Revolving Credit Commitments.  The L/C Sublimit is part of, and not in addition to, the Revolving Credit Facility.

"**Landlord Lien State**" means any state in which a landlord's claim for rent has priority by law over the Lien of the Collateral Agent in any of the Collateral.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Incremental Revolving Credit Loan or any Extended Revolving Credit Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, legally enforceable guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the legally binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Legal Holiday**" means Saturday, Sunday or a day on which commercial banking institutions are not required to be open in the State of New York or at the place of payment.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and, as the context requires, includes any Issuing Bank, the Swing Line Lender and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."  For avoidance of doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered an Incremental Amendment, as the case may be, and to the extent such Incremental Amendment shall have become effective in accordance with the terms hereof and thereof, and each Extending Lender shall continue to be a Lender.  As of the Third Amendment Effective Date, Schedule 2.01 sets forth the name of each Lender.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Letter of Credit**" means any letter of credit issued hereunder.  A Letter of Credit may be a commercial letter of credit or a standby letter of credit; *provided*, *however*, that any commercial letter of credit issued hereunder shall provide solely for cash payment upon presentation of a sight draft.

"**LIBOR**" has the meaning specified in the definition of "Eurodollar Rate".

"**LIBOR Floor**" means 0.25% per annum.

"**LIBOR Replacement Date**" has the meaning specified in Section 3.03(c).

"**LIBOR Screen Rate**" means the LIBOR quote on the applicable screen page that Administrative Agent designates to determine LIBOR (or such other commercially available source providing such quotations as designated by Administrative Agent from time to time).

"**LIBOR Successor Rate**" has the meaning specified in Section 3.03(c).

"**LIBOR Successor Rate Conforming Changes**" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definition of Business Day, timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Administrative Agent, to reflect the adoption and implementation of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"**Lien**" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest and any effective filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event will an operating lease be deemed to constitute a Lien.

"**Limited Condition Acquisition**" means any Permitted Acquisition or other investment permitted hereunder by the Borrower or one or more of its Restricted Subsidiaries whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"**Loan**" means an extension of credit under Article II by a Lender (x) to the Borrower in the form of a Revolving Credit Loan, a Swing Line Loan or a Protective Advance (including any loans made pursuant to any Revolving Credit Commitment Increase or loans made pursuant to Extended Revolving Credit Commitments).

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) any Incremental Amendment or Extension Amendment, (d) the Guaranty, (e) the Collateral Documents, (f) the Applicable Intercreditor Agreements, (g) the Fee Letter, (h) the Third Amendment Fee Letter, and (i) each L/C Application.

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each Subsidiary Guarantor.

"**London Banking Day**" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Management Services Agreement**" means the management services agreement or similar agreements among the Sponsor or certain of its respective management companies associated with it or their advisors, if applicable, and the Borrower (or any Parent Company).

"**Management Stockholders**" means the members of management (and their Controlled Investment Affiliates and Immediate Family Members and any permitted transferees thereof) of the Borrower (or a Parent Company) who are holders of Equity Interests of any Permitted Parent or Parent Company on the Closing Date or that become holders of such Equity Interests .

"**Mandatory Swing Line Borrowing**" has the meaning specified in Section 2.04(3)(a).

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Material Adverse Effect**" means (i) on the Closing Date, a Company Material Adverse Effect and (ii) after the Closing Date, a circumstance or condition that would materially and adversely affect (a) the business, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, other than, in each case, customary events or circumstances which resulted from the commencement of the Chapter 11 Cases, (b) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents to which it is a party or (c) the rights and remedies of the Lenders, the Collateral Agent and the Administrative Agent under the Loan Documents.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries that is a Restricted Subsidiary (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiary at the last day of the most recent Test Period) were equal to or greater than 5.0% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiary for such Test Period) were equal to or greater than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time, Domestic Subsidiaries that are not Material Domestic Subsidiaries solely because they do not meet the thresholds set forth in the preceding clause (a) or (b) comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiaries at the last day of the most recent Test Period) 7.5% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiaries for such Test Period) 7.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries that are Restricted Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 with respect to any such Subsidiaries.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries that are Restricted Subsidiaries (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiary at the last day of the most recent Test Period) were equal to or greater than 5.0% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the revenues of the Restricted Subsidiaries of such Foreign Subsidiary for such Test Period) were equal to or greater than 5.0% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time, Foreign Subsidiaries that are not Material Foreign Subsidiaries comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiaries at the last day of the most recent Test Period) 7.5% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period) 7.5% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries that are Restricted Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) with respect to any tranche of the Revolving Credit Loans, August 29, 2024, (ii) with respect to the Extended Revolving Credit Loans, the final maturity date as specified in the applicable Extension Amendment and (iii) with respect to any Incremental Revolving Credit Loans, the final maturity date as specified in the applicable Incremental Amendment, and (iv) with respect to any FILO Tranche, the maturity date applicable to such FILO Tranche in accordance with the terms hereof; provided that in each case, if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Borrowing Amount**" means, at any time, the lesser of (1) the aggregate amount of Revolving Credit Commitments at such time and (2) the Borrowing Base set forth in the Borrowing Base Certificate most recently delivered pursuant to Section 6.20.

"**Maximum Rate**" has the meaning specified in Section 10.11.

"**Merger**" has the meaning specified in the preliminary statements to this Agreement.

"**Moody's**" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Necessary Cure Amount**" has the meaning specified in Section 8.04(2).

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"**Net Orderly Liquidation Value**" means, with respect to Eligible Inventory, the net appraised liquidation value thereof (expressed as a percentage of the cost of such Inventory) as determined from time to time by an Acceptable Appraiser in accordance with Section 6.10; *provided that*, with respect to that certain inventory appraisal conducted by Gordon Brothers and delivered to the Administrative Agent on or about September 15, 2020, the Net Orderly Liquidation Value set forth in such appraisal will be applied beginning December 31, 2020.

"**New Store**" means each new store or shopping facility opened or acquired by the Borrower or a Restricted Subsidiary that has been open for commercial operations for less than twelve full calendar months.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Non-Extended Lender**" has the meaning specified in Section 2.16.

"**Non-Expiring Credit Commitment**" has the meaning specified in Section 2.04(7).

"**Non-Excluded Taxes**" means all Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Non-Extension Notice Date**" has the meaning specified in Section 2.03(2)(c).

"**Non-FILO Tranche**" means any Loans and Revolving Credit Commitments other than the FILO Tranche.

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Non-Recourse Indebtedness**" means Indebtedness that is non-recourse to the Borrower and the Restricted Subsidiaries.

"**Note**" means a Revolving Credit Note or Swing Line Note, as the context may require.

"**Notice of Intent to Cure**" has the meaning specified in Section 6.02(1).

"**Obligations**" means all

(1)      advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party with respect to any Loan or arising under any Loan Document, including the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding,

(2)        obligations (other than Excluded Swap Obligations) of the Borrower or any Restricted Subsidiary arising under any Secured Hedge Agreement,

(3)        Cash Management Obligations under each Secured Cash Management Agreement;

(4)        Secured Bank Product Obligations; and

(5)        the Guaranty in respect of each of the foregoing.

"**Officer's Certificate**" means a certificate signed on behalf of a Person by a Responsible Officer of such Person.

"**OID**" means original issue discount.

"**Opinion of Counsel**" means a written opinion from legal counsel who is reasonably acceptable to the Administrative Agent.  Counsel may be an employee of or counsel to the Borrower or the Administrative Agent.

"**ordinary course of business**" means activity conducted in the ordinary course of business of the Borrower and any Restricted Subsidiary, including the expansion, remodeling, acquisition, modernization, construction, improvement and repair of department stores and other retail centers of Belk operated, or expected to be operated, by the Borrower or a Restricted Subsidiary, and financing transactions in connection therewith, and will include Sale-Leaseback Transactions.

"**Organizational Documents**" means

(1)        with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction);

(2)        with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and

(3)        with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" means any and all present or future stamp, court or documentary Taxes, intangible, recording, filing or similar Taxes arising from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Outstanding Amount**" means (a) with respect to the Revolving Credit Loans and Swing Line Loans on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Credit Loans (including any refinancing of outstanding Unreimbursed Amounts under Letters of Credit or L/C Credit Extensions as a Revolving Credit Borrowing) and Swing Line Loans, as the case may be, occurring on such date; and (b) with respect to

any L/C Obligations on any date, the outstanding principal amount thereof on such date after giving effect to any related L/C Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Unreimbursed Amounts under related Letters of Credit (including any refinancing of outstanding Unreimbursed Amounts under related Letters of Credit or related L/C Credit Extensions as a Revolving Credit Borrowing) or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent, an Issuing Bank or the Swing Line Lender, as applicable, in accordance with banking industry rules on interbank compensation.

"**Parent Company**" means any Person so long as such Person directly or indirectly holds 100.0% of the total voting power of the Capital Stock of the Borrower, and at the time such Person acquired such voting power, no Person and no group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any such group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) (other than any Permitted Holder), will have beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), directly or indirectly, of 50.0% or more of the total voting power of the Voting Stock of such Person. For the avoidance of doubt, Fashion Holdings Intermediate LLC, a Delaware limited liability company, is a Parent Company of the Borrower.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Payment Conditions**" means, at any time of determination, that (a) no Specified Event of Default exists or would arise as a result of the making of the subject Specified Payment, (b) after giving *pro forma effect* to such Specified Payment, the Fixed Charge Coverage Ratio as of the end of the most recently ended Test Period (regardless of whether a Covenant Trigger Period has occurred and is continuing) is greater than or equal to 1.0 to 1.0 calculated as if such Specified Payment (if applicable to such calculation) had been made as of the first day of such Test Period and (c) the Borrower has Excess Availability, after giving *pro forma effect* to such Specified Payment, as of the date of such Specified Payment and for each day during the thirty (30) calendar days immediately prior to such Specified Payment, in excess of the greater of (A) in the case of a Permitted Acquisition, other Permitted Investments and Restricted Payments of the type described in Section 7.05(a)(C) (such Restricted Payments, "**Restricted Debt Payments**"), (x) 12.5% of the Maximum Borrowing Amount and (y) $80,000,000 and (B) in all other cases, (x) 15.0% of the Maximum Borrowing Amount and (y) $100,000,000; *provided*, *however*, that the condition set forth in clause (b) above shall not be applicable if Excess Availability after giving *pro forma effect* to such Specified Payment is as of the date of such Specified Payment and for each day during the thirty (30) calendar days immediately prior to such Specified Payment in excess of the greater of (A) in the case of a Permitted Acquisition, other Permitted Investments and Restricted Debt Payments, (x) 17.5% of the Maximum Borrowing Amount and (y) $120,000,000 and (B) otherwise, (x) 20.0% of the Maximum Borrowing Amount and (y) $140,000,000. Notwithstanding anything set forth in this Agreement, in the case of the Limited Condition Acquisition provisions set forth in Section 1.07(8), only the testing of Payment Conditions for Permitted Acquisitions will receive the benefit of such Limited Condition Acquisition provisions.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is

sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"**Perfection Certificate**" has the meaning specified in the Security Agreement.

"**Permitted Acquisition**" has the meaning specified in clause (3) of the definition of "Permitted Investments."

"**Permitted Asset Swap**" means the substantially concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Borrower or any Restricted Subsidiary and another Person.

"**Permitted Bond Hedge Transaction**" means any call or capped call option (or substantively equivalent derivative transaction) on the Borrower's common stock purchased by the Borrower in connection with the issuance of any Convertible Indebtedness; *provided* that the purchase price for such Permitted Bond Hedge Transaction, less the proceeds received by the Borrower from the sale of any related Permitted Warrant Transaction, does not exceed the net proceeds received by the Borrower from the sale of such Convertible Indebtedness issued in connection with the Permitted Bond Hedge Transaction.

"**Permitted Convertible Indebtedness Call Transaction**" means any Permitted Bond Hedge Transaction and any Permitted Warrant Transaction.

"**Permitted Discretion**" means the Administrative Agent's reasonable credit judgment (from the perspective of an asset-based lender) in establishing reserves, exercised in good faith in accordance with customary business practices for similar asset based lending facilities, based upon its consideration of any factor that it reasonably believes (i) could materially adversely affect the quantity, quality, mix or value of Collateral (including any applicable laws that may inhibit collection of a receivable), the enforceability or priority of the Administrative Agent's liens thereon, or the amount that the Administrative Agent, the Lenders or the Issuing Bank could receive in liquidation of any Collateral; (ii) that any collateral report or financial information delivered by the Borrower or any Guarantor is incomplete, inaccurate or misleading in any material respect; or (iii) creates an event of default.  In exercising such judgment, the Administrative Agent may consider any factors that could materially increase the credit risk of lending to the Borrower on the security of the Collateral.  Any Reserve established or modified by the Administrative Agent shall have a reasonable relationship to circumstances, conditions, events or contingencies which are the basis for such Reserve, as reasonably determined, without duplication, by the Administrative Agent in good faith; *provided* that circumstances, conditions, events or contingencies existing or arising prior to the Closing Date and, in each case, disclosed in writing in any field examination or inventory appraisal delivered to the Administrative Agent in connection herewith or otherwise known to the Administrative Agent, in either case, prior to the Closing Date, shall not be the basis for any establishment of any Reserves after the Closing Date, unless such circumstances, conditions, events or contingencies shall have changed in a material respect since the Closing Date.

"**Permitted Holder**" means (1) the Investors and Management Stockholders and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the foregoing are members; *provided* that in the case of such group and without giving effect to the existence of such group or any other group, such Investors and Management Stockholders, collectively, have beneficial ownership of more than forty percent (40%) of the total voting power of the Voting Stock of the Borrower or any Permitted Parent, and (2) any Person acting in the capacity of an underwriter (solely

to the extent that and for so long as such Person is acting in such capacity) in connection with a public or private offering of Capital Stock of the Borrower or any Permitted Parent.

"**Permitted Indebtedness**" means Indebtedness permitted to be incurred in accordance with Section 7.02.

"**Permitted Investments**" means:

(1)    any Investment (a) in any Loan Party, (b) by any Restricted Subsidiary that is a Non-Loan Party in any other Restricted Subsidiary that is a Non-Loan Party and (c) by any Loan Party in any Restricted Subsidiary that is a Non-Loan Party; *provided* that the aggregate amount of Investments (other than as a result of the transfer of Equity Interests or Indebtedness of any Restricted Subsidiary that is a Non-Loan Party to any other Restricted Subsidiary that is a Non-Loan Party) outstanding at any time pursuant to this clause (c) shall not exceed the greater of (i) $50.0 million and (ii) 10.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto;

(2)    any Investment(s) in Cash Equivalents or Investment Grade Securities and Investments that were Cash Equivalents or Investment Grade Securities when made;

(3)    (a)    any Investment by the Borrower or any Restricted Subsidiary in any Person (directly or through entities that will be Restricted Subsidiaries), if as a result of such Investment (i) such Person becomes a Restricted Subsidiary or (ii) such Person, in one transaction or a series of related transactions, is amalgamated, merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Borrower or a Restricted Subsidiary (a "**Permitted Acquisition**"); *provided* that:

(A)    Investments made by Loan Parties in Persons that do not become Loan Parties or in assets that are not owned by a Loan Party pursuant to a Permitted Acquisition permitted by this clause (3) shall be permitted without limitation; provided that following such Permitted Acquisition, any Investment in such Restricted Subsidiary will be subject to the limitation set forth in clause (1)(c) above;

(B)    (i) subject to Section 1.07(8), immediately before and after giving *pro forma* effect to any such Investment, no Event of Default under Sections 8.01(1) or 8.01(6) will have occurred and be continuing,

(ii)    to the extent required by the Collateral and Guarantee Requirement, after giving effect to any such Permitted Acquisition, the Borrower shall be in compliance with the covenant set forth in Section 6.11

(iii)    after giving effect to any such Permitted Acquisition, the Borrower shall be in compliance with the covenant set forth in Section 6.17; and

(iv)    the Payment Conditions shall have been satisfied on a *pro forma* basis;

(b)    any Investment held by such Person that is acquired pursuant to such Permitted Acquisition; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, amalgamation, consolidation, transfer or conveyance;

(4)     any Investment in securities or other assets not constituting Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made in accordance with Section 7.04 or any other disposition of assets not constituting an Asset Sale;

(5)     any Investment existing on the Closing Date or made pursuant to binding commitments in effect on the Closing Date or an Investment consisting of any extension, modification, replacement, renewal or reinvestment of any Investment or binding commitment existing on the Closing Date; *provided* that the amount of any such Investment or binding commitment may be increased, extended, modified, replaced, reinvested or renewed, (a) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities) or (b) as otherwise permitted hereunder;

(6)     any Investment acquired by the Borrower or any Restricted Subsidiary:

(a)     in exchange for any other Investment, accounts receivable or endorsements for collection or deposit held by the Borrower or any Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer);

(b)     in satisfaction of judgments against other Persons;

(c)     as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or

(d)     as a result of the settlement, compromise or resolution of (i) litigation, arbitration or other disputes or (ii) obligations of trade creditors or customers that were incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer;

(7)     Hedging Obligations permitted under Section 7.02(b)(10);

(8)     any Investment in a Similar Business taken together with all other Investments made pursuant to this clause (8) that are at the time outstanding together with, but without duplication of, Investments made pursuant to clause (23) of this definition that are at that time outstanding not to exceed the greater of (a) $40.0 million and (b) 7.5% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto (with the amount of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment");

(9)     Investments the payment for which consists of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company;

(10)     (a) guarantees of Indebtedness permitted under Section 7.02, performance guarantees and Contingent Obligations incurred in the ordinary course of business or consistent with industry practice and (b) the creation of liens on the assets of the Borrower or any Restricted Subsidiary in compliance with Section 7.01;

(11)     any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Sections 7.06(b)(3), (4), (7), (8), (10), (12), (14), (16), (17), (18), (19), (20), (23) and (24);

(12)     Investments consisting of purchases and acquisitions of inventory, supplies, material, services or equipment or similar assets or the licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons;

(13)     Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of Cash Equivalents or marketable securities), not to exceed the greater of (a) $50.0 million and (b) 10.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided*, *however*, that if any Investment pursuant to this clause (13) is made in any Person that is not a Restricted Subsidiary of the Borrower at the date of the making of such Investment and such Person becomes a Restricted Subsidiary after such date, such Investment will thereafter be deemed to have been made pursuant to clause (1) above (to the extent permitted thereunder) and will cease to have been made pursuant to this clause (13) for so long as such Person continues to be a Restricted Subsidiary;

(14)     [reserved];

(15)     loans and advances to, or guarantees of Indebtedness of, officers, directors, employees, consultants and members of management not in excess of the greater of $10.0 million and 2.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(16)     loans and advances to employees, directors, officers, members of management and consultants for business-related travel expenses, moving expenses, payroll advances and other similar expenses or payroll expenses, in each case incurred in the ordinary course of business or consistent with past practice or consistent with industry practice or to future, present and former employees, directors, officers, members of management and consultants (and their Controlled Investment Affiliates and Immediate Family Members) to fund such Person's purchase of Equity Interests of the Borrower or, so long as the proceeds thereof are contributed to the Borrower, any Parent Company;

(17)     advances, loans or extensions of trade credit or prepayments to suppliers or loans or advances made to distributors, in each case, in the ordinary course of business or consistent with past practice or consistent with industry practice by the Borrower or any Restricted Subsidiary;

(18)     any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business or consistent with industry practice;

(19)     Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with industry practice;

(20)     Investments made in the ordinary course of business or consistent with industry practice in connection with obtaining, maintaining or renewing client contacts and loans or advances made to distributors;

(21)     Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business or consistent with industry practice;

(22)     the purchase or other acquisition of any Indebtedness of the Borrower or any Restricted Subsidiary to the extent otherwise permitted hereunder;

(23)     Investments in the ordinary course of business or consistent with industry practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers;

(24)     any Investment by any Captive Insurance Subsidiary in connection with its provision of insurance to the Borrower or any of its Subsidiaries, which Investment is made in the ordinary course of business or consistent with industry practice of such Captive Insurance Subsidiary, or by reason of applicable law, rule, regulation or order, or that is required or approved by any regulatory authority having jurisdiction over such Captive Insurance Subsidiary or its business, as applicable;

(25)     Investments in Unrestricted Subsidiaries having an aggregate fair market value, taken together with all other Permitted Investments made pursuant to this clause (25) that are at the time outstanding together with, but without duplication of, Investments made pursuant to clause (8) of this definition that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of, or have not been subsequently sold or transferred for, Cash Equivalents or marketable securities, not to exceed the greater of (a) $40.0 million and (b) 7.5% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided*, *however*, that if any Investment pursuant to this clause (25) is made in any Person that is an Unrestricted Subsidiary of the Borrower at the date of the making of such Investment and such Person becomes a Restricted Subsidiary after such date, such Investment will thereafter be deemed to have been made pursuant to clause (1) above to the extent permitted thereunder and will cease to have been made pursuant to this clause (25) for so long as such Person continues to be a Restricted Subsidiary;

(26)     Investments made as part of, to effect or resulting from the Closing Date Transactions;

(27)     Investments of assets relating to non-qualified deferred payment plans in the ordinary course of business or consistent with industry practice;

(28)     intercompany current liabilities owed to Unrestricted Subsidiaries or joint ventures incurred in the ordinary course of business or consistent with industry practice in connection with the cash management operations of the Borrower and its Subsidiaries;

(29)     acquisitions of obligations of one or more directors, officers or other employees or consultants or independent contractors of any Parent Company, the Borrower, or any Subsidiary of the Borrower in connection with such director's, officer's, employee's consultant's or independent contractor's acquisition of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, to the extent no cash is actually advanced by the Borrower or any Restricted Subsidiary to such directors, officers, employees, consultants or independent contractors in connection with the acquisition of any such obligations;

(30)     Investments constituting promissory notes or other non-cash proceeds of dispositions of assets to the extent permitted under Section 7.04;

(31)     Investments resulting from pledges and deposits permitted pursuant to the definition of "Permitted Liens";

(32)     loans and advances to any direct or indirect parent of the Borrower in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made in cash to such parent in accordance with Section 7.05 at such time, such Investment being treated for purposes of the applicable clause of Section 7.05, including any limitations, as if a Restricted Payment were made pursuant to such applicable clause;

(33)     any other Investments if on a *pro forma* basis after giving effect to such Investment, the Payment Conditions shall have been satisfied with respect thereto;

(34)     Permitted Bond Hedge Transactions; and

(35)     any Investment made by any Restricted Subsidiary that is not a Loan Party to the extent that such Investment is financed with the proceeds received by such Restricted Subsidiary from an Investment in such Restricted Subsidiary permitted under this Agreement.

; *provided* that (x) after giving effect to any such Investment, no Overadvance would exist or would result therefrom and (y) to the extent such Investment includes IP Rights material and necessary for the operation of the assets of the Borrower and its Subsidiaries, taken as a whole, which constitute ABL Priority Collateral, such IP Rights shall be subject to a non-exclusive, royalty-free worldwide license in favor of the Administrative Agent for the purpose of the Administrative Agent's exercise of rights and remedies under this Agreement in connection with the ABL Priority Collateral. For purposes of determining compliance with this definition, (A) an Investment need not be incurred solely by reference to one category of Permitted Investments described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption, (B) in the event that an Investment (or any portion thereof) meets the criteria of one or more of the categories of Permitted Investments, the Borrower may, in its sole discretion, classify or reclassify such Investment (or any portion thereof) in any manner that complies with this definition and Section 7.05 and (C) after giving effect to any Permitted Investment of Equity Interests of a Restricted Subsidiary, no Overadvance shall exist or result therefrom.

"**Permitted Liens**" means, with respect to any Person:

(1)    Liens created pursuant to any Loan Document;

(2)    Liens, pledges or deposits made in connection with:

    (a)    workers' compensation laws, unemployment insurance, health, disability or employee benefits, other social security laws or similar legislation or regulations,

    (b)    insurance-related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) securing reimbursement or indemnification obligations of (including obligations in respect of letters of credit, bank guarantees or similar documents or instruments for the benefit of) insurance carriers providing property, casualty or liability insurance or otherwise supporting the payment of items set forth in the foregoing clause (a) or

    (c)    bids, tenders, contracts, statutory obligations, surety, indemnity, warranty, release, appeal or similar bonds, or with regard to other regulatory requirements, completion guarantees, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities, and other obligations of like nature (including those to secure health, safety and environmental obligations) (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for the payment of rent, contested taxes or import duties and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with industry practice;

(3)    Liens imposed by law, such as landlords', carriers', warehousemen's, materialmen's, repairmen's, construction, mechanics' or other similar Liens (a) for sums not yet overdue for a period of more than sixty (60) days or, if more than sixty (60) days overdue, are unfiled and no other action has been taken to enforce such Liens or (b) being contested in good faith by appropriate actions or other Liens arising out of or securing judgments or awards against such Person with respect to which such Person will then be proceeding with an appeal or other proceedings for review if such Liens are adequately bonded or adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)    Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than thirty (30) days or not yet payable or not subject to penalties for nonpayment or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

    (5)    Liens in favor of issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds, instruments or obligations or with respect to regulatory requirements or letters of credit or bankers acceptance issued, and completion guarantees provided for, in each ease, issued pursuant to the request of and for the account of such Person in the ordinary course of its business or consistent with past practice or industry practice;

    (6)    survey exceptions, encumbrances, ground leases, easements, restrictions, protrusions, encroachments or reservations of, or rights of others for, licenses, rights-of-way,

servitudes, sewers, electric lines, drains, telegraph, telephone and cable television lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that were not incurred in connection with Indebtedness and that do not in the aggregate materially impair their use in the operation of the business of such Person;

(7)     Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (2), (4), (12), (13), (14), (23) or (25) of Section 7.02(b); *provided* that:

(a)     Liens securing obligations relating to any Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (13) relate only to obligations relating to Refinancing Indebtedness that (x) is secured by Liens on the same assets as the assets securing the Refinanced Debt (as defined in the definition of Refinancing Indebtedness), *plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property, or (y) serves to refund, refinance, extend, replace, renew or defease Indebtedness, Disqualified Stock or Preferred Stock incurred under such clause (4), (12) or (13) of Section 7.02(b);

(b)     Liens securing obligations relating to Indebtedness or Disqualified Stock permitted to be incurred pursuant to such clause (23) extend only to the assets of Subsidiaries that are not Guarantors;

(c)     Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (4) extend only to the assets so purchased, replaced, leased or improved and proceeds and products thereof; *provided further* that individual financings of assets provided by a counterparty may be cross-collateralized to other financings of assets provided by such counterparty;

(d)     If any such Liens secure Indebtedness for borrowed money, Disqualified Stock or Preferred Stock incurred pursuant to such clause (12) in a principal amount in excess of $25.0 million, they will be subject to an Applicable Intercreditor Agreement; *provided* that (x) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations and (y) any Liens on the Term Priority Collateral may be pari passu, junior or senior to the Liens on the Term Priority Collateral securing the Obligation;

(e)     In the case of Liens securing Indebtedness incurred under clause (2) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement; *provided* that (x) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations and (y) any Liens on the Term Priority Collateral may be pari passu, junior or senior to the Liens on the Term Priority Collateral securing the Obligations;

(f)     In the case of Liens securing Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (14) of Section 7.02(b), (x) with respect to Liens securing Indebtedness assumed in connection with a Permitted Acquisition, (1) such Liens are secured solely on assets or Restricted Subsidiaries acquired in such Permitted Acquisition, (2) such Liens extend only to the same assets (and any after acquired assets

pursuant to an after-acquired property clause in the applicable security documents), (3) such Liens secure only the Indebtedness assumed pursuant to such Permitted Acquisition and (4) such Liens were not created in contemplation thereof and (y) with respect to Liens securing Indebtedness incurred to finance a Permitted Acquisition, (A) such Liens do not secure any acquired assets of the type that would constitute ABL Priority Collateral unless such assets (1) are excluded from the calculation of the Borrowing Base, (2) are owned by a Restricted Subsidiary that does not constitute a Loan Party whose assets are included in the calculation of the Borrowing Base and (3) with respect to acquired assets that constitute inventory, such acquired assets are not co-mingled or held in a location where Eligible Inventory are located unless segregated on terms and conditions to be reasonably agreed with the Administrative Agent and (B) in the case of any such Liens on Term Priority Collateral (whether acquired pursuant to the Permitted Acquisition or otherwise), such Liens may be pari passu, junior or senior to the Liens on the Term Priority Collateral securing the Obligations and the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement; and

(g)     In the case Liens securing Indebtedness incurred under clause (25) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement; *provided* that (x) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations and (y) any Liens on the Term Priority Collateral may be pari passu, junior or senior to the Liens on the Term Priority Collateral securing the Obligations.

(8)     Liens existing, or provided for under binding contracts existing, on the Third Amendment Effective Date (including Liens in effect on the Closing Date securing Indebtedness permitted under 7.02(3));

(9)     [reserved];

(10)     Liens on property or other assets at the time the Borrower or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger, amalgamation or consolidation with or into the Borrower or any Restricted Subsidiary; *provided* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition, amalgamation, merger or consolidation; *provided further* that such Liens are limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after acquired-property) that secured the obligations to which such Liens relate;

(11)     Liens securing obligations in respect of Indebtedness or other obligations of a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary permitted to be incurred in accordance with Section 7.02;

(12)     Liens securing (x) Hedging Obligations and (y) obligations in respect of Cash Management Services;

(13)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's accounts payable or similar obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(14)     leases, subleases, licenses or sublicenses (or other agreement under which the Borrower or any Restricted Subsidiary has granted rights to end users to access and use the Borrower's or any Restricted Subsidiary's products, technologies or services) that do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and the customary rights reserved or vested in any Person by the terms of any lease, sublease, license, sublicense, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(15)     Liens arising from Uniform Commercial Code (or equivalent statutes) financing statement filings regarding operating leases, consignments or accounts entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business or consistent with industry practice or purported Liens evidenced by the filing of precautionary Uniform Commercial Code (or equivalent statutes) financing statements or similar public filings;

(16)     Liens in favor of the Borrower or any Guarantor;

(17)     Liens on equipment or vehicles of the Borrower or any Restricted Subsidiary granted in the ordinary course of business or consistent with industry practice;

(18)     [reserved];

(19)     Liens to secure any modification, refinancing, refunding, extension, renewal or replacement (or successive modification, refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness, Disqualified Stock or Preferred Stock secured by any Lien referred to in clauses (7), (8) or (10) of this definition; *provided* that:  (a) such new Lien will be limited to all or part of the same property (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property) that secured the original Lien (plus improvements and accessions on such property) and proceeds and products thereof and (b) the Indebtedness, Disqualified Stock or Preferred Stock secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clauses (7), (8) or (10) at the time the original Lien became a Permitted Lien hereunder, *plus* (ii) an amount necessary to pay any fees and expenses (including original issue discount, upfront fees, defeasance costs, underwriting discounts or similar fees) and premiums (including tender premiums and accrued and unpaid interest), related to such refinancing, refunding, extension, renewal or replacement;

(20)     deposits made or other security provided to secure liability to insurance brokers, carriers, underwriters or self-insurance arrangements, including Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(21)     other Liens securing obligations in an aggregate principal amount at any one time outstanding not to exceed the greater of (a) $25.0 million and (b) 5.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto;

(22)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(23)     (a) the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business or consistent with industry practice,

(b) Liens arising out of conditional sale, title retention or similar arrangements for the sale of goods in the ordinary course of business or consistent with industry practice and (c) Liens arising by operation of law under Article 2 of the Uniform Commercial Code;

(24)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(7);

(25)     Liens (a) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on items in the course of collection, (b) attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business or consistent with industry practice and (c) in favor of banking or other institutions or other electronic payment service providers arising as a matter of law or under general terms and conditions encumbering deposits or margin deposits or other funds maintained with such institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(26)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under this Agreement; *provided* that such Liens do not extend to assets other than those that are subject to such repurchase agreements;

(27)     Liens that are contractual rights of setoff (a) relating to the establishment of depository relations with banks or other deposit-taking financial institutions or other electronic payment service providers and not given in connection with the issuance of Indebtedness, (b) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary or (c) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business or consistent with industry practice;

(28)     Liens on cash proceeds (as defined in Article 9 of the Uniform Commercial Code) of assets sold that were subject to a Lien permitted hereunder;

(29)     any encumbrance or restriction (including put, call arrangements, tag, drag, right of first refusal and similar rights) with respect to capital stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(30)     Liens (a) on cash advances or cash earnest money deposits in favor of the seller of any property to be acquired in an Investment permitted under this Agreement to be applied against the purchase price for such Investment and (b) consisting of a letter of intent or an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under Section 7.04 in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(31)     ground leases, leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(32)     Liens in connection with any Specified Real Estate Financings;

(33)     Liens on Capital Stock or other securities of an Unrestricted Subsidiary;

(34)    any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business or consistent with industry practice;

(35)    deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business or consistent with industry practice of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(36)    rights of set-off, banker's liens, netting arrangements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(37)    Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; *provided* that such satisfaction or discharge is permitted under this Agreement;

(38)    receipt of progress payments and advances from customers in the ordinary course of business or consistent with industry practice to the extent the same creates a Lien on the related inventory and proceeds thereof;

(39)    Liens on all or any portion of the Collateral (but no other assets) to secure obligations, which are secured on a junior basis to the Obligations ("**Junior Lien Debt**") in respect of (a) Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to Section 7.02; *provided* that after giving *pro forma* effect to the incurrence of the then proposed Indebtedness, Disqualified Stock or Preferred Stock (or, in the case of Designated Revolving Commitments, on the date such Designated Revolving Commitments are established) (and without netting any cash received from the incurrence of such Indebtedness, Disqualified Stock or Preferred Stock), (i) the Senior Secured Leverage Ratio as of the end of the most recently ended Test Period, calculated giving *pro forma* effect thereto, would be no greater than 5.10 to 1.00 (and solely in the case of the issuance of any Disqualified Stock and/or Preferred Stock, counting all Disqualified Stock and Preferred Stock so secured as Junior Lien Debt as Consolidated Total Debt for purpose of this clause (39)) and (ii) the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement and (b) any Refinancing Indebtedness of Junior Lien Debt;

(40)    agreements to subordinate any interest of the Borrower or any Restricted Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any Restricted Subsidiary pursuant to an agreement entered into in the ordinary course of business or consistent with industry practice;

(41)    Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act or similar provision of any Environmental Law;

(42)    Liens disclosed by the title insurance policies delivered on or prior to the Closing Date and any replacement, extension or renewal of any such Lien (to the extent the Indebtedness and other obligations secured by such replacement, extension or renewal Liens are permitted by this Agreement); *provided* that such replacement, extension or renewal Liens do not cover any

property other than the property that was subject to such Liens prior to such replacement, extension or renewal;

(43)     rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of its Restricted Subsidiaries or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(44)     restrictive covenants affecting the use to which real property may be put; *provided* that the covenants are complied with in all material respects;

(45)     security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business or consistent with industry practice; and

(46)     zoning by-laws and other land use restrictions, including site plan agreements, development agreements and contract zoning agreements.

For purposes of determining compliance with this definition, (A) a Lien need not be incurred solely by reference to one category of Permitted Liens described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption and (B) in the event that a Lien (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens, the Borrower will, in its sole discretion, be entitled to divide, classify or reclassify, in whole or in part, any such Lien (or any portion thereof) among one or more such categories or clauses in any manner that complies with this definition.

If any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing and if any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by a fixed dollar amount, such fixed dollar Basket will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing.

For purposes of this definition, the term "Indebtedness" will be deemed to include interest on such Indebtedness.

"**Permitted Parent**" means any direct or indirect parent of the Borrower that at the time it became a parent of the Borrower was a Permitted Holder pursuant to clause (1) of the definition thereof.

"**Permitted Ratio Debt**" means Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary; provided that (a) such Indebtedness does not mature or have any scheduled amortization or payments, repurchases or redemptions of principal (other than customary amortization payments), in each case, prior the Latest Maturity Date (or, in the case of Subordinated Indebtedness, 91 days after the Latest Maturity Date) of the Revolving Credit Commitments at the time such Indebtedness is incurred, (b) such Indebtedness does not

have a shorter Weighted Average Life to Maturity than the Revolving Credit Commitments then outstanding, (c) in the case of Disqualified Stock and Preferred Stock, such Disqualified Stock or Preferred Stock does not by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, mature or become mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or become redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date of the Revolving Credit Commitments at the time such Disqualified Stock or Preferred Stock is issued, (d) the Total Net Leverage Ratio after giving *pro forma effect* to the incurrence of such Indebtedness, Disqualified Stock or Preferred Stock, as of the end of the most recently ended Test Period, is no greater than 5.10 to 1.00, (e) such Indebtedness may be secured to the extent such Liens constitute Permitted Liens in accordance with the definition thereof and (f) the aggregate amount of (x) Permitted Ratio Debt and (y) Indebtedness, Preferred Stock and Disqualified Stock incurred pursuant to the last proviso of clause (14)(b)(ii) of Section 7.02, in each case incurred by Restricted Subsidiaries of the Borrower that are not and do not become Guarantors, shall not exceed the greater of (a) $100.0 million and 20.0% of Adjusted EBITDA in the aggregate as of the most recently ended Test Period calculated giving *pro forma* effect thereto.  To the extent the Borrower or any Restricted Subsidiary issues any Disqualified Stock or any Restricted Subsidiary issues any Preferred Stock as Designated Preferred Stock or, solely for the purpose of calculating the Total Net Leverage Ratio under clause (d) above, the Consolidated Total Debt shall also include all such Disqualified Stock and Preferred Stock issued pursuant to this definition and under Section 7.02(14)(b)(ii)(I) and then outstanding.

"**Permitted Replacement Credit Card Program**" means any private label credit card program or similar arrangement substantially similar in all material respects to the Synchrony Financial Credit Card Program, with such modifications as the Administrative Agent shall have consented to in writing prior to the effectiveness thereof (such consent not to be unreasonably withheld or delayed), which, after notice to the Administrative Agent in accordance with Section 5.14, is entered into by the Borrower or any of its Subsidiaries on commercially reasonable terms generally available at that time (as determined in good faith by a Responsible Officer of the Borrower), or is in effect with respect to any Person that becomes a Subsidiary after the date hereof in connection with a Permitted Acquisition and is not created in contemplation of or in connection therewith, *provided* that if such program grants a security interest in any assets other than those certain Accounts, receivables, or transferor interest or other similar residual interests subject to such program or arrangement, including a security interest in any returned goods, and the grant of such security interest would reasonably be expected to be detrimental in any material respect to the rights and interests of the Lenders under the Loan Documents, as determined by the Administrative Agent in its reasonable discretion, such program will not be considered a Permitted Replacement Credit Card Program unless and until the Administrative Agent and the third party with whom such program is created have entered into an intercreditor agreement reasonably satisfactory to the Administrative Agent with respect to the priority and enforcement of such security interests.

"**Permitted Warrant Transaction**" means any call option, warrant or right to purchase (or substantively equivalent derivative transaction) on the Borrower's or a Parent Company's common stock sold by the Borrower or a Parent Company substantially concurrently with any purchase by the Borrower of a related Permitted Bond Hedge Transaction.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established or maintained by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Collateral**" has the meaning specified in the Security Agreement.

"**Pre-Adjustment Successor Rate**" has the meaning specified in <u>Section 3.03(c)</u>.

"**Preferred Stock**" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Private-Side Information**" means any information with respect to Holdings and its Subsidiaries that is not Public-Side Information.

"**Proposed Acquisition**" has the meaning specified in the definition of "Borrowing Base."

"**Proposed Target**" has the meaning specified in the definition of "Borrowing Base."

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Revolving Credit Commitment or Revolving Credit Loans of any Lender and any Letters of Credit issued or participations purchased therein by any Lender or any participations in any Swing Line Loans purchased by any Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolving Credit Exposure of that Lender and the denominator of which is the aggregate Revolving Credit Exposure of all Lenders at such time.

"**Protective Advances**" has the meaning specified in Section 2.01(c)(3).

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time

"**Public Company Costs**" means the initial costs relating to establishing compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the Borrower's or its Restricted Subsidiaries' initial establishment of compliance with the obligations of a reporting company, including costs, fees and expenses (including legal, accounting and other professional fees) relating to compliance with provisions of the Securities Act and the Exchange Act.

"**Public Lender**" means Lenders that do not wish to receive Private-Side Information.

"**Public-Side Information**" means (i) at any time prior to Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that is (a) of a type that would be required by applicable Law to be publicly disclosed in connection with an issuance by Holdings or any of its Subsidiaries of its debt or equity securities pursuant to a registered public offering made at such time or (b) not material to make an investment decision with respect to securities of Holdings or any of its Subsidiaries (for purposes of United States federal, state or other applicable securities laws), and (ii) at any time on or after Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that does not constitute material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Holdings or any of its Subsidiaries or any of their respective securities.

"**Purchase Money Obligations**" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement or property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**" has the meaning specified in <u>Section 10.29</u>.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10.0 million at the time the relevant Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Stock.

"**Qualified Holding Company Debt**" means unsecured Indebtedness of Holdings that

(1)      is not subject to any Guarantee by any Subsidiary of Holdings (including the Borrower),

(2)      will not mature prior to the date that is six (6) months after the Latest Maturity Date in effect on the date of issuance or incurrence thereof,

(3)      has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (5) below),

(4)      does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the later to occur of (i) the date that is four (4) years from the date of the issuance or incurrence thereof and (ii) the date that is 180 days after the Latest Maturity Date in effect on the date of such issuance or incurrence, and

(5)      has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior discount notes of a holding company);

*provided* that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Event of Default shall have occurred and be continuing.

"**Qualified Proceeds**" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business.

"**Qualifying IPO**" means the issuance by the Borrower, or any Parent Company, of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Quarterly Financial Statements**" means the unaudited quarterly balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries for the most recent fiscal quarter(s) ended after October 31, 2020.

"**Rating Agencies**" means Moody's and S&P, or if Moody's or S&P (or both) are not making ratings on the relevant obligations publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Borrower that will be substituted for Moody's or S&P (or both), as the case may be.

"**RBC**" means Royal Bank of Canada.

"**RBCCM**" means RBC Capital Markets.

"**Refinance**" has the meaning assigned in the definition of "Refinancing Indebtedness" and "**Refinancing**" and "**Refinanced**" have meanings correlative to the foregoing.

"**Refinanced Debt**" has the meaning assigned to such term in the definition of "Refinancing Indebtedness."

"**Refinancing Indebtedness**" means (x) Indebtedness incurred by the Borrower or any Restricted Subsidiary, (y) Disqualified Stock issued by the Borrower or any Restricted Subsidiary or (z) Preferred Stock issued by any Restricted Subsidiary which, in each case, serves to extend, replace, refund, refinance, renew or defease ("**Refinance**") any Indebtedness, Disqualified Stock or Preferred Stock, including any Refinancing Indebtedness, so long as:

(1)     (a) the principal amount (or accreted value, if applicable) of such new Indebtedness, the amount of such new Preferred Stock or the liquidation preference of such new Disqualified Stock does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness, the amount of Preferred Stock or the liquidation preference of Disqualified Stock, as applicable, being refinanced except to the extent permitted under Section 1.02(10), *plus* (b) any accrued and unpaid interest on, the Indebtedness, the amount of any accrued and unpaid dividends on, the Preferred Stock or the liquidation preference of the Disqualified Stock, *plus* any accrued and unpaid dividends on, the Disqualified Stock being so extended, replaced, refunded, refinanced, renewed or defeased (such Indebtedness, Disqualified Stock or Preferred Stock, the "**Refinanced Debt**"), *plus* (c) the amount of any tender premium or penalty or premium required to be paid under the terms of the instrument or documents governing such Refinanced Debt and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness, Preferred Stock or Disqualified Stock or to Refinance such Refinanced Debt (such amounts in clause (b) and (c) the "**Incremental Amounts**");

(2)     such Refinancing Indebtedness has a:

(a)     Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred that is not less than the remaining Weighted Average Life to Maturity of the applicable Refinanced Debt; and

(b)      final scheduled maturity date equal to or later than the final scheduled maturity date of the Refinanced Debt;

(3)      to the extent such Refinancing Indebtedness Refinances (a) Subordinated Indebtedness, such Refinancing Indebtedness is subordinated in right of payment to the Loans or the Guaranty thereof at least to the same extent as the applicable Refinanced Debt, (b) Junior Lien Debt, such Refinancing Indebtedness is (i) unsecured or (ii) secured by Liens that are subordinated to the Liens that secure the Loans or the Guaranty thereof, in each case at least to the same extent as the applicable Refinanced Debt or pursuant to the Applicable Intercreditor Agreement or (c) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively;

(4)      such Refinancing Indebtedness shall not be guaranteed or borrowed by any Person other than a Person that is so obligated in respect of the Refinanced Debt being Refinanced; and

(5)      such Refinancing Indebtedness shall not be secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not secure the Refinanced Debt being Refinanced (*plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property); *provided* that Refinancing Indebtedness will not include:

(a)      Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness or Disqualified Stock of the Borrower;

(b)      Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

(c)      Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of an Unrestricted Subsidiary;

*provided further* that Refinancing Indebtedness may be incurred in the form of a customary "bridge" or other interim credit facility intended to be refinanced or replaced with long-term indebtedness which does not satisfy the requirements of clause (2) above so long as, subject to customary conditions, as determined in good faith by the Borrower, such "bridge" or other interim indebtedness will either be automatically converted into or required to be exchanged for permanent financing which satisfies the requirements of clause (2) of this definition.

"**Refunding Capital Stock**" has the meaning specified in Section 7.05(b)(2).

"**Register**" has the meaning specified in Section 10.07(c).

"**Related Adjustment**" means, in determining any LIBOR Successor Rate, the first relevant available alternative set forth in the order below that can be determined by the Administrative Agent applicable to such LIBOR Successor Rate:

(A)      the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the

relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto) and which adjustment or method (x) is published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion or (y) solely with respect to Term SOFR, if not currently published, which was previously so recommended for Term SOFR and published on an information service acceptable to the Administrative Agent; or

(B)    the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA Definitions (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"**Related Business Assets**" means assets (other than Cash Equivalents) used or useful in a Similar Business; *provided* that any assets received by the Borrower or a Restricted Subsidiary in exchange for assets transferred by the Borrower or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person is or would become a Restricted Subsidiary.

"**Related Indemnified Person**" of an Indemnitee means (1) the respective directors, officers or employees of such Indemnitee or any of its controlling Persons or controlled Affiliates and (2) the respective agents of such Indemnitee acting at the instructions of such Indemnitee.

"**Related Person**" means, with respect to any Person, (a) any Affiliate of such Person and (b) the respective directors, officers, employees, agents and other representatives of such Person or any of its Affiliates.

"**Release**" means any release, spill, emission, discharge, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York.

"**Report**" means reports prepared by the Administrative Agent, the Collateral Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's and the Subsidiary Guarantors' assets from information furnished by or on behalf of the Borrower and the Subsidiary Guarantors, after the Administrative Agent or Collateral Agent has exercised its rights of inspection pursuant to this Agreement, which Report may be distributed to the Lenders by the Administrative Agent, subject to the provisions of Section 10.09.

"**Reportable Event**" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Request for Credit Extension**" means (a) with respect to a Borrowing, conversion or continuation of Revolving Credit Loans, a Committed Loan Notice, (b) with respect to an L/C Credit Extension, a L/C Application and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"**Required Facility Lenders**" means, as of any date of determination, with respect to one or more Facilities, Lenders having more than 50% of the sum of the (a) aggregate principal amount of outstanding Loans under such Facility or Facilities and (b) aggregate unused Commitments under such

Facility or Facilities; *provided* that the Revolving Credit Exposure of or held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Required Lenders**" means, as of any date of determination, Lenders having or holding more than 50% of the aggregate Revolving Credit Exposure of all Lenders; *provided* that the Revolving Credit Exposure of or held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Reserves**" means, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves (including banking services reserves, landlord lien reserves, customer credit liabilities reserves, customer deposits reserves, reserves for Secured Hedge Obligations, Secured Bank Product Obligations and Secured Cash Management Obligations and reserves against Eligible Accounts Receivable and Eligible Inventory) that the Administrative Agent from time to time determines in its Permitted Discretion as being appropriate to reflect:

> (1)     the impediments to the Administrative Agent's ability to realize upon the Collateral included in the Borrowing Base in accordance with the Loan Documents;

> (2)     claims, liabilities, costs and expenses that may need to be satisfied, or will dilute the amounts received by holders of Loans, in connection with the realization upon such Collateral; or

> (3)     criteria, events, conditions, contingencies or risks that adversely affect any component of the Borrowing Base, the Collateral included therein or the validity or enforceability of the Loan Documents or any remedies of the Administrative Agent, the Collateral Agent, each Issuing Bank and each Lender under the Loan Documents with respect to such Collateral.

The establishment or increase of any Reserve will be limited to the exercise by the Administrative Agent of Permitted Discretion, upon at least five Business Days' prior written notice to the Borrower (which notice will include a reasonably detailed description of the Reserve being established); *provided* that (i) no such prior notice shall be required for changes to any Reserves resulting solely by virtue of mathematical calculations of the amount of the Reserves in accordance with the methodology of calculation previously utilized and (ii) upon such notice, the Borrower will not be permitted to borrow so as to exceed the Borrowing Base after giving effect to such new or modified Reserves.  During such five Business Day period, the Administrative Agent will, if requested, discuss any such new or modified Reserve with the Borrower, and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such new or modified Reserve no longer exists or exists in a manner that would result in the establishment of a lower Reserve, in each case, in a manner and to the extent reasonably satisfactory to the Administrative Agent.  Notwithstanding anything to the contrary herein, (a) the amount of any such reserve or change shall have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or such change, (b) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria (including collection/advance rates) and (c) no reserves shall be imposed on the first five percent (5%) of dilution of Accounts and thereafter no dilution reserve shall exceed one percent (1%) for each incremental whole percentage in dilution over five percent (5%), *provided* that dilution reserves may reflect fractional percentages in dilution.

"**Resolution Authority**" an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means, with respect to a Person, the chief executive officer, chief operating officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer or Person performing similar functions, of such Person.  With respect to any document delivered by a Loan Party on the Closing Date, Responsible Officer includes any secretary or assistant secretary of such Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.  Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"**Restricted Debt Prepayments**" has the meaning specified in the definition of "Payment Conditions."

"**Restricted Investment**" means any Investment other than any Permitted Investment(s).

"**Restricted Payment**" has the meaning specified in Section 7.05.

"**Restricted Subsidiary**" means, at any time, any direct or indirect Subsidiary of the Borrower (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided* that notwithstanding the foregoing, in no event will any special purpose vehicle that borrows mortgage debt secured by department stores or retail centers of Belk and has no other activities be considered a Restricted Subsidiary for purposes of Section 8.01(5) or (7); *provided further* that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary will be included in the definition of "Restricted Subsidiary."  Wherever the term "Restricted Subsidiary" is used herein with respect to any Subsidiary of a referenced Person that is not the Borrower, then it will be construed to mean a Person that would be a Restricted Subsidiary of the Borrower on a *pro forma* basis following consummation of one or a series of related transactions involving such referenced Person and the Borrower (but which transactions may include a designation of a Subsidiary of such Person as an Unrestricted Subsidiary on a *pro forma* basis in accordance with this Agreement).

"**Revolving Credit Borrowing**" means a borrowing consisting of simultaneous Revolving Credit Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period, made by each of the Revolving Credit Lenders pursuant to Section 2.01.

"**Revolving Credit Commitment**" means, as to each Revolving Credit Lender, its obligation to (1) make Revolving Credit Loans to the Borrower pursuant to Section 2.01(2) and (2) purchase participations in L/C Obligations in respect of Letters of Credit and purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount specified opposite such Lender's name on Schedule 2.01 under the caption "Revolving Credit Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate Revolving Credit Commitments of all Revolving Credit Lenders as of the Third Amendment Effective Date is $900.0 million, as such amount may be adjusted from time to time in accordance with the terms of this Agreement.

"**Revolving Credit Commitment Increase**" has the meaning specified in Section 2.14(1).

"**Revolving Credit Exposure**" means, as to each Revolving Credit Lender, the sum of the amount of the Outstanding Amount of such Revolving Credit Lender's Revolving Credit Loans and its Pro Rata Share or other applicable share provided for under this Agreement of the aggregate principal amount of the L/C Obligations and the Swing Line Obligations outstanding at such time.

"**Revolving Credit Facility**" means, at any time, the aggregate amount of the Revolving Credit Commitments at such time.

"**Revolving Credit Lender**" means, at any time, any Lender that has a Revolving Credit Commitment at such time or, if Revolving Credit Commitments have terminated, Revolving Credit Exposure.

"**Revolving Credit Loan**" has the meaning specified in Section 2.01 and includes Revolving Credit Loans, Incremental Revolving Credit Loans and Loans made pursuant to Extended Revolving Credit Commitments.

"**Revolving Credit Note**" means a promissory note of the Borrower payable to any Revolving Credit Lender or its registered assigns, in substantially the form of Exhibit B-1 hereto, evidencing the aggregate Indebtedness of the Borrower to such Revolving Credit Lender resulting from the Revolving Credit Loans made by such Revolving Credit Lender.

"**Revolving Credit Termination Date**" means the earliest of (a) the Maturity Date, (b) the date of termination of all of the Revolving Credit Commitments pursuant to Section 2.05 and (c) the date on which the Obligations become due and payable pursuant to Section 10.02.

"**S&P**" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"**Sale-Leaseback Transaction**" means any arrangement providing for the leasing by the Borrower or any Restricted Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to a Person other than the Borrower or any Restricted Subsidiary in contemplation of such leasing.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Sanctioned Countries**" has the meaning specified in Section 5.17.

"**Sanctioned Persons**" has the meaning specified in Section 5.17.

"**Sanctions**" has the meaning specified in Section 5.17.

"**Scheduled Unavailability Date**" has the meaning specified in Section 3.03(c).

"**SDN**" has the meaning specified in Section 5.17.

"**SEC**" means the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Credit Agreement**" means the Amended and Restated Second Lien Credit Agreement dated as of the Third Amendment Effective Date, among Holdings, the Borrower, Wilmington Trust, National Association, as administrative agent and collateral agent and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an Second Lien Credit Agreement) in each case to the extent permitted hereunder.

"**Second Lien Facility**" means the collective reference to the Second Lien Credit Agreement, the Second Lien Loan Documents, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not a Second Lien Facility), in each case to the extent permitted hereunder.

"**Second Lien Loan Documents**" means, collectively, (i) the Second Lien Credit Agreement and (ii) the security documents, intercreditor agreements (including the Term Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the Second Lien Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the Second Lien Facility.

"**Second Lien Loans**" means "Loans" as defined in the Second Lien Facility as in effect on the Third Amendment Effective Date.

"**Second Lien Obligations**" means "Obligations" as defined in the Second Lien Facility as in effect on the Third Amendment Effective Date.

"**Secured Bank Product Agreement**" means any Bank Product Agreement that is entered into by and between Holdings, the Borrower or any Restricted Subsidiary and a Bank Product Provider; and designated in writing by the Bank Product Provider and the Borrower to the Administrative Agent as a "Secured Bank Product Agreement".

"**Secured Bank Product Obligations**" shall mean Bank Product Obligations owing to a Bank Product Provider, in the amount (in the case of any Bank Product Provider other than Bank of America and its Affiliates) specified by such provider in writing to the Administrative Agent in the manner set forth under the definition of "Bank Product Provider", which amount may be established or increased by further written notice to the Administrative Agent from time to time.

"**Secured Cash Management Agreement**" means any Cash Management Agreement that is entered into by and between Holdings, the Borrower or any Restricted Subsidiary and a Cash Management Bank; and designated in writing by the Cash Management Bank and the Borrower to the Administrative Agent as a "Secured Cash Management Agreement".

"**Secured Cash Management Obligations**" shall mean Obligations under Secured Cash Management Agreements.

"**Secured Hedge Agreement**" means any Hedge Agreement with respect to Hedging Obligations permitted under Section 7.02 that is (a) entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank and (b) designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "Secured Hedge Agreement."

"**Secured Hedge Obligations**" shall mean Obligations under Secured Hedge Agreements.

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, each Hedge Bank party to a Secured Hedge Agreement, each Cash Management Bank party to a

Secured Cash Management Agreement, each Bank Product Provider that is party to a Secured Bank Product Agreement, each Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(2) or 9.07.

"**Securities Account**" means any securities account maintained by the Borrower and the Subsidiary Guarantors, including any "security accounts" under Article 9 of the UCC.  All funds in such Securities Accounts (other than Excluded Accounts) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Securities Accounts, subject to this Agreement, the Security Agreement and the ABL Intercreditor Agreement.

"**Securities Account Control Agreement**" means an effective securities account control agreement with an Approved Securities Intermediary, in each case in the form set forth as an exhibit to the Security Agreement or otherwise in form and substance reasonably satisfactory to the Administrative Agent.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Security Agreement**" means, collectively, the Pledge and Security Agreement executed by the Loan Parties and the Collateral Agent, substantially in the form of Exhibit F, together with supplements or joinders thereto executed and delivered pursuant to Section 6.11.

"**Selected Months**" means May, June and July or such other consecutive three month period occurring during the applicable fiscal year, which is selected by the Borrower, with written notice thereof being delivered to the Administrative Agent, no later than January 31st of the prior fiscal year; provided that failure to make any such election shall result in the consecutive three month period from the prior fiscal year to remain in effect; provided that the Borrower shall not be permitted to elect the first three months of any fiscal year to the extent it had elected the last three months of the prior fiscal year.

"**Senior Secured Leverage Ratio**" means, with respect to any Test Period, the ratio of Consolidated Secured Debt outstanding on the last date of such Test Period to Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**Settlement Date**" has the meaning specified in Section 2.12(g).

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X of the SEC, as such regulation is in effect on the Closing Date.

"**Similar Business**" means (1) any business conducted or proposed to be conducted by the Borrower or any Restricted Subsidiary on the Closing Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any Permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Restricted Subsidiaries conduct or propose to conduct on the Closing Date.

"**SOFR**" with respect to any Business Day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New York's website (or any successor source) at

approximately 8:00 a.m. (New York City time) on the immediately succeeding Business Day and, in each case, that has been selected or recommended by the Relevant Governmental Body.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date:

(1)     the sum of the liabilities of such Person (including contingent liabilities), on a consolidated basis, does not exceed the present fair saleable value of the present assets of such Person, on a consolidated basis,

(2)     the fair value of the property of such Person, on a consolidated basis, is greater than the total amount of liabilities (including contingent liabilities) of such Person, on a consolidated basis,

(3)     the capital of such Person, on a consolidated basis, is not unreasonably small in relation to its business as contemplated on such date and

(4)     such Person has not incurred and does not intend to incur, or believe that it will incur, debts including current obligations beyond their ability to pay such debts as they become due (whether at maturity or otherwise).

The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances as of such date, would reasonably be expected to become an actual and matured liability.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Acquisition Agreement Representations**" means such of the representations made by, or with respect to, the Acquired Company in the Transaction Agreement as are material to the interests of the Lenders, but only to the extent that Parent or Initial Borrower have the right (taking into account any applicable cure provisions) to terminate its obligations under the Transaction Agreement as a result of a breach of such representations in the Transaction Agreement or the failure of a Specified Acquisition Agreement Representation results in a failure of a condition precedent to Parent's or Initial Borrower's obligations to consummate the Merger in accordance with the Transaction Agreement.

"**Specified Event of Default**" means the occurrence of any Event of Default specified in Section 8.01(1), Section 8.01(2)(a) (due to a failure to comply with Section 6.19), Section 8.01(2)(b), Section 8.01(2)(c), Section 8.01(2)(d) or Section 8.01(6).

"**Specified Excess Availability**" means the sum of (a) Excess Availability and (b) the amount by which the Borrowing Base at such time exceeds the Revolving Credit Commitments up to an amount not to exceed 2.5% of the Revolving Credit Commitments.

"**Specified Indebtedness**" means any Subordinated Indebtedness or unsecured Indebtedness, in each case, in an aggregate principal in excess of $25.0 million.

"**Specified Payment**" means any Investment (including a Permitted Acquisition) or Restricted Payment that, in each case, is subject to the satisfaction of the Payment Conditions.

"**Specified Real Estate Distribution**" means a Restricted Payment with the Specified Sale-Leaseback Net Proceeds received from Specified Sale-Leaseback Transactions consummated after the Closing Date; provided that:

(1)       the Specified Sale-Leaseback Net Proceeds received by the Borrower or its Restricted Subsidiaries from such Sale Leaseback Transaction are applied (x) 77.5% (or more, at the Borrower's option) to prepay the First Lien Facility so long as the First Lien Facility remains outstanding and, following the repayment in full of the First Lien Facility, such proceeds will be applied to the repayment of other long-term indebtedness of the Borrower and the Restricted Subsidiaries (other than the Facilities) and (y) 22.5% (or less) to make Specified Real Estate Distributions in accordance with the terms hereof;

(2)       after giving pro forma effect to such Specified Real Estate Distribution (calculated on a *pro forma basis* after giving effect to the application of the Specified Sale-Leaseback Net Proceeds therefrom (and the transfer of real property on a non-recourse basis in connection therewith)):

(a)       the Total Rent Adjusted Leverage Ratio shall be no greater than the Closing Date Total Rent Adjusted Leverage Ratio; and

(b)       the First Lien Net Leverage Ratio shall be no greater than the Closing Date First Lien Net Leverage Ratio; and

(3)       the aggregate amount of Specified Real Estate Distributions following the Closing Date shall not exceed $75.0 million in the aggregate.

For purposes of Specified Real Estate Distributions, "**Closing Date Total Rent Adjusted Leverage Ratio**" and "**Closing Date First Lien Net Leverage Ratio**" mean the Total Rent Adjusted Leverage Ratio and First Lien Net Leverage Ratio, in each case, as of the Closing Date, calculated based on the pro forma Adjusted EBITDA of $469.0 million.

"**Specified Real Estate Financing**" means any Specified Sale-Leaseback Transaction.

"**Specified Representations**" means those representations and warranties made by Holdings and the Initial Borrower in Sections 5.01(1) (with respect to the organizational existence of the Loan Parties only), 5.01(2)(b), 5.02(1), 5.02(2)(a) (with respect to the Loan Parties only and as related to the borrowing under, guaranteeing under, granting of security interests in the Collateral pursuant to, and performance of the Loan Documents by the Loan Parties), 5.04, 5.13, 5.16, 5.17 (in the case of OFAC and the FCPA, solely with respect to the use of the proceeds of the Revolving Credit Loans borrowed on the Closing Date) and 5.18 (other than any representation therein as it relates to priority).

"**Specified Sale-Leaseback Net Proceeds**" means with respect to the sale component of any Specified Sale-Leaseback Transaction, the excess, if any, of (i) the sum of cash and Cash Equivalents received as purchase consideration in connection with such Specified Sale-Leaseback Transaction sale component pursuant to the applicable purchase and sale agreement over (ii) the sum of (A) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred or required to be paid by the Borrower or any Restricted Subsidiary on behalf of a purchaser by the Borrower or any Restricted Subsidiary in connection with such Specified Sale-Leaseback Transaction, (B) taxes (including transfer taxes) or distributions made pursuant to clauses (a) and (b) of

Section 7.05(b)(14) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Specified Sale-Leaseback Net Proceeds) and (C) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such Specified Sale-Leaseback Transaction, including liabilities related to environmental matters or against any indemnification obligations associated with such Specified Sale-Leaseback Transaction, it being understood that "Specified Sale-Leaseback Net Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (C).  The net proceeds of any Sale-Leaseback Transaction will be determined giving effect to transaction expenses and the tax effect of such transactions based on the actual effective tax rate (including taxes incurred and required to be paid or payable as a result of such transactions).

"**Specified Sale-Leaseback Transaction**" means one or more Sale-Leaseback Transactions entered into on an arm's length basis for fair market value as determined by a Responsible Officer of the Borrower in good faith with respect to all or any portion of any owned real property or ground-leased property of the Borrower or any Restricted Subsidiary acquired on the Closing Date.

"**Specified Segregated Accounts**" means those segregated Deposit Accounts that the Borrower designates to the Administrative Agent from time to time in writing, into which (1) funds from the sale of Inventory (a) held by the Borrower or any Restricted Subsidiary on a consignment basis or (b) relating to a leased department within retail stores of the Borrower or any Restricted Subsidiary, in each case, which Inventory is not owned by a Loan Party (and would not be reflected on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP); or (2) in-store payments in respect of private label credit cards subject to any Permitted Replacement Credit Card Program are made.

"**Specified Transaction**" means:

(1)     solely for the purposes of determining the applicable cash balance, any contribution of capital, including as a result of an Equity Offering, to the Borrower, in each case, in connection with an acquisition or Investment,

(2)     any designation of operations or assets of the Borrower or a Restricted Subsidiary as discontinued operations (as defined under GAAP),

(3)     any Investment that results in a Person becoming a Restricted Subsidiary,

(4)     any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary in compliance with this Agreement,

(5)     any purchase or other acquisition of a business of any Person, of assets constituting a business unit, line of business or division of any Person,

(6)     any Asset Sale (a) that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower or (b) of a business, business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whether by merger, amalgamation, consolidation or otherwise,

(7)     any operational changes identified by the Borrower that have been made by the Borrower or any Restricted Subsidiary during the Test Period,

(8)      any borrowing of Incremental Revolving Credit Loans (or establishment of an Incremental Revolving Credit Facility),

(9)      any other transaction that by the terms of this Agreement requires a financial ratio to be calculated on a *pro forma* basis, or

(10)      the satisfaction of the Payment Conditions on a *pro forma* basis.

"**Sponsor**" means Sycamore Partners Management, L.P. and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Subordinated Indebtedness**" means any Indebtedness for borrowed money of any Loan Party that by its terms is subordinated in right of payment to the Obligations of such Loan Party arising under the Loans or the Guaranty.

"**Subsidiary**" means, with respect to any Person:

(1)      any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2)      any partnership, joint venture, limited liability company or similar entity of which:

(a)      more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and

(b)      such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

(c)      Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than Holdings and any other Parent Company.

"**Successor Borrower**" has the meaning specified in Section 7.03(4).

"**Successor Holdings**" has the meaning specified in Section 7.03(5).

"**Supermajority Lenders**" means, as of any date of determination, Lenders having more than 66.7% of the sum of the (a) Total Outstandings (with the aggregate outstanding amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition) and (b) aggregate unused Revolving Credit Commitments

and Extended Revolving Credit Commitments; provided that the unused Revolving Credit Commitment or Extended Revolving Credit Commitments of, and the portion of the Total Outstandings held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Lenders.

"**Supplemental Administrative Agent**" and "**Supplemental Administrative Agents**" have the meanings specified in Section 9.15(1).

"**Supported QFC**" has he meaning specified in <u>Section 10.29</u>

"**Swap Obligation**" has the meaning specified in the definition of "Excluded Swap Obligation."

"**Swing Line Borrowing**" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"**Swing Line Facility**" means the swing line facility made available by the Swing Line Lender pursuant to Section 2.04.

"**Swing Line Lender**" means the Administrative Agent, and/or (as the context requires) any other Lender that becomes a Swing Line Lender in accordance with Section 2.04(8), or any successor Swing Line Lender hereunder.

"**Swing Line Loan**" has the meaning specified in Section 2.04(1).

"**Swing Line Loan Notice**" means a notice of a Swing Line Borrowing pursuant to Section 2.04(2), which, if in writing, shall be substantially in the form of Exhibit A-2.

"**Swing Line Note**" means a promissory note of the Borrower payable to any Swing Line Lender or its registered assigns, in substantially the form of Exhibit B-2, evidencing the aggregate Indebtedness of the Borrower to the Swing Line Lender resulting from the Swing Line Loans.

"**Swing Line Obligations**" means, as at any date of determination, the aggregate Outstanding Amount of all Swing Line Loans outstanding.

"**Swing Line Settlement**" has the meaning specified in Section 2.04(3)(b).

"**Swing Line Settlement Date**" has the meaning specified in Section 2.04(3)(b).

"**Swing Line Sublimit**" means an amount equal to the lesser of (a) $75,000,000 and (b) the aggregate amount of the Revolving Credit Commitments.  The Swing Line Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"**Synchrony Financial Credit Card Program**" means the private label credit card program among Belk and Synchrony Financial and Fifth Third Bank, N.A.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"**Tax Group**" has the meaning specified in Section 7.05(b)(14)(b).

"**Tax Indemnitee**" as defined in Section 3.01(5).

"**Term Intercreditor Agreement**" means the Term Intercreditor Agreement substantially in the form of Exhibit G-2 among Morgan Stanley Senior Funding, Inc., as collateral agent under the First Lien Credit Agreement, Wilmington Trust, N.A., as collateral agent under the Second Lien Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**Term Priority Collateral**" means all the "Term Priority Collateral" as defined in the Intercreditor Agreement.

"**Term SOFR**" means the forward-looking term rate for any period that is approximately (as determined by the Administrative Agent) as long as any of the Interest Period options set forth in the definition of "Interest Period" and that is based on SOFR and that has been selected or recommended by the Relevant Governmental Body, in each case as published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion.

"**Termination Conditions**" means, the termination of all Commitments and (i) the payment in full in cash of the Obligations (other than (x) contingent indemnification obligations as to which no claim has been asserted and (y) Secured Hedge Obligations, Secured Cash Management Obligations and Secured Bank Product Obligations) and (ii) the payment in full in cash, or cash collateralization or making of arrangements reasonably satisfactory to the respective Secured Parties, of all Secured Hedge Obligations, Secured Cash Management Obligations and Secured Bank Product Obligations.

"**Test Period**" in effect at any time means the Borrower's most recently ended twelve (12) consecutive fiscal months for which, subject to Section 1.07(1), financial statements have been or were required to be delivered pursuant to Section 6.01(3).

"**Third Amendment**" means that certain Amendment No. 3 to ABL Credit Agreement, dated as of February 24, 2021, among the Borrower, Holdings, the Administrative Agent and the Lenders party thereto.

"**Third Amendment Effective Date**" means the "Amendment No. 3 Effective Date", as defined in the Third Amendment.

"**Third Amendment Fee Letter**" means that certain Third Amendment Fee Letter, dated as of February 22, 2021, by and among Holdings, the Borrower and Bank of America, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Third Amendment Transaction Expenses**" means any fees, expenses, costs or charges incurred or paid by Holdings, the Borrower or any Restricted Subsidiary in connection with the Third Amendment Transactions.

"**Third Amendment Transactions**" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the First Lien Loans and Second Lien Loans on the Third Amendment Effective Date, the consummation of the other transactions contemplated by this Agreement, the First Lien Loan Documents, the Second Lien Loan Documents, the Approved Plan or the Confirmation Order, the consummation of any other transactions in

connection with the foregoing and the payment of the fees and expenses incurred in connection with any of the foregoing.

"**Threshold Amount**" means $40.0 million.

"**Total Assets**" means, at any time, the total assets of the Borrower and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the then most recent balance sheet of the Borrower or such other Person as may be available (as determined in good faith by the Borrower).

"**Total Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt outstanding as of the last day of such Test Period to (b) Adjusted EBITDA of the Borrower for such Test Period, in each case on a *pro forma* basis with such *pro forma* adjustments as are appropriate and consistent with Section 1.07.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"**Total Rent Adjusted Leverage Ratio**" shall mean, in the case of any Specified Sale-Leaseback Transaction after the Closing Date, as of the most recently ended Test Period, the ratio of (x) (I) Consolidated Total Debt of the Borrower and the Restricted Subsidiaries outstanding as of the last day of such Test Period plus (II) the Borrower's and its Restricted Subsidiaries' trailing twelve month rent expense calculated on a *pro forma basis* as of the last day of such Test Period multiplied by 8 to (y) (I) Adjusted EBITDA of the Borrower and its Restricted Subsidiaries as of such Test Period plus (II) the pro forma trailing twelve month rent expense of the Borrower and its Restricted Subsidiaries as of such Test Period, in each case calculated on a *pro forma basis*.

"**Traded Securities**" means any debt or equity securities issued pursuant to a public offering or Rule 144A offering.

"**Transaction Agreement**" means the Agreement and Plan of Merger, dated as of August 23, 2015, by and among Bear Parent Inc., Bear Merger Sub Inc. and Belk, Inc., as amended, modified and supplemented from time to time.

"**Transaction Consideration**" means an amount equal to the total funds required to consummate the Merger as set forth in the Transaction Agreement.

"**Transaction Expenses**" means any fees, expenses, costs or charges incurred or paid by the Investors, any Parent Company, Holdings, the Borrower or any Restricted Subsidiary in connection with the Closing Date Transactions, including any expenses in connection with hedging transactions, payments to officers, employees and directors as change of control payments, severance payments, special or retention bonuses and charges for repurchase or rollover of, or modifications to, stock options or restricted stock.

"**Treasury Capital Stock**" has the meaning assigned to such term in Section 7.05(b)(2)(a).

"**Trust Account**" means any accounts or trusts used solely to hold Trust Funds.

"**Trust Funds**" means cash, Cash Equivalents or other assets comprised of:

(1)     funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of such Loan Party's employees;

(2)     all taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)); and

(3)     any other funds which Holdings, the Borrower or any of its Restricted Subsidiaries holds in trust or as an escrow or fiduciary for another person which is not a Restricted Subsidiary of the Borrower.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**UK Financial Institution**" means any BRRD Undertaking (as defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unfinanced Capital Expenditures**" means, with respect to any Person and for any period, Capital Expenditures made by such Person during such period that are not Financed Capital Expenditures.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning specified in Section 3.01(3)(b)(iii).

"**Unreimbursed Amount**" has the meaning specified in Section 2.03(3)(a).

"**Unrestricted Subsidiary**" means (i) each Subsidiary of the Borrower listed on Schedule 1.02 on the Third Amendment Effective Date, (ii) any Subsidiary of the Borrower designated by the Borrower as an Unrestricted Subsidiary pursuant to Section 6.18 subsequent to the date hereof or pursuant to the First Lien Credit Agreement or the Second Lien Credit Agreement and (iii) any Subsidiary of an Unrestricted Subsidiary.

"**Unused Commitment Fee**" has the meaning specified in Section 2.09(1).

"**U.S. Lender**" means any Lender that is not a Foreign Lender.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Public Law No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**U.S. Special Resolution Regimes**" has he meaning specified in Section 10.29.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1)      the sum of the products of the number of years (calculated to the nearest one-twenty fifth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock, *multiplied by* the amount of such payment, *by*

(2)      the sum of all such payments; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being Refinanced (the "**Applicable Indebtedness**"), the effects of any amortization or prepayments made on such Applicable Indebtedness prior to the date of the applicable Refinancing will be disregarded.

"**wholly owned**" means, with respect to any Subsidiary of any Person, a Subsidiary of such Person one hundred percent (100%) of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable Law) is at the time owned by such Person or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, (a) the write-down and conversion powers of the applicable EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which powers are described in the EU Bail-In Legislation Schedule; or (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(1)      The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(2)      The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(3)      References in this Agreement to an Exhibit, Schedule, Article, Section, Annex, clause or subclause refer (a) to the appropriate Exhibit or Schedule to, or Article, Section, clause or subclause in

this Agreement or (b) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears, in each case as such Exhibit, Schedule, Article, Section, Annex, clause or subclause may be amended or supplemented from time to time.

(4)     The term "including" is by way of example and not limitation.

(5)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(6)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(7)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(8)     The word "or" is not intended to be exclusive unless expressly indicated otherwise.

(9)     With respect to any Default or Event of Default, the words "exists", "is continuing" or similar expressions with respect thereto shall mean that the Default or Event of Default has occurred and has not yet been cured or waived.  If, prior to the taking of any action under Section 8.02 (or the occurrence of any event set forth in the proviso thereto), any Default or Event of Default occurs due to (i) the failure by any Loan Party to take any action by a specified time, such Default or Event of Default shall be deemed to have been cured at the time, if any, that the applicable Loan Party takes such action or (ii) the taking of any action by any Loan Party that is not then permitted by the terms of this Agreement or any other Loan Document, such Default or Event of Default shall be deemed to be cured on the earlier to occur of (x) the date on which such action would be permitted at such time to be taken under this Agreement and the other Loan Documents and (y) the date on which such action is unwound or otherwise modified to the extent necessary for such revised action to be permitted at such time by this Agreement and the other Loan Documents.  If any Default or Event of Default occurs that is subsequently cured (a "**Cured Default**"), any other Default or Event of Default resulting from the making or deemed making of any representation or warranty by any Loan Party or the taking of any action by any Loan Party or any Subsidiary of any Loan Party, in each case which subsequent Default or Event of Default would not have arisen had the Cured Default not occurred, shall be deemed to be cured automatically upon, and simultaneous with, the cure of the Cured Default.

(i)     Notwithstanding anything to the contrary in this Section 1.02(9), an Event of Default (the "Initial Default") may not be cured pursuant to this Section 1.02(9):

(ii)     If the taking of any action by any Loan Party or Subsidiary of a Loan Party that is not permitted during, and as a result of, the continuance of such Initial Default directly results in the cure of such Initial Default and the applicable Loan Party or Subsidiary had actual knowledge at the time of taking such action that the Initial Default had occurred and was continuing.

(iii)     In the case of an Event of Default under Section 8.01(9) or (10) that directly results in a material impairment of the rights and remedies of the Lenders, the Collateral Agent and Administrative Agent under the Loan Documents and that is incapable of being cured.

(iv)     In the case of an Event of Default under Section 8.01(3) arising due to the failure to perform or observe Section 6.07 that directly results in a material adverse effect on the ability

94

of the Borrower and the other Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Documents to which the Borrower or any of the other Loan Parties is a party; or

(v)     In the case of an Initial Default for which (i) the Borrower failed to give notice to the Administrative Agent and the Lenders of such Initial Default in accordance with Section 6.03(1) of the Agreement and (ii) the Borrower had actual notice of such failure to give notice.

(10)     For purposes of determining compliance with any Section of Article VII, in the event that any Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate Transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time, shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.  For purposes of determining compliance with the incurrence of any Refinancing Indebtedness that restricts the amount of such Indebtedness relative to the amount of Refinanced Debt, respectively, the Borrower and Restricted Subsidiaries may incur an incremental principal amount of Refinancing Indebtedness in such refinancing to the extent that the excess portion of the Refinancing Indebtedness would otherwise be permitted to be incurred in accordance with this Agreement (provided that (1) any additional Indebtedness referenced in this sentence satisfies the other applicable requirements of the definition of Refinancing Indebtedness, as applicable (with such additional amounts incurred constituting a utilization of the relevant basket or exception contained in Section 7.02(b) pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of Section 7.01).  For purposes of determining compliance with the incurrence of any Indebtedness under Designated Revolving Commitments in reliance on compliance with any ratio or Basket, if on the date such Designated Revolving Commitments are established after giving *pro forma* effect to the incurrence of the entire committed amount of then proposed Indebtedness thereunder, then such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with any ratio.

(11)     For purposes hereof, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

Section 1.03     Accounting Terms.

(1)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending on the Saturday closest to each January 31 or fiscal quarter ending April 30, July 31, October 31 or the Saturday ending on the Saturday closest to each January 31 of the Borrower.

(2)     Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (A) such ratio or requirement shall continue to be computed in accordance with GAAP prior to

such change therein and (B) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing, it is understood that at the time any determination of the amount of a Capitalized Lease Obligation is to be made, the amount of the liability in respect thereof would be the amount required to be reflected as a liability on the balance sheet of the Borrower (excluding the footnotes thereto) in accordance with GAAP as in effect on January 1, 2015 (it being understood that all obligations of the Borrower and the Subsidiaries that are or would be characterized as an operating lease as determined in accordance with GAAP as in effect on January 1, 2015 (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capitalized Lease Obligation) for purposes of this Agreement regardless of any change in GAAP following January 1, 2015 that would otherwise require such obligation to be recharacterized as a Capitalized Lease Obligation to the extent that financial reporting shall not be affected hereby).

Section 1.04    Rounding.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, etc.  Unless otherwise expressly provided herein, (1) references to Organizational Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (2) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day and Timing of Payment and Performance.  Unless otherwise specified, all references herein to times of day shall be references to New York time (daylight or standard, as applicable).  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

Section 1.07    Pro Forma and Other Calculations.

(1)    Notwithstanding anything to the contrary herein, financial ratios and tests, including the First Lien Net Leverage Ratio, the Fixed Charge Coverage Ratio, the Senior Secured Leverage Ratio, the satisfaction of the Payment Conditions and the Total Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.07.  In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower have been delivered pursuant to Section 6.01(3).

(2)    For purposes of calculating any financial ratio or test (or Total Assets), Specified Transactions (and, subject to clause (4) below, the incurrence or repayment of any Indebtedness in connection therewith) that have been made (a) during the applicable Test Period or (b) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any

increase or decrease in Adjusted EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Total Assets, on the last day of the applicable Test Period).  If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.07, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.07 as if such Specified Transaction had occurred at the beginning of the most recently ended Test Period.

(3)     Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and may include, for the avoidance of doubt, the amount of "run-rate" cost savings, synergies and operating expense reductions resulting from or related to any such Specified Transaction (including the Closing Date Transactions) which is being given *pro forma* effect that have been realized or are expected to be realized and for which the actions necessary to realize such cost savings, operating expense reductions and synergies are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than eighteen (18) months after the date of any such Specified Transaction (calculated on a *pro forma* basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions and synergies were realized during the entirety of such period and "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken (including any savings expected to result from the elimination of a public target's compliance costs with public company requirements) net of the amount of actual benefits realized during such period from such actions, and any such adjustments shall be included in the initial *pro forma* calculations of such financial ratios or tests and during any subsequent Test Period in which the effects thereof are expected to be realized) relating to such Specified Transaction; *provided* that (a) such amounts are (i) reasonably identifiable and projected in the good faith judgment of the Borrower to result from such actions and (ii) such actions are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than eighteen (18) months after the date of such Specified Transaction, (b) no amounts shall be added to the extent duplicative of any amounts that are otherwise added back in computing Adjusted EBITDA (or any other components thereof), whether through a *pro forma* adjustment or otherwise, with respect to such period; provided that amounts added back shall not exceed 10% of Adjusted EBITDA for such period calculated after giving effect to the add-backs and being calculated on a pro forma basis and (c) added back pursuant to this clause (3), together with the amounts added back pursuant to clauses (k) and (l) of the definition of Adjusted EBITDA, and together with any Projected Restructuring Adjustments referred to in the proviso of clause (n) of the definition of Adjusted EBITDA, shall not exceed, 10% of Adjusted EBITDA for such period calculated after giving effect to the add-backs set forth in clauses (k) and (l), such Projected Restructuring Adjustments, and the adjustments made in accordance with Section 1.07(3) and being calculated on a pro forma basis.

(4)     In the event that (a) the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees), issues or repays (including by redemption, repurchase, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit unless such Indebtedness has been permanently repaid and not replaced), (b) the Borrower or any Restricted Subsidiary issues, repurchases or redeems Disqualified Stock, (c) any Restricted Subsidiary issues, repurchases or redeems Preferred Stock or (d) the Borrower or any Restricted Subsidiary establishes or eliminates any Designated Revolving Commitments, in each case included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for

which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period (except in the case of the First Lien Net Leverage Ratio, the Fixed Charge Coverage Ratio, the Senior Secured Leverage Ratio, the satisfaction of the Payment Conditions or the Total Net Leverage Ratio (or similar ratio), in which case such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case will be given effect, as if the same had occurred on the first day of the applicable Test Period) and, in the case of Indebtedness for all purposes as if such Indebtedness in the full amount of any undrawn Designated Revolving Commitments had been incurred thereunder throughout such period in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(5)     If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the First Lien Net Leverage Ratio, the Fixed Charge Coverage Ratio, the Senior Secured Leverage Ratio, the satisfaction of the Payment Conditions, the Total Net Leverage Ratio and/or Total Rent Adjusted Leverage Ratio, is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Financial Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or applicable Restricted Subsidiary may designate.

(6)     Notwithstanding anything to the contrary in this Section 1.07 or in any classification under GAAP of any Person, business, assets or operations in respect of which a definitive agreement for the disposition thereof has been entered into, no *pro forma* effect shall be given to any discontinued operations (and the Adjusted EBITDA attributable to any such Person, business, assets or operations shall not be excluded for any purposes hereunder) until such disposition shall have been consummated.

(7)     Any determination of Total Assets shall be made by reference to the last day of the Test Period most recently ended for which financial statements of the Borrower have been delivered pursuant to Section 6.01(3), on or prior to the relevant date of determination.

(8)     Notwithstanding anything in this Agreement or any Loan Document to the contrary, when (a) calculating any applicable ratio, the satisfaction of the Payment Conditions solely as it relates to a Permitted Acquisition, Consolidated Net Income or Adjusted EBITDA in connection with incurrence of Indebtedness, the creation of Liens, the making of any Asset Sale, the making of an Investment, the making of a Restricted Payment, the designation of a Subsidiary as restricted or unrestricted or the repayment of Indebtedness or otherwise testing availability under any Basket, (b) determining compliance with any provision of this Agreement which requires that no Default, Event of Default or Specified Event of Default has occurred, is continuing or would result therefrom, (c) determining compliance with any provision of this Agreement which requires compliance with any representations and warranties set forth herein or (d) the satisfaction of all other conditions precedent to the incurrence with of Indebtedness, the creation of Liens, the making of any disposition, the making of an Investment, the making of a Restricted Payment, the designation of a Subsidiary as restricted or unrestricted or the repayment of Indebtedness, in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or other provisions, determination of whether any Default, Event of Default or Specified Event of Default

has occurred, is continuing or would result therefrom, determination of compliance with any representations or warranties or the satisfaction of any other conditions shall, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "**LCA Election**"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "**LCA Test Date**").  If on a *pro forma* basis after giving effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios and other provisions are calculated as if such Limited Condition Acquisition or other transactions had occurred at the beginning of the most recent Test Period ending prior to the LCA Test Date for which financial statements of the Borrower have been delivered pursuant to Section 6.01(3), the Borrower could have taken such action on the relevant LCA Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with.  For the avoidance of doubt, (i) if any of such ratios or other provisions are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in Adjusted EBITDA or other components of such ratio) or other provisions at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Acquisition is permitted hereunder and (ii) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Acquisition or related Specified Transactions.  If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or Basket availability with respect to any other Specified Transaction on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or Basket shall be calculated on a *pro forma basis* assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated on the LCA Test Date except that (other than solely with respect to the incurrence test under which such Limited Condition Acquisition is being made) Adjusted EBITDA, assets and Consolidated Net Income of any target of such Limited Condition Acquisition can only be used in the determination of the relevant ratios and Baskets if and when such acquisition has closed. Notwithstanding anything in this Agreement or any Loan Document to the contrary, if the Borrower or its Restricted Subsidiaries (x) incurs Indebtedness, creates Liens, makes Asset Sales, makes Investments, makes Restricted Payments, designates any Subsidiary as restricted or unrestricted or repays any Indebtedness in connection with any Limited Condition Acquisition under a ratio-based Basket and (y) incurs Indebtedness, creates Liens, makes Asset Sales, makes Investments or Restricted Payments, designates any Subsidiary as restricted or unrestricted or repays any Indebtedness in connection with such Limited Condition Acquisition under a non-ratio-based Basket (which shall occur within five Business Days of the events in clause (x) above), then the applicable ratio will be calculated with respect to any such action under the applicable ratio-based Basket without regard to any such action under such non-ratio-based Basket made in connection with such Limited Condition Acquisition.

Notwithstanding the foregoing, the Limited Condition Acquisition provisions set forth above shall not apply in respect of any incurrence of any Loans the proceeds of which will be used to finance such Limited Condition Acquisition (other than Loans in respect of a FILO Tranche); *provided* that, if the Borrower has made an LCA Election with respect to an agreed acquisition transaction, then during the period following the execution and delivery of the definitive documentation with respect to such transaction and prior to the consummation thereof, any determination of the compliance with the Payment Conditions shall be made giving full pro forma effect to such agreed acquisition transaction.

(9)      Notwithstanding anything to the contrary herein, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that does not

require compliance with a financial ratio or test (including, without limitation, pro forma compliance with any First Lien Net Leverage Ratio test, any Total Net Leverage Ratio test, any Fixed Charge Coverage Ratio test, any Senior Secured Leverage Ratio test, and/or any other financial ratio or test) (any such amounts, the "***Fixed Amounts***") substantially concurrently with any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with any such financial ratio or test (any such amounts, the "***Incurrence Based Amounts***"), it is understood and agreed that the Fixed Amounts (and any cash proceeds thereof) shall be disregarded in the calculation of the financial ratio or test applicable to the Incurrence Based Amounts in connection with such substantially concurrent incurrence.

Section 1.08    Divisions.  Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.09    Guaranties of Hedging Obligations.  Notwithstanding anything else to the contrary in any Loan Document, no non-Qualified ECP Guarantor shall be required to guarantee or provide security for Excluded Swap Obligations, and any reference in any Loan Document with respect to such non-Qualified ECP Guarantor guaranteeing or providing security for the Obligations shall be deemed to be all Obligations other than the Excluded Swap Obligations.

Section 1.10    Currency Generally.

(1)      The Borrower shall determine in good faith the dollar amount of any utilization or other measurement denominated in a currency other than Dollars for purposes of compliance with any Basket. For purposes of determining compliance with any Basket under Article VII or VIII with respect to any amount expressed in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Basket utilization occurs or other Basket measurement is made (so long as such Basket utilization or other measurement, at the time incurred, made or acquired, was permitted hereunder).  Except with respect to any ratio calculated under any Basket, any subsequent change in rates of currency exchange with respect to any prior utilization or other measurement of a Basket previously made in reliance on such Basket (as the same may have been reallocated in accordance with this Agreement) shall be disregarded for purposes of determining any unutilized portion under such Basket.

(2)      For purposes of determining the First Lien Net Leverage Ratio, the Fixed Charge Coverage Ratio, the Senior Secured Leverage Ratio, the Total Net Leverage Ratio and/or the Total Rent Adjusted Leverage Ratio, the amount of Indebtedness and cash and Cash Equivalents shall reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

(3)      For purposes of determining compliance under any Basket under Article VII or VIII, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(1); provided, however, that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness.  For purposes of determining compliance with any restriction on the

incurrence of Indebtedness, the Dollar equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.11    Letters of Credit.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the amount of the stated amount of such Letter of Credit in effect at such time after giving effect to any automatic reductions to such stated amount pursuant to the terms of the applicable Letter of Credit after the occurrence of any applicable condition (including the expiration of any applicable period); *provided*, *however*, that with respect to any Letter of Credit that, by its terms or the terms of any Issuing Bank Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the amount of the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

Section 1.12    Interest Rates.  Neither the Administrative Agent nor any Lender warrants, nor accepts responsibility, nor shall the Agent or any Lender have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Eurodollar Rate" or with respect to any rate that is an alternative or replacement for or successor to any of such rate (including, without limitation, any LIBOR Successor Rate) or the effect of any of the foregoing, or of any LIBOR Successor Rate Conforming Changes.

## ARTICLE II

### The Commitments and Borrowings

Section 2.01    The Loans.  (a) Subject to the terms and conditions set forth herein, each Revolving Credit Lender severally agrees to make loans denominated in Dollars pursuant to Section 2.02 from its applicable Lending Office (each such loan, a "**Revolving Credit Loan**") to the Borrower from time to time, on any Business Day during the period from the Closing Date until the Revolving Credit Termination Date in an aggregate principal amount that will not result in (i) such Revolving Credit Lender's Revolving Exposure exceeding such Revolving Credit Lender's Revolving Credit Commitment or (ii) the total Revolving Credit Exposure exceeding the Maximum Borrowing Amount (subject to the Administrative Agent's authority, in its sole discretion, to make Overadvances under Section 2.01(b) or Protective Advances under Section 2.01(c)).  Within the limits of each Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01(2), prepay under Section 2.05 and reborrow under this Section 2.01(2).  Revolving Credit Loans may be Base Rate Loans, Eurodollar Rate Loans, as further provided herein.

(b)    Overadvances.  The Borrower may request and the Administrative Agent or Required Lenders may be willing in their sole discretion to make Revolving Credit Loans to the Borrower at a time when the Total Outstanding exceeds, or would exceed with the making of any such Revolving Credit Loan, the Borrowing Base (any such Loan being herein referred to individually as an "**Overadvance**"), the Administrative Agent will enter such Overadvances as debits in the applicable Loan account.  All Overadvances will be repaid on demand, will be secured by the Collateral and will bear

interest as provided in this Agreement for Revolving Credit Loans generally.  Any Overadvance made pursuant to the terms hereof will be made to the Borrower by all Lenders ratably in accordance with their respective Revolving Credit Facility Percentages.  Overadvances in the aggregate amount of $10.0 million or less may, unless a Default or Event of Default has occurred and is continuing, be made in the sole, reasonable discretion of the Administrative Agent; provided that the Required Lenders may at any time revoke the Administrative Agent's authorization to make future Overadvances; provided that no existing Overadvances will be subject to such revocation and any such revocation must be in writing and will become effective prospectively upon the Administrative Agent's receipt thereof.  Overadvances in an aggregate amount of more than $10.0 million but less than $25.0 million may, unless a Default or Event of Default has occurred and is continuing, be made with the consent of the Required Lenders.  Overadvances in an aggregate amount of $25.0 million or more and Overadvances to be made after the occurrence and during the continuation of a Default or Event of Default will require the consent of all Revolving Credit Lenders.  The foregoing notwithstanding, in no event, unless otherwise consented to by all Revolving Credit Lenders will:

> (1)     any Overadvances be outstanding for more than 90 consecutive days;

> (2)     the Administrative Agent or Lenders make any additional Overadvances unless 30 days or more have expired since the last date on which any Overadvances were outstanding; or

> (3)     the Administrative Agent make Revolving Credit Loans on behalf of Lenders under this Section 2.01(b) to the extent such Revolving Credit Loans would cause a Lender's share of the Total Outstanding to exceed such Lender's Revolving Credit Commitment or cause the aggregate Revolving Credit Commitments to be exceeded.

> (c)     **Protective Advances.**  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, in its sole, reasonable discretion, may make Revolving Credit Loans to the Borrower on behalf of the Lenders, so long as the aggregate amount of such Revolving Credit Loans will not exceed 5.0% of the Borrowing Base, if the Administrative Agent, in its Permitted Discretion, deems that such Revolving Credit Loans are necessary or desirable to:

> (1)     protect all or any portion of the Collateral;

> (2)     enhance the likelihood or maximize the amount of repayment of the Loans and the other Obligations; or

> (3)     pay any other amount chargeable to the Borrower pursuant to this Agreement (such Revolving Credit Loans, "**Protective Advances**"); provided that (i) in no event will the Total Outstanding exceed the aggregate Revolving Credit Commitments and (ii) the Required Lenders under the Revolving Credit Facility may at any time revoke the Administrative Agent's authorization to make future Protective Advances; provided, further, that any such revocation must be in writing and will become effective prospectively upon the Administrative Agent's receipt thereof and existing Protective Advances will not be subject to thereto.

Each applicable Lender will be obligated to advance to the Borrower its Revolving Facility Percentage of each Protective Advance made in accordance with this Section 2.01(c).  If Protective Advances are made in accordance with the preceding sentence, then all Revolving Credit Lenders will be bound to make, or permit to remain outstanding, such Protective Advances based upon their Revolving Credit Facility Percentages in accordance with the terms of this Agreement.  All Protective Advances will be repaid by the Borrower on demand, will be secured by the Collateral and will bear interest as provided in this Agreement for Revolving Credit Loans generally.

Section 2.02    Borrowings, Conversions and Continuations of Loans.

(1)    Each Revolving Credit Borrowing, each conversion of Revolving Credit Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice, to the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, (a) three (3) Business Days prior to the requested date of any Borrowing or continuation of Eurodollar Rate Loans or any conversion of Base Rate Loans to Eurodollar Rate Loans and (b) on the requested date of any Borrowing of Base Rate Loans. Each telephonic notice by the Borrower pursuant to this Section 2.02(1) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Except as provided in Sections 2.14 and 2.16, each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $5.0 million or a whole multiple of $1.0 million in excess thereof. Except as provided in Sections 2.03(3), 2.14 and 2.16, each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify:

(i)    whether the Borrower is requesting a Revolving Credit Borrowing, a conversion of Revolving Credit Loans from one Type to the other or a continuation of Eurodollar Rate Loans,

(ii)    the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day),

(iii)    the principal amount of Loans to be borrowed, converted or continued,

(iv)    the Class and Type of Loans to be borrowed or to which existing Revolving Credit Loans are to be converted,

(v)    if applicable, the duration of the Interest Period with respect thereto and

(vi)    wire instructions of the account(s) to which funds are to be disbursed.

If the Borrower fails to specify a Type of Loan to be made in a Committed Loan Notice, then the applicable Loans shall be made as Eurodollar Rate Loans with an Interest Period of one (1) month.  If the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made or continued as the same Type of Loan, which if a Eurodollar Rate Loan, shall have a one-month Interest Period.  Any such automatic continuation of Eurodollar Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.  If the Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(2)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this Agreement of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic continuation of Eurodollar Rate Loans or continuation of Loans described in Section 2.02(1). In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than 3:00 p.m., New York time, on the Business Day specified in the applicable Committed Loan Notice.

(3)     Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan, unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith.  Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent at the direction of the Required Lenders under the applicable Facility may require by notice to the Borrower that no Loans under such Facility may be converted to or continued as Eurodollar Rate Loans.

(4)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.  The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive in the absence of manifest error.  At any time when Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Administrative Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(5)     After giving effect to all Revolving Credit Borrowings, all conversions of Revolving Credit Loans from one Type to the other, and all continuations of Revolving Credit Loans as the same Type, there shall not be more than ten Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent.

(6)     The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(7)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing, or, in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York time, on the date of such Borrowing, that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (2) above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (a) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (b) in the case of such Lender, the Overnight Rate *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in accordance with the foregoing.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(7) shall be conclusive in the absence of manifest error.  If the Borrower and such Lender shall both pay all or any portion of the principal amount in respect of such Borrowing or interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such Borrowing or interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.03     Letters of Credit.

(1)        The Letter of Credit Commitments.

(a)        Subject to the terms and conditions set forth herein, (i) each Issuing Bank agrees, in reliance upon the agreements of the other Revolving Credit Lenders set forth in this Section 2.03, (A) from time to time on any Business Day during the period from the Closing Date until the L/C Expiration Date, to issue Letters of Credit at sight denominated in Dollars for the account of the Borrower (*provided* that any such Letter of Credit may be for the benefit of any Subsidiary of the Borrower) and to amend or renew Letters of Credit previously issued by it, in accordance with Section 2.03(2), and (B) to honor drawings under the Letters of Credit and (ii) the Revolving Credit Lenders severally agree to participate in Letters of Credit issued pursuant to this Section 2.03; *provided* that no Issuing Bank shall be obligated to make any L/C Credit Extension with respect to any Letter of Credit, and no Lender shall be obligated to participate in any Letter of Credit if after giving effect to such L/C Credit Extension, (x) the Revolving Credit Exposure of any Revolving Credit Lender would exceed such Lender's Revolving Credit Commitment, (y) the Outstanding Amount of the L/C Obligations would exceed the L/C Sublimit or (z) the aggregate Total Outstandings would exceed the Maximum Borrowing Amount.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(b)        An Issuing Bank shall be under no obligation to issue any Letter of Credit if:

(i)        any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Bank from issuing such Letter of Credit, or any Law applicable to such Issuing Bank or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Bank shall prohibit, or direct that such Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Bank is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Closing Date (for which such Issuing Bank is not otherwise compensated hereunder);

(ii)        subject to Section 2.03(2)(c), the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last renewal, unless each Appropriate Lender has approved of such expiration date;

(iii)        the expiry date of such requested Letter of Credit would occur after the L/C Expiration Date, unless (A) the applicable Issuing Bank has approved of such expiration date (B) the Outstanding Amount of L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the applicable Issuing Bank; or

(iv)        the issuance of such Letter of Credit would violate any Laws binding upon such Issuing Bank;

(v)        the Letter of Credit is to be denominated in a currency other than Dollars, unless otherwise agreed by the relevant Issuing Bank and the Administrative Agent;

(vi)        the Letter of Credit is in an initial amount less than $25,000; or

(vii)     any Revolving Credit Lender is at that time a Defaulting Lender, unless such Issuing Bank has entered into arrangements, including the delivery of Cash Collateral, satisfactory to such Issuing Bank (in its sole discretion) with the Borrower or such Lender to eliminate such Issuing Bank's actual or potential Fronting Exposure (after giving effect to Section 2.17(1)(d)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which such Issuing Bank has actual or potential Fronting Exposure, as it may elect in its sole discretion.

(c)     An Issuing Bank shall be under no obligation to amend any Letter of Credit if such Issuing Bank would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof or (ii) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(2)     <u>Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit</u>.

(a)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to an Issuing Bank (with a copy to the Administrative Agent) in the form of a L/C Application, appropriately completed and signed by a Responsible Officer of the Borrower. Such L/C Application must be received by the relevant Issuing Bank and the Administrative Agent not later than 12:00 p.m., New York time, at least two (2) Business Days prior to the proposed issuance date or date of amendment, as the case may be, or, in each case, such later date and time as the relevant Issuing Bank may agree in a particular instance in its sole discretion.  In the case of a request for an initial issuance of a Letter of Credit, such L/C Application shall specify in form and detail reasonably satisfactory to the relevant Issuing Bank:

(i)     the proposed issuance date of the requested Letter of Credit (which shall be a Business Day);

(ii)     the amount thereof;

(iii)     the expiry date thereof;

(iv)     the name and address of the beneficiary thereof;

(v)     the documents to be presented by such beneficiary in case of any drawing thereunder;

(vi)     the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder;

(vii)     the currency in which the requested Letter of Credit to be issued will be denominated; and

(viii)     such other matters as the relevant Issuing Bank may reasonably request.

In the case of a request for an amendment of any outstanding Letter of Credit, such L/C Application shall specify in form and detail reasonably satisfactory to the relevant Issuing Bank:

(A)     the Letter of Credit to be amended;

(B)      the proposed date of amendment thereof (which shall be a Business Day);

(C)      the nature of the proposed amendment; and

(D)      such other matters as the relevant Issuing Bank may reasonably request.

(b)      Promptly after receipt of any L/C Application, the relevant Issuing Bank will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such L/C Application from the Borrower and, if not, such Issuing Bank will provide the Administrative Agent with a copy thereof.  Upon receipt by the relevant Issuing Bank of confirmation from the Administrative Agent that the requested issuance or amendment is permitted in accordance with the terms hereof, then, subject to the terms and conditions hereof, such Issuing Bank shall, on the requested date, issue a Letter of Credit for the account of the Borrower (which may be used to provide credit support to any Restricted Subsidiary of the Borrower) or enter into the applicable amendment, as the case may be.  Immediately upon the issuance of each Letter of Credit, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the relevant Issuing Bank a risk participation in such Letter of Credit in an amount equal to the product of such Lender's Pro Rata Share or other applicable share provided for under this Agreement times the amount of such Letter of Credit; *provided* that no Lender shall be required to purchase a risk participation in any Letter of Credit with an expiration date after the expiration date of such Lender's Commitments.

(c)      If the Borrower so requests in any applicable L/C Application, the relevant Issuing Bank shall agree to issue a Letter of Credit that has automatic extension provisions (each, an "**Auto-Extension Letter of Credit**"); *provided* that any such Auto-Extension Letter of Credit must permit the relevant Issuing Bank to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "**Non-Extension Notice Date**") in each such twelve-month period to be agreed upon by the relevant Issuing Bank and the Borrower at the time such Letter of Credit is issued.  Unless otherwise agreed in such Letter of Credit, the Borrower shall not be required to make a specific request to the relevant Issuing Bank for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the applicable Lenders shall be deemed to have authorized (but may not require) the relevant Issuing Bank to permit the extension of such Letter of Credit at any time to an expiry date not later than the applicable L/C Expiration Date, unless the Outstanding Amount of L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the applicable Issuing Bank; *provided* that the relevant Issuing Bank shall not permit any such extension if (i) the relevant Issuing Bank has determined that it would have no obligation at such time to issue such Letter of Credit in its extended form under the terms hereof (by reason of the provisions of Section 2.03(1)(b) or otherwise) or (ii) it has received notice (which may be by telephone or in writing) on or before the day that is seven (7) Business Days before the Non-Extension Notice Date from the Administrative Agent, any Revolving Credit Lender or the Borrower that one or more of the applicable conditions specified in Section 4.02 will not be satisfied on the applicable date of the Credit Extension.

(d)      Promptly after issuance of any Letter of Credit or any amendment to a Letter of Credit, the relevant Issuing Bank will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(3)      <u>Drawings and Reimbursements; Funding of Participations</u>.

(a)     Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the relevant Issuing Bank shall promptly notify the Borrower and the Administrative Agent thereof (including the date on which such payment is to be made).  Upon the same day of any payment by an Issuing Bank under a Letter of Credit with notice to the Borrower (each such date, an "**Honor Date**"), the Borrower shall reimburse, or cause to be reimbursed, such Issuing Bank through the Administrative Agent in an amount equal to the amount of such drawing; *provided* that if such reimbursement is not made on the date of drawing, the Borrower shall pay interest to the relevant Issuing Bank on such amount at the rate applicable to Base Rate Loans (without duplication of interest payable on L/C Borrowings).  The relevant Issuing Bank shall notify the Borrower of the amount of the drawing promptly following the determination or revaluation thereof.  If the Borrower fails to so reimburse, or cause to be reimbursed, such Issuing Bank by such time, the Administrative Agent shall promptly notify each Appropriate Lender of the Honor Date, the amount of the unreimbursed drawing (the "**Unreimbursed Amount**") and the amount of such Appropriate Lender's Pro Rata Share or other applicable share provided for under this Agreement thereof.  In such event, in the case of an Unreimbursed Amount under a Letter of Credit, the Borrower shall be deemed to have requested a Revolving Credit Borrowing of Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Base Rate Loans but subject to the requirements for the amount of the unutilized portion of the Revolving Credit Commitments under the applicable Revolving Credit Facility of the Appropriate Lenders and the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice).  Any notice given by an Issuing Bank or the Administrative Agent pursuant to this Section 2.03(3)(a) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(b)     Each Appropriate Lender (including any Lender acting as an Issuing Bank) shall upon any notice pursuant to Section 2.03(3)(a) make funds available to the Administrative Agent for the account of the relevant Issuing Bank in Dollars at the Administrative Agent's Office for payments in an amount equal to its Pro Rata Share or other applicable share provided for under this Agreement of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.03(3)(c), each Appropriate Lender that so makes funds available shall be deemed to have made a Revolving Credit Loan that is a Base Rate Loan to the Borrower in such amount.  The Administrative Agent shall remit the funds so received to the relevant Issuing Bank.

(c)     With respect to any Unreimbursed Amount that is not fully refinanced by a Revolving Credit Borrowing of Base Rate Loans because the conditions set forth in Section 4.02 cannot be satisfied or for any other reason, the Borrower shall be deemed to have incurred from the relevant Issuing Bank an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Appropriate Lender's payment to the Administrative Agent for the account of the relevant Issuing Bank pursuant to Section 2.03(3)(b) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.03.

(d)     Until each Appropriate Lender funds its Revolving Credit Loan or L/C Advance pursuant to this Section 2.03(3) to reimburse the relevant Issuing Bank for any amount drawn under any Letter of Credit, interest in respect of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such amount shall be solely for the account of the relevant Issuing Bank.

(e)     Each Revolving Credit Lender's obligation to make Revolving Credit Loans or L/C Advances to reimburse an Issuing Bank for amounts drawn under Letters of Credit, as contemplated

by this Section 2.03(3), shall be absolute and unconditional and shall not be affected by any circumstance, including

(i)       any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the relevant Issuing Bank, the Borrower or any other Person for any reason whatsoever;

(ii)      the occurrence or continuance of a Default; or

(iii)     any other occurrence, event or condition, whether or not similar to any of the foregoing;

(f)       If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the relevant Issuing Bank any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.03(3) by the time specified in Section 2.03(3)(b), such Issuing Bank shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to be made to the date on which such payment is immediately available to such Issuing Bank at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  A certificate of the relevant Issuing Bank submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(3)(d) shall be conclusive absent manifest error.

(4)      Repayment of Participations.

(a)       If, at any time after an Issuing Bank has made a payment under any Letter of Credit and has received from any Revolving Credit Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.03(3), the Administrative Agent receives for the account of such Issuing Bank any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Pro Rata Share or other applicable share provided for under this Agreement thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding) in the amount received by the Administrative Agent.

(b)       If any payment received by the Administrative Agent for the account of an Issuing Bank pursuant to Section 2.03(3)(a) or Section 2.03(3)(b) is required to be returned under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by such Issuing Bank in its discretion), each Appropriate Lender shall pay to the Administrative Agent for the account of such Issuing Bank its Pro Rata Share or other applicable share provided for under this Agreement thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  The Obligations of the Revolving Credit Lenders under this Section 2.03(4)(b) shall survive the payment in full of the Obligations and the termination of this Agreement.

(5)      Obligations Absolute.  The obligation of the Borrower to reimburse the relevant Issuing Bank for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(a)      any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other agreement or instrument relating thereto;

(b)      the existence of any claim, counterclaim, setoff, defense or other right that any Loan Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the relevant Issuing Bank or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(c)      any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(d)      any payment by the relevant Issuing Bank under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the relevant Issuing Bank under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(e)      any exchange, release or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty or any other guarantee, for all or any of the Obligations of any Loan Party in respect of such Letter of Credit; or

(f)      any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party;

*provided* that the foregoing shall not excuse any Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are waived by the Borrower to the extent permitted by applicable Law) suffered by the Borrower that are caused by acts or omissions by such Issuing Bank constituting gross negligence, bad faith or willful misconduct on the part of such Issuing Bank as determined in a final and non-appealable judgment by a court of competent jurisdiction.

(6)      <u>Role of Issuing Banks.</u>  The Issuing Bank shall be entitled to rely upon, and shall be fully protected in relying upon, any note, writing, resolution, notice, statement, certificate or facsimile message, order or other document or telephone message signed, sent or made by any Person that the Issuing Bank reasonably believed to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by the Issuing Bank (which may include, at the Issuing Bank's option, counsel of the Administrative Agent or the Borrower).  Each Lender and the Borrower agrees that, in paying any drawing under a Letter of Credit, the relevant Issuing Bank shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the Issuing Banks, any Related Person of such Issuing Banks, nor any of the respective correspondents, participants or assignees of any Issuing Bank shall be liable to any Lender for:

(a)      any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable;

(b)      any action taken or omitted in the absence of gross negligence, bad faith or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction; or

(c)      the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or L/C Application.

The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided* that this assumption is not intended to, and shall not, preclude the Borrower from pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the Issuing Banks, any Related Persons of such Issuing Banks, nor any of the respective correspondents, participants or assignees of any Issuing Bank, shall be liable or responsible for any of the matters described in clauses (a) through (f) of Section 2.03(5); *provided* that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against an Issuing Bank, and such Issuing Bank may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential, damages suffered by the Borrower which the Borrower proves were caused by such Issuing Bank's willful misconduct, bad faith or gross negligence or such Issuing Bank's willful or grossly negligent, or bad faith, failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit in each case as determined in a final and non-appealable judgment by a court of competent jurisdiction.  In furtherance and not in limitation of the foregoing, each Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no Issuing Bank shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

Each Lender shall, ratably in accordance with its Pro Rata Share, indemnify each Issuing Bank, its Related Persons and their respective directors, officers, agents and employees (to the extent not reimbursed by the Borrower) against any cost, expense (including reasonable counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from such indemnitees' willful misconduct, bad faith or gross negligence or such Issuing Bank's willful or grossly negligent, or bad faith, failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit in each case as determined in a final and non-appealable judgment by a court of competent jurisdiction) that such indemnitees may suffer or incur in connection with this Section 2.03 or any action taken or omitted to be taken by such indemnitees hereunder.

(7)      Cash Collateral.  Subject to Section 2.17(1)(d), if,

(a)      as of any L/C Expiration Date, any applicable Letter of Credit issued for the account of the Borrower may for any reason remain outstanding and partially or wholly undrawn,

(b)      any Event of Default occurs and is continuing and the Administrative Agent or the Required Lenders, as applicable, may require the Borrower to Cash Collateralize the L/C Obligations pursuant to Section 8.02, or

(c)      an Event of Default set forth under Section 8.01(6) occurs and is continuing,

the Borrower will Cash Collateralize, or cause to be Cash Collateralized, the then Outstanding Amount of all relevant L/C Obligations (in an amount equal to such Outstanding Amount determined as of the date of such Event of Default or the applicable L/C Expiration Date, as the case may be), and shall do so not later than 2:00 p.m. on (i) in the case of the immediately preceding clauses (a) or (b), (x) the Business Day that the Borrower receives notice thereof, if such notice is received on such day prior to 12:00 p.m. or (y) if clause (x) above does not apply, the Business Day immediately following the day that the Borrower receives such notice and (ii) in the case of the immediately preceding clause (c), the Business Day on which an Event of Default set forth under Section 8.01(6) occurs or, if such day is not a Business Day, the Business Day immediately succeeding such day.  At any time that there shall exist a Defaulting Lender, immediately upon the request of the Administrative Agent or the applicable Issuing Bank, the Borrower will Cash Collateralize all Fronting Exposure (after giving effect to Section 2.17(1)(d) and any Cash Collateral provided by the Defaulting Lender) at 100% of the amount thereof. The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Banks and the Revolving Credit Lenders of the applicable Facility, a security interest in all such Cash Collateral.  Cash Collateral shall be maintained in blocked accounts at the Administrative Agent and may be invested in readily available Cash Equivalents selected by the Administrative Agent in its sole discretion.  If at any time the Administrative Agent determines that any funds held as Cash Collateral are expressly subject to any right or claim of any Person other than the Loan Parties or the Administrative Agent (on behalf of the Secured Parties) or that the total amount of such funds is less than 100% of the aggregate Outstanding Amount of all relevant L/C Obligations, the Borrower will, forthwith upon demand by the Administrative Agent, pay, or cause to be paid, to the Administrative Agent, as additional funds to be deposited and held in the deposit accounts at the Administrative Agent as aforesaid, an amount equal to the excess of (A) 100% of such aggregate Outstanding Amount over (B) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent reasonably determines to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Law, to reimburse the relevant Issuing Bank.  To the extent the amount of any Cash Collateral exceeds the then Outstanding Amount of such relevant L/C Obligations and so long as no Event of Default has occurred and is continuing, the excess shall promptly be refunded to the Borrower.  To the extent any Event of Default giving rise to the requirement to Cash Collateralize any Letter of Credit pursuant to this Section 2.03(7) is cured or otherwise waived, then so long as no other Event of Default has occurred and is continuing, the amount of any Cash Collateral pledged to Cash Collateralize such Letter of Credit shall promptly be refunded to the Borrower.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Loan Parties or the Administrative Agent as herein provided, or that the total amount of such Cash Collateral is less than 100% of the applicable Fronting Exposure and other obligations secured thereby, the Borrower or the relevant Defaulting Lender will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency.

(8)      [Reserved].

(9)      Letter of Credit Fees.  The Borrower shall pay to the Administrative Agent, for the account of each Revolving Credit Lender for the applicable Revolving Credit Facility in accordance with its Pro Rata Share or other applicable share provided for under this Agreement, a Letter of Credit fee for each Letter of Credit issued pursuant to this Agreement equal to the Applicable Rate set forth in the "Applicable Rate for Eurodollar Loans" column of the chart in the definition of "Applicable Rate" times the daily maximum amount then available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount decreases or increases periodically pursuant to the terms of such Letter of Credit); *provided*, *however*, that any Letter of Credit fees otherwise payable for the account of a Defaulting Lender with respect to any Letter of Credit as to which such Defaulting Lender has not provided Cash Collateral satisfactory to the applicable

Issuing Bank pursuant to this Section 2.03 shall be payable, to the maximum extent permitted by applicable Law, to the other Lenders in accordance with the upward adjustments in their respective Pro Rata Shares allocable to such Letter of Credit pursuant to Section 2.17(1)(d), with the balance of such fee, if any, payable to the applicable Issuing Bank for its own account.  Such Letter of Credit fees shall be computed on a quarterly basis in arrears.  Such Letter of Credit fees shall be due and payable in Dollars on the first calendar day of each February, May, August and November, commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date and thereafter on demand.  If there is any change in the Applicable Rate set forth in the "Applicable Rate for Eurodollar Loans" column of the chart in the definition of "Applicable Rate" during any calendar quarter, the daily maximum amount of each Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such calendar quarter that such Applicable Rate was in effect.

(10)    Fronting Fee and Documentary and Processing Charges Payable to Issuing Banks.  The Borrower shall pay directly to each Issuing Bank for its own account a fronting fee with respect to each Letter of Credit issued by such Issuing Bank equal to 0.25% per annum (or such other lower amount as may be mutually agreed by the Borrower and the applicable Issuing Bank) of the maximum amount then available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount increases or decreases periodically pursuant to the terms of such Letter of Credit) or such lesser fee as may be agreed with such Issuing Bank.  Such fronting fees shall be computed on a quarterly basis in arrears. Such fronting fees shall be due and payable in Dollars on the first calendar day of each of each February, May, August and November, commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date and thereafter on demand.  In addition, the Borrower shall pay, or cause to be paid, directly to each Issuing Bank for its own account with respect to each Letter of Credit issued for the account of the Borrower or any Restricted Subsidiary the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such Issuing Bank relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable within ten (10) Business Days of demand and are nonrefundable.

(11)    Conflict with L/C Application.  Notwithstanding anything else to the contrary in this Agreement or any L/C Application, in the event of any conflict between the terms hereof and the terms of any L/C Application, the terms hereof shall control.

(12)    Addition of an Issuing Bank.  There may be one or more Issuing Banks under this Agreement from time to time.  A Revolving Credit Lender reasonably acceptable to the Borrower and the Administrative Agent may become an additional Issuing Bank hereunder pursuant to a written agreement among the Borrower, the Administrative Agent and such Revolving Credit Lender.  The Administrative Agent shall notify the Revolving Credit Lenders of any such additional Issuing Bank.

(13)    Provisions Related to Extended Revolving Credit Commitments.  If the L/C Expiration Date in respect of any Class of Revolving Credit Commitments occurs prior to the expiry date of any Letter of Credit, then (a) if consented to by the Issuing Bank which issued such Letter of Credit, if one or more other Classes of Revolving Credit Commitments in respect of which the L/C Expiration Date shall not have so occurred are then in effect, such Letters of Credit for which consent has been obtained shall automatically be deemed to have been issued (including for purposes of the obligations of the Revolving Credit Lenders to purchase participations therein and to make Revolving Credit Loans and payments in respect thereof pursuant to Sections 2.03(3) and 4)) under (and ratably participated in by Revolving Credit Lenders pursuant to) the Revolving Credit Commitments in respect of such non-terminating Classes up to an aggregate amount not to exceed the aggregate principal amount of the unutilized Revolving Credit Commitments thereunder at such time (it being understood that no partial face amount of any Letter of Credit may be so reallocated) and (b) to the extent not reallocated pursuant to

immediately preceding clause (a) and unless provisions reasonably satisfactory to the applicable Issuing Bank for the treatment of such Letter of Credit as a letter of credit under a successor credit facility have been agreed upon, the Borrower shall, on or prior to the applicable Maturity Date, cause all such Letters of Credit to be replaced and returned to the applicable Issuing Bank undrawn and marked "cancelled" or to the extent that the Borrower is unable to so replace and return any Letter(s) of Credit, such Letter(s) of Credit shall be backstopped by a "back to back" letter of credit reasonably satisfactory to the applicable Issuing Bank or the Borrower shall Cash Collateralize any such Letter of Credit in accordance with Section 2.03(7).

(14)    Letter of Credit Reports.  For so long as any Letter of Credit issued by an Issuing Bank is outstanding, such Issuing Bank shall deliver to the Administrative Agent on the last Business Day of each calendar month, and on each date that an L/C Credit Extension occurs with respect to any such Letter of Credit, a report in the form of Exhibit R, appropriately completed with the information for every outstanding Letter of Credit issued by such Issuing Bank.

(15)    Letters of Credit Issued for Holdings and Subsidiaries.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of a Restricted Subsidiary of the Borrower, the Borrower shall be obligated to reimburse, or cause to be reimbursed, the applicable Issuing Bank hereunder for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit in support or its Restricted Subsidiaries inures to the benefit of the Borrower, and that the Borrower's businesses derives substantial benefits from the businesses of its Restricted Subsidiaries.

Section 2.04    Swing Line Loans.

(1)    The Swing Line.  Subject to the terms and conditions set forth herein, the Swing Line Lender may, in its sole discretion and in its individual capacity, make revolving credit loans in Dollars to the Borrower (each such loan, a "**Swing Line Loan**"), from time to time on any Business Day during the period beginning on the Business Day after the Closing Date and until the Maturity Date of the Revolving Credit Facility in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Pro Rata Share or other applicable share provided for under this Agreement of the Outstanding Amount of Revolving Credit Loans and L/C Obligations of the Swing Line Lender, may exceed the amount of such Swing Line Lender's Revolving Credit Commitment; *provided* that, after giving effect to any Swing Line Loan, (i) the Revolving Credit Exposure shall not exceed the aggregate Revolving Credit Commitment and (ii) the aggregate Total Outstandings shall not exceed the Maximum Borrowing Amount.  Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04.  Each Swing Line Loan will be obtained or maintained as a Base Rate Loan and upon the occurrence and during the continuance of an Event of Default under Section 8.01(1), the Swing Line Loans will, at the option of Swing Line Lender, bear interest on past due amounts at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws.

(2)    Borrowing Procedures.  Each Swing Line Borrowing shall be made upon the Borrower's irrevocable notice to the Swing Line Lender, which may be given in writing or by telephone.  Each such notice must be received by the Swing Line Lender not later than 2:00 p.m., New York time, on the requested Borrowing date and shall specify (a) the amount to be borrowed, which shall be a minimum of $100,000 and (b) the requested Borrowing date, which shall be a Business Day.  Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower, together with substantially simultaneous notice (by telephone or in writing) to the Administrative Agent.  If the Swing

Line Lender agrees to provide such requested Swing Line Borrowing, unless it has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Revolving Credit Lender) or it determines that (i) after giving effect to any Swing Line Loan, the Revolving Credit Exposure will exceed the aggregate Revolving Credit Commitment, (ii) the aggregate Total Outstandings exceed the Maximum Borrowing Amount or (iii) one or more of the applicable conditions specified in Section 4.02 is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will, not later than 3:00 p.m., New York time, on the Borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrower.

(3)     Repayment or Refinancing of Swing Line Loans.

(a)     The Borrower has the right to prepay all or a portion of any Swing Line Loan at any time without premium or penalty.

(b)     To facilitate administration of the Revolving Credit Loans, the Revolving Credit Lenders and the Administrative Agent agree (which agreement is solely among them, and not for the benefit of or enforceable by the Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among them as to the Swing Line Loans shall take place on a periodic basis in accordance with this clause (b).  The Administrative Agent shall request settlement (a "**Swing Line Settlement**") with the Revolving Credit Lenders on at least a weekly basis, or on a more frequent basis if so determined by the Administrative Agent, (A) on behalf of the Swing Line Lender, with respect to each outstanding Swing Line Loan and (B) with respect to collections received, in each case, by notifying the applicable Revolving Credit Lenders of such requested Swing Line Settlement by facsimile or other electronic form of transmission, of such requested Swing Line Settlement, no later than 1:00 p.m. New York City time, on the date of such requested Swing Line Settlement (the "**Swing Line Settlement Date**").  Each applicable Revolving Credit Lender (other than the Swing Line Lender) shall make the amount of such Revolving Credit Lender's Pro Rata Share of the outstanding principal amount of the Swing Line Loans with respect to which Swing Line Settlement is requested available to the Administrative Agent, to such account of the Administrative Agent as the Administrative Agent may designate, not later than 3:00 p.m., New York City time, on the Swing Line Settlement Date applicable thereto, which may occur before or after the occurrence or during the continuation of a Default or an Event of Default and whether or not the applicable conditions precedent set forth in Article IV have then been satisfied without regard to any minimum amount specified therein.  Such amounts made available to the Administrative Agent shall be applied against the amounts of the applicable Swing Line Loan and, together with the portion of such Swing Line Loan representing the Swing Line Lender's Pro Rata Share thereof, shall constitute Revolving Credit Loans of the Revolving Credit Lenders under such Facility.  If any such amount is not made available to the Administrative Agent by any Revolving Credit Lender on the Swing Line Settlement Date applicable thereto, the Administrative Agent shall, on behalf of the Swing Line Lender with respect to each outstanding Swing Line Loan, be entitled to recover such amount on demand from such Revolving Credit Lender together with interest thereon at the Base Rate for the first three days from and after the Swing Line Settlement Date and thereafter at the interest rate then applicable to Revolving Credit Loans.  Between Swing Line Settlement Dates, the Administrative Agent may pay over to the Swing Line Lender any payments received by the Administrative Agent, which in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Credit Loans, for application to such Swing Line Lender's Revolving Credit Loans or Swing Line Loans.  If, as of any Swing Line Settlement Date, collections received since the then immediately preceding Swing Line Settlement Date have been applied to such Swing Line Lender's Revolving Credit Loans, such Swing Line Lender shall pay to the Administrative Agent for the accounts of the applicable Revolving Credit Lenders, to be applied to the outstanding Revolving Credit Loans of such Revolving Credit Lenders, an amount such that each Revolving Credit Lender shall, upon receipt of such amount, have, as of such Swing Line Settlement Date, its Pro Rata Share of the Revolving Credit Loans under such

Facility.  During the period between Swing Line Settlement Dates, each Swing Line Lender with respect to its Swing Line Loans, the Administrative Agent with respect to Protective Advances under the applicable Facility and each Revolving Credit Lender with respect to its Revolving Credit Loans shall be entitled to interest thereon at the applicable rate or rates payable under this Agreement.

(c)     In addition, the Swing Line Lender at any time in its sole and absolute discretion may request, by written notice to the Borrower, the Administrative Agent and the Revolving Credit Lenders, on behalf of the Borrower (which hereby irrevocably authorizes such Swing Line Lender to so request on its behalf), that each Revolving Credit Lender make a Base Rate Loan in an amount equal to such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the amount of Swing Line Loans of the Borrower then outstanding.  Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but not in excess of the unutilized portion of the aggregate Revolving Credit Commitments and subject to the conditions set forth in Section 4.02; *provided* that, a request shall also be deemed to have been given one Business Day prior to each of (i) the Maturity Date of the Revolving Credit Facility, (ii) the occurrence of an Event of Default with respect to the Borrower under Section 8.01(6) or (iii) the acceleration of the Obligations or other exercise of remedies under Section 8.02 (each such borrowing made on account of any such deemed request under this Section 2.04(3)(a), a "**Mandatory Swing Line Borrowing**").  The Swing Line Lender shall furnish the Borrower with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Administrative Agent.  Each Revolving Credit Lender shall make an amount equal to its Pro Rata Share or other applicable share provided for under this Agreement of the amount specified in such Committed Loan Notice available to the Administrative Agent in Same Day Funds for the account of the Swing Line Lender at the Administrative Agent's Office not later than 1:00 p.m. New York time on the date specified in such Committed Loan Notice, whereupon, subject to Section 2.04(3)(b), each Revolving Credit Lender that so makes funds available shall be deemed to have made a Revolving Credit Loan that is a Base Rate Loan to the Borrower in such amount.  The Administrative Agent shall remit the funds so received to the Swing Line Lender.

(d)     If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 2.04(3)(a) (including as a result of a proceeding under any Debtor Relief Law), the request for Base Rate Loans submitted by the relevant Swing Line Lender as set forth herein shall be deemed to be a request by such Swing Line Lender that each of the Revolving Credit Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Credit Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to Section 2.04(a)(1) shall be deemed payment in respect of such participation; *provided*, that (i) all interest payable on the Swing Line Loans is for the account of Swing Line Lender until the date as of which the respective participation is purchased and (ii) at the time any purchase of participations pursuant to this sentence is actually made, the purchasing Revolving Credit Lender shall pay Swing Line Lender interest on the principal amount of such participation purchased for each day from and including the day upon which the Mandatory Swing Line Borrowing purchase occurs under this Agreement to but excluding the date of payment for such participation, at the applicable rate received by the Swing Line Lender.

(e)     If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by the Lender pursuant to the foregoing provisions of this Section 2.04(3) by the time specified in Section 2.04(3)(a), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  If such Revolving Credit Lender pays such

amount, the amount so paid shall constitute such Lender's Revolving Credit Loan included in the relevant Borrowing or funded participation in the relevant Swing Line Loan, as the case may be. A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (c) shall be conclusive absent manifest error.

(f)     Each Revolving Credit Lender's obligation to make Revolving Credit Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(3) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default, or (iii) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that each Revolving Credit Lender's obligation to make Revolving Credit Loans pursuant to this Section 2.04(3) (but not to purchase and fund risk participations in Swing Line Loans) is subject to the conditions set forth in Section 4.02. No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay the applicable Swing Line Loans, together with interest as provided herein.

(4)     Repayment of Participations.

(a)     At any time after any Revolving Credit Lender has purchased and funded a risk participation in a Swing Line Loan, if the relevant Swing Line Lender receives any payment on account of such Swing Line Loan, such Swing Line Lender will distribute to such Lender its Pro Rata Share or other applicable share provided for under this Agreement of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by such Swing Line Lender.

(b)     If any payment received by the relevant Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by such Swing Line Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Credit Lender shall pay to such Swing Line Lender its Pro Rata Share or other applicable share provided for under this Agreement thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the applicable Overnight Rate. The Administrative Agent will make such demand upon the request of a Swing Line Lender. The obligations of the Revolving Credit Lenders under this clause (d)(ii) shall survive the payment in full of the Obligations and the termination of this Agreement.

(5)     Interest for Account of Swing Line Lender. The Swing Line Lender shall be responsible for invoicing the Borrower for interest on the Swing Line Loans. Until each Revolving Credit Lender funds its Base Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Lender's Pro Rata Share or other applicable share provided for under this Agreement of any Swing Line Loan, interest in respect of such Pro Rata Share or other applicable share provided for under this Agreement shall be solely for the account of the Swing Line Lender.

(6)     Payments Directly to Swing Line Lender. Subject to Section 2.04(3)(a), the Borrower shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

(7)     Provisions Related to Extended Revolving Credit Commitments. If the Maturity Date shall have occurred in respect of any Class of Revolving Credit Commitments (the "**Expiring Credit Commitment**") at a time when another Class or Classes of Revolving Credit Commitments is or are in

117

effect with a later Maturity Date (each a "**Non-Expiring Credit Commitment**" and collectively, the "**Non-Expiring Credit Commitments**"), then with respect to each outstanding Swing Line Loan, if consented to by the Swing Line Lender, on the earliest occurring Maturity Date such Swing Line Loan shall be deemed reallocated to the Class or Classes of the Non-Expiring Credit Commitments on a pro rata basis; *provided* that (a) to the extent that the amount of such reallocation would cause the aggregate credit exposure to exceed the aggregate amount of such Non-Expiring Credit Commitments, immediately prior to such reallocation (after giving effect to any repayments of Revolving Credit Loans and any reallocation of Letter of Credit participations as contemplated in Section 2.03(13)) the amount of Swing Line Loans to be reallocated equal to such excess shall be repaid and (b) notwithstanding the foregoing, if a Default or Event of Default has occurred and is continuing, the Borrower shall still be obligated to pay Swing Line Loans allocated to the Revolving Credit Lenders holding the Expiring Credit Commitments at the Maturity Date of the Expiring Credit Commitment or if the Loans have been accelerated prior to the Maturity Date of the Expiring Credit Commitment.

Section 2.05    Prepayments.

(1)    Optional.

(a)    The Borrower may, upon notice to the Administrative Agent by the Borrower, at any time or from time to time voluntarily prepay any Revolving Credit Loans in whole or in part without premium or penalty; *provided* that

(i)    such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans;

(ii)    any partial prepayment of Eurodollar Rate Loans shall be in a principal amount of $2.0 million or a whole multiple of $500,000 in excess thereof or, if less, the entire principal amount thereof then outstanding; and

(iii)    any prepayment of Base Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.

Each such notice shall specify the date and amount of such prepayment and Type(s) of Loans to be prepaid (and, for the avoidance of doubt, may indicate the prepayments by more than one Borrower on such date in such amounts so specified, which, individually, may be below any minimum or multiple, but which, in the aggregate amount on any given date, shall satisfy such minimum and multiple requirements). The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment. If such notice is given, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.

(b)    The Borrower may, upon notice to the applicable Swing Line Lender (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by such Swing Line Lender and the Administrative Agent not later than 12:00 p.m., New York City time, on the date of the prepayment and (2) any such prepayment of Swing Line Loans made in Dollars shall be in a minimum principal amount of $100,000 or a whole multiple of $100,000 in excess thereof, or the entire

principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(1)(a) if such prepayment would have resulted from a refinancing of all or a portion of the applicable Facility, which refinancing shall not be consummated or shall otherwise be delayed.

(2)     Mandatory.

(a)     If at any time, the aggregate principal amount of Total Outstandings (excluding the face amount of any Letters of Credit that are Cash Collateralized or back-stopped to the reasonable satisfaction of the Administrative Agent) exceeds the Maximum Borrowing Amount, the Borrower shall within one (1) Business Day, upon notification by the Administrative Agent, prepay the Swing Line Loans *first* and then prepay (or Cash Collateralize, in the amount required by Section 2.03(7), in the case of Letters of Credit) the other Loans then outstanding in an amount equal to such excess; *provided* that nothing in this clause (2)(a) shall reduce the Revolving Credit Commitments.

(b)     Subject to Section 3.05 hereof, all such payments in respect of the Loans pursuant to this Section 2.05 shall be without premium or penalty.  All interest accrued on the principal amount of the Loans paid pursuant to this Section 2.05 shall be paid, or may be charged by the Administrative Agent to any loan account(s) of the Borrower, at the Administrative Agent's option, on the date of such payment.  Interest shall accrue and be due, until the next Business Day, if the amount so paid by the Borrower to the bank account designated by the Administrative Agent for such purpose is received in such bank account after 3:00 p.m., New York City time.

(c)     At all times after the occurrence and during the continuance of a Cash Dominion Period and notification thereof by the Administrative Agent to the Borrower, on each Business Day, the Administrative Agent shall apply all same day funds in excess of $3,500,000 (other than Excluded Funds held in Excluded Accounts) credited to the Concentration Account and all amounts received pursuant to this Section 2.05(2) to one or more accounts maintained by Administrative Agent or such other account as directed by the Administrative Agent.  All amounts received in such account shall be applied (and allocated) by the Administrative Agent in accordance with Section 8.03.

(3)     Interest, Funding Losses, etc.

(a)     All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

(b)     Notwithstanding any of the other provisions of this Section 2.05, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under this Section 2.05 prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.05 in respect of any such Eurodollar Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05.  Upon the occurrence and during the continuance of any

Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 2.05.  Such deposit shall be deemed to be a prepayment of such Loans by the Borrower for all purposes under this Agreement.

Section 2.06   Termination or Reduction of Commitments.

(1)   Optional.  The Borrower may, upon written notice by the Borrower to the Administrative Agent, terminate the unused Commitments, or from time to time permanently reduce the unused Commitments, in each case without premium or penalty; *provided* that (a) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (b) any such partial reduction shall be in an aggregate amount of $5.0 million or any whole multiple of $1.0 million in excess thereof or, if less, the entire amount thereof; and (c) if, after giving effect to any reduction of the Commitments, the L/C Sublimit or Swing Line Sublimit exceeds the amount of the Revolving Credit Facility, such sublimit shall be automatically reduced by the amount of such excess.  To the extent there are any FILO Tranches outstanding at the time of any termination of Revolving Credit Commitments under this Section 2.06, such termination shall be applied first to the non-FILO Tranche of Revolving Credit Loans on a pro-rata basis.

(2)   Mandatory.  The Revolving Credit Commitment of each Revolving Credit Lender shall automatically and permanently terminate on the Maturity Date for the applicable Revolving Credit Facility.

(3)   Application of Commitment Reductions.  The Administrative Agent will promptly notify the Appropriate Lenders of any termination or reduction of unused portions of the L/C Sublimit, Swing Line Sublimit or the unused Commitments of any Class under this Section 2.06.  Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07).  Any commitment fees accrued until the effective date of any termination of the Revolving Credit Commitments shall be paid on the effective date of such termination.  Other than with respect to a FILO Tranche, such reductions shall be applied pro rata to the Revolving Credit Commitments.

Section 2.07   Repayment of Loans.

(1)   Revolving Credit Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date for the applicable Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans under such Facility outstanding on such date.

(2)   Swing Line Loans.  The Borrower shall repay the aggregate principal amount of each Swing Line Loan on the earlier to occur of (a) the date selected by Swing Line Lender and (b) the Maturity Date for the applicable Revolving Credit Facility.

Section 2.08   Interest.

(1)   Subject to the provisions of Section 2.08(2), (a) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period, respectively, *plus* the Applicable Rate, (b) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date

at a rate per annum equal to the Base Rate, *plus* the Applicable Rate and (c) each Swing Line Loan shall bear interest as provided in Section 2.04(1).

(2)     During the continuance of an Event of Default, the Borrower shall pay interest on past due amounts hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws; *provided* that no interest at the Default Rate shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(3)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09   Fees.

(1)     Commitment Fee.  The Borrower agrees to pay in same day funds in Dollars to the Administrative Agent for the account of each Lender a commitment fee (the "**Unused Commitment Fee**") on the average daily amount by which the Revolving Credit Commitment of such Lender exceeds such Lender's Pro Rata Share of the sum of (i) the aggregate outstanding principal amount of Loans (other than Swing Line Loans) for the applicable Class and (ii) the aggregate maximum amount then available to be drawn under all outstanding Letters of Credit, from the Closing Date through the Revolving Credit Termination Date, at the Applicable Unused Commitment Fee Rate, payable in arrears (x) on the first calendar day of each February, May, August and November, commencing on the first such day following the Closing Date and (y) on the Revolving Credit Termination Date.  All Unused Commitment Fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(2)     Other Fees.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.10   Computation of Interest and Fees.  All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(1), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11   Evidence of Indebtedness.

(1)     The Revolving Credit Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Revolving Credit Borrowings made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so

shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent, as set forth in the Register, in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(2)     In addition to the accounts and records referred to in Section 2.11(1), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records and, in the case of the Administrative Agent, entries in the Register, evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(3)     Entries made in good faith by the Administrative Agent in the Register pursuant to Sections 2.11(1) and (2), and by each Lender in its account or accounts pursuant to Sections 2.11(1) and (2), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12   Payments Generally.

(1)     All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m., New York time, on the date specified herein. The Administrative Agent will promptly distribute to each Appropriate Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  Any payments under this Agreement that are made later than 2:00 p.m., New York time, shall be deemed to have been made on the next succeeding Business Day and any applicable interest or fees shall continue to accrue.

(2)     If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurodollar Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(3)     Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date, or in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York time, on the date of such Borrowing, any payment required to be made by it to the Administrative Agent hereunder (in the case of the Borrower, for the account of any Lender or an Issuing Bank hereunder or, in the case of the Lenders, for the account of any Issuing Bank, Swing Line Lender or the Borrower hereunder), that the

Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(a)      if the Borrower failed to make such payment, each Lender or Issuing Bank shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender or Issuing Bank in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender or Issuing Bank to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(b)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount, or cause such amount to be paid, to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.  A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(3) shall be conclusive, absent manifest error.

(c)      If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Revolving Credit Borrowing set forth in Section 4.02 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)      The obligations of the Lenders hereunder to make Loans and to fund participations in Letters of Credit and Swing Line Loans are several and not joint.  The failure of any Lender to make any Loan or fund any participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(e)      Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)      Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan

Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03 (or otherwise expressly set forth herein).  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the sum of (i) the Outstanding Amount of all Loans outstanding at such time and (ii) the Outstanding Amount of all L/C Obligations outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

(g)     The amount of each Lender's Pro Rata Share of outstanding Revolving Credit Loans (including outstanding Swing Line Loans) will be computed weekly (or more frequently in the Administrative Agent's discretion) and will be adjusted upward or downward based on all Revolving Credit Loans (including outstanding Swing Line Loans) and repayments of Revolving Credit Loans (including outstanding Swing Line Loans) received by the Administrative Agent as of 4:00 p.m. on the first Business Day (such date, the "**Settlement Date**") following the end of such week (or shorter period specified by the Administrative Agent).  The Administrative Agent will deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Credit Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (a) the Administrative Agent will transfer to each Lender its Pro Rata Share of repayments and (b) each Lender will transfer to the Administrative Agent or the Administrative Agent will transfer to each Lender such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Revolving Credit Loans made by each Lender will be equal to such Lender's Pro Rata Share of all Revolving Credit Loans outstanding as of such Settlement Date.

Section 2.13    Sharing of Payments.  If, other than expressly provided in this Agreement, if any Lender of any Class shall obtain any payment in respect of any principal of or interest on account of the Loans of such Class made by it or the participations in L/C Obligations and Swing Line Loans held by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (1) notify the Administrative Agent of such fact, and (2) purchase at par from the other Lenders such participations in the Loans of such Class made by them or such subparticipations in the participations in L/C Obligations or Swing Line Loans held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment on such Loans of such Class or such participations, as the case may be, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (a) the amount of such paying Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  For avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.10) with respect to such participation as fully as if such Lender were the

direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    Incremental Facilities.

(1)    Incremental Revolving Credit Loan Request. The Borrower may at any time and from time to time, on one or more occasions, by notice to the Administrative Agent, request one or more increases to the aggregate principal amount of the Revolving Credit Commitments (or, solely to the extent set forth in Section 2.14(9) below, provide commitments under a new facility constituting a FILO Tranche) ("**Incremental Commitments**" and the Revolving Credit Loans and other extensions of credit made thereunder, the "**Incremental Revolving Credit Loans**").

(2)    Size. The aggregate amount of Incremental Commitments hereunder shall not exceed $200,000,000.  Each Incremental Commitment will be in an integral multiple of $1.0 million and in an aggregate principal amount that is not less than $5.0 million (or such lesser minimum amount approved by the Administrative Agent in its reasonable discretion); *provided* that such amount may be less than such minimum amount or integral multiple amount if such amount represents all the remaining availability under the limit set forth above.

(3)    Incremental Lenders. The Borrower shall not be obligated to offer any existing Lender the opportunity to provide any Incremental Commitments.  Incremental Commitments may be provided by any existing Lender (it being understood that no existing Lender will have an obligation to make all or any portion of any Incremental Revolving Credit Loan, nor will the Borrower have any obligation to approach any existing Lender(s) to provide any Incremental Commitments) or by any Additional Lender on terms permitted by this Section 2.14; *provided* that the Administrative Agent, the Swing Line Lender and each Issuing Bank shall have consented (in each case, such consent not to be unreasonably withheld, conditioned or delayed) to any such Person's providing Incremental Revolving Credit Facilities if such consent would be required under Section 10.07(b)(iii) for an assignment of such Loans or Revolving Credit Commitments, as applicable, to such Person.  Final allocations in respect of Incremental Revolving Credit Facilities will be made by the Borrower together with the arrangers thereof, if any, in their discretion, on the terms permitted by this Section 2.14.

(4)    Incremental Revolving Credit Facility Amendments; Use of Proceeds. Incremental Commitments (including under a FILO Tranche) shall become Commitments under this Agreement pursuant to an amendment (each, an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Person providing such Incremental Commitments and the Administrative Agent.  The Administrative Agent will promptly notify each Lender as to the effectiveness of each Incremental Amendment. Incremental Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent, (x) to effect the provisions of this Section 2.14.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Amendment, this Agreement and the other Loan Documents, as applicable, will be amended to the extent necessary to reflect the existence and terms of the Incremental Commitments and the Incremental Revolving Credit Loans evidenced thereby. The Borrower may use the proceeds of the Incremental Revolving Credit Loans for any purpose not prohibited by this Agreement.

(5)     Conditions. The availability of the Incremental Commitments under this Agreement will be subject solely to the following conditions:

(a)     No Event of Default shall have occurred and be continuing or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as (x) no Loans hereunder (other than any Loans that constitute a FILO Tranche) are being used or will be used to fund such Limited Condition Acquisition and (y) at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing; and

(b)     all representations and warranties set forth in Article V shall be true and correct in all material respects on and as of the date of incurrence of the Incremental Revolving Credit Facilities except any representations and warranties which expressly relate to a given date or period shall be required only to be true and correct in all material respects as of the respective date or for the respective period, as the case may be; provided that in connection with any Permitted Acquisition or similar committed investment that constitute a Limited Condition Acquisition (other than any such Permitted Acquisition or committed investment which will be funded with the proceeds of Loans (other than a FILO Tranche) hereunder), (x) the Lenders providing such Incremental Commitments may elect to waive the requirement to make the representations and warranties set forth in Article V as required by the foregoing and (y) such representations and warranties will be limited to Specified Representations and Specified Acquisition Agreement Representations.

(6)     Terms.  Except as set forth below or with respect to any FILO Tranche under Section 2.14(8) below, any Incremental Commitments shall be on the same terms and pursuant to the same documentation applicable to the existing Revolving Credit Commitments hereunder; *provided* that:

(a)     the final maturity date of such Incremental Revolving Credit Loans will be no earlier than the Latest Maturity Date of the Revolving Credit Loans borrowed on the Closing Date;

(b)     the Weighted Average Life to Maturity of such Incremental Revolving Credit Loans will be no shorter than the longest remaining Weighted Average Life to Maturity of the Revolving Credit Loans borrowed on the Closing Date;

(7)     Pricing.  Other than in the case of a FILO Tranche as described below, the interest rate, margin, commitment fees, original issue discount and upfront or similar fees for any Incremental Commitments will be as determined by the Borrower and the Persons providing such Incremental Commitments; *provided*, that the interest rate, margin, commitment fees and letter of credit fee of all Commitments in effect on the Closing Date shall be increased to match the corresponding terms of the Incremental Commitments.

(8)     FILO Tranche.  The Revolving Credit Commitment Increase may be in the form of a separate "first-in, last-out" or "last-out" tranche (the "**FILO Tranche**") with interest rate margins, rate floors, upfront fees, funding discounts and original issue discounts, in each case to be agreed upon (which, for the avoidance of doubt, shall not require any adjustment to the Applicable Rate of other Revolving Credit Loans to be set forth in the Incremental Amendment) among the Borrower and the Lenders providing the FILO Tranche so long as (a) any Loans and related Obligations in respect of the FILO Tranche are not to be guaranteed by any Person other than the Guarantors and are not secured by any assets other than Collateral, (b) as between (x) the Revolving Credit Loans (other than the FILO

Tranche) and (y) the FILO Tranche, all proceeds from the liquidation or other realization of the Collateral (including ABL Priority Collateral) or application of funds in accordance with Section 8.03 shall be applied, first to obligations owing under, or with respect to, the Revolving Credit Loans (other than the FILO Tranche) and second to the FILO Tranche; (c) the Borrower may not prepay Loans under the FILO Tranche or terminate or reduce the commitments in respect thereof at any time that other Loans (including Swing Line Loans) and/or Unreimbursed Amounts (unless cash collateralized or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent) are outstanding; (d) the Required Lenders (calculated as including the FILO Tranche) shall, subject to the terms of the ABL Intercreditor Agreement, control exercise of remedies in respect of the Collateral; (e) no changes affecting the priority status of the Revolving Credit Facility (other than the FILO Tranche) vis-à-vis the FILO Tranche may be made without the consent of the Required Lenders under the Revolving Credit Facility, other than such changes which affect only the FILO Tranche; (f) the final maturity of any FILO Tranche shall not occur, and no FILO Tranche shall require mandatory commitment reductions prior to, the Latest Maturity Date at such time; and (g) except as otherwise set forth in this Section 2.14(8), the terms of any FILO Tranche are not materially less favorable to the Borrower than those hereunder (including, without limitation, the inclusion of any additional financial or other material covenant without the consent of the Administrative Agent); *provided however*, that (i) advance rates with respect to the items included in the borrowing base for such FILO Tranche shall not exceed 105% of the Net Orderly Liquidation Value of Eligible Inventory and 100% of Eligible Credit Card Receivables and Eligible Accounts Receivable and (ii) at no time shall the total Revolving Credit Exposure (including the FILO Tranche) exceed 100% of the Net Orderly Liquidation Value of the ABL Priority Collateral (other than ineligible assets).

(9)     Reallocation of Revolving Credit Exposure.  Upon each Revolving Credit Commitment Increase pursuant to this Section 2.14:

(a)     each Revolving Credit Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each lender providing a portion of such increase (each an "**Incremental Revolving Credit Lender**"), and each such Incremental Revolving Credit Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Credit Lender's participations hereunder in outstanding Letters of Credit and Swing Line Loans such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding participations hereunder in Letters of Credit and Swing Line Loans held by each Revolving Credit Lender will equal the percentage of the aggregate Revolving Credit Commitments of all Lenders represented by such Revolving Credit Lender's Revolving Credit Commitments; and

(b)     if, on the date of such increase, there are any Revolving Credit Loans outstanding, such Revolving Credit Loans shall on or prior to the effectiveness of such Incremental Revolving Credit Facility be prepaid from the proceeds of Incremental Revolving Credit Loans made hereunder (reflecting such increase in Revolving Credit Commitments), which prepayment shall be accompanied by accrued interest on the Revolving Credit Loans being prepaid and any costs incurred by any Revolving Credit Lender in accordance with Section 3.05.

(10)     The Administrative Agent and the Lenders hereby agree that the minimum borrowing, *pro rata* borrowing and *pro rata* payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

Section 2.15     [Reserved].

Section 2.16     Extensions of Loans.

(1)     Extension Offers.  Pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date, the Borrower may extend such Maturity Date and otherwise modify the terms of such Loans or Commitments pursuant to the terms set forth in an Extension Offer (each, an "**Extension**," and each group of Loans or Commitments so extended, as well as any Loans of the same Class not so extended, each being a "**tranche**" for purposes of this Section 2.16).  Each Extension Offer will specify the minimum amount of Loans or Commitments with respect to which an Extension Offer may be accepted, which will be an integral multiple of $1.0 million and an aggregate principal amount that is not less than $10.0 million, or if less, (a) the aggregate principal amount of such Loans outstanding or (b) such lesser minimum amount as is approved by the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed.  Extension Offers will be made on a *pro rata* basis to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date.  If the aggregate outstanding principal amount of such Loans (calculated on the face amount thereof) or Commitments in respect of which Lenders have accepted an Extension Offer exceeds the maximum aggregate principal amount of Loans or Commitments offered to be extended pursuant to such Extension Offer, then the Loans or Commitments of such Lenders will be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer.  There is no requirement that any Extension Offer or Extension Amendment (defined as follows) be subject to any "most favored nation" pricing provisions, any condition on the non-existence of any Default or Event of Default or any financial ratio tests.  The terms of an Extension Offer shall be determined by the Borrower, and Extension Offers may contain one or more conditions to their effectiveness, including a condition that a minimum amount of Loans or Commitments of any or all applicable tranches be tendered.

(2)     Extension Amendments.  The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents (each, an "**Extension Amendment**") as may be necessary or appropriate in order to effect the provisions of this Section 2.16, establish new tranches in respect of Extended Revolving Credit Loans and Extended Revolving Credit Commitments and such amendments as permitted by clause (5) below as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such Extended Revolving Credit Loans and Extended Revolving Credit Commitments.  Extensions will not constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.  It is understood that no existing Lender will have an obligation to participate in Extended Revolving Credit Loans or Extended Revolving Credit Commitments of any Class of Revolving Credit Loans, and any Lender who fails to accept an offer to participate in writing shall be deemed to have rejected the offer.  Any Lender of an existing Class of Revolving Credit Loans that elects (or that has deemed to have elected) not to participate in Extended Revolving Credit Loans or Extended Revolving Credit Commitments of such Class of Revolving Credit Loans shall be referred to herein as a "**Non-Extended Lender**".

(3)     Terms of Extension Offers and Extension Amendments.  The terms of any Extended Revolving Credit Loans and Extended Revolving Credit Commitments will be set forth in an Extension Offer and as agreed between the Borrower and the Extending Lenders accepting such Extension Offer; *provided* that:

(a)     the final maturity date of such Extended Revolving Credit Loans and Extended Revolving Credit Commitments will be no earlier than the Latest Maturity Date applicable to the Loans or Commitments subject to such Extension Offer;

(b)     [reserved];

(c)     [reserved];

(d)     such Extended Revolving Credit Loans and Extended Revolving Credit Commitments are not secured by any assets or property that does not constitute Collateral and may not be secured on a senior basis to the existing Revolving Credit Loans;

(e)     such Extended Revolving Credit Loans and Extended Revolving Credit Commitments are not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Loan Party; and

(f)     the terms, conditions, covenants and events of default applicable to Extended Revolving Credit Loans or Extended Revolving Credit Commitments are, except as to pricing terms (interest rate and fees) and maturity, substantially identical to, or, taken as a whole, no more favorable to the lenders or holders providing such indebtedness than, those subject to such Extension Offer, as determined in good faith by a Responsible Officer of the Borrower.

Any Extended Revolving Credit Loans will constitute a separate tranche of Revolving Credit Loans from the Revolving Credit Loans held by Lenders that did not accept the applicable Extension Offer.

(4)     _Extension of Revolving Credit Commitments_.  In the case of any Extension of Revolving Credit Commitments or Revolving Credit Loans, the following shall apply:

(a)     all borrowings and all prepayments of Revolving Credit Loans shall continue to be made on a ratable basis among all Revolving Credit Lenders, based on the relative amounts of their Revolving Credit Commitments, until the repayment of the Revolving Credit Loans attributable to the non-extended Revolving Credit Commitments on the relevant Maturity Date; provided that the Borrower shall be permitted to repay the Revolving Credit Loans attributable to non-extended Revolving Credit Commitments on the relevant Maturity Date without the necessity of making any pro rata payments to Extending Lenders;

(b)     the allocation of the participation exposure with respect to any then-existing or subsequently issued Letter of Credit as between the Revolving Credit Commitments of such new tranche and the remaining Revolving Credit Commitments shall be made on a ratable basis in accordance with the relative amounts thereof until the Maturity Date relating to such non-extended Revolving Credit Commitments has occurred;

(c)     no termination of extended Revolving Credit Commitments and no repayment of extended Revolving Credit Loans accompanied by a corresponding permanent reduction in extended Revolving Credit Commitments shall be permitted unless such termination or repayment (and corresponding reduction) is accompanied by at least a pro rata termination or permanent repayment (and corresponding pro rata permanent reduction), as applicable, of each other tranche of Revolving Credit Loans and Revolving Credit Commitments (or each other tranche of Revolving Credit Commitments and Revolving Credit Loans shall have otherwise been terminated and repaid in full);

(d)     the Maturity Date with respect to the Revolving Credit Commitments may not be extended without the prior written consent of the Swing Line Lender and the Issuing Banks; and

(e)     at no time shall there be more than three (3) different tranches of Revolving Credit Commitments (or greater than three (3) tranches to the extent agreed by the Administrative Agent).

If the aggregate Outstanding Amount of Revolving Credit Loans, Swing Line Loans and L/C Obligations exceeds the Revolving Credit Commitment as a result of the occurrence of the Maturity Date with respect to any tranche of Revolving Credit Commitments while an extended tranche of Revolving Credit Commitments remains outstanding, the Borrower shall make such payments as are necessary in order to eliminate such excess on such Maturity Date.

(5)    Required Consents.  No consent of any Lender or any other Person will be required to effectuate any Extension, other than the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or condition), the Borrower and the applicable Extending Lender.  The transactions contemplated by this Section 2.16 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Revolving Credit Loans on such terms as may be set forth in the relevant Extension Offer) will not require the consent of any other Lender or any other Person, and the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.16 will not apply to any of the transactions effected pursuant to this Section 2.16.

Section 2.17   Defaulting Lenders.

(1)    Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(a)    Waivers and Amendments.  That Defaulting Lender's right to approve or disapprove of any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)    Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise), shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to the relevant Swing Line Lender or Issuing Banks hereunder; third, as the Borrower may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fourth, to the payment of any amounts owing to the Lenders, the relevant Swing Line Lender or Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the relevant Swing Line Lender or Issuing Banks against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (i) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (ii) such Loans or L/C Borrowings were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Borrowings owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Borrowings owed to, that Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant

to this Section 2.17(1)(b) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(c)    Certain Fees.  That Defaulting Lender (i) shall not be entitled to receive any commitment fee pursuant to Section 2.09(1) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender) and (ii) shall be limited in its right to receive Letter of Credit fees as provided in Section 2.03(9).

(d)    Reallocation of Pro Rata Share to Reduce Fronting Exposure.  During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit or Swing Line Loans pursuant to Section 2.03, the "Pro Rata Share" of each Non-Defaulting Lender's Revolving Credit Loans and L/C Obligations shall be computed without giving effect to the Commitment of that Defaulting Lender; *provided* that (i) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Default or Event of Default has occurred and is continuing; and (ii) the aggregate obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit or Swing Line Loans shall not exceed the positive difference, if any, of (1) the Commitment of that Non-Defaulting Lender *minus* (2) the aggregate Outstanding Amount of the Revolving Credit Loans of that Non-Defaulting Lender.  If the reallocation described above in this clause (d) cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under any law, (x) first, prepay Swing Line Loans in an amount equal to the Swing Line Lender's Fronting Exposure and (y) second, Cash Collateralize the applicable Issuing Bank's Fronting Exposure in accordance with the procedures set forth in Section 2.03.

(2)    Defaulting Lender Cure.  If the Borrower, the Administrative Agent, the Swing Line Lender and the relevant Issuing Banks agree in writing in their sole discretion (such agreement not to be unreasonably withheld or delayed) that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Credit Loans of the applicable Facility and funded and unfunded participations in Letters of Credit and Swing Line Loans to be held on a pro rata basis by the Lenders in accordance with their Pro Rata Share of the applicable Facility (without giving effect to Section 2.17(1)(d)), whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; *provided further* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  So long as any Lender is a Defaulting Lender, (i) the Swing Line Lender shall not be required to fund any Swing Line Loans unless it is satisfied that it will have no Fronting Exposure after giving effect to such Swing Line Loan and (ii) no Issuing Bank shall be required to issue, extent, renew or increase any Letter of Credit unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

## ARTICLE III

### Taxes, Increased Costs Protection and Illegality

Section 3.01    Taxes.

(1)     Except as required by applicable Law, any and all payments by any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes.

(2)     If any Loan Party or any other applicable withholding agent is required by applicable Law (as determined in the good faith discretion of such Loan Party or withholding agent) to make any deduction or withholding on account of any Taxes from any sum paid or payable by any Loan Party to any Lender or Agent under any of the Loan Documents:

(a)     the applicable Loan Party shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as such Loan Party becomes aware of it;

(b)     the applicable Loan Party or other applicable withholding agent shall be entitled to make such deduction or withholding and shall pay any amounts deducted or withheld to the relevant Governmental Authority any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on the Lender or Agent) on behalf of and in the name of the Lender or Agent (as applicable);

(c)     if the Tax in question is a Non-Excluded Tax or Other Tax, the sum payable to such Lender or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding for Non-Excluded Taxes or Other Taxes (including any deductions or withholdings for Non-Excluded Taxes or Other Taxes attributable to any payments required to be made under this Section 3.01), the Lender or the Agent (as applicable) receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and

(d)     within thirty days after paying any sum from which it is required by Law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (b) above to pay, the Borrower shall deliver to the Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(3)     <u>Status of Lender.</u>  The Administrative Agent and each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to such Lender under any Loan Document.  Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(3)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and Administrative Agent of its inability to do so.

Without limiting the foregoing:

(a)     Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(b)     Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(i)     two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(ii)     two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (A) two properly completed and duly signed certificates substantially in the form of Exhibit H (any such certificate, a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(iv)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed originals of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, Form W-8BEN or W-8BEN-E, as applicable, a United States Tax Compliance Certificate, Form W-9, Form W-8IMY and any other required information (or any successor forms) from each beneficial owner that would be required under this Section 3.01(3) if such beneficial owner were a Lender, as applicable (*provided* that if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such beneficial owner), or

(v)     two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding Tax on any payments to such Lender under the Loan Documents.

(c)     If a payment made to a Lender under any Loan Document would be subject to Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this paragraph, the term "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(4)     In addition to the payments by a Loan Party required by Section 3.01(2), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(5)     The Loan Parties shall, jointly and severally, indemnify a Lender or Agent (each a "**Tax Indemnitee**"), within 10 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee on or attributable to any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Administrative Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(6)     If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), then such Tax Indemnitee shall pay to the relevant Loan Party the amount of such refund, net of all out-of-pocket expenses of the Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee to the extent the Tax Indemnitee is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (6), in no event will the Tax Indemnitee be required to pay any amount to a Loan Party pursuant to this paragraph (6) the payment of which would place the Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(7)     For purposes of determining withholding Taxes imposed under FATCA, from and after the Closing Date of this Agreement, the Borrower and the Agents shall treat (and the Lenders hereby authorize the Agents to treat) this Agreement as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

(8)     The agreements in this Section 3.01 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 3.02    Illegality.  If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on written notice thereof by such Lender to the Borrower through the Administrative Agent, (1) any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended, and (2) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be reasonably determined by the Administrative Agent without reference to the Eurodollar Rate

component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (a) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans and shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate) and (b) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate component of the Base Rate with respect to any Base Rate Loans, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03   Inability to Determine Rates.

(a)   If in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof, (i) the Administrative Agent determines that (A) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, or (B) (x) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan or in connection with an existing or proposed Base Rate Loan and (y) the circumstances described in Section 3.03(c)(i) do not apply (in each case with respect to this clause (i), "**Impacted Loans**"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurodollar Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended, (to the extent of the affected Eurodollar Rate Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (ii) of Section 3.03(a), until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)   Notwithstanding the foregoing, if the Administrative Agent has made the determination described in clause (i) of Section 3.03(a), the Administrative Agent, in consultation with the Borrower and Required Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (i) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under clause (i) of the first sentence of Section 3.03(a), (ii) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (iii) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate

or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

(c)     Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower) that the Borrower or Required Lenders (as applicable) have determined, that:

(i)     adequate and reasonable means do not exist for ascertaining LIBOR for any Interest Period hereunder or any other tenors of LIBOR, including, without limitation, because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)     the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator has made a public statement identifying a specific date after which LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide LIBOR after such specific date (such specific date, the "**Scheduled Unavailability Date**"); or

(iii)     the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over such administrator has made a public statement announcing that all Interest Periods and other tenors of LIBOR are no longer representative; or

(iv)     syndicated loans currently being executed, or that include language similar to that contained in this Section 3.03, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, in the case of clauses (i)-(iii) above, on a date and time determined by the Administrative Agent (any such date, the "**LIBOR Replacement Date**"), which date shall be at the end of an Interest Period or on the relevant interest payment date, as applicable, for interest calculated and shall occur reasonably promptly upon the occurrence of any of the events or circumstances under clauses (i), (ii) or (iii) above and, solely with respect to clause (ii) above, no later than the Scheduled Unavailability Date, LIBOR will be replaced hereunder and under any Loan Document with, subject to the proviso below, the first available alternative set forth in the order below for any payment period for interest calculated that can be determined by the Administrative Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "**LIBOR Successor Rate**"; and any such rate before giving effect to the Related Adjustment, the "**Pre-Adjustment Successor Rate**"):

(x)     Term SOFR *plus* the Related Adjustment; and

(y)     SOFR *plus* the Related Adjustment;

and in the case of clause (iv) above, the Borrower and Administrative Agent may amend this Agreement solely for the purpose of replacing LIBOR under this Agreement and under any other Loan Document in accordance with the definition of "LIBOR Successor Rate" and such amendment will become effective at 5:00 p.m., on the fifth Business Day after the Administrative Agent shall have notified all Lenders and the Borrower of the occurrence of the circumstances described in clause (iv) above unless, prior to such time,

Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to the implementation of a LIBOR Successor Rate pursuant to such clause;

*provided* that, if the Administrative Agent determines that Term SOFR has become available, is administratively feasible for the Administrative Agent and would have been identified as the Pre-Adjustment Successor Rate in accordance with the foregoing if it had been so available at the time that the LIBOR Successor Rate then in effect was so identified, and the Administrative Agent notifies the Borrower and each Lender of such availability, then from and after the beginning of the Interest Period, relevant interest payment date or payment period for interest calculated, in each case, commencing no less than thirty (30) days after the date of such notice, the Pre-Adjustment Successor Rate shall be Term SOFR and the LIBOR Successor Rate shall be Term SOFR *plus* the relevant Related Adjustment.

The Administrative Agent will promptly (in one or more notices) notify the Borrower and each Lender of (x) any occurrence of any of the events, periods or circumstances under clauses (i) through (iii) above, (y) a LIBOR Replacement Date and (z) the LIBOR Successor Rate.

Any LIBOR Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Administrative Agent, such LIBOR Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

Notwithstanding anything else herein, if at any time any LIBOR Successor Rate as so determined would otherwise be less than the LIBOR Floor, the LIBOR Successor Rate will be deemed to be the LIBOR Floor for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a LIBOR Successor Rate, the Administrative Agent will have the right to make LIBOR Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such LIBOR Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such LIBOR Successor Rate Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

If the events or circumstances of the type described in 3.03(c)(i)-(iii) have occurred with respect to the LIBOR Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "LIBOR Successor Rate."

(d)     Notwithstanding anything to the contrary herein, (i) after any such determination by the Administrative Agent or receipt by the Administrative Agent of any such notice described under Section 3.03(c)(i)-(iii), as applicable, if the Administrative Agent determines that none of the LIBOR Successor Rates is available on or prior to the LIBOR Replacement Date, (ii) if the events or circumstances described in Section 3.03(c)(iv) have occurred but none of the LIBOR Successor Rates is available, or (iii) if the events or circumstances of the type described in Section 3.03(c)(i)-(iii) have occurred with respect to the LIBOR Successor Rate then in effect and the Administrative Agent determines that none of the LIBOR Successor Rates is available, then in each case, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing LIBOR or any then current LIBOR Successor Rate in accordance with this Section 3.03 at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with another alternate benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any Related Adjustments and any other mathematical or other adjustments to such benchmark

giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated. For the avoidance of doubt, any such proposed rate and adjustments shall constitute a LIBOR Successor Rate. Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to such amendment.

(e)    If, at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, no LIBOR Successor Rate has been determined in accordance with clauses (c) or (d) of this Section 3.03 and the circumstances under clauses (c)(i) or (c)(iii) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended, (to the extent of the affected Eurodollar Rate Loans, Interest Periods, interest payment dates or payment periods), and (y) the Eurodollar Rate component shall no longer be utilized in determining the Base Rate, until the LIBOR Successor Rate has been determined in accordance with clauses (c) or (d). Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans, Interest Periods, interest payment dates or payment periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loan.

(1)    Increased Costs Generally.  If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(b)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes or Other Taxes covered by Section 3.01 and any Excluded Taxes); or

(c)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender that is not otherwise accounted for in the definition of "Eurodollar Rate" or this clause (c);

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan the interest on which is determined by reference to the Eurodollar Rate (or of maintaining its obligation to make any such Loan or Letter of Credit), or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this

Section 3.04(1) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(2)     Capital Requirements.  If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it, or participations in or issuance of Letters of Credit by such Lender, to a level below that which such Lender or such Lender's holding company, as the case may be, could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(2) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(3)     Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (1) or (2) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

Section 3.05     Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits or margin) actually incurred by it as a result of:

(1)     any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(2)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurodollar Rate Loan on the date or in the amount notified by the Borrower; or

(3)     any assignment of a Eurodollar Rate Loan on a day prior to the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 3.07; including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Eurodollar Rate Loan or from fees payable to terminate the deposits from which such funds were obtained.

Notwithstanding the foregoing, no Lender may make any demand under this Section 3.05 with respect to the "floor" specified in the proviso to the definition of "Eurodollar Rate".

Section 3.06     Matters Applicable to All Requests for Compensation.

(1)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

(2)     Suspension of Lender Obligations.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurodollar Rate Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Eurodollar Rate Loans until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(3) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(3)     Conversion of Eurodollar Rate Loans.  If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurodollar Rate Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders, as applicable, are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans to the extent necessary so that, after giving effect thereto, all Loans of a given Class held by the Lenders of such Class holding Eurodollar Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

(4)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of Sections 3.01 or 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of Section 3.01 or 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event giving rise to such claim and of such Lender's intention to claim compensation therefor (except that, if the circumstance giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.07   Replacement of Lenders under Certain Circumstances.  If (1) any Lender requests compensation under Section 3.04 or ceases to make Eurodollar Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (2) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or 3.04, (3) any Lender is a Non-Consenting Lender or Non-Extended Lender, (4) any Lender becomes a Defaulting Lender or (5) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent:

(a)        require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement (or, with respect to clause (3) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver, or amendment, as applicable) and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(i)        the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(iv);

(ii)        such Lender shall have received payment of an amount equal to the applicable outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05);

(iii)        such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to all, or a portion, as applicable, of such Lender's Commitment and outstanding Loans and participations in L/C Obligations and Swing Line Loans and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Notes shall be deemed to be canceled upon such failure;

(iv)        the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans and Commitments, except with respect to indemnification and confidentiality provisions under this Agreement, which shall survive as to such assigning Lender;

(v)        in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(vi)        such assignment does not conflict with applicable Laws;

(vii)        any Lender that acts as an Issuing Bank may not be replaced hereunder at any time when it has any Letter of Credit outstanding hereunder unless arrangements reasonably satisfactory to such Issuing Bank (including the furnishing of a back-up standby letter of credit in form and substance, and issued by an issuer, reasonably satisfactory to such Issuing Bank or the depositing of Cash Collateral into a Cash Collateral Account in amounts and pursuant to arrangements reasonably satisfactory to such Issuing Bank) have been made with respect to each such outstanding Letter of Credit; and

(viii)        the Lender that acts as Administrative Agent cannot be replaced in its capacity as Administrative Agent other than in accordance with Section 9.11, or

(b)        terminate the Commitment of such Lender or Issuing Bank, as the case may be, and (A) in the case of a Lender (other than an Issuing Bank), repay all Obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date

and (B) in the case of an Issuing Bank, repay all Obligations of the Borrower owing to such Issuing Bank relating to the Loans and participations held by such Issuing Bank as of such termination date and Cash Collateralize, cancel or backstop, or provide for the deemed reissuance under another facility, on terms satisfactory to such Issuing Bank any Letters of Credit issued by it; *provided* that in the case of any such termination of the Commitment of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable consent, waiver or amendment of the Loan Documents and such termination shall, with respect to clause (3) above, be in respect of all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment.

(c)     In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans/Commitments and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

(d)     A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(e)     Notwithstanding anything herein to the contrary, each party hereto agrees that any assignment pursuant to the terms of this Section 3.07 may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender making such assignment need not be a party thereto

Section 3.08     Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment, satisfaction or discharge of all other Obligations under this Agreement and resignation of the Administrative Agent.

## ARTICLE IV

### Conditions Precedent to Revolving Credit Borrowings

Section 4.01     Conditions to Effectiveness of this Agreement on Closing Date.  The effectiveness of this Agreement on the Closing Date was subject to satisfaction (or waiver) of the following conditions precedent:

(1)     The Administrative Agent's receipt of the following, each of which shall be originals, facsimiles or copies in .pdf format (followed promptly by originals) (unless otherwise reasonably agreed by the Administrative Agent) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party:

(a)     a Committed Loan Notice;

(b)     executed counterparts of this Agreement and the Guaranty;

(c)     each Collateral Document set forth on Schedule 4.01(1)(c) required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party that is party thereto, together with:

142

(i)    certificates, if any, representing the Pledged Collateral referred to therein, and to the extent certificated, accompanied by undated stock or note powers executed in blank; and

(ii)    evidence that all UCC-1 financing statements in the jurisdiction of organization of each Loan Party that the Administrative Agent and the Collateral Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been provided for, and arrangements for the filing thereof in a manner reasonably satisfactory to the Administrative Agent shall have been made;

(d)    (i) certificates of good standing from the secretary of state of the state of organization of each Loan Party (to the extent such concept exists in such jurisdiction), (ii) customary certificates of resolutions or other action, incumbency certificates or other certificates of Responsible Officers of each Loan Party evidencing the authority of each Loan Party to enter into the applicable Loan Documents and the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date, and (iii) copies of each Loan Party's organization documents as of the Closing Date;

(e)    a customary legal opinion from (i) Kirkland & Ellis LLP, special counsel to the Loan Parties, (ii) Moore & Van Allen PLLC, North Carolina and South Carolina counsel to the Loan Parties and (iii) Brunini, Grantham, Grower & Hewes, PLLC, Mississippi counsel to the Loan Parties;

(f)    a solvency certificate from a Financial Officer of the Borrower (after giving effect to the Closing Date Transactions) substantially in the form attached hereto as <u>Exhibit I</u>; and

(g)    a Borrowing Base Certificate that calculates the Borrowing Base as of October 31, 2015;

*provided*, *however*, that each of the requirements set forth in clause (1)(c) above, including the delivery of any document(s) or instrument(s) necessary to satisfy the Collateral and Guarantee Requirement (except for the execution and delivery of the Security Agreement and to the extent that a Lien on Collateral may be perfected by (x) the filing of a financing statement under the UCC or (y) the delivery of the stock certificate of the Initial Borrower and the wholly owned Material Domestic Subsidiaries of Belk (or stock certificates of such wholly owned Material Domestic Subsidiaries delivered to the Initial Borrower on the Closing Date, if the Initial Borrower has used commercially reasonable efforts to procure the delivery thereof prior to the Closing Date)) will not constitute conditions precedent to the Borrowing on the Closing Date after the Initial Borrower's use of commercially reasonable efforts to provide such items on or prior to the Closing Date if the Initial Borrower agrees to deliver, or cause to be delivered, such documents and instruments, or take or cause to be taken such other actions as may be required to perfect such security interests within ninety (90) days after the Closing Date (subject to extensions approved by the Administrative Agent in its reasonable discretion) or, in the case of stock certificates of Belk, no later than 5:00 p.m., New York time, on the Closing Date;

*provided further* that with respect to the requirements set forth in clauses (1)(b), (1)(c) or (1)(d) above, each Loan Document (or certificate or other document) required to be executed and delivered on the Closing Date by any Loan Party other than Holdings or Initial Borrower will not constitute conditions precedent to the borrowing of Revolving Credit Loans on the Closing Date; *provided* that each of Belk and its Restricted Subsidiaries that are Loan Parties will execute and deliver any such document(s) substantially concurrently with the consummation of the Merger, but no later than 5:00 p.m. on the Closing Date.

(2)     The Arrangers shall have received (i) the Closing Date Annual Financial Statements, and (ii) the Closing Date Quarterly Financial Statements; provided that the filing of the required financial statements on Form 10-K and Form 10-Q with the SEC within the required time periods by the Acquired Company will constitute receipt by the Arrangers of the Closing Date Annual Financial Statements and the Closing Date Quarterly Financial Statements.

(3)     The Administrative Agent and the Arrangers shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information in respect of Holdings and the Borrower reasonably determined by the Administrative Agent or the Arrangers to be required by applicable regulatory authorities required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, that has been reasonably requested by the Administrative Agent or the Arrangers in writing by it at least ten (10) Business Days prior to the Closing Date.

(4)     The Arrangers shall have received a certification by a Responsible Officer of the Initial Borrower, to the knowledge of the Initial Borrower (other than with respect to any Specified Representations), that the conditions set forth in clauses (5) and (7) of this Section 4.01 have been satisfied.

(5)     The Specified Representations and the Specified Acquisition Agreement Representations shall be true and correct in all material respects on and as of the Closing Date; provided that to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that the condition precedent in this clause (5) with respect to Specified Acquisition Agreement Representations shall fail to be satisfied only to the extent a breach of such Specified Acquisition Agreement Representations results in a failure of a condition precedent to the obligation of Holdings or the Initial Borrower to consummate the Merger pursuant to the terms of the Transaction Agreement or provides Holdings or the Initial Borrower with the right to, pursuant to the Transaction Agreement, terminate its obligations under the Transaction Agreement or decline to consummate the Merger as a result of the breach of such Specified Acquisition Agreement Representations.

(6)     The Arrangers shall have received a certification by a Responsible Officer of the Initial Borrower that prior to or substantially concurrently with the funding of Revolving Credit Loans borrowed on the Closing Date, (i) the Equity Contribution (subject to any reduction pursuant to the second proviso of this Section 4.01(6)) shall have been consummated; and (ii) the Merger shall have been consummated in all material respects in accordance with the terms of the Transaction Agreement, after giving effect to any modifications, amendments, supplements, consents, waivers or requests, other than those modifications, amendments, supplements, consents, waivers or requests (including the effects of any such requests) made by Holdings or the Initial Borrower that are materially adverse to the interests of the Lenders;

provided that each of the following will be deemed to be materially adverse to the interests of the Lenders:

(i)     any change to the definition of "Company Material Adverse Effect" contained in the Transaction Agreement as in effect on August 23, 2015,

(ii)     any waiver of or amendment to the representation contained in the Transaction Agreement that since January 31, 2015 through the date of the Transaction Agreement, there has not been any event or effect that has had, or would reasonably be expected to have, individually

or in the aggregate, a "Company Material Adverse Effect" (as defined in the Transaction Agreement); and

(iii)     any amendment to the "Xerox" provisions contained in the Transaction Agreement in effect on August 23, 2015;

*provided further* that (i) any reduction in the amount of consideration required to consummate the Merger shall be deemed not to be materially adverse to the interest of the Lenders so long as any reduction will be allocated (A) first, to a reduction in the Equity Contribution so long as the Equity Contribution is no less than 22.5% of the Total Capitalization (as defined in the Commitment Letter) and (B) thereafter (1) 77.5% to a reduction in the First Lien Loans and the Second Lien Loans (on a *pro rata* basis without giving effect to certain adjustments that may otherwise be agreed) and (2) 22.5% to the Equity Contribution and (ii) any increase in the purchase price of, or consideration for the Merger shall not be deemed to be materially adverse to the interests of the Lenders so long as such increase is not funded with any Indebtedness.

(7)     Since August 23, 2015, there has not been any Circumstance (as defined in the Transaction Agreement as in effect on August 23, 2015) that has had, or would reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect (as defined in the Transaction Agreement).

(8)     All fees required to be paid pursuant to the Fee Letter on the Closing Date and reasonable out-of-pocket expenses required to be paid on the Closing Date pursuant to the Commitment Letter, to the extent invoiced at least 3 Business Days prior to the Closing Date shall have been paid in full in cash substantially concurrently with the borrowing Revolving Credit Loans on the Closing Date (which amounts may, at the option of the Borrower, be offset against the proceeds of the Revolving Credit Loans borrowed on the Closing Date).

(9)     Prior to or substantially concurrently with the funding of the Revolving Credit Loans borrowed on the Closing Date and the initial borrowings under the First Lien Facility and the Second Lien Facility, the Closing Date Refinancing shall have been consummated.

(10)     The terms and conditions of the Second Lien Loan Documents shall be consistent with the terms and conditions previously agreed between the Borrower and the Arrangers.

(11)     The Administrative Agent shall have received the ABL Intercreditor Agreement and Term Intercreditor Agreement acknowledged and delivered by the Borrower and the other Loan Parties party thereto.

Without limiting the generality of the provisions of the last paragraph of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02    Conditions to Credit Extensions after Closing Date.

Except as set forth in Section 2.14(6) with respect to Incremental Revolving Credit Loans and 2.16(2) with respect to Extended Revolving Credit Loans, and subject to Section 1.07(8), the obligation of each Lender to honor any Request for Credit Extension (other than (x) a Committed Loan Notice

requesting only a conversion of Loans to the other Type or a continuation of Eurodollar Rate Loans or (y) borrowings made pursuant to Section 2.14 in connection with a Limited Condition Acquisition to be funded with the proceeds of a FILO Tranche) after the Closing Date, is subject to the following conditions precedent:

(1)     The representations and warranties of the Borrower contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(2)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of proceeds therefrom.

(3)     The Administrative Agent, and, if applicable, the relevant Issuing Bank or the Swing Line Lender (as applicable) shall have received a Request for Credit Extension in accordance with the requirements hereof.

(4)     Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Eurodollar Rate Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(1) and 4.02(2) have been satisfied on and as of the date of the applicable Credit Extension.

(5)     After giving effect to the Loans or Letters of Credit requested to be made or issued on any such date and the use of proceeds thereof, the Total Outstandings shall not exceed the Maximum Borrowing Amount at such time.

In addition, solely to the extent the Borrower has delivered to the Administrative Agent a notice of intent to cure pursuant to Section 8.04, no request for Borrowing shall be honored after delivery of such notice until the applicable Cure Amount specified in such notice is actually received by the Borrower.  For the avoidance of doubt, the preceding sentence shall have no effect on the continuation or conversion of any Loans outstanding.

## ARTICLE V

### Representations and Warranties

The Borrower represents and warrants to the Administrative Agent and the Lenders, after giving effect to the Merger, at the time of each Credit Extension (solely to the extent required to be true and correct for such Revolving Credit Borrowing pursuant to Article IV or Section 2.14, as applicable):

Section 5.01    Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each of its respective Restricted Subsidiaries that is a Material Subsidiary:

(1)     is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction),

(2)      has all corporate or other organizational power and authority to (a) own or lease its assets and carry on its business as currently conducted and (b) in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party,

(3)      is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business as currently conducted requires such qualification,

(4)      is in compliance with all applicable Laws, orders, writs, injunctions and orders and

(5)      has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted;

except in each case referred to in the preceding clauses (2)(a), (3), (4) or (5), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.02    Authorization; No Contravention.

(1)      The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.

(2)      None of the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party will:

(a)      contravene the terms of any of such Person's Organizational Documents;

(b)      result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 7.01) under (i) any Contractual Obligation in excess of the Threshold Amount to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan party or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject; or

(c)      violate any applicable Law;

except with respect to any breach, contravention or violation (but not creation of Liens) referred to in the preceding clauses (b) and (c), to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.03    Governmental Authorization.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for:

(1)      filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties,

(2)      the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and

(3)      those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.04    Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party hereto or thereto, as applicable.  Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05    Financial Statements; No Material Adverse Effect.

(1)      The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the date(s) thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (i) except as otherwise expressly noted therein and (ii) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(2)      Since the Third Amendment Effective Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06    Litigation.  Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

Section 5.07    Labor Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (1) there are no strikes or other labor disputes against the Borrower or the Restricted Subsidiaries pending or, to the knowledge of the Borrower, overtly threatened in writing and (2) hours worked by and payment made based on hours worked to employees of each of the Borrower or the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

Section 5.08    Ownership of Property; Liens.  Each Loan Party and each of its respective Restricted Subsidiaries has good and valid record title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.09   <u>Environmental Matters</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) each Loan Party and each of its Restricted Subsidiaries and their respective operations and properties is in compliance with all applicable Environmental Laws; (b) each Loan Party and each of its Restricted Subsidiaries has obtained and maintained all Environmental Permits required to conduct their operations; (c) none of the Loan Parties or any of their respective Restricted Subsidiaries has become subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim in writing or Environmental Liability; and (d) none of the Loan Parties or any of their respective Restricted Subsidiaries or, to the knowledge of the Borrower, predecessors has treated, stored, transported or Released Hazardous Materials at or from any currently or formerly owned, leased or operated real estate or facility.

Section 5.10   <u>Taxes</u>.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Loan Party and each of its Restricted Subsidiaries has timely filed all Tax returns and reports required to be filed, and have timely paid all Taxes (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets (whether or not shown in a Tax return), which are due and payable, except those Taxes which are being contested in good faith by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP.

There is no proposed Tax assessment, deficiency or other claim against any Loan Party or any of its Restricted Subsidiaries except (i) those being actively contested by a Loan Party or such Restricted Subsidiary in good faith and by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP or (ii) those which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 5.11   <u>ERISA Compliance</u>.

(1)   Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(2)   (a)   No ERISA Event has occurred or is reasonably expected to occur;

(b)   no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan;

(c)   none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan;

(d)   none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and

(e)   neither any Loan Party nor any ERISA Affiliate has been notified in writing by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent or has been determined to be in endangered or critical status and no such Multiemployer Plan is expected to be insolvent or in endangered or critical status,

except, with respect to each of the foregoing clauses of this Section 5.11(2), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(3)     Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, (a) each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and (b) none of Holdings, the Borrower or any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

(4)     The Borrower is not an entity deemed to hold "plan assets" (within the meaning of ERISA), and provided the Loan is not funded with "plan assets," neither the making of any loan or any outstanding loan hereunder will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

Section 5.12    Subsidiaries.

(1)     As of the Third Amendment Effective Date, all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable, and all Equity Interests owned by Holdings in the Borrower, and by the Borrower or any Subsidiary Guarantor in any of their respective Subsidiaries are owned free and clear of all Liens of any person except (a) those Liens created under the Collateral Documents, the "Collateral Documents" (as defined in the First Lien Credit Agreement) and the "Collateral Documents" (as defined in the Second Lien Credit Agreement) and (b) any nonconsensual Lien that is permitted under Section 7.01.

(2)     As of the Third Amendment Effective Date, Schedule 5.12 sets forth:

(a)     the name and jurisdiction of each Subsidiary,

(b)     the ownership interests of Holdings in the Borrower and of the Borrower and any Subsidiary of the Borrower in each Subsidiary, including the percentage of such ownership, and

(c)     the Equity Interests of each Subsidiary described in clause (b) that were required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.13    Margin Regulations; Investment Company Act.

(a)     No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)     No Loan Party is an "investment company" under the Investment Company Act of 1940.

Section 5.14    Disclosure.  None of the written information and written data heretofore or contemporaneously furnished in writing by or on behalf of the Borrower or any Subsidiary Guarantor to any Agent or any Lender on or prior to the Closing Date in connection with the Closing Date Transactions, when taken as a whole, when furnished, contains any material misstatement of fact or omits to state any material fact necessary to make such written information and written data taken as a whole, in the light of the circumstances under which it was delivered, not materially misleading (after giving effect to all modifications and supplements to such written information and written data, in each case, furnished after the date on which such written information or such written data was originally delivered and prior to

the Closing Date); it being understood that for purposes of this Section 5.14, such written information and written data shall not include any projections, *pro forma* financial information, financial estimates, forecasts and forward-looking information or information of a general economic or general industry nature.

Section 5.15    Intellectual Property; Licenses, etc.  The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, technology, software, know-how database rights and other intellectual property rights (collectively, "**IP Rights**") that to the knowledge of the Borrower are reasonably necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any Subsidiary of the Borrower as currently conducted does not infringe upon, dilute, misappropriate or violate any IP Rights held by any Person except for such infringements, dilutions, misappropriations or violations, individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Subsidiary, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.16    Solvency.  On the Third Amendment Effective Date and after giving effect to the Third Amendment Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act.  To the extent applicable, Holdings, Borrower and the Restricted Subsidiaries are in compliance, in all material respects, with (i) the USA PATRIOT Act, (ii) the United States Foreign Corrupt Practices Act of 1977 (the "**FCPA**"), (iii) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (iv) all other applicable Anti-Terrorism Laws. None of Holdings, Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer or employee of any of Holdings, the Borrower or any of the Restricted Subsidiaries, is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") ("**Sanctions**").  No proceeds of the Loans will be used by Holdings, the Borrower or any Restricted Subsidiary (a) directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business, or to obtain any improper advantage, in violation of the FCPA or (b) for the purpose of financing activities of or with any Person, that, at the time of such financing, is the subject of any Sanctions administered by OFAC. None of Holdings, Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer or employee of any of Holdings, the Borrower or any of the Restricted Subsidiaries is: (a) located, organized, or ordinarily resident in a country or territory that is subject to a comprehensive trade embargo administered by OFAC (presently, Cuba, Iran, North Korea, Sudan, Syria, or the Crimea region of Ukraine (collectively, "**Sanctioned Countries**")); (b) identified on OFAC's Specially Designated Nationals and Blocked Persons List ("**SDNs**"); (c) majority owned by one or more SDNs (collectively with SDNs, "**Sanctioned Persons**"); or (d) engaged, directly or knowingly indirectly, in dealings or transactions in or with Sanctioned Countries or Sanctioned Persons that are prohibited by Sanctions.

Section 5.18    Collateral Documents.  Except as otherwise contemplated hereby or under any other Loan Documents and subject to limitations set forth in the Collateral and Guarantee Requirement, the provisions of the Collateral Documents, together with such filings and other actions required to be

taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Collateral required to be delivered pursuant hereto or the applicable Collateral Documents), are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien (subject to Liens permitted by Section 7.01) with the priority set forth in the Applicable Intercreditor Agreement on all right, title and interest of the respective Loan Parties in the Collateral described therein.

Notwithstanding anything herein (including this Section 5.18) or in any other Loan Document to the contrary, no Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) any Excluded Assets.

Section 5.19    Use of Proceeds.  The Borrower has used the proceeds of the Loans issued hereunder only in compliance with (and not in contravention of) each Loan Document.

Section 5.20    Beneficial Ownership Certification. As of the First Amendment Effective Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

## ARTICLE VI

## Affirmative Covenants

So long as the Termination Conditions have not been satisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

Section 6.01    Financial Statements.  Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender each of the following:

(1)    as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or, with respect to the fiscal year of the Borrower ended January 30, 2021, one hundred and five (105) days after the end of such fiscal year), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, together with related notes thereto and management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, setting forth in each case in comparative form the figures for the previous fiscal year, in reasonable detail and all prepared in accordance with GAAP, audited and accompanied by a report and opinion of PricewaterhouseCoopers, LLP, KPMG LLP or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Administrative Agent, which report and opinion (a) will be prepared in accordance with generally accepted auditing standards and (b) other than with respect to the report and opinion for fiscal year ending January 30, 2021, will not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than with respect to (i) an upcoming maturity of the

Loans under this Agreement, the First Lien Facility or the Second Lien Facility, or (ii) any anticipated inability to satisfy any financial maintenance covenant);

(2)      as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (a) condensed consolidated statement of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (b) condensed consolidated statement of cash flows for the portion of the fiscal year then ended, setting forth, in each case of the preceding clauses (a) and (b), in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, accompanied by an Officer's Certificate stating that such financial statements fairly present in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes, together with management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower;

(3)      as soon as available, but in any event within (x) thirty (30) days after the end of each of the first two (2) fiscal months of each fiscal quarter of the Borrower, (y) except as provided in clause (z) below, forty-five (45) days after the end of the third fiscal month of each fiscal quarter of the Borrower and (z) sixty (60) days after the end of the last fiscal month of each fiscal year of the Borrower, a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month, and the related (a) condensed consolidated statement of income or operations for such fiscal month and for the portion of the fiscal year then ended and (b) condensed consolidated statement of cash flows for the portion of the fiscal year then ended, setting forth, in each case of the preceding clauses (a) and (b), in comparative form the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, accompanied by an Officer's Certificate stating that such financial statements fairly present in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes;

(4)      within ninety (90) days after the end of each fiscal year of the Borrower, (I) a consolidated budget for the following fiscal year on a quarterly basis as customarily prepared by management of the Borrower for its internal use (including (x) any projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected operations or income, in each case, to the extent prepared by management of the Borrower and included in such consolidated budget and (y) an Availability Model), which projected financial statements shall be prepared in good faith on the basis of assumptions believed to be reasonable at the time of preparation of such projected financial statements (it being understood by the Secured Parties that any such projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and the Investors and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material) and (II) a consolidated monthly forecast prepared on a monthly basis by management of the Borrower, including information of the type that would otherwise be included in clause (I) above but presented on a monthly basis;

(5)      simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(1), 6.01(2) and 6.01(3), the related unaudited (it being understood that such information may be audited at the option of the Borrower) consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; and

(6)        quarterly, upon request of the Administrative Agent, at a time mutually agreed with the Administrative Agent that is promptly after the delivery of the information required pursuant to Section 6.01(1) and Section 6.01(2) above, as applicable, to participate in a conference call for Lenders to discuss the financial position and results of operations of the Borrower and its Subsidiaries for the most recently ended period for which financial statements have been delivered.

Notwithstanding the foregoing, the obligations referred to in Sections 6.01(1) and 6.01(2) may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any Parent Company or (B) the Borrower's or such Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC (and the public filing of such report with the SEC shall constitute delivery under this Section 6.01); *provided* that with respect to each of the preceding clauses (A) and (B), (1) to the extent such information relates to a parent of the Borrower, if and so long as such Parent Company will have Independent Assets or Operations, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such Parent Company and its Independent Assets or Operations, on the one hand, and the information relating to the Borrower and the consolidated Restricted Subsidiaries on a stand-alone basis, on the other hand and (2) to the extent such information is in lieu of information required to be provided under Section 6.01(1) (it being understood that such information may be audited at the option of the Borrower), such materials are accompanied by a report and opinion of PricewaterhouseCoopers, LLP, KPMG LLP or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Administrative Agent, which report and opinion (x) shall be prepared in accordance with generally accepted auditing standards and (y) shall not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than with respect to (i) an upcoming maturity of the Loans under this Agreement, the First Lien Facility or the Second Lien Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant).

Any financial statements required to be delivered pursuant to Sections 6.01(1) or 6.01(2) shall not be required to contain all purchase accounting adjustments relating to the Closing Date Transactions or the Third Amendment Transactions or any other transaction(s) permitted hereunder to the extent it is not practicable to include any such adjustments in such financial statements.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP, or the respective interpretation thereof, and that such restatements will not result in a Default or an Event of Default under the Loan Documents.

Section 6.02    Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender:

(1)        no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(1), (2) and (3), a duly completed Compliance Certificate signed by a Financial Officer of the Borrower;

(2)        promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement

on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(3)     promptly after the furnishing thereof, copies of any notices of default to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the First Lien Facility and/or the Second Lien Facility, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount (in each case, other than in connection with any board observer rights) and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(4)     together with the delivery of the Compliance Certificate with respect to the financial statements referred to in Section 6.01(1), (a) a report setting forth the information required by Sections 1(a), (e) and (f) and Section 11 of the Perfection Certificate (or confirming that there has been no change in such information since the latter of the Closing Date or the last such report) and (b) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such list or a confirmation that there is no change in such information since the later of the Closing Date and the last such list; and

(5)     promptly, such additional information regarding the business and financial affairs of any Loan Party or any Material Subsidiary that is a Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request in writing from time to time.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02(2) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's (or any Parent Company's) website on the Internet at the website address listed on Schedule 10.02 hereto (or as such address may be updated from time to time in accordance with Section 10.02); or (b) on which such documents are posted on the Borrower's behalf on SyndTrak or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (i) upon written request by the Administrative Agent, the Borrower will deliver paper copies of such documents to the Administrative Agent for further distribution by the Administrative Agent to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents or link and, upon the Administrative Agent's request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on SyndTrak or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may have personnel who do not wish to receive any information with respect to the Borrower, its Subsidiaries or their respective securities that is not Public-Side Information, and who may be engaged in investment and other market-related activities with respect to such Person's securities.  The Borrower hereby agrees that (i) at the Administrative Agent's request, all Borrower Materials that are to be made available to Public Lenders will be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" will appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower will be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials

as containing only Public-Side Information (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they will be treated as set forth in Section 10.09); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information"; and (iv) the Administrative Agent and the Arrangers will treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated as "Public Side Information." Notwithstanding the foregoing, the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC."

Anything to the contrary notwithstanding, nothing in this Agreement will require Holdings, the Borrower or any Subsidiary to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.03    Notices.  Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent, who will in turn notify the Lenders (it being understand that the failure to so notify shall not constitute a Default or an Event of Default hereunder), of:

(1)    any Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(2)    (a) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (b) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or its Subsidiary, or (c) the occurrence of any ERISA Event that, in any such case referred to in clauses (a), (b) or (c) of this Section 6.03(2), has resulted or would reasonably be expected to result in a Material Adverse Effect; and

(3)    any material change in accounting policies or financial reporting practices by any Loan Party with respect Accounts Receivable, Credit Card Processor Accounts and Inventory or other changes, in each case, which impact the calculation of the Borrowing Base or Reserves in a manner that is adverse to the interests of the Lenders.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (a) that such notice is being delivered pursuant to Section 6.03(1) or (2) (as applicable) and (b) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04    Payment of Obligations.  Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (1) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (2) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 6.05    Preservation of Existence, etc.

(1)    Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(2)      take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, and IP Rights material to the conduct of its business,

(3)      except in the case of clauses (1) or (2) to the extent (other than with respect to the preservation of the existence of the Borrower set forth in clause (1)) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or disposition permitted by Article VII.

Section 6.06    Maintenance of Properties.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in reasonably good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

Section 6.07    Maintenance of Insurance.  Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed or with a Captive Insurance Subsidiary, insurance with respect to the Borrower's and the Restricted Subsidiaries' properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried; *provided* that notwithstanding the foregoing, in no event will the Borrower or any Restricted Subsidiary be required to obtain or maintain insurance that is more restrictive than what is consistent with past practice. Each such policy of insurance will as appropriate, (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear or (ii) in the case of each casualty insurance policy, contain an additional loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the additional loss payee thereunder.Compliance with Laws.   Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property (including ERISA, the USA PATRIOT Act, Sanctions, OFAC and FCPA), except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.Books and Records.   Maintain proper books of record and account, in which entries that are full, true and correct in all material respects shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).Inspection Rights.   Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the

foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  For the avoidance of doubt, this Section 6.10 is subject to the last paragraph of Section 6.02.

Section 6.11    Covenant to Guarantee Obligations and Give Security.  At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including: (x) upon (i) the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary) by any Loan Party, (ii) the designation of any existing direct or indirect wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary) as a Restricted Subsidiary, (iii) any Subsidiary (other than any Excluded Subsidiary) becoming a wholly owned Material Domestic Subsidiary or (iv) an Excluded Subsidiary that is a Material Domestic Subsidiary ceasing to be an Excluded Subsidiary but continuing as a Restricted Subsidiary of the Borrower, (y) upon the acquisition of any material assets by the Borrower or any Subsidiary Guarantor or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any material assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(a)    within sixty (60) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Administrative Agent may agree in its reasonable discretion cause such Material Domestic Subsidiary required to become a Guarantor under the Collateral and Guarantee Requirement to execute the Guaranty (or a joinder thereto) and other documentation the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Guaranty and the Collateral Documents and

(A)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Subsidiary Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent supplements to the Security Agreement, a counterpart signature page to the Intercompany Subordination Agreement, Intellectual Property Security Agreements and other security agreements and documents necessary to satisfy the Collateral and Guarantee Requirement, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting and perfecting Liens required by the Collateral and Guarantee Requirement;

(B)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and a joinder to the Intercompany Subordination Agreement substantially in the form of Annex I thereto with respect to the intercompany Indebtedness held by such Material Domestic Subsidiary;

(C)    within sixty (60) days after such formation, acquisition or designation, take and cause (i) the applicable Material Domestic Subsidiary that is required to become

a Guarantor pursuant to the Collateral and Guarantee Requirement and (ii) to the extent applicable, each direct or indirect parent of such applicable Material Domestic Subsidiary, in each case, to take customary action(s) (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be necessary in the reasonable opinion of the Administrative Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected (subject to Liens permitted by Section 7.01) Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law); and

(D)    within sixty (60) days after the reasonable request therefor by the Administrative Agent (or such longer period as the Administrative Agent may agree in its reasonable discretion), deliver to the Administrative Agent a signed copy of a customary Opinion of Counsel, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 6.11(1) as the Administrative Agent may reasonably request (with such opinion being consistent with the Opinion of Counsel delivered to the Administrative Agent on the Closing Date);

*provided* that actions relating to Liens on real property are governed by Section 6.11(2) and not this Section 6.11(1).

Section 6.12    <u>Compliance with Environmental Laws</u>.  Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (1) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits (including any cleanup, removal or remedial obligations) and (2) obtain and renew all Environmental Permits required to conduct its operations or in connection with its properties.

Section 6.13    <u>Further Assurances</u>.  Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Borrower, promptly upon reasonable request from time to time by the Administrative Agent or the Collateral Agent or as may be required by applicable Laws (a) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents and to satisfy the Collateral and Guarantee Requirement.<u>Use of Proceeds</u>.

(1)    On the Closing Date, the proceeds of the Revolving Credit Loans borrowed on the Closing Date, together with the proceeds of the Equity Contribution, the First Lien Facility, the Second Lien Facility and any Specified Real Estate Financing, if applicable, were used (a) to consummate the Closing Date Refinancing, (b) to finance the Transaction Consideration and the Transaction Expenses, (c) to fund any original issue discount or upfront fees in connection with the Closing Date Transactions resulting from the exercise of any "market flex" pursuant to the Fee Letter and (d) for working capital and general corporate purposes not prohibited by the terms of this Agreement; provided that in the case of the foregoing clauses (a) and (b), the aggregate amount of proceeds of the Revolving Credit Loans borrowed on the Closing Date to finance the consummation thereof shall not exceed $450.0 million.

(2)     The proceeds of the Revolving Credit Loans and Swing Line Loans borrowed after the Closing Date will be used for working capital and other general corporate purposes, including the financing of transactions that are not prohibited by the terms of this Agreement (including Permitted Acquisitions and other investments permitted hereunder and permitted distributions).

(3)     Letters of Credit will be used by the Borrower for general corporate purposes of the Borrower and its Restricted Subsidiaries, including supporting transactions not prohibited by the Loan Documents.

Section 6.15     [Reserved].

Section 6.16     Accounting Changes.  The Borrower shall, and shall cause its Restricted Subsidiaries to, maintain their fiscal year as in effect on the Closing Date; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.17     Nature of Business.  The Borrower shall and shall cause its Restricted Subsidiaries to, engage in material line of business substantially the same as those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business(es) or any other activities that are reasonably similar, ancillary, incidental, complimentary or related to, or a reasonable extension, development or expansion of, the business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries on the Closing Date.

Section 6.18     Designation of Subsidiaries.

(a)     Subject to Section 6.18(b) below, the Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) the designation of any Restricted Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the fair market value of the Borrower's investment therein subject to (x) pro forma compliance with the Payment Conditions or (y) utilization of Investment capacity under clause (13) of the definition of Permitted Investment in the amount thereof and (ii) the designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time; and

(b)     the Borrower may not (x) designate any Restricted Subsidiary as an Unrestricted Subsidiary, or (y) designate an Unrestricted Subsidiary as a Restricted Subsidiary, in each case unless no Event of Default shall have occurred or be continuing immediately before and after giving effect to such designation.

Section 6.19     Cash Receipts; Cash Dominion Period.

(1)     Each Loan Party shall use commercially reasonable efforts to enter into an effective account control agreement (a "**Deposit Account Control Agreement**") with each account bank, in each case, in form and substance reasonably satisfactory to the Administrative Agent and the Borrower, with respect to each primary domestic concentration Deposit Account in which funds of the Borrower and the Subsidiary Guarantors from Cash Receipts of the Borrower and the Subsidiary Guarantors are deposited (including those existing as of the Third Amendment Effective Date and listed on Schedule 6.19 attached

hereto, excluding Excluded Funds maintained in Excluded Accounts); *provided* that the applicable Loan Party shall enter into a Deposit Account Control Agreement with respect to any such Deposit Account (other than an Excluded Account) which is established after the Closing Date, promptly and in any event within ninety (90) days upon such establishment (or such longer period as the Administrative Agent may agree in its discretion).  Notwithstanding anything in this section to the contrary, the provisions of this Section 6.19(1) shall not apply to any Deposit Account acquired by the Borrower and the Subsidiary Guarantors in connection with a Permitted Acquisition prior to the date that is 120 days (or such later date as the Administrative Agent may agree) following the consummation of such Permitted Acquisition.

(2)    Each Deposit Account Control Agreement shall require (without further consent of the Loan Parties), and the Loan Parties shall cause, after the occurrence and during the continuance of a Cash Dominion Period and subject to the ABL Intercreditor Agreement, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained by, in the name of and under the sole dominion and control of the Administrative Agent (the "**Concentration Account**"), of all cash receipts and collections, set forth below, other than amounts in Excluded Accounts (collectively, the "**Cash Receipts**"):

(a)    all available cash receipts from the sale of ABL Priority Collateral or casualty insurance proceeds arising from any of the foregoing;

(b)    all proceeds of collections of Accounts; and

(c)    the then contents of each Approved Deposit Account (in each case, net of any minimum balance as may be required to be kept therein by the institution at which such Deposit Account is maintained).

(3)    The Concentration Account shall at all times be under the sole dominion and control of the Administrative Agent, subject to the Borrower's right to use of the account as set forth in clause (4) below.  The Borrower shall use commercially reasonable efforts to cause the applicable depositary (if not the Administrative Agent) to provide daily reports to the Administrative Agent setting forth the balances in the Concentration Account (which may relate to the previous Business Day) (and it being understood that failure on the part of such depositary bank to provide such reports shall not constitute a Default or Event of Default hereunder). The Loan Parties hereby acknowledge and agree that (i) the Borrower and the Subsidiary Guarantors have no right of withdrawal from the Concentration Account to the extent a Cash Dominion Period is in effect, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Concentration Account shall be applied as provided in this Agreement (subject to the ABL Intercreditor Agreement).  In the event that, notwithstanding the provisions of this Section 6.19, during the continuation of any Cash Dominion Period, the Borrower or any Subsidiary Guarantor receives or otherwise has dominion and control of any Cash Receipts which are not on deposit in the Concentration Account, such Cash Receipts shall be held by the Borrower or any Subsidiary Guarantor for the Administrative Agent in Deposit Accounts subject to a Deposit Account Control Agreement and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as the Borrower or any Subsidiary Guarantor may be instructed by the Administrative Agent.

(4)    Subject to the ability of the Secured Parties to exercise remedies in accordance with Section 8.02 during the occurrence and continuance of an Event of Default, so long as no Cash Dominion Period is continuing, the Borrower and the Subsidiary Guarantors may direct, and shall have sole control over, the manner of disposition of funds in the Approved Deposit Accounts.  The Administrative Agent and the other Secured Parties hereby acknowledge and agree that so long as no Cash Dominion Period is continuing the Borrower and the Subsidiary Guarantors shall have the right, subject to the ability of the

Secured Parties to exercise remedies in accordance with Section 8.02 during the occurrence and continuance of an Event of Default, to withdraw all funds remaining on deposit in any Concentration Account and the Administrative Agent shall no longer be permitted to direct any account bank under any Deposit Account Control Agreement to ACH or wire transfer any Cash Receipts into any Concentration Account.

(5)     Any amounts received in the Concentration Account following satisfaction of the Termination Conditions or to the extent no Cash Dominion Period is continuing shall be remitted to the operating account of the Borrower and the Subsidiary Guarantors maintained with the Administrative Agent or to an operating account otherwise designated by the Borrower.

(6)     The Administrative Agent shall promptly (but in any event within three (3) Business Days) furnish written notice to each Approved Account Bank of any termination of a Cash Dominion Period.

Section 6.20    Borrowing Base Certificates.

(1)     The Borrower shall provide the Administrative Agent with a Borrowing Base Certificate setting forth the calculation of the Borrowing Base and of Excess Availability as of the last Business Day of the applicable period set forth below, duly completed and executed by a Responsible Officer of the Borrower, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed:

(a)     as soon as possible but in any event within twenty (20) days after the end of each calendar month (or on a more frequent basis at the discretion of the Borrower, provided that once a more frequent basis is elected it must be continued for the remainder of the current fiscal year after the date of such election); and

(b)     during the continuance of an Increased Reporting Period, on each Wednesday of each week (calculated as of the immediately preceding Friday).

(2)     The Borrower shall furnish to the Administrative Agent any information that the Administrative Agent may reasonably request regarding the determination and calculation of the Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.

Section 6.21    Appraisals and Field Examinations.

(1)     The Administrative Agent may carry out, at the Borrower's expense, one (1) Inventory appraisal in any calendar year (with an additional Inventory appraisal at the expense of the Lenders or the Administrative Agent); *provided*, *however*, that notwithstanding the foregoing limitations (i) at any time after a Collateral Test Triggering Event, the Administrative Agent may carry out, at the Borrower's expense, two (2) inventory appraisals in such calendar year, and (ii) at any time during the continuation of a Specified Event of Default, the Administrative Agent may carry out, at the Borrower's expense, inventory appraisals as frequently as determined by the Administrative Agent in its Permitted Discretion.

(2)     The Administrative Agent may carry out, at the Borrower's expense, one (1) field examination in any calendar year (with an additional field examination at the expense of the Lenders or the Administrative Agent); *provided*, *however*, that notwithstanding the foregoing limitations, (i) at any time after a Collateral Test Triggering Event, the Administrative Agent may carry out, at the Borrower's

expense, two (2) field examinations in such calendar year, and (ii) at any time during the continuation of a Specified Event of Default, the Administrative Agent may carry out, at the Borrower's expense, field examinations as frequently as determined by the Administrative Agent in its Permitted Discretion.

Section 6.22   Agent's Advisor.        At any time that Excess Availability is less than 17.5% of the Maximum Borrowing Amount for a continuous period of ten (10) Business Days, the Administrative Agent, on behalf of itself, and the Lenders, shall be entitled to retain, in consultation with the Borrower, or continue to retain (either directly or through counsel), which retention shall continue for a period of not less than sixty (60) days (or such lesser period as determined by the Administrative Agent), one financial advisor the Administrative Agent may deem reasonably necessary (collectively, the "**Agent's Advisor**") to provide advice, analysis and reporting for the benefit of the Agents and the Lenders in respect of this Agreement and the other Loan Documents.

# ARTICLE VII

## Negative Covenants

So long as the Termination Conditions are not satisfied:

Section 7.01   Liens.  The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien (except any Permitted Lien(s)) that secures obligations under any Indebtedness or any related guarantee of Indebtedness on any asset or property of the Borrower or any Restricted Subsidiary, or any income or profits therefrom.

The expansion of Liens by virtue of accretion or amortization of original issue discount, the payment of dividends in the form of Indebtedness, and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 7.01.

Section 7.02   Indebtedness.

(a)        The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(1)        create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "**incur**" and collectively, an "**incurrence**") with respect to any Indebtedness (including Acquired Indebtedness), or

(2)        issue any shares of Disqualified Stock or permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; and

(b)        the foregoing clause (a) shall not apply to the following:

(1)        Indebtedness of the Borrower and of its Subsidiaries under the Loan Documents (including Incremental Revolving Credit Loans and Extended Revolving Credit Loans);

(2)        Indebtedness incurred pursuant to the Second Lien Facility in an aggregate principal amount not to exceed the sum of (w) $125.0 million (plus interest with respect thereto that is paid-in-kind

by increasing the outstanding principal amount thereof) plus (x) other Second Lien Obligations not constituting principal and, in each case, together with any Refinancing Indebtedness in respect thereof;

(3)    (a) the incurrence of Indebtedness by the Borrower and any Restricted Subsidiary in existence on the Third Amendment Effective Date listed on Schedule 7.02(3) (excluding Indebtedness described in the preceding clauses (1) and (2) and clause (25) below);

(4)    (a) the incurrence of Attributable Indebtedness and (b) Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock incurred or issued by the Borrower or any Restricted Subsidiary and Preferred Stock issued by any Restricted Subsidiary, to finance the purchase, lease, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or other assets, including assets that are used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate principal amount, together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts) and all other Indebtedness, Disqualified Stock or Preferred Stock incurred or issued and outstanding under this clause (4), without regard to any Indebtedness listed on Schedule 7.02(3), at such time not to exceed the greater of $100.0 million and 20.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto and any Refinancing Indebtedness of the Indebtedness referred to in this clause (4) thereof;

(5)    Indebtedness incurred by the Borrower or any Restricted Subsidiary (a) constituting reimbursement obligations with respect to letters of credit, bank guarantees, banker's acceptances, warehouse receipts, or similar instruments issued or entered into, or relating to obligations or liabilities incurred, in the ordinary course of business or consistent with industry practice, including in respect of workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or (b) as an account party in respect of letters of credit, bank guarantees or similar instruments in favor of suppliers, trade creditors or other Persons issued or incurred in the ordinary course of business or consistent with industry practice;

(6)    the incurrence of Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price, earnouts or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition;

(7)    the incurrence of Indebtedness of the Borrower to a Restricted Subsidiary (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Restricted Subsidiary); *provided* that any such Indebtedness for borrowed money owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Loans to the extent permitted by applicable law and it does not result in adverse tax consequences; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (7);

(8)      the incurrence of Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Restricted Subsidiary) to the extent permitted by Section 7.05; *provided* that any such Indebtedness for borrowed money incurred by a Guarantor and owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Guaranty of the Loans of such Guarantor to the extent permitted by applicable law and it does not result in adverse tax consequences; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any such subsequent transfer of any such Indebtedness (except to the Borrower or a Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (8);

(9)      the issuance of shares of Preferred Stock or Disqualified Stock of a Restricted Subsidiary issued to the Borrower or a Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary that holds such Preferred Stock or Disqualified Stock ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock or Disqualified Stock (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an issuance of such shares of Preferred Stock or Disqualified Stock (to the extent such Preferred Stock is then outstanding) not permitted by this clause (9);

(10)     the incurrence of Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes);

(11)     the incurrence of Indebtedness in respect of self-insurance and Indebtedness in respect of performance, bid, appeal and surety bonds and performance, banker's acceptance facilities and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary or Indebtedness in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with industry practice, including those incurred to secure health, safety and environmental obligations;

(12)     the incurrence of:

(a)      Indebtedness or Disqualified Stock of the Borrower and Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or any Restricted Subsidiary in an aggregate principal amount or liquidation preference up to 100.0% of the net cash proceeds received by the Borrower and its Restricted Subsidiaries since the Closing Date from the issue or sale of Equity Interests of the Borrower and the Subsidiary Guarantors or contributions to the capital of the Borrower and the Subsidiary Guarantors, including through consolidation, amalgamation or merger (in each case, other than proceeds of Disqualified Stock, Cure Amounts or sales of Equity Interests to the Borrower or any Subsidiary) to the extent such net cash proceeds or cash have not been applied to make Permitted Investments under clause (9) of the definition of Permitted Investments; and

(b)      Indebtedness or Disqualified Stock of the Borrower and Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or any Restricted Subsidiary in an aggregate principal amount or liquidation preference that, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred or issued, as applicable, pursuant to this clause (12)(b), together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts), does not exceed (i) the greater of (x) $150.0 million and (y) 30.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto (and any Refinancing Indebtedness thereof ) *plus*, without

duplication, (ii) in the event of any extension, replacement, refinancing, renewal or defeasance of any such Indebtedness or Disqualified Stock, an amount equal to the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness or Disqualified Stock and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness or the extension, replacement, refunding, refinancing, renewal or defeasance of such Indebtedness or Disqualified Stock;

*provided* that any Indebtedness, Disqualified Stock or Preferred Stock incurred or issued pursuant to this clause (12) will cease to be deemed incurred, issued or outstanding for purposes of this clause (12) but will be deemed incurred or issued as Permitted Ratio Debt from and after the first date on which the Borrower or such Restricted Subsidiary could have incurred or issued such Indebtedness, Disqualified Stock or Preferred Stock as Permitted Ratio Debt without reliance on this clause (12);

(13)    the incurrence by the Borrower of Indebtedness or Disqualified Stock or the incurrence by a Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock that serves to Refinance any Indebtedness permitted under clauses (3) and (12)(a) above, this clause (13) and clauses (14), (23), (29), (30) and (31), or any successive Refinancing Indebtedness with respect to any of the foregoing;

(14)    the incurrence of:

(a)    Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary, incurred or issued to finance a Permitted Acquisition or any other similar acquisition or investment or that is assumed by the Borrower or any Restricted Subsidiary in connection with such acquisition or investment, and

(b)    Indebtedness, Disqualified Stock or Preferred Stock of Persons that are acquired by the Borrower or any Restricted Subsidiary or merged into, amalgamated or consolidated with the Borrower or a Restricted Subsidiary in accordance with the terms of this Agreement (it being understood that with respect to assumed Indebtedness incurred under this clause (14), such Indebtedness is only the obligation of the Person and/or Person's Subsidiaries that are acquired or that acquire the relevant assets and such Indebtedness was not created in contemplation of such acquisition); *provided* that, the aggregate amount of such Indebtedness, Disqualified Stock or Preferred Stock incurred or assumed under this clause (14) shall not exceed the sum of:

(i)    the greater of (A) $100.0 million and (B) 20.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto, at any one time outstanding, together with all other outstanding Indebtedness, Disqualified Stock or Preferred Stock issued under this clause (i) and any outstanding Indebtedness under clause (13) of this Section 7.02(b) incurred to Refinance Indebtedness initially incurred in reliance on this clause (i) (excluding any Incremental Amounts) (and it being understood and agreed that any Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to this clause (i) will cease to be deemed to be incurred or outstanding for purposes of this clause (i) but will be deemed to be incurred under clause (ii) below or under clause (2) of the definition of Permitted Incremental Amount from and after the first date on which the Borrower or such Restricted Subsidiary could have incurred such Indebtedness, Disqualified Stock or Preferred Stock under such foregoing provision); plus

(ii)    such additional unlimited amounts, so long as (I) in the case of unsecured Indebtedness or Disqualified Stock of the Borrower or any Restricted Subsidiary or Preferred Stock of any Restricted Subsidiary (or Indebtedness or Disqualified Stock of the Borrower or any Restricted Subsidiary or Preferred Stock of any Restricted Subsidiary secured on a junior basis to

the Obligations to the extent permitted under the definition of Permitted Liens), the Borrower's Total Net Leverage Ratio is equal to or less than either (x) 5.10 to 1.00 or (y) the Total Net Leverage Ratio in effect immediately prior to the consummation of such transaction and the incurrence thereof or (II) in the case of Indebtedness secured by the Term Priority Collateral on a pari passu, junior or senior basis to the Liens on the Term Priority Collateral securing the Obligations (or Disqualified Stock of the Borrower or any Restricted Subsidiary or Preferred Stock of any Restricted Subsidiary secured by the Term Priority Collateral on a pari passu, junior or senior basis to the Obligations to the extent permitted under the definition of Permitted Liens), the Borrower's First Lien Net Leverage Ratio is equal to or less than either (x) 3.75 to 1.00 or (y) the First Lien Net Leverage Ratio in effect immediately prior to the consummation of such transaction and the incurrence thereof, in the case of each of the foregoing clauses (I) and (II), determined as of the most recently ended Test Period and on a *pro forma* basis in accordance with Section 1.07 and including a *pro forma* application of the net proceeds therefrom; provided that in the case of any Indebtedness incurred under this clause (ii), (A) such Indebtedness does not mature prior the Latest Maturity Date of the Revolving Credit Loans at the time such Indebtedness is incurred and (B) in the case of Disqualified Stock and Preferred Stock, such Disqualified Stock or Preferred Stock does not by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, mature or become mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or become redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date of the Revolving Credit Loans at the time such Disqualified Stock or Preferred Stock is issued; provided further, to the extent the Borrower or any Restricted Subsidiary issues any Disqualified Stock or any Restricted Subsidiary issues any Preferred Stock pursuant to the foregoing clause (I) or (II), solely for the purpose of calculating the Total Net Leverage Ratio under such clause (I) above or the First Lien Net Leverage Ratio under such clause (II) above, as the case may be, the Consolidated Total Debt shall also include all such Disqualified Stock and Preferred Stock issued pursuant to such clause (I) or clause (II), respectively, and the definition of "Permitted Ratio Debt" and then outstanding; provided further, the aggregate amount of (x) Indebtedness incurred and Disqualified Stock and Preferred Stock issued under this clause (14) and (y) Permitted Ratio Debt, in each case incurred by Restricted Subsidiaries of the Borrower that are not and do not become Guarantors, shall not exceed the greater of (a) $100.0 million and 20.0% of Adjusted EBITDA in the aggregate as of the most recently ended Test Period calculated giving *pro forma* effect thereto,

(15)   the incurrence of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with industry practice;

(16)   the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary supported by letters of credit or bank guarantees permitted hereunder, in each case, in a principal amount not in excess of the stated amount of such letters of credit or bank guarantees;

(17)   (a) the incurrence of any guarantee by the Borrower or a Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations incurred by the Borrower or such Restricted Subsidiary is permitted by this Agreement, or (b) any co-issuance by the Borrower or any Restricted Subsidiary of any Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence

of such Indebtedness or other obligations by the Borrower or such Restricted Subsidiary was permitted hereunder;

(18)     the incurrence of Indebtedness issued by the Borrower or any Restricted Subsidiary to future, present or former employees, directors, officers, members of management and consultants thereof, their respective Controlled Investment Affiliates or Immediate Family Members and permitted transferees thereof, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Company to the extent described in Section 7.05(b)(4);

(19)     customer deposits and advance payments received in the ordinary course of business or consistent with industry practice from customers for goods and services purchased in the ordinary course of business or consistent with industry practice;

(20)     the incurrence of (a) Indebtedness owed to banks and other financial institutions incurred in the ordinary course of business or consistent with industry practice in connection with ordinary banking arrangements to manage cash balances of the Borrower and its Restricted Subsidiaries and (b) Indebtedness in respect of Cash Management Services, including Cash Management Obligations;

(21)     Indebtedness incurred by the Borrower or any Restricted Subsidiary in connection with bankers' acceptances, discounted bills of exchange or the discounting or factoring of receivables for credit management purposes, in each case incurred or undertaken in the ordinary course of business or consistent with industry practice on arm's-length commercial terms;

(22)     the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business or consistent with industry practice;

(23)     the incurrence of Indebtedness or Disqualified Stock by Restricted Subsidiaries of the Borrower that are not Guarantors in an amount not to exceed and together with any other Indebtedness and Disqualified Stock incurred and outstanding under this clause (23) and any outstanding Indebtedness or Disqualified Stock under clause (13) to Refinance Indebtedness initially incurred in reliance on this clause (23) (excluding any Incremental Amounts) the greater of (a) $75.0 million and 15.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto; it being understood that any Indebtedness or Disqualified Stock deemed incurred or issued pursuant to this clause (23) will cease to be deemed incurred or issued or outstanding for the purpose of this clause (23) but will be deemed incurred or issued under clause (e) of the definition of Permitted Ratio Debt from and after the first date on which the Borrower or such Restricted Subsidiaries could have incurred such Indebtedness under clause (e) of the definition of Permitted Ratio Debt without reliance on this clause (23);

(24)     the incurrence of Indebtedness by the Borrower or any Restricted Subsidiary undertaken in connection with cash management (including netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and related or similar services or activities) with respect to the Borrower, any Subsidiaries or any joint venture in the ordinary course of business or consistent with industry practice, including with respect to financial accommodations of the type described in the definition of Cash Management Services;

(25)     Indebtedness incurred pursuant to the First Lien Facility in an aggregate principal amount not to exceed the sum of (w) $1,122.0 million (plus interest with respect thereto that is paid-in-kind by increasing the outstanding principal amount thereof) *plus* (x) the aggregate amount of Incremental Term Loans (as defined in the First Lien Credit Agreement as in effect on the Third Amendment Effective Date) *plus* (y) Permitted Incremental Equivalent Debt (as defined in the First Lien Credit Agreement as in effect

168

on the Third Amendment Effective Date) *plus* (z) other First Lien Obligations (not constituting principal) and, in each case, together with any Refinancing Indebtedness in respect thereof (which includes for the avoidance of doubt Permitted Debt Exchange Notes (as defined in the First Lien Credit Agreement as in effect on the Third Amendment Effective Date));

(26)     guarantees incurred in the ordinary course of business or consistent with industry practice in respect of obligations to suppliers, customers, franchisees, lessors, licensees, sub-licensees and distribution partners;

(27)     the incurrence of Indebtedness attributable to (but not incurred to finance) the exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) with respect to the Closing Date Transactions or any other acquisition (by merger, consolidation or amalgamation or otherwise) in accordance with the terms hereof;

(28)     the incurrence of Indebtedness representing deferred compensation to employees of any Parent Company, the Borrower or any Restricted Subsidiary, including Indebtedness consisting of obligations under deferred compensation or any other similar arrangements incurred in connection with the Closing Date Transactions, any investment or any acquisition (by merger, consolidation or amalgamation or otherwise) permitted under this Agreement;

(29)     the incurrence of Indebtedness arising out of any Specified Real Estate Financing;

(30)     [reserved];

(31)     Permitted Ratio Debt; and

(32)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (1) through (31) above.

(c)     For purposes of determining compliance with this Section 7.02:

(1)     in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) at any time, whether at the time of incurrence or upon the application of all or a portion of the proceeds thereof or subsequently, meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (32) above, the Borrower, in its sole discretion, may divide and classify and may subsequently re-divide and reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock (or a portion thereof) in such of the above clauses as determined by the Borrower at such time; *provided* that all Indebtedness incurred hereunder on the Closing Date will, at all times, be treated as incurred on the Closing Date under Section 7.02(b)(1), (2) and (25), respectively, and may not be reclassified;

(2)     the Borrower is entitled to divide and classify an item of Indebtedness, Disqualified Stock or Preferred Stock in more than one of the types of Indebtedness, Disqualified Stock or Preferred Stock described in Section 7.02(b), subject to the proviso to the preceding clause (1) of this Section 7.02(c);

(3)     the principal amount of Indebtedness outstanding under any clause of this Section 7.02 will be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness;

(4)        in the event an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) is incurred or issued pursuant to a fixed dollar Basket under Section 7.02(b) on the same date that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) is incurred or issued under an applicable incurrence test available under Section 7.02(b), then the applicable incurrence test under Section 7.02(b) will be calculated with respect to such incurrence under such incurrence test without regard to any incurrence under a fixed dollar Basket then available under Section 7.02(b); *provided* that unless the Borrower elects otherwise, the incurrence of Indebtedness, Disqualified Stock or Preferred Stock will be deemed incurred or issued first under the then available incurrence test under Section 7.02(b) to the extent permitted with the balance incurred under a then available fixed dollar Basket under Section 7.02(b); and

(5)        guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that are otherwise included in the determination of a particular amount of Indebtedness will not be included in the determination of such amount of Indebtedness; *provided* that the incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was incurred in compliance with this Section 7.02.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, in each case, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 7.02.  Any Indebtedness incurred to refinance Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to clauses (2), (3), (4), (12), (13), (14), (23) and (25) of Section 7.02(b) will be permitted to include additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay accrued but unpaid interest and dividends and premiums, defeasance costs and fees and expenses incurred in connection with such refinancing.

For purposes of determining compliance with any Dollar denominated restriction on the incurrence of Indebtedness or issuance of Disqualified Stock or Preferred Stock, the Dollar equivalent principal amount of Indebtedness or Disqualified Stock or Preferred Stock denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness, Disqualified Stock or Preferred Stock was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness, Disqualified Stock or Preferred Stock is issued to Refinance other Indebtedness, Disqualified Stock or Preferred Stock denominated in a foreign currency, and such refinancing would cause the applicable Dollar denominated (or the applicable growth component with respect to such Basket, if greater) restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar denominated restriction will be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness, Disqualified Stock or Preferred Stock does not exceed (i) the principal amount of such Indebtedness, Disqualified Stock or Preferred Stock (as applicable) being refinanced *plus* (ii) the aggregate amount of accrued but unpaid interest, fees, underwriting discounts, defeasance costs, premiums (including tender premiums) and other costs and expenses (including OID, upfront fees or similar fees) incurred in connection with such refinancing.

The principal amount of any Indebtedness, Disqualified Stock or Preferred Stock incurred to refinance other Indebtedness, Disqualified Stock or Preferred Stock, if incurred in a different currency from the Indebtedness, Disqualified Stock or Preferred Stock, as applicable, being refinanced, will be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness or Disqualified Stock or Preferred Stock is denominated that is in effect on the date of such

refinancing.  The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date will be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.02, if any Indebtedness is refinanced in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Indebtedness does not exceed the sum of (i) the principal amount of such Indebtedness being refinanced, *plus* (ii) the related costs incurred or payable in connection with such refinancing.

Section 7.03    Fundamental Changes.  The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consolidate, amalgamate or merge with or into or wind up into another Person, or liquidate or dissolve or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (including, in each case, pursuant to a Division) (other than as part of the Closing Date Transactions), except that:

(1)    Subject to Section 3.03(a) of the Security Agreement, Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that

(a)    the Borrower shall be the continuing or surviving Person,

(b)    such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and

(c)    in the case of a merger or consolidation of Holdings with and into the Borrower,

(i)    Holdings shall not be an obligor in respect of any Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement,

(ii)    Holdings shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower,

(iii)    no Default or Event of Default exists at such time or after giving effect to such transaction and

(iv)    after giving effect to such transaction, the direct parent of the Borrower will (A) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower, (B) pledge 100% of the Equity Interests of the Borrower to the Administrative Agent as Collateral to secure the Obligations in form reasonably satisfactory to the Administrative Agent and the Borrower and (C) be in compliance with Section 7.09;

(2)    (a)    any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary that is not a Loan Party,

(a)      any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary that is a Loan Party; provided that a Loan Party shall be the continuing or surviving Person;

(b)      any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States will be permitted; and

(c)      any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and the Restricted Subsidiaries and is not materially disadvantageous to the Lenders;

*provided* that in the case of clauses (b) through (d) of this Section 7.03(2), (x) no Event of Default shall have occurred and be continuing or result therefrom or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom and (y) the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor shall be a Loan Party or such disposition shall otherwise be permitted under Section 7.05 or the definition of "Permitted Investments";

(3)      any Restricted Subsidiary may dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (x) the transferee must be a Loan Party or (y) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Restricted Subsidiary which is not a Loan Party in connection with any Investment permitted hereunder;

(4)      so long as no Event of Default shall have occurred and be continuing or result therefrom or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom, the Borrower may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) the Borrower shall be the continuing or surviving corporation or (b) if the Person formed by or surviving any such merger or consolidation is not the Borrower (or, in connection with a disposition of all or substantially all of the Borrower's assets, is the transferee of such assets) (any such Person, a "**Successor Borrower**"):

(i)      the Successor Borrower will:

(A)      be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(B)      expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower; and

(C)　　deliver to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this Section 7.03(4) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Administrative Agent;

(ii)　　substantially contemporaneously with such transaction (or at a later date as agreed by the Administrative Agent),

(A)　　each Guarantor, unless it is the other party to such merger or consolidation, will by a supplement to the Guaranty (or in another form reasonably satisfactory to the Administrative Agent and the Borrower) reaffirm its Guaranty of the Obligations (including the Successor Borrower's obligations under this Agreement), and

(B)　　each Loan Party, unless it is the other party to such merger or consolidation, will, by a supplement to the Security Agreement (or in another form reasonably satisfactory to the Administrative Agent), confirm its grant or pledge thereunder,

(iii)　　after giving *pro forma* effect to such incurrence, the Borrower would be permitted to incur at least $1.00 of additional Indebtedness pursuant to clause (31) of Section 7.02(b); or

(iv)　　the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Borrower required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided further* that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(5)　　so long as no Event of Default shall have occurred and be continuing or result therefrom or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom, Holdings may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) Holdings will be the continuing or surviving Person or (b) if:

(i)　　the Person formed by or surviving any such merger or consolidation is not Holdings,

(ii)　　Holdings is not the Person into which the applicable Person has been liquidated or

(iii)      in connection with a disposition of all or substantially all of Holdings' assets, the Person that is the transferee of such assets is not Holdings (any such Person described in the preceding clauses (i) through (iii), a "**Successor Holdings**"), then the Successor Holdings will:

(A)      be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia,

(B)      expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower,

(C)      (I) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower and (II) pledge 100% of the Equity Interests of the Borrower to the Administrative Agent as Collateral to secure the Obligations in accordance with the Security Agreement or otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Borrower, and

(D)      if requested by the Administrative Agent, deliver, or cause the Borrower to deliver, to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this 7.03(5) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Administrative Agent;

(iv)      the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Holdings required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

*provided further* that if the foregoing are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement;

(6)      any Restricted Subsidiary may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person in order to effect a Permitted Investment or other investment permitted pursuant to Section 7.05; *provided* that solely in the case of a merger or consolidation involving a Loan Party and subject to Section 1.07(8) in the case of a Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom; *provided further*, that the continuing or surviving Person will be (a) the Borrower or (b) a Loan Party, in each case, which together with each of its Restricted Subsidiaries, will have complied with the applicable requirements of Section 6.11;

(7)      a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a disposition permitted pursuant to Section 7.04 (other than under clause (2)(c) of the definition of "Asset Sale");

(8)      subject to Section 3.03 of the Security Agreement, the Borrower may (a) convert into a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of the Borrower or the laws of a jurisdiction in the United States and (b) change its name;

(9)      the Loan Parties and the Restricted Subsidiaries may consummate the Closing Date Transactions; and

(10)      the commencement of any proceedings against any Restricted Subsidiary under Debtor Relief Laws to the extent it shall not constitute an Event of Default under Section 8.01(6).

Section 7.04      Asset Sales.  The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consummate any Asset Sale unless:

(1)      the Borrower or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise in connection with such Asset Sale) at least equal to the fair market value (measured at the time of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of, and

(2)      except in the case of a Permitted Asset Swap, at least 75.0% of the consideration for such Asset Sale, together with all other Asset Sales since the Closing Date (on a cumulative basis) received by the Borrower or a Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that each of the following will be deemed to be cash or Cash Equivalents for purposes of this clause (2):

(a)      any liabilities (as shown on the Borrower's or any Restricted Subsidiary's most recent balance sheet or in the footnotes thereto or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or a Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet, as determined in good faith by the Borrower) of the Borrower or any Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Obligations, that are (i) assumed by the transferee of any such assets (or a third party in connection with such transfer) or (ii) otherwise cancelled or terminated in connection with the transaction with such transferee (other than intercompany debt owed to the Borrower or a Restricted Subsidiary);

(b)      any securities, notes or other obligations or assets received by the Borrower or any Restricted Subsidiary from such transferee or in connection with such Asset Sale (including earnouts and similar obligations) that are converted by the Borrower or a Restricted Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of such Asset Sale;

(c)      any Designated Non-Cash Consideration received by the Borrower or any Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed the greater of (i) $50.0 million and (ii) 1.8% of Total Assets as of the most recently ended Test Period calculated giving *pro forma* effect thereto on the date of the receipt of such Designated Non-Cash Consideration (or, at the Borrower's option, at the time of contractually agreeing to such Asset Sale), with the fair market value of each item of Designated Non-Cash Consideration being

measured, at the Borrower's option, either at the time of contractually agreeing to such Asset Sale or at the time received and, in either case, without giving effect to any subsequent change(s) in value; or

(d)      Indebtedness of any Restricted Subsidiary that ceases to be a Restricted Subsidiary as a result of such Asset Sale (other than intercompany debt owed to the Borrower or a Restricted Subsidiary), to the extent that the Borrower and each other Restricted Subsidiary are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Asset Sale.

(3)      in the event of an Asset Sale of IP Rights used or useful in connection with the ABL Priority Collateral (after giving effect to such Asset Sale), the purchaser, assignee or other transferee thereof agrees in writing to be bound by a non-exclusive royalty-free worldwide license of such IP Rights in favor of the Administrative Agent for use in connection with the exercise of the rights and remedies of the Secured Parties, which license shall be in form and substance reasonably satisfactory to the Administrative Agent, and provided further that in the case of an Asset Sale of IP Rights of the Borrower or one of its Subsidiaries from a third party, the transferee thereof shall be required to provide such a license only to the extent to which the applicable license gives it a right to do so.

To the extent any Collateral is disposed of as expressly permitted by this Section 7.04 to any Person other than a Loan Party, such Collateral shall automatically be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such disposition is permitted by this Agreement, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing, provided that after giving effect to any such disposition, no Overadvance shall exist or result therefrom.

Following the consummation of any disposition of other transfer of Collateral constituting ABL Priority Collateral that results in Net Proceeds to the Borrower or any Restricted Subsidiary in excess of $50.0 million, the Borrower shall deliver an updated Borrowing Base Certificate that gives *pro forma* effect to such disposition or other transfer upon the earliest of (x) the date of the Revolving Credit Borrowing subsequent to such disposition or transfer, (y) the consummation of a transaction hereunder that requires the satisfaction of the Payment Conditions or (z) the date on which the next Borrowing Base Certificate is required to be delivered pursuant to Section 6.20.

In addition, none of the Borrower or any Restricted Subsidiary shall enter into any Specified Real Estate Financing unless such Specified Real Estate Financing is conducted as an arm's-length basis and is for fair market value of the applicable property as determined by a Responsible Officer of the Borrower in good faith.

Section 7.05   Restricted Payments.  (a)The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(A)      declare or pay any dividend or make any payment or distribution on account of the Borrower's or any Restricted Subsidiary's Equity Interests (in each case, solely in such Person's capacity as holder of such Equity Interests), including any dividend or distribution payable in connection with any merger, amalgamation or consolidation, other than:

(1)      dividends, payments or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or a Parent Company or in options, warrants or other rights to purchase such Equity Interests; or

(2)       dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a wholly owned Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend, payment or distribution in accordance with its Equity Interests in such class or series of securities or such other amount to which it is entitled pursuant to the terms of such Equity Interest;

(B)       purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Borrower or any Parent Company, including in connection with any merger, amalgamation or consolidation, in each case held by Persons other than the Borrower or a Restricted Subsidiary;

(C)       make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment or final maturity, any Specified Indebtedness, other than Indebtedness permitted under clauses (7), (8) and (9) of Section 7.02(b); or

(D)       make any Restricted Investment;

(all such payments and other actions set forth in clauses (A) through (D) above being collectively referred to as "**Restricted Payments**");

(b)       The provisions of Section 7.05(a) will not prohibit:

(1)       the payment of any dividend or other distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or other distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or other distribution or redemption payment would have complied with the provisions of this Section 7.05;

(2)       (a)       the redemption, repurchase, defeasance, discharge, retirement or other acquisition of (i) any Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company, including any accrued and unpaid dividends thereon ("**Treasury Capital Stock**") or (ii) Specified Indebtedness, in each case, made (x) in exchange for, or out of the proceeds of, a sale or issuance (other than to a Restricted Subsidiary) of Equity Interests of the Borrower or any Parent Company (to the extent such Equity Interests or proceeds therefrom are contributed to the Borrower) (in each case, other than Disqualified Stock or Cure Amounts) and (y) within 120 days of such sale or issuance ("**Refunding Capital Stock**"),

(b)       the declaration and payment of dividends on Treasury Capital Stock out of the proceeds of a sale or issuance (other than to a Restricted Subsidiary of the Borrower or to an employee stock ownership plan or any trust established by the Borrower or any Restricted Subsidiary) of Refunding Capital Stock made within 120 days of such sale or issuance, and

(c)       if, immediately prior to the retirement of Treasury Capital Stock, the declaration and payment of dividends thereon by the Borrower were permitted under clauses (6)(a) or (b) of this Section 7.05(b), the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any Parent Company) in an aggregate amount *per annum* no greater than the aggregate

amount of dividends per annum that were declarable and payable on such Treasury Capital Stock immediately prior to such retirement;

(3)      the principal payment on, defeasance, redemption, repurchase, exchange or other acquisition or retirement of:

(a)      Specified Indebtedness of the Borrower or a Subsidiary Guarantor made (i) by exchange for, or out of the proceeds of the sale, issuance or incurrence of, new Specified Indebtedness of the Borrower or a Subsidiary Guarantor or Disqualified Stock of the Borrower or a Subsidiary Guarantor and (ii) within 120 days of such sale, issuance or incurrence, *provided* such new Specified Indebtedness shall mature no earlier, and not have a shorter weighted average life, than the Specified Indebtedness being so refinanced or exchanged (*provided further* that (x) if the Specified Indebtedness being refinanced or exchanged is subordinated indebtedness, such new Specified Indebtedness shall also be subordinated indebtedness and (y) if such Specified Indebtedness is unsecured, such new Specified Indebtedness shall be unsecured),

(b)      Disqualified Stock of the Borrower or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale, issuance or incurrence of Disqualified Stock or Specified Indebtedness of the Borrower or a Subsidiary Guarantor, made within 120 days of such sale, issuance or incurrence,

(c)      Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale or issuance of, Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor, made within 120 days of such sale or issuance that, in each case, is Refinancing Indebtedness incurred or issued, as applicable, in compliance with Section 7.02 and

(d)      any Specified Indebtedness or Disqualified Stock that constitutes Acquired Indebtedness;

(4)      (a) Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) (including related stock appreciation rights or similar securities) of the Borrower or any Parent Company held by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, or any equity subscription or equity holder agreement (including, for the avoidance of doubt, any principal and interest payable on any notes issued by the Borrower or any Parent Company in connection with any such repurchase, retirement or other acquisition), including any Equity Interests rolled over by management of the Borrower, any of its Subsidiaries or any Parent Company in connection with the Closing Date Transactions; *provided* that the aggregate amount of Restricted Payments made under this clause (4) does not exceed $10.0 million in any fiscal year (increasing to $20.0 million following an underwritten public Equity Offering by the Borrower or any Parent Company) with unused amounts in any calendar year being carried over to the next two succeeding calendar years; *provided further* that each of the amounts in any calendar year under this clause (4) may be increased by an amount not to exceed:

(b)     the cash proceeds from the sale of Equity Interests (other than Disqualified Stock or Cure Amounts) of the Borrower and, to the extent contributed to the Borrower, the cash proceeds from the sale of Equity Interests of any Parent Company, in each case to any future, present or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that occurs after the Closing Date; *plus*

(c)     the amount of any cash bonuses otherwise payable to members of management, employees, directors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that are foregone in exchange for the receipt of Equity Interests of the Borrower or any Parent Company pursuant to any compensation arrangement, including any deferred compensation plan; *plus*

(d)     the cash proceeds of life insurance policies received by the Borrower or its Restricted Subsidiaries (or by any Parent Company to the extent contributed to the Borrower) after the Closing Date; *minus*

(e)     the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a), (b) and (c) of this clause (4);

*provided* that the Borrower may elect to apply all or any portion of the aggregate increase contemplated by clauses (a), (b) and (c) above in any calendar year; *provided further* that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from any future, present or former employees, directors, officers, members of management, or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary in connection with a repurchase of Equity Interests of the Borrower or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.05 or any other provision of this Agreement; and *provided further*, that no Event of Default shall have occurred and be continuing or would result from the making of any Restricted Payment pursuant to this clause (4);

(5)     [reserved];

(6)     (a)     the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock issued by the Borrower or any Restricted Subsidiary after the Closing Date;

(b)     the declaration and payment of dividends or distributions to any Parent Company, the proceeds of which will be used to fund the payment of dividends or distributions to holders of any class or series of Designated Preferred Stock issued by such Parent Company after the Closing Date; *provided* that the amount of dividends and distributions paid pursuant to this clause (b) will not exceed the aggregate amount of cash actually contributed to the Borrower from the sale of such Designated Preferred Stock; or

(c)     the declaration and payment of dividends on Refunding Capital Stock that is Designated Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this Section 7.05(b);

*provided* that in the case of each of clauses (a) and (c) of this clause (6), that for the most recently ended Test Period preceding the date of issuance of such Designated Preferred Stock or the declaration of such dividends on Refunding Capital Stock that is Preferred Stock, after giving effect to such issuance or declaration on a *pro forma* basis, the Borrower would be able to incur $1.00 of Permitted Ratio Debt (and solely for the purpose of the testing hereunder, including all Designated Preferred Stock issued and outstanding in Consolidated Total Debt);

(7)    (a)    payments made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any Restricted Subsidiary or any Parent Company,

(b)    any repurchases or withholdings of Equity Interests in connection with the exercise of stock options, warrants or similar rights if such Equity Interests represent a portion of the exercise of, or withholding obligations with respect to, such options, warrants or similar rights or required withholding or similar taxes and

(c)    loans or advances to officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Restricted Subsidiary or any Parent Company in connection with such Person's purchase of Equity Interests of the Borrower or any Parent Company; *provided* that no cash is actually advanced pursuant to this clause (c) other than to pay taxes due in connection with such purchase, unless immediately repaid;

(8)    the declaration and payment of dividends on the Borrower's common equity (or the payment of dividends to any Parent Company to fund a payment of dividends on such company's common equity), following the first public offering of the Borrower's common equity or the common equity of any Parent Company after the Closing Date that is a Qualifying IPO, in an amount not to exceed 6.0% per annum of the net cash proceeds received by or contributed to the Borrower other than any public sale constituting an Excluded Contribution; provided that no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or would result therefrom;

(9)    Restricted Payments in an amount that does not exceed the aggregate amount of Excluded Contributions, if on a *pro forma* basis after giving effect to such Restricted Payment, the Payment Conditions shall have been satisfied with respect thereto;

(10)    Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (10) not to exceed the greater of (a) $75.0 million and (b) 15.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto; *provided* that if this clause (10) is utilized to make a Restricted Investment, the amount deemed to be utilized under this clause (10) will be the amount of such Restricted Investment at any time outstanding (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); and provided further that no Event of Default shall have occurred and be continuing or would result therefrom;

(11)    [reserved];

(12)     any Restricted Payment made in connection with the Closing Date Transactions and the fees and expenses related thereto or owed to any Affiliate(s) including any payments to holders of Equity Interests of Belk in connection with, or as a result of, their exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) related to the Closing Date Transactions;

(13)     [reserved];

(14)     the declaration and payment of dividends or distributions by the Borrower or any Restricted Subsidiary to, or the making of loans or advances to, the Borrower or any Parent Company in amounts required for any Parent Company to pay in each case without duplication:

(a)     franchise, excise and similar taxes and other fees, taxes and expenses required to maintain their corporate or other legal existence;

(b)     for any taxable period for which the Borrower or any of its Restricted Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for U.S. federal or applicable foreign, state or local income tax purposes of which a Parent Company is the common parent (a "**Tax Group**"), to pay the portion of any U.S. federal, foreign, state and local income taxes of such Tax Group for such taxable period that are attributable to the taxable income of the Borrower and its Restricted Subsidiaries and Unrestricted Subsidiaries (net of any payments of such taxes made by the Borrower); *provided* that for each taxable period, (A) the amount of such payments made in respect of such taxable period in the aggregate will not exceed the amount that the Borrower and its Subsidiaries, as applicable, would have been required to pay as stand-alone taxpayers or a stand-alone Tax Group and (B) the amount of such payments made in respect of an Unrestricted Subsidiary will be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary for such purpose;

(c)     salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, employees, directors, officers, members of management and consultants of any Parent Company, and any payroll, social security or similar taxes thereof;

(d)     general corporate or other operating, administrative, compliance and overhead costs and expenses (including expenses relating to auditing and other accounting matters) of any Parent Company attributable to the ownership of the Borrower and its Restricted Subsidiaries;

(e)     fees and expenses (including ongoing compliance costs and listing expenses) related to any equity or debt offering of a Parent Company (whether or not consummated);

(f)     amounts that would be permitted to be paid directly by the Borrower or its Restricted Subsidiaries under Section 7.06(b) (other than clause 2(a) thereof);

(g)     interest or principal on Indebtedness the proceeds of which have been contributed to the Borrower or any Restricted Subsidiary (other than Excluded Contributions) or that has been guaranteed by, or is otherwise considered Indebtedness

of, the Borrower or any Restricted Subsidiary incurred in accordance with Section 7.02, if on a *pro forma* basis after giving effect to such Restricted Payment, the Payment Conditions shall have been satisfied with respect thereto;

(h)     to finance Investments or other acquisitions or investments otherwise permitted to be made pursuant to this Section 7.05 if made by the Borrower; *provided* that:

(i)     such Restricted Payment must be made within 120 days of the closing of such Investment, acquisition or investment,

(ii)     such Parent Company must, promptly following the closing thereof, cause (A) all property acquired (whether assets or Equity Interests) to be contributed to the capital of the Borrower or another Loan Party (which, for the avoidance of doubt, shall not be designated as Excluded Contributions) or (B) the merger, amalgamation, consolidation or sale of the Person formed or acquired into the Borrower or another Loan Party (to the extent not prohibited by Section 7.03) in order to consummate such Investment, acquisition or investment,

(iii)     such Parent Company and its Affiliates (other than the Borrower or any Restricted Subsidiary) receives no consideration or other payment in connection with such transaction except to the extent the Borrower or a Restricted Subsidiary could have given such consideration or made such payment in compliance with this Agreement,

(iv)     [reserved]; and

(v)     to the extent constituting an Investment, such Investment will be deemed to be made by the Borrower or such Restricted Subsidiary pursuant to another provision of this Section 7.05 (other than pursuant to clause (9) of this Section 7.05(b)) or pursuant to the definition of "Permitted Investments" (other than clause (9) thereof);

(15)     the distribution, by dividend or otherwise, or other transfer or disposition of shares of Capital Stock of, Equity Interests in, or Indebtedness owed to the Borrower or a Restricted Subsidiary by, Unrestricted Subsidiaries (other than Unrestricted Subsidiaries, substantially all the assets of which are cash and Cash Equivalents); provided that no Event of Default shall have occurred and be continuing or would result therefrom;

(16)     cash payments, or loans, advances, dividends or distributions to any Parent Company to make payments, in lieu of issuing fractional shares in connection with share dividends, share splits, reverse share splits, mergers, consolidations, amalgamations or other business combinations and in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company;

(17)     unlimited additional Restricted Payments shall be permitted, if on a *pro forma* basis after giving effect to such Restricted Payment, the Payment Conditions shall have been satisfied with respect thereto;

(18)    making payments for the benefit of the Borrower or any Restricted Subsidiary to the extent such payments could have been made by the Borrower or any Restricted Subsidiary because such payments (a) would not otherwise be Restricted Payments and (b) would be permitted by Section 7.06;

(19)    payments and distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries taken as a whole that complies with the terms of this Agreement or any other transaction that complies with the terms of this Agreement;

(20)    the payment of dividends, other distributions and other amounts by the Borrower to, or the making of loans to, any Parent Company in the amount required for such parent to, if applicable, pay amounts equal to amounts required for any Parent Company, if applicable, to pay interest or principal (including AHYDO Payments) on Indebtedness, the proceeds of which have been permanently contributed to the Borrower or any Restricted Subsidiary (which, for the avoidance of doubt, shall not be designated as Excluded Contributions) and that has been guaranteed by, or is otherwise considered Indebtedness of, the Borrower or any Restricted Subsidiary incurred in accordance with this Agreement; *provided* that the aggregate amount of such dividends, distributions, loans and other amounts shall not exceed the amount of cash actually contributed to the Borrower for the incurrence of such Indebtedness;

(21)    the making of cash payments in connection with any conversion of Convertible Indebtedness of the Borrower or any Restricted Subsidiary in an aggregate amount since the date of this Agreement not to exceed the sum of (a) the principal amount of such Convertible Indebtedness *plus* (b) any payments received by the Borrower or any Restricted Subsidiary pursuant to the exercise, settlement or termination of any related Permitted Bond Hedge Transaction, if on a *pro forma* basis after giving effect to such Restricted Payment, the Payment Conditions shall have been satisfied with respect thereto;

(22)    any payments in connection with (a) a Permitted Bond Hedge Transaction and (b) the settlement of any related Permitted Warrant Transaction (i) by delivery of shares of the Borrower's common stock upon settlement thereof or (ii) by (A) set-off against the related Permitted Bond Hedge Transaction or (B) payment of an early termination amount thereof in common stock upon any early termination thereof; and

(23)    the making of Specified Real Estate Distributions;

*provided* that for purposes of clauses (7), (14) and (20) above, taxes will include all interest and penalties with respect thereto and all additions thereto; *provided further* that notwithstanding the foregoing, the Borrower shall not directly or indirectly make any cash Restricted Payments (other than Restricted Payments permitted pursuant to clauses (4), (7) and (14)(a)-(f) above)  prior to the first anniversary of the Third Amendment Effective Date.

(c)    For purposes of determining compliance with this Section 7.05, in the event that any Restricted Payment or Investment (or any portion thereof) meets the criteria of more than one of the categories of Restricted Payments described in clauses (1) through (23) of Section 7.05(b) or one or more of the clauses contained in the definition of "Permitted Investments," the Borrower will be entitled to divide or classify (or later divide, classify or reclassify), in whole or in part, in its sole discretion, such Restricted Payment or Investment (or any portion thereof) among such clauses (1) through (23) of

Section 7.05(b) or one or more clauses contained in the definition of "Permitted Investments," in any manner that otherwise complies with this Section 7.05.

The amount of all Restricted Payments (other than cash) will be the fair market value on the date the Restricted Payment is made, or at the Borrower's election, the date a commitment is made to make such Restricted Payment, of the assets or securities proposed to be transferred or issued by the Borrower or any Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

After giving effect to any Restricted Payment constituting the Equity Interests of a Restricted Subsidiary, no Overadvance shall exist or result therefrom.

For the avoidance of doubt, this Section 7.05 will not restrict the making of any AHYDO Payment with respect to, and required by the terms of, any Indebtedness of the Borrower or any Restricted Subsidiary permitted to be incurred under this Agreement.

Section 7.06    Transactions with Affiliates.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an **Affiliate Transaction**") involving aggregate payments or consideration in excess of $25.0 million, unless (A) such Affiliate Transaction is on terms, taken as a whole, that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained at such time in a comparable transaction by the Borrower or such Restricted Subsidiary with a Person other than an Affiliate of the Borrower on an arm's-length basis or, if in the good faith judgment of the Board of Directors no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to the Borrower or such Restricted Subsidiary from a financial point of view, and (B) the Borrower delivers to the Administrative Agent with respect to any Affiliate Transaction or series of related Affiliate Transactions requiring aggregate payments or consideration in excess of $50.0 million, a resolution adopted by the majority of the Board of Directors approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (A) above.

(b)    The foregoing restriction will not apply to the following:

(1)    (a) transactions between or among the Borrower and one or more Restricted Subsidiaries or between or among Restricted Subsidiaries or, in any case, any entity that becomes a Restricted Subsidiary as a result of such transaction and (b) any merger, consolidation or amalgamation of the Borrower and any Parent Company; *provided* that such merger, consolidation or amalgamation of the Borrower is otherwise in compliance with the terms of this Agreement and effected for a *bona fide* business purpose;

(2)    (a) Restricted Payments permitted by Section 7.05 (including any transaction specifically excluded from the definition of the term "Restricted Payments," including pursuant to the exceptions contained in the definition thereof and the parenthetical exclusions of such definition), and (b) any Permitted Investment(s) or any acquisition otherwise permitted;

(3)    (a) so long as no Event of Default under Section 8.01(1) and Section 8.01(6) shall have occurred and be continuing or would result therefrom, the payment of management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses pursuant to

the Management Services Agreement (including any unpaid management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses accrued in any prior year) and any termination fees pursuant to the Management Services Agreement, or any amendment thereto or replacement thereof so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders when taken as a whole, as compared to the Management Services Agreement as in effect on the Closing Date,

        (b)     the payment of indemnification and similar amounts to, and reimbursement of expenses to, the Investors and its officers, directors, employees and Affiliates, in each case, approved by, or pursuant to arrangements approved by, the Board of Directors,

        (c)     payments, loans, advances or guarantees (or cancellation of loans, advances or guarantees) to future, present or former employees, officers, directors, managers, consultants or independent contractors or guarantees in respect thereof for bona fide business purposes or in the ordinary course of business or consistent with industry practice,

        (d)     any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company and

        (e)     any payment of compensation or other employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company;

        (4)     the payment of fees and compensation paid to, and indemnities and reimbursements and employment and severance arrangements provided to, or on behalf of or for the benefit of, present, future or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary;

        (5)     transactions in which the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or stating that the terms, when taken as a whole, are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Restricted Subsidiary with a Person that is not an Affiliate of the Borrower on an arm's length basis;

        (6)     the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any agreement as in effect as of the Closing Date, or any amendment thereto or replacement thereof (so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the applicable agreement as in effect on the Closing Date);

(7)        the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any equity holders agreement or the equivalent (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Closing Date and any amendment thereto and, similar agreements or arrangements that it may enter into thereafter; *provided* that the existence of, or the performance by the Borrower or any Restricted Subsidiary of obligations under any future amendment to any such existing agreement or arrangement or under any similar agreement or arrangement entered into after the Third Amendment Effective Date will be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement or arrangement are not otherwise materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the original agreement or arrangement in effect on the Third Amendment Effective Date;

(8)        (i) the Closing Date Transactions and the payment of all fees and expenses related to the Closing Date Transactions, including Transaction Expenses and (ii) the Third Amendment Transactions and the payment of all fees and expenses related to the  Third Amendment Transactions, including Third Amendment Transaction Expenses;

(9)        transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business or consistent with industry practice and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10)        the issuance, sale or transfer of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company to any Person and the granting and performing of customary rights (including registration rights) in connection therewith, and any contribution to the capital of the Borrower;

(11)        [reserved];

(12)        payments by the Borrower or any Restricted Subsidiary made for any financial advisory, consulting, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by, or made pursuant to arrangements approved by, a majority of the Board of Directors in good faith;

(13)        payments with respect to Indebtedness, Disqualified Stock and other Equity Interests (and cancellation of any thereof) of the Borrower, any Parent Company and any Restricted Subsidiary and Preferred Stock (and cancellation of any thereof) of any Restricted Subsidiary to any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any equity subscription or equity holder agreement that are, in each case, approved by the Borrower in good faith; and any employment agreements, severance arrangements, stock option plans and other compensatory arrangements (and any successor plans thereto) and any supplemental executive retirement benefit plans or arrangements with any such employees, directors, officers, members of management or consultants (or their respective

Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) that are, in each case, approved by the Borrower in good faith;

(14)    (a) investments by Affiliates in securities of the Borrower (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Borrower or such Restricted Subsidiary generally to other investors on the same or more favorable terms and (b) payments to Affiliates in respect of securities of the Borrower or any Restricted Subsidiary contemplated in the foregoing subclause (a) or that were acquired from Persons other than the Borrower and the Restricted Subsidiaries, in each case, in accordance with the terms of such securities;

(15)    payments to or from, and transactions with, any joint venture or Unrestricted Subsidiary in the ordinary course of business or consistent with past practice, industry practice or industry norms (including, any cash management activities related thereto);

(16)    payments by the Borrower (and any Parent Company) and its Subsidiaries pursuant to tax sharing agreements among the Borrower (and any Parent Company) and its Subsidiaries; *provided* that in each case the amount of such payments in any taxable year does not exceed the amount that the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amount received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such taxable year were the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any such Parent Company;

(17)    any lease entered into between the Borrower or any Restricted Subsidiary, as lessee and any Affiliate of the Borrower, as lessor, and any transaction(s) pursuant to that lease, which lease is approved by the Board of Directors or senior management of the Borrower in good faith;

(18)    IP Rights licenses in the ordinary course of business or consistent with industry practice;

(19)    the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to equity holders of the Borrower or any Parent Company pursuant to the equity holders agreement or the registration rights agreement entered into on or after the Closing Date;

(20)    transactions permitted by, and complying with, Section 7.03 solely for the purpose of (a) reorganizing to facilitate any initial public offering of securities of the Borrower or any Parent Company, (b) forming a holding company or (c) reincorporating the Borrower in a new jurisdiction;

(21)    transactions undertaken in good faith (as determined by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate) for the purposes of improving the consolidated tax efficiency of the Borrower and its Restricted Subsidiaries and not for the purpose of circumventing Articles VI and VII of this Agreement; so long as such transactions, when taken as a whole, do not result in a material adverse effect on the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, when taken as a whole, in each case, as determined in good faith by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate;

187

(22)    (a) transactions with a Person that is an Affiliate of the Borrower (other than an Unrestricted Subsidiary) solely because the Borrower or any Restricted Subsidiary owns, directly or indirectly, Equity Interests in such Person and (b) transactions with any Person that is an Affiliate solely because a director or officer of such Person is a director or officer of the Borrower, any Restricted Subsidiary or any Parent Company;

(23)    (a) pledges and other transfers of Equity Interests in Unrestricted Subsidiaries and (b) any transactions with an Affiliate in which the consideration paid consists solely of Equity Interests of the Borrower or a Parent Company;

(24)    the sale, issuance or transfer of Equity Interests (other than Disqualified Stock) of the Borrower;

(25)    investments by any Investor or Parent Company in securities of the Borrower; and

(26)    payments in respect of (a) the Obligations or (b) other Indebtedness of the Borrower and its Subsidiaries held by Affiliates; *provided* that such Obligations were acquired by an Affiliate of the Borrower in compliance herewith.

Section 7.07    Burdensome Agreements.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to, directly or indirectly, create or otherwise cause to exist or become effective any consensual encumbrance or consensual restriction (other than this Agreement or any other Loan Document) on the ability of any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to:

(1)    (a)    pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(b)    pay any Indebtedness owed to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(2)    make loans or advances to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(3)    sell, lease or transfer any of its properties or assets to the Borrower or to any Restricted Subsidiary that is a Guarantor; or

(4)    with respect to the Borrower or any Subsidiary Guarantor, (a) Guaranty the Obligations or (b) create, incur or cause to exist or become effective Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents to the extent such Lien is required to be given to the Secured Parties pursuant to the Loan Documents;

*provided* that any dividend or liquidation priority between or among classes or series of Capital Stock, and the subordination of any Obligation (including the application of any remedy bars thereto) to any other Obligation will not be deemed to constitute such an encumbrance or restriction.

     (b)     Section 7.07(a) will not apply to any encumbrances or restrictions existing under or by reason of:

     (a)     encumbrances or restrictions in effect on the Third Amendment Effective Date, including pursuant to the Loan Documents and any Hedge Agreements, Hedging Obligations and the related documentation and any definitive documentation in respect of the Indebtedness set forth on Schedule 7.02(b)(3);

     (b)     the First Lien Loan Documents and the Second Lien Loan Documents;

     (c)     Purchase Money Obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) above on the property so acquired;

     (d)     applicable Law or any applicable rule, regulation or order;

     (e)     any agreement or other instrument of a Person, or relating to Indebtedness or Equity Interests of a Person, acquired by or merged, amalgamated or consolidated with and into the Borrower or any Restricted Subsidiary or an Unrestricted Subsidiary that is designated as a Restricted Subsidiary, or any other transaction entered into in connection with any such acquisition, merger, consolidation or amalgamation in existence at the time of such acquisition or at the time it merges, amalgamates or consolidates with or into the Borrower or any Restricted Subsidiary or an Unrestricted Subsidiary that is designated as a Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person so acquired and its Subsidiaries, or the property or assets of the Person so acquired or designated and its Subsidiaries or the property or assets so acquired or designated;

     (f)     contracts or agreements for the sale or disposition of assets, including any restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

     (g)     restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business or consistent with industry practice or arising in connection with any Liens permitted by Section 7.01;

     (h)     Indebtedness, Disqualified Stock or Preferred Stock of Restricted Subsidiaries that are not Guarantors permitted to be incurred subsequent to the Closing Date pursuant to Section 7.02;

     (i)     provisions in joint venture agreements and other similar agreements (including equity holder agreements) relating to such joint venture or its members or entered into in the ordinary course of business or consistent with industry practice;

(j)     customary provisions contained in leases, sub-leases, licenses, sub-licenses, Equity Interests or similar agreements, including with respect to IP Rights and other agreements;

(k)     [reserved];

(l)     restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale or other agreement to which the Borrower or any Restricted Subsidiary is a party entered into in the ordinary course of business or consistent with industry practice; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are the subject to such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of another Restricted Subsidiary;

(m)     customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Restricted Subsidiary;

(n)     customary provisions restricting assignment of any agreement;

(o)     restrictions arising in connection with cash or other deposits permitted under Section 7.01; any other agreement or instrument governing any Indebtedness, Disqualified Stock, or Preferred Stock permitted to be incurred or issued pursuant to Section 7.02 entered into after the Closing Date that contains encumbrances and restrictions that either (i) are no more restrictive in any material respect, taken as a whole, with respect to any Restricted Subsidiary than (A) the restrictions contained in the Loan Documents as of the Closing Date or the First Lien Loan Documents as of the Closing Date or (B) those encumbrances and other restrictions that are in effect on the Closing Date with respect to that Restricted Subsidiary pursuant to agreements in effect on the Closing Date, (ii) are not materially more disadvantageous, taken as a whole, to the Lenders than is customary in comparable financings for similarly situated issuers or (iii) will not materially impair the Borrower's ability to make payments on the Obligations when due, in each case in the good faith judgment of the Borrower;

(p)     (i) Indebtedness permitted to be incurred pursuant to Section 7.02(b)(4) and any Refinancing Indebtedness in respect of the foregoing and (ii) agreements entered into in connection with any Specified Real Estate Financing or any Sale-Leaseback Transaction entered into in the ordinary course of business or consistent with industry practice;

(q)     customary restrictions and conditions contained in documents relating to any Lien so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 7.07;

(r)     any encumbrance or restriction with respect to a Restricted Subsidiary that was previously an Unrestricted Subsidiary which encumbrance or restriction exists pursuant to or by reason of an agreement that such Subsidiary is a party to or entered into before the date on which such Subsidiary became a Restricted Subsidiary; *provided* that

such agreement was not entered into in anticipation of an Unrestricted Subsidiary becoming a Restricted Subsidiary and any such encumbrance or restriction does not extend to any assets or property of the Borrower or any other Restricted Subsidiary other than the assets and property of such Restricted Subsidiary;

(s)     any encumbrances or restrictions of the type referred to in clauses (1), (2) or (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (r) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive in any material respect with respect to such encumbrance and other restrictions, taken as a whole, than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(t)     existing under, by reason of or with respect to Refinancing Indebtedness; *provided* that the encumbrances and restrictions contained in the agreements governing that Refinancing Indebtedness are, in the good faith judgment of the Borrower, not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced; and

(u)     applicable law or any applicable rule, regulation or order in any jurisdiction where Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred pursuant to Section 7.02 is incurred.

Section 7.08    <u>Modification of Terms of Specified Indebtedness</u>.  The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, amend, modify or change in any manner materially adverse to the interests of the Lenders, as determined in good faith by the Borrower (on the basis of such proposed amendments, modifications or changes taken as a whole), any term or condition of any Specified Indebtedness (other than as a result of any Refinancing Indebtedness in respect thereof) without the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed); *provided*, *however*, that no amendment, modification or change of any term or condition of any Specified Indebtedness permitted by any subordination provisions set forth in the applicable Specified Indebtedness or any other stand-alone subordination agreement in respect thereof and, in each case consented to by the Administrative Agent shall be deemed to be materially adverse to the interests of the Lenders.

Section 7.09    <u>Holdings</u>.  Holdings will not conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto):

(1)     the ownership or acquisition of the Capital Stock (other than Disqualified Stock) of any other Successor Holdings or the Borrower,

(2)     the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance,

(3)     to the extent applicable, participating in tax, accounting and other administrative matters as a member of the combined group of Holdings and the Borrower,

(4)     the performance of its obligations under and in connection with, and payments with respect to, the Loan Documents, the First Lien Loan Documents, the Second Lien Loan Documents and

related documentation in respect of the foregoing and any documents relating to other Indebtedness permitted under Section 7.02 (including, for the avoidance of doubt, the incurrence of Qualified Holding Company Debt),

(5)      any public offering of its common stock or any other issuance or registration of its Capital Stock for sale or resale not prohibited by this Article VII, including the costs, fees and expenses related thereto,

(6)      repurchases of Indebtedness through open market purchases and Dutch auctions (in the case of Loans, to the extent permitted hereunder),

(7)      the incurrence of Qualified Holding Company Debt,

(8)      any transaction that Holdings is permitted to enter into or consummate under this Article VII and any transaction between or among Holdings and the Borrower or any one or more Restricted Subsidiaries permitted under this Article VII, including:

(a)      making any payment(s) or Restricted Payment(s) (i) to the extent otherwise permitted under this Section 7.09 and (ii) with any amounts received pursuant to transactions permitted under Section 7.05 (or the making of a loan to any Parent Company in lieu of any such payment(s) or Restricted Payment(s)) or holding any cash received in connection therewith pending application thereof by Holdings,

(b)      making any Investment to the extent (i) payment therefor is made solely with the Capital Stock of Holdings (other than Disqualified Stock), the proceeds of Restricted Payments received from the Borrower or proceeds of the issuance of, or contribution in respect of the, Capital Stock (other than Disqualified Stock) of Holdings and (ii) any property (including Capital Stock) acquired in connection therewith is contributed to the Borrower or a Subsidiary Guarantor (or, if otherwise permitted by Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary) or the Person formed or acquired in connection therewith is merged with the Borrower or a Subsidiary Guarantor;

(c)      guaranteeing the obligations and granting of Liens of the Borrower and its Subsidiaries to the extent such obligations are not prohibited hereunder;

(d)      incurrence of Indebtedness of Holdings representing deferred compensation to employees, consultants or independent contractors of Holdings and unsecured Indebtedness consisting of promissory notes issued by any Loan Party to future, present or former employees, directors, officers, managers, distributors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any Subsidiary or any Parent Company to finance the retirement, acquisition, repurchase, purchase or redemption of Capital Stock of Holdings,

(e)      incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes,

(f)      providing indemnification to officers and directors and as otherwise permitted in this Article VII,

(g)      activities incidental to the consummation of the Closing Date Transactions,

(h)      the making of any loan to any officers or directors contemplated by Section 7.05 or constituting a Permitted Investment, the making of any investment in the Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary,

(i)      making contributions to the capital of its Subsidiaries, or

(j)      making Investments in cash and Cash Equivalents.

(9)      activities incidental to the businesses or activities described in clauses (1) through (8) of this Section 7.09.

Section 7.10    Financial Covenant.  (a) Prior to the Financial Covenant Change Date, permit Specified Excess Availability, at any time, to be less than the greater of (x) $60,000,000 and (y) 10.0% of the Maximum Borrowing Amount and (b) after the Financial Covenant Change Date, permit the Fixed Charge Coverage Ratio for any Test Period to be less than 1.00 to 1.00; provided that such Fixed Charge Coverage Ratio will only be tested on the date any Covenant Trigger Period commences (as of the last day of the Test Period ending immediately prior to the date on which such Covenant Trigger Period shall have commenced) and shall continue to be tested as of the last day of each Test Period thereafter until such Covenant Trigger Period is no longer continuing.

Section 7.11    Excess Cash Amounts.  Permit (a) the aggregate amount of cash and Cash Equivalents in the Deposit Accounts (including all disbursement accounts), Securities Accounts and the Concentration Account (excluding, in each case, the aggregate amount of cash and/or Cash Equivalents in Excluded Accounts) maintained by the Loan Parties less (b) the sum of, without duplication of amounts contained in Excluded Accounts, (i) any cash and Cash Equivalents to pay (A) payroll, payroll taxes and other taxes, (B) employee wage, benefit payments, severance payments and similar payments, (C) trust and fiduciary obligations, or (D) the principal and interest payments on Indebtedness within three (3) days thereafter with respect to this clause (D), and (ii) other obligations of the Borrower or any of its Subsidiaries owed to a Person other than the Borrower or another Subsidiary of the Borrower and, with respect to this clause (ii), for which the Borrower or any such Subsidiary either (x) has issued checks or has initiated wires or ACH transfers (but which amounts have not, as of such time, been subtracted from the balance in the relevant account of the Borrower or such Subsidiary) or (y) reasonably anticipates in good faith that it will issue checks or initiate wires or ACH transfers within two (2) Business Days thereafter, to exceed $75,000,000 at any time that Excess Availability, determined by reference to the most recent Borrowing Base Certificate delivered by the Borrower pursuant to Section 6.20, is less than 15.0% of the Maximum Borrowing Amount.

# ARTICLE VIII

## Events of Default and Remedies

Section 8.01    Events of Default.  Each of the events referred to in clauses (1) through (11) of this Section 8.01 shall constitute an "Event of Default":

(1)      Non-Payment.  The Borrower fails to pay (a) when and as required to be paid herein, any amount of principal of any Loan or (b) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(2)    <u>Specific Covenants.</u>  (a) The Borrower, any other Loan Party or, in the case of Section 7.09, Holdings, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(1) or 6.05(1) (solely with respect to the Borrower, other than in a transaction permitted under Section 7.03 or 7.04), Section 6.19 (during a Cash Dominion Period, but otherwise subject to a three (3) day grace period to the extent that such default is capable of being cured) or Article VII (other than Section 7.10), (b) the Borrower fails to deliver a Borrowing Base Certificate (after a five (5) Business Day grace period when required to be delivered monthly and three (3) Business Day grace period when required to be delivered weekly), (c) the Borrower makes a material inaccuracy in the calculation of the Borrowing Base included in any Borrowing Base Certificate (and the Borrower fails to correct such inaccuracy within three (3) Business Days following the delivery of any Borrowing Base Certificate to the extent that such inaccuracy is capable of being cured) or (d) the Borrower fails to perform or observe the covenant contained in Section 7.10; *provided* that in the case of this clause (d) an Event of Default shall not occur until the expiration of the Cure Deadline without the consummation of the Cure Right; or

(3)    <u>Other Defaults.</u>  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(1) or (2) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(4)    <u>Representations and Warranties.</u>  Any representation, warranty, certification or statement of fact made or deemed made by the Borrower or any Subsidiary Guarantor herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(5)    <u>Cross-Default and Cross-Acceleration.</u>  Any Loan Party or any Restricted Subsidiary (a) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (b) fails to observe or perform any other agreement or condition relating to any such Indebtedness referred to in the foregoing clause (a), or any other event occurs (other than, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of such Hedging Obligations and not as a result of any default thereunder by the Borrower, or any Subsidiary Guarantor or any Restricted Subsidiary) with respect to such Indebtedness, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that (A) such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02, (B) this clause (5)(b) shall not apply to any Indebtedness if the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto is to convert such Indebtedness into Equity Interests (other than Disqualified Stock) and cash in lieu of fractional shares and (C) this clause (5)(b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or

(6)    <u>Insolvency Proceedings, etc.</u>  Holdings, the Borrower, any Loan Party or any Restricted Subsidiary that is a Significant Subsidiary institutes or consents to the institution of any proceeding under

any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(7)     Judgments.  There is entered against any Loan Party or any Restricted Subsidiary a final judgment and order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) calendar days; or

(8)     ERISA.  (a) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan, (ii) the Borrower or any Subsidiary Guarantor or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan, or (b) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable Law or plan terms, except, with respect to each of the foregoing clauses of this Section 8.01(8), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

(9)     Invalidity of Loan Documents.  Any material provision of the Loan Documents, taken as a whole, at any time after its execution and delivery and for any reason, other than (a) as expressly permitted by any Loan Documents (including as a result of a transaction permitted under 7.03 or 7.04), (b) as a result of acts or omissions by an Agent or any Lender or (c) due to the satisfaction in full of the Termination Conditions, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or any Loan Party denies in writing that it has any or further liability or obligation under the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or purports in writing to revoke or rescind the Loan Documents, taken as a whole, prior to the satisfaction of the Termination Conditions;

(10)     Collateral Documents.  Any Collateral Document with respect to a material portion of the Collateral after delivery thereof pursuant to Section 4.01, 6.11 or 6.13 for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) ceases to create, a valid and perfected Lien with the priority required by the Applicable Intercreditor Agreement (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of Collateral actually delivered to it and pledged under the Collateral Documents or to file Uniform Commercial Code amendments relating to a Loan Party's change of name or jurisdiction of formation (solely to the extent that the Borrower provides the Collateral Agent written notice thereof in accordance with the Security Agreement, and the Collateral Agent and the Borrower have agreed that the Collateral Agent will be responsible for filing such amendments) and continuation statements or to take any other action primarily within its control with respect to the

Collateral and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(11)     Change of Control.  There occurs any Change of Control.

Section 8.02     Remedies upon Event of Default.  If any Event of Default occurs and is continuing (other than an Event of Default under Section 8.01(2)(d) unless the condition in the proviso contained therein has been satisfied), the Administrative Agent may with the consent of the Required Lenders and shall, at the request of the Required Lenders, take any or all of the following actions:

(1)     declare the Commitments of each Lender to make Loans and any obligation of the Issuing Bank to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(2)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under any Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(3)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law; and

(4)     require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to the then Outstanding Amount thereof)

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"), the obligation of each Lender to make Loans and any obligation of the Issuing Bank to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid will automatically become due and payable and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case, without further act of the Administrative Agent or any Lender.

Section 8.03     Application of Funds.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), subject to the Applicable Intercreditor Agreement then in effect, any amounts received on account of the Obligations will be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such (other than in connection with Secured Cash Management Obligations, Obligations in respect of Secured Hedge Agreements or Secured Bank Product Obligations);

*Second*, to pay interest due in respect of all Protective Advances until paid in full;

*Third*, to pay the principal of all Protective Advances until paid in full;

*Fourth*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Fourth payable to them (other than in connection with Secured Cash Management Obligations, Obligations in respect of Secured Hedge Agreements or Secured Bank Product Obligations);

*Fifth*, to pay interest accrued in respect of the Swing Line Loans until paid in full;

*Sixth*, to pay the principal of all Swing Line Loans until paid in full;

*Seventh*, to pay interest accrued in respect of the Revolving Credit Loans (other than Protective Advances) until paid in full;

*Eighth*, ratably (i) to pay the principal of all Revolving Credit Loans (other than Protective Advances) until paid in full and (ii) to the Administrative Agent, to be held by the Administrative Agent, for the benefit of the Issuing Banks, as Cash Collateral in an amount up to 100% of the maximum drawable amount of any outstanding Letters of Credit;

*Ninth*, ratably to pay outstanding Secured Cash Management Obligations;

*Tenth*, ratably to pay outstanding Secured Bank Product Obligations and Secured Hedge Obligations;

*Eleventh*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date, until paid in full; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

Subject to Section 2.03(3), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Eighth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above and, if no Obligations remain outstanding, to the Borrower.

Notwithstanding the foregoing, no amounts received from any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

Section 8.04    Right to Cure.

(1)    Notwithstanding anything to the contrary contained in Section 8.01(2), in the event that the Borrower fails to comply with the requirement of the Financial Covenant, any of the Permitted Holders, Holdings or any other Person designated by the Borrower shall have the right (1) at any time during the period beginning at the start of the last fiscal quarter of the applicable Test Period and ending on or prior to the tenth (10th) Business Day after the date on which financial statements with respect to the Test Period in which such covenant is being measured are required to be delivered pursuant to

Section 6.01 or (2) within ten (10) Business Day after the beginning of a Covenant Trigger Period (such later date, the "**Cure Deadline**"), to make a direct or indirect equity investment in the Borrower in cash in the form of common Equity Interests (or other Qualified Equity Interests reasonably acceptable to the Administrative Agent) (the "**Cure Right**"), and upon the receipt by the Borrower of net cash proceeds pursuant to the exercise of the Cure Right (the "**Cure Amount**"), the Financial Covenant shall be recalculated, giving effect to a pro forma increase to Adjusted EBITDA for such Test Period in an amount equal to such Cure Amount; provided that such pro forma adjustment to Adjusted EBITDA shall be given solely for the purpose of determining the existence of a Default or an Event of Default under the Financial Covenant with respect to any Test Period that includes the fiscal quarter for which such Cure Right was exercised and not for any other purpose under any Loan Document.

(2)        If, after the receipt of the Cure Amounts and the recalculations pursuant to clause (2) above, the Borrower shall then be in compliance with the requirements of the Financial Covenant during such Test Period, the Borrower shall be deemed to have satisfied the requirements of the Financial Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Default that had occurred shall be deemed cured; *provided* that (i) the Cure Right may be exercised on no more than five (5) occasions, (ii) in each four fiscal quarter period, there shall be at least two fiscal quarters in respect of which no Cure Right is exercised, (iii) with respect to any exercise of the Cure Right, the Cure Amount shall be no greater than the amount required to cause the Borrower to be in pro forma compliance with the Financial Covenant (such amount, the "**Necessary Cure Amount**") (*provided* that if the Cure Right is exercised prior to the date financial statements are required to be delivered for such fiscal quarter then the Cure Amount shall be equal to the amount reasonably determined by the Borrower in good faith that is required for purposes of complying with the Financial Covenant for such fiscal quarter (such amount, the "**Expected Cure Amount**")), (iv) subject to clause (3) below, all Cure Amounts shall be disregarded for purposes of determining any baskets or financial ratio calculations (other than with respect to the Financial Covenant), with respect to the covenants contained in the Loan Documents and (v) there shall be no pro forma or other reduction in Indebtedness (by netting or otherwise) with the proceeds of any Cure Amount for determining compliance with the Financial Covenant for the fiscal quarter for which such Cure Amount is deemed applied unless such proceeds are actually applied to prepay Indebtedness.

(3)        Notwithstanding anything herein to the contrary, (A) to the extent that the Expected Cure Amount is (i) greater than the Necessary Cure Amount, then such difference may be used for the purposes of determining any baskets (other than any previously contributed Cure Amounts), with respect to the covenants contained in the Loan Documents and (ii) *less* than the Necessary Cure Amount, then not later than the applicable Cure Deadline, the Borrower must receive a direct or indirect equity investment in cash in the form of common Equity Interests (or other Qualified Equity Interests reasonably acceptable to the Administrative Agent), which cash proceeds received by Borrower shall be equal to the shortfall between such Expected Cure Amount and such Necessary Cure Amount and (B) prior to the Cure Deadline (x) the Lenders shall not be permitted to exercise any rights then available as a result of an Event of Default under Section 8.02 on the basis of a breach of the Financial Covenant so as to enable the Borrower to consummate its Cure Rights as permitted under this Section 8.04 and (y) the Lenders shall not be required to make any Credit Extension unless and until the Borrower has received the Cure Amount required to cause the Borrower to be in compliance with the Financial Covenant.

# ARTICLE IX

## Administrative Agent and Other Agents

Section 9.01    Appointment and Authorization of the Administrative Agent.

(1)    Each Lender hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article IX (other than Sections 9.09, 9.10, 9.11, 9.12 and 9.16) are solely for the benefit of the Administrative Agent, the Lenders and each Issuing Bank and the Borrower shall not have rights as a third-party beneficiary of any such provision.

(2)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a Revolving Credit Lender, Swing Line Lender (if applicable), Issuing Bank (if applicable) and as a potential Hedge Bank or Cash Management Bank) and the Issuing Banks hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender and Issuing Bank for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including any Applicable Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

(3)    The Administrative Agent agrees to furnish to each Lender, promptly after they become available, (i) copies of all Borrowing Base Certificates and financial statements required to be delivered by the Borrower hereunder; and (ii) copies of each Report.  Upon reasonable request by any Lender, Administrative Agent agrees to use commercial reasonable efforts to furnish to such Lender copies of any other information or material delivered by the Loan Parties pursuant to the requirements of this Agreement or any other Loan Document.

Section 9.02    Rights as a Lender.  Any Lender that is also serving as an Agent (including as Administrative Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Lender (if any) serving as an Agent hereunder in its individual capacity.  Any such Person serving as an Agent and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.  The Lenders acknowledge that, pursuant to such activities, any Agent

or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.03    Exculpatory Provisions.  The Administrative Agent, Collateral Agent and the Arrangers shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, an Agent (including the Administrative Agent) and an Arranger:

(1)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent or Arranger is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(2)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent or Arranger is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that no Agent or Arranger shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent or Arranger to liability or that is contrary to any Loan Document or applicable law;

(3)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by any Person serving as an Agent, Arranger or any of their Affiliates in any capacity; and

(4)    shall not have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, to any Lender or any Issuing Bank, any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their Affiliates, that is communicated to, obtained or in the possession of, any Agent, any Arranger or any of their Related Persons in any capacity, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents herein.

Neither the Administrative Agent nor any of its Related Persons shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final and non-appealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender or an Issuing Bank.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the

covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, each Arranger is named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Loan Documents or the transactions contemplated hereby and thereby; it being understood and agreed that each Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Section 10.05.  Without limitation of the foregoing, each Arranger shall not, solely by reason of this Agreement or any other Loan Documents, have any fiduciary relationship in respect of any Lender or any other Person.

Section 9.04   Lack of Reliance on the Administrative Agent.  Each Lender and each Issuing Bank expressly acknowledges that none of the Agents nor any Arranger has made any representation or warranty to it, and that no act by any Agent or any Arranger hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Loan Party of any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent or any Arranger to any Lender or each Issuing Bank as to any matter, including whether any Agent or any Arranger have disclosed material information in their (or their Related Persons') possession.  Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings, the Borrower and the Restricted Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings, the Borrower and the Restricted Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder.  Each Lender and each Issuing Bank also acknowledges that it will, independently and without reliance upon the Agents, the Arrangers, any other Lender or any of their Related Persons and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties.  Except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.  The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement

or any other Loan Document or the financial condition of the Holdings, the Borrower or any of the Restricted Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of Holdings, the Borrower or any of the Restricted Subsidiaries or the existence or possible existence of any Default or Event of Default.  Each Lender and each Issuing Bank represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender or Issuing Bank for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender or Issuing Bank, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender and each Issuing Bank agrees not to assert a claim in contravention of the foregoing.  Each Lender and each Issuing Bank represents and warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender or such Issuing Bank, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

Section 9.05   Certain Rights of the Administrative Agent.  If the Administrative Agent requests instructions from the Required Lenders (or such greater percentage of Lenders required) with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders (or such greater percentage of Lenders required); and the Administrative Agent shall not incur liability to any Lender by reason of so refraining.  Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders (or such greater percentage of Lenders required).

Section 9.06   Reliance by the Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any note, writing, resolution, notice, statement, certificate, telex, teletype or facsimile message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.  In determining compliance with any condition hereunder to the making of a Loan or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or Issuing Bank prior to the making of such Loan or issuances of such Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.07   Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub agents appointed by the Administrative Agent.  The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Agent-Related Persons of the Administrative Agent and any such sub agent, and shall

apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 9.08    Indemnification.  Whether or not the transactions contemplated hereby are consummated, to the extent the Administrative Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; *provided* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or any other Agent-Related Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.08 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided further* that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof.  The undertaking in this Section 9.08 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

Section 9.09    The Administrative Agent in Its Individual Capacity.  With respect to its obligation to make Loans under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders" or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its respective individual capacities.  The Administrative Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Loan Party or any Affiliate of any Loan Party (or any Person engaged in a similar business with any Loan Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party or any Affiliate of any Loan Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.  The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.10    Holders.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

Section 9.11    Resignation by the Administrative Agent.  The Administrative Agent may resign from the performance of all its respective functions and duties hereunder or under the other Loan Documents at any time by giving 30 Business Days prior written notice to the Lenders and the Borrower. If the Administrative Agent is in material breach of its obligations hereunder as Administrative Agent, then the Administrative Agent may be removed as the Administrative Agent at the reasonable request of the Required Lenders.  If the Administrative Agent is a Defaulting Lender, the Borrower may remove the Defaulting Lender from such role upon 15 days prior written notice to the Lenders.  Such resignation or removal shall take effect upon the appointment of a successor Administrative Agent as provided below.

Upon any such notice of resignation by, or notice of removal of, the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a Lender reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (*provided* that the Borrower's approval shall not be required if an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing).

If a successor Administrative Agent shall not have been so appointed within such 30 Business Day period, the Administrative Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed, *provided* that the Borrower's consent shall not be required if an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing), shall then appoint a Lender as successor Administrative Agent who shall serve as Administrative Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

If no successor Administrative Agent has been appointed pursuant to the foregoing by the 35th Business Day after the date such notice of resignation was given by the Administrative Agent or such notice of removal was given by the Required Lenders or the Borrower, as applicable, the Administrative Agent's resignation shall nonetheless become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.  The retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the Issuing Banks under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender or Issuing Bank directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 9.11.

Upon the acceptance of a successor's appointment as Administrative Agent hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall

succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.11).

The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Upon a resignation of the Administrative Agent pursuant to this Section 9.11, the Administrative Agent (i) shall continue to be subject to Section 10.09 and (ii) shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this Article IX (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

Section 9.12   Collateral Matters.  Each Lender (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) irrevocably authorizes and directs the Collateral Agent to take the actions to be taken by them as set forth in Section 7.04 and 10.24.

Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders (or such greater percentage of Lenders required) in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders (or such greater percentage of Lenders required) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, to take any action with respect to any Collateral or Collateral Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Collateral Documents.

Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 9.12. In each case as specified in this Section 9.12, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.12.

The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 9.12, Section 10.24 or in any of the Collateral Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it

may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 9.13   [Reserved].

Section 9.14   Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, any Issuing Bank and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, any Issuing Bank and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, any Issuing Bank and the Administrative Agent under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuing Bank to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and relevant Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or Issuing Bank or to authorize the Administrative Agent to vote in respect of the claim of any Lender or Issuing Bank in any such proceeding.

Section 9.15   Appointment of Supplemental Administrative Agents.

(1)   It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee,

co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(2)        In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent or such Supplemental Administrative Agent, as the context may require.

(3)        Should any instrument in writing from any Loan Party be reasonably required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments reasonably acceptable to it promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

Section 9.16    Intercreditor Agreements.  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document:  (a) the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Loan Documents and the exercise of any right related to any Collateral shall be subject, in each case, to the terms of the ABL Intercreditor Agreement or any other Applicable Intercreditor Agreement, (b) in the event of any conflict between the express terms and provisions of this Agreement or any other Loan Document, on the one hand, and of the ABL Intercreditor Agreement or any other Applicable Intercreditor Agreement, on the other hand, the terms and provisions of the ABL Intercreditor Agreement shall control, and (c) each Lender (and, by its acceptance of the benefits of any Collateral Document, each other Secured Party) hereunder authorizes and instructs the Administrative Agent and Collateral Agent to execute the ABL Intercreditor Agreement or any other Applicable Intercreditor Agreement on behalf of such Lender, and such Lender agrees to be bound by the terms thereof.

Section 9.17    Secured Cash Management Agreements and Secured Hedge Agreements.  Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank or Hedge Bank that obtains the benefits of Section 8.03, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory

arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

Section 9.18    Bank Product Providers.  Each Bank Product Provider, by delivery of a notice to the Administrative Agent of a Bank Product, agrees to be bound by Section 8.03 and this Article IX. Each Bank Product Provider shall indemnify and hold harmless the Administrative Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent), to the extent not reimbursed by the Borrower, against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Administrative Agent or such other Agent-Related Person in connection with such provider's Secured Bank Product Obligations.

Section 9.19    Withholding Tax.  To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.18.  The agreements in this Section 9.18 shall survive the resignation or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 9.20    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance

company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

## ARTICLE X

### Miscellaneous

Section 10.01  Amendments, etc.

(1)     Subject to Section 3.03(c) and except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (other than with respect to any amendment or waiver contemplated in clause (i) below, which shall only require the consent of the Required Facility Lenders under the applicable Facility or Facilities) (or by the Administrative Agent with the consent of the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and the Administrative Agent hereby agrees to acknowledge any such waiver, consent or amendment that otherwise satisfies the requirements of this Section 10.01 as promptly as possible, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)      extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.01 or Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments or Loans or the making of any Protective Advance shall not constitute an extension or increase of any Commitment of any Lender) (provided that any Lender, upon the request of the Borrower, may extend the maturity date of any of such Lender's Commitments without the consent of any other Lender, including the Required Lenders but any Lender that does not consent to such request shall not be deemed a Non-Extended Lender except in accordance with Section 2.16 hereof);

(b)      postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or 2.08 (other than pursuant to Section 2.08(2)) or any payment of fees or premiums hereunder or under any Loan Document with respect to payments to any Lender without the written consent of such Lender, it being understood that none of the following will constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of principal, interest, fees or premiums:  the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans, Default, Event of Default or any condition precedent set forth in Section 4.01 or 4.02 (provided that any Lender, upon the request of the Borrower, may extend the maturity date of any of such Lender's Commitments without the consent of any other Lender, including the Required Lenders);

(c)      reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing (it being understood that a waiver of any condition precedent set forth in Section 4.02 or any Default, Event of Default or mandatory prepayment shall not constitute a reduction or forgiveness of principal), or (subject to clause (I) of the proviso immediately succeeding clause (k) of this Section 10.01(1)) any fees or other amounts payable hereunder or under any other Loan Document to any Lender without the written consent of such Lender; *provided* that only the consent of (A) the Required Lenders shall be necessary to amend the definition of "Default Rate" and (B) the Required Lenders will be necessary to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)      except as contemplated by clause (C) in the second proviso immediately succeeding clause (k) of this Section 10.01(1), change any provision of this Section 10.01 or the definition of "Required Lenders" or "Supermajority Lenders" or any other provision, in each case, specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender;

(e)      other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(f)      other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)      amend the provisions of Section 2.13 or 8.03 of this Agreement or any analogous provision of any other Loan Document, in a manner that would by its terms alter the pro rata sharing of payments required thereby or the relative priorities of such payments, without the prior written consent of each Lender;

(h)      change the priority of the ABL Priority Collateral or the definition of "ABL Priority Collateral" in the ABL Intercreditor Agreement to any priority subordinated to such initial priority without the written consent of each Lender (other than a Defaulting Lender) except as expressly provided in the Loan Documents; or

(i)     amend, waive or otherwise modify any term or provision (including the availability and conditions to funding and the rate of interest applicable thereto) which directly affects Lenders of one Facility and does not directly affect Lenders under any other Facility, in each case, without the written consent of the Required Facility Lenders under such applicable Facility;

(j)     change the definition of the term "Borrowing Base" or any component definition thereof, but excluding an increase in the percentage advance rates, the amendment or modifications of which shall be subject to clause (k) below, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, without the written consent of the Supermajority Lenders, provided that the foregoing shall not limit the discretion of the Administrative Agent's ability to change, establish or eliminate any Reserves as determined in its Permitted Discretion without the consent of any Lenders; or

(k)     increase percentage advance rates set forth in the definition of "Borrowing Base", without the written consent of each Lender; provided that the foregoing shall not limit the ability of the Administrative Agent to change, establish or eliminate any Reserves without the consent of any Lenders;

provided that:

(I)     no amendment, waiver or consent shall, unless in writing and signed by each Issuing Bank in addition to the Lenders required above, materially affect the rights or duties of an Issuing Bank under this Agreement or any L/C Application related to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, materially affect the rights or duties of the Swing Line Lender under this Agreement, (iii) no amendment, waiver or consent shall, unless in writing and signed by (x) the Administrative Agent  but not the Lenders, affect any fees or other amounts payable to the Administrative Agent under this Agreement or any other Loan Document, or (y) the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document;

(II)     the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any changes necessary or advisable to be made in connection with any FILO Tranche, Revolving Credit Commitment Increases or Extended Revolving Credit Commitments to effect the provisions of Section 2.14 or 2.16 (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any FILO Tranche, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant is also added for the benefit of any corresponding Revolving Credit Loans remaining outstanding after the issuance or incurrence of any such FILO Tranche in connection therewith); and

(III)     Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification;

provided further that notwithstanding the foregoing:

(A)     no Defaulting Lender shall have any right to approve or disapprove of any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders, the Required Facility Lenders, the Required Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that the Revolving Credit Commitment of any Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender) (it being understood that any Commitments or Loans

held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders);

(B)     no Lender consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement (i) that is for the purpose of adding the holders of Permitted Indebtedness that is secured Indebtedness (or a Debt Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of such Applicable Intercreditor Agreement, as applicable (it being understood that any such amendment, modification or supplement may make such other changes to the applicable Applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by any Applicable Intercreditor Agreement, provided that such other changes are not adverse, in any material respect, to the interests of the Lenders; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable;

(C)     this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Revolving Credit Loans, the Swing Line Loans and the L/C Obligations and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders; *provided* that, after giving effect to such new credit facilities (and each incurrence of Indebtedness thereunder), in no event shall the total Revolving Credit Exposure (plus any such Indebtedness under a new facility permitted under this subsection (C)) exceed the Maximum Borrowing Amount (subject to the Administrative Agent's authority, in its sole discretion, to make Overadvances under Section 2.01(b) or Protective Advances under Section 2.01(c));

(D)     any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section 10.01 if such Class of Lenders were the only Class of Lenders hereunder at the time;

(E)     Without limiting the scope of Section 10.01(3) below, any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency (including amendments, supplements or waivers to any of the Collateral Documents, guarantees, intercreditor agreements or related documents executed by any Loan Party or any other Subsidiary in connection with this Agreement if such amendment, supplement or waiver is delivered in order to cause such Collateral Documents, guarantees, intercreditor agreements or related documents to be consistent with this Agreement and the other Loan Documents) so long as, in each case, the Lenders

shall have received at least 5 Business Days' prior written notice thereof and the Administrative Agent shall not have received, within 5 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; *provided* that the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any such changes necessary to be made in connection with any borrowing of Incremental Revolving Credit Loans, any Extension and otherwise to effect the provisions of Section 2.14 or 2.16 or the immediately succeeding paragraph of this Section 10.01, respectively;

(F)     the Borrower and the Administrative Agent may, without the input or consent of the other Lenders, effect changes to any Security Document as may be necessary or appropriate in the opinion of the Collateral Agent.

(2)     [Reserved].

(3)     In addition, notwithstanding anything to the contrary in this Section 10.01,

(a)     In addition to the amendments permitted under Section 10.01(I)(E) above, the Guaranty, the Collateral Documents and related documents executed by Holdings, the Borrower or any Restricted Subsidiaries in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause the Guaranty, Collateral Documents or other document to be consistent with this Agreement and the other Loan Documents (including by adding additional parties as contemplated herein or therein); provided that notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective; and

(b)     if the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document.  Notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective.

Section 10.02  <u>Notices and Other Communications; Facsimile Copies</u>.

(1)     <u>General</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)     if to Holdings, the Borrower or the Administrative Agent, an Issuing Bank and the Swing Line Lender, to the address, facsimile number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

(b)        if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next succeeding Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (2) below shall be effective as provided in such subsection (2).

(2)        Electronic Communication.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(3)        Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next succeeding Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(4)        The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Agent-Related Persons or any Arranger (collectively, the "**Agent Parties**") have any liability to Holdings, the Borrower, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(5)     Change of Address.  Each Loan Party and the Administrative Agent may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the other parties hereto.  Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(6)     Reliance by the Administrative Agent.  The Administrative Agent, the Issuing Bank and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent or the Issuing Bank may be recorded by the Administrative Agent or the Issuing Bank, as applicable, and each of the parties hereto hereby consents to such recording.

Section 10.03  No Waiver; Cumulative Remedies.  No failure by any Lender, the Issuing Bank or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Issuing Bank or Swing Line Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as Issuing Bank or Swing Line Lender, as the case may be) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 10.10 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided further* that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the

Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04   <u>Costs and Expenses</u>.  The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Arrangers for all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and the Arrangers (promptly following a written demand therefor, together with backup documentation supporting such reimbursement request) incurred in connection with the preparation, negotiation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Morgan, Lewis & Bockius LLP and, if necessary, a single local counsel in each relevant material jurisdiction, and (b) upon presentation of a summary statement, together with any supporting documentation reasonably requested by the Borrower, to pay or reimburse the Administrative Agent, each Issuing Bank, the Swing Line Lender and the other Lenders, taken as a whole, promptly following a written demand therefor for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of one counsel to the Administrative Agent and the Lenders taken as a whole (and, if necessary, one local counsel in any relevant material jurisdiction and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)).  The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05   <u>Indemnification by the Borrower</u>.  The Borrower shall indemnify and hold harmless the Agents, each Issuing Bank, the Swing Line Lender, each other Lender, the Arrangers and their respective Related Persons (collectively, the "**Indemnitees**") from and against any and all losses, claims, damages, liabilities or expenses (including Attorney Costs and Environmental Liabilities) to which any such Indemnitee may become subject arising out of, resulting from or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) any (i) actual or threatened claim, litigation, investigation, proceeding or Environmental Liabilities relating to the Closing Date Transactions or (ii) to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents, the Loans or the use, or proposed use of the proceeds therefrom, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation, investigation or proceeding), and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Loan Document by such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees

other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under any Loan Document and other than any claims arising out of any act or omission of the Borrower or any of their Affiliates (as determined by a final, non-appealable judgment of a court of competent jurisdiction).  To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that they are permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through SyndTrak or other similar information transmission systems in connection with this Agreement (except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnitee), nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party for which such Indemnitee is otherwise entitled to indemnification pursuant to this Section 10.05).  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated.  All amounts due under this Section 10.05 shall be paid within twenty (20) Business Days after written demand therefor.  The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.  This Section 10.05 shall not apply to Taxes, except any Taxes that represent losses or damages arising from any non-Tax claim.  Notwithstanding the foregoing, each Indemnitee shall be obligated to refund and return promptly any and all amounts paid by the Borrower under this Section 10.05 to such Indemnitee for any such fees, expenses or damages to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.

Section 10.06  <u>Marshaling; Payments Set Aside</u>.  None of the Administrative Agent or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

Section 10.07  <u>Successors and Assigns</u>.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 7.03, assign or otherwise transfer any of

its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder (including to existing Lenders and their Affiliates) except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f), or (iv) to an SPC in accordance with the provisions of Section 10.07(g) (and any other attempted assignment or transfer by any party hereto (other than the replacement of the Administrative Agent pursuant to Article IX above) shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d) and, to the extent expressly contemplated hereby, Indemnitees and Related Persons of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      Assignments by Lenders.  Any Lender may at any time assign to (v) any Lender or any of its Affiliates (of similar credit worthiness), (w) any bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250.0 million, (x) an Approved Fund and (y) any Person to whom a Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Lender's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, in each case, all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)      Minimum Amounts.

(A)      in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)      in any case not described in subsection (b)(i)(A) of this Section 10.07, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5.0 million, unless either (x) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (y) each of the Administrative Agent and the Borrower otherwise consents; *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)      Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)      Required Consents.  No consent shall be required for any assignment except to the extent required by Section 10.07(b)(i)(B) and, in addition:

(A)      the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing at the time of such assignment determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date or (2) in respect of an assignment of all or a portion of the Loans, such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that the Borrower shall be deemed to have consented to any assignment unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice of a failure to respond to such request for assignment;

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund with respect to a Lender; *provided* that no consent of the Administrative Agent shall be required for an assignment of all or a portion of the Loans pursuant to Section 10.07(g);

(C)      the consent of each Issuing Bank (such consent not to be unreasonably withheld or delayed) shall be required at the time of such assignment; *provided* that no consent of the Issuing Banks shall be required for any assignment not related to Revolving Credit Commitments or Revolving Credit Exposure or any assignment to an Agent or an Affiliate of an Agent; and

(D)      the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required; *provided* that no consent of a Swing Line Lender shall be required for any assignment not related to Revolving Credit Commitments or Revolving Credit Exposure or any assignment to an Agent or an Affiliate of an Agent.

(iv)      <u>Assignment and Assumption.</u>  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent). The Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.  Each assignee Lender shall be required to represent in the Assignment and Assumption that it is not a Disqualified Institution or an Affiliate of a Disqualified Institution.

(v)      <u>No Assignments to Certain Persons.</u>  No such assignment shall be made (A) to Holdings, the Borrower or any of its Subsidiaries, (B) to any Affiliate of the Borrower, (C) to a natural person or (D) to any Disqualified Institution.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable

assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans and participations in Letters of Credit and Swing Line Loans in accordance with its Pro Rata Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.  Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section 10.07, from and after the effective date specified in each Assignment and Assumption, (x) the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (y) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment), but shall in any event continue to be subject to Section 10.09.  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(d).

(c)     The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, each notice of cancellation of any Loans delivered by the Borrower pursuant to subsections (h) or (l) below, and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, L/C Obligations (specifying Unreimbursed Amounts), L/C Borrowings and amounts due under Section 2.03, owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Agent and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior notice.  This Section 10.07(3) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any Affiliate or Subsidiary of the Borrower or a Disqualified Institution) (each, a "**Participant**") in all or a portion of such Lender's rights or obligations under this Agreement (including all or a portion of its Commitment or the Loans (including such Lender's participations in L/C Obligations or Swing Line Loans owing to it)); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or

any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than clauses (d) and (i) thereof) that directly affects such Participant.  Subject to subsection (e) of this Section 10.07, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements of Section 3.01 (including subsections (2), (3) and (4), as applicable as though it were a Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.07.  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.10 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(e)     <u>Limitations upon Participant Rights.</u>  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or such entitlement to a greater payment results from a Change in Law after the sale of the participation takes place.  Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**").  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and the Borrower shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary; *provided* that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of the Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or other obligations under any Loan Document) to any Person except to the extent such disclosure is necessary to establish that such commitments, loans, letters of credit or other obligations are in registered form for U.S. federal income tax purposes.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof shall be appropriately reflected in the Participant Register.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the

approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

      (h)    [Reserved].

      (i)    [Reserved].

      (j)    [Reserved].

      (k)    [Reserved];

      (l)    [Reserved];

      (i)    [Reserved]; and

      (ii)    [Reserved].

      (m)    Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

      (n)    Notwithstanding the foregoing, no Disqualified Institution that purports to become a Lender hereunder (notwithstanding the provisions of this Agreement that prohibit Disqualified Institutions from becoming Lenders) shall be entitled to any of the rights or privileges enjoyed by the other Lenders with respect to voting, information and lender meetings.  In addition, if any assignment or participation is made to any Disqualified Institution without the Borrower's express prior written consent (which consent shall state expressly that the Borrower acknowledges that the assignee Lender is a Disqualified Institution) in violation of clause (v) of Section 10.07(b), the Borrower may, in addition to any other rights and remedies that it may have against such Disqualified Institution, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) in the case of outstanding Revolving Credit Loans held by Disqualified Institutions, purchase or prepay such Revolving Credit Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Revolving Credit Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the

restrictions contained in Section 10.07), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

(o)     The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution.

Section 10.08  [Reserved].

Section 10.09  Confidentiality.  Each of the Agents, the Arrangers, the Lenders and each Issuing Bank agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, legal counsel, independent auditors, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, with such Affiliate being responsible for such Person's compliance with this Section 10.09; *provided*, *however*, that such Agent, Arranger, Lender or Issuing Bank, as applicable, shall be principally liable to the extent this Section 10.09 is violated by one or more of its Affiliates or any of its or their respective employees, directors or officers), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided*, *however*, that each Agent, each Arranger, each Lender and each Issuing Bank agrees to seek confidential treatment with respect to any such disclosure, (c) to the extent required by applicable laws or regulations or by any subpoena or otherwise as required by applicable Law or regulation or as requested by a governmental authority; *provided* that such Agent, such Arranger, such Lender or such Issuing Bank, as applicable, agrees (x) that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (except in connection with any request as part of any audit or regulatory examination) unless such notification is prohibited by law, rule or regulation and (y) to seek confidential treatment with respect to any such disclosure, (d) to any other party hereto, (e) subject to an agreement containing provisions at least as restrictive as those of this Section 10.09, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee (or its agent) invited to be an Additional Lender or (ii) with the prior consent of the Borrower, any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any of their Subsidiaries or any of their respective obligations; *provided* that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, Participant or Eligible Assignee that such Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to the Borrower, the Agents and the Arrangers, including as set forth in any confidential information memorandum or other marketing materials) in accordance with the standard syndication process of the Agents and the Arrangers or market standards for dissemination of such type of information which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information, (f) for purposes of establishing a "due diligence" defense, (g) with the consent of the Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach by any Person of this Section 10.09 or any other confidentiality

provision in favor of any Loan Party, (y) becomes available to any Agent, any Arranger, any Lender, any Issuing Bank or any of their respective Affiliates on a non-confidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent, such Lender, such Issuing Bank or the applicable Affiliate to be subject to a confidentiality restriction in respect thereof in favor of Holdings, the Borrower or any Affiliate of the Borrower or (z) is independently developed by the Agents, the Lenders, the Issuing Banks, the Arrangers or their respective Affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this Section 10.09 or (i) in order to enforce its respective rights under any Loan Document in any action or proceeding.

For purposes of this Section 10.09, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary or Affiliate thereof or their respective businesses, other than any such information that is available to any Agent, any Lender or any Issuing Bank on a non-confidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary or Affiliate thereof after the date hereof shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 10.09 shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Agent, each Arranger, each Lender and each Issuing Bank acknowledges that (a) the Information may include trade secrets, protected confidential information, or material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of such information and (c) it will handle such information in accordance with applicable Law, including United States Federal and state securities Laws and to preserve its trade secret or confidential character.

The respective obligations of the Agents, the Arrangers, the Lenders and any Issuing Bank under this Section 10.09 shall survive, to the extent applicable to such Person, (x) the payment in full of the Obligations and the termination of this Agreement, (y) any assignment of its rights and obligations under this Agreement and (z) the resignation or removal of any Agent.

        Section 10.10  Setoff.

If an Event of Default shall have occurred and be continuing, each Lender, each Issuing Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or such Issuing Bank to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party then due and payable under this Agreement or any other Loan Document to such Lender or such Issuing Bank, irrespective of whether or not such Lender or such Issuing Bank or any such Affiliate shall have made any demand under this Agreement or any other Loan Document; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Banks, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, each Issuing

Bank and each of their respective Affiliates under this Section 10.10 are in addition to other rights and remedies (including other rights of setoff) that such Lender, such Issuing Bank or their respective Affiliates may have.  Each Lender and each Issuing Bank agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.11  Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.12  Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.13  Electronic Execution of Assignments and Certain Other Documents.

(a)      The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

(b)      This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "**Communication**"), including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures. Each of the Loan Parties agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on each of the Loan Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation each of the Loan

Parties enforceable against such in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent and each of the Credit Parties of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent and each of the Credit Parties may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("**Electronic Copy**"), which shall be deemed created in the ordinary course of the such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Administrative Agent is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Administrative Agent has agreed to accept such Electronic Signature, the Administrative Agent and each of the Credit Parties shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

Section 10.14  <u>Survival of Representations and Warranties</u>.  Subject to Section 1.02(9), all representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.15  <u>Severability</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.16  <u>GOVERNING LAW</u>.

(a)     THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

(b)     THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF

AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)     THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION 10.16.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 10.17  WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.17.

Section 10.18  Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

Section 10.19  Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the

Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent.  The provision of this Section 10.19 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.20  <u>Use of Name, Logo, etc</u>.  Each Loan Party consents to the publication in the ordinary course by Administrative Agent or the Arrangers of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark.  Such consent shall remain effective until revoked by such Loan Party in writing to the Administrative Agent and the Arrangers.

Section 10.21  <u>USA PATRIOT Act and other Anti-Terrorism Laws</u>.  Each Lender that is subject to the USA PATRIOT Act and other Anti-Terrorism Laws and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act and other Anti-Terrorism Laws, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act and other Anti-Terrorism Laws.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including and the Beneficial Ownership Regulation, the USA PATRIOT Act and other Anti-Terrorism Laws.

Section 10.22  <u>Service of Process</u>.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.23  <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Agents, the Arrangers and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agents, the Arrangers and the Lenders, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, Arranger and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents, the Arrangers nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Agents, the Arrangers nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the

Borrower and Holdings hereby waives and releases any claims that it may have against the Agents, the Arrangers or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.24   Release of Collateral and Guarantee Obligations; Subordination of Liens.

(a)      The Lenders and the Issuing Banks hereby irrevocably agree that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released (i) in full, as set forth in clause (b) below, (ii) upon the sale or other transfer of such Collateral (including as part of or in connection with any other sale or other transfer permitted hereunder) to any Person other than another Loan Party, to the extent such sale, transfer or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party by a Person that is not a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guaranty (in accordance with the second succeeding sentence), (vi) as required by the Collateral Agent to effect any sale, transfer or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Collateral Documents and (vii) to the extent such Collateral otherwise becomes Excluded Assets.  Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents.  Additionally, the Lenders and the Issuing Banks hereby irrevocably agree that the Guarantors shall be released from the Guaranties upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary, or otherwise becoming an Excluded Subsidiary, provided that after giving effect to any such release, no Overadvance shall exist or result therefrom.  The Lenders and the Issuing Banks hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender or Issuing Bank.  Any representation, warranty or covenant contained in any Loan Document relating to any such released Collateral or Guarantor shall no longer be deemed to be repeated.

(b)      Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements, (iii) any contingent obligations not then due and (iv) the Outstanding Amount of L/C Obligations related to any Letter of Credit that has been Cash Collateralized, backstopped by a letter of credit reasonably satisfactory to the applicable Issuing Bank or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank) have been paid in full and all Commitments have terminated, upon request of the Borrower, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements, (iii) any contingent obligations not then due and (iv) any Outstanding Amount of L/C Obligations related to any Letter of Credit that has been Cash Collateralized, backstopped by a

229

letter of credit reasonably satisfactory to the applicable Issuing Bank or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank.  Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Permitted Lien specified in clause (7) of the definition thereof securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of Section 7.02(b) in any Collateral, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to subordinate the Lien on any Collateral to any such Permitted Lien to be senior to the Liens in favor of the Collateral Agent.

(d)     Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrower's assets in a bankruptcy, foreclosure or other similar proceeding, forbear from exercising remedies upon an Event of Default, or in a bankruptcy proceeding, enter into a settlement agreement on behalf of all Lenders.

Section 10.25  Assumption and Acknowledgment.  On the Closing Date, Belk assumed all of Initial Borrower's rights, title, interests, duties, liabilities and obligations (including the Obligations) under the Loan Documents as the "Borrower" hereunder (collectively, the "**Assumption**"), including, any claims, liabilities, or obligations arising from Initial Borrower's failure to perform any of its covenants, agreements, commitments or obligations under the Loan Documents to be performed prior to the date of the Assumption.

Section 10.26  Judgment Currency.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

Section 10.27  <u>Secured Bank Product Agreements, Secured Cash Management Agreements and Secured Hedge Agreements</u>.

Except as otherwise expressly set forth herein or in any Guarantee or any Collateral Document, no party to any Secured Bank Product Agreement, Secured Cash Management Agreement or Secured Hedge Agreement that obtains the benefits of any Guarantee or any Collateral by virtue of the provisions hereof or of any Guarantee or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article X to the contrary, the Collateral Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Secured Bank Product Agreements, Secured Cash Management Agreements or Secured Hedge Agreements unless the Administrative Agent has received written notice of such Secured Bank Product Agreement, Secured Cash Management Agreement or Secured Hedge Agreement, together with such supporting documentation as the Administrative Agent may request, from the applicable Agent, Lender or Affiliate of an Agent or Lender party thereto.

Section 10.28  <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender or an Issuing Bank that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender or any Issuing Bank that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 10.29  <u>Acknowledgement Regarding Any Supported QFCs</u>.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act

231

and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BELK, INC.,
 as the Borrower

By: _____
Name:
Title:

DB1/ 118926700.9

BEAR PARENT INC.,
  as Holdings


By: _____
       Name:
       Title:

[Signature Page to ABL Credit Agreement]

BANK OF AMERICA, N.A.,
    as Administrative Agent and Collateral Agent

By: _____
    Name:
    Title:

[Signature Page to ABL Credit Agreement]

[_____],
    as Lender


By: _____
    Name:
    Title:

[Signature Page to ABL Credit Agreement]

**ANNEX B**

Amended Schedules

[see attached]

**<u>ANNEX C</u>**

<u>Updated Exhibits</u>

[see attached]

LIMITED WAIVER AND AMENDMENT NO. 3 TO ABL CREDIT AGREEMENT

This LIMITED WAIVER AND AMENDMENT NO. 3 TO ABL CREDIT AGREEMENT, dated as of February ~~[ ],~~24, 2021 (this "**Agreement**"), is among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation (the "**Borrower**"), BANK OF AMERICA, N.A., as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each Lender party hereto.

## PRELIMINARY STATEMENTS

**WHEREAS**, reference is made to that certain ABL Credit Agreement, dated as of December 10, 2015 (as amended by that certain Amendment No. 1 to ABL Credit Agreement, dated as of August 29, 2019, as further amended by that certain Amendment No. 2 to ABL Credit Agreement, dated as of October 30, 2020, as in effect immediately prior to the effectiveness of this Agreement, the "**Existing Credit Agreement**"; the Existing Credit Agreement as amended by this Agreement, the "**Amended Credit Agreement**"; capitalized terms used but not defined herein having the meanings provided in the Amended Credit Agreement), among the Borrower, Holdings, the Lenders from time to time party thereto, the Administrative Agent and the Collateral Agent;

**WHEREAS**, as of the date hereof the Borrower and certain of its Subsidiaries will commence the Chapter 11 Cases with the United States Bankruptcy Court for the Southern District of Texas. Such commencement of an insolvency proceeding is an Event of Default pursuant to Section 8.01(6) of the Existing Credit Agreement (the "**Insolvency Proceeding Default**").

**WHEREAS**, the Borrower has failed to make that certain payment of Indebtedness due February 1, 2021 pursuant to the terms of the First Lien Credit Agreement. Such missed payment of Indebtedness is an Event of Default pursuant to Section 8.01(5) of the Existing Credit Agreement (the "**Payment Default**", together with the Insolvency Proceeding Default, the "**Specified Defaults**")

**WHEREAS**, the Administrative Agent and each of the Lenders have agreed to (i) waive the Specified Defaults and (ii) modify the Existing Credit Agreement in the manner described in Section 2 herein;

**NOW**, **THEREFORE**, in consideration of the undertakings set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Limited Waiver; No Other Waiver.

(a)    Subject to the terms and conditions herein contained and in reliance upon the representations and warranties of the Loan Parties herein contained, effective upon the Amendment No. 3 Effective Date, the Administrative Agent and the Lenders hereby waive for any and all purposes of the Existing Credit Agreement and the other Loan Documents, the Specified Defaults. The Administrative Agent acknowledges that, to the actual knowledge of any of the officers, representatives, sub-advisors or managers of the Administrative Agent who are actively involved in the negotiation of this Agreement, after giving effect to the transactions contemplated by this Agreement (including the waiver of the Specified Defaults contemplated by this clause (a)), they are not aware of any Default or Event of Default existing on the Amendment No. 3 Effective Date or of any circumstance existing on the Amendment No. 3 Effective Date that could give rise to a Default or an Event of Default.

(b)      No Other Waiver.  Other than the limited waiver set forth in Section 1(a) of this Agreement, nothing contained in this Agreement shall be construed as a waiver by Administrative Agent or any Lender of any covenant or provision of the Existing Credit Agreement, the other Loan Documents, this Agreement, or of any other contract or instrument between Loan Parties and Administrative Agent or any Lender, and the failure of Administrative Agent or any Lender at any time or times hereafter to require strict performance by the Loan Parties of any provision thereof shall not waive, affect or diminish any right of Administrative Agent or the Lenders to thereafter demand strict compliance therewith.  Other than with respect to the limited waiver set forth in Section 1(a) of this Agreement, Administrative Agent and each Lender hereby reserves all rights granted under the Existing Credit Agreement, the other Loan Documents, this Agreement and any other contract or instrument between any of them. The foregoing limited waiver shall be effective only in this specific instance and for the specific purpose for which it is given, and shall not entitle the Loan Parties to any other or further waiver in any similar or other circumstances.

2.      Amendments to the Existing Credit Agreement.  The Lenders and the Borrower hereby agree to amend the Existing Credit Agreement, as of the Amendment No. 3 Effective Date (as defined below), as follows:

(a)      Composite Credit Agreement.  The Existing Credit Agreement is hereby amended to delete the bold, stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the bold, double-under lined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages of the Amended Credit Agreement attached as Annex A hereto.

(b)      Schedules to Credit Agreement.  Each of the Schedules to the Existing Credit Agreement are hereby replaced by the corresponding new schedules attached as Annex B hereto.

(c)      Exhibits to Credit Agreement. Exhibit C (Form of Compliance Certificate) and Exhibit J (Form of Borrowing Base Certificate) are hereby deleted in their entirety and a new Exhibit C and Exhibit J are substituted in their stead, each as attached hereto as Annex C.

3.      Representations and Warranties.  To induce the other parties hereto to enter into this Agreement, the Borrower and Holdings represent and warrant to each of the Lenders party hereto, the Administrative Agent and the Collateral Agent that, after giving effect to this Agreement:

(a)      the execution, delivery and performance of this Agreement by the Borrower and Holdings, and the consummation of the transactions contemplated herein are within the corporate or other organizational powers of the Borrower or Holdings, as applicable, has been duly authorized by all necessary action on the part of the Borrower or Holdings, as applicable, and does not or will not contravene the terms of any applicable Organizational Documents;

(b)      this Agreement has been duly executed and delivered by Holdings and the Borrower, and this Agreement and the Amended Credit Agreement constitute a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing; and

(c)      all representations and warranties made in any Loan Document are true and correct in all material respects as if made on the date hereof; provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, any representation and warranty

that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

4.    Conditions Precedent. This Agreement and the amendments set forth in Section 2 of this Agreement shall become effective on the first date (the "**Amendment No. 3 Effective Date**") that:

(a)    the Administrative Agent has received counterparts of this Agreement, each of which shall be originals or .pdf copies or other facsimiles, duly executed and delivered by (w) each Lender, (x) Holdings, (y) the Borrower and (z) the Administrative Agent;

(b)    the Administrative Agent has received a Perfection Certificate, dated as of the Amendment No. 3 Effective Date, duly executed and delivered by the Borrower;

(c)    the Administrative Agent has received that certain Borrowing Base Certificate, dated as of the date hereof which reflects the Third Amendment Transactions;

(d)    the Administrative Agent has received (i) certificates of good standing from the secretary of state of the state of organization of each Loan Party (to the extent such concept exists in such jurisdiction), (ii) customary certificates of resolutions or other action, incumbency certificates or other certificates of Responsible Officers of each Loan Party evidencing the authority of each Loan Party to enter into this Agreement and applicable Loan Documents and the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Amendment No. 3 Effective Date, and (iii) a certification with respect to each Loan Party that either (A) the Organizational Documents provided in connection with that certain Omnibus Secretary's Certificate, dated as of December 10, 2015 remain in effect as of the Amendment No. 3 Effective Date or (B) attached thereto are the Organizational Documents of such Loan Party, and, in each case, such Organizational Documents have not been amended, modified, or repealed and no proceedings for the amendment, modification or any other related documents has been filed in the office of the Secretary of State of such Loan Party's jurisdiction of organization;

(e)    the Administrative Agent has received a customary legal opinion from Kirkland & Ellis LLP, special counsel to the Loan Parties;

(f)    the Administrative Agent has received a certificate from a Responsible Officer of the Borrower reasonably satisfactory in form and substance to the Administrative Agent, certifying that as of the Amendment No. 3 Effective Date and after giving effect to the Third Amendment Transactions (i) the Borrower and its Subsidiaries, on a consolidated basis, are Solvent, (ii)(x) since the date of the Annual Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect (other than customary events or circumstances which resulted from the commencement of the Chapter 11 Cases), and (y) since the entry of the Confirmation Order, no material adverse change in the ability of the Agents and the Lenders to enforce the Loan Documents and the obligations of the Loan Parties thereunder has occurred and (iii) the representations and warranties made by the Borrower in Section 3 above are true and correct as of the Amendment No. 3 Effective Date and that after giving effect to this Agreement, no Default or Event of Default has occurred and is continuing;

(g)    the Administrative Agent shall have received an amendment of the ABL Intercreditor Agreement, duly executed by the parties thereto and acknowledged and delivered by the Borrower and the other Loan Parties party thereto;

(h)    the Administrative Agent has received (i) that certain Amendment No. 2 to the First Lien Credit Agreement and (ii) that certain ~~Amended and Restated~~Amendment No. 3 to the Second Lien Credit Agreement, in each case, entered into by the Borrower, duly executed by the parties thereto and dated as of the Amendment No. 3 Effective Date;

(i)    the Administrative Agent shall have received the following documents to join Belk Sourcing LLC as a Guarantor (the "New Guarantor"):

(i)    a supplement to the Security Agreement;

(ii)    a supplement to the Guaranty Agreement;

(iii)    a supplement to the Intercompany Subordination Agreement; and

(iv)    a UCC-1 financing statement in the applicable jurisdiction of the New Guarantor;

(j)    the Confirmation Order, authorizing the Loan Parties to execute, deliver, and perform their obligations under this Agreement (including the payment of all fees with respect hereto), has been entered and is in full force and effect and has not (i) been stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could be reasonably expected to adversely affect the interests of the Administrative Agent or the Lenders or (ii) been the subject of an appeal;

(k)    the Third Amendment Transactions, including the Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Approved Plan, have been (or concurrently with the occurrence of the Amendment No. 3 Effective Date, shall be) substantially consummated in accordance with applicable Law, the Court, and the Bankruptcy Code;

(l)    to the extent requested at least three (3) Business Days prior to the Amendment No. 3 Effective Date, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Borrower shall have delivered to the Administrative Agent (on behalf of each Lender that so requests) a Beneficial Ownership Certification in relation to the Borrower;

(m)    the Administrative Agent has received all reasonable and documented out-of-pocket expenses incurred in connection with this Agreement and required to be paid to the Administrative Agent pursuant to the Amended Credit Agreement, to the extent invoiced no less than three (3) days prior to the proposed Amendment No. 3 Effective Date; and

(n)    the Administrative Agent has received all fees required to be paid to the Administrative Agent pursuant to that certain Third Amendment Fee Letter.

Without limiting the generality of the provisions of Section 10.01(1) of the Amended Credit Agreement, for purposes of determining compliance with the condition specified in this Section 4, each Lender that has signed this Agreement shall be deemed to have consented to, approved, accepted and to be satisfied with this Agreement and other matters required hereunder to be consented to or approved by or acceptable or

satisfactory to such Lender, unless the Administrative Agent shall have received notice from such Lender prior to the Amendment No. 3 Effective Date specifying its objection thereto.

5.        Joinder of New Lenders; Acknowledgment of New Lenders.

(a)        Each of PNC Bank, National Association and Siemens Financial Services, Inc. (together the "New Lenders"), by its signature below, confirms that it has agreed to become a "Lender" under, and as defined in the Amended Credit Agreement holding the Revolving Credit Loans in the amount set forth opposite such New Lender's name on Schedule 2.01 attached hereto under the heading "Commitments", effective on the Amendment No. 3 Effective Date. Each New Lender (i) acknowledges that in connection with it becoming a Lender it has received a copy of the Amended Credit Agreement (including all schedules and exhibits thereto), together with copies of the most recent financial statements delivered by the Borrower pursuant to the Existing Credit Agreement, and such other documents and information as it has deemed appropriate to make its own credit and legal analysis and decision to become a Lender and (ii) agrees that, upon it becoming a Lender on the Amendment No. 3 Effective Date, it will, independently and without reliance on the Administrative Agent, or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit and legal decisions in taking or not taking action under the Amended Credit Agreement. In addition, each New Lender represents and warrants that (x) it has duly authorized and has full power and authority to take, and has taken, all action necessary to execute and deliver this Agreement and to consummate the transaction contemplated hereby and to become a Lender on the Amendment No. 3 Effective Date and (y) no notices to, or consents, authorizations or approvals of, any Person are required (other than any already given or obtained) for its due execution and delivery of this Agreement or the performance of its obligations hereunder or as a Lender under the Amended Credit Agreement as of the date hereof. Each New Lender acknowledges and agrees that, on the Amendment No. 3 Effective Date, such New Lender shall become a Lender and, from and after such date such New Lender will be bound by the terms of the Amended Credit Agreement.

(b)        Each New Lender acknowledges that it has had the opportunity to request and has received such documents and information as it has deemed material or desirable or otherwise appropriate in making its evaluation and credit analysis of the Borrower and the other Loan parties and its decision to become a Lender and make Loans to the Borrower. Each New Lender has carefully reviewed such document and information and, independently and without reliance upon the Administrative Agent, performed its own investigation and credit analysis of the Loans, this Agreement, and the transactions contemplated hereby and the creditworthiness of the Borrower and the other Loan Parties. Each New Lender acknowledges that the Administrative Agent and its affiliates' activities in connection with the Loans, this Agreement, and the transactions contemplated hereby are undertaken by the Administrative Agent or such affiliates as a principal on an arm's-length basis and neither the Administrative Agent nor its affiliate has any fiduciary, advisory, or similar responsibility in favor of such New Lender in connection with the Loan, this Agreement or the transactions contemplated herby or the process related thereto. Each of the New Lenders hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent or any of its affiliates with respect to any breach or alleged breach of agency or fiduciary duty. In connection with all aspects of each transaction contemplated herby, each New Lender acknowledges and agrees that (i) the Administrative Agent and its affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such New Lenders and its affiliates, and neither the Administrative Agent nor its affiliates has any obligation to disclose any of such interest by virtue of any advisory, agency or fiduciary relationship, (ii) neither the Administrative Agent has provided and will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby

11                                    5

and the New Lender has consulted its own legal , accounting, regulatory, and tax advisors to the extent it has deemed appropriate, (iii) neither the Administrative Agent nor any of its affiliates bears any responsibility   (or shall be liable)  for the accuracy or completeness (or lack thereof) of any documents or information provided such New Lender in connection with the Loan, this Agreement and the transactions contemplated hereby; no representation regarding such documents or information is made by the Administrative Agent or any of its affiliates; neither the Administrative Agent nor any of its affiliates has made any independent verification as to the accuracy or completeness of any such documents or informational  and the Administrative Agent and its affiliates hall have no obligation  to update or supplement any such documents or information or otherwise provide additional  information. In connection with the transactions contemplated hereby, including  its decision to become a Lender and to make Loans to the Borrower, each New Lender acknowledges and agrees that it is not relying upon any representation or warranties made by the Administrative Agent or any of its affiliates or, except as expressly set forth in this Agreement and the other Loan Documents, any other Person.

5.6.     Reaffirmation.   The Borrower (a) confirms its obligations  under the Loan Documents, (b) confirms that its obligations  under the Existing Credit Agreement as modified  hereby are entitled to the benefits of the Liens and pledges set forth in the Loan Documents and remain in full force and effect and (c) agrees that the Existing Credit Agreement as modified  hereby is the "Credit Agreement" under and for all purposes of the Loan Documents.  Without limiting  the foregoing, the Borrower, on behalf of each Loan Party, (a) consents to this Agreement and agrees that the transactions contemplated by this Agreement shall not limit  or diminish  the obligations  of such Person, or release such Person from any obligations,  under any of the Loan Documents to which it is a party, (b) confirms and reaffirms its obligations  under each of the Loan Documents to which it is a party and all representations, warranties, and covenants contained therein, (c) agrees that each of the Loan Documents to which it is a party remains in full force and effect and is hereby ratified and confirmed and (d) acknowledges that any and all financing statements filed under the UCC in connection with the Existing Credit Agreement, naming Bank of America, N.A., as administrative agent (or otherwise as a representative for itself and other financial institutions),  as secured party, and such Loan Party, as debtor, shall be effective to perfect the Administrative  Agent's security interest granted by such Loan Party pursuant to the Security Agreement to the extent such security interest may be perfected by the filing of financing statements under the UCC for the purposes of so perfecting the security interest granted by such Loan Party. The Borrower, on behalf of each Guarantor, hereby acknowledges, confirms and agrees that it shall  guarantee all Obligations  of the Loan Parties at any time and from time to time outstanding under the Amended Credit Agreement and the other Loan Documents. The Borrower, on behalf of each Loan Party, hereby acknowledges,  confirms and agrees that the Security Agreement, the other Collateral Documents and any and all Collateral previously  pledged to the Administrative  Agent, for the benefit of the Secured Parties, pursuant thereto, shall continue  to secure all applicable Obligations  (which, for the avoidance of doubt, shall include all Obligations  outstanding as of the date hereof) of such Loan Parties at any time and from time to time outstanding under the Amended Credit Agreement and the other Loan Documents, including,  in each case, after giving effect to this Agreement.

6.7.     Amendment, Modification  and Waiver.   This Agreement may not be amended, modified or waived except in accordance with the Amended Credit Agreement. The execution, delivery and effectiveness of this Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative  Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.

7.8.     Loan Document.  This Agreement shall constitute a Loan Document for all purposes of the Amended Credit Agreement and the other Loan Documents.

8.9.    Governing Law, Etc. **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.  SECTIONS 10.15, 10.16 AND 10.17 OF THE AMENDED CREDIT AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE, *MUTATIS MUTANDIS*.**

9.10.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original,  but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original  executed counterpart of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each of the undersigned has caused its duly authorized officer to execute and deliver this Agreement as of the date first set forth above.

**BELK, INC.**,
as Borrower

By: _____
    Name:
    Title:

**BEAR PARENT INC.**,
as Holdings

By: _____
    Name:
    Title:

[Belk - Amendment No. 3 Signature Page]

**BANK OF AMERICA, N.A.,** as the
Administrative Agent


By: _____
    Name:
    Title:

**BANK OF AMERICA, N.A.**, as a Lender

By: _____
     Name:
     Title:

[Belk - Amendment No. 3 Signature Page]

[_____], as a Lender


By: _____
    Name:
    Title:

[Belk - Amendment No. 3 Signature Page]

## **ANNEX A**

Composite Credit Agreement

[see attached]

*DRAFT SUBJECT* TO *REVISION*
ANNEX A TO THIRD AMENDMENT

---

$900,000,000
ABL CREDIT AGREEMENT

Dated as of December 10, 2015,
as amended on August 29, 2019,
as amended on October 30, 2020,
and as further amended on February [———],24, 2021

among

BEAR PARENT INC.,
as Holdings,

BELK, INC.,
as Borrower,

BANK OF AMERICA, N.A.,
as Administrative Agent and Collateral Agent,

[WELLS FARGO BANK, NATIONAL ASSOCIATION

CAPITAL ONE, NATIONAL ASSOCIATION, and
U.S.PNC BANK, NATIONAL ASSOCIATION,
as Syndication Agents,

and

REGIONS BANK,
and
TD BANK, N.A., and
U.S. BANK, NATIONAL ASSOCIATION
as Documentation Agents

THE OTHER LENDERS PARTY HERETO

---

BANK OF AMERICA, N.A.,
WELLS FARGO BANK, NATIONAL ASSOCIATION, and
U.S. BANK, NATIONAL ASSOCIATION
CAPITAL ONE, NATIONAL ASSOCIATION, and
PNC CAPITAL MARKETS LLC
as Joint Lead Arrangers and Joint Lead Bookrunners]¹

---

¹ To be confirmed.

# TABLE OF CONTENTS

**Page**

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Other Interpretive Provisions | 106 |
| Section 1.03 | Accounting Terms | 108 |
| Section 1.04 | Rounding | 109 |
| Section 1.05 | References to Agreements, Laws, etc | 109 |
| Section 1.06 | Times of Day and Timing of Payment and Performance | 109 |
| Section 1.07 | Pro Forma and Other Calculations. | 109 |
| Section 1.08 | Divisions | 114 |
| Section 1.09 | Guaranties of Hedging Obligations | 114 |
| Section 1.10 | Currency Generally. | 114 |
| Section 1.11 | Letters of Credit | 115 |
| Section 1.12 | Interest Rates | 115 |

## ARTICLE II

## THE COMMITMENTS AND BORROWINGS

| | | |
|---|---|---|
| Section 2.01 | The Loans | 115 |
| Section 2.02 | Borrowings, Conversions and Continuations of Loans | 117 |
| Section 2.03 | Letters of Credit. | 119 |
| Section 2.04 | Swing Line Loans | 130 |
| Section 2.05 | Prepayments | 135 |
| Section 2.06 | Termination or Reduction of Commitments. | 137 |
| Section 2.07 | Repayment of Loans | 137 |
| Section 2.08 | Interest | 138 |
| Section 2.09 | Fees | 138 |
| Section 2.10 | Computation of Interest and Fees | 138 |
| Section 2.11 | Evidence of Indebtedness. | 139 |
| Section 2.12 | Payments Generally. | 139 |
| Section 2.13 | Sharing of Payments | 142 |
| Section 2.14 | Incremental Facilities | 143 |
| Section 2.15 | [Reserved] | 146 |
| Section 2.16 | Extensions of Loans | 146 |
| Section 2.17 | Defaulting Lenders. | 149 |

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

| | | |
|---|---|---|
| Section 3.01 | Taxes | 150 |
| Section 3.02 | Illegality | 154 |
| Section 3.03 | Inability to Determine Rates. | 154 |

DB1/ 118926700.9

# TABLE OF CONTENTS
## (cont'd)

**Page**

| | | |
|---|---|---|
| Section 3.04 | Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loan | 158 |
| Section 3.05 | Funding Losses | 159 |
| Section 3.06 | Matters Applicable to All Requests for Compensation. | 160 |
| Section 3.07 | Replacement of Lenders under Certain Circumstances | 161 |
| Section 3.08 | Survival | 163 |

## ARTICLE IV

## CONDITIONS PRECEDENT TO REVOLVING CREDIT BORROWINGS

| | | |
|---|---|---|
| Section 4.01 | Conditions to Effectiveness of this Agreement on Closing Date | 163 |
| Section 4.02 | Conditions to All Credit Extensions. | 166 |

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 5.01 | Existence, Qualification and Power; Compliance with Laws | 167 |
| Section 5.02 | Authorization; No Contravention. | 168 |
| Section 5.03 | Governmental Authorization | 169 |
| Section 5.04 | Binding Effect | 169 |
| Section 5.05 | Financial Statements; No Material Adverse Effect. | 169 |
| Section 5.06 | Litigation | 169 |
| Section 5.07 | Labor Matters. | 170 |
| Section 5.08 | Ownership of Property; Liens | 170 |
| Section 5.09 | Environmental Matters | 170 |
| Section 5.10 | Taxes. | 170 |
| Section 5.11 | ERISA Compliance. | 170 |
| Section 5.12 | Subsidiaries. | 171 |
| Section 5.13 | Margin Regulations; Investment Company Act. | 172 |
| Section 5.14 | Disclosure | 172 |
| Section 5.15 | Intellectual Property; Licenses, etc. | 172 |
| Section 5.16 | Solvency | 173 |
| Section 5.17 | USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act | 173 |
| Section 5.18 | Collateral Documents. | 173 |
| Section 5.19 | Use of Proceeds. | 174 |

## ARTICLE VI

## AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| Section 6.01 | Financial Statements | 174 |
| Section 6.02 | Certificates; Other Information | 176 |
| Section 6.03 | Notices | 178 |
| Section 6.04 | Payment of Obligations | 179 |
| Section 6.05 | Preservation of Existence, etc. | 179 |

DB1/ 118926700.9

# TABLE OF CONTENTS
## (cont'd)

**Page**

| | | |
|---|---|---|
| Section 6.06 | Maintenance of Properties | 179 |
| Section 6.07 | Maintenance of Insurance | 179 |
| Section 6.08 | Compliance with Laws | 180 |
| Section 6.09 | Books and Records | 180 |
| Section 6.10 | Inspection Rights | 180 |
| Section 6.11 | Covenant to Guarantee Obligations and Give Security | 180 |
| Section 6.12 | Compliance with Environmental Laws | 182 |
| Section 6.13 | Further Assurances | 182 |
| Section 6.14 | Use of Proceeds | 183 |
| Section 6.15 | [Reserved] | 183 |
| Section 6.16 | Accounting Changes | 183 |
| Section 6.17 | Nature of Business | 183 |
| Section 6.18 | Designation of Subsidiaries | 184 |
| Section 6.19 | Cash Receipts; Cash Dominion Period | 184 |
| Section 6.20 | Borrowing Base Certificates | 186 |
| Section 6.21 | Appraisals and Field Examinations | 186 |
| Section 6.22 | Beneficial Ownership Certification | 187 |
| Section 6.23 | Agent's Advisor | 187 |

## ARTICLE VII

## NEGATIVE COVENANTS

| | | |
|---|---|---|
| Section 7.01 | Liens | 187 |
| Section 7.02 | Indebtedness | 187 |
| Section 7.03 | Fundamental Changes | 196 |
| Section 7.04 | Asset Sales | 201 |
| Section 7.05 | Restricted Payments | 202 |
| Section 7.06 | Transactions with Affiliates | 211 |
| Section 7.07 | Burdensome Agreements | 215 |
| Section 7.08 | Modification of Terms of Specified Indebtedness | 219 |
| Section 7.09 | Holdings | 219 |
| Section 7.10 | Financial Covenant | 221 |
| Section 7.11 | Excess Cash Amounts | 221 |

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

| | | |
|---|---|---|
| Section 8.01 | Events of Default | 221 |
| Section 8.02 | Remedies upon Event of Default | 224 |
| Section 8.03 | Application of Funds | 224 |
| Section 8.04 | Right to Cure | 226 |

# TABLE OF CONTENTS
## (cont'd)

**Page**

## ARTICLE IX

### ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01  Appointment and Authorization of the Administrative Agent .................................... 227
Section 9.02  Rights as a Lender ............................................................................................... 228
Section 9.03  Exculpatory Provisions ......................................................................................... 228
Section 9.04  Lack of Reliance on the Administrative Agent ........................................................ 230
Section 9.05  Certain Rights of the Administrative Agent ............................................................ 231
Section 9.06  Reliance by the Administrative Agent .................................................................... 231
Section 9.07  Delegation of Duties ............................................................................................. 232
Section 9.08  Indemnification .................................................................................................... 232
Section 9.09  The Administrative Agent in Its Individual Capacity .............................................. 233
Section 9.10  Holders ................................................................................................................ 233
Section 9.11  Resignation by the Administrative Agent ............................................................... 233
Section 9.12  Collateral Matters ................................................................................................ 235
Section 9.13  [Reserved] ............................................................................................................ 235
Section 9.14  Administrative Agent May File Proofs of Claim ...................................................... 235
Section 9.15  Appointment of Supplemental Administrative Agents .............................................. 236
Section 9.16  Intercreditor Agreements ...................................................................................... 237
Section 9.17  Secured Cash Management Agreements and Secured Hedge Agreements .................. 237
Section 9.18  Bank Product Providers ........................................................................................ 238
Section 9.19  Withholding Tax ................................................................................................... 238
Section 9.20  Certain ERISA Matters. ........................................................................................ 238

## ARTICLE X

### MISCELLANEOUS

Section 10.01  Amendments, etc. ................................................................................................ 240
Section 10.02  Notices and Other Communications; Facsimile Copies ........................................... 244
Section 10.03  No Waiver; Cumulative Remedies ........................................................................ 246
Section 10.04  Costs and Expenses ............................................................................................. 247
Section 10.05  Indemnification by the Borrower .......................................................................... 248
Section 10.06  Marshaling; Payments Set Aside .......................................................................... 249
Section 10.07  Successors and Assigns ........................................................................................ 249
Section 10.08  [Reserved] ........................................................................................................... 255
Section 10.09  Confidentiality .................................................................................................... 255
Section 10.10  Setoff .................................................................................................................. 257
Section 10.11  Interest Rate Limitation ....................................................................................... 258
Section 10.12  Counterparts; Integration; Effectiveness ............................................................... 258
Section 10.13  Electronic Execution of Assignments and Certain Other Documents ....................... 258
Section 10.14  Survival of Representations and Warranties ........................................................... 259
Section 10.15  Severability ......................................................................................................... 259
Section 10.16  GOVERNING LAW ........................................................................................... 260
Section 10.17  WAIVER OF RIGHT TO TRIAL BY JURY .......................................................... 260

DB1/ 118926700.9

# TABLE OF CONTENTS
## (cont'd)

<div align="right">**Page**</div>

| | | |
|---|---|---|
| Section 10.18 | Binding Effect | 261 |
| Section 10.19 | Lender Action | 261 |
| Section 10.20 | Use of Name, Logo, etc | 261 |
| Section 10.21 | USA PATRIOT Act and other Anti-Terrorism Laws | 261 |
| Section 10.22 | Service of Process | 261 |
| Section 10.23 | No Advisory or Fiduciary Responsibility | 262 |
| Section 10.24 | Release of Collateral and Guarantee Obligations; Subordination of Liens | 262 |
| Section 10.25 | Assumption and Acknowledgment | 264 |
| Section 10.26 | Judgment Currency | 264 |
| Section 10.27 | Secured Bank Product Agreements, Secured Cash Management Agreements and Secured Hedge Agreements | 264 |
| Section 10.28 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 265 |
| Section 10.29 | Acknowledgement Regarding Any Supported QFCs | 265 |

SCHEDULES

1.01(1)        Guarantors
1.01(3)        Non-U.S. Account Debtors
1.02           Unrestricted Subsidiaries
2.01           Commitments
4.01(1)(c)     Certain Collateral Documents
5.06           Litigation
5.12           Subsidiaries and Other Equity Investments
6.19           Deposit and Security Accounts
7.02(3)        Existing Indebtedness

10.02          Administrative Agent's Office, Certain Addresses for Notices

EXHIBITS

*Form of*

A-1            Committed Loan Notice
A-2            Swing Line Loan Notice
B-1            Revolving Credit Note
B-2            Swing Line Note
C              Compliance Certificate
D              Assignment and Assumption
E              Guaranty
F              Security Agreement
G-1            ABL Intercreditor Agreement
G-2            Term Intercreditor Agreement
H              United States Tax Compliance Certificates
I              Solvency Certificate
J              Borrowing Base Certificate
K              [Reserved]
L              [Reserved]
M              [Reserved]
N              [Reserved]
O              [Reserved]
P              [Reserved]
Q              Intercompany Subordination Agreement
R              Letter of Credit Report

<u>**CREDIT AGREEMENT**</u>

This ABL CREDIT AGREEMENT (this "**Agreement**") is entered into as of December 10, 2015, as amended on August 29, 2019, as amended on October 30, 2020, and as further amended on February [~~____~~],24, 2021 by and among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation ("**Belk**") and direct subsidiary of Holdings ("**Borrower**"), BANK OF AMERICA, N.A., as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**").

**PRELIMINARY STATEMENTS**

Pursuant to the Transaction Agreement (such term and any other capitalized but undefined terms used herein are defined in Section 1.01 below), BEAR MERGER SUB INC., a Delaware corporation (the "**Initial Borrower**") merged (the "**Merger**") with and into Belk (the "**Acquired Company**"), which survived the Merger and succeeded to all the rights and obligations of the Initial Borrower under this Agreement and the other Loan Documents.

On February [~~____~~],23, 2021 (the "**Petition Date**"), (i) Belk and certain of its Subsidiaries (collectively, the "**Debtors**" and each individually, a "**Debtor**"~~"), commenced Chapter 11 Case No. [_____]~~("") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code and their cases are being jointly administered under Case No. 21-30630 (the "**Chapter 11 Cases**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").

On February [~~____~~],24, 2021, the Court entered the Confirmation Order (as hereinafter defined) approving the Debtors' Joint Chapter 11 Plan of Reorganization of [Belk, Inc. and its Affiliated Debtors] (the "**Approved Plan**").

The Borrower has requested that the Lenders enter into the Third Amendment to provide exit financing to the Debtors in connection with their emergence from the Chapter 11 Cases on the Third Amendment Effective Date, on the terms and conditions set forth herein.

The Lenders have indicated their willingness to lend, and the Issuing Banks have indicated their willingness to issue Letters of Credit, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I**

**Definitions and Accounting Terms**

Section 1.01    <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings set forth below:

"**ABL Intercreditor Agreement**" means the ABL Intercreditor Agreement substantially in the form of Exhibit G-1 among the Collateral Agent, Morgan Stanley Senior Funding, Inc., as collateral agent under the First Lien Credit Agreement, Wilmington Trust, National Association, as collateral agent under the Second Lien Credit Agreement and the representatives for purposes thereof for holders of one or more

1

other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Priority Collateral**" means all the "ABL Priority Collateral" as defined in the Intercreditor Agreement.

 "**Acceptable Appraiser**" means (a) Gordon Brothers and (b) any other experienced and reputable appraiser reasonably acceptable to the Administrative Agent (after consultation with the Borrower).

"**Accounts**" means Accounts Receivable and Credit Card Processor Accounts.

"**Account Receivable**" has the meaning given to the term "Account" in Article 9 of the UCC.

"**Account Debtor**" has the meaning given to the term "Account Debtor" in Article 9 of the UCC.

"**ACH**" means automated clearing house transfers.

"**Acquired Company**" has the meaning specified in the preliminary statements of this Agreement.

"**Acquired Indebtedness**" means, with respect to any specified Person,

      (1)    Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person, and

      (2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Additional Lender**" means, at any time, any bank, other financial institution or institutional lender or investor that, in any case, is not an existing Lender and that agrees to provide any portion of any Incremental Revolving Credit Loan in accordance with Section 2.14; *provided* that each Additional Lender (other than any Person that is a Lender, an Affiliate of a Lender or an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent, the Swing Line Lender or the Issuing Bank(s) (such approval not to be unreasonably withheld, conditioned or delayed), in each case solely to the extent that any such consent would be required from the Administrative Agent, the Swing Line Lender or the Issuing (s) under Section 10.07(b)(iii) for an assignment of Loans to such Additional Lender.

"**Adjusted EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period:

      (1)    increased (without duplication) by the following, in each case (other than clauses (h) and (l)) to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(a)     total interest expense and, to the extent not reflected in such total interest expense, any losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such Hedging Obligations or such derivative instruments, and bank and letter of credit fees and costs of surety bonds in connection with financing activities, together with items excluded from the definition of "Consolidated Interest Expense" pursuant to the definition thereof; *plus*

(b)     provision for taxes based on income, profits, revenue or capital, including federal, foreign and state income, franchise, excise, value added and similar taxes, property taxes and similar taxes, and foreign withholding taxes paid or accrued during such period (including any future taxes or other levies that replace or are intended to be in lieu of taxes, and any penalties and interest related to taxes or arising from tax examinations), and any payments to a Parent Company in respect of such taxes permitted to be made hereunder; *plus*

(c)     Consolidated Depreciation and Amortization Expense for such period; *plus*

(d)     any other non-cash expenses, charges, expenses, losses or items (including any write-offs or write-downs) reducing Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (i) the Borrower may determine not to add back such non-cash charge in the current period and (ii) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Adjusted EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *provided* that the foregoing shall not permit adding back the write-down or reserve of inventory outside the ordinary course of business; *plus*

(e)     minority interest expense, the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any non-wholly-owned Subsidiary deducted (and not added back) in such period to Consolidated Net Income, excluding cash distributions in respect thereof, and the amount of any reductions in arriving at Consolidated Net Income resulting from the application of Accounting Standards Codification Topic No. 810, *Consolidation*; *plus*

(f)     (i) the amount of management, monitoring, consulting, transaction, advisory and other fees (including termination fees) and indemnities and expenses paid or accrued in such period under the Management Services Agreement or otherwise to the extent otherwise permitted under Section 7.06 and (ii) the amount of payments made to option holders of such Person or any Parent Company in connection with, or as a result of, any distribution being made to shareholders of such Person or its Parent Companies, which payments are being made to compensate such option holders as though they were shareholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted hereunder; *plus*

(g)     [reserved]; *plus*

(h)      cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Adjusted EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Adjusted EBITDA pursuant to clause (2) below for any previous period and not added back; *plus*

(i)      any costs or expenses incurred pursuant to any management equity plan, stock option plan or any other management or employee benefit plan, agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of such Person or net cash proceeds of an issuance of Equity Interest of such Person (other than Disqualified Stock); *plus*

(j)      any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of *FASB Accounting Standards Codification Topic 715—Compensation—Retirement Benefits*, and any other items of a similar nature, *plus*

(k)      any net loss from operations expected to be disposed of, abandoned or discontinued within twelve months after the end of such period; provided that amounts added back pursuant to clauses (k) and (l), and together with (i) any Projected Restructuring Adjustments referred to in the proviso of clause (n) below and (ii) any similar adjustments made in accordance with Section 1.07(3), shall not exceed, 10% of Adjusted EBITDA for such period calculated after giving effect to the add-backs set forth in clauses (k) and (l), such Projected Restructuring Adjustments, and the adjustments made in accordance with Section 1.07(3) and being calculated on a pro forma basis; *plus*

(l)      (I) pro forma adjustments, including pro forma "run rate" cost savings, operating expense reductions and other synergies (in each case, net of amounts actually realized) related to acquisitions, dispositions and other specified transactions, or related to restructuring initiatives, cost savings initiatives and other initiatives that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are that are expected to be taken within six fiscal quarters after the date of consummation of such acquisition, disposition or other specified transaction or the initiation of such restructuring initiative, cost savings initiative or other initiatives and (II) pro forma "run rate" cost savings, operating expense reductions and synergies (in each case, net of amounts actually realized) related to the Closing Date Transactions that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within six fiscal quarters after the Closing Date (it is understood and agreed that "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken)~~,~~), in each case, together with reasonable detail with respect to the adjustments taken pursuant to this clause; provided that amounts added back pursuant to clauses (k) and (l), and together with (i) any Projected Restructuring Adjustments referred to in the proviso of clause (n) below and (ii) any similar adjustments made in accordance with Section 1.07(3), shall not exceed, 10% of Adjusted EBITDA for such period calculated

4

after giving effect to the add-backs set forth in clauses (k) and (l), such Projected Restructuring Adjustments, and the adjustments made in accordance with Section 1.07(3) and being calculated on a pro forma basis; *plus*

(m)     any payments in the nature of compensation or expense reimbursement made to independent board members; *plus*

(n)     one time pro forma costs, charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of cost savings initiatives and operating expense reductions, restructuring and similar charges, severance, relocation costs, integration and facilities and New Store opening costs and other business optimization expenses, signing costs, retention or completion bonuses, transition costs, costs related to closure/consolidation of facilities, stores and curtailments or modifications to pension and post-retirement employee benefits plans (including any settlement of pension liabilities); provided that in the case of pro forma adjustments related to cost savings initiatives and operating expense reductions that are projected to be incurred by the Borrower, in good faith to result from actions that are expected to be taken within six fiscal quarters after the date of such cost savings initiative or operating expense reductions, in each case, together with reasonable detail with respect to the adjustments taken pursuant to this clause (the adjustments in this proviso being referred to as "Projected Restructuring Adjustments"), such Projected Restructuring Adjustments shall not exceed, together with the adjustments in clauses (k) and (l) of the definition of Adjusted EBITDA and Section 1.07(3), 10% of Adjusted EBITDA for such period calculated after giving effect to such add-backs and the adjustments made in accordance with Section 1.07(3) and being calculated on a pro forma basis; *plus*

(o)     the amount of any loss attributable to any New Store; *provided* that the aggregate amounts added back pursuant to this clause (o) shall not exceed $5.0 million for such period,

(p)     costs and expenses in connection with the implementation of fresh start accounting and all adjustments resulting from the application of fresh start accounting principles, ~~and~~in each case, together with reasonable detail with respect to the adjustments taken pursuant to this clause, and

(2)     decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

(a)     non-cash gains for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Adjusted EBITDA in any prior period other than any such accrual or reserve that has been added back to Consolidated Net Income in calculating Adjusted EBITDA in accordance with this definition), and

(b)     the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any non-wholly owned subsidiary added (and not deducted in such period from Consolidated Net Income).

Adjusted EBITDA of Belk and its Restricted Subsidiaries will be deemed to equal (i) $[ ] million$124,997,000 for the fiscal quarter ended [ ], 2019February 1, 2020 (ii) $[ ]

~~million~~($67,491,000) for the fiscal quarter ended ~~[ ],~~May 2, 2020, (iii) ~~$[ ] million~~$1,505,000 for the fiscal quarter ended ~~[ ],~~August 1, 2020 and (iv) ~~$[ ] million~~($41,751,000) for the fiscal quarter ended ~~[ ],~~October 31, 2020, in each case and, without duplication, adjusted to reflect any pro forma adjustments with respect to any relevant Specified Transaction as are appropriate and consistent with the pro forma adjustment provisions set forth in Section 1.07, in each case, occurring or identified after the Third Amendment Effective Date and not otherwise included in the calculation of the foregoing amounts.

"**Adjustment Date**" means the first day of each February, May, August and November, as applicable.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affected Financial Institution**" any EEA Financial Institution or UK Financial Institution.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"**Affiliate Transaction**" has the meaning specified in Section 7.06.

"**Agent's Advisor**" has the meaning provided in Section 6.23.

"**Agent Parties**" has the meaning specified in Section 10.02(4).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Supplemental Administrative Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Credit Agreement, as amended, restated, amended and restated, modified or supplemented from time to time in accordance with the terms hereof.

"**Agreement Currency**" has the meaning specified in Section 10.26.

"**AHYDO Payment**" means any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Code Section 163(i).

"**Annual Financial Statements**" means the audited consolidated balance sheets of the Borrower and its Subsidiaries as of the fiscal year ended January 30, 2020, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the Borrower and its Subsidiaries for the fiscal years then ended.

"**Anti-Terrorism Laws**" means any applicable law relating to terrorism, trade sanctions programs and embargoes, money laundering, corruption or bribery, and any regulation, or order promulgated, issued or enforced pursuant to such laws by an applicable Governmental Authority, all as amended, supplemented or replaced from time to time.

"**Applicable Intercreditor Agreement**" means (a) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that (i) are intended to rank junior in priority to the Liens on the ABL Priority Collateral securing the Obligations and (ii) are intended to rank equal or junior in priority to the Liens on the Term Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the First Lien Obligations, the ABL Intercreditor Agreement, and (b) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank junior in priority to the Liens securing the Obligations, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations.

"**Applicable Rate**" means a percentage per annum equal to the following percentages per annum, based upon Average Historical Excess Availability as of the most recent Adjustment Date:

| Average Historical Excess Availability | Applicable Rate for Eurodollar Rate Loans | Applicable Rate for Base Rate Loans |
|---|---|---|
| > 66.7% | 2.00% | 1.00% |
| ≤ 66.7% but ≥ 33.3% | 2.25% | 1.25% |
| < 33.3% | 2.50% | 1.50% |

The Applicable Rate shall be adjusted quarterly in accordance with the table above on each Adjustment Date for the period beginning on such Adjustment Date based upon the Average Historical Excess Availability as the Administrative Agent shall determine in good faith. Any increase or decrease in the Applicable Rate resulting from a change in the Average Historical Excess Availability shall become effective on the Adjustment Date.

"**Applicable Unused Commitment Fee Rate**" means, for any day, a percentage per annum equal to the following percentages per annum, based upon Average Revolving Credit Loan Utilization as of the most recent Adjustment Date:

| Average Revolving Credit Loan Utilization | Unused Commitment Fee |
|---|---|
| < 50% | 0.375% |
| ≥ 50% | 0.250% |

"**Appropriate Lender**" means, at any time, (a) with respect to Loans of any Class, the Lenders of such Class and (b) with respect to Letters of Credit, (i) the relevant Issuing Banks and (ii) the relevant Revolving Credit Lenders.

"**Approved Account Bank**" means a financial institution at which any Borrower or a Subsidiary Guarantor maintains an Approved Deposit Account.

"**Approved Deposit Account**" means each Deposit Account in respect of which a Borrower or any Subsidiary Guarantor shall have entered into a Deposit Account Control Agreement.

"**Approved Plan**" has the meaning specified in the preliminary statements of this Agreement.

"**Approved Securities Account**" means each Securities Account in respect of which any Borrower or any Subsidiary Guarantor shall have entered into a Securities Account Control Agreement.

"**Approved Securities Intermediary**" means a securities intermediary at which any Borrower or a Subsidiary Guarantor maintains an Approved Securities Account.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Arrangers**" means Bank of America, Wells Fargo Bank, National Association and U.S. Bank, National Association.

"**Asset Sale**" means:

(1)     the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, and whether effected pursuant to a Division or otherwise, of property or assets of the Borrower or any Restricted Subsidiary (each referred to in this definition as a "**disposition**"); or

(2)     the issuance or sale of Equity Interests (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 7.02 and directors' qualifying shares or shares or interests required to be held by foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Borrower or another Restricted Subsidiary), whether in a single transaction or a series of related transactions, so long as after giving pro forma effect to any such issuance or sale, no Overadvance would exist or would result therefrom.

in each case, other than:

(a)     any disposition of:

(i)     Cash Equivalents or Investment Grade Securities,

(ii)     obsolete, damaged or worn out property or assets in the ordinary course of business or consistent with industry practice or any disposition of inventory or goods (or other assets) held for sale or no longer used or useful in the ordinary course,

(iii) assets no longer economically practicable or commercially reasonable to maintain (as determined in good faith by the management of the Borrower),

(iv) improvements made to leased real property to landlords pursuant to customary terms of leases entered into in the ordinary course of business and

(v) assets for purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Borrower and its Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b) the disposition of any assets by the Borrower or any Restricted Subsidiary in a manner permitted pursuant to Section 7.03;

(c) any disposition in connection with the making of any Restricted Payment that is permitted to be made, and is made, under Section 7.05, any Permitted Investment or any acquisition otherwise permitted under this Agreement;

(d) any disposition of property or assets or issuance or sale of Equity Interests of any Restricted Subsidiary with an aggregate fair market value of less than (i) $5.0 million for any individual transaction or series of related transactions and (ii) $10.0 million for all such transactions in any fiscal year;

(e) any disposition of property or assets or issuance of securities by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary to the extent otherwise permitted hereunder;

(f) to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g) (i) the lease, assignment or sublease, license or sublicense of any real or personal property in the ordinary course of business or consistent with industry practice and (ii) the exercise of termination rights with respect to any lease, sublease, license or sublicense or other agreement;

(h) any issuance, disposition or sale of Equity Interests in, or Indebtedness, assets or other securities of, an Unrestricted Subsidiary;

(i) foreclosures, condemnation, expropriation, eminent domain or any similar action (including for the avoidance of doubt, any Casualty Event) with respect to assets or the granting of Liens not prohibited hereunder;

(j) sales of accounts receivable, or participations therein, or the disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with industry practice or in bankruptcy or similar proceedings;

(k) any financing transaction with respect to property built or acquired by the Borrower or any Restricted Subsidiary after the Closing Date;

(l)      the sale, lease, assignment, license, sublease or discount of inventory, equipment, accounts receivable, notes receivable or other current assets in the ordinary course of business or consistent with industry practice or the conversion of accounts receivable to notes receivable or other dispositions of accounts receivable in connection with the collection thereof;

(m)      the licensing or sublicensing of IP Rights or other general intangibles in the ordinary course of business or consistent with industry practice;

(n)      any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business or consistent with industry practice;

(o)      the unwinding of any Hedging Obligations;

(p)      sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)      the lapse or abandonment of IP Rights, which in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(r)      the granting of a Lien that is permitted under Section 7.01;

(s)      the issuance of directors' qualifying shares and shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable law;

(t)      the disposition of any assets (including Equity Interests) (i) acquired in a transaction permitted hereunder, which assets are not used or useful in the principal business of the Borrower and its Restricted Subsidiaries or (ii) made in connection with the approval of any applicable antitrust authority or otherwise necessary or advisable in the good faith determination of the Borrower to consummate any acquisition permitted hereunder;

(u)      dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property;

(v)      dispositions and transfers of property in connection with any Specified Real Estate Financings (other than any Specified Sale Leaseback Transactions);

(w)      the settlement or early termination of any Permitted Bond Hedge Transaction and the settlement or early termination of any related Permitted Warrant Transaction; and

(x)      the sales of property or assets for an aggregate fair market value since the date of this Agreement not to exceed $35.0 million.

; provided that after giving effect to any sale, issuance or other disposition of Equity Interests of a Restricted Subsidiary, no Overadvance shall exist or result therefrom

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"**Assumption**" has the meaning specified in Section 10.25.

"**Attorney Costs**" means all reasonable fees, expenses and disbursements of any law firm or other external legal counsel, to the extent documented in reasonable detail and invoiced.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease Obligation of any Person, the amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auto-Extension Letter of Credit**" has the meaning specified in Section 2.03(2)(c).

"**Availability Model**" means a monthly availability model in substantially the same form as the availability model delivered by the Sponsor to the Administrative Agent prior to the Closing Date.

"**Average Historical Excess Availability**" means, at any Adjustment Date, the average daily Excess Availability for the three-month period immediately preceding such Adjustment Date, divided by the Maximum Borrowing Amount at such time.

"**Average Revolving Credit Loan Utilization**" means, at any Adjustment Date, the average daily aggregate Revolving Credit Exposure (excluding any Revolving Credit Exposure resulting from any outstanding Swing Line Loans) for the three-month period immediately preceding such Adjustment Date, divided by the Aggregate Commitments at such time.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, with respect to (a) any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, or (b) the United Kingdom, Part I of the United Kingdom Banking Act 2009 and any other law applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bank of America**" means Bank of America, N.A.

"**Bank Product**" shall mean any of the following products, services or facilities provided to Holdings, the Borrower or any Restricted Subsidiary: (a) supply chain or trade finance or (b) other banking products or services (other than Letters of Credit and Cash Management Services).

"**Bank Product Agreement**" means any agreement entered into from time to time by Holdings, the Borrower or any Restricted Subsidiary in connection with a Bank Product, designated by the Bank

Product Provider and the Borrower in writing to the Administrative Agent as "Bank Product Obligations" under this Agreement (but only if such obligations have not been designated as "Bank Product Obligations" under the First Lien Credit Agreement).

"**Bank Product Provider**" means any Person that is an Agent, an Arranger, a Lender or an Affiliate of an Agent or Lender at the time it entered into a Bank Product Agreement, whether or not such Person subsequently ceases to be an Agent, an Arranger, a Lender or an Affiliate of an Agent or Lender.

"**Bank Product Obligations**" shall mean Indebtedness and other obligations or liabilities of Holdings, the Borrower or any Restricted Subsidiary owed to the provider of a Bank Product.

"**Bankruptcy Code**" has the meaning specified in Section 8.02.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," and (c) the Eurodollar Rate plus 1.00%, subject to the interest rate floors set forth therein; provided that if the Base Rate shall be less than 1.25%, such rate shall be deemed 1.25% for purposes of this Agreement. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change. If the Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then the Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Basket**" means any amount, threshold or other value permitted or prescribed with respect to any Lien, Indebtedness, Asset Sale, Investment, Restricted Payment, transaction value, judgment or other amount under any provision in Articles V, VI, VII or VIII and the definitions related thereto.

"**Belk**" has the meaning specified in the preliminary statements of this Agreement.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Board of Directors**" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any

committee thereof duly authorized to act on behalf of such Board of Directors. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Borrower.

"**Borrower**" has the meaning specified in the preliminary statements of this Agreement.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrowing**" means a borrowing consisting of Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurodollar Rate Loans, having the same Interest Period.

"**Borrowing Base**" means, at any time, the sum of:

(1)     90% of the book value of the Eligible Credit Card Receivables held by the Borrower and the Subsidiary Guarantors; *plus*

(2)     85% of the book value of the Eligible Accounts Receivable held by the Borrower and the Subsidiary Guarantors; *plus*

(3)     90% of the Net Orderly Liquidation Value of Eligible Inventory held by the Borrower and the Subsidiary Guarantors, which percentage may increase to 92.5% for each of the Selected Months at the Borrower's option; *less*

(4)     the then-current amount of all Reserves.

In connection with any acquisition or similar Investment (including, in connection with a merger or consolidation of the Borrower permitted pursuant to Section 7.03(4)) (a "**Proposed Acquisition**"), the portion of the Borrowing Base that is attributable to the assets of the target in any such acquisition or other Investment (the "**Proposed Target**") will be limited to, to the extent the applicable field examinations and inventory appraisals are not complete as of such date, not greater than 5% of the Borrowing Base (provided that the portion of the Borrowing Base attributable to acquired Inventory, shall not exceed 90% of the Net Orderly Liquidation Value of any such acquired Inventory which would otherwise constitute Eligible Inventory) until the applicable field examination or inventory appraisal has been delivered; it being understood and agreed that there shall be no Default or Event of Default solely as a result of a failure to complete and deliver such items.

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 6.20, as adjusted to give effect to Reserves determined in the Permitted Discretion of the Administrative Agent following such delivery. Notwithstanding anything herein to the contrary, Reserves shall not duplicate eligibility criteria contained in the definition of Eligible Accounts Receivable, Eligible Credit Card Receivables, Eligible Inventory or any other Reserve then established.

"**Borrowing Base Certificate**" means a certificate by a Responsible Officer of the Borrower, substantially in the form of Exhibit J (or another form acceptable to the Administrative Agent and the Borrower) setting forth the calculation of the Borrowing Base, including a calculation of each component thereof (including, to the extent the Borrower has received notice of any such Reserve from the Administrative Agent, any of the Reserves included in such calculation), all in such detail as is reasonably satisfactory to the Administrative Agent. All calculations of the Borrowing Base in connection with the preparation of any Borrowing Base Certificate will be made by the Borrower and certified to the Administrative Agent.

13

"**Broker-Dealer Regulated Subsidiary**" means any Subsidiary of the Borrower that is registered as a broker-dealer under the Exchange Act or any other applicable Laws requiring such registration.

"**Business Day**" means any day that is not a Legal Holiday and, with respect to any interest rate settings as to a Eurodollar Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurodollar Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurodollar Rate Loan, any day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (paid in cash) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and the Restricted Subsidiaries; *provided*, *however*, that Capital Expenditures for the Borrower and its Restricted Subsidiaries shall not include:

(1)     expenditures to the extent they are made with (a) the proceeds from the issuance of Equity Interests by any Parent Company (to the extent contributed to the Borrower as common equity) or (b) proceeds of the issuance of Equity Interests of, or a cash capital contribution to, the Borrower after the Closing Date;

(2)     expenditures with proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrower and its Subsidiaries;

(3)     interest capitalized during such period;

(4)     (i) expenditures that are accounted for as capital expenditures of such person and that actually are paid for by a third party (excluding Holdings, the Borrower or any Subsidiary thereof) and for which neither Holdings, the Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period) and (ii) expenditures that are financed with tenant improvement allowances (or similar real estate incentive programs);

(5)     the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (a) used or surplus equipment traded in at the time of such purchase or (b) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business;

(6)     Investments in respect of a Permitted Acquisition; or

(7)     (i) the purchase of property, plant or equipment made within eighteen (18) months of any Asset Sale to the extent purchased with the proceeds of such Asset Sale; and (ii) with respect to any property, plant and equipment that, within twelve months following the purchase or acquisition thereof, is sold pursuant to a sale-leaseback or similar capitalized financing.

"**Capital Stock**" means:

(1)     in the case of a corporation, corporate stock or shares in the capital of such corporation;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into or exchangeable for Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP as in effect on the Closing Date.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"**Captive Insurance Subsidiary**" means any Subsidiary of the Borrower that is subject to regulation as an insurance company (or any Subsidiary thereof).

"**Cash Collateral**" has the meaning specified in the definition of "Cash Collateralize".

"**Cash Collateral Account**" means an account held at, and subject to the sole dominion and control of, the Collateral Agent.

"**Cash Collateralize**" means, in respect of an Obligation, to provide and pledge cash or deposit account balances in Dollars as collateral, at a location and pursuant to documentation in form and substance satisfactory to Administrative Agent or the Issuing Bank with respect to any Letter of Credit, as applicable (and "**Cash Collateralization**" has a corresponding meaning).

"**Cash Dominion Period**" means (a) each period beginning on the date that Excess Availability shall have been less than the greater of (x) $60,000,000 and (y) 12.5% of the Maximum Borrowing Amount, in either case, for three (3) consecutive Business Days, and ending on the date Excess Availability shall have been at least the greater of (x) $60,000,000 and (y) 12.5% of the Maximum Borrowing Amount, in each case, for twenty (20) consecutive calendar days or (b) upon the occurrence of a Specified Event of Default, the period that such Specified Event of Default shall be continuing.

"**Cash Equivalents**" means:

(1)     Dollars;

(2)     [reserved];

(3)      local currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business or consistent with industry practice;

(4)      readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 36 months or less from the date of acquisition;

(5)      certificates of deposit, time deposits and eurodollar time deposits with maturities of three years or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(6)      repurchase obligations for underlying securities of the types described in clauses (4) and (5) above or clauses (7) and (8) below entered into with any financial institution or recognized securities dealer meeting the qualifications specified in clause (5) above;

(7)      commercial paper and variable or fixed rate notes rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 36 months after the date of acquisition thereof;

(8)      marketable short-term money market and similar liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(9)      securities issued or directly and fully and unconditionally guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority of any such state, commonwealth or territory or any public instrumentality thereof having maturities of not more than 36 months from the date of acquisition thereof;

(10)      readily marketable direct obligations issued or directly and fully and unconditionally guaranteed by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency selected by the Borrower) with maturities of 36 months or less from the date of acquisition;

(11)      Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) with maturities of 24 months or less from the date of acquisition;

(12)      Investments with average maturities of 36 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(13)    investment funds investing substantially all of their assets in securities of the types described in clauses (1) through (12) above; and

(14)    solely with respect to any Captive Insurance Subsidiary, any investment that the Captive Insurance Subsidiary is not prohibited to make in accordance with applicable law.

In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents will also include (i) investments of the type and maturity described in clauses (1) through (13) above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (1) through (13) and in this paragraph.

"**Cash Management Agreement**" means any agreement entered into from time to time by Holdings, the Borrower or any Restricted Subsidiary in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, information reporting services, lockbox services, stop payment services and wire transfer services, designated by the Cash Management Bank and the Borrower in writing to the Administrative Agent as "Cash Management Obligations" under this Agreement (but only if such obligations have not been designated as "Cash Management Obligations" under the First Lien Credit Agreement).

"**Cash Management Bank**" means any Person that is an Agent, an Arranger, a Lender or an Affiliate of an Agent or Lender at the time it entered into a Cash Management Agreement, whether or not such Person subsequently ceases to be an Agent, an Arranger, a Lender or an Affiliate of an Agent or Lender.

"**Cash Management Obligations**" means obligations owed by Holdings, the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"**Cash Management Services**" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automatic clearing house fund transfer services, return items and interstate depository network services), (c) foreign exchange, netting and currency management services and (d) any other demand deposit or operating account relationships or other cash management services, including under any Cash Management Agreements.

"**Cash Receipt**" has the meaning specified in Section 6.19(2).

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CCT**" means Corporate Capital Trust, Inc.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"**CFC Holdco**" means a Domestic Subsidiary that has no material assets other than the Equity Interests in or indebtedness of one or more Foreign Subsidiaries that are CFCs, including the indirect ownership of such Equity Interests or indebtedness through one or more CFC Holdcos that have no other material assets.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following:  (a) the adoption of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.  It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111 203, H.R. 4173), all Laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

"**Change of Control**" means the occurrence of any of the following after the Closing Date:

(1)     at any time prior to the consummation of a Qualifying IPO after the Closing Date, the Permitted Holders ceasing to beneficially own (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), in the aggregate, directly or indirectly, at least forty percent (40%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or any Parent Company; or

(2)     at any time following the consummation of a Qualifying IPO after the Closing Date, (a) any Person (other than a Permitted Holder) or (b) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), becoming the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Exchange Act) of Equity Interests of the Borrower or such Parent Company representing more than thirty-five percent (35%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or such Parent Company, as applicable, and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of the Borrower or such Parent Company, as applicable, beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders;

(3)     the occurrence of a "Change of Control" (or any comparable term) as defined in each of the First Lien Credit Agreement, the Second Lien Credit Agreement or any other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount; or

(4)     Holdings shall cease to be the registered owner of 100% of the Equity Interests of the Borrower unless in connection with the consummation of a Qualifying IPO by the Borrower.

unless, in the case of clause (1) or (2) above, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of the Borrower or any Parent Company.

"**Chapter 11 Cases**" has the meaning specified in the preliminary statements of this Agreement.

"**Claim**" means any actions, suits or written demands or claims.

"**Class**" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the Type of Loan, Interest Period, upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (e.g., "fungibility")) and (ii) with respect to Lenders, those of such Lenders that have Commitments or Loans of a particular Class.

"**Closing Date**" means December 10, 2015.

"**Closing Date Annual Financial Statements**" means the audited consolidated balance sheets of the Acquired Company as of the fiscal years ended February 2, 2013, February 1, 2014 and January 31, 2015, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the Acquired Company for the fiscal years then ended.

"**Closing Date Quarterly Financial Statements**" means the unaudited quarterly balance sheet and related statements of income and cash flows of the Acquired Company for the most recent fiscal quarter(s) ended after January 31, 2015 and at least 45 days prior to the Closing Date, in each case to the extent delivered to Initial Borrower pursuant to the Acquisition Agreement or otherwise.

"**Closing Date Refinancing**" means (a) the repayment in full of the principal, accrued and unpaid interest, fees and other amounts and the termination of all commitments to extend credit under that certain Credit Agreement, dated as of October 22, 2014, by and among Belk, certain affiliates of Belk, the lenders party thereto, and Wells Fargo Bank, National Association, as agent and (b) the Acquired Company will voluntarily redeem in full the entire unpaid principal amount, along with unpaid interest, fees, premiums and any other amounts owed under each series of Existing Company Notes.

"**Closing Date Transactions**" means, collectively, (a) the consummation of the Equity Contribution, (b) the consummation of the Merger pursuant to the Transaction Agreement and the payment of the Transaction Consideration, (c) the funding of the Revolving Credit Loans borrowed on the Closing Date, (d) the borrowings under the First Lien Facility and the Second Lien Facility on the Closing Date, (e) the execution and delivery of the Loan Documents, the First Lien Loan Documents and the Second Lien Loan Documents, (f) the consummation of the Closing Date Refinancing, (g) the consummation of any other transactions in connection with the foregoing and (h) the payment of Transaction Expenses.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the "Collateral" as defined in any Collateral Documents and all other property of whatever kind or nature pledged or charged as collateral under any Collateral Document.

"**Collateral Access Agreement**" means a landlord waiver or other agreement, in a form as shall be reasonably satisfactory to the Collateral Agent, between the Collateral Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any premises where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"**Collateral Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(1)  the Collateral Agent shall have received each Collateral Document required to be delivered (a) on the Closing Date pursuant to Section 4.01(1)(c) or (b) pursuant to Section 6.11 or 6.13 at such time required by such Sections to be delivered, in each case, duly executed by each Loan Party that is party thereto;

(2)  all Obligations shall have been unconditionally guaranteed by (a) Holdings (or any successor thereto), (b) each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary), which shall include those that are listed on Schedule 1.01(1) hereto and (c) any Restricted Subsidiary of the Borrower that Guarantees (or is the borrower or issuer of) the First Lien Facility (including any Permitted Incremental Equivalent Debt (as defined in the First Lien Credit Agreement)) and/or the Second Lien Facility (the Persons in the preceding clauses (a) through (c) collectively, the "**Guarantors**");

(3)  except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected security interest with the priority set forth in the Applicable Intercreditor Agreement, subject only to Liens permitted by Section 7.01, in

(a)  all the Equity Interests of the Borrower,

(b)  all Equity Interests of each direct, wholly owned Material Domestic Subsidiary (other than any CFC Holdco) that is directly owned by the Borrower or any Subsidiary Guarantor; and

(c)  65% of the issued and outstanding voting Equity Interests and 100% of the issued and outstanding Equity Interests that are not voting Equity Interests of each (i) wholly owned Material Domestic Subsidiary that is (a) a CFC Holdco and (b) directly owned by the Borrower or any Subsidiary Guarantor and (ii) Foreign Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor; and

(4)  except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01 or under any Collateral Document and in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents, the Obligations and the Guaranty shall have been secured by a security interest in substantially all tangible and intangible personal property of the Borrower and each Guarantor, inventory, equipment, investment property, contract rights, applications and registrations of IP Rights filed in the United States, Accounts, Credit Card Processor Accounts, Deposit Accounts, Securities Accounts, documents of title, other general intangibles, and proceeds of the foregoing, in each case,

(a)  that has been perfected, to the extent such security interest may be perfected by:

(i)  delivering certificated securities, intercompany notes and other instruments in which a security interest can be perfected by physical control, in each case to the extent required hereunder or the Security Agreement;

(ii)  filing financing statements under the Uniform Commercial Code,

(iii)     making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office, or

(iv)     [reserved], or

(v)     control solely to the extent required by Section 6.19 and

(b)     with the priority required by the Collateral Documents and the Applicable Intercreditor Agreement; *provided* that any such security interests in the Collateral shall be subject to the terms of the Applicable Intercreditor Agreements.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)     Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents;

(B)     the Collateral and Guarantee Requirement shall not apply to any Excluded Assets;

(C)     no deposit account control agreement, securities account control agreement or other control agreements or control arrangements shall be required with respect to any deposit account, securities account or other asset specifically requiring perfection through control agreements except to the extent set forth in Section 6.19;

(D)     no actions in any jurisdiction other than the U.S. or that are necessary to comply with the Laws of any jurisdiction other than the U.S. shall be required in order to create any security interests in assets located, titled, registered, applied for, filed, or arising under laws outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the Laws of any jurisdiction other than the U.S.) and there shall be no requirement to deliver landlord lien waivers, estoppels and collateral access letters;

(E)     no stock certificates Subsidiaries other than Material Subsidiaries shall be required to be delivered to the Collateral Agent; and

(F)     no perfection steps shall be required with respect to (i) motor vehicles and other assets subject to certificates of title to the extent a Lien thereon cannot be perfected by the filing of a UCC financing statement, (ii) letter of credit rights, except to the extent constituting a support obligation for other Collateral as to which perfection is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (iii) commercial tort claims with a value of less than $2.5 million, and (iv) promissory notes evidencing debt for borrowed money in a principal amount of less than $2.5 million.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, each of the collateral assignments, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent, Collateral Agent or the Lenders pursuant to Sections 4.01(1)(c), 6.11 or 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Collateral Test Triggering Event**" means any time on or after the date on which Excess Availability has been less than the greater of (A) $120,000,000 and (B) 17.5% of the Maximum Borrowing Amount for five (5) consecutive Business Days.

"**Commitment**" means, (a) with respect to each Lender (to the extent applicable), such Lender's Revolving Credit Commitment, Extended Revolving Credit Commitment or a Revolving Credit Commitment Increase or any combination thereof (as the context requires) and (b) with respect to the applicable Swing Line Lender, or swingline lender under any Extended Revolving Credit Commitments, its Swing Line Facility or swingline commitment, as applicable.

"**Commitment Letter**" means that certain Amended and Restated Commitment Letter, dated as of September 4, 2015, among the Initial Borrower, Morgan Stanley, Merrill Lynch, Bank of America, Jefferies, Credit Suisse, DB, Nomura, RBC, RBCCM, Wells Fargo, MCS Capital Markets, MCS Lending and CCT, as amended by the Letter Agreement dated November 6, 2015 and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Committed Loan Notice**" means a notice of (1) a Borrowing with respect to a given Class of Loans, (2) a conversion of Loans of a given Class from one Type to the other or (3) a continuation of Eurodollar Rate Loans of a given Class, pursuant to Section 2.02(1), which, if in writing, shall be substantially in the form of <u>Exhibit A-1</u> (or such other form as shall be reasonably acceptable to the Borrower and the Administrative Agent).

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time and any successor statute.

"**Communication**" has the meaning specified in Section 10.13(b).

"**Company Material Adverse Effect**" has the meaning specified in the Transaction Agreement as in effect on August 23, 2015.

"**Compensation Period**" has the meaning specified in Section 2.12(3)(b).

"**Compliance Certificate**" means a certificate substantially in the form of <u>Exhibit C</u> and which certificate shall in any event be a certificate of a Financial Officer of the Borrower

    (1)    certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto (in each case, other than any Default with respect to which the Administrative Agent has otherwise obtained notice in accordance with Section 6.03(1)), and

    (2)    to the extent that compliance with the financial covenant under Section 7.10 is (or was) required in respect of the period covered by such financial statements, certifying as to (and containing all information and calculations necessary for determining) compliance with such financial covenant as of the last day of the applicable Test Period, and

"**Concentration Account**" has the meaning specified in Section 6.19(2).

"**Confirmation Order**" means the order of the Court confirming the Approved Plan.

"**Consolidated Cash Interest Charges**" means, as of any date for the applicable period ending on such date with respect to Borrower and its Restricted Subsidiaries on a consolidated basis, the Consolidated Interest Expense determined on a cash basis only and solely in respect of Indebtedness of the type described in clause (1) of the definition thereof and excluding, for the avoidance of doubt, (i) any non-cash interest expense, including capitalized interest, whether paid or accrued, (ii) the amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (iii) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses, (iv) any expenses resulting from discounting of indebtedness in connection with the application of recapitalization accounting or purchase accounting, (v) penalties or interest related to taxes and any other amounts of noncash interest resulting from the effects of acquisition method accounting or pushdown accounting, (vi) the accretion or accrual of, or accrued interest on, discounted liabilities (other than Indebtedness) during such period, (vii) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or other derivative instruments pursuant to FASB Accounting Standards Codification No. 815-Derivatives and Hedging, (viii) any one-time cash costs associated with breakage in respect of Hedge Agreements for interest rates, (ix) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, (viii) all non-recurring interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with GAAP and (ix) expensing of bridge, arrangement, structuring, commitment or other financing fees.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person and its Restricted Subsidiaries, including the amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses and amortization of Capitalized Software Expenditures of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated First Lien Debt**" means as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, (a) Loans under this Agreement (including any Incremental Revolving Credit Loans), Loans (as defined in the First Lien Facility) under the First Lien Facility (including any Incremental Term Loans (as defined in the First Lien Credit Agreement)), Capitalized Lease Obligations and other Consolidated Total Debt secured by Collateral (or any portion thereof) on an equal priority basis (but without regard to the control of remedies) with Liens securing the Obligations or the Liens securing the First Lien Obligations minus (b) without duplication, the aggregate amount of unrestricted cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, which aggregate amount of cash and Cash Equivalents shall be determined without giving *pro forma effect* to the proceeds of Indebtedness incurred on such date.

"**Consolidated Interest Expense**" means, with respect to any Person for any period, without duplication, the sum of:

(1)    consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount or premium resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (c) non-cash interest payments, (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate obligations under any Hedge Agreements with respect to Indebtedness); plus

(2)      consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(3)      interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" means, with respect to any Person for any period, the net income (loss) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding (and excluding the effect of), without duplication,

(1)      extraordinary, non-recurring or unusual gains, losses, fees, costs, charges or expenses (including relating to any multi-year strategic initiatives and accruals and reserves in connection with such gains, losses, charges or expenses); restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves, and in each case, whether or not classified as such under GAAP); costs and expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of stores or facilities and fixed assets for alternative uses; Public Company Costs; costs and expenses related to the integration, consolidation, opening, pre-opening and closing of stores or facilities and fixed assets; severance and relocation costs and expenses, one-time compensation costs and expenses, consulting fees, signing, retention or completion bonuses, and executive recruiting costs; costs and expenses incurred in connection with strategic initiatives; transition costs and duplicative running costs; costs and expenses incurred in connection with non-ordinary course product and IP Rights development; costs incurred in connection with acquisitions (or purchases of assets) prior to or after the Closing Date (including integration costs); business optimization expenses (including costs and expenses relating to business optimization programs, new systems design, retention charges, system establishment costs and implementation costs and project start-up costs), accruals and reserves; operating expenses attributable to the implementation of cost-savings initiatives; curtailments and modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments);

(2)      the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period whether effected through a cumulative effect adjustment or a retroactive application, in each case in accordance with GAAP;

(3)      Transaction Expenses and the Third Amendment Transaction Expenses;

(4)      any gain (loss) on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business or consistent with industry practice) or income (loss) from discontinued operations (but if such operations are classified as discontinued due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of);

(5)      the Net Income for such period of any Person that is an Unrestricted Subsidiary; *provided* that the Consolidated Net Income of a Person will be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or

to the extent converted into cash or Cash Equivalents) to such Person or a Restricted Subsidiary thereof in respect of such period;

(6)      [reserved];

(7)      effects of adjustments (including the effects of such adjustments pushed down to such Person and its Restricted Subsidiaries) related to the application of recapitalization accounting or purchase accounting (including in the inventory, property and equipment, software, goodwill, intangible assets, in process research and development, deferred revenue and debt line items);

(8)      income (loss) from the early extinguishment or conversion of (a) Indebtedness, (b) Hedging Obligations or (c) other derivative instruments;

(9)      any impairment charge or asset write-off or write-down in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP;

(10)      (a) any equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation, equity incentive programs or similar rights, stock options, restricted stock or other rights to, and any cash charges associated with the rollover, acceleration or payout of, Equity Interests by management of such Person or of a Restricted Subsidiary or any Parent Company, (b) noncash compensation expense resulting from the application of Accounting Standards Codification Topic No. 718, *Compensation—Stock Compensation* or Accounting Standards Codification Topic 505-50, *Equity-Based Payments to Non-Employees*, and (c) any income (loss) attributable to deferred compensation plans or trusts;

(11)      any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, disposition, incurrence or repayment of Indebtedness (including such fees, expenses or charges related to the offering and issuance of the Revolving Credit Notes and the syndication and incurrence of any Facilities), issuance of Equity Interests (including by any direct or indirect parent of the Borrower), recapitalization, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Indebtedness evidenced by this Agreement, the First Lien Facility or the Second Lien Facility) and including, in each case, any such transaction whether consummated on, after or prior to the Closing Date and any such transaction undertaken but not completed, and any charges or nonrecurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful or consummated (including, for the avoidance of doubt, the effects of expensing all transaction related expenses in accordance with Accounting Standards Codification Topic No. 805, *Business Combinations*);

(12)      accruals and reserves that are established or adjusted in connection with the Closing Date Transactions or the Third Amendment Transactions, an Investment or an acquisition that are required to be established or adjusted as a result of the Closing Date Transactions or the Third Amendment Transactions, such Investment or such acquisition, in each case accordance with GAAP;

(13)      any expenses, charges or losses to the extent covered by insurance that are, directly or indirectly, reimbursed or reimbursable by a third party, and any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with

any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement;

(14)    any non-cash gain (loss) attributable to the mark to market movement in the valuation of Hedging Obligations or other derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—*Derivatives and Hedging* or mark to market movement of other financial instruments pursuant to FASB Accounting Standards Codification Topic 825—*Financial Instruments*;

(15)    any net unrealized gain or loss (after any offset) resulting in such period from currency transaction or translation gains or losses including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from (a) Hedging Obligations for currency exchange risk and (b) resulting from intercompany indebtedness) and any other foreign currency transaction or translation gains and losses, to the extent such gain or losses are non-cash items;

(16)    any adjustments resulting from the application of Accounting Standards Codification Topic No. 460, *Guarantees*, or any comparable regulation;

(17)    any non-cash rent expense;

(18)    the amount of any management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Investors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 7.06;

(19)    any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures; and

(20)    earn-out and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries, Consolidated Net Income will include the amount of proceeds received or receivable from business interruption insurance, the amount of any expenses or charges incurred by such Person or its Restricted Subsidiaries during such period that are, directly or indirectly, reimbursed or reimbursable by a third party, and amounts that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder.

"**Consolidated Secured Debt**" means, as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, the aggregate amount of Consolidated Total Debt that is secured by a Lien on any assets or property of the Borrower or any of its Restricted Subsidiaries.

"**Consolidated Total Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Closing Date Transaction or any Permitted Acquisition), consisting of Indebtedness for borrowed money, Capitalized Lease Obligations, debt obligations evidenced by notes or similar instruments and Guarantees of Indebtedness listed above minus (b) the aggregate amount of all cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date (but

excluding cash and Cash Equivalents which are listed as "Restricted" on such balance sheet), which aggregate amount of cash and Cash Equivalents shall be determined without giving pro forma effect to the proceeds of Indebtedness incurred on such date; provided, Consolidated Total Debt will not include Non-Recourse Indebtedness and Indebtedness in respect of any (1) letter of credit, except to the extent of obligations in respect of drawn standby letters of credit which have not been reimbursed within three (3) Business Days and (2) Hedging Obligations, except any unpaid termination payments thereunder. The Dollar-equivalent principal amount of any Indebtedness denominated in a foreign currency will reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar-equivalent principal amount of such Indebtedness.

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2)     to advance or supply funds:

(a)     for the purchase or payment of any such primary obligation or

(b)     to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Controlled Investment Affiliate**" means, as to any Person, any other Person, other than any Investor, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower or other companies.

"**Court**" has the meaning specified in the preliminary statements of this Agreement.

"**Convertible Indebtedness**" means Indebtedness of the Borrower (which may be guaranteed by the Guarantors) permitted to be incurred hereunder that is either (a) convertible into common stock of the Borrower (and cash in lieu of fractional shares) or cash (in an amount determined by reference to the price of such common stock) or (b) sold as units with call options, warrants or rights to purchase (or substantially equivalent derivative transactions) that are exercisable for common stock of the Borrower or cash (in an amount determined by reference to the price of such common stock).

"**Covenant Trigger Period**" means any period (a) commencing on the date upon which Specified Excess Availability is less than the greater of (x) $60,000,000 and (y) 10.0% of the Maximum Borrowing Amount and (b) ending on the date upon which Specified Excess Availability shall have been

at least the greater of (x) $60,000,000 and (y) 10.0% of the Maximum Borrowing Amount for a period of twenty (20) consecutive calendar days.

"**Covered Entity**" means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**" has the meaning specified in <u>Section 10.29</u>.

"**Credit Card Processor**" means any Person (other than a Loan Party or any Affiliate of any Loan Party) who issues or whose members or Affiliates issue credit or debit cards, including MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Synchrony Financial, Carte Blanche and other non-bank credit or debit cards, including credit or debit cards issued by or through American Express Travel Related Services Company, Inc., or Novus Services, Inc. or any Permitted Replacement Credit Card Program, and any servicing or processing agent or any factor or financial intermediary that facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Loan Party's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards.

"**Credit Card Processor Accounts**" means Accounts owing to the Borrower or a Subsidiary Guarantor from a Credit Card Processor (including any Permitted Replacement Credit Card Program and pursuant to the Synchrony Credit Card Program).

"**Credit Extension**" means each of the following: (i) a Borrowing and (ii) an L/C Credit Extension.

"**Credit Suisse**" means Credit Suisse Securities and CS, as the context may require.

"**Credit Suisse Securities**" means Credit Suisse Securities (USA) LLC.

"**CS**" means Credit Suite AG (acting through such of its affiliates or branches as it deems appropriate).

"**Cure Amount**" has the meaning specified in Section 8.04(1).

"**Cure Deadline**" has the meaning specified in Section 8.04(1).

"**Cure Right**" has the meaning specified in Section 8.04(1).

"**Customs Broker Agreement**" means an agreement, in form reasonably satisfactory to the Collateral Agent, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Collateral Agent

and agrees, upon notice from the Collateral Agent, to hold and dispose of such Inventory solely as directed by the Collateral Agent.

"**DB**" means, collectively, DBNY and DBSI.

"**DBNY**" means Deutsche Bank AG New York Branch.

"**DBSI**" means Deutsche Bank Securities Inc.

"**Debt Representative**" means, with respect to any series of Indebtedness secured by Liens permitted under clause (21) or (39) of the definition of "Permitted Liens" and Liens securing Indebtedness permitted under clauses (2), (14) and (25) of Section 7.02(b), the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning specified in the preliminary statements of this Agreement.

"**Default**" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"**Default Rate**" means an interest rate with respect to any Eurodollar Rate Loan or Base Rate Loan, equal to (1) the Base Rate, *plus* (2) the Applicable Rate applicable to Base Rate Loans, *plus* (3) 2.00% per annum; *provided* that with respect to the outstanding principal amount of any Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.02(3)) *plus* 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable

"**Defaulting Lender**" means, subject to Section 2.17(2), any Lender (including any Issuing Bank) that (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans or participations in respect of L/C Obligations or Swing Line Loans, within one Business Day of the date required to be funded by it hereunder, unless such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular Default, if any) has not been satisfied, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations, *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's receipt of such confirmation in form and substance satisfactory the Lender and the Administrative Agent, or (d) has, or has a direct or indirect parent company that has, (i) become or is the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of

creditors or similar Person charged with reorganization or liquidation of its business or assets or a custodian appointed for it, (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (iv) become the subject of a Bail-in Action. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under this definition shall be conclusive absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Deposit Account**" means any checking or other demand deposit account maintained by the Borrower and any Subsidiary Guarantors, including any "deposit accounts" under Article 9 of the UCC. All funds in such Deposit Accounts (other than Excluded Accounts) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Deposit Accounts, subject to this Agreement, the Security Agreement and the ABL Intercreditor Agreement.

"**Deposit Account Control Agreement**" has the meaning assigned to such term in Section 6.19(1).

"**Designated Non-Cash Consideration**" means the fair market value of non-cash consideration received by the Borrower or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-Cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, *less* the amount of cash or Cash Equivalents received in connection with a subsequent sale, redemption or repurchase of or collection or payment on such Designated Non-Cash Consideration.

"**Designated Preferred Stock**" means Preferred Stock of the Borrower, any Restricted Subsidiary thereof or any Parent Company (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on or promptly after the issuance date thereof.

"**Designated Revolving Commitments**" means any commitments to make loans or extend credit on a revolving basis to the Borrower or any Restricted Subsidiary by any Person other than the Borrower or any Restricted Subsidiary that have been designated in an Officer's Certificate delivered to the Administrative Agent as "Designated Revolving Commitments" until such time as the Borrower subsequently delivers an Officer's Certificate to the Administrative Agent to the effect that such commitments will no longer constitute "Designated Revolving Commitments;" provided that on the date such Designated Revolving Commitments are established, such Designated Revolving Commitments will be a deemed an incurrence of Indebtedness on such date and will be deemed outstanding for purposes of calculating the applicable Total Net Leverage Ratio, Senior Secured Leverage Ratio, First Lien Net Leverage Ratio and the availability of any applicable Basket hereunder on such date after giving *pro forma* effect to the incurrence of the entire committed amount of the Indebtedness thereunder (but without netting any cash proceeds thereof), in which case such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with the Total Net Leverage Ratio, Senior Secured Leverage Ratio, First Lien Net Leverage Ratio and the availability of any Baskets hereunder. For the avoidance of doubt, in the

case of any Designated Revolving Commitments permitted hereunder, the reference to the "incurrence" of Indebtedness shall refer to the date on which such Designated Revolving Commitments are established.

"**Discharge**" means, with respect to any Indebtedness, the repayment, prepayment, repurchase (including pursuant to an offer to purchase), redemption, defeasance or other discharge of such Indebtedness, any such case in whole or in part.

"**disposition**" has the meaning set forth in the definition of "Asset Sale".

"**Disqualified Institution**" means (a) any competitor of the Borrower or its Subsidiaries (including for purposes of this definition Belk and its Subsidiaries) identified by or on behalf of the Borrower or the Sponsor to (i) the Arrangers from time to time on or prior to the Closing Date or (ii) the Administrative Agent from time to time after the Closing Date, (b) those particular banks, financial institutions, other institutional lenders and other Persons identified by or on behalf of the Borrower or the Sponsor to the Arrangers prior to August 23, 2015 and (c) any Affiliate of the entities described in the preceding clauses (a) or (b) (excluding, in the case of clause (a), bona fide debt funds) that are either readily identifiable as such on the basis of their name or are identified as such in writing by or on behalf of the Borrower or the Sponsor to (i) the Arrangers on or prior to the Closing Date or (ii) the Administrative Agent from time to time after the Closing Date; it being understood and agreed that the identification of any Person as a Disqualified Institution after the Closing Date shall not apply to retroactively disqualify any Person that has previously acquired an assignment or participation interest in any Loan, subject to Section 10.07(n), until such time such Person no longer constitutes a Lender. The identity of Disqualified Institutions shall be posted or distributed to all Lenders and prospective assignees.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date or the date the Loans are no longer outstanding and the Commitments have been terminated; *provided* that if such Capital Stock is issued pursuant to any plan for the benefit of, future, current or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower or its Subsidiaries or any Parent Company or by any such plan to such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof), such Capital Stock will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability; *provided further* any Capital Stock held by any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries, any Parent Company, or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof), in each case pursuant to any equity subscription or equity holders' agreement, management equity plan or stock option plan or any other management or employee benefit plan or agreement will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any Subsidiary or in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's

31

termination, death or disability.   For the purposes hereof, the aggregate principal amount of Disqualified Stock will be deemed to be equal to the greater of its voluntary or involuntary liquidation preference and maximum fixed repurchase price, determined on a consolidated basis in accordance with GAAP, and the "maximum fixed repurchase price" of any Disqualified Stock that does not have a fixed repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were purchased on any date on which the Consolidated Total Debt will be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock.

"**Dividing Person**" has the meaning assigned to it in the definition of "Division."

"**Division**" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any direct or indirect Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electronic Copy**" has the meaning specified in Section 10.13(b).

"**Electronic Record**" has the meaning specified in Section 10.13.

"**Electronic Signature**" has the meaning specified in Section 10.13.

"**Eligible Accounts Receivable**" means all Accounts Receivable (other than Credit Card Processor Accounts) due to the Borrower and the Subsidiary Guarantors that are reflected in the most recent Borrowing Base Certificate, except any Accounts Receivable with respect to which any of the exclusionary criteria set forth below applies.  No Account Receivable will be an Eligible Account Receivable if:

(1)     such Account Receivable does not arise from the sale of goods or the performance of services by the Borrower or a Guarantor in the ordinary course of its business;

(2)      the Borrower and the Subsidiary Guarantor's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever (other than the preparation and delivery of an invoice);

(3)      any defense, counterclaim, set-off or dispute exists as to such Account Receivable, but only to the extent of such defense, counterclaim, set-off or dispute;

(4)      such Account Receivable is not a true and correct statement of *bona fide* indebtedness incurred in the amount of the Account Receivable for merchandise sold to or services rendered and accepted by the applicable Account Debtor;

(5)      such Account Receivable with respect to which an invoice has not been sent to the applicable Account Debtor on or before the date as of which such Account is first included in the Borrowing Base Certificate or otherwise reported to the Administrative Agent as Collateral;

(6)      such Account Receivable (i) is not owned by the Borrower or a Subsidiary Guarantor or (ii) is not subject to the first priority, valid and perfected security interest and Lien of Collateral Agent, for and on behalf of itself and the Lenders or (iii) is subject to any other Lien (other than Liens permitted under clauses (1), (3), (4), (7), (12), (25), (28), (30), (36), or (37) of the definition of Permitted Liens) (the foregoing clauses (ii) and (iii) not being intended to limit the ability of the Administrative Agent to change, establish or eliminate any Reserves in its Permitted Discretion on account of any such permitted Liens);

(7)      the Account Debtor is also a creditor or supplier of the Borrower or applicable Subsidiary Guarantor that owns such Account, or the Account Debtor has disputed liability with respect to such Account Receivable, or the Account Debtor has made any claim with respect to any other Account Receivable due from such Account Debtor to the Borrower or applicable Subsidiary Guarantor that owns such Account Receivable, or the Account Receivable otherwise is or may become subject to right of setoff by the Account Debtor; provided that any such Account Receivable shall be ineligible under this clause only to the extent of such contract, dispute, claim, setoff or similar right;

(8)      such Account Receivable is the obligation of an Account Debtor that is any Governmental Authority, unless the applicable Loan Party assigns its right to payment of such Account Receivable to the Collateral Agent, in a manner satisfactory to the Administrative Agent, in its Reasonable Credit Judgment, so as to comply with the Assignment of Claims Act of 1940 (31 U.S.C. §3727, 41 U.S.C. §15 et seq., as amended);

(9)      such Account Receivable is reissued in respect of partial payment, including debit memos and chargebacks (it being understood that this clause (9) shall only apply with respect to, and to the extent of, such partial payment);

(10)      [reserved];

(11)      such Account Receivable remains unpaid more than 45 days after the original due date shown on the invoice or more than 90 days after the original invoice date;

(12)      such Account Receivable is the obligation of an Account Debtor from whom 50% or more of the amount of all Accounts owing by that Account Debtor are ineligible under the criteria set forth in this definition;

(13)     such Account Receivable is evidenced by chattel paper or an instrument of any kind, or has been reduced to judgment;

(14)     such Account Receivable, together with all other Accounts owing by such Account Debtor and its Affiliates as of any date of determination, exceeds 50% of all Eligible Accounts Receivable (but, in each case, only to the extent of such excess);

(15)     such Account Receivable is (x) payable in any currency other than Dollars or (y) is owed by an Account Debtor that is not organized under the laws of the United States of America, except to the extent that such Account Receivable is secured or payable by a letter of credit, credit insurance, guaranty, acceptance or similar terms satisfactory to the Administrative Agent in its Permitted Discretion;

(16)     such Account Receivable has been redated, extended, compromised, settled or otherwise modified or discounted, except discounts or modifications that are granted by the Borrower or a Subsidiary Guarantor in the ordinary course of business and that are reflected in the calculation of the Borrowing Base;

(17)     the Account Debtor is subject to an event of the type described in Section 8.01(6); *provided* that (i) the Administrative Agent may, in its sole discretion, include Accounts from Account Debtors subject to such proceedings if and to the extent that such Accounts are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Administrative Agent not to pose an unreasonable risk of non-collectability;

(18)     such Account Receivable represents a sale on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or other repurchase or return basis;

(19)     the portion, if any, of any Account Receivable that includes a billing for interest, fees or late charges;

(20)     such Account Receivable is governed by the laws of any jurisdiction other than the United States, any State thereof or the District of Columbia; or

(21)     it is an Account Receivable due to the Borrower from major credit card processors, whether or not constituting Eligible Credit Card Receivables.

Any Accounts which are not Eligible Accounts Receivable shall nevertheless be part of the Collateral.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b), *provided* that no Defaulting Lender(s) or Disqualified Institution(s) may be Eligible Assignee(s).

"**Eligible Credit Card Receivables**" means all Credit Card Processor Accounts (including, for the avoidance of doubt, Credit Card Processor Accounts in the form of deposits in transit from Solutran, Inc. and its Affiliates) that constitute proceeds from the sale or disposition of Inventory or services, in each case, in the ordinary course of business and that are reflected in the most recent Borrowing Base Certificate, except any Credit Card Processor Account with respect to which any of the exclusionary criteria set forth below applies. No Credit Card Processor Account will be an Eligible Credit Card Receivable if:

(1)     such Credit Card Processor Account has been outstanding for more than five (5) Business Days from the date of sale;

(2)     such Credit Card Processor Account is (a) not subject to the first priority, valid and perfected Lien of the Collateral Agent as to such Credit Card Processor Account or (b) is subject to any other Lien, other than (i) a Lien permitted under clauses (1), (2) and (7) of the definition of "Permitted Liens" or other Permitted Lien arising by operation of law (it being understood that customary offsets to fees and chargebacks in the ordinary course by the credit card or debit card processors will not be deemed violative of this clause (2));

(3)     the Borrower or a Subsidiary Guarantor does not have good, valid and marketable title thereto, free and clear of any Lien (other than (i) Liens granted to the Administrative Agent, for its own benefit and the benefit of the other Secured Parties pursuant to the Collateral Documents, (ii) a junior priority Lien permitted under clauses (2) and (7) of the definition of "Permitted Liens" or other Permitted Lien arising by operation of law or (iii) a lien securing Indebtedness permitted clauses (1) and (7) of the definition of "Permitted Liens");

(4)     such Credit Card Processor Account does not constitute the legal, valid and binding obligation of the applicable Credit Card Processor enforceable in accordance with its terms;

(5)     such Credit Card Processor Account is disputed, or a claim, counterclaim, discount, deduction, reserve, allowance, recoupment, offset or chargeback has been asserted with respect thereto by the applicable Credit Card Processor (but only to the extent of such dispute, claim, counterclaim, discount, deduction, reserve, allowance, recoupment, offset or chargeback);

(6)     such Credit Card Processor Account is owed by a Credit Card Processor that is subject to a bankruptcy proceeding of the type specified in Section 8.01(6) or that is liquidating, dissolving or winding up its affairs or otherwise deemed not creditworthy by the Administrative Agent in its Permitted Discretion;

(7)     the Credit Card Processor is organized or has its principal offices or assets outside the United States;

(8)     such Credit Card Processor Account is evidenced by Chattel Paper or an Instrument (each as defined in the Security Agreement of any kind, or has been reduced to judgment);

(9)     such Credit Card Processor Account includes a billing for interest, fees or late charges, but ineligibility will be limited to the extent thereof; or

(10)     such Credit Card Processor Account is payable in any currency other than Dollars.

Anything contained herein to the contrary notwithstanding, for purposes of determining the amount of Eligible Credit Card Receivable in the Borrowing Base at any time, any Credit Card Processor Account that otherwise meets the requirements for Eligible Credit Card Receivables may be included in such calculation even though the same does not constitute proceeds from the sale or disposition of Inventory; *provided* that such amount will be subject to adjustment as may be required by the Administrative Agent at any time and from time to time to reflect such fact.

"**Eligible Inventory**" means all Inventory reflected in the most recent Borrowing Base Certificate, except any Inventory with respect to which any of the exclusionary criteria set forth below applies.  No Inventory will be an Eligible Inventory if:

(1)      such Inventory is not subject to a first priority perfected Lien in favor of the Collateral Agent;

(2)      such Inventory is subject to any Lien other than (a) a Lien in favor of the Collateral Agent, (b) a Lien permitted under clause (2) of the definition of "Permitted Liens" or other Permitted Lien arising by operation of law or (c) a Lien securing Indebtedness permitted under clause (7) of the definition of "Permitted Liens";

(3)      such Inventory is slow moving (other than Inventory located at a clearance center that has been appropriately priced consistent with the Borrower or Applicable Subsidiary Guarantor's customary practices), obsolete, unmerchantable, defective, used or unfit for sale;

(4)      such Inventory is not owned only by the Borrower of a Subsidiary Guarantor;

(5)      such Inventory is not finished goods or which constitutes work-in-process, raw materials, packaging and shipping material, supplies, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return (but not held for resale) or repossessed, or which constitutes goods held on consignment or goods which are not of a type held for sale in the ordinary course of business;

(6)      other than Permitted In-Transit Inventory, such Inventory is not located in the United States (excluding territories and possessions of the United States);

(7)      other than Permitted In-Transit Inventory, such Inventory (a) is located at any location (other than a retail store or clearance center) leased or subject to a short-term rental agreement by a Loan Party, unless (x) the lessor has delivered to the Collateral Agent a Collateral Access Agreement as to such location, (y) a Reserve for rent, charges, and other amounts due or to become due with respect to such location has been established by the Administrative Agent in its Permitted Discretion or (z) has an aggregate net book value (together with all such Inventory at such locations) of less than $5.0 million in the aggregate or (b) is located at a retail store or clearance center leased by a Loan Party and such location is in a Landlord Lien State, unless a Reserve for rent, charges, and other amounts due or to become due with respect to such location has been established by the Administrative Agent in its Permitted Discretion;

(8)      other than Permitted In-Transit Inventory, such Inventory is located in any third-party warehouse or is in the possession of a bailee (other than a third-party processor) and is not evidenced by a Document (as defined in Article 9 of the UCC), unless an appropriate Reserve has been established by the Administrative Agent in its Permitted Discretion;

(9)      such Inventory contains or bears any intellectual property rights licensed to the Borrower or any Subsidiary Guarantor by any Person other than the Borrower or any Subsidiary Guarantor unless the Collateral Agent is reasonably satisfied that it may sell or otherwise dispose of such Inventory without (a) infringing the rights of such licensor, (b) violating any contract with such licensor, or (c) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement relating thereto;

(10)    such Inventory is in transit, except that Inventory in transit will not be deemed ineligible if (the following being referred to herein as, "**Permitted In-Transit Inventory**"):

(a)    (i) it has been delivered to a carrier in a foreign port or foreign airport for receipt by the Borrower or a Subsidiary Guarantor in the United States within 60 days, but which has not yet been received by the Borrower or a Subsidiary Guarantor or (ii) it has been delivered to a carrier in the United States for receipt by the Borrower or a Subsidiary Guarantor in the United States within ten (10) Business Days, but which has not yet been received by the Borrower or a Subsidiary Guarantor;

(b)    title and legal ownership and risk of loss thereof has passed to the Borrower or any Subsidiary Guarantor (or is retained by the applicable Loan Party) as evidenced by customary documents of title;

(c)    the bill of lading, waybill, document of title or other shipping documents (which may be in electronic format) (collectively, "**Shipping Documents**") with respect to such Inventory shall be issued in the name of the Borrower as consignee, and if so requested by the Collateral Agent, shall be in negotiable form;

(d)    if the Shipping Documents with respect to such Inventory are in negotiable form, the Collateral Agent shall have received confirmation that the applicable freight forwarder or customs broker has possession of the original Shipping Documents issued in the name of the Borrower, as consignee (or, if so requested by the Collateral Agent, consigned to the order of the Collateral Agent);

(e)    the Collateral Agent has control over the documents of title which evidence ownership of the subject Inventory (including, if requested by the Collateral Agent, by the delivery of a Customs Broker Agreement);

(f)    such Inventory satisfies all of the criteria for Eligible Inventory (other than such Inventory is in-transit); and

(g)    it is insured to the reasonable satisfaction of the Collateral Agent; or

(11)    such Inventory constitutes operating supplies, packaging or shipping materials, cartons, repair parts, labels or miscellaneous spare parts or other such materials not considered for sale in the ordinary course of business.

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and sub-surface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, or proceedings with respect to any Environmental Liability or Environmental Law, (hereinafter "Claims"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to pollution or the protection of the Environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) resulting from or relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Contribution**" means cash equity contributions by the Sponsor and the other Investors to the Borrower (provided that any contributions in a form other than common equity shall be reasonably acceptable to the majority Arrangers), directly or indirectly, in an aggregate amount equal to, when combined with the fair market value of all capital contributions and investments by management and existing equity holders of Belk rolled over or invested in connection with the Closing Date Transactions of at least 22.50% of the sum of (1) (X) the aggregate gross proceeds of the Revolving Credit Loans borrowed on the Closing Date, Closing Date Term Loans (as defined in the First Lien Credit Agreement) and Closing Date Term Loans (as defined in the Second Lien Credit Agreement), in each case borrowed on the Closing Date, excluding the gross proceeds of any loans to fund (A) working capital needs and (B) original issue discount and/or upfront fees in accordance with the "market flex" provisions of the Fee Letter plus (Y) indebtedness in respect of Capitalized Lease Obligations permitted to be outstanding pursuant to the terms of the Transaction Agreement, which will survive the Closing Date plus (Z) the proceeds of any Specified Real Estate Financings (other than Sale Leaseback Transactions) borrowed on the Closing Date, if any and (2) the Equity Contribution on the Closing Date in respect of Holdings and its subsidiaries after giving effect to the Closing Date Transactions; provided that, after giving effect to the Closing Date Transactions, the Sponsor will own and control no less than a majority of the economic and voting Equity Interests of Holdings.

"**Equity Interests**" means, with respect to any Person, the Capital Stock of such Person and all warrants, options or other rights to acquire Capital Stock of such Person, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock of such Person.

"**Equity Offering**" means any public or private sale of common stock or Preferred Stock of the Borrower or any Parent Company (excluding Disqualified Stock), other than:

      (1)    public offerings with respect to the Borrower's or any Parent Company's common stock registered on Form S-4 or Form S-8;

      (2)    issuances to any Restricted Subsidiary of the Borrower; and

      (3)    any such public or private sale that constitutes an Excluded Contribution.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of withdrawal liability or written notification that a Multiemployer Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement in writing of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived; (h) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (i) the imposition of a lien under Section 303(k) of ERISA or Section 412(c) of the Code with respect to any Pension Plan; (j) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); or (k) the occurrence of a nonexempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party or any of their respective ERISA Affiliates (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Loan Party.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Eurodollar Base Rate**" has the meaning specified in the definition of Eurodollar Rate.

"**Eurodollar Rate**" means the higher of:

(i)        the LIBOR Floor, and

(ii)(a)     for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to the London Interbank Offered Rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for U.S. Dollars) for a period equal in length to such Interest Period ("LIBOR") as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)        for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two London Banking Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Availability**" means, as of any date of determination, the excess, if any, of (a) the Maximum Borrowing Amount at such time, *minus* (b) the aggregate Total Outstandings at such time.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Accounts**" means any Deposit Account of any Loan Party or Restricted Subsidiary (and all cash, Cash Equivalents and other securities or investments credited thereto or deposited therein): (1) that does not have an individual daily balance in excess of $500,000, or in the aggregate with each other account described in this clause (1), in excess of $5,000,000; (2) the balance of which is swept at the end of each Business Day into a Deposit Account subject to a Deposit Account Control Agreement, so long as such daily sweep is not terminated or modified (other than to provide that the balance in such Deposit Account is swept into another Deposit Account subject to a Deposit Account Control Agreement) without the consent of the Collateral Agent; (3) that is a Trust Account or Specified Segregated Account; (4) any Deposit Account of the Borrower or any Restricted Subsidiary the balance of which consists solely of proceeds of any sale or other disposition of any Term Priority Collateral so long as all amounts on deposit therein constitute Term Priority Collateral; (5) any Deposit Account that constitutes a disbursement account of the Borrower or any Restricted Subsidiary the balance of which consists solely of proceeds of Indebtedness, including the proceeds of the Loans; provided that in the case of the Loans, the aggregate amount that may be maintained in an Excluded Account described in this clause (5) shall not exceed $50.0 million at any one time; or (6) to the extent that it is cash collateral for letters of credit (other than Letters of Credit) to the extent permitted hereunder.

"**Excluded Assets**" means (i) any fee-owned real property or ground leased property and all real property leasehold interests, (ii) pledges and security interests prohibited by applicable Law (including any legally effective requirement to obtain the consent of any governmental authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), (iii) Margin Stock, (iv) cash and Cash Equivalents on deposit in Excluded Accounts, (v) any lease, license or other agreements, or any property subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license or agreement, purchase money, Capitalized Lease Obligations or similar arrangement, or create a right of termination in favor of any other party thereto (other than a Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition, (vi) assets for which a pledge thereof or a security interest therein would result in a material adverse tax consequence as reasonably determined by the Borrower (in consultation with (but without the consent of) the Administrative Agent), (vii) assets for which the Administrative Agent and the Borrower have determined in their reasonable judgment and agree in writing that the cost of creating or perfecting such pledges or security interests therein would be excessive in view of the benefits to be obtained by the Lenders therefrom, (viii) any intent-to-use trademark application in the United States prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto with the United States Patent and Trademark Office and (ix) Excluded Equity.

"**Excluded Contribution**" means net cash proceeds or the fair market value of marketable securities or the fair market value of Qualified Proceeds received by the Borrower from:

contributions to its common equity capital;

> (1)     dividends, distributions, fees and other payments from any joint ventures that are not Restricted Subsidiaries; and

> (2)     the sale (other than to a Restricted Subsidiary of the Borrower or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Borrower) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Borrower;

in each case designated as Excluded Contributions pursuant to an Officer's Certificate.

"**Excluded Equity**" means Equity Interests (or, in the case of clause (iii) below, Voting Stock) (i) of any Unrestricted Subsidiary, (ii) of any Subsidiary acquired pursuant to a Permitted Acquisition if such Equity Interests are pledged and/or mortgaged as security for any assumed Indebtedness permitted under Section 7.02(b)(14) and if and for so long as the terms of such Indebtedness prohibit the creation of any other Lien on such Equity Interests, (iii) of any Foreign Subsidiary or CFC Holdco, in each case of the Borrower or a Domestic Subsidiary of the Borrower and not otherwise constituting Excluded Equity, in excess of 65% of the issued and outstanding Voting Stock of each such Foreign Subsidiary or CFC Holdco, (iv) of any Subsidiary with respect to which the Administrative Agent and the Borrower have determined in their reasonable judgment and agreed in writing that the costs of providing a pledge of such Equity Interests or perfection thereof is excessive in view of the benefits to be obtained by the Secured Parties therefrom, (v) of any captive insurance companies, not-for-profit Subsidiaries, special purpose entities, (vi) to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than Holdings, the Borrower or any wholly owned Restricted Subsidiary of the Borrower), under the terms of any applicable organizational documents, joint venture agreement or shareholders' agreement, equity interests in any person other than wholly-owned Restricted Subsidiaries; and (vii) of any Subsidiary outside the United States the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers.

"**Excluded Funds**" means all amounts (i) solely for the purpose of payroll, employee wages and benefits and payment of taxes, including when a Credit Extension is not permitted hereunder, (ii) solely for the purpose of trust related activities and (iii) other amounts, not to exceed $2,500,000 in the aggregate.

"**Excluded Subsidiaries**" means all of the following and "**Excluded Subsidiary**" means any of them:

> (3)     any Subsidiary that is not a direct, wholly owned Subsidiary of the Borrower or a Subsidiary Guarantor,

> (4)     any Foreign Subsidiary,

> (5)     any CFC Holdco,

> (6)     any Domestic Subsidiary that is a Subsidiary of any (i) Foreign Subsidiary, (ii) CFC or (iii) CFC Holdco,

> (7)     any Subsidiary (including any regulated entity that is subject to net worth or net capital or similar capital and surplus restrictions) that is prohibited or restricted by applicable

Law, accounting policies or by Contractual Obligation existing on the Closing Date (or, with respect to any Subsidiary acquired by the Borrower or a Restricted Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired) from providing a Guaranty, or if such Guaranty would require governmental (including regulatory) or third party (other than a Loan Party) consent, approval, license or authorization, unless such consent, approval, license or authorization has been received, or is received after commercially reasonable efforts to obtain the same, which efforts may be requested by the Administrative Agent,

> (1)     any special purpose securitization vehicle (or similar entity),

> (2)     any Captive Insurance Subsidiary or not-for-profit Subsidiary,

> (3)     any Subsidiary that is not a Material Subsidiary,

> (4)     any Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the burden or cost (including any adverse tax consequences) of providing the Guaranty is excessive in relation to the benefits to be obtained by the Lenders therefrom,

> (5)     any special purpose entity formed for the primary purpose to hold a leasehold interest in real property that is subject to a Sale-Leaseback Transaction that has no other activities other than those incidental to holding such leasehold interest, and any such special purpose tenant entities formed in connection with any Specified Sale-Leaseback Transactions, and

> (6)     any Unrestricted Subsidiary.

"**Excluded Swap Obligation**" means, with respect to any Loan Party, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 2.07 of the Guaranty and any other "keepwell, support or other agreement" for the benefit of such Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act) at the time the Guaranty of such Loan Party, or a grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation.   If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest becomes illegal.

"**Excluded Taxes**" means, with respect to each Agent and each Lender,

> (1)     any tax on such Agent or Lender's net income or profits (or franchise tax in lieu of such tax on net income or profits) imposed by a jurisdiction as a result of such Agent or Lender being organized or having its principal office or applicable Lending Office located in such jurisdiction or as a result of any other present or former connection between such Agent or Lender and the jurisdiction (including as a result of such Agent or Lender carrying on a trade or

business, having a permanent establishment or being a resident for tax purposes in such jurisdiction, other than a connection arising solely from such Agent or Lender having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or sold or assigned an interest in, any Loan or Loan Document),

(2)     any branch profits tax under Section 884(a) of the Code, or any similar tax, imposed by any other jurisdiction described in clause (1),

(3)     other than with respect to any Lender that becomes a party hereto pursuant to the Borrower's request under Section 3.07, any U.S. federal withholding tax that is imposed on amounts payable with respect to an applicable interest in a Loan or Commitment to a Lender pursuant to a Law in effect at the time such Lender acquires such interest (or designates a new Lending Office) (or where the Lender is a partnership for U.S. federal income tax purposes, pursuant to a law in effect on the later of the date on which such Lender becomes a party hereto or the date on which the affected partner becomes a partner of such Lender or designates a new Lending Office), except, in the case of a Lender or partner that designates a new Lending Office or is an assignee, to the extent that such Lender or partner (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to Section 3.01,

(4)     any withholding tax attributable to a Lender's failure to comply with Section 3.01(3),

(5)     any tax imposed under FATCA and

(6)     any interest, additions to taxes and penalties with respect to any taxes described in clauses (1) through (5) of this definition.

"**Existing Company Notes**" means each of the Acquired Company's (x) 5.21% Senior Notes due 2022, (y) 5.70% Senior Notes due 2020 and (z) 6.20% Senior Notes due 2017.

"**Expected Cure Amount**" has the meaning specified in Section 8.04(2).

"**Expiring Credit Commitment**" has the meaning specified in Section 2.04(7).

"**Extended Revolving Credit Commitments**" means the Revolving Credit Commitments held by an Extending Lender.

"**Extended Revolving Credit Loans**" means the Revolving Credit Loans made pursuant to Extended Revolving Credit Commitments.

"**Extending Lender**" means each Lender accepting an Extension Offer.

"**Extension**" has the meaning specified in Section 2.16(1).

"**Extension Amendment**" has the meaning specified in Section 2.16(2).

"**Extension Offer**" has the meaning specified in Section 2.16(1).

"**Facilities**" means the Revolving Credit Loans, the Revolving Credit Facility, the Swing Line Facility, any Extended Revolving Credit Commitments and Extended Revolving Credit Loans or any Incremental Revolving Credit Loan Commitments, as the context may require, and "**Facility**" means any of them.

"**fair market value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"**FCPA**" has the meaning specified in Section 5.17.

"**Federal Funds Rate**" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Fee Letter**" means that certain Amended and Restated Fee Letter, dated as of September 4, 2015, by and among Initial Borrower, Morgan Stanley, Merrill Lynch, Bank of America, Jefferies, Credit Suisse, DB, Nomura, RBC, RBCCM, Wells Fargo, MCS Capital Markets, MCS Lending and CCT, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**FILO Tranche**" has the meaning specified in Section 2.14(8).

"**Financial Covenant**" means the covenant specified in Section 7.10.

"**Financial Covenant Change Date**" means the date that is eighteen (18) months after the Third Amendment Effective Date.

"**Financial Officer**" means, with respect to a Person, the chief financial officer, accounting officer, treasurer, controller or other senior financial or accounting officer of such Person, as appropriate.

"**Financed Capital Expenditures**" means, with respect to any Person and for any period, Capital Expenditures made by such Person during such period that are financed with the proceeds of Indebtedness (other than Loans) or net proceeds of any Asset Sale, net proceeds of any Casualty Event, any Incurrence of Indebtedness or any issuance of Equity Interests (other than Disqualified Stock or any other issuance of Equity Interests which increases any available basket hereunder).

"**First Amendment**" means that certain Amendment No. 1 to ABL Credit Agreement, dated as of August 29, 2019, among Belk, as the borrower, Holdings, the Administrative Agent and the Lenders party thereto

"**First Amendment Effective Date**" means the "Amendment No. 1 Effective Date", as defined in the First Amendment.

"**First Lien Credit Agreement**" means the First Lien Credit Agreement dated as of the Closing Date among Holdings, the Borrower, Alter Domus (US) LLC, as administrative agent, and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an First Lien Credit Agreement) in each case to the extent permitted hereunder.

"**First Lien Facility**" means the collective reference to the First Lien Credit Agreement, the First Lien Loan Documents, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not a First Lien Facility), in each case to the extent permitted hereunder.

"**First Lien Loan Documents**" means, collectively, (i) the First Lien Credit Agreement and (ii) the security documents, intercreditor agreements (including the ABL Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the First Lien Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the First Lien Facility.

"**First Lien Obligations**" means "Obligations" as defined in the First Lien Facility as in effect on the Third Amendment Effective Date.

"**First Lien Loans**" means "Loans" as defined in the First Lien Facility as in effect on the Third Amendment Effective Date.

"**First Lien Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Debt outstanding the last day of such Test Period to (b) Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**Fixed Amounts**" has the meaning specified in Section 1.07(9).

"**Fixed Charge Coverage Ratio**" means, for any Test Period, the ratio of (a) Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such period *minus* taxes based on income, profits or capital, including federal, foreign, state, franchise, excise and similar taxes (including in respect of repatriated funds), net of cash refunds received, of the Borrower and its Restricted Subsidiaries paid in cash during such Test Period *minus* Unfinanced Capital Expenditures paid in cash by the Borrower and its Restricted Subsidiaries during such Test Period, to (b) the Fixed Charges of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07. For purposes of calculating the Fixed Charge Coverage Ratio only, the amount of Consolidated Cash Interest Charges: (i) for the period ending on the first full fiscal quarter after the ~~Closing~~Third Amendment Effective Date, shall be deemed

to be the actual dollar amount of such component for the fiscal quarter then ended multiplied by four; (ii) for the period ending on the second full fiscal quarter after the ~~Closing~~Third Amendment Effective Date shall be deemed to be the actual dollar amount of such component for the two fiscal quarters then ended multiplied by two; and (iii) for the period ending on the third full fiscal quarter after the ~~Closing~~Third Amendment Effective Date shall be deemed to be the actual dollar amount of such component for the three fiscal quarters then ended multiplied by 4/3.

"**Fixed Charges**" means, for any Test Period, the sum, determined on a consolidated basis, of (a) the Consolidated Cash Interest Charges of the Borrower and its Restricted Subsidiaries for such period *plus* (b) scheduled amortization of the principal amount of Indebtedness for borrowed money of the Borrower and its Restricted Subsidiaries (other than payments by Borrower or any of its Restricted Subsidiaries to Borrower or to any Loan Parties or Restricted Subsidiaries) due and payable in cash during such period *plus* (c) cash dividends on any Designated Preferred Stock of the Borrower for such periods *plus* (d) for the purposes of calculating the Fixed Charge Coverage Ratio when determining compliance with the Payment Conditions for the making of any Restricted Payment, the amount of Restricted Payments previously made in cash during such Test Period.

"**floor**" means, with respect to any reference rate of interest, any fixed minimum amount specified for such rate.

"**Foreign Lender**" means a Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Code.

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, the Borrower or any Subsidiary of the Borrower with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender (a) with respect to an L/C Borrowing, such Defaulting Lender's Pro Rata Share or other applicable share provided under this Agreement of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof and (b) with respect to the Swing Line Lender, such Defaulting Lender's Pro Rata Share or other applicable share provided under this Agreement of Swing Line Loans other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"**Fund**" means any Person (other than a natural person) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, as in effect from time to time. At any time after the Closing Date, the

Borrower may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP will thereafter be construed to mean IFRS (except as otherwise provided in this Agreement); *provided, however*, that any such election, once made, will be irrevocable; *provided further* that any calculation or determination in this Agreement that requires the application of GAAP for periods that include fiscal quarters ended prior to the Borrower's election to apply IFRS will remain as previously calculated or determined in accordance with GAAP. The Borrower will give notice of any such election made in accordance with this definition to the Administrative Agent. Notwithstanding any other provision contained herein the amount of any Indebtedness under GAAP with respect to Capitalized Lease Obligations and Attributable Indebtedness shall be determined in accordance with the definition of Capitalized Lease Obligations and Attributable Indebtedness, respectively.

Notwithstanding the foregoing, if at any time any change occurring after the Closing Date in GAAP (or IFRS) or in the application thereof on the computation of any financial ratio or financial requirement, or compliance with any covenant, set forth in any Loan Document, and the Borrower shall so request (regardless of whether any such request is given before or after such change), the Administrative Agent, the Lenders and the Borrower will negotiate in good faith to amend (subject to the approval of the Required Lenders) such ratio, requirement or covenant to preserve the original intent thereof in light of such change in GAAP (or IFRS); provided further that until so amended, (a) such ratio, requirement or covenant shall continue to be computed in accordance with GAAP (or IFRS) prior to such change therein and (b) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP (or IFRS).

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**guarantee**" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such

Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantor**" has the meaning specified in clause (2) of the definition of "Collateral and Guarantee Requirement." For avoidance of doubt, the Borrower may, in its sole discretion, cause any domestic Parent Company or Restricted Subsidiary that is not required to be a Guarantor to Guarantee the Obligations by causing such Parent Company or Restricted Subsidiary to execute a joinder to the Guaranty (substantially in the form provided therein or as the Administrative Agent, the Borrower and such Guarantor may otherwise agree), and any such Parent Company or Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"**Guaranty**" means (a) the Guarantee of the Obligations by the Guarantors substantially in the form of Exhibit E, (b) each other Guarantee and Guarantee supplement delivered pursuant to Section 6.11 and (c) each other Guarantee and Guarantee supplement delivered by any Parent Company or Restricted Subsidiary pursuant to the second sentence of the definition of "Guarantor".

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, and all other hazardous or toxic substances or wastes, pollutants and contaminants and chemicals in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, or radon gas and infectious or medical wastes, to the extent any of the foregoing are regulated pursuant to, or can form the basis for liability under, any Environmental Law.

"**Hedge Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedge Bank**" means any Person party to a Hedge Agreement that is an Agent, a Lender, an Arranger or an Affiliate of any of the foregoing on the Closing Date or at the time it enters into such Hedge Agreement, in its capacity as a party thereto, whether or not such Person subsequently ceases to be an Agent, a Lender, an Arranger or an Affiliate of any of the foregoing.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under any Hedge Agreement. For the avoidance of doubt, any Permitted Convertible Indebtedness Call Transaction will not constitute Hedging Obligations.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Honor Date**" has the meaning specified in Section 2.03(3)(a).

"**IFRS**" means international financial reporting standards and interpretations issued by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants or any successor to either such Board, or the SEC, as the case may be), as in effect from time to time.

"**Immediate Family Members**" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including, in each case, adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"**Impacted Loans**" has the meaning specified in <u>Section 3.03(a)</u>.

"**Increased Reporting Period**" means (a) each period beginning on the date that Excess Availability shall have been less than the greater of (x) $100,000,000 and (y) 12.5% of the Maximum Borrowing Amount, in either case, for three (3) consecutive Business Days, and ending on the date Excess Availability shall have been at least the greater of (x) $100,000,000 and (y) 12.5% of the Maximum Borrowing Amount, in each case, for twenty (20) consecutive calendar days or (b) upon the occurrence and continuance of a Specified Event of Default, the period that such Specified Event of Default shall be continuing.

"**Incremental Amendment**" has the meaning specified in Section 2.14(5).

"**Incremental Amounts**" has the meaning specified in clause (1) of the definition of Refinancing Indebtedness.

"**Incremental Revolving Credit Facility**" means, at any time, the aggregate amount of the Incremental Revolving Credit Lenders' Incremental Revolving Credit Commitments and Incremental Revolving Credit Loans and participations in Letters of Credit and Swing Line Loans with respect thereto at such time.

"**Incremental Revolving Credit Lender**" has the meaning specified in Section 2.14(10)(a).

"**Incremental Revolving Credit Loan**" has the meaning specified in Section 2.14(1).

"**Incremental Revolving Credit Loan Commitment**" means the commitment of a Lender to make or otherwise fund an Incremental Revolving Credit Loan and "Incremental Revolving Credit Loan Commitments" means such commitments of all Lenders in the aggregate.

"**Incurrence Based Amounts**" has the meaning specified in Section 1.07(9).

"**Indebtedness**" means, with respect to any Person, without duplication:

(1)      any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)      in respect of borrowed money;

(b)      evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)      representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations) due more than twelve months after such property is acquired, except (i) any such balance that constitutes an obligation in respect of a commercial letter of credit, a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business or consistent with industry practice, (ii) any earn-out obligations until such obligation is reflected as a liability on the balance sheet (excluding any footnotes thereto) of such Person in accordance with GAAP and is not paid within 60 days after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business; or

(d)      representing the net obligations under any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than obligations in respect of letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP; *provided* that Indebtedness of any Parent Company appearing upon the balance sheet of the Borrower solely by reason of push-down accounting under GAAP will be excluded;

(2)      to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice; and

(3)      to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of such Indebtedness will be the lesser of (i) the fair market value of such asset at such date of determination and (ii) the amount of such Indebtedness of such other Person; *provided* that notwithstanding the foregoing, Indebtedness will be deemed not to include:

(i)      Contingent Obligations incurred in the ordinary course of business or consistent with industry practice,

(ii)      reimbursement obligations under commercial letters of credit (provided that unreimbursed amounts under letters of credit will be counted as Indebtedness three (3) Business Days after such amount is drawn),

(iii)      [reserved],

(iv)     accrued expenses,

(v)      deferred or prepaid revenues, and

(vi)     asset retirement obligations and obligations in respect of reclamation and workers compensation (including pensions and retiree medical care);

*provided further* that Indebtedness will be calculated without giving effect to the effects of Accounting Standards Codification Topic No. 815, *Derivatives and Hedging*, and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Assets or Operations**" means, with respect to any Parent Company, that Parent Company's total assets, revenues, income from continuing operations before income taxes and cash flows from operating activities (excluding in each case amounts related to its investment in the Borrower and the Restricted Subsidiaries), determined in accordance with GAAP and as shown on the most recent balance sheet of such Parent Company, is more than 3.0% of such Parent Company's corresponding consolidated amount.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that, in the good faith judgment of the Borrower, is qualified to perform the task for which it has been engaged.

"**Information**" has the meaning specified in Section 10.09.

"**Initial Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means the Intercompany Subordination Agreement, dated as of the Closing Date, substantially in the form of Exhibit Q executed by the Borrower and each Restricted Subsidiary that is party thereto.

"**Interest Payment Date**" means, (a) as to any Loan of any Class other than a Base Rate Loan (other than any Swing Line Loan), the last day of each Interest Period applicable to such Loan and the applicable Maturity Date of the Loans of such Class; *provided* that if any Interest Period for a Eurodollar Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any Base Rate Loan (other than any Swing Line Loan) of any Class, the first calendar day of each February, May, August and November and the applicable Maturity Date of the Loans of such Class; and (c) as to any Swing Line Loan, the first calendar day of each February, May, August and November or, if any Event of Default has occurred and is continuing, upon demand of the Swing Line Lender.

"**Interest Period**" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one, two, three or six months thereafter, or to the extent consented to by each applicable Lender, twelve months (or such period of less than one month as may be consented to by each applicable Lender), as selected by the Borrower in its Committed Loan Notice; *provided* that:

        (1)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

        (2)      any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

        (3)      no Interest Period shall extend beyond the applicable Maturity Date for the Class of Loans of which such Eurodollar Rate Loan is a part.

"**Inventory**" means, with respect to a Person, all of such Person's now owned and hereafter acquired inventory (as defined in the UCC), goods and merchandise, wherever located, in each case, to be furnished under any contract of service or held for sale or lease, all returned goods, raw materials, work-in-process, finished goods (including embedded software), other materials, and supplies of any kind, nature or description which are used or consumed in such Person's business or used in connection with the packing, shipping, advertising, selling, or finishing of such goods, merchandise and other property, and all documents of title or other documents representing the foregoing.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's or BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency selected by the Borrower.

"**Investment Grade Securities**" means:

        (1)      securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

        (2)      debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or debt instruments constituting loans or advances among the Borrower and its Subsidiaries;

        (3)      investments in any fund that invests at least 95% of its assets in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

        (4)      corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"**Investments**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to employees, directors, officers, members of

management, manufacturers and consultants, in each case made in the ordinary course of business or consistent with industry practice), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person. For purposes of the definition of "Unrestricted Subsidiary" and Section 7.05,

(1)     "Investments" will include the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)     the Borrower's "Investment" in such Subsidiary at the time of such redesignation; *minus*

(b)     the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2)     any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer.

The amount of any Investment outstanding at any time will be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.

"**Investors**" means the Sponsor.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**ISDA Definitions**" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"**Issuing Bank**" means (i) Bank of America, in its capacity as an issuer of Letters of Credit hereunder, together with its permitted successors and assigns, (ii) Wells Fargo Bank, National Association, together with its permitted successors and assigns, and (iii) any other Revolving Credit Lender that becomes an Issuing Bank in accordance with Section 2.03(12).

"**Issuing Bank Document**" means with respect to any Letter of Credit, the L/C Application, and any other document, agreement and instrument entered into by any Issuing Bank and the Borrower (or any of its Subsidiaries) or in favor of such Issuing Bank and relating to such Letter of Credit.

"**Judgment Currency**" has the meaning specified in Section 10.26.

"**Junior Lien Debt**" has the meaning specified in clause (39) of the definition of Permitted Liens.

"**L/C Advance**" means, with respect to each Revolving Credit Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Pro Rata Share or other applicable share provided for under this Agreement.

"**L/C Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the relevant Issuing Bank.

"**L/C Borrowing**" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Revolving Credit Borrowing.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"**L/C Expiration Date**" means the day that is five (5) Business Days prior to the scheduled Maturity Date then in effect for the applicable Revolving Credit Facility (or, if such day is not a Business Day, the next preceding Business Day).

"**L/C Obligations**" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit *plus* the aggregate of all Unreimbursed Amounts, including all L/C Borrowings. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be the stated amount thereof in effect at such time. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**L/C Sublimit**" means an amount equal to the lesser of (a) $100.0 million and (b) the aggregate amount of the Revolving Credit Commitments. The L/C Sublimit is part of, and not in addition to, the Revolving Credit Facility.

"**Landlord Lien State**" means any state in which a landlord's claim for rent has priority by law over the Lien of the Collateral Agent in any of the Collateral.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Incremental Revolving Credit Loan or any Extended Revolving Credit Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, legally enforceable guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the legally binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Legal Holiday**" means Saturday, Sunday or a day on which commercial banking institutions are not required to be open in the State of New York or at the place of payment.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and, as the context requires, includes any Issuing Bank, the Swing Line Lender and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender." For avoidance of

doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered an Incremental Amendment, as the case may be, and to the extent such Incremental Amendment shall have become effective in accordance with the terms hereof and thereof, and each Extending Lender shall continue to be a Lender.  As of the Third Amendment Effective Date, Schedule 2.01 sets forth the name of each Lender.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Letter of Credit**" means any letter of credit issued hereunder.  A Letter of Credit may be a commercial letter of credit or a standby letter of credit; *provided*, *however*, that any commercial letter of credit issued hereunder shall provide solely for cash payment upon presentation of a sight draft.

"**LIBOR**" has the meaning specified in the definition of "Eurodollar Rate".

"**LIBOR Floor**" means 0.25% per annum.

"**LIBOR Replacement Date**" has the meaning specified in Section 3.03(c).

"**LIBOR Screen Rate**" means the LIBOR quote on the applicable screen page that Administrative Agent designates to determine LIBOR (or such other commercially available source providing such quotations as designated by Administrative Agent from time to time).

"**LIBOR Successor Rate**" has the meaning specified in Section 3.03(c).

"**LIBOR Successor Rate Conforming Changes**" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definition of Business Day, timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Administrative Agent, to reflect the adoption and implementation of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"**Lien**" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest and any effective filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event will an operating lease be deemed to constitute a Lien.

"**Limited Condition Acquisition**" means any Permitted Acquisition or other investment permitted hereunder by the Borrower or one or more of its Restricted Subsidiaries whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"**Loan**" means an extension of credit under Article II by a Lender (x) to the Borrower in the form of a Revolving Credit Loan, a Swing Line Loan or a Protective Advance (including any loans made pursuant to any Revolving Credit Commitment Increase or loans made pursuant to Extended Revolving Credit Commitments).

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) any Incremental Amendment or Extension Amendment, (d) the Guaranty, (e) the Collateral Documents, (f) the Applicable Intercreditor Agreements, (g) the Fee Letter, (h) the Third Amendment Fee Letter, and (i) each L/C Application.

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each Subsidiary Guarantor.

"**London Banking Day**" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Management Services Agreement**" means the management services agreement or similar agreements among the Sponsor or certain of its respective management companies associated with it or their advisors, if applicable, and the Borrower (or any Parent Company).

"**Management Stockholders**" means the members of management (and their Controlled Investment Affiliates and Immediate Family Members and any permitted transferees thereof) of the Borrower (or a Parent Company) who are holders of Equity Interests of any Permitted Parent or Parent Company on the Closing Date or that become holders of such Equity Interests .

"**Mandatory Swing Line Borrowing**" has the meaning specified in Section 2.04(3)(a).

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Material Adverse Effect**" means (i) on the Closing Date, a Company Material Adverse Effect and (ii) after the Closing Date, a circumstance or condition that would materially and adversely affect (a) the business, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, other than, in each case, customary events or circumstances which resulted from the commencement of the Chapter 11 Cases, (b) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents to which it is a party or (c) the rights and remedies of the Lenders, the Collateral Agent and the Administrative Agent under the Loan Documents.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries that is a Restricted Subsidiary (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiary at the last day of the most recent Test Period) were equal to or greater than 5.0% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiary for such Test Period) were equal to or greater than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time, Domestic Subsidiaries that are not Material Domestic Subsidiaries solely because they do not meet the thresholds set forth in the preceding clause (a) or (b) comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiaries at the last day of the most recent Test Period) 7.5% of Total

Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiaries for such Test Period) 7.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries that are Restricted Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 with respect to any such Subsidiaries.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries that are Restricted Subsidiaries (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiary at the last day of the most recent Test Period) were equal to or greater than 5.0% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the revenues of the Restricted Subsidiaries of such Foreign Subsidiary for such Test Period) were equal to or greater than 5.0% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time, Foreign Subsidiaries that are not Material Foreign Subsidiaries comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiaries at the last day of the most recent Test Period) 7.5% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period) 7.5% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries that are Restricted Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) with respect to any tranche of the Revolving Credit Loans, August 29, 2024, (ii) with respect to the Extended Revolving Credit Loans, the final maturity date as specified in the applicable Extension Amendment and (iii) with respect to any Incremental Revolving Credit Loans, the final maturity date as specified in the applicable Incremental Amendment, and (iv) with respect to any FILO Tranche, the maturity date applicable to such FILO Tranche in accordance with the terms hereof; provided that in each case, if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Borrowing Amount**" means, at any time, the lesser of (1) the aggregate amount of Revolving Credit Commitments at such time and (2) the Borrowing Base set forth in the Borrowing Base Certificate most recently delivered pursuant to Section 6.20.

"**Maximum Rate**" has the meaning specified in Section 10.11.

"**Merger**" has the meaning specified in the preliminary statements to this Agreement.

"**Moody's**" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Necessary Cure Amount**" has the meaning specified in Section 8.04(2).

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"**Net Orderly Liquidation Value**" means, with respect to Eligible Inventory, the net appraised liquidation value thereof (expressed as a percentage of the cost of such Inventory) as determined from time to time by an Acceptable Appraiser in accordance with Section 6.10; *provided that*, with respect to that certain inventory appraisal conducted by Gordon Brothers and delivered to the Administrative Agent on or about September 15, 2020, the Net Orderly Liquidation Value set forth in such appraisal will be applied beginning December 31, 2020.

"**New Store**" means each new store or shopping facility opened or acquired by the Borrower or a Restricted Subsidiary that has been open for commercial operations for less than twelve full calendar months.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Non-Extended Lender**" has the meaning specified in Section 2.16.

"**Non-Expiring Credit Commitment**" has the meaning specified in Section 2.04(7).

"**Non-Excluded Taxes**" means all Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Non-Extension Notice Date**" has the meaning specified in Section 2.03(2)(c).

"**Non-FILO Tranche**" means any Loans and Revolving Credit Commitments other than the FILO Tranche.

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Non-Recourse Indebtedness**" means Indebtedness that is non-recourse to the Borrower and the Restricted Subsidiaries.

"**Note**" means a Revolving Credit Note or Swing Line Note, as the context may require.

"**Notice of Intent to Cure**" has the meaning specified in Section 6.02(1).

~~"**Notes Amendments**" means the each of the consent and amendments to each series of the Existing Company Notes to permit, among other things, the Acquired Company to deliver a notice of redemption in respect of each series of Existing Company Notes.~~

"**Obligations**" means all

(1)     advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party with respect to any Loan or arising under any Loan Document, including the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding,

(2)     obligations (other than Excluded Swap Obligations) of the Borrower or any Restricted Subsidiary arising under any Secured Hedge Agreement,

(3)     Cash Management Obligations under each Secured Cash Management Agreement;

(4)     Secured Bank Product Obligations; and

(5)     the Guaranty in respect of each of the foregoing.

"**Officer's Certificate**" means a certificate signed on behalf of a Person by a Responsible Officer of such Person.

"**OID**" means original issue discount.

"**Opinion of Counsel**" means a written opinion from legal counsel who is reasonably acceptable to the Administrative Agent. Counsel may be an employee of or counsel to the Borrower or the Administrative Agent.

"**ordinary course of business**" means activity conducted in the ordinary course of business of the Borrower and any Restricted Subsidiary, including the expansion, remodeling, acquisition, modernization, construction, improvement and repair of department stores and other retail centers of Belk operated, or expected to be operated, by the Borrower or a Restricted Subsidiary, and financing transactions in connection therewith, and will include Sale-Leaseback Transactions.

"**Organizational Documents**" means

(1)     with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction);

(2)     with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and

(3) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" means any and all present or future stamp, court or documentary Taxes, intangible, recording, filing or similar Taxes arising from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Outstanding Amount**" means (a) with respect to the Revolving Credit Loans and Swing Line Loans on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Credit Loans (including any refinancing of outstanding Unreimbursed Amounts under Letters of Credit or L/C Credit Extensions as a Revolving Credit Borrowing) and Swing Line Loans, as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the outstanding principal amount thereof on such date after giving effect to any related L/C Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Unreimbursed Amounts under related Letters of Credit (including any refinancing of outstanding Unreimbursed Amounts under related Letters of Credit or related L/C Credit Extensions as a Revolving Credit Borrowing) or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent, an Issuing Bank or the Swing Line Lender, as applicable, in accordance with banking industry rules on interbank compensation.

"**Parent Company**" means any Person so long as such Person directly or indirectly holds 100.0% of the total voting power of the Capital Stock of the Borrower, and at the time such Person acquired such voting power, no Person and no group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any such group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) (other than any Permitted Holder), will have beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), directly or indirectly, of 50.0% or more of the total voting power of the Voting Stock of such Person. For the avoidance of doubt, Fashion Holdings Intermediate LLC, a Delaware limited liability company, is a Parent Company of the Borrower.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Payment Conditions**" means, at any time of determination, that (a) no Specified Event of Default exists or would arise as a result of the making of the subject Specified Payment, (b) after giving *pro forma effect* to such Specified Payment, the Fixed Charge Coverage Ratio as of the end of the most recently ended Test Period (regardless of whether a Covenant Trigger Period has occurred and is continuing) is greater than or equal to 1.0 to 1.0 calculated as if such Specified Payment (if applicable to such calculation) had been made as of the first day of such Test Period and (c) the Borrower has Excess Availability, after giving *pro forma effect* to such Specified Payment, as of the date of such Specified Payment and for each day during the thirty (30) calendar days immediately prior to such Specified Payment, in excess of the greater of (A) in the case of a Permitted Acquisition, other Permitted

Investments and Restricted Payments of the type described in Section 7.05(a)(C) (such Restricted Payments, "**Restricted Debt Payments**"), (x) 12.5% of the Maximum Borrowing Amount and (y) $80,000,000 and (B) in all other cases, (x) 15.0% of the Maximum Borrowing Amount and (y) $100,000,000; *provided*, *however*, that the condition set forth in clause (b) above shall not be applicable if Excess Availability after giving *pro forma effect* to such Specified Payment is as of the date of such Specified Payment and for each day during the thirty (30) calendar days immediately prior to such Specified Payment in excess of the greater of (A) in the case of a Permitted Acquisition, other Permitted Investments and Restricted Debt Payments, (x) 17.5% of the Maximum Borrowing Amount and (y) $120,000,000 and (B) otherwise, (x) 20.0% of the Maximum Borrowing Amount and (y) $140,000,000. Notwithstanding anything set forth in this Agreement, in the case of the Limited Condition Acquisition provisions set forth in Section 1.07(8), only the testing of Payment Conditions for Permitted Acquisitions will receive the benefit of such Limited Condition Acquisition provisions.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"**Perfection Certificate**" has the meaning specified in the Security Agreement.

"**Permitted Acquisition**" has the meaning specified in clause (3) of the definition of "Permitted Investments."

"**Permitted Asset Swap**" means the substantially concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Borrower or any Restricted Subsidiary and another Person.

"**Permitted Bond Hedge Transaction**" means any call or capped call option (or substantively equivalent derivative transaction) on the Borrower's common stock purchased by the Borrower in connection with the issuance of any Convertible Indebtedness; *provided* that the purchase price for such Permitted Bond Hedge Transaction, less the proceeds received by the Borrower from the sale of any related Permitted Warrant Transaction, does not exceed the net proceeds received by the Borrower from the sale of such Convertible Indebtedness issued in connection with the Permitted Bond Hedge Transaction.

"**Permitted Convertible Indebtedness Call Transaction**" means any Permitted Bond Hedge Transaction and any Permitted Warrant Transaction.

"**Permitted Discretion**" means the Administrative Agent's reasonable credit judgment (from the perspective of an asset-based lender) in establishing reserves, exercised in good faith in accordance with customary business practices for similar asset based lending facilities, based upon its consideration of any factor that it reasonably believes (i) could materially adversely affect the quantity, quality, mix or value of Collateral (including any applicable laws that may inhibit collection of a receivable), the enforceability or priority of the Administrative Agent's liens thereon, or the amount that the Administrative Agent, the Lenders or the Issuing Bank could receive in liquidation of any Collateral; (ii) that any collateral report or financial information delivered by the Borrower or any Guarantor is incomplete, inaccurate or misleading in any material respect; or (iii) creates an event of default. In exercising such judgment, the

Administrative Agent may consider any factors that could materially increase the credit risk of lending to the Borrower on the security of the Collateral. Any Reserve established or modified by the Administrative Agent shall have a reasonable relationship to circumstances, conditions, events or contingencies which are the basis for such Reserve, as reasonably determined, without duplication, by the Administrative Agent in good faith; *provided* that circumstances, conditions, events or contingencies existing or arising prior to the Closing Date and, in each case, disclosed in writing in any field examination or inventory appraisal delivered to the Administrative Agent in connection herewith or otherwise known to the Administrative Agent, in either case, prior to the Closing Date, shall not be the basis for any establishment of any Reserves after the Closing Date, unless such circumstances, conditions, events or contingencies shall have changed in a material respect since the Closing Date.

"**Permitted Holder**" means (1) the Investors and Management Stockholders and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the foregoing are members; *provided* that in the case of such group and without giving effect to the existence of such group or any other group, such Investors and Management Stockholders, collectively, have beneficial ownership of more than forty percent (40%) of the total voting power of the Voting Stock of the Borrower or any Permitted Parent, and (2) any Person acting in the capacity of an underwriter (solely to the extent that and for so long as such Person is acting in such capacity) in connection with a public or private offering of Capital Stock of the Borrower or any Permitted Parent.

"**Permitted Indebtedness**" means Indebtedness permitted to be incurred in accordance with Section 7.02.

"**Permitted Investments**" means:

(1)    any Investment (a) in any Loan Party, (b) by any Restricted Subsidiary that is a Non-Loan Party in any other Restricted Subsidiary that is a Non-Loan Party and (c) by any Loan Party in any Restricted Subsidiary that is a Non-Loan Party; *provided* that the aggregate amount of Investments (other than as a result of the transfer of Equity Interests or Indebtedness of any Restricted Subsidiary that is a Non-Loan Party to any other Restricted Subsidiary that is a Non-Loan Party) outstanding at any time pursuant to this clause (c) shall not exceed the greater of (i) $50.0 million and (ii) 10.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto;

(2)    any Investment(s) in Cash Equivalents or Investment Grade Securities and Investments that were Cash Equivalents or Investment Grade Securities when made;

(3)    (a)    any Investment by the Borrower or any Restricted Subsidiary in any Person (directly or through entities that will be Restricted Subsidiaries), if as a result of such Investment (i) such Person becomes a Restricted Subsidiary or (ii) such Person, in one transaction or a series of related transactions, is amalgamated, merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Borrower or a Restricted Subsidiary (a "**Permitted Acquisition**"); *provided* that:

(A)    Investments made by Loan Parties in Persons that do not become Loan Parties or in assets that are not owned by a Loan Party pursuant to a Permitted Acquisition permitted by this clause (3) shall be permitted without limitation; provided that following such Permitted Acquisition, any Investment in such Restricted Subsidiary will be subject to the limitation set forth in clause (1)(c) above;

(B)   (i) subject to Section 1.07(8), immediately before and after giving *pro forma* effect to any such Investment, no Event of Default under Sections 8.01(1) or 8.01(6) will have occurred and be continuing,

(ii)   to the extent required by the Collateral and Guarantee Requirement, after giving effect to any such Permitted Acquisition, the Borrower shall be in compliance with the covenant set forth in Section 6.11

(iii)   after giving effect to any such Permitted Acquisition, the Borrower shall be in compliance with the covenant set forth in Section 6.17; and

(iv)   the Payment Conditions shall have been satisfied on a *pro forma* basis;

(b)   any Investment held by such Person that is acquired pursuant to such Permitted Acquisition; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, amalgamation, consolidation, transfer or conveyance;

(4)   any Investment in securities or other assets not constituting Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made in accordance with Section 7.04 or any other disposition of assets not constituting an Asset Sale;

(5)   any Investment existing on the Closing Date or made pursuant to binding commitments in effect on the Closing Date or an Investment consisting of any extension, modification, replacement, renewal or reinvestment of any Investment or binding commitment existing on the Closing Date; *provided* that the amount of any such Investment or binding commitment may be increased, extended, modified, replaced, reinvested or renewed, (a) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities) or (b) as otherwise permitted hereunder;

(6)   any Investment acquired by the Borrower or any Restricted Subsidiary:

(a)   in exchange for any other Investment, accounts receivable or endorsements for collection or deposit held by the Borrower or any Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer);

(b)   in satisfaction of judgments against other Persons;

(c)   as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or

(d)   as a result of the settlement, compromise or resolution of (i) litigation, arbitration or other disputes or (ii) obligations of trade creditors or customers that were incurred in the ordinary course of business or consistent with industry practice of the

Borrower or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer;

(7)     Hedging Obligations permitted under Section 7.02(b)(10);

(8)     any Investment in a Similar Business taken together with all other Investments made pursuant to this clause (8) that are at the time outstanding together with, but without duplication of, Investments made pursuant to clause (23) of this definition that are at that time outstanding not to exceed the greater of (a) $40.0 million and (b) 7.5% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto (with the amount of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment");

(9)     Investments the payment for which consists of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company;

(10)     (a) guarantees of Indebtedness permitted under Section 7.02, performance guarantees and Contingent Obligations incurred in the ordinary course of business or consistent with industry practice and (b) the creation of liens on the assets of the Borrower or any Restricted Subsidiary in compliance with Section 7.01;

(11)     any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Sections 7.06(b)(3), (4), (7), (8), (10), (12), (14), (16), (17), (18), (19), (20), (23) and (24);

(12)     Investments consisting of purchases and acquisitions of inventory, supplies, material, services or equipment or similar assets or the licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons;

(13)     Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of Cash Equivalents or marketable securities), not to exceed the greater of (a) $50.0 million and (b) 10.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided*, *however*, that if any Investment pursuant to this clause (13) is made in any Person that is not a Restricted Subsidiary of the Borrower at the date of the making of such Investment and such Person becomes a Restricted Subsidiary after such date, such Investment will thereafter be deemed to have been made pursuant to clause (1) above (to the extent permitted thereunder) and will cease to have been made pursuant to this clause (13) for so long as such Person continues to be a Restricted Subsidiary;

(14)     [reserved];

(15)     loans and advances to, or guarantees of Indebtedness of, officers, directors, employees, consultants and members of management not in excess of the greater of $10.0 million and 2.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(16)     loans and advances to employees, directors, officers, members of management and consultants for business-related travel expenses, moving expenses, payroll advances and other similar expenses or payroll expenses, in each case incurred in the ordinary course of business or consistent with past practice or consistent with industry practice or to future, present and former employees, directors, officers, members of management and consultants (and their Controlled Investment Affiliates and Immediate Family Members) to fund such Person's purchase of Equity Interests of the Borrower or, so long as the proceeds thereof are contributed to the Borrower, any Parent Company;

(17)     advances, loans or extensions of trade credit or prepayments to suppliers or loans or advances made to distributors, in each case, in the ordinary course of business or consistent with past practice or consistent with industry practice by the Borrower or any Restricted Subsidiary;

(18)     any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business or consistent with industry practice;

(19)     Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with industry practice;

(20)     Investments made in the ordinary course of business or consistent with industry practice in connection with obtaining, maintaining or renewing client contacts and loans or advances made to distributors;

(21)     Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business or consistent with industry practice;

(22)     the purchase or other acquisition of any Indebtedness of the Borrower or any Restricted Subsidiary to the extent otherwise permitted hereunder;

(23)     Investments in the ordinary course of business or consistent with industry practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers;

(24)     any Investment by any Captive Insurance Subsidiary in connection with its provision of insurance to the Borrower or any of its Subsidiaries, which Investment is made in the ordinary course of business or consistent with industry practice of such Captive Insurance Subsidiary, or by reason of applicable law, rule, regulation or order, or that is required or approved by any regulatory authority having jurisdiction over such Captive Insurance Subsidiary or its business, as applicable;

(25)     Investments in Unrestricted Subsidiaries having an aggregate fair market value, taken together with all other Permitted Investments made pursuant to this clause (25) that are at the time outstanding together with, but without duplication of, Investments made pursuant to clause (8) of this definition that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of, or have not been subsequently sold or transferred for, Cash Equivalents or marketable securities, not to exceed the

greater of (a) $40.0 million  and (b) 7.5% of Adjusted EBITDA as of the most recently ended Test Period calculated giving  *pro forma* effect thereto (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition  of "Investment"); *provided, however*, that if any Investment pursuant to this clause (25) is made in any Person that is an Unrestricted Subsidiary of the Borrower at the date of the making of such Investment and such Person becomes a Restricted Subsidiary  after such date, such Investment will  thereafter be deemed to have been made pursuant to clause (1) above to the extent permitted thereunder and will cease to have been made pursuant to this clause (25) for so long as such Person continues to be a Restricted Subsidiary;

(26)     Investments made as part of, to effect or resulting  from the Closing  Date Transactions;

(27)     Investments of assets relating to non-qualified  deferred payment plans  in the ordinary course of business  or consistent with industry practice;

(28)     intercompany current liabilities  owed to Unrestricted Subsidiaries  or joint ventures incurred in the ordinary course of business  or consistent with industry practice in connection with the cash management operations of the Borrower and its Subsidiaries;

(29)     acquisitions of obligations  of one or more directors, officers or other employees or consultants or independent  contractors of any Parent Company, the Borrower, or any Subsidiary of the Borrower in connection with such director's, officer's, employee's consultant's or independent contractor's acquisition of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, to the extent no cash is actually advanced by the Borrower or any Restricted Subsidiary  to such directors, officers, employees, consultants or independent contractors in connection with the acquisition  of any such obligations;

(30)     Investments constituting  promissory notes or other non-cash proceeds of dispositions  of assets to the extent permitted under Section 7.04;

(31)     Investments resulting  from pledges and deposits permitted pursuant to the definition  of "Permitted Liens";

(32)     loans and advances to any direct or indirect parent of the Borrower in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made in cash to such parent in accordance with Section 7.05 at such time, such Investment being treated for purposes of the applicable clause of Section 7.05, including  any limitations,  as if a Restricted Payment were made pursuant to such applicable  clause;

(33)     any other Investments if on a *pro forma* basis after giving  effect to such Investment, the Payment Conditions  shall have been satisfied with respect thereto;

(34)     Permitted Bond Hedge Transactions; and

(35)     any Investment made by any Restricted Subsidiary that is not a Loan Party to the extent that such Investment is financed with the proceeds received by such Restricted Subsidiary from an Investment in such Restricted Subsidiary  permitted under this Agreement.

; *provided* that (x) after giving effect to any such Investment, no Overadvance would exist or would result therefrom and (y) to the extent such Investment includes IP Rights material and necessary for the operation of the assets of the Borrower and its Subsidiaries, taken as a whole, which constitute ABL Priority Collateral, such IP Rights shall be subject to a non-exclusive, royalty-free worldwide license in favor of the Administrative Agent for the purpose of the Administrative Agent's exercise of rights and remedies under this Agreement in connection with the ABL Priority Collateral. For purposes of determining compliance with this definition, (A) an Investment need not be incurred solely by reference to one category of Permitted Investments described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption, (B) in the event that an Investment (or any portion thereof) meets the criteria of one or more of the categories of Permitted Investments, the Borrower may, in its sole discretion, classify or reclassify such Investment (or any portion thereof) in any manner that complies with this definition and Section 7.05 and (C) after giving effect to any Permitted Investment of Equity Interests of a Restricted Subsidiary, no Overadvance shall exist or result therefrom.

"**Permitted Liens**" means, with respect to any Person:

(1)      Liens created pursuant to any Loan Document;

(2)      Liens, pledges or deposits made in connection with:

      (a)      workers' compensation laws, unemployment insurance, health, disability or employee benefits, other social security laws or similar legislation or regulations,

      (b)      insurance-related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) securing reimbursement or indemnification obligations of (including obligations in respect of letters of credit, bank guarantees or similar documents or instruments for the benefit of) insurance carriers providing property, casualty or liability insurance or otherwise supporting the payment of items set forth in the foregoing clause (a) or

      (c)      bids, tenders, contracts, statutory obligations, surety, indemnity, warranty, release, appeal or similar bonds, or with regard to other regulatory requirements, completion guarantees, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities, and other obligations of like nature (including those to secure health, safety and environmental obligations) (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for the payment of rent, contested taxes or import duties and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with industry practice;

(3)      Liens imposed by law, such as landlords', carriers', warehousemen's, materialmen's, repairmen's, construction, mechanics' or other similar Liens (a) for sums not yet overdue for a period of more than sixty (60) days or, if more than sixty (60) days overdue, are unfiled and no other action has been taken to enforce such Liens or (b) being contested in good faith by appropriate actions or other Liens arising out of or securing judgments or awards against such Person with respect to which such Person will then be proceeding with an appeal or other

proceedings for review if such Liens are adequately bonded or adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)    Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than thirty (30) days or not yet payable or not subject to penalties for nonpayment or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(5)    Liens in favor of issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds, instruments or obligations or with respect to regulatory requirements or letters of credit or bankers acceptance issued, and completion guarantees provided for, in each ease, issued pursuant to the request of and for the account of such Person in the ordinary course of its business or consistent with past practice or industry practice;

(6)    survey exceptions, encumbrances, ground leases, easements, restrictions, protrusions, encroachments or reservations of, or rights of others for, licenses, rights-of-way, servitudes, sewers, electric lines, drains, telegraph, telephone and cable television lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that were not incurred in connection with Indebtedness and that do not in the aggregate materially impair their use in the operation of the business of such Person;

(7)    Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (2), (4), (12), (13), (14), (23) or (25) of Section 7.02(b); *provided* that:

(a)    Liens securing obligations relating to any Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (13) relate only to obligations relating to Refinancing Indebtedness that (x) is secured by Liens on the same assets as the assets securing the Refinanced Debt (as defined in the definition of Refinancing Indebtedness), *plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property, or (y) serves to refund, refinance, extend, replace, renew or defease Indebtedness, Disqualified Stock or Preferred Stock incurred under such clause (4), (12) or (13) of Section 7.02(b);

(b)    Liens securing obligations relating to Indebtedness or Disqualified Stock permitted to be incurred pursuant to such clause (23) extend only to the assets of Subsidiaries that are not Guarantors;

(c)    Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (4) extend only to the assets so purchased, replaced, leased or improved and proceeds and products thereof; *provided further* that individual financings of assets provided by a counterparty may be cross-collateralized to other financings of assets provided by such counterparty;

(d)    If any such Liens secure Indebtedness for borrowed money, Disqualified Stock or Preferred Stock incurred pursuant to such clause (12) in a principal amount in excess of $25.0 million, they will be subject to an Applicable Intercreditor Agreement; *provided* that (x) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations and (y) any Liens on the Term Priority

Collateral may be pari passu, junior or senior to the Liens on the Term Priority Collateral securing the Obligation;

(e)      In the case of Liens securing Indebtedness incurred under clause (2) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement; *provided* that (x) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations and (y) any Liens on the Term Priority Collateral may be pari passu, junior or senior to the Liens on the Term Priority Collateral securing the Obligations;

(f)      In the case of Liens securing Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (14) of Section 7.02(b), (x) with respect to Liens securing Indebtedness assumed in connection with a Permitted Acquisition, (1) such Liens are secured solely on assets or Restricted Subsidiaries acquired in such Permitted Acquisition, (2) such Liens extend only to the same assets (and any after acquired assets pursuant to an after-acquired property clause in the applicable security documents), (3) such Liens secure only the Indebtedness assumed pursuant to such Permitted Acquisition and (4) such Liens were not created in contemplation thereof and (y) with respect to Liens securing Indebtedness incurred to finance a Permitted Acquisition, (A) such Liens do not secure any acquired assets of the type that would constitute ABL Priority Collateral unless such assets (1) are excluded from the calculation of the Borrowing Base, (2) are owned by a Restricted Subsidiary that does not constitute a Loan Party whose assets are included in the calculation of the Borrowing Base and (3) with respect to acquired assets that constitute inventory, such acquired assets are not co-mingled or held in a location where Eligible Inventory are located unless segregated on terms and conditions to be reasonably agreed with the Administrative Agent and (B) in the case of any such Liens on Term Priority Collateral (whether acquired pursuant to the Permitted Acquisition or otherwise), such Liens may be pari passu, junior or senior to the Liens on the Term Priority Collateral securing the Obligations and the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement; and

(g)      In the case Liens securing Indebtedness incurred under clause (25) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement; *provided* that (x) any Liens on ABL Priority Collateral shall be junior to the Liens on the ABL Priority Collateral securing the Obligations and (y) any Liens on the Term Priority Collateral may be pari passu, junior or senior to the Liens on the Term Priority Collateral securing the Obligations.

(8)      Liens existing, or provided for under binding contracts existing, on the Third Amendment Effective Date (including Liens in effect on the Closing Date securing Indebtedness permitted under 7.02(3));

(9)      [reserved];

(10)     Liens on property or other assets at the time the Borrower or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger, amalgamation or consolidation with or into the Borrower or any Restricted Subsidiary; *provided* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition, amalgamation, merger or consolidation; *provided further* that such Liens are

limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after acquired-property) that secured the obligations to which such Liens relate;

(11)     Liens securing obligations in respect of Indebtedness or other obligations of a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary permitted to be incurred in accordance with Section 7.02;

(12)     Liens securing (x) Hedging Obligations and (y) obligations in respect of Cash Management Services;

(13)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's accounts payable or similar obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(14)     leases, subleases, licenses or sublicenses (or other agreement under which the Borrower or any Restricted Subsidiary has granted rights to end users to access and use the Borrower's or any Restricted Subsidiary's products, technologies or services) that do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and the customary rights reserved or vested in any Person by the terms of any lease, sublease, license, sublicense, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(15)     Liens arising from Uniform Commercial Code (or equivalent statutes) financing statement filings regarding operating leases, consignments or accounts entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business or consistent with industry practice or purported Liens evidenced by the filing of precautionary Uniform Commercial Code (or equivalent statutes) financing statements or similar public filings;

(16)     Liens in favor of the Borrower or any Guarantor;

(17)     Liens on equipment or vehicles of the Borrower or any Restricted Subsidiary granted in the ordinary course of business or consistent with industry practice;

(18)     [reserved];

(19)     Liens to secure any modification, refinancing, refunding, extension, renewal or replacement (or successive modification, refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness, Disqualified Stock or Preferred Stock secured by any Lien referred to in clauses (7), (8) or (10) of this definition; *provided* that: (a) such new Lien will be limited to all or part of the same property (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property) that secured the original Lien (plus improvements and accessions on such property) and proceeds and products thereof and (b) the Indebtedness, Disqualified Stock or Preferred Stock secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clauses (7), (8) or (10) at the time the original Lien became a Permitted Lien hereunder, *plus* (ii) an amount necessary to pay any fees and expenses (including original issue discount, upfront fees, defeasance costs, underwriting discounts or similar fees) and premiums (including tender

premiums and accrued and unpaid interest), related to such refinancing, refunding, extension, renewal or replacement;

(20)     deposits made or other security provided to secure liability to insurance brokers, carriers, underwriters or self-insurance arrangements, including Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(21)     other Liens securing obligations in an aggregate principal amount at any one time outstanding not to exceed the greater of (a) $25.0 million and (b) 5.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto;

(22)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(23)     (a) the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business or consistent with industry practice, (b) Liens arising out of conditional sale, title retention or similar arrangements for the sale of goods in the ordinary course of business or consistent with industry practice and (c) Liens arising by operation of law under Article 2 of the Uniform Commercial Code;

(24)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(7);

(25)     Liens (a) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on items in the course of collection, (b) attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business or consistent with industry practice and (c) in favor of banking or other institutions or other electronic payment service providers arising as a matter of law or under general terms and conditions encumbering deposits or margin deposits or other funds maintained with such institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(26)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under this Agreement; *provided* that such Liens do not extend to assets other than those that are subject to such repurchase agreements;

(27)     Liens that are contractual rights of setoff (a) relating to the establishment of depository relations with banks or other deposit-taking financial institutions or other electronic payment service providers and not given in connection with the issuance of Indebtedness, (b) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary or (c) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business or consistent with industry practice;

(28)     Liens on cash proceeds (as defined in Article 9 of the Uniform Commercial Code) of assets sold that were subject to a Lien permitted hereunder;

(29)     any encumbrance or restriction (including put, call arrangements, tag, drag, right of first refusal and similar rights) with respect to capital stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

71

(30)     Liens (a) on cash advances or cash earnest money deposits in favor of the seller of any property to be acquired in an Investment permitted under this Agreement to be applied against the purchase price for such Investment and (b) consisting of a letter of intent or an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under Section 7.04 in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(31)     ground leases, leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(32)     Liens in connection with any Specified Real Estate Financings;

(33)     Liens on Capital Stock or other securities of an Unrestricted Subsidiary;

(34)     any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business or consistent with industry practice;

(35)     deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business or consistent with industry practice of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(36)     rights of set-off, banker's liens, netting arrangements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(37)     Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; *provided* that such satisfaction or discharge is permitted under this Agreement;

(38)     receipt of progress payments and advances from customers in the ordinary course of business or consistent with industry practice to the extent the same creates a Lien on the related inventory and proceeds thereof;

(39)     Liens on all or any portion of the Collateral (but no other assets) to secure obligations, which are secured on a junior basis to the Obligations ("**Junior Lien Debt**") in respect of (a) Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to Section 7.02; *provided* that after giving *pro forma* effect to the incurrence of the then proposed Indebtedness, Disqualified Stock or Preferred Stock (or, in the case of Designated Revolving Commitments, on the date such Designated Revolving Commitments are established) (and without netting any cash received from the incurrence of such Indebtedness, Disqualified Stock or Preferred Stock), (i) the Senior Secured Leverage Ratio as of the end of the most recently ended Test Period, calculated giving *pro forma* effect thereto, would be no greater than 5.10 to 1.00 (and solely in the case of the issuance of any Disqualified Stock and/or Preferred Stock, counting all Disqualified Stock and Preferred Stock so secured as Junior Lien Debt as Consolidated Total Debt for purpose of this clause (39)) and (ii) the Debt Representative in

respect thereof shall have entered into the Applicable Intercreditor Agreement and (b) any Refinancing Indebtedness of Junior Lien Debt;

(40)      agreements to subordinate any interest of the Borrower or any Restricted Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any Restricted Subsidiary pursuant to an agreement entered into in the ordinary course of business or consistent with industry practice;

(41)      Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act or similar provision of any Environmental Law;

(42)      Liens disclosed by the title insurance policies delivered on or prior to the Closing Date and any replacement, extension or renewal of any such Lien (to the extent the Indebtedness and other obligations secured by such replacement, extension or renewal Liens are permitted by this Agreement); *provided* that such replacement, extension or renewal Liens do not cover any property other than the property that was subject to such Liens prior to such replacement, extension or renewal;

(43)      rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of its Restricted Subsidiaries or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(44)      restrictive covenants affecting the use to which real property may be put; *provided* that the covenants are complied with in all material respects;

(45)      security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business or consistent with industry practice; and

(46)      zoning by-laws and other land use restrictions, including site plan agreements, development agreements and contract zoning agreements.

For purposes of determining compliance with this definition, (A) a Lien need not be incurred solely by reference to one category of Permitted Liens described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption and (B) in the event that a Lien (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens, the Borrower will, in its sole discretion, be entitled to divide, classify or reclassify, in whole or in part, any such Lien (or any portion thereof) among one or more such categories or clauses in any manner that complies with this definition.

If any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing and if any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by a fixed dollar amount, such fixed dollar Basket will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed

the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing.

For purposes of this definition, the term "Indebtedness" will be deemed to include interest on such Indebtedness.

"**Permitted Parent**" means any direct or indirect parent of the Borrower that at the time it became a parent of the Borrower was a Permitted Holder pursuant to clause (1) of the definition thereof.

"**Permitted Ratio Debt**" means Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary; provided that (a) such Indebtedness does not mature or have any scheduled amortization or payments, repurchases or redemptions of principal (other than customary amortization payments), in each case, prior the Latest Maturity Date (or, in the case of Subordinated Indebtedness, 91 days after the Latest Maturity Date) of the Revolving Credit Commitments at the time such Indebtedness is incurred, (b) such Indebtedness does not have a shorter Weighted Average Life to Maturity than the Revolving Credit Commitments then outstanding, (c) in the case of Disqualified Stock and Preferred Stock, such Disqualified Stock or Preferred Stock does not by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, mature or become mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or become redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date of the Revolving Credit Commitments at the time such Disqualified Stock or Preferred Stock is issued, (d) the Total Net Leverage Ratio after giving *pro forma effect* to the incurrence of such Indebtedness, Disqualified Stock or Preferred Stock, as of the end of the most recently ended Test Period, is no greater than 5.10 to 1.00, (e) such Indebtedness may be secured to the extent such Liens constitute Permitted Liens in accordance with the definition thereof and (f) the aggregate amount of (x) Permitted Ratio Debt and (y) Indebtedness, Preferred Stock and Disqualified Stock incurred pursuant to the last proviso of clause (14)(b)(ii) of Section 7.02, in each case incurred by Restricted Subsidiaries of the Borrower that are not and do not become Guarantors, shall not exceed the greater of (a) $100.0 million and 20.0% of Adjusted EBITDA in the aggregate as of the most recently ended Test Period calculated giving *pro forma* effect thereto. To the extent the Borrower or any Restricted Subsidiary issues any Disqualified Stock or any Restricted Subsidiary issues any Preferred Stock as Designated Preferred Stock or, solely for the purpose of calculating the Total Net Leverage Ratio under clause (d) above, the Consolidated Total Debt shall also include all such Disqualified Stock and Preferred Stock issued pursuant to this definition and under Section 7.02(14)(b)(ii)(I) and then outstanding.

"**Permitted Replacement Credit Card Program**" means any private label credit card program or similar arrangement substantially similar in all material respects to the Synchrony Financial Credit Card Program, with such modifications as the Administrative Agent shall have consented to in writing prior to the effectiveness thereof (such consent not to be unreasonably withheld or delayed), which, after notice to the Administrative Agent in accordance with Section 5.14, is entered into by the Borrower or any of its Subsidiaries on commercially reasonable terms generally available at that time (as determined in good faith by a Responsible Officer of the Borrower), or is in effect with respect to any Person that becomes a Subsidiary after the date hereof in connection with a Permitted Acquisition and is not created in contemplation of or in connection therewith, *provided* that if such program grants a security interest in any assets other than those certain Accounts, receivables, or transfer or interest or other similar residual interests subject to such program or arrangement, including a security interest in any returned goods, and the grant of such security interest would reasonably be expected to be detrimental in any material respect

74

to the rights and interests of the Lenders under the Loan Documents, as determined by the Administrative Agent in its reasonable discretion, such program will not be considered a Permitted Replacement Credit Card Program unless and until the Administrative Agent and the third party with whom such program is created have entered into an intercreditor agreement reasonably satisfactory to the Administrative Agent with respect to the priority and enforcement of such security interests.

"**Permitted Warrant Transaction**" means any call option, warrant or right to purchase (or substantively equivalent derivative transaction) on the Borrower's or a Parent Company's common stock sold by the Borrower or a Parent Company substantially concurrently with any purchase by the Borrower of a related Permitted Bond Hedge Transaction.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established or maintained by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Collateral**" has the meaning specified in the Security Agreement.

"**Pre-Adjustment Successor Rate**" has the meaning specified in Section 3.03(c).

"**Preferred Stock**" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Private-Side Information**" means any information with respect to Holdings and its Subsidiaries that is not Public-Side Information.

"**Proposed Acquisition**" has the meaning specified in the definition of "Borrowing Base."

"**Proposed Target**" has the meaning specified in the definition of "Borrowing Base."

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Revolving Credit Commitment or Revolving Credit Loans of any Lender and any Letters of Credit issued or participations purchased therein by any Lender or any participations in any Swing Line Loans purchased by any Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolving Credit Exposure of that Lender and the denominator of which is the aggregate Revolving Credit Exposure of all Lenders at such time.

"**Protective Advances**" has the meaning specified in Section 2.01(c)(3).

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time

"**Public Company Costs**" means the initial costs relating to establishing compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the Borrower's or its Restricted Subsidiaries' initial establishment of compliance with the obligations of a

reporting company, including costs, fees and expenses (including legal, accounting and other professional fees) relating to compliance with provisions of the Securities Act and the Exchange Act.

"**Public Lender**" means Lenders that do not wish to receive Private-Side Information.

"**Public-Side Information**" means (i) at any time prior to Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that is (a) of a type that would be required by applicable Law to be publicly disclosed in connection with an issuance by Holdings or any of its Subsidiaries of its debt or equity securities pursuant to a registered public offering made at such time or (b) not material to make an investment decision with respect to securities of Holdings or any of its Subsidiaries (for purposes of United States federal, state or other applicable securities laws), and (ii) at any time on or after Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that does not constitute material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Holdings or any of its Subsidiaries or any of their respective securities.

"**Purchase Money Obligations**" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement or property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**" has the meaning specified in <u>Section 10.29</u>.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10.0 million at the time the relevant Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Stock.

"**Qualified Holding Company Debt**" means unsecured Indebtedness of Holdings that

(1)   is not subject to any Guarantee by any Subsidiary of Holdings (including the Borrower),

(2)   will not mature prior to the date that is six (6) months after the Latest Maturity Date in effect on the date of issuance or incurrence thereof,

(3)   has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (5) below),

(4)   does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the later to occur of (i) the date that is four (4) years from the date of

the issuance or incurrence thereof and (ii) the date that is 180 days after the Latest Maturity Date in effect on the date of such issuance or incurrence, and

(5)      has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior discount notes of a holding company);

*provided* that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Event of Default shall have occurred and be continuing.

"**Qualified Proceeds**" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business.

"**Qualifying IPO**" means the issuance by the Borrower, or any Parent Company, of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Quarterly Financial Statements**" means the unaudited quarterly balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries for the most recent fiscal quarter(s) ended after October 31, 2020.

"**Rating Agencies**" means Moody's and S&P, or if Moody's or S&P (or both) are not making ratings on the relevant obligations publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Borrower that will be substituted for Moody's or S&P (or both), as the case may be.

"**RBC**" means Royal Bank of Canada.

"**RBCCM**" means RBC Capital Markets.

"**Refinance**" has the meaning assigned in the definition of "Refinancing Indebtedness" and "**Refinancing**" and "**Refinanced**" have meanings correlative to the foregoing.

"**Refinanced Debt**" has the meaning assigned to such term in the definition of "Refinancing Indebtedness."

"**Refinancing Indebtedness**" means (x) Indebtedness incurred by the Borrower or any Restricted Subsidiary, (y) Disqualified Stock issued by the Borrower or any Restricted Subsidiary or (z) Preferred Stock issued by any Restricted Subsidiary which, in each case, serves to extend, replace, refund, refinance, renew or defease ("**Refinance**") any Indebtedness, Disqualified Stock or Preferred Stock, including any Refinancing Indebtedness, so long as:

(1)      (a) the principal amount (or accreted value, if applicable) of such new Indebtedness, the amount of such new Preferred Stock or the liquidation preference of such new Disqualified Stock does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness, the amount of Preferred Stock or the liquidation preference of Disqualified Stock, as applicable, being refinanced except to the extent permitted under Section 1.02(10), *plus* (b) any

accrued and unpaid interest on, the Indebtedness, the amount of any accrued and unpaid dividends on, the Preferred Stock or the liquidation preference of the Disqualified Stock, *plus* any accrued and unpaid dividends on, the Disqualified Stock being so extended, replaced, refunded, refinanced, renewed or defeased (such Indebtedness, Disqualified Stock or Preferred Stock, the "**Refinanced Debt**"), *plus* (c) the amount of any tender premium or penalty or premium required to be paid under the terms of the instrument or documents governing such Refinanced Debt and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness, Preferred Stock or Disqualified Stock or to Refinance such Refinanced Debt (such amounts in clause (b) and (c) the "**Incremental Amounts**");

(2)      such Refinancing Indebtedness has a:

(a)      Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred that is not less than the remaining Weighted Average Life to Maturity of the applicable Refinanced Debt; and

(b)      final scheduled maturity date equal to or later than the final scheduled maturity date of the Refinanced Debt;

(3)      to the extent such Refinancing Indebtedness Refinances (a) Subordinated Indebtedness, such Refinancing Indebtedness is subordinated in right of payment to the Loans or the Guaranty thereof at least to the same extent as the applicable Refinanced Debt, (b) Junior Lien Debt, such Refinancing Indebtedness is (i) unsecured or (ii) secured by Liens that are subordinated to the Liens that secure the Loans or the Guaranty thereof at least to the same extent as the applicable Refinanced Debt or pursuant to the Applicable Intercreditor Agreement or (c) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively;

(4)      such Refinancing Indebtedness shall not be guaranteed or borrowed by any Person other than a Person that is so obligated in respect of the Refinanced Debt being Refinanced; and

(5)      such Refinancing Indebtedness shall not be secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not secure the Refinanced Debt being Refinanced (*plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property); *provided* that Refinancing Indebtedness will not include:

(a)      Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness or Disqualified Stock of the Borrower;

(b)      Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

(c)      Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of an Unrestricted Subsidiary;

*provided further* that Refinancing Indebtedness may be incurred in the form of a customary "bridge" or other interim credit facility intended to be refinanced or replaced with long-term indebtedness which does not satisfy the requirements of clause (2) above so long as, subject to customary conditions, as determined in good faith by the Borrower, such "bridge" or other interim indebtedness will either be automatically converted into or required to be exchanged for permanent financing which satisfies the requirements of clause (2) of this definition.

"**Refunding Capital Stock**" has the meaning specified in Section 7.05(b)(2).

"**Register**" has the meaning specified in Section 10.07(c).

"**Related Adjustment**" means, in determining any LIBOR Successor Rate, the first relevant available alternative set forth in the order below that can be determined by the Administrative Agent applicable to such LIBOR Successor Rate:

(A)      the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto) and which adjustment or method (x) is published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion or (y) solely with respect to Term SOFR, if not currently published, which was previously so recommended for Term SOFR and published on an information service acceptable to the Administrative Agent; or

(B)      the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA Definitions (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"**Related Business Assets**" means assets (other than Cash Equivalents) used or useful in a Similar Business; *provided* that any assets received by the Borrower or a Restricted Subsidiary in exchange for assets transferred by the Borrower or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person is or would become a Restricted Subsidiary.

"**Related Indemnified Person**" of an Indemnitee means (1) the respective directors, officers or employees of such Indemnitee or any of its controlling Persons or controlled Affiliates and (2) the respective agents of such Indemnitee acting at the instructions of such Indemnitee.

"**Related Person**" means, with respect to any Person, (a) any Affiliate of such Person and (b) the respective directors, officers, employees, agents and other representatives of such Person or any of its Affiliates.

"**Release**" means any release, spill, emission, discharge, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York.

"**Report**" means reports prepared by the Administrative Agent, the Collateral Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's and the Subsidiary Guarantors' assets from information furnished by or on behalf of the Borrower and the Subsidiary Guarantors, after the Administrative Agent or Collateral Agent has exercised its rights of inspection pursuant to this Agreement, which Report may be distributed to the Lenders by the Administrative Agent, subject to the provisions of Section 10.09.

"**Reportable Event**" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Request for Credit Extension**" means (a) with respect to a Borrowing, conversion or continuation of Revolving Credit Loans, a Committed Loan Notice, (b) with respect to an L/C Credit Extension, a L/C Application and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"**Required Facility Lenders**" means, as of any date of determination, with respect to one or more Facilities, Lenders having more than 50% of the sum of the (a) aggregate principal amount of outstanding Loans under such Facility or Facilities and (b) aggregate unused Commitments under such Facility or Facilities; *provided* that the Revolving Credit Exposure of or held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Required Lenders**" means, as of any date of determination, Lenders having or holding more than 50% of the aggregate Revolving Credit Exposure of all Lenders; *provided* that the Revolving Credit Exposure of or held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Reserves**" means, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves (including banking services reserves, landlord lien reserves, customer credit liabilities reserves, customer deposits reserves, reserves for Secured Hedge Obligations, Secured Bank Product Obligations and Secured Cash Management Obligations and reserves against Eligible Accounts Receivable and Eligible Inventory) that the Administrative Agent from time to time determines in its Permitted Discretion as being appropriate to reflect:

      (1)     the impediments to the Administrative Agent's ability to realize upon the Collateral included in the Borrowing Base in accordance with the Loan Documents;

      (2)     claims, liabilities, costs and expenses that may need to be satisfied, or will dilute the amounts received by holders of Loans, in connection with the realization upon such Collateral; or

      (3)     criteria, events, conditions, contingencies or risks that adversely affect any component of the Borrowing Base, the Collateral included therein or the validity or enforceability of the Loan Documents or any remedies of the Administrative Agent, the Collateral Agent, each Issuing Bank and each Lender under the Loan Documents with respect to such Collateral.

The establishment or increase of any Reserve will be limited to the exercise by the Administrative Agent of Permitted Discretion, upon at least five Business Days' prior written notice to the Borrower (which notice will include a reasonably detailed description of the Reserve being established); *provided* that (i) no such prior notice shall be required for changes to any Reserves resulting solely by virtue of mathematical calculations of the amount of the Reserves in accordance with the methodology of

calculation previously utilized and (ii) upon such notice, the Borrower will not be permitted to borrow so as to exceed the Borrowing Base after giving effect to such new or modified Reserves. During such five Business Day period, the Administrative Agent will, if requested, discuss any such new or modified Reserve with the Borrower, and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such new or modified Reserve no longer exists or exists in a manner that would result in the establishment of a lower Reserve, in each case, in a manner and to the extent reasonably satisfactory to the Administrative Agent. Notwithstanding anything to the contrary herein, (a) the amount of any such reserve or change shall have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or such change, (b) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria (including collection/advance rates) and (c) no reserves shall be imposed on the first five percent (5%) of dilution of Accounts and thereafter no dilution reserve shall exceed one percent (1%) for each incremental whole percentage in dilution over five percent (5%), *provided* that dilution reserves may reflect fractional percentages in dilution.

"**Resolution Authority**" an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means, with respect to a Person, the chief executive officer, chief operating officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer or Person performing similar functions, of such Person. With respect to any document delivered by a Loan Party on the Closing Date, Responsible Officer includes any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"**Restricted Debt Prepayments**" has the meaning specified in the definition of "Payment Conditions."

"**Restricted Investment**" means any Investment other than any Permitted Investment(s).

"**Restricted Payment**" has the meaning specified in Section 7.05.

"**Restricted Subsidiary**" means, at any time, any direct or indirect Subsidiary of the Borrower (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided* that notwithstanding the foregoing, in no event will any special purpose vehicle that borrows mortgage debt secured by department stores or retail centers of Belk and has no other activities be considered a Restricted Subsidiary for purposes of Section 8.01(5) or (7); *provided further* that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary will be included in the definition of "Restricted Subsidiary." Wherever the term "Restricted Subsidiary" is used herein with respect to any Subsidiary of a referenced Person that is not the Borrower, then it will be construed to mean a Person that would be a Restricted Subsidiary of the Borrower on a *pro forma* basis following consummation of one or a series of related transactions involving such referenced Person and the Borrower (but which transactions may include a designation of a Subsidiary of such Person as an Unrestricted Subsidiary on a *pro forma* basis in accordance with this Agreement).

"**Revolving Credit Borrowing**" means a borrowing consisting of simultaneous Revolving Credit Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period, made by each of the Revolving Credit Lenders pursuant to Section 2.01.

"**Revolving Credit Commitment**" means, as to each Revolving Credit Lender, its obligation to (1) make Revolving Credit Loans to the Borrower pursuant to Section 2.01(2) and (2) purchase participations in L/C Obligations in respect of Letters of Credit and purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount specified opposite such Lender's name on Schedule 2.01 under the caption "Revolving Credit Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate Revolving Credit Commitments of all Revolving Credit Lenders as of the Third Amendment Effective Date is $900.0 million, as such amount may be adjusted from time to time in accordance with the terms of this Agreement.

"**Revolving Credit Commitment Increase**" has the meaning specified in Section 2.14(1).

"**Revolving Credit Exposure**" means, as to each Revolving Credit Lender, the sum of the amount of the Outstanding Amount of such Revolving Credit Lender's Revolving Credit Loans and its Pro Rata Share or other applicable share provided for under this Agreement of the aggregate principal amount of the L/C Obligations and the Swing Line Obligations outstanding at such time.

"**Revolving Credit Facility**" means, at any time, the aggregate amount of the Revolving Credit Commitments at such time.

"**Revolving Credit Lender**" means, at any time, any Lender that has a Revolving Credit Commitment at such time or, if Revolving Credit Commitments have terminated, Revolving Credit Exposure.

"**Revolving Credit Loan**" has the meaning specified in Section 2.01 and includes Revolving Credit Loans, Incremental Revolving Credit Loans and Loans made pursuant to Extended Revolving Credit Commitments.

"**Revolving Credit Note**" means a promissory note of the Borrower payable to any Revolving Credit Lender or its registered assigns, in substantially the form of Exhibit B-1 hereto, evidencing the aggregate Indebtedness of the Borrower to such Revolving Credit Lender resulting from the Revolving Credit Loans made by such Revolving Credit Lender.

"**Revolving Credit Termination Date**" means the earliest of (a) the Maturity Date, (b) the date of termination of all of the Revolving Credit Commitments pursuant to Section 2.05 and (c) the date on which the Obligations become due and payable pursuant to Section 10.02.

"**S&P**" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"**Sale-Leaseback Transaction**" means any arrangement providing for the leasing by the Borrower or any Restricted Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to a Person other than the Borrower or any Restricted Subsidiary in contemplation of such leasing.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Sanctioned Countries**" has the meaning specified in Section 5.17.

"**Sanctioned Persons**" has the meaning specified in Section 5.17

DB1/ 118926700.59

"**Sanctions**" has the meaning specified in Section 5.17.

"**Scheduled Unavailability Date**" has the meaning specified in Section 3.03(c).

"**SDN**" has the meaning specified in Section 5.17.

"**SEC**" means the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Credit Agreement**" means the Amended and Restated Second Lien Credit Agreement dated as of the Third Amendment Effective Date, among Holdings, the Borrower, Wilmington Trust, National Association, as administrative agent and collateral agent and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an Second Lien Credit Agreement) in each case to the extent permitted hereunder.

"**Second Lien Facility**" means the collective reference to the Second Lien Credit Agreement, the Second Lien Loan Documents, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not a Second Lien Facility), in each case to the extent permitted hereunder.

"**Second Lien Loan Documents**" means, collectively, (i) the Second Lien Credit Agreement and (ii) the security documents, intercreditor agreements (including the Term Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the Second Lien Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the Second Lien Facility.

"**Second Lien Loans**" means "Loans" as defined in the Second Lien Facility as in effect on the Third Amendment Effective Date.

"**Second Lien Obligations**" means "Obligations" as defined in the Second Lien Facility as in effect on the Third Amendment Effective Date.

"**Secured Bank Product Agreement**" means any Bank Product Agreement that is entered into by and between Holdings, the Borrower or any Restricted Subsidiary and a Bank Product Provider; and designated in writing by the Bank Product Provider and the Borrower to the Administrative Agent as a "Secured Bank Product Agreement".

"**Secured Bank Product Obligations**" shall mean Bank Product Obligations owing to a Bank Product Provider, in the amount (in the case of any Bank Product Provider other than Bank of America and its Affiliates) specified by such provider in writing to the Administrative Agent in the manner set forth under the definition of "Bank Product Provider", which amount may be established or increased by further written notice to the Administrative Agent from time to time.

"**Secured Cash Management Agreement**" means any Cash Management Agreement that is entered into by and between Holdings, the Borrower or any Restricted Subsidiary and a Cash Management Bank; and designated in writing by the Cash Management Bank and the Borrower to the Administrative Agent as a "Secured Cash Management Agreement".

"**Secured Cash Management Obligations**" shall mean Obligations under Secured Cash Management Agreements.

"**Secured Hedge Agreement**" means any Hedge Agreement with respect to Hedging Obligations permitted under Section 7.02 that is (a) entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank and (b) designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "Secured Hedge Agreement."

"**Secured Hedge Obligations**" shall mean Obligations under Secured Hedge Agreements.

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, each Hedge Bank party to a Secured Hedge Agreement, each Cash Management Bank party to a Secured Cash Management Agreement, each Bank Product Provider that is party to a Secured Bank Product Agreement, each Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(2) or 9.07.

"**Securities Account**" means any securities account maintained by the Borrower and the Subsidiary Guarantors, including any "security accounts" under Article 9 of the UCC. All funds in such Securities Accounts (other than Excluded Accounts) shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Securities Accounts, subject to this Agreement, the Security Agreement and the ABL Intercreditor Agreement.

"**Securities Account Control Agreement**" means an effective securities account control agreement with an Approved Securities Intermediary, in each case in the form set forth as an exhibit to the Security Agreement or otherwise in form and substance reasonably satisfactory to the Administrative Agent.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Security Agreement**" means, collectively, the Pledge and Security Agreement executed by the Loan Parties and the Collateral Agent, substantially in the form of Exhibit F, together with supplements or joinders thereto executed and delivered pursuant to Section 6.11.

"**Selected Months**" means May, June and July or such other consecutive three month period occurring during the applicable fiscal year, which is selected by the Borrower, with written notice thereof being delivered to the Administrative Agent, no later than January 31st of the prior fiscal year; provided that failure to make any such election shall result in the consecutive three month period from the prior fiscal year to remain in effect; provided that the Borrower shall not be permitted to elect the first three months of any fiscal year to the extent it had elected the last three months of the prior fiscal year.

"**Senior Secured Leverage Ratio**" means, with respect to any Test Period, the ratio of Consolidated Secured Debt outstanding on the last date of such Test Period to Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**Settlement Date**" has the meaning specified in Section 2.12(g).

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X of the SEC, as such regulation is in effect on the Closing Date.

"**Similar Business**" means (1) any business conducted or proposed to be conducted by the Borrower or any Restricted Subsidiary on the Closing Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any Permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Restricted Subsidiaries conduct or propose to conduct on the Closing Date.

"**SOFR**" with respect to any Business Day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New York's website (or any successor source) at approximately 8:00 a.m. (New York City time) on the immediately succeeding Business Day and, in each case, that has been selected or recommended by the Relevant Governmental Body.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date:

(1)     the sum of the liabilities of such Person (including contingent liabilities), on a consolidated basis, does not exceed the present fair saleable value of the present assets of such Person, on a consolidated basis,

(2)     the fair value of the property of such Person, on a consolidated basis, is greater than the total amount of liabilities (including contingent liabilities) of such Person, on a consolidated basis,

(3)     the capital of such Person, on a consolidated basis, is not unreasonably small in relation to its business as contemplated on such date and

(4)     such Person has not incurred and does not intend to incur, or believe that it will incur, debts including current obligations beyond their ability to pay such debts as they become due (whether at maturity or otherwise).

The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances as of such date, would reasonably be expected to become an actual and matured liability.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Acquisition Agreement Representations**" means such of the representations made by, or with respect to, the Acquired Company in the Transaction Agreement as are material to the interests of the Lenders, but only to the extent that Parent or Initial Borrower have the right (taking into account any applicable cure provisions) to terminate its obligations under the Transaction Agreement as a result of a breach of such representations in the Transaction Agreement or the failure of a Specified Acquisition Agreement Representation results in a failure of a condition precedent to Parent's or Initial Borrower's obligations to consummate the Merger in accordance with the Transaction Agreement.

"**Specified Event of Default**" means the occurrence of any Event of Default specified in Section 8.01(1), Section 8.01(2)(a) (due to a failure to comply with Section 6.19), Section 8.01(2)(b), Section 8.01(2)(c), Section 8.01(2)(d) or Section 8.01(6).

"**Specified Excess Availability**" means the sum of (a) Excess Availability and (b) the amount by which the Borrowing Base at such time exceeds the Revolving Credit Commitments up to an amount not to exceed 2.5% of the Revolving Credit Commitments.

"**Specified Indebtedness**" means any Subordinated Indebtedness or unsecured Indebtedness, in each case, in an aggregate principal in excess of $25.0 million.

"**Specified Payment**" means any Investment (including a Permitted Acquisition) or Restricted Payment that, in each case, is subject to the satisfaction of the Payment Conditions.

"**Specified Real Estate Distribution**" means a Restricted Payment with the Specified Sale-Leaseback Net Proceeds received from Specified Sale-Leaseback Transactions consummated after the Closing Date; provided that:

(1)     the Specified Sale-Leaseback Net Proceeds received by the Borrower or its Restricted Subsidiaries from such Sale Leaseback Transaction are applied (x) 77.5% (or more, at the Borrower's option) to prepay the First Lien Facility so long as the First Lien Facility remains outstanding and, following the repayment in full of the First Lien Facility, such proceeds will be applied to the repayment of other long-term indebtedness of the Borrower and the Restricted Subsidiaries (other than the Facilities) and (y) 22.5% (or less) to make Specified Real Estate Distributions in accordance with the terms hereof;

(2)     after giving pro forma effect to such Specified Real Estate Distribution (calculated on a *pro forma basis* after giving effect to the application of the Specified Sale-Leaseback Net Proceeds therefrom (and the transfer of real property on a non-recourse basis in connection therewith)):

(a)     the Total Rent Adjusted Leverage Ratio shall be no greater than the Closing Date Total Rent Adjusted Leverage Ratio; and

(b)     the First Lien Net Leverage Ratio shall be no greater than the Closing Date First Lien Net Leverage Ratio; and

(3)     the aggregate amount of Specified Real Estate Distributions following the Closing Date shall not exceed $75.0 million in the aggregate.

For purposes of Specified Real Estate Distributions, "**Closing Date Total Rent Adjusted Leverage Ratio**" and "**Closing Date First Lien Net Leverage Ratio**" mean the Total Rent Adjusted Leverage Ratio and First Lien Net Leverage Ratio, in each case, as of the Closing Date, calculated based on the pro forma Adjusted EBITDA of $469.0 million.

"**Specified Real Estate Financing**" means any Specified Sale-Leaseback Transaction.

"**Specified Representations**" means those representations and warranties made by Holdings and the Initial Borrower in Sections 5.01(1) (with respect to the organizational existence of the Loan Parties only), 5.01(2)(b), 5.02(1), 5.02(2)(a) (with respect to the Loan Parties only and as related to the borrowing under, guaranteeing under, granting of security interests in the Collateral pursuant to, and performance of

the Loan Documents by the Loan Parties), 5.04, 5.13, 5.16, 5.17 (in the case of OFAC and the FCPA, solely with respect to the use of the proceeds of the Revolving Credit Loans borrowed on the Closing Date) and 5.18 (other than any representation therein as it relates to priority).

"**Specified Sale-Leaseback Net Proceeds**" means with respect to the sale component of any Specified Sale-Leaseback Transaction, the excess, if any, of (i) the sum of cash and Cash Equivalents received as purchase consideration in connection with such Specified Sale-Leaseback Transaction sale component pursuant to the applicable purchase and sale agreement over (ii) the sum of (A) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred or required to be paid by the Borrower or any Restricted Subsidiary on behalf of a purchaser by the Borrower or any Restricted Subsidiary in connection with such Specified Sale-Leaseback Transaction, (B) taxes (including transfer taxes) or distributions made pursuant to clauses (a) and (b) of Section 7.05(b)(14) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Specified Sale-Leaseback Net Proceeds) and (C) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such Specified Sale-Leaseback Transaction, including liabilities related to environmental matters or against any indemnification obligations associated with such Specified Sale-Leaseback Transaction, it being understood that "Specified Sale-Leaseback Net Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (C). The net proceeds of any Sale-Leaseback Transaction will be determined giving effect to transaction expenses and the tax effect of such transactions based on the actual effective tax rate (including taxes incurred and required to be paid or payable as a result of such transactions).

"**Specified Sale-Leaseback Transaction**" means one or more Sale-Leaseback Transactions entered into on an arm's length basis for fair market value as determined by a Responsible Officer of the Borrower in good faith with respect to all or any portion of any owned real property or ground-leased property of the Borrower or any Restricted Subsidiary acquired on the Closing Date.

"**Specified Segregated Accounts**" means those segregated Deposit Accounts that the Borrower designates to the Administrative Agent from time to time in writing, into which (1) funds from the sale of Inventory (a) held by the Borrower or any Restricted Subsidiary on a consignment basis or (b) relating to a leased department within retail stores of the Borrower or any Restricted Subsidiary, in each case, which Inventory is not owned by a Loan Party (and would not be reflected on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP); or (2) in-store payments in respect of private label credit cards subject to any Permitted Replacement Credit Card Program are made.

"**Specified Transaction**" means:

(1)    solely for the purposes of determining the applicable cash balance, any contribution of capital, including as a result of an Equity Offering, to the Borrower, in each case, in connection with an acquisition or Investment,

(2)    any designation of operations or assets of the Borrower or a Restricted Subsidiary as discontinued operations (as defined under GAAP),

(3)    any Investment that results in a Person becoming a Restricted Subsidiary,

(4)      any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary in compliance with this Agreement,

(5)      any purchase or other acquisition of a business of any Person, of assets constituting a business unit, line of business or division of any Person,

(6)      any Asset Sale (a) that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower or (b) of a business, business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whether by merger, amalgamation, consolidation or otherwise,

(7)      any operational changes identified by the Borrower that have been made by the Borrower or any Restricted Subsidiary during the Test Period,

(8)      any borrowing of Incremental Revolving Credit Loans (or establishment of an Incremental Revolving Credit Facility),

(9)      any other transaction that by the terms of this Agreement requires a financial ratio to be calculated on a *pro forma* basis, or

(10)      the satisfaction of the Payment Conditions on a *pro forma* basis.

"**Sponsor**" means Sycamore Partners Management, L.P. and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Subordinated Indebtedness**" means any Indebtedness for borrowed money of any Loan Party that by its terms is subordinated in right of payment to the Obligations of such Loan Party arising under the Loans or the Guaranty.

"**Subsidiary**" means, with respect to any Person:

(1)      any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2)      any partnership, joint venture, limited liability company or similar entity of which:

(a)      more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and

(b)      such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

(c)    Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than Holdings and any other Parent Company.

"**Successor Borrower**" has the meaning specified in Section 7.03(4).

"**Successor Holdings**" has the meaning specified in Section 7.03(5).

"**Supermajority Lenders**" means, as of any date of determination, Lenders having more than 66.7% of the sum of the (a) Total Outstandings (with the aggregate outstanding amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition) and (b) aggregate unused Revolving Credit Commitments and Extended Revolving Credit Commitments; provided that the unused Revolving Credit Commitment or Extended Revolving Credit Commitments of, and the portion of the Total Outstandings held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Supermajority Lenders.

"**Supplemental Administrative Agent**" and "**Supplemental Administrative Agents**" have the meanings specified in Section 9.15(1).

"**Supported QFC**" has he meaning specified in Section 10.29

"**Swap Obligation**" has the meaning specified in the definition of "Excluded Swap Obligation."

"**Swing Line Borrowing**" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"**Swing Line Facility**" means the swing line facility made available by the Swing Line Lender pursuant to Section 2.04.

"**Swing Line Lender**" means the Administrative Agent, and/or (as the context requires) any other Lender that becomes a Swing Line Lender in accordance with Section 2.04(8), or any successor Swing Line Lender hereunder.

"**Swing Line Loan**" has the meaning specified in Section 2.04(1).

"**Swing Line Loan Notice**" means a notice of a Swing Line Borrowing pursuant to Section 2.04(2), which, if in writing, shall be substantially in the form of Exhibit A-2.

"**Swing Line Note**" means a promissory note of the Borrower payable to any Swing Line Lender or its registered assigns, in substantially the form of Exhibit B-2, evidencing the aggregate Indebtedness of the Borrower to the Swing Line Lender resulting from the Swing Line Loans.

"**Swing Line Obligations**" means, as at any date of determination, the aggregate Outstanding Amount of all Swing Line Loans outstanding.

"**Swing Line Settlement**" has the meaning specified in Section 2.04(3)(b).

"**Swing Line Settlement Date**" has the meaning specified in Section 2.04(3)(b).

"**Swing Line Sublimit**" means an amount equal to the lesser of (a) $75,000,000 and (b) the aggregate amount of the Revolving Credit Commitments. The Swing Line Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"**Synchrony Financial Credit Card Program**" means the private label credit card program among Belk and Synchrony Financial and Fifth Third Bank, N.A.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"**Tax Group**" has the meaning specified in Section 7.05(b)(14)(b).

"**Tax Indemnitee**" as defined in Section 3.01(5).

"**Term Intercreditor Agreement**" means the Term Intercreditor Agreement substantially in the form of Exhibit G-2 among Morgan Stanley Senior Funding, Inc., as collateral agent under the First Lien Credit Agreement, Wilmington Trust, N.A., as collateral agent under the Second Lien Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**Term Priority Collateral**" means all the "Term Priority Collateral" as defined in the Intercreditor Agreement.

"**Term SOFR**" means the forward-looking term rate for any period that is approximately (as determined by the Administrative Agent) as long as any of the Interest Period options set forth in the definition of "Interest Period" and that is based on SOFR and that has been selected or recommended by the Relevant Governmental Body, in each case as published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion.

"**Termination Conditions**" means, the termination of all Commitments and (i) the payment in full in cash of the Obligations (other than (x) contingent indemnification obligations as to which no claim has been asserted and (y) Secured Hedge Obligations, Secured Cash Management Obligations and Secured Bank Product Obligations) and (ii) the payment in full in cash, or cash collateralization or making of arrangements reasonably satisfactory to the respective Secured Parties, of all Secured Hedge Obligations, Secured Cash Management Obligations and Secured Bank Product Obligations.

"**Test Period**" in effect at any time means the Borrower's most recently ended twelve (12) consecutive fiscal months for which, subject to Section 1.07(1), financial statements have been or were required to be delivered pursuant to Section 6.01(3).

"**Third Amendment**" means that certain Amendment No. 3 to ABL Credit Agreement, dated as of February [—],24, 2021, among the Borrower, Holdings, the Administrative Agent and the Lenders party thereto.

"**Third Amendment Effective Date**" means the "Amendment No. 3 Effective Date", as defined in the Third Amendment.

"**Third Amendment Fee Letter**" means that certain Third Amendment Fee Letter, dated as of February [___],22, 2021, by and among Holdings, the Borrower and Bank of America, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Third Amendment Transaction Expenses**" means any fees, expenses, costs or charges incurred or paid by Holdings, the Borrower or any Restricted Subsidiary in connection with the Third Amendment Transactions.

"**Third Amendment Transactions**" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the First Lien Loans and Second Lien Loans on the Third Amendment Effective Date, the consummation of the other transactions contemplated by this Agreement, the First Lien Loan Documents, the Second Lien Loan Documents, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing and the payment of the fees and expenses incurred in connection with any of the foregoing.

"**Threshold Amount**" means $40.0 million.

"**Total Assets**" means, at any time, the total assets of the Borrower and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the then most recent balance sheet of the Borrower or such other Person as may be available (as determined in good faith by the Borrower).

"**Total Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt outstanding as of the last day of such Test Period to (b) Adjusted EBITDA of the Borrower for such Test Period, in each case on a *pro forma* basis with such *pro forma* adjustments as are appropriate and consistent with Section 1.07.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"**Total Rent Adjusted Leverage Ratio**" shall mean, in the case of any Specified Sale-Leaseback Transaction after the Closing Date, as of the most recently ended Test Period, the ratio of (x) (I) Consolidated Total Debt of the Borrower and the Restricted Subsidiaries outstanding as of the last day of such Test Period plus (II) the Borrower's and its Restricted Subsidiaries' trailing twelve month rent expense calculated on a *pro forma basis* as of the last day of such Test Period multiplied by 8 to (y) (I) Adjusted EBITDA of the Borrower and its Restricted Subsidiaries as of such Test Period plus (II) the pro forma trailing twelve month rent expense of the Borrower and its Restricted Subsidiaries as of such Test Period, in each case calculated on a *pro forma basis*.

"**Traded Securities**" means any debt or equity securities issued pursuant to a public offering or Rule 144A offering.

"**Transaction Agreement**" means the Agreement and Plan of Merger, dated as of August 23, 2015, by and among Bear Parent Inc., Bear Merger Sub Inc. and Belk, Inc., as amended, modified and supplemented from time to time.

"**Transaction Consideration**" means an amount equal to the total funds required to consummate the Merger as set forth in the Transaction Agreement.

"**Transaction Expenses**" means any fees, expenses, costs or charges incurred or paid by the Investors, any Parent Company, Holdings, the Borrower or any Restricted Subsidiary in connection with the Closing Date Transactions, including any expenses in connection with hedging transactions, payments to officers, employees and directors as change of control payments, severance payments, special or retention bonuses and charges for repurchase or rollover of, or modifications to, stock options or restricted stock.

"**Treasury Capital Stock**" has the meaning assigned to such term in Section 7.05(b)(2)(a).

"**Trust Account**" means any accounts or trusts used solely to hold Trust Funds.

"**Trust Funds**" means cash, Cash Equivalents or other assets comprised of:

(1)     funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of such Loan Party's employees;

(2)     all taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)); and

(3)     any other funds which Holdings, the Borrower or any of its Restricted Subsidiaries holds in trust or as an escrow or fiduciary for another person which is not a Restricted Subsidiary of the Borrower.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**UK Financial Institution**" means any BRRD Undertaking (as defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unfinanced Capital Expenditures**" means, with respect to any Person and for any period, Capital Expenditures made by such Person during such period that are not Financed Capital Expenditures.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning specified in Section 3.01(3)(b)(iii).

"**Unreimbursed Amount**" has the meaning specified in Section 2.03(3)(a).

"**Unrestricted Subsidiary**" means (i) each Subsidiary of the Borrower listed on Schedule 1.02 on the Third Amendment Effective Date, (ii) any Subsidiary of the Borrower designated by the Borrower as an Unrestricted Subsidiary pursuant to Section 6.18 subsequent to the date hereof or pursuant to the First Lien Credit Agreement or the Second Lien Credit Agreement and (iii) any Subsidiary of an Unrestricted Subsidiary.

"**Unused Commitment Fee**" has the meaning specified in Section 2.09(1).

"**U.S. Lender**" means any Lender that is not a Foreign Lender.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Public Law No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**U.S. Special Resolution Regimes**" has he meaning specified in Section 10.29.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

> (1)    the sum of the products of the number of years (calculated to the nearest one-twenty fifth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock, *multiplied by* the amount of such payment, *by*

> (2)    the sum of all such payments; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being Refinanced (the "**Applicable Indebtedness**"), the effects of any amortization or prepayments made on such Applicable Indebtedness prior to the date of the applicable Refinancing will be disregarded.

"**wholly owned**" means, with respect to any Subsidiary of any Person, a Subsidiary of such Person one hundred percent (100%) of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable Law) is at the time owned by such Person or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, (a) the write-down and conversion powers of the applicable EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which powers are described in the EU Bail-In Legislation Schedule; or (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such

contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(1)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(2)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(3)    References in this Agreement to an Exhibit, Schedule, Article, Section, Annex, clause or subclause refer (a) to the appropriate Exhibit or Schedule to, or Article, Section, clause or subclause in this Agreement or (b) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears, in each case as such Exhibit, Schedule, Article, Section, Annex, clause or subclause may be amended or supplemented from time to time.

(4)    The term "including" is by way of example and not limitation.

(5)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(6)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(7)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(8)    The word "or" is not intended to be exclusive unless expressly indicated otherwise.

(9)    With respect to any Default or Event of Default, the words "exists", "is continuing" or similar expressions with respect thereto shall mean that the Default or Event of Default has occurred and has not yet been cured or waived. If, prior to the taking of any action under Section 8.02 (or the occurrence of any event set forth in the proviso thereto), any Default or Event of Default occurs due to (i) the failure by any Loan Party to take any action by a specified time, such Default or Event of Default shall be deemed to have been cured at the time, if any, that the applicable Loan Party takes such action or (ii) the taking of any action by any Loan Party that is not then permitted by the terms of this Agreement or any other Loan Document, such Default or Event of Default shall be deemed to be cured on the earlier to occur of (x) the date on which such action would be permitted at such time to be taken under this Agreement and the other Loan Documents and (y) the date on which such action is unwound or otherwise modified to the extent necessary for such revised action to be permitted at such time by this Agreement and the other Loan Documents. If any Default or Event of Default occurs that is subsequently cured (a "**Cured Default**"), any other Default or Event of Default resulting from the making or deemed making of any representation or warranty by any Loan Party or the taking of any action by any Loan Party or any Subsidiary of any Loan Party, in each case which subsequent Default or Event of Default would not have

arisen had the Cured Default not occurred, shall be deemed to be cured automatically upon, and simultaneous with, the cure of the Cured Default.

(i)     Notwithstanding anything to the contrary in this Section 1.02(9), an Event of Default (the "Initial Default") may not be cured pursuant to this Section 1.02(9):

(ii)     If the taking of any action by any Loan Party or Subsidiary of a Loan Party that is not permitted during, and as a result of, the continuance of such Initial Default directly results in the cure of such Initial Default and the applicable Loan Party or Subsidiary had actual knowledge at the time of taking such action that the Initial Default had occurred and was continuing.

(iii)     In the case of an Event of Default under Section 8.01(9) or (10) that directly results in a material impairment of the rights and remedies of the Lenders, the Collateral Agent and Administrative Agent under the Loan Documents and that is incapable of being cured.

(iv)     In the case of an Event of Default under Section 8.01(3) arising due to the failure to perform or observe Section 6.07 that directly results in a material adverse effect on the ability of the Borrower and the other Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Documents to which the Borrower or any of the other Loan Parties is a party; or

(v)     In the case of an Initial Default for which (i) the Borrower failed to give notice to the Administrative Agent and the Lenders of such Initial Default in accordance with Section 6.03(1) of the Agreement and (ii) the Borrower had actual notice of such failure to give notice.

(10)     For purposes of determining compliance with any Section of Article VII, in the event that any Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate Transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time, shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time. For purposes of determining compliance with the incurrence of any Refinancing Indebtedness that restricts the amount of such Indebtedness relative to the amount of Refinanced Debt, respectively, the Borrower and Restricted Subsidiaries may incur an incremental principal amount of Refinancing Indebtedness in such refinancing to the extent that the excess portion of the Refinancing Indebtedness would otherwise be permitted to be incurred in accordance with this Agreement (provided that (1) any additional Indebtedness referenced in this sentence satisfies the other applicable requirements of the definition of Refinancing Indebtedness, as applicable (with such additional amounts incurred constituting a utilization of the relevant basket or exception contained in Section 7.02(b) pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of Section 7.01). For purposes of determining compliance with the incurrence of any Indebtedness under Designated Revolving Commitments in reliance on compliance with any ratio or Basket, if on the date such Designated Revolving Commitments are established after giving *pro forma* effect to the incurrence of the entire committed amount of then proposed Indebtedness thereunder, then such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with any ratio.

(11)     For purposes hereof, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

Section 1.03    <u>Accounting Terms</u>.

(1)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending on the Saturday closest to each January 31 or fiscal quarter ending April 30, July 31, October 31 or the Saturday ending on the Saturday closest to each January 31 of the Borrower.

(2)    <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (A) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (B) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing, it is understood that at the time any determination of the amount of a Capitalized Lease Obligation is to be made, the amount of the liability in respect thereof would be the amount required to be reflected as a liability on the balance sheet of the Borrower (excluding the footnotes thereto) in accordance with GAAP as in effect on January 1, 2015 (it being understood that all obligations of the Borrower and the Subsidiaries that are or would be characterized as an operating lease as determined in accordance with GAAP as in effect on January 1, 2015 (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capitalized Lease Obligation) for purposes of this Agreement regardless of any change in GAAP following January 1, 2015 that would otherwise require such obligation to be recharacterized as a Capitalized Lease Obligation to the extent that financial reporting shall not be affected hereby).

Section 1.04    <u>Rounding</u>.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    <u>References to Agreements, Laws, etc</u>.  Unless otherwise expressly provided herein, (1) references to Organizational Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (2) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    <u>Times of Day and Timing of Payment and Performance</u>.  Unless otherwise specified, all references herein to times of day shall be references to New York time (daylight or standard, as applicable).  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

Section 1.07    Pro Forma and Other Calculations.

(1)    Notwithstanding anything to the contrary herein, financial ratios and tests, including the First Lien Net Leverage Ratio, the Fixed Charge Coverage Ratio, the Senior Secured Leverage Ratio, the satisfaction of the Payment Conditions and the Total Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.07. In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower have been delivered pursuant to Section 6.01(3).

(2)    For purposes of calculating any financial ratio or test (or Total Assets), Specified Transactions (and, subject to clause (4) below, the incurrence or repayment of any Indebtedness in connection therewith) that have been made (a) during the applicable Test Period or (b) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Adjusted EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Total Assets, on the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.07, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.07 as if such Specified Transaction had occurred at the beginning of the most recently ended Test Period.

(3)    Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and may include, for the avoidance of doubt, the amount of "run-rate" cost savings, synergies and operating expense reductions resulting from or related to any such Specified Transaction (including the Closing Date Transactions) which is being given *pro forma* effect that have been realized or are expected to be realized and for which the actions necessary to realize such cost savings, operating expense reductions and synergies are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than eighteen (18) months after the date of any such Specified Transaction (calculated on a *pro forma* basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions and synergies were realized during the entirety of such period and "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken (including any savings expected to result from the elimination of a public target's compliance costs with public company requirements) net of the amount of actual benefits realized during such period from such actions, and any such adjustments shall be included in the initial *pro forma* calculations of such financial ratios or tests and during any subsequent Test Period in which the effects thereof are expected to be realized) relating to such Specified Transaction; *provided* that (a) such amounts are (i) reasonably identifiable and projected in the good faith judgment of the Borrower to result from such actions and (ii) such actions are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than eighteen (18) months after the date of such Specified Transaction, (b) no amounts shall be added to the extent duplicative of any amounts that are otherwise added back in computing Adjusted EBITDA (or any other components thereof), whether through a *pro forma* adjustment or otherwise, with respect to such period; provided that amounts added back shall not exceed 10% of Adjusted EBITDA for such period calculated after giving effect to the add-backs and being calculated on a pro forma basis and (c) added back pursuant to this clause (3), together with the amounts added back pursuant to clauses (k) and (l) of

97

the definition of Adjusted EBITDA, and together with any Projected Restructuring Adjustments referred to in the proviso of clause (n) of the definition of Adjusted EBITDA, shall not exceed, 10% of Adjusted EBITDA for such period calculated after giving effect to the add-backs set forth in clauses (k) and (l), such Projected Restructuring Adjustments, and the adjustments made in accordance with Section 1.07(3) and being calculated on a pro forma basis.

(4)     In the event that (a) the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees), issues or repays (including by redemption, repurchase, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit unless such Indebtedness has been permanently repaid and not replaced), (b) the Borrower or any Restricted Subsidiary issues, repurchases or redeems Disqualified Stock, (c) any Restricted Subsidiary issues, repurchases or redeems Preferred Stock or (d) the Borrower or any Restricted Subsidiary establishes or eliminates any Designated Revolving Commitments, in each case included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period (except in the case of the First Lien Net Leverage Ratio, the Fixed Charge Coverage Ratio, the Senior Secured Leverage Ratio, the satisfaction of the Payment Conditions or the Total Net Leverage Ratio (or similar ratio), in which case such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case will be given effect, as if the same had occurred on the first day of the applicable Test Period) and, in the case of Indebtedness for all purposes as if such Indebtedness in the full amount of any undrawn Designated Revolving Commitments had been incurred thereunder throughout such period in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(5)     If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the First Lien Net Leverage Ratio, the Fixed Charge Coverage Ratio, the Senior Secured Leverage Ratio, the satisfaction of the Payment Conditions, the Total Net Leverage Ratio and/or Total Rent Adjusted Leverage Ratio, is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Financial Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or applicable Restricted Subsidiary may designate.

(6)     Notwithstanding anything to the contrary in this Section 1.07 or in any classification under GAAP of any Person, business, assets or operations in respect of which a definitive agreement for the disposition thereof has been entered into, no *pro forma* effect shall be given to any discontinued operations (and the Adjusted EBITDA attributable to any such Person, business, assets or operations shall not be excluded for any purposes hereunder) until such disposition shall have been consummated.

(7)     Any determination of Total Assets shall be made by reference to the last day of the Test Period most recently ended for which financial statements of the Borrower have been delivered pursuant to Section 6.01(3), on or prior to the relevant date of determination.

(8)     Notwithstanding anything in this Agreement or any Loan Document to the contrary, when (a) calculating any applicable ratio, the satisfaction of the Payment Conditions solely as it relates to a Permitted Acquisition, Consolidated Net Income or Adjusted EBITDA in connection with incurrence of Indebtedness, the creation of Liens, the making of any Asset Sale, the making of an Investment, the making of a Restricted Payment, the designation of a Subsidiary as restricted or unrestricted or the repayment of Indebtedness or otherwise testing availability under any Basket, (b) determining compliance with any provision of this Agreement which requires that no Default, Event of Default or Specified Event of Default has occurred, is continuing or would result therefrom, (c) determining compliance with any provision of this Agreement which requires compliance with any representations and warranties set forth herein or (d) the satisfaction of all other conditions precedent to the incurrence with of Indebtedness, the creation of Liens, the making of any disposition, the making of an Investment, the making of a Restricted Payment, the designation of a Subsidiary as restricted or unrestricted or the repayment of Indebtedness, in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or other provisions, determination of whether any Default, Event of Default or Specified Event of Default has occurred, is continuing or would result therefrom, determination of compliance with any representations or warranties or the satisfaction of any other conditions shall, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "**LCA Election**"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "**LCA Test Date**"). If on a *pro forma* basis after giving effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios and other provisions are calculated as if such Limited Condition Acquisition or other transactions had occurred at the beginning of the most recent Test Period ending prior to the LCA Test Date for which financial statements of the Borrower have been delivered pursuant to Section 6.01(3), the Borrower could have taken such action on the relevant LCA Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with. For the avoidance of doubt, (i) if any of such ratios or other provisions are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in Adjusted EBITDA or other components of such ratio) or other provisions at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Acquisition is permitted hereunder and (ii) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Acquisition or related Specified Transactions. If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or Basket availability with respect to any other Specified Transaction on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or Basket shall be calculated on a *pro forma basis* assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated on the LCA Test Date except that (other than solely with respect to the incurrence test under which such Limited Condition Acquisition is being made) Adjusted EBITDA, assets and Consolidated Net Income of any target of such Limited Condition Acquisition can only be used in the determination of the relevant ratios and Baskets if and when such acquisition has closed. Notwithstanding anything in this Agreement or any Loan Document to the contrary, if the Borrower or its Restricted Subsidiaries (x) incurs Indebtedness, creates Liens, makes Asset Sales, makes Investments, makes Restricted Payments, designates any Subsidiary as restricted or unrestricted or repays any Indebtedness in connection with any Limited Condition Acquisition under a ratio-based Basket and (y) incurs Indebtedness, creates Liens, makes Asset Sales, Investments or Restricted Payments, designates any Subsidiary as restricted or unrestricted or repays any Indebtedness in connection with such Limited Condition Acquisition under a non-ratio-based Basket (which shall occur within five Business Days of

the events in clause (x) above), then the applicable ratio will be calculated with respect to any such action under the applicable ratio-based Basket without regard to any such action under such non-ratio-based Basket made in connection with such Limited Condition Acquisition.

Notwithstanding the foregoing, the Limited Condition Acquisition provisions set forth above shall not apply in respect of any incurrence of any Loans the proceeds of which will be used to finance such Limited Condition Acquisition (other than Loans in respect of a FILO Tranche); *provided* that, if the Borrower has made an LCA Election with respect to an agreed acquisition transaction, then during the period following the execution and delivery of the definitive documentation with respect to such transaction and prior to the consummation thereof, any determination of the compliance with the Payment Conditions shall be made giving full pro forma effect to such agreed acquisition transaction.

(9)     Notwithstanding anything to the contrary herein, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that does not require compliance with a financial ratio or test (including, without limitation, pro forma compliance with any First Lien Net Leverage Ratio test, any Total Net Leverage Ratio test, any Fixed Charge Coverage Ratio test, any Senior Secured Leverage Ratio test, and/or any other financial ratio or test) (any such amounts, the "*Fixed Amounts*") substantially concurrently with any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with any such financial ratio or test (any such amounts, the "*Incurrence Based Amounts*"), it is understood and agreed that the Fixed Amounts (and any cash proceeds thereof) shall be disregarded in the calculation of the financial ratio or test applicable to the Incurrence Based Amounts in connection with such substantially concurrent incurrence.

Section 1.08    Divisions.  Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.09    Guaranties of Hedging Obligations.  Notwithstanding anything else to the contrary in any Loan Document, no non-Qualified ECP Guarantor shall be required to guarantee or provide security for Excluded Swap Obligations, and any reference in any Loan Document with respect to such non-Qualified ECP Guarantor guaranteeing or providing security for the Obligations shall be deemed to be all Obligations other than the Excluded Swap Obligations.

Section 1.10    Currency Generally.

(1)     The Borrower shall determine in good faith the dollar amount of any utilization or other measurement denominated in a currency other than Dollars for purposes of compliance with any Basket. For purposes of determining compliance with any Basket under Article VII or VIII with respect to any amount expressed in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Basket utilization occurs or other Basket measurement is made (so long as such Basket utilization or other measurement, at the time incurred, made or acquired, was permitted hereunder). Except with respect to any ratio calculated under any Basket, any subsequent change in rates of currency exchange with respect to any prior utilization or other measurement of a Basket previously made in reliance on such Basket (as the same may have been

reallocated in accordance with this Agreement) shall be disregarded for purposes of determining any unutilized portion under such Basket.

(2)      For purposes of determining the First Lien Net Leverage Ratio, the Fixed Charge Coverage Ratio, the Senior Secured Leverage Ratio, the Total Net Leverage Ratio and/or the Total Rent Adjusted Leverage Ratio, the amount of Indebtedness and cash and Cash Equivalents shall reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

(3)      For purposes of determining compliance under any Basket under Article VII or VIII, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(1); provided, however, that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness. For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the Dollar equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.11      Letters of Credit.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the amount of the stated amount of such Letter of Credit in effect at such time after giving effect to any automatic reductions to such stated amount pursuant to the terms of the applicable Letter of Credit after the occurrence of any applicable condition (including the expiration of any applicable period); provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuing Bank Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the amount of the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

Section 1.12      Interest Rates.  ~~The~~Neither the Administrative Agent ~~does not warrant,~~ nor ~~accept~~any Lender warrants, nor accepts responsibility, nor shall the Agent or any Lender have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Eurodollar Rate" or with respect to any rate that is an alternative or replacement for or successor to any of such rate (including, without limitation, any LIBOR Successor Rate) or the effect of any of the foregoing, or of any LIBOR Successor Rate Conforming Changes.

## ARTICLE II

### The Commitments and Borrowings

Section 2.01      The Loans.  (a) Subject to the terms and conditions set forth herein, each Revolving Credit Lender severally agrees to make loans denominated in Dollars pursuant to Section 2.02 from its applicable Lending Office (each such loan, a "**Revolving Credit Loan**") to the Borrower from

time to time, on any Business Day during the period from the Closing Date until the Revolving Credit Termination Date in an aggregate principal amount that will not result in (i) such Revolving Credit Lender's Revolving Exposure exceeding such Revolving Credit Lender's Revolving Credit Commitment or (ii) the total Revolving Credit Exposure exceeding the Maximum Borrowing Amount (subject to the Administrative Agent's authority, in its sole discretion, to make Overadvances under Section 2.01(b) or Protective Advances under Section 2.01(c)). Within the limits of each Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01(2), prepay under Section 2.05 and reborrow under this Section 2.01(2). Revolving Credit Loans may be Base Rate Loans, Eurodollar Rate Loans, as further provided herein.

(b)  Overadvances. The Borrower may request and the Administrative Agent or Required Lenders may be willing in their sole discretion to make Revolving Credit Loans to the Borrower at a time when the Total Outstanding exceeds, or would exceed with the making of any such Revolving Credit Loan, the Borrowing Base (any such Loan being herein referred to individually as an "**Overadvance**"), the Administrative Agent will enter such Overadvances as debits in the applicable Loan account. All Overadvances will be repaid on demand, will be secured by the Collateral and will bear interest as provided in this Agreement for Revolving Credit Loans generally. Any Overadvance made pursuant to the terms hereof will be made to the Borrower by all Lenders ratably in accordance with their respective Revolving Credit Facility Percentages. Overadvances in the aggregate amount of $10.0 million or less may, unless a Default or Event of Default has occurred and is continuing, be made in the sole, reasonable discretion of the Administrative Agent; provided that the Required Lenders may at any time revoke the Administrative Agent's authorization to make future Overadvances; provided that no existing Overadvances will be subject to such revocation and any such revocation must be in writing and will become effective prospectively upon the Administrative Agent's receipt thereof. Overadvances in an aggregate amount of more than $10.0 million but less than $25.0 million may, unless a Default or Event of Default has occurred and is continuing, be made with the consent of the Required Lenders. Overadvances in an aggregate amount of $25.0 million or more and Overadvances to be made after the occurrence and during the continuation of a Default or Event of Default will require the consent of all Revolving Credit Lenders. The foregoing notwithstanding, in no event, unless otherwise consented to by all Revolving Credit Lenders will:

(1)  any Overadvances be outstanding for more than 90 consecutive days;

(2)  the Administrative Agent or Lenders make any additional Overadvances unless 30 days or more have expired since the last date on which any Overadvances were outstanding; or

(3)  the Administrative Agent make Revolving Credit Loans on behalf of Lenders under this Section 2.01(b) to the extent such Revolving Credit Loans would cause a Lender's share of the Total Outstanding to exceed such Lender's Revolving Credit Commitment or cause the aggregate Revolving Credit Commitments to be exceeded.

(c)  Protective Advances. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, in its sole, reasonable discretion, may make Revolving Credit Loans to the Borrower on behalf of the Lenders, so long as the aggregate amount of such Revolving Credit Loans will not exceed 5.0% of the Borrowing Base, if the Administrative Agent, in its Permitted Discretion, deems that such Revolving Credit Loans are necessary or desirable to:

(1)  protect all or any portion of the Collateral;

(2)  enhance the likelihood or maximize the amount of repayment of the Loans and the other Obligations; or

(3)      pay any other amount chargeable to the Borrower pursuant to this Agreement (such Revolving Credit Loans, "**Protective Advances**"); provided that (i) in no event will the Total Outstanding exceed the aggregate Revolving Credit Commitments and (ii) the Required Lenders under the Revolving Credit Facility may at any time revoke the Administrative Agent's authorization to make future Protective Advances; provided, further, that any such revocation must be in writing and will become effective prospectively upon the Administrative Agent's receipt thereof and existing Protective Advances will not be subject to thereto.

Each applicable Lender will be obligated to advance to the Borrower its Revolving Facility Percentage of each Protective Advance made in accordance with this Section 2.01(c). If Protective Advances are made in accordance with the preceding sentence, then all Revolving Credit Lenders will be bound to make, or permit to remain outstanding, such Protective Advances based upon their Revolving Credit Facility Percentages in accordance with the terms of this Agreement. All Protective Advances will be repaid by the Borrower on demand, will be secured by the Collateral and will bear interest as provided in this Agreement for Revolving Credit Loans generally.

Section 2.02      Borrowings, Conversions and Continuations of Loans.

(1)      Each Revolving Credit Borrowing, each conversion of Revolving Credit Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice, to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, (a) three (3) Business Days prior to the requested date of any Borrowing or continuation of Eurodollar Rate Loans or any conversion of Base Rate Loans to Eurodollar Rate Loans and (b) on the requested date of any Borrowing of Base Rate Loans. Each telephonic notice by the Borrower pursuant to this Section 2.02(1) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Except as provided in Sections 2.14 and 2.16, each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $5.0 million or a whole multiple of $1.0 million in excess thereof. Except as provided in Sections 2.03(3), 2.14 and 2.16, each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify:

(i)      whether the Borrower is requesting a Revolving Credit Borrowing, a conversion of Revolving Credit Loans from one Type to the other or a continuation of Eurodollar Rate Loans,

(ii)      the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day),

(iii)      the principal amount of Loans to be borrowed, converted or continued,

(iv)      the Class and Type of Loans to be borrowed or to which existing Revolving Credit Loans are to be converted,

(v)      if applicable, the duration of the Interest Period with respect thereto and

(vi)      wire instructions of the account(s) to which funds are to be disbursed.

If the Borrower fails to specify a Type of Loan to be made in a Committed Loan Notice, then the applicable Loans shall be made as Eurodollar Rate Loans with an Interest Period of one (1) month. If the

Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made or continued as the same Type of Loan, which if a Eurodollar Rate Loan, shall have a one-month Interest Period. Any such automatic continuation of Eurodollar Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(2)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this Agreement of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic continuation of Eurodollar Rate Loans or continuation of Loans described in Section 2.02(1). In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than 3:00 p.m., New York time, on the Business Day specified in the applicable Committed Loan Notice.

(3)     Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan, unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith. Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent at the direction of the Required Lenders under the applicable Facility may require by notice to the Borrower that no Loans under such Facility may be converted to or continued as Eurodollar Rate Loans.

(4)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive in the absence of manifest error. At any time when Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Administrative Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(5)     After giving effect to all Revolving Credit Borrowings, all conversions of Revolving Credit Loans from one Type to the other, and all continuations of Revolving Credit Loans as the same Type, there shall not be more than ten Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent.

(6)     The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(7)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing, or, in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York time, on the date of such Borrowing, that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (2) above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount

together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (a) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (b) in the case of such Lender, the Overnight Rate *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(7) shall be conclusive in the absence of manifest error. If the Borrower and such Lender shall both pay all or any portion of the principal amount in respect of such Borrowing or interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such Borrowing or interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.03    <u>Letters of Credit</u>.

(1)    The Letter of Credit Commitments.

(a)    Subject to the terms and conditions set forth herein, (i) each Issuing Bank agrees, in reliance upon the agreements of the other Revolving Credit Lenders set forth in this Section 2.03, (A) from time to time on any Business Day during the period from the Closing Date until the L/C Expiration Date, to issue Letters of Credit at sight denominated in Dollars for the account of the Borrower (*provided* that any such Letter of Credit may be for the benefit of any Subsidiary of the Borrower) and to amend or renew Letters of Credit previously issued by it, in accordance with Section 2.03(2), and (B) to honor drawings under the Letters of Credit and (ii) the Revolving Credit Lenders severally agree to participate in Letters of Credit issued pursuant to this Section 2.03; *provided* that no Issuing Bank shall be obligated to make any L/C Credit Extension with respect to any Letter of Credit, and no Lender shall be obligated to participate in any Letter of Credit if after giving effect to such L/C Credit Extension, (x) the Revolving Credit Exposure of any Revolving Credit Lender would exceed such Lender's Revolving Credit Commitment, (y) the Outstanding Amount of the L/C Obligations would exceed the L/C Sublimit or (z) the aggregate Total Outstandings would exceed the Maximum Borrowing Amount. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(b)    An Issuing Bank shall be under no obligation to issue any Letter of Credit if:

(i)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Bank from issuing such Letter of Credit, or any Law applicable to such Issuing Bank or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Bank shall prohibit, or direct that such Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Bank is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Closing Date (for which such Issuing Bank is not otherwise compensated hereunder);

(ii)        subject to Section 2.03(2)(c), the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last renewal, unless each Appropriate Lender has approved of such expiration date;

(iii)        the expiry date of such requested Letter of Credit would occur after the L/C Expiration Date, unless (A) the applicable Issuing Bank has approved of such expiration date (B) the Outstanding Amount of L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the applicable Issuing Bank; or

(iv)        the issuance of such Letter of Credit would violate any Laws binding upon such Issuing Bank;

(v)        the Letter of Credit is to be denominated in a currency other than Dollars, unless otherwise agreed by the relevant Issuing Bank and the Administrative Agent;

(vi)        the Letter of Credit is in an initial amount less than $25,000; or

(vii)        any Revolving Credit Lender is at that time a Defaulting Lender, unless such Issuing Bank has entered into arrangements, including the delivery of Cash Collateral, satisfactory to such Issuing Bank (in its sole discretion) with the Borrower or such Lender to eliminate such Issuing Bank's actual or potential Fronting Exposure (after giving effect to Section 2.17(1)(d)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which such Issuing Bank has actual or potential Fronting Exposure, as it may elect in its sole discretion.

(c)        An Issuing Bank shall be under no obligation to amend any Letter of Credit if such Issuing Bank would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof or (ii) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(2)        Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.

(a)        Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to an Issuing Bank (with a copy to the Administrative Agent) in the form of a L/C Application, appropriately completed and signed by a Responsible Officer of the Borrower. Such L/C Application must be received by the relevant Issuing Bank and the Administrative Agent not later than 12:00 p.m., New York time, at least two (2) Business Days prior to the proposed issuance date or date of amendment, as the case may be, or, in each case, such later date and time as the relevant Issuing Bank may agree in a particular instance in its sole discretion. In the case of a request for an initial issuance of a Letter of Credit, such L/C Application shall specify in form and detail reasonably satisfactory to the relevant Issuing Bank:

(i)        the proposed issuance date of the requested Letter of Credit (which shall be a Business Day);

(ii)        the amount thereof;

(iii)        the expiry date thereof;

(iv)    the name and address of the beneficiary thereof;

(v)    the documents to be presented by such beneficiary in case of any drawing thereunder;

(vi)    the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder;

(vii)    the currency in which the requested Letter of Credit to be issued will be denominated; and

(viii)    such other matters as the relevant Issuing Bank may reasonably request.

In the case of a request for an amendment of any outstanding Letter of Credit, such L/C Application shall specify in form and detail reasonably satisfactory to the relevant Issuing Bank:

(A)    the Letter of Credit to be amended;

(B)    the proposed date of amendment thereof (which shall be a Business Day);

(C)    the nature of the proposed amendment; and

(D)    such other matters as the relevant Issuing Bank may reasonably request.

(b)    Promptly after receipt of any L/C Application, the relevant Issuing Bank will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such L/C Application from the Borrower and, if not, such Issuing Bank will provide the Administrative Agent with a copy thereof. Upon receipt by the relevant Issuing Bank of confirmation from the Administrative Agent that the requested issuance or amendment is permitted in accordance with the terms hereof, then, subject to the terms and conditions hereof, such Issuing Bank shall, on the requested date, issue a Letter of Credit for the account of the Borrower (which may be used to provide credit support to any Restricted Subsidiary of the Borrower) or enter into the applicable amendment, as the case may be. Immediately upon the issuance of each Letter of Credit, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the relevant Issuing Bank a risk participation in such Letter of Credit in an amount equal to the product of such Lender's Pro Rata Share or other applicable share provided for under this Agreement times the amount of such Letter of Credit; *provided* that no Lender shall be required to purchase a risk participation in any Letter of Credit with an expiration date after the expiration date of such Lender's Commitments.

(c)    If the Borrower so requests in any applicable L/C Application, the relevant Issuing Bank shall agree to issue a Letter of Credit that has automatic extension provisions (each, an "**Auto-Extension Letter of Credit**"); *provided* that any such Auto-Extension Letter of Credit must permit the relevant Issuing Bank to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "**Non-Extension Notice Date**") in each such twelve-month period to be agreed upon by the relevant Issuing Bank and the Borrower at the time such Letter of Credit is issued. Unless otherwise agreed in such Letter of Credit, the Borrower shall not be required to make a specific request to the relevant Issuing Bank for any such extension. Once an Auto-Extension Letter of Credit has been issued, the applicable Lenders shall be deemed to have authorized (but may not require) the relevant

Issuing Bank to permit the extension of such Letter of Credit at any time to an expiry date not later than the applicable L/C Expiration Date, unless the Outstanding Amount of L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the applicable Issuing Bank; *provided* that the relevant Issuing Bank shall not permit any such extension if (i) the relevant Issuing Bank has determined that it would have no obligation at such time to issue such Letter of Credit in its extended form under the terms hereof (by reason of the provisions of Section 2.03(1)(b) or otherwise) or (ii) it has received notice (which may be by telephone or in writing) on or before the day that is seven (7) Business Days before the Non-Extension Notice Date from the Administrative Agent, any Revolving Credit Lender or the Borrower that one or more of the applicable conditions specified in Section 4.02 will not be satisfied on the applicable date of the Credit Extension.

(d)     Promptly after issuance of any Letter of Credit or any amendment to a Letter of Credit, the relevant Issuing Bank will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(3)     Drawings and Reimbursements; Funding of Participations.

(a)     Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the relevant Issuing Bank shall promptly notify the Borrower and the Administrative Agent thereof (including the date on which such payment is to be made). Upon the same day of any payment by an Issuing Bank under a Letter of Credit with notice to the Borrower (each such date, an "**Honor Date**"), the Borrower shall reimburse, or cause to be reimbursed, such Issuing Bank through the Administrative Agent in an amount equal to the amount of such drawing; *provided* that if such reimbursement is not made on the date of drawing, the Borrower shall pay interest to the relevant Issuing Bank on such amount at the rate applicable to Base Rate Loans (without duplication of interest payable on L/C Borrowings). The relevant Issuing Bank shall notify the Borrower of the amount of the drawing promptly following the determination or revaluation thereof. If the Borrower fails to so reimburse, or cause to be reimbursed, such Issuing Bank by such time, the Administrative Agent shall promptly notify each Appropriate Lender of the Honor Date, the amount of the unreimbursed drawing (the "**Unreimbursed Amount**") and the amount of such Appropriate Lender's Pro Rata Share or other applicable share provided for under this Agreement thereof. In such event, in the case of an Unreimbursed Amount under a Letter of Credit, the Borrower shall be deemed to have requested a Revolving Credit Borrowing of Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Base Rate Loans but subject to the requirements for the amount of the unutilized portion of the Revolving Credit Commitments under the applicable Revolving Credit Facility of the Appropriate Lenders and the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice). Any notice given by an Issuing Bank or the Administrative Agent pursuant to this Section 2.03(3)(a) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(b)     Each Appropriate Lender (including any Lender acting as an Issuing Bank) shall upon any notice pursuant to Section 2.03(3)(a) make funds available to the Administrative Agent for the account of the relevant Issuing Bank in Dollars at the Administrative Agent's Office for payments in an amount equal to its Pro Rata Share or other applicable share provided for under this Agreement of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.03(3)(c), each Appropriate Lender that so makes funds available shall be deemed to have made a Revolving Credit Loan that is a Base Rate Loan to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the relevant Issuing Bank.

(c)        With respect to any Unreimbursed Amount that is not fully refinanced by a Revolving Credit Borrowing of Base Rate Loans because the conditions set forth in Section 4.02 cannot be satisfied or for any other reason, the Borrower shall be deemed to have incurred from the relevant Issuing Bank an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Appropriate Lender's payment to the Administrative Agent for the account of the relevant Issuing Bank pursuant to Section 2.03(3)(b) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.03.

(d)        Until each Appropriate Lender funds its Revolving Credit Loan or L/C Advance pursuant to this Section 2.03(3) to reimburse the relevant Issuing Bank for any amount drawn under any Letter of Credit, interest in respect of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such amount shall be solely for the account of the relevant Issuing Bank.

(e)        Each Revolving Credit Lender's obligation to make Revolving Credit Loans or L/C Advances to reimburse an Issuing Bank for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(3), shall be absolute and unconditional and shall not be affected by any circumstance, including

(i)        any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the relevant Issuing Bank, the Borrower or any other Person for any reason whatsoever;

(ii)        the occurrence or continuance of a Default; or

(iii)        any other occurrence, event or condition, whether or not similar to any of the foregoing;

(f)        If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the relevant Issuing Bank any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.03(3) by the time specified in Section 2.03(3)(b), such Issuing Bank shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such Issuing Bank at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  A certificate of the relevant Issuing Bank submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(3)(d) shall be conclusive absent manifest error.

(4)        Repayment of Participations.

(a)        If, at any time after an Issuing Bank has made a payment under any Letter of Credit and has received from any Revolving Credit Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.03(3), the Administrative Agent receives for the account of such Issuing Bank any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Pro Rata Share or other applicable share provided for under this Agreement thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding) in the amount received by the Administrative Agent.

(b)     If any payment received by the Administrative Agent for the account of an Issuing Bank pursuant to Section 2.03(3)(a) or Section 2.03(3)(b) is required to be returned under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by such Issuing Bank in its discretion), each Appropriate Lender shall pay to the Administrative Agent for the account of such Issuing Bank its Pro Rata Share or other applicable share provided for under this Agreement thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the applicable Overnight Rate from time to time in effect. The Obligations of the Revolving Credit Lenders under this Section 2.03(4)(b) shall survive the payment in full of the Obligations and the termination of this Agreement.

(5)     <u>Obligations Absolute.</u>  The obligation of the Borrower to reimburse the relevant Issuing Bank for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(a)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other agreement or instrument relating thereto;

(b)     the existence of any claim, counterclaim, setoff, defense or other right that any Loan Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the relevant Issuing Bank or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(c)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(d)     any payment by the relevant Issuing Bank under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the relevant Issuing Bank under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(e)     any exchange, release or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty or any other guarantee, for all or any of the Obligations of any Loan Party in respect of such Letter of Credit; or

(f)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party;

*provided* that the foregoing shall not excuse any Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are waived by the Borrower to the extent permitted by applicable Law) suffered by the Borrower that are caused by acts or omissions by such Issuing Bank constituting gross negligence, bad faith or willful misconduct on the part of such Issuing Bank as determined in a final and non-appealable judgment by a court of competent jurisdiction.

(6)     Role of Issuing Banks.  The Issuing Bank shall be entitled to rely upon, and shall be fully protected in relying upon, any note, writing, resolution, notice, statement, certificate or facsimile message, order or other document or telephone message signed, sent or made by any Person that the Issuing Bank reasonably believed to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by the Issuing Bank (which may include, at the Issuing Bank's option, counsel of the Administrative Agent or the Borrower).  Each Lender and the Borrower agrees that, in paying any drawing under a Letter of Credit, the relevant Issuing Bank shall not have any responsibility  to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire  as to the validity  or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the Issuing Banks, any Related Person of such Issuing Banks, nor any of the respective correspondents, participants or assignees of any Issuing Bank shall be liable to any Lender for:

(a)     any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable;

(b)     any action taken or omitted in the absence of gross negligence, bad faith or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction;  or

(c)     the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or L/C Application.

The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided* that this assumption is not intended to, and shall not, preclude the Borrower from pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the Issuing Banks, any Related Persons of such Issuing Banks, nor any of the respective correspondents, participants or assignees of any Issuing Bank, shall be liable or responsible for any of the matters described in clauses (a) through (f) of Section 2.03(5); *provided* that anything in such clauses to the contrary notwithstanding,  the Borrower may have a claim against an Issuing Bank, and such Issuing Bank may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential,  damages suffered by the Borrower which the Borrower proves were caused by such Issuing Bank's willful misconduct, bad faith or gross negligence or such Issuing Bank's willful or grossly negligent,  or bad faith, failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit in each case as determined in a final and non-appealable judgment by a court of competent jurisdiction.   In furtherance and not in limitation  of the foregoing, each Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation,  regardless of any notice or information  to the contrary, and no Issuing Bank shall be responsible for the validity  or sufficiency of any instrument transferring or assigning or purporting  to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid  or ineffective for any reason.

Each Lender shall, ratably in accordance with its Pro Rata Share, indemnify  each Issuing Bank, its Related Persons and their respective directors, officers, agents and employees (to the extent not reimbursed by the Borrower) against any cost, expense (including reasonable counsel fees and disbursements), claim, demand, action, loss or liability  (except such as result from such indemnitees' willful misconduct, bad faith or gross negligence or such Issuing Bank's willful  or grossly negligent, or bad faith, failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying  with the terms and conditions of a Letter of Credit in each case

as determined in a final and non-appealable judgment by a court of competent jurisdiction) that such indemnitees may suffer or incur in connection with this Section 2.03 or any action taken or omitted to be taken by such indemnitees hereunder.

   (7) <u>Cash Collateral.</u> Subject to Section 2.17(1)(d), if,

     (a) as of any L/C Expiration Date, any applicable Letter of Credit issued for the account of the Borrower may for any reason remain outstanding and partially or wholly undrawn,

     (b) any Event of Default occurs and is continuing and the Administrative Agent or the Required Lenders, as applicable, may require the Borrower to Cash Collateralize the L/C Obligations pursuant to Section 8.02, or

     (c) an Event of Default set forth under Section 8.01(6) occurs and is continuing,

the Borrower will Cash Collateralize, or cause to be Cash Collateralized, the then Outstanding Amount of all relevant L/C Obligations (in an amount equal to such Outstanding Amount determined as of the date of such Event of Default or the applicable L/C Expiration Date, as the case may be), and shall do so not later than 2:00 p.m. on (i) in the case of the immediately preceding clauses (a) or (b), (x) the Business Day that the Borrower receives notice thereof, if such notice is received on such day prior to 12:00 p.m. or (y) if clause (x) above does not apply, the Business Day immediately following the day that the Borrower receives such notice and (ii) in the case of the immediately preceding clause (c), the Business Day on which an Event of Default set forth under Section 8.01(6) occurs or, if such day is not a Business Day, the Business Day immediately succeeding such day. At any time that there shall exist a Defaulting Lender, immediately upon the request of the Administrative Agent or the applicable Issuing Bank, the Borrower will Cash Collateralize all Fronting Exposure (after giving effect to Section 2.17(1)(d) and any Cash Collateral provided by the Defaulting Lender) at 100% of the amount thereof. The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Banks and the Revolving Credit Lenders of the applicable Facility, a security interest in all such Cash Collateral. Cash Collateral shall be maintained in blocked accounts at the Administrative Agent and may be invested in readily available Cash Equivalents selected by the Administrative Agent in its sole discretion. If at any time the Administrative Agent determines that any funds held as Cash Collateral are expressly subject to any right or claim of any Person other than the Loan Parties or the Administrative Agent (on behalf of the Secured Parties) or that the total amount of such funds is less than 100% of the aggregate Outstanding Amount of all relevant L/C Obligations, the Borrower will, forthwith upon demand by the Administrative Agent, pay, or cause to be paid, to the Administrative Agent, as additional funds to be deposited and held in the deposit accounts at the Administrative Agent as aforesaid, an amount equal to the excess of (A) 100% of such aggregate Outstanding Amount over (B) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent reasonably determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Law, to reimburse the relevant Issuing Bank. To the extent the amount of any Cash Collateral exceeds the then Outstanding Amount of such relevant L/C Obligations and so long as no Event of Default has occurred and is continuing, the excess shall promptly be refunded to the Borrower. To the extent any Event of Default giving rise to the requirement to Cash Collateralize any Letter of Credit pursuant to this Section 2.03(7) is cured or otherwise waived, then so long as no other Event of Default has occurred and is continuing, the amount of any Cash Collateral pledged to Cash Collateralize such Letter of Credit shall promptly be refunded to the Borrower. If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Loan Parties or the Administrative Agent as herein provided, or that the total amount of such Cash Collateral is less than 100% of the applicable Fronting Exposure and other obligations secured thereby, the Borrower or the relevant Defaulting Lender will, promptly upon demand

by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency.

(8)     [Reserved].

(9)     <u>Letter of Credit Fees.</u>  The Borrower shall pay to the Administrative Agent, for the account of each Revolving Credit Lender for the applicable Revolving Credit Facility in accordance with its Pro Rata Share or other applicable share provided for under this Agreement, a Letter of Credit fee for each Letter of Credit issued pursuant to this Agreement equal to the Applicable Rate set forth in the "Applicable Rate for Eurodollar Loans" column of the chart in the definition of "Applicable Rate" times the daily maximum amount then available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount decreases or increases periodically pursuant to the terms of such Letter of Credit); *provided, however*, that any Letter of Credit fees otherwise payable for the account of a Defaulting Lender with respect to any Letter of Credit as to which such Defaulting Lender has not provided Cash Collateral satisfactory to the applicable Issuing Bank pursuant to this Section 2.03 shall be payable, to the maximum extent permitted by applicable Law, to the other Lenders in accordance with the upward adjustments in their respective Pro Rata Shares allocable to such Letter of Credit pursuant to Section 2.17(1)(d), with the balance of such fee, if any, payable to the applicable Issuing Bank for its own account.  Such Letter of Credit fees shall be computed on a quarterly basis in arrears.  Such Letter of Credit fees shall be due and payable in Dollars on the first calendar day of each February, May, August and November, commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date and thereafter on demand.  If there is any change in the Applicable Rate set forth in the "Applicable Rate for Eurodollar Loans" column of the chart in the definition of "Applicable Rate" during any calendar quarter, the daily maximum amount of each Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such calendar quarter that such Applicable Rate was in effect.

(10)     <u>Fronting Fee and Documentary and Processing Charges Payable to Issuing Banks.</u>  The Borrower shall pay directly to each Issuing Bank for its own account a fronting fee with respect to each Letter of Credit issued by such Issuing Bank equal to 0.25% per annum (or such other lower amount as may be mutually agreed by the Borrower and the applicable Issuing Bank) of the maximum amount then available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount increases or decreases periodically pursuant to the terms of such Letter of Credit) or such lesser fee as may be agreed with such Issuing Bank.  Such fronting fees shall be computed on a quarterly basis in arrears.  Such fronting fees shall be due and payable in Dollars on the first calendar day of each of each February, May, August and November, commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date and thereafter on demand.  In addition, the Borrower shall pay, or cause to be paid, directly to each Issuing Bank for its own account with respect to each Letter of Credit issued for the account of the Borrower or any Restricted Subsidiary the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such Issuing Bank relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable within ten (10) Business Days of demand and are nonrefundable.

(11)     <u>Conflict with L/C Application.</u>  Notwithstanding anything else to the contrary in this Agreement or any L/C Application, in the event of any conflict between the terms hereof and the terms of any L/C Application, the terms hereof shall control.

(12)     <u>Addition of an Issuing Bank.</u>  There may be one or more Issuing Banks under this Agreement from time to time.  A Revolving Credit Lender reasonably acceptable to the Borrower and the Administrative Agent may become an additional Issuing Bank hereunder pursuant to a written agreement

among the Borrower, the Administrative Agent and such Revolving Credit Lender. The Administrative Agent shall notify the Revolving Credit Lenders of any such additional Issuing Bank.

(13)    Provisions Related to Extended Revolving Credit Commitments. If the L/C Expiration Date in respect of any Class of Revolving Credit Commitments occurs prior to the expiry date of any Letter of Credit, then (a) if consented to by the Issuing Bank which issued such Letter of Credit, if one or more other Classes of Revolving Credit Commitments in respect of which the L/C Expiration Date shall not have so occurred are then in effect, such Letters of Credit for which consent has been obtained shall automatically be deemed to have been issued (including for purposes of the obligations of the Revolving Credit Lenders to purchase participations therein and to make Revolving Credit Loans and payments in respect thereof pursuant to Sections 2.03(3) and (4)) under (and ratably participated in by Revolving Credit Lenders pursuant to) the Revolving Credit Commitments in respect of such non-terminating Classes up to an aggregate amount not to exceed the aggregate principal amount of the unutilized Revolving Credit Commitments thereunder at such time (it being understood that no partial face amount of any Letter of Credit may be so reallocated) and (b) to the extent not reallocated pursuant to immediately preceding clause (a) and unless provisions reasonably satisfactory to the applicable Issuing Bank for the treatment of such Letter of Credit as a letter of credit under a successor credit facility have been agreed upon, the Borrower shall, on or prior to the applicable Maturity Date, cause all such Letters of Credit to be replaced and returned to the applicable Issuing Bank undrawn and marked "cancelled" or to the extent that the Borrower is unable to so replace and return any Letter(s) of Credit, such Letter(s) of Credit shall be backstopped by a "back to back" letter of credit reasonably satisfactory to the applicable Issuing Bank or the Borrower shall Cash Collateralize any such Letter of Credit in accordance with Section 2.03(7).

(14)    Letter of Credit Reports. For so long as any Letter of Credit issued by an Issuing Bank is outstanding, such Issuing Bank shall deliver to the Administrative Agent on the last Business Day of each calendar month, and on each date that an L/C Credit Extension occurs with respect to any such Letter of Credit, a report in the form of Exhibit R, appropriately completed with the information for every outstanding Letter of Credit issued by such Issuing Bank.

(15)    Letters of Credit Issued for Holdings and Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of a Restricted Subsidiary of the Borrower, the Borrower shall be obligated to reimburse, or cause to be reimbursed, the applicable Issuing Bank hereunder for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit in support or its Restricted Subsidiaries inures to the benefit of the Borrower, and that the Borrower's businesses derives substantial benefits from the businesses of its Restricted Subsidiaries.

Section 2.04    Swing Line Loans.

(1)    The Swing Line. Subject to the terms and conditions set forth herein, the Swing Line Lender may, in its sole discretion and in its individual capacity, make revolving credit loans in Dollars to the Borrower (each such loan, a "**Swing Line Loan**"), from time to time on any Business Day during the period beginning on the Business Day after the Closing Date and until the Maturity Date of the Revolving Credit Facility in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Pro Rata Share or other applicable share provided for under this Agreement of the Outstanding Amount of Revolving Credit Loans and L/C Obligations of the Swing Line Lender, may exceed the amount of such Swing Line Lender's Revolving Credit Commitment; *provided* that, after giving effect to any Swing Line Loan, (i) the Revolving Credit Exposure shall not exceed the aggregate Revolving Credit Commitment and (ii) the aggregate Total Outstandings shall not exceed the Maximum Borrowing Amount. Within the

foregoing limits, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04. Each Swing Line Loan will be obtained or maintained as a Base Rate Loan and upon the occurrence and during the continuance of an Event of Default under Section 8.01(1), the Swing Line Loans will, at the option of Swing Line Lender, bear interest on past due amounts at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws.

(2)     Borrowing Procedures. Each Swing Line Borrowing shall be made upon the Borrower's irrevocable notice to the Swing Line Lender, which may be given in writing or by telephone. Each such notice must be received by the Swing Line Lender not later than 2:00 p.m., New York time, on the requested Borrowing date and shall specify (a) the amount to be borrowed, which shall be a minimum of $100,000 and (b) the requested Borrowing date, which shall be a Business Day. Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower, together with substantially simultaneous notice (by telephone or in writing) to the Administrative Agent. If the Swing Line Lender agrees to provide such requested Swing Line Borrowing, unless it has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Revolving Credit Lender) or it determines that (i) after giving effect to any Swing Line Loan, the Revolving Credit Exposure will exceed the aggregate Revolving Credit Commitment, (ii) the aggregate Total Outstandings exceed the Maximum Borrowing Amount or (iii) one or more of the applicable conditions specified in Section 4.02 is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will, not later than 3:00 p.m., New York time, on the Borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrower.

(3)     Repayment or Refinancing of Swing Line Loans.

(a)     The Borrower has the right to prepay all or a portion of any Swing Line Loan at any time without premium or penalty.

(b)     To facilitate administration of the Revolving Credit Loans, the Revolving Credit Lenders and the Administrative Agent agree (which agreement is solely among them, and not for the benefit of or enforceable by the Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among them as to the Swing Line Loans shall take place on a periodic basis in accordance with this clause (b). The Administrative Agent shall request settlement (a "**Swing Line Settlement**") with the Revolving Credit Lenders on at least a weekly basis, or on a more frequent basis if so determined by the Administrative Agent, (A) on behalf of the Swing Line Lender, with respect to each outstanding Swing Line Loan and (B) with respect to collections received, in each case, by notifying the applicable Revolving Credit Lenders of such requested Swing Line Settlement by facsimile or other electronic form of transmission, of such requested Swing Line Settlement, no later than 1:00 p.m. New York City time, on the date of such requested Swing Line Settlement (the "**Swing Line Settlement Date**"). Each applicable Revolving Credit Lender (other than the Swing Line Lender) shall make the amount of such Revolving Credit Lender's Pro Rata Share of the outstanding principal amount of the Swing Line Loans with respect to which Swing Line Settlement is requested available to the Administrative Agent, to such account of the Administrative Agent as the Administrative Agent may designate, not later than 3:00 p.m., New York City time, on the Swing Line Settlement Date applicable thereto, which may occur before or after the occurrence or during the continuation of a Default or an Event of Default and whether or not the applicable conditions precedent set forth in Article IV have then been satisfied without regard to any minimum amount specified therein. Such amounts made available to the Administrative Agent shall be applied against the amounts of the applicable Swing Line Loan and, together with the portion of such Swing Line Loan representing the Swing Line Lender's Pro Rata Share thereof, shall constitute Revolving Credit Loans of the Revolving Credit Lenders under such Facility. If

any such amount is not made available to the Administrative Agent by any Revolving Credit Lender on the Swing Line Settlement Date applicable thereto, the Administrative Agent shall, on behalf of the Swing Line Lender with respect to each outstanding Swing Line Loan, be entitled to recover such amount on demand from such Revolving Credit Lender together with interest thereon at the Base Rate for the first three days from and after the Swing Line Settlement Date and thereafter at the interest rate then applicable to Revolving Credit Loans. Between Swing Line Settlement Dates, the Administrative Agent may pay over to the Swing Line Lender any payments received by the Administrative Agent, which in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Credit Loans, for application to such Swing Line Lender's Revolving Credit Loans or Swing Line Loans. If, as of any Swing Line Settlement Date, collections received since the then immediately preceding Swing Line Settlement Date have been applied to such Swing Line Lender's Revolving Credit Loans, such Swing Line Lender shall pay to the Administrative Agent for the accounts of the applicable Revolving Credit Lenders, to be applied to the outstanding Revolving Credit Loans of such Revolving Credit Lenders, an amount such that each Revolving Credit Lender shall, upon receipt of such amount, have, as of such Swing Line Settlement Date, its Pro Rata Share of the Revolving Credit Loans under such Facility. During the period between Swing Line Settlement Dates, each Swing Line Lender with respect to its Swing Line Loans, the Administrative Agent with respect to Protective Advances under the applicable Facility and each Revolving Credit Lender with respect to its Revolving Credit Loans shall be entitled to interest thereon at the applicable rate or rates payable under this Agreement.

(c)     In addition, the Swing Line Lender at any time in its sole and absolute discretion may request, by written notice to the Borrower, the Administrative Agent and the Revolving Credit Lenders, on behalf of the Borrower (which hereby irrevocably authorizes such Swing Line Lender to so request on its behalf), that each Revolving Credit Lender make a Base Rate Loan in an amount equal to such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the amount of Swing Line Loans of the Borrower then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but not in excess of the unutilized portion of the aggregate Revolving Credit Commitments and subject to the conditions set forth in Section 4.02; *provided* that, a request shall also be deemed to have been given one Business Day prior to each of (i) the Maturity Date of the Revolving Credit Facility, (ii) the occurrence of an Event of Default with respect to the Borrower under Section 8.01(6) or (iii) the acceleration of the Obligations or other exercise of remedies under Section 8.02 (each such borrowing made on account of any such deemed request under this Section 2.04(3)(a), a "**Mandatory Swing Line Borrowing**"). The Swing Line Lender shall furnish the Borrower with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Administrative Agent. Each Revolving Credit Lender shall make an amount equal to its Pro Rata Share or other applicable share provided for under this Agreement of the amount specified in such Committed Loan Notice available to the Administrative Agent in Same Day Funds for the account of the Swing Line Lender at the Administrative Agent's Office not later than 1:00 p.m. New York time on the date specified in such Committed Loan Notice, whereupon, subject to Section 2.04(3)(b), each Revolving Credit Lender that so makes funds available shall be deemed to have made a Revolving Credit Loan that is a Base Rate Loan to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the Swing Line Lender.

(d)     If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 2.04(3)(a) (including as a result of a proceeding under any Debtor Relief Law), the request for Base Rate Loans submitted by the relevant Swing Line Lender as set forth herein shall be deemed to be a request by such Swing Line Lender that each of the Revolving Credit Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Credit Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to

Section 2.04(a)(1) shall be deemed payment in respect of such participation; *provided*, that (i) all interest payable on the Swing Line Loans is for the account of Swing Line Lender until the date as of which the respective participation is purchased and (ii) at the time any purchase of participations pursuant to this sentence is actually made, the purchasing Revolving Credit Lender shall pay Swing Line Lender interest on the principal amount of such participation purchased for each day from and including the day upon which the Mandatory Swing Line Borrowing purchase occurs under this Agreement to but excluding the date of payment for such participation, at the applicable rate received by the Swing Line Lender.

(e)      If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by the Lender pursuant to the foregoing provisions of this Section 2.04(3) by the time specified in Section 2.04(3)(a), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the applicable Overnight Rate from time to time in effect. If such Revolving Credit Lender pays such amount, the amount so paid shall constitute such Lender's Revolving Credit Loan included in the relevant Borrowing or funded participation in the relevant Swing Line Loan, as the case may be. A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (c) shall be conclusive absent manifest error.

(f)      Each Revolving Credit Lender's obligation to make Revolving Credit Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(3) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default, or (iii) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that each Revolving Credit Lender's obligation to make Revolving Credit Loans pursuant to this Section 2.04(3) (but not to purchase and fund risk participations in Swing Line Loans) is subject to the conditions set forth in Section 4.02. No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay the applicable Swing Line Loans, together with interest as provided herein.

(4)      Repayment of Participations.

(a)      At any time after any Revolving Credit Lender has purchased and funded a risk participation in a Swing Line Loan, if the relevant Swing Line Lender receives any payment on account of such Swing Line Loan, such Swing Line Lender will distribute to such Lender its Pro Rata Share or other applicable share provided for under this Agreement of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by such Swing Line Lender.

(b)      If any payment received by the relevant Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by such Swing Line Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Credit Lender shall pay to such Swing Line Lender its Pro Rata Share or other applicable share provided for under this Agreement thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the applicable Overnight Rate. The Administrative Agent will make such demand upon the request of a Swing Line Lender. The obligations of the Revolving Credit Lenders under this clause (d)(ii) shall survive the payment in full of the Obligations and the termination of this Agreement.

(5)     Interest for Account of Swing Line Lender.  The Swing Line Lender shall be responsible for invoicing the Borrower for interest on the Swing Line Loans.  Until each Revolving Credit Lender funds its Base Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Lender's Pro Rata Share or other applicable share provided for under this Agreement of any Swing Line Loan, interest in respect of such Pro Rata Share or other applicable share provided for under this Agreement shall be solely for the account of the Swing Line Lender.

(6)     Payments Directly to Swing Line Lender.  Subject to Section 2.04(3)(a), the Borrower shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

(7)     Provisions Related to Extended Revolving Credit Commitments.  If the Maturity Date shall have occurred in respect of any Class of Revolving Credit Commitments (the "**Expiring Credit Commitment**") at a time when another Class or Classes of Revolving Credit Commitments is or are in effect with a later Maturity Date (each a "**Non-Expiring Credit Commitment**" and collectively, the "**Non-Expiring Credit Commitments**"), then with respect to each outstanding Swing Line Loan, if consented to by the Swing Line Lender, on the earliest occurring Maturity Date such Swing Line Loan shall be deemed reallocated to the Class or Classes of the Non-Expiring Credit Commitments on a pro rata basis; *provided* that (a) to the extent that the amount of such reallocation would cause the aggregate credit exposure to exceed the aggregate amount of such Non-Expiring Credit Commitments, immediately prior to such reallocation (after giving effect to any repayments of Revolving Credit Loans and any reallocation of Letter of Credit participations as contemplated in Section 2.03(13)) the amount of Swing Line Loans to be reallocated equal to such excess shall be repaid and (b) notwithstanding the foregoing, if a Default or Event of Default has occurred and is continuing, the Borrower shall still be obligated to pay Swing Line Loans allocated to the Revolving Credit Lenders holding the Expiring Credit Commitments at the Maturity Date of the Expiring Credit Commitment or if the Loans have been accelerated prior to the Maturity Date of the Expiring Credit Commitment.

Section 2.05     Prepayments.

(1)     Optional.

(a)     The Borrower may, upon notice to the Administrative Agent by the Borrower, at any time or from time to time voluntarily prepay any Revolving Credit Loans in whole or in part without premium or penalty; *provided* that

(i)     such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans;

(ii)     any partial prepayment of Eurodollar Rate Loans shall be in a principal amount of $2.0 million or a whole multiple of $500,000 in excess thereof or, if less, the entire principal amount thereof then outstanding; and

(iii)     any prepayment of Base Rate Loans shall be in a principal amount of $1.0 million or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.

Each such notice shall specify the date and amount of such prepayment and Type(s) of Loans to be prepaid (and, for the avoidance of doubt, may indicate the prepayments by more than one Borrower on such date in such amounts so specified, which, individually, may be below any minimum or multiple, but

which, in the aggregate amount on any given date, shall satisfy such minimum and multiple requirements). The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment. If such notice is given, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.

(b)        The Borrower may, upon notice to the applicable Swing Line Lender (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by such Swing Line Lender and the Administrative Agent not later than 12:00 p.m., New York City time, on the date of the prepayment and (2) any such prepayment of Swing Line Loans made in Dollars shall be in a minimum principal amount of $100,000 or a whole multiple of $100,000 in excess thereof, or the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment.

(c)        Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(1)(a) if such prepayment would have resulted from a refinancing of all or a portion of the applicable Facility, which refinancing shall not be consummated or shall otherwise be delayed.

(2)        <u>Mandatory</u>.

(a)        If at any time, the aggregate principal amount of Total Outstandings (excluding the face amount of any Letters of Credit that are Cash Collateralized or back-stopped to the reasonable satisfaction of the Administrative Agent) exceeds the Maximum Borrowing Amount, the Borrower shall within one (1) Business Day, upon notification by the Administrative Agent, prepay the Swing Line Loans *first* and then prepay (or Cash Collateralize, in the amount required by Section 2.03(7), in the case of Letters of Credit) the other Loans then outstanding in an amount equal to such excess; *provided* that nothing in this clause (2)(a) shall reduce the Revolving Credit Commitments.

(b)        Subject to Section 3.05 hereof, all such payments in respect of the Loans pursuant to this Section 2.05 shall be without premium or penalty. All interest accrued on the principal amount of the Loans paid pursuant to this Section 2.05 shall be paid, or may be charged by the Administrative Agent to any loan account(s) of the Borrower, at the Administrative Agent's option, on the date of such payment. Interest shall accrue and be due, until the next Business Day, if the amount so paid by the Borrower to the bank account designated by the Administrative Agent for such purpose is received in such bank account after 3:00 p.m., New York City time.

(c)        At all times after the occurrence and during the continuance of a Cash Dominion Period and notification thereof by the Administrative Agent to the Borrower, on each Business Day, the Administrative Agent shall apply all same day funds in excess of $3,500,000 (other than Excluded Funds held in Excluded Accounts) credited to the Concentration Account and all amounts received pursuant to this Section 2.05(2) to one or more accounts maintained by Administrative Agent or such other account as directed by the Administrative Agent. All amounts received in such account shall be applied (and allocated) by the Administrative Agent in accordance with Section 8.03.

(3)        <u>Interest, Funding Losses, etc</u>.

(a) All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

(b) Notwithstanding any of the other provisions of this Section 2.05, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under this Section 2.05 prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.05 in respect of any such Eurodollar Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 2.05. Such deposit shall be deemed to be a prepayment of such Loans by the Borrower for all purposes under this Agreement.

Section 2.06 <u>Termination or Reduction of Commitments</u>.

(1) <u>Optional.</u> The Borrower may, upon written notice by the Borrower to the Administrative Agent, terminate the unused Commitments, or from time to time permanently reduce the unused Commitments, in each case without premium or penalty; *provided* that (a) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (b) any such partial reduction shall be in an aggregate amount of $5.0 million or any whole multiple of $1.0 million in excess thereof or, if less, the entire amount thereof; and (c) if, after giving effect to any reduction of the Commitments, the L/C Sublimit or Swing Line Sublimit exceeds the amount of the Revolving Credit Facility, such sublimit shall be automatically reduced by the amount of such excess. To the extent there are any FILO Tranches outstanding at the time of any termination of Revolving Credit Commitments under this <u>Section 2.06</u>, such termination shall be applied first to the non-FILO Tranche of Revolving Credit Loans on a pro-rata basis.

(2) <u>Mandatory.</u> The Revolving Credit Commitment of each Revolving Credit Lender shall automatically and permanently terminate on the Maturity Date for the applicable Revolving Credit Facility.

(3) <u>Application of Commitment Reductions.</u> The Administrative Agent will promptly notify the Appropriate Lenders of any termination or reduction of unused portions of the L/C Sublimit, Swing Line Sublimit or the unused Commitments of any Class under this Section 2.06. Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07). Any commitment fees accrued until the effective date of any termination of the Revolving Credit Commitments shall be paid on the effective date of such termination. Other than with respect to a FILO Tranche, such reductions shall be applied pro rata to the Revolving Credit Commitments.

Section 2.07 <u>Repayment of Loans</u>.

(1)        Revolving Credit Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date for the applicable Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans under such Facility outstanding on such date.

(2)        Swing Line Loans.  The Borrower shall repay the aggregate principal amount of each Swing Line Loan on the earlier to occur of (a) the date selected by Swing Line Lender and (b) the Maturity Date for the applicable Revolving Credit Facility.

Section 2.08        Interest.

(1)        Subject to the provisions of Section 2.08(2), (a) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period, respectively, *plus* the Applicable Rate, (b) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Base Rate, *plus* the Applicable Rate and (c) each Swing Line Loan shall bear interest as provided in Section 2.04(1).

(2)        During the continuance of an Event of Default, the Borrower shall pay interest on past due amounts hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws; *provided* that no interest at the Default Rate shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(3)        Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09        Fees.

(1)        Commitment Fee.  The Borrower agrees to pay in same day funds in Dollars to the Administrative Agent for the account of each Lender a commitment fee (the "**Unused Commitment Fee**") on the average daily amount by which the Revolving Credit Commitment of such Lender exceeds such Lender's Pro Rata Share of the sum of (i) the aggregate outstanding principal amount of Loans (other than Swing Line Loans) for the applicable Class and (ii) the aggregate maximum amount then available to be drawn under all outstanding Letters of Credit, from the Closing Date through the Revolving Credit Termination Date, at the Applicable Unused Commitment Fee Rate, payable in arrears (x) on the first calendar day of each February, May, August and November, commencing on the first such day following the Closing Date and (y) on the Revolving Credit Termination Date.  All Unused Commitment Fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(2)        Other Fees.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.10        Computation of Interest and Fees.  All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days

elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(1), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11   Evidence of Indebtedness.

(1)   The Revolving Credit Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Revolving Credit Borrowings made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent, as set forth in the Register, in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(2)   In addition to the accounts and records referred to in Section 2.11(1), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records and, in the case of the Administrative Agent, entries in the Register, evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(3)   Entries made in good faith by the Administrative Agent in the Register pursuant to Sections 2.11(1) and (2), and by each Lender in its account or accounts pursuant to Sections 2.11(1) and (2), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12   Payments Generally.

(1)   All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m., New York time, on the date specified herein. The Administrative Agent will promptly distribute to each Appropriate Lender its Pro Rata Share (or

122

other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. Any payments under this Agreement that are made later than 2:00 p.m., New York time, shall be deemed to have been made on the next succeeding Business Day and any applicable interest or fees shall continue to accrue.

(2)        If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurodollar Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(3)        Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date, or in the case of any Borrowing of Base Rate Loans, prior to 1:00 p.m., New York time, on the date of such Borrowing, any payment is required to be made by it to the Administrative Agent hereunder (in the case of the Borrower, for the account of any Lender or an Issuing Bank hereunder or, in the case of the Lenders, for the account of any Issuing Bank, Swing Line Lender or the Borrower hereunder), that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(a)        if the Borrower failed to make such payment, each Lender or Issuing Bank shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender or Issuing Bank in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender or Issuing Bank to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(b)        if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount, or cause such amount to be paid, to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder. A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(3) shall be conclusive, absent manifest error.

(c)        If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Revolving Credit Borrowing set forth in Section 4.02 are not satisfied or waived in accordance with the terms hereof, the

Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)      The obligations of the Lenders hereunder to make Loans and to fund participations in Letters of Credit and Swing Line Loans are several and not joint. The failure of any Lender to make any Loan or fund any participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(e)      Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)      Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03 (or otherwise expressly set forth herein). If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the sum of (i) the Outstanding Amount of all Loans outstanding at such time and (ii) the Outstanding Amount of all L/C Obligations outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

(g)      The amount of each Lender's Pro Rata Share of outstanding Revolving Credit Loans (including outstanding Swing Line Loans) will be computed weekly (or more frequently in the Administrative Agent's discretion) and will be adjusted upward or downward based on all Revolving Credit Loans (including outstanding Swing Line Loans) and repayments of Revolving Credit Loans (including outstanding Swing Line Loans) received by the Administrative Agent as of 4:00 p.m. on the first Business Day (such date, the "**Settlement Date**") following the end of such week (or shorter period specified by the Administrative Agent). The Administrative Agent will deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Credit Loans for the period and the amount of repayments received for the period. As reflected on the summary statement, (a) the Administrative Agent will transfer to each Lender its Pro Rata Share of repayments and (b) each Lender will transfer to the Administrative Agent or the Administrative Agent will transfer to each Lender such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Revolving Credit Loans made by each Lender will be equal to such Lender's Pro Rata Share of all Revolving Credit Loans outstanding as of such Settlement Date.

Section 2.13   <u>Sharing of Payments</u>. If, other than expressly provided in this Agreement, if any Lender of any Class shall obtain any payment in respect of any principal of or interest on account of the Loans of such Class made by it or the participations in L/C Obligations and Swing Line Loans held by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (1) notify the Administrative Agent of such fact, and (2) purchase at par from the other Lenders such participations in the Loans of such Class made by them or such subparticipations in the participations in L/C Obligations or Swing Line Loans held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment on such Loans of such Class or such participations, as the

case may be, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (a) the amount of such paying Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.10) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    Incremental Facilities.

(1)    *Incremental Revolving Credit Loan Request*. The Borrower may at any time and from time to time, on one or more occasions, by notice to the Administrative Agent, request one or more increases to the aggregate principal amount of the Revolving Credit Commitments (or, solely to the extent set forth in Section 2.14(9) below, provide commitments under a new facility constituting a FILO Tranche) ("**Incremental Commitments**" and the Revolving Credit Loans and other extensions of credit made thereunder, the "**Incremental Revolving Credit Loans**").

(2)    *Size*. The aggregate amount of Incremental Commitments hereunder shall not exceed $200,000,000. Each Incremental Commitment will be in an integral multiple of $1.0 million and in an aggregate principal amount that is not less than $5.0 million (or such lesser minimum amount approved by the Administrative Agent in its reasonable discretion); *provided* that such amount may be less than such minimum amount or integral multiple amount if such amount represents all the remaining availability under the limit set forth above.

(3)    *Incremental Lenders*. The Borrower shall not be obligated to offer any existing Lender the opportunity to provide any Incremental Commitments. Incremental Commitments may be provided by any existing Lender (it being understood that no existing Lender will have an obligation to make all or any portion of any Incremental Revolving Credit Loan, nor will the Borrower have any obligation to approach any existing Lender(s) to provide any Incremental Commitments) or by any Additional Lender on terms permitted by this Section 2.14; *provided* that the Administrative Agent, the Swing Line Lender and each Issuing Bank shall have consented (in each case, such consent not to be unreasonably withheld, conditioned or delayed) to any such Person's providing Incremental Revolving Credit Facilities if such consent would be required under Section 10.07(b)(iii) for an assignment of such Loans or Revolving Credit Commitments, as applicable, to such Person. Final allocations in respect of Incremental Revolving

Credit Facilities will be made by the Borrower together with the arrangers thereof, if any, in their discretion, on the terms permitted by this Section 2.14.

(4)      Incremental Revolving Credit Facility Amendments; Use of Proceeds. Incremental Commitments (including under a FILO Tranche) shall become Commitments under this Agreement pursuant to an amendment (each, an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Person providing such Incremental Commitments and the Administrative Agent. The Administrative Agent will promptly notify each Lender as to the effectiveness of each Incremental Amendment. Incremental Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent, (x) to effect the provisions of this Section 2.14. Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Amendment, this Agreement and the other Loan Documents, as applicable, will be amended to the extent necessary to reflect the existence and terms of the Incremental Commitments and the Incremental Revolving Credit Loans evidenced thereby. The Borrower may use the proceeds of the Incremental Revolving Credit Loans for any purpose not prohibited by this Agreement.

(5)      Conditions. The availability of the Incremental Commitments under this Agreement will be subject solely to the following conditions:

(a)      No Event of Default shall have occurred and be continuing or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as (x) no Loans hereunder (other than any Loans that constitute a FILO Tranche) are being used or will be used to fund such Limited Condition Acquisition and (y) at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing; and

(b)      all representations and warranties set forth in Article V shall be true and correct in all material respects on and as of the date of incurrence of the Incremental Revolving Credit Facilities except any representations and warranties which expressly relate to a given date or period shall be required only to be true and correct in all material respects as of the respective date or for the respective period, as the case may be; provided that in connection with any Permitted Acquisition or similar committed investment that constitute a Limited Condition Acquisition (other than any such Permitted Acquisition or committed investment which will be funded with the proceeds of Loans (other than a FILO Tranche) hereunder), (x) the Lenders providing such Incremental Commitments may elect to waive the requirement to make the representations and warranties set forth in Article V as required by the foregoing and (y) such representations and warranties will be limited to Specified Representations and Specified Acquisition Agreement Representations.

(6)      Terms. Except as set forth below or with respect to any FILO Tranche under Section 2.14(8) below, any Incremental Commitments shall be on the same terms and pursuant to the same documentation applicable to the existing Revolving Credit Commitments hereunder; *provided* that:

(a)      the final maturity date of such Incremental Revolving Credit Loans will be no earlier than the Latest Maturity Date of the Revolving Credit Loans borrowed on the Closing Date;

(b)      the Weighted Average Life to Maturity of such Incremental Revolving Credit Loans will be no shorter than the longest remaining Weighted Average Life to Maturity of the Revolving Credit Loans borrowed on the Closing Date;

(7)     Pricing. Other than in the case of a FILO Tranche as described below, the interest rate, margin, commitment fees, original issue discount and upfront or similar fees for any Incremental Commitments will be as determined by the Borrower and the Persons providing such Incremental Commitments; *provided*, that the interest rate, margin, commitment fees and letter of credit fee of all Commitments in effect on the Closing Date shall be increased to match the corresponding terms of the Incremental Commitments.

(8)     FILO Tranche. The Revolving Credit Commitment Increase may be in the form of a separate "first-in, last-out" or "last-out" tranche (the "**FILO Tranche**") with interest rate margins, rate floors, upfront fees, funding discounts and original issue discounts, in each case to be agreed upon (which, for the avoidance of doubt, shall not require any adjustment to the Applicable Rate of other Revolving Credit Loans to be set forth in the Incremental Amendment) among the Borrower and the Lenders providing the FILO Tranche so long as (a) any Loans and related Obligations in respect of the FILO Tranche are not to be guaranteed by any Person other than the Guarantors and are not secured by any assets other than Collateral, (b) as between (x) the Revolving Credit Loans (other than the FILO Tranche) and (y) the FILO Tranche, all proceeds from the liquidation or other realization of the Collateral (including ABL Priority Collateral) or application of funds in accordance with Section 8.03 shall be applied, first to obligations owing under, or with respect to, the Revolving Credit Loans (other than the FILO Tranche) and second to the FILO Tranche; (c) the Borrower may not prepay Loans under the FILO Tranche or terminate or reduce the commitments in respect thereof at any time that other Loans (including Swing Line Loans) and/or Unreimbursed Amounts (unless cash collateralized or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent) are outstanding; (d) the Required Lenders (calculated as including the FILO Tranche) shall, subject to the terms of the ABL Intercreditor Agreement, control exercise of remedies in respect of the Collateral; (e) no changes affecting the priority status of the Revolving Credit Facility (other than the FILO Tranche) vis-à-vis the FILO Tranche may be made without the consent of the Required Lenders under the Revolving Credit Facility, other than such changes which affect only the FILO Tranche; (f) the final maturity of any FILO Tranche shall not occur, and no FILO Tranche shall require mandatory commitment reductions prior to, the Latest Maturity Date at such time; and (g) except as otherwise set forth in this Section 2.14(8), the terms of any FILO Tranche are not materially less favorable to the Borrower than those hereunder (including, without limitation, the inclusion of any additional financial or other material covenant without the consent of the Administrative Agent); *provided however*, that (i) advance rates with respect to the items included in the borrowing base for such FILO Tranche shall not exceed 105% of the Net Orderly Liquidation Value of Eligible Inventory and 100% of Eligible Credit Card Receivables and Eligible Accounts Receivable and (ii) at no time shall the total Revolving Credit Exposure (including the FILO Tranche) exceed 100% of the Net Orderly Liquidation Value of the ABL Priority Collateral (other than ineligible assets).

(9)     Reallocation of Revolving Credit Exposure. Upon each Revolving Credit Commitment Increase pursuant to this Section 2.14:

(a)     each Revolving Credit Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each lender providing a portion of such increase (each an "**Incremental Revolving Credit Lender**"), and each such Incremental Revolving Credit Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Credit Lender's participations hereunder in outstanding Letters of Credit and Swing Line Loans such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding participations hereunder in Letters of Credit and Swing Line Loans held by each Revolving Credit Lender will equal the percentage of the aggregate Revolving Credit Commitments of all Lenders represented by such Revolving Credit Lender's Revolving Credit Commitments; and

(b)       if, on the date of such increase, there are any Revolving Credit Loans outstanding, such Revolving Credit Loans shall on or prior to the effectiveness of such Incremental Revolving Credit Facility be prepaid from the proceeds of Incremental Revolving Credit Loans made hereunder (reflecting such increase in Revolving Credit Commitments), which prepayment shall be accompanied by accrued interest on the Revolving Credit Loans being prepaid and any costs incurred by any Revolving Credit Lender in accordance with Section 3.05.

(10)       The Administrative Agent and the Lenders hereby agree that the minimum borrowing, *pro rata* borrowing and *pro rata* payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

Section 2.15       [Reserved].

Section 2.16       Extensions of Loans.

(1)       Extension Offers.  Pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date, the Borrower may extend such Maturity Date and otherwise modify the terms of such Loans or Commitments pursuant to the terms set forth in an Extension Offer (each, an "**Extension**," and each group of Loans or Commitments so extended, as well as any Loans of the same Class not so extended, each being a "**tranche**" for purposes of this Section 2.16).  Each Extension Offer will specify the minimum amount of Loans or Commitments with respect to which an Extension Offer may be accepted, which will be an integral multiple of $1.0 million and an aggregate principal amount that is not less than $10.0 million, or if less, (a) the aggregate principal amount of such Loans outstanding or (b) such lesser minimum amount as is approved by the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed.  Extension Offers will be made on a *pro rata* basis to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date.  If the aggregate outstanding principal amount of such Loans (calculated on the face amount thereof) or Commitments in respect of which Lenders have accepted an Extension Offer exceeds the maximum aggregate principal amount of Loans or Commitments offered to be extended pursuant to such Extension Offer, then the Loans or Commitments of such Lenders will be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which Lenders have accepted such Extension Offer.  There is no requirement that any Extension Offer or Extension Amendment (defined as follows) be subject to any "most favored nation" pricing provisions, any condition on the non-existence of any Default or Event of Default or any financial ratio tests.  The terms of an Extension Offer shall be determined by the Borrower, and Extension Offers may contain one or more conditions to their effectiveness, including a condition that a minimum amount of Loans or Commitments of any or all applicable tranches be tendered.

(2)       Extension Amendments.  The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents (each, an "**Extension Amendment**") as may be necessary or appropriate in order to effect the provisions of this Section 2.16, establish new tranches in respect of Extended Revolving Credit Loans and Extended Revolving Credit Commitments and such amendments as permitted by clause (5) below as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such Extended Revolving Credit Loans and Extended Revolving Credit Commitments.  Extensions will not constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.  It is understood that no existing Lender will have an obligation to participate in Extended Revolving Credit Loans or Extended Revolving Credit Commitments of any Class of Revolving Credit Loans, and any Lender who fails to accept an offer to participate in writing shall be deemed to have rejected the offer.  Any Lender of an existing Class of Revolving Credit Loans that elects (or that has

128

deemed to have elected) not to participate in Extended Revolving Credit Loans or Extended Revolving Credit Commitments of such Class of Revolving Credit Loans shall be referred to herein as a "**Non-Extended Lender**".

(3)     <u>Terms of Extension Offers and Extension Amendments</u>.  The terms of any Extended Revolving Credit Loans and Extended Revolving Credit Commitments will be set forth in an Extension Offer and as agreed between the Borrower and the Extending Lenders accepting such Extension Offer; *provided* that:

(a)     the final maturity date of such Extended Revolving Credit Loans and Extended Revolving Credit Commitments will be no earlier than the Latest Maturity Date applicable to the Loans or Commitments subject to such Extension Offer;

(b)     [reserved];

(c)     [reserved];

(d)     such Extended Revolving Credit Loans and Extended Revolving Credit Commitments are not secured by any assets or property that does not constitute Collateral and may not be secured on a senior basis to the existing Revolving Credit Loans;

(e)     such Extended Revolving Credit Loans and Extended Revolving Credit Commitments are not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Loan Party; and

(f)     the terms, conditions, covenants and events of default applicable to Extended Revolving Credit Loans or Extended Revolving Credit Commitments are, except as to pricing terms (interest rate and fees) and maturity, substantially identical to, or, taken as a whole, no more favorable to the lenders or holders providing such indebtedness than, those subject to such Extension Offer, as determined in good faith by a Responsible Officer of the Borrower.

Any Extended Revolving Credit Loans will constitute a separate tranche of Revolving Credit Loans from the Revolving Credit Loans held by Lenders that did not accept the applicable Extension Offer.

(4)     <u>Extension of Revolving Credit Commitments</u>.  In the case of any Extension of Revolving Credit Commitments or Revolving Credit Loans, the following shall apply:

(a)     all borrowings and all prepayments of Revolving Credit Loans shall continue to be made on a ratable basis among all Revolving Credit Lenders, based on the relative amounts of their Revolving Credit Commitments, until the repayment of the Revolving Credit Loans attributable to the non-extended Revolving Credit Commitments on the relevant Maturity Date; provided that the Borrower shall be permitted to repay the Revolving Credit Loans attributable to non-extended Revolving Credit Commitments on the relevant Maturity Date without the necessity of making any pro rata payments to Extending Lenders;

(b)     the allocation of the participation exposure with respect to any then-existing or subsequently issued Letter of Credit as between the Revolving Credit Commitments of such new tranche and the remaining Revolving Credit Commitments shall be made on a ratable basis in accordance with the relative amounts thereof until the Maturity Date relating to such non-extended Revolving Credit Commitments has occurred;

(c)      no termination of extended Revolving Credit Commitments and no repayment of extended Revolving Credit Loans accompanied by a corresponding permanent reduction in extended Revolving Credit Commitments shall be permitted unless such termination or repayment (and corresponding reduction) is accompanied by at least a pro rata termination or permanent repayment (and corresponding pro rata permanent reduction), as applicable, of each other tranche of Revolving Credit Loans and Revolving Credit Commitments (or each other tranche of Revolving Credit Commitments and Revolving Credit Loans shall have otherwise been terminated and repaid in full);

(d)      the Maturity Date with respect to the Revolving Credit Commitments may not be extended without the prior written consent of the Swing Line Lender and the Issuing Banks; and

(e)      at no time shall there be more than three (3) different tranches of Revolving Credit Commitments (or greater than three (3) tranches to the extent agreed by the Administrative Agent).

If the aggregate Outstanding Amount of Revolving Credit Loans, Swing Line Loans and L/C Obligations exceeds the Revolving Credit Commitment as a result of the occurrence of the Maturity Date with respect to any tranche of Revolving Credit Commitments while an extended tranche of Revolving Credit Commitments remains outstanding, the Borrower shall make such payments as are necessary in order to eliminate such excess on such Maturity Date.

(5)      Required Consents.  No consent of any Lender or any other Person will be required to effectuate any Extension, other than the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or condition), the Borrower and the applicable Extending Lender.  The transactions contemplated by this Section 2.16 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Revolving Credit Loans on such terms as may be set forth in the relevant Extension Offer) will not require the consent of any other Lender or any other Person, and the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.16 will not apply to any of the transactions effected pursuant to this Section 2.16.

Section 2.17    Defaulting Lenders.

(1)      Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(a)      Waivers and Amendments.  That Defaulting Lender's right to approve or disapprove of any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)      Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise), shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to the relevant Swing Line Lender or Issuing Banks hereunder; third, as the Borrower may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fourth, to the payment of any amounts owing to the Lenders, the relevant Swing Line Lender or Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the

relevant Swing Line Lender or Issuing Banks against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (i) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (ii) such Loans or L/C Borrowings were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Borrowings owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Borrowings owed to, that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.17(1)(b) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(c)     **Certain Fees.**  That Defaulting Lender (i) shall not be entitled to receive any commitment fee pursuant to Section 2.09(1) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender) and (ii) shall be limited in its right to receive Letter of Credit fees as provided in Section 2.03(9).

(d)     **Reallocation of Pro Rata Share to Reduce Fronting Exposure.**  During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit or Swing Line Loans pursuant to Section 2.03, the "Pro Rata Share" of each Non-Defaulting Lender's Revolving Credit Loans and L/C Obligations shall be computed without giving effect to the Commitment of that Defaulting Lender; *provided* that (i) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Default or Event of Default has occurred and is continuing; and (ii) the aggregate obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit or Swing Line Loans shall not exceed the positive difference, if any, of (1) the Commitment of that Non-Defaulting Lender *minus* (2) the aggregate Outstanding Amount of the Revolving Credit Loans of that Non-Defaulting Lender. If the reallocation described above in this clause (d) cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under any law, (x) first, prepay Swing Line Loans in an amount equal to the Swing Line Lender's Fronting Exposure and (y) second, Cash Collateralize the applicable Issuing Bank's Fronting Exposure in accordance with the procedures set forth in Section 2.03.

(2)     **Defaulting Lender Cure.**  If the Borrower, the Administrative Agent, the Swing Line Lender and the relevant Issuing Banks agree in writing in their sole discretion (such agreement not to be unreasonably withheld or delayed) that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Credit Loans of the applicable Facility and funded and unfunded participations in Letters of Credit and Swing Line Loans to be held on a pro rata basis by the Lenders in accordance with their Pro Rata Share of the applicable Facility (without giving effect to Section 2.17(1)(d)), whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; *provided further* that except to the extent

otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  So long as any Lender is a Defaulting Lender, (i) the Swing Line Lender shall not be required to fund any Swing Line Loans unless it is satisfied that it will have no Fronting Exposure after giving effect to such Swing Line Loan and (ii) no Issuing Bank shall be required to issue, extent, renew or increase any Letter of Credit unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

# ARTICLE III

## Taxes, Increased Costs Protection and Illegality

Section 3.01    Taxes.

(1)    Except as required by applicable Law, any and all payments by any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes.

(2)    If any Loan Party or any other applicable withholding agent is required by applicable Law (as determined in the good faith discretion of such Loan Party or withholding agent) to make any deduction or withholding on account of any Taxes from any sum paid or payable by any Loan Party to any Lender or Agent under any of the Loan Documents:

(a)    the applicable Loan Party shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as such Loan Party becomes aware of it;

(b)    the applicable Loan Party or other applicable withholding agent shall be entitled to make such deduction or withholding and shall pay any amounts deducted or withheld to the relevant Governmental Authority any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on the Lender or Agent) on behalf of and in the name of the Lender or Agent (as applicable);

(c)    if the Tax in question is a Non-Excluded Tax or Other Tax, the sum payable to such Lender or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding for Non-Excluded Taxes or Other Taxes (including any deductions or withholdings for Non-Excluded Taxes or Other Taxes attributable to any payments required to be made under this Section 3.01), the Lender or the Agent (as applicable) receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and

(d)    within thirty days after paying any sum from which it is required by Law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (b) above to pay, the Borrower shall deliver to the Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(3)    Status of Lender.  The Administrative Agent and each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to such Lender under any

Loan Document. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(3)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and Administrative Agent of its inability to do so.

Without limiting the foregoing:

(a)  Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(b)  Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(i)  two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(ii)  two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)  in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (A) two properly completed and duly signed certificates substantially in the form of Exhibit H (any such certificate, a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(iv)  to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed originals of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, Form W-8BEN or W-8BEN-E, as applicable, a United States Tax Compliance Certificate, Form W-9, Form W-8IMY and any other required information (or any successor forms) from each beneficial owner that would be required under this Section 3.01(3) if such beneficial owner were a Lender, as applicable (*provided* that if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such beneficial owner), or

(v)  two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding Tax on any payments to such Lender under the Loan Documents.

(c)  If a payment made to a Lender under any Loan Document would be subject to Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such

Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, the term "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(4)       In addition to the payments by a Loan Party required by Section 3.01(2), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(5)       The Loan Parties shall, jointly and severally, indemnify a Lender or Agent (each a "**Tax Indemnitee**"), within 10 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee on or attributable to any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Administrative Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(6)       If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), then such Tax Indemnitee shall pay to the relevant Loan Party the amount of such refund, net of all out-of-pocket expenses of the Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee to the extent the Tax Indemnitee is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (6), in no event will the Tax Indemnitee be required to pay any amount to a Loan Party pursuant to this paragraph (6) the payment of which would place the Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(7)       For purposes of determining withholding Taxes imposed under FATCA, from and after the Closing Date of this Agreement, the Borrower and the Agents shall treat (and the Lenders hereby authorize the Agents to treat) this Agreement as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

(8)       The agreements in this Section 3.01 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 3.02    Illegality.  If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on written notice thereof by such Lender to the Borrower through the Administrative Agent, (1) any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended, and (2) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be reasonably determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (a) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans and shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate) and (b) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate component of the Base Rate with respect to any Base Rate Loans, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03    Inability to Determine Rates.

(a)    If in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof, (i) the Administrative Agent determines that (A) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, or (B) (x) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan or in connection with an existing or proposed Base Rate Loan and (y) the circumstances described in Section 3.03(c)(i) do not apply (in each case with respect to this clause (i), "**Impacted Loans**"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurodollar Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended, (to the extent of the affected Eurodollar Rate Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (ii) of Section 3.03(a), until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)       Notwithstanding the foregoing, if the Administrative Agent has made the determination described in clause (i) of Section 3.03(a), the Administrative Agent, in consultation with the Borrower and Required Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (i) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under clause (i) of the first sentence of Section 3.03(a), (ii) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (iii) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

(c)       Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower) that the Borrower or Required Lenders (as applicable) have determined, that:

(i)       adequate and reasonable means do not exist for ascertaining LIBOR for any Interest Period hereunder or any other tenors of LIBOR, including, without limitation, because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)      the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator has made a public statement identifying a specific date after which LIBOR or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide LIBOR after such specific date (such specific date, the "**Scheduled Unavailability Date**"); or

(iii)     the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over such administrator has made a public statement announcing that all Interest Periods and other tenors of LIBOR are no longer representative; or

(iv)      syndicated loans currently being executed, or that include language similar to that contained in this Section 3.03, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, in the case of clauses (i)-(iii) above, on a date and time determined by the Administrative Agent (any such date, the "**LIBOR Replacement Date**"), which date shall be at the end of an Interest Period or on the relevant interest payment date, as applicable, for interest calculated and shall occur reasonably promptly upon the occurrence of any of the events or circumstances under clauses (i), (ii) or (iii) above and, solely with respect to clause (ii) above, no later than the Scheduled Unavailability Date, LIBOR will be replaced hereunder and under any Loan Document with, subject to the proviso below, the first available alternative set forth in the order below for any payment period for interest calculated that can be determined by the Administrative Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "**LIBOR Successor**

**Rate**"; and any such rate before giving effect to the Related Adjustment, the "**Pre-Adjustment Successor Rate**"):

(x)        Term SOFR *plus* the Related Adjustment; and

(y)        SOFR *plus* the Related Adjustment;

and in the case of clause (iv) above, the Borrower and Administrative Agent may amend this Agreement solely for the purpose of replacing LIBOR under this Agreement and under any other Loan Document in accordance with the definition of "LIBOR Successor Rate" and such amendment will become effective at 5:00 p.m., on the fifth Business Day after the Administrative Agent shall have notified all Lenders and the Borrower of the occurrence of the circumstances described in clause (iv) above unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to the implementation of a LIBOR Successor Rate pursuant to such clause;

*provided* that, if the Administrative Agent determines that Term SOFR has become available, is administratively feasible for the Administrative Agent and would have been identified as the Pre-Adjustment Successor Rate in accordance with the foregoing if it had been so available at the time that the LIBOR Successor Rate then in effect was so identified, and the Administrative Agent notifies the Borrower and each Lender of such availability, then from and after the beginning of the Interest Period, relevant interest payment date or payment period for interest calculated, in each case, commencing no less than thirty (30) days after the date of such notice, the Pre-Adjustment Successor Rate shall be Term SOFR and the LIBOR Successor Rate shall be Term SOFR *plus* the relevant Related Adjustment.

The Administrative Agent will promptly (in one or more notices) notify the Borrower and each Lender of (x) any occurrence of any of the events, periods or circumstances under clauses (i) through (iii) above, (y) a LIBOR Replacement Date and (z) the LIBOR Successor Rate.

Any LIBOR Successor Rate shall be applied in a manner consistent with market practice; *provided* that to the extent such market practice is not administratively feasible for the Administrative Agent, such LIBOR Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

Notwithstanding anything else herein, if at any time any LIBOR Successor Rate as so determined would otherwise be less than the LIBOR Floor, the LIBOR Successor Rate will be deemed to be the LIBOR Floor for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a LIBOR Successor Rate, the Administrative Agent will have the right to make LIBOR Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such LIBOR Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; *provided* that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such LIBOR Successor Rate Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

If the events or circumstances of the type described in 3.03(c)(i)-(iii) have occurred with respect to the LIBOR Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "LIBOR Successor Rate."

(d)      Notwithstanding anything to the contrary herein, (i) after any such determination by the Administrative Agent or receipt by the Administrative Agent of any such notice described under Section 3.03(c)(i)-(iii), as applicable, if the Administrative Agent determines that none of the LIBOR

Successor Rates is available on or prior to the LIBOR Replacement Date, (ii) if the events or circumstances described in Section 3.03(c)(iv) have occurred but none of the LIBOR Successor Rates is available, or (iii) if the events or circumstances of the type described in Section 3.03(c)(i)-(iii) have occurred with respect to the LIBOR Successor Rate then in effect and the Administrative Agent determines that none of the LIBOR Successor Rates is available, then in each case, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing LIBOR or any then current LIBOR Successor Rate in accordance with this Section 3.03 at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with another alternate benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any Related Adjustments and any other mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated. For the avoidance of doubt, any such proposed rate and adjustments shall constitute a LIBOR Successor Rate. Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to such amendment.

(e)     If, at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, no LIBOR Successor Rate has been determined in accordance with clauses (c) or (d) of this Section 3.03 and the circumstances under clauses (c)(i) or (c)(iii) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended, (to the extent of the affected Eurodollar Rate Loans, Interest Periods, interest payment dates or payment periods), and (y) the Eurodollar Rate component shall no longer be utilized in determining the Base Rate, until the LIBOR Successor Rate has been determined in accordance with clauses (c) or (d). Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans, Interest Periods, interest payment dates or payment periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

Section 3.04     Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loan.

(1)     Increased Costs Generally.  If any Change in Law shall:

(a)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(b)     subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes or Other Taxes covered by Section 3.01 and any Excluded Taxes); or

(c)         impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender that is not otherwise accounted for in the definition of "Eurodollar Rate" or this clause (c);

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan the interest on which is determined by reference to the Eurodollar Rate (or of maintaining its obligation to make any such Loan or Letter of Credit), or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(1) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(2)         Capital Requirements.  If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it, or participations in or issuance of Letters of Credit by such Lender, to a level below that which such Lender or such Lender's holding company, as the case may be, could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(2) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(3)         Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (1) or (2) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

Section 3.05    Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits or margin) actually incurred by it as a result of:

(1)         any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(2)         any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurodollar Rate Loan on the date or in the amount notified by the Borrower; or

(3)        any assignment of a Eurodollar Rate Loan on a day prior to the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 3.07; including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Eurodollar Rate Loan or from fees payable to terminate the deposits from which such funds were obtained.

Notwithstanding the foregoing, no Lender may make any demand under this Section 3.05 with respect to the "floor" specified in the proviso to the definition of "Eurodollar Rate".

Section 3.06    Matters Applicable to All Requests for Compensation.

(1)        Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

(2)        Suspension of Lender Obligations.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurodollar Rate Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Eurodollar Rate Loans until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(3) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(3)        Conversion of Eurodollar Rate Loans.  If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurodollar Rate Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders, as applicable, are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans to the extent necessary so that, after giving effect thereto, all Loans of a given Class held by the Lenders of such Class holding Eurodollar Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

(4)        Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of Sections 3.01 or 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of Section 3.01 or 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event giving rise to such claim and of such Lender's intention to claim compensation therefor (except that, if the circumstance giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.07    <u>Replacement of Lenders under Certain Circumstances</u>. If (1) any Lender requests compensation under Section 3.04 or ceases to make Eurodollar Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (2) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or 3.04, (3) any Lender is a Non-Consenting Lender or Non-Extended Lender, (4) any Lender becomes a Defaulting Lender or (5) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent:

(a)    require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement (or, with respect to clause (3) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver, or amendment, as applicable) and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(i)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(iv);

(ii)    such Lender shall have received payment of an amount equal to the applicable outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05);

(iii)    such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to all, or a portion, as applicable, of such Lender's Commitment and outstanding Loans and participations in L/C Obligations and Swing Line Loans and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Notes shall be deemed to be canceled upon such failure;

(iv)    the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans and Commitments, except with respect to indemnification and confidentiality provisions under this Agreement, which shall survive as to such assigning Lender;

(v)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(vi)    such assignment does not conflict with applicable Laws;

(vii)    any Lender that acts as an Issuing Bank may not be replaced hereunder at any time when it has any Letter of Credit outstanding hereunder unless arrangements reasonably satisfactory to such Issuing Bank (including the furnishing of a back-up standby letter of credit in form and substance, and issued by an issuer, reasonably satisfactory to such Issuing Bank or the depositing of Cash Collateral into a Cash Collateral Account in amounts and pursuant to

arrangements reasonably satisfactory to such Issuing Bank) have been made with respect to each such outstanding Letter of Credit; and

(viii)   the Lender that acts as Administrative Agent cannot be replaced in its capacity as Administrative Agent other than in accordance with Section 9.11, or

(b)   terminate the Commitment of such Lender or Issuing Bank, as the case may be, and (A) in the case of a Lender (other than an Issuing Bank), repay all Obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date and (B) in the case of an Issuing Bank, repay all Obligations of the Borrower owing to such Issuing Bank relating to the Loans and participations held by such Issuing Bank as of such termination date and Cash Collateralize, cancel or backstop, or provide for the deemed reissuance under another facility, on terms satisfactory to such Issuing Bank any Letters of Credit issued by it; *provided* that in the case of any such termination of the Commitment of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable consent, waiver or amendment of the Loan Documents and such termination shall, with respect to clause (3) above, be in respect of all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment.

(c)   In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans/Commitments and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

(d)   A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(e)   Notwithstanding anything herein to the contrary, each party hereto agrees that any assignment pursuant to the terms of this Section 3.07 may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender making such assignment need not be a party thereto

Section 3.08   Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment, satisfaction or discharge of all other Obligations under this Agreement and resignation of the Administrative Agent.

# ARTICLE IV

## Conditions Precedent to Revolving Credit Borrowings

Section 4.01   Conditions to Effectiveness of this Agreement on Closing Date.  The effectiveness of this Agreement on the Closing Date was subject to satisfaction (or waiver) of the following conditions precedent:

(1)   The Administrative Agent's receipt of the following, each of which shall be originals, facsimiles or copies in .pdf format (followed promptly by originals) (unless otherwise reasonably agreed

by the Administrative Agent) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party:

(a)    a Committed Loan Notice;

(b)    executed counterparts of this Agreement and the Guaranty;

(c)    each Collateral Document set forth on Schedule 4.01(1)(c) required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party that is party thereto, together with:

(i)    certificates, if any, representing the Pledged Collateral referred to therein, and to the extent certificated, accompanied by undated stock or note powers executed in blank; and

(ii)    evidence that all UCC-1 financing statements in the jurisdiction of organization of each Loan Party that the Administrative Agent and the Collateral Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been provided for, and arrangements for the filing thereof in a manner reasonably satisfactory to the Administrative Agent shall have been made;

(d)    (i) certificates of good standing from the secretary of state of the state of organization of each Loan Party (to the extent such concept exists in such jurisdiction), (ii) customary certificates of resolutions or other action, incumbency certificates or other certificates of Responsible Officers of each Loan Party evidencing the authority of each Loan Party to enter into the applicable Loan Documents and the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date, and (iii) copies of each Loan Party's organization documents as of the Closing Date;

(e)    a customary legal opinion from (i) Kirkland & Ellis LLP, special counsel to the Loan Parties, (ii) Moore & Van Allen PLLC, North Carolina and South Carolina counsel to the Loan Parties and (iii) Brunini, Grantham, Grower & Hewes, PLLC, Mississippi counsel to the Loan Parties;

(f)    a solvency certificate from a Financial Officer of the Borrower (after giving effect to the Closing Date Transactions) substantially in the form attached hereto as Exhibit I; and

(g)    a Borrowing Base Certificate that calculates the Borrowing Base as of October 31, 2015;

provided, however, that each of the requirements set forth in clause (1)(c) above, including the delivery of any document(s) or instrument(s) necessary to satisfy the Collateral and Guarantee Requirement (except for the execution and delivery of the Security Agreement and to the extent that a Lien on Collateral may be perfected by (x) the filing of a financing statement under the UCC or (y) the delivery of the stock certificate of the Initial Borrower and the wholly owned Material Domestic Subsidiaries of Belk (or stock certificates of such wholly owned Material Domestic Subsidiaries delivered to the Initial Borrower on the Closing Date, if the Initial Borrower has used commercially reasonable efforts to procure the delivery thereof prior to the Closing Date)) will not constitute conditions precedent to the Borrowing on the Closing Date after the Initial Borrower's use of commercially reasonable efforts to provide such items on or prior to the Closing Date if the Initial Borrower agrees to deliver, or cause to be delivered, such documents and instruments, or take or cause to be taken such other actions as may be required to perfect such security interests within ninety (90) days after the Closing Date (subject to extensions approved by

143

the Administrative Agent in its reasonable discretion) or, in the case of stock certificates of Belk, no later than 5:00 p.m., New York time, on the Closing Date;

*provided further* that with respect to the requirements set forth in clauses (1)(b), (1)(c) or (1)(d) above, each Loan Document (or certificate or other document) required to be executed and delivered on the Closing Date by any Loan Party other than Holdings or Initial Borrower will not constitute conditions precedent to the borrowing of Revolving Credit Loans on the Closing Date; *provided* that each of Belk and its Restricted Subsidiaries that are Loan Parties will execute and deliver any such document(s) substantially concurrently with the consummation of the Merger, but no later than 5:00 p.m. on the Closing Date.

(2)      The Arrangers shall have received (i) the Closing Date Annual Financial Statements, and (ii) the Closing Date Quarterly Financial Statements; <u>provided</u> that the filing of the required financial statements on Form 10-K and Form 10-Q with the SEC within the required time periods by the Acquired Company will constitute receipt by the Arrangers of the Closing Date Annual Financial Statements and the Closing Date Quarterly Financial Statements.

(3)      The Administrative Agent and the Arrangers shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information in respect of Holdings and the Borrower reasonably determined by the Administrative Agent or the Arrangers to be required by applicable regulatory authorities required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, that has been reasonably requested by the Administrative Agent or the Arrangers in writing by it at least ten (10) Business Days prior to the Closing Date.

(4)      The Arrangers shall have received a certification by a Responsible Officer of the Initial Borrower, to the knowledge of the Initial Borrower (other than with respect to any Specified Representations), that the conditions set forth in clauses (5) and (7) of this Section 4.01 have been satisfied.

(5)      The Specified Representations and the Specified Acquisition Agreement Representations shall be true and correct in all material respects on and as of the Closing Date; *provided* that to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that the condition precedent in this clause (5) with respect to Specified Acquisition Agreement Representations shall fail to be satisfied only to the extent a breach of such Specified Acquisition Agreement Representations results in a failure of a condition precedent to the obligation of Holdings or the Initial Borrower to consummate the Merger pursuant to the terms of the Transaction Agreement or provides Holdings or the Initial Borrower with the right to, pursuant to the Transaction Agreement, terminate its obligations under the Transaction Agreement or decline to consummate the Merger as a result of the breach of such Specified Acquisition Agreement Representations.

(6)      The Arrangers shall have received a certification by a Responsible Officer of the Initial Borrower that prior to or substantially concurrently with the funding of Revolving Credit Loans borrowed on the Closing Date, (i) the Equity Contribution (subject to any reduction pursuant to the second proviso of this Section 4.01(6)) shall have been consummated; and (ii) the Merger shall have been consummated in all material respects in accordance with the terms of the Transaction Agreement, after giving effect to any modifications, amendments, supplements, consents, waivers or requests, other than those modifications, amendments, supplements, consents, waivers or requests (including the effects of any such requests) made by Holdings or the Initial Borrower that are materially adverse to the interests of the Lenders;

*provided* that each of the following will be deemed to be materially adverse to the interests of the Lenders:

(i)     any change to the definition of "Company Material Adverse Effect" contained in the Transaction Agreement as in effect on August 23, 2015,

(ii)     any waiver of or amendment to the representation contained in the Transaction Agreement that since January 31, 2015 through the date of the Transaction Agreement, there has not been any event or effect that has had, or would reasonably be expected to have, individually or in the aggregate, a "Company Material Adverse Effect" (as defined in the Transaction Agreement); and

(iii)     any amendment to the "Xerox" provisions contained in the Transaction Agreement in effect on August 23, 2015;

*provided further* that (i) any reduction in the amount of consideration required to consummate the Merger shall be deemed not to be materially adverse to the interest of the Lenders so long as any reduction will be allocated (A) first, to a reduction in the Equity Contribution so long as the Equity Contribution is no less than 22.5% of the Total Capitalization (as defined in the Commitment Letter) and (B) thereafter (1) 77.5% to a reduction in the First Lien Loans and the Second Lien Loans (on a *pro rata* basis without giving effect to certain adjustments that may otherwise be agreed) and (2) 22.5% to the Equity Contribution and (ii) any increase in the purchase price of, or consideration for the Merger shall not be deemed to be materially adverse to the interests of the Lenders so long as such increase is not funded with any Indebtedness.

(7)     Since August 23, 2015, there has not been any Circumstance (as defined in the Transaction Agreement as in effect on August 23, 2015) that has had, or would reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect (as defined in the Transaction Agreement).

(8)     All fees required to be paid pursuant to the Fee Letter on the Closing Date and reasonable out-of-pocket expenses required to be paid on the Closing Date pursuant to the Commitment Letter, to the extent invoiced at least 3 Business Days prior to the Closing Date shall have been paid in full in cash substantially concurrently with the borrowing Revolving Credit Loans on the Closing Date (which amounts may, at the option of the Borrower, be offset against the proceeds of the Revolving Credit Loans borrowed on the Closing Date).

(9)     Prior to or substantially concurrently with the funding of the Revolving Credit Loans borrowed on the Closing Date and the initial borrowings under the First Lien Facility and the Second Lien Facility, the Closing Date Refinancing shall have been consummated.

(10)     The terms and conditions of the Second Lien Loan Documents shall be consistent with the terms and conditions previously agreed between the Borrower and the Arrangers.

(11)     The Administrative Agent shall have received the ABL Intercreditor Agreement and Term Intercreditor Agreement acknowledged and delivered by the Borrower and the other Loan Parties party thereto.

Without limiting the generality of the provisions of the last paragraph of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied

with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02    Conditions to Credit Extensions after Closing Date.

Except as set forth in Section 2.14(6) with respect to Incremental Revolving Credit Loans and 2.16(2) with respect to Extended Revolving Credit Loans, and subject to Section 1.07(8), the obligation of each Lender to honor any Request for Credit Extension (other than (x) a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Eurodollar Rate Loans or (y) borrowings made pursuant to Section 2.14 in connection with a Limited Condition Acquisition to be funded with the proceeds of a FILO Tranche) after the Closing Date, is subject to the following conditions precedent:

(1)     The representations and warranties of the Borrower contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(2)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of proceeds therefrom.

(3)     The Administrative Agent, and, if applicable, the relevant Issuing Bank or the Swing Line Lender (as applicable) shall have received a Request for Credit Extension in accordance with the requirements hereof.

(4)     Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Eurodollar Rate Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(1) and 4.02(2) have been satisfied on and as of the date of the applicable Credit Extension.

(5)     After giving effect to the Loans or Letters of Credit requested to be made or issued on any such date and the use of proceeds thereof, the Total Outstandings shall not exceed the Maximum Borrowing Amount at such time.

In addition, solely to the extent the Borrower has delivered to the Administrative Agent a notice of intent to cure pursuant to Section 8.04, no request for Borrowing shall be honored after delivery of such notice until the applicable Cure Amount specified in such notice is actually received by the Borrower. For the avoidance of doubt, the preceding sentence shall have no effect on the continuation or conversion of any Loans outstanding.

## ARTICLE V

### Representations and Warranties

The Borrower represents and warrants to the Administrative Agent and the Lenders, after giving effect to the Merger, at the time of each Credit Extension (solely to the extent required to be true and correct for such Revolving Credit Borrowing pursuant to Article IV or Section 2.14, as applicable):

Section 5.01     Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each of its respective Restricted Subsidiaries  that is a Material Subsidiary:

(1)     is a Person duly organized or formed, validly  existing and in good standing under the Laws of the jurisdiction  of its incorporation  or organization  (to the extent such concept exists in such jurisdiction),

(2)     has all corporate or other organizational  power and authority to (a) own or lease its assets and carry on its business as currently conducted and (b) in the case of the Loan Parties, execute, deliver and perform its obligations  under the Loan Documents to which it is a party,

(3)     is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction  where its ownership, lease or operation of properties or the conduct of its business as currently conducted requires such qualification,

(4)     is in compliance with all applicable Laws, orders, writs, injunctions  and orders and

(5)     has all requisite governmental licenses, authorizations,  consents and approvals to operate its business as currently conducted;

except in each case referred to in the preceding clauses (2)(a), (3), (4) or (5), to the extent that failure to do so would not reasonably be expected to have, individually  or in the aggregate, a Material Adverse Effect.

Section 5.02     Authorization; No Contravention.

(1)     The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.

(2)     None of the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party will:

(a)     contravene the terms of any of such Person's Organizational Documents;

(b)     result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries  (other than as permitted by Section 7.01) under (i) any Contractual Obligation  in excess of the Threshold Amount to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan party or any of its Subsidiaries  or (ii) any order, injunction,  writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject; or

(c)     violate any applicable Law;

except with respect to any breach, contravention or violation  (but not creation of Liens) referred to in the preceding clauses (b) and (c), to the extent that such breach, contravention or violation  would not reasonably be expected to have, individually  or in the aggregate, a Material Adverse Effect.

Section 5.03     Governmental Authorization.  No material approval, consent, exemption, authorization,  or other action by, or notice to, or filing  with, any Governmental Authority is necessary or

required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for:

(1)     filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties,

(2)     the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and

(3)     those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.04     Binding Effect.   This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party hereto or thereto, as applicable.   Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05     Financial Statements; No Material Adverse Effect.

(1)     The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the date(s) thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (i) except as otherwise expressly noted therein and (ii) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(2)     Since the Third Amendment Effective Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06     Litigation.   Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

Section 5.07     Labor Matters.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (1) there are no strikes or other labor disputes against the Borrower or the Restricted Subsidiaries pending or, to the knowledge of the Borrower, overtly threatened in writing and (2) hours worked by and payment made based on hours worked to employees of each of the Borrower or the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

Section 5.08     Ownership of Property; Liens.   Each Loan Party and each of its respective Restricted Subsidiaries has good and valid record title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its

business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.09    Environmental Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) each Loan Party and each of its Restricted Subsidiaries and their respective operations and properties is in compliance with all applicable Environmental Laws; (b) each Loan Party and each of its Restricted Subsidiaries has obtained and maintained all Environmental Permits required to conduct their operations; (c) none of the Loan Parties or any of their respective Restricted Subsidiaries has become subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim in writing or Environmental Liability; and (d) none of the Loan Parties or any of their respective Restricted Subsidiaries or, to the knowledge of the Borrower, predecessors has treated, stored, transported or Released Hazardous Materials at or from any currently or formerly owned, leased or operated real estate or facility.

Section 5.10    Taxes.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Loan Party and each of its Restricted Subsidiaries has timely filed all Tax returns and reports required to be filed, and have timely paid all Taxes (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets (whether or not shown in a Tax return), which are due and payable, except those Taxes which are being contested in good faith by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP.

There is no proposed Tax assessment, deficiency or other claim against any Loan Party or any of its Restricted Subsidiaries except (i) those being actively contested by a Loan Party or such Restricted Subsidiary in good faith and by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP or (ii) those which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 5.11    ERISA Compliance.

(1)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(2)    (a)    No ERISA Event has occurred or is reasonably expected to occur;

(b)    no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan;

(c)    none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan;

(d)    none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and

(e)    neither any Loan Party nor any ERISA Affiliate has been notified in writing by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent or has been determined to

be in endangered or critical status and no such Multiemployer Plan is expected to be insolvent or in endangered or critical status,

except, with respect to each of the foregoing clauses of this Section 5.11(2), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(3)     Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, (a) each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and (b) none of Holdings, the Borrower or any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

(4)     The Borrower is not an entity deemed to hold "plan assets" (within the meaning of ERISA), and provided the Loan is not funded with "plan assets," neither the making of any loan or any outstanding loan hereunder will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

Section 5.12     Subsidiaries.

(1)     As of the Third Amendment Effective Date, all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable, and all Equity Interests owned by Holdings in the Borrower, and by the Borrower or any Subsidiary Guarantor in any of their respective Subsidiaries are owned free and clear of all Liens of any person except (a) those Liens created under the Collateral Documents, the "Collateral Documents" (as defined in the First Lien Credit Agreement) and the "Collateral Documents" (as defined in the Second Lien Credit Agreement) and (b) any nonconsensual Lien that is permitted under Section 7.01.

(2)     As of the Third Amendment Effective Date, Schedule 5.12 sets forth:

(a)     the name and jurisdiction of each Subsidiary,

(b)     the ownership interests of Holdings in the Borrower and of the Borrower and any Subsidiary of the Borrower in each Subsidiary, including the percentage of such ownership, and

(c)     the Equity Interests of each Subsidiary described in clause (b) that were required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.13     Margin Regulations; Investment Company Act.

(a)     No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)     No Loan Party is an "investment company" under the Investment Company Act of 1940.

Section 5.14     Disclosure. None of the written information and written data heretofore or contemporaneously furnished in writing by or on behalf of the Borrower or any Subsidiary Guarantor to any Agent or any Lender on or prior to the Closing Date in connection with the Closing Date

Transactions, when taken as a whole, when furnished, contains any material misstatement of fact or omits to state any material fact necessary to make such written information and written data taken as a whole, in the light of the circumstances under which it was delivered, not materially misleading (after giving effect to all modifications and supplements to such written information and written data, in each case, furnished after the date on which such written information or such written data was originally delivered and prior to the Closing Date); it being understood that for purposes of this Section 5.14, such written information and written data shall not include any projections, *pro forma* financial information, financial estimates, forecasts and forward-looking information or information of a general economic or general industry nature.

Section 5.15    Intellectual Property; Licenses, etc.  The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, technology, software, know-how database rights and other intellectual property rights (collectively, "**IP Rights**") that to the knowledge of the Borrower are reasonably necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any Subsidiary of the Borrower as currently conducted does not infringe upon, dilute, misappropriate or violate any IP Rights held by any Person except for such infringements, dilutions, misappropriations or violations, individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Subsidiary, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.16    Solvency.  On the Third Amendment Effective Date and after giving effect to the Third Amendment Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act.  To the extent applicable, Holdings, Borrower and the Restricted Subsidiaries are in compliance, in all material respects, with (i) the USA PATRIOT Act, (ii) the United States Foreign Corrupt Practices Act of 1977 (the "**FCPA**"), (iii) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (iv) all other applicable Anti-Terrorism Laws. None of Holdings, Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer or employee of any of Holdings, the Borrower or any of the Restricted Subsidiaries, is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") ("**Sanctions**").  No proceeds of the Loans will be used by Holdings, the Borrower or any Restricted Subsidiary (a) directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business, or to obtain any improper advantage, in violation of the FCPA or (b) for the purpose of financing activities of or with any Person, that, at the time of such financing, is the subject of any Sanctions administered by OFAC. None of Holdings, Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer or employee of any of Holdings, the Borrower or any of the Restricted Subsidiaries is: (a) located, organized, or ordinarily resident in a country or territory that is subject to a comprehensive trade embargo administered by OFAC (presently, Cuba, Iran, North Korea, Sudan, Syria, or the Crimea region of Ukraine (collectively, "**Sanctioned Countries**")); (b) identified on OFAC's Specially Designated Nationals and Blocked Persons List ("**SDNs**"); (c) majority owned by one or more SDNs (collectively with SDNs, "**Sanctioned**

Persons"); or (d) engaged, directly or knowingly indirectly, in dealings or transactions in or with Sanctioned Countries or Sanctioned Persons that are prohibited by Sanctions.

Section 5.18    Collateral Documents. Except as otherwise contemplated hereby or under any other Loan Documents and subject to limitations set forth in the Collateral and Guarantee Requirement, the provisions of the Collateral Documents, together with such filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Collateral required to be delivered pursuant hereto or the applicable Collateral Documents), are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien (subject to Liens permitted by Section 7.01) with the priority set forth in the Applicable Intercreditor Agreement on all right, title and interest of the respective Loan Parties in the Collateral described therein.

Notwithstanding anything herein (including this Section 5.18) or in any other Loan Document to the contrary, no Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) any Excluded Assets.

Section 5.19    Use of Proceeds. The Borrower has used the proceeds of the Loans issued hereunder only in compliance with (and not in contravention of) each Loan Document.

Section 5.20    Beneficial Ownership Certification. As of the First Amendment Effective Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

# ARTICLE VI

## Affirmative Covenants

So long as the Termination Conditions have not been satisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

Section 6.01    Financial Statements. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender each of the following:

(1)       as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or, with respect to the fiscal year of the Borrower ended [January 30, 2021], one hundred and five (105) days after the end of such fiscal year), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, together with related notes thereto and management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, setting forth in each case in comparative form the figures for the previous fiscal year, in reasonable detail and all prepared in accordance with GAAP, audited and accompanied by a report and opinion of PricewaterhouseCoopers, LLP, KPMG LLP or any

other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Administrative Agent, which report and opinion (a) will be prepared in accordance with generally accepted auditing standards and (b) other than with respect to the report and opinion for fiscal year ending [January 30], 2021, will not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than with respect to (i) an upcoming maturity of the Loans under this Agreement, the First Lien Facility or the Second Lien Facility, or (ii) any anticipated inability to satisfy any financial maintenance covenant);

(2)       as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (a) condensed consolidated statement of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (b) condensed consolidated statement of cash flows for the portion of the fiscal year then ended, setting forth, in each case of the preceding clauses (a) and (b), in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, accompanied by an Officer's Certificate stating that such financial statements fairly present in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes, together with management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower;

(3)       as soon as available, but in any event within (x) thirty (30) days after the end of each of the first two (2) fiscal months of each fiscal quarter of the Borrower, (y) except as provided in clause (z) below, forty-five (45) days after the end of the third fiscal month of each fiscal quarter of the Borrower and (z) sixty (60) days after the end of the last fiscal month of each fiscal year of the Borrower, a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month, and the related (a) condensed consolidated statement of income or operations for such fiscal month and for the portion of the fiscal year then ended and (b) condensed consolidated statement of cash flows for the portion of the fiscal year then ended, setting forth, in each case of the preceding clauses (a) and (b), in comparative form the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, accompanied by an Officer's Certificate stating that such financial statements fairly present in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes;

(4)       within ninety (90) days after the end of each fiscal year of the Borrower, (I) a consolidated budget for the following fiscal year on a quarterly basis as customarily prepared by management of the Borrower for its internal use (including (x) any projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected operations or income, in each case, to the extent prepared by management of the Borrower and included in such consolidated budget and (y) an Availability Model), which projected financial statements shall be prepared in good faith on the basis of assumptions believed to be reasonable at the time of preparation of such projected financial statements (it being understood by the Secured Parties that any such projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and the Investors and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material);) and (II) a consolidated monthly forecast prepared on a monthly basis by management of the Borrower, including information of the type that would otherwise be included in clause (I) above but presented on a monthly basis;

(5)        simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(1), 6.01(2) and 6.01(3), the related unaudited (it being understood that such information may be audited at the option of the Borrower) consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; and

(6)        quarterly, upon request of the Administrative Agent, at a time mutually agreed with the Administrative Agent that is promptly after the delivery of the information required pursuant to Section 6.01(1) and Section 6.01(2) above, as applicable, to participate in a conference call for Lenders to discuss the financial position and results of operations of the Borrower and its Subsidiaries for the most recently ended period for which financial statements have been delivered.

Notwithstanding the foregoing, the obligations referred to in Sections 6.01(1), 6.01(2) and 6.01(3~~2~~) may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any Parent Company or (B) the Borrower's or such Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC (and the public filing of such report with the SEC shall constitute delivery under this Section 6.01); *provided* that with respect to each of the preceding clauses (A) and (B), (1) to the extent such information relates to a parent of the Borrower, if and so long as such Parent Company will have Independent Assets or Operations, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such Parent Company and its Independent Assets or Operations, on the one hand, and the information relating to the Borrower and the consolidated Restricted Subsidiaries on a stand-alone basis, on the other hand and (2) to the extent such information is in lieu of information required to be provided under Section 6.01(1) (it being understood that such information may be audited at the option of the Borrower), such materials are accompanied by a report and opinion of PricewaterhouseCoopers, LLP, KPMG LLP or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Administrative Agent, which report and opinion (x) shall be prepared in accordance with generally accepted auditing standards and (y) shall not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than with respect to (i) an upcoming maturity of the Loans under this Agreement, the First Lien Facility or the Second Lien Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant).

Any financial statements required to be delivered pursuant to Sections 6.01(1) or 6.01(2) shall not be required to contain all purchase accounting adjustments relating to the Closing Date Transactions or the Third Amendment Transactions or any other transaction(s) permitted hereunder to the extent it is not practicable to include any such adjustments in such financial statements.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP, or the respective interpretation thereof, and that such restatements will not result in a Default or an Event of Default under the Loan Documents.

Section 6.02     Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender:

(1)        no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(1), (2) and (3), a duly completed Compliance Certificate signed by a Financial Officer of the Borrower;

(2)      promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(3)      promptly after the furnishing thereof, copies of any notices of default to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the First Lien Facility and/or the Second Lien Facility, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount (in each case, other than in connection with any board observer rights) and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(4)      together with the delivery of the Compliance Certificate with respect to the financial statements referred to in Section 6.01(1), (a) a report setting forth the information required by Sections 1(a), (e) and (f) and Section 11 of the Perfection Certificate (or confirming that there has been no change in such information since the latter of the Closing Date or the last such report) and (b) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such list or a confirmation that there is no change in such information since the later of the Closing Date and the last such list; and

(5)      promptly, such additional information regarding the business and financial affairs of any Loan Party or any Material Subsidiary that is a Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request in writing from time to time.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02(2) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's (or any Parent Company's) website on the Internet at the website address listed on Schedule 10.02 hereto (or as such address may be updated from time to time in accordance with Section 10.02); or (b) on which such documents are posted on the Borrower's behalf on SyndTrak or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (i) upon written request by the Administrative Agent, the Borrower will deliver paper copies of such documents to the Administrative Agent for further distribution by the Administrative Agent to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents or link and, upon the Administrative Agent's request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on SyndTrak or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may have personnel who do not wish to receive any information with respect to the Borrower, its Subsidiaries or their respective securities that is not

Public-Side Information, and who may be engaged in investment and other market-related activities with respect to such Person's securities. The Borrower hereby agrees that (i) at the Administrative Agent's request, all Borrower Materials that are to be made available to Public Lenders will be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" will appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower will be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public-Side Information (*provided, however,* that to the extent such Borrower Materials constitute Information, they will be treated as set forth in Section 10.09); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information"; and (iv) the Administrative Agent and the Arrangers will treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated as "Public Side Information." Notwithstanding the foregoing, the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC."

Anything to the contrary notwithstanding, nothing in this Agreement will require Holdings, the Borrower or any Subsidiary to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.03    Notices. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent, who will in turn notify the Lenders (it being understand that the failure to so notify shall not constitute a Default or an Event of Default hereunder), of:

(1)    any Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(2)    (a) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (b) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or its Subsidiary, or (c) the occurrence of any ERISA Event that, in any such case referred to in clauses (a), (b) or (c) of this Section 6.03(2), has resulted or would reasonably be expected to result in a Material Adverse Effect; and

(3)    any material change in accounting policies or financial reporting practices by any Loan Party with respect Accounts Receivable, Credit Card Processor Accounts and Inventory or other changes, in each case, which impact the calculation of the Borrowing Base or Reserves in a manner that is adverse to the interests of the Lenders.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (a) that such notice is being delivered pursuant to Section 6.03(1) or (2) (as applicable) and (b) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04    Payment of Obligations. Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (1) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (2) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 6.05    Preservation of Existence, etc.

(1)    Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(2)    take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, and IP Rights material to the conduct of its business,

(3)    except in the case of clauses (1) or (2) to the extent (other than with respect to the preservation of the existence of the Borrower set forth in clause (1)) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or disposition permitted by Article VII.

Section 6.06    Maintenance of Properties.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in reasonably good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

Section 6.07    Maintenance of Insurance.  Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed or with a Captive Insurance Subsidiary, insurance with respect to the Borrower's and the Restricted Subsidiaries' properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried; *provided* that notwithstanding the foregoing, in no event will the Borrower or any Restricted Subsidiary be required to obtain or maintain insurance that is more restrictive than what is consistent with past practice. Each such policy of insurance will as appropriate, (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear or (ii) in the case of each casualty insurance policy, contain an additional loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the additional loss payee thereunder.Compliance with Laws.  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property (including ERISA, the USA PATRIOT Act, Sanctions, OFAC and FCPA), except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.Books and Records.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).Inspection Rights.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that only the

Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. For the avoidance of doubt, this Section 6.10 is subject to the last paragraph of Section 6.02.

Section 6.11    <u>Covenant to Guarantee Obligations and Give Security</u>. At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including: (x) upon (i) the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary) by any Loan Party, (ii) the designation of any existing direct or indirect wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary) as a Restricted Subsidiary, (iii) any Subsidiary (other than any Excluded Subsidiary) becoming a wholly owned Material Domestic Subsidiary or (iv) an Excluded Subsidiary that is a Material Domestic Subsidiary ceasing to be an Excluded Subsidiary but continuing as a Restricted Subsidiary of the Borrower, (y) upon the acquisition of any material assets by the Borrower or any Subsidiary Guarantor or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any material assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(a)    within sixty (60) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Administrative Agent may agree in its reasonable discretion cause such Material Domestic Subsidiary required to become a Guarantor under the Collateral and Guarantee Requirement to execute the Guaranty (or a joinder thereto) and other documentation the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Guaranty and the Collateral Documents and

(A)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Subsidiary Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent supplements to the Security Agreement, a counterpart signature page to the Intercompany Subordination Agreement, Intellectual Property Security Agreements and other security agreements and documents necessary to satisfy the Collateral and Guarantee Requirement, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting and perfecting Liens required by the Collateral and Guarantee Requirement;

(B)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and a joinder to the

Intercompany Subordination Agreement substantially in the form of Annex I thereto with respect to the intercompany Indebtedness held by such Material Domestic Subsidiary;

(C)    within sixty (60) days after such formation, acquisition or designation, take and cause (i) the applicable Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and (ii) to the extent applicable, each direct or indirect parent of such applicable Material Domestic Subsidiary, in each case, to take customary action(s) (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be necessary in the reasonable opinion of the Administrative Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected (subject to Liens permitted by Section 7.01) Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law); and

(D)    within sixty (60) days after the reasonable request therefor by the Administrative Agent (or such longer period as the Administrative Agent may agree in its reasonable discretion), deliver to the Administrative Agent a signed copy of a customary Opinion of Counsel, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 6.11(1) as the Administrative Agent may reasonably request (with such opinion being consistent with the Opinion of Counsel delivered to the Administrative Agent on the Closing Date);

*provided* that actions relating to Liens on real property are governed by Section 6.11(2) and not this Section 6.11(1).

Section 6.12    Compliance with Environmental Laws.  Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (1) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits (including any cleanup, removal or remedial obligations) and (2) obtain and renew all Environmental Permits required to conduct its operations or in connection with its properties.

Section 6.13    Further Assurances.  Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Borrower, promptly upon reasonable request from time to time by the Administrative Agent or the Collateral Agent or as may be required by applicable Laws (a) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents and to satisfy the Collateral and Guarantee Requirement.Use of Proceeds.

(1)    On the Closing Date, the proceeds of the Revolving Credit Loans borrowed on the Closing Date, together with the proceeds of the Equity Contribution, the First Lien Facility, the Second Lien Facility and any Specified Real Estate Financing, if applicable, were used (a) to consummate the Closing Date Refinancing, (b) to finance the Transaction Consideration and the Transaction Expenses, (c)

to fund any original issue discount or upfront fees in connection with the Closing Date Transactions resulting from the exercise of any "market flex" pursuant to the Fee Letter and (d) for working capital and general corporate purposes not prohibited by the terms of this Agreement; provided that in the case of the foregoing clauses (a) and (b), the aggregate amount of proceeds of the Revolving Credit Loans borrowed on the Closing Date to finance the consummation thereof shall not exceed $450.0 million.

(2)      The proceeds of the Revolving Credit Loans and Swing Line Loans borrowed after the Closing Date will be used for working capital and other general corporate purposes, including the financing of transactions that are not prohibited by the terms of this Agreement (including Permitted Acquisitions and other investments permitted hereunder and permitted distributions).

(3)      Letters of Credit will be used by the Borrower for general corporate purposes of the Borrower and its Restricted Subsidiaries, including supporting transactions not prohibited by the Loan Documents.

Section 6.15      [Reserved].

Section 6.16      Accounting Changes. The Borrower shall, and shall cause its Restricted Subsidiaries to, maintain their fiscal year as in effect on the Closing Date; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.17      Nature of Business. The Borrower shall and shall cause its Restricted Subsidiaries to, engage in material line of business substantially the same as those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business(es) or any other activities that are reasonably similar, ancillary, incidental, complimentary or related to, or a reasonable extension, development or expansion of, the business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries on the Closing Date.

Section 6.18      Designation of Subsidiaries.

(a)      Subject to Section 6.18(b) below, the Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) the designation of any Restricted Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the fair market value of the Borrower's investment therein subject to (x) pro forma compliance with the Payment Conditions or (y) utilization of Investment capacity under clause (13) of the definition of Permitted Investment in the amount thereof and (ii) the designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time; and

(b)      the Borrower may not (x) designate any Restricted Subsidiary as an Unrestricted Subsidiary, or (y) designate an Unrestricted Subsidiary as a Restricted Subsidiary, in each case unless no Event of Default shall have occurred or be continuing immediately before and after giving effect to such designation.

Section 6.19      Cash Receipts; Cash Dominion Period.

(1)      Each Loan Party shall use commercially reasonable efforts to enter into an effective account control agreement (a "**Deposit Account Control Agreement**") with each account bank, in each case, in form and substance reasonably satisfactory to the Administrative Agent and the Borrower, with respect to each primary domestic concentration Deposit Account in which funds of the Borrower and the Subsidiary Guarantors from Cash Receipts of the Borrower and the Subsidiary Guarantors are deposited (including those existing as of the Third Amendment Effective Date and listed on Schedule 6.19 attached hereto, excluding Excluded Funds maintained in Excluded Accounts); *provided* that the applicable Loan Party shall enter into a Deposit Account Control Agreement with respect to any such Deposit Account (other than an Excluded Account) which is established after the Closing Date, promptly and in any event within ninety (90) days upon such establishment (or such longer period as the Administrative Agent may agree in its discretion). Notwithstanding anything in this section to the contrary, the provisions of this Section 6.19(1) shall not apply to any Deposit Account acquired by the Borrower and the Subsidiary Guarantors in connection with a Permitted Acquisition prior to the date that is 120 days (or such later date as the Administrative Agent may agree) following the consummation of such Permitted Acquisition.

(2)      Each Deposit Account Control Agreement shall require (without further consent of the Loan Parties), and the Loan Parties shall cause, after the occurrence and during the continuance of a Cash Dominion Period and subject to the ABL Intercreditor Agreement, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained by, in the name of and under the sole dominion and control of the Administrative Agent (the "**Concentration Account**"), of all cash receipts and collections, set forth below, other than amounts in Excluded Accounts (collectively, the "**Cash Receipts**"):

(a)      all available cash receipts from the sale of ABL Priority Collateral or casualty insurance proceeds arising from any of the foregoing;

(b)      all proceeds of collections of Accounts; and

(c)      the then contents of each Approved Deposit Account (in each case, net of any minimum balance as may be required to be kept therein by the institution at which such Deposit Account is maintained).

(3)      The Concentration Account shall at all times be under the sole dominion and control of the Administrative Agent, subject to the Borrower's right to use of the account as set forth in clause (4) below. The Borrower shall use commercially reasonable efforts to cause the applicable depositary (if not the Administrative Agent) to provide daily reports to the Administrative Agent setting forth the balances in the Concentration Account (which may relate to the previous Business Day) (and it being understood that failure on the part of such depositary bank to provide such reports shall not constitute a Default or Event of Default hereunder). The Loan Parties hereby acknowledge and agree that (i) the Borrower and the Subsidiary Guarantors have no right of withdrawal from the Concentration Account to the extent a Cash Dominion Period is in effect, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Concentration Account shall be applied as provided in this Agreement (subject to the ABL Intercreditor Agreement). In the event that, notwithstanding the provisions of this Section 6.19, during the continuation of any Cash Dominion Period, the Borrower or any Subsidiary Guarantor receives or otherwise has dominion and control of any Cash Receipts which are not on deposit in the Concentration Account, such Cash Receipts shall be held by the Borrower or any Subsidiary Guarantor for the Administrative Agent in Deposit Accounts subject to a Deposit Account Control Agreement and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as the Borrower or any Subsidiary Guarantor may be instructed by the Administrative Agent.

(4)     Subject to the ability of the Secured Parties to exercise remedies in accordance with Section 8.02 during the occurrence and continuance of an Event of Default, so long as no Cash Dominion Period is continuing, the Borrower and the Subsidiary Guarantors may direct, and shall have sole control over, the manner of disposition of funds in the Approved Deposit Accounts. The Administrative Agent and the other Secured Parties hereby acknowledge and agree that so long as no Cash Dominion Period is continuing the Borrower and the Subsidiary Guarantors shall have the right, subject to the ability of the Secured Parties to exercise remedies in accordance with Section 8.02 during the occurrence and continuance of an Event of Default, to withdraw all funds remaining on deposit in any Concentration Account and the Administrative Agent shall no longer be permitted to direct any account bank under any Deposit Account Control Agreement to ACH or wire transfer any Cash Receipts into any Concentration Account.

(5)     Any amounts received in the Concentration Account following satisfaction of the Termination Conditions or to the extent no Cash Dominion Period is continuing shall be remitted to the operating account of the Borrower and the Subsidiary Guarantors maintained with the Administrative Agent or to an operating account otherwise designated by the Borrower.

(6)     The Administrative Agent shall promptly (but in any event within three (3) Business Days) furnish written notice to each Approved Account Bank of any termination of a Cash Dominion Period.

Section 6.20     Borrowing Base Certificates.

(1)     The Borrower shall provide the Administrative Agent with a Borrowing Base Certificate setting forth the calculation of the Borrowing Base and of Excess Availability as of the last Business Day of the applicable period set forth below, duly completed and executed by a Responsible Officer of the Borrower, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed:

(a)     as soon as possible but in any event within twenty (20) days after the end of each calendar month (or on a more frequent basis at the discretion of the Borrower, provided that once a more frequent basis is elected it must be continued for the remainder of the current fiscal year after the date of such election); and

(b)     during the continuance of an Increased Reporting Period, on each Wednesday of each week (calculated as of the immediately preceding Friday).

(2)     The Borrower shall furnish to the Administrative Agent any information that the Administrative Agent may reasonably request regarding the determination and calculation of the Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.

Section 6.21     Appraisals and Field Examinations.

(1)     The Administrative Agent may carry out, at the Borrower's expense, one (1) Inventory appraisal in any calendar year (with an additional Inventory appraisal at the expense of the Lenders or the Administrative Agent); *provided, however,* that notwithstanding the foregoing limitations (i) at any time after a Collateral Test Triggering Event, the Administrative Agent may carry out, at the Borrower's expense, two (2) inventory appraisals in such calendar year, and (ii) at any time during the continuation of

a Specified Event of Default, the Administrative Agent may carry out, at the Borrower's expense, inventory appraisals as frequently as determined by the Administrative Agent in its Permitted Discretion.

(2)      The Administrative Agent may carry out, at the Borrower's expense, one (1) field examination in any calendar year (with an additional field examination at the expense of the Lenders or the Administrative Agent); *provided*, *however*, that notwithstanding the foregoing limitations, (i) at any time after a Collateral Test Triggering Event, the Administrative Agent may carry out, at the Borrower's expense, two (2) field examinations in such calendar year, and (ii) at any time during the continuation of a Specified Event of Default, the Administrative Agent may carry out, at the Borrower's expense, field examinations as frequently as determined by the Administrative Agent in its Permitted Discretion.

Section 6.22   <u>Agent's Advisor</u>.   At any time that Excess Availability is less than 17.5% of the Maximum Borrowing Amount for a continuous period of ten (10) Business Days, the Administrative Agent, on behalf of itself, and the Lenders, shall be entitled to retain, in consultation with the Borrower, or continue to retain (either directly or through counsel), which retention shall continue for a period of not less than sixty (60) days (or such lesser period as determined by the Administrative Agent), one financial advisor the Administrative Agent may deem reasonably necessary (collectively, the "**Agent's Advisor**") to provide advice, analysis and reporting for the benefit of the Agents and the Lenders in respect of this Agreement and the other Loan Documents.

# ARTICLE VII

## Negative Covenants

So long as the Termination Conditions are not satisfied:

Section 7.01   <u>Liens</u>.  The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien (except any Permitted Lien(s)) that secures obligations under any Indebtedness or any related guarantee of Indebtedness on any asset or property of the Borrower or any Restricted Subsidiary, or any income or profits therefrom.

The expansion of Liens by virtue of accretion or amortization of original issue discount, the payment of dividends in the form of Indebtedness, and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 7.01.

Section 7.02   <u>Indebtedness</u>.

(a)     The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(1)      create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "**incur**" and collectively, an "**incurrence**") with respect to any Indebtedness (including Acquired Indebtedness), or

(2)      issue any shares of Disqualified Stock or permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; and

(b)     the foregoing clause (a) shall not apply to the following:

(1)      Indebtedness of the Borrower and of its Subsidiaries under the Loan Documents (including Incremental Revolving Credit Loans and Extended Revolving Credit Loans);

(2)      Indebtedness incurred pursuant to the Second Lien Facility in an aggregate principal amount not to exceed the sum of (w) $~~550~~125.0 million (plus interest with respect thereto that is paid-in-kind by increasing the outstanding principal amount thereof) plus (x) other Second Lien Obligations not constituting principal and, in each case, together with any Refinancing Indebtedness in respect thereof;

(3)      (a) the incurrence of Indebtedness by the Borrower and any Restricted Subsidiary in existence on the Third Amendment Effective Date listed on Schedule 7.02(3) (excluding Indebtedness described in the preceding clauses (1) and (2) and clause (25) below);

(4)      (a) the incurrence of Attributable Indebtedness and (b) Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock incurred or issued by the Borrower or any Restricted Subsidiary and Preferred Stock issued by any Restricted Subsidiary, to finance the purchase, lease, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or other assets, including assets that are used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate principal amount, together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts) and all other Indebtedness, Disqualified Stock or Preferred Stock incurred or issued and outstanding under this clause (4), without regard to any Indebtedness listed on Schedule 7.02(3), at such time not to exceed the greater of $100.0 million and 20.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto and any Refinancing Indebtedness of the Indebtedness referred to in this clause (4) thereof;

(5)      Indebtedness incurred by the Borrower or any Restricted Subsidiary (a) constituting reimbursement obligations with respect to letters of credit, bank guarantees, banker's acceptances, warehouse receipts, or similar instruments issued or entered into, or relating to obligations or liabilities incurred, in the ordinary course of business or consistent with industry practice, including in respect of workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or (b) as an account party in respect of letters of credit, bank guarantees or similar instruments in favor of suppliers, trade creditors or other Persons issued or incurred in the ordinary course of business or consistent with industry practice;

(6)      the incurrence of Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price, earnouts or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition;

(7)      the incurrence of Indebtedness of the Borrower to a Restricted Subsidiary (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Restricted Subsidiary); *provided* that any such Indebtedness for borrowed money owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Loans to the extent permitted by applicable law and it does not result in adverse tax consequences; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary

ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (7);

(8)     the incurrence of Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Restricted Subsidiary) to the extent permitted by Section 7.05; *provided* that any such Indebtedness for borrowed money incurred by a Guarantor and owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Guaranty of the Loans of such Guarantor to the extent permitted by applicable law and it does not result in adverse tax consequences; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any such subsequent transfer of any such Indebtedness (except to the Borrower or a Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (8);

(9)     the issuance of shares of Preferred Stock or Disqualified Stock of a Restricted Subsidiary issued to the Borrower or a Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary that holds such Preferred Stock or Disqualified Stock ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock or Disqualified Stock (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an issuance of such shares of Preferred Stock or Disqualified Stock (to the extent such Preferred Stock is then outstanding) not permitted by this clause (9);

(10)     the incurrence of Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes);

(11)     the incurrence of Indebtedness in respect of self-insurance and Indebtedness in respect of performance, bid, appeal and surety bonds and performance, banker's acceptance facilities and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary or Indebtedness in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with industry practice, including those incurred to secure health, safety and environmental obligations;

(12)     the incurrence of:

(a)     Indebtedness or Disqualified Stock of the Borrower and Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or any Restricted Subsidiary in an aggregate principal amount or liquidation preference up to 100.0% of the net cash proceeds received by the Borrower and its Restricted Subsidiaries since the Closing Date from the issue or sale of Equity Interests of the Borrower and the Subsidiary Guarantors or contributions to the capital of the Borrower and the Subsidiary Guarantors, including through consolidation, amalgamation or merger (in each case, other than proceeds of Disqualified Stock, Cure Amounts or sales of Equity Interests to the Borrower or any Subsidiary) to the extent such net cash proceeds or cash have not been applied to make Permitted Investments under clause (9) of the definition of Permitted Investments; and

(b)     Indebtedness or Disqualified Stock of the Borrower and Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or any Restricted Subsidiary in an aggregate principal amount or liquidation preference that, when aggregated with the principal amount and

liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred or issued, as applicable, pursuant to this clause (12)(b), together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts), does not exceed (i) the greater of (x) $150.0 million and (y) 30.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto (and any Refinancing Indebtedness thereof ) *plus*, without duplication, (ii) in the event of any extension, replacement, refinancing, renewal or defeasance of any such Indebtedness or Disqualified Stock, an amount equal to the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness or Disqualified Stock and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness or the extension, replacement, refunding, refinancing, renewal or defeasance of such Indebtedness or Disqualified Stock;

*provided* that any Indebtedness, Disqualified Stock or Preferred Stock incurred or issued pursuant to this clause (12) will cease to be deemed incurred, issued or outstanding for purposes of this clause (12) but will be deemed incurred or issued as Permitted Ratio Debt from and after the first date on which the Borrower or such Restricted Subsidiary could have incurred or issued such Indebtedness, Disqualified Stock or Preferred Stock as Permitted Ratio Debt without reliance on this clause (12);

(13)    the incurrence by the Borrower of Indebtedness or Disqualified Stock or the incurrence by a Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock that serves to Refinance any Indebtedness permitted under clauses (3) and (12)(a) above, this clause (13) and clauses (14), (23), (29), (30) and (31), or any successive Refinancing Indebtedness with respect to any of the foregoing;

(14)    the incurrence of:

(a)    Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary, incurred or issued to finance a Permitted Acquisition or any other similar acquisition or investment or that is assumed by the Borrower or any Restricted Subsidiary in connection with such acquisition or investment, and

(b)    Indebtedness, Disqualified Stock or Preferred Stock of Persons that are acquired by the Borrower or any Restricted Subsidiary or merged into, amalgamated or consolidated with the Borrower or a Restricted Subsidiary in accordance with the terms of this Agreement (it being understood that with respect to assumed Indebtedness incurred under this clause (14), such Indebtedness is only the obligation of the Person and/or Person's Subsidiaries that are acquired or that acquire the relevant assets and such Indebtedness was not created in contemplation of such acquisition); *provided* that, the aggregate amount of such Indebtedness, Disqualified Stock or Preferred Stock incurred or assumed under this clause (14) shall not exceed the sum of:

(i)    the greater of (A) $100.0 million and (B) 20.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto, at any one time outstanding, together with all other outstanding Indebtedness, Disqualified Stock or Preferred Stock issued under this clause (i) and any outstanding Indebtedness under clause (13) of this Section 7.02(b) incurred to Refinance Indebtedness initially incurred in reliance on this clause (i) (excluding any Incremental Amounts) (and it being understood and agreed that any Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to this clause (i) will cease to be deemed to be incurred or outstanding for purposes of this clause (i) but will be deemed to be incurred under clause (ii) below or under clause (2) of the definition of Permitted Incremental Amount from and after the first date on which the Borrower or such Restricted Subsidiary could have incurred such Indebtedness, Disqualified Stock or Preferred Stock under such foregoing provision); plus

(ii)      such additional unlimited amounts, so long as (I) in the case of unsecured Indebtedness or Disqualified Stock of the Borrower or any Restricted Subsidiary or Preferred Stock of any Restricted Subsidiary (or Indebtedness or Disqualified Stock of the Borrower or any Restricted Subsidiary or Preferred Stock of any Restricted Subsidiary secured on a junior basis to the Obligations to the extent permitted under the definition of Permitted Liens), the Borrower's Total Net Leverage Ratio is equal to or less than either (x) 5.10 to 1.00 or (y) the Total Net Leverage Ratio in effect immediately prior to the consummation of such transaction and the incurrence thereof or (II) in the case of Indebtedness secured by the Term Priority Collateral on a pari passu, junior or senior basis to the Liens on the Term Priority Collateral securing the Obligations (or Disqualified Stock of the Borrower or any Restricted Subsidiary or Preferred Stock of any Restricted Subsidiary secured by the Term Priority Collateral on a pari passu, junior or senior basis to the Obligations to the extent permitted under the definition of Permitted Liens), the Borrower's First Lien Net Leverage Ratio is equal to or less than either (x) 3.75 to 1.00 or (y) the First Lien Net Leverage Ratio in effect immediately prior to the consummation of such transaction and the incurrence thereof, in the case of each of the foregoing clauses (I) and (II), determined as of the most recently ended Test Period and on a *pro forma* basis in accordance with Section 1.07 and including a *pro forma* application of the net proceeds therefrom; provided that in the case of any Indebtedness incurred under this clause (ii), (A) such Indebtedness does not mature prior the Latest Maturity Date of the Revolving Credit Loans at the time such Indebtedness is incurred and (B) in the case of Disqualified Stock and Preferred Stock, such Disqualified Stock or Preferred Stock does not by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, mature or become mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or become redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date of the Revolving Credit Loans at the time such Disqualified Stock or Preferred Stock is issued; provided further, to the extent the Borrower or any Restricted Subsidiary issues any Disqualified Stock or any Restricted Subsidiary issues any Preferred Stock pursuant to the foregoing clause (I) or (II), solely for the purpose of calculating the Total Net Leverage Ratio under such clause (I) above or the First Lien Net Leverage Ratio under such clause (II) above, as the case may be, the Consolidated Total Debt shall also include all such Disqualified Stock and Preferred Stock issued pursuant to such clause (I) or clause (II), respectively, and the definition of "Permitted Ratio Debt" then outstanding; provided further, the aggregate amount of (x) Indebtedness incurred and Disqualified Stock and Preferred Stock issued under this clause (14) and (y) Permitted Ratio Debt, in each case incurred by Restricted Subsidiaries of the Borrower that are not and do not become Guarantors, shall not exceed the greater of (a) $100.0 million and 20.0% of Adjusted EBITDA in the aggregate as of the most recently ended Test Period calculated giving *pro forma* effect thereto,

(15)      the incurrence of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with industry practice;

(16)      the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary supported by letters of credit or bank guarantees permitted hereunder, in each case, in a principal amount not in excess of the stated amount of such letters of credit or bank guarantees;

(17)      (a) the incurrence of any guarantee by the Borrower or a Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence

167

of such Indebtedness or other obligations incurred by the Borrower or such Restricted Subsidiary is permitted by this Agreement, or (b) any co-issuance by the Borrower or any Restricted Subsidiary of any Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations by the Borrower or such Restricted Subsidiary was permitted hereunder;

(18)     the incurrence of Indebtedness issued by the Borrower or any Restricted Subsidiary to future, present or former employees, directors, officers, members of management and consultants thereof, their respective Controlled Investment Affiliates or Immediate Family Members and permitted transferees thereof, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Company to the extent described in Section 7.05(b)(4);

(19)     customer deposits and advance payments received in the ordinary course of business or consistent with industry practice from customers for goods and services purchased in the ordinary course of business or consistent with industry practice;

(20)     the incurrence of (a) Indebtedness owed to banks and other financial institutions incurred in the ordinary course of business or consistent with industry practice in connection with ordinary banking arrangements to manage cash balances of the Borrower and its Restricted Subsidiaries and (b) Indebtedness in respect of Cash Management Services, including Cash Management Obligations;

(21)     Indebtedness incurred by the Borrower or any Restricted Subsidiary in connection with bankers' acceptances, discounted bills of exchange or the discounting or factoring of receivables for credit management purposes, in each case incurred or undertaken in the ordinary course of business or consistent with industry practice on arm's-length commercial terms;

(22)     the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business or consistent with industry practice;

(23)     the incurrence of Indebtedness or Disqualified Stock by Restricted Subsidiaries of the Borrower that are not Guarantors in an amount not to exceed and together with any other Indebtedness and Disqualified Stock incurred and outstanding under this clause (23) and any outstanding Indebtedness or Disqualified Stock under clause (13) to Refinance Indebtedness initially incurred in reliance on this clause (23) (excluding any Incremental Amounts) the greater of (a) $75.0 million and 15.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto; it being understood that any Indebtedness or Disqualified Stock deemed incurred or issued pursuant to this clause (23) will cease to be deemed incurred or issued or outstanding for the purpose of this clause (23) but will be deemed incurred or issued under clause (e) of the definition of Permitted Ratio Debt from and after the first date on which the Borrower or such Restricted Subsidiaries could have incurred such Indebtedness under clause (e) of the definition of Permitted Ratio Debt without reliance on this clause (23);

(24)     the incurrence of Indebtedness by the Borrower or any Restricted Subsidiary undertaken in connection with cash management (including netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and related or similar services or activities) with respect to the Borrower, any Subsidiaries or any joint venture in the ordinary course of business or consistent with industry practice, including with respect to financial accommodations of the type described in the definition of Cash Management Services;

(25)    Indebtedness incurred pursuant to the First Lien Facility in an aggregate principal amount not to exceed the sum of (w) $[$1,122.0] million (plus interest with respect thereto that is paid-in-kind by increasing the outstanding principal amount thereof) *plus* (x) [the aggregate amount of Incremental Term Loans (as defined in the First Lien Credit Agreement as in effect on the Third Amendment Effective Date)]) *plus* (y) Permitted Incremental Equivalent Debt (as defined in the First Lien Credit Agreement as in effect on the Third Amendment Effective Date) *plus* (z) other First Lien Obligations (not constituting principal) and, in each case, together with any Refinancing Indebtedness in respect thereof (which includes for the avoidance of doubt Permitted Debt Exchange Notes (as defined in the First Lien Credit Agreement as in effect on the Third Amendment Effective Date));

(26)    guarantees incurred in the ordinary course of business or consistent with industry practice in respect of obligations to suppliers, customers, franchisees, lessors, licensees, sub-licensees and distribution partners;

(27)    the incurrence of Indebtedness attributable to (but not incurred to finance) the exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) with respect to the Closing Date Transactions or any other acquisition (by merger, consolidation or amalgamation or otherwise) in accordance with the terms hereof;

(28)    the incurrence of Indebtedness representing deferred compensation to employees of any Parent Company, the Borrower or any Restricted Subsidiary, including Indebtedness consisting of obligations under deferred compensation or any other similar arrangements incurred in connection with the Closing Date Transactions, any investment or any acquisition (by merger, consolidation or amalgamation or otherwise) permitted under this Agreement;

(29)    the incurrence of Indebtedness arising out of any Specified Real Estate Financing;

(30)    [reserved];

(31)    Permitted Ratio Debt; and

(32)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (1) through (31) above.

(c)    For purposes of determining compliance with this Section 7.02:

(1)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) at any time, whether at the time of incurrence or upon the application of all or a portion of the proceeds thereof or subsequently, meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (32) above, the Borrower, in its sole discretion, may divide and classify and may subsequently re-divide and reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock (or a portion thereof) in such of the above clauses as determined by the Borrower at such time; *provided* that all Indebtedness incurred hereunder on the Closing Date will, at all times, be treated as incurred on the Closing Date under Section 7.02(b)(1), (2) and (25), respectively, and may not be reclassified;

(2)    the Borrower is entitled to divide and classify an item of Indebtedness, Disqualified Stock or Preferred Stock in more than one of the types of Indebtedness, Disqualified Stock or Preferred Stock described in Section 7.02(b), subject to the proviso to the preceding clause (1) of this Section 7.02(c);

(3)      the principal amount of Indebtedness outstanding under any clause of this Section 7.02 will be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness;

(4)      in the event an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) is incurred or issued pursuant to a fixed dollar Basket under Section 7.02(b) on the same date that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) is incurred or issued under an applicable incurrence test available under Section 7.02(b), then the applicable incurrence test under Section 7.02(b) will be calculated with respect to such incurrence under such incurrence test without regard to any incurrence under a fixed dollar Basket then available under Section 7.02(b); *provided* that unless the Borrower elects otherwise, the incurrence of Indebtedness, Disqualified Stock or Preferred Stock will be deemed incurred or issued first under the then available incurrence test under Section 7.02(b) to the extent permitted with the balance incurred under a then available fixed dollar Basket under Section 7.02(b); and

(5)      guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that are otherwise included in the determination of a particular amount of Indebtedness will not be included in the determination of such amount of Indebtedness; *provided* that the incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was incurred in compliance with this Section 7.02.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, in each case, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 7.02. Any Indebtedness incurred to refinance Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to clauses (2), (3), (4), (12), (13), (14), (23) and (25) of Section 7.02(b) will be permitted to include additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay accrued but unpaid interest and dividends and premiums, defeasance costs and fees and expenses incurred in connection with such refinancing.

For purposes of determining compliance with any Dollar denominated restriction on the incurrence of Indebtedness or issuance of Disqualified Stock or Preferred Stock, the Dollar equivalent principal amount of Indebtedness or Disqualified Stock or Preferred Stock denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness, Disqualified Stock or Preferred Stock was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness, Disqualified Stock or Preferred Stock is issued to Refinance other Indebtedness, Disqualified Stock or Preferred Stock denominated in a foreign currency, and such refinancing would cause the applicable Dollar denominated (or the applicable growth component with respect to such Basket, if greater) restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar denominated restriction will be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness, Disqualified Stock or Preferred Stock does not exceed (i) the principal amount of such Indebtedness, Disqualified Stock or Preferred Stock (as applicable) being refinanced *plus* (ii) the aggregate amount of accrued but unpaid interest, fees, underwriting discounts, defeasance costs, premiums (including tender premiums) and other costs and expenses (including OID, upfront fees or similar fees) incurred in connection with such refinancing.

The principal amount of any Indebtedness, Disqualified Stock or Preferred Stock incurred to refinance other Indebtedness, Disqualified Stock or Preferred Stock, if incurred in a different currency from the Indebtedness, Disqualified Stock or Preferred Stock, as applicable, being refinanced, will be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness or Disqualified Stock or Preferred Stock is denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date will be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.02, if any Indebtedness is refinanced in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Indebtedness does not exceed the sum of (i) the principal amount of such Indebtedness being refinanced, *plus* (ii) the related costs incurred or payable in connection with such refinancing.

Section 7.03     Fundamental Changes. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consolidate, amalgamate or merge with or into or wind up into another Person, or liquidate or dissolve or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (including, in each case, pursuant to a Division) (other than as part of the Closing Date Transactions), except that:

(1)     Subject to Section 3.03(a) of the Security Agreement, Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that

(a)     the Borrower shall be the continuing or surviving Person,

(b)     such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and

(c)     in the case of a merger or consolidation of Holdings with and into the Borrower,

(i)     Holdings shall not be an obligor in respect of any Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement,

(ii)     Holdings shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower,

(iii)     no Default or Event of Default exists at such time or after giving effect to such transaction and

(iv)     after giving effect to such transaction, the direct parent of the Borrower will (A) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower, (B) pledge 100% of the Equity Interests of the Borrower to the Administrative Agent as Collateral to secure the Obligations in form reasonably satisfactory to the Administrative Agent and the Borrower and (C) be in compliance with Section 7.09;

(2)        (a)        any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary that is not a Loan Party,

(a)        any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary that is a Loan Party; provided that a Loan Party shall be the continuing or surviving Person;

(b)        any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States will be permitted; and

(c)        any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and the Restricted Subsidiaries and is not materially disadvantageous to the Lenders;

*provided* that in the case of clauses (b) through (d) of this Section 7.03(2), (x) no Event of Default shall have occurred and be continuing or result therefrom or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom and (y) the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor shall be a Loan Party or such disposition shall otherwise be permitted under Section 7.05 or the definition of "Permitted Investments";

(3)        any Restricted Subsidiary may dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (x) the transferee must be a Loan Party or (y) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Restricted Subsidiary which is not a Loan Party in connection with any Investment permitted hereunder;

(4)        so long as no Event of Default shall have occurred and be continuing or result therefrom or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom, the Borrower may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) the Borrower shall be the continuing or surviving corporation or (b) if the Person formed by or surviving any such merger or consolidation is not the Borrower (or, in connection with a disposition of all or substantially all of the Borrower's assets, is the transferee of such assets) (any such Person, a "**Successor Borrower**"):

(i)        the Successor Borrower will:

(A)        be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(B)        expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a

supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower; and

(C)   deliver to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this Section 7.03(4) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Administrative Agent;

(ii)   substantially contemporaneously with such transaction (or at a later date as agreed by the Administrative Agent),

(A)   each Guarantor, unless it is the other party to such merger or consolidation, will by a supplement to the Guaranty (or in another form reasonably satisfactory to the Administrative Agent and the Borrower) reaffirm its Guaranty of the Obligations (including the Successor Borrower's obligations under this Agreement), and

(B)   each Loan Party, unless it is the other party to such merger or consolidation, will, by a supplement to the Security Agreement (or in another form reasonably satisfactory to the Administrative Agent), confirm its grant or pledge thereunder,

(iii)   after giving *pro forma* effect to such incurrence, the Borrower would be permitted to incur at least $1.00 of additional Indebtedness pursuant to clause (31) of Section 7.02(b); or

(iv)   the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Borrower required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided further* that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(5)   so long as no Event of Default shall have occurred and be continuing or result therefrom or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom, Holdings may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) Holdings will be the continuing or surviving Person or (b) if:

(i)   the Person formed by or surviving any such merger or consolidation is not Holdings,

(ii)   Holdings is not the Person into which the applicable Person has been liquidated or

(iii)      in connection with a disposition of all or substantially all of Holdings' assets, the Person that is the transferee of such assets is not Holdings (any such Person described in the preceding clauses (i) through (iii), a "**Successor Holdings**"), then the Successor Holdings will:

(A)      be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia,

(B)      expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower,

(C)      (I) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower and (II) pledge 100% of the Equity Interests of the Borrower to the Administrative Agent as Collateral to secure the Obligations in accordance with the Security Agreement or otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Borrower, and

(D)      if requested by the Administrative Agent, deliver, or cause the Borrower to deliver, to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this 7.03(5) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Administrative Agent;

(iv)      the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Holdings required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

*provided further* that if the foregoing are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement;

(6)      any Restricted Subsidiary may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person in order to effect a Permitted Investment or other investment permitted pursuant to Section 7.05; *provided* that solely in the case of a merger or consolidation involving a Loan Party and subject to Section 1.07(8) in the case of a Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or result therefrom; *provided further*, that the continuing or surviving Person will be (a) the Borrower or (b) a Loan Party, in each case, which together with each of its Restricted Subsidiaries, will have complied with the applicable requirements of Section 6.11;

(7)      a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a disposition permitted pursuant to Section 7.04 (other than under clause (2)(c) of the definition of "Asset Sale");

(8)        subject to Section 3.03 of the Security Agreement, the Borrower may (a) convert into a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of the Borrower or the laws of a jurisdiction in the United States and (b) change its name;

(9)        the Loan Parties and the Restricted Subsidiaries may consummate the Closing Date Transactions; and

(10)       the commencement of any proceedings against any Restricted Subsidiary under Debtor Relief Laws to the extent it shall not constitute an Event of Default under Section 8.01(6).

Section 7.04        Asset Sales. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consummate any Asset Sale unless:

(1)        the Borrower or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise in connection with such Asset Sale) at least equal to the fair market value (measured at the time of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of, and

(2)        except in the case of a Permitted Asset Swap, at least 75.0% of the consideration for such Asset Sale, together with all other Asset Sales since the Closing Date (on a cumulative basis) received by the Borrower or a Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that each of the following will be deemed to be cash or Cash Equivalents for purposes of this clause (2):

(a)        any liabilities (as shown on the Borrower's or any Restricted Subsidiary's most recent balance sheet or in the footnotes thereto or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or a Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet, as determined in good faith by the Borrower) of the Borrower or any Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Obligations, that are (i) assumed by the transferee of any such assets (or a third party in connection with such transfer) or (ii) otherwise cancelled or terminated in connection with the transaction with such transferee (other than intercompany debt owed to the Borrower or a Restricted Subsidiary);

(b)        any securities, notes or other obligations or assets received by the Borrower or any Restricted Subsidiary from such transferee or in connection with such Asset Sale (including earnouts and similar obligations) that are converted by the Borrower or a Restricted Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of such Asset Sale;

(c)        any Designated Non-Cash Consideration received by the Borrower or any Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed the greater of (i) $50.0 million and (ii) 1.8% of Total Assets as of the most recently ended Test Period calculated giving *pro forma* effect thereto on the date of the receipt of such Designated Non-Cash Consideration (or, at the Borrower's option, at the time of contractually agreeing to such Asset Sale), with the fair market value of each item of Designated Non-Cash Consideration being

measured, at the Borrower's option, either at the time of contractually agreeing to such Asset Sale or at the time received and, in either case, without giving effect to any subsequent change(s) in value; or

(d)        Indebtedness of any Restricted Subsidiary that ceases to be a Restricted Subsidiary as a result of such Asset Sale (other than intercompany debt owed to the Borrower or a Restricted Subsidiary), to the extent that the Borrower and each other Restricted Subsidiary are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Asset Sale.

(3)        in the event of an Asset Sale of IP Rights used or useful in connection with the ABL Priority Collateral (after giving effect to such Asset Sale), the purchaser, assignee or other transferee thereof agrees in writing to be bound by a non-exclusive royalty-free worldwide license of such IP Rights in favor of the Administrative Agent for use in connection with the exercise of the rights and remedies of the Secured Parties, which license shall be in form and substance reasonably satisfactory to the Administrative Agent, and provided further that in the case of an Asset Sale of IP Rights of the Borrower or one of its Subsidiaries from a third party, the transferee thereof shall be required to provide such a license only to the extent to which the applicable license gives it a right to do so.

To the extent any Collateral is disposed of as expressly permitted by this Section 7.04 to any Person other than a Loan Party, such Collateral shall automatically be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such disposition is permitted by this Agreement, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing, provided that after giving effect to any such disposition, no Overadvance shall exist or result therefrom.

Following the consummation of any disposition of other transfer of Collateral constituting ABL Priority Collateral that results in Net Proceeds to the Borrower or any Restricted Subsidiary in excess of $50.0 million, the Borrower shall deliver an updated Borrowing Base Certificate that gives *pro forma* effect to such disposition or other transfer upon the earliest of (x) the date of the Revolving Credit Borrowing subsequent to such disposition or transfer, (y) the consummation of a transaction hereunder that requires the satisfaction of the Payment Conditions or (z) the date on which the next Borrowing Base Certificate is required to be delivered pursuant to Section 6.20.

In addition, none of the Borrower or any Restricted Subsidiary shall enter into any Specified Real Estate Financing unless such Specified Real Estate Financing is conducted as an arm's-length basis and is for fair market value of the applicable property as determined by a Responsible Officer of the Borrower in good faith.

Section 7.05   Restricted Payments.  (a) The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(A)        declare or pay any dividend or make any payment or distribution on account of the Borrower's or any Restricted Subsidiary's Equity Interests (in each case, solely in such Person's capacity as holder of such Equity Interests), including any dividend or distribution payable in connection with any merger, amalgamation or consolidation, other than:

(1)        dividends, payments or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or a Parent Company or in options, warrants or other rights to purchase such Equity Interests; or

176

(2)     dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a wholly owned Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend, payment or distribution in accordance with its Equity Interests in such class or series of securities or such other amount to which it is entitled pursuant to the terms of such Equity Interest;

(B)     purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Borrower or any Parent Company, including in connection with any merger, amalgamation or consolidation, in each case held by Persons other than the Borrower or a Restricted Subsidiary;

(C)     make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment or final maturity, any Specified Indebtedness, other than Indebtedness permitted under clauses (7), (8) and (9) of Section 7.02(b); or

(D)     make any Restricted Investment;

(all such payments and other actions set forth in clauses (A) through (D) above being collectively referred to as "**Restricted Payments**");

(b)     The provisions of Section 7.05(a) will not prohibit:

(1)     the payment of any dividend or other distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or other distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or other distribution or redemption payment would have complied with the provisions of this Section 7.05;

(2)     (a)     the redemption, repurchase, defeasance, discharge, retirement or other acquisition of (i) any Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company, including any accrued and unpaid dividends thereon ("**Treasury Capital Stock**") or (ii) Specified Indebtedness, in each case, made (x) in exchange for, or out of the proceeds of, a sale or issuance (other than to a Restricted Subsidiary) of Equity Interests of the Borrower or any Parent Company (to the extent such Equity Interests or proceeds therefrom are contributed to the Borrower) (in each case, other than Disqualified Stock or Cure Amounts) and (y) within 120 days of such sale or issuance ("**Refunding Capital Stock**"),

(b)     the declaration and payment of dividends on Treasury Capital Stock out of the proceeds of a sale or issuance (other than to a Restricted Subsidiary of the Borrower or to an employee stock ownership plan or any trust established by the Borrower or any Restricted Subsidiary) of Refunding Capital Stock made within 120 days of such sale or issuance, and

(c)     if, immediately prior to the retirement of Treasury Capital Stock, the declaration and payment of dividends thereon by the Borrower were permitted under clauses (6)(a) or (b) of this Section 7.05(b), the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any Parent Company) in an aggregate amount *per annum* no greater than the aggregate

177

amount of dividends per annum that were declarable and payable on such Treasury Capital Stock immediately prior to such retirement;

(3)     the principal payment on, defeasance, redemption, repurchase, exchange or other acquisition or retirement of:

(a)     Specified Indebtedness of the Borrower or a Subsidiary Guarantor made (i) by exchange for, or out of the proceeds of the sale, issuance or incurrence of, new Specified Indebtedness of the Borrower or a Subsidiary Guarantor or Disqualified Stock of the Borrower or a Subsidiary Guarantor and (ii) within 120 days of such sale, issuance or incurrence, *provided* such new Specified Indebtedness shall mature no earlier, and not have a shorter weighted average life, than the Specified Indebtedness being so refinanced or exchanged (*provided further* that (x) if the Specified Indebtedness being refinanced or exchanged is subordinated indebtedness, such new Specified Indebtedness shall also be subordinated indebtedness and (y) if such Specified Indebtedness is unsecured, such new Specified Indebtedness shall be unsecured),

(b)     Disqualified Stock of the Borrower or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale, issuance or incurrence of Disqualified Stock or Specified Indebtedness of the Borrower or a Subsidiary Guarantor, made within 120 days of such sale, issuance or incurrence,

(c)     Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale or issuance of, Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor, made within 120 days of such sale or issuance that, in each case, is Refinancing Indebtedness incurred or issued, as applicable, in compliance with Section 7.02 and

(d)     any Specified Indebtedness or Disqualified Stock that constitutes Acquired Indebtedness;

(4)     (a) Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) (including related stock appreciation rights or similar securities) of the Borrower or any Parent Company held by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, or any equity subscription or equity holder agreement (including, for the avoidance of doubt, any principal and interest payable on any notes issued by the Borrower or any Parent Company in connection with any such repurchase, retirement or other acquisition), including any Equity Interests rolled over by management of the Borrower, any of its Subsidiaries or any Parent Company in connection with the Closing Date Transactions; *provided* that the aggregate amount of Restricted Payments made under this clause (4) does not exceed $10.0 million in any fiscal year (increasing to $20.0 million following an underwritten public Equity Offering by the Borrower or any Parent Company) with unused amounts in any calendar year being carried over to the next two succeeding calendar years; *provided further* that each of the amounts in any calendar year under this clause (4) may be increased by an amount not to exceed:

(b)      the cash proceeds from the sale of Equity Interests (other than Disqualified Stock or Cure Amounts) of the Borrower and, to the extent contributed to the Borrower, the cash proceeds from the sale of Equity Interests of any Parent Company, in each case to any future, present or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that occurs after the Closing Date; *plus*

(c)      the amount of any cash bonuses otherwise payable to members of management, employees, directors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that are foregone in exchange for the receipt of Equity Interests of the Borrower or any Parent Company pursuant to any compensation arrangement, including any deferred compensation plan; *plus*

(d)      the cash proceeds of life insurance policies received by the Borrower or its Restricted Subsidiaries (or by any Parent Company to the extent contributed to the Borrower) after the Closing Date; *minus*

(e)      the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a), (b) and (c) of this clause (4);

*provided* that the Borrower may elect to apply all or any portion of the aggregate increase contemplated by clauses (a), (b) and (c) above in any calendar year; *provided further* that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from any future, present or former employees, directors, officers, members of management, or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary in connection with a repurchase of Equity Interests of the Borrower or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.05 or any other provision of this Agreement; and *provided further*, that no Event of Default shall have occurred and be continuing or would result from the making of any Restricted Payment pursuant to this clause (4);

(5)      [reserved];

(6)      (a)      the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock issued by the Borrower or any Restricted Subsidiary after the Closing Date;

(b)      the declaration and payment of dividends or distributions to any Parent Company, the proceeds of which will be used to fund the payment of dividends or distributions to holders of any class or series of Designated Preferred Stock issued by such Parent Company after the Closing Date; *provided* that the amount of dividends and distributions paid pursuant to this clause (b) will not exceed the aggregate amount of cash actually contributed to the Borrower from the sale of such Designated Preferred Stock; or

(c)      the declaration and payment of dividends on Refunding Capital Stock that is Designated Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this Section 7.05(b);

*provided* that in the case of each of clauses (a) and (c) of this clause (6), that for the most recently ended Test Period preceding the date of issuance of such Designated Preferred Stock or the declaration of such dividends on Refunding Capital Stock that is Preferred Stock, after giving effect to such issuance or declaration on a *pro forma* basis, the Borrower would be able to incur $1.00 of Permitted Ratio Debt (and solely for the purpose of the testing hereunder, including all Designated Preferred Stock issued and outstanding in Consolidated Total Debt);

(7)    (a)    payments made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any Restricted Subsidiary or any Parent Company,

(b)    any repurchases or withholdings of Equity Interests in connection with the exercise of stock options, warrants or similar rights if such Equity Interests represent a portion of the exercise of, or withholding obligations with respect to, such options, warrants or similar rights or required withholding or similar taxes and

(c)    loans or advances to officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Restricted Subsidiary or any Parent Company in connection with such Person's purchase of Equity Interests of the Borrower or any Parent Company; *provided* that no cash is actually advanced pursuant to this clause (c) other than to pay taxes due in connection with such purchase, unless immediately repaid;

(8)    the declaration and payment of dividends on the Borrower's common equity (or the payment of dividends to any Parent Company to fund a payment of dividends on such company's common equity), following the first public offering of the Borrower's common equity or the common equity of any Parent Company after the Closing Date that is a Qualifying IPO, in an amount not to exceed 6.0% per annum of the net cash proceeds received by or contributed to the Borrower other than any public sale constituting an Excluded Contribution; provided that no Event of Default under Section 8.01(1) or Section 8.01(6) shall have occurred and be continuing or would result therefrom;

(9)    Restricted Payments in an amount that does not exceed the aggregate amount of Excluded Contributions, if on a *pro forma* basis after giving effect to such Restricted Payment, the Payment Conditions shall have been satisfied with respect thereto;

(10)    Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (10) not to exceed the greater of (a) $75.0 million and (b) 15.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto; *provided* that if this clause (10) is utilized to make a Restricted Investment, the amount deemed to be utilized under this clause (10) will be the amount of such Restricted Investment at any time outstanding (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); and provided further that no Event of Default shall have occurred and be continuing or would result therefrom;

(11)    [reserved];

(12)     any Restricted Payment made in connection with the Closing Date Transactions and the fees and expenses related thereto or owed to any Affiliate(s) including any payments to holders of Equity Interests of Belk in connection with, or as a result of, their exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) related to the Closing Date Transactions;

(13)     [reserved];

(14)     the declaration and payment of dividends or distributions by the Borrower or any Restricted Subsidiary to, or the making of loans or advances to, the Borrower or any Parent Company in amounts required for any Parent Company to pay in each case without duplication:

(a)     franchise, excise and similar taxes and other fees, taxes and expenses required to maintain their corporate or other legal existence;

(b)     for any taxable period for which the Borrower or any of its Restricted Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for U.S. federal or applicable foreign, state or local income tax purposes of which a Parent Company is the common parent (a "**Tax Group**"), to pay the portion of any U.S. federal, foreign, state and local income taxes of such Tax Group for such taxable period that are attributable to the taxable income of the Borrower and its Restricted Subsidiaries and Unrestricted Subsidiaries (net of any payments of such taxes made by the Borrower); *provided* that for each taxable period, (A) the amount of such payments made in respect of such taxable period in the aggregate will not exceed the amount that the Borrower and its Subsidiaries, as applicable, would have been required to pay as stand-alone taxpayers or a stand-alone Tax Group and (B) the amount of such payments made in respect of an Unrestricted Subsidiary will be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary for such purpose;

(c)     salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, employees, directors, officers, members of management and consultants of any Parent Company, and any payroll, social security or similar taxes thereof;

(d)     general corporate or other operating, administrative, compliance and overhead costs and expenses (including expenses relating to auditing and other accounting matters) of any Parent Company attributable to the ownership of the Borrower and its Restricted Subsidiaries;

(e)     fees and expenses (including ongoing compliance costs and listing expenses) related to any equity or debt offering of a Parent Company (whether or not consummated);

(f)     amounts that would be permitted to be paid directly by the Borrower or its Restricted Subsidiaries under Section 7.06(b) (other than clause 2(a) thereof);

(g)     interest or principal on Indebtedness the proceeds of which have been contributed to the Borrower or any Restricted Subsidiary (other than Excluded Contributions) or that has been guaranteed by, or is otherwise considered Indebtedness

of, the Borrower or any Restricted Subsidiary incurred in accordance with Section 7.02, if on a *pro forma* basis after giving effect to such Restricted Payment, the Payment Conditions shall have been satisfied with respect thereto;

(h)    to finance Investments or other acquisitions or investments otherwise permitted to be made pursuant to this Section 7.05 if made by the Borrower; *provided* that:

(i)    such Restricted Payment must be made within 120 days of the closing of such Investment, acquisition or investment,

(ii)    such Parent Company must, promptly following the closing thereof, cause (A) all property acquired (whether assets or Equity Interests) to be contributed to the capital of the Borrower or another Loan Party (which, for the avoidance of doubt, shall not be designated as Excluded Contributions) or (B) the merger, amalgamation, consolidation or sale of the Person formed or acquired into the Borrower or another Loan Party (to the extent not prohibited by Section 7.03) in order to consummate such Investment, acquisition or investment,

(iii)    such Parent Company and its Affiliates (other than the Borrower or any Restricted Subsidiary) receives no consideration or other payment in connection with such transaction except to the extent the Borrower or a Restricted Subsidiary could have given such consideration or made such payment in compliance with this Agreement,

(iv)    [reserved]; and

(v)    to the extent constituting an Investment, such Investment will be deemed to be made by the Borrower or such Restricted Subsidiary pursuant to another provision of this Section 7.05 (other than pursuant to clause (9) of this Section 7.05(b)) or pursuant to the definition of "Permitted Investments" (other than clause (9) thereof);

(15)    the distribution, by dividend or otherwise, or other transfer or disposition of shares of Capital Stock of, Equity Interests in, or Indebtedness owed to the Borrower or a Restricted Subsidiary by, Unrestricted Subsidiaries (other than Unrestricted Subsidiaries, substantially all the assets of which are cash and Cash Equivalents); provided that no Event of Default shall have occurred and be continuing or would result therefrom;

(16)    cash payments, or loans, advances, dividends or distributions to any Parent Company to make payments, in lieu of issuing fractional shares in connection with share dividends, share splits, reverse share splits, mergers, consolidations, amalgamations or other business combinations and in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company;

(17)    unlimited additional Restricted Payments shall be permitted, if on a *pro forma* basis after giving effect to such Restricted Payment, the Payment Conditions shall have been satisfied with respect thereto;

(18)    making payments for the benefit of the Borrower or any Restricted Subsidiary to the extent such payments could have been made by the Borrower or any Restricted Subsidiary because such payments (a) would not otherwise be Restricted Payments and (b) would be permitted by Section 7.06;

(19)    payments and distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries taken as a whole that complies with the terms of this Agreement or any other transaction that complies with the terms of this Agreement;

(20)    the payment of dividends, other distributions and other amounts by the Borrower to, or the making of loans to, any Parent Company in the amount required for such parent to, if applicable, pay amounts equal to amounts required for any Parent Company, if applicable, to pay interest or principal (including AHYDO Payments) on Indebtedness, the proceeds of which have been permanently contributed to the Borrower or any Restricted Subsidiary (which, for the avoidance of doubt, shall not be designated as Excluded Contributions) and that has been guaranteed by, or is otherwise considered Indebtedness of, the Borrower or any Restricted Subsidiary incurred in accordance with this Agreement; *provided* that the aggregate amount of such dividends, distributions, loans and other amounts shall not exceed the amount of cash actually contributed to the Borrower for the incurrence of such Indebtedness;

(21)    the making of cash payments in connection with any conversion of Convertible Indebtedness of the Borrower or any Restricted Subsidiary in an aggregate amount since the date of this Agreement not to exceed the sum of (a) the principal amount of such Convertible Indebtedness *plus* (b) any payments received by the Borrower or any Restricted Subsidiary pursuant to the exercise, settlement or termination of any related Permitted Bond Hedge Transaction, if on a *pro forma* basis after giving effect to such Restricted Payment, the Payment Conditions shall have been satisfied with respect thereto;

(22)    any payments in connection with (a) a Permitted Bond Hedge Transaction and (b) the settlement of any related Permitted Warrant Transaction (i) by delivery of shares of the Borrower's common stock upon settlement thereof or (ii) by (A) set-off against the related Permitted Bond Hedge Transaction or (B) payment of an early termination amount thereof in common stock upon any early termination thereof; and

(23)    the making of Specified Real Estate Distributions;

*provided* that for purposes of clauses (7), (14) and (20) above, taxes will include all interest and penalties with respect thereto and all additions thereto; *provided further* that notwithstanding the foregoing, the Borrower shall not directly or indirectly make any cash Restricted Payments (other than Restricted Payments permitted pursuant to clauses (4), (7) and (14)(a)-(f) above) prior to the first anniversary of the Third Amendment Effective Date.

(c)    For purposes of determining compliance with this Section 7.05, in the event that any Restricted Payment or Investment (or any portion thereof) meets the criteria of more than one of the categories of Restricted Payments described in clauses (1) through (23) of Section 7.05(b) or one or more of the clauses contained in the definition of "Permitted Investments," the Borrower will be entitled to divide or classify (or later divide, classify or reclassify), in whole or in part, in its sole discretion, such Restricted Payment or Investment (or any portion thereof) among such clauses (1) through (23) of

Section 7.05(b) or one or more clauses contained in the definition of "Permitted Investments," in any manner that otherwise complies with this Section 7.05.

The amount of all Restricted Payments (other than cash) will be the fair market value on the date the Restricted Payment is made, or at the Borrower's election, the date a commitment is made to make such Restricted Payment, of the assets or securities proposed to be transferred or issued by the Borrower or any Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

After giving effect to any Restricted Payment constituting the Equity Interests of a Restricted Subsidiary, no Overadvance shall exist or result therefrom.

For the avoidance of doubt, this Section 7.05 will not restrict the making of any AHYDO Payment with respect to, and required by the terms of, any Indebtedness of the Borrower or any Restricted Subsidiary permitted to be incurred under this Agreement.

Section 7.06    Transactions with Affiliates.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "**Affiliate Transaction**") involving aggregate payments or consideration in excess of $25.0 million, unless (A) such Affiliate Transaction is on terms, taken as a whole, that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained at such time in a comparable transaction by the Borrower or such Restricted Subsidiary with a Person other than an Affiliate of the Borrower on an arm's-length basis or, if in the good faith judgment of the Board of Directors no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to the Borrower or such Restricted Subsidiary from a financial point of view, and (B) the Borrower delivers to the Administrative Agent with respect to any Affiliate Transaction or series of related Affiliate Transactions requiring aggregate payments or consideration in excess of $50.0 million, a resolution adopted by the majority of the Board of Directors approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (A) above.

(b)    The foregoing restriction will not apply to the following:

(1)    (a) transactions between or among the Borrower and one or more Restricted Subsidiaries or between or among Restricted Subsidiaries or, in any case, any entity that becomes a Restricted Subsidiary as a result of such transaction and (b) any merger, consolidation or amalgamation of the Borrower and any Parent Company; *provided* that such merger, consolidation or amalgamation of the Borrower is otherwise in compliance with the terms of this Agreement and effected for a *bona fide* business purpose;

(2)    (a) Restricted Payments permitted by Section 7.05 (including any transaction specifically excluded from the definition of the term "Restricted Payments," including pursuant to the exceptions contained in the definition thereof and the parenthetical exclusions of such definition), and (b) any Permitted Investment(s) or any acquisition otherwise permitted;

(3)    (a) so long as no Event of Default under Section 8.01(1) and Section 8.01(6) shall have occurred and be continuing or would result therefrom, the payment of management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses pursuant to

the Management Services Agreement (including any unpaid management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses accrued in any prior year) and any termination fees pursuant to the Management Services Agreement, or any amendment thereto or replacement thereof so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders when taken as a whole, as compared to the Management Services Agreement as in effect on the Closing Date,

       (b)    the payment of indemnification and similar amounts to, and reimbursement of expenses to, the Investors and its officers, directors, employees and Affiliates, in each case, approved by, or pursuant to arrangements approved by, the Board of Directors,

       (c)    payments, loans, advances or guarantees (or cancellation of loans, advances or guarantees) to future, present or former employees, officers, directors, managers, consultants or independent contractors or guarantees in respect thereof for bona fide business purposes or in the ordinary course of business or consistent with industry practice,

       (d)    any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company and

       (e)    any payment of compensation or other employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company;

       (4)    the payment of fees and compensation paid to, and indemnities and reimbursements and employment and severance arrangements provided to, or on behalf of or for the benefit of, present, future or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary;

       (5)    transactions in which the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or stating that the terms, when taken as a whole, are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Restricted Subsidiary with a Person that is not an Affiliate of the Borrower on an arm's length basis;

       (6)    the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any agreement as in effect as of the Closing Date, or any amendment thereto or replacement thereof (so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the applicable agreement as in effect on the Closing Date);

(7)     the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any equity holders agreement or the equivalent (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Closing Date and any amendment thereto and, similar agreements or arrangements that it may enter into thereafter; *provided* that the existence of, or the performance by the Borrower or any Restricted Subsidiary of obligations under any future amendment to any such existing agreement or arrangement or under any similar agreement or arrangement entered into after the Third Amendment Effective Date will be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement or arrangement are not otherwise materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the original agreement or arrangement in effect on the Third Amendment Effective Date;

(8)     (i) the Closing Date Transactions and the payment of all fees and expenses related to the Closing Date Transactions, including Transaction Expenses and (ii) the Third Amendment Transactions and the payment of all fees and expenses related to the Third Amendment Transactions, including Third Amendment Transaction Expenses;

(9)     transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business or consistent with industry practice and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10)     the issuance, sale or transfer of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company to any Person and the granting and performing of customary rights (including registration rights) in connection therewith, and any contribution to the capital of the Borrower;

(11)     [reserved];

(12)     payments by the Borrower or any Restricted Subsidiary made for any financial advisory, consulting, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by, or made pursuant to arrangements approved by, a majority of the Board of Directors in good faith;

(13)     payments with respect to Indebtedness, Disqualified Stock and other Equity Interests (and cancellation of any thereof) of the Borrower, any Parent Company and any Restricted Subsidiary and Preferred Stock (and cancellation of any thereof) of any Restricted Subsidiary to any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any equity subscription or equity holder agreement that are, in each case, approved by the Borrower in good faith; and any employment agreements, severance arrangements, stock option plans and other compensatory arrangements (and any successor plans thereto) and any supplemental executive retirement benefit plans or arrangements with any such employees, directors, officers, members of management or consultants (or their respective

Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) that are, in each case, approved by the Borrower in good faith;

(14)     (a) investments by Affiliates in securities of the Borrower (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Borrower or such Restricted Subsidiary generally to other investors on the same or more favorable terms and (b) payments to Affiliates in respect of securities of the Borrower or any Restricted Subsidiary contemplated in the foregoing subclause (a) or that were acquired from Persons other than the Borrower and the Restricted Subsidiaries, in each case, in accordance with the terms of such securities;

(15)     payments to or from, and transactions with, any joint venture or Unrestricted Subsidiary in the ordinary course of business or consistent with past practice, industry practice or industry norms (including, any cash management activities related thereto);

(16)     payments by the Borrower (and any Parent Company) and its Subsidiaries pursuant to tax sharing agreements among the Borrower (and any Parent Company) and its Subsidiaries; *provided* that in each case the amount of such payments in any taxable year does not exceed the amount that the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amount received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such taxable year were the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any such Parent Company;

(17)     any lease entered into between the Borrower or any Restricted Subsidiary, as lessee and any Affiliate of the Borrower, as lessor, and any transaction(s) pursuant to that lease, which lease is approved by the Board of Directors or senior management of the Borrower in good faith;

(18)     IP Rights licenses in the ordinary course of business or consistent with industry practice;

(19)     the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to equity holders of the Borrower or any Parent Company pursuant to the equity holders agreement or the registration rights agreement entered into on or after the Closing Date;

(20)     transactions permitted by, and complying with, Section 7.03 solely for the purpose of (a) reorganizing to facilitate any initial public offering of securities of the Borrower or any Parent Company, (b) forming a holding company or (c) reincorporating the Borrower in a new jurisdiction;

(21)     transactions undertaken in good faith (as determined by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate) for the purposes of improving the consolidated tax efficiency of the Borrower and its Restricted Subsidiaries and not for the purpose of circumventing Articles VI and VII of this Agreement; so long as such transactions, when taken as a whole, do not result in a material adverse effect on the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, when taken as a whole, in each case, as determined in good faith by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate;

(22)    (a) transactions with a Person that is an Affiliate of the Borrower (other than an Unrestricted Subsidiary) solely because the Borrower or any Restricted Subsidiary owns, directly or indirectly, Equity Interests in such Person and (b) transactions with any Person that is an Affiliate solely because a director or officer of such Person is a director or officer of the Borrower, any Restricted Subsidiary or any Parent Company;

(23)    (a) pledges and other transfers of Equity Interests in Unrestricted Subsidiaries and (b) any transactions with an Affiliate in which the consideration paid consists solely of Equity Interests of the Borrower or a Parent Company;

(24)    the sale, issuance or transfer of Equity Interests (other than Disqualified Stock) of the Borrower;

(25)    investments by any Investor or Parent Company in securities of the Borrower; and

(26)    payments in respect of (a) the Obligations or (b) other Indebtedness of the Borrower and its Subsidiaries held by Affiliates; *provided* that such Obligations were acquired by an Affiliate of the Borrower in compliance herewith.

Section 7.07    <u>Burdensome Agreements</u>.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to, directly or indirectly, create or otherwise cause to exist or become effective any consensual encumbrance or consensual restriction (other than this Agreement or any other Loan Document) on the ability of any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to:

(1)    (a)    pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(b)    pay any Indebtedness owed to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(2)    make loans or advances to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(3)    sell, lease or transfer any of its properties or assets to the Borrower or to any Restricted Subsidiary that is a Guarantor; or

(4)    with respect to the Borrower or any Subsidiary Guarantor, (a) Guaranty the Obligations or (b) create, incur or cause to exist or become effective Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents to the extent such Lien is required to be given to the Secured Parties pursuant to the Loan Documents;

*provided* that any dividend or liquidation priority between or among classes or series of Capital Stock, and the subordination of any Obligation (including the application of any remedy bars thereto) to any other Obligation will not be deemed to constitute such an encumbrance or restriction.

(b)        Section 7.07(a) will not apply to any encumbrances or restrictions existing under or by reason of:

(a)        encumbrances or restrictions in effect on the Third Amendment Effective Date, including pursuant to the Loan Documents and any Hedge Agreements, Hedging Obligations and the related documentation and any definitive documentation in respect of the Indebtedness set forth on Schedule 7.02(b)(3);

(b)        the First Lien Loan Documents and the Second Lien Loan Documents;

(c)        Purchase Money Obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) above on the property so acquired;

(d)        applicable Law or any applicable rule, regulation or order;

(e)        any agreement or other instrument of a Person, or relating to Indebtedness or Equity Interests of a Person, acquired by or merged, amalgamated or consolidated with and into the Borrower or any Restricted Subsidiary or an Unrestricted Subsidiary that is designated as a Restricted Subsidiary, or any other transaction entered into in connection with any such acquisition, merger, consolidation or amalgamation in existence at the time of such acquisition or at the time it merges, amalgamates or consolidates with or into the Borrower or any Restricted Subsidiary or an Unrestricted Subsidiary that is designated as a Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person so acquired and its Subsidiaries, or the property or assets of the Person so acquired or designated and its Subsidiaries or the property or assets so acquired or designated;

(f)        contracts or agreements for the sale or disposition of assets, including any restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(g)        restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business or consistent with industry practice or arising in connection with any Liens permitted by Section 7.01;

(h)        Indebtedness, Disqualified Stock or Preferred Stock of Restricted Subsidiaries that are not Guarantors permitted to be incurred subsequent to the Closing Date pursuant to Section 7.02;

(i)        provisions in joint venture agreements and other similar agreements (including equity holder agreements) relating to such joint venture or its members or entered into in the ordinary course of business or consistent with industry practice;

(j)         customary provisions contained in leases, sub-leases, licenses, sub-licenses, Equity Interests or similar agreements, including with respect to IP Rights and other agreements;

(k)         [reserved];

(l)         restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale or other agreement to which the Borrower or any Restricted Subsidiary is a party entered into in the ordinary course of business or consistent with industry practice; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are the subject to such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of another Restricted Subsidiary;

(m)         customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Restricted Subsidiary;

(n)         customary provisions restricting assignment of any agreement;

(o)         restrictions arising in connection with cash or other deposits permitted under Section 7.01; any other agreement or instrument governing any Indebtedness, Disqualified Stock, or Preferred Stock permitted to be incurred or issued pursuant to Section 7.02 entered into after the Closing Date that contains encumbrances and restrictions that either (i) are no more restrictive in any material respect, taken as a whole, with respect to any Restricted Subsidiary than (A) the restrictions contained in the Loan Documents as of the Closing Date or the First Lien Loan Documents as of the Closing Date or (B) those encumbrances and other restrictions that are in effect on the Closing Date with respect to that Restricted Subsidiary pursuant to agreements in effect on the Closing Date, (ii) are not materially more disadvantageous, taken as a whole, to the Lenders than is customary in comparable financings for similarly situated issuers or (iii) will not materially impair the Borrower's ability to make payments on the Obligations when due, in each case in the good faith judgment of the Borrower;

(p)         (i) Indebtedness permitted to be incurred pursuant to Section 7.02(b)(4) and any Refinancing Indebtedness in respect of the foregoing and (ii) agreements entered into in connection with any Specified Real Estate Financing or any Sale-Leaseback Transaction entered into in the ordinary course of business or consistent with industry practice;

(q)         customary restrictions and conditions contained in documents relating to any Lien so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 7.07;

(r)         any encumbrance or restriction with respect to a Restricted Subsidiary that was previously an Unrestricted Subsidiary which encumbrance or restriction exists pursuant to or by reason of an agreement that such Subsidiary is a party to or entered into before the date on which such Subsidiary became a Restricted Subsidiary; *provided* that

such agreement was not entered into in anticipation of an Unrestricted Subsidiary becoming a Restricted Subsidiary and any such encumbrance or restriction does not extend to any assets or property of the Borrower or any other Restricted Subsidiary other than the assets and property of such Restricted Subsidiary;

(s)     any encumbrances or restrictions of the type referred to in clauses (1), (2) or (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (r) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive in any material respect with respect to such encumbrance and other restrictions, taken as a whole, than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(t)     existing under, by reason of or with respect to Refinancing Indebtedness; *provided* that the encumbrances and restrictions contained in the agreements governing that Refinancing Indebtedness are, in the good faith judgment of the Borrower, not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced; and

(u)     applicable law or any applicable rule, regulation or order in any jurisdiction where Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred pursuant to Section 7.02 is incurred.

Section 7.08     Modification of Terms of Specified Indebtedness. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, amend, modify or change in any manner materially adverse to the interests of the Lenders, as determined in good faith by the Borrower (on the basis of such proposed amendments, modifications or changes taken as a whole), any term or condition of any Specified Indebtedness (other than as a result of any Refinancing Indebtedness in respect thereof) without the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed); *provided, however*, that no amendment, modification or change of any term or condition of any Specified Indebtedness permitted by any subordination provisions set forth in the applicable Specified Indebtedness or any other stand-alone subordination agreement in respect thereof and, in each case consented to by the Administrative Agent shall be deemed to be materially adverse to the interests of the Lenders.

Section 7.09     Holdings. Holdings will not conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto):

(1)     the ownership or acquisition of the Capital Stock (other than Disqualified Stock) of any other Successor Holdings or the Borrower,

(2)     the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance,

(3)     to the extent applicable, participating in tax, accounting and other administrative matters as a member of the combined group of Holdings and the Borrower,

(4)     the performance of its obligations under and in connection with, and payments with respect to, the Loan Documents, the First Lien Loan Documents, the Second Lien Loan Documents and

related documentation in respect of the foregoing and any documents relating to other Indebtedness permitted under Section 7.02 (including, for the avoidance of doubt, the incurrence of Qualified Holding Company Debt),

(5)    any public offering of its common stock or any other issuance or registration of its Capital Stock for sale or resale not prohibited by this Article VII, including the costs, fees and expenses related thereto,

(6)    repurchases of Indebtedness through open market purchases and Dutch auctions (in the case of Loans, to the extent permitted hereunder),

(7)    the incurrence of Qualified Holding Company Debt,

(8)    any transaction that Holdings is permitted to enter into or consummate under this Article VII and any transaction between or among Holdings and the Borrower or any one or more Restricted Subsidiaries permitted under this Article VII, including:

(a)    making any payment(s) or Restricted Payment(s) (i) to the extent otherwise permitted under this Section 7.09 and (ii) with any amounts received pursuant to transactions permitted under Section 7.05 (or the making of a loan to any Parent Company in lieu of any such payment(s) or Restricted Payment(s)) or holding any cash received in connection therewith pending application thereof by Holdings,

(b)    making any Investment to the extent (i) payment therefor is made solely with the Capital Stock of Holdings (other than Disqualified Stock), the proceeds of Restricted Payments received from the Borrower or proceeds of the issuance of, or contribution in respect of the, Capital Stock (other than Disqualified Stock) of Holdings and (ii) any property (including Capital Stock) acquired in connection therewith is contributed to the Borrower or a Subsidiary Guarantor (or, if otherwise permitted by Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary) or the Person formed or acquired in connection therewith is merged with the Borrower or a Subsidiary Guarantor;

(c)    guaranteeing the obligations and granting of Liens of the Borrower and its Subsidiaries to the extent such obligations are not prohibited hereunder;

(d)    incurrence of Indebtedness of Holdings representing deferred compensation to employees, consultants or independent contractors of Holdings and unsecured Indebtedness consisting of promissory notes issued by any Loan Party to future, present or former employees, directors, officers, managers, distributors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any Subsidiary or any Parent Company to finance the retirement, acquisition, repurchase, purchase or redemption of Capital Stock of Holdings,

(e)    incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes,

(f)    providing indemnification to officers and directors and as otherwise permitted in this Article VII,

(g)    activities incidental to the consummation of the Closing Date Transactions,

(h)     the making of any loan to any officers or directors contemplated by Section 7.05 or constituting a Permitted Investment, the making of any investment in the Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary,

(i)     making contributions to the capital of its Subsidiaries, or

(j)     making Investments in cash and Cash Equivalents.

(9)     activities incidental to the businesses or activities described in clauses (1) through (8) of this Section 7.09.

Section 7.10    Financial Covenant. (a) Prior to the Financial Covenant Change Date, permit Specified Excess Availability, at any time, to be less than the greater of (x) $60,000,000 and (y) 10.0% of the Maximum Borrowing Amount and (b) after the Financial Covenant Change Date, permit the Fixed Charge Coverage Ratio for any Test Period to be less than 1.00 to 1.00; provided that such Fixed Charge Coverage Ratio will only be tested on the date any Covenant Trigger Period commences (as of the last day of the Test Period ending immediately prior to the date on which such Covenant Trigger Period shall have commenced) and shall continue to be tested as of the last day of each Test Period thereafter until such Covenant Trigger Period is no longer continuing.

Section 7.11    Excess Cash Amounts. Permit (a) the aggregate amount of cash and Cash Equivalents in the Deposit Accounts (including all disbursement accounts), Securities Accounts and the Concentration Account (excluding, in each case, the aggregate amount of cash and/or Cash Equivalents in Excluded Accounts) maintained by the Loan Parties less (b) the sum of, without duplication of amounts contained in Excluded Accounts, (i) any cash and Cash Equivalents to pay (A) payroll, payroll taxes and other taxes, (B) employee wage, benefit payments, severance payments and similar payments, (C) trust and fiduciary obligations, or (D) the principal and interest payments on Indebtedness within three (3) days thereafter with respect to this clause (D), and (ii) other obligations of the Borrower or any of its Subsidiaries owed to a Person other than the Borrower or another Subsidiary of the Borrower and, with respect to this clause (ii), for which the Borrower or any such Subsidiary either (x) has issued checks or has initiated wires or ACH transfers (but which amounts have not, as of such time, been subtracted from the balance in the relevant account of the Borrower or such Subsidiary) or (y) reasonably anticipates in good faith that it will issue checks or initiate wires or ACH transfers within two (2) Business Days thereafter, to exceed $75,000,000 at any time that Excess Availability, determined by reference to the most recent Borrowing Base Certificate delivered by the Borrower pursuant to Section 6.20, is less than 15.0% of the Maximum Borrowing Amount.

# ARTICLE VIII

## Events of Default and Remedies

Section 8.01    Events of Default. Each of the events referred to in clauses (1) through (11) of this Section 8.01 shall constitute an "Event of Default":

(1)     Non-Payment. The Borrower fails to pay (a) when and as required to be paid herein, any amount of principal of any Loan or (b) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(2)    <u>Specific Covenants</u>.  (a) The Borrower, any other Loan Party or, in the case of Section 7.09, Holdings, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(1) or 6.05(1) (solely with respect to the Borrower, other than in a transaction permitted under Section 7.03 or 7.04), Section 6.19 (during a Cash Dominion Period, but otherwise subject to a three (3) day grace period to the extent that such default is capable of being cured) or Article VII (other than Section 7.10), (b) the Borrower fails to deliver a Borrowing Base Certificate (after a five (5) Business Day grace period when required to be delivered monthly and three (3) Business Day grace period when required to be delivered weekly), (c) the Borrower makes a material inaccuracy in the calculation of the Borrowing Base included in any Borrowing Base Certificate (and the Borrower fails to correct such inaccuracy within three (3) Business Days following the delivery of any Borrowing Base Certificate to the extent that such inaccuracy is capable of being cured) or (d) the Borrower fails to perform or observe the covenant contained in Section 7.10; *provided* that in the case of this clause (d) an Event of Default shall not occur until the expiration of the Cure Deadline without the consummation of the Cure Right; or

(3)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(1) or (2) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(4)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by the Borrower or any Subsidiary Guarantor herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(5)    <u>Cross-Default and Cross-Acceleration</u>.  Any Loan Party or any Restricted Subsidiary (a) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (b) fails to observe or perform any other agreement or condition relating to any such Indebtedness referred to in the foregoing clause (a), or any other event occurs (other than, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of such Hedging Obligations and not as a result of any default thereunder by the Borrower, or any Subsidiary Guarantor or any Restricted Subsidiary) with respect to such Indebtedness, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that (A) such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02, (B) this clause (5)(b) shall not apply to any Indebtedness if the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto is to convert such Indebtedness into Equity Interests (other than Disqualified Stock) and cash in lieu of fractional shares and (C) this clause (5)(b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or

(6)    <u>Insolvency Proceedings, etc</u>.  Holdings, the Borrower, any Loan Party or any Restricted Subsidiary that is a Significant Subsidiary institutes or consents to the institution of any proceeding under

any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(7)    Judgments.   There is entered against any Loan Party or any Restricted Subsidiary a final judgment and order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) calendar days; or

(8)    ERISA.   (a) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan, (ii) the Borrower or any Subsidiary Guarantor or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan, or (b) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable Law or plan terms, except, with respect to each of the foregoing clauses of this Section 8.01(8), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

(9)    Invalidity of Loan Documents.   Any material provision of the Loan Documents, taken as a whole, at any time after its execution and delivery and for any reason, other than (a) as expressly permitted by any Loan Documents (including as a result of a transaction permitted under Section 7.03 or 7.04), (b) as a result of acts or omissions by an Agent or any Lender or (c) due to the satisfaction in full of the Termination Conditions, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or any Loan Party denies in writing that it has any or further liability or obligation under the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or purports in writing to revoke or rescind the Loan Documents, taken as a whole, prior to the satisfaction of the Termination Conditions;

(10)    Collateral Documents.   Any Collateral Document with respect to a material portion of the Collateral after delivery thereof pursuant to Section 4.01, 6.11 or 6.13 for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) ceases to create, a valid and perfected Lien with the priority required by the Applicable Intercreditor Agreement (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of Collateral actually delivered to it and pledged under the Collateral Documents or to file Uniform Commercial Code amendments relating to a Loan Party's change of name or jurisdiction of formation (solely to the extent that the Borrower provides the Collateral Agent written notice thereof in accordance with the Security Agreement, and the Collateral Agent and the Borrower have agreed that the Collateral Agent will be responsible for filing such amendments) and continuation statements or to take any other action primarily within its control with respect to the

Collateral and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(11)    Change of Control.  There occurs any Change of Control.

Section 8.02    Remedies upon Event of Default.  If any Event of Default occurs and is continuing (other than an Event of Default under Section 8.01(2)(d) unless the condition in the proviso contained therein has been satisfied), the Administrative Agent may with the consent of the Required Lenders and shall, at the request of the Required Lenders, take any or all of the following actions:

(1)    declare the Commitments of each Lender to make Loans and any obligation of the Issuing Bank to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(2)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under any Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(3)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law; and

(4)    require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to the then Outstanding Amount thereof)

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"), the obligation of each Lender to make Loans and any obligation of the Issuing Bank to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid will automatically become due and payable and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case, without further act of the Administrative Agent or any Lender.

Section 8.03    Application of Funds.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), subject to the Applicable Intercreditor Agreement then in effect, any amounts received on account of the Obligations will be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such (other than in connection with Secured Cash Management Obligations, Obligations in respect of Secured Hedge Agreements or Secured Bank Product Obligations);

*Second*, to pay interest due in respect of all Protective Advances until paid in full;

*Third*, to pay the principal of all Protective Advances until paid in full;

*Fourth*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Fourth payable to them (other than in connection with Secured Cash Management Obligations, Obligations in respect of Secured Hedge Agreements or Secured Bank Product Obligations);

*Fifth*, to pay interest accrued in respect of the Swing Line Loans until paid in full;

*Sixth*, to pay the principal of all Swing Line Loans until paid in full;

*Seventh*, to pay interest accrued in respect of the Revolving Credit Loans (other than Protective Advances) until paid in full;

*Eighth*, ratably (i) to pay the principal of all Revolving Credit Loans (other than Protective Advances) until paid in full and (ii) to the Administrative Agent, to be held by the Administrative Agent, for the benefit of the Issuing Banks, as Cash Collateral in an amount up to 100% of the maximum drawable amount of any outstanding Letters of Credit;

*Ninth*, ratably to pay outstanding Secured Cash Management Obligations;

*Tenth*, ratably to pay outstanding Secured Bank Product Obligations and Secured Hedge Obligations;

*Eleventh*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date, until paid in full; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

Subject to Section 2.03(3), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Eighth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above and, if no Obligations remain outstanding, to the Borrower.

Notwithstanding the foregoing, no amounts received from any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

Section 8.04    Right to Cure.

(1)    Notwithstanding anything to the contrary contained in Section 8.01(2), in the event that the Borrower fails to comply with the requirement of the Financial Covenant, any of the Permitted Holders, Holdings or any other Person designated by the Borrower shall have the right (1) at any time during the period beginning at the start of the last fiscal quarter of the applicable Test Period and ending on or prior to the tenth (10th) Business Day after the date on which financial statements with respect to the Test Period in which such covenant is being measured are required to be delivered pursuant to

Section 6.01 or (2) within ten (10) Business Day after the beginning of a Covenant Trigger Period (such later date, the "**Cure Deadline**"), to make a direct or indirect equity investment in the Borrower in cash in the form of common Equity Interests (or other Qualified Equity Interests reasonably acceptable to the Administrative Agent) (the "**Cure Right**"), and upon the receipt by the Borrower of net cash proceeds pursuant to the exercise of the Cure Right (the "**Cure Amount**"), the Financial Covenant shall be recalculated, giving effect to a pro forma increase to Adjusted EBITDA for such Test Period in an amount equal to such Cure Amount; provided that such pro forma adjustment to Adjusted EBITDA shall be given solely for the purpose of determining the existence of a Default or an Event of Default under the Financial Covenant with respect to any Test Period that includes the fiscal quarter for which such Cure Right was exercised and not for any other purpose under any Loan Document.

  (2) If, after the receipt of the Cure Amounts and the recalculations pursuant to clause (2) above, the Borrower shall then be in compliance with the requirements of the Financial Covenant during such Test Period, the Borrower shall be deemed to have satisfied the requirements of the Financial Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Default that had occurred shall be deemed cured; *provided* that (i) the Cure Right may be exercised on no more than five (5) occasions, (ii) in each four fiscal quarter period, there shall be at least two fiscal quarters in respect of which no Cure Right is exercised, (iii) with respect to any exercise of the Cure Right, the Cure Amount shall be no greater than the amount required to cause the Borrower to be in pro forma compliance with the Financial Covenant (such amount, the "**Necessary Cure Amount**") (*provided* that if the Cure Right is exercised prior to the date financial statements are required to be delivered for such fiscal quarter then the Cure Amount shall be equal to the amount reasonably determined by the Borrower in good faith that is required for purposes of complying with the Financial Covenant for such fiscal quarter (such amount, the "**Expected Cure Amount**")), (iv) subject to clause (3) below, all Cure Amounts shall be disregarded for purposes of determining any baskets or financial ratio calculations (other than with respect to the Financial Covenant), with respect to the covenants contained in the Loan Documents and (v) there shall be no pro forma or other reduction in Indebtedness (by netting or otherwise) with the proceeds of any Cure Amount for determining compliance with the Financial Covenant for the fiscal quarter for which such Cure Amount is deemed applied unless such proceeds are actually applied to prepay Indebtedness.

  (3) Notwithstanding anything herein to the contrary, (A) to the extent that the Expected Cure Amount is (i) greater than the Necessary Cure Amount, then such difference may be used for the purposes of determining any baskets (other than any previously contributed Cure Amounts), with respect to the covenants contained in the Loan Documents and (ii) *less* than the Necessary Cure Amount, then not later than the applicable Cure Deadline, the Borrower must receive a direct or indirect equity investment in cash in the form of common Equity Interests (or other Qualified Equity Interests reasonably acceptable to the Administrative Agent), which cash proceeds received by Borrower shall be equal to the shortfall between such Expected Cure Amount and such Necessary Cure Amount and (B) prior to the Cure Deadline (x) the Lenders shall not be permitted to exercise any rights then available as a result of an Event of Default under Section 8.02 on the basis of a breach of the Financial Covenant so as to enable the Borrower to consummate its Cure Rights as permitted under this Section 8.04 and (y) the Lenders shall not be required to make any Credit Extension unless and until the Borrower has received the Cure Amount required to cause the Borrower to be in compliance with the Financial Covenant.

# ARTICLE IX

## Administrative Agent and Other Agents

Section 9.01    Appointment and Authorization of the Administrative Agent.

(1)    Each Lender hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX (other than Sections 9.09, 9.10, 9.11, 9.12 and 9.16) are solely for the benefit of the Administrative Agent, the Lenders and each Issuing Bank and the Borrower shall not have rights as a third-party beneficiary of any such provision.

(2)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a Revolving Credit Lender, Swing Line Lender (if applicable), Issuing Bank (if applicable) and as a potential Hedge Bank or Cash Management Bank) and the Issuing Banks hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender and Issuing Bank for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including any Applicable Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

(3)    The Administrative Agent agrees to furnish to each Lender, promptly after they become available, (i) copies of all Borrowing Base Certificates and financial statements required to be delivered by the Borrower hereunder; and (ii) copies of each Report. Upon reasonable request by any Lender, Administrative Agent agrees to use commercial reasonable efforts to furnish to such Lender copies of any other information or material delivered by the Loan Parties pursuant to the requirements of this Agreement or any other Loan Document.

Section 9.02    Rights as a Lender. Any Lender that is also serving as an Agent (including as Administrative Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Lender (if any) serving as an Agent hereunder in its individual capacity. Any such Person serving as an Agent and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent

or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.03    Exculpatory Provisions.  The Administrative Agent, Collateral Agent and the Arrangers shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, an Agent (including the Administrative Agent) and an Arranger:

(1)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent or Arranger is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(2)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent or Arranger is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that no Agent or Arranger shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent or Arranger to liability or that is contrary to any Loan Document or applicable law;

(3)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by any Person serving as an Agent, Arranger or any of their Affiliates in any capacity; and

(4)    shall not have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, to any Lender or any Issuing Bank, any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their Affiliates, that is communicated to, obtained or in the possession of, any Agent, any Arranger or any of their Related Persons in any capacity, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents herein.

Neither the Administrative Agent nor any of its Related Persons shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final and non-appealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender or an Issuing Bank.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the

covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, each Arranger is named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Loan Documents or the transactions contemplated hereby and thereby; it being understood and agreed that each Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Section 10.05. Without limitation of the foregoing, each Arranger shall not, solely by reason of this Agreement or any other Loan Documents, have any fiduciary relationship in respect of any Lender or any other Person.

Section 9.04   Lack of Reliance on the Administrative Agent. Each Lender and each Issuing Bank expressly acknowledges that none of the Agents nor any Arranger has made any representation or warranty to it, and that no act by any Agent or any Arranger hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Loan Party of any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent or any Arranger to any Lender or each Issuing Bank as to any matter, including whether any Agent or any Arranger have disclosed material information in their (or their Related Persons') possession. Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings, the Borrower and the Restricted Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings, the Borrower and the Restricted Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Lender and each Issuing Bank also acknowledges that it will, independently and without reliance upon the Agents, the Arrangers, any other Lender or any of their Related Persons and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties. Except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement

or any other Loan Document or the financial condition of the Holdings, the Borrower or any of the Restricted Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of Holdings, the Borrower or any of the Restricted Subsidiaries or the existence or possible existence of any Default or Event of Default. Each Lender and each Issuing Bank represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender or Issuing Bank for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender or Issuing Bank, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender and each Issuing Bank agrees not to assert a claim in contravention of the foregoing. Each Lender and each Issuing Bank represents and warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender or such Issuing Bank, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

Section 9.05    Certain Rights of the Administrative Agent. If the Administrative Agent requests instructions from the Required Lenders (or such greater percentage of Lenders required) with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders (or such greater percentage of Lenders required); and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders (or such greater percentage of Lenders required).

Section 9.06    Reliance by the Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any note, writing, resolution, notice, statement, certificate, telex, teletype or facsimile message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent. In determining compliance with any condition hereunder to the making of a Loan or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or Issuing Bank prior to the making of such Loan or issuances of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.07    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub agents appointed by the Administrative Agent. The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. The exculpatory provisions of this Article shall apply to any such sub agent and to the Agent-Related Persons of the Administrative Agent and any such sub agent, and shall

apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 9.08    Indemnification.    Whether or not the transactions contemplated hereby are consummated, to the extent the Administrative Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; *provided* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or any other Agent-Related Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.08 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided further* that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof. The undertaking in this Section 9.08 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

Section 9.09    The Administrative Agent in Its Individual Capacity.    With respect to its obligation to make Loans under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders" or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its respective individual capacities. The Administrative Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Loan Party or any Affiliate of any Loan Party (or any Person engaged in a similar business with any Loan Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party or any Affiliate of any Loan Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.10    Holders.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

Section 9.11    Resignation by the Administrative Agent.  The Administrative Agent may resign from the performance of all its respective functions and duties hereunder or under the other Loan Documents at any time by giving 30 Business Days prior written notice to the Lenders and the Borrower.  If the Administrative Agent is in material breach of its obligations hereunder as Administrative Agent, then the Administrative Agent may be removed as the Administrative Agent at the reasonable request of the Required Lenders.  If the Administrative Agent is a Defaulting Lender, the Borrower may remove the Defaulting Lender from such role upon 15 days prior written notice to the Lenders.  Such resignation or removal shall take effect upon the appointment of a successor Administrative Agent as provided below.

Upon any such notice of resignation by, or notice of removal of, the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a Lender reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (*provided* that the Borrower's approval shall not be required if an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing).

If a successor Administrative Agent shall not have been so appointed within such 30 Business Day period, the Administrative Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed, *provided* that the Borrower's consent shall not be required if an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing), shall then appoint a Lender as successor Administrative Agent who shall serve as Administrative Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

If no successor Administrative Agent has been appointed pursuant to the foregoing by the 35th Business Day after the date such notice of resignation was given by the Administrative Agent or such notice of removal was given by the Required Lenders or the Borrower, as applicable, the Administrative Agent's resignation shall nonetheless become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.  The retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the Issuing Banks under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender or Issuing Bank directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 9.11.

Upon the acceptance of a successor's appointment as Administrative Agent hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall

succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.11).

The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Upon a resignation of the Administrative Agent pursuant to this Section 9.11, the Administrative Agent (i) shall continue to be subject to Section 10.09 and (ii) shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this Article IX (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

Section 9.12    Collateral Matters. Each Lender (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) irrevocably authorizes and directs the Collateral Agent to take the actions to be taken by them as set forth in Section 7.04 and 10.24.

Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders (or such greater percentage of Lenders required) in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders (or such greater percentage of Lenders required) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, to take any action with respect to any Collateral or Collateral Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Collateral Documents.

Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 9.12. In each case as specified in this Section 9.12, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.12.

The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 9.12, Section 10.24 or in any of the Collateral Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it

may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 9.13    [Reserved].

Section 9.14    Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, any Issuing Bank and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, any Issuing Bank and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, any Issuing Bank and the Administrative Agent under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuing Bank to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and relevant Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or Issuing Bank or to authorize the Administrative Agent to vote in respect of the claim of any Lender or Issuing Bank in any such proceeding.

Section 9.15    Appointment of Supplemental Administrative Agents.

(1)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee,

co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(2)     In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent or such Supplemental Administrative Agent, as the context may require.

(3)     Should any instrument in writing from any Loan Party be reasonably required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments reasonably acceptable to it promptly upon request by the Administrative Agent. In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

Section 9.16   <u>Intercreditor Agreements.</u>  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document:  (a) the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Loan Documents and the exercise of any right related to any Collateral shall be subject, in each case, to the terms of the ABL Intercreditor Agreement or any other Applicable Intercreditor Agreement, (b) in the event of any conflict between the express terms and provisions of this Agreement or any other Loan Document, on the one hand, and of the ABL Intercreditor Agreement or any other Applicable Intercreditor Agreement, on the other hand, the terms and provisions of the ABL Intercreditor Agreement shall control, and (c) each Lender (and, by its acceptance of the benefits of any Collateral Document, each other Secured Party) hereunder authorizes and instructs the Administrative Agent and Collateral Agent to execute the ABL Intercreditor Agreement or any other Applicable Intercreditor Agreement on behalf of such Lender, and such Lender agrees to be bound by the terms thereof.

Section 9.17   <u>Secured Cash Management Agreements and Secured Hedge Agreements</u>.  Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank or Hedge Bank that obtains the benefits of Section 8.03, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory

207

arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

Section 9.18    Bank Product Providers. Each Bank Product Provider, by delivery of a notice to the Administrative Agent of a Bank Product, agrees to be bound by Section 8.03 and this Article IX. Each Bank Product Provider shall indemnify and hold harmless the Administrative Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent), to the extent not reimbursed by the Borrower, against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Administrative Agent or such other Agent-Related Person in connection with such provider's Secured Bank Product Obligations.

Section 9.19    Withholding Tax. To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.18. The agreements in this Section 9.18 shall survive the resignation or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 9.20    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance

company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

## ARTICLE X

### Miscellaneous

Section 10.01   Amendments, etc.

(1)     Subject to Section 3.03(c) and except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (other than with respect to any amendment or waiver contemplated in clause (i) below, which shall only require the consent of the Required Facility Lenders under the applicable Facility or Facilities) (or by the Administrative Agent with the consent of the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and the Administrative Agent hereby agrees to acknowledge any such waiver, consent or amendment that otherwise satisfies the requirements of this Section 10.01 as promptly as possible, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)     extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.01 or Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments or Loans or the making of any Protective Advance shall not constitute an extension or increase of any Commitment of any Lender) (provided that any Lender, upon the request of the Borrower, may extend the maturity date of any of such Lender's Commitments without the consent of any other Lender, including the Required Lenders but any Lender that does not consent to such request shall not be deemed a Non-Extended Lender except in accordance with Section 2.16 hereof);

(b)     postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or 2.08 (other than pursuant to Section 2.08(2)) or any payment of fees or premiums hereunder or under any Loan Document with respect to payments to any Lender without the written consent of such Lender, it being understood that none of the following will constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of principal, interest, fees or premiums:  the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans, Default, Event of Default or any condition precedent set forth in Section 4.01 or 4.02 (provided that any Lender, upon the request of the Borrower, may extend the maturity date of any of such Lender's Commitments without the consent of any other Lender, including the Required Lenders);

(c)     reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing (it being understood that a waiver of any condition precedent set forth in Section 4.02 or any Default, Event of Default or mandatory prepayment shall not constitute a reduction or forgiveness of principal), or (subject to clause (I) of the proviso immediately succeeding clause (k) of this Section 10.01(1)) any fees or other amounts payable hereunder or under any other Loan Document to any Lender without the written consent of such Lender; *provided* that only the consent of (A) the Required Lenders shall be necessary to amend the definition of "Default Rate" and (B) the Required Lenders will be necessary to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)     except as contemplated by clause (C) in the second proviso immediately succeeding clause (k) of this Section 10.01(1), change any provision of this Section 10.01 or the definition of "Required Lenders" or "Supermajority Lenders" or any other provision, in each case, specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender;

(e)     other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(f)     other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)     amend the provisions of Section 2.13 or 8.03 of this Agreement or any analogous provision of any other Loan Document, in a manner that would by its terms alter the pro rata sharing of payments required thereby or the relative priorities of such payments, without the prior written consent of each Lender;

(h)     change the priority of the ABL Priority Collateral or the definition of "ABL Priority Collateral" in the ABL Intercreditor Agreement to any priority subordinated to such initial priority without the written consent of each Lender (other than a Defaulting Lender) except as expressly provided in the Loan Documents; or

(i)     amend, waive or otherwise modify any term or provision (including the availability and conditions to funding and the rate of interest applicable thereto) which directly affects Lenders of one Facility and does not directly affect Lenders under any other Facility, in each case, without the written consent of the Required Facility Lenders under such applicable Facility;

(j)     change the definition of the term "Borrowing Base" or any component definition thereof, but excluding an increase in the percentage advance rates, the amendment or modifications of which shall be subject to clause (k) below, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, without the written consent of the Supermajority Lenders, provided that the foregoing shall not limit the discretion of the Administrative Agent's ability to change, establish or eliminate any Reserves as determined in its Permitted Discretion without the consent of any Lenders; or

(k)     increase percentage advance rates set forth in the definition of "Borrowing Base", without the written consent of each Lender; provided that the foregoing shall not limit the ability of the Administrative Agent to change, establish or eliminate any Reserves without the consent of any Lenders;

provided that:

(I)     no amendment, waiver or consent shall, unless in writing and signed by each Issuing Bank in addition to the Lenders required above, materially affect the rights or duties of an Issuing Bank under this Agreement or any L/C Application related to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, materially affect the rights or duties of the Swing Line Lender under this Agreement, (iii) no amendment, waiver or consent shall, unless in writing and signed by (x) the Administrative Agent but not the Lenders, affect ~~the rights or duties of, or~~ any fees or other amounts payable to~~,~~ the Administrative Agent under this Agreement or any other Loan Document, or (y) the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document;

(II)     the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any changes necessary or advisable to be made in connection with any FILO Tranche, Revolving Credit Commitment Increases or Extended Revolving Credit Commitments to effect the provisions of Section 2.14 or 2.16 (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any FILO Tranche, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant is also added for the benefit of any corresponding Revolving Credit Loans remaining outstanding after the issuance or incurrence of any such FILO Tranche in connection therewith); and

(III)     Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification;

*provided further* that notwithstanding the foregoing:

(A)     no Defaulting Lender shall have any right to approve or disapprove of any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders, the Required Facility Lenders, the Required Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that the Revolving Credit Commitment of any Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender) (it being understood that any Commitments or Loans

held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders);

(B)        no Lender consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement (i) that is for the purpose of adding the holders of Permitted Indebtedness that is secured Indebtedness (or a Debt Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of such Applicable Intercreditor Agreement, as applicable (it being understood that any such amendment, modification or supplement may make such other changes to the applicable Applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by any Applicable Intercreditor Agreement, provided that such other changes are not adverse, in any material respect, to the interests of the Lenders; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable;

(C)        this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Revolving Credit Loans, the Swing Line Loans and the L/C Obligations and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders; *provided* that, after giving effect to such new credit facilities (and each incurrence of Indebtedness thereunder), in no event shall the total Revolving Credit Exposure (plus any such Indebtedness under a new facility permitted under this subsection (C)) exceed the Maximum Borrowing Amount (subject to the Administrative Agent's authority, in its sole discretion, to make Overadvances under Section 2.01(b) or Protective Advances under Section 2.01(c));

(D)        any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section 10.01 if such Class of Lenders were the only Class of Lenders hereunder at the time;

(E)        Without limiting the scope of Section 10.01(3) below, any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency (including amendments, supplements or waivers to any of the Collateral Documents, guarantees, intercreditor agreements or related documents executed by any Loan Party or any other Subsidiary in connection with this Agreement if such amendment, supplement or waiver is delivered in order to cause such Collateral Documents, guarantees, intercreditor agreements or related documents to be consistent with this Agreement and the other Loan Documents) so long as, in each case, the Lenders

212

shall have received at least 5 Business Days' prior written notice thereof and the Administrative Agent shall not have received, within 5 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; *provided* that the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any such changes necessary to be made in connection with any borrowing of Incremental Revolving Credit Loans, any Extension and otherwise to effect the provisions of Section 2.14 or 2.16 or the immediately succeeding paragraph of this Section 10.01, respectively;

(F)     the Borrower and the Administrative Agent may, without the input or consent of the other Lenders, effect changes to any Security Document as may be necessary or appropriate in the opinion of the Collateral Agent.

(2)     [Reserved].

(3)     In addition, notwithstanding anything to the contrary in this Section 10.01,

(a)     In addition to the amendments permitted under Section 10.01(I)(E) above, the Guaranty, the Collateral Documents and related documents executed by Holdings, the Borrower or any Restricted Subsidiaries in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause the Guaranty, Collateral Documents or other document to be consistent with this Agreement and the other Loan Documents (including by adding additional parties as contemplated herein or therein); provided that notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective; and

(b)     if the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document. Notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective.

Section 10.02  Notices and Other Communications; Facsimile Copies.

(1)     General. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)     if to Holdings, the Borrower or the Administrative Agent, an Issuing Bank and the Swing Line Lender, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(b)      if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next succeeding Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (2) below shall be effective as provided in such subsection (2).

(2)      Electronic Communication. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(3)      Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next succeeding Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(4)      The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Agent-Related Persons or any Arranger (collectively, the "**Agent Parties**") have any liability to Holdings, the Borrower, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party; *provided, however*, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(5)     Change of Address.  Each Loan Party and the Administrative Agent may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the other parties hereto.  Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(6)     Reliance by the Administrative Agent.  The Administrative Agent, the Issuing Bank and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent or the Issuing Bank may be recorded by the Administrative Agent or the Issuing Bank, as applicable, and each of the parties hereto hereby consents to such recording.

Section 10.03  No Waiver; Cumulative Remedies.  No failure by any Lender, the Issuing Bank or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; *provided, however,* that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Issuing Bank or Swing Line Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as Issuing Bank or Swing Line Lender, as the case may be) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 10.10 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided further* that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the

Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04  Costs and Expenses.  The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Arrangers for all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and the Arrangers (promptly following a written demand therefor, together with backup documentation supporting such reimbursement request) incurred in connection with the preparation, negotiation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Morgan, Lewis & Bockius LLP and, if necessary, a single local counsel in each relevant material jurisdiction, and (b) upon presentation of a summary statement, together with any supporting documentation reasonably requested by the Borrower, to pay or reimburse the Administrative Agent, each Issuing Bank, the Swing Line Lender and the other Lenders, taken as a whole, promptly following a written demand therefor for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of one counsel to the Administrative Agent and the Lenders taken as a whole (and, if necessary, one local counsel in any relevant material jurisdiction and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)). The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05  Indemnification by the Borrower.  The Borrower shall indemnify and hold harmless the Agents, each Issuing Bank, the Swing Line Lender, each other Lender, the Arrangers and their respective Related Persons (collectively, the "**Indemnitees**") from and against any and all losses, claims, damages, liabilities or expenses (including Attorney Costs and Environmental Liabilities) to which any such Indemnitee may become subject arising out of, resulting from or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) any (i) actual or threatened claim, litigation, investigation, proceeding or Environmental Liabilities relating to the Closing Date Transactions or (ii) to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents, the Loans or the use, or proposed use of the proceeds therefrom, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation, investigation or proceeding), and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Loan Document by such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees

216

other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under any Loan Document and other than any claims arising out of any act or omission of the Borrower or any of their Affiliates (as determined by a final, non-appealable judgment of a court of competent jurisdiction). To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that they are permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through SyndTrak or other similar information transmission systems in connection with this Agreement (except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnitee), nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party for which such Indemnitee is otherwise entitled to indemnification pursuant to this Section 10.05). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this Section 10.05 shall be paid within twenty (20) Business Days after written demand therefor. The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. This Section 10.05 shall not apply to Taxes, except any Taxes that represent losses or damages arising from any non-Tax claim. Notwithstanding the foregoing, each Indemnitee shall be obligated to refund and return promptly any and all amounts paid by the Borrower under this Section 10.05 to such Indemnitee for any such fees, expenses or damages to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.

Section 10.06  <u>Marshaling; Payments Set Aside</u>.  None of the Administrative Agent or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

Section 10.07  <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 7.03, assign or otherwise transfer any of

its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder (including to existing Lenders and their Affiliates) except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f), or (iv) to an SPC in accordance with the provisions of Section 10.07(g) (and any other attempted assignment or transfer by any party hereto (other than the replacement of the Administrative Agent pursuant to Article IX above) shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d) and, to the extent expressly contemplated hereby, Indemnitees and Related Persons of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  _Assignments by Lenders._  Any Lender may at any time assign to (v) any Lender or any of its Affiliates (of similar credit worthiness), (w) any bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250.0 million, (x) an Approved Fund and (y) any Person to whom a Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Lender's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, in each case, all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); _provided_ that any such assignment shall be subject to the following conditions:

(i)  _Minimum Amounts._

(A)  in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)  in any case not described in subsection (b)(i)(A) of this Section 10.07, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5.0 million, unless either (x) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (y) each of the Administrative Agent and the Borrower otherwise consents; _provided_, _however_, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)  _Proportionate Amounts._  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)  _Required Consents._  No consent shall be required for any assignment except to the extent required by Section 10.07(b)(i)(B) and, in addition:

(A)      the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing at the time of such assignment determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date or (2) in respect of an assignment of all or a portion of the Loans, such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that the Borrower shall be deemed to have consented to any assignment unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice of a failure to respond to such request for assignment;

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund with respect to a Lender; *provided* that no consent of the Administrative Agent shall be required for an assignment of all or a portion of the Loans pursuant to Section 10.07(g);

(C)      the consent of each Issuing Bank (such consent not to be unreasonably withheld or delayed) shall be required at the time of such assignment; *provided* that no consent of the Issuing Banks shall be required for any assignment not related to Revolving Credit Commitments or Revolving Credit Exposure or any assignment to an Agent or an Affiliate of an Agent; and

(D)      the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required; *provided* that no consent of a Swing Line Lender shall be required for any assignment not related to Revolving Credit Commitments or Revolving Credit Exposure or any assignment to an Agent or an Affiliate of an Agent.

(iv)      <u>Assignment and Assumption.</u>   The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent). The Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire. Each assignee Lender shall be required to represent in the Assignment and Assumption that it is not a Disqualified Institution or an Affiliate of a Disqualified Institution.

(v)      <u>No Assignments to Certain Persons.</u>   No such assignment shall be made (A) to Holdings, the Borrower or any of its Subsidiaries, (B) to any Affiliate of the Borrower, (C) to a natural person or (D) to any Disqualified Institution.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable

assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans and participations in Letters of Credit and Swing Line Loans in accordance with its Pro Rata Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs. Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section 10.07, from and after the effective date specified in each Assignment and Assumption, (x) the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (y) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment), but shall in any event continue to be subject to Section 10.09. Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(d).

(c)    The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, each notice of cancellation of any Loans delivered by the Borrower pursuant to subsections (h) or (l) below, and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, L/C Obligations (specifying Unreimbursed Amounts), L/C Borrowings and amounts due under Section 2.03, owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 10.07(3) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(d)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any Affiliate or Subsidiary of the Borrower or a Disqualified Institution) (each, a "**Participant**") in all or a portion of such Lender's rights or obligations under this Agreement (including all or a portion of its Commitment or the Loans (including such Lender's participations in L/C Obligations or Swing Line Loans owing to it)); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or

any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than clauses (d) and (i) thereof) that directly affects such Participant. Subject to subsection (e) of this Section 10.07, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements of Section 3.01 (including subsections (2), (3) and (4), as applicable as though it were a Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.07. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.10 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(e)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or such entitlement to a greater payment results from a Change in Law after the sale of the participation takes place. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and the Borrower shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary; *provided* that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of the Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or other obligations under any Loan Document) to any Person except to the extent such disclosure is necessary to establish that any such commitments, loans, letters of credit or other obligations are in registered form for U.S. federal income tax purposes. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof shall be appropriately reflected in the Participant Register. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the

approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)    [Reserved].

(i)    [Reserved].

(j)    [Reserved].

(k)    [Reserved];

(l)    [Reserved];

(i)    [Reserved]; and

(ii)    [Reserved].

(m)    Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(n)    Notwithstanding the foregoing, no Disqualified Institution that purports to become a Lender hereunder (notwithstanding the provisions of this Agreement that prohibit Disqualified Institutions from becoming Lenders) shall be entitled to any of the rights or privileges enjoyed by the other Lenders with respect to voting, information and lender meetings. In addition, if any assignment or participation is made to any Disqualified Institution without the Borrower's express prior written consent (which consent shall state expressly that the Borrower acknowledges that the assignee Lender is a Disqualified Institution) in violation of clause (v) of Section 10.07(b), the Borrower may, in addition to any other rights and remedies that it may have against such Disqualified Institution, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) in the case of outstanding Revolving Credit Loans held by Disqualified Institutions, purchase or prepay such Revolving Credit Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Revolving Credit Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the

restrictions contained in Section 10.07), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

(o)     The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution.

Section 10.08   [Reserved].

Section 10.09   Confidentiality.   Each of the Agents, the Arrangers, the Lenders and each Issuing Bank agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, legal counsel, independent auditors, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, with such Affiliate being responsible for such Person's compliance with this Section 10.09; *provided, however*, that such Agent, Arranger, Lender or Issuing Bank, as applicable, shall be principally liable to the extent this Section 10.09 is violated by one or more of its Affiliates or any of its or their respective employees, directors or officers), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided, however*, that each Agent, each Arranger, each Lender and each Issuing Bank agrees to seek confidential treatment with respect to any such disclosure, (c) to the extent required by applicable laws or regulations or by any subpoena or otherwise as required by applicable Law or regulation or as requested by a governmental authority; *provided* that such Agent, such Arranger, such Lender or such Issuing Bank, as applicable, agrees (x) that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (except in connection with any request as part of any audit or regulatory examination) unless such notification is prohibited by law, rule or regulation and (y) to seek confidential treatment with respect to any such disclosure, (d) to any other party hereto, (e) subject to an agreement containing provisions at least as restrictive as those of this Section 10.09, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee (or its agent) invited to be an Additional Lender or (ii) with the prior consent of the Borrower, any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any of their Subsidiaries or any of their respective obligations; *provided* that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, Participant or Eligible Assignee that such Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to the Borrower, the Agents and the Arrangers, including as set forth in any confidential information memorandum or other marketing materials) in accordance with the standard syndication process of the Agents and the Arrangers or market standards for dissemination of such type of information which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information, (f) for purposes of establishing a "due diligence" defense, (g) with the consent of the Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach by any Person of this Section 10.09 or any other confidentiality

provision in favor of any Loan Party, (y) becomes available to any Agent, any Arranger, any Lender, any Issuing Bank or any of their respective Affiliates on a non-confidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent, such Lender, such Issuing Bank or the applicable Affiliate to be subject to a confidentiality restriction in respect thereof in favor of Holdings, the Borrower or any Affiliate of the Borrower or (z) is independently developed by the Agents, the Lenders, the Issuing Banks, the Arrangers or their respective Affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this Section 10.09 or (i) in order to enforce its respective rights under any Loan Document in any action or proceeding.

For purposes of this Section 10.09, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary or Affiliate thereof or their respective businesses, other than any such information that is available to any Agent, any Lender or any Issuing Bank on a non-confidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary or Affiliate thereof after the date hereof shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 10.09 shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Agent, each Arranger, each Lender and each Issuing Bank acknowledges that (a) the Information may include trade secrets, protected confidential information, or material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of such information and (c) it will handle such information in accordance with applicable Law, including United States Federal and state securities Laws and to preserve its trade secret or confidential character.
The respective obligations of the Agents, the Arrangers, the Lenders and any Issuing Bank under this Section 10.09 shall survive, to the extent applicable to such Person, (x) the payment in full of the Obligations and the termination of this Agreement, (y) any assignment of its rights and obligations under this Agreement and (z) the resignation or removal of any Agent.

Section 10.10  Setoff.

If an Event of Default shall have occurred and be continuing, each Lender, each Issuing Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or such Issuing Bank to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party then due and payable under this Agreement or any other Loan Document to such Lender or such Issuing Bank, irrespective of whether or not such Lender or such Issuing Bank or any such Affiliate shall have made any demand under this Agreement or any other Loan Document; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Banks, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, each Issuing

Bank and each of their respective Affiliates under this Section 10.10 are in addition to other rights and remedies (including other rights of setoff) that such Lender, such Issuing Bank or their respective Affiliates may have. Each Lender and each Issuing Bank agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.11   <u>Interest Rate Limitation</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.12   <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.13   <u>Electronic Execution of Assignments and Certain Other Documents</u>.

(a)   The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; <u>provided</u> that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

(b)   This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "**Communication**"), including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures. Each of the Loan Parties agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on each of the Loan Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation  each of the Loan

225

Parties enforceable against such in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent and each of the Credit Parties of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent and each of the Credit Parties may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("**Electronic Copy**"), which shall be deemed created in the ordinary course of the such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Administrative Agent is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Administrative Agent has agreed to accept such Electronic Signature, the Administrative Agent and each of the Credit Parties shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

Section 10.14  <u>Survival of Representations and Warranties</u>. Subject to Section 1.02(9), all representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.15  <u>Severability</u>. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.16  <u>GOVERNING LAW</u>.

(a)  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

(b)  THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF

AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)     THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION 10.16. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 10.17  WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.17.

Section 10.18  Binding Effect. This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

Section 10.19  Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the

Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent. The provision of this Section 10.19 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.20  <u>Use of Name, Logo, etc</u>. Each Loan Party consents to the publication in the ordinary course by Administrative Agent or the Arrangers of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark. Such consent shall remain effective until revoked by such Loan Party in writing to the Administrative Agent and the Arrangers.

Section 10.21  <u>USA PATRIOT Act and other Anti-Terrorism Laws</u>. Each Lender that is subject to the USA PATRIOT Act and other Anti-Terrorism Laws and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act and other Anti-Terrorism Laws, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act and other Anti-Terrorism Laws. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including and the Beneficial Ownership Regulation, the USA PATRIOT Act and other Anti-Terrorism Laws.

Section 10.22  <u>Service of Process</u>. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.23  <u>No Advisory or Fiduciary Responsibility</u>. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Agents, the Arrangers and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agents, the Arrangers and the Lenders, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, Arranger and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents, the Arrangers nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Agents, the Arrangers nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the

Borrower and Holdings hereby waives and releases any claims that it may have against the Agents, the Arrangers or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.24    Release of Collateral and Guarantee Obligations; Subordination of Liens.

(a)    The Lenders and the Issuing Banks hereby irrevocably agree that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released (i) in full, as set forth in clause (b) below, (ii) upon the sale or other transfer of such Collateral (including as part of or in connection with any other sale or other transfer permitted hereunder) to any Person other than another Loan Party, to the extent such sale, transfer or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party by a Person that is not a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guaranty (in accordance with the second succeeding sentence), (vi) as required by the Collateral Agent to effect any sale, transfer or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Collateral Documents and (vii) to the extent such Collateral otherwise becomes Excluded Assets. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents. Additionally, the Lenders and the Issuing Banks hereby irrevocably agree that the Guarantors shall be released from the Guaranties upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary, or otherwise becoming an Excluded Subsidiary, provided that after giving effect to any such release, no Overadvance shall exist or result therefrom. The Lenders and the Issuing Banks hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender or Issuing Bank. Any representation, warranty or covenant contained in any Loan Document relating to any such released Collateral or Guarantor shall no longer be deemed to be repeated.

(b)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements, (iii) any contingent obligations not then due and (iv) the Outstanding Amount of L/C Obligations related to any Letter of Credit that has been Cash Collateralized, backstopped by a letter of credit reasonably satisfactory to the applicable Issuing Bank or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank) have been paid in full and all Commitments have terminated, upon request of the Borrower, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements, (iii) any contingent obligations not then due and (iv) any Outstanding Amount of L/C Obligations related to any Letter of Credit that has been Cash Collateralized, backstopped by a

letter of credit reasonably satisfactory to the applicable Issuing Bank or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Permitted Lien specified in clause (7) of the definition thereof securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of Section 7.02(b) in any Collateral, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to subordinate the Lien on any Collateral to any such Permitted Lien to be senior to the Liens in favor of the Collateral Agent.

(d)      Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrower's assets in a bankruptcy, foreclosure or other similar proceeding, forbear from exercising remedies upon an Event of Default, or in a bankruptcy proceeding, enter into a settlement agreement on behalf of all Lenders.

Section 10.25    Assumption and Acknowledgment.  On the Closing Date, Belk assumed all of Initial Borrower's rights, title, interests, duties, liabilities and obligations (including the Obligations) under the Loan Documents as the "Borrower" hereunder (collectively, the "**Assumption**"), including, any claims, liabilities, or obligations arising from Initial Borrower's failure to perform any of its covenants, agreements, commitments or obligations under the Loan Documents to be performed prior to the date of the Assumption.

Section 10.26    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

Section 10.27   <u>Secured Bank Product Agreements, Secured Cash Management Agreements and Secured Hedge Agreements</u>.

Except as otherwise expressly set forth herein or in any Guarantee or any Collateral Document, no party to any Secured Bank Product Agreement, Secured Cash Management Agreement or Secured Hedge Agreement that obtains the benefits of any Guarantee or any Collateral by virtue of the provisions hereof or of any Guarantee or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article X to the contrary, the Collateral Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Secured Bank Product Agreements, Secured Cash Management Agreements or Secured Hedge Agreements unless the Administrative Agent has received written notice of such Secured Bank Product Agreement, Secured Cash Management Agreement or Secured Hedge Agreement, together with such supporting documentation as the Administrative Agent may request, from the applicable Agent, Lender or Affiliate of an Agent or Lender party thereto.

Section 10.28   <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender or an Issuing Bank that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender or any Issuing Bank that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 10.29   <u>Acknowledgement Regarding Any Supported QFCs</u>.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act

and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regime**s") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BELK, INC.,
  as the Borrower

By: _____
    Name:
    Title:

BEAR PARENT INC.,
  as Holdings

By: _____
    Name:
    Title:

[Signature Page to ABL Credit Agreement]

BANK OF AMERICA, N.A.,
    as Administrative  Agent and Collateral Agent

By: _____
    Name:
    Title:

[Signature Page to ABL Credit  Agreement]

[_____],
    as Lender


By:    _____
       Name:
       Title:

**ANNEX B**

Amended Schedules

[see attached]

**<u>ANNEX C</u>**

<u>Updated Exhibits</u>

[see attached]

## **Exhibit E**

**Form of New Second Lien Credit Facility Documents**

Execution Version

## AMENDMENT NO. 3 TO SECOND LIEN CREDIT AGREEMENT

This AMENDMENT NO. 3 TO SECOND LIEN CREDIT AGREEMENT, dated as of February 24, 2021 (this "**Agreement**"), is among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation (the "**Borrower**"), the other Guarantors party hereto, Wilmington Trust, National Association, as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each Lender party hereto.

## PRELIMINARY STATEMENTS

**WHEREAS**, reference is made to that certain Second Lien Credit Agreement, dated as of December 10, 2015 (as amended by Amendment No. 1 to Second Lien Credit Agreement, dated as of October 29, 2019, Amendment No. 2 to Second Lien Credit Agreement, dated October 29, 2019, and as is in effect immediately prior to the effectiveness of this Agreement, the "**Existing Credit Agreement**"; the Existing Credit Agreement as amended and restated in the form attached as Exhibit A hereto, the "**A&R Credit Agreement**"; capitalized terms used but not defined herein having the meanings provided in the A&R Credit Agreement), among the Borrower, Holdings, the Lenders (as defined therein) from time to time party thereto, the Administrative Agent and the Collateral Agent;

**WHEREAS**, the undersigned Lenders constituting all Lenders necessary to approve this Agreement have agreed to modify the Existing Credit Agreement in the manner described in Section 1 herein;

**NOW, THEREFORE**, in consideration of the undertakings set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. <u>Amendments to the Existing Loan Documents</u>. Effective as of the Amendment No. 3 Effective Date (as defined below), subject to the satisfaction of the conditions set forth in Section 3 hereof, each of the parties hereto agrees that:

(a) the Existing Credit Agreement (excluding all Exhibits thereto (except as set forth in clause (b) below), but including the Schedules attached to the A&R Credit Agreement on Exhibit A hereto) shall be amended and restated in its entirety and replaced as set forth in the document attached as Exhibit A hereto; and

(b) Exhibit C (Compliance Certificate) shall be amended and restated in its entirety and replaced as set forth in the document attached as Exhibit B hereto.

2. <u>Representations and Warranties</u>. To induce the other parties hereto to enter into this Agreement, each of the Loan Parties represents and warrants to each of the Lenders party hereto and the Administrative Agent that, after giving effect to this Agreement:

(a) the execution, delivery and performance of this Agreement by such Loan Party and the consummation of the transactions contemplated herein are within such Loan Party's corporate or other organizational powers;

(b) this Agreement has been duly authorized, executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party enforceable against

such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing;

(c)        no Default or Event of Default exists or has occurred and is continuing as of the date hereof;

(d)        Upon receipt of the Confirmation Order (as defined in the RSA), no consent of any lender (other than the Lenders party hereto) or any other Person is necessary or required in connection with the execution, delivery or performance by or enforcement against any Loan Party of this Agreement (including but not limited to the consent of the First Lien Administrative Agent or the banks and other financial institutions from time to time party to the First Lien Credit Agreement); and

(e)        all representations and warranties made in any Loan Document are true and correct in all material respects as if made on the date hereof; provided that to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; provided, further, that to the extent any representation or warranty would not be true or correct solely as a result of customary events or circumstances in connection with the Plan of Reorganization, such representation or warranty shall not be deemed to be untrue or incorrect in any material respect.

3.        Conditions Precedent.  This Agreement and the amendments set forth in Section 1 shall become effective on the first date (the "**Amendment No. 3 Effective Date**") that:

i.        The Administrative Agent (or in the case of clause (c)(1), the First Lien Administrative Agent) shall have received each of the following, each of which shall be .pdf copies unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party and, if applicable, each of the other parties thereto, each dated as of the Amendment No. 3 Effective Date (or, in the case of certificates of government officials, a recent date before the Amendment No. 3 Effective Date) each in form and substance consistent with the Backstop Commitment Letter (as defined in the RSA) and the New Credit Facilities Term Sheet attached as Exhibit 1 to the Restructuring Term Sheet (as defined in the RSA) (the "**New Credit Facilities Term Sheet**"), and otherwise reasonably satisfactory to the Administrative Agent, the Required Lenders and the Sponsor:

(a)        executed counterparts of this Agreement, duly executed by the Borrower, the other Loan Parties, the Administrative Agent and each Lender;

(b)        certificates of good standing from the secretary of state of the state of organization of each Loan Party (to the extent such concept exists in such jurisdiction), a certificate from the Borrower and each other Loan Party with appropriate insertions and attachments of resolutions or other actions, evidence or incumbency and the signature of authorized signatories and Organizational Documents, executed by a Responsible Officer and the secretary or assistant secretary or other authorized representative of such Loan Party;

(c)        each of the following:

(1) certificates, if any, representing the Pledged Equity referred to in the Security Agreement accompanied by undated stock powers executed in blank and

2

instruments, if any, evidencing the Pledged Debt (as defined in the Security Agreement) indorsed in blank (or confirmation in lieu thereof that such certificates, powers and instruments have been sent for overnight delivery to the First Lien Administrative Agent);

(2) evidence that all other actions, recordings and filings required by the Collateral Documents that the Required Lenders may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Required Lenders;

(3) a perfection certificate, duly executed and delivered by the Loan Parties, in form and substance reasonably satisfactory to the Required Lenders; and

(4) copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Required Lenders with respect to the Loan Parties;

(d)      a certificate of an officer of the Borrower certifying that the conditions set forth in Paragraphs (ii) and (iii) below have been satisfied

(e)      a certificate, substantially in the form of Exhibit I to the Existing Credit Agreement, of the chief financial officer (or other comparable officer), of the Borrower certifying the Solvency, after giving effect to the New Money First-Out Loans (as defined in the First Lien Credit Agreement) and the other transactions contemplated hereby and by the RSA on the Amendment No. 3 Effective Date, of the Borrower and its Subsidiaries on a consolidated basis;

(f)      an executed legal opinion of (i) Kirkland & Ellis LLP, counsel to the Borrower and the other Loan Parties, (ii) Moore & Van Allen, special South Carolina and North Carolina counsel to certain of the Loan Parties, and (iii) Butler Snow LLP, special Mississippi counsel to certain of the Loan Parties;

(g)      (1) a Supplement No. 1 to the Security Agreement (the "**Security Agreement Supplement**"), (2) a Supplement No. 1 to the Guaranty (the "**Guaranty Supplement**") and (3) a Joinder Agreement to Intercompany Subordination Agreement, in each case, executed by Belk Sourcing LLC;

(h)      the Amended & Restated Fee Letter, executed by the Borrower and the Administrative Agent;

(i)      receipt by Administrative Agent of executed Funds Flow Direction Letter; and

(j)      a Reaffirmation Agreement, executed by the Loan Parties and the Agent, in the form attached as Exhibit C hereto (the "**2L Reaffirmation Agreement**").

ii.      The representations and warranties of the Loan Parties contained in the A&R Credit Agreement shall be true and correct in all material respects on and as of the Amendment No. 3 Effective Date; provided that to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

iii.   At the time of and immediately after giving effect to the New Money First-Out Loans (as defined in the First Lien Credit Agreement) and the other transactions contemplated hereby and by the RSA on the Amendment No. 3 Effective Date, no Default or Event of Default under the A&R Credit Agreement shall exist;

iv.   The Administrative Agent shall have received an executed (i) Amendment No. 2 to the First Lien Credit Agreement, (ii) Limited Waiver and Amendment No. 3 to the ABL Credit Agreement, (iii) Amended and Restated Term Intercreditor Agreement, in the form attached as Exhibit D hereto (the "**A&R Term Intercreditor Agreement**"), and (iv) First Amendment to Intercreditor Agreement, in the form attached as Exhibit E hereto (the "**ABL Intercreditor Agreement Amendment**"), each in form and substance consistent with the Backstop Commitment Letter and the New Credit Facilities Term Sheet and otherwise reasonably satisfactory to the Administrative Agent, the Required Lenders and the Required Lenders (as defined in the First Lien Credit Agreement);

v.   The Backstop Commitment Parties (as defined in the Backstop Commitment Letter) shall have received all fees required to be paid pursuant to the Backstop Commitment Letter payable to them to the extent due (which may be offset against the proceeds of the New Money First-Out Loans (as defined in the First Lien Credit Agreement));

vi.   Each holder of an allowed Second Lien Term Loan Claim (as defined in the RSA) shall have received all accrued interest (at the Default Rate) on the principal amount of such Second Lien Term Loan Claim through the Petition Date;

vii.   The Administrative Agent, the Ad Hoc Crossover Lender Group, the Ad Hoc First Lien Lender Group and the Consenting Sponsors (each as defined in the RSA) shall have received all fees, expenses and other amounts required to be reimbursed or paid by the Borrower under the A&R Credit Agreement, the RSA and any other applicable fee letters executed by the Borrower and such parties or their respective professionals (with respect to amounts incurred, or reasonably estimated to be incurred, on or prior to the Amendment No. 3 Effective Date), to the extent invoiced at least one (1) Business Day prior to the Amendment No. 3 Effective Date;

viii.   The Administrative Agent and the Lenders shall have received at least three (3) Business Days prior to the Amendment No. 3 Effective Date (or such later date as the Administrative Agent or such Lender shall reasonably agree) all documentation and other information about the Loan Parties that has been reasonably requested in writing (including by email) by the Administrative Agent or the Lenders as required by the U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and the Beneficial Ownership Regulation;

ix.   The RSA shall remain in full force and effect;

x.   The entry of the Confirmation Order (as defined in the RSA) shall have occurred; and

xi.   The Plan Effective Date (as defined in the RSA) shall have occurred.

Without limiting the generality of the provisions of Section 10.01(1) of the A&R Credit Agreement, for purposes of determining compliance with the condition specified in this Section 3, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, this Agreement and the other matters required hereunder to be consented to or approved by or acceptable

or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Amendment No. 3 Effective Date specifying its objection thereto.

4.      [Reserved].

5.      [Reserved].

6.      Amendment, Modification and Waiver; No Novation.

(a)      This Agreement may not be amended, modified or waived except in accordance with the A&R Credit Agreement. The execution, delivery and effectiveness of this Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.

(b)      On and after the Amendment No. 3 Effective Date, each reference in the Existing Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement", "thereunder", "thereof" or words of like import referring to the Existing Credit Agreement shall mean and be a reference to the A&R Credit Agreement.  Each reference to the applicable Loan Document shall mean and be a reference to such Loan Document, as amended hereby.

(c)      On and after the Amendment No. 3 Effective Date, the A&R Credit Agreement shall supersede and replace the Existing Credit Agreement.  Except as specifically amended by this Agreement or the other documents executed in connection herewith, the Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

(d)      The execution and delivery of this Agreement shall not constitute a novation of any indebtedness or other obligations owing to the Lenders under the Existing Credit Agreement based on facts or events occurring or existing prior to the execution and delivery of this Agreement.

7.      Loan Document.  This Agreement shall constitute a Loan Document for all purposes of the A&R Credit Agreement and the other Loan Documents.

8.      Governing Law, Etc.  **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. SECTIONS 10.15, 10.16 AND 10.17 OF THE A&R CREDIT AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE, *MUTATIS MUTANDIS.***

9.      Counterparts; Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.  The words "execution," "signed," "signature," and words of like import in this Agreement or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

10.     <u>Direction to Administrative Agent</u>.   Each of the Lenders party hereto (collectively constituting all of the Lenders necessary to approve this Agreement and the A&R Credit Agreement) hereby (i) authorizes and directs the Administrative Agent and the Collateral Agent to execute and deliver this Agreement, the 2L Reaffirmation Agreement, the Security Agreement Supplement, the Guaranty Supplement, the A&R Term Intercreditor Agreement and the ABL Intercreditor Agreement Amendment, and to take, or forbear from taking, any and all actions as set forth herein and therein, and (ii) acknowledges and agrees that (x) the direction set forth in this Section 10 constitutes an instruction and request of the undersigned Lenders pursuant to the Loan Documents under Article IX of each of the Existing Credit Agreement and A&R Credit Agreement, and (y) Sections 9.03, 9.05, 9.08, 10.04, and 10.05 of each of the Existing Credit Agreement and A&R Credit Agreement, and all other rights, protections, privileges, immunities, exculpations, and indemnities afforded to such Administrative Agent under the Loan Documents shall apply to any and all actions taken or not taken by such Administrative Agent in accordance with such direction

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each of the undersigned has caused its duly authorized officer to execute and deliver this Agreement as of the date first set forth above.

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent

By: _____
     Name:
     Title:

**BELK, INC.,**
as Borrower


By: _____
    Name:
    Title:


**BEAR PARENT INC.,**
as Holdings


By: _____
    Name:
    Title:

**BELK-SIMPSON COMPANY,**
    **GREENVILLE, SOUTH CAROLINA,**
**BELK INTERNATIONAL, INC.,**
**BELK STORES SERVICES, LLC,**
**BELK ADMINISTRATION, LLC,**
**BELK STORES OF VIRGINIA LLC,**
**BELK ACCOUNTS RECEIVABLE LLC,**
**BELK GIFT CARD COMPANY LLC,**
**BELK MERCHANDISING LLC,**
**BELK TEXAS HOLDINGS LLC,**
**BELK ECOMMERCE LLC,**
**BELK STORES OF MISSISSIPPI LLC,**
**BELK SOURCING LLC,**
each as a Guarantor

By: _____
    Name:
    Title:


**BELK DEPARTMENT STORES LP**


By: Belk, Inc.
Its: General Partner


By: _____
    Name:
    Title:

**GSO BEACON HOLDINGS LP**, as Lender
By:   GSO Beacon Co-Invest Associates LLC
Its:   General Partner


By: _____
Name:
Title:

**GSO CREDIT ALPHA FUND LP**, as Lender
By:   GSO Credit Alpha Associates LLC
Its:   General Partner


By: _____
Name:
Title:

**KATRIONA INVESTMENT PTE LTD**,
as Lender


By: _____
Name:
Title:

**FS KKR CAPITAL CORP**, as Lender

By: _____
Name:
Title:

**OREGON PUBLIC EMPLOYEES RETIREMENT FUND**, as Lender

By: _____
Name:
Title:

Amendment No.3 Signature Page

**PCOP II TOPCO INTERMEDIATE B L.P.,**
as Lender


By: _____
Name:
Title

**PRISMA SPC HOLDINGS LTD.,**
as Lender

**SIGNED** on behalf of and for the account of   )

**Prisma SPC Holdings Ltd. - Segregated**

**Portfolio AC:**                                   )

 

 

_____

 Duly Authorised Signatory

)

)

 Name:

)          _____

 Title:

)          _____

Amendment No.3 Signature Page

**PRISMA SPC HOLDINGS LTD.,**
as Lender

**SIGNED** on behalf of and for the account of  )

**Prisma SPC Holdings Ltd. - Segregated**

**Portfolio AB:**                                                   )

_____
 Duly Authorised Signatory
)
)
 Name:
)         _____

 Title:
 )

## <u>EXHIBIT A</u>

**A&R Credit Agreement**

[*See attached.*]

**Execution Version**

_____

AMENDED AND RESTATED
SECOND LIEN CREDIT AGREEMENT

dated as of February 24, 2021

among

BEAR PARENT INC.,
as Holdings,

BELK, INC.,
as Borrower,

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent and Collateral Agent,

and

THE OTHER LENDERS PARTY HERETO

_____

## TABLE OF CONTENTS

**Page**

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Other Interpretive Provisions | 73 |
| Section 1.03 | Accounting Terms | 75 |
| Section 1.04 | Rounding | 75 |
| Section 1.05 | References to Agreements, Laws, etc. | 75 |
| Section 1.06 | Times of Day and Timing of Payment and Performance | 75 |
| Section 1.07 | Pro Forma and Other Calculations | 75 |
| Section 1.08 | Available Amount Transaction | 78 |
| Section 1.09 | [Reserved] | 78 |
| Section 1.10 | Currency Generally | 78 |
| Section 1.11 | Divisions | 79 |

### ARTICLE II

### THE COMMITMENTS AND BORROWINGS

| | | |
|---|---|---|
| Section 2.01 | The Loans | 79 |
| Section 2.02 | Borrowings, Conversions and Continuations of Loans | 79 |
| Section 2.03 | [Reserved] | 81 |
| Section 2.04 | [Reserved] | 81 |
| Section 2.05 | Prepayments | 81 |
| Section 2.06 | Termination or Reduction of Commitments | 91 |
| Section 2.07 | Repayment of Loans | 92 |
| Section 2.08 | Interest | 92 |
| Section 2.09 | Fees | 92 |
| Section 2.10 | Computation of Interest and Fees | 92 |
| Section 2.11 | Evidence of Indebtedness | 92 |
| Section 2.12 | Payments Generally | 93 |
| Section 2.13 | Sharing of Payments | 95 |
| Section 2.14 | Incremental Term Facilities | 95 |
| Section 2.15 | Refinancing Amendments | 97 |
| Section 2.16 | Extensions of Loans | 98 |
| Section 2.17 | Defaulting Lenders | 100 |

# TABLE OF CONTENTS
## (cont'd)

Page

## ARTICLE III

### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    Taxes, Increased Costs Protection and Illegality Taxes ...............................101
Section 3.02    [Reserved].........................................................................................104
Section 3.03    [Reserved].........................................................................................104
Section 3.04    Increased Cost and Reduced Return; Capital Adequacy ....................104
Section 3.05    [Reserved].........................................................................................105
Section 3.06    Matters Applicable to All Requests for Compensation .......................105
Section 3.07    Replacement of Lenders under Certain Circumstances.......................106
Section 3.08    Survival...............................................................................................107

## ARTICLE IV

### CONDITIONS PRECEDENT TO TERM BORROWINGS

Section 4.01    Conditions to Term Borrowings on Closing Date .........................107

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power; Compliance with Laws .......................108
Section 5.02    Authorization; No Contravention .....................................................108
Section 5.03    Governmental Authorization ............................................................109
Section 5.04    Binding Effect....................................................................................109
Section 5.05    Financial Statements; No Material Adverse Effect .....................................109
Section 5.06    Litigation............................................................................................109
Section 5.07    Labor Matters.....................................................................................110
Section 5.08    Real Property Matters........................................................................110
Section 5.09    Environmental Matters ......................................................................111
Section 5.10    Taxes...................................................................................................111
Section 5.11    ERISA Compliance ...........................................................................111
Section 5.12    Subsidiaries........................................................................................112
Section 5.13    Margin Regulations; Investment Company Act .........................................112
Section 5.14    Disclosure ..........................................................................................113
Section 5.15    Intellectual Property; Licenses, etc....................................................113
Section 5.16    Solvency ............................................................................................113
Section 5.17    USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act 113
Section 5.18    Collateral Documents ........................................................................113
Section 5.19    Use of Proceeds .................................................................................114
Section 5.20    Beneficial Ownership Certification ...................................................114

ii

# TABLE OF CONTENTS
## (cont'd)

## ARTICLE VI

## AFFIRMATIVE COVENANTS

Section 6.01   Financial Statements.................................................................114
Section 6.02   Certificates; Other Information...................................................116
Section 6.03   Notices......................................................................................118
Section 6.04   Payment of Obligations .............................................................118
Section 6.05   Preservation of Existence, etc....................................................118
Section 6.06   Maintenance of Properties .........................................................118
Section 6.07   Maintenance of Insurance ..........................................................119
Section 6.08   Compliance with Laws ...............................................................119
Section 6.09   Books and Records ....................................................................119
Section 6.10   Inspection Rights .......................................................................120
Section 6.11   Covenant to Guarantee Obligations and Give Security ...............120
Section 6.12   Compliance with Environmental Laws .......................................124
Section 6.13   Further Assurances and Post-Closing Covenant...........................125
Section 6.14   [Reserved].................................................................................125
Section 6.15   Maintenance of Ratings .............................................................125
Section 6.16   Accounting Changes ..................................................................126
Section 6.17   Nature of Business .....................................................................126
Section 6.18   Designation of Subsidiaries .......................................................126
Section 6.19   Lender Meetings ........................................................................126

## ARTICLE VII

## NEGATIVE COVENANTS

Section 7.01   Liens.........................................................................................126
Section 7.02   Indebtedness ..............................................................................126
Section 7.03   Fundamental Changes.................................................................132
Section 7.04   Asset Sales.................................................................................136
Section 7.05   Restricted Payments...................................................................137
Section 7.06   Transactions with Affiliates........................................................142
Section 7.07   Burdensome Agreements.............................................................146
Section 7.08   Modification of Terms of Subordinated Indebtedness ..................150
Section 7.09   Holdings....................................................................................150
Section 7.10   Anti-Layering ............................................................................151
Section 7.11   Subsidiaries................................................................................152

# TABLE OF CONTENTS
## (cont'd)

**Page**

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

| | | |
|---|---|---|
| Section 8.01 | Events of Default | 152 |
| Section 8.02 | Remedies upon Event of Default | 154 |
| Section 8.03 | Application of Funds | 155 |

## ARTICLE IX

## ADMINISTRATIVE AGENT, COLLATERAL AGENT AND OTHER AGENTS

| | | |
|---|---|---|
| Section 9.01 | Appointment and Authorization of the Agents | 155 |
| Section 9.02 | Rights as a Lender | 156 |
| Section 9.03 | Exculpatory Provisions | 156 |
| Section 9.04 | Lack of Reliance on the Agents | 158 |
| Section 9.05 | Certain Rights of the Agents | 158 |
| Section 9.06 | Reliance by the Agents | 158 |
| Section 9.07 | Delegation of Duties | 158 |
| Section 9.08 | Indemnification | 159 |
| Section 9.09 | The Agents in their Individual Capacity | 159 |
| Section 9.10 | Holders | 159 |
| Section 9.11 | Resignation by the Agents | 160 |
| Section 9.12 | Collateral Matters | 161 |
| Section 9.13 | [Reserved] | 162 |
| Section 9.14 | Administrative Agent May File Proofs of Claim | 162 |
| Section 9.15 | Appointment of Supplemental Administrative Agents | 162 |
| Section 9.16 | Intercreditor Agreements | 163 |
| Section 9.17 | [Reserved] | 163 |
| Section 9.18 | Withholding Tax | 163 |
| Section 9.19 | No Reliance on Administrative Agent's Customer Identification Program | 164 |
| Section 9.20 | Survival | 164 |

## ARTICLE X

## MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.01 | Amendments, etc. | 164 |
| Section 10.02 | Notices and Other Communications; Facsimile Copies | 169 |
| Section 10.03 | No Waiver; Cumulative Remedies | 171 |
| Section 10.04 | Costs and Expenses | 171 |
| Section 10.05 | Indemnification by the Borrower | 172 |
| Section 10.06 | Marshaling; Payments Set Aside | 173 |
| Section 10.07 | Successors and Assigns | 173 |

iv

# TABLE OF CONTENTS
## (cont'd)

**Page**

Section 10.08  [Reserved]................................................................................180
Section 10.09  Confidentiality ........................................................................180
Section 10.10  Setoff.......................................................................................182
Section 10.11  Interest Rate Limitation ..........................................................182
Section 10.12  Counterparts; Integration; Effectiveness ................................182
Section 10.13  Electronic Execution of Assignments and Certain Other Documents...........182
Section 10.14  Survival of Representations and Warranties..............................183
Section 10.15  Severability .............................................................................183
Section 10.16  GOVERNING LAW .................................................................183
Section 10.17  WAIVER OF RIGHT TO TRIAL BY JURY ...............................184
Section 10.18  Binding Effect.........................................................................184
Section 10.19  Lender Action .........................................................................184
Section 10.20  Use of Name, Logo, etc. .........................................................184
Section 10.21  USA PATRIOT Act..................................................................184
Section 10.22  Service of Process....................................................................185
Section 10.23  No Advisory or Fiduciary Responsibility.................................185
Section 10.24  Release of Collateral and Guarantee Obligations; Subordination of Liens...185
Section 10.25  [Reserved]................................................................................186
Section 10.26  Judgment Currency..................................................................186
Section 10.27  Amendment and Restatement ..................................................187

SCHEDULES

| 1.01(1) | Closing Date Guarantors |
| 1.01(2) | Existing Mortgaged Properties |
| 1.02 | Closing Date Unrestricted Subsidiaries |
| 2.01 | Commitments |
| 5.06 | Litigation |
| 5.08(2) | Owned Real Property |
| 5.08(3) | Leased Real Property |
| 5.08(4) | Space Leased Property |
| 5.08(5) | Real Estate Proceedings |
| 5.08(6) | Real Property Improvements |
| 5.08(7) | Real Property Violations |
| 5.08(8) | Occupied Real Property |
| 5.12 | Subsidiaries and Other Equity Investments |
| 7.02(3) | Existing Indebtedness |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| A-1 | Committed Loan Notice |
| B-1 | Term Note |
| C | Compliance Certificate |
| D-1 | Assignment and Assumption |
| D-2 | Affiliated Lender Assignment and Assumption |
| E | Guaranty |
| F | Security Agreement |
| G-1 | ABL Intercreditor Agreement |
| G-2 | Term Intercreditor Agreement |
| H | United States Tax Compliance Certificates |
| I | Solvency Certificate |
| J | Discount Range Prepayment Notice |
| K | Discount Range Prepayment Offer |
| L | Solicited Discounted Prepayment Notice |
| M | Acceptance and Prepayment Notice |
| N | Specified Discount Prepayment Notice |
| O | Solicited Discounted Prepayment Offer |
| P | Specified Discount Prepayment Response |
| Q | Intercompany Subordination Agreement |

## AMENDED AND RESTATED SECOND LIEN CREDIT AGREEMENT

This AMENDED AND RESTATED SECOND LIEN CREDIT AGREEMENT (this "**Agreement**"), by and among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation and direct subsidiary of Holdings ("**Belk**" or the "**Borrower**"), WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent ("**Wilmington Trust**" and, in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**") is attached to the Third Amendment and constitutes the agreement of the parties hereto on and after the Closing Date.

## PRELIMINARY STATEMENTS

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## Definitions and Accounting Terms

Section 1.01    Defined Terms. As used in this Agreement, the following terms have the meanings set forth below:

"**ABL Commitments**" means "Commitments" as defined in the ABL Facility.

"**ABL Credit Agreement**" means the ABL Credit Agreement dated as of the Original Closing Date (as amended by that certain Amendment No. 1 to ABL Credit Agreement, dated as of August 29, 2019, that certain Amendment No. 2 to the ABL Credit Agreement, dated as of October 30, 2020 and that certain Limited Waiver and Amendment No. 3 to ABL Credit Agreement, dated as of the Closing Date, by and among the Borrower, Holdings, the lenders party thereto and the ABL Facility Administrative Agent), among Holdings, the Borrower, the ABL Facility Administrative Agent and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, supplemented, waived or otherwise modified from time to time, in each case to the extent permitted hereunder and under the ABL Intercreditor Agreement and any Refinancing Indebtedness thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Credit Agreement) in each case to the extent permitted hereunder.

"**ABL Event of Default**" means "Event of Default" as set forth in the ABL Credit Agreement.

"**ABL Facility**" means the collective reference to the ABL Credit Agreement, any ABL Loan Document, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time, or refunded, refinanced, restructured, replaced, renewed, repaid, increased or extended from time to time, in each case to the extent permitted hereunder and under the ABL Intercreditor Agreement and any Refinancing Indebtedness thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Facility).

1

"**ABL Facility Administrative Agent**" means Bank of America, N.A. in its capacity as administrative agent under the ABL Credit Agreement or any successor agent under the ABL Loan Documents.

"**ABL Intercreditor Agreement**" means the ABL Intercreditor Agreement substantially in the form of Exhibit G-1 among the Collateral Agent, the First Lien Administrative Agent, as collateral agent under the First Lien Credit Agreement, Bank of America, N.A., as collateral agent under the ABL Credit Agreement and the representatives thereof for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Lenders**" means "Lenders" under the ABL Credit Agreement.

"**ABL Loan Documents**" means, collectively, (i) the ABL Credit Agreement and (ii) the security documents, intercreditor agreements (including the ABL Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the ABL Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the ABL Facility.

"**ABL Obligations**" means "Obligations" as defined in the ABL Facility.

"**Acceptable Discount**" has the meaning specified in Section 2.05(1)(e)(D)(2).

"**Acceptable Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Acceptance and Prepayment Notice**" means a notice of the Borrower's acceptance of the Acceptable Discount in substantially the form of Exhibit M.

"**Acceptance Date**" has the meaning specified in Section 2.05(1)(e)(D)(2).

"**Acquired Indebtedness**" means, with respect to any specified Person,

(1)     Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person, and

(2)     Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Additional Lender**" means, at any time, any bank, other financial institution or institutional lender or investor that, in any case, is not an existing Lender and that agrees to provide any portion of any (a) Incremental Term Loan in accordance with Section 2.14, (b) Loans pursuant to a Refinancing Amendment in accordance with Section 2.15 or (c) Replacement Loans pursuant to Section 10.01; *provided* that each Additional Lender (other than any Person that is a Lender, an Affiliate of a Lender or an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), in each case solely to the extent that any such consent would be required from the Administrative Agent under Section 10.07(b)(iii)(B) for an assignment of Loans to such Additional Lender.

"**Adjusted EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period:

(1)     increased (without duplication) by the following, in each case (other than clauses (h) and (l)) to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(a)     total interest expense and, to the extent not reflected in such total interest expense, any losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such Hedging Obligations or such derivative instruments, and bank and letter of credit fees and costs of surety bonds in connection with financing activities, together with items excluded from the definition of "Consolidated Interest Expense" pursuant to the definition thereof; *plus*

(b)     provision for taxes based on income, profits, revenue or capital, including federal, foreign and state income, franchise, excise, value added and similar taxes, property taxes and similar taxes, and foreign withholding taxes paid or accrued during such period (including any future taxes or other levies that replace or are intended to be in lieu of taxes, and any penalties and interest related to taxes or arising from tax examinations), and any payments to a Parent Company in respect of such taxes permitted to be made hereunder; *plus*

(c)     Consolidated Depreciation and Amortization Expense for such period; *plus*

(d)     any other non-cash expenses, charges, expenses, losses or items (including any write-offs or write-downs) reducing Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (i) the Borrower may determine not to add back such non-cash charge in the current period and (ii) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Adjusted EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *provided* that the foregoing shall not permit adding back the write-down or reserve of inventory outside the ordinary course of business; *plus*

(e)     minority interest expense, the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any non-wholly-owned Subsidiary deducted (and not added back) in such period to Consolidated Net Income, excluding cash distributions in respect thereof, and the amount of any reductions in arriving at Consolidated Net Income resulting from the application of Accounting Standards Codification Topic No. 810, *Consolidation*; *plus*

(f)     (i) the amount of management, monitoring, consulting, transaction, advisory and other fees (including termination fees) and indemnities and expenses paid or accrued in such period under the Management Services Agreement or otherwise to the extent otherwise permitted under Section 7.06 and (ii) the amount of payments made to option holders of such Person or any Parent Company in connection with, or as a result of, any distribution being made to shareholders of such Person or its Parent Companies, which payments are being made to compensate such option holders as though they were

3

shareholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted hereunder; *plus*

(g)    the amount of loss or discount on sale of receivables, Securitization Assets and related assets to any Securitization Subsidiary in connection with a Qualified Securitization Facility; *plus*

(h)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Adjusted EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Adjusted EBITDA pursuant to clause (2) below for any previous period and not added back; *plus*

(i)    any costs or expenses incurred pursuant to any management equity plan, stock option plan or any other management or employee benefit plan, agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of such Person or net cash proceeds of an issuance of Equity Interest of such Person (other than Disqualified Stock); *plus*

(j)    any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of *FASB Accounting Standards Codification Topic 715—Compensation— Retirement Benefits*, and any other items of a similar nature, *plus*

(k)    any net loss from operations expected to be disposed of, abandoned or discontinued within twelve months after the end of such period; *plus*

(l)    (I) pro forma adjustments, including pro forma "run rate" cost savings, operating expense reductions and other synergies (in each case, net of amounts actually realized) related to acquisitions, dispositions and other specified transactions, or related to restructuring initiatives, cost savings initiatives and other initiatives that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are that are expected to be taken within four fiscal quarters after the date of consummation of such acquisition, disposition or other specified transaction or the initiation of such restructuring initiative, cost savings initiative or other initiatives and (II) pro forma "run rate" cost savings, operating expense reductions and synergies (in each case, net of amounts actually realized) related to the Transactions that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within four fiscal quarters after the Closing Date (it is understood and agreed that "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken); *provided* that amounts added back pursuant to this clause (l), together with the amounts added back pursuant to clauses (n) and (o) below and any similar adjustments made in accordance with Section 1.07(3) and add-backs included in clause (1) of the definition of "Consolidated Net Income", shall not exceed 10% of Adjusted EBITDA for such period calculated prior to giving effect to the add-backs set forth in this clause (l), clauses (n) and (o) below and the adjustments made

4

in accordance with Section 1.07(3) and add-backs included in clause (1) of the definition of "Consolidated Net Income", and being calculated on a pro forma basis (the cap in this proviso, the "**Combined Adjusted EBITDA Cap**"); *plus*

(m)     any payments in the nature of compensation or expense reimbursement made to independent board members; *plus*

(n)     costs, charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of cost savings initiatives and operating expense reductions, restructuring and similar charges (including the Transactions), severance, relocation costs, integration and facilities and New Store opening costs and other business optimization expenses, signing costs, retention or completion bonuses, transition costs, costs related to closure/consolidation of facilities, stores and curtailments or modifications to pension and post-retirement employee benefits plans (including any settlement of pension liabilities), subject to the Combined Adjusted EBITDA Cap; *plus*

(o)     the amount of any loss attributable to any New Store, subject to the Combined Adjusted EBITDA Cap; *provided* that the aggregate amounts added back pursuant to this clause (o) shall not exceed $5.0 million for such period; *plus*

(p)     costs and expenses in connection with the implementation of fresh start accounting and all adjustments resulting from the application of fresh start accounting principles;

(2)     decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

(a)     non-cash gains for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Adjusted EBITDA in any prior period other than any such accrual or reserve that has been added back to Consolidated Net Income in calculating Adjusted EBITDA in accordance with this definition), and

(b)     the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any non-wholly owned subsidiary added (and not deducted in such period from Consolidated Net Income).

Adjusted EBITDA of Belk and its Restricted Subsidiaries will be deemed to equal (i) $124,997,000 for the fiscal quarter ended February 1, 2020, (ii) ($67,491,000) for the fiscal quarter ended May 2, 2020, (iii) $1,505,000 for the fiscal quarter ended August 1, 2020 and (iv) ($41,751,000) for the fiscal quarter ended October 31, 2020, in each case and, without duplication, adjusted to reflect any pro forma adjustments with respect to any relevant Specified Transaction as are appropriate and consistent with the pro forma adjustment provisions set forth in Section 1.07, in each case, occurring or identified after the Closing Date and not otherwise included in the calculation of the foregoing amounts.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement prior to the Closing Date and on and after the Closing Date, means Wilmington Trust, National Association, and any successor thereto.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  Notwithstanding the foregoing, other than with respect to Section 7.06, none of Blackstone, KKR, any Agent, any Third Amendment Lender as of the Closing Date nor any of their respective Affiliates shall be deemed an Affiliate of the Sponsor, Holdings, the Borrower or any of its Subsidiaries.

"**Affiliate Transaction**" has the meaning specified in Section 7.06.

"**Affiliated Lender**" means, at any time, any Lender that is the Sponsor or an Affiliate of the Sponsor or an Affiliate of the Borrower (other than (a) Holdings, the Borrower or any Subsidiary or (b) any natural person) at such time.  For the avoidance of doubt, none of Blackstone, KKR, any Agent, any Third Amendment Lender as of the Closing Date nor any of their respective Affiliates or permitted assignees shall be deemed an Affiliated Lender.

"**Affiliated Lender Assignment and Assumption**" has the meaning specified in Section 10.07(h)(v).

"**Affiliated Lender Cap**" has the meaning specified in Section 10.07(h)(iv).

"**Agent Fee Letter**" means the Amended & Restated Fee Letter for Second Lien Credit Facility, dated as of the Closing Date, between the Borrower and Wilmington Trust, National Association, as Administrative Agent and Collateral Agent.

"**Agent Parties**" has the meaning specified in Section 10.02(4).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, members, managers, employees, agents, representatives, sub-agents, co-agents, attorneys-in-fact, partners, trustees, attorneys, and advisors of such Persons and of such Persons' Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Supplemental Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Agreement, as amended, restated, amended and restated, modified or supplemented from time to time in accordance with the terms hereof.

"**Agreement Currency**" has the meaning specified in Section 10.26.

"**AHYDO Payment**" means any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Code Section 163(i).

"**All-In Yield**" means, with respect to any term loan facility or other term loans, as of any date of determination, the sum of (i) the higher of (A) the LIBOR rate on such date for a deposit in Dollars with a maturity of one month and (B) the LIBOR rate "floor," if any, with respect thereto as of such date, (ii) the applicable margin as of such date for loans that accrue interest by reference to the LIBOR rate or a similar reference rate and (iii) the amount of original issue discount and upfront fees thereon (converted to yield assuming a four-year average life and without any present value discount), but excluding the effect of any arrangement, structuring, syndication or other fees payable in connection therewith that are not shared with all lenders or holders of such term loan facility or other term loans; provided that the amounts set forth in clauses (i) and (ii) above for any term loans that are not incurred under this Agreement shall be based on the stated interest rate basis for such term loans.

"**Applicable Discount**" has the meaning specified in Section 2.05(1)(e)(C)(2).

"**Applicable Intercreditor Agreement**" means (a) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that (i) are intended to rank equal in priority to the Liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the ABL Obligations and (ii) are intended to rank junior in priority to the Liens on the Term Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the Obligations, the ABL Intercreditor Agreement, (b) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank senior in priority to the Liens on the Collateral securing the Obligations (but without regard to control of remedies), each of the ABL Intercreditor Agreement and the Term Intercreditor Agreement, (c) to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank equal in priority to the Liens on the Collateral securing the Obligations, the Term Intercreditor Agreement and the ABL Intercreditor Agreement and (d) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank junior in priority to the Liens securing the Obligations, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations.

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Asset Sale**" means:

(1)     the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions of property or assets of the Borrower or any Restricted Subsidiary (each referred to in this definition as a "**disposition**"); or

(2)     the issuance or sale of Equity Interests (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 7.02 and directors' qualifying shares or shares or interests required to be held by foreign nationals or other third parties to the

extent required by applicable law) of any Restricted Subsidiary (other than to the Borrower or another Restricted Subsidiary), whether in a single transaction or a series of related transactions;

in each case, other than:

(a)     any disposition of:

(i)     Cash Equivalents or Investment Grade Securities,

(ii)     obsolete, damaged or worn out property or assets in the ordinary course of business or consistent with industry practice or any disposition of inventory or goods (or other assets) held for sale or no longer used or useful in the ordinary course;

(iii)     assets no longer economically practicable or commercially reasonable to maintain (as determined in good faith by the management of the Borrower) in an aggregate amount not to exceed $2,400,000 in any fiscal year;

(iv)     improvements made to leased real property to landlords pursuant to customary terms of leases entered into in the ordinary course of business;

(v)     assets for purposes of charitable contributions or similar gifts in *de minimis* amounts to the extent consistent with past practices;

(b)     the disposition of any assets by the Borrower or any Restricted Subsidiary in a manner permitted pursuant to Section 7.03;

(c)     any disposition in connection with the making of any Restricted Payment that is permitted to be made, and is made, under Section 7.05, any Permitted Investment or any acquisition otherwise permitted under this Agreement;

(d)     [reserved];

(e)     any disposition of property or assets or issuance of securities by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary to the extent otherwise permitted hereunder; *provided* that dispositions by Loan Parties to Non-Loan Parties shall be permitted solely to the extent permitted under Section 7.05;

(f)     to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)     (i) the lease, assignment or sublease, license or sublicense of any real or personal property in the ordinary course of business or consistent with industry practice and (ii) the exercise of termination rights with respect to any lease, sublease, license or sublicense or other agreement;

(h)     the sale of the Knox property pursuant to an agreement existing on the Closing Date;

8

(i)      foreclosures, condemnation, expropriation, eminent domain or any similar action (including for the avoidance of doubt, any Casualty Event) with respect to assets or the granting of Liens not prohibited hereunder;

(j)      sales of accounts receivable, or participations therein, or Securitization Assets or related assets in connection with any Qualified Securitization Facility or the disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with industry practice or in bankruptcy or similar proceedings;

(k)      any financing transaction with respect to property built or acquired by the Borrower or any Restricted Subsidiary after the Closing Date to the extent permitted hereunder, including Qualified Securitization Facilities;

(l)      the sale, lease, assignment, license, sublease or discount of inventory, equipment, accounts receivable, notes receivable or other current assets in the ordinary course of business or consistent with industry practice or the conversion of accounts receivable to notes receivable or other dispositions of accounts receivable in connection with the collection thereof;

(m)      the licensing or sublicensing of IP Rights or other general intangibles in the ordinary course of business or consistent with industry practice;

(n)      any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business or consistent with industry practice;

(o)      the unwinding of any Hedging Obligations;

(p)      sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)      the lapse or abandonment of IP Rights, which in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(r)      the granting of a Lien that is permitted under Section 7.01;

(s)      the issuance of directors' qualifying shares and shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable law;

(t)      the disposition of any assets (including Equity Interests) acquired in a transaction permitted hereunder, which assets are not used or useful in the principal business of the Borrower and its Restricted Subsidiaries, so long as such assets do not constitute a material portion of the assets acquired in any individual transaction; or

(u)      dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"**Assumption**" has the meaning specified in Section 10.25.

"**Attorney Costs**" means all reasonable fees, expenses and disbursements of any law firm or other external legal counsel, to the extent documented in reasonable detail and invoiced.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease Obligation of any Person, the amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction Agent**" means (a) the Administrative Agent or (b) any other financial institution or advisor engaged by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to Section 2.05(1)(e); *provided* that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); *provided further* that neither the Borrower nor any of its Affiliates may act as the Auction Agent.

"**Available Amount**" means at any time on and after the Closing Date (the "**Available Amount Reference Time**"), an amount (which shall not be less than zero) equal to the sum of:

(1)     [reserved]; plus

(2)     the Retained Excess Cash Flow Amount (as defined in the First Lien Credit Agreement); plus

(3)     the amount of any common capital contributions received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary other than the amount of any Specified Equity Contribution during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time; *provided* that such amount shall have been applied substantially contemporaneously with the receipt thereof in a permitted Investment in assets that constitute or will constitute Collateral; plus

(4)     [reserved]; plus

(5)     [reserved]; plus

(6)     [reserved]; plus

(7)     [reserved]; minus

(8)     the aggregate amount of Restricted Payments made with the Available Amount pursuant to clause (10)(Y) of Section 7.05(b) (net of any return of capital in respect of any Investments or deemed reduction in the amount of such Investment, including the sale, transfer, lease or other disposition of any such Investments), during the period commencing on the Closing Date through and including the Available Amount Reference Time (and, for purposes of this <u>clause</u>

(8), without taking account of the intended usage of the Available Amount at such Available Amount Reference Time).

"**Bankruptcy Code**" has the meaning specified in Section 8.02.

"**Basket**" means any amount, threshold or other value permitted or prescribed with respect to any Lien, Indebtedness, Asset Sale, Investment, Restricted Payment, transaction value, judgment or other amount under any provision in Articles V, VI, VII or VIII and the definitions related thereto.

"**Belk**" has the meaning specified in the preliminary statements of this Agreement.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Blackstone**" means Blackstone Alternative Credit Advisors LP and any of its respective Affiliates and funds or accounts managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Board of Directors**" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such Board of Directors. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Borrower.

"**Borrower**" means (a) Belk and (b) upon the consummation of any transaction permitted by Section 7.03(4), the Successor Borrower.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrower Offer of Specified Discount Prepayment**" means any offer by any Borrower Party to make a voluntary prepayment of Loans at a specified discount to par pursuant to Section 2.05(1)(e)(B).

"**Borrower Parties**" means the collective reference to Holdings, the Borrower and each Subsidiary of the Borrower and "**Borrower Party**" means any of them.

"**Borrower Solicitation of Discount Range Prepayment Offers**" means the solicitation by any Borrower Party of offers for, and the corresponding acceptance by a Lender of, a voluntary prepayment of Loans at a specified range of discounts to par pursuant to Section 2.05(1)(e)(C).

"**Borrower Solicitation of Discounted Prepayment Offers**" means the solicitation by any Borrower Party of offers for, and the subsequent acceptance, if any, by a Lender of, a voluntary prepayment of Loans at a discount to par pursuant to Section 2.05(1)(e)(D).

"**Borrowing**" means a borrowing consisting of Loans of the same Class made (or deemed to be made) on the same date.

"**Business Day**" means any day that is not a Legal Holiday.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under

11

Capitalized Lease Obligations) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and the Restricted Subsidiaries.

"**Capital Stock**" means:

(1)      in the case of a corporation, corporate stock or shares in the capital of such corporation;

(2)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)      in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into or exchangeable for Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP as in effect on the Original Closing Date.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"**Captive Insurance Subsidiary**" means any Subsidiary of the Borrower that is subject to regulation as an insurance company (or any Subsidiary thereof).

 "**Cash Equivalents**" means:

(1)      Dollars;

(2)      [reserved];

(3)      local currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business or consistent with industry practice;

(4)      readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 36 months or less from the date of acquisition;

(5)      certificates of deposit, time deposits and eurodollar time deposits with maturities of three years or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with any domestic

or foreign commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(6)     repurchase obligations for underlying securities of the types described in clauses (4) and (5) above or clauses (7) and (8) below entered into with any financial institution or recognized securities dealer meeting the qualifications specified in clause (5) above;

(7)     commercial paper and variable or fixed rate notes rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 36 months after the date of acquisition thereof;

(8)     marketable short-term money market and similar liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(9)     securities issued or directly and fully and unconditionally guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority of any such state, commonwealth or territory or any public instrumentality thereof having maturities of not more than 36 months from the date of acquisition thereof;

(10)     readily marketable direct obligations issued or directly and fully and unconditionally guaranteed by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency selected by the Borrower) with maturities of 36 months or less from the date of acquisition;

(11)     Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) with maturities of 24 months or less from the date of acquisition;

(12)     Investments with average maturities of 36 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(13)     investment funds investing substantially all of their assets in securities of the types described in clauses (1) through (12) above; and

(14)     solely with respect to any Captive Insurance Subsidiary, any investment that the Captive Insurance Subsidiary is not prohibited to make in accordance with applicable law.

In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents will also include (i) investments of the type and maturity described in clauses (1) through (13) above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal

investment practices for cash management in investments analogous to the foregoing investments in clauses (1) through (13) and in this paragraph.

"**Cash Management Agreement**" means any agreement entered into from time to time by Holdings, the Borrower or any Restricted Subsidiary in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, information reporting services, lockbox services, stop payment services and wire transfer services.

"**Cash Management Services**" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automatic clearing house fund transfer services, return items and interstate depository network services), (c) foreign exchange, netting and currency management services and (d) any other demand deposit or operating account relationships or other cash management services, including under any Cash Management Agreements.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"**CFC Holdco**" means a Domestic Subsidiary that has no material assets other than the Equity Interests in or indebtedness of one or more Foreign Subsidiaries that are CFCs, including the indirect ownership of such Equity Interests or indebtedness through one or more CFC Holdcos that have no other material assets.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority. It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111 203, H.R. 4173), all Laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

"**Change of Control**" means the occurrence of any of the following after the Closing Date:

(1)     at any time prior to the consummation of a Qualifying IPO after the Closing Date, the Permitted Holders ceasing to beneficially own (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), in the aggregate, directly or indirectly, at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or any Parent Company; or

(2)     at any time following the consummation of a Qualifying IPO after the Closing Date, (a) any Person (other than a Permitted Holder) or (b) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the

14

Exchange Act), becoming the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act) of Equity Interests of the Borrower or such Parent Company representing more than thirty-five percent (35%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or such Parent Company, as applicable, and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of the Borrower or such Parent Company, as applicable, beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders;

(3)       the occurrence of a "Change of Control" (or any comparable term) as defined in each of the First Lien Credit Agreement or any other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount (other than the ABL Credit Agreement); or

(4)       Holdings shall cease to be the registered owner of 100% of the Equity Interests of the Borrower unless in connection with the consummation of a Qualifying IPO by the Borrower.

unless, in the case of clause (1) or (2) above, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of the Borrower or any Parent Company.

"**Claim**" means any actions, suits or written demands or claims.

"**Class**" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (e.g., "fungibility")) and (ii) with respect to Lenders, those of such Lenders that have Commitments or Loans of a particular Class.

"**Closing Date**" means the first date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01, and the Closing Date Term Loans were made (or deemed made) to the Borrower pursuant to Sections 2.01, which date was February 24, 2021.

"**Closing Date Term Loan Commitment**" means, as to each Term Lender, its obligation to make (or be deemed to make) a Closing Date Term Loan to the Borrower in an aggregate amount not to exceed the amount specified opposite such Lender's name under on Schedule 2.01 under the caption "Closing Date Term Loan Commitment" or in the Assignment and Assumption (or Affiliated Lender Assignment and Assumption) pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement (including pursuant to Section 2.14, 2.15, 2.16 or 10.01). The aggregate amount of the Closing Date Term Loan Commitments on the Closing Date is $110,000,000.

"**Closing Date Term Loans**" means the Term Loans made (or deemed made) by the Lenders on the Closing Date to the Borrower pursuant to Section 2.01.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the "Collateral" and "Second Lien Collateral" (or equivalent term of each of the foregoing) as defined in any Collateral Document and the Mortgaged Properties.

"**Collateral Agent**" has the meaning specified in the introductory paragraph to this Agreement prior to the Closing Date and on and after the Closing Date, means Wilmington Trust, National Association, and any successor thereto.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(1)     the Collateral Agent shall have received each Collateral Document required to be delivered (a) on the Closing Date pursuant to Section 4.01 or (b) pursuant to Section 6.11 or 6.13 at such time required by such Sections to be delivered, in each case, duly executed by each Loan Party that is party thereto;

(2)     all Obligations shall have been unconditionally guaranteed by (a) Holdings (or any successor thereto), (b) each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary), which as of the Closing Date after giving effect to the Assumption shall include those that are listed on Schedule 1.01(1) hereto and (c) any Restricted Subsidiary of the Borrower that Guarantees (or is the borrower or issuer of) any Credit Agreement Refinancing Indebtedness, the First Lien Facility (and any "Credit Agreement Refinancing Indebtedness" as defined in the First Lien Credit Agreement), the ABL Facility and/or other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount (the Persons in the preceding clauses (a) through (c) collectively, the "**Guarantors**");

(3)     except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected security interest with the priority set forth in the Applicable Intercreditor Agreement, subject only to Liens permitted by Section 7.01, in

(a)     all the Equity Interests of the Borrower,

(b)     all Equity Interests of each direct, wholly owned Material Domestic Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor and

(c)     100% of the issued and outstanding Equity Interests of each (i) wholly owned Material Domestic Subsidiary that is (a) a CFC Holdco and (b) directly owned by the Borrower or any Subsidiary Guarantor and (ii) Foreign Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor;

(4)     except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01 or under any Collateral Document and in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents, the Obligations and the Guaranty shall have been secured by a security interest in substantially all tangible and intangible personal property of the Borrower and each Guarantor (including accounts other than Securitization Assets), inventory, equipment, investment property, contract rights, applications and registrations of IP Rights filed in the United States, other general intangibles, and proceeds of the foregoing, in each case,

(a)     that has been perfected (to the extent such security interest may be perfected by

16

(i)      delivering certificated securities, intercompany notes and other instruments in which a security interest can be perfected by physical control, in each case to the extent required hereunder or the Security Agreement;

(ii)      filing financing statements under the Uniform Commercial Code,

(iii)      making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office or

(iv)      filings in the applicable real estate records with respect to Mortgaged Properties (or any fixtures related to Mortgaged Properties) to the extent required by the Collateral Documents and

(b)      with the priority required by the Collateral Documents; *provided* that any such security interests in the Collateral shall be subject to the terms of the Applicable Intercreditor Agreements; and

(5)      with respect to each Real Property other than the Existing Mortgaged Properties, the Collateral Agent shall have received counterparts of a Mortgage, together with the other deliverables described in Section 6.11(2)(b), with respect to each Real Property (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property within the time periods set forth in Sections 6.11(2)(b) and 6.13; *provided* that to the extent any Mortgaged Property is located in a jurisdiction which imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, the relevant Mortgage shall not secure an amount in excess of the fair market value of the Mortgaged Property subject thereto.  Unless requested by the Required Lenders, there will not be any obligation to deliver a new Mortgage with respect to an Existing Mortgaged Property.

(6)      [Reserved].

(7)      Within sixty (60) days after the Closing Date (or such longer period that the Required Lenders may agree in their reasonable discretion), the Collateral Agent shall have received (i) evidence that an amendment, supplement or modification in form reasonably satisfactory to the Collateral Agent and the Required Lenders (the "**Mortgage Amendments**") with respect to each Existing Mortgaged Property set forth on Schedule 1.01(2), duly executed, acknowledged and delivered and is in form suitable for filing and recording in all filing or recording offices that the Required Lenders may reasonably deem necessary to maintain or protect the Lien of the related Mortgage and the priority thereof; (ii) with respect to the real properties subject to the Mortgage Amendments, (x) fully paid title date-down endorsements or modification endorsements (to the extent such date-down endorsements or modification endorsements are available in the applicable jurisdiction at reasonable costs) to the related Mortgage Policies or (y) title searches (to the extent such date-down endorsements are not available at reasonable costs in any such jurisdictions), in each case confirming ownership of the related real property by the applicable Loan Party and showing no Liens of record other than Permitted Liens; (iii) evidence that all filing, documentary, stamp, intangible and recording taxes and fees in respect to such Mortgage Amendments have been paid in connection with the preparation, execution, filing and recordation of the Mortgage Amendments; and (iv) the deliverables described in Sections 6.11(2)(b)(ii) (to the extent required thereunder), (iv), (v), (vi) (to the extent not previously delivered), and (vii) (to the extent requested by the Collateral Agent or the Required Lenders), with respect to any Real Property subject to the Mortgage Amendments.

The foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, the creation, perfection or maintenance of pledges of, or security interests in, Mortgages on, or the obtaining of Mortgage Policies, surveys, abstracts or appraisals or taking other actions with respect to, any Excluded Assets.

The Required Lenders may grant extensions of time for the creation, perfection or maintenance of security interests in, or the execution or delivery of any Mortgage and the obtaining of title insurance, surveys or Opinions of Counsel with respect to, particular assets (including extensions beyond the Closing Date for the creation, perfection or maintenance of security interests in the assets of the Loan Parties on such date) where they reasonably determine, in consultation with the Borrower, that creation or perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)     Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Required Lenders and the Borrower;

(B)     the Collateral and Guarantee Requirement shall not apply to any Excluded Assets;

(C)     no deposit account control agreement, securities account control agreement or other control agreements or control arrangements shall be required with respect to any deposit account, securities account or other asset specifically requiring perfection through control agreements except to the extent such control agreement would or could be required under the ABL Credit Agreement as in effect on the Closing Date, whether or not such ABL Credit Agreement were than actually in effect;

(D)     no actions in any jurisdiction other than the U.S. or that are necessary to comply with the Laws of any jurisdiction other than the U.S. shall be required in order to create any security interests in assets located, titled, registered, applied for, filed, or arising under laws outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the Laws of any jurisdiction other than the U.S.) and there shall be no requirement to deliver landlord lien waivers, estoppels and collateral access letters;

(E)     [reserved];

(F)     no perfection steps shall be required with respect to (i) letter of credit rights, except to the extent constituting a support obligation for other Collateral as to which perfection is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (ii) commercial tort claims with a value of less than $2.5 million, (iii) motor vehicles and other assets subject to certificates of title to the extent a Lien thereon cannot be perfected by the filing of a UCC financing statement, and (iv) promissory notes evidencing debt for borrowed money in a principal amount of less than $2.5 million; and

(G)     to the extent any Subsidiary of the Borrower is not required to be a guarantor under the First Lien Facility, such Subsidiary shall not be required to be a Guarantor hereunder with the consent of the Required Lenders (not to be unreasonably withheld or delayed).

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages (if any), each of the collateral assignments, security agreements, pledge agreements, account control agreements or other similar agreements delivered to the Administrative Agent, Collateral Agent or the Lenders pursuant to Sections 4.01, 6.11 or 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Combined Adjusted EBITDA Cap**" has the meaning specified in clause (1)(l) of the definition of "Adjusted EBITDA".

"**Commitment**" means the Closing Date Term Loan Commitments, Incremental Commitments, Refinancing Commitments or Extended Commitments, or any commitment in respect of Replacement Loans, as the context may require.

"**Commitment Parties**" means Blackstone Alternative Credit Advisors LP, KKR Credit Advisors (US) LLC, KKR TFO Partners LP and Polar Bear Fund LP - Class B.

"**Committed Loan Notice**" means a notice of a Borrowing with respect to a given Class of Loans, which shall be substantially in the form of Exhibit A-1.

"**Compensation Period**" has the meaning specified in Section 2.12(3)(b).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of a Financial Officer of the Borrower:

(1)     certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto (in each case, other than any Default with respect to which the Administrative Agent has otherwise obtained notice in accordance with Section 6.03(1)); and

(2)     in the case of financial statements delivered under Section 6.01(1), setting forth reasonably detailed calculations of the Net Proceeds and Specified Sale-Leaseback Net Proceeds (as applicable) received during the applicable period by or on behalf of the Borrower or any Restricted Subsidiary in respect of any (x) Asset Sale or Casualty Event subject to prepayment pursuant to Section 2.05(2)(b)(i) and the portion of such Net Proceeds that has been invested or is intended to be reinvested in accordance with Section 2.05(2)(b)(ii) and (y) Specified Sale-Leaseback Transaction subject to prepayment pursuant to Section 2.05(2)(c).

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and Cash Equivalents, amounts related to current or deferred taxes based on income or profits, assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees, derivative financial instruments and any assets in respect of Hedge Agreements, and excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding (A) the current portion of any Funded Debt and other long-term liabilities, (B) the current portion of interest, (C) accruals for current or deferred taxes based

on income or profits, (D) accruals of any costs or expenses related to restructuring reserves or severance, (E) all Indebtedness consisting of Loans (as defined in the ABL Facility), Swing Line Loans (as defined in the ABL Facility) and L/C Obligations (as defined in the ABL Facility) to the extent otherwise included therein or any other revolving loans, swingline loans and letter of credit obligations under any other revolving credit facility, (F) the current portion of any Capitalized Lease Obligation, (G) deferred revenue arising from cash receipts that are earmarked for specific projects, (H) liabilities in respect of unpaid earn-outs, (I) the current portion of any other long-term liabilities, (J) accrued litigation settlement costs and (K) any liabilities in respect of Hedge Agreements, and, furthermore, excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person and its Restricted Subsidiaries, including the amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses and amortization of Capitalized Software Expenditures of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated Interest Expense**" means, with respect to any Person for any period, without duplication, the sum of:

(1)     consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount or premium resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (c) non-cash interest payments, (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate obligations under any Hedge Agreement with respect to Indebtedness); plus

(2)     consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(3)     interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" means, with respect to any Person for any period, the net income (loss) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding (and excluding the effect of), without duplication,

(1)     extraordinary, non-recurring or unusual gains, losses, fees, costs, charges or expenses (including relating to any multi-year strategic initiatives and accruals and reserves in connection with such gains, losses, charges or expenses); restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves, and in each case, whether or not classified as such under GAAP); costs and expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of stores or facilities and fixed assets for alternative uses; Public Company Costs; costs and expenses related to the integration, consolidation, opening, pre-opening and closing of stores or facilities and fixed assets; severance and relocation costs and expenses, one-time compensation costs and

expenses, consulting fees, signing, retention or completion bonuses, and executive recruiting costs; costs and expenses incurred in connection with strategic initiatives; transition costs and duplicative running costs; costs and expenses incurred in connection with non-ordinary course product and IP Rights development; costs incurred in connection with acquisitions (or purchases of assets) or the Transactions, in each case, prior to or after the Closing Date (including integration costs); business optimization expenses (including costs and expenses relating to business optimization programs, new systems design, retention charges, system establishment costs and implementation costs and project start-up costs), accruals and reserves; operating expenses attributable to the implementation of cost-savings initiatives; curtailments and modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments); provided that amounts added back pursuant to this clause (1) shall be subject to the Combined Adjusted EBITDA Cap;

(2)     the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period whether effected through a cumulative effect adjustment or a retroactive application, in each case in accordance with GAAP;

(3)     Transaction Expenses;

(4)     any gain (loss) on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business or consistent with industry practice) or income (loss) from discontinued operations (but if such operations are classified as discontinued due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of);

(5)     the Net Income for such period of any Person that is an Unrestricted Subsidiary and, solely for the purpose of the Available Amount, the Net Income for such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; provided that the Consolidated Net Income of a Person will be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents) to such Person or a Restricted Subsidiary thereof in respect of such period;

(6)     solely for the purpose of determining the Available Amount, the Net Income for such period of any Restricted Subsidiary (other than any Guarantor) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived; provided that Consolidated Net Income of a Person will be increased by the amount of dividends or other distributions or other payments actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents);

(7)     effects of adjustments (including the effects of such adjustments pushed down to such Person and its Restricted Subsidiaries) related to the application of recapitalization accounting or purchase accounting (including in the inventory, property and equipment, software, goodwill, intangible assets, in process research and development, deferred revenue and debt line items);

(8)      income (loss) from the early extinguishment or conversion of (a) Indebtedness, (b) Hedging Obligations or (c) other derivative instruments;

(9)      any impairment charge or asset write-off or write-down in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP; *provided* that this clause (9) shall not permit the write-down or reserve of inventory outside the ordinary course of business;

(10)      (a) any equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation, equity incentive programs or similar rights, stock options, restricted stock or other rights to, and any cash charges associated with the rollover, acceleration or payout of, Equity Interests by management of such Person or of a Restricted Subsidiary or any Parent Company, (b) noncash compensation expense resulting from the application of Accounting Standards Codification Topic No. 718, *Compensation—Stock Compensation* or Accounting Standards Codification Topic 505-50, *Equity-Based Payments to Non-Employees*, and (c) any income (loss) attributable to deferred compensation plans or trusts;

(11)      any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, disposition, incurrence or repayment of Indebtedness (including such fees, expenses or charges related to the offering and issuance of the Term Notes and the syndication and incurrence of any Facilities), issuance of Equity Interests (including by any direct or indirect parent of the Borrower), recapitalization, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Indebtedness evidenced by this Agreement, the First Lien Facility, or the ABL Facility) and including, in each case, any such transaction whether consummated on, after or prior to the Closing Date and any such transaction undertaken but not completed, and any charges or nonrecurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful or consummated (including, for the avoidance of doubt, the effects of expensing all transaction related expenses in accordance with Accounting Standards Codification Topic No. 805, *Business Combinations*);

(12)      accruals and reserves that are established or adjusted in connection with the Transactions, an Investment or an acquisition that are required to be established or adjusted as a result of the Transactions, such Investment or such acquisition, in each case accordance with GAAP;

(13)      any expenses, charges or losses to the extent covered by insurance that are, directly or indirectly, reimbursed or reimbursable by a third party, and any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement;

(14)      any non-cash gain (loss) attributable to the mark to market movement in the valuation of Hedging Obligations or other derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—*Derivatives and Hedging* or mark to market movement of other financial instruments pursuant to FASB Accounting Standards Codification Topic 825—*Financial Instruments*;

(15)      any net unrealized gain or loss (after any offset) resulting in such period from currency transaction or translation gains or losses including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from (a) Hedging Obligations for currency exchange risk and (b) resulting from intercompany indebtedness) and any

other foreign currency transaction or translation gains and losses, to the extent such gain or losses are non-cash items;

(16)     any adjustments resulting from the application of Accounting Standards Codification Topic No. 460, *Guarantees*, or any comparable regulation;

(17)     any non-cash rent expense;

(18)     the amount of any management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Investors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 7.06;

(19)     any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures; and

(20)     earn-out and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries, Consolidated Net Income will include the amount of proceeds received or receivable from business interruption insurance, the amount of any expenses or charges incurred by such Person or its Restricted Subsidiaries during such period that are, directly or indirectly, reimbursed or reimbursable by a third party, and amounts that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder.

"**Consolidated Secured Debt**" means, as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, the aggregate amount of Consolidated Total Debt that is secured by a Lien on any assets or property of the Borrower or any of its Restricted Subsidiaries.

"**Consolidated Total Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transaction), consisting of Indebtedness for borrowed money, Capitalized Lease Obligations, debt obligations evidenced by notes or similar instruments and Guarantees of Indebtedness listed above <u>minus</u> (b) the aggregate amount of all cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, in each case, subject to control agreements for the benefit of the Obligations (including control agreements entered into by the ABL Facility Administrative Agent or the First Lien Administrative Agent for the benefit of, among others, the Obligations hereunder) (but excluding cash and Cash Equivalents which are listed as "Restricted" on such balance sheet), which aggregate amount of cash and Cash Equivalents shall be determined without giving pro forma effect to the proceeds of Indebtedness incurred on such date; provided, Consolidated Total Debt will not include Non-Recourse Indebtedness and Indebtedness in respect of any (1) letter of credit, except to the extent of obligations in respect of drawn standby letters of credit which have not been reimbursed within three (3) Business Days and (2) Hedging Obligations, except any unpaid termination payments thereunder. The Dollar-equivalent principal amount of any Indebtedness denominated in a foreign currency will reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar-equivalent principal amount of such Indebtedness.

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2)     to advance or supply funds:

(a)     for the purchase or payment of any such primary obligation or

(b)     to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Controlled Investment Affiliate**" means, as to any Person, any other Person, other than any Investor, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower or other companies.

"**Credit Agreement Refinanced Debt**" has the meaning assigned to such term in the definition of "Credit Agreement Refinancing Indebtedness."

"**Credit Agreement Refinancing Indebtedness**" means secured or unsecured Indebtedness of the Borrower or any Guarantor; *provided* that:

(1)     such Indebtedness is incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) to Refinance, in whole or in part, Indebtedness that is either (a) Loans, or (b) other Credit Agreement Refinancing Indebtedness ("**Credit Agreement Refinanced Debt**");

(2)     such Indebtedness is in an original aggregate principal amount not greater than the principal amount of the Credit Agreement Refinanced Debt being Refinanced except to the extent permitted under Section 1.02(10) (*plus* (a) the amount of all unpaid, accrued or capitalized interest, penalties, premiums (including tender premiums), and other similar amounts payable with respect to the Credit Agreement Refinanced Debt and (b) underwriting discounts, fees, commissions, costs, expenses and other similar amounts payable with respect to such refinancing);

(3)     the (a) Weighted Average Life to Maturity of such Indebtedness is equal to or longer than the remaining Weighted Average Life to Maturity of the Credit Agreement Refinanced Debt and (b) final maturity date of such Credit Agreement Refinancing Indebtedness is no earlier than the final maturity date of the Credit Agreement Refinanced Debt;

(4)  any mandatory prepayments of:

(a)  any Permitted Junior Priority Refinancing Debt or any Credit Agreement Refinancing Indebtedness that comprises unsecured notes or loans may not be made except to the extent that prepayments are (i) permitted hereunder and (ii) to the extent required hereunder or pursuant to the terms of any Permitted Equal Priority Refinancing Debt, first made or offered to the Loans and any such Permitted Equal Priority Refinancing Debt; and

(b)  any Permitted Equal Priority Refinancing Debt shall be made on a *pro rata* basis or less than *pro rata* basis (but not greater than a pro rata basis) with the Closing Date Term Loans (other than pursuant to a refinancing permitted hereunder or with respect to greater than *pro rata* payments to an earlier maturing tranche);

(5)  such Indebtedness is not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Guarantor;

(6)  if such Indebtedness is secured:

(a)  such Indebtedness is not secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not constitute Collateral;

(b)  the security agreements relating to such Indebtedness are substantially similar to or the same as the Collateral Documents (as determined in good faith by a Responsible Officer of the Borrower);

(c)  if such Indebtedness is secured, a Debt Representative acting on behalf of the holders of such Indebtedness has become party to or is otherwise subject to the provisions of the Applicable Intercreditor Agreement;

(7)  to the extent such Credit Agreement Refinancing Indebtedness Refinances Indebtedness that is subordinated (including by way of Section 8.03 or other "waterfall" provisions) to the Obligations in respect of any Class of Term Loans, such Credit Agreement Refinancing Indebtedness is subordinated to such Obligations at least to the same extent as the applicable Refinanced Debt;

(8)  the covenants and events of default applicable to such Indebtedness are substantially identical to, or, taken as a whole, not materially more favorable to the lenders or holders providing such Indebtedness than, those applicable to such Credit Agreement Refinanced Debt, in each case as determined in good faith by a Responsible Officer of the Borrower in its reasonable judgment; *provided* that the Borrower will promptly deliver to the Administrative Agent final copies of the definitive credit documentation relating to such Indebtedness (unless the Borrower is bound by a confidentiality obligation with respect thereto, in which case the Borrower will deliver a reasonably detailed description of the material terms and conditions of such Indebtedness in lieu thereof); *provided further* that this clause (8) will not apply to:

(i)  terms addressed in the preceding clauses (1) through (7),

(ii)  interest rate, fees, funding discounts and other pricing terms,

(iii)  redemption, prepayment or other premiums,

(iv)     optional redemption or prepayment terms and

(v)     covenants and other terms applicable only to periods after the Latest Maturity Date of the Closing Date Term Loans at the time of incurrence of such Indebtedness or added for the benefit of the Lenders hereunder; and

(9)     with respect to the incurrence of any Credit Agreement Refinancing Indebtedness in respect of the Loans of any Class hereunder, the Lenders of the applicable Class of Credit Agreement Refinanced Debt shall be offered the opportunity to provide such Credit Agreement Refinancing Indebtedness on a pro rata basis based on their ownership of the applicable Credit Agreement Refinanced Debt.

Anything to the contrary notwithstanding (including, for the avoidance of doubt, clause (3) above), Credit Agreement Refinancing Indebtedness will include (1) any Registered Equivalent Notes issued in exchange therefor and (2) any bridge or other interim credit facility intended to be Refinanced with long-term indebtedness (so long as such credit facility includes customary "rollover provisions"), in which case, clause (3) of the first proviso in this definition shall not prohibit the inclusion of customary terms for "bridge" facilities, including customary mandatory prepayment, repurchase or redemption provisions.

For the avoidance of doubt, any voluntary prepayments of Credit Agreement Refinancing Indebtedness may be made on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis with other Loans.

Notwithstanding anything set forth above, if the All-In Yield of any Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations, including such Indebtedness incurred pursuant to a Refinancing Amendment, shall be higher than the All-In Yield of the Closing Date Term Loans, then the interest rate margins for the Closing Date Term Loans shall be increased to the extent necessary so that the All-In Yield for such Closing Date Term Loans is equal to the All-In Yield of such Credit Agreement Refinancing Indebtedness.

"**Debt Representative**" means, with respect to any series of Indebtedness secured by Liens permitted under clause (21) or (39) of the definition of "Permitted Liens", Liens securing Indebtedness permitted under clauses (2), (14) and (25) of Section 7.02(b), Permitted Equal Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Declined Proceeds**" has the meaning specified in Section 2.05(2)(g).

"**Deemed Consent Provision**" means each of (x) the definitions of "Applicable Intercreditor Agreement", "Collateral and Guarantee Requirement", "Excluded Assets", "Excluded Equity", "Excluded Subsidiaries", "Guarantor", "Landlord Consent and Estoppel", "Material Domestic Subsidiary", "Material Foreign Subsidiary", "Mortgages" and "Opinion of Counsel" and (y) Section 6.01, Section 6.07, Section 6.11, Section 6.13, Section 6.16, Section 7.03(4)(ii) and Section 7.08.

"**Default**" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"**Default Rate**" means an interest rate with respect to any principal and other amount, the applicable interest rate plus 2.00% per annum, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means, subject to Section 2.17(2), any Lender that (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans, within one Business Day of the date required to be funded by it hereunder (if applicable), (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations (if applicable) or (d) has, or has a direct or indirect parent company that has, (i) become or is the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets or a custodian appointed for it or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under this definition shall be conclusive absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Deposit Account**" means any checking or other demand deposit account maintained by the Borrower and any Subsidiary Guarantors, including any "deposit accounts" under Article 9 of the UCC.

"**Designated Preferred Stock**" means Preferred Stock of the Borrower, any Restricted Subsidiary thereof or any Parent Company (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on or promptly after the issuance date thereof, the cash proceeds of which are excluded from the calculation of the Available Amount.

"**Designated Revolving Commitments**" means any commitments to make loans or extend credit on a revolving basis to the Borrower or any Restricted Subsidiary by any Person other than the Borrower or any Restricted Subsidiary that have been designated in an Officer's Certificate delivered to the Administrative Agent as "Designated Revolving Commitments" until such time as the Borrower subsequently delivers an Officer's Certificate to the Administrative Agent to the effect that such commitments will no longer constitute "Designated Revolving Commitments;" provided that on the date such Designated Revolving Commitments are established, such Designated Revolving Commitments will be deemed an incurrence of Indebtedness on such date and will be deemed outstanding for purposes of calculating the Total Net Leverage Ratio, Senior Secured Leverage Ratio,  and the availability of any applicable Basket hereunder on such date after giving *pro forma* effect to the incurrence of the entire committed amount of the Indebtedness thereunder (but without netting any cash proceeds thereof), in which case such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with the Total Net

Leverage Ratio, Senior Secured Leverage Ratio,  and the availability of any Baskets hereunder.  For the avoidance of doubt, in the case of any Designated Revolving Commitments permitted hereunder, the reference to the "incurrence" of Indebtedness shall refer to the date on which such Designated Revolving Commitments are established.

"**Discharge**" or "**discharge**" means, with respect to any Indebtedness, the repayment, prepayment, repurchase (including pursuant to an offer to purchase), redemption, defeasance or other discharge of such Indebtedness, any such case in whole or in part.

"**Discount Prepayment Accepting Lender**" has the meaning assigned to such term in Section 2.05(1)(e)(B)(2).

"**Discount Range**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Prepayment Amount**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Prepayment Notice**" means a written notice of the Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.05(1)(e)(C)(1) substantially in the form of Exhibit J.

"**Discount Range Prepayment Offer**" means the written offer by a Lender, substantially in the form of Exhibit K, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"**Discount Range Prepayment Response Date**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Proration**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(3).

"**Discounted Prepayment Determination Date**" has the meaning assigned to such term in Section 2.05(1)(e)(D)(3).

"**Discounted Prepayment Effective Date**" means in the case of the Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation of Discounted Prepayment Offer, five (5) Business Days following the Specified Discount Prepayment Response Date, the Discount Range Prepayment Response Date or the Solicited Discounted Prepayment Response Date, as applicable, in accordance with Section 2.05(1)(e)(B), Section 2.05(1)(e)(C) or Section 2.05(1)(e)(D), respectively, unless a shorter period is agreed to between the Borrower and the Auction Agent.

"**Discounted Term Loan Prepayment**" has the meaning assigned to such term in Section 2.05(1)(e)(A).

"**disposition**" has the meaning set forth in the definition of "Asset Sale".

"**Disqualified Institution**" means (a) any competitor of the Borrower or its Subsidiaries (including for purposes of this definition Belk and its Subsidiaries) identified in writing by or on behalf of the Borrower or the Sponsor to the Administrative Agent from time to time after the Closing Date, (b) those particular banks, financial institutions, other institutional lenders and other Persons (x) identified by or on behalf of the Borrower or the Sponsor to the Consenting Lenders (as defined in the RSA) prior to January 26, 2021

or (y) otherwise approved in writing by the Required Consenting Lenders (as defined in the RSA) on or prior to the Closing Date and (c) any Affiliate of the entities described in the preceding clauses (a) or (b) (excluding, in the case of clause (a), bona fide debt funds) that are either readily identifiable as such on the basis of their name or are identified as such in writing by or on behalf of the Borrower or the Sponsor to the Administrative Agent from time to time; it being understood and agreed that the identification of any Person as a Disqualified Institution after the Closing Date shall not apply to retroactively disqualify any Person that has previously acquired an assignment or participation interest in any Loan, subject to Section 10.07(n), until such time such Person no longer constitutes a Lender.  The identity of Disqualified Institutions shall be posted or distributed to all Lenders and prospective assignees.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date or the date the Loans are no longer outstanding and the Commitments have been terminated; *provided* that if such Capital Stock is issued pursuant to any plan for the benefit of, future, current or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower or its Subsidiaries or any Parent Company or by any such plan to such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof), such Capital Stock will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability; *provided further* any Capital Stock held by any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries, any Parent Company, or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof), in each case pursuant to any equity subscription or equity holders' agreement, management equity plan or stock option plan or any other management or employee benefit plan or agreement will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any Subsidiary or in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability. For the purposes hereof, the aggregate principal amount of Disqualified Stock will be deemed to be equal to the greater of its voluntary or involuntary liquidation preference and maximum fixed repurchase price, determined on a consolidated basis in accordance with GAAP, and the "maximum fixed repurchase price" of any Disqualified Stock that does not have a fixed repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were purchased on any date on which the Consolidated Total Debt will be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any direct or indirect Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b), *provided* that no Defaulting Lender(s) or Disqualified Institution(s) may be Eligible Assignee(s).

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and sub-surface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, or proceedings with respect to any Environmental Liability or Environmental Law, (hereinafter "Claims"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to pollution or the protection of the Environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) resulting from or relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, the Capital Stock of such Person and all warrants, options or other rights to acquire Capital Stock of such Person, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock of such Person.

"**Equity Offering**" means any public or private sale of common stock or Preferred Stock of the Borrower or any Parent Company (excluding Disqualified Stock), other than:

> (1)     public offerings with respect to the Borrower's or any Parent Company's common stock registered on Form S-4 or Form S-8;

> (2)     issuances to any Restricted Subsidiary of the Borrower; and

> (3)     any such public or private sale that constitutes an Excluded Contribution.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of

ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability or written notification that a Multiemployer Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement in writing of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived; (h) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (i) the imposition of a lien under Section 303(k) of ERISA or Section 412(c) of the Code with respect to any Pension Plan; (j) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); or (k) the occurrence of a nonexempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party or any of their respective ERISA Affiliates (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Loan Party.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Accounts**" means any Deposit Account of any Loan Party or Restricted Subsidiary (and all cash, Cash Equivalents and other securities or investments credited thereto or deposited therein): (1) that does not have an individual daily balance in excess of $600,000, or in the aggregate with each other account described in this clause (1), in excess of $6,000,000; (2) the balance of which is swept at the end of each Business Day into a Deposit Account subject to a Deposit Account Control Agreement (as defined in the ABL Facility), so long as such daily sweep is not terminated or modified (other than to provide that the balance in such Deposit Account is swept into another Deposit Account subject to a Deposit Account Control Agreement (as defined in the ABL Facility)) without the consent of the ABL Facility Administrative Agent; (3) that is a Trust Account or Specified Segregated Account (as defined in the ABL Facility); (4) [reserved]; (5) any Deposit Account that constitutes a disbursement account of the Borrower or any Restricted Subsidiary the balance of which consists solely of proceeds of Indebtedness, including the proceeds of the loans under the ABL Facility; *provided* that in the case of the proceeds of the loans under the ABL Facility, the aggregate amount that may be maintained in an Excluded Account described in this clause (5) shall not exceed $60.0 million at any one time; or (6) to the extent that it is cash collateral for letters of credit (other than Letters of Credit (as defined in the ABL Facility)) to the extent permitted hereunder.

"**Excluded Assets**" means (i) any Owned Real Property or Leased Real Property, in each case subject to a Specified Sale-Leaseback Transaction and Leased Real Property (a) where the consent or other affirmative action of the applicable landlord is required for Borrower or the applicable Subsidiary to grant a Mortgage, perfect the security interest granted thereby, or otherwise comply with the Collateral and Guarantee Requirement and such consent cannot be obtained after the Borrower or the applicable

Subsidiary's use of commercially reasonable efforts to do so (which commercially reasonable efforts, for the avoidance of doubt, shall not require the Borrower or applicable Subsidiary to amend or otherwise modify any of the existing terms or conditions of any agreement with any landlord or pay additional economics to any landlord) or (b) no legal description for the parcel or store leased by the Borrower or the Restricted Subsidiary was provided by such landlord pursuant to the ground lease thereto, (ii) pledges and security interests prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), (iii) Margin Stock, (iv) cash and Cash Equivalents on deposit in Excluded Accounts, (v) any lease, license or other agreements, or any property subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license or agreement, purchase money, Capitalized Lease Obligations or similar arrangement, or create a right of termination in favor of any other party thereto (other than a Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition, (vi) assets for which a pledge thereof or a security interest therein would result in a material adverse tax consequence as reasonably determined by the Borrower and consented to by the Required Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed), (vii) assets for which the Required Lenders and the Borrower have determined in their reasonable judgment and agree in writing that the cost of creating or perfecting such pledges or security interests therein would be excessive in view of the benefits to be obtained by the Lenders therefrom, (viii) any intent-to-use trademark application in the United States prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto with the United States Patent and Trademark Office and (ix) Excluded Equity.

"**Excluded Contribution**" means net cash proceeds or the fair market value of marketable securities or the fair market value of Qualified Proceeds received by the Borrower from:

      (1)    contributions to its common equity capital;

      (2)    dividends, distributions, fees and other payments from any joint ventures that are not Restricted Subsidiaries; and

      (3)    the sale (other than to a Restricted Subsidiary of the Borrower or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Borrower) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Borrower;

in each case designated as Excluded Contributions pursuant to an Officer's Certificate.

"**Excluded Equity**" means Equity Interests (i) [reserved], (ii) [reserved], (iii) [reserved], (iv) of any Subsidiary with respect to which the Required Lenders and the Borrower have determined in their reasonable judgment and agreed in writing that the costs of providing a pledge of such Equity Interests or perfection thereof is excessive in view of the benefits to be obtained by the Secured Parties therefrom, (v) of any captive insurance companies, not-for-profit Subsidiaries, special purpose entities (including any Securitization Subsidiary), (vi) to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than Holdings, the Borrower or any wholly owned Restricted Subsidiary of the Borrower), under the terms of any applicable Organizational Documents, joint venture agreement or shareholders' agreement,  equity interests in any person other than wholly-owned Restricted

Subsidiaries; and (vii) of any Foreign Subsidiary the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers or to the extent that the grant or perfection of a security interest in such Voting Stock would reasonably be expected to result in material adverse tax consequences to any Loan Party, as determined by the Borrower in good faith with the consent of the Required Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed).

"**Excluded Subsidiaries**" means all of the following and "**Excluded Subsidiary**" means any of them:

(1)  any Subsidiary that is a bona fide joint venture with Persons other than Affiliates of the Borrower entered into in the ordinary course of business or a Subsidiary of such bona fide joint venture,

(2)  any Foreign Subsidiary,

(3)  any CFC Holdco,

(4)  any Domestic Subsidiary that is a Subsidiary of any (i) Foreign Subsidiary, (ii) CFC or (iii) CFC Holdco,

(5)  any Subsidiary (including any regulated entity that is subject to net worth or net capital or similar capital and surplus restrictions) that is prohibited or restricted by applicable Law, accounting policies or by Contractual Obligation existing on the Closing Date (or, with respect to any Subsidiary acquired by the Borrower or a Restricted Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired) from providing a Guaranty, or if such Guaranty would require governmental (including regulatory) or third party (other than a Loan Party) consent, approval, license or authorization, unless such consent, approval, license or authorization has been received, or is received after commercially reasonable efforts to obtain the same, which efforts may be requested by the Administrative Agent or the Required Lenders,

(6)  any special purpose securitization vehicle (or similar entity) or any Securitization Subsidiary, to the extent formed for the purpose of consummating a Qualified Securitization Facility permitted hereunder,

(7)  [reserved],

(8)  any Subsidiary that is not a Material Subsidiary,

(9)  any Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the burden or cost (including any adverse tax consequences) of providing the Guaranty is excessive in relation to the benefits to be obtained by the Lenders therefrom,

(10)  [reserved], and

(11)  any Unrestricted Subsidiary.

"**Excluded Taxes**" means, with respect to each Agent and each Lender,

(1)     any tax on such Agent or Lender's net income or profits (or franchise tax in lieu of such tax on net income or profits) imposed by a jurisdiction as a result of such Agent or Lender being organized or having its principal office or applicable Lending Office located in such jurisdiction or as a result of any other present or former connection between such Agent or Lender and the jurisdiction (including as a result of such Agent or Lender carrying on a trade or business, having a permanent establishment or being a resident for tax purposes in such jurisdiction, other than a connection arising solely from such Agent or Lender having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or sold or assigned an interest in, any Loan or Loan Document),

(2)     any branch profits tax under Section 884(a) of the Code, or any similar tax, imposed by any other jurisdiction described in clause (1),

(3)     other than with respect to any Lender that becomes a party hereto pursuant to the Borrower's request under Section 3.07, any U.S. federal withholding tax that is imposed on amounts payable with respect to an applicable interest in a Loan or Commitment to a Lender pursuant to a Law in effect at the time such Lender acquires such interest (or designates a new Lending Office) (or where the Lender is a partnership for U.S. federal income tax purposes, pursuant to a law in effect on the later of the date on which such Lender becomes a party hereto or the date on which the affected partner becomes a partner of such Lender or designates a new Lending Office), except, in the case of a Lender or partner that designates a new Lending Office or is an assignee, to the extent that such Lender or partner (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to Section 3.01,

(4)     any withholding tax attributable to a Lender's failure to comply with Section 3.01(3),

(5)     any tax imposed under FATCA and

(6)     any interest, additions to taxes and penalties with respect to any taxes described in clauses (1) through (5) of this definition.

"**Existing Credit Agreement**" means that certain Credit Agreement, dated as of October 22, 2014, by and among Belk, certain affiliates of Belk, the lenders from time to time party thereto, the agents party thereto and Wells Fargo Bank, National Association, as administrative agent, as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Existing Mortgaged Property**" means each Real Property set forth on Schedule 1.01(2) annexed hereto that, as of the Closing Date, is subject to a Mortgage in favor of the Collateral Agent.

"**Extended Commitments**" means the Term Loan Commitments held by an Extending Lender.

"**Extended Loans**" means the Term Loans made pursuant to Extended Commitments.

"**Extending Lender**" means each Lender accepting an Extension Offer.

"**Extension**" has the meaning specified in Section 2.16(1).

"**Extension Amendment**" has the meaning specified in Section 2.16(2).

"**Extension Offer**" has the meaning specified in Section 2.16(1).

"**Facilities**" means the Closing Date Term Loans, any Extended Loans, any Refinancing Term Loans, any Incremental Term Loans or any Replacement Loans, as the context may require, and "**Facility**" means any of them.

"**fair market value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code as in effect on the date hereof or any amended or successor version thereof that is substantively comparable and not materially more onerous to comply with (and, in each case, any regulations promulgated thereunder or official interpretations thereof), and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreements (together with any laws, rules, or practices implementing such agreements).

"**FCPA**" has the meaning specified in Section 5.17.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted to the Administrative Agent by three (3) federal funds brokers on such day on such transactions as determined by the Administrative Agent.

"**Financial Officer**" means, with respect to a Person, the chief financial officer, accounting officer, treasurer, controller or other senior financial or accounting officer of such Person, as appropriate.

"**First Lien Administrative Agent**" means Alter Domus (US) LLC, or any Supplemental Administrative Agent (as defined in the First Lien Credit Agreement) or successor agent under the First Lien Loan Documents.

"**First Lien Credit Agreement**" means the First Lien Term Loan Credit Agreement dated as of the date hereof among Holdings, the Borrower, the First Lien Administrative Agent, as administrative agent and collateral agent and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an First Lien Credit Agreement) in each case to the extent permitted hereunder.

"**First Lien Credit Agreement Second Amendment**" means that certain Amendment No. 2 to Credit Agreement, dated as of the Closing Date, by and among the Loan Parties party thereto, the lenders party thereto and Alter Domus (US) LLC, as administrative agent and collateral agent.

"**First Lien Facility**" means the collective reference to the First Lien Credit Agreement, the First Lien Loan Documents, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and

other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not a First Lien Facility), in each case to the extent permitted hereunder.

"**First Lien Loan Documents**" means, collectively, (i) the Second Lien Credit Agreement and (ii) the security documents, intercreditor agreements (including the Term Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the Second Lien Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the Second Lien Facility.

"**First Lien Loans**" means "Loans" as defined in the First Lien Facility as in effect on the Closing Date.

"**First Lien Obligations**" means "Obligations" as defined in the First Lien Facility as in effect on the date hereof.

"**Flood Hazard Property**" has the meaning specified in Section 6.07(2).

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Flood Insurance Requirements**" has the meaning specified in Section 6.07(2).

"**floor**" means, with respect to any reference rate of interest, any fixed minimum amount specified for such rate.

"**Foreign Asset Sale**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Casualty Event**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Lender**" means a Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Code.

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, the Borrower or any Subsidiary of the Borrower with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Sale-Leaseback**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

36

"**Fund**" means any Person (other than a natural person) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**Funded Debt**" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**GAAP**" means generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, as in effect from time to time. At any time after the Closing Date, the Borrower may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP will thereafter be construed to mean IFRS (except as otherwise provided in this Agreement); *provided*, *however*, that any such election, once made, will be irrevocable; *provided further* that any calculation or determination in this Agreement that requires the application of GAAP for periods that include fiscal quarters ended prior to the Borrower's election to apply IFRS will remain as previously calculated or determined in accordance with GAAP. The Borrower will give notice of any such election made in accordance with this definition to the Administrative Agent. Notwithstanding any other provision contained herein the amount of any Indebtedness under GAAP with respect to Capitalized Lease Obligations and Attributable Indebtedness shall be determined in accordance with the definition of Capitalized Lease Obligations and Attributable Indebtedness, respectively.

Notwithstanding the foregoing, if at any time any change occurring after the Closing Date in GAAP (or IFRS) or in the application thereof on the computation of any financial ratio or financial requirement, or compliance with any covenant, set forth in any Loan Document, and the Borrower shall so request (regardless of whether any such request is given before or after such change), the Lenders and the Borrower will negotiate in good faith to amend (subject to the approval of the Required Lenders) such ratio, requirement or covenant to preserve the original intent thereof in light of such change in GAAP (or IFRS); provided further that until so amended, (a) such ratio, requirement or covenant shall continue to be computed in accordance with GAAP (or IFRS) prior to such change therein and (b) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP (or IFRS).

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**guarantee**" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantor**" has the meaning specified in clause (2) of the definition of "Collateral and Guarantee Requirement." For avoidance of doubt, the Borrower may, in its sole discretion, cause any domestic Parent Company or Restricted Subsidiary that is not required to be a Guarantor to Guarantee the Obligations by causing such Parent Company or Restricted Subsidiary to execute a joinder to the Guaranty (substantially in the form provided therein or as the Administrative Agent, the Required Lenders, the Borrower and such Guarantor may otherwise agree), and any such Parent Company or Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"**Guaranty**" means (a) the Guarantee of the Obligations by the Guarantors substantially in the form of Exhibit E, (b) each other Guarantee and Guarantee supplement delivered pursuant to Section 6.11 and (c) each other Guarantee and Guarantee supplement delivered by any Parent Company or Restricted Subsidiary pursuant to the second sentence of the definition of "Guarantor".

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, and all other hazardous or toxic substances or wastes, pollutants and contaminants and chemicals in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, or radon gas and infectious or medical wastes, to the extent any of the foregoing are regulated pursuant to, or can form the basis for liability under, any Environmental Law.

"**Hedge Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b)

any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under any Hedge Agreement.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Identified Participating Lenders**" has the meaning specified in Section 2.05(1)(e)(C)(3).

"**Identified Qualifying Lenders**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**IFRS**" means international financial reporting standards and interpretations issued by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants or any successor to either such Board, or the SEC, as the case may be), as in effect from time to time.

"**Immediate Family Members**" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including, in each case, adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"**Incremental Amendment**" has the meaning specified in Section 2.14(5).

"**Incremental Amounts**" has the meaning specified in clause (1) of the definition of Refinancing Indebtedness.

"**Incremental Term Facility**" has the meaning specified in Section 2.14(1).

"**Incremental Term Loan**" has the meaning specified in Section 2.14(1).

"**Incremental Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund an Incremental Term Loan and "Incremental Term Loan Commitments" means such commitments of all Lenders in the aggregate.

"**Incremental Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Incremental Term Loans of such Lenders; *provided* that at any time prior to the making of the Incremental Term Loans, the Incremental Term Loan Exposure of any Lender shall be equal to such Lender's Incremental Term Loan Commitment.

"**Indebtedness**" means, with respect to any Person, without duplication:

(1)    any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)      in respect of borrowed money;

(b)      evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)      representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations) due more than twelve months after such property is acquired, except (i) any such balance that constitutes an obligation in respect of a commercial letter of credit, a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business or consistent with industry practice, (ii) any earn-out obligations until such obligation is reflected as a liability on the balance sheet (excluding any footnotes thereto) of such Person in accordance with GAAP and is not paid within 60 days after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business; or

(d)      representing the net obligations under any Hedging Obligations;

(2)      to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice; and

(3)      to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of such Indebtedness will be the lesser of (i) the fair market value of such asset at such date of determination and (ii) the amount of such Indebtedness of such other Person; *provided* that notwithstanding the foregoing, Indebtedness will be deemed not to include:

(i)      Contingent Obligations incurred in the ordinary course of business or consistent with industry practice,

(ii)      reimbursement obligations under commercial letters of credit (*provided* that unreimbursed amounts under letters of credit will be counted as Indebtedness three (3) Business Days after such amount is drawn),

(iii)      obligations under or in respect of Qualified Securitization Facilities that are non-recourse to the Loan Parties other than any Securitization Repurchase Obligation,

(iv)      accrued expenses,

(v)      deferred or prepaid revenues, and

(vi)      asset retirement obligations and obligations in respect of reclamation and workers compensation (including pensions and retiree medical care);

*provided further* that Indebtedness will be calculated without giving effect to the effects of Accounting Standards Codification Topic No. 815, *Derivatives and Hedging*, and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this

Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Assets or Operations**" means, with respect to any Parent Company, that Parent Company's total assets, revenues, income from continuing operations before income taxes and cash flows from operating activities (excluding in each case amounts related to its investment in the Borrower and the Restricted Subsidiaries), determined in accordance with GAAP and as shown on the most recent balance sheet of such Parent Company, is more than 3.0% of such Parent Company's corresponding consolidated amount.

"**Information**" has the meaning specified in Section 10.09.

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means the Intercompany Subordination Agreement, dated as of the Closing Date, substantially in the form of Exhibit Q executed by the Borrower and each Restricted Subsidiary that is party thereto.

"**Interest Payment Date**" means the first Business Day of each February, May, August and November and the applicable Maturity Date of the Loans of such Class.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's or BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency selected by the Borrower.

"**Investment Grade Securities**" means:

(1)    securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2)    debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or debt instruments constituting loans or advances among the Borrower and its Subsidiaries;

(3)    investments in any fund that invests at least 95% of its assets in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4)    corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"**Investments**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to employees, directors, officers, members of management, manufacturers and consultants, in each case made in the ordinary course of business or consistent with

industry practice), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person. For purposes of the definition of "Unrestricted Subsidiary" and Section 7.05,

> (1) "Investments" will include the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

>> (a) the Borrower's "Investment" in such Subsidiary at the time of such redesignation; *minus*

>> (b) the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

> (2) any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer.

The amount of any Investment outstanding at any time will be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.

"**Investors**" means the Sponsor.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**Judgment Currency**" has the meaning specified in Section 10.26.

"**Junior Debt**" has the meaning specified in Section 7.05(a)(C).

"**KKR**" means KKR Credit Advisors (US) LLC and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Landlord Consent and Estoppel**" means with respect to any Leased Real Property, a letter, certificate or other instrument in writing from the lessor under the related lease, reasonably satisfactory in form and substance to the Collateral Agent and the Required Lenders, pursuant to which such lessor agrees, for the benefit of Collateral Agent, (i) that without any further consent of such lessor or any further action on the part of the Loan Party holding such Leased Real Property, such Leased Real Property may be encumbered pursuant to a Mortgage and may be assigned to the purchaser at a foreclosure sale or in a transfer in lieu of such a sale (and to a subsequent third party assignee if Collateral Agent or its designee so acquires such Leased Real Property), (ii) that such lessor shall not terminate such lease as a result of a default by such Loan Party thereunder without first giving Collateral Agent written notice of such default and at least 60 days (or, if such default cannot reasonably be cured by Collateral Agent or the Required Lenders within such period, such longer period as may reasonably be required) to cure such default and

(iii) to such other matters relating to such Leased Real Property as Collateral Agent or the Required Lenders may reasonably request.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Closing Date Term Loan, Incremental Term Loan, Refinancing Term Loan, Replacement Loan or any Extended Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, legally enforceable guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the legally binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Leased Real Property**" means any real property located in the United States and ground leased by any Loan Party, or in which Loan Party acquires a ground leasehold interest after the Closing Date; *provided* that for the avoidance of doubt, Leased Real Property will not include any Excluded Assets.

"**Legal Holiday**" means Saturday, Sunday or a day on which commercial banking institutions are not required to be open in the State of New York or at the place of payment.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender." For the avoidance of doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered a Refinancing Amendment, an Incremental Amendment or an amendment in respect of Replacement Loans, as the case may be, and to the extent such Refinancing Amendment, Incremental Amendment or amendment in respect of Replacement Loans shall have become effective in accordance with the terms hereof and thereof, and each Extending Lender shall continue to be a Lender. As of the Closing Date, Schedule 2.01 sets forth the name of each Lender.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest and any authorized filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event will an operating lease be deemed to constitute a Lien.

"**Limited Condition Acquisition**" means any investment permitted hereunder by the Borrower or one or more of its Restricted Subsidiaries whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"**Loan**" means an extension of credit under Article II or the making of Replacement Loans pursuant to Section 10.01 by a Lender to the Borrower in the form of a Term Loan.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) any Refinancing Amendment, Incremental Amendment, Extension Amendment or amendment in respect of Replacement Loans, (d) the Guaranty, (e) the Collateral Documents, (f) the Applicable Intercreditor Agreements, (g) the Agent Fee Letter and (h) any other agreement, document or instrument designated as a "Loan Document" by the Borrower and the Administrative Agent (or the Required Lenders).  Any reference to this Agreement or any other Loan Document shall include all appendices, exhibits, schedules, annexes or attachments thereto.

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each Subsidiary Guarantor.

"**Management Services Agreement**" means the management services agreement or similar agreements among the Sponsor or certain of its respective management companies associated with it or their advisors, if applicable, and the Borrower (or any Parent Company).

"**Management Stockholders**" means the members of management (and their Controlled Investment Affiliates and Immediate Family Members and any permitted transferees thereof) of the Borrower (or a Parent Company) who are holders of Equity Interests of any Permitted Parent or any Parent Company on the Closing Date or that become holders of such Equity Interests thereafter.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Material Adverse Effect**" means a circumstance or condition that would materially and adversely affect (a) the business, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents to which it is a party or (c) the rights and remedies of the Lenders, the Collateral Agent and the Administrative Agent under the Loan Documents, in each case, other than customary events or circumstances in connection with the Plan of Reorganization.

"**Material Domestic Subsidiary**" means, as of the Closing Date and thereafter at any date of determination, each of the Borrower's Domestic Subsidiaries that is a Restricted Subsidiary (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiary at the last day of the most recent Test Period) were equal to or greater than 1.0% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiary for such Test Period) were equal to or greater than 1.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time after the date which is 30 days after the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion), Domestic Subsidiaries that are not Material Domestic Subsidiaries solely because they do not meet the thresholds set forth in the preceding clause (a) or (b) comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiaries at the last day of the most recent Test Period) 2.5% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiaries for such Test Period) 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be

delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries that are Restricted Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 with respect to any such Subsidiaries.

"**Material Foreign Subsidiary**" means, as of the Closing Date and thereafter at any date of determination, each of the Borrower's Foreign Subsidiaries that are Restricted Subsidiaries (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiary at the last day of the most recent Test Period) were equal to or greater than 1.0% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the revenues of the Restricted Subsidiaries of such Foreign Subsidiary for such Test Period) were equal to or greater than 1.0% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time after the date which is 30 days after the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion), Foreign Subsidiaries that are not Material Foreign Subsidiaries comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiaries at the last day of the most recent Test Period) 2.5% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period) 2.5% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries that are Restricted Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) with respect to the Closing Date Term Loans, in each case that have not been extended pursuant to Section 2.16 after the Closing Date, July 31, 2025, (ii) with respect to any tranche of Extended Loans, the final maturity date as specified in the applicable Extension Amendment, (iii) with respect to any Refinancing Term Loans, the final maturity date as specified in the applicable Refinancing Amendment, (iv) with respect to any Incremental Term Loans, the final maturity date as specified in the applicable Incremental Amendment and (v) with respect to Replacement Loans, the final maturity date as specified in the applicable amendment; *provided* that in each case, if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Rate**" has the meaning specified in Section 10.11.

"**Moody's**" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"**Mortgage Policies**" has the meaning specified in Section 6.11(2)(b)(ii).

"**Mortgaged Properties**" has the meaning specified in paragraph (5) of the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the fee or leasehold, as applicable, deeds of trust, trust deeds, hypothecs, deeds to secure debt and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent for the benefit of the Secured Parties in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, including such modifications as may be required by local laws, pursuant to Section 6.13(2) and any other deeds of trust, trust deeds, hypothecs, deeds to secure debt or mortgages executed and delivered pursuant to Sections 6.11.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"**Net Proceeds**" means:

(1)    with respect to any Asset Sale or any Casualty Event, the aggregate Cash Equivalent proceeds received by the Borrower or any Restricted Subsidiary in respect of such Asset Sale or Casualty Event, net of the costs relating to such Asset Sale or Casualty Event, including legal, accounting and investment banking fees, payments made in order to obtain a necessary consent or required by applicable law, brokerage and sales commissions, all dividends, distributions or other payments required to be made to minority interest holders in Restricted Subsidiaries as a result of any such Asset Sale or Casualty Event by a Restricted Subsidiary, the amount of any purchase price or similar adjustment claimed by any Person to be owed by the Borrower or any Restricted Subsidiary, until such time as such claim will have been settled or otherwise finally resolved, or paid or payable by the Borrower or any Restricted Subsidiary, in either case in respect of such Asset Sale or Casualty Event, any relocation expenses incurred as a result thereof, costs and expenses in connection with unwinding any Hedging Obligation in connection therewith, other fees and expenses, including title and recordation expenses, taxes paid or payable as a result thereof or any transactions occurring or deemed to occur to effectuate a payment under this Agreement, amounts required to be applied to the repayment of principal, premium, if any, and interest on Indebtedness (other than Subordinated Indebtedness, the ABL Facility or the First Lien Facility) secured by a Lien on such assets and required (other than required by Section 2.05(2)(b) of the First Lien Credit Agreement) to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Borrower or any Restricted Subsidiary as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction; *provided* that (a) subject to clause (b) below, no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds shall exceed $1.0 million and (b) no such net cash proceeds shall constitute Net Proceeds under this clause (1) in any fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $2.0 million (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (1)); and

(2)    (a) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower or any Parent Company, the excess, if any, of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (ii) all taxes paid or reasonably estimated to be payable, and

all fees (including investment banking fees, attorneys' fees, accountants' fees, underwriting fees and discounts), commissions, costs and other out-of-pocket expenses and other customary expenses incurred, in each case by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (b) with respect to any Permitted Equity Issuance by any Parent Company, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower;

*provided* that "Net Proceeds" shall not include, or apply to, the proceeds of the sale component of any Sale-Leaseback Transaction, although proceeds from Specified Sale-Leaseback Transactions shall be governed by the definition of "Specified Sale-Leaseback Net Proceeds".

"**New Store**" means each new store or shopping facility opened or acquired by the Borrower or a Restricted Subsidiary that has been open for commercial operations for less than twelve full calendar months.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Non-Excluded Taxes**" means all Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Non-Extended Lender**" has the meaning specified in Section 2.16.

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Non-Recourse Indebtedness**" means Indebtedness that is non-recourse to the Borrower and the Restricted Subsidiaries.

"**Obligations**" means all

(1)     advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, including the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, premiums, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including principal, interest, reimbursement obligations, charges, expenses, fees, premiums, Attorney Costs, indemnities and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding, and

(2)     the Guaranty in respect of each of the foregoing.

"**OFAC**" has the meaning specified in Section 5.17.

"**Offered Amount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Offered Discount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Officer's Certificate**" means a certificate signed on behalf of a Person by a Responsible Officer of such Person.

"**OID**" means original issue discount.

"**Opinion of Counsel**" means a written opinion from legal counsel who is reasonably acceptable to the Required Lenders. Counsel may be an employee of or counsel to the Borrower or the Administrative Agent.

"**ordinary course of business**" means activity conducted in the ordinary course of business of the Borrower and any Restricted Subsidiary, including the expansion, remodeling, acquisition, modernization, construction, improvement and repair of department stores and other retail centers of Belk operated, or expected to be operated, by the Borrower or a Restricted Subsidiary, and financing transactions in connection therewith, and will include Sale-Leaseback Transactions.

"**Organizational Documents**" means

(1)      with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction);

(2)      with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and

(3)      with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Original Closing Date**" means December 10, 2015.

"**Other Applicable Indebtedness**" means Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations, together with Refinancing Indebtedness in respect of any of the foregoing that is secured on a *pari passu* basis with the Obligations.

"**Other Applicable Net Proceeds**" means Net Proceeds or a comparable measure as determined in accordance with the documentation governing Other Applicable Indebtedness.

"**Other Taxes**" means any and all present or future stamp, court or documentary Taxes, intangible, recording, filing or similar Taxes arising from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Outstanding Amount**" means on any date, the outstanding principal amount of any Term Loans after giving effect to any borrowings and prepayments or repayments of Term Loans, occurring on such date.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Owned Real Property**" means any fee-owned real property located in the United States and owned on, or acquired after, the Closing Date, by any Loan Party; *provided* that for the avoidance of doubt, Owned Real Property will not include any Excluded Assets.

"**Parent Company**" means any Person so long as such Person directly or indirectly holds 100.0% of the total voting power of the Capital Stock of the Borrower, and at the time such Person acquired such voting power, no Person and no group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any such group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) (other than any Permitted Holder), will have beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), directly or indirectly, of 50.0% or more of the total voting power of the Voting Stock of such Person. For the avoidance of doubt, Fashion Holdings Intermediate Inc., a Delaware corporation, is a Parent Company of the Borrower.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Participating Lender**" has the meaning specified in Section 2.05(1)(e)(C)(2).

"**Payment in Full**" means, with respect to the Obligations in respect of the Loans or any Class of Loans, the occurrence of all of the following:

(a) termination or expiration of all commitments to extend credit that would constitute such Obligations;

(b) payment in full in cash of the principal of, interest and premium (if any) on, fees and other charges comprising such Obligations that are due and payable (including, in any event, principal, interest, premium, fees and other charges that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding); and

(c) payment in full in cash of all other such Obligations that are outstanding and due and payable at the time the principal of, interest and premium (if any) on, fees and other charges comprising such Obligations are paid in full in cash (other than any obligations for taxes, costs, indemnification, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time) (including, in any event, reimbursement obligations, expenses, Attorney Costs, indemnities and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"**Perfection Certificate**" has the meaning specified in the Security Agreement.

"**Permitted Asset Swap**" means the substantially concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Borrower or any Restricted Subsidiary and another Person; *provided* that any cash or Cash Equivalents received must be applied in accordance with Section 2.05(2)(b)(i).

"**Permitted Equal Priority Refinancing Debt**" means any Credit Agreement Refinancing Indebtedness that is secured on a *pari passu* basis with the Closing Date Term Loans.

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of the Borrower or any Parent Company.

"**Permitted Holder**" means (1) the Investors, KKR, Blackstone and Management Stockholders and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the foregoing are members; *provided* that in the case of such group and without giving effect to the existence of such group or any other group, such Investors, KKR, Blackstone and Management Stockholders, collectively, have beneficial ownership of more than a majority of the total voting power of the Voting Stock of the Borrower or any Permitted Parent, and (2) any Person acting in the capacity of an underwriter (solely to the extent that and for so long as such Person is acting in such capacity) in connection with a public or private offering of Capital Stock of the Borrower or any Permitted Parent.

"**Permitted Indebtedness**" means Indebtedness permitted to be incurred in accordance with Section 7.02.

"**Permitted Investments**" means:

(1)     any Investment (a) in any Loan Party and (b) by any Restricted Subsidiary that is a Non-Loan Party in any other Restricted Subsidiary that is a Non-Loan Party;

(2)     any Investment(s) in Cash Equivalents or Investment Grade Securities and Investments that were Cash Equivalents or Investment Grade Securities when made;

(3)     [reserved];

(4)     any Investment in securities or other assets not constituting Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made in accordance with Section 7.04 or any other disposition of assets not constituting an Asset Sale;

(5)     any Investment existing on the Closing Date or made pursuant to binding commitments in effect on the Closing Date or an Investment consisting of any extension, modification, replacement, renewal or reinvestment of any Investment or binding commitment existing on the Closing Date; *provided* that the amount of any such Investment or binding commitment may be increased, extended, modified, replaced, reinvested or renewed, (a) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities) or (b) as otherwise permitted hereunder;

(6)     any Investment acquired by the Borrower or any Restricted Subsidiary:

(a)      in exchange for any other Investment, accounts receivable or indorsements for collection or deposit held by the Borrower or any Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer);

(b)      in satisfaction of judgments against other Persons;

(c)      as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or

(d)      as a result of the settlement, compromise or resolution of (i) litigation, arbitration or other disputes or (ii) obligations of trade creditors or customers that were incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer;

(7)      Hedging Obligations permitted under Section 7.02(b)(10);

(8)      [reserved];

(9)      Investments the payment for which consists of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company; *provided* that such Equity Interests will not increase the Available Amount;

(10)      (a) guarantees of Indebtedness permitted under Section 7.02, performance guarantees and Contingent Obligations incurred in the ordinary course of business or consistent with industry practice, and (b) the creation of liens on the assets of the Borrower or any Restricted Subsidiary in compliance with Section 7.01;

(11)      any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 7.06(b)(3), (4), (7), (8), (10), (14), (16), (17), (18), (19), (20) and (23);

(12)      Investments consisting of purchases and acquisitions of inventory, supplies, material, services or equipment or similar assets or the licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons;

(13)      Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding, not to exceed $60.0 million (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided, however*, that if any Investment pursuant to this clause (13) is made in any Person that is not a Restricted Subsidiary (or Subsidiary Guarantor, as applicable) at the date of the making of such Investment and such Person becomes a Restricted Subsidiary (or Subsidiary Guarantor, as applicable) after such date, such Investment will thereafter be deemed to have been made pursuant to clause (1) above (to the extent permitted thereunder) and will cease to have been made pursuant to this clause (13) for so long as such Person continues to be a Restricted Subsidiary (or Subsidiary Guarantor, as applicable); *provided, further*, that the Investments made by Loan

Parties in Non-Loan Parties pursuant to this clause (13), together with the Investments made pursuant to clause (18), shall not in the aggregate exceed $42.0 million at any time outstanding;

(14)     Investments in a Securitization Subsidiary that, in the good faith determination of the Borrower, are necessary to effect any Qualified Securitization Facility or any repurchase obligation pursuant to a Securitization Repurchase Obligation;

(15)     loans and advances to, or guarantees of Indebtedness of, officers, directors, employees, consultants and members of management, together with the amounts described in clause (16), not in excess of the greater of $12.0 million and 2.4% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(16)     loans and advances to employees, directors, officers, members of management and consultants for business-related travel expenses, moving expenses, payroll advances and other similar expenses or payroll expenses, in each case incurred in the ordinary course of business or consistent with past practice or consistent with industry practice or to future, present and former employees, directors, officers, members of management and consultants (and their Controlled Investment Affiliates and Immediate Family Members) to fund such Person's purchase of Equity Interests of the Borrower or any Parent Company, together with the amounts described in clause (15), not in excess of the greater of $12.0 million and 2.4% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(17)     advances, loans or extensions of trade credit or prepayments to suppliers or loans or advances made to distributors, in each case, in the ordinary course of business or consistent with past practice or consistent with industry practice by the Borrower or any Restricted Subsidiary;

(18)     any Investment in any Subsidiary (other than an Unrestricted Subsidiary) or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business or consistent with industry practice; *provided*, that the Investments made by Loan Parties in Non-Loan Parties pursuant to this clause (18), together with the Investments made by Loan Parties in Non-Loan Parties pursuant to clause (13), shall not exceed $42.0 million in the aggregate at any time outstanding;

(19)     Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with industry practice;

(20)     Investments made in the ordinary course of business or consistent with industry practice in connection with obtaining, maintaining or renewing client contacts and loans or advances made to distributors;

(21)     Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business or consistent with industry practice;

(22)     the purchase or other acquisition of any Indebtedness of the Borrower or any Restricted Subsidiary to the extent otherwise permitted hereunder;

(23)     [reserved];

(24)     Investments in the ordinary course of business or consistent with industry practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers;

(25)     any Investment by any Captive Insurance Subsidiary in connection with its provision of insurance to the Borrower or any of its Subsidiaries, which Investment is made in the ordinary course of business or consistent with industry practice of such Captive Insurance Subsidiary, or by reason of applicable law, rule, regulation or order, or that is required or approved by any regulatory authority having jurisdiction over such Captive Insurance Subsidiary or its business, as applicable;

(26)     Investments made as part of, to effect or resulting from the Transactions;

(27)     Investments of assets relating to non-qualified deferred payment plans in the ordinary course of business or consistent with industry practice;

(28)     [reserved];

(29)     acquisitions of obligations of one or more directors, officers or other employees or consultants or independent contractors of any Parent Company, the Borrower, or any Subsidiary of the Borrower in connection with such director's, officer's, employee's consultant's or independent contractor's acquisition of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, to the extent no cash is actually advanced by the Borrower or any Restricted Subsidiary to such directors, officers, employees, consultants or independent contractors in connection with the acquisition of any such obligations;

(30)     Investments constituting promissory notes or other non-cash proceeds of dispositions of assets to the extent permitted under Section 7.04; and

(31)     Investments resulting from pledges and deposits permitted pursuant to the definition of "Permitted Liens".

For purposes of determining compliance with this definition, an Investment need not be incurred solely by reference to one category of Permitted Investments described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption.

"**Permitted Junior Priority Refinancing Debt**" means any Credit Agreement Refinancing Indebtedness that is secured on a junior lien basis to the Closing Date Term Loans.

"**Permitted Liens**" means, with respect to any Person:

(1)     Liens created pursuant to any Loan Document;

(2)     Liens, pledges or deposits made in connection with:

(a)     workers' compensation laws, unemployment insurance, health, disability or employee benefits, other social security laws or similar legislation or regulations,

(b)     insurance-related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) securing reimbursement or indemnification obligations of (including obligations in respect of letters of credit, bank

53

guarantees or similar documents or instruments for the benefit of) insurance carriers providing property, casualty or liability insurance or otherwise supporting the payment of items set forth in the foregoing clause (a) or

(c)    bids, tenders, contracts, statutory obligations, surety, indemnity, warranty, release, appeal or similar bonds, or with regard to other regulatory requirements, completion guarantees, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities, and other obligations of like nature (including those to secure health, safety and environmental obligations) (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for the payment of rent, contested taxes or import duties and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with industry practice;

(3)    Liens imposed by law, such as landlords', carriers', warehousemen's, materialmen's, repairmen's, construction, mechanics' or other similar Liens (a) for sums not yet overdue for a period of more than sixty (60) days or, if more than sixty (60) days overdue, are unfiled and no other action has been taken to enforce such Liens or (b) being contested in good faith by appropriate actions or other Liens arising out of or securing judgments or awards against such Person with respect to which such Person will then be proceeding with an appeal or other proceedings for review if such Liens are adequately bonded or adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)    Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than thirty (30) days or not yet payable or not subject to penalties for nonpayment or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(5)    Liens in favor of issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds, instruments or obligations or with respect to regulatory requirements or letters of credit or bankers acceptance issued, and completion guarantees provided for, in each ease, issued pursuant to the request of and for the account of such Person in the ordinary course of its business or consistent with past practice or industry practice;

(6)    survey exceptions, encumbrances, ground leases, easements, restrictions, protrusions, encroachments or reservations of, or rights of others for, licenses, rights-of-way, servitudes, sewers, electric lines, drains, telegraph, telephone and cable television lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that were not incurred in connection with Indebtedness and that do not in the aggregate materially impair their use in the operation of the business of such Person and exceptions on title policies insuring liens granted on Mortgaged Properties;

(7)    Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (2), (4), (12), (13), (23) or (25) of Section 7.02(b); *provided* that:

Case 21-30630   Document 64   Filed in TXSB on 02/24/21   Page 1096 of 1503

(a)      Liens securing obligations relating to any Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (13) relate only to obligations relating to Refinancing Indebtedness that is secured by Liens on the same assets as the assets securing the Refinanced Debt (as defined in the definition of Refinancing Indebtedness), *plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property, or serves to refund, refinance, extend, replace, renew or defease Indebtedness, Disqualified Stock or Preferred Stock incurred under such clause (4), (12) or (13) of Section 7.02(b);

(b)      Liens securing obligations relating to Indebtedness or Disqualified Stock permitted to be incurred pursuant to such clause (23) extend only to the assets of Subsidiaries that are not Guarantors;

(c)      Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (4) extend only to the assets so purchased, replaced, leased or improved and proceeds and products thereof; *provided further* that individual financings of assets provided by a counterparty may be cross-collateralized to other financings of assets provided by such counterparty;

(d)      In the case of Liens securing Indebtedness for borrowed money, Disqualified Stock or Preferred Stock incurred pursuant to such clause (12), such Indebtedness may be secured by the Collateral on a senior, pari passu or junior basis to the Closing Date Term Loans; *provided* that if such Liens secure any Indebtedness for borrowed money on a senior pari passu basis with, or junior basis to, the Liens that secure the Closing Date Term Loans, the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement;

(e)      In the case of Liens securing Indebtedness incurred under clause (2) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement, which may provide that the Liens securing such Indebtedness rank senior to the Liens securing the Closing Date Term Loans;

(f)      [reserved]; and

(g)      In the case Liens securing Indebtedness incurred under clause (25) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement, which shall provide that (i) the Liens on the ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing such Indebtedness may be pari passu or senior to the Liens on the ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing the Closing Date Term Loans and (ii) the Liens on the Term Priority Collateral (as such term is defined in the ABL Intercreditor Agreement)  securing such Indebtedness shall be junior to the Liens on the Term Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing the Closing Date Term Loans.

(8)      Liens existing, or provided for under binding contracts existing, on the Closing Date (including Liens in effect on the Closing Date securing Indebtedness permitted under Section 7.02(b)(3)) but excluding Liens securing Indebtedness permitted under Section 7.02(b)(2) and Section 7.02(b)(25));

(9)     [reserved];

(10)     Liens on property or other assets at the time the Borrower or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger, amalgamation or consolidation with or into the Borrower or any Restricted Subsidiary; *provided* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition, amalgamation, merger or consolidation; *provided further* that such Liens are limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after acquired-property) that secured the obligations to which such Liens relate;

(11)     Liens securing obligations in respect of Indebtedness or other obligations of a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary permitted to be incurred in accordance with Section 7.02;

(12)     Liens securing (x) Hedging Obligations and (y) obligations in respect of Cash Management Services;

(13)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's accounts payable or similar obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(14)     leases, subleases, licenses or sublicenses (or other agreement under which the Borrower or any Restricted Subsidiary has granted rights to end users to access and use the Borrower's or any Restricted Subsidiary's products, technologies or services) that do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and the customary rights reserved or vested in any Person by the terms of any lease, sublease, license, sublicense, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(15)     Liens arising from Uniform Commercial Code (or equivalent statutes) financing statement filings regarding operating leases, consignments or accounts entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business or consistent with industry practice or purported Liens evidenced by the filing of precautionary Uniform Commercial Code (or equivalent statutes) financing statements or similar public filings;

(16)     Liens in favor of the Borrower or any Guarantor;

(17)     Liens on equipment or vehicles of the Borrower or any Restricted Subsidiary granted in the ordinary course of business or consistent with industry practice;

(18)     Liens on accounts receivable, Securitization Assets and related assets incurred in connection with a Qualified Securitization Facility;

(19)     Liens to secure any modification, refinancing, refunding, extension, renewal or replacement (or successive modification, refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness, Disqualified Stock or Preferred Stock secured by any Lien referred to in clauses (7), (8) or (10) of this definition; *provided* that: (a) such new Lien will be limited to all or part of the same property (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property) that secured

the original Lien (plus improvements and accessions on such property) and proceeds and products thereof and (b) the Indebtedness, Disqualified Stock or Preferred Stock secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clauses (7), (8) or (10) at the time the original Lien became a Permitted Lien hereunder, *plus* (ii) an amount necessary to pay any fees and expenses (including original issue discount, upfront fees, defeasance costs, underwriting discounts or similar fees) and premiums (including tender premiums and accrued and unpaid interest), related to such refinancing, refunding, extension, renewal or replacement;

(20)     deposits made or other security provided to secure liability to insurance brokers, carriers, underwriters or self-insurance arrangements, including Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(21)     other Liens securing obligations in an aggregate principal amount at any one time outstanding not to exceed the greater of (a) $30.0 million and (b) 6.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto; *provided*, that if such Liens secure any Indebtedness for borrowed money in an amount in excess of $30.0 million and are secured by the Collateral on a *pari passu* basis with, or junior basis to, the Liens that secure the Closing Date Term Loans, the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement;

(22)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(23)     (a) the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business or consistent with industry practice, (b) Liens arising out of conditional sale, title retention or similar arrangements for the sale of goods in the ordinary course of business or consistent with industry practice and (c) Liens arising by operation of law under Article 2 of the Uniform Commercial Code;

(24)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(7);

(25)     Liens (a) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on items in the course of collection, (b) attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business or consistent with industry practice and (c) in favor of banking or other institutions or other electronic payment service providers arising as a matter of law or under general terms and conditions encumbering deposits or margin deposits or other funds maintained with such institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(26)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under this Agreement; *provided* that such Liens do not extend to assets other than those that are subject to such repurchase agreements;

(27)     Liens that are contractual rights of setoff (a) relating to the establishment of depository relations with banks or other deposit-taking financial institutions or other electronic payment service providers and not given in connection with the issuance of Indebtedness, (b) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business or consistent with industry practice of the

57

Borrower or any Restricted Subsidiary or (c) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business or consistent with industry practice;

(28)     Liens on cash proceeds (as defined in Article 9 of the Uniform Commercial Code) of assets sold that were subject to a Lien permitted hereunder;

(29)     any encumbrance or restriction (including put, call arrangements, tag, drag, right of first refusal and similar rights) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(30)     Liens (a) on cash advances or cash earnest money deposits in favor of the seller of any property to be acquired in an Investment permitted under this Agreement to be applied against the purchase price for such Investment and (b) consisting of a letter of intent or an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under Section 7.04 in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(31)     ground leases, leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(32)     Liens in connection with any Specified Sale-Leaseback Transactions;

(33)     Liens on Capital Stock or other securities of an Unrestricted Subsidiary;

(34)     any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business or consistent with industry practice;

(35)     deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business or consistent with industry practice of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(36)     rights of set-off, banker's liens, netting arrangements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(37)     Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; *provided* that such satisfaction or discharge is permitted under this Agreement;

(38)     receipt of progress payments and advances from customers in the ordinary course of business or consistent with industry practice to the extent the same creates a Lien on the related inventory and proceeds thereof;

(39)     [reserved];

(40)    agreements to subordinate any interest of the Borrower or any Restricted Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any Restricted Subsidiary pursuant to an agreement entered into in the ordinary course of business or consistent with industry practice;

(41)    Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act or similar provision of any Environmental Law;

(42)    Liens disclosed by the title insurance policies delivered on or prior to the Closing Date and any replacement, extension or renewal of any such Lien (to the extent the Indebtedness and other obligations secured by such replacement, extension or renewal Liens are permitted by this Agreement); *provided* that such replacement, extension or renewal Liens do not cover any property other than the property that was subject to such Liens prior to such replacement, extension or renewal;

(43)    rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of its Restricted Subsidiaries or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(44)    restrictive covenants affecting the use to which real property may be put; *provided* that the covenants are complied with in all material respects;

(45)    security given to a public utility or any municipality or Governmental Authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business or consistent with industry practice;

(46)    zoning by-laws and other land use restrictions, including site plan agreements, development agreements and contract zoning agreements; and

(47)    Liens on all or any portion of the Collateral (but no other assets) securing (i) Permitted Equal Priority Refinancing Debt or (ii) Permitted Junior Priority Refinancing Debt, and, in each case, Liens securing any Refinancing Indebtedness in respect thereof.

Notwithstanding anything set forth above, the granting of a consensual Lien by any Person with respect to any property set forth in clause (i) of the definition of "Excluded Assets" shall be subject to the proviso set forth therein.

For purposes of determining compliance with this definition, a Lien need not be incurred solely by reference to one category of Permitted Liens described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption.

If any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing and if any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by a fixed dollar amount, such fixed dollar Basket will not be deemed to be exceeded to

the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing.

For purposes of this definition, the term "Indebtedness" will be deemed to include interest on such Indebtedness.

"**Permitted Parent**" means any direct or indirect parent of the Borrower that at the time it became a parent of the Borrower was a Permitted Holder pursuant to clause (1) of the definition thereof.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**PIK Interest**" means, with respect to any Loan, a payment of interest with respect to such Loan in-kind in arrears by increasing the outstanding principal amount of such Loan on the relevant Interest Payment Date by the amount of accrued and unpaid interest due and payable on such date.  Once PIK Interest is capitalized and added to the principal amount of the Loans, such PIK Interest shall thenceforth be considered principal for all purposes hereunder (and shall bear interest in accordance with Section 2.08) from the applicable Interest Payment Date on which such PIK Interest has been so added.

"**PIK Rate**" has the meaning specified in Section 2.08(1).

"**Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established or maintained by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Plan of Reorganization**" means that certain *Joint Prepackaged Plan of Reorganization of Belk, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement (as defined in the Plan of Reorganization).

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Collateral**" has the meaning specified in the Security Agreement.

"**Preferred Stock**" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Prepetition First Lien Term Loans**" means "First Lien Term Loans" as defined in the RSA.

"**Prepetition Second Lien Term Loans**" means "Second Lien Term Loans" as defined in the RSA.

"**Private-Side Information**" means any information with respect to Holdings and its Subsidiaries that is not Public-Side Information.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Term Loan of a given Class of any Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Term Loan Exposure of such Class of such Lender at such time and the denominator of which is the aggregate Term Loan Exposure of such Class of all Lenders at such time and (ii) with respect to all payments, computations and other matters

relating to the Incremental Term Loans of any Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Incremental Term Loan Exposure of such Lender at such time and the denominator of which is the aggregate Incremental Term Loan Exposure of all Lenders at such time.

"**Public Company Costs**" means the initial costs relating to establishing compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the Borrower's or its Restricted Subsidiaries' initial establishment of compliance with the obligations of a reporting company, including costs, fees and expenses (including legal, accounting and other professional fees) relating to compliance with provisions of the Securities Act and the Exchange Act.

"**Public Lender**" means Lenders that do not wish to receive Private-Side Information.

"**Public-Side Information**" means (i) at any time prior to Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that is (a) of a type that would be required by applicable Law to be publicly disclosed in connection with an issuance by Holdings or any of its Subsidiaries of its debt or equity securities pursuant to a registered public offering made at such time or (b) not material to make an investment decision with respect to securities of Holdings or any of its Subsidiaries (for purposes of United States federal, state or other applicable securities laws), and (ii) at any time on or after Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that does not constitute material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Holdings or any of its Subsidiaries or any of their respective securities.

"**Purchase Money Obligations**" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement or property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Stock.

"**Qualified Holding Company Debt**" means unsecured Indebtedness of Holdings that

(1)       is not subject to any Guarantee by any Subsidiary of Holdings (including the Borrower),

(2)       will not mature prior to the date that is six (6) months after the Latest Maturity Date in effect on the date of issuance or incurrence thereof,

(3)       has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (5) below),

(4)       does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the later to occur of (i) the date that is four (4) years from the date of the issuance or incurrence thereof and (ii) the date that is 180 days after the Latest Maturity Date in effect on the date of such issuance or incurrence, and

(5)       has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy

61

provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior discount notes of a holding company);

*provided* that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Event of Default shall have occurred and be continuing.

"**Qualified Proceeds**" means the fair market value of assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business.

"**Qualified Securitization Facility**" means any Securitization Facility (1) constituting a securitization financing facility that meets the following conditions: (a) the Board of Directors will have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the applicable Restricted Subsidiary or Securitization Subsidiary and (b) all sales or contributions of Securitization Assets and related assets to the applicable Person or Securitization Subsidiary are made at fair market value (as determined in good faith by the Borrower) or (2) constituting a receivables financing facility.

"**Qualifying IPO**" means the issuance by the Borrower, or any Parent Company, of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Qualifying Lender**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Quarterly Financial Statements**" has the meaning specified in Section 5.05(1).

"**Rating Agencies**" means Moody's and S&P, or if Moody's or S&P (or both) are not making ratings on the relevant obligations publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Borrower that will be substituted for Moody's or S&P (or both), as the case may be.

"**Real Property**" means, collectively, all Owned Real Property and all Leased Real Property.

"**Refinance**" has the meaning assigned in the definition of "Refinancing Indebtedness" and "**Refinancing**" and "**Refinanced**" have meanings correlative to the foregoing.

"**Refinanced Debt**" has the meaning assigned to such term in the definition of "Refinancing Indebtedness."

"**Refinancing Amendment**" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, and the Borrower executed by each of (a) the Borrower, (b) the Administrative Agent and (c) each Additional Lender and Lender that agrees to provide any portion of the Refinancing Loans or Refinancing Commitments being incurred or provided pursuant thereto, in accordance with Section 2.15.

"**Refinancing Commitments**" means any Refinancing Term Commitments.

"**Refinancing Indebtedness**" means (x) Indebtedness incurred by the Borrower or any Restricted Subsidiary, (y) Disqualified Stock issued by the Borrower or any Restricted Subsidiary or (z) Preferred

Stock issued by any Restricted Subsidiary which, in each case, serves to extend, replace, refund, refinance, renew, exchange for or defease ("**Refinance**") any Indebtedness, Disqualified Stock or Preferred Stock, including any Refinancing Indebtedness, so long as:

(1)     (a) the principal amount (or accreted value, if applicable) of such new Indebtedness, the amount of such new Preferred Stock or the liquidation preference of such new Disqualified Stock does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness, the amount of Preferred Stock or the liquidation preference of Disqualified Stock, as applicable, being refinanced except to the extent permitted under Section 1.02(10), *plus* (b) any accrued and unpaid interest on, the Indebtedness, the amount of any accrued and unpaid dividends on, the Preferred Stock or the liquidation preference of the Disqualified Stock, *plus* any accrued and unpaid dividends on, the Disqualified Stock being so extended, replaced, refunded, refinanced, renewed or defeased (such Indebtedness, Disqualified Stock or Preferred Stock, the "**Refinanced Debt**"), *plus* (c) the amount of any tender premium or penalty or premium required to be paid under the terms of the instrument or documents governing such Refinanced Debt and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness, Preferred Stock or Disqualified Stock or to Refinance such Refinanced Debt (such amounts in clause (b) and (c) the "**Incremental Amounts**");

(2)     such Refinancing Indebtedness has a:

(a)     Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred that is not less than the remaining Weighted Average Life to Maturity of the applicable Refinanced Debt; and

(b)     final scheduled maturity date equal to or later than the final scheduled maturity date of the Refinanced Debt;

(3)     to the extent such Refinancing Indebtedness Refinances (a) Subordinated Indebtedness, such Refinancing Indebtedness is subordinated in right of payment to the Loans or the Guaranty thereof at least to the same extent as the applicable Refinanced Debt, (b) Indebtedness that is secured by Liens on Collateral that are subordinated to the Liens that secure the Loans or the Guaranty thereof, such Refinancing Indebtedness is (i) unsecured or (ii) secured by Liens that are subordinated to the Liens that secure the Loans or the Guaranty thereof, in each case at least to the same extent as the applicable Refinanced Debt or pursuant to the Applicable Intercreditor Agreement or (c) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively;

(4)     such Refinancing Indebtedness shall not be guaranteed or borrowed by any Person other than a Person that is so obligated in respect of the Refinanced Debt being Refinanced; and

(5)     such Refinancing Indebtedness shall not be secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not secure the Refinanced Debt being Refinanced (*plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property); *provided* that Refinancing Indebtedness will not include:

(a)     Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness or Disqualified Stock of the Borrower;

(b)      Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

(c)      Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of an Unrestricted Subsidiary;

*provided further* that (x) clause (2) of this definition will not apply to any Refinancing Indebtedness other than Indebtedness, Disqualified Stock and Preferred Stock incurred under clauses (2), (14), (25), (30) and (31) of Section 7.02(b) (including any successive Refinancings thereof incurred under clause (13) of Section 7.02(b)) and any Subordinated Indebtedness (other than Subordinated Indebtedness assumed or acquired in an Investment or acquisition and not created in contemplation thereof) and (y) Refinancing Indebtedness may be incurred in the form of a customary "bridge" or other interim credit facility intended to be refinanced or replaced with long-term indebtedness which does not satisfy the requirements of clause (2) above so long as, subject to customary conditions, as determined in good faith by the Borrower, such "bridge" or other interim indebtedness will either be automatically converted into or required to be exchanged for permanent financing which satisfies the requirements of clause (2) of this definition.

"**Refinancing Loans**" means any Refinancing Term Loans.

"**Refinancing Term Commitments**" means one or more Classes of Term Loan commitments hereunder that result from a Refinancing Amendment.

"**Refinancing Term Loans**" means one or more Classes of Term Loans that result from a Refinancing Amendment.

"**Refunding Capital Stock**" has the meaning specified in Section 7.05(b)(2).

"**Register**" has the meaning specified in Section 10.07(c).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Rejection Notice**" has the meaning specified in Section 2.05(2)(g).

"**Related Business Assets**" means assets (other than Cash Equivalents) used or useful in a Similar Business; *provided* that any assets received by the Borrower or a Restricted Subsidiary in exchange for assets transferred by the Borrower or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person is or would become a Restricted Subsidiary.

"**Related Indemnified Person**" of an Indemnitee means (1) the respective directors, officers or employees of such Indemnitee and (2) the respective agents of such Indemnitee, in the case of this clause (2), acting at the instructions of such Indemnitee.

"**Related Person**" means, with respect to any Person, (a) any Affiliate of such Person and (b) the respective officers, directors, members, managers, employees, agents, representatives, sub-agents, co-agents, attorneys-in-fact, partners, trustees, attorneys, and advisors of such Person or any of its Affiliates.

"**Release**" means any release, spill, emission, discharge, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment.

"**Replaced Loans**" has the meaning specified in Section 10.01.

"**Replacement Loans**" has the meaning specified in Section 10.01.

"**Reportable Event**" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Required Administrative Lenders**" means (a) for the period that the Commitment Parties, their Affiliates and Approved Funds constitute Required Lenders, (1) the Commitment Parties acting together or (2) in the event that any Commitment Party no longer constitutes a Lender, such other Commitment Parties and (b) for the period that the Commitment Parties, their Affiliates and Approved Funds no longer constitute Required Lenders, at the Borrower's option either (1) the Required Lenders or (2) such Lender (or Lenders) as the Borrower and the Required Lenders may agree.

"**Required Facility Lenders**" means, as of any date of determination, with respect to one or more Facilities, Lenders having more than 50% of the sum of the (a) aggregate principal amount of outstanding Loans under such Facility or Facilities and (b) aggregate unused Commitments under such Facility or Facilities; *provided* that (i) to the same extent specified in Section 10.07(i) with respect to determination of Required Lenders, the Loans of any Affiliated Lender shall in each case be excluded for purposes of making a determination of Required Facility Lenders unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on the other Lenders and (ii) the portion of outstanding Loans and the unused Commitments of any such Facility, as applicable, held or deemed held by a Defaulting Lender shall be excluded for purposes of making a determination of Required Facility Lenders.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the aggregate Term Loan Exposure; *provided* that (i) the aggregate Term Loan Exposure of or held by any Defaulting Lender shall be excluded for purposes of making a determination of the "Required Lenders" and (ii) any determination of Required Lenders shall be subject to the limitations set forth in Section 10.07(h) with respect to Affiliated Lenders.

"**Responsible Officer**" means, with respect to a Person, the chief executive officer, chief operating officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer or Person performing similar functions, of such Person. With respect to any document delivered by a Loan Party on the Closing Date, Responsible Officer includes any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"**Restricted Investment**" means any Investment other than any Permitted Investment(s).

"**Restricted Payment**" has the meaning specified in Section 7.05.

"**Restricted Subsidiary**" means, at any time, any direct or indirect Subsidiary of the Borrower (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided* that notwithstanding the foregoing, in no event will (i) any Securitization Subsidiary, or (ii) any special purpose

vehicle that borrows mortgage debt secured by department stores or retail centers of Belk and has no other activities be considered a Restricted Subsidiary for purposes of Section 8.01(5) or (7); *provided further* that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary will be included in the definition of "Restricted Subsidiary."  Wherever the term "Restricted Subsidiary" is used herein with respect to any Subsidiary of a referenced Person that is not the Borrower, then it will be construed to mean a Person that would be a Restricted Subsidiary of the Borrower on a *pro forma* basis following consummation of one or a series of related transactions involving such referenced Person and the Borrower (but which transactions may include a designation of a Subsidiary of such Person as an Unrestricted Subsidiary on a *pro forma* basis in accordance with this Agreement).

"**RSA**" means that certain Restructuring Support Agreement, dated as of January 26, 2021, by and among Holdings, the other Loan Parties party thereto, the Consenting First Lien Term Lenders (as defined therein), the Consenting Second Lien Term Lenders (as defined therein) and the Consenting Sponsors (as defined therein), as such agreement may be amended, supplemented, waived or otherwise modified from time to time, in each case to the extent permitted thereunder.

"**S&P**" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"**Sale-Leaseback Transaction**" means any arrangement providing for the leasing by the Borrower or any Restricted Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to a Person other than the Borrower or any Restricted Subsidiary in contemplation of such leasing.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Sanctions**" has the meaning specified in Section 5.17.

"**SEC**" means the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, each Supplemental Agent and each co-agent or sub-agent appointed by the Administrative Agent or Collateral Agent from time to time pursuant to Section 9.01(2) or 9.07.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Securitization Assets**" means (a) the accounts receivable, royalty or other revenue streams and other rights to payment and other assets related thereto subject to a Qualified Securitization Facility and the proceeds thereof and (b) contract rights, lockbox accounts and records with respect to such accounts receivable and any other assets customarily transferred together with accounts receivable in a securitization financing.

"**Securitization Facility**" means any transaction or series of securitization financings that may be entered into by the Borrower or any Restricted Subsidiary pursuant to which the Borrower or any such Restricted Subsidiary may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) a Person that is not the Borrower or a Restricted Subsidiary or (b) a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not the Borrower or a Restricted Subsidiary, or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries.

"**Securitization Fees**" means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees and expenses (including reasonable fees and expenses of legal counsel) paid to a Person that is not a Securitization Subsidiary in connection with, any Qualified Securitization Facility.

"**Securitization Repurchase Obligation**" means any obligation of a seller of Securitization Assets in a Qualified Securitization Facility to repurchase Securitization Assets arising as a result of a breach of representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" means any Subsidiary formed for the purpose of, and that solely engages only in one or more Qualified Securitization Facilities and other activities reasonably related thereto.

"**Security Agreement**" means, collectively, the Pledge and Security Agreement executed by the Loan Parties and the Collateral Agent, substantially in the form of Exhibit F, together with supplements or joinders thereto executed and delivered pursuant to Section 6.11.

"**Senior Secured Leverage Ratio**" means, with respect to any Test Period, the ratio of Consolidated Secured Debt outstanding on the last date of such Test Period to Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X of the SEC, as such regulation is in effect on the Closing Date.

"**Similar Business**" means (1) any business conducted or proposed to be conducted by the Borrower or any Restricted Subsidiary on the Closing Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any Permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Restricted Subsidiaries conduct or propose to conduct on the Closing Date.

"**Solicited Discount Proration**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Solicited Discounted Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Solicited Discounted Prepayment Notice**" means a written notice of the Borrower of Solicited Discounted Prepayment Offers made pursuant to Section 2.05(1)(e)(D) substantially in the form of Exhibit L.

"**Solicited Discounted Prepayment Offer**" means the written offer by each Lender, substantially in the form of Exhibit O, submitted following the Administrative Agent's receipt of a Solicited Discounted Prepayment Notice.

"**Solicited Discounted Prepayment Response Date**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date:

(1)      the sum of the liabilities of such Person (including contingent liabilities), on a consolidated basis, does not exceed the present fair saleable value of the present assets of such Person, on a consolidated basis,

(2)      the fair value of the property of such Person, on a consolidated basis, is greater than the total amount of liabilities (including contingent liabilities) of such Person, on a consolidated basis,

(3)      the capital of such Person, on a consolidated basis, is not unreasonably small in relation to its business as contemplated on such date and

(4)      such Person has not incurred and does not intend to incur, or believe that it will incur, debts including current obligations beyond their ability to pay such debts as they become due (whether at maturity or otherwise).

The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances as of such date, would reasonably be expected to become an actual and matured liability.

"**Space Leased Property**" means any real property located in the United States, other than the Leased Real Property and the Owned Real Property, that any Loan Party or any Subsidiary occupies as a tenant, sub-tenant, or licensee.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Discount**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Prepayment Notice**" means a written notice of the Borrower's Offer of Specified Discount Prepayment made pursuant to Section 2.05(1)(e)(B) substantially in the form of Exhibit N.

"**Specified Discount Prepayment Response**" means the written response by each Lender, substantially in the form of Exhibit P, to a Specified Discount Prepayment Notice.

"**Specified Discount Prepayment Response Date**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Proration**" has the meaning specified in Section 2.05(1)(e)(B)(3).

"**Specified Equity Contribution**" has the meaning assigned to it in the ABL Credit Agreement.

"**Specified Sale-Leaseback Net Proceeds**" means with respect to the sale component of any Specified Sale-Leaseback Transaction, the excess, if any, of (i) the sum of cash and Cash Equivalents received as purchase consideration in connection with such Specified Sale-Leaseback Transaction sale component pursuant to the applicable purchase and sale agreement over (ii) the sum of (A) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance

premiums and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred or required to be paid by the Borrower or any Restricted Subsidiary on behalf of a purchaser by the Borrower or any Restricted Subsidiary in connection with such Specified Sale-Leaseback Transaction, (B) taxes (including transfer taxes) or distributions made pursuant to clauses (a) and (b) of Section 7.05(b)(14) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Specified Sale-Leaseback Net Proceeds) and (C) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such Specified Sale-Leaseback Transaction, including liabilities related to environmental matters or against any indemnification obligations associated with such Specified Sale-Leaseback Transaction, it being understood that "Specified Sale-Leaseback Net Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (C). The net proceeds of any Sale-Leaseback Transaction will be determined giving effect to transaction expenses and the tax effect of such transactions based on the actual effective tax rate (including taxes incurred and required to be paid or payable as a result of such transactions).

"**Specified Sale-Leaseback Transaction**" means one or more Sale-Leaseback Transactions entered into on an arm's length basis for fair market value as determined by a Responsible Officer of the Borrower in good faith with respect to all or any portion of any Owned Real Property or Leased Real Property of the Borrower or any Restricted Subsidiary owned on, or acquired after, the Closing Date.

"**Specified Transaction**" means:

(1)     solely for the purposes of determining the applicable cash balance, any contribution of capital, including as a result of an Equity Offering, to the Borrower, in each case, in connection with an acquisition or Investment,

(2)     any designation of operations or assets of the Borrower or a Restricted Subsidiary as discontinued operations (as defined under GAAP),

(3)     any Investment that results in a Person becoming a Restricted Subsidiary,

(4)     any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary in compliance with this Agreement,

(5)     any purchase or other acquisition of a business of any Person, of assets constituting a business unit, line of business or division of any Person,

(6)     any Asset Sale (a) that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower or (b) of a business, business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whether by merger, amalgamation, consolidation or otherwise,

(7)     any operational changes identified by the Borrower that have been made by the Borrower or any Restricted Subsidiary during the Test Period,

(8)     any borrowing of Incremental Term Loans, or

(9)     any other transaction that by the terms of this Agreement requires a financial ratio to be calculated on a *pro forma* basis.

69

"**Sponsor**" means Sycamore Partners Management, L.P. and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Submitted Amount**" has the meaning specified in Section 2.05(1)(e)(C)(1).

"**Submitted Discount**" has the meaning specified in Section 2.05(1)(e)(C)(1).

"**Subordinated Indebtedness**" means any Indebtedness for borrowed money of any Loan Party that by its terms is subordinated in right of payment to the Obligations of such Loan Party arising under the Loans or the Guaranty.

"**Subsidiary**" means, with respect to any Person:

(1)     any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2)     any partnership, joint venture, limited liability company or similar entity of which:

(a)     more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and

(b)     such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than Holdings and any other Parent Company.

"**Successor Borrower**" has the meaning specified in Section 7.03(4).

"**Successor Holdings**" has the meaning specified in Section 7.03(5)(iii).

"**Supplemental Agent**" and "**Supplemental Agents**" have the meanings specified in Section 9.15(1).

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"**Tax Group**" has the meaning specified in Section 7.05(b)(14)(b).

"**Tax Indemnitee**" as defined in Section 3.01(5).

"**Term Borrowing**" means a Borrowing of any Term Loans.

"**Term Commitment**" means, as to each Term Lender, its obligation to make a Term Loan to the Borrower hereunder, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Term Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to this Agreement and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Term Lender pursuant to an Assignment and Assumption, (ii) an Incremental Amendment, (iii) a Refinancing Amendment, (iv) an Extension Amendment or (v) an amendment in respect of Replacement Loans. The initial amount of each Term Lender's Term Commitment is its Closing Date Term Commitment or, otherwise, in the Assignment and Assumption (or Affiliated Lender Assignment and Assumption), Incremental Amendment, Refinancing Amendment, Extension Amendment or amendment in respect of Replacement Loans pursuant to which such Lender shall have assumed its Commitment, as the case may be.

"**Term Facility**" means any Facility consisting of Term Loans or Term Commitments.

"**Term Intercreditor Agreement**" means the Term Intercreditor Agreement substantially in the form of Exhibit G-2 among the Collateral Agent, First Lien Administrative Agent, as collateral agent under the First Lien Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**Term Lender**" means, at any time, any Lender that has a Term Commitment or a Term Loan at such time.

"**Term Loan**" means any Closing Date Term Loan, Incremental Term Loan, Refinancing Term Loan, Extended Loan or Replacement Loan, as the context may require.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender; *provided* that at any time prior to the making of the Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Commitment, or, with regard to any Incremental Amendment at any time prior to the making of the applicable Incremental Term Loans thereunder, the Term Loan Exposure of any Lender with respect to such Incremental Term Facility shall be equal to such Lender's Incremental Term Loan Commitment thereunder.

"**Term Loan Increase**" has the meaning specified in Section 2.14(1).

"**Term Note**" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit B-1 hereto, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from the Term Loans made by such Term Lender.

"**Termination Conditions**" means, the Payment in Full in cash of the Obligations.

"**Test Period**" in effect at any time means the Borrower's most recently ended four consecutive fiscal quarters (taken as one accounting period) for which, subject to Section 1.07(1), financial statements have been delivered pursuant to Section 6.01(1) or (2), as applicable.

"**Third Amendment**" means that certain Amendment No. 3 to Credit Agreement, dated as of the Closing Date, among Holdings, the Borrower, the Lenders party thereto, the Administrative Agent and the Collateral Agent.

"**Third Amendment Lenders**" means the Lenders.

"**Threshold Amount**" means $48.0 million.

"**Total Assets**" means, at any time, the total assets of the Borrower and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the then most recent balance sheet of the Borrower or such other Person as may be available (as determined in good faith by the Borrower).

"**Total Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt outstanding as of the last day of such Test Period to (b) Adjusted EBITDA of the Borrower for such Test Period, in each case on a *pro forma* basis with such *pro forma* adjustments as are appropriate and consistent with Section 1.07.

"**Traded Securities**" means any debt or equity securities issued pursuant to a public offering or Rule 144A offering.

"**Transaction Expenses**" means any fees, expenses, costs or charges incurred or paid by Holdings, the Borrower or any Restricted Subsidiary in connection with the Transactions.

"**Transactions**" means (a) the amendment to this Agreement pursuant to the terms of the Third Amendment, (b), the amendment to the First Lien Credit Agreement pursuant to the First Lien Credit Agreement Second Amendment, (c) the execution and delivery of the Third Amendment and the First Lien Credit Agreement Second Amendment, (d) the funding of the New Money First-Out Loans pursuant to the First Lien Credit Agreement on the Closing Date, (e) the consummation of the transactions contemplated by the Plan of Reorganization, (f) the conversion (and deemed prepayment) of all Prepetition First Lien Term Loans immediately prior to the effectiveness of the Third Amendment and all Prepetition Second Lien Term Loans to First-Out Loans (as defined in the First Lien Credit Agreement), Second-Out Loans (as defined in the First Lien Credit Agreement) and Closing Date Term Loans on the Closing Date, (g) any other transaction contemplated by the RSA, (h) any transaction contemplated by the "Description of Transaction Steps" attached to the Plan Supplement (as defined in the RSA) and (i) the payment of Transaction Expenses.

"**Treasury Capital Stock**" has the meaning assigned to such term in Section 7.05(b)(2)(a).

"**Trust Account**" means any accounts or trusts used solely to hold Trust Funds.

"**Trust Funds**" means cash, Cash Equivalents or other assets comprised of:

(1) funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of such Loan Party's employees;

(2) all taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)); and

(3) any other funds which Holdings, the Borrower or any of its Restricted Subsidiaries holds in trust or as an escrow or fiduciary for another person which is not a Restricted Subsidiary of the Borrower.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning specified in Section 3.01(3)(b)(iii).

"**Unrestricted Subsidiary**" means each of The Belk Center, Inc. and 2801 West Tyvola Condominium Association Inc.

"**U.S. Lender**" means any Lender that is not a Foreign Lender.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Public Law No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

> (1)     the sum of the products of the number of years (calculated to the nearest one-twenty fifth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock, *multiplied by* the amount of such payment, *by*

> (2)     the sum of all such payments; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being Refinanced (the "**Applicable Indebtedness**"), the effects of any amortization or prepayments made on such Applicable Indebtedness prior to the date of the applicable Refinancing will be disregarded.

"**wholly owned**" means, with respect to any Subsidiary of any Person, a Subsidiary of such Person one hundred percent (100%) of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable Law) is at the time owned by such Person or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02     Other Interpretive Provisions. As used in this Agreement, the following terms have the meanings set forth below:

(1)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(2)     The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(3)     References in this Agreement to an Exhibit, Schedule, Article, Section, Annex, clause or subclause refer (a) to the appropriate Exhibit or Schedule to, or Article, Section, clause or subclause in this Agreement or (b) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears, in each case as such Exhibit, Schedule, Article, Section, Annex, clause or subclause may be amended or supplemented from time to time.

(4)     The term "including" is by way of example and not limitation.

(5)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(6)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(7)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(8)     The word "or" is not intended to be exclusive unless expressly indicated otherwise.

(9)     [Reserved].

(10)     For purposes of determining compliance with any Section of Article VII, in the event that any Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate Transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time, shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time. For purposes of determining compliance with the incurrence of any Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness that restricts the amount of such Indebtedness relative to the amount of Credit Agreement Refinanced Debt or Refinanced Debt, respectively, the Borrower and Restricted Subsidiaries may incur an incremental principal amount of Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness in such refinancing to the extent that the excess portion of the Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness would otherwise be permitted to be incurred in accordance with this Agreement (provided that (1) any additional Indebtedness referenced in this sentence satisfies the other applicable requirements of the definition of Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness, as applicable (with such additional amounts incurred constituting a utilization of the relevant basket or exception contained in Section 7.02(b) pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of Section 7.01). For purposes of determining compliance with the incurrence of any Indebtedness under Designated Revolving Commitments in reliance on compliance with any ratio or Basket, if on the date such Designated Revolving Commitments are established after giving *pro forma* effect to the incurrence of the entire committed amount of then proposed Indebtedness thereunder, then such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with any ratio.

(11)     For purposes hereof, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

Section 1.03     Accounting Terms. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending on the Saturday closest to each January 31 or fiscal quarter ending April 30, July 31, October 31 or the Saturday ending on the Saturday closest to each January 31 of the Borrower.

Section 1.04     Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05     References to Agreements, Laws, etc.. Unless otherwise expressly provided herein, (1) references to Organizational Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (2) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06     Times of Day and Timing of Payment and Performance. Unless otherwise specified, all references herein to times of day shall be references to New York time (daylight or standard, as applicable). When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.07     Pro Forma and Other Calculations.

(1)     Notwithstanding anything to the contrary herein, financial ratios and tests, including the Senior Secured Leverage Ratio and the Total Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.07. In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable.

(2)     For purposes of calculating any financial ratio or test (or Total Assets), Specified Transactions (and, subject to clause (4) below, the incurrence or repayment of any Indebtedness in connection therewith) that have been made (a) during the applicable Test Period or (b) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Adjusted EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Total Assets, on the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated

with or into the Borrower or any Restricted Subsidiary since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.07, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.07 as if such Specified Transaction had occurred at the beginning of the most recently ended Test Period.

(3)     Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and may include, for the avoidance of doubt, the amount of "run-rate" cost savings, synergies and operating expense reductions resulting from or related to any such Specified Transaction (including the Transactions) which is being given *pro forma* effect that have been realized or are expected to be realized and for which the actions necessary to realize such cost savings, operating expense reductions and synergies are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than twelve (12) months after the date of any such Specified Transaction (calculated on a *pro forma* basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions and synergies were realized during the entirety of such period and "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken (including any savings expected to result from the elimination of a public target's compliance costs with public company requirements) net of the amount of actual benefits realized during such period from such actions, and any such adjustments shall be included in the initial *pro forma* calculations of such financial ratios or tests and during any subsequent Test Period in which the effects thereof are expected to be realized) relating to such Specified Transaction; *provided* that (a) such amounts are (i) reasonably identifiable and projected in the good faith judgment of the Borrower to result from such actions and (ii) such actions are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than twelve (12) months after the date of such Specified Transaction, (b) no amounts shall be added to the extent duplicative of any amounts that are otherwise added back in computing Adjusted EBITDA (or any other components thereof), whether through a *pro forma* adjustment or otherwise, with respect to such period and (c) amounts added back pursuant to this clause (3) shall be subject to the Combined Adjusted EBITDA Cap.

(4)     In the event that (a) the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees), issues or repays (including by redemption, repurchase, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit unless such Indebtedness has been permanently repaid and not replaced), (b) the Borrower or any Restricted Subsidiary issues, repurchases or redeems Disqualified Stock, (c) any Restricted Subsidiary issues, repurchases or redeems Preferred Stock or (d) the Borrower or any Restricted Subsidiary establishes or eliminates any Designated Revolving Commitments, in each case included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period (except in the case of the Senior Secured Leverage Ratio or Total Net Leverage Ratio (or similar ratio), in which case such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case will be given effect, as if the same had occurred on the first day of the applicable Test Period) and, in the case of Indebtedness for all purposes as if such Indebtedness in the full amount of any undrawn Designated Revolving Commitments had been incurred thereunder throughout

such period in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(5)     If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the Senior Secured Leverage Ratio and/or Total Net Leverage Ratio, is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Financial Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or applicable Restricted Subsidiary may designate.

(6)     Notwithstanding anything to the contrary in this Section 1.07 or in any classification under GAAP of any Person, business, assets or operations in respect of which a definitive agreement for the disposition thereof has been entered into, no *pro forma* effect shall be given to any discontinued operations (and the Adjusted EBITDA attributable to any such Person, business, assets or operations shall not be excluded for any purposes hereunder) until such disposition shall have been consummated.

(7)     Any determination of Total Assets shall be made by reference to the last day of the Test Period most recently ended for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable, on or prior to the relevant date of determination.

(8)     Notwithstanding anything in this Agreement or any Loan Document to the contrary, when (a) calculating any applicable ratio, Consolidated Net Income or Adjusted EBITDA in connection with the making of an Investment, (b) determining compliance with any provision of this Agreement which requires that no Default or Event of Default has occurred, is continuing or would result therefrom, (c) determining compliance with any provision of this Agreement which requires compliance with any representations and warranties set forth herein or (d) the satisfaction of all other conditions precedent to the making of an Investment, in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or other provisions, determination of whether any Default or Event of Default has occurred, is continuing or would result therefrom, determination of compliance with any representations or warranties or the satisfaction of any other conditions shall, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "**LCA Election**"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "**LCA Test Date**"). If on a *pro forma* basis after giving effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios and other provisions are calculated as if such Limited Condition Acquisition or other transactions had occurred at the beginning of the most recent Test Period ending prior to the LCA Test Date for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable, the Borrower could have taken such action on the relevant LCA Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with.  For the avoidance of doubt, (i) if any of such ratios or other provisions are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in Adjusted EBITDA or other components of such ratio) or other provisions at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Acquisition is permitted hereunder and (ii) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Acquisition or related Specified Transactions. If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in

connection with any subsequent calculation of any ratio or Basket availability with respect to any other Specified Transaction on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or Basket shall be calculated on a *pro forma basis* assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated on the LCA Test Date except that (other than solely with respect to the incurrence test under which such Limited Condition Acquisition is being made) Adjusted EBITDA, assets and Consolidated Net Income of any target of such Limited Condition Acquisition can only be used in the determination of the relevant ratios and Baskets if and when such acquisition has closed.   Notwithstanding anything in this Agreement or any Loan Document to the contrary, if the Borrower or its Restricted Subsidiaries (x) incurs Indebtedness, creates Liens, makes Asset Sales, makes Investments, makes Restricted Payments or repays any Indebtedness in connection with any Limited Condition Acquisition under a ratio-based Basket and (y) incurs Indebtedness, creates Liens, makes Asset Sales, Investments or Restricted Payments or repays any Indebtedness in connection with such Limited Condition Acquisition under a non-ratio-based Basket (which shall occur within five Business Days of the events in clause (x) above), then the applicable ratio will be calculated with respect to any such action under the applicable ratio-based Basket without regard to any such action under such non-ratio-based Basket made in connection with such Limited Condition Acquisition.

Section 1.08    Available Amount Transaction. If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the Available Amount immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously, i.e., each transaction must constitute a permitted use of the Available Amount.

Section 1.09    [Reserved].

Section 1.10    Currency Generally.

(1)     The Borrower shall determine in good faith the dollar amount of any utilization or other measurement denominated in a currency other than Dollars for purposes of compliance with any Basket. For purposes of determining compliance with any Basket under Article VII or VIII with respect to any amount expressed in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Basket utilization occurs or other Basket measurement is made (so long as such Basket utilization or other measurement, at the time incurred, made or acquired, was permitted hereunder). Except with respect to any ratio calculated under any Basket, any subsequent change in rates of currency exchange with respect to any prior utilization or other measurement of a Basket previously made in reliance on such Basket (as the same may have been reallocated in accordance with this Agreement) shall be disregarded for purposes of determining any unutilized portion under such Basket.

(2)     For purposes of determining the Senior Secured Leverage Ratio and/or the Total Net Leverage Ratio, the amount of Indebtedness and cash and Cash Equivalents shall reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

(3)     For purposes of determining compliance under any Basket under Article VII or VIII, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section

78

6.01(1); provided, however, that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness. For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the Dollar equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.11    Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II

### The Commitments and Borrowings

Section 2.01    The Loans.  Subject to the terms and conditions set forth herein and in the Plan of Reorganization, on the Closing Date, pursuant to the Plan of Reorganization, the certain of the Prepetition Second Lien Term Loans held by the Lenders as of such date shall be automatically converted into (and be deemed to be prepaid), and each Lender shall be deemed to have made on the Closing Date to the Borrower Closing Date Term Loans in a principal amount equal to its Closing Date Term Loan Commitment. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

Section 2.02    Borrowings, Conversions and Continuations of Loans.

(1)    Each Term Borrowing shall be made upon the Borrower's irrevocable notice, on behalf of the Borrower, to the Administrative Agent (provided that the notice in respect of any Term Borrowing on the Closing Date may be conditioned on the closing of the Transactions (other than any transactions constituting such Term Borrowing)). Each such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time one (1) Business Day prior to the requested date of any Borrowing. Each notice by the Borrower pursuant to this Section 2.02(1) must be a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Except as provided in Sections 2.14, 2.15 and 2.16, each Borrowing of Loans shall be in a principal amount of $1.0 million or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice shall specify:

(i)    [reserved],

(ii)    the requested date of the Borrowing (which shall be a Business Day),

(iii)    the principal amount of Loans to be borrowed,

(iv)    [reserved],

(v)     the Class of Loans to be borrowed,

(vi)    [reserved], and

(vii)   wire instructions of the account(s) to which funds are to be disbursed.

Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this Agreement of the applicable Class of Loans. In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than, in the case of Borrowing on the Closing Date, 10:00 a.m., New York time, and otherwise 2:00 p.m., New York time, on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.01 for the Borrowing on the Closing Date, the Administrative Agent shall make all funds so received available to the applicable Borrower in like funds as received by the Administrative Agent either by (a) crediting the account(s) of the applicable Borrower on the books of the Administrative Agent with the amount of such funds or (b) wire transfer of such funds, in each case in accordance with instructions provided by the Borrower to (and reasonably acceptable to) the Administrative Agent.

(2)     [Reserved].

(3)     [Reserved].

(4)     [Reserved].

(5)     The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(6)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing, that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (2) above, and the Administrative Agent may (but shall have no obligation to), in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (a) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (b) in the case of such Lender, the Overnight Rate *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(7) shall be conclusive in the absence of manifest error. If the Borrower and such Lender shall both pay all or any portion of the principal amount in respect of such Borrowing or interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such Borrowing or interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such

Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.03       [Reserved].

Section 2.04       [Reserved].

Section 2.05       Prepayments.

(1)       Optional.

(a)    The Borrower may, upon written notice to the Administrative Agent by the Borrower, at any time or from time to time voluntarily prepay any Class or Classes of Term Loans in whole or in part without premium or penalty; *provided* that

(i)       such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, one (1) Business Day prior to any date of prepayment of Term Loans;

(ii)       [Reserved]; and

(iii)       any prepayment of Term Loans shall be in a principal amount of $1.0 million or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.

Each such notice shall specify the date and amount of such prepayment and the Class(es) of Loans to be prepaid. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment. If such notice is given, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. In the case of each prepayment of the Loans pursuant to this Section 2.05(1), the Borrower may in its sole discretion select the Borrowing or Borrowings (and the order of maturity of principal payments) to be repaid, and such payment shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares or other applicable share provided for under this Agreement.

(b)    [Reserved].

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(1)(a) if such prepayment would have resulted from a refinancing of all or a portion of the applicable Facility, which refinancing shall not be consummated or shall otherwise be delayed.

(d)    Each prepayment in respect of any Term Loans pursuant to this Section 2.05(1) may be applied to any Class of Term Loans as directed by the Borrower. For the avoidance of doubt, the Borrower may (i) prepay Term Loans of any Term Loan Class pursuant to this Section 2.05 without any requirement to prepay Extended Loans that were converted or exchanged from such Term Loan Class and (ii) prepay Extended Loans pursuant to this Section 2.05 without any requirement to prepay any Term Loans that were not converted or exchanged for such Extended Loans. In the event that the Borrower does not specify the order in which to apply prepayments to reduce scheduled installments of principal or as between Classes of Term Loans, the Borrower shall be deemed to have elected that such proceeds be applied to reduce the scheduled installments of principal in direct order of maturity on a *pro rata* basis among Term Loan Classes.

(e)     Notwithstanding anything in any Loan Document to the contrary, so long as (x) no Event of Default has occurred and is continuing or shall occur as a result thereof and (y) no proceeds of ABL Loans are used for this purpose, any Borrower Party may (i) purchase outstanding Term Loans on a non-pro rata basis through open market purchases or (ii) prepay the outstanding Term Loans (which Term Loans shall, for the avoidance of doubt, be automatically and permanently canceled immediately upon such purchase or prepayment, and the Borrower shall provide notice of such cancellation to the Administrative Agent), which in the case of clause (ii) only shall be prepaid without premium or penalty on the following basis:

(A)     Any Borrower Party shall have the right to make a voluntary prepayment of Loans at a discount to par pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers (any such prepayment, the "**Discounted Term Loan Prepayment**"), in each case made in accordance with this Section 2.05(1)(e) and without premium or penalty.

(B)     any Borrower Party may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent with five (5) Business Days' notice (or such shorter period as agreed by the Auction Agent) in the form of a Specified Discount Prepayment Notice; *provided* that (I) any such offer shall be made available, at the sole discretion of the applicable Borrower Party, to (x) each Term Lender or (y) each Term Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "**Specified Discount Prepayment Amount**") with respect to each applicable Class, the Class or Classes of Term Loans subject to such offer and the specific percentage discount to par (the "**Specified Discount**") of such Term Loans to be prepaid (it being understood that different Specified Discounts or Specified Discount Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(B)), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) each such offer shall remain outstanding through the Specified Discount Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Lenders (the "**Specified Discount Prepayment Response Date**").

(1)     Each Term Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its applicable then outstanding Term Loans at the Specified Discount and, if so (such accepting Lender, a "**Discount Prepayment Accepting Lender**"), the amount and the Classes of such Lender's Term Loans to be prepaid at such offered discount. Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable. Any Term Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(2)    If there is at least one Discount Prepayment Accepting Lender, the relevant Borrower Party will make a prepayment of outstanding Term Loans pursuant to this paragraph (B) to each Discount Prepayment Accepting Lender in accordance with the respective Outstanding Amount and Classes of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to subsection (2) above; *provided* that if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made pro rata among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "**Specified Discount Proration**"). The Auction Agent shall promptly, and in any case within three (3) Business Days following the Specified Discount Prepayment Response Date, notify (I) the relevant Borrower Party of the respective Term Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the Classes of Term Loans to be prepaid at the Specified Discount on such date and (III) the Administrative Agent and each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, Class of Term Loans of such Lender to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the applicable Borrower Party and such Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the applicable Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(C)    Subject to the proviso to subsection (A) above, any Borrower Party may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice (or such shorter period as agreed by the Auction Agent) in the form of a Discount Range Prepayment Notice; *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Borrower Party, to (x) each Term Lender or (y) each Term Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "**Discount Range Prepayment Amount**"), the Class or Classes of Term Loans subject to such offer and the maximum and minimum percentage discounts to each (the "**Discount Range**") of the principal amount of such Term Loans with respect to each relevant Class of Term Loans willing to be prepaid by such Borrower Party (it being understood that different Discount Ranges or Discount Range Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(C)), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) unless rescinded, each such solicitation by the applicable Borrower Party shall remain outstanding through the Discount Range Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such

Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Lenders (the "**Discount Range Prepayment Response Date**"). Each Term Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "**Submitted Discount**") at which such Lender is willing to allow prepayment of any or all of its then outstanding Term Loans of the applicable Class or Classes and the maximum aggregate principal amount and Classes of such Lender's Term Loans (the "**Submitted Amount**") such Term Lender is willing to have prepaid at the Submitted Discount. Any Term Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(1)     The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Term Loans to be prepaid at such Applicable Discount in accordance with this subsection (C). The relevant Borrower Party agrees to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by the Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "**Applicable Discount**") which yields a Discounted Term Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts. Each Term Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following subsection (3)) at the Applicable Discount (each such Term Lender, a "**Participating Lender**").

(2)     If there is at least one Participating Lender, the relevant Borrower Party will prepay the respective outstanding Term Loans of each Participating Lender in the aggregate principal amount and of the Classes specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; *provided* that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "**Identified Participating Lenders**") shall be made pro rata among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will

calculate such proration (the "**Discount Range Proration**"). The Auction Agent shall promptly, and in any case within five (5) Business Days following the Discount Range Prepayment Response Date, notify (I) the relevant Borrower Party of the respective Term Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, the aggregate principal amount of the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, the Applicable Discount and the aggregate principal amount and Classes of Term Loans to be prepaid at the Applicable Discount on such date, (III) the Administrative Agent and each Participating Lender of the aggregate principal amount and Classes of such Term Lender to be prepaid at the Applicable Discount on such date and (IV) if applicable, each Identified Participating Lender of the Discount Range Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the relevant Borrower Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the applicable Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(D)     Subject to the proviso to subsection (A) above, any Borrower Party may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice in the form of a Solicited Discounted Prepayment Notice (or such later notice specified therein); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Borrower Party, to (x) each Term Lender or (y) each Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such notice shall specify the maximum aggregate amount of the Term Loans (the "**Solicited Discounted Prepayment Amount**") and the Class or Classes of Term Loans the applicable Borrower Party is willing to prepay at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(D)), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) unless rescinded, each such solicitation by the applicable Borrower Party shall remain outstanding through the Solicited Discounted Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Term Lenders (the "**Solicited Discounted Prepayment Response Date**"). Each Term Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date and (z) specify both a discount to par (the "**Offered Discount**") at which such Term Lender is willing to allow prepayment of its then outstanding Term Loan and the maximum aggregate principal amount and Classes of such Term Loans (the "**Offered Amount**") such Term Lender is willing to have prepaid at the Offered Discount. Any Term Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(1)     The Auction Agent shall promptly provide the relevant Borrower Party with a copy of all Solicited Discounted Prepayment Offers received on or

before the Solicited Discounted Prepayment Response Date. Such Borrower Party shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Term Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the applicable Borrower Party (the "**Acceptable Discount**"), if any. If the applicable Borrower Party elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the third Business Day after the date of receipt by such Borrower Party from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this subsection (2) (the "**Acceptance Date**"), the applicable Borrower Party shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount. If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the applicable Borrower Party by the Acceptance Date, such Borrower Party shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(2)     Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, within three (3) Business Days after receipt of an Acceptance and Prepayment Notice (the "**Discounted Prepayment Determination Date**"), the Auction Agent will determine (in consultation with the consent of such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the Classes of Term Loans (the "**Acceptable Prepayment Amount**") to be prepaid by the relevant Borrower Party at the Acceptable Discount in accordance with this Section 2.05(1)(e)(D). If the applicable Borrower Party elects to accept any Acceptable Discount, then such Borrower Party agrees to accept all Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount. Each Term Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "**Qualifying Lender**"). The applicable Borrower Party will prepay outstanding Term Loans pursuant to this subsection (D) to each Qualifying Lender in the aggregate principal amount and of the Classes specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; *provided* that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "**Identified Qualifying Lenders**") shall be made pro rata among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Solicited Discount Proration**"). On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the relevant Borrower Party of the Discounted

Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Term Loans and the Classes to be prepaid to be prepaid at the Applicable Discount on such date, (III) the Administrative Agent and each Qualifying Lender of the aggregate principal amount and the Classes of such Term Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Borrower Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to such Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(E)      In connection with any Discounted Term Loan Prepayment, the Borrower Parties and the Term Lenders acknowledge and agree that the Auction Agent may require, as a condition to the applicable Discounted Term Loan Prepayment, the payment of customary fees and expenses from a Borrower Party to such Auction Agent for its own account in connection therewith.

(F)      If any Term Loan is prepaid in accordance with subsections (B) through (D) above, a Borrower Party shall prepay such Term Loans on the Discounted Prepayment Effective Date. The relevant Borrower Party shall make such prepayment to the Administrative Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 12:00 p.m., New York time, on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the relevant Class(es) and Lenders as specified by the applicable Borrower Party in the applicable offer. The Term Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the Discounted Prepayment Effective Date. Each prepayment of the outstanding Term Loans pursuant to this Section 2.05(1)(e) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, and shall be applied to the relevant Loans of such Lenders in accordance with their respective applicable share as calculated by the Auction Agent in accordance with this Section 2.05(1)(e). The aggregate principal amount of the Classes and installments of the relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the Classes of Term Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment. In connection with each prepayment pursuant to this Section 2.05(1)(e), the relevant Borrower Party shall make a representation to the assigning or assignee Term Lenders, as applicable, that it does not possess material non-public information with respect to the Borrower and its Subsidiaries or the securities of any of them that has not been disclosed to the Term Lenders generally (other than Term Lenders that have elected not to receive such information) or shall make a statement that such representation cannot be made.

(G)      To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the

provisions in this Section 2.05(1)(e), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the applicable Borrower Party.

(H)     Notwithstanding anything in any Loan Document to the contrary, for purposes of this Section 2.05(1)(e), each notice or other communication required to be delivered or otherwise provided to the Auction Agent (or its delegate) shall be deemed to have been given upon Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; *provided* that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next succeeding Business Day.

(I)     Each of the Borrower Parties and the Term Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this Section 2.05(1)(e) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate. The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Term Loan Prepayment provided for in this Section 2.05(1)(e) as well as activities of the Auction Agent.

(J)     Each Borrower Party shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discounted Prepayment Response Date (and if such offer is revoked pursuant to the preceding clauses, any failure by such Borrower Party to make any prepayment to a Lender, as applicable, pursuant to this Section 2.05(1)(e) shall not constitute a Default or Event of Default under Section 8.01 or otherwise).

(K)     The Administrative Agent (i) shall not be required to serve as the Auction Agent or have any other obligations to participate in (other than mechanical administrative duties), or facilitate any Discounted Term Loan Prepayment unless it is reasonably satisfied with the terms and restrictions thereof and (ii) shall not have any obligation to participate in, arrange, sell or otherwise facilitate, and will have no liability in connection with, any open market repurchases by Holdings, the Borrower or any of its Restricted Subsidiaries.

(2)     <u>Mandatory</u>.

(a)     [Reserved].

(b)     Subject to Section 2.05(2)(f) below, (i) if (x) the Borrower or any Restricted Subsidiary makes an Asset Sale or (y) any Casualty Event occurs, which results in the realization or receipt by the Borrower or such Restricted Subsidiary of Net Proceeds, the Borrower shall prepay, or cause to be prepaid, on or prior to the date which is ten (10) Business Days after the date of the realization or receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds, subject to clause (ii) of this Section 2.05(2)(b) (solely in connection with Net Proceeds realized or received in connection with any Casualty Event) and clauses (2)(g) and (h) of this Section 2.05, an aggregate principal amount of Term Loans equal to 100% of all Net Proceeds realized or received; *provided* that no prepayment shall be required pursuant to this Section 2.05(2)(b)(i) with respect to such portion of such Net Proceeds that

the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment to reinvest) in accordance with Section 2.05(2)(b)(ii); *provided further* that

> (A)    if at the time that any such prepayment would be required, the Borrower (or any Restricted Subsidiary) is required to Discharge any Other Applicable Indebtedness with Other Applicable Net Proceeds pursuant to the terms of the documentation governing such Indebtedness, then the Borrower (or any Restricted Subsidiary) may apply such Net Proceeds on a *pro rata* basis (determined on the basis of the aggregate outstanding principal amount of the Term Loans and Other Applicable Indebtedness requiring such Discharge at such time);

> (B)    the portion of such Net Proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of such Other Applicable Net Proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Net Proceeds shall be allocated to the Term Loans in accordance with the terms hereof to the prepayment of the Term Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 2.05(2)(b)(i) shall be reduced accordingly; and

> (C)    to the extent the holders of Other Applicable Indebtedness decline to have such Indebtedness repurchased or prepaid with such portion of such Net Proceeds, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof; *provided further* that no prepayment shall be required pursuant to this Section 2.05(2)(b)(i) with respect to such portion of such Net Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment to reinvest) in accordance with Section 2.05(2)(b)(ii).

(ii)    With respect to any Net Proceeds realized or received with respect to any Casualty Event, the Borrower or any Restricted Subsidiary, at its option, may reinvest all or any portion of such Net Proceeds in assets (other than Cash Equivalents) used or useful in the business of the Loan Parties (including capital expenditures) within (x) twelve (12) months following receipt of such Net Proceeds or (y) if the Borrower or any Restricted Subsidiary enters into a legally binding commitment to reinvest such Net Proceeds within twelve (12) months following receipt thereof, within the later of (A) twelve (12) months following receipt thereof and (B) one hundred eighty (180) days of the date of such legally binding commitment; *provided* that, (i) the aggregate amount of any such Net Proceeds reinvested pursuant to this Section 2.05(b)(ii) shall not exceed $5.0 million in any fiscal year (with any unused amount being carried over to the next fiscal year, with such carried over amounts being utilized first in any given year) and (ii) if any Net Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, and subject to clauses (g) and (h) of this Section 2.05(2), an amount equal to any such Net Proceeds shall be applied within five (5) Business Days after the Borrower reasonably determines that such Net Proceeds are no longer intended to be or cannot be so reinvested to the prepayment of the Term Loans as set forth in this Section 2.05.

(c)    [Reserved].

(d)    Subject to Section 2.05(2)(f) below, if (1) the Borrower or any Restricted Subsidiary incurs or issues any Indebtedness (A) not expressly permitted to be incurred or issued pursuant to Section 7.02(b) or (B) that constitutes Credit Agreement Refinancing Indebtedness or Refinancing Loans, the Borrower shall prepay, or cause to be prepaid, an aggregate principal amount of Term Loans of any Class or Classes (in each case, as directed by the Borrower) equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds or (2) the Borrower receives any "Declined Proceeds" (as defined in the First Lien Credit Agreement) other than in respect of Section 2.05(2)(a) thereof, the Borrower shall within five (5) Business Days after receipt of such "Declined Proceeds" (as defined in the First Lien Credit Agreement), offer to prepay, in accordance with clause (g) below, a principal amount of Term Loans and unpaid accrued interest thereon in an amount equal to 100% of such "Declined Proceeds" (as defined in the First Lien Credit Agreement) other than in respect of Section 2.05(2)(a) thereof.

(e)    Except as otherwise set forth in any Refinancing Amendment, Extension Amendment or Incremental Amendment (*provided*, in each case, that such amendment may not provide that such Class of Term Loans shall receive a greater than pro rata portion of mandatory prepayments pursuant to Section 2.05(2) than the Class of Term Loans refinanced, converted or extended thereby):

(i)    each prepayment of Term Loans required by Sections 2.05(2)(a) through (d) shall be applied to each Class of Term Loans then outstanding on a *pro rata* basis or a less than *pro rata* basis (but not greater than *pro rata* basis) with any other Term Loans (in each case, other than pursuant to a refinancing); and

(ii)    each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(f)    If the Borrower or any Restricted Subsidiary enters into a Specified Sale-Leaseback Transaction, which results in the receipt by the Borrower or such Restricted Subsidiary of Specified Sale-Leaseback Net Proceeds, or the Borrower or any Restricted Subsidiary enters into any Qualified Securitization Facility, which results in the receipt by the Borrower or such Restricted Subsidiary of Net Proceeds (in each case, determined after giving effect to the Transactions and without giving effect to the last *proviso* of clause (1) of the definition of "Net Proceeds"), the Borrower shall, within three (3) Business Days after the receipt of such proceeds, prepay the Term Loans in an aggregate principal amount equal to the amount of such proceeds received.

(g)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (b) through (d) or (f) of this Section 2.05(2) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower. The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's prepayment notice and of such Appropriate Lender's Pro Rata Share of the prepayment or other applicable share provided for under this Agreement. Each Term Lender may reject all or a portion of its Pro Rata Share, or other applicable share provided for under this Agreement, of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (a), (b), (d)(2) or (f) of this Section 2.05(2) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York time, two (2) Business Days prior to the date of such prepayment. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender. If a Term Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans

to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans. Any Declined Proceeds remaining shall be retained by the Borrower (or the applicable Restricted Subsidiary) and may be applied by the Borrower or such Restricted Subsidiary in any manner not prohibited by this Agreement.

(h)     Notwithstanding any other provisions of this Section 2.05(2), (A) to the extent that any or all of the Net Proceeds of any Asset Sale by a Foreign Subsidiary giving rise to a prepayment event pursuant to Section 2.05(2)(b) or (f) (a "**Foreign Asset Sale**") or the Net Proceeds of any Casualty Event from a Foreign Subsidiary (a "**Foreign Casualty Event**"), the Specified Sale-Leaseback Net Proceeds of any Specified Sale-Leaseback Transaction by a Foreign Subsidiary (a "**Foreign Sale-Leaseback**") are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in this Section 2.05(2) but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions available under by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds or Specified Sale-Leaseback Net Proceeds is permitted under the applicable local law such repatriation will be promptly effected and an amount equal to such repatriated Net Proceeds or Excess Cash Flow will be promptly (and in any event not later than two (2) Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to this Section 2.05(2) to the extent otherwise provided herein and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all or the Net Proceeds of any Foreign Asset Sale or Foreign Casualty Event or the Specified Sale-Leaseback Net Proceeds of any Foreign Sale-Leaseback would have a material adverse tax consequence (taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Proceeds or Specified Sale-Leaseback Net Proceeds, the Net Proceeds or Specified Sale-Leaseback Net Proceeds so affected may be retained by the applicable Foreign Subsidiary.

(i)     Notwithstanding anything to the contrary set forth in any other clause in this Section 2.05, other than in the case of mandatory prepayments (x) declined by the lenders under the First Lien Credit Agreement in accordance with Section 2.05(2)(g) thereof (other than in respect of Section 2.05(2)(a) thereof) and offered to the Lenders under Section 2.05(2)(d)(2) or (y) required under Section 2.05(2)(d)(1)(B), until the Discharge of Senior Obligations (as defined in the Term Intercreditor Agreement) shall have occurred, no mandatory prepayments of Term Loans that would have otherwise been required under this <u>Section 2.05(b)</u> shall be required to be made.

(j)     <u>Interest</u>. All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon.

Section 2.06     <u>Termination or Reduction of Commitments</u>.

(1)     <u>Optional.</u> The Borrower may, upon written notice by the Borrower to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class, in each case without premium or penalty; *provided* that

(a)     any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, and

(b)     any such partial reduction shall be in an aggregate amount of $5.0 million or any whole multiple of $1.0 million in excess thereof or, if less, the entire amount thereof.

(2)  <u>Mandatory.</u> The Closing Date Term Loan Commitment of each Lender on the Closing Date shall be automatically and permanently reduced to $0 upon the conversion of such Lender's Prepetition Second Lien Term Loans into Closing Date Term Loans pursuant to Section 2.01 and the Plan of Reorganization.

(3)  <u>Application of Commitment Reductions.</u> Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07).

Section 2.07    <u>Repayment of Loans</u>.  The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date for the Closing Date Term Loans, the aggregate principal amount of all Closing Date Term Loans outstanding on such date.

Section 2.08    <u>Interest</u>.

(1)  Each Closing Date Term Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to PIK Interest of 10.00% (the "**PIK Rate**").

(2)  During the continuance of an Event of Default, the Borrower shall pay interest on all outstanding Obligations in respect of the Closing Date Term Loans at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws; *provided* that, no interest at the Default Rate shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Accrued and unpaid interest based on the Default Rate (including interest on interest) shall be due and payable upon demand.

(3)  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09    <u>Fees</u>.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in the Agent Fee Letter in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.10    <u>Computation of Interest and Fees</u>. All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed, notwithstanding the use of the phrase "per annum" or similar phrases. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(1), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    <u>Evidence of Indebtedness</u>.

(1)  The Term Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest

error of the amount of the Term Borrowings made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent, as set forth in the Register, in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Term Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Term Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(2)    [Reserved].

(3)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(1), and by each Lender in its account or accounts pursuant to Section 2.11(1), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12    Payments Generally.

(1)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m., New York time, on the date specified herein. The Administrative Agent will promptly distribute to each Appropriate Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. Any payments under this Agreement that are made later than 2:00 p.m., New York time, shall be deemed to have been made on the next succeeding Business Day (but the Administrative Agent may extend such deadline for purposes of computing interest and fees (but not beyond the end of such day) in its sole discretion whether or not such payments are in process).

(2)    If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(3)    Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date, any payment is required to be made by it to the Administrative Agent hereunder (in the case of the Borrower, for the account of any Lender hereunder or, in the case of the Lenders, for the account of the Borrower hereunder), that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(a)    if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available

to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(b)    if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount, or cause such amount to be paid, to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder. A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(3) shall be conclusive, absent manifest error.

(c)    If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Term Borrowing set forth in Section 4.01 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan.

(e)    Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03 (or otherwise expressly set forth herein). If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the sum of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13    Sharing of Payments. Other than as expressly provided elsewhere herein (including with respect to any discounted prepayment of Term Loans pursuant to Section 2.05(2)(e) or 2.05(2)(g)), if any Lender of any Class shall obtain payment in respect of any principal of or interest on account of the Loans of such Class made by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (1) notify the Administrative Agent of such fact, and (2) purchase from the other Lenders such participations in the Loans of such Class made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of any principal of or interest on such Loans of such Class, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (a) the amount of such paying Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.10) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    Incremental Term Facilities.

(1)    Incremental Term Loan Request. The Borrower may at any time and from time to time, on one or more occasions, after the Closing Date, by notice to the Administrative Agent increase the aggregate principal amount of the Closing Date Term Loans (a "**Term Loan Increase**") or add one or more additional Classes of term loans under the Loan Documents (each an "**Incremental Term Facility**" and the term loans made thereunder, the "**Incremental Term Loans**").

(2)    Ranking. Incremental Term Facilities will be secured by Liens over the Collateral that rank on a *pari passu* basis with the Closing Date Term Loans and only Guarantors shall provide guarantees of Incremental Term Facilities; *provided* that any Liens that rank on a pari passu basis or junior basis to the Liens securing the Obligations will be subject to the Applicable Intercreditor Agreement.

(3)    Size. The aggregate principal amount of Incremental Term Facilities incurred on any date will not exceed $15.0 million. Each Incremental Term Facility will be in an integral multiple of $1.0 million and in an aggregate principal amount that is not less than $10.0 million (or such lesser minimum amount approved by the Administrative Agent in its reasonable discretion); *provided* that such amount may be less than such minimum amount or integral multiple amount if such amount represents all the remaining availability under the limit set forth above.

(4)    Incremental Lenders. Incremental Term Facilities may be provided by any existing Lender (it being understood that no existing Lender will have an obligation to make all or any portion of any

Incremental Term Loan, nor will the Borrower have any obligation to approach any existing Lender(s) to provide any Incremental Term Loan) or by any Additional Lender on terms permitted by this Section 2.14. While existing Lenders may (but are not obligated, unless invited and so elect, to) participate in any syndication of an Incremental Term Facility and may (but are not obligated, unless invited and so elect, to) become lenders with respect thereto, the existing Lenders will not have any right to participate in any syndication, and will not have any right of first refusal or other right to provide all or any portion, of any Incremental Term Facility or Incremental Term Loan except to the extent the Borrower and the arrangers thereof, if any, in their discretion, choose to invite or include any such existing Lender (which may or may not apply to all existing Lenders and may or may not be pro rata among existing Lenders). Final allocations in respect of Incremental Term Facilities will be made by the Borrower together with the arrangers thereof, if any, in their discretion, on the terms permitted by this Section 2.14.

(5)     Incremental Term Facility Amendments; Use of Proceeds. Each Incremental Term Facility will become effective pursuant to an amendment (each, an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Person providing such Incremental Term Facility and the Administrative Agent. The Administrative Agent will promptly notify each Lender as to the effectiveness of each Incremental Amendment. Incremental Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.14. An Incremental Amendment may (a) add "call protection" to the Closing Date Term Loans, including amendments to Section 2.18, (b) [reserved] and (c) make other amendments to the terms of the existing Closing Date Term Loans, in the case of each clause (a) and (c), so that such Incremental Term Loans and the applicable existing Closing Date Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the existing Term Lenders (as determined in good faith by the Borrower). Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Amendment, this Agreement and the other Loan Documents, as applicable, will be amended to the extent necessary to reflect the existence and terms of the Incremental Term Facility and the Incremental Term Loans evidenced thereby. The Borrower may use the proceeds of the Incremental Term Loans for any purpose not prohibited by this Agreement.

(6)     Conditions. The availability of Incremental Term Facilities under this Agreement will be subject solely to the following conditions:

(a)     No Event of Default shall have occurred and be continuing or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) (with respect to the Borrower only) shall have occurred and be continuing; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) (with respect to the Borrower only) shall have occurred and be continuing; and

(b)     all representations and warranties set forth in Article V shall be true and correct in all material respects on and as of the date of incurrence of the Incremental Term Facilities except any representations and warranties which expressly relate to a given date or period shall be required only to be true and correct in all material respects as of the respective date or for the respective period, as the case may be.

(7)     Terms. Each Incremental Amendment will set forth the amount and terms of the relevant Incremental Term Facility. The terms of each Incremental Term Facility will be as agreed between the Borrower and the Persons providing such Incremental Term Loans; *provided* that:

(a)    the final maturity date of such Incremental Term Loans will be no earlier than the Latest Maturity Date of the existing Closing Date Term Loans;

(b)    the Weighted Average Life to Maturity of such Incremental Term Loans will be no shorter than the longest remaining Weighted Average Life to Maturity of the existing Closing Date Term Loans;

(c)    such Incremental Term Loans may participate on a *pro rata* basis or a less than *pro rata* basis (but not greater than a *pro rata* basis) in any mandatory repayments or prepayments of the Closing Date Term Loans (in each case, other than pursuant to a refinancing or with respect to greater than *pro rata* payments to an earlier maturing tranche) and may participate on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis in any voluntary prepayments of the Closing Date Term Loans; and

(d)    except as otherwise set forth herein, all other terms of any (i) Term Loan Increase will be on terms and pursuant to documentation applicable to the Closing Date Term Loans and (ii) any Incremental Term Facility shall be on terms and pursuant to documentation to be determined; provided that to the extent such terms and documentation are not consistent with the existing Closing Date Term Loans (except to the extent permitted by clause (8) below), they shall be reasonably satisfactory to the Administrative Agent (except for covenants or other provisions applicable only to the periods after the Latest Maturity Date of the existing Closing Date Term Loans or any Incremental Term Facility in effect at such time) (it being understood that to the extent that any financial maintenance covenant is contained in any Incremental Term Facility, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of the existing Closing Date Term Loans or any Incremental Term Facility in effect at such time).

(8)    <u>Pricing</u>. The interest rate, fees, original issue discount, rate floors and fees and maturity and amortization schedule for any Incremental Term Facilities will be as determined by the Borrower and the Persons providing such Incremental Term Facilities; *provided* that in the event that with respect to the existing Closing Date Term Loans, the All-In Yield applicable to any Incremental Term Loans exceeds the All-In Yield of any existing Closing Date Term Loans by more than 50 basis points, then the interest rate margins for such existing Closing Date Term Loans shall be increased to the extent necessary so that the All-In Yield of such existing Closing Date Term Loans is equal to the All-In Yield of such Incremental Term Loans *minus* 50 basis points; *provided further* that any increase in All-In Yield of the existing Closing Date Term Loans due to the increase in a Eurodollar Rate or Base Rate floor on any Incremental Term Loan shall be effected solely through an increase in any Eurodollar Rate or Base Rate floor applicable to such existing Closing Date Term Loans.

(9)    The Administrative Agent and the Lenders hereby agree that the minimum borrowing, *pro rata* borrowing and *pro rata* payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

Section 2.15    <u>Refinancing Amendments</u>.

(1)    <u>Refinancing Loans</u>. At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender, Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Term Loans then outstanding under this Agreement, in the form of Refinancing Loans or Refinancing Commitments in each case pursuant to a Refinancing Amendment.

(2)    <u>Refinancing Amendments</u>. The effectiveness of any Refinancing Amendment will be subject only to the satisfaction on the date thereof of such conditions precedent as may be requested by the

providers of the applicable Refinancing Loans. The Administrative Agent will promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Refinancing Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate in the reasonable opinion of the Required Administrative Lenders and the Borrower, to effect the provisions of this Section 2.15 and to reflect the existence and terms of the Refinancing Loans incurred pursuant thereto (including any amendments necessary to treat the Term Loans subject thereto as Refinancing Term Loans). A Refinancing Amendment may (a) extend or add "call protection" to any existing Class of Term Loans, (b) [Reserved] and (c) make other amendments to the terms of any existing Term Loans, in the case of each clause (a), (b) and (c), so that such Refinancing Term Loans and the applicable existing Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the applicable existing Term Lenders (as determined in good faith by the Borrower). Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement and the other Loan Documents, as applicable, will be amended to the extent necessary to reflect the existence and terms of the Refinancing Loans. At the request of the Administrative Agent, the Borrower shall deliver an Officer's Certificate to the Administrative Agent, certifying that the conditions and requirements with respect to such Refinancing Loans set forth in this Section 2.15 have been met and such Refinancing Amendment is authorized under this Section 2.15 (upon which the Administrative Agent may conclusively rely without independent inquiry).

(3)    Required Consents. Any Refinancing Amendment may, without the consent of any Person other than the Administrative Agent, the Borrower and the Persons providing the applicable Refinancing Loans, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Required Administrative Lenders and the Borrower, to effect the provisions of this Section 2.15. This Section 2.15 supersedes any provision in this Agreement to the contrary (including Section 10.01).

(4)    Providers of Refinancing Loans. Refinancing Loans may be provided by any existing Lender (it being understood that no existing Lender shall have an obligation to make all or any portion of any Refinancing Loan) or by any Additional Lender on terms permitted by this Section 2.15; *provided* that the Administrative Agent shall have consented (in each case, such consent not to be unreasonably withheld, conditioned or delayed) to any such Person's providing Refinancing Loans or Refinancing Commitments if such consent would be required under Section 10.07(b)(iii) for an assignment of Loans or Commitments to such Person. For the avoidance of doubt, any Affiliated Lender that provides any Refinancing Term Loans will be subject to the limitations on Affiliated Lenders set forth in Section 10.07(h) (including the Affiliated Lender Cap).

Section 2.16    Extensions of Loans.

(1)    Extension Offers. Pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date, the Borrower may extend such Maturity Date and otherwise modify the terms of such Loans or Commitments pursuant to the terms set forth in an Extension Offer (each, an "**Extension**," and each group of Loans or Commitments so extended, as well as any Loans of the same Class not so extended, each being a "**tranche**" for purposes of this Section 2.16). Each Extension Offer will specify the minimum amount of Loans or Commitments with respect to which an Extension Offer may be accepted, which will be an integral multiple of $1.0 million and an aggregate principal amount that is not less than $10.0 million, or if less, (a) the aggregate principal amount of such Loans outstanding or (b) such lesser minimum amount as is approved by the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed. Extension Offers will be made on a *pro rata* basis to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date. If the aggregate outstanding principal amount of such Loans (calculated on the face amount thereof) or Commitments in respect of which Lenders have accepted an

Extension Offer exceeds the maximum aggregate principal amount of Loans or Commitments offered to be extended pursuant to such Extension Offer, then the Loans or Commitments of such Lenders will be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer. There is no requirement that any Extension Offer or Extension Amendment (defined as follows) be subject to any "most favored nation" pricing provisions, any condition on the non-existence of any Default or Event of Default or any financial ratio tests. The terms of an Extension Offer shall be determined by the Borrower, and Extension Offers may contain one or more conditions to their effectiveness, including a condition that a minimum amount of Loans or Commitments of any or all applicable tranches be tendered.

(2)    <u>Extension Amendments</u>. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents (each, an "**Extension Amendment**") as may be necessary or appropriate in order to effect the provisions of this Section 2.16, establish new tranches in respect of Extended Loans and Extended Commitments and such amendments as permitted by clause (5) below as may be necessary or appropriate in the reasonable opinion of the Required Administrative Lenders and the Borrower in connection with the establishment of such Extended Loans and Extended Commitments. An Extension Amendment may (a) extend or add "call protection" to any existing Class of Term Loans, (b) amend the schedule of amortization payments relating to any existing tranche of Term Loans, including amendments to Section 2.07 (*provided* that any such amendment shall not decrease the dollar amount of any amortization payment to any Lender that would have otherwise been payable to such Lender prior to the effectiveness of the applicable Extension Amendment) and (c) make other amendments to the terms of any existing Term Loans, in the case of each clause (a), (b) and (c), so that such Extended Loans and the applicable existing Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the existing Term Loan Lenders (as determined in good faith by the Borrower). At the request of the Administrative Agent, the Borrower shall deliver an Officer's Certificate to the Administrative Agent, certifying that the conditions and requirements with respect to such Extension Loans set forth in this Section 2.16 have been met and such Extension Amendment is authorized under this Section 2.16 (upon which the Administrative Agent may conclusively rely without independent inquiry). This Section 2.16 supersedes any provision(s) in Section 2.13 or 10.01 to the contrary. Except as otherwise set forth in an Extension Offer, there will be no conditions to the effectiveness of an Extension Amendment. Extensions will not constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement. Any Lender of an existing Class of Term Loans that elects not to participate in Extended Loans or Extended Commitments of such Class of Term Loans shall be referred to herein as a "**Non-Extended Lender**".

(3)    <u>Terms of Extension Offers and Extension Amendments</u>. The terms of any Extended Loans and Extended Commitments will be set forth in an Extension Offer and as agreed between the Borrower and the Extending Lenders accepting such Extension Offer; *provided* that:

(a)    the final maturity date of such Extended Loans and Extended Commitments will be no earlier than the Latest Maturity Date applicable to the Loans or Commitments subject to such Extension Offer;

(b)    the Weighted Average Life to Maturity of any Extended Loans that are Term Loans will be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans subject to such Extension Offer;

(c)    any Extended Loans that are Term Loans may participate on a pro rata basis or a less than pro rata basis (but not greater than a pro rata basis) in any mandatory repayments or prepayments of the Term Loans (in each case, other than pursuant to a refinancing) and may participate

99

on a pro rata basis, greater than pro rata basis or less than pro rata basis in any voluntary prepayments of the Term Loans;

      (d)   such Extended Loans and Extended Commitments are not secured by any assets or property that does not constitute Collateral and may not be secured on a senior basis to the existing Term Loans;

      (e)   such Extended Loans and Extended Commitments are not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Guarantor; and

      (f)   the covenants and events of default applicable to Extended Loans or Extended Commitments are substantially identical to, or, taken as a whole, no more favorable to the Lenders providing such Extended Loans or Extended Commitments than, those applicable to the Loans subject to such Extension Offer, as determined in good faith by a Responsible Officer of the Borrower in its reasonable judgment; *provided* that this clause (f) will not apply:

      (A)   [reserved] or

      (B)   to any of the following:

      (1)   terms addressed in the preceding clauses (a) through (e),

      (2)   interest rate, fees, funding discounts and other pricing terms,

      (3)   redemption, prepayment or other premiums,

      (4)   optional redemption or prepayment terms and

      (5)   covenants and events of default applicable only to periods after the Latest Maturity Date at the time of incurrence of such Indebtedness.

Any Extended Loans will constitute a separate tranche of Term Loans from the Term Loans held by Lenders that did not accept the applicable Extension Offer.

(4)   <u>Required Consents.</u> No consent of any Lender or any other Person will be required to effectuate any Extension, other than the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned), the Borrower and the applicable Extending Lender. The transactions contemplated by this Section 2.16 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Offer) will not require the consent of any other Lender or any other Person, and the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.16 will not apply to any of the transactions effected pursuant to this Section 2.16.

Section 2.17   <u>Defaulting Lenders.</u>

(1)   <u>Adjustments.</u> Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

       (a)  <u>Waivers and Amendments.</u> That Defaulting Lender's right to approve or disapprove of any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

       (b)  <u>Reallocation of Payments.</u> Any payment of principal, interest, fees or other amounts received by any Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise), shall be applied at such time or times as may be determined by such Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to any Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (i) such payment is a payment of the principal amount of any Loans s in respect of which that Defaulting Lender has not fully funded its appropriate share and (ii) such Loans were made at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender. Any payments, prepayments or other amounts payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

    (2)   <u>Defaulting Lender Cure.</u> If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders, whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; *provided further* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III

## <u>TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY</u>

    Section 3.01   <u>Taxes, Increased Costs Protection and Illegality Taxes.</u>

    (1)   Except as required by applicable Law, any and all payments by any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes.

(2)     If any Loan Party or any other applicable withholding agent is required by applicable Law (as determined in the good faith discretion of such Loan Party or withholding agent) to make any deduction or withholding on account of any Taxes from any sum paid or payable by any Loan Party to any Lender or Agent under any of the Loan Documents:

(a)   the applicable Loan Party shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as such Loan Party becomes aware of it;

(b)   the applicable Loan Party or other applicable withholding agent shall be entitled to make such deduction or withholding and shall pay any amounts deducted or withheld to the relevant Governmental Authority any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on the Lender or Agent) on behalf of and in the name of the Lender or Agent (as applicable);

(c)   if the Tax in question is a Non-Excluded Tax or Other Tax, the sum payable to such Lender or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding for Non-Excluded Taxes or Other Taxes (including any deductions or withholdings for Non-Excluded Taxes or Other Taxes attributable to any payments required to be made under this Section 3.01), such Lender or such Agent (as applicable) receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and

(d)   within thirty days after paying any sum from which it is required by Law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (b) above to pay, the Borrower shall deliver to the Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(3)     Status of Lender. The Administrative Agent and each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of the Administrative Agent and such Lender, as applicable, to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to the Administrative Agent or such Lender under any Loan Document. In addition, Administrative Agent or any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not the Administrative Agent or such Lender is subject to backup withholding or information reporting requirements.  Each such Lender or Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(3)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and Administrative Agent of its inability to do so.

Without limiting the foregoing:

(a)   Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(b)    Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(i)    two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(ii)    two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (A) two properly completed and duly signed certificates substantially in the form of Exhibit H (any such certificate, a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(iv)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed originals of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, Form W-8BEN or W-8BEN-E, as applicable, a United States Tax Compliance Certificate, Form W-9, Form W-8IMY and any other required information (or any successor forms) from each beneficial owner that would be required under this Section 3.01(3) if such beneficial owner were a Lender, as applicable (*provided* that if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such beneficial owner), or

(v)    two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding Tax on any payments to such Lender under the Loan Documents.

(c)    If a payment made to a Lender under any Loan Document would be subject to Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, the term "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(4)        In addition to the payments by a Loan Party required by Section 3.01(2), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law and as soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(5)        The Loan Parties shall, jointly and severally, indemnify a Lender or Agent (each a "**Tax Indemnitee**"), within 10 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee on or attributable to any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Administrative Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(6)        If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), then such Tax Indemnitee shall pay to the relevant Loan Party the amount of such refund, net of all out-of-pocket expenses of the Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee to the extent the Tax Indemnitee is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (6), in no event will the Tax Indemnitee be required to pay any amount to a Loan Party pursuant to this paragraph (6) the payment of which would place the Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(7)        The agreements in this Section 3.01 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

(8)        For purposes of this Section, the term "Applicable Law" includes FATCA.

Section 3.02        [Reserved].

Section 3.03        [Reserved].

Section 3.04        Increased Cost and Reduced Return; Capital Adequacy.

(1)        Increased Costs Generally. If any Change in Law shall:

        (a)   impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender; or

        (b)   subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes or Other Taxes covered by Section 3.01 and any Excluded Taxes).;

and the result of any of the foregoing shall be to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(1) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

        (2)   <u>Capital Requirements.</u> If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it, to a level below that which such Lender or such Lender's holding company, as the case may be, could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(2) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

        (3)   <u>Certificates for Reimbursement.</u> A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (1) or (2) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

        Section 3.05    [Reserved].

        Section 3.06    <u>Matters Applicable to All Requests for Compensation</u>.

        (1)   <u>Designation of a Different Lending Office.</u> If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, and (b) in each case, would not subject such Lender

to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

(2)     [Reserved].

(3)     [Reserved].

(4)     Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of Sections 3.01 or 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of Section 3.01 or 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event giving rise to such claim and of such Lender's intention to claim compensation therefor (except that, if the circumstance giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.07     Replacement of Lenders under Certain Circumstances. If (1) any Lender requests compensation under Section 3.04, (2) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (3) any Lender is a Non-Consenting Lender or Non-Extended Lender, (4) any Lender becomes a Defaulting Lender or (5) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent:

(a)     require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement (or, with respect to clause (3) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver, or amendment, as applicable) and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(i)     the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(iv);

(ii)     such Lender shall have received payment of an amount equal to the applicable outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)     such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to all, or a portion, as applicable, of such Lender's Commitment and outstanding Loans and (ii) deliver any Term Notes evidencing such Loans to the Borrower (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Term Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Term Notes shall be deemed to be canceled upon such failure;

106

(iv)     the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans and Commitments, except with respect to indemnification and confidentiality provisions under this Agreement, which shall survive as to such assigning Lender;

(v)     in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(vi)     such assignment does not conflict with applicable Laws; and

(vii)     the Lender that acts as an Agent cannot be replaced in its capacity as such Agent other than in accordance with Section 9.11, or

(b)     terminate the Commitment of such Lender and in the case of a Lender, repay all Obligations of the Borrower owing to such Lender relating to the Loans held by such Lender as of such termination date; *provided* that in the case of any such termination of the Commitment of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable consent, waiver or amendment of the Loan Documents and such termination shall, with respect to clause (3) above, be in respect of all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans/Commitments and (iii) the Required Lenders or Required Facility Lenders, as applicable, have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 3.08     Survival. All of the Borrower's obligations under this Article III shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

## ARTICLE IV

## Conditions Precedent to Term Borrowings

Section 4.01     Conditions to Term Borrowings on Closing Date. The obligation of each Lender to make the Closing Date Term Loans on the Closing Date is subject to satisfaction (or waiver by the Required Lenders) of the conditions set forth in Section 3 of the Third Amendment.

## ARTICLE V

### Representations and Warranties

The Borrower represents and warrants to the Agents and the Lenders, at the time of each Term Borrowing (solely to the extent required to be true and correct for such Term Borrowing pursuant to Article IV or Section 2.14, as applicable):

Section 5.01    <u>Existence, Qualification and Power; Compliance with Laws</u>. Each Loan Party and each of its respective Restricted Subsidiaries that is a Material Subsidiary:

(1)    is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction),

(2)    has all corporate or other organizational power and authority to (a) own or lease its assets and carry on its business as currently conducted and (b) in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party,

(3)    is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business as currently conducted requires such qualification,

(4)    is in compliance with all applicable Laws, orders, writs, injunctions and orders and

(5)    has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted;

except in each case referred to in the preceding clauses (2)(a), (3), (4) or (5), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.02    <u>Authorization; No Contravention</u>.

(1)    The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.

(2)    None of the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party will:

(a)    contravene the terms of any of such Person's Organizational Documents;

(b)    result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 7.01) under (i) any Contractual Obligation in excess of the Threshold Amount to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan party or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject; or

(c)    violate any applicable Law;

except with respect to any breach, contravention or violation (but not creation of Liens) referred to in the preceding clauses (b) and (c), to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.03    Governmental Authorization. No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for:

(1)    filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties,

(2)    the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and

(3)    those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.04    Binding Effect. This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party hereto or thereto, as applicable. Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05    Financial Statements; No Material Adverse Effect.

(1)    The (a) audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as of the fiscal year ended February 2, 2020, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the Borrower and its consolidated Subsidiaries for such fiscal year then ended, and (b) the unaudited quarterly balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries for the fiscal quarter ended October 31, 2020 (the "**Quarterly Financial Statements**"), in each case, fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the date(s) thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (i) except as otherwise expressly noted therein and (ii) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(2)    Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06    Litigation. Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

Section 5.07    Labor Matters. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (1) there are no strikes or other labor disputes against the Borrower or the Restricted Subsidiaries pending or, to the knowledge of the Borrower, overtly threatened in writing and (2) hours worked by and payment made based on hours worked to employees of each of the Borrower or the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

Section 5.08    Real Property Matters.

(1)    Each Loan Party and each of its respective Restricted Subsidiaries has good and valid record title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property and Space Leased Property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(2)    As of the Closing Date, Schedule 5.08(2) annexed hereto contains a true, accurate and complete list of all Owned Real Property.

(3)    As of the Closing Date, Schedule 5.08(3) annexed hereto contains a true, accurate and complete list of all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting any Leased Real Property, including reasonable detail as to lease term, extension options, rental obligations and the counterparties.  Except as specified in Schedule 5.08(3) annexed hereto, each agreement listed on Schedule 5.08(3) is in full force and effect and there is no default by any Loan Party or any Restricted Subsidiary thereunder.  No Loan Party or any Restricted Subsidiary has knowledge of any default by any other party thereto that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(4)    As of the Closing Date, Schedule 5.08(4) annexed hereto contains a true, accurate and complete list of all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting any Space Leased Property, including reasonable detail as to lease term, extension options, rental obligations and the counterparties.  Except as specified in Schedule 5.08(4) annexed hereto, each agreement listed on Schedule 5.08(4) is in full force and effect and there is no default by any Loan Party thereunder.  No Loan Party or any Restricted Subsidiary has knowledge of any default by any other party thereto that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party or each applicable or any Restricted Subsidiary, enforceable against such Loan Party or Restricted Subsidiary in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(5)    As of the Closing Date, other than as set forth on Schedule 5.08(5) annexed hereto, there are no pending condemnation, zoning or other land use proceedings or special assessment proceedings with respect to any Real Property or the use thereof, and no Loan Party or Restricted Subsidiary has received written notice from any Governmental Authority threatening any such proceeding.  No Loan Party or Restricted Subsidiary has entered into any agreements or commitments with Governmental Authorities that (i) materially affect the operations of or the entitlements applicable to such properties, (ii) require the owner of any such property to make improvements to such property or make dedications or off-site improvements

110

for the benefit of adjoining properties, or (iii) make additional expenditures with respect to the operation of the Real Property.

(6)     Other than as forth on Schedule 5.08(6) annexed hereto, there is no construction or tenant improvement work currently underway at any Real Property or Space Leased Property having a total cost of more than $500,000.

(7)     Other than as forth on Schedule 5.08(7) annexed hereto, no Loan Party or Restricted Subsidiary has received written notice from any Governmental Authority asserting a violation of any Law with respect to any Real Property or Space Leased Property.

(8)     Other than as forth on Schedule 5.05(8) attached here, each Loan Party or Subsidiary that owns or leases any Real Property or Space Leased Property is current occupying and conducting business at such Real Property or Space Leased Property.

Section 5.09     Environmental Matters. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) each Loan Party and each of its Restricted Subsidiaries and their respective operations and properties is in compliance with all applicable Environmental Laws; (b) each Loan Party and each of its Restricted Subsidiaries has obtained and maintained all Environmental Permits required to conduct their operations; (c) none of the Loan Parties or any of their respective Restricted Subsidiaries has become subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim in writing or Environmental Liability; and (d) none of the Loan Parties or any of their respective Restricted Subsidiaries or, to the knowledge of the Borrower, predecessors has treated, stored, transported or Released Hazardous Materials at or from any currently or formerly owned, leased or operated real estate or facility.

Section 5.10     Taxes. Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Loan Party and each of its Restricted Subsidiaries has timely filed all Tax returns and reports required to be filed, and have timely paid all Taxes (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets (whether or not shown in a Tax return), which are due and payable, except those Taxes which are being contested in good faith by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP.

There is no proposed Tax assessment, deficiency or other claim against any Loan Party or any of its Restricted Subsidiaries except (i) those being actively contested by a Loan Party or such Restricted Subsidiary in good faith and by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP or (ii) those which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 5.11     ERISA Compliance.

(1)     Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(2)     No ERISA Event has occurred or is reasonably expected to occur;

(a)   no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan;

(b)   none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan;

(c)   none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and

(d)   neither any Loan Party nor any ERISA Affiliate has been notified in writing by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent or has been determined to be in endangered or critical status and no such Multiemployer Plan is expected to be insolvent or in endangered or critical status,

except, with respect to each of the foregoing clauses of this Section 5.11(2), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(3)      Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, (a) each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and (b) none of Holdings, the Borrower or any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

Section 5.12      Subsidiaries.

(1)      As of the Closing Date, after giving effect to the Transactions all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable, and all Equity Interests owned by Holdings in the Borrower, and by the Borrower or any Subsidiary Guarantor in any of their respective Subsidiaries are owned free and clear of all Liens of any person except (a) those Liens created under the Collateral Documents, the "Collateral Documents" (as defined in the ABL Credit Agreement) and the "Collateral Documents" (as defined in the First Lien Credit Agreement) and (b) any nonconsensual Lien that is permitted under Section 7.01.

(2)      As of the Closing Date, Schedule 5.12 sets forth:

(a)   the name and jurisdiction of each Subsidiary,

(b)   the ownership interests of Holdings in the Borrower and of the Borrower and any Subsidiary of the Borrower in each Subsidiary, including the percentage of such ownership, and

(c)   the Equity Interests of each Subsidiary described in clause (b) that are required to be pledged on the Closing Date after giving effect to the Transactions pursuant to the Collateral and Guarantee Requirement.

Section 5.13      Margin Regulations; Investment Company Act.

(a)   No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)    No Loan Party is an "investment company" under the Investment Company Act of 1940.

Section 5.14    <u>Disclosure</u>. None of the written information and written data heretofore or contemporaneously furnished in writing by or on behalf of the Borrower or any Subsidiary Guarantor to any Agent or any Lender on or prior to the Closing Date in connection with the Transactions, when taken as a whole, when furnished, contains any material misstatement of fact or omits to state any material fact necessary to make such written information and written data taken as a whole, in the light of the circumstances under which it was delivered, not materially misleading (after giving effect to all modifications and supplements to such written information and written data, in each case, furnished after the date on which such written information or such written data was originally delivered and prior to the Closing Date); it being understood that for purposes of this Section 5.14, such written information and written data shall not include any projections, *pro forma* financial information, financial estimates, forecasts and forward-looking information or information of a general economic or general industry nature.

Section 5.15    <u>Intellectual Property; Licenses, etc</u>. The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, technology, software, know-how database rights and other intellectual property rights (collectively, "**IP Rights**") that to the knowledge of the Borrower are reasonably necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any Subsidiary of the Borrower as currently conducted does not infringe upon, dilute, misappropriate or violate any IP Rights held by any Person except for such infringements, dilutions, misappropriations or violations, individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Subsidiary, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.16    <u>Solvency</u>. On the Closing Date after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    <u>USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act</u>. To the extent applicable, Holdings, Borrower and the Restricted Subsidiaries are in compliance, in all material respects, with (i) the USA PATRIOT Act, (ii) the United States Foreign Corrupt Practices Act of 1977 (the "**FCPA**"), and (iii) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto. None of Holdings, Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer or employee of any of Holdings, the Borrower or any of the Restricted Subsidiaries, is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") ("**Sanctions**").   No proceeds of the Loans will be used by Holdings, the Borrower or any Restricted Subsidiary (a) directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business, or to obtain any improper advantage, in violation of the FCPA or (b) for the purpose of financing activities of or with any Person, that, at the time of such financing, is the subject of any Sanctions administered by OFAC.

Section 5.18    <u>Collateral Documents</u>. Except as otherwise contemplated hereby or under any other Loan Documents and subject to limitations set forth in the Collateral and Guarantee Requirement, the provisions of the Collateral Documents, together with such filings and other actions required to be taken

hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Collateral required to be delivered pursuant hereto or the applicable Collateral Documents), are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien (subject to Liens permitted by Section 7.01) with the priority set forth in the Applicable Intercreditor Agreement on all right, title and interest of the respective Loan Parties in the Collateral described therein.

Notwithstanding anything herein (including this Section 5.18) or in any other Loan Document to the contrary, no Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) any Excluded Assets.

Section 5.19    <u>Use of Proceeds</u>. The Borrower has used the proceeds of the Loans issued hereunder only in compliance with (and not in contravention of) each Loan Document.

Section 5.20    <u>Beneficial Ownership Certification</u>. As of the Closing Date, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

## ARTICLE VI

## Affirmative Covenants

From and after the Closing Date, so long as the Termination Conditions have not been satisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

Section 6.01    <u>Financial Statements</u>. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender each of the following:

(1)    as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or, with respect to the fiscal year of the Borrower ended January 30, 2021, one hundred and five (105) days after the end of such fiscal year), commencing with the fiscal year ending January 30, 2021, (I) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, together with related notes thereto and management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, setting forth in each case in comparative form the figures for the previous fiscal year, in reasonable detail and all prepared in accordance with GAAP, audited and accompanied by a report and opinion of any of the "big four" accounting firms or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Required Administrative Lenders, which report and opinion (a) will be prepared in accordance with generally accepted auditing standards and (b), other than with respect to the report and opinion for fiscal year ending January 30, 2021, will not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than such a qualification based solely on (i) an upcoming maturity of the Loans under this Agreement, the First Lien Facility or the ABL Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant hereunder or under the ABL Credit Agreement) and (II) a report setting forth in reasonable detail the portion of revenues

and gross margin for such fiscal year derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement);

(2) as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower commencing with the fiscal quarter ending May 1, 2021, (I) a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (a) condensed consolidated statement of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (b) condensed consolidated statement of cash flows for the portion of the fiscal year then ended, setting forth, in each case of the preceding clauses (a) and (b), in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, accompanied by an Officer's Certificate stating that such financial statements fairly present in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes, together with management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower and (II) a report setting forth in reasonable detail the portion of revenues and gross margin for such fiscal quarter and the portion of the fiscal year then ended derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the corresponding fiscal quarter of the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement) and the corresponding portion of the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement);

(3) within ninety (90) days after the end of each fiscal year of the Borrower (or 120 days after the end of the fiscal year during which the Closing Date occurs), (a) a consolidated budget for the following fiscal year on a quarterly basis as customarily prepared by management of the Borrower for its internal use (including any projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected operations or income, in each case, to the extent prepared by management of the Borrower and included in such consolidated budget) and (b) projections of the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, in each case, prepared on a quarterly basis, which projected financial statements shall be prepared in good faith on the basis of assumptions believed to be reasonable at the time of preparation of such projected financial statements (it being understood by the Secured Parties that any such projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and the Investors and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material);

(4) simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(1) and 6.01(2), the related unaudited (it being understood that such information may be audited at the option of the Borrower) consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; and

Notwithstanding the foregoing, the obligations referred to in Sections 6.01(1) and 6.01(2) may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the

applicable financial statements of any Parent Company or (B) the Borrower's or such Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC (and the public filing of such report with the SEC shall constitute delivery under this Section 6.01); *provided* that with respect to each of the preceding clauses (A) and (B), (1) to the extent such information relates to a parent of the Borrower, if and so long as such Parent Company will have Independent Assets or Operations, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such Parent Company and its Independent Assets or Operations, on the one hand, and the information relating to the Borrower and the consolidated Restricted Subsidiaries on a stand-alone basis, on the other hand and (2) to the extent such information is in lieu of information required to be provided under Section 6.01(1) (it being understood that such information may be audited at the option of the Borrower), such materials are accompanied by a report and opinion of PricewaterhouseCoopers, LLP, KPMG LLP or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Required Administrative Lenders, which report and opinion (x) shall be prepared in accordance with generally accepted auditing standards and (y) shall not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than such a qualification based solely on (i) an upcoming maturity of the Loans under this Agreement, the First Lien Facility or the ABL Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant hereunder).

Any financial statements required to be delivered pursuant to Sections 6.01(1) or 6.01(2) shall not be required to contain all purchase accounting adjustments relating to the Transactions or any other transaction(s) permitted hereunder to the extent it is not practicable to include any such adjustments in such financial statements.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP, or the respective interpretation thereof, and that such restatements will not result in a Default or an Event of Default under the Credit Documents.

Section 6.02   Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender:

(1)      no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(1) and (2), a duly completed Compliance Certificate signed by a Financial Officer of the Borrower;

(2)      promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(3)      promptly after the furnishing thereof, copies of any notices of default to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the First Lien Facility and/or the ABL Facility, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount (in each case, other than in connection with any board observer rights) and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(4)      together with the delivery of the Compliance Certificate with respect to the financial statements referred to in Section 6.01(1), (a) a report setting forth the information required by Sections 1(a), (e) and (f) and Section 11 of the Perfection Certificate (or confirming that there has been no change in such information since the latter of the Closing Date or the last such report) and (b) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such list or a confirmation that there is no change in such information since the later of the Closing Date and the last such list;

(5)      [reserved]; and

(6)      promptly, such additional information regarding the business and financial affairs of any Loan Party or any Material Subsidiary that is a Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request in writing from time to time.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02(2) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's (or any Parent Company's) website on the Internet at the website address listed on Schedule 10.02 hereto (or as such address may be updated from time to time in accordance with Section 10.02); or (b) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (i) upon written request by the Administrative Agent, the Borrower will deliver paper copies of such documents to the Administrative Agent for further distribution by the Administrative Agent to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents or link and, upon the Administrative Agent's request, provide to the Administrative Agent by electronic mail electronic versions (i.e., pdf copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available to the Lenders materials or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks, DebtDomain, SyndTrak, ClearPar or another similar electronic system chosen by the Administrative Agent to be its electronic transmission system  (the "**Platform**") and (b) certain of the Lenders may have personnel who do not wish to receive any information with respect to the Borrower, its Subsidiaries or their respective securities that is not Public-Side Information, and who may be engaged in investment and other market-related activities with respect to such Person's securities. The Borrower hereby agrees that (i) at the Administrative Agent's request, all Borrower Materials that are to be made available to Public Lenders will be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" will appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower will be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public-Side Information (*provided, however*, that to the extent such Borrower Materials constitute Information, they will be treated as set forth in Section 10.09); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information"; and (iv) the Administrative Agent will treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated as "Public Side Information." Notwithstanding the foregoing, (x) the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC" and (y) the following

117

Communications shall be deemed "PUBLIC," unless the Borrower notifies the Administrative Agent promptly in writing that any such document contains material non-public information:  (1) the Loan Documents, and (2) notification of changes in the terms of the Loans.

Anything to the contrary notwithstanding, nothing in this Agreement will require Holdings, the Borrower or any Subsidiary to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.03    Notices. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent of:

(1)    the occurrence of any Default; and

(2)    (a) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (b) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or its Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (c) the occurrence of any ERISA Event that, in any such case referred to in clauses (a), (b) or (c) of this Section 6.03(2), has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (a) that such notice is being delivered pursuant to Section 6.03(1) or (2) (as applicable) and (b) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04    Payment of Obligations. Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (1) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (2) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 6.05    Preservation of Existence, etc..

(1)    Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(2)    take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, and IP Rights material to the conduct of its business,

except in the case of clauses (1) or (2) of this Section 6.05 to the extent (other than with respect to the preservation of the existence of the Borrower set forth in clause (1)) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or disposition permitted by Article VII.

Section 6.06    Maintenance of Properties. Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect

all of its material properties and equipment used in the operation of its business in reasonably good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

Section 6.07    Maintenance of Insurance.

(1)    Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed or with a Captive Insurance Subsidiary, insurance with respect to the Borrower's and the Restricted Subsidiaries' properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Collateral Agent or the Required Lenders, information presented in reasonable detail as to the insurance so carried; *provided* that notwithstanding the foregoing, in no event will the Borrower or any Restricted Subsidiary be required to obtain or maintain insurance that is more restrictive than what is consistent with past practice. Each such policy of insurance will as appropriate, (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear or (ii) in the case of each casualty insurance policy, contain an additional loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the additional loss payee thereunder; *provided* that to the extent that the requirements of this Section 6.07 are not satisfied on the Closing Date, the Borrower may satisfy such requirements within ninety (90) days of the Closing Date (or such later date as the Required Administrative Lenders may agree).

(2)    If any improved portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws (each, a "**Flood Hazard Property**"), then the Borrower will, or will cause each Loan Party to (a) maintain, or cause to be maintained, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (b) deliver to the Collateral Agent (A) evidence as to whether the community in which such Mortgaged Property is located is participating in the National Flood Insurance Program, (B) the Borrower's written acknowledgment as to the fact that such Mortgaged Property is a Flood Hazard Property and as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (C) copies of an application for a flood insurance policy plus proof of premium payment, a declaration page confirming that such flood insurance has been issued, or such other evidence of such flood insurance reasonably satisfactory to the Collateral Agent and the Required Administrative Lenders and naming the Collateral Agent as mortgagee and loss payee (the requirements of clauses (a) and (b) being the "**Flood Insurance Requirements**").

Section 6.08    Compliance with Laws. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property (including ERISA, the USA PATRIOT Act, Sanctions, OFAC and FCPA), except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

Section 6.09    Books and Records. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of

organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.10    Inspection Rights. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided that only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; provided further that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. For the avoidance of doubt, this Section 6.10 is subject to the last paragraph of Section 6.02. In no event shall the Administrative Agent be required to bear any cost or expense hereunder.

Section 6.11    Covenant to Guarantee Obligations and Give Security. At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent, the Collateral Agent or the Required Lenders to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(1)    (x) upon (i) the formation or acquisition of any new direct or indirect Material Domestic Subsidiary (other than any Excluded Subsidiary) by any Loan Party, (ii) the designation of any existing direct or indirect Material Domestic Subsidiary (other than any Excluded Subsidiary) as a Restricted Subsidiary, (iii) any Subsidiary (other than any Excluded Subsidiary) becoming a Material Domestic Subsidiary or (iv) an Excluded Subsidiary that is a Material Domestic Subsidiary ceasing to be an Excluded Subsidiary but continuing as a Restricted Subsidiary of the Borrower, (y) upon the acquisition of any assets by the Borrower or any Subsidiary Guarantor or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(a)    within sixty (60) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Required Lenders may agree in their reasonable discretion cause such Material Domestic Subsidiary required to become a Guarantor under the Collateral and Guarantee Requirement to execute the Guaranty (or a joinder thereto) and other documentation the Collateral Agent or the Required Administrative Lenders may reasonably request from time to time in order to carry out more effectively the purposes of the Guaranty and the Collateral Documents and

(A)    within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Subsidiary Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent supplements to the Security Agreement, a counterpart signature page to the Intercompany Subordination Agreement, Intellectual Property Security Agreements and other security agreements and documents necessary to satisfy the

Collateral and Guarantee Requirement, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent and the Required Administrative Lenders (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting and perfecting Liens required by the Collateral and Guarantee Requirement;

(B)     within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and a joinder to the Intercompany Subordination Agreement substantially in the form of Annex I thereto with respect to the intercompany Indebtedness held by such Material Domestic Subsidiary;

(C)     within sixty (60) days after such formation, acquisition or designation, take and cause (i) the applicable Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and (ii) to the extent applicable, each direct or indirect parent of such applicable Material Domestic Subsidiary, in each case, to take customary action(s) (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be necessary in the reasonable opinion of the Collateral Agent or the Required Lenders to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected (subject to Liens permitted by Section 7.01) Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law); and

(D)     within sixty (60) days after the reasonable request therefor by the Collateral Agent (or such longer period as the Required Administrative Lenders may agree in their reasonable discretion), deliver to the Administrative Agent a signed copy of a customary Opinion of Counsel, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Required Administrative Lenders as to such matters set forth in this Section 6.11(1) as the Collateral Agent or the Required Administrative Lenders may reasonably request (with such opinion being consistent with the Opinion of Counsel delivered to the Collateral Agent on the Closing Date);

*provided* that actions relating to Liens on Real Property are governed by Section 6.11(2) and not this Section 6.11(1).

(2)     Real Property.

(a)     Notice.

(i)     Within sixty (60) days (or such longer period as the Required Administrative Lenders may agree in their reasonable discretion), after the formation, acquisition or designation of a Material Domestic Subsidiary that is required to become a Subsidiary Guarantor under the Collateral and Guarantee Requirement, the Borrower will, or will cause such Material Domestic Subsidiary to, furnish to the Collateral Agent a description of any Real Property owned or leased by such Material Domestic Subsidiary.

(ii)    Within sixty (60) days (or such longer period as the Required Administrative Lenders may agree in their reasonable discretion), after the acquisition of any Owned Real Property or Leased Real Property (other than any Excluded Asset(s)) by a Loan Party (other than Holdings), after the Closing Date, the Borrower will, or will cause such Loan Party to, furnish to the Collateral Agent a description of any such Owned Real Property or Leased Real Property.

(b)    <u>Mortgages.</u>  The Borrower will, or will cause the applicable Loan Party to, provide the Collateral Agent with a Mortgage with respect to any Real Property acquired after the Closing Date, that is the subject of a notice delivered pursuant to Section 6.11(2)(a), within ninety (90) days of the acquisition, formation or designation of such Material Domestic Subsidiary or the acquisition of such Real Property (or such longer period as the Required Administrative Lenders may agree in their reasonable discretion), together with:

(i)    evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Collateral Agent or the Required Administrative Lenders may deem reasonably necessary or desirable in order to create, except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, a valid and subsisting perfected Lien on such Real Property, in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Required Administrative Lenders;

(ii)    In the case of a Leased Real Property, to the extent required by the terms of the Lease as a condition to any new Mortgage, Borrower shall use commercially reasonable efforts to obtain a Landlord Consent and Estoppel (for the avoidance of doubt, no Landlord Consent and Estoppel will be required for any Existing Mortgage, unless the terms of the applicable lease require the consent of the landlord or lessor with respect to the proposed Mortgage Amendment), unless otherwise waived by Collateral Agent in its reasonable discretion, such waiver not to be unreasonably withheld; <u>provided</u>, that Collateral Agent shall, at the Borrower's expense and the Borrower's reasonable request, and if required by such lessor in order to obtain a Landlord Consent and Estoppel, deliver to such lessor a recognition agreement in a recordable form.  Notwithstanding the foregoing, where the consent or other affirmative action of the applicable landlord is required for Borrower or the applicable Subsidiary to deliver the Landlord Consent and Estoppel, and such consent cannot be obtained after the Borrower or the applicable Subsidiary's use of commercially reasonable efforts to do so (which commercially reasonable efforts, for the avoidance of doubt, shall not require the Borrower or applicable Subsidiary to amend or otherwise modify any of the existing terms or conditions of any agreement with any landlord or pay additional economics to any landlord), the delivery of the Landlord Consent and Estoppel by the Borrower shall automatically be deemed waived hereunder for such Leased Real Property, provided that Borrower shall provide Collateral Agent with notice within five (5) business days of Borrower's determination that a Landlord Consent and Estoppel cannot be obtained, as well as a reasonably detailed description of Borrower's efforts to obtain the Landlord Consent and Estoppel;

(iii)    fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in each applicable jurisdiction (the "**Mortgage Policies**") in form and substance, with endorsements, including zoning endorsements, available in the applicable jurisdiction and in amounts, reasonably acceptable to the Required Administrative Lenders (not to exceed the fair market value of the real properties or ground leasehold interests covered thereby), issued, coinsured and reinsured (as applicable) by title insurers reasonably acceptable to the Required Administrative Lenders, insuring the Mortgages to be valid subsisting Liens on the property or ground leasehold interests described therein, subject only to

Liens permitted by Section 7.01 or such other Liens that do not have a material adverse impact on the use or value of the Mortgaged Properties, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Required Administrative Lenders may reasonably request and is available in the applicable jurisdiction and with respect to any property located in a state in which a zoning endorsement is not available, a zoning compliance letter from the applicable municipality or a zoning report from Planning and Zoning Resources Corporation (or other similar company reasonably acceptable to the Required Administrative Lenders), in each case to be reasonably satisfactory to the Required Lenders;

(iv)    customary Opinions of Counsel for the applicable Loan Parties in states in which such Real Properties are located with respect to the enforceability and perfection of the Mortgage(s) or the Mortgage Amendments, as applicable, and any related fixture filings, the authorization, execution and delivery of the Mortgages or the Mortgage Amendments, as applicable, and such other matters as the Collateral Agent or the Required Lenders may reasonably request, in form and substance reasonably satisfactory to the Collateral Agent;

(v)    American Land Title/American Congress on Surveying and Mapping surveys for each Real Property, or existing surveys together with customary no change affidavits, in each case certified to the Collateral Agent if deemed necessary by Collateral Agent or the Required Lenders in their reasonable discretion, sufficient for the title insurance company issuing a Mortgage Policy or any title date-down or modification endorsement with respect to the Existing Mortgages to remove the standard survey exception and issue standard survey related endorsements;

(vi)    a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Real Property, containing improved land addressed to the Collateral Agent and otherwise in compliance with the Flood Insurance Laws, and if any such Real Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, the Borrower's duly executed acknowledgement of special flood hazard area status and flood disaster assistance and evidence of compliance with the Flood Insurance Requirements; and

(vii)    as promptly as practicable after the reasonable request therefor by the Collateral Agent or the Required Lenders, environmental assessment reports and reliance letters (if any) that have been prepared in connection with such acquisition, designation or formation of any Material Domestic Subsidiary or acquisition of any Real Property, or in connection with the Real Property subject to the Mortgage.

(3)    <u>Additional Deposit Account Control Agreements</u>.  Following the termination of the ABL Facility and the ABL Intercreditor Agreement, the Borrower shall enter into, within 90 days after the establishment of any new deposit accounts that would be or could be required to be subject to an account control agreement pursuant to the terms of the ABL Credit Agreement if it were not terminated (which, for the avoidance of doubt, shall not include any Excluded Account, deposit account control agreements with each account bank in respect of such deposit accounts in form and substance reasonably satisfactory to the Collateral Agent.

Notwithstanding the foregoing, until the Discharge of Senior Obligations (as defined in the Term Intercreditor Agreement) shall have occurred, any requirements under this Section 6.11 to deliver any stock and membership interest certificates to the extent certificated, instruments evidencing Indebtedness or other possessory Collateral to the Collateral Agent shall be deemed satisfied by the delivery of such Collateral to the First Lien Administrative Agent, as contemplated by the Term Intercreditor Agreement.

Section 6.12     Compliance with Environmental Laws.

(1)     Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (1) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits (including any cleanup, removal or remedial obligations) and (2) obtain and renew all Environmental Permits required to conduct its operations or in connection with its properties.

(2)     The Borrower will, or will cause the applicable Loan Party to, deliver to the Collateral Agent:

(a)     As soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Borrower or any Loan Party or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Real Property which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or with respect to any Environmental Claims which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(b)     Promptly upon the occurrence thereof, written notice describing in reasonable detail (a) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, and (b) any remedial action taken by Borrower or any Loan Party or any other Person in response to (1) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(c)     As soon as practicable following the sending or receipt thereof by Borrower or any Loan Party, a copy of any and all written communications with respect to (a) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (b) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (c) any request for information from any governmental agency that suggests such agency is investigating whether Borrower or any Loan Party may be potentially responsible for any Hazardous Materials Activity.

(d)     Prompt written notice describing in reasonable detail (a) any proposed acquisition of stock, assets, or property by Borrower or any Loan Party that could reasonably be expected to (1) expose Borrower or any Loan Party to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (2) affect the ability of Borrower or any Loan Party to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (b) any proposed action to be taken by Borrower or any Loan Party to commence manufacturing or other industrial operations or to modify current operations in a manner that could reasonably be expected to subject Borrower or any Loan Party to any material additional obligations or requirements under any Environmental Laws that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     With reasonable promptness, such other documents and information as from time to time may be reasonably requested by the Administrative Agent or the Required Lenders in relation to any matters disclosed pursuant to this subsection 6.12.

(3)      The Borrower will, or will cause the applicable Loan Party to:

(a)      Promptly undertake, and shall cause each of its Subsidiaries promptly to undertake, any and all investigations, studies, sampling, testing, abatement, cleanup, removal, remediation or other response actions necessary to remove, remediate, clean up or abate any Hazardous Materials Activity on, under or about any Real Property that is in violation of any Environmental Laws or that presents a material risk of giving rise to an Environmental Claim.  In the event by Borrower or any Loan Party undertakes any such action with respect to any Hazardous Materials, by Borrower or such Loan Party shall conduct and complete such action in compliance with all applicable Environmental Laws and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, Borrower's or such Loan Party's liability with respect to such Hazardous Materials Activity is being contested in good faith by Borrower or such Loan Party.

(b)      Promptly take any and all actions necessary to (1) cure any material violation of applicable Environmental Laws by Borrower or any Loan Party that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (2) make an appropriate response to any Environmental Claim against Borrower or any Loan Party and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.13      Further Assurances and Post-Closing Covenant.

(1)      Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Borrower, promptly upon reasonable request from time to time by the Administrative Agent, the Collateral Agent or the Required Lenders or as may be required by applicable Laws (a) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, the Collateral Agent or the Required Lenders may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents and to satisfy the Collateral and Guarantee Requirement.

(2)      As promptly as practicable, and in any event no later than (x) sixty (60) days after the Closing Date with respect to any Owned Real Property that is not an Existing Mortgaged Property and (y) ninety (90) days after the Closing Date with respect to any Leased Real Property that is not an Existing Mortgaged Property (other than Existing Mortgaged Properties where the Administrative Agent or the Required Lenders have requested that a new Mortgage be executed), or, in each case, such later date as the Required Administrative Lenders reasonably agree to in writing, including to reasonably accommodate circumstances unforeseen on the Closing Date, deliver the documents or take the actions required pursuant to sub clauses (i) through (vii) of Section 6.11(2)(b) hereof, except to the extent otherwise agreed by the Required Administrative Lenders.

Section 6.14      [Reserved].

Section 6.15      Maintenance of Ratings. Use commercially reasonable efforts to maintain (1) a public corporate credit rating (but not any specific rating) from S&P and a public corporate family rating (but not any specific rating) from Moody's, in each case in respect of the Borrower, and (2) a public rating (but not any specific rating) in respect of each Term Facility as of the Closing Date from each of S&P and Moody's.

Section 6.16    <u>Accounting Changes</u>.    The Borrower shall, and shall cause its Restricted Subsidiaries to, maintain their fiscal year as in effect on the Closing Date; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Administrative Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.17    <u>Nature of Business</u>.  The Borrower shall and shall cause its Restricted Subsidiaries to, engage in material line of business substantially the same as those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business(es) or any other activities that are reasonably similar, ancillary, incidental, complimentary or related to, or a reasonable extension, development or expansion of, the business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries on the Closing Date.

Section 6.18    <u>Designation of Subsidiaries</u>.  On and after the Closing Date, the Borrower shall not designate any Restricted Subsidiaries as Unrestricted Subsidiaries or any Unrestricted Subsidiaries as Restricted Subsidiaries.

Section 6.19    <u>Lender Meetings</u>.  On a quarterly basis, upon reasonable request from the Required Lenders, promptly after the delivery of the information required pursuant to Section 6.01(1) and Section 6.01(2) (but no earlier than five (5) Business Days following the delivery of such financial statements), the Borrower (including, without limitation, the chief executive officer and chief financial officer of the Borrower) shall and shall cause its Restricted Subsidiaries to participate in a conference call with Lenders to discuss the financial position and results of operations of the Borrower and its Subsidiaries for the most recently ended period for which financial statements have been delivered; <u>provided</u>, that no such conference call shall be required to the extent the requesting Lenders are Lenders (as defined in the First Lien Credit Agreement) under the First Lien Credit Agreement and such a conference call was, or shall be, held pursuant to the First Lien Credit Agreement.

## ARTICLE VII

## <u>Negative Covenants</u>

From and after the Closing Date and so long as the Termination Conditions are not satisfied:

Section 7.01    <u>Liens</u>.  The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien (except any Permitted Lien(s)) that secures obligations under any Indebtedness or any related guarantee of Indebtedness on any asset or property of the Borrower or any Restricted Subsidiary, or any income or profits therefrom.

The expansion of Liens by virtue of accretion or amortization of original issue discount, the payment of dividends in the form of Indebtedness, and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 7.01.

Section 7.02    <u>Indebtedness</u>.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(i)     create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "**incur**" and collectively, an "**incurrence**") with respect to any Indebtedness (including Acquired Indebtedness), or

(ii)     issue any shares of Disqualified Stock or permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; and

(b)     the foregoing clause (a) shall not apply to the following:

(1)     Indebtedness of the Borrower and of its Restricted Subsidiaries under the Loan Documents (including Incremental Term Loans, Refinancing Loans, Extended Loans and Replacement Loans);

(2)     Indebtedness (a) incurred pursuant to the First Lien Facility in an aggregate principal amount not to exceed the sum of (w) $1,122,929,968.71 (plus interest with respect thereto that is paid in-kind by increasing the outstanding principal amount thereof) plus (x) other First Lien Obligations (as defined in the First Lien Credit Agreement as in effect on the date hereof) not constituting principal and (b) consisting of "Credit Agreement Refinancing Indebtedness" (as defined in the First Lien Credit Agreement as in effect on the date hereof) and Indebtedness permitted to be incurred on a *pari passu* basis with the First Lien Facility under the First Lien Credit Agreement as in effect on the date hereof, in each case, together with any Refinancing Indebtedness in respect thereof;

(3)     the incurrence of Indebtedness by the Borrower and any Restricted Subsidiary in existence on the Closing Date listed on Schedule 7.02(3) (excluding Indebtedness described in the preceding clauses (1) and (2) and clause (25) below);

(4)     (a) the incurrence of Attributable Indebtedness and (b) Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock incurred or issued by the Borrower or any Restricted Subsidiary and Preferred Stock issued by any Restricted Subsidiary, to finance the purchase, lease, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or other assets, including assets that are used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate principal amount, together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts) and all other Indebtedness, Disqualified Stock or Preferred Stock incurred or issued and outstanding under this clause (4), without regard to any Indebtedness listed on Schedule 7.02(3), at such time not to exceed (x) the greater of $60.0 million and 12.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto and (y) the aggregate principal amount of Attributable Indebtedness and Indebtedness described in clause (b) above, in each case outstanding on the Closing Date and any Refinancing Indebtedness of the Indebtedness referred to in this clause (4) thereof;

(5)     Indebtedness incurred by the Borrower or any Restricted Subsidiary (a) constituting reimbursement obligations with respect to letters of credit, bank guarantees, banker's acceptances, warehouse receipts, or similar instruments issued or entered into, or relating to obligations or liabilities incurred, in the ordinary course of business or consistent with industry practice, including in respect of workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or (b) as an account party in respect of letters of credit, bank guarantees or similar instruments in favor of suppliers, trade creditors or other Persons issued or incurred in the ordinary course of business or consistent with industry practice;

(6)        [reserved];

(7)        the incurrence of Indebtedness of the Borrower to a Subsidiary Guarantor (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Subsidiary Guarantor); *provided* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Subsidiary Guarantor ceasing to be a Subsidiary Guarantor or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Subsidiary Guarantor or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (7);

(8)        the incurrence of Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Restricted Subsidiary) to the extent permitted by Section 7.05; *provided* that any such Indebtedness for borrowed money incurred by a Guarantor and owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Guaranty of the Loans of such Guarantor to the extent permitted by applicable law; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any such subsequent transfer of any such Indebtedness (except to the Borrower or a Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (8);

(9)        [reserved];

(10)        the incurrence of Hedging Obligations in the ordinary course of business (excluding Hedging Obligations entered into for speculative purposes);

(11)        the incurrence of Indebtedness in respect of self-insurance and Indebtedness in respect of performance, bid, appeal and surety bonds and performance, banker's acceptance facilities and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary or Indebtedness in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with industry practice, including those incurred to secure health, safety and environmental obligations;

(12)        the incurrence of:

(a)        [reserved]

(b)        Indebtedness or Disqualified Stock of the Borrower and Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or any Subsidiary Guarantor in an aggregate principal amount or liquidation preference that, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred or issued, as applicable, pursuant to this clause (12)(b), together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts), does not exceed (i) $60.0 million *plus*, without duplication, (ii) in the event of any extension, replacement, refinancing, renewal or defeasance of any such Indebtedness or Disqualified Stock, an amount equal to the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness or Disqualified Stock and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness or the extension, replacement, refunding, refinancing, renewal or defeasance of such Indebtedness or Disqualified Stock;

(13)     the incurrence by the Borrower of Indebtedness or Disqualified Stock or the incurrence by a Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock that serves to Refinance any Indebtedness permitted under clause (3) above, this clause (13) and clauses (23), (29) and (30), or any successive Refinancing Indebtedness with respect to any of the foregoing;

(14)     [reserved];

(15)     the incurrence of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with industry practice;

(16)     the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary supported by letters of credit or bank guarantees permitted hereunder, in each case, in a principal amount not in excess of the stated amount of such letters of credit or bank guarantees;

(17)     (a) the incurrence of any guarantee by the Borrower or a Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations incurred by the Borrower or such Restricted Subsidiary is permitted by this Agreement, or (b) any co-issuance by the Borrower or any Restricted Subsidiary of any Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations by the Borrower or such Restricted Subsidiary was permitted hereunder; provided that the incurrence of any such guarantee or co-issuance by a Loan Party of Indebtedness or other obligations of any Non-Loan Party shall be deemed to be an Investment made under the final proviso to clause (13) of the definition of "Permitted Investments" and shall be permitted to be incurred only to the extent of available capacity under such proviso at the time of such incurrence or co-issuance;

(18)     the incurrence of Indebtedness issued by the Borrower or any Restricted Subsidiary to future, present or former employees, directors, officers, members of management and consultants thereof, their respective Controlled Investment Affiliates or Immediate Family Members and permitted transferees thereof, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Company to the extent described in Section 7.05(b)(4);

(19)     customer deposits and advance payments received in the ordinary course of business or consistent with industry practice from customers for goods and services purchased in the ordinary course of business or consistent with industry practice;

(20)     the incurrence of (a) Indebtedness owed to banks and other financial institutions incurred in the ordinary course of business or consistent with industry practice in connection with ordinary banking arrangements to manage cash balances of the Borrower and its Restricted Subsidiaries and (b) Indebtedness in respect of Cash Management Services;

(21)     Indebtedness incurred by the Borrower or any Restricted Subsidiary in connection with bankers' acceptances or discounted bills of exchange, in each case incurred or undertaken in the ordinary course of business or consistent with industry practice on arm's-length commercial terms;

(22)     the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business or consistent with industry practice;

(23)     the incurrence of Indebtedness or Disqualified Stock by Restricted Subsidiaries of the Borrower that are not Guarantors in an amount not to exceed and together with any other Indebtedness and

Disqualified Stock incurred and outstanding under this clause (23) and any outstanding Indebtedness or Disqualified Stock under clause (13) to Refinance Indebtedness initially incurred in reliance on this clause (23) (excluding any Incremental Amounts) $18.0 million;

(24)     the incurrence of Indebtedness by the Borrower or any Restricted Subsidiary undertaken in connection with cash management (including netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and related or similar services or activities) with respect to the Borrower, any Subsidiaries or any joint venture in the ordinary course of business or consistent with industry practice, including with respect to financial accommodations of the type described in the definition of Cash Management Services;

(25)     Indebtedness incurred pursuant to the ABL Facility in an aggregate principal amount not to exceed the sum of (x) the greater of $900.0 million and the Borrowing Base (as defined in the ABL Facility in effect on the date hereof) plus (y) Incremental Revolving Credit Loans (up to the amount provided, and as defined, in the ABL Facility in effect on the date hereof) plus other ABL Obligations (as defined in the ABL Facility on the date hereof) not constituting principal and, in each case, together with any Refinancing Indebtedness in respect thereof; *provided* that the Indebtedness under this clause (25) shall not be permitted to contain or include any "last out" or similar tranche or facility nor shall it be permitted to include any term loan or similar Indebtedness;

(26)     guarantees incurred in the ordinary course of business or consistent with industry practice in respect of obligations to suppliers, customers, franchisees, lessors, licensees, sub-licensees and distribution partners;

(27)     the incurrence of Indebtedness attributable to (but not incurred to finance) the exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) with respect to the Transactions or any other acquisition (by merger, consolidation or amalgamation or otherwise) in accordance with the terms hereof;

(28)     the incurrence of Indebtedness representing deferred compensation to employees of any Parent Company, the Borrower or any Restricted Subsidiary, including Indebtedness consisting of obligations under deferred compensation or any other similar arrangements incurred in connection with the Transactions, any investment or any acquisition (by merger, consolidation or amalgamation or otherwise) permitted under this Agreement;

(29)     the incurrence of Indebtedness arising out of any Specified Sale-Leaseback Transaction to the extent such Indebtedness is not incurred in contemplation of such Specified Sale-Leaseback Transaction;

(30)     [reserved];

(31)     [reserved]; and

(32)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (1) through (31) above.

(c)     For purposes of determining compliance with this Section 7.02:

(1)     [reserved];

(2)      the Borrower is entitled to divide and classify (but, not, for the avoidance of doubt, reclassify) an item of Indebtedness, Disqualified Stock or Preferred Stock in more than one of the types of Indebtedness, Disqualified Stock or Preferred Stock described in Section 7.02(b), *provided* that all Indebtedness incurred under the Loan Documents, the First Lien Facility and the ABL Facility, and in each case, all Refinancing Indebtedness in respect thereof, will, at all times, be treated as incurred under Section 7.02(b)(1), (2) and (25), respectively;

(3)      the principal amount of Indebtedness outstanding under any clause of this Section 7.02 will be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness;

(4)      [reserved]; and

(5)      guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that are otherwise included in the determination of a particular amount of Indebtedness will not be included in the determination of such amount of Indebtedness; *provided* that the incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was incurred in compliance with this Section 7.02.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, in each case, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 7.02. Any Indebtedness incurred to refinance Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to clauses (2), (3), (4), (12), (13), (23) and (25) of Section 7.02(b) will be permitted to include additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay accrued but unpaid interest and dividends and premiums, defeasance costs and fees and expenses incurred in connection with such refinancing.

For purposes of determining compliance with any Dollar denominated restriction on the incurrence of Indebtedness or issuance of Disqualified Stock or Preferred Stock, the Dollar equivalent principal amount of Indebtedness or Disqualified Stock or Preferred Stock denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness, Disqualified Stock or Preferred Stock was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness, Disqualified Stock or Preferred Stock is issued to Refinance other Indebtedness, Disqualified Stock or Preferred Stock denominated in a foreign currency, and such refinancing would cause the applicable Dollar denominated (or the applicable growth component with respect to such Basket, if greater) restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar denominated restriction will be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness, Disqualified Stock or Preferred Stock does not exceed (i) the principal amount of such Indebtedness, Disqualified Stock or Preferred Stock (as applicable) being refinanced *plus* (ii) the aggregate amount of accrued but unpaid interest, fees, underwriting discounts, defeasance costs, premiums (including tender premiums) and other costs and expenses (including OID, upfront fees or similar fees) incurred in connection with such refinancing.

The principal amount of any Indebtedness, Disqualified Stock or Preferred Stock incurred to refinance other Indebtedness, Disqualified Stock or Preferred Stock, if incurred in a different currency from the Indebtedness, Disqualified Stock or Preferred Stock, as applicable, being refinanced, will be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness or Disqualified Stock or Preferred Stock is denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting

Indebtedness at any date will be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.02, if any Indebtedness is refinanced in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Indebtedness does not exceed the sum of (i) the principal amount of such Indebtedness being refinanced, *plus* (ii) the related costs incurred or payable in connection with such refinancing.

Section 7.03   Fundamental Changes. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consolidate, amalgamate or merge with or into or wind up into another Person, or liquidate or dissolve or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), including by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division" under the Delaware Limited Liability Company Act, except that:

(1)   Subject to Section 3.03(a) of the Security Agreement, Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that

(a)   the Borrower shall be the continuing or surviving Person,

(b)   such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and

(c)   in the case of a merger or consolidation of Holdings with and into the Borrower,

(i)   Holdings shall not be an obligor in respect of any Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement,

(ii)   Holdings shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower,

(iii)   no Default or Event of Default exists at such time or after giving effect to such transaction and

(iv)   after giving effect to such transaction, the direct parent of the Borrower will (A) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Required Administrative Lenders and the Borrower, (B) pledge 100% of the Equity Interests of the Borrower to the Collateral Agent as Collateral to secure the Obligations in form reasonably satisfactory to the Collateral Agent, the Required Administrative Lenders and the Borrower and (C) be in compliance with Section 7.09;

(2)   (a)   any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary that is not a Loan Party,

(b)    any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary that is a Loan Party; provided that a Loan Party shall be the continuing or surviving Person;

(c)    any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States will be permitted and

(d)    any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and the Restricted Subsidiaries and is not materially disadvantageous to the Lenders;

provided that in the case of clauses (b) through (d) of this Section 7.03(2), (x) no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom and (y) the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor shall be a Loan Party or such disposition shall otherwise be permitted under Section 7.05 or the definition of "Permitted Investments";

(3)    any Restricted Subsidiary may dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then (x) the transferee must be a Loan Party or (y) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Restricted Subsidiary which is not a Loan Party in connection with any Investment permitted hereunder;

(4)    so long as no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom, the Borrower may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; provided that (a) the Borrower shall be the continuing or surviving corporation or (b) if the Person formed by or surviving any such merger or consolidation is not the Borrower (or, in connection with a disposition of all or substantially all of the Borrower's assets, is the transferee of such assets) (any such Person, a "**Successor Borrower**"):

(i)    the Successor Borrower will:

(A)    be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(B)    expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, the Required Administrative Lenders and the Borrower; and

(C)    deliver to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this Section 7.03(4) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions

delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Required Administrative Lenders;

(ii)     substantially contemporaneously with such transaction (or at a later date as agreed by the Required Administrative Lenders),

(A)     each Guarantor, unless it is the other party to such merger or consolidation, will by a supplement to the Guaranty (or in another form reasonably satisfactory to the Administrative Agent, the Required Administrative Lenders and the Borrower) reaffirm its Guaranty of the Obligations (including the Successor Borrower's obligations under this Agreement),

(B)     each Loan Party, unless it is the other party to such merger or consolidation, will, by a supplement to the Security Agreement (or in another form reasonably satisfactory to the Collateral Agent and the Required Administrative Lenders), confirm its grant or pledge thereunder,

(C)     if reasonably requested by the Required Administrative Lenders, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, will, by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Collateral Agent, the Required Administrative Lenders and the Borrower), confirm that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement; and

(iii)     after giving *pro forma* effect to such incurrence, the Total Net Leverage Ratio as of the end of the most recently ended Test Period is no greater than 5.25:1.00; and

(iv)     the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Borrower required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided further* that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(5)     so long as no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom, Holdings may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) Holdings will be the continuing or surviving Person or (b) if:

(i)     the Person formed by or surviving any such merger or consolidation is not Holdings,

(ii)     Holdings is not the Person into which the applicable Person has been liquidated or

(iii)     in connection with a disposition of all or substantially all of Holdings' assets, the Person that is the transferee of such assets is not Holdings (any such Person described in the preceding clauses (i) through (iii), a "**Successor Holdings**"), then the Successor Holdings will:

(A)     be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia,

(B)      expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, the Required Administrative Lenders and the Borrower,

(C)      (I) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, the Required Administrative Lenders and the Borrower and (II) pledge 100% of the Equity Interests of the Borrower to the Collateral Agent as Collateral to secure the Obligations in accordance with the Security Agreement or otherwise in form and substance reasonably satisfactory to the Collateral Agent, the Required Administrative Lenders and the Borrower; and

(D)      if requested by the Required Administrative Lenders, deliver, or cause the Borrower to deliver, to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this 7.03(5) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Required Administrative Lenders,

(iv)      the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Holdings required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

*provided further* that if the foregoing are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement;

(6)      any Restricted Subsidiary may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person in order to effect a Permitted Investment or other investment permitted pursuant to Section 7.05; *provided* that solely in the case of a merger or consolidation involving a Loan Party and subject to Section 1.07(8) in the case of a Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom; *provided further*, that the continuing or surviving Person will be (a) the Borrower or (b) a Loan Party, in each case, which together with each of its Restricted Subsidiaries, will have complied with the applicable requirements of Section 6.11;

(7)      a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a disposition permitted pursuant to Section 7.04 (other than under clause (2)(c) of the definition of "Asset Sale");

(8)      subject to Section 3.03(a) of the Security Agreement, the Borrower may (a) convert into a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of the Borrower or the laws of a jurisdiction in the United States and (b) change its name;

(9)      the Loan Parties and the Restricted Subsidiaries may consummate the Transactions; and

(10)      the commencement of any proceedings against any Restricted Subsidiary under Debtor Relief Laws to the extent it shall not constitute an Event of Default under Section 8.01(6).

Section 7.04    Asset Sales. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consummate any Asset Sale unless:

(1)    the Borrower or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise in connection with such Asset Sale) at least equal to the fair market value (measured at the time of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of, and

(2)    except in the case of a Permitted Asset Swap consummated in the ordinary course of business in an amount not to exceed $12.0 million, at least 75.0% of the consideration for such Asset Sale, together with all other Asset Sales since the Closing Date (on a cumulative basis), received by the Borrower or a Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that each of the following will be deemed to be cash or Cash Equivalents for purposes of this clause (2);

(a)    any liabilities (as shown on the Borrower's or any Restricted Subsidiary's most recent balance sheet or in the footnotes thereto or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or a Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet, as determined in good faith by the Borrower) of the Borrower or any Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Obligations, that are (i) assumed by the transferee of any such assets (or a third party in connection with such transfer) or (ii) otherwise cancelled or terminated in connection with the transaction with such transferee (other than intercompany debt owed to the Borrower or a Restricted Subsidiary);

(b)    any securities, notes or other obligations or assets received by the Borrower or any Restricted Subsidiary from such transferee or in connection with such Asset Sale (including earnouts and similar obligations) that are converted by the Borrower or a Restricted Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of such Asset Sale;

(c)    [reserved]; or

(d)    Indebtedness of any Restricted Subsidiary that ceases to be a Restricted Subsidiary as a result of such Asset Sale (other than intercompany debt owed to the Borrower or a Restricted Subsidiary), to the extent that the Borrower and each other Restricted Subsidiary are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Asset Sale; and

(3)    the Net Proceeds of such Asset Sale shall be applied and/or reinvested as (and to the extent) required by Section 2.05(2)(b).

To the extent any Collateral is disposed of as expressly permitted by this Section 7.04 to any Person other than a Loan Party, such Collateral shall automatically be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such disposition is permitted by this Agreement, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

In addition, none of the Borrower or any Restricted Subsidiary shall enter into any Specified Sale-Leaseback Transaction unless such Specified Sale-Leaseback Transaction is conducted as an arm's-length

basis and is for fair market value of the applicable property as determined by a Responsible Officer of the Borrower in good faith.

Section 7.05    Restricted Payments. (a)         The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(A)      declare or pay any dividend or make any payment or distribution on account of the Borrower's or any Restricted Subsidiary's Equity Interests (in each case, solely in such Person's capacity as holder of such Equity Interests), including any dividend or distribution payable in connection with any merger, amalgamation or consolidation, other than:

(1)      dividends, payments or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or a Parent Company or in options, warrants or other rights to purchase such Equity Interests; or

(2)      dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a wholly owned Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend, payment or distribution in accordance with its Equity Interests in such class or series of securities or such other amount to which it is entitled pursuant to the terms of such Equity Interest;

(B)      purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Borrower or any Parent Company, including in connection with any merger, amalgamation or consolidation, in each case held by Persons other than the Borrower or a Restricted Subsidiary;

(C)      make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment or final maturity, any Subordinated Indebtedness, any Indebtedness secured on a junior lien basis to the Obligations or any unsecured Indebtedness for borrowed money (other than any intercompany Indebtedness among the Borrower and its Restricted Subsidiaries), in each case in excess of $6,000,000 (collectively, "**Junior Debt**"), other than:

(i)      Indebtedness permitted under clauses (7) and (8) of Section 7.02(b); or

(ii)      the Transactions;

(D)      make any Restricted Investment;

(all such payments and other actions set forth in clauses (A) through (D) above being collectively referred to as "**Restricted Payments**");

(b)      The provisions of Section 7.05(a) will not prohibit:

(1)      the payment of any dividend or other distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or other

137

distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or other distribution or redemption payment would have complied with the provisions of this Section 7.05;

(2)     the redemption, repurchase, defeasance, discharge, retirement or other acquisition of (i) any Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company, including any accrued and unpaid dividends thereon ("**Treasury Capital Stock**") or (ii) Junior Debt, in each case, made (x) in exchange for, or out of the proceeds of, a sale or issuance (other than to a Restricted Subsidiary) of Equity Interests of the Borrower or any Parent Company (to the extent such Equity Interests or proceeds therefrom are contributed to the Borrower) (in each case, other than Disqualified Stock) and (y) within 120 days of such sale or issuance ("**Refunding Capital Stock**"),

(a)     the declaration and payment of dividends on Treasury Capital Stock out of the proceeds of a sale or issuance (other than to a Restricted Subsidiary of the Borrower or to an employee stock ownership plan or any trust established by the Borrower or any Restricted Subsidiary) of Refunding Capital Stock made within 120 days of such sale or issuance, and

(b)     [reserved];

(3)     the principal payment on, defeasance, redemption, repurchase, exchange or other acquisition or retirement of:

(a)     Junior Debt of the Borrower or a Subsidiary Guarantor made (i) by exchange for, or out of the proceeds of the sale, issuance or incurrence of, new Junior Debt of the Borrower or a Subsidiary Guarantor or Disqualified Stock of the Borrower or a Subsidiary Guarantor, (ii) within 120 days of such sale, issuance or incurrence and (iii) in each case, is Refinancing Indebtedness incurred or issued, as applicable in compliance with Section 7.02,

(b)     Disqualified Stock of the Borrower or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale, issuance or incurrence of Disqualified Stock or Junior Debt of the Borrower or a Subsidiary Guarantor, (i) made within 120 days of such sale, issuance or incurrence and (ii) ) in each case, is Refinancing Indebtedness incurred or issued, as applicable in compliance with Section 7.02,

(c)     Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale or issuance of, Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor, made within 120 days of such sale or issuance that, in each case, is Refinancing Indebtedness incurred or issued, as applicable, in compliance with Section 7.02 and

(d)     any Junior Debt or Disqualified Stock that constitutes Acquired Indebtedness;

(4)     a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) (including related stock appreciation rights or similar securities) of the Borrower or any Parent Company held by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted

transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, or any equity subscription or equity holder agreement (including, for the avoidance of doubt, any principal and interest payable on any notes issued by the Borrower or any Parent Company in connection with any such repurchase, retirement or other acquisition), including any Equity Interests rolled over by management of the Borrower, any of its Subsidiaries or any Parent Company in connection with the Transactions; *provided* that the aggregate amount of Restricted Payments made under this clause (4) does not exceed $12.0 million in any fiscal year (increasing to $24.0 million following an underwritten public Equity Offering by the Borrower or any Parent Company) with unused amounts in any calendar year being carried over to the next two succeeding calendar years; *provided further* that each of the amounts in any calendar year under this clause (4) may be increased by an amount not to exceed:

> (a)     the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Borrower and, to the extent contributed to the Borrower, the cash proceeds from the sale of Equity Interests of any Parent Company, in each case to any future, present or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to make a Restricted Payment with the Available Amount; *plus*

> (b)     the amount of any cash bonuses otherwise payable to members of management, employees, directors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that are foregone in exchange for the receipt of Equity Interests of the Borrower or any Parent Company pursuant to any compensation arrangement, including any deferred compensation plan; *plus*

> (c)     the cash proceeds of life insurance policies received by the Borrower or its Restricted Subsidiaries (or by any Parent Company to the extent contributed to the Borrower) after the Closing Date; *minus*

> (d)     the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a), (b) and (c) of this clause (4);

*provided* that the Borrower may elect to apply all or any portion of the aggregate increase contemplated by clauses (a), (b) and (c) above in any calendar year; *provided further* that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from any future, present or former employees, directors, officers, members of management, or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary in connection with a repurchase of Equity Interests of the Borrower or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.05 or any other provision of this Agreement;

> (5)     [Reserved];

> (6)     [Reserved];

(7)    payments made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any Restricted Subsidiary or any Parent Company,

(a)    any repurchases or withholdings of Equity Interests in connection with the exercise of stock options, warrants or similar rights if such Equity Interests represent a portion of the exercise of, or withholding obligations with respect to, such options, warrants or similar rights or required withholding or similar taxes and

(b)    loans or advances to officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Restricted Subsidiary or any Parent Company in connection with such Person's purchase of Equity Interests of the Borrower or any Parent Company; *provided* that no cash is actually advanced pursuant to this clause (c) other than to pay taxes due in connection with such purchase, unless immediately repaid;

(8)    [reserved];

(9)    [reserved];

(10)    Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (10) not to exceed the sum of (X) [reserved] plus (Y) additional Restricted Payments made with the Available Amount; *provided* that if this clause (10) is utilized to make a Restricted Investment, the amount deemed to be utilized under this clause (10) will be the amount of such Restricted Investment at any time outstanding (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided further* that (other than in the case of Restricted Investments made with clause (3) of the definition of Available Amount) no Event of Default shall have occurred and be continuing or would result therefrom; and *provided further* that Restricted Payments made with clause (2) of the definition of Available Amount shall only be permitted to the extent that after giving *pro forma* effect thereto and the application of the net proceeds therefrom, the Total Net Leverage Ratio for the Test Period immediately preceding such Restricted Payment would be no greater than 2.75 to 1.00;

(11)    distributions or payments of Securitization Fees;

(12)    any Restricted Payment made in connection with the Transactions and the fees and expenses related thereto or owed to any Affiliate(s) including any payments to holders of Equity Interests of Belk in connection with, or as a result of, their exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) related to the Transactions;

(13)    [reserved];

(14)    the declaration and payment of dividends or distributions by the Borrower or any Restricted Subsidiary to, or the making of loans or advances to, the Borrower or any Parent Company in amounts required for any Parent Company to pay in each case without duplication:

(a)      franchise, excise and similar taxes and other fees, taxes and expenses required to maintain their corporate or other legal existence;

(b)      for any taxable period for which the Borrower or any of its Restricted Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for U.S. federal or applicable foreign, state or local income tax purposes of which a Parent Company is the common parent (a "**Tax Group**"), to pay the portion of any U.S. federal, foreign, state and local income taxes of such Tax Group for such taxable period that are attributable to the taxable income of the Borrower and its Restricted Subsidiaries and Unrestricted Subsidiaries (net of any payments of such taxes made by the Borrower); *provided* that for each taxable period, (A) the amount of such payments made in respect of such taxable period in the aggregate will not exceed the amount that the Borrower and its Subsidiaries, as applicable, would have been required to pay as stand-alone taxpayers or a stand-alone Tax Group and (B) the amount of such payments made in respect of an Unrestricted Subsidiary will be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary for such purpose;

(c)      salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, employees, directors, officers, members of management and consultants of any Parent Company, and any payroll, social security or similar taxes thereof;

(d)      general corporate or other operating, administrative, compliance and overhead costs and expenses (including expenses relating to auditing and other accounting matters) of any Parent Company attributable to the ownership of the Borrower and its Restricted Subsidiaries;

(e)      fees and expenses (including ongoing compliance costs and listing expenses) related to any equity or debt offering of a Parent Company (whether or not consummated);

(f)      amounts that would be permitted to be paid directly by the Borrower or its Restricted Subsidiaries under Section 7.06(b) (other than clause 2(a) thereof);

(g)      [reserved];

(h)      [reserved];

(15)      [reserved];

(16)      cash payments, or loans, advances, dividends or distributions to any Parent Company to make payments, in lieu of issuing fractional shares in connection with share dividends, share splits, reverse share splits, mergers, consolidations, amalgamations or other business combinations and in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company;

(17)      [reserved];

(18)    making payments for the benefit of the Borrower or any Restricted Subsidiary to the extent such payments could have been made by the Borrower or any Restricted Subsidiary because such payments (a) would not otherwise be Restricted Payments and (b) would be permitted by Section 7.06; and

(19)    payments and distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries taken as a whole that complies with the terms of this Agreement or any other transaction that complies with the terms of this Agreement;

*provided* that for purposes of clauses (7) and (14) above, taxes will include all interest and penalties with respect thereto and all additions thereto.

(c)    Notwithstanding anything to the contrary in this Section 7.05, no Investment shall be made in any Unrestricted Subsidiary after the Closing Date.

The amount of all Restricted Payments (other than cash) will be the fair market value on the date the Restricted Payment is made, or at the Borrower's election, the date a commitment is made to make such Restricted Payment, of the assets or securities proposed to be transferred or issued by the Borrower or any Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

For the avoidance of doubt, this Section 7.05 will not restrict the making of any AHYDO Payment with respect to, and required by the terms of, any Indebtedness of the Borrower or any Restricted Subsidiary permitted to be incurred under this Agreement.

Section 7.06    Transactions with Affiliates.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "**Affiliate Transaction**") involving aggregate payments or consideration in excess of $2.0 million, unless (A) such Affiliate Transaction is on terms, taken as a whole, that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained at such time in a comparable transaction by the Borrower or such Restricted Subsidiary with a Person other than an Affiliate of the Borrower on an arm's-length basis or, if in the good faith judgment of the Board of Directors no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to the Borrower or such Restricted Subsidiary from a financial point of view, and (B) the Borrower delivers to the Administrative Agent with respect to any Affiliate Transaction or series of related Affiliate Transactions requiring aggregate payments or consideration in excess of $15.0 million, a resolution adopted by the majority of the Board of Directors approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (A) above.

(b)    The foregoing restriction will not apply to the following:

(1)    (a) transactions between or among the Borrower and one or more Restricted Subsidiaries or between or among Restricted Subsidiaries or, in any case, any entity that becomes a Restricted Subsidiary as a result of such transaction and (b) any merger, consolidation or amalgamation of the Borrower and any Parent

Company; *provided* that such merger, consolidation or amalgamation of the Borrower is otherwise in compliance with the terms of this Agreement and effected for a *bona fide* business purpose;

(2)  (a) Restricted Payments permitted by Section 7.05 (including any transaction specifically excluded from the definition of the term "Restricted Payments," including pursuant to the exceptions contained in the definition thereof and the parenthetical exclusions of such definition) and (b) any Permitted Investment(s) or any acquisition otherwise permitted hereunder;

(3)  so long as no Event of Default shall have occurred and be continuing or would result therefrom, the payment of management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses pursuant to the Management Services Agreement (including any unpaid management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses accrued in any prior year) and any termination fees pursuant to the Management Services Agreement as in effect on the Closing Date,

(a)  the payment of indemnification and similar amounts to, and reimbursement of expenses to, the Investors and its officers, directors, employees and Affiliates, in each case, approved by, or pursuant to arrangements approved by, the Board of Directors,

(b)  payments, loans, advances or guarantees (or cancellation of loans, advances or guarantees) to future, present or former employees, officers, directors, managers, consultants or independent contractors or guarantees in respect thereof for bona fide business purposes or in the ordinary course of business or consistent with industry practice,

(c)  any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company and

(d)  any payment of compensation or other employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company;

(4)  the payment of fees and compensation paid to, and indemnities and reimbursements and employment and severance arrangements provided to, or on behalf of or for the benefit of, present, future or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary;

(5)  [reserved];

(6)      the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any agreement as in effect as of the Closing Date, or any amendment thereto or replacement thereof (so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the applicable agreement as in effect on the Closing Date);

(7)      the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any equity holders agreement or the equivalent (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Closing Date and any amendment thereto and, similar agreements or arrangements that it may enter into thereafter; *provided* that the existence of, or the performance by the Borrower or any Restricted Subsidiary of obligations under any future amendment to any such existing agreement or arrangement or under any similar agreement or arrangement entered into after the Closing Date will be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement or arrangement are not otherwise materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the original agreement or arrangement in effect on the Closing Date;

(8)      the Transactions and the payment of all fees and expenses related to the Transactions, including Transaction Expenses;

(9)      transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business or consistent with industry practice and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10)      the issuance, sale or transfer of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company to any Person and the granting and performing of customary rights (including registration rights) in connection therewith, and any contribution to the capital of the Borrower;

(11)      sales of accounts receivable, or participations therein, or Securitization Assets or related assets in connection with any Qualified Securitization Facility and any other transaction effected in connection with a Qualified Securitization Facility or a financing related thereto and sales and/or other transactions of property in connection with Specified Sale-Leaseback Transactions;

(12)      [reserved];

(13)      payments with respect to Indebtedness, Disqualified Stock and other Equity Interests (and cancellation of any thereof) of the Borrower, any Parent Company and any Restricted Subsidiary and Preferred Stock (and cancellation of any thereof) of any Restricted Subsidiary to any future, current or former

employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any equity subscription or equity holder agreement that are, in each case, approved by the Borrower in good faith; and any employment agreements, severance arrangements, stock option plans and other compensatory arrangements (and any successor plans thereto) and any supplemental executive retirement benefit plans or arrangements with any such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) that are, in each case, approved by the Borrower in good faith;

(14)     (a) investments by Affiliates in securities of the Borrower (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Borrower or such Restricted Subsidiary generally to other investors on the same or more favorable terms and (b) payments to Affiliates in respect of securities of the Borrower or any Restricted Subsidiary contemplated in the foregoing subclause (a) or that were acquired from Persons other than the Borrower and the Restricted Subsidiaries, in each case, in accordance with the terms of such securities;

(15)     payments to or from, and transactions with, any joint venture or Unrestricted Subsidiary in the ordinary course of business or consistent with past practice, industry practice or industry norms (including, any cash management activities related thereto);

(16)     payments by the Borrower (and any Parent Company) and its Subsidiaries pursuant to tax sharing agreements among the Borrower (and any Parent Company) and its Subsidiaries; *provided* that in each case the amount of such payments in any taxable year does not exceed the amount that the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amount received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such taxable year were the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any such Parent Company;

(17)     any lease entered into between the Borrower or any Restricted Subsidiary, as lessee and any Affiliate of the Borrower, as lessor, and any transaction(s) pursuant to that lease, which lease is approved by the Board of Directors or senior management of the Borrower in good faith;

(18)     IP Rights licenses in the ordinary course of business or consistent with industry practice;

(19)     the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to equity holders of the Borrower or any Parent Company pursuant to the equity holders agreement or the registration rights agreement entered into on or after the Closing Date;

(20)     transactions permitted by, and complying with, Section 7.03 solely for the purpose of (a) reorganizing to facilitate any initial public offering of securities of the Borrower or any Parent Company, (b) forming a holding company or (c) reincorporating the Borrower in a new jurisdiction;

(21)     transactions undertaken in good faith (as determined by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate) for the purposes of improving the consolidated tax efficiency of the Borrower and its Restricted Subsidiaries and not for the purpose of circumventing Articles VI and VII of this Agreement; so long as such transactions, when taken as a whole, do not result in a material adverse effect on the Liens on the Collateral granted by Loan Parties in favor of the Secured Parties, when taken as a whole, in each case, as determined in good faith by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate;

(22)     (a) transactions with a Person that is an Affiliate of the Borrower (other than an Unrestricted Subsidiary) solely because the Borrower or any Restricted Subsidiary owns, directly or indirectly, Equity Interests in such Person and (b) transactions with any Person that is an Affiliate solely because a director or officer of such Person is a director or officer of the Borrower, any Restricted Subsidiary or any Parent Company;

(23)     (a) pledges and other transfers of Equity Interests in Unrestricted Subsidiaries and (b) any transactions with an Affiliate in which the consideration paid consists solely of Equity Interests of the Borrower or a Parent Company;

(24)     the sale, issuance or transfer of Equity Interests (other than Disqualified Stock) of the Borrower;

(25)     investments by any Investor or Parent Company in securities of the Borrower; and

(26)     payments in respect of (a) the Obligations (or any Credit Agreement Refinancing Indebtedness) or (b) other Indebtedness of the Borrower and its Subsidiaries held by Affiliates; *provided* that such Obligations were acquired by an Affiliate of the Borrower in compliance herewith.

Section 7.07     <u>Burdensome Agreements</u>.

(a)     The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to, directly or indirectly, create or otherwise cause to exist or become effective any consensual encumbrance or consensual restriction (other than this Agreement or any other Loan Document) on the ability of any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to:

(1)     (a)     pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(b)      pay any Indebtedness owed to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(2)      make loans or advances to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(3)      sell, lease or transfer any of its properties or assets to the Borrower or to any Restricted Subsidiary that is a Guarantor; or

(4)      with respect to the Borrower or any Subsidiary Guarantor, (a) Guaranty the Obligations or (b) create, incur or cause to exist or become effective Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents to the extent such Lien is required to be given to the Secured Parties pursuant to the Loan Documents;

*provided* that any dividend or liquidation priority between or among classes or series of Capital Stock, and the subordination of any Obligation (including the application of any remedy bars thereto) to any other Obligation will not be deemed to constitute such an encumbrance or restriction.

(b)   Section 7.07(a) will not apply to any encumbrances or restrictions existing under or by reason of:

(a)      encumbrances or restrictions in effect on the Closing Date, including pursuant to the Loan Documents and any Hedge Agreements, Hedging Obligations and the related documentation and any definitive documentation in respect of the Indebtedness set forth on Schedule 7.02(b)(3);

(b)      the First Lien Loan Documents and the ABL Loan Documents;

(c)      Purchase Money Obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) above on the property so acquired;

(d)      applicable Law or any applicable rule, regulation or order;

(e)      any agreement or other instrument of a Person, or relating to Indebtedness or Equity Interests of a Person, acquired by or merged, amalgamated or consolidated with and into the Borrower or any Restricted Subsidiary, or any other transaction entered into in connection with any such acquisition, merger, consolidation or amalgamation in existence at the time of such acquisition or at the time it merges, amalgamates or consolidates with or into the Borrower or any Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person so acquired and its Subsidiaries, or the property or assets of the Person so acquired or designated and its Subsidiaries or the property or assets so acquired or designated;

147

(f)       contracts or agreements for the sale or disposition of assets, including any restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(g)       restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business or consistent with industry practice or arising in connection with any Liens permitted by Section 7.01;

(h)       Indebtedness, Disqualified Stock or Preferred Stock of Restricted Subsidiaries that are not Guarantors permitted to be incurred subsequent to the Closing Date pursuant to Section 7.02;

(i)       provisions in joint venture agreements and other similar agreements (including equity holder agreements) relating to such joint venture or its members or entered into in the ordinary course of business or consistent with industry practice;

(j)       customary provisions contained in leases, sub-leases, licenses, sub-licenses, Equity Interests or similar agreements, including with respect to IP Rights and other agreements;

(k)       restrictions created in connection with any Qualified Securitization Facility that, in the good faith determination of the Board of Directors of the Borrower, are necessary or advisable to effect such Qualified Securitization Facility;

(l)       restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale or other agreement to which the Borrower or any Restricted Subsidiary is a party entered into in the ordinary course of business or consistent with industry practice; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are the subject to such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of another Restricted Subsidiary;

(m)       customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Restricted Subsidiary;

(n)       customary provisions restricting assignment of any agreement;

(o)       restrictions arising in connection with cash or other deposits permitted under Section 7.01; any other agreement or instrument governing any Indebtedness, Disqualified Stock, or Preferred Stock permitted to be incurred or issued pursuant to Section 7.02 entered into after the Closing Date that contains encumbrances and restrictions that

148

either (i) are no more restrictive in any material respect, taken as a whole, with respect to any Restricted Subsidiary than (A) the restrictions contained in the First Lien Loan Documents as of the Closing Date or the ABL Loan Documents as of the Closing Date or (B) those encumbrances and other restrictions that are in effect on the Closing Date with respect to that Restricted Subsidiary pursuant to agreements in effect on the Closing Date, (ii) are not materially more disadvantageous, taken as a whole, to the Lenders than is customary in comparable financings for similarly situated issuers or (iii) will not materially impair the Borrower's ability to make payments on the Obligations when due, in each case in the good faith judgment of the Borrower;

(p)    (i) Indebtedness permitted to be incurred pursuant to Section 7.02(b)(4) and any Refinancing Indebtedness in respect of the foregoing and (ii) agreements entered into in connection with any Specified Sale-Leaseback Transaction or any Sale-Leaseback Transaction entered into in the ordinary course of business or consistent with industry practice;

(q)    customary restrictions and conditions contained in documents relating to any Lien so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 7.07;

(r)    [reserved];

(s)    any encumbrances or restrictions of the type referred to in clauses (1), (2) or (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (r) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive in any material respect with respect to such encumbrance and other restrictions, taken as a whole, than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(t)    existing under, by reason of or with respect to Refinancing Indebtedness; *provided* that the encumbrances and restrictions contained in the agreements governing that Refinancing Indebtedness are, in the good faith judgment of the Borrower, not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced; and

(u)    applicable law or any applicable rule, regulation or order in any jurisdiction where Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred pursuant to Section 7.02 is incurred.

Section 7.08     Modification of Terms of Subordinated Indebtedness.  The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, amend, modify or change in any manner materially adverse to the interests of the Lenders, as determined in good faith by the Borrower (on the basis of such proposed amendments, modifications or changes taken as a whole), any term or condition of any Subordinated Indebtedness having an aggregate outstanding principal amount greater than the Threshold Amount (other than as a result of any Refinancing Indebtedness in respect thereof) without the consent of the Required Administrative Lenders (which consent shall not be unreasonably withheld or delayed); *provided*, *however*, that no amendment, modification or change of any term or condition of any Subordinated Indebtedness permitted by any subordination provisions set forth in the applicable Subordinated Indebtedness or any other stand-alone subordination agreement in respect thereof and, in each case consented to by the Required Administrative Lenders shall be deemed to be materially adverse to the interests of the Lenders.

Section 7.09     Holdings. Holdings will not conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto):

(1)     the ownership or acquisition of the Capital Stock (other than Disqualified Stock) of any other Successor Holdings or the Borrower,

(2)     the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance,

(3)     to the extent applicable, participating in tax, accounting and other administrative matters as a member of the combined group of Holdings and the Borrower,

(4)     the performance of its obligations under and in connection with, and payments with respect to, the Loan Documents, the ABL Loan Documents, the First Lien Loan Documents and related documentation in respect of the foregoing and any documents relating to other Indebtedness permitted under Section 7.02 (including, for the avoidance of doubt, the incurrence of Qualified Holding Company Debt),

(5)     any public offering of its common stock or any other issuance or registration of its Capital Stock for sale or resale not prohibited by this Article VII, including the costs, fees and expenses related thereto,

(6)     repurchases of Indebtedness through open market purchases and Dutch auctions (in the case of Loans, to the extent permitted hereunder),

(7)     the incurrence of Qualified Holding Company Debt,

(8)     any transaction that Holdings is permitted to enter into or consummate under this Article VII and any transaction between or among Holdings and the Borrower or any one or more Restricted Subsidiaries permitted under this Article VII, including:

(a)   making any payment(s) or Restricted Payment(s) (i) to the extent otherwise permitted under this Section 7.09 and (ii) with any amounts received pursuant to transactions permitted under Section 7.05 (or the making of a loan to any Parent Company in lieu of any such payment(s) or Restricted Payment(s)) or holding any cash received in connection therewith pending application thereof by Holdings,

(b)   making any Investment to the extent (i) payment therefor is made solely with the Capital Stock of Holdings (other than Disqualified Stock), the proceeds of Restricted Payments received from the Borrower or proceeds of the issuance of, or contribution in respect of the, Capital Stock (other than Disqualified Stock) of Holdings and (ii) any property (including Capital Stock) acquired in connection therewith is contributed to the Borrower or a Subsidiary Guarantor (or, if otherwise permitted by Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary) or the Person formed or acquired in connection therewith is merged with the Borrower or a Subsidiary Guarantor;

(c)   guaranteeing the obligations and granting of Liens of the Borrower and its Subsidiaries to the extent such obligations are not prohibited hereunder;

(d)   incurrence of Indebtedness of Holdings representing deferred compensation to employees, consultants or independent contractors of Holdings and unsecured Indebtedness consisting of promissory notes issued by any Loan Party to future, present or former employees, directors, officers, managers, distributors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any Subsidiary or any Parent Company to finance the retirement, acquisition, repurchase, purchase or redemption of Capital Stock of Holdings,

(e)   incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes,

(f)   providing indemnification to officers and directors and as otherwise permitted in this Article VII,

(g)   activities incidental to the consummation of the Transactions,

(h)   the making of any loan to any officers or directors contemplated by Section 7.05 or constituting a Permitted Investment, the making of any investment in the Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary,

(i)   making contributions to the capital of its Subsidiaries, or

(j)   making Investments in cash and Cash Equivalents.

(9)   activities incidental to the businesses or activities described in clauses (1) through (8) of this Section 7.09.

Section 7.10   Anti-Layering. Notwithstanding anything herein to the contrary, the Borrower and the Subsidiary Guarantors shall not, directly or indirectly, incur any Indebtedness that is contractually subordinated or junior in right of payment to any other Indebtedness of such Person unless such Indebtedness is expressly subordinated in right of payment to the Loans hereunder to the extent and in the same manner as such Indebtedness is subordinated to other senior Indebtedness of such Person (it being understood and agreed that Indebtedness shall not be considered junior in right of payment solely because it is unsecured or secured by Liens junior in priority to the Liens securing the Loans); *provided* that the foregoing shall not apply to the incurrence of the Second-Out Loans (as defined in the First Lien Credit Agreement) or any other Indebtedness that is secured on a pari passu basis with the Second-Out Loans and having the same payment priority as the Second-Out Loans, in each case, that is permitted to be incurred under Section 7.02(b)(2).

(1)   Material Intellectual Property

. On and after the Closing Date, the Borrower shall not permit any IP Rights owned by the Borrower and its Restricted Subsidiaries and material to their business, taken as a whole, to be owned by any Person that is not a Loan Party.

Section 7.11    Subsidiaries. On and after the Closing Date, the Borrower shall not enter into, nor shall it permit any of its Restricted Subsidiaries to enter into any transaction, the purpose of which is primarily to release any Guaranty of the Closing Date Term Loans (or to structure any transaction to avoid providing a Guaranty of the Closing Date Term Loans by any Restricted Subsidiaries to the extent such Guaranty would have otherwise been required to be provided pursuant to the Collateral and Guaranty Requirements), it being understood and agreed that bona fide joint ventures entered into in the ordinary course of business with Persons other than Affiliates of the Borrower shall be permitted. In addition, neither the Borrower nor its Restricted Subsidiaries shall transfer any assets (by an Asset Sale or otherwise) to an Unrestricted Subsidiary after the Closing Date.

## ARTICLE VIII

## Events of Default and Remedies

Section 8.01    Events of Default. Subject to the last paragraph hereof, each of the events referred to in clauses (1) through (11) of this Section 8.01 shall constitute an "Event of Default":

(1)    Non-Payment. The Borrower fails to pay (a) when and as required to be paid herein, any amount of principal of any Loan or (b) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(2)    Specific Covenants. The Borrower, any other Loan Party or, in the case of Section 7.09, Holdings, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(1) or 6.05(1) (solely with respect to the Borrower, other than in a transaction permitted under Section 7.03 or 7.04) or Article VII; or

(3)    Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(1) or (2) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(4)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by the Borrower or any Subsidiary Guarantor herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(5)    Cross-Default and Cross-Acceleration. Any Loan Party or any Restricted Subsidiary (a) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (b) fails to observe or perform any other agreement or condition relating to any such Indebtedness referred to in the foregoing clause (a), or any other event occurs (other than, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of such Hedging Obligations and not as a result of any default thereunder by the Borrower, or any Subsidiary Guarantor or any Restricted Subsidiary) with respect to such Indebtedness, the effect of which default or other event is

to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that (A) such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02, (B) this clause (5)(b) shall not apply to any Indebtedness if the sole remedy of the holder thereof in the event of the nonpayment of such Indebtedness or the non-payment or non-performance of obligations related thereto is to convert such Indebtedness into Equity Interests (other than Disqualified Stock) and cash in lieu of fractional shares and (C) this clause (5)(b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided further* that an ABL Event of Default, any Event of Default (as defined in the First Lien Credit Agreement) or an event of default under any agreement in respect of other Indebtedness secured by Liens on the Collateral that rank senior in priority to the Liens on the Collateral securing the Obligations shall not constitute an Event of Default hereunder unless and until the requisite controlling (or majority) of lenders or creditors thereunder have actually declared such Indebtedness to be immediately due and payable and such declaration has not been rescinded by the requisite controlling (or majority) of lenders or creditors thereunder on or before such date; or

(6)     Insolvency Proceedings, etc. Holdings, the Borrower, any Loan Party or any Restricted Subsidiary that is a Significant Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(7)     Judgments. There is entered against any Loan Party or any Restricted Subsidiary a final judgment and order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) calendar days; or

(8)     ERISA. (a) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan, (b) the Borrower or any Subsidiary Guarantor or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan, or (c) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable Law or plan terms, except, with respect to each of the foregoing clauses of this Section 8.01(8), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

(9)     Invalidity of Loan Documents. Any material provision of the Loan Documents, taken as a whole, at any time after its execution and delivery and for any reason, other than (a) as expressly permitted by any Loan Documents (including as a result of a transaction permitted under Section 7.03 or 7.04), (b) as a result of acts or omissions by an Agent (it being understood that the foregoing exception shall not impose

any obligations on any Agent exculpated under Article IX) or any Lender or (c) due to the satisfaction in full of the Termination Conditions, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or any Loan Party denies in writing that it has any or further liability or obligation under the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or purports in writing to revoke or rescind the Loan Documents, taken as a whole, prior to the satisfaction of the Termination Conditions; or

(10)     <u>Collateral Documents</u>. Any Collateral Document with respect to a material portion of the Collateral after delivery thereof pursuant to Section 4.01, 6.11 or 6.13 for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) ceases to create, a valid and perfected Lien with the priority required by the Applicable Intercreditor Agreement (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of Collateral actually delivered to it and pledged under the Collateral Documents or to file Uniform Commercial Code amendments relating to a Loan Party's change of name or jurisdiction of formation (solely to the extent that the Borrower provides the Collateral Agent written notice thereof in accordance with the Security Agreement, and the Collateral Agent and the Borrower have agreed that the Collateral Agent will be responsible for filing such amendments; provided that each party to this Agreement acknowledges and agrees that the Collateral Agent and the Required Administrative Lenders may use an outside service provider for the tracking of all Uniform Commercial Code financing statements required to be filed pursuant to the Loan Documents and notification to the Collateral Agent or the Required Administrative Lenders, as the case may be, of, among other things, the upcoming lapse or expiration thereof) and continuation statements or to take any other action primarily within its control with respect to the Collateral and except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage (it being understood that the foregoing exception shall not impose any obligations on any Agent exculpated under Article IX); or

(11)     <u>Change of Control</u>. There occurs any Change of Control.

Section 8.02     <u>Remedies upon Event of Default</u>. If any Event of Default occurs and is continuing, the Administrative Agent may with the consent of the Required Lenders and shall, at the request of the Required Lenders, take any or all of the following actions:

(1)     declare the Commitments of each Lender to be terminated, whereupon such Commitments will be terminated;

(2)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under any Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(3)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief, with respect to the Borrower under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"), the Commitments of each Lender will automatically

terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid will automatically become due and payable without further act of the Administrative Agent or any Lender.

Section 8.03    Application of Funds. After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), subject to the Applicable Intercreditor Agreement then in effect, any amounts received on account of the Obligations will be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and all other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III) payable to the Agents in their capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other Obligations of the Loan Parties that are due and payable to the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the other Secured Parties on such date; and

(1)    Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

## ARTICLE IX

## Administrative Agent, Collateral Agent and Other Agents

Section 9.01    Appointment and Authorization of the Agents.

(1)    Each Lender hereby irrevocably appoints Wilmington Trust, National Association, to act on its behalf as the Administrative Agent and Collateral Agent hereunder and under the other Loan Documents and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent and Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX (other than Sections 9.09, 9.10, 9.11, 9.12 and 9.16) are solely for the benefit of the Agents and the Lenders and the Borrower and the other Loan Parties shall not have rights as a third-party beneficiary of any such provision.

(2)     Each of the Lenders hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX and Article X (including Sections 9.07, 9.08, 10.04 and 10.05, as though such co-agents, sub-agents and attorneys-in-fact were the Collateral Agent under the Loan Documents), and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent and the Collateral Agent to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including any Applicable Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders, and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the written direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

Section 9.02     Rights as a Lender. Any Lender that is also serving as an Agent (including as Administrative Agent or Collateral Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Lender (if any) serving as an Agent hereunder in its individual capacity. Any such Person serving as an Agent and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.03     Exculpatory Provisions. The Administrative Agent and the Collateral Agent shall not have any duties, obligations or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents. Without limiting the generality of the foregoing, an Agent (including the Administrative Agent and the Collateral Agent):

(1)     shall not be subject to any fiduciary or other implied duties or obligations, regardless of whether a Default or Event of Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" or "ad hoc group" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative or representative relationship between independent contracting parties;

(2)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan

Documents), *provided* that notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(3)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, the Loan Parties, or any of their Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Affiliates in any capacity.

Neither the Agents nor any of their Related Persons shall be liable for and shall be fully protected from any action taken or not taken by it (i) with the consent, instruction, direction or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as any Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final and non-appealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default and stating that such notice is a "notice of default" is given to such Agent by the Borrower or a Lender.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. The duties of the Agents shall be mechanical and administrative in nature; the Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender or the holder of any Term Note; and nothing in this Agreement or in any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, no Agent shall be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral. The actions described in items (i) through (iii) shall be the sole responsibility of the Borrower.

In no event shall any Agent be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 9.04    Lack of Reliance on the Agents. Independently and without reliance upon the Agents, each Lender and the holder of each Term Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings, the Borrower and the Restricted Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings, the Borrower and the Restricted Subsidiaries and, except as expressly provided in this Agreement, the Agents shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Term Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. The Agents shall not be responsible to any Lender or the holder of any Term Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Loan Document or the financial condition of the Holdings, the Borrower or any of the Restricted Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of Holdings, the Borrower or any of the Restricted Subsidiaries or the existence or possible existence of any Default or Event of Default.

Section 9.05    Certain Rights of the Agents. If an Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders; and such Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Term Note shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders.

Section 9.06    Reliance by the Agents. The Agents shall be entitled to rely upon, and shall be fully protected in relying upon, any note, writing, resolution, notice, statement, certificate, telex, teletype or facsimile message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that such Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Agents may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.07    Delegation of Duties. The Agents may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub agents appointed by the Agents. The Agents and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. All provisions of this Article IX and Article X (including Sections 9.07, 9.08, 10.04 and 10.05) and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and under the other Loan Documents shall apply to any such sub agent and to the Agent-Related Persons of the Agents and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent or Collateral Agent.

Section 9.08    Indemnification. Whether or not the transactions contemplated hereby are consummated, to the extent the Agents or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent or Collateral Agent) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Agents or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent or Collateral Agent) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent, the Collateral Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent or the Collateral Agent) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; *provided* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or the Collateral Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.08 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent or the Collateral Agent, as applicable, upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not promptly reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided further* that the failure of any Lender to indemnify or reimburse the Administrative Agent or the Collateral Agent shall not relieve any other Lender of its obligation in respect thereof. The undertaking in this Section 9.08 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent and the Collateral Agent.

Section 9.09    The Agents in their Individual Capacity. With respect to its obligation to make Loans under this Agreement, the Agents shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders" or any similar terms shall, unless the context clearly indicates otherwise, include the Agents in their respective individual capacities. The Agents and their affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Loan Party or any Affiliate of any Loan Party (or any Person engaged in a similar business with any Loan Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party or any Affiliate of any Loan Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.10    Holders. The Administrative Agent may deem and treat the payee of any Term Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority

or consent, is the holder of any Term Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Term Note or of any Term Note or Term Notes issued in exchange therefor.

Section 9.11    Resignation by the Agents. The Administrative Agent and the Collateral Agent may resign from the performance of all its respective functions and duties hereunder or under the other Loan Documents at any time by giving 30 days prior written notice to the Lenders and the Borrower. If the Administrative Agent or the Collateral Agent is in material breach of its obligations hereunder, then such Agent may be removed as the Administrative Agent and/or Collateral Agent at the reasonable request of the Required Lenders. If any Agent is a Defaulting Lender, the Borrower may remove the Defaulting Lender from such role upon 15 days prior written notice to the Lenders.

Upon any such notice of resignation by, or notice of removal of, the Administrative Agent or the Collateral Agent, the Required Lenders shall appoint a successor Administrative Agent or Collateral Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (*provided* that the Borrower's approval shall not be required if an Event of Default under Section 8.01(1) or Section 8.01(6) has occurred and is continuing).

If a successor Administrative Agent or Collateral Agent shall not have been so appointed within such 30 day period, the Administrative Agent or Collateral Agent, as applicable, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed, *provided* that the Borrower's consent shall not be required if an Event of Default under Section 8.01(1) or Section 8.01(6) has occurred and is continuing), shall then appoint a successor Administrative Agent or Collateral Agent, who shall serve as Administrative Agent or Collateral Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided above.

If no successor Administrative Agent or Collateral Agent has been appointed pursuant to the foregoing by the 30th day after the date such notice of resignation was given by the Administrative Agent or Collateral Agent, or such notice of removal was given by the Required Lenders or the Borrower, as applicable, such Agent's resignation shall nonetheless become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent and/or Collateral Agent, as applicable, hereunder or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided above. The retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from its respective duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and all payments, communications and determinations provided to be made by, to or through the such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided for above in this Section 9.11.

Upon the acceptance of a successor's appointment as Administrative Agent and/or Collateral Agent hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.11).

The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent and the Collateral Agent hereunder and the other Loan Documents shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent or Collateral Agent was acting as Administrative Agent and/or Collateral Agent, as applicable.

Upon a resignation of the Administrative Agent or Collateral Agent pursuant to this Section 9.11, such Agent (i) shall continue to be subject to Section 10.09 and (ii) shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this Article IX (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of the Administrative Agent or Collateral Agent, as applicable, for all of its actions and inactions while serving as the Administrative Agent or Collateral Agent.

Section 9.12    Collateral Matters. Each Lender irrevocably authorizes and directs the Collateral Agent to take the actions to be taken by them as set forth in Section 7.04 and 10.24.

Each Lender hereby agrees, and each holder of any Term Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Collateral Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Collateral Documents.

Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 9.12. In each case as specified in this Section 9.12, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.12.

The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 9.12, Section 10.24 or in any of the Collateral Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 9.13     [Reserved].

Section 9.14     <u>Administrative Agent May File Proofs of Claim</u>. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.09, 3.01, 10.04 and 10.05) allowed in such judicial proceeding; and

(b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under the Loan Documents (including all amounts due under Sections 2.09, 3.01, 10.04 and 10.05).

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.15     <u>Appointment of Supplemental Administrative Agents</u>.

(1)     It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(2)     In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the

Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent or such Supplemental Administrative Agent, as the context may require.

(3)     Should any instrument in writing from any Loan Party be reasonably required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments reasonably acceptable to it promptly upon request by the Administrative Agent. In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

Section 9.16    Intercreditor Agreements.      Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, each Lender (and, by its acceptance of the benefits of any Collateral Document, each other Secured Party): (a) acknowledges that it has received a copy of ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, (b) consents to the subordination of Liens provided for in the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Loan Documents and the exercise of any right related to any Collateral shall be subject, in each case, to the terms of the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, (c) acknowledges that in the event of any conflict between the express terms and provisions of this Agreement or any other Loan Document, on the one hand, and of the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, on the other hand, the terms and provisions of the ABL Intercreditor Agreement or Term Intercreditor Agreement, as the case may be, shall control, and (d) authorizes and instructs the Administrative Agent and Collateral Agent to execute the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement (including, in each case, any and all amendments, amendments and restatements, modifications, supplements and acknowledgements thereto permitted hereby from time to time) on behalf of such Lender, and such Lender agrees to be bound by the terms thereof.

Section 9.17     [Reserved].

Section 9.18    Withholding Tax. To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not

delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.18. The agreements in this Section 9.18 shall survive the resignation, replacement or removal of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

Section 9.19    No Reliance on Administrative Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Administrative Agent or Collateral Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other anti-terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any recordkeeping, (c) comparisons with government lists, (d) customer notices; or (e) other procedures required under the CIP Regulations or such anti-terrorism Laws.

Section 9.20    Survival. The agreements in this Article IX shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

## ARTICLE X

## Miscellaneous

Section 10.01    Amendments, etc.

(1)    Except as otherwise set forth in this Agreement or in the Term Intercreditor Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (with a fully-executed copy thereof delivered to the Administrative Agent) (other than with respect to any amendment or waiver contemplated in clause (i) below), which shall only require the consent of the Required Facility Lenders under the applicable Facility or Facilities) (or by the Administrative Agent with the consent of the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)    extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or 2.08 (other than pursuant to Section 2.08(2)) or any payment of fees or

premiums hereunder or under any Loan Document with respect to payments to any Lender without the written consent of such Lender, it being understood that none of the following will constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of principal, interest, fees or premiums: the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans;

(c)   reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (I) of the proviso immediately succeeding clause (i) of this Section 10.01(1)) any fees or other amounts payable hereunder or under any other Loan Document to any Lender without the written consent of such Lender; *provided* that only the consent of (A) the Required Lenders shall be necessary to amend the definition of "Default Rate" and (B) the Required Lenders will be necessary to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)   except as contemplated by clause (C) in the second proviso immediately succeeding clause (i) of this Section 10.01(1), (x) change any provision of this Section 10.01 or the definition of "Required Lenders" or "Required Facility Lenders," or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender and (y) change the definition of "Pro Rata Share" without the written consent of each Lender directly and adversely affected thereby;

(e)   other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(f)   other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)   change any provision requiring pro rata payments or pro rata sharing of payments, without the written consent of each Lender directly and adversely affected thereby;

(h)   [Reserved];

(i)   change any term or provision of Section 8.03, without the written consent of each Lender directly and adversely affected thereby;

(j)   amend, waive or otherwise modify any term or provision (including the availability and conditions to funding and the rate of interest applicable thereto) which directly affects Lenders of one Facility and does not directly affect Lenders under any other Facility, in each case, without the written consent of the Required Facility Lenders under such applicable Facility; or

(k)   change the definition of "Unrestricted Subsidiary" or the addition of any Unrestricted Subsidiaries after the Closing Date, without the written consent of each Lender;

*provided* that:

(I)   no amendment, waiver or consent shall, unless in writing and signed by the applicable Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, such Administrative Agent under this Agreement or any other Loan Document; and

(II)      Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification;

*provided further* that notwithstanding the foregoing:

(A)      no Defaulting Lender shall have any right to approve or disapprove of any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders, the Required Lenders, the Required Facility Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders) (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders);

(B)      no Lender consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement (i) that is for the purpose of adding the holders of Credit Agreement Refinancing Indebtedness or any other Permitted Indebtedness that is secured Indebtedness (or a Debt Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of such Applicable Intercreditor Agreement, as applicable (it being understood that any such amendment, modification or supplement may make such other changes to the applicable Applicable Intercreditor Agreement as, in the good faith determination of the Required Administrative Lenders, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by any Applicable Intercreditor Agreement; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of, or any fees or other amounts payable to, any Agent hereunder or under any other Loan Document without the prior written consent of such Agent, as applicable;

(C)      this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders;

(D)      any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section 10.01 if such Class of Lenders were the only Class of Lenders hereunder at the time;

(E)      Without limiting the scope of Section 10.01(3) below, any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency (including amendments, supplements or waivers to any of the Collateral Documents, guarantees, intercreditor agreements or related documents

executed by any Loan Party or any other Subsidiary in connection with this Agreement if such amendment, supplement or waiver is delivered in order to cause such Collateral Documents, guarantees, intercreditor agreements or related documents to be consistent with this Agreement and the other Loan Documents) so long as, in each case, the Lenders shall have received at least 5 Business Days' prior written notice thereof and the Administrative Agent shall not have received, within 5 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; *provided* that the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any such changes necessary to be made in connection with any borrowing of Incremental Term Loans, Refinancing Loans, any Extension or any borrowing of Replacement Loans and otherwise to effect the provisions of Section 2.14, 2.15 or 2.16 or the immediately succeeding paragraph of this Section 10.01, respectively;

(F) the Borrower and the Collateral Agent may, without the input or consent of the other Lenders, but with the consent of the Required Administrative Lenders, (i) effect changes to any Mortgage or any other Collateral Document as may be necessary or appropriate in the opinion of the Required Administrative Lenders and (ii) effect changes to this Agreement that are necessary and appropriate to effect the offering process set forth in Section 2.05(1)(e); and

(G) with respect to the consent of Required Lenders or Required Administrative Lenders expressly required by any Deemed Consent Provision (but not, for the avoidance of doubt, any amendment or waiver of, or consent to a departure from, any Deemed Consent Provision), the Administrative Agent or the Collateral Agent, as applicable, shall deliver any such request from the Borrower to the Lenders and, if the Lenders shall have received at least 15 Business Days' prior written notice thereof and the Administrative Agent or the Collateral Agent shall not have received, within 15 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders or Required Administrative Lenders, as applicable, stating that the Required Lenders or Required Administrative Lenders, as applicable, object to such request, then the Required Lenders or Required Administrative Lenders, as applicable, shall be deemed to have accepted (provided, however, for the avoidance of doubt, this clause (G) shall not alter or be deemed to alter the rights, privileges, protections, immunities and indemnities granted to any Agent under this Agreement, including, without limitation, Article IX above, and the other Loan Documents).

(2)     In addition, notwithstanding anything to the contrary in this Section 10.01, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the Replacement Loans (as defined below) to permit the refinancing of all outstanding Term Loans of any Class ("**Replaced Loans**") with replacement term loans ("**Replacement Loans**") hereunder; *provided* that

(a)   the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of such Replaced Loans, *plus* accrued interest, fees, premiums (if any) and penalties thereon and fees and expenses incurred in connection with such refinancing of Replaced Loans with such Replacement Loans,

(b)   the All-In Yield with respect to such Replacement Loans (or similar interest rate spread applicable to such Replacement Loans) shall not be higher than the All-In Yield for such

Replaced Loans (or similar interest rate spread applicable to such Replaced Loans) immediately prior to such refinancing,

(c)   the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Replaced Loans at the time of such refinancing; and

(d)   all other terms (other than with respect to pricing, premiums and optional prepayment or redemption terms) applicable to such Replacement Loans shall be substantially identical to, or no more favorable taken as a whole (in each case as determined by the Borrower in its reasonable judgment) to the Lenders providing such Replacement Loans than, those applicable to such Replaced Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the Latest Maturity Date of the Loans in effect immediately prior to such refinancing (*provided* that an Officer's Certificate delivered to the Administrative Agent at least 5 Business Days prior to the incurrence of such Replacement Loans, together with a reasonably detailed description of the material terms and conditions of such Replacement Loans or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this Section 10.01(2) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Required Administrative Lenders notify the Borrower and the Administrative Agent within such five 5 Business Day period that it disagrees with such determination (including a description of the basis upon which the Required Administrative Lenders disagree));

*provided further* that each amendment to this Agreement providing for Replacement Loans may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower to effect the provisions of this paragraph, and for the avoidance of doubt, this paragraph shall supersede any other provisions in this Section 10.01 to the contrary.

(3)   In addition, notwithstanding anything to the contrary in this Section 10.01,

(a)   the Guaranty, the Collateral Documents and related documents executed by Holdings, the Borrower or any Restricted Subsidiaries in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Required Administrative Lenders and may be, together with this Agreement, amended and waived with the consent of the Required Administrative Lenders and the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause the Guaranty, Collateral Documents or other document to be consistent with this Agreement and the other Loan Documents (including by adding additional parties as contemplated herein or therein) and

(b)   if the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document. Notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective.

Section 10.02     Notices and Other Communications; Facsimile Copies.

(1)     General. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)     if to Holdings, the Borrower or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(b)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next succeeding Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (2) below shall be effective as provided in such subsection (2).

(2)     Electronic Communication. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(3)     Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next succeeding Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(4)     The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN

CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall any Agent or any of its Agent-Related Persons (collectively, the "**Agent Parties**") have any liability to any Loan Party, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or such Agent's transmission of Borrower Materials through the Internet or the Platform.  Although the Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Platform is secured through a per-deal authorization method whereby each user may access the Platform only on a deal-by-deal basis, each of the Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agents are not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Platform, and that there are confidentiality and other risks associated with such distribution. Each of the Lenders and the Borrower hereby approves distribution of the Borrower Materials through the Platform and understands and assumes the risks of such distribution.

(5)     Change of Address. Each Loan Party and any Agent may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private-Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.  In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Loan Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

(6)     Reliance by the Agents. The Agents and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic notices to and other telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.  The Borrower's obligations under this Section 10.02(6) shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

Section 10.03    No Waiver; Cumulative Remedies. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as such) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 10.10 (subject to the terms of Section 2.13), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided further* that if at any time there is no Person acting as Administrative Agent or Collateral Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent or Collateral Agent, as applicable, pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04    Costs and Expenses. The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse each Agent for all reasonable and documented out-of-pocket costs and expenses of such Agent (promptly following a written demand therefor, together with backup documentation supporting such reimbursement request) incurred in connection with the preparation, negotiation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Ballard Spahr LLP, as counsel to the Agents and, if necessary, a single local counsel in each relevant material jurisdiction, and (b) upon presentation of a summary statement, together with any supporting documentation reasonably requested by the Borrower, to pay or reimburse the Agents (taken as a whole) and the Lenders (taken as a whole), promptly following a written demand therefor for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including (i) all Attorney Costs of one counsel to the Agents (and, if necessary, one local counsel in any relevant material jurisdiction) and (ii) all Attorney Costs of one counsel to the Lenders taken as a whole (and, if necessary, one local counsel in any relevant material jurisdiction and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)). The agreements in this Section 10.04 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document. All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05    Indemnification by the Borrower. The Borrower shall indemnify and hold harmless the Agents, each other Lender and their respective Related Persons (collectively, the "**Indemnitees**") from and against any and all losses, claims, actions, judgments, damages, liabilities or expenses (including Attorney Costs and Environmental Liabilities) to which any such Indemnitee may become subject arising out of, resulting from or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of (a) one counsel to the Agents and their Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for the Agents and their Indemnitees taken as a whole in each relevant jurisdiction) and (b) one counsel to all other Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all other Indemnitees taken as a whole in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (i) any actual or threatened claim, litigation, investigation, proceeding or Environmental Liabilities relating to the Transactions or (ii) the execution, delivery, funding, enforcement, performance and administration of this Agreement, the other Loan Documents, the Loans or the use, or proposed use of the proceeds therefrom, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation, investigation or proceeding), and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) other than with respect to the Agents and their Indemnitees, the bad faith of or a material breach of any obligations under any Loan Document by such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent, collateral agent, or arranger or any similar role under any Loan Document and other than any claims arising out of any act or omission of the Loan Parties or any of their Affiliates) (as determined by a final, non-appealable judgment of a court of competent jurisdiction). To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that they are permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnitee), nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party for which such Indemnitee is otherwise entitled to indemnification pursuant to this Section 10.05). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this Section 10.05 shall be paid within 20 Business Days after written demand therefor. The agreements in this Section 10.05 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document. This Section 10.05 shall not apply to Taxes, except any Taxes that represent losses or damages

arising from any non-Tax claim. Notwithstanding the foregoing, each Indemnitee shall be obligated to refund and return promptly any and all amounts paid by the Borrower under this Section 10.05 to such Indemnitee for any such fees, expenses or damages to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.

Section 10.06   Marshaling; Payments Set Aside. None of the Agents or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to any Agent upon demand its applicable share of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

Section 10.07   Successors and Assigns.

(a)   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 7.03, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder (including to existing Lenders and their Affiliates) except (i) to an Eligible Assignee and (A) in the case of any Eligible Assignee that, immediately prior to or upon giving effect to such assignment, is an Affiliated Lender, in accordance with the provisions of Section 10.07(h) and (B) in the case of any Eligible Assignee that is Holdings, the Borrower or any Subsidiary thereof, in accordance with the provisions of Section 10.07(l), (ii) by way of participation in accordance with the provisions of Section 10.07(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f), or (iv) to an SPC in accordance with the provisions of Section 10.07(g) (and any other attempted assignment or transfer by any party hereto (other than the replacement of the Administrative Agent pursuant to Article IX above) shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d) and, to the extent expressly contemplated hereby, Related Persons of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)   Minimum Amounts.

(A)   in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)        in any case not described in subsection (b)(i)(A) of this Section 10.07, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1.0 million, unless either (x) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (y) each of the Administrative Agent and the Borrower otherwise consents; *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)        Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)        Required Consents. No consent shall be required for any assignment except to the extent required by Section 10.07(b)(i)(B) and, in addition:

(A)        the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default under Section 8.01(1) or, solely with respect to the Borrower, Section 8.01(6) has occurred and is continuing at the time of such assignment determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, or (2) in respect of an assignment of all or a portion of the Loans, such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that the Borrower shall be deemed to have consented to any assignment of all or a portion of the Term Loans unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice of a failure to respond to such request for assignment; *provided further* that no consent of the Borrower shall be required for an assignment of all or a portion of the Loans pursuant to Section 10.07(h) or (l); and

(B)        the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund with respect to a Lender; *provided* that no consent of the Administrative Agent shall be required for an assignment (i) of all or a portion of the Loans pursuant to Section 10.07(g), (h), or (l).

(iv)        Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent). Other than in the case of assignments pursuant to Section 10.07(l), the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.  Each assignee Lender shall be required to represent in the Assignment and Assumption that it is not a Disqualified Institution or an Affiliate of a Disqualified Institution.

(v)     No Assignments to Certain Persons. No such assignment shall be made (A) to Holdings, the Borrower or any of its Subsidiaries except as permitted under Section 2.05(1)(e) or Section 10.07(l), (B) subject to Sections 10.07(h) and (l) below, to any Affiliate of the Borrower, (C) to a natural person or (D) to any Disqualified Institution.

This Section 10.07(b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis among such Facilities.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans in accordance with its Pro Rata Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section 10.07 (and, in the case of an Affiliated Lender or a Person that, after giving effect to such assignment, would become an Affiliated Lender, to the requirements of clause (h) of this Section 10.07), from and after the effective date specified in each Assignment and Assumption, other than in connection with an assignment pursuant to Section 10.07(l), (x) the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (y) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment), but shall in any event continue to be subject to Section 10.09. Upon request, and the surrender by the assigning Lender of its Term Note, the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(d).

(c)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, each Affiliated Lender Assignment and Assumption delivered to it, each notice of cancellation of any Loans delivered by the Borrower pursuant to subsections (h) or (l) below, and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans and amounts due under Section 2.03, owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall

175

be available for inspection by the Borrower, any Agent and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 10.07(3) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations). Notwithstanding the foregoing, in no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is an Affiliated Lender, nor shall the Administrative Agent be obligated to monitor the aggregate amount of the Term Loans or Incremental Term Loans held by Affiliated Lenders.

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any Affiliate or Subsidiary of the Borrower or a Disqualified Institution) (each, a "**Participant**") in all or a portion of such Lender's rights or obligations under this Agreement (including all or a portion of its Commitment or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than clauses (d) and (i) thereof) that directly affects such Participant. Subject to subsection (e) of this Section 10.07, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements of Section 3.01 (including subsections (2), (3) and (4), as applicable as though it were a Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.07. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.10 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(e)     <u>Limitations upon Participant Rights.</u> A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and the Borrower shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary; *provided* that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of the Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or other obligations under any Loan Document) to any Person except to the extent such disclosure is necessary to establish that any such commitments, loans, letters of credit or other obligations are in registered form for U.S. federal income tax purposes. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof shall be appropriately reflected in the Participant Register. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)    Any Lender may at any time, assign all or a portion of its rights and obligations with respect to Loans and Commitments under this Agreement to a Person who is or will become, after such assignment, an Affiliated Lender through (x) Dutch auctions or other offers to purchase or take by assignment open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.05(1)(e) or (y) open market purchase on a non-pro rata basis, in each case subject to the following limitations:

(i)    Affiliated Lenders will not make any challenge to any Agent's or any Lender's attorney-client privilege on the basis of its status as a Lender;

(ii)    each Affiliated Lender that purchases any Loans or Commitments will clearly identify itself as an Affiliated Lender in any Affiliated Lender Assignment and Assumption executed in connection with such purchases or sales and each such Affiliated Lender Assignment and Assumption shall contain customary "big boy" representations but no requirement to make representations as to the absence of any material nonpublic information;

(iii)    as a condition to each assignment pursuant to this subsection (h), the Administrative Agent and the Borrower shall have been provided a notice in connection with each assignment to an Affiliated Lender or a Person that upon effectiveness of such assignment would constitute an Affiliated Lender pursuant to which such Affiliated Lender (in its capacity as such)

shall waive any right to bring any action in connection with such Loans and Commitments against any Agent, in its capacity as such;

(iv)     the aggregate principal amount of Term Loans of any Class under this Agreement held by Affiliated Lenders at the time of any such purchase or assignment shall not exceed 25.0% of the aggregate principal amount of Term Loans of such Class outstanding at such time under this Agreement (such percentage, the "**Affiliated Lender Cap**"); *provided* that to the extent any assignment to an Affiliated Lender would result in the aggregate principal amount of all Term Loans of any Class held by Affiliated Lenders exceeding the Affiliated Lender Cap (in each case, determined at the time of purchase), the assignment of such excess amount will be void *ab initio*; and

(v)     the assigning Lender and the Affiliated Lender purchasing such Lender's Term Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit D-2 hereto (an "**Affiliated Lender Assignment and Assumption**").

Notwithstanding anything to the contrary contained herein, any Affiliated Lender that has purchased Term Loans pursuant to this subsection (h) may, in its sole discretion, contribute, directly or indirectly, the principal amount of such Term Loans or any portion thereof, *plus* all accrued and unpaid interest thereon, to the Borrower for the purpose of cancelling and extinguishing such Term Loans. Upon the date of such contribution, assignment or transfer, (x) the aggregate outstanding principal amount of Term Loans shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (y) the Borrower shall promptly provide notice to the Administrative Agent of such contribution of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register.

Each Affiliated Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it acquires any Person who is also a Lender, and each Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it becomes an Affiliated Lender. The Administrative Agent may conclusively rely upon any notice delivered pursuant to the immediately preceding sentence or pursuant to clause (v) of this subsection (h) and shall not have any liability for any losses suffered by any Person as a result of any purported assignment to or from an Affiliated Lender.

Notwithstanding anything to the contrary contained herein, (x) any Affiliated Lender shall be entitled to (a) receive information made available to any Lender holding the same Class of Term Loans as such Affiliated Lender and (b) attend all lender meetings and participate in any conference calls with the Borrower that are open to any Lender holding the same Class of Term Loans as such Affiliated Lender and (y) with respect to any amendment, modification, waiver, consent or other action that requires the consent of Required Lenders or the consent of Required Facility Lenders, all fees and other benefits made available to any consenting Lenders holding the same Class of Term Loans any Affiliated Lender shall be made available to such Affiliated Lender on a no less than pro rata basis.

(i)     Notwithstanding anything in Section 10.01 or the definition of "Required Lenders," or "Required Facility Lenders" to the contrary, for purposes of determining whether the Required Lenders and Required Facility Lenders (in respect of a Class of Term Loans) have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, or subject to Section 10.07(j), any plan of reorganization pursuant to the Bankruptcy Code, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required any Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, no Affiliated

Lender shall have any right to consent (or not consent), otherwise act or direct or require any Agent or any Lender to take (or refrain from taking) any such action and:

(i)     all Term Loans held by any Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders and Required Facility Lenders (in respect of a Class of Term Loans) have taken any actions; and

(ii)     all Term Loans held by Affiliated Lenders shall be deemed to have been voted in the same proportion as non-Affiliated Lenders voting on such matter unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

(j)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliated Lender hereby agrees that, and each Affiliated Lender Assignment and Assumption shall provide a confirmation that, if a proceeding under any Debtor Relief Law shall be commenced by or against the Borrower or any other Loan Party at a time when such Lender is an Affiliated Lender, such Affiliated Lender irrevocably authorizes and empowers the Administrative Agent (at the direction of the Required Lenders) to vote on behalf of such Affiliated Lender with respect to the Term Loans held by such Affiliated Lender in the same proportion as non-Affiliated Lenders voting on such matter, unless the Administrative Agent (at the direction of the Required Lenders) instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Term Loans held by it as the Administrative Agent (at the direction of the Required Lenders) directs; *provided* that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner than the proposed treatment of similar Obligations held by Term Lenders that are not Affiliated Lenders.

(k)     [Reserved].

(l)     Any Lender may, so long as no Event of Default has occurred and is continuing, at any time, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to Holdings, the Borrower or any Subsidiary of the Borrower through (x) Dutch auctions or other offers to purchase open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.05(1)(e) or (y) open market purchases on a non-pro rata basis; *provided* that:

(i)     (x) if the assignee is Holdings or a Subsidiary of the Borrower, upon such assignment, transfer or contribution, the applicable assignee shall automatically be deemed to have contributed or transferred the principal amount of such Term Loans, *plus* all accrued and unpaid interest thereon, to the Borrower; or (y) if the assignee is the Borrower (including through contribution or transfers set forth in clause (x)), (a) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Lenders shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (c) the Borrower shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(ii)     [Reserved]; and

179

(iii)    purchases of Term Loans pursuant to this subsection (l) may not be funded with the proceeds of ABL Loans.

(m)    Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(n)    Notwithstanding the foregoing, no Disqualified Institution that purports to become a Lender hereunder (notwithstanding the provisions of this Agreement that prohibit Disqualified Institutions from becoming Lenders) shall be entitled to any of the rights or privileges enjoyed by the other Lenders with respect to voting, information and lender meetings. In addition, if any assignment or participation is made to any Disqualified Institution without the Borrower's express prior written consent (which consent shall state expressly that the Borrower acknowledges that the assignee Lender is a Disqualified Institution) in violation of clause (v) of Section 10.07(b), the Borrower may, in addition to any other rights and remedies that it may have against such Disqualified Institution, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) in the case of outstanding Term Loans held by Disqualified Institutions, purchase or prepay such Term Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in Section 10.07), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

(o)    No Agent shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions or otherwise take (or omit to take) any action with respect thereto.  Without limiting the generality of the foregoing, no Agent shall (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution.

Section 10.08    [Reserved].

Section 10.09    Confidentiality. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, equity owners, investors, funding sources, legal counsel, independent auditors, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, with such Affiliate being responsible for such Person's compliance with this

Section 10.09; *provided*, *however*, that such Agent or Lender, as applicable, shall be principally liable to the extent this Section 10.09 is violated by one or more of its Affiliates or any of its or their respective employees, directors or officers), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided*, *however*, that each Agent and each Lender agrees to seek confidential treatment with respect to any such disclosure, (c) to the extent required by applicable laws or regulations or by any subpoena or otherwise as required by applicable Law or regulation or as requested by a Governmental Authority; *provided* that such Agent or such Lender, as applicable, agrees (x) that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (except in connection with any request as part of any audit or regulatory examination) unless such notification is prohibited by law, rule or regulation and (y) to seek confidential treatment with respect to any such disclosure, (d) to any other party hereto, (e) subject to an agreement containing provisions at least as restrictive as those of this Section 10.09, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee (or its agent) invited to be an Additional Lender or (ii) with the prior consent of the Borrower, any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any of their Subsidiaries or any of their respective obligations; *provided* that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, Participant or Eligible Assignee that such Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to the Borrower and the Agents, including as set forth in any confidential information memorandum or other marketing materials) in accordance with the standard syndication process of the Agents or market standards for dissemination of such type of information which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information, (f) for purposes of establishing a "due diligence" defense, (g) with the consent of the Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach by any Person of this Section 10.09 or any other confidentiality provision in favor of any Loan Party, (y) becomes available to any Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent, such Lender or the applicable Affiliate to be subject to a confidentiality restriction in respect thereof in favor of Holdings, the Borrower or any Affiliate of the Borrower or (z) is independently developed by the Agents, the Lenders or their respective Affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this Section 10.09 or (i) in order to enforce its respective rights under any Loan Document in any action or proceeding.

For purposes of this Section 10.09, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary or Affiliate thereof or their respective businesses, other than any such information that is available to any Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary or Affiliate thereof after the date hereof shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 10.09 shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Agent and each Lender acknowledges that (a) the Information may include trade secrets, protected confidential information, or material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of such information and (c) it will handle such information in accordance with applicable Law, including United States Federal and state securities Laws and to preserve its trade secret or confidential character.

The respective obligations of the Agents and the Lenders under this Section 10.09 shall survive, to the extent applicable to such Person, (x) the payment in full of the Obligations and the termination of this Agreement, (y) any assignment of its rights and obligations under this Agreement and (z) the resignation or removal of any Agent.

Section 10.10    Setoff. If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party then due and payable under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender under this Section 10.10 are in addition to other rights and remedies (including other rights of setoff) that such Lender may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.11    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.12    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.13    Electronic Execution of Assignments and Certain Other Documents. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal

Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.14    Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Term Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.15    Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.16    GOVERNING LAW.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

(b)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)   THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION 10.16. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 10.17    WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.17.

Section 10.18    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

Section 10.19    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Required Lenders.

Section 10.20    Use of Name, Logo, etc.. Each Loan Party consents to the publication in the ordinary course by any Agent of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark. Such consent shall remain effective until revoked by such Loan Party in writing to such Agent.

Section 10.21    USA PATRIOT Act. Each Lender that is subject to the USA PATRIOT Act and each Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act. The Borrower shall, promptly following a request by any Agent or any Lender, provide all documentation and other information that such Agent or Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 10.22    Service of Process. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.23    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Agents and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Agents nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Agents or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.24    Release of Collateral and Guarantee Obligations; Subordination of Liens.

(a)    The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released (i) in full, as set forth in clause (b) below, (ii) upon the sale or other transfer of such Collateral (including as part of or in connection with any other sale or other transfer permitted hereunder) to any Person other than another Loan Party, to the extent such sale, transfer or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party by a Person that is not a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guaranty (in accordance with the second succeeding sentence), (vi) as required by the Collateral Agent to effect any sale, transfer or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Collateral Documents and (vii) to the extent such Collateral otherwise becomes Excluded Assets. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents. Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guaranties upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted

Subsidiary, or otherwise becoming an Excluded Subsidiary. The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. The Administrative Agent or the Collateral Agent, as applicable, shall, at the Borrower's expense, upon receipt of an Officer's Certificate from the Borrower certifying that the requested release is permitted under this Section 10.24, release the requested Collateral from the Liens securing the Obligations and provide the Borrower with such additional documentation as the Borrower may reasonably request to evidence such release; *provided* that such release shall be without recourse to or representation or warranty by the Administrative Agent and the Collateral Agent.  Any representation, warranty or covenant contained in any Loan Document relating to any such released Collateral or Guarantor shall no longer be deemed to be repeated.

(b)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than any contingent obligations not then due) have been paid in full and all Commitments have terminated, upon request of the Borrower, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any contingent obligations not then due. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Permitted Lien specified in clause (7) of the definition thereof securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of Section 7.02(b) in any Collateral, and at the Borrower's expense, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to subordinate the Lien on any Collateral to any such Permitted Lien to be senior to the Liens in favor of the Collateral Agent; *provided*, that the Borrower shall have provided the Administrative Agent or Collateral Agent, as applicable, with an Officer's Certificate certifying that such requested subordination and such requested actions are permitted under this Section 10.24; *provided, further*, that such requested actions shall not expose the Administrative Agent or the Collateral Agent to liability and shall be without recourse to or representation or warranty by the Administrative Agent and the Collateral Agent.

(d)    Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrower's assets in a bankruptcy, foreclosure or other similar proceeding, forbear from exercising remedies upon an Event of Default, or in a bankruptcy proceeding, enter into a settlement agreement on behalf of all Lenders.

Section 10.25    [Reserved].

Section 10.26    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another

currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).  The obligations of the Borrower under this Section 10.26 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

Section 10.27   <u>Amendment and Restatement</u>.   On the Closing Date, the Existing Credit Agreement shall be amended, restated and superseded in its entirety by this Agreement.  The parties hereto acknowledge and agree that (i) this Agreement and the other documents entered into in connection herewith do not constitute a novation or termination of the "Obligations" (as defined in the Existing Credit Agreement, as applicable) under the Existing Credit Agreement, as applicable, as in effect prior to the Closing Date, (ii) such "Obligations" are in all respects continuing (as amended and restated hereby) as indebtedness and obligations outstanding under this Agreement and (iii) all claims, actions, causes of action, suits, damages and indemnities by any Loan Party or any Agent or Lender on account of any action, breach, non-compliance or default by any Loan Party or any Agent or Lender that occurred, or any inaction by any Loan Party or any Agent or Lender that should have occurred, in each case, on or prior to the Closing Date, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, shall cease to exist and be forever waived, released and discharged to the full extent permitted by law.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

## **EXHIBIT B**

**Amended and Restated Exhibit C (Compliance Certificate)**

# EXHIBIT C

**2L Reaffirmation Agreement**

## EXHIBIT D

**A&R Term Intercreditor Agreement**

## __EXHIBIT E__

**ABL Intercreditor Agreement Amendment**

<p align="right"><i>DRAFT SUBJECT TO REVISION</i>Execution Version</p>

_____

AMENDED AND RESTATED
SECOND LIEN CREDIT AGREEMENT

dated as of February 24, 2021

among

BEAR PARENT INC.,
as Holdings,

BELK, INC.,
as Borrower,

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent and Collateral Agent,

and

THE OTHER LENDERS PARTY HERETO

_____

**TABLE OF CONTENTS**

**Page**

**ARTICLE I**

**DEFINITIONS AND ACCOUNTING TERMS**

Section 1.01   Defined Terms ................................................................ 2
Section 1.02   Other Interpretive Provisions ........................................ 73
Section 1.03   Accounting Terms .......................................................... 75
Section 1.04   Rounding ....................................................................... 75
Section 1.05   References to Agreements, Laws, etc. ............................ 75
Section 1.06   Times of Day and Timing of Payment and Performance ... 75
Section 1.07   Pro Forma and Other Calculations ................................ 75
Section 1.08   Available Amount Transaction ...................................... 78
Section 1.09   [Reserved] ..................................................................... 78
Section 1.10   Currency Generally ....................................................... 78
Section 1.11   Divisions ....................................................................... 79

**ARTICLE II**

**THE COMMITMENTS AND BORROWINGS**

Section 2.01   The Loans ...................................................................... 79
Section 2.02   Borrowings, Conversions and Continuations of Loans .... 79
Section 2.03   [Reserved] ..................................................................... 81
Section 2.04   [Reserved] ..................................................................... 81
Section 2.05   Prepayments .................................................................. 81
Section 2.06   Repayment of Loans ...................................................... 92
Section 2.07   Interest .......................................................................... 92
Section 2.08   Fees ............................................................................... 92
Section 2.09   Computation of Interest and Fees .................................. 92
Section 2.10   Evidence of Indebtedness .............................................. 92
Section 2.11   Payments Generally ....................................................... 93
Section 2.12   Sharing of Payments ..................................................... 94
Section 2.13   [Reserved] ..................................................................... 95
Section 2.14   Refinancing Amendments .............................................. 95
Section 2.15   Extensions of Loans ...................................................... 96
Section 2.16   Defaulting Lenders ........................................................ 98

**ARTICLE III**

**TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY**

Section 3.01   Taxes, Increased Costs Protection and Illegality Taxes ... 99
Section 3.02   [Reserved ...................................................................... 102
Section 3.03   [Reserved ...................................................................... 102

i

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

Section 3.04   Increased Cost and Reduced Return; Capital Adequacy ..............102
Section 3.05   [Reserved ............................................................................103
Section 3.06   Matters Applicable to All Requests for Compensation ..............103
Section 3.07   Replacement of Lenders under Certain Circumstances ..............103
Section 3.08   Survival ..............................................................................105

**ARTICLE IV**

**CONDITIONS PRECEDENT TO TERM BORROWINGS**

Section 4.01   Conditions to Term Borrowings on Closing Date ......................105

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES**

Section 5.01   Existence, Qualification and Power; Compliance with Laws.......105
Section 5.02   Authorization; No Contravention ............................................106
Section 5.03   Governmental Authorization ..................................................106
Section 5.04   Binding Effect......................................................................106
Section 5.05   Financial Statements; No Material Adverse Effect.....................107
Section 5.06   Litigation ............................................................................107
Section 5.07   Labor Matters ......................................................................107
Section 5.08   Real Property Matters ..........................................................107
Section 5.09   Environmental Matters ..........................................................108
Section 5.10   Taxes ..................................................................................109
Section 5.11   ERISA Compliance................................................................109
Section 5.12   Subsidiaries ........................................................................109
Section 5.13   Margin Regulations; Investment Company Act ........................110
Section 5.14   Disclosure............................................................................110
Section 5.15   Intellectual Property; Licenses, etc .........................................110
Section 5.16   Solvency..............................................................................111
Section 5.17   USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act 111
Section 5.18   Collateral Documents............................................................111
Section 5.19   Use of Proceeds....................................................................111
Section 5.20   Beneficial Ownership Certification ..........................................111

**ARTICLE VI**

**AFFIRMATIVE COVENANTS**

Section 6.01   Financial Statements.............................................................112
Section 6.02   Certificates; Other Information ..............................................114
Section 6.03   Notices ................................................................................115

ii

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

Section 6.04   Payment of Obligations ................................................................ 116
Section 6.05   Preservation of Existence, etc. ..................................................... 116
Section 6.06   Maintenance of Properties ............................................................ 116
Section 6.07   Maintenance of Insurance ............................................................. 116
Section 6.08   Compliance with Laws .................................................................. 117
Section 6.09   Books and Records ....................................................................... 117
Section 6.10   Inspection Rights .......................................................................... 117
Section 6.11   Covenant to Guarantee Obligations and Give Security ............... 118
Section 6.12   Compliance with Environmental Laws ......................................... 121
Section 6.13   Further Assurances and Post-Closing Covenant ........................... 122
Section 6.14   [Reserved] ..................................................................................... 123
Section 6.15   Maintenance of Ratings ................................................................. 123
Section 6.16   Accounting Changes ...................................................................... 123
Section 6.17   Nature of Business ......................................................................... 123
Section 6.18   Designation of Subsidiaries .......................................................... 123
Section 6.19   Lender Meetings ............................................................................ 123

**ARTICLE VII**

**NEGATIVE COVENANTS**

Section 7.01   Liens .............................................................................................. 124
Section 7.02   Indebtedness .................................................................................. 124
Section 7.03   Fundamental Changes .................................................................... 129
Section 7.04   Asset Sales ..................................................................................... 133
Section 7.05   Restricted Payments ...................................................................... 134
Section 7.06   Transactions with Affiliates .......................................................... 140
Section 7.07   Burdensome Agreements ............................................................... 144
Section 7.08   Modification of Terms of Subordinated Indebtedness ................. 147
Section 7.09   Holdings ......................................................................................... 148
Section 7.10   Anti-Layering ................................................................................. 149
Section 7.11   Subsidiaries .................................................................................... 150

**ARTICLE VIII**

**EVENTS OF DEFAULT AND REMEDIES**

Section 8.01   Events of Default ........................................................................... 150
Section 8.02   Remedies upon Event of Default ................................................... 152
Section 8.03   Application of Funds ...................................................................... 153

**ARTICLE IX**

**ADMINISTRATIVE AGENT, COLLATERAL AGENT AND OTHER AGENTS**

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

Section 9.01   Appointment and Authorization of the Agents .............................................. 153
Section 9.02   Rights as a Lender ...................................................................................... 154
Section 9.03   Exculpatory Provisions ................................................................................ 154
Section 9.04   Lack of Reliance on the Agents .................................................................. 155
Section 9.05   Certain Rights of the Agents ....................................................................... 156
Section 9.06   Reliance by the Agents ............................................................................... 156
Section 9.07   Delegation of Duties ................................................................................... 156
Section 9.08   Indemnification ........................................................................................... 156
Section 9.09   The Agents in their Individual Capacity ..................................................... 157
Section 9.10   Holders ....................................................................................................... 157
Section 9.11   Resignation by the Agents .......................................................................... 157
Section 9.12   Collateral Matters ....................................................................................... 159
Section 9.13   [Reserved.] .................................................................................................. 159
Section 9.14   Administrative Agent May File Proofs of Claim ........................................ 159
Section 9.15   Appointment of Supplemental Administrative Agents ................................ 160
Section 9.16   Intercreditor Agreements ............................................................................ 161
Section 9.17   [Reserved.] .................................................................................................. 161
Section 9.18   Withholding Tax .......................................................................................... 161
Section 9.19   No Reliance on Administrative Agent's Customer Identification Program . 162
Section 9.20   Survival ....................................................................................................... 162

**ARTICLE X**

**MISCELLANEOUS**

Section 10.01  Amendments, etc ......................................................................................... 162
Section 10.02  Notices and Other Communications; Facsimile Copies .............................. 166
Section 10.03  No Waiver; Cumulative Remedies .............................................................. 168
Section 10.04  Costs and Expenses ..................................................................................... 168
Section 10.05  Indemnification by the Borrower ................................................................. 169
Section 10.06  Marshaling; Payments Set Aside ................................................................. 170
Section 10.07  Successors and Assigns ............................................................................... 170
Section 10.08  [Reserved] ................................................................................................... 178
Section 10.09  Confidentiality ............................................................................................. 178
Section 10.10  Setoff .......................................................................................................... 179
Section 10.11  Interest Rate Limitation .............................................................................. 180
Section 10.12  Counterparts; Integration; Effectiveness ..................................................... 180
Section 10.13  Electronic Execution of Assignments and Certain Other Documents .......... 180
Section 10.14  Survival of Representations and Warranties ................................................. 180
Section 10.15  Severability .................................................................................................. 180
Section 10.16  GOVERNING LAW .................................................................................... 180
Section 10.17  WAIVER OF RIGHT TO TRIAL BY JURY ............................................... 181
Section 10.18  Binding Effect ............................................................................................. 181

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

Section 10.19  Lender Action ....................................................................................... 182
Section 10.20  Use of Name, Logo, etc. ....................................................................... 182
Section 10.21  USA PATRIOT Act .............................................................................. 182
Section 10.22  Service of Process ................................................................................. 182
Section 10.23  No Advisory or Fiduciary Responsibility ............................................. 182
Section 10.24  Release of Collateral and Guarantee Obligations; Subordination of Liens .. 183
Section 10.25  [Reserved] ............................................................................................. 184
Section 10.26  Judgment Currency ............................................................................... 184
Section 10.27  Amendment and Restatement ............................................................... 184

**ARTICLE I**

**DEFINITIONS AND ACCOUNTING TERMS**

Section 1.01    Defined Terms......................................................................................... 1
Section 1.02    Other Interpretive Provisions ................................................................ 73
Section 1.03    Accounting Terms .................................................................................. 75
Section 1.04    Rounding ................................................................................................ 75
Section 1.05    References to Agreements, Laws, etc...................................................... 75
Section 1.06    Times of Day and Timing of Payment and Performance ....................... 75
Section 1.07    Pro Forma and Other Calculations ........................................................ 75
Section 1.08    Available Amount Transaction ............................................................... 78
Section 1.09    [Reserved] .............................................................................................. 78
Section 1.10    Currency Generally ................................................................................ 78
Section 1.11    Divisions ................................................................................................ 79

**ARTICLE II**

**THE COMMITMENTS AND BORROWINGS**

Section 2.01    The Loans................................................................................................ 79
Section 2.02    Borrowings, Conversions and Continuations of Loans .................................. 79
Section 2.03    [Reserved]................................................................................................ 81
Section 2.04    [Reserved]................................................................................................ 81
Section 2.05    Prepayments............................................................................................ 81
Section 2.06    Termination or Reduction of Commitments.............................................. 91
Section 2.07    Repayment of Loans ............................................................................... 92
Section 2.08    Interest.................................................................................................... 92
Section 2.09    Fees ........................................................................................................ 92
Section 2.10    Computation of Interest and Fees ........................................................... 92
Section 2.11    Evidence of Indebtedness........................................................................ 92
Section 2.12    Payments Generally ................................................................................ 93
Section 2.13    Sharing of Payments ............................................................................... 95
Section 2.14    Incremental Term Facilities .................................................................... 95

**TABLE OF CONTENTS**
**(cont'd)**

|  | | Page |
|---|---|---|
| Section 2.15 | Refinancing Amendments | 97 |
| Section 2.16 | Extensions of Loans | 98 |
| Section 2.17 | Defaulting Lenders | 100 |

**TABLE OF CONTENTS**
**(cont'd)**

<div align="right">

**Page**

</div>

**ARTICLE III**

**TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY**

Section 3.01   Taxes, Increased Costs Protection and Illegality Taxes.................................. 101
Section 3.02   [Reserved]........................................................................................................ 104
Section 3.03   [Reserved]........................................................................................................ 104
Section 3.04   Increased Cost and Reduced Return; Capital Adequacy ............................ 104
Section 3.05   [Reserved]........................................................................................................ 105
Section 3.06   Matters Applicable to All Requests for Compensation ............................. 105
Section 3.07   Replacement of Lenders under Certain Circumstances ............................. 106
Section 3.08   Survival ............................................................................................................ 107

**ARTICLE IV**

**CONDITIONS PRECEDENT TO TERM BORROWINGS**

Section 4.01   Conditions to Term Borrowings on Closing Date ........................................ 107

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES**

Section 5.01   Existence, Qualification and Power; Compliance with Laws...................... 108
Section 5.02   Authorization; No Contravention ................................................................ 108
Section 5.03   Governmental Authorization ........................................................................ 109
Section 5.04   Binding Effect ................................................................................................ 109
Section 5.05   Financial Statements; No Material Adverse Effect..................................... 109
Section 5.06   Litigation ......................................................................................................... 109
Section 5.07   Labor Matters ................................................................................................. 110
Section 5.08   Real Property Matters .................................................................................... 110
Section 5.09   Environmental Matters .................................................................................. 111
Section 5.10   Taxes................................................................................................................. 111
Section 5.11   ERISA Compliance.......................................................................................... 111
Section 5.12   Subsidiaries ..................................................................................................... 112
Section 5.13   Margin Regulations; Investment Company Act .......................................... 112
Section 5.14   Disclosure ........................................................................................................ 113
Section 5.15   Intellectual Property; Licenses, etc .............................................................. 113
Section 5.16   Solvency............................................................................................................ 113
Section 5.17   USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act 113
Section 5.18   Collateral Documents..................................................................................... 113
Section 5.19   Use of Proceeds............................................................................................... 114
Section 5.20   Beneficial Ownership Certification .............................................................. 114

<div align="center">

vii

</div>

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

**ARTICLE VI**

**AFFIRMATIVE COVENANTS**

Section 6.01    Financial Statements ................................................................................ 114
Section 6.02    Certificates; Other Information ............................................................... 116
Section 6.03    Notices ..................................................................................................... 118
Section 6.04    Payment of Obligations ........................................................................... 118
Section 6.05    Preservation of Existence, etc. ................................................................ 118
Section 6.06    Maintenance of Properties ....................................................................... 118
Section 6.07    Maintenance of Insurance ........................................................................ 119
Section 6.08    Compliance with Laws ............................................................................. 119
Section 6.09    Books and Records .................................................................................. 119
Section 6.10    Inspection Rights ..................................................................................... 120
Section 6.11    Covenant to Guarantee Obligations and Give Security ........................... 120
Section 6.12    Compliance with Environmental Laws .................................................... 124
Section 6.13    Further Assurances and Post-Closing Covenant ..................................... 125
Section 6.14    [Reserved] ................................................................................................ 125
Section 6.15    Maintenance of Ratings ........................................................................... 125
Section 6.16    Accounting Changes ................................................................................ 126
Section 6.17    Nature of Business .................................................................................. 126
Section 6.18    Designation of Subsidiaries ..................................................................... 126
Section 6.19    Lender Meetings ...................................................................................... 126

**ARTICLE VII**

**NEGATIVE COVENANTS**

Section 7.01    Liens ......................................................................................................... 126
Section 7.02    Indebtedness ............................................................................................ 126
Section 7.03    Fundamental Changes ............................................................................. 132
Section 7.04    Asset Sales .............................................................................................. 136
Section 7.05    Restricted Payments ................................................................................ 137
Section 7.06    Transactions with Affiliates ..................................................................... 142
Section 7.07    Burdensome Agreements ......................................................................... 146
Section 7.08    Modification of Terms of Subordinated Indebtedness ............................. 150
Section 7.09    Holdings .................................................................................................. 150
Section 7.10    Anti-Layering .......................................................................................... 151
Section 7.11    Subsidiaries ............................................................................................. 152

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

### ARTICLE VIII

### EVENTS OF DEFAULT AND REMEDIES

Section 8.01   Events of Default ..................................................................... 152
Section 8.02   Remedies upon Event of Default ........................................... 154
Section 8.03   Application of Funds .............................................................. 155

### ARTICLE IX

### ADMINISTRATIVE AGENT, COLLATERAL AGENT AND OTHER AGENTS

Section 9.01   Appointment and Authorization of the Agents ..................... 155
Section 9.02   Rights as a Lender ................................................................. 156
Section 9.03   Exculpatory Provisions .......................................................... 156
Section 9.04   Lack of Reliance on the Agents ............................................ 158
Section 9.05   Certain Rights of the Agents ................................................. 158
Section 9.06   Reliance by the Agents .......................................................... 158
Section 9.07   Delegation of Duties .............................................................. 158
Section 9.08   Indemnification ...................................................................... 159
Section 9.09   The Agents in their Individual Capacity ............................... 159
Section 9.10   Holders ................................................................................... 159
Section 9.11   Resignation by the Agents ..................................................... 160
Section 9.12   Collateral Matters .................................................................. 161
Section 9.13   [Reserved] .............................................................................. 162
Section 9.14   Administrative Agent May File Proofs of Claim .................. 162
Section 9.15   Appointment of Supplemental Administrative Agents .......... 162
Section 9.16   Intercreditor Agreements ....................................................... 163
Section 9.17   [Reserved] .............................................................................. 163
Section 9.18   Withholding Tax ..................................................................... 163
Section 9.19   No Reliance on Administrative Agent's Customer Identification Program . 164
Section 9.20   Survival .................................................................................. 164

### ARTICLE X

### MISCELLANEOUS

Section 10.01  Amendments, etc. .................................................................... 164
Section 10.02  Notices and Other Communications; Facsimile Copies ........ 169
Section 10.03  No Waiver; Cumulative Remedies ......................................... 171
Section 10.04  Costs and Expenses ............................................................... 171
Section 10.05  Indemnification by the Borrower .......................................... 172
Section 10.06  Marshaling; Payments Set Aside .......................................... 173
Section 10.07  Successors and Assigns .......................................................... 173

ix

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

Section 10.08  [Reserved]................................................................. 180
Section 10.09  Confidentiality ......................................................... 180
Section 10.10  Setoff..................................................................... 182
Section 10.11  Interest Rate Limitation ......................................... 182
Section 10.12  Counterparts; Integration; Effectiveness................. 182
Section 10.13  Electronic Execution of Assignments and Certain Other Documents ......... 182
Section 10.14  Survival of Representations and Warranties............. 183
Section 10.15  Severability ............................................................. 183
Section 10.16  GOVERNING LAW................................................. 183
Section 10.17  WAIVER OF RIGHT TO TRIAL BY JURY............... 184
Section 10.18  Binding Effect........................................................ 184
Section 10.19  Lender Action ........................................................ 184
Section 10.20  Use of Name, Logo, etc. ......................................... 184
Section 10.21  USA PATRIOT Act ................................................. 184
Section 10.22  Service of Process.................................................. 185
Section 10.23  No Advisory or Fiduciary Responsibility ................. 185
Section 10.24  Release of Collateral and Guarantee Obligations; Subordination of Liens .. 185
Section 10.25  [Reserved]................................................................ 186
Section 10.26  Judgment Currency................................................. 186
Section 10.27  Amendment and Restatement.................................. 187

x

SCHEDULES

| | |
|---|---|
| 1.01(1) | Closing Date Guarantors |
| 1.01(2) | Existing Mortgaged Properties |
| 1.02 | Closing Date Unrestricted Subsidiaries |
| 2.01 | Commitments |
| ~~4.01(1)(c)~~ | ~~Certain Collateral Documents~~ |
| 5.06 | Litigation |
| 5.08(2) | Owned Real Property |
| 5.08(3) | Leased Real Property |
| 5.08(4) | Space Leased Property |
| 5.08(5) | Real Estate Proceedings |
| 5.08(6) | Real Property Improvements |
| 5.08(7) | Real Property Violations |
| 5.08(8) | Occupied Real Property |
| 5.12 | Subsidiaries and Other Equity Investments |
| 7.02(3) | Existing Indebtedness |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A-1 | Committed Loan Notice |
| B-1 | Term Note |
| C | Compliance Certificate |
| D-1 | Assignment and Assumption |
| D-2 | Affiliated Lender Assignment and Assumption |
| E | Guaranty |
| F | Security Agreement |
| G-1 | ABL Intercreditor Agreement |
| G-2 | Term Intercreditor Agreement |
| H | United States Tax Compliance Certificates |
| I | Solvency Certificate |
| J | Discount Range Prepayment Notice |
| K | Discount Range Prepayment Offer |
| L | Solicited Discounted Prepayment Notice |
| M | Acceptance and Prepayment Notice |
| N | Specified Discount Prepayment Notice |
| O | Solicited Discounted Prepayment Offer |
| P | Specified Discount Prepayment Response |
| Q | Intercompany Subordination Agreement |

**AMENDED AND RESTATED SECOND LIEN CREDIT AGREEMENT**

This AMENDED AND RESTATED SECOND LIEN CREDIT AGREEMENT (this "**Agreement**"), by and among BEAR PARENT INC., a Delaware corporation ("**Holdings**"), BELK, INC., a Delaware corporation and direct subsidiary of Holdings ("**Belk**" or the "**Borrower**"), WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent ("**Wilmington Trust**" and, in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**") is attached to the Third Amendment and constitutes the agreement of the parties hereto on and after the Closing Date.

**PRELIMINARY STATEMENTS**

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I**

**Definitions and Accounting Terms**

Section 1.01    Defined Terms. As used in this Agreement, the following terms have the meanings set forth below:

"**ABL Commitments**" means "Commitments" as defined in the ABL Facility.

"**ABL Credit Agreement**" means the ABL Credit Agreement dated as of the Original Closing Date (as amended by that certain Amendment No. 1 to ABL Credit Agreement, dated as of August 29, 2019, that certain Amendment No. 2 to the ABL Credit Agreement, dated as of October 30, 2020 and that certain Limited Waiver and Amendment No. 3 to ABL Credit Agreement, dated as of [●], 2021the Closing Date, by and among the Borrower, Holdings, the lenders party thereto and the ABL Facility Administrative Agent), among Holdings, the Borrower, the ABL Facility Administrative Agent and the several banks and other financial institutions from time to time parties thereto, as such agreement may be amended, supplemented, waived or otherwise modified from time to time, in each case to the extent permitted hereunder and under the ABL Intercreditor Agreement and any Refinancing Indebtedness thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Credit Agreement) in each case to the extent permitted hereunder.

"**ABL Event of Default**" means "Event of Default" as set forth in the ABL Credit Agreement.

"**ABL Facility**" means the collective reference to the ABL Credit Agreement, any ABL Loan Document, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time, or refunded, refinanced, restructured, replaced, renewed, repaid, increased or extended from time to time, in each case to the extent permitted hereunder and under the ABL Intercreditor Agreement and any Refinancing Indebtedness thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an ABL Facility).

1

"**ABL Facility Administrative Agent**" means Bank of America, N.A. in its capacity as administrative agent under the ABL Credit Agreement or any successor agent under the ABL Loan Documents.

"**ABL Intercreditor Agreement**" means the ABL Intercreditor Agreement substantially in the form of Exhibit G-1 among the Collateral Agent, the First Lien Administrative Agent, as collateral agent under the First Lien Credit Agreement, Bank of America, N.A., as collateral agent under the ABL Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**ABL Lenders**" means "Lenders" under the ABL Credit Agreement.

"**ABL Loan Documents**" means, collectively, (i) the ABL Credit Agreement and (ii) the security documents, intercreditor agreements (including the ABL Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the ABL Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the ABL Facility.

"**ABL Obligations**" means "Obligations" as defined in the ABL Facility.

"**Acceptable Discount**" has the meaning specified in Section 2.05(1)(e)(D)(2).

"**Acceptable Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Acceptance and Prepayment Notice**" means a notice of the Borrower's acceptance of the Acceptable Discount in substantially the form of Exhibit M.

"**Acceptance Date**" has the meaning specified in Section 2.05(1)(e)(D)(2).

"**Acquired Indebtedness**" means, with respect to any specified Person,

(1)    Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person, and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Additional Lender**" means, at any time, any bank, other financial institution or institutional lender or investor that, in any case, is not an existing Lender and that agrees to provide any portion of any (a) Incremental Term Loan in accordance with Section 2.14, (b) Loans pursuant to a Refinancing Amendment in accordance with Section 2.15 or (b c) Replacement Loans pursuant to Section 10.01; *provided* that each Additional Lender (other than any Person that is a Lender, an Affiliate of a Lender or an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), in each case solely to the extent that any such consent would be required from the Administrative Agent under Section 10.07(b)(iii)(B) for an assignment of Loans to such Additional Lender.

2

"**Adjusted EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period:

(1)     increased (without duplication) by the following, in each case (other than clauses (h) and (l)) to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(a)     total interest expense and, to the extent not reflected in such total interest expense, any losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such Hedging Obligations or such derivative instruments, and bank and letter of credit fees and costs of surety bonds in connection with financing activities, together with items excluded from the definition of "Consolidated Interest Expense" pursuant to the definition thereof; *plus*

(b)     provision for taxes based on income, profits, revenue or capital, including federal, foreign and state income, franchise, excise, value added and similar taxes, property taxes and similar taxes, and foreign withholding taxes paid or accrued during such period (including any future taxes or other levies that replace or are intended to be in lieu of taxes, and any penalties and interest related to taxes or arising from tax examinations), and any payments to a Parent Company in respect of such taxes permitted to be made hereunder; *plus*

(c)     Consolidated Depreciation and Amortization Expense for such period; *plus*

(d)     any other non-cash expenses, charges, expenses, losses or items (including any write-offs or write-downs) reducing Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (i) the Borrower may determine not to add back such non-cash charge in the current period and (ii) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Adjusted EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *provided* that the foregoing shall not permit adding back the write-down or reserve of inventory outside the ordinary course of business; *plus*

(e)     minority interest expense, the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any non-wholly-owned Subsidiary deducted (and not added back) in such period to Consolidated Net Income, excluding cash distributions in respect thereof, and the amount of any reductions in arriving at Consolidated Net Income resulting from the application of Accounting Standards Codification Topic No. 810, *Consolidation*; *plus*

(f)     (i) the amount of management, monitoring, consulting, transaction, advisory and other fees (including termination fees) and indemnities and expenses paid or accrued in such period under the Management Services Agreement or otherwise to the extent otherwise permitted under Section 7.06 and (ii) the amount of payments made to option holders of such Person or any Parent Company in connection with, or as a result of, any distribution being made to shareholders of such Person or its Parent Companies, which payments are being made to compensate such option holders as though they were

3

shareholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted hereunder; *plus*

       (g)    the amount of loss or discount on sale of receivables, Securitization Assets and related assets to any Securitization Subsidiary in connection with a Qualified Securitization Facility; *plus*

       (h)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Adjusted EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Adjusted EBITDA pursuant to clause (2) below for any previous period and not added back; *plus*

       (i)    any costs or expenses incurred pursuant to any management equity plan, stock option plan or any other management or employee benefit plan, agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of such Person or net cash proceeds of an issuance of Equity Interest of such Person (other than Disqualified Stock); *plus*

       (j)    any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of *FASB Accounting Standards Codification Topic 715—Compensation— Retirement Benefits*, and any other items of a similar nature, *plus*

       (k)    any net loss from operations expected to be disposed of, abandoned or discontinued within twelve months after the end of such period; *plus*

       (l)    (I) pro forma adjustments, including pro forma "run rate" cost savings, operating expense reductions and other synergies (in each case, net of amounts actually realized) related to acquisitions, dispositions and other specified transactions, or related to restructuring initiatives, cost savings initiatives and other initiatives that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are that are expected to be taken within four fiscal quarters after the date of consummation of such acquisition, disposition or other specified transaction or the initiation of such restructuring initiative, cost savings initiative or other initiatives and (II) pro forma "run rate" cost savings, operating expense reductions and synergies (in each case, net of amounts actually realized) related to the Transactions that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken, with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within four fiscal quarters after the Closing Date (it is understood and agreed that "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken); *provided* that amounts added back pursuant to this clause (l), together with the amounts added back pursuant to clauses (n) and (o) below and any similar adjustments made in accordance with Section 1.07(3) and add-backs included in clause (1) of the definition of "Consolidated Net Income", shall not exceed 10% of Adjusted EBITDA for such period calculated prior to giving effect to the add-backs set forth in this clause (l), clauses (n) and (o) below and the adjustments made

4

in accordance with Section 1.07(3) and add-backs included in clause (1) of the definition of "Consolidated Net Income", and being calculated on a pro forma basis (the cap in this proviso, the "**Combined Adjusted EBITDA Cap**"); *plus*

(m)      any payments in the nature of compensation or expense reimbursement made to independent board members; *plus*

(n)      costs, charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of cost savings initiatives and operating expense reductions, restructuring and similar charges (including the Transactions), severance, relocation costs, integration and facilities and New Store opening costs and other business optimization expenses, signing costs, retention or completion bonuses, transition costs, costs related to closure/consolidation of facilities, stores and curtailments or modifications to pension and post-retirement employee benefits plans (including any settlement of pension liabilities), subject to the Combined Adjusted EBITDA Cap; *plus*

(o)      the amount of any loss attributable to any New Store, subject to the Combined Adjusted EBITDA Cap; *provided* that the aggregate amounts added back pursuant to this clause (o) shall not exceed $5.0 million for such period; *plus*

(p)      costs and expenses in connection with the implementation of fresh start accounting and all adjustments resulting from the application of fresh start accounting principles;

(2)      decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

(a)      non-cash gains for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Adjusted EBITDA in any prior period other than any such accrual or reserve that has been added back to Consolidated Net Income in calculating Adjusted EBITDA in accordance with this definition), and

(b)      the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any non-wholly owned subsidiary added (and not deducted in such period from Consolidated Net Income).

Adjusted EBITDA of Belk and its Restricted Subsidiaries will be deemed to equal (i) ~~$[__] million~~$124,997,000 for the fiscal quarter ended ~~[__], 2019~~February 1, 2020, (ii) ~~$[__] million~~($67,491,000) for the fiscal quarter ended ~~[__],~~May 2, 2020, (iii) ~~$[__] million~~ $1,505,000 for the fiscal quarter ended ~~[__],~~August 1, 2020 and (iv) ~~$[__] million~~($41,751,000) for the fiscal quarter ended ~~[__],~~October 31, 2020, in each case and, without duplication, adjusted to reflect any pro forma adjustments with respect to any relevant Specified Transaction as are appropriate and consistent with the pro forma adjustment provisions set forth in Section 1.07, in each case, occurring or identified after the Closing Date and not otherwise included in the calculation of the foregoing amounts.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement prior to the Closing Date and on and after the Closing Date, means Wilmington Trust, National Association, and any successor thereto.

5

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. Notwithstanding the foregoing, other than with respect to Section 7.06, none of Blackstone, KKR, any Agent, any Third Amendment Lender as of the Closing Date nor any of their respective Affiliates shall be deemed an Affiliate of the Sponsor, Holdings, the Borrower or any of its Subsidiaries.

"**Affiliate Transaction**" has the meaning specified in Section 7.06.

"**Affiliated Lender**" means, at any time, any Lender that is the Sponsor or an Affiliate of the Sponsor or an Affiliate of the Borrower (other than (a) Holdings, the Borrower or any Subsidiary or (b) any natural person) at such time. For avoidance of doubt, none of Blackstone, KKR, ~~the Administrative~~any Agent, any Third Amendment Lender as of the Closing Date nor any of their respective Affiliates or permitted assignees shall be deemed an Affiliated Lender.

~~-~~"**Affiliated Lender Assignment and Assumption**" has the meaning specified in Section 10.07(h)(v).

"**Affiliated Lender Cap**" has the meaning specified in Section 10.07(h)(iv).

"**Agent Fee Letter**" means the Amended & Restated Fee Letter for Second Lien Credit Facility, dated as of ~~[●]~~the Closing Date, between the Borrower and Wilmington Trust, National Association, as Administrative Agent and Collateral Agent.

"**Agent Parties**" has the meaning specified in Section 10.02(4).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, members, managers, employees, agents, representatives, sub-agents, co-agents, attorneys-in-fact, partners, trustees, attorneys, and advisors of such Persons and of such Persons' Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Supplemental Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Agreement, as amended, restated, amended and restated, modified or supplemented from time to time in accordance with the terms hereof.

"**Agreement Currency**" has the meaning specified in Section 10.26.

6

"**AHYDO Payment**" means any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Code Section 163(i).

"**All-In Yield**" means, with respect to any term loan facility or other term loans, as of any date of determination, the sum of (i) the higher of (A) the LIBOR rate on such date for a deposit in Dollars with a maturity of one month and (B) the LIBOR rate "floor," if any, with respect thereto as of such date, (ii) the applicable margin as of such date for loans that accrue interest by reference to the LIBOR rate or a similar reference rate and (iii) the amount of original issue discount and upfront fees thereon (converted to yield assuming a four-year average life and without any present value discount), but excluding the effect of any arrangement, structuring, syndication or other fees payable in connection therewith that are not shared with all lenders or holders of such term loan facility or other term loans; provided that the amounts set forth in clauses (i) and (ii) above for any term loans that are not incurred under this Agreement shall be based on the stated interest rate basis for such term loans.

"**Applicable Discount**" has the meaning specified in Section 2.05(1)(e)(C)(2).

"**Applicable Intercreditor Agreement**" means (a) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that (i) are intended to rank equal in priority to the Liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the ABL Obligations and (ii) are intended to rank junior in priority to the Liens on the Term Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the Obligations, the ABL Intercreditor Agreement, (b) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank senior in priority to the Liens on the Collateral securing the Obligations (but without regard to control of remedies), each of the ABL Intercreditor Agreement and the Term Intercreditor Agreement, (c) to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank equal in priority to the Liens on the Collateral securing the Obligations, the Term Intercreditor Agreement and the ABL Intercreditor Agreement and (d) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank junior in priority to the Liens securing the Obligations, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations.

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Asset Sale**" means:

(1)     the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions of property or assets of the Borrower or any Restricted Subsidiary (each referred to in this definition as a "**disposition**"); or

(2)     the issuance or sale of Equity Interests (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 7.02 and directors' qualifying shares or shares or interests required to be held by foreign nationals or other third parties to the

7

extent required by applicable law) of any Restricted Subsidiary (other than to the Borrower or another Restricted Subsidiary), whether in a single transaction or a series of related transactions;

in each case, other than:

(a)     any disposition of:

(i)     Cash Equivalents or Investment Grade Securities,

(ii)     obsolete, damaged or worn out property or assets in the ordinary course of business or consistent with industry practice or any disposition of inventory or goods (or other assets) held for sale or no longer used or useful in the ordinary course;

(iii)     assets no longer economically practicable or commercially reasonable to maintain (as determined in good faith by the management of the Borrower) in an aggregate amount not to exceed $2,400,000 in any fiscal year;

(iv)     improvements made to leased real property to landlords pursuant to customary terms of leases entered into in the ordinary course of business;

(v)     assets for purposes of charitable contributions or similar gifts in *de minimis* amounts to the extent consistent with past practices;

(b)     the disposition of any assets by the Borrower or any Restricted Subsidiary in a manner permitted pursuant to Section 7.03;

(c)     any disposition in connection with the making of any Restricted Payment that is permitted to be made, and is made, under Section 7.05, any Permitted Investment or any acquisition otherwise permitted under this Agreement;

(d)     [reserved];

(e)     any disposition of property or assets or issuance of securities by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary to the extent otherwise permitted hereunder; *provided* that dispositions by Loan Parties to Non-Loan Parties shall be permitted solely to the extent permitted under Section 7.05;

(f)     to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)     (i) the lease, assignment or sublease, license or sublicense of any real or personal property in the ordinary course of business or consistent with industry practice and (ii) the exercise of termination rights with respect to any lease, sublease, license or sublicense or other agreement;

(h)     [reserved];

(h)     the sale of the Knox property pursuant to an agreement existing on the Closing Date;

8

(i)      foreclosures, condemnation, expropriation, eminent domain or any similar action (including for the avoidance of doubt, any Casualty Event) with respect to assets or the granting of Liens not prohibited hereunder;

(j)      sales of accounts receivable, or participations therein, or Securitization Assets or related assets in connection with any Qualified Securitization Facility or the disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with industry practice or in bankruptcy or similar proceedings;

(k)      any financing transaction with respect to property built or acquired by the Borrower or any Restricted Subsidiary after the Closing Date to the extent permitted hereunder, including Qualified Securitization Facilities;

(l)      the sale, lease, assignment, license, sublease or discount of inventory, equipment, accounts receivable, notes receivable or other current assets in the ordinary course of business or consistent with industry practice or the conversion of accounts receivable to notes receivable or other dispositions of accounts receivable in connection with the collection thereof;

(m)      the licensing or sublicensing of IP Rights or other general intangibles in the ordinary course of business or consistent with industry practice;

(n)      any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business or consistent with industry practice;

(o)      the unwinding of any Hedging Obligations;

(p)      sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)      the lapse or abandonment of IP Rights, which in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and its Restricted Subsidiaries taken as a whole;

(r)      the granting of a Lien that is permitted under Section 7.01;

(s)      the issuance of directors' qualifying shares and shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable law;

(t)      the disposition of any assets (including Equity Interests) acquired in a transaction permitted hereunder, which assets are not used or useful in the principal business of the Borrower and its Restricted Subsidiaries, so long as such assets do not constitute a material portion of the assets acquired in any individual transaction; or

(u)      dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"**Assumption**" has the meaning specified in Section 10.25.

"**Attorney Costs**" means all reasonable fees, expenses and disbursements of any law firm or other external legal counsel, to the extent documented in reasonable detail and invoiced.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease Obligation of any Person, the amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction Agent**" means (a) the Administrative Agent or (b) any other financial institution or advisor engaged by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to Section 2.05(1)(e); *provided* that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); *provided further* that neither the Borrower nor any of its Affiliates may act as the Auction Agent.

"**Available Amount**" means at any time on and after the Closing Date (the "**Available Amount Reference Time**"), an amount (which shall not be less than zero) equal to the sum of:

        (1)     [reserved]; plus

        (2)     the Retained Excess Cash Flow Amount (as defined in the First Lien Credit Agreement); plus

        (3)     the amount of any common capital contributions received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary other than the amount of any Specified Equity Contribution during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time; *provided* that such amount shall have been applied substantially contemporaneously with the receipt thereof in a permitted Investment in assets that constitute or will constitute Collateral; plus

        (4)     [reserved]; plus

        (5)     [reserved]; plus

        (6)     [reserved]; plus

        (7)     [reserved]; minus

        (8)     the aggregate amount of Restricted Payments made with the Available Amount pursuant to clause (10)(Y) of Section 7.05(b) (net of any return of capital in respect of any Investments or deemed reduction in the amount of such Investment, including the sale, transfer, lease or other disposition of any such Investments), during the period commencing on the Closing Date through and including the Available Amount Reference Time (and, for purposes of this clause

10

(8), without taking account of the intended usage of the Available Amount at such Available Amount Reference Time).

"**Bankruptcy Code**" has the meaning specified in Section 8.02.

"**Basket**" means any amount, threshold or other value permitted or prescribed with respect to any Lien, Indebtedness, Asset Sale, Investment, Restricted Payment, transaction value, judgment or other amount under any provision in Articles V, VI, VII or VIII and the definitions related thereto.

"**Belk**" has the meaning specified in the preliminary statements of this Agreement.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Blackstone**" means Blackstone Alternative Credit Advisors LP and any of its respective Affiliates and funds or accounts managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Board of Directors**" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such Board of Directors. Unless otherwise provided, "Board of Directors" means the Board of Directors of the Borrower.

"**Borrower**" means (a) Belk and (b) upon the consummation of any transaction permitted by Section 7.03(4), the Successor Borrower.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrower Offer of Specified Discount Prepayment**" means any offer by any Borrower Party to make a voluntary prepayment of Loans at a specified discount to par pursuant to Section 2.05(1)(e)(B).

"**Borrower Parties**" means the collective reference to Holdings, the Borrower and each Subsidiary of the Borrower and "**Borrower Party**" means any of them.

"**Borrower Solicitation of Discount Range Prepayment Offers**" means the solicitation by any Borrower Party of offers for, and the corresponding acceptance by a Lender of, a voluntary prepayment of Loans at a specified range of discounts to par pursuant to Section 2.05(1)(e)(C).

"**Borrower Solicitation of Discounted Prepayment Offers**" means the solicitation by any Borrower Party of offers for, and the subsequent acceptance, if any, by a Lender of, a voluntary prepayment of Loans at a discount to par pursuant to Section 2.05(1)(e)(D).

"**Borrowing**" means a borrowing consisting of Loans of the same Class made (or deemed to be made) on the same date.

"**Business Day**" means any day that is not a Legal Holiday.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under

11

Capitalized Lease Obligations) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and the Restricted Subsidiaries.

"**Capital Stock**" means:

> (1)     in the case of a corporation, corporate stock or shares in the capital of such corporation;

> (2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

> (3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

> (4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into or exchangeable for Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP as in effect on the Original Closing Date.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"**Captive Insurance Subsidiary**" means any Subsidiary of the Borrower that is subject to regulation as an insurance company (or any Subsidiary thereof).

"**Cash Equivalents**" means:

> (1)     Dollars;

> (2)     [Rreserved];

> (3)     local currencies held by the Borrower or any Restricted Subsidiary from time to time in the ordinary course of business or consistent with industry practice;

> (4)     readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 36 months or less from the date of acquisition;

> (5)     certificates of deposit, time deposits and eurodollar time deposits with maturities of three years or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with any domestic

or foreign commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(6)     repurchase obligations for underlying securities of the types described in clauses (4) and (5) above or clauses (7) and (8) below entered into with any financial institution or recognized securities dealer meeting the qualifications specified in clause (5) above;

(7)     commercial paper and variable or fixed rate notes rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 36 months after the date of acquisition thereof;

(8)     marketable short-term money market and similar liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(9)     securities issued or directly and fully and unconditionally guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority of any such state, commonwealth or territory or any public instrumentality thereof having maturities of not more than 36 months from the date of acquisition thereof;

(10)     readily marketable direct obligations issued or directly and fully and unconditionally guaranteed by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency selected by the Borrower) with maturities of 36 months or less from the date of acquisition;

(11)     Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency) with maturities of 24 months or less from the date of acquisition;

(12)     Investments with average maturities of 36 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P is rating such obligations, an equivalent rating from another Rating Agency);

(13)     investment funds investing substantially all of their assets in securities of the types described in clauses (1) through (12) above; and

(14)     solely with respect to any Captive Insurance Subsidiary, any investment that the Captive Insurance Subsidiary is not prohibited to make in accordance with applicable law.

In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents will also include (i) investments of the type and maturity described in clauses (1) through (13) above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal

investment practices for cash management in investments analogous to the foregoing investments in clauses (1) through (13) and in this paragraph.

"**Cash Management Agreement**" means any agreement entered into from time to time by Holdings, the Borrower or any Restricted Subsidiary in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, information reporting services, lockbox services, stop payment services and wire transfer services.

"**Cash Management Services**" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automatic clearing house fund transfer services, return items and interstate depository network services), (c) foreign exchange, netting and currency management services and (d) any other demand deposit or operating account relationships or other cash management services, including under any Cash Management Agreements.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"**CFC Holdco**" means a Domestic Subsidiary that has no material assets other than the Equity Interests in or indebtedness of one or more Foreign Subsidiaries that are CFCs, including the indirect ownership of such Equity Interests or indebtedness through one or more CFC Holdcos that have no other material assets.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority. It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111 203, H.R. 4173), all Laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

"**Change of Control**" means the occurrence of any of the following after the Closing Date:

> (1)    at any time prior to the consummation of a Qualifying IPO after the Closing Date, the Permitted Holders ceasing to beneficially own (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), in the aggregate, directly or indirectly, at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or any Parent Company; or

> (2)    at any time following the consummation of a Qualifying IPO after the Closing Date, (a) any Person (other than a Permitted Holder) or (b) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the

Exchange Act), becoming the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act) of Equity Interests of the Borrower or such Parent Company representing more than thirty-five percent (35%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or such Parent Company, as applicable, and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of the Borrower or such Parent Company, as applicable, beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders;

(3)     the occurrence of a "Change of Control" (or any comparable term) as defined in each of the First Lien Credit Agreement or any other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount (other than the ABL ~~Facility~~Credit Agreement); or

(4)     Holdings shall cease to be the registered owner of 100% of the Equity Interests of the Borrower unless in connection with the consummation of a Qualifying IPO by the Borrower.

unless, in the case of clause (1) or (2) above, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of the Borrower or any Parent Company.

"**Claim**" means any actions, suits or written demands or claims.

"**Class**" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (e.g., "fungibility")) and (ii) with respect to Lenders, those of such Lenders that have Commitments or Loans of a particular Class.

"**Closing Date**" means the first date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01, and the Closing Date Term Loans were made (or deemed made) to the Borrower pursuant to Sections 2.01, which date was February ~~[●]~~,24, 2021.

"**Closing Date Term Loan Commitment**" means, as to each Term Lender, its obligation to make (or be deemed to make) a Closing Date Term Loan to the Borrower in an aggregate amount not to exceed the amount specified opposite such Lender's name under on Schedule 2.01 under the caption "Closing Date Term Loan Commitment" or in the Assignment and Assumption (or Affiliated Lender Assignment and Assumption) pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement (including pursuant to Section 2.14, 2.15, 2.16 or 10.01). The aggregate amount of the Closing Date Term Loan Commitments on the Closing Date is $110 ~~million~~,000,000.

"**Closing Date Term Loans**" means the Term Loans made (or deemed made) by the Lenders on the Closing Date to the Borrower pursuant to Section 2.01.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the "Collateral" and "Second Lien Collateral" (or equivalent term of each of the foregoing) as defined in any Collateral Document and the Mortgaged Properties.

15

"**Collateral Agent**" has the meaning specified in the introductory paragraph to this Agreement prior to the Closing Date and on and after the Closing Date, means Wilmington Trust, National Association, and any successor thereto.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(1)     the Collateral Agent shall have received each Collateral Document required to be delivered (a) on the Closing Date pursuant to Section 4.01(1)(c) or (b) pursuant to Section 6.11 or 6.13 at such time required by such Sections to be delivered, in each case, duly executed by each Loan Party that is party thereto;

(2)     all Obligations shall have been unconditionally guaranteed by (a) Holdings (or any successor thereto), (b) each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary), which as of the Closing Date after giving effect to the Assumption shall include those that are listed on Schedule 1.01(1) hereto and (c) any Restricted Subsidiary of the Borrower that Guarantees (or is the borrower or issuer of) any Credit Agreement Refinancing Indebtedness, the First Lien Facility (and any "Credit Agreement Refinancing Indebtedness" as defined in the First Lien Credit Agreement), the ABL Facility and/or other Indebtedness having an aggregate outstanding principal amount of not less than the Threshold Amount (the Persons in the preceding clauses (a) through (c) collectively, the "**Guarantors**");

(3)     except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected security interest with the priority set forth in the Applicable Intercreditor Agreement, subject only to Liens permitted by Section 7.01, in

(a)     all the Equity Interests of the Borrower,

(b)     all Equity Interests of each direct, wholly owned Material Domestic Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor and

(c)     100% of the issued and outstanding Equity Interests of each (i) wholly owned Material Domestic Subsidiary that is (a) a CFC Holdco and (b) directly owned by the Borrower or any Subsidiary Guarantor and (ii) Foreign Subsidiary that is directly owned by the Borrower or any Subsidiary Guarantor;

(4)     except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01 or under any Collateral Document and in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents, the Obligations and the Guaranty shall have been secured by a security interest in substantially all tangible and intangible personal property of the Borrower and each Guarantor (including accounts other than Securitization Assets), inventory, equipment, investment property, contract rights, applications and registrations of IP Rights filed in the United States, other general intangibles, and proceeds of the foregoing, in each case,

(a)     that has been perfected (to the extent such security interest may be perfected by

16

(i)     delivering certificated securities, intercompany notes and other instruments in which a security interest can be perfected by physical control, in each case to the extent required hereunder or the Security Agreement;

(ii)     filing financing statements under the Uniform Commercial Code,

(iii)     making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office or

(iv)     filings in the applicable real estate records with respect to Mortgaged Properties (or any fixtures related to Mortgaged Properties) to the extent required by the Collateral Documents and

(b)     with the priority required by the Collateral Documents; *provided* that any such security interests in the Collateral shall be subject to the terms of the Applicable Intercreditor Agreements; and

(5)     with respect to each Real Property other than the Existing Mortgaged Properties, the Collateral Agent shall have received counterparts of a Mortgage, together with the other deliverables described in Section 6.11(2)(b), with respect to each Real Property (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property within the time periods set forth in Sections 6.11(2)(b) and 6.13; *provided* that to the extent any Mortgaged Property is located in a jurisdiction which imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, the relevant Mortgage shall not secure an amount in excess of the fair market value of the Mortgaged Property subject thereto. Unless requested by the Required Lenders, there will not be any obligation to deliver a new Mortgage with respect to an Existing Mortgaged Property.[1]

(6)     [~~r~~Reserved].

(7)     [within [●]Within sixty (60) days after the Closing Date (or such longer period that the Required Lenders may agree in their reasonable discretion), the Collateral Agent shall have received (i) evidence that an amendment, supplement or modification in form reasonably satisfactory to the Collateral Agent and the Required Lenders (the "**Mortgage Amendments**") with respect to each Existing Mortgaged Property set forth on Schedule 1.01(2~~) has been~~), duly executed, acknowledged and delivered and is in form suitable for filing and recording in all filing or recording offices that the Required Lenders may reasonably deem necessary to maintain or protect the Lien of the related Mortgage and the priority thereof; (ii) with respect to the real properties subject to the Mortgage Amendments, (x) fully paid title date-down endorsements or modification endorsements (to the extent such date-down endorsements or modification endorsements are available in the applicable jurisdiction at reasonable costs) to the related Mortgage Policies or (y) title searches (to the extent such date-down endorsements are not available at reasonable costs in any such jurisdictions), in each case confirming ownership of the related real property by the applicable Loan Party and showing no Liens of record other than Permitted Liens; ~~and~~ (iii) evidence that all filing, documentary, stamp, intangible and recording taxes and fees in respect to such Mortgage Amendments have been paid in connection with the preparation,

---

[1] ~~**Note:** This is OK, but whether this will be required is TBD, subject to input from title companies and local counsel (in addition to any bankruptcy issues).~~

execution, filing and recordation of the Mortgage Amendments[2]; and (iv) the deliverables described in Sections 6.11(2)(b)(ii) (to the extent required thereunder), (iv), (v), (vi) (to the extent not previously delivered), and (vii) (to the extent requested by the Collateral Agent or the Required Lenders), with respect to any Real Property subject to the Mortgage Amendments.

The foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, the creation, perfection or maintenance of pledges of, or security interests in, Mortgages on, or the obtaining of Mortgage Policies, surveys, abstracts or appraisals or taking other actions with respect to, any Excluded Assets.

The Required Lenders may grant extensions of time for the creation, perfection or maintenance of security interests in, or the execution or delivery of any Mortgage and the obtaining of title insurance, surveys or Opinions of Counsel with respect to, particular assets (including extensions beyond the Closing Date for the creation, perfection or maintenance of security interests in the assets of the Loan Parties on such date) where they reasonably determine, in consultation with the Borrower, that creation or perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)     Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Required Lenders and the Borrower;

(B)     the Collateral and Guarantee Requirement shall not apply to any Excluded Assets;

(C)     no deposit account control agreement, securities account control agreement or other control agreements or control arrangements shall be required with respect to any deposit account, securities account or other asset specifically requiring perfection through control agreements except to the extent such control agreement would or could be required under the ABL Credit Agreement as in effect on the Closing Date, whether or not such ABL Credit Agreement were than actually in effect;

(D)     no actions in any jurisdiction other than the U.S. or that are necessary to comply with the Laws of any jurisdiction other than the U.S. shall be required in order to create any security interests in assets located, titled, registered, applied for, filed, or arising under laws outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the Laws of any jurisdiction other than the U.S.) and there shall be no requirement to deliver landlord lien waivers, estoppels and collateral access letters;

(E)     [reserved];

(F)     no perfection steps shall be required with respect to (i) letter of credit rights, except to the extent constituting a support obligation for other Collateral as to which perfection is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (ii) commercial tort claims with a value of less than $2.5 million, (iii) motor vehicles and other assets subject to certificates of title to the extent a Lien thereon cannot be perfected by the filing of a UCC financing

---

[2] Note: To be included to the extent it is determined that Mortgage Amendments will be required.

statement, and (iv) promissory notes evidencing debt for borrowed money in a principal amount of less than $2.5 million; and

(G)      to the extent any Subsidiary of the Borrower is not required to be a guarantor under the First Lien Facility, such Subsidiary shall not be required to be a Guarantor hereunder with the consent of the Required Lenders (not to be unreasonably withheld or delayed).

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages (if any), each of the collateral assignments, security agreements, pledge agreements, account control agreements or other similar agreements delivered to the Administrative Agent, Collateral Agent or the Lenders pursuant to Sections 4.01(1)(c),, 6.11 or 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Combined Adjusted EBITDA Cap**" has the meaning specified in clause (1)(l) of the definition of "Adjusted EBITDA".

"**Commitment**" means the Closing Date Term Loan Commitments, Incremental Commitments, Refinancing Commitments or Extended Commitments, or any commitment in respect of Replacement Loans, as the context may require.

"**Commitment Parties**" means Blackstone Alternative Credit Advisors LP, KKR Credit Advisors (US) LLC, KKR TFO Partners LP and Polar Bear Fund LP - Class B.

"**Committed Loan Notice**" means a notice of a Borrowing with respect to a given Class of Loans, which shall be substantially in the form of Exhibit A-1.

"**Compensation Period**" has the meaning specified in Section 2.12(3)(b).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of a Financial Officer of the Borrower:

(1)      certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto (in each case, other than any Default with respect to which the Administrative Agent has otherwise obtained notice in accordance with Section 6.03(1)); and

(2)      in the case of financial statements delivered under Section 6.01(1), setting forth reasonably detailed calculations of the Net Proceeds and Specified Sale-Leaseback Net Proceeds (as applicable) received during the applicable period by or on behalf of the Borrower or any Restricted Subsidiary in respect of any (x) Asset Sale or Casualty Event subject to prepayment pursuant to Section 2.05(2)(b)(i) and the portion of such Net Proceeds that has been invested or is intended to be reinvested in accordance with Section 2.05(2)(b)(ii) and (y) Specified Sale-Leaseback Transaction subject to prepayment pursuant to Section 2.05(2)(c).

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and Cash Equivalents, amounts related to current or deferred taxes based on income or profits, assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees, derivative financial instruments and any assets in respect of Hedge Agreements, and excluding the effects of adjustments pursuant to GAAP resulting from the application of

19

recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding (A) the current portion of any Funded Debt and other long-term liabilities, (B) the current portion of interest, (C) accruals for current or deferred taxes based on income or profits, (D) accruals of any costs or expenses related to restructuring reserves or severance, (E) all Indebtedness consisting of Loans (as defined in the ABL Facility), Swing Line Loans (as defined in the ABL Facility) and L/C Obligations (as defined in the ABL Facility) to the extent otherwise included therein or any other revolving loans, swingline loans and letter of credit obligations under any other revolving credit facility, (F) the current portion of any Capitalized Lease Obligation, (G) deferred revenue arising from cash receipts that are earmarked for specific projects, (H) liabilities in respect of unpaid earn-outs, (I) the current portion of any other long-term liabilities, (J) accrued litigation settlement costs and (K) any liabilities in respect of Hedge Agreements, and, furthermore, excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person and its Restricted Subsidiaries, including the amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses and amortization of Capitalized Software Expenditures of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated Interest Expense**" means, with respect to any Person for any period, without duplication, the sum of:

(1)     consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount or premium resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (c) non-cash interest payments, (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate obligations under any Hedge Agreement with respect to Indebtedness); plus

(2)     consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(3)     interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" means, with respect to any Person for any period, the net income (loss) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding (and excluding the effect of), without duplication,

(1)     extraordinary, non-recurring or unusual gains, losses, fees, costs, charges or expenses (including relating to any multi-year strategic initiatives and accruals and reserves in

connection with such gains, losses, charges or expenses); restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves, and in each case, whether or not classified as such under GAAP); costs and expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of stores or facilities and fixed assets for alternative uses; Public Company Costs; costs and expenses related to the integration, consolidation, opening, pre-opening and closing of stores or facilities and fixed assets; severance and relocation costs and expenses, one-time compensation costs and expenses, consulting fees, signing, retention or completion bonuses, and executive recruiting costs; costs and expenses incurred in connection with strategic initiatives; transition costs and duplicative running costs; costs and expenses incurred in connection with non-ordinary course product and IP Rights development; costs incurred in connection with acquisitions (or purchases of assets) or the Transactions, in each case, prior to or after the Closing Date (including integration costs); business optimization expenses (including costs and expenses relating to business optimization programs, new systems design, retention charges, system establishment costs and implementation costs and project start-up costs), accruals and reserves; operating expenses attributable to the implementation of cost-savings initiatives; curtailments and modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments); provided that amounts added back pursuant to this clause (1) shall be subject to the Combined Adjusted EBITDA Cap;

(2)     the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period whether effected through a cumulative effect adjustment or a retroactive application, in each case in accordance with GAAP;

(3)     Transaction Expenses;

(4)     any gain (loss) on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business or consistent with industry practice) or income (loss) from discontinued operations (but if such operations are classified as discontinued due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of);

(5)     the Net Income for such period of any Person that is an Unrestricted Subsidiary and, solely for the purpose of the Available Amount, the Net Income for such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; provided that the Consolidated Net Income of a Person will be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents) to such Person or a Restricted Subsidiary thereof in respect of such period;

(6)     solely for the purpose of determining the Available Amount, the Net Income for such period of any Restricted Subsidiary (other than any Guarantor) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived; provided that Consolidated Net Income of a Person will be increased by the amount of dividends or other distributions or other payments actually paid in cash or Cash Equivalents (or to the extent converted into cash or Cash Equivalents);

21

(7)      effects of adjustments (including the effects of such adjustments pushed down to such Person and its Restricted Subsidiaries) related to the application of recapitalization accounting or purchase accounting (including in the inventory, property and equipment, software, goodwill, intangible assets, in process research and development, deferred revenue and debt line items);

(8)      income (loss) from the early extinguishment or conversion of (a) Indebtedness, (b) Hedging Obligations or (c) other derivative instruments;

(9)      any impairment charge or asset write-off or write-down in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP; *provided* that this clause (9) shall not permit the write-down or reserve of inventory outside the ordinary course of business;

(10)      (a) any equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation, equity incentive programs or similar rights, stock options, restricted stock or other rights to, and any cash charges associated with the rollover, acceleration or payout of, Equity Interests by management of such Person or of a Restricted Subsidiary or any Parent Company, (b) noncash compensation expense resulting from the application of Accounting Standards Codification Topic No. 718, *Compensation—Stock Compensation* or Accounting Standards Codification Topic 505-50, *Equity-Based Payments to Non-Employees*, and (c) any income (loss) attributable to deferred compensation plans or trusts;

(11)      any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, disposition, incurrence or repayment of Indebtedness (including such fees, expenses or charges related to the offering and issuance of the Term Notes and the syndication and incurrence of any Facilities), issuance of Equity Interests (including by any direct or indirect parent of the Borrower), recapitalization, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Indebtedness evidenced by this Agreement, the First Lien Facility, or the ABL Facility) and including, in each case, any such transaction whether consummated on, after or prior to the Closing Date and any such transaction undertaken but not completed, and any charges or nonrecurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful or consummated (including, for the avoidance of doubt, the effects of expensing all transaction related expenses in accordance with Accounting Standards Codification Topic No. 805, *Business Combinations*);

(12)      accruals and reserves that are established or adjusted in connection with the Transactions, an Investment or an acquisition that are required to be established or adjusted as a result of the Transactions, such Investment or such acquisition, in each case accordance with GAAP;

(13)      any expenses, charges or losses to the extent covered by insurance that are, directly or indirectly, reimbursed or reimbursable by a third party, and any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement;

(14)      any non-cash gain (loss) attributable to the mark to market movement in the valuation of Hedging Obligations or other derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—*Derivatives and Hedging* or mark to market movement of other financial instruments pursuant to FASB Accounting Standards Codification Topic 825—*Financial Instruments*;

22

(15)    any net unrealized gain or loss (after any offset) resulting in such period from currency transaction or translation gains or losses including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from (a) Hedging Obligations for currency exchange risk and (b) resulting from intercompany indebtedness) and any other foreign currency transaction or translation gains and losses, to the extent such gain or losses are non-cash items;

(16)    any adjustments resulting from the application of Accounting Standards Codification Topic No. 460, *Guarantees*, or any comparable regulation;

(17)    any non-cash rent expense;

(18)    the amount of any management, monitoring, consulting, transaction and advisory fees and related expenses paid to the Investors (or any accruals relating to such fees and related expenses) during such period to the extent otherwise permitted by Section 7.06;

(19)    any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures; and

(20)    earn-out and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries, Consolidated Net Income will include the amount of proceeds received or receivable from business interruption insurance, the amount of any expenses or charges incurred by such Person or its Restricted Subsidiaries during such period that are, directly or indirectly, reimbursed or reimbursable by a third party, and amounts that are covered by indemnification or other reimbursement provisions in connection with any acquisition, Investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder.

"**Consolidated Secured Debt**" means, as of any date of determination, with respect to the Borrower and its Restricted Subsidiaries, the aggregate amount of Consolidated Total Debt that is secured by a Lien on any assets or property of the Borrower or any of its Restricted Subsidiaries.

"**Consolidated Total Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transaction), consisting of Indebtedness for borrowed money, Capitalized Lease Obligations, debt obligations evidenced by notes or similar instruments and Guarantees of Indebtedness listed above minus (b) the aggregate amount of all cash and Cash Equivalents included in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, in each case, subject to control agreements for the benefit of the Obligations (including control agreements entered into by the ABL Facility Administrative Agent or the First Lien Administrative Agent for the benefit of, among others, the Obligations hereunder) (but excluding cash and Cash Equivalents which are listed as "Restricted" on such balance sheet), which aggregate amount of cash and Cash Equivalents shall be determined without giving pro forma effect to the proceeds of Indebtedness incurred on such date; provided, Consolidated Total Debt will not include Non-Recourse Indebtedness and Indebtedness in respect of any (1) letter of credit, except to the extent of obligations in respect of drawn standby letters of credit which have not been reimbursed within three (3) Business Days and (2) Hedging Obligations, except any unpaid termination payments thereunder. The Dollar-equivalent principal amount of any Indebtedness denominated in a foreign currency will reflect the currency translation

23

effects, determined in accordance with GAAP, of Hedging Obligations for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar-equivalent principal amount of such Indebtedness.

"~~**Consolidated Working Capital**~~" ~~means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities. In measuring any increase or decrease in Consolidated Working Capital for any period, (1) to the extent the Borrower or any Restricted Subsidiary has consummated during such period any one or more acquisitions or dispositions of any Person, then (a) in the case of an acquisition, the Consolidated Working Capital of such acquired Person as of the date of the consummation of such acquisition (after giving effect to the transactions consummated with respect to such acquisition) will be added to the Consolidated Working Capital of the Borrower and its Restricted Subsidiaries as of the first day of such period and (b) in the case of a disposition, the Consolidated Working Capital of the disposed Person as of the date of the disposition of such Person shall be subtracted from the Consolidated Working Capital of the Borrower and its Restricted Subsidiaries as of the first day of such period and (2) the application of recapitalization or purchase accounting as a result of any acquisitions or dispositions completed during such period will be excluded and the application of fresh start accounting in relation to the Transactions shall be disregarded.~~

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent:

    (1)    to purchase any such primary obligation or any property constituting direct or indirect security therefor;

    (2)    to advance or supply funds:

        (a)    for the purchase or payment of any such primary obligation or

        (b)    to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

    (3)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Controlled Investment Affiliate**" means, as to any Person, any other Person, other than any Investor, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower or other companies.

"**Credit Agreement Refinanced Debt**" has the meaning assigned to such term in the definition of "Credit Agreement Refinancing Indebtedness."

"**Credit Agreement Refinancing Indebtedness**" means secured or unsecured Indebtedness of the Borrower or any Guarantor; *provided* that:

(1)     such Indebtedness is incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) to Refinance, in whole or in part, Indebtedness that is either (a) Loans, or (b) other Credit Agreement Refinancing Indebtedness ("**Credit Agreement Refinanced Debt**");

(2)     such Indebtedness is in an original aggregate principal amount not greater than the principal amount of the Credit Agreement Refinanced Debt being Refinanced except to the extent permitted under Section 1.02(10) (*plus* (a) the amount of all unpaid, accrued or capitalized interest, penalties, premiums (including tender premiums), and other similar amounts payable with respect to the Credit Agreement Refinanced Debt and (b) underwriting discounts, fees, commissions, costs, expenses and other similar amounts payable with respect to such refinancing);

(3)     the (a) Weighted Average Life to Maturity of such Indebtedness is equal to or longer than the remaining Weighted Average Life to Maturity of the Credit Agreement Refinanced Debt and (b) final maturity date of such Credit Agreement Refinancing Indebtedness is no earlier than the final maturity date of the Credit Agreement Refinanced Debt;

(4)     any mandatory prepayments of:

(a)     any Permitted Junior Priority Refinancing Debt or any Credit Agreement Refinancing Indebtedness that comprises unsecured notes or loans may not be made except to the extent that prepayments are (i) permitted hereunder and (ii) to the extent required hereunder or pursuant to the terms of any Permitted Equal Priority Refinancing Debt, first made or offered to the Loans and any such Permitted Equal Priority Refinancing Debt; and

(b)     any Permitted Equal Priority Refinancing Debt shall be made on a *pro rata* basis or less than *pro rata* basis (but not greater than a pro rata basis) with the Closing Date Term Loans (other than pursuant to a refinancing permitted hereunder or with respect to greater than *pro rata* payments to an earlier maturing tranche);

(5)     such Indebtedness is not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Guarantor;

(6)     if such Indebtedness is secured:

(a)     such Indebtedness is not secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not constitute Collateral;

(b)     the security agreements relating to such Indebtedness are substantially similar to or the same as the Collateral Documents (as determined in good faith by a Responsible Officer of the Borrower);

(c)     if such Indebtedness is secured, a Debt Representative acting on behalf of the holders of such Indebtedness has become party to or is otherwise subject to the provisions of the Applicable Intercreditor Agreement;

(7)     to the extent such Credit Agreement Refinancing Indebtedness Refinances Indebtedness that is subordinated (including by way of Section 8.03 or other "waterfall" provisions) to the Obligations in respect of any Class of Term Loans, such Credit Agreement Refinancing Indebtedness is subordinated to such Obligations at least to the same extent as the applicable Refinanced Debt;

(8)     the covenants and events of default applicable to such Indebtedness are substantially identical to, or, taken as a whole, not materially more favorable to the lenders or holders providing such Indebtedness than, those applicable to such Credit Agreement Refinanced Debt, in each case as determined in good faith by a Responsible Officer of the Borrower in its reasonable judgment; *provided* that the Borrower will promptly deliver to the Administrative Agent final copies of the definitive credit documentation relating to such Indebtedness (unless the Borrower is bound by a confidentiality obligation with respect thereto, in which case the Borrower will deliver a reasonably detailed description of the material terms and conditions of such Indebtedness in lieu thereof); *provided further* that this clause (8) will not apply to:

(i)      terms addressed in the preceding clauses (1) through (7),

(ii)     interest rate, fees, funding discounts and other pricing terms,

(iii)    redemption, prepayment or other premiums,

(iv)     optional redemption or prepayment terms and

(v)      covenants and other terms applicable only to periods after the Latest Maturity Date of the Closing Date Term Loans at the time of incurrence of such Indebtedness or added for the benefit of the Lenders hereunder; and

(9)     with respect to the incurrence of any Credit Agreement Refinancing Indebtedness in respect of the Loans of any Class hereunder, the Lenders of the applicable Class of Credit Agreement Refinanced Debt shall be offered the opportunity to provide such Credit Agreement Refinancing Indebtedness on a pro rata basis based on their ownership of the applicable Credit Agreement Refinanced Debt.

Anything to the contrary notwithstanding (including, for the avoidance of doubt, clause (3) above), Credit Agreement Refinancing Indebtedness will include (1) any Registered Equivalent Notes issued in exchange therefor and (2) any bridge or other interim credit facility intended to be Refinanced with long-term indebtedness (so long as such credit facility includes customary "rollover provisions"), in which case, clause (3) of the first proviso in this definition shall not prohibit the inclusion of customary terms for "bridge" facilities, including customary mandatory prepayment, repurchase or redemption provisions.

For the avoidance of doubt, any voluntary prepayments of Credit Agreement Refinancing Indebtedness may be made on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis with other Loans.

Notwithstanding anything set forth above, if the All-In Yield of any Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations, including such Indebtedness incurred pursuant to a Refinancing Amendment, shall be higher than the All-In Yield of the Closing Date Term Loans, then the interest rate margins for the Closing Date Term Loans shall be increased to the extent necessary so that the All-In Yield for such Closing Date Term Loans is equal to the All-In Yield of such Credit Agreement Refinancing Indebtedness.

"**Debt Representative**" means, with respect to any series of Indebtedness secured by Liens permitted under clause (21) or (39) of the definition of "Permitted Liens", Liens securing Indebtedness permitted under clauses (2), (14) and (25) of Section 7.02(b), Permitted Equal Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt, the trustee, administrative agent, collateral agent, security agent

or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Declined Proceeds**" has the meaning specified in Section 2.05(2)(g).

"**Deemed Consent Provision**" means each of (x) the definitions of "Applicable Intercreditor Agreement", "Collateral and Guarantee Requirement", "Excluded Assets", "Excluded Equity", "Excluded Subsidiaries", "Guarantor", "Landlord Consent and Estoppel", "Material Domestic Subsidiary", "Material Foreign Subsidiary", "Mortgages" and "Opinion of Counsel" and (y) Section 6.01, Section 6.07, Section 6.11, Section 6.13, Section 6.16, Section 7.03(4)(ii) and Section 7.08.

"**Default**" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"**Default Rate**" means an interest rate with respect to any principal and other amount, the applicable interest rate plus 2.00% per annum, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means, subject to Section 2.17(2), any Lender that (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans, within one Business Day of the date required to be funded by it hereunder (if applicable), (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations (if applicable) or (d) has, or has a direct or indirect parent company that has, (i) become or is the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets or a custodian appointed for it or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under this definition shall be conclusive absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Deposit Account**" means any checking or other demand deposit account maintained by the Borrower and any Subsidiary Guarantors, including any "deposit accounts" under Article 9 of the UCC.

"**Designated Preferred Stock**" means Preferred Stock of the Borrower, any Restricted Subsidiary thereof or any Parent Company (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's

Certificate, on or promptly after the issuance date thereof, the cash proceeds of which are excluded from the calculation of the Available Amount.

"**Designated Revolving Commitments**" means any commitments to make loans or extend credit on a revolving basis to the Borrower or any Restricted Subsidiary by any Person other than the Borrower or any Restricted Subsidiary that have been designated in an Officer's Certificate delivered to the Administrative Agent as "Designated Revolving Commitments" until such time as the Borrower subsequently delivers an Officer's Certificate to the Administrative Agent to the effect that such commitments will no longer constitute "Designated Revolving Commitments;" provided that on the date such Designated Revolving Commitments are established, such Designated Revolving Commitments will be deemed an incurrence of Indebtedness on such date and will be deemed outstanding for purposes of calculating the Total Net Leverage Ratio, Senior Secured Leverage Ratio, and the availability of any applicable Basket hereunder on such date after giving *pro forma* effect to the incurrence of the entire committed amount of the Indebtedness thereunder (but without netting any cash proceeds thereof), in which case such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with the Total Net Leverage Ratio, Senior Secured Leverage Ratio, and the availability of any Baskets hereunder. For the avoidance of doubt, in the case of any Designated Revolving Commitments permitted hereunder, the reference to the "incurrence" of Indebtedness shall refer to the date on which such Designated Revolving Commitments are established.

"**Discharge**" or "**discharge**" means, with respect to any Indebtedness, the repayment, prepayment, repurchase (including pursuant to an offer to purchase), redemption, defeasance or other discharge of such Indebtedness, any such case in whole or in part.

"**Discount Prepayment Accepting Lender**" has the meaning assigned to such term in Section 2.05(1)(e)(B)(2).

"**Discount Range**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Prepayment Amount**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Prepayment Notice**" means a written notice of the Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.05(1)(e)(C)(1) substantially in the form of Exhibit J.

"**Discount Range Prepayment Offer**" means the written offer by a Lender, substantially in the form of Exhibit K, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"**Discount Range Prepayment Response Date**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(1).

"**Discount Range Proration**" has the meaning assigned to such term in Section 2.05(1)(e)(C)(3).

"**Discounted Prepayment Determination Date**" has the meaning assigned to such term in Section 2.05(1)(e)(D)(3).

"**Discounted Prepayment Effective Date**" means in the case of the Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation

28

of Discounted Prepayment Offer, five (5) Business Days following the Specified Discount Prepayment Response Date, the Discount Range Prepayment Response Date or the Solicited Discounted Prepayment Response Date, as applicable, in accordance with Section 2.05(1)(e)(B), Section 2.05(1)(e)(C) or Section 2.05(1)(e)(D), respectively, unless a shorter period is agreed to between the Borrower and the Auction Agent.

"**Discounted Term Loan Prepayment**" has the meaning assigned to such term in Section 2.05(1)(e)(A).

"**disposition**" has the meaning set forth in the definition of "Asset Sale".

"**Disqualified Institution**" means (a) any competitor of the Borrower or its Subsidiaries (including for purposes of this definition Belk and its Subsidiaries) identified in writing by or on behalf of the Borrower or the Sponsor to the Administrative Agent from time to time after the Closing Date, (b) those particular banks, financial institutions, other institutional lenders and other Persons (x) identified by or on behalf of the Borrower or the Sponsor to the Consenting Lenders (as defined in the RSA) prior to January 26, 2021 or (y) otherwise approved in writing by the Required Consenting Lenders (as defined in the RSA) on or prior to the Closing Date and (c) any Affiliate of the entities described in the preceding clauses (a) or (b) (excluding, in the case of clause (a), bona fide debt funds) that are either readily identifiable as such on the basis of their name or are identified as such in writing by or on behalf of the Borrower or the Sponsor to the Administrative Agent from time to time; it being understood and agreed that the identification of any Person as a Disqualified Institution after the Closing Date shall not apply to retroactively disqualify any Person that has previously acquired an assignment or participation interest in any Loan, subject to Section 10.07(n), until such time such Person no longer constitutes a Lender. The identity of Disqualified Institutions shall be posted or distributed to all Lenders and prospective assignees.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than (i) for any Qualified Equity Interests or (ii) solely as a result of a change of control, asset sale, casualty, condemnation or eminent domain), in whole or in part, in each case prior to the date 91 days after Latest Maturity Date or the date the Loans are no longer outstanding and the Commitments have been terminated; *provided* that if such Capital Stock is issued pursuant to any plan for the benefit of, future, current or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower or its Subsidiaries or any Parent Company or by any such plan to such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof), such Capital Stock will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability; *provided further* any Capital Stock held by any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries, any Parent Company, or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof), in each case pursuant to any equity subscription or equity holders' agreement, management equity plan or stock option plan or any other management or employee benefit plan or agreement will not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any Subsidiary or in order to satisfy applicable

statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability. For the purposes hereof, the aggregate principal amount of Disqualified Stock will be deemed to be equal to the greater of its voluntary or involuntary liquidation preference and maximum fixed repurchase price, determined on a consolidated basis in accordance with GAAP, and the "maximum fixed repurchase price" of any Disqualified Stock that does not have a fixed repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were purchased on any date on which the Consolidated Total Debt will be required to be determined pursuant to this Agreement, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any direct or indirect Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b), *provided* that no Defaulting Lender(s) or Disqualified Institution(s) may be Eligible Assignee(s).

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and sub-surface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, or proceedings with respect to any Environmental Liability or Environmental Law, (hereinafter "Claims"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to pollution or the protection of the Environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) resulting from or relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, the Capital Stock of such Person and all warrants, options or other rights to acquire Capital Stock of such Person, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock of such Person.

"**Equity Offering**" means any public or private sale of common stock or Preferred Stock of the Borrower or any Parent Company (excluding Disqualified Stock), other than:

(1)     public offerings with respect to the Borrower's or any Parent Company's common stock registered on Form S-4 or Form S-8;

(2)      issuances to any Restricted Subsidiary of the Borrower; and

(3)      any such public or private sale that constitutes an Excluded Contribution.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability or written notification that a Multiemployer Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement in writing of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived; (h) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (i) the imposition of a lien under Section 303(k) of ERISA or Section 412(c) of the Code with respect to any Pension Plan; (j) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); or (k) the occurrence of a nonexempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party or any of their respective ERISA Affiliates (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Loan Party.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Accounts**" means any Deposit Account of any Loan Party or Restricted Subsidiary (and all cash, Cash Equivalents and other securities or investments credited thereto or deposited therein): (1) that does not have an individual daily balance in excess of $600,000, or in the aggregate with each other account described in this clause (1), in excess of $6,000,000; (2) the balance of which is swept at the end of each Business Day into a Deposit Account subject to a Deposit Account Control Agreement (as defined in the ABL Facility), so long as such daily sweep is not terminated or modified (other than to provide that the balance in such Deposit Account is swept into another Deposit Account subject to a Deposit Account Control Agreement (as defined in the ABL Facility)) without the consent of the ABL Facility

Administrative Agent; (3) that is a Trust Account or Specified Segregated Account (as defined in the ABL Facility); (4) [reserved]; (5) any Deposit Account that constitutes a disbursement account of the Borrower or any Restricted Subsidiary the balance of which consists solely of proceeds of Indebtedness, including the proceeds of the loans under the ABL Facility; *provided* that in the case of the proceeds of the loans under the ABL Facility, the aggregate amount that may be maintained in an Excluded Account described in this clause (5) shall not exceed $60.0 million at any one time; or (6) to the extent that it is cash collateral for letters of credit (other than Letters of Credit (as defined in the ABL Facility)) to the extent permitted hereunder.

"**Excluded Assets**" means (i) any Owned Real Property or Leased Real Property, in each case subject to a Specified Sale-Leaseback Transaction and Leased Real Property (a) where the consent or other affirmative action of the applicable landlord is required for Borrower or the applicable Subsidiary to grant a Mortgage, perfect the security interest granted thereby, or otherwise comply with the Collateral and Guarantee Requirement and such consent cannot be obtained after the Borrower or the applicable Subsidiary's use of commercially reasonable efforts to do so (which commercially reasonable efforts, for the avoidance of doubt, shall not require the Borrower or applicable Subsidiary to amend or otherwise modify any of the existing terms or conditions of any agreement with any landlord or pay additional economics to any landlord) or (b) no legal description for the parcel or store leased by the Borrower or the Restricted Subsidiary was provided by such landlord pursuant to the ground lease thereto, (ii) pledges and security interests prohibited by applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), (iii) Margin Stock, (iv) cash and Cash Equivalents on deposit in Excluded Accounts, (v) any lease, license or other agreements, or any property subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license or agreement, purchase money, Capitalized Lease Obligations or similar arrangement, or create a right of termination in favor of any other party thereto (other than a Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition, (vi) assets for which a pledge thereof or a security interest therein would result in a material adverse tax consequence as reasonably determined by the Borrower and consented to by the Required Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed), (vii) assets for which the Required Lenders and the Borrower have determined in their reasonable judgment and agree in writing that the cost of creating or perfecting such pledges or security interests therein would be excessive in view of the benefits to be obtained by the Lenders therefrom, (viii) any intent-to-use trademark application in the United States prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto with the United States Patent and Trademark Office and (ix) Excluded Equity.

"**Excluded Contribution**" means net cash proceeds or the fair market value of marketable securities or the fair market value of Qualified Proceeds received by the Borrower from:

        (1)       contributions to its common equity capital;

        (2)       dividends, distributions, fees and other payments from any joint ventures that are not Restricted Subsidiaries; and

        (3)       the sale (other than to a Restricted Subsidiary of the Borrower or to any management equity plan or stock option plan or any other management or employee benefit plan

or agreement of the Borrower) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Borrower;

in each case designated as Excluded Contributions pursuant to an Officer's Certificate.

"**Excluded Equity**" means Equity Interests (i) [reserved], (ii) [reserved], (iii) [reserved], (iv) of any Subsidiary with respect to which the Required Lenders and the Borrower have determined in their reasonable judgment and agreed in writing that the costs of providing a pledge of such Equity Interests or perfection thereof is excessive in view of the benefits to be obtained by the Secured Parties therefrom, (v) of any captive insurance companies, not-for-profit Subsidiaries, special purpose entities (including any Securitization Subsidiary), (vi) to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than Holdings, the Borrower or any wholly owned Restricted Subsidiary of the Borrower), under the terms of any applicable Organizational Documents, joint venture agreement or shareholders' agreement, equity interests in any person other than wholly-owned Restricted Subsidiaries; and (vii) of any Foreign Subsidiary the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers or to the extent that the grant or perfection of a security interest in such Voting Stock would reasonably be expected to result in material adverse tax consequences to any Loan Party, as determined by the Borrower in good faith with the consent of the Required Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed).

"**Excluded Subsidiaries**" means all of the following and "**Excluded Subsidiary**" means any of them:

(1)    any Subsidiary that is a bona fide joint venture with Persons other than Affiliates of the Borrower entered into in the ordinary course of business or a Subsidiary of such bona fide joint venture,

(2)    any Foreign Subsidiary,

(3)    any CFC Holdco,

(4)    any Domestic Subsidiary that is a Subsidiary of any (i) Foreign Subsidiary, (ii) CFC or (iii) CFC Holdco,

(5)    any Subsidiary (including any regulated entity that is subject to net worth or net capital or similar capital and surplus restrictions) that is prohibited or restricted by applicable Law, accounting policies or by Contractual Obligation existing on the Closing Date (or, with respect to any Subsidiary acquired by the Borrower or a Restricted Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired) from providing a Guaranty, or if such Guaranty would require governmental (including regulatory) or third party (other than a Loan Party) consent, approval, license or authorization, unless such consent, approval, license or authorization has been received, or is received after commercially reasonable efforts to obtain the same, which efforts may be requested by the Administrative Agent or the Required Lenders,

(6)    any special purpose securitization vehicle (or similar entity) or any Securitization Subsidiary, to the extent formed for the purpose of consummating a Qualified Securitization Facility permitted hereunder,

(7)    [reserved],

33

(8)      any Subsidiary that is not a Material Subsidiary,

(9)      any Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the burden or cost (including any adverse tax consequences) of providing the Guaranty is excessive in relation to the benefits to be obtained by the Lenders therefrom,

(10)      [reserved], and

(11)      any Unrestricted Subsidiary.

"**Excluded Taxes**" means, with respect to each Agent and each Lender,

(1)      any tax on such Agent or Lender's net income or profits (or franchise tax in lieu of such tax on net income or profits) imposed by a jurisdiction as a result of such Agent or Lender being organized or having its principal office or applicable Lending Office located in such jurisdiction or as a result of any other present or former connection between such Agent or Lender and the jurisdiction (including as a result of such Agent or Lender carrying on a trade or business, having a permanent establishment or being a resident for tax purposes in such jurisdiction, other than a connection arising solely from such Agent or Lender having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or sold or assigned an interest in, any Loan or Loan Document),

(2)      any branch profits tax under Section 884(a) of the Code, or any similar tax, imposed by any other jurisdiction described in clause (1),

(3)      other than with respect to any Lender that becomes a party hereto pursuant to the Borrower's request under Section 3.07, any U.S. federal withholding tax that is imposed on amounts payable with respect to an applicable interest in a Loan or Commitment to a Lender pursuant to a Law in effect at the time such Lender becomes a party heretoacquires such interest (or designates a new Lending Office) (or where the Lender is a partnership for U.S. federal income tax purposes, pursuant to a law in effect on the later of the date on which such Lender becomes a party hereto or the date on which the affected partner becomes a partner of such Lender or designates a new Lending Office), except, in the case of a Lender or partner that designates a new Lending Office or is an assignee, to the extent that such Lender or partner (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to Section 3.01,

(4)      any withholding tax attributable to a Lender's failure to comply with Section 3.01(3),

(5)      any tax imposed under FATCA and

(6)      any interest, additions to taxes and penalties with respect to any taxes described in clauses (1) through (5) of this definition.

"**Existing Credit Agreement**" means that certain Credit Agreement, dated as of October 22, 2014, by and among Belk, certain affiliates of Belk, the lenders from time to time party thereto, the agents

34

party thereto and Wells Fargo Bank, National Association, as administrative agent, as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Existing Mortgaged Property**" means each Real Property set forth on Schedule 1.01(2) annexed hereto that, as of the Closing Date, is subject to a Mortgage in favor of the Collateral Agent.

"**Extended Commitments**" means the Term Loan Commitments held by an Extending Lender.

"**Extended Loans**" means the Term Loans made pursuant to Extended Commitments.

"**Extending Lender**" means each Lender accepting an Extension Offer.

"**Extension**" has the meaning specified in Section 2.16(1).

"**Extension Amendment**" has the meaning specified in Section 2.16(2).

"**Extension Offer**" has the meaning specified in Section 2.16(1).

"**Facilities**" means the Closing Date Term Loans, any Extended Loans, any Refinancing Term Loans, any Incremental Term Loans or any Replacement Loans, as the context may require, and "**Facility**" means any of them.

"**fair market value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code as in effect on the date hereof or any amended or successor version thereof that is substantively comparable and not materially more onerous to comply with (and, in each case, any regulations promulgated thereunder or official interpretations thereof), and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreements (together with any laws, rules, or practices implementing such agreements).

"**FCPA**" has the meaning specified in Section 5.17.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted to the Administrative Agent by three (3) federal funds brokers on such day on such transactions as determined by the Administrative Agent.

"**Financial Officer**" means, with respect to a Person, the chief financial officer, accounting officer, treasurer, controller or other senior financial or accounting officer of such Person, as appropriate.

"**First Lien Administrative Agent**" means Alter Domus (US) LLC, or any Supplemental Administrative Agent (as defined in the First Lien Credit Agreement) or successor agent under the First Lien Loan Documents.

"**First Lien Credit Agreement**" means the First Lien Term Loan Credit Agreement dated as of the date hereof among Holdings, the Borrower, the First Lien Administrative Agent, as administrative agent and collateral agent and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not an First Lien Credit Agreement) in each case to the extent permitted hereunder.

"**First Lien Credit Agreement Second Amendment**" means [●].that certain Amendment No. 2 to Credit Agreement, dated as of the Closing Date, by and among the Loan Parties party thereto, the lenders party thereto and Alter Domus (US) LLC, as administrative agent and collateral agent.

"**First Lien Facility**" means the collective reference to the First Lien Credit Agreement, the First Lien Loan Documents, any notes and letters of credit issued pursuant thereto and any guarantee, security agreement, patent, trademark or copyright security agreements, mortgages, letter of credit applications and other guarantees, pledge agreements, security agreements and collateral documents, and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented, waived or otherwise modified from time to time to the extent permitted hereunder and any Refinancing Indebtedness in respect thereof (unless such agreement, instrument or document expressly provides that it is not intended to be and is not a First Lien Facility), in each case to the extent permitted hereunder.

"**First Lien Loan Documents**" means, collectively, (i) the Second Lien Credit Agreement and (ii) the security documents, intercreditor agreements (including the Term Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with the Second Lien Facility or such other agreements, in each case, as amended, modified, supplemented, substituted, replaced, restated or refinanced, in whole or in part, from time to time including in connection with Refinancing Indebtedness of the Second Lien Facility.

"**First Lien Loans**" means "["Loans]"" as defined in the First Lien Facility as in effect on the Closing Date.

"**First Lien Obligations**" means "Obligations" as defined in the First Lien Facility as in effect on the date hereof.

"**Flood Hazard Property**" means [●].has the meaning specified in Section 6.07(2).

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Flood Insurance Requirements**" has the meaning specified in Section 6.07(2).

"**floor**" means, with respect to any reference rate of interest, any fixed minimum amount specified for such rate.

"**Foreign Asset Sale**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Casualty Event**" has the meaning specified in Section 2.05(2)(h).

36

"**Foreign Lender**" means a Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Code.

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, the Borrower or any Subsidiary of the Borrower with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Sale-Leaseback**" has the meaning specified in Section 2.05(2)(h).

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**Funded Debt**" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**GAAP**" means generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, as in effect from time to time. At any time after the Closing Date, the Borrower may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP will thereafter be construed to mean IFRS (except as otherwise provided in this Agreement); *provided*, *however*, that any such election, once made, will be irrevocable; *provided further* that any calculation or determination in this Agreement that requires the application of GAAP for periods that include fiscal quarters ended prior to the Borrower's election to apply IFRS will remain as previously calculated or determined in accordance with GAAP. The Borrower will give notice of any such election made in accordance with this definition to the Administrative Agent. Notwithstanding any other provision contained herein the amount of any Indebtedness under GAAP with respect to Capitalized Lease Obligations and Attributable Indebtedness shall be determined in accordance with the definition of Capitalized Lease Obligations and Attributable Indebtedness, respectively.

Notwithstanding the foregoing, if at any time any change occurring after the Closing Date in GAAP (or IFRS) or in the application thereof on the computation of any financial ratio or financial requirement, or compliance with any covenant, set forth in any Loan Document, and the Borrower shall so request (regardless of whether any such request is given before or after such change), the Lenders and the Borrower will negotiate in good faith to amend (subject to the approval of the Required Lenders) such ratio, requirement or covenant to preserve the original intent thereof in light of such change in GAAP (or IFRS); provided further that until so amended, (a) such ratio, requirement or covenant shall continue to be computed in accordance with GAAP (or IFRS) prior to such change therein and (b) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP (or IFRS).

37

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**guarantee**" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantor**" has the meaning specified in clause (2) of the definition of "Collateral and Guarantee Requirement." For avoidance of doubt, the Borrower may, in its sole discretion, cause any domestic Parent Company or Restricted Subsidiary that is not required to be a Guarantor to Guarantee the Obligations by causing such Parent Company or Restricted Subsidiary to execute a joinder to the Guaranty (substantially in the form provided therein or as the Administrative Agent, the Required Lenders, the Borrower and such Guarantor may otherwise agree), and any such Parent Company or Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"**Guaranty**" means (a) the Guarantee of the Obligations by the Guarantors substantially in the form of Exhibit E, (b) each other Guarantee and Guarantee supplement delivered pursuant to Section 6.11 and (c) each other Guarantee and Guarantee supplement delivered by any Parent Company or Restricted Subsidiary pursuant to the second sentence of the definition of "Guarantor".

38

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, and all other hazardous or toxic substances or wastes, pollutants and contaminants and chemicals in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, or radon gas and infectious or medical wastes, to the extent any of the foregoing are regulated pursuant to, or can form the basis for liability under, any Environmental Law.

"**Hedge Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under any Hedge Agreement.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Identified Participating Lenders**" has the meaning specified in Section 2.05(1)(e)(C)(3).

"**Identified Qualifying Lenders**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**IFRS**" means international financial reporting standards and interpretations issued by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants or any successor to either such Board, or the SEC, as the case may be), as in effect from time to time.

"**Immediate Family Members**" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including, in each case, adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"**Incremental Amendment**" has the meaning specified in Section 2.14(5).

"**Incremental Amounts**" has the meaning specified in clause (1) of the definition of Refinancing Indebtedness.

"**Incremental Term Facility**" has the meaning specified in Section 2.14(1).

"**Incremental Term Loan**" has the meaning specified in Section 2.14(1).

"**Incremental Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund an Incremental Term Loan and "Incremental Term Loan Commitments" means such commitments of all Lenders in the aggregate.

"**Incremental Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Incremental Term Loans of such Lenders; *provided* that at any time prior to the making of the Incremental Term Loans, the Incremental Term Loan Exposure of any Lender shall be equal to such Lender's Incremental Term Loan Commitment.

"**Indebtedness**" means, with respect to any Person, without duplication:

(1)      any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)      in respect of borrowed money;

(b)      evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)      representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations) due more than twelve months after such property is acquired, except (i) any such balance that constitutes an obligation in respect of a commercial letter of credit, a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business or consistent with industry practice, (ii) any earn-out obligations until such obligation is reflected as a liability on the balance sheet (excluding any footnotes thereto) of such Person in accordance with GAAP and is not paid within 60 days after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business; or

(d)      representing the net obligations under any Hedging Obligations;

(2)      to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business or consistent with industry practice; and

(3)      to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of such Indebtedness will be the lesser of (i) the fair market value of such asset at such date of determination and (ii) the amount of such Indebtedness of such other Person; *provided* that notwithstanding the foregoing, Indebtedness will be deemed not to include:

(i)      Contingent Obligations incurred in the ordinary course of business or consistent with industry practice,

(ii)      reimbursement obligations under commercial letters of credit (*provided* that unreimbursed amounts under letters of credit will be counted as Indebtedness three (3) Business Days after such amount is drawn),

40

(iii)     obligations under or in respect of Qualified Securitization Facilities that are non-recourse to the Loan Parties other than any Securitization Repurchase Obligation,

(iv)     accrued expenses,

(v)     deferred or prepaid revenues, and

(vi)     asset retirement obligations and obligations in respect of reclamation and workers compensation (including pensions and retiree medical care);

*provided further* that Indebtedness will be calculated without giving effect to the effects of Accounting Standards Codification Topic No. 815, *Derivatives and Hedging*, and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Assets or Operations**" means, with respect to any Parent Company, that Parent Company's total assets, revenues, income from continuing operations before income taxes and cash flows from operating activities (excluding in each case amounts related to its investment in the Borrower and the Restricted Subsidiaries), determined in accordance with GAAP and as shown on the most recent balance sheet of such Parent Company, is more than 3.0% of such Parent Company's corresponding consolidated amount.

"**Information**" has the meaning specified in Section 10.09.

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means the Intercompany Subordination Agreement, dated as of the Closing Date, substantially in the form of Exhibit Q executed by the Borrower and each Restricted Subsidiary that is party thereto.

"**Interest Payment Date**" means the first Business Day of each February, May, August and November and the applicable Maturity Date of the Loans of such Class.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's or BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency selected by the Borrower.

"**Investment Grade Securities**" means:

(1)     securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2)     debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or debt instruments constituting loans or advances among the Borrower and its Subsidiaries;

41

(3)      investments in any fund that invests at least 95% of its assets in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4)      corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"**Investments**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to employees, directors, officers, members of management, manufacturers and consultants, in each case made in the ordinary course of business or consistent with industry practice), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person. For purposes of the definition of "Unrestricted Subsidiary" and Section 7.05,

(1)      "Investments" will include the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)      the Borrower's "Investment" in such Subsidiary at the time of such redesignation; *minus*

(b)      the portion (proportionate to the Borrower's Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2)      any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer.

The amount of any Investment outstanding at any time will be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.

"**Investors**" means the Sponsor.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**Judgment Currency**" has the meaning specified in Section 10.26.

"**Junior Debt**" has the meaning specified in Section 7.05(a)(C).

"**KKR**" means KKR Credit Advisors (US) LLC and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

42

"**Landlord Consent and Estoppel**" means with respect to any Leased Real Property, a letter, certificate or other instrument in writing from the lessor under the related lease, reasonably satisfactory in form and substance to the Collateral Agent and the Required Lenders, pursuant to which such lessor agrees, for the benefit of Collateral Agent, (i) that without any further consent of such lessor or any further action on the part of the Loan Party holding such Leased Real Property, such Leased Real Property may be encumbered pursuant to a Mortgage and may be assigned to the purchaser at a foreclosure sale or in a transfer in lieu of such a sale (and to a subsequent third party assignee if Collateral Agent or its designee so acquires such Leased Real Property), (ii) that such lessor shall not terminate such lease as a result of a default by such Loan Party thereunder without first giving Collateral Agent written notice of such default and at least 60 days (or, if such default cannot reasonably be cured by Collateral Agent or the Required Lenders within such period, such longer period as may reasonably be required) to cure such default and (iii) to such other matters relating to such Leased Real Property as Collateral Agent or the Required Lenders may reasonably request.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Closing Date Term Loan, Incremental Term Loan, Refinancing Term Loan, Replacement Loan or any Extended Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, legally enforceable guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the legally binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Leased Real Property**" means any real property located in the United States and ground leased by any Loan Party, or in which Loan Party acquires a ground leasehold interest after the Closing Date; *provided* that for the avoidance of doubt, Leased Real Property will not include any Excluded Assets.

"**Legal Holiday**" means Saturday, Sunday or a day on which commercial banking institutions are not required to be open in the State of New York or at the place of payment.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender." For the avoidance of doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered a Refinancing Amendment, an Incremental Amendment or an amendment in respect of Replacement Loans, as the case may be, and to the extent such Refinancing Amendment, Incremental Amendment or amendment in respect of Replacement Loans shall have become effective in accordance with the terms hereof and thereof, and each Extending Lender shall continue to be a Lender. As of the Closing Date, Schedule 2.01 sets forth the name of each Lender.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest and any authorized filing of or agreement to give any financing statement under the Uniform

43

Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event will an operating lease be deemed to constitute a Lien.

"**Limited Condition Acquisition**" means any investment permitted hereunder by the Borrower or one or more of its Restricted Subsidiaries whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"**Loan**" means an extension of credit under Article II or the making of Replacement Loans pursuant to Section 10.01 by a Lender to the Borrower in the form of a Term Loan.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) any Refinancing Amendment, Incremental Amendment, Extension Amendment or amendment in respect of Replacement Loans, (d) the Guaranty, (e) the Collateral Documents, (f) the Applicable Intercreditor Agreements, (g) the Agent Fee Letter and (h) any other agreement, document or instrument designated as a "Loan Document" by the Borrower and the Administrative Agent (or the Required Lenders). Any reference to this Agreement or any other Loan Document shall include all appendices, exhibits, schedules, annexes or attachments thereto.

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each Subsidiary Guarantor.

"**Management Services Agreement**" means the management services agreement or similar agreements among the Sponsor or certain of its respective management companies associated with it or their advisors, if applicable, and the Borrower (or any Parent Company).

"**Management Stockholders**" means the members of management (and their Controlled Investment Affiliates and Immediate Family Members and any permitted transferees thereof) of the Borrower (or a Parent Company) who are holders of Equity Interests of any Permitted Parent or any Parent Company on the Closing Date or that become holders of such Equity Interests thereafter.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Material Adverse Effect**" means a circumstance or condition that would materially and adversely affect (a) the business, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents to which it is a party or (c) the rights and remedies of the Lenders, the Collateral Agent and the Administrative Agent under the Loan Documents, in each case, other than customary events or circumstances in connection with the Plan of Reorganization.

"**Material Domestic Subsidiary**" means, as of the Closing Date and thereafter at any date of determination, each of the Borrower's Domestic Subsidiaries that is a Restricted Subsidiary (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiary at the last day of the most recent Test Period) were equal to or greater than 1.0% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiary for such Test Period) were equal to or greater than 1.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time after the date which is 30 days after the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion), Domestic

Subsidiaries that are not Material Domestic Subsidiaries solely because they do not meet the thresholds set forth in the preceding clause (a) or (b) comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Domestic Subsidiaries at the last day of the most recent Test Period) 2.5% of Total Assets of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Domestic Subsidiaries for such Test Period) 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries that are Domestic Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries that are Restricted Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 with respect to any such Subsidiaries.

"**Material Foreign Subsidiary**" means, as of the Closing Date and thereafter at any date of determination, each of the Borrower's Foreign Subsidiaries that are Restricted Subsidiaries (a) whose Total Assets at the last day of the most recent Test Period (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiary at the last day of the most recent Test Period) were equal to or greater than 1.0% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries at such date or (b) whose gross revenues for such Test Period (when taken together with the revenues of the Restricted Subsidiaries of such Foreign Subsidiary for such Test Period) were equal to or greater than 1.0% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, in each case determined in accordance with GAAP; *provided* that if at any time and from time to time after the date which is 30 days after the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion), Foreign Subsidiaries that are not Material Foreign Subsidiaries comprise in the aggregate more than (when taken together with the Total Assets of the Restricted Subsidiaries of such Foreign Subsidiaries at the last day of the most recent Test Period) 2.5% of Total Assets of the Restricted Subsidiaries that are Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) as of the end of the most recently ended Test Period or more than (when taken together with the gross revenues of the Restricted Subsidiaries of such Foreign Subsidiaries (excluding Subsidiaries otherwise constituting Excluded Subsidiaries) for such Test Period) 2.5% of the consolidated gross revenues of the Restricted Subsidiaries that are Foreign Subsidiaries for such Test Period, then the Borrower shall, not later than thirty (30) days after the date by which financial statements for such Test Period were required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries that are Restricted Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) with respect to the Closing Date Term Loans, in each case that have not been extended pursuant to Section 2.16 after the Closing Date, July 31, 2025, (ii) with respect to any tranche of Extended Loans, the final maturity date as specified in the applicable Extension Amendment, (iii) with respect to any Refinancing Term Loans, the final maturity date as specified in the applicable Refinancing Amendment ~~and (iv~~, (iv) with respect to any Incremental Term Loans, the final maturity date as specified in the applicable Incremental Amendment and (v) with respect to Replacement Loans, the final maturity date as specified in the applicable amendment; *provided* that in each case, if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

45

"**Maximum Rate**" has the meaning specified in Section 10.11.

"**Moody's**" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"**Mortgage Policies**" has the meaning specified in Section 6.11(2)(b)(ii).

"**Mortgaged Properties**" has the meaning specified in paragraph (5) of the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the fee or leasehold, as applicable, deeds of trust, trust deeds, hypothecs, deeds to secure debt and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent for the benefit of the Secured Parties in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, including such modifications as may be required by local laws, pursuant to Section 6.13(2) and any other deeds of trust, trust deeds, hypothecs, deeds to secure debt or mortgages executed and delivered pursuant to Sections 6.11.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"**Net Proceeds**" means:

(1)      with respect to any Asset Sale or any Casualty Event, the aggregate Cash Equivalent proceeds received by the Borrower or any Restricted Subsidiary in respect of such Asset Sale or Casualty Event, net of the costs relating to such Asset Sale or Casualty Event, including legal, accounting and investment banking fees, payments made in order to obtain a necessary consent or required by applicable law, brokerage and sales commissions, all dividends, distributions or other payments required to be made to minority interest holders in Restricted Subsidiaries as a result of any such Asset Sale or Casualty Event by a Restricted Subsidiary, the amount of any purchase price or similar adjustment claimed by any Person to be owed by the Borrower or any Restricted Subsidiary, until such time as such claim will have been settled or otherwise finally resolved, or paid or payable by the Borrower or any Restricted Subsidiary, in either case in respect of such Asset Sale or Casualty Event, any relocation expenses incurred as a result thereof, costs and expenses in connection with unwinding any Hedging Obligation in connection therewith, other fees and expenses, including title and recordation expenses, taxes paid or payable as a result thereof or any transactions occurring or deemed to occur to effectuate a payment under this Agreement, amounts required to be applied to the repayment of principal, premium, if any, and interest on Indebtedness (other than Subordinated Indebtedness, the ABL Facility or the First Lien Facility) secured by a Lien on such assets and required (other than required by Section 2.05(2)(b) of the First Lien Credit Agreement) to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Borrower or any Restricted Subsidiary as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction; *provided* that (a) subject to clause (b) below, no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net

46

Proceeds unless such net cash proceeds shall exceed $1.0 million and (b) no such net cash proceeds shall constitute Net Proceeds under this clause (1) in any fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $2.0 million (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (1)); and

(2)     (a) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower or any Parent Company, the excess, if any, of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (ii) all taxes paid or reasonably estimated to be payable, and all fees (including investment banking fees, attorneys' fees, accountants' fees, underwriting fees and discounts), commissions, costs and other out-of-pocket expenses and other customary expenses incurred, in each case by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (b) with respect to any Permitted Equity Issuance by any Parent Company, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower;

*provided* that "Net Proceeds" shall not include, or apply to, the proceeds of the sale component of any Sale-Leaseback Transaction, although proceeds from Specified Sale-Leaseback Transactions shall be governed by the definition of "Specified Sale-Leaseback Net Proceeds".

"**New Store**" means each new store or shopping facility opened or acquired by the Borrower or a Restricted Subsidiary that has been open for commercial operations for less than twelve full calendar months.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Non-Excluded Taxes**" means all Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Non-Extended Lender**" has the meaning specified in Section 2.16.

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Non-Recourse Indebtedness**" means Indebtedness that is non-recourse to the Borrower and the Restricted Subsidiaries.

"**Obligations**" means all

(1)     advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, including the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, premiums, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including principal, interest, reimbursement obligations, charges, expenses, fees, premiums, Attorney Costs, indemnities and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding, and

47

(2)      the Guaranty in respect of each of the foregoing.

"**OFAC**" has the meaning specified in Section 5.17.

"**Offered Amount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Offered Discount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Officer's Certificate**" means a certificate signed on behalf of a Person by a Responsible Officer of such Person.

"**OID**" means original issue discount.

"**Opinion of Counsel**" means a written opinion from legal counsel who is reasonably acceptable to the Required Lenders. Counsel may be an employee of or counsel to the Borrower or the Administrative Agent.

"**ordinary course of business**" means activity conducted in the ordinary course of business of the Borrower and any Restricted Subsidiary, including the expansion, remodeling, acquisition, modernization, construction, improvement and repair of department stores and other retail centers of Belk operated, or expected to be operated, by the Borrower or a Restricted Subsidiary, and financing transactions in connection therewith, and will include Sale-Leaseback Transactions.

"**Organizational Documents**" means

(1)      with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction);

(2)      with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and

(3)      with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Original Closing Date**" means December 10, 2015.

"**Other Applicable Indebtedness**" means Credit Agreement Refinancing Indebtedness secured on a *pari passu* basis with the Obligations, together with Refinancing Indebtedness in respect of any of the foregoing that is secured on a *pari passu* basis with the Obligations.

"**Other Applicable Net Proceeds**" means Net Proceeds or a comparable measure as determined in accordance with the documentation governing Other Applicable Indebtedness.

"**Other Taxes**" means any and all present or future stamp, court or documentary Taxes, intangible, recording, filing or similar Taxes arising from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

48

"**Outstanding Amount**" means on any date, the outstanding principal amount of any Term Loans after giving effect to any borrowings and prepayments or repayments of Term Loans, occurring on such date.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Owned Real Property**" means any fee-owned real property located in the United States and owned on, or acquired after, the Closing Date, by any Loan Party; *provided* that for the avoidance of doubt, Owned Real Property will not include any Excluded Assets.

"**Parent Company**" means any Person so long as such Person directly or indirectly holds 100.0% of the total voting power of the Capital Stock of the Borrower, and at the time such Person acquired such voting power, no Person and no group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any such group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) (other than any Permitted Holder), will have beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), directly or indirectly, of 50.0% or more of the total voting power of the Voting Stock of such Person. For the avoidance of doubt, Fashion Holdings Intermediate Inc., a Delaware corporation, is a Parent Company of the Borrower.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Participating Lender**" has the meaning specified in Section 2.05(1)(e)(C)(2).

"**Payment in Full**" means, with respect to the Obligations in respect of the Loans or any Class of Loans, the occurrence of all of the following:

(a)   termination or expiration of all commitments to extend credit that would constitute such Obligations;

(b)   payment in full in cash of the principal of, interest and premium (if any) on, fees and other charges comprising such Obligations that are due and payable (including, in any event, principal, interest, premium, fees and other charges that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding); and

(c)   payment in full in cash of all other such Obligations that are outstanding and due and payable at the time the principal of, interest and premium (if any) on, fees and other charges comprising such Obligations are paid in full in cash (other than any obligations for taxes, costs, indemnification, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time) (including, in any event, reimbursement obligations, expenses, Attorney Costs, indemnities and other amounts that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such amounts are enforceable, allowed or allowable claims in such proceeding).

49

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"**Perfection Certificate**" has the meaning specified in the Security Agreement.

"**Permitted Asset Swap**" means the substantially concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Borrower or any Restricted Subsidiary and another Person; *provided* that any cash or Cash Equivalents received must be applied in accordance with Section 2.05(2)(b)(i).

"**Permitted Equal Priority Refinancing Debt**" means any Credit Agreement Refinancing Indebtedness that is secured on a *pari passu* basis with the Closing Date Term Loans.

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of the Borrower or any Parent Company.

"**Permitted Holder**" means (1) the Investors, KKR, Blackstone and Management Stockholders and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the foregoing are members; *provided* that in the case of such group and without giving effect to the existence of such group or any other group, such Investors, KKR, Blackstone and Management Stockholders, collectively, have beneficial ownership of more than a majority of the total voting power of the Voting Stock of the Borrower or any Permitted Parent, and (2) any Person acting in the capacity of an underwriter (solely to the extent that and for so long as such Person is acting in such capacity) in connection with a public or private offering of Capital Stock of the Borrower or any Permitted Parent.

"**Permitted Indebtedness**" means Indebtedness permitted to be incurred in accordance with Section 7.02.

"**Permitted Investments**" means:

(1)     any Investment (a) in any Loan Party, and (b) by any Restricted Subsidiary that is a Non-Loan Party in any other Restricted Subsidiary that is a Non-Loan Party and (c) [reserved];.

(2)     any Investment(s) in Cash Equivalents or Investment Grade Securities and Investments that were Cash Equivalents or Investment Grade Securities when made;

(3)     [Rreserved];

(4)     any Investment in securities or other assets not constituting Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made in accordance with Section 7.04 or any other disposition of assets not constituting an Asset Sale;

(5)     any Investment existing on the Closing Date or made pursuant to binding commitments in effect on the Closing Date or an Investment consisting of any extension, modification, replacement, renewal or reinvestment of any Investment or binding commitment

existing on the Closing Date; *provided* that the amount of any such Investment or binding commitment may be increased, extended, modified, replaced, reinvested or renewed, (a) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities) or (b) as otherwise permitted hereunder;

(6)     any Investment acquired by the Borrower or any Restricted Subsidiary:

(a)     in exchange for any other Investment, accounts receivable or indorsements for collection or deposit held by the Borrower or any Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer);

(b)     in satisfaction of judgments against other Persons;

(c)     as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or

(d)     as a result of the settlement, compromise or resolution of (i) litigation, arbitration or other disputes or (ii) obligations of trade creditors or customers that were incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer;

(7)     Hedging Obligations permitted under Section 7.02(b)(10);

(8)     [reserved];

(9)     Investments the payment for which consists of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company; *provided* that such Equity Interests will not increase the Available Amount;

(10)     (a) guarantees of Indebtedness permitted under Section 7.02, performance guarantees and Contingent Obligations incurred in the ordinary course of business or consistent with industry practice, and (b) the creation of liens on the assets of the Borrower or any Restricted Subsidiary in compliance with Section 7.01;

(11)     any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 7.06(b)(3), (4), (7), (8), (10), (14), (16), (17), (18), (19), (20) and (23);

(12)     Investments consisting of purchases and acquisitions of inventory, supplies, material, services or equipment or similar assets or the licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons;

(13)     Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding, not to exceed $60.0 million (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition

of "Investment"); *provided*, *however*, that if any Investment pursuant to this clause (13) is made in any Person that is not a Restricted Subsidiary (or Subsidiary Guarantor, as applicable) at the date of the making of such Investment and such Person becomes a Restricted Subsidiary (or Subsidiary Guarantor, as applicable) after such date, such Investment will thereafter be deemed to have been made pursuant to clause (1) above (to the extent permitted thereunder) and will cease to have been made pursuant to this clause (13) for so long as such Person continues to be a Restricted Subsidiary (or Subsidiary Guarantor, as applicable); *provided*, *further*, that the Investments made by Loan Parties in Non-Loan Parties pursuant to this clause (13), together with the Investments made pursuant to clause (18), shall not in the aggregate exceed $42.0 million at any time outstanding;

(14)    Investments in a Securitization Subsidiary that, in the good faith determination of the Borrower, are necessary to effect any Qualified Securitization Facility or any repurchase obligation pursuant to a Securitization Repurchase Obligation;

(15)    loans and advances to, or guarantees of Indebtedness of, officers, directors, employees, consultants and members of management, together with the amounts described in clause (16), not in excess of the greater of $12.0 million and 2.4% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(16)    loans and advances to employees, directors, officers, members of management and consultants for business-related travel expenses, moving expenses, payroll advances and other similar expenses or payroll expenses, in each case incurred in the ordinary course of business or consistent with past practice or consistent with industry practice or to future, present and former employees, directors, officers, members of management and consultants (and their Controlled Investment Affiliates and Immediate Family Members) to fund such Person's purchase of Equity Interests of the Borrower or any Parent Company, together with the amounts described in clause (15), not in excess of the greater of $12.0 million and 2.4% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto outstanding at any one time, in the aggregate;

(17)    advances, loans or extensions of trade credit or prepayments to suppliers or loans or advances made to distributors, in each case, in the ordinary course of business or consistent with past practice or consistent with industry practice by the Borrower or any Restricted Subsidiary;

(18)    any Investment in any Subsidiary (other than an Unrestricted Subsidiary) or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business or consistent with industry practice; *provided*, that the Investments made by Loan Parties in Non-Loan Parties pursuant to this clause (18), together with the Investments made by Loan Parties in Non-Loan Parties pursuant to clause (13), shall not exceed $42.0 million in the aggregate at any time outstanding;

(19)    Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with industry practice;

(20)    Investments made in the ordinary course of business or consistent with industry practice in connection with obtaining, maintaining or renewing client contacts and loans or advances made to distributors;

(21)    Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result

52

of the operations of the business in the ordinary course of business or consistent with industry practice;

(22)     the purchase or other acquisition of any Indebtedness of the Borrower or any Restricted Subsidiary to the extent otherwise permitted hereunder;

(23)     [reserved];

(24)     Investments in the ordinary course of business or consistent with industry practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers;

(25)     any Investment by any Captive Insurance Subsidiary in connection with its provision of insurance to the Borrower or any of its Subsidiaries, which Investment is made in the ordinary course of business or consistent with industry practice of such Captive Insurance Subsidiary, or by reason of applicable law, rule, regulation or order, or that is required or approved by any regulatory authority having jurisdiction over such Captive Insurance Subsidiary or its business, as applicable;

(26)     Investments made as part of, to effect or resulting from the Transactions;

(27)     Investments of assets relating to non-qualified deferred payment plans in the ordinary course of business or consistent with industry practice;

(28)     [reserved];

(29)     acquisitions of obligations of one or more directors, officers or other employees or consultants or independent contractors of any Parent Company, the Borrower, or any Subsidiary of the Borrower in connection with such director's, officer's, employee's consultant's or independent contractor's acquisition of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, to the extent no cash is actually advanced by the Borrower or any Restricted Subsidiary to such directors, officers, employees, consultants or independent contractors in connection with the acquisition of any such obligations;

(30)     Investments constituting promissory notes or other non-cash proceeds of dispositions of assets to the extent permitted under Section 7.04; and

(31)     Investments resulting from pledges and deposits permitted pursuant to the definition of "Permitted Liens".";

(32)     [reserved];

(33)     [reserved];

(34)     [reserved]; and

(35)     [reserved].

For purposes of determining compliance with this definition, (A) an Investment need not be incurred solely by reference to one category of Permitted Investments described in this definition, but is

permitted to be incurred in part under any combination thereof and of any other available exemption and (B) [reserved].

"**Permitted Junior Priority Refinancing Debt**" means any Credit Agreement Refinancing Indebtedness that is secured on a junior lien basis to the Closing Date Term Loans.

"**Permitted Liens**" means, with respect to any Person:

(1)     Liens created pursuant to any Loan Document;

(2)     Liens, pledges or deposits made in connection with:

(a)     workers' compensation laws, unemployment insurance, health, disability or employee benefits, other social security laws or similar legislation or regulations,

(b)     insurance-related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) securing reimbursement or indemnification obligations of (including obligations in respect of letters of credit, bank guarantees or similar documents or instruments for the benefit of) insurance carriers providing property, casualty or liability insurance or otherwise supporting the payment of items set forth in the foregoing clause (a) or

(c)     bids, tenders, contracts, statutory obligations, surety, indemnity, warranty, release, appeal or similar bonds, or with regard to other regulatory requirements, completion guarantees, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities, and other obligations of like nature (including those to secure health, safety and environmental obligations) (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for the payment of rent, contested taxes or import duties and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with industry practice;

(3)     Liens imposed by law, such as landlords', carriers', warehousemen's, materialmen's, repairmen's, construction, mechanics' or other similar Liens (a) for sums not yet overdue for a period of more than sixty (60) days or, if more than sixty (60) days overdue, are unfiled and no other action has been taken to enforce such Liens or (b) being contested in good faith by appropriate actions or other Liens arising out of or securing judgments or awards against such Person with respect to which such Person will then be proceeding with an appeal or other proceedings for review if such Liens are adequately bonded or adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)     Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than thirty (30) days or not yet payable or not subject to penalties for nonpayment or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(5)     Liens in favor of issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds, instruments or obligations or with respect to regulatory requirements or letters of credit or bankers acceptance issued, and completion guarantees provided for, in each case,

issued pursuant to the request of and for the account of such Person in the ordinary course of its business or consistent with past practice or industry practice;

(6)　　survey exceptions, encumbrances, ground leases, easements, restrictions, protrusions, encroachments or reservations of, or rights of others for, licenses, rights-of-way, servitudes, sewers, electric lines, drains, telegraph, telephone and cable television lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that were not incurred in connection with Indebtedness and that do not in the aggregate materially impair their use in the operation of the business of such Person and exceptions on title policies insuring liens granted on Mortgaged Properties;

(7)　　Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (2), (4), (12), (13), (23) or (25) of Section 7.02(b); *provided* that:

(a)　　Liens securing obligations relating to any Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (13) relate only to obligations relating to Refinancing Indebtedness that is secured by Liens on the same assets as the assets securing the Refinanced Debt (as defined in the definition of Refinancing Indebtedness), *plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property, or serves to refund, refinance, extend, replace, renew or defease Indebtedness, Disqualified Stock or Preferred Stock incurred under such clause (4), (12) or (13) of Section 7.02(b);

(b)　　Liens securing obligations relating to Indebtedness or Disqualified Stock permitted to be incurred pursuant to such clause (23) extend only to the assets of Subsidiaries that are not Guarantors;

(c)　　Liens securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to such clause (4) extend only to the assets so purchased, replaced, leased or improved and proceeds and products thereof; *provided further* that individual financings of assets provided by a counterparty may be cross-collateralized to other financings of assets provided by such counterparty;

(d)　　In the case of Liens securing Indebtedness for borrowed money, Disqualified Stock or Preferred Stock incurred pursuant to such clause (12), such Indebtedness may be secured by the Collateral on a senior, pari passu or junior basis to the Closing Date Term Loans; *provided* that if such Liens secure any Indebtedness for borrowed money on a senior pari passu basis with, or junior basis to, the Liens that secure the Closing Date Term Loans, the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement;

(e)　　In the case of Liens securing Indebtedness incurred under clause (2) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement, which may provide that the Liens securing such Indebtedness rank senior to the Liens securing the Closing Date Term Loans;

(f)　　[reserved]; and

55

(g)     In the case Liens securing Indebtedness incurred under clause (25) of Section 7.02(b), together with any Refinancing Indebtedness in respect thereof, the Debt Representative in respect of such Indebtedness shall have entered into the Applicable Intercreditor Agreement, which shall provide that (i) the Liens on the ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing such Indebtedness may be pari passu or senior to the Liens on the ABL Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing the Closing Date Term Loans and (ii) the Liens on the Term Priority Collateral (as such term is defined in the ABL Intercreditor Agreement)  securing such Indebtedness shall be junior to the Liens on the Term Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) securing the Closing Date Term Loans.

(8)     Liens existing, or provided for under binding contracts existing, on the Closing Date (including Liens in effect on the Closing Date securing Indebtedness permitted under Section 7.02(b)(3)) but excluding Liens securing Indebtedness permitted under Section 7.02(b)(2) and Section 7.02(b)(25));

(9)     [reserved];

(10)     Liens on property or other assets at the time the Borrower or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger, amalgamation or consolidation with or into the Borrower or any Restricted Subsidiary; *provided* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition, amalgamation, merger or consolidation; *provided further* that such Liens are limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after acquired-property) that secured the obligations to which such Liens relate;

(11)     Liens securing obligations in respect of Indebtedness or other obligations of a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary permitted to be incurred in accordance with Section 7.02;

(12)     Liens securing (x) Hedging Obligations and (y) obligations in respect of Cash Management Services;

(13)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's accounts payable or similar obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(14)     leases, subleases, licenses or sublicenses (or other agreement under which the Borrower or any Restricted Subsidiary has granted rights to end users to access and use the Borrower's or any Restricted Subsidiary's products, technologies or services) that do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and the customary rights reserved or vested in any Person by the terms of any lease, sublease, license, sublicense, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(15)     Liens arising from Uniform Commercial Code (or equivalent statutes) financing statement filings regarding operating leases, consignments or accounts entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business or consistent with industry practice

56

or purported Liens evidenced by the filing of precautionary Uniform Commercial Code (or equivalent statutes) financing statements or similar public filings;

(16)    Liens in favor of the Borrower or any Guarantor;

(17)    Liens on equipment or vehicles of the Borrower or any Restricted Subsidiary granted in the ordinary course of business or consistent with industry practice;

(18)    Liens on accounts receivable, Securitization Assets and related assets incurred in connection with a Qualified Securitization Facility;

(19)    Liens to secure any modification, refinancing, refunding, extension, renewal or replacement (or successive modification, refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness, Disqualified Stock or Preferred Stock secured by any Lien referred to in clauses (7), (8) or (10) of this definition; *provided* that: (a) such new Lien will be limited to all or part of the same property (plus improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property) that secured the original Lien (plus improvements and accessions on such property) and proceeds and products thereof and (b) the Indebtedness, Disqualified Stock or Preferred Stock secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clauses (7), (8) or (10) at the time the original Lien became a Permitted Lien hereunder, *plus* (ii) an amount necessary to pay any fees and expenses (including original issue discount, upfront fees, defeasance costs, underwriting discounts or similar fees) and premiums (including tender premiums and accrued and unpaid interest), related to such refinancing, refunding, extension, renewal or replacement;

(20)    deposits made or other security provided to secure liability to insurance brokers, carriers, underwriters or self-insurance arrangements, including Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(21)    other Liens securing obligations in an aggregate principal amount at any one time outstanding not to exceed the greater of (a) $30.0 million and (b) 6.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto; *provided*, that if such Liens secure any Indebtedness for borrowed money in an amount in excess of $30.0 million and are secured by the Collateral on a *pari passu* basis with, or junior basis to, the Liens that secure the Closing Date Term Loans, the Debt Representative in respect thereof shall have entered into the Applicable Intercreditor Agreement;

(22)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(23)    (a) the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business or consistent with industry practice, (b) Liens arising out of conditional sale, title retention or similar arrangements for the sale of goods in the ordinary course of business or consistent with industry practice and (c) Liens arising by operation of law under Article 2 of the Uniform Commercial Code;

(24)    Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(7);

57

(25)     Liens (a) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on items in the course of collection, (b) attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business or consistent with industry practice and (c) in favor of banking or other institutions or other electronic payment service providers arising as a matter of law or under general terms and conditions encumbering deposits or margin deposits or other funds maintained with such institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(26)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under this Agreement; *provided* that such Liens do not extend to assets other than those that are subject to such repurchase agreements;

(27)     Liens that are contractual rights of setoff (a) relating to the establishment of depository relations with banks or other deposit-taking financial institutions or other electronic payment service providers and not given in connection with the issuance of Indebtedness, (b) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business or consistent with industry practice of the Borrower or any Restricted Subsidiary or (c) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business or consistent with industry practice;

(28)     Liens on cash proceeds (as defined in Article 9 of the Uniform Commercial Code) of assets sold that were subject to a Lien permitted hereunder;

(29)     any encumbrance or restriction (including put, call arrangements, tag, drag, right of first refusal and similar rights) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(30)     Liens (a) on cash advances or cash earnest money deposits in favor of the seller of any property to be acquired in an Investment permitted under this Agreement to be applied against the purchase price for such Investment and (b) consisting of a letter of intent or an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under Section 7.04 in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(31)     ground leases, leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(32)     Liens in connection with any Specified Sale-Leaseback Transactions;

(33)     Liens on Capital Stock or other securities of an Unrestricted Subsidiary;

(34)     any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business or consistent with industry practice;

(35)     deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business or consistent with industry practice of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(36)    rights of set-off, banker's liens, netting arrangements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(37)    Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; *provided* that such satisfaction or discharge is permitted under this Agreement;

(38)    receipt of progress payments and advances from customers in the ordinary course of business or consistent with industry practice to the extent the same creates a Lien on the related inventory and proceeds thereof;

(39)    [reserved];

(40)    agreements to subordinate any interest of the Borrower or any Restricted Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any Restricted Subsidiary pursuant to an agreement entered into in the ordinary course of business or consistent with industry practice;

(41)    Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act or similar provision of any Environmental Law;

(42)    Liens disclosed by the title insurance policies delivered on or prior to the Closing Date and any replacement, extension or renewal of any such Lien (to the extent the Indebtedness and other obligations secured by such replacement, extension or renewal Liens are permitted by this Agreement); *provided* that such replacement, extension or renewal Liens do not cover any property other than the property that was subject to such Liens prior to such replacement, extension or renewal;

(43)    rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of its Restricted Subsidiaries or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(44)    restrictive covenants affecting the use to which real property may be put; *provided* that the covenants are complied with in all material respects;

(45)    security given to a public utility or any municipality or Governmental Authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business or consistent with industry practice;

(46)    zoning by-laws and other land use restrictions, including site plan agreements, development agreements and contract zoning agreements; and

(47)    Liens on all or any portion of the Collateral (but no other assets) securing (i) Permitted Equal Priority Refinancing Debt or (ii) Permitted Junior Priority Refinancing Debt, and, in each case, Liens securing any Refinancing Indebtedness in respect thereof.

Notwithstanding anything set forth above, the granting of a consensual Lien by any Person with respect to any property set forth in clause (i) of the definition of "Excluded Assets" shall be subject to the proviso set forth therein.

For purposes of determining compliance with this definition, (A) a Lien need not be incurred solely by reference to one category of Permitted Liens described in this definition, but is permitted to be incurred in part under any combination thereof and of any other available exemption and (B) [reserved].

If any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing and if any Liens securing obligations are incurred to refinance liens securing obligations initially incurred in reliance on a Basket measured by a fixed dollar amount, such fixed dollar Basket will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Lien does not exceed the principal amount of such obligations secured by such Liens being refinanced, plus the related costs incurred or payable in connection with such refinancing.

For purposes of this definition, the term "Indebtedness" will be deemed to include interest on such Indebtedness.

"**Permitted Parent**" means any direct or indirect parent of the Borrower that at the time it became a parent of the Borrower was a Permitted Holder pursuant to clause (1) of the definition thereof.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**PIK Interest**" means, with respect to any Loan, a payment of interest with respect to such Loan in-kind in arrears by increasing the outstanding principal amount of such Loan on the relevant Interest Payment Date by the amount of accrued and unpaid interest due and payable on such date. Once PIK Interest is capitalized and added to the principal amount of the Loans, such PIK Interest shall thenceforth be considered principal for all purposes hereunder (and shall bear interest in accordance with Section 2.0708) from the applicable Interest Payment Date on which such PIK Interest has been so added.

"**PIK Rate**" has the meaning specified in Section 2.08(1).

"**Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established or maintained by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Plan of Reorganization**" means that certain *Joint Prepackaged Plan of Reorganization of Belk, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement (as defined in the Plan of Reorganization).

"**Platform**" has the meaning specified in Section 6.02.

60

"**Pledged Collateral**" has the meaning specified in the Security Agreement.

"**Preferred Stock**" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Prepetition First Lien Term Loans**" means "First Lien Term Loans" as defined in the RSA.

"**Prepetition Second Lien Term Loans**" means "Second Lien Term Loans" as defined in the RSA.

"**Private-Side Information**" means any information with respect to Holdings and its Subsidiaries that is not Public-Side Information.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Term Loan of a given Class of any Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Term Loan Exposure of such Class of such Lender at such time and the denominator of which is the aggregate Term Loan Exposure of such Class of all Lenders at such time, and (ii) with respect to all payments, computations and other matters relating to the Incremental Term Loans of any Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Incremental Term Loan Exposure of such Lender at such time and the denominator of which is the aggregate Incremental Term Loan Exposure of all Lenders at such time.

"**Public Company Costs**" means the initial costs relating to establishing compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the Borrower's or its Restricted Subsidiaries' initial establishment of compliance with the obligations of a reporting company, including costs, fees and expenses (including legal, accounting and other professional fees) relating to compliance with provisions of the Securities Act and the Exchange Act.

"**Public Lender**" means Lenders that do not wish to receive Private-Side Information.

"**Public-Side Information**" means (i) at any time prior to Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that is (a) of a type that would be required by applicable Law to be publicly disclosed in connection with an issuance by Holdings or any of its Subsidiaries of its debt or equity securities pursuant to a registered public offering made at such time or (b) not material to make an investment decision with respect to securities of Holdings or any of its Subsidiaries (for purposes of United States federal, state or other applicable securities laws), and (ii) at any time on or after Holdings or any of its Subsidiaries becoming the issuer of any Traded Securities, information that does not constitute material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Holdings or any of its Subsidiaries or any of their respective securities.

"**Purchase Money Obligations**" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement or property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Stock.

"**Qualified Holding Company Debt**" means unsecured Indebtedness of Holdings that

      (1)      is not subject to any Guarantee by any Subsidiary of Holdings (including the Borrower),

61

(2)      will not mature prior to the date that is six (6) months after the Latest Maturity Date in effect on the date of issuance or incurrence thereof,

(3)      has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (5) below),

(4)      does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the later to occur of (i) the date that is four (4) years from the date of the issuance or incurrence thereof and (ii) the date that is 180 days after the Latest Maturity Date in effect on the date of such issuance or incurrence, and

(5)      has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior discount notes of a holding company);

*provided* that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Event of Default shall have occurred and be continuing.

"**Qualified Proceeds**" means the fair market value of assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business.

"**Qualified Securitization Facility**" means any Securitization Facility (1) constituting a securitization financing facility that meets the following conditions: (a) the Board of Directors will have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the applicable Restricted Subsidiary or Securitization Subsidiary and (b) all sales or contributions of Securitization Assets and related assets to the applicable Person or Securitization Subsidiary are made at fair market value (as determined in good faith by the Borrower) or (2) constituting a receivables financing facility.

"**Qualifying IPO**" means the issuance by the Borrower, or any Parent Company, of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Qualifying Lender**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Quarterly Financial Statements**" has the meaning specified in Section 5.05(1).

"**Rating Agencies**" means Moody's and S&P, or if Moody's or S&P (or both) are not making ratings on the relevant obligations publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Borrower that will be substituted for Moody's or S&P (or both), as the case may be.

"**Real Property**" means, collectively, all Owned Real Property and all Leased Real Property.

62

"**Refinance**" has the meaning assigned in the definition of "Refinancing Indebtedness" and "**Refinancing**" and "**Refinanced**" have meanings correlative to the foregoing.

"**Refinanced Debt**" has the meaning assigned to such term in the definition of "Refinancing Indebtedness."

"**Refinancing Amendment**" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, and the Borrower executed by each of (a) the Borrower, (b) the Administrative Agent and (c) each Additional Lender and Lender that agrees to provide any portion of the Refinancing Loans or Refinancing Commitments being incurred or provided pursuant thereto, in accordance with Section 2.15.

"**Refinancing Commitments**" means any Refinancing Term Commitments.

"**Refinancing Indebtedness**" means (x) Indebtedness incurred by the Borrower or any Restricted Subsidiary, (y) Disqualified Stock issued by the Borrower or any Restricted Subsidiary or (z) Preferred Stock issued by any Restricted Subsidiary which, in each case, serves to extend, replace, refund, refinance, renew, exchange for or defease ("**Refinance**") any Indebtedness, Disqualified Stock or Preferred Stock, including any Refinancing Indebtedness, so long as:

(1)    (a) the principal amount (or accreted value, if applicable) of such new Indebtedness, the amount of such new Preferred Stock or the liquidation preference of such new Disqualified Stock does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness, the amount of Preferred Stock or the liquidation preference of Disqualified Stock, as applicable, being refinanced except to the extent permitted under Section 1.02(10), *plus* (b) any accrued and unpaid interest on, the Indebtedness, the amount of any accrued and unpaid dividends on, the Preferred Stock or the liquidation preference of the Disqualified Stock, *plus* any accrued and unpaid dividends on, the Disqualified Stock being so extended, replaced, refunded, refinanced, renewed or defeased (such Indebtedness, Disqualified Stock or Preferred Stock, the "**Refinanced Debt**"), *plus* (c) the amount of any tender premium or penalty or premium required to be paid under the terms of the instrument or documents governing such Refinanced Debt and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness, Preferred Stock or Disqualified Stock or to Refinance such Refinanced Debt (such amounts in clause (b) and (c) the "**Incremental Amounts**");

(2)    such Refinancing Indebtedness has a:

(a)    Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred that is not less than the remaining Weighted Average Life to Maturity of the applicable Refinanced Debt; and

(b)    final scheduled maturity date equal to or later than the final scheduled maturity date of the Refinanced Debt;

(3)    to the extent such Refinancing Indebtedness Refinances (a) Subordinated Indebtedness, such Refinancing Indebtedness is subordinated in right of payment to the Loans or the Guaranty thereof at least to the same extent as the applicable Refinanced Debt, (b) Indebtedness that is secured by Liens on Collateral that are subordinated to the Liens that secure the Loans or the Guaranty thereof, such Refinancing Indebtedness is (i) unsecured or (ii) secured by Liens that are subordinated to the Liens that secure the Loans or the Guaranty thereof, in each case at least to the

63

same extent as the applicable Refinanced Debt or pursuant to the Applicable Intercreditor Agreement or (c) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively;

(4)    such Refinancing Indebtedness shall not be guaranteed or borrowed by any Person other than a Person that is so obligated in respect of the Refinanced Debt being Refinanced; and

(5)    such Refinancing Indebtedness shall not be secured by any assets or property of Holdings, the Borrower or any Restricted Subsidiary that does not secure the Refinanced Debt being Refinanced (*plus* improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property); *provided* that Refinancing Indebtedness will not include:

(a)    Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness or Disqualified Stock of the Borrower;

(b)    Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

(c)    Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of an Unrestricted Subsidiary;

*provided further* that (x) clause (2) of this definition will not apply to any Refinancing Indebtedness other than Indebtedness, Disqualified Stock and Preferred Stock incurred under clauses (2), (14), (25), (30) and (31) of Section 7.02(b) (including any successive Refinancings thereof incurred under clause (13) of Section 7.02(b)) and any Subordinated Indebtedness (other than Subordinated Indebtedness assumed or acquired in an Investment or acquisition and not created in contemplation thereof) and (y) Refinancing Indebtedness may be incurred in the form of a customary "bridge" or other interim credit facility intended to be refinanced or replaced with long-term indebtedness which does not satisfy the requirements of clause (2) above so long as, subject to customary conditions, as determined in good faith by the Borrower, such "bridge" or other interim indebtedness will either be automatically converted into or required to be exchanged for permanent financing which satisfies the requirements of clause (2) of this definition.

"**Refinancing Loans**" means any Refinancing Term Loans.

"**Refinancing Term Commitments**" means one or more Classes of Term Loan commitments hereunder that result from a Refinancing Amendment.

"**Refinancing Term Loans**" means one or more Classes of Term Loans that result from a Refinancing Amendment.

"**Refunding Capital Stock**" has the meaning specified in Section 7.05(b)(2).

"**Register**" has the meaning specified in Section 10.07(c).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Rejection Notice**" has the meaning specified in Section 2.05(2)(g).

"**Related Business Assets**" means assets (other than Cash Equivalents) used or useful in a Similar Business; *provided* that any assets received by the Borrower or a Restricted Subsidiary in exchange for assets transferred by the Borrower or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person is or would become a Restricted Subsidiary.

"**Related Indemnified Person**" of an Indemnitee means (1) the respective directors, officers or employees of such Indemnitee and (2) the respective agents of such Indemnitee, in the case of this clause (2), acting at the instructions of such Indemnitee.

"**Related Person**" means, with respect to any Person, (a) any Affiliate of such Person and (b) the respective officers, directors, members, managers, employees, agents, representatives, sub-agents, co-agents, attorneys-in-fact, partners, trustees, attorneys, and advisors of such Person or any of its Affiliates.

"**Release**" means any release, spill, emission, discharge, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment.

"**Replaced Loans**" has the meaning specified in Section 10.01.

"**Replacement Loans**" has the meaning specified in Section 10.01.

"**Reportable Event**" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Required Administrative Lenders**" means (a) for the period that the Commitment Parties, their Affiliates and Approved Funds constitute Required Lenders, (1) the Commitment Parties acting together or (2) in the event that any Commitment Party no longer constitutes a Lender, such other Commitment Parties and (b) for the period that the Commitment Parties, their Affiliates and Approved Funds no longer constitute Required Lenders, at the ~~b~~Borrower's option either (1) the Required Lenders or (2) such Lender (or Lenders) as the Borrower and the Required Lenders may agree.

"**Required Facility Lenders**" means, as of any date of determination, with respect to one or more Facilities, Lenders having more than 50% of the sum of the (a) aggregate principal amount of outstanding Loans under such Facility or Facilities and (b) aggregate unused Commitments under such Facility or Facilities; *provided* that (i) to the same extent specified in Section 10.07(i) with respect to determination of Required Lenders, the Loans of any Affiliated Lender shall in each case be excluded for purposes of making a determination of Required Facility Lenders unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on the other Lenders and (ii) the portion of outstanding Loans and the unused Commitments of any such Facility, as applicable, held or deemed held by a Defaulting Lender shall be excluded for purposes of making a determination of Required Facility Lenders.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the aggregate Term Loan Exposure; *provided* that (i) the aggregate Term Loan Exposure of or held by any Defaulting Lender shall be excluded for purposes of making a determination of the "Required Lenders" and (ii) any determination of Required Lenders shall be subject to the limitations set forth in Section 10.07(h) with respect to Affiliated Lenders.

"**Responsible Officer**" means, with respect to a Person, the chief executive officer, chief operating officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer or Person performing similar functions, of such Person. With respect to any document delivered by a Loan Party on the Closing Date, Responsible Officer includes any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"**Restricted Investment**" means any Investment other than any Permitted Investment(s).

"**Restricted Payment**" has the meaning specified in Section 7.05.

"**Restricted Subsidiary**" means, at any time, any direct or indirect Subsidiary of the Borrower (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided* that notwithstanding the foregoing, in no event will (i) any Securitization Subsidiary, or (ii) any special purpose vehicle that borrows mortgage debt secured by department stores or retail centers of Belk and has no other activities be considered a Restricted Subsidiary for purposes of Section 8.01(5) or (7); *provided further* that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary will be included in the definition of "Restricted Subsidiary." Wherever the term "Restricted Subsidiary" is used herein with respect to any Subsidiary of a referenced Person that is not the Borrower, then it will be construed to mean a Person that would be a Restricted Subsidiary of the Borrower on a *pro forma* basis following consummation of one or a series of related transactions involving such referenced Person and the Borrower (but which transactions may include a designation of a Subsidiary of such Person as an Unrestricted Subsidiary on a *pro forma* basis in accordance with this Agreement).

"**RSA**" means that certain Restructuring Support Agreement, dated as of January 26, 2021, by and among Holdings, the other Loan Parties party thereto, the Consenting First Lien Term Lenders (as defined therein), the Consenting Second Lien Term Lenders (as defined therein) and the Consenting Sponsors (as defined therein), as such agreement may be amended, supplemented, waived or otherwise modified from time to time, in each case to the extent permitted thereunder.

"**S&P**" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"**Sale-Leaseback Transaction**" means any arrangement providing for the leasing by the Borrower or any Restricted Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to a Person other than the Borrower or any Restricted Subsidiary in contemplation of such leasing.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Sanctions**" has the meaning specified in Section 5.17.

"**SEC**" means the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, each Supplemental Agent and each co-agent or sub-agent appointed by the Administrative Agent or Collateral Agent from time to time pursuant to Section 9.01(2) or 9.07.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Securitization Assets**" means (a) the accounts receivable, royalty or other revenue streams and other rights to payment and other assets related thereto subject to a Qualified Securitization Facility and the proceeds thereof and (b) contract rights, lockbox accounts and records with respect to such accounts receivable and any other assets customarily transferred together with accounts receivable in a securitization financing.

"**Securitization Facility**" means any transaction or series of securitization financings that may be entered into by the Borrower or any Restricted Subsidiary pursuant to which the Borrower or any such Restricted Subsidiary may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) a Person that is not the Borrower or a Restricted Subsidiary or (b) a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not the Borrower or a Restricted Subsidiary, or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries.

"**Securitization Fees**" means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees and expenses (including reasonable fees and expenses of legal counsel) paid to a Person that is not a Securitization Subsidiary in connection with, any Qualified Securitization Facility.

"**Securitization Repurchase Obligation**" means any obligation of a seller of Securitization Assets in a Qualified Securitization Facility to repurchase Securitization Assets arising as a result of a breach of representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" means any Subsidiary formed for the purpose of, and that solely engages only in one or more Qualified Securitization Facilities and other activities reasonably related thereto.

"**Security Agreement**" means, collectively, the Pledge and Security Agreement executed by the Loan Parties and the Collateral Agent, substantially in the form of Exhibit F, together with supplements or joinders thereto executed and delivered pursuant to Section 6.11.

"**Senior Secured Leverage Ratio**" means, with respect to any Test Period, the ratio of Consolidated Secured Debt outstanding on the last date of such Test Period to Adjusted EBITDA of the Borrower and its Restricted Subsidiaries for such Test Period, in each case calculated on a *pro forma basis* with such pro forma adjustments as are appropriate and consistent with Section 1.07.

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X of the SEC, as such regulation is in effect on the Closing Date.

"**Similar Business**" means (1) any business conducted or proposed to be conducted by the Borrower or any Restricted Subsidiary on the Closing Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any Permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Restricted Subsidiaries conduct or propose to conduct on the Closing Date.

67

"**Solicited Discount Proration**" has the meaning specified in Section 2.05(1)(e)(D)(3).

"**Solicited Discounted Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Solicited Discounted Prepayment Notice**" means a written notice of the Borrower of Solicited Discounted Prepayment Offers made pursuant to Section 2.05(1)(e)(D) substantially in the form of <u>Exhibit L.</u>

"**Solicited Discounted Prepayment Offer**" means the written offer by each Lender, substantially in the form of <u>Exhibit O,</u> submitted following the Administrative Agent's receipt of a Solicited Discounted Prepayment Notice.

"**Solicited Discounted Prepayment Response Date**" has the meaning specified in Section 2.05(1)(e)(D)(1).

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date:

(1)     the sum of the liabilities of such Person (including contingent liabilities), on a consolidated basis, does not exceed the present fair saleable value of the present assets of such Person, on a consolidated basis,

(2)     the fair value of the property of such Person, on a consolidated basis, is greater than the total amount of liabilities (including contingent liabilities) of such Person, on a consolidated basis,

(3)     the capital of such Person, on a consolidated basis, is not unreasonably small in relation to its business as contemplated on such date and

(4)     such Person has not incurred and does not intend to incur, or believe that it will incur, debts including current obligations beyond their ability to pay such debts as they become due (whether at maturity or otherwise).

The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances as of such date, would reasonably be expected to become an actual and matured liability.

"**Space Leased Property**" means any real property located in the United States, other than the Leased Real Property and the Owned Real Property, that any Loan Party or any Subsidiary occupies as a tenant, sub-tenant, or licensee.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Discount**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Prepayment Amount**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Prepayment Notice**" means a written notice of the Borrower's Offer of Specified Discount Prepayment made pursuant to Section 2.05(1)(e)(B) substantially in the form of <u>Exhibit N.</u>

68

"**Specified Discount Prepayment Response**" means the written response by each Lender, substantially in the form of Exhibit P, to a Specified Discount Prepayment Notice.

"**Specified Discount Prepayment Response Date**" has the meaning specified in Section 2.05(1)(e)(B)(1).

"**Specified Discount Proration**" has the meaning specified in Section 2.05(1)(e)(B)(3).

"**Specified Equity Contribution**" has the meaning assigned to it in the ABL Credit Agreement.

"**Specified Sale-Leaseback Net Proceeds**" means with respect to the sale component of any Specified Sale-Leaseback Transaction, the excess, if any, of (i) the sum of cash and Cash Equivalents received as purchase consideration in connection with such Specified Sale-Leaseback Transaction sale component pursuant to the applicable purchase and sale agreement over (ii) the sum of (A) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred or required to be paid by the Borrower or any Restricted Subsidiary on behalf of a purchaser by the Borrower or any Restricted Subsidiary in connection with such Specified Sale-Leaseback Transaction, (B) taxes (including transfer taxes) or distributions made pursuant to clauses (a) and (b) of Section 7.05(b)(14) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Specified Sale-Leaseback Net Proceeds) and (C) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such Specified Sale-Leaseback Transaction, including liabilities related to environmental matters or against any indemnification obligations associated with such Specified Sale-Leaseback Transaction, it being understood that "Specified Sale-Leaseback Net Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (C). The net proceeds of any Sale-Leaseback Transaction will be determined giving effect to transaction expenses and the tax effect of such transactions based on the actual effective tax rate (including taxes incurred and required to be paid or payable as a result of such transactions).

"**Specified Sale-Leaseback Transaction**" means one or more Sale-Leaseback Transactions entered into on an arm's length basis for fair market value as determined by a Responsible Officer of the Borrower in good faith with respect to all or any portion of any Owned Real Property or Leased Real Property of the Borrower or any Restricted Subsidiary owned on, or acquired after, the Closing Date.

"**Specified Transaction**" means:

(1)     solely for the purposes of determining the applicable cash balance, any contribution of capital, including as a result of an Equity Offering, to the Borrower, in each case, in connection with an acquisition or Investment,

(2)     any designation of operations or assets of the Borrower or a Restricted Subsidiary as discontinued operations (as defined under GAAP),

(3)     any Investment that results in a Person becoming a Restricted Subsidiary,

(4)     any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary in compliance with this Agreement,

69

(5)      any purchase or other acquisition of a business of any Person, of assets constituting a business unit, line of business or division of any Person,

(6)      any Asset Sale (a) that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower or (b) of a business, business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whereby merger, amalgamation, consolidation or otherwise,

(7)      any operational changes identified by the Borrower that have been made by the Borrower or any Restricted Subsidiary during the Test Period, ~~or~~

(8)      any borrowing of Incremental Term Loans, or

~~(8)~~(9)   any other transaction that by the terms of this Agreement requires a financial ratio to be calculated on a *pro forma* basis.

"**Sponsor**" means Sycamore Partners Management, L.P. and any of its respective Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Submitted Amount**" has the meaning specified in Section 2.05(1)(e)(C)(1).

"**Submitted Discount**" has the meaning specified in Section 2.05(1)(e)(C)(1).

"**Subordinated Indebtedness**" means any Indebtedness for borrowed money of any Loan Party that by its terms is subordinated in right of payment to the Obligations of such Loan Party arising under the Loans or the Guaranty.

"**Subsidiary**" means, with respect to any Person:

(1)      any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2)      any partnership, joint venture, limited liability company or similar entity of which:

(a)      more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and

(b)      such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

70

"**Subsidiary Guarantor**" means any Guarantor other than Holdings and any other Parent Company.

"**Successor Borrower**" has the meaning specified in Section 7.03(4).

"**Successor Holdings**" has the meaning specified in Section 7.03(5)(iii).

"**Supplemental Agent**" and "**Supplemental Agents**" have the meanings specified in Section 9.15(1).

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"**Tax Group**" has the meaning specified in Section 7.05(b)(14)(b).

"**Tax Indemnitee**" as defined in Section 3.01(5).

"**Term Borrowing**" means a Borrowing of any Term Loans.

"**Term Commitment**" means, as to each Term Lender, its obligation to make a Term Loan to the Borrower hereunder, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Term Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to this Agreement and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Term Lender pursuant to an Assignment and Assumption, (ii) an Incremental Amendment, (iii) a Refinancing Amendment, (iiiiv) an Extension Amendment or (ivv) an amendment in respect of Replacement Loans. The initial amount of each Term Lender's Term Commitment is its Closing Date Term Commitment or, otherwise, in the Assignment and Assumption (or Affiliated Lender Assignment and Assumption), Incremental Amendment, Refinancing Amendment, Extension Amendment or amendment in respect of Replacement Loans pursuant to which such Lender shall have assumed its Commitment, as the case may be.

"**Term Facility**" means any Facility consisting of Term Loans or Term Commitments.

"**Term Intercreditor Agreement**" means the Term Intercreditor Agreement substantially in the form of Exhibit G-2 among the Collateral Agent, First Lien Administrative Agent, as collateral agent under the First Lien Credit Agreement and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement, and which shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"**Term Lender**" means, at any time, any Lender that has a Term Commitment or a Term Loan at such time.

"**Term Loan**" means any Closing Date Term Loan, Incremental Term Loan, Refinancing Term Loan, Extended Loan or Replacement Loan, as the context may require.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender; *provided* that at any time prior to the making of the Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term

71

Commitment, or, with regard to any Incremental Amendment at any time prior to the making of the applicable Incremental Term Loans thereunder, the Term Loan Exposure of any Lender with respect to such Incremental Term Facility shall be equal to such Lender's Incremental Term Loan Commitment thereunder.

"**Term Loan Increase**" has the meaning specified in Section 2.14(1).

"**Term Note**" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit B-1 hereto, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from the Term Loans made by such Term Lender.

"**Termination Conditions**" means, the Payment in Full in cash of the Obligations.

"**Test Period**" in effect at any time means the Borrower's most recently ended four consecutive fiscal quarters (taken as one accounting period) for which, subject to Section 1.07(1), financial statements have been delivered pursuant to Section 6.01(1) or (2), as applicable.

"**Third Amendment**" means that certain Amendment No. 3 to Credit Agreement, dated as of February [●], 2021the Closing Date, among Holdings, the Borrower, the Lenders party thereto, the Administrative Agent and the Collateral Agent.

"**Third Amendment Lenders**" means the Lenders.

"**Threshold Amount**" means $48.0 million.

"**Total Assets**" means, at any time, the total assets of the Borrower and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the then most recent balance sheet of the Borrower or such other Person as may be available (as determined in good faith by the Borrower).

"**Total Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt outstanding as of the last day of such Test Period to (b) Adjusted EBITDA of the Borrower for such Test Period, in each case on a *pro forma* basis with such *pro forma* adjustments as are appropriate and consistent with Section 1.07.

"**Traded Securities**" means any debt or equity securities issued pursuant to a public offering or Rule 144A offering.

"**Transaction Expenses**" means any fees, expenses, costs or charges incurred or paid by Holdings, the Borrower or any Restricted Subsidiary in connection with the Transactions.

"**Transactions**" means (a) the amendment to this Agreement pursuant to the terms of the Third Amendment, (b) the amendment to the First Lien Credit Agreement pursuant to the First Lien Credit Agreement Second Amendment, (c) the execution and delivery of the Third Amendment and the First Lien Credit Agreement Second Amendment, (d) the funding of the New Money First-Out Loans pursuant to the First Lien Credit Agreement on the Closing Date, (e) the consummation of the transactions contemplated by the Plan of Reorganization, (f) the conversion (and deemed prepayment) of all Prepetition First Lien Term Loans immediately prior to the effectiveness of the Third Amendment and all Prepetition Second Lien Term Loans to First-Out Loans (as defined in the First Lien Credit Agreement), Second-Out Loans (as defined in the First Lien Credit Agreement) and Closing Date Term Loans on the Closing Date, (g) any other transaction contemplated by the RSA, (h) any transaction contemplated by the "Description of

72

Transaction Steps" attached to the Plan Supplement (as defined in the RSA) and (i) the payment of Transaction Expenses.

"**Treasury Capital Stock**" has the meaning assigned to such term in Section 7.05(b)(2)(a).

"**Trust Account**" means any accounts or trusts used solely to hold Trust Funds.

"**Trust Funds**" means cash, Cash Equivalents or other assets comprised of:

(1) funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of such Loan Party's employees;

(2) all taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)); and

(3) any other funds which Holdings, the Borrower or any of its Restricted Subsidiaries holds in trust or as an escrow or fiduciary for another person which is not a Restricted Subsidiary of the Borrower.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning specified in Section 3.01(3)(b)(iii).

"**Unrestricted Subsidiary**" means each of The Belk Center, Inc. and 2801 West Tyvola Condominium Association Inc.

"**U.S. Lender**" means any Lender that is not a Foreign Lender.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Public Law No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1)     the sum of the products of the number of years (calculated to the nearest one-twenty fifth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock, *multiplied by* the amount of such payment, *by*

(2)     the sum of all such payments; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being Refinanced (the "**Applicable Indebtedness**"), the effects of any amortization or prepayments made on such Applicable Indebtedness prior to the date of the applicable Refinancing will be disregarded.

73

"**wholly owned**" means, with respect to any Subsidiary of any Person, a Subsidiary of such Person one hundred percent (100%) of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable Law) is at the time owned by such Person or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02    Other Interpretive Provisions. As used in this Agreement, the following terms have the meanings set forth below:

(1)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(2)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(3)    References in this Agreement to an Exhibit, Schedule, Article, Section, Annex, clause or subclause refer (a) to the appropriate Exhibit or Schedule to, or Article, Section, clause or subclause in this Agreement or (b) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears, in each case as such Exhibit, Schedule, Article, Section, Annex, clause or subclause may be amended or supplemented from time to time.

(4)    The term "including" is by way of example and not limitation.

(5)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(6)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(7)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(8)    The word "or" is not intended to be exclusive unless expressly indicated otherwise.

(9)    [Reserved].

(9)(10) For purposes of determining compliance with any Section of Article VII, in the event that any Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate Transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time, shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time. For purposes of determining compliance with the incurrence of any Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness that restricts the amount of such Indebtedness relative to the amount of Credit Agreement Refinanced Debt or Refinanced Debt, respectively, the Borrower and

74

Restricted Subsidiaries may incur an incremental principal amount of Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness in such refinancing to the extent that the excess portion of the Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness would otherwise be permitted to be incurred in accordance with this Agreement (provided that (1) any additional Indebtedness referenced in this sentence satisfies the other applicable requirements of the definition of Credit Agreement Refinancing Indebtedness or Refinancing Indebtedness, as applicable (with such additional amounts incurred constituting a utilization of the relevant basket or exception contained in Section 7.02(b) pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of Section 7.01).   For purposes of determining compliance with the incurrence of any Indebtedness under Designated Revolving Commitments in reliance on compliance with any ratio or Basket, if on the date such Designated Revolving Commitments are established after giving *pro forma* effect to the incurrence of the entire committed amount of then proposed Indebtedness thereunder, then such committed amount under such Designated Revolving Commitments may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with any ratio.

(10)(11)      For purposes hereof, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

Section 1.03    Accounting Terms. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending on the Saturday closest to each January 31 or fiscal quarter ending April 30, July 31, October 31 or the Saturday ending on the Saturday closest to each January 31 of the Borrower.

Section 1.04    Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, etc.. Unless otherwise expressly provided herein, (1) references to Organizational Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (2) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day and Timing of Payment and Performance. Unless otherwise specified, all references herein to times of day shall be references to New York time (daylight or standard, as applicable). When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

75

Section 1.07    Pro Forma and Other Calculations.

(1)    Notwithstanding anything to the contrary herein, financial ratios and tests, including the Senior Secured Leverage Ratio and the Total Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.07. In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable.

(2)    For purposes of calculating any financial ratio or test (or Total Assets), Specified Transactions (and, subject to clause (4) below, the incurrence or repayment of any Indebtedness in connection therewith) that have been made (a) during the applicable Test Period or (b) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Adjusted EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Total Assets, on the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.07, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.07 as if such Specified Transaction had occurred at the beginning of the most recently ended Test Period.

(3)    Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and may include, for the avoidance of doubt, the amount of "run-rate" cost savings, synergies and operating expense reductions resulting from or related to any such Specified Transaction (including the Transactions) which is being given *pro forma* effect that have been realized or are expected to be realized and for which the actions necessary to realize such cost savings, operating expense reductions and synergies are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than twelve (12) months after the date of any such Specified Transaction (calculated on a *pro forma* basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions and synergies were realized during the entirety of such period and "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken (including any savings expected to result from the elimination of a public target's compliance costs with public company requirements) net of the amount of actual benefits realized during such period from such actions, and any such adjustments shall be included in the initial *pro forma* calculations of such financial ratios or tests and during any subsequent Test Period in which the effects thereof are expected to be realized) relating to such Specified Transaction; *provided* that (a) such amounts are (i) reasonably identifiable and projected in the good faith judgment of the Borrower to result from such actions and (ii) such actions are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than twelve (12) months after the date of such Specified Transaction, (b) no amounts shall be added to the extent duplicative of any amounts that are otherwise added back in computing Adjusted EBITDA (or any other components thereof), whether through a *pro forma* adjustment or otherwise, with respect to such period and (c) amounts added back pursuant to this clause (3) shall be subject to the Combined Adjusted EBITDA Cap.

(4)    In the event that (a) the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees), issues or repays (including by redemption, repurchase, repayment, retirement

76

or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit unless such Indebtedness has been permanently repaid and not replaced), (b) the Borrower or any Restricted Subsidiary issues, repurchases or redeems Disqualified Stock, (c) any Restricted Subsidiary issues, repurchases or redeems Preferred Stock or (d) the Borrower or any Restricted Subsidiary establishes or eliminates any Designated Revolving Commitments, in each case included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period (except in the case of the Senior Secured Leverage Ratio or Total Net Leverage Ratio (or similar ratio), in which case such incurrence, issuance, repayment or redemption of Indebtedness, issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, or establishment or elimination of any Designated Revolving Commitments, in each case will be given effect, as if the same had occurred on the first day of the applicable Test Period) and, in the case of Indebtedness for all purposes as if such Indebtedness in the full amount of any undrawn Designated Revolving Commitments had been incurred thereunder throughout such period in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(5)     If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the Senior Secured Leverage Ratio and/or Total Net Leverage Ratio, is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Financial Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or applicable Restricted Subsidiary may designate.

(6)     Notwithstanding anything to the contrary in this Section 1.07 or in any classification under GAAP of any Person, business, assets or operations in respect of which a definitive agreement for the disposition thereof has been entered into, no *pro forma* effect shall be given to any discontinued operations (and the Adjusted EBITDA attributable to any such Person, business, assets or operations shall not be excluded for any purposes hereunder) until such disposition shall have been consummated.

(7)     Any determination of Total Assets shall be made by reference to the last day of the Test Period most recently ended for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable, on or prior to the relevant date of determination.

(8)     Notwithstanding anything in this Agreement or any Loan Document to the contrary, when (a) calculating any applicable ratio, Consolidated Net Income or Adjusted EBITDA in connection with the making of an Investment, (b) determining compliance with any provision of this Agreement which requires that no Default or Event of Default has occurred, is continuing or would result therefrom, (c) determining compliance with any provision of this Agreement which requires compliance with any representations and warranties set forth herein or (d) the satisfaction of all other conditions precedent to the making of an Investment, in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or other provisions, determination of whether any Default or Event of Default has occurred, is continuing or would result therefrom, determination of compliance with any representations or warranties or the satisfaction of any other conditions shall, at the option of the Borrower (the Borrower's election to

77

exercise such option in connection with any Limited Condition Acquisition, an "**LCA Election**"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "**LCA Test Date**"). If on a *pro forma* basis after giving effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) such ratios and other provisions are calculated as if such Limited Condition Acquisition or other transactions had occurred at the beginning of the most recent Test Period ending prior to the LCA Test Date for which financial statements of the Borrower have been delivered pursuant to Section 6.01(1) or (2), as applicable, the Borrower could have taken such action on the relevant LCA Test Date in compliance with the applicable ratios or other provisions, such provisions shall be deemed to have been complied with. For the avoidance of doubt, (i) if any of such ratios or other provisions are exceeded or breached as a result of fluctuations in such ratio (including due to fluctuations in Adjusted EBITDA or other components of such ratio) or other provisions at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Acquisition is permitted hereunder and (ii) such ratios and compliance with such conditions shall not be tested at the time of consummation of such Limited Condition Acquisition or related Specified Transactions. If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or Basket availability with respect to any other Specified Transaction on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or Basket shall be calculated on a *pro forma basis* assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated on the LCA Test Date except that (other than solely with respect to the incurrence test under which such Limited Condition Acquisition is being made) Adjusted EBITDA, assets and Consolidated Net Income of any target of such Limited Condition Acquisition can only be used in the determination of the relevant ratios and Baskets if and when such acquisition has closed. Notwithstanding anything in this Agreement or any Loan Document to the contrary, if the Borrower or its Restricted Subsidiaries (x) incurs Indebtedness, creates Liens, makes Asset Sales, makes Investments, makes Restricted Payments or repays any Indebtedness in connection with any Limited Condition Acquisition under a ratio-based Basket and (y) incurs Indebtedness, creates Liens, makes Asset Sales, Investments or Restricted Payments or repays any Indebtedness in connection with such Limited Condition Acquisition under a non-ratio-based Basket (which shall occur within five Business Days of the events in clause (x) above), then the applicable ratio will be calculated with respect to any such action under the applicable ratio-based Basket without regard to any such action under such non-ratio-based Basket made in connection with such Limited Condition Acquisition.

Section 1.08    Available Amount Transaction. If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the Available Amount immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously, i.e., each transaction must constitute a permitted use of the Available Amount.

Section 1.09    [Reserved].

Section 1.10    Currency Generally.

(1)    The Borrower shall determine in good faith the dollar amount of any utilization or other measurement denominated in a currency other than Dollars for purposes of compliance with any Basket. For purposes of determining compliance with any Basket under Article VII or VIII with respect to any amount expressed in a currency other than Dollars, no Default shall be deemed to have occurred solely as

a result of changes in rates of currency exchange occurring after the time such Basket utilization occurs or other Basket measurement is made (so long as such Basket utilization or other measurement, at the time incurred, made or acquired, was permitted hereunder). Except with respect to any ratio calculated under any Basket, any subsequent change in rates of currency exchange with respect to any prior utilization or other measurement of a Basket previously made in reliance on such Basket (as the same may have been reallocated in accordance with this Agreement) shall be disregarded for purposes of determining any unutilized portion under such Basket.

(2)     For purposes of determining the Senior Secured Leverage Ratio and/or the Total Net Leverage Ratio, the amount of Indebtedness and cash and Cash Equivalents shall reflect the currency translation effects, determined in accordance with GAAP, of Hedging Obligations permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

(3)     For purposes of determining compliance under any Basket under Article VII or VIII, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(1); provided, however, that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness. For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the Dollar equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.11     Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II

### The Commitments and Borrowings

Section 2.01     The Loans.

Subject to the terms and conditions set forth herein and in the Plan of Reorganization, on the Closing Date, pursuant to the Plan of Reorganization, the certain of the Prepetition Second Lien Term Loans held by the Lenders as of such date shall be automatically converted into (and be deemed to be prepaid), and each Lender shall be deemed to have made on the Closing Date to the Borrower Closing Date Term Loans in a principal amount equal to its Closing Date Term Loan Commitment. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

Section 2.02       Borrowings, Conversions and Continuations of Loans.

(1)       Each Term Borrowing shall be made upon the Borrower's irrevocable notice, on behalf of the Borrower, to the Administrative Agent (*provided* that the notice in respect of any Term Borrowing on the Closing Date may be conditioned on the closing of the Transactions (other than any transactions constituting such Term Borrowing)). Each such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time one (1) Business Day prior to the requested date of any Borrowing. Each notice by the Borrower pursuant to this Section 2.02(1) must be a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Except as provided in Sections 2.14, 2.15 and 2.16, each Borrowing of Loans shall be in a principal amount of $1.0 million or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice shall specify:

(i)        [Reserved.],

(ii)       the requested date of the Borrowing (which shall be a Business Day),

(iii)      the principal amount of Loans to be borrowed,

(iv)       [Reserved.],

(v)        the Class of Loans to be borrowed,

(vi)       [Reserved.], and

(vii)      wire instructions of the account(s) to which funds are to be disbursed.

Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this Agreement of the applicable Class of Loans. In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than, in the case of Borrowing on the Closing Date, 10:00 a.m., New York time, and otherwise 2:00 p.m., New York time, on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.01 for the Borrowing on the Closing Date, the Administrative Agent shall make all funds so received available to the applicable Borrower in like funds as received by the Administrative Agent either by (a) crediting the account(s) of the applicable Borrower on the books of the Administrative Agent with the amount of such funds or (b) wire transfer of such funds, in each case in accordance with instructions provided by the Borrower to (and reasonably acceptable to) the Administrative Agent.

(2)       [Reserved.].

(3)       [Reserved.].

(4)       [Reserved.].

(5)       The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(6)      Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing, that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (2) above, and the Administrative Agent may (but shall have no obligation to), in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (a) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (b) in the case of such Lender, the Overnight Rate *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(7) shall be conclusive in the absence of manifest error. If the Borrower and such Lender shall both pay all or any portion of the principal amount in respect of such Borrowing or interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such Borrowing or interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.03      [Reserved].

Section 2.04      [Reserved].

Section 2.05      Prepayments.

(1)      Optional.

(a)      The Borrower may, upon written notice to the Administrative Agent by the Borrower, at any time or from time to time voluntarily prepay any Class or Classes of Term Loans in whole or in part without premium or penalty; *provided* that

(i)      such notice must be received by the Administrative Agent not later than 12:00 p.m., New York time, one (1) Business Day prior to any date of prepayment of Term Loans;

(ii)      [Reserved]; and

(iii)      any prepayment of Term Loans shall be in a principal amount of $1.0 million or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.

Each such notice shall specify the date and amount of such prepayment and the Class(es) of Loans to be prepaid. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment. If such notice is given, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. In the case of each prepayment of the Loans pursuant to this Section 2.05(1), the Borrower may in its sole discretion select the Borrowing or Borrowings (and the order of maturity of principal payments) to be

81

repaid, and such payment shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares or other applicable share provided for under this Agreement.

(b)   [Reserved].

(c)   Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(1)(a) if such prepayment would have resulted from a refinancing of all or a portion of the applicable Facility, which refinancing shall not be consummated or shall otherwise be delayed.

(d)   Each prepayment in respect of any Term Loans pursuant to this Section 2.05(1) may be applied to any Class of Term Loans as directed by the Borrower. For the avoidance of doubt, the Borrower may (i) prepay Term Loans of any Term Loan Class pursuant to this Section 2.05 without any requirement to prepay Extended Loans that were converted or exchanged from such Term Loan Class and (ii) prepay Extended Loans pursuant to this Section 2.05 without any requirement to prepay any Term Loans that were not converted or exchanged for such Extended Loans. In the event that the Borrower does not specify the order in which to apply prepayments to reduce scheduled installments of principal or as between Classes of Term Loans, the Borrower shall be deemed to have elected that such proceeds be applied to reduce the scheduled installments of principal in direct order of maturity on a *pro rata* basis among Term Loan Classes.

(e)   Notwithstanding anything in any Loan Document to the contrary, so long as (x) no Event of Default has occurred and is continuing or shall occur as a result thereof and (y) no proceeds of ABL Loans are used for this purpose, any Borrower Party may (i) purchase outstanding Term Loans on a non-pro rata basis through open market purchases or (ii) prepay the outstanding Term Loans (which Term Loans shall, for the avoidance of doubt, be automatically and permanently canceled immediately upon such purchase or prepayment, and the Borrower shall provide notice of such cancellation to the Administrative Agent), which in the case of clause (ii) only shall be prepaid without premium or penalty on the following basis:

(A)   Any Borrower Party shall have the right to make a voluntary prepayment of Loans at a discount to par pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers (any such prepayment, the "**Discounted Term Loan Prepayment**"), in each case made in accordance with this Section 2.05(1)(e) and without premium or penalty.

(B)   any Borrower Party may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent with five (5) Business Days' notice (or such shorter period as agreed by the Auction Agent) in the form of a Specified Discount Prepayment Notice; *provided* that (I) any such offer shall be made available, at the sole discretion of the applicable Borrower Party, to (x) each Term Lender or (y) each Term Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "**Specified Discount Prepayment Amount**") with respect to each applicable Class, the Class or Classes of Term Loans subject to such offer and the specific percentage discount to par (the "**Specified Discount**") of such Term Loans to be prepaid (it being understood that different Specified Discounts or Specified Discount Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(B)), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than

$5.0 million and whole increments of $1.0 million in excess thereof and (IV) each such offer shall remain outstanding through the Specified Discount Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Lenders (the "**Specified Discount Prepayment Response Date**").

(1)     Each Term Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its applicable then outstanding Term Loans at the Specified Discount and, if so (such accepting Lender, a "**Discount Prepayment Accepting Lender**"), the amount and the Classes of such Lender's Term Loans to be prepaid at such offered discount. Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable. Any Term Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(2)     If there is at least one Discount Prepayment Accepting Lender, the relevant Borrower Party will make a prepayment of outstanding Term Loans pursuant to this paragraph (B) to each Discount Prepayment Accepting Lender in accordance with the respective Outstanding Amount and Classes of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to subsection (2) above; *provided* that if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made pro rata among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "**Specified Discount Proration**"). The Auction Agent shall promptly, and in any case within three (3) Business Days following the Specified Discount Prepayment Response Date, notify (I) the relevant Borrower Party of the respective Term Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the Classes of Term Loans to be prepaid at the Specified Discount on such date and (III) the Administrative Agent and each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, Class of Term Loans of such Lender to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the applicable Borrower Party and such Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the applicable Borrower Party shall be due and payable by such Borrower Party on the Discounted

Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(C)    Subject to the proviso to subsection (A) above, any Borrower Party may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice (or such shorter period as agreed by the Auction Agent) in the form of a Discount Range Prepayment Notice; *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Borrower Party, to (x) each Term Lender or (y) each Term Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "**Discount Range Prepayment Amount**"), the Class or Classes of Term Loans subject to such offer and the maximum and minimum percentage discounts to par (the "**Discount Range**") of the principal amount of such Term Loans with respect to each relevant Class of Term Loans willing to be prepaid by such Borrower Party (it being understood that different Discount Ranges or Discount Range Prepayment Amounts may be offered with respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(C)), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) unless rescinded, each such solicitation by the applicable Borrower Party shall remain outstanding through the Discount Range Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Lenders (the "**Discount Range Prepayment Response Date**"). Each Term Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "**Submitted Discount**") at which such Lender is willing to allow prepayment of any or all of its then outstanding Term Loans of the applicable Class or Classes and the maximum aggregate principal amount and Classes of such Lender's Term Loans (the "**Submitted Amount**") such Term Lender is willing to have prepaid at the Submitted Discount. Any Term Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(1)    The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Term Loans to be prepaid at such Applicable Discount in accordance with this subsection (C). The relevant Borrower Party agrees to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by the Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "**Applicable Discount**") which yields a Discounted Term Loan Prepayment in an aggregate principal

amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts. Each Term Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following subsection (3)) at the Applicable Discount (each such Term Lender, a "**Participating Lender**").

(2)     If there is at least one Participating Lender, the relevant Borrower Party will prepay the respective outstanding Term Loans of each Participating Lender in the aggregate principal amount and of the Classes specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; *provided* that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "**Identified Participating Lenders**") shall be made pro rata among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Discount Range Proration**"). The Auction Agent shall promptly, and in any case within five (5) Business Days following the Discount Range Prepayment Response Date, notify (I) the relevant Borrower Party of the respective Term Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, the aggregate principal amount of the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, the Applicable Discount and the aggregate principal amount and Classes of Term Loans to be prepaid at the Applicable Discount on such date, (III) the Administrative Agent and each Participating Lender of the aggregate principal amount and Classes of such Term Lender to be prepaid at the Applicable Discount on such date and (IV) if applicable, each Identified Participating Lender of the Discount Range Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the relevant Borrower Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the applicable Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(D)     Subject to the proviso to subsection (A) above, any Borrower Party may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with five (5) Business Days' notice in the form of a Solicited Discounted Prepayment Notice (or such later notice specified therein); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Borrower Party, to (x) each Term Lender or (y) each Lender with respect to any Class of Term Loans on an individual Class basis, (II) any such notice shall specify the maximum aggregate amount of the Term Loans (the "**Solicited Discounted Prepayment Amount**") and the Class or Classes of Term Loans the applicable Borrower Party is willing to prepay at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with

respect to different Classes of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(1)(e)(D)), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $5.0 million and whole increments of $1.0 million in excess thereof and (IV) unless rescinded, each such solicitation by the applicable Borrower Party shall remain outstanding through the Solicited Discounted Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York time, on the third Business Day after the date of delivery of such notice to such Term Lenders (the "**Solicited Discounted Prepayment Response Date**"). Each Term Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date and (z) specify both a discount to par (the "**Offered Discount**") at which such Term Lender is willing to allow prepayment of its then outstanding Term Loan and the maximum aggregate principal amount and Classes of such Term Loans (the "**Offered Amount**") such Term Lender is willing to have prepaid at the Offered Discount. Any Term Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(1)     The Auction Agent shall promptly provide the relevant Borrower Party with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date. Such Borrower Party shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Term Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the applicable Borrower Party (the "**Acceptable Discount**"), if any. If the applicable Borrower Party elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the third Business Day after the date of receipt by such Borrower Party from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this subsection (2) (the "**Acceptance Date**"), the applicable Borrower Party shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount. If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the applicable Borrower Party by the Acceptance Date, such Borrower Party shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(2)     Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, within three (3) Business Days after receipt of an Acceptance and Prepayment Notice (the "**Discounted Prepayment Determination Date**"), the Auction Agent will determine (in consultation with the consent of such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the Classes of Term Loans (the "**Acceptable Prepayment Amount**") to be prepaid by the relevant Borrower Party at the Acceptable Discount in accordance with this Section 2.05(1)(e)(D). If the applicable Borrower Party elects to accept any Acceptable Discount, then such Borrower Party agrees to accept all Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest

Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount. Each Term Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "**Qualifying Lender**"). The applicable Borrower Party will prepay outstanding Term Loans pursuant to this subsection (D) to each Qualifying Lender in the aggregate principal amount and of the Classes specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; *provided* that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "**Identified Qualifying Lenders**") shall be made pro rata among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (in consultation with such Borrower Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Solicited Discount Proration**"). On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the relevant Borrower Party of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the Classes to be prepaid, (II) the Administrative Agent and each Term Lender of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Term Loans and the Classes to be prepaid to be prepaid at the Applicable Discount on such date, (III) the Administrative Agent and each Qualifying Lender of the aggregate principal amount and the Classes of such Term Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Borrower Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to such Borrower Party shall be due and payable by such Borrower Party on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(E)     In connection with any Discounted Term Loan Prepayment, the Borrower Parties and the Term Lenders acknowledge and agree that the Auction Agent may require, as a condition to the applicable Discounted Term Loan Prepayment, the payment of customary fees and expenses from a Borrower Party to such Auction Agent for its own account in connection therewith.

(F)     If any Term Loan is prepaid in accordance with subsections (B) through (D) above, a Borrower Party shall prepay such Term Loans on the Discounted Prepayment Effective Date. The relevant Borrower Party shall make such prepayment to the Administrative Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 12:00 p.m., New York time, on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the

relevant Class(es) and Lenders as specified by the applicable Borrower Party in the applicable offer. The Term Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the Discounted Prepayment Effective Date. Each prepayment of the outstanding Term Loans pursuant to this Section 2.05(1)(e) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, and shall be applied to the relevant Loans of such Lenders in accordance with their respective applicable share as calculated by the Auction Agent in accordance with this Section 2.05(1)(e). The aggregate principal amount of the Classes and installments of the relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the Classes of Term Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment. In connection with each prepayment pursuant to this Section 2.05(1)(e), the relevant Borrower Party shall make a representation to the assigning or assignee Term Lenders, as applicable, that it does not possess material non-public information with respect to the Borrower and its Subsidiaries or the securities of any of them that has not been disclosed to the Term Lenders generally (other than Term Lenders that have elected not to receive such information) or shall make a statement that such representation cannot be made.

(G)     To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the provisions in this Section 2.05(1)(e), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the applicable Borrower Party.

(H)     Notwithstanding anything in any Loan Document to the contrary, for purposes of this Section 2.05(1)(e), each notice or other communication required to be delivered or otherwise provided to the Auction Agent (or its delegate) shall be deemed to have been given upon Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; *provided* that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next succeeding Business Day.

(I)     Each of the Borrower Parties and the Term Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this Section 2.05(1)(e) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate. The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Term Loan Prepayment provided for in this Section 2.05(1)(e) as well as activities of the Auction Agent.

(J)     Each Borrower Party shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discounted Prepayment Response Date (and if such offer is revoked pursuant to the preceding clauses, any failure by such Borrower Party to make any prepayment to a Lender, as applicable, pursuant to this Section 2.05(1)(e) shall not constitute a Default or Event of Default under Section 8.01 or otherwise).

(K)    The Administrative Agent (i) shall not be required to serve as the Auction Agent or have any other obligations to participate in (other than mechanical administrative duties), or facilitate any Discounted Term Loan Prepayment unless it is reasonably satisfied with the terms and restrictions thereof and (ii) shall not have any obligation to participate in, arrange, sell or otherwise facilitate, and will have no liability in connection with, any open market repurchases by Holdings, the Borrower or any of its Restricted Subsidiaries.

(2)    <u>Mandatory</u>.

(a)    [Reserved~~.~~].

(b)    Subject to Section 2.05(2)(f) below, (i) if (x) the Borrower or any Restricted Subsidiary makes an Asset Sale or (y) any Casualty Event occurs, which results in the realization or receipt by the Borrower or such Restricted Subsidiary of Net Proceeds, the Borrower shall prepay, or cause to be prepaid, on or prior to the date which is ten (10) Business Days after the date of the realization or receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds, subject to clause (ii) of this Section 2.05(2)(b) (solely in connection with Net Proceeds realized or received in connection with any Casualty Event) and clauses (2)(g) and (h) of this Section 2.05, an aggregate principal amount of Term Loans equal to 100% of all Net Proceeds realized or received; *provided* that no prepayment shall be required pursuant to this Section 2.05(2)(b)(i) with respect to such portion of such Net Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment to reinvest) in accordance with Section 2.05(2)(b)(ii); *provided further* that

(A)    if at the time that any such prepayment would be required, the Borrower (or any Restricted Subsidiary) is required to Discharge any Other Applicable Indebtedness with Other Applicable Net Proceeds pursuant to the terms of the documentation governing such Indebtedness, then the Borrower (or any Restricted Subsidiary) may apply such Net Proceeds on a *pro rata* basis (determined on the basis of the aggregate outstanding principal amount of the Term Loans and Other Applicable Indebtedness requiring such Discharge at such time);

(B)    the portion of such Net Proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of such Other Applicable Net Proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Net Proceeds shall be allocated to the Term Loans in accordance with the terms hereof to the prepayment of the Term Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 2.05(2)(b)(i) shall be reduced accordingly; and

(C)    to the extent the holders of Other Applicable Indebtedness decline to have such Indebtedness repurchased or prepaid with such portion of such Net Proceeds, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof; *provided further* that no prepayment shall be required pursuant to this Section 2.05(2)(b)(i) with respect to such portion of such Net Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment to reinvest) in accordance with Section 2.05(2)(b)(ii).

(ii)     With respect to any Net Proceeds realized or received with respect to any Casualty Event, the Borrower or any Restricted Subsidiary, at its option, may reinvest all or any portion of such Net Proceeds in assets (other than Cash Equivalents) used or useful in the business of the Loan Parties (including capital expenditures) within (x) twelve (12) months following receipt of such Net Proceeds or (y) if the Borrower or any Restricted Subsidiary enters into a legally binding commitment to reinvest such Net Proceeds within twelve (12) months following receipt thereof, within the later of (A) twelve (12) months following receipt thereof and (B) one hundred eighty (180) days of the date of such legally binding commitment; *provided* that, (i) the aggregate amount of any such Net Proceeds reinvested pursuant to this Section 2.05(b)(ii) shall not exceed $5.0 million in any fiscal year (with any unused amount being carried over to the next fiscal year, with such carried over amounts being utilized first in any given year) and (ii) if any Net Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, and subject to clauses (g) and (h) of this Section 2.05(2), an amount equal to any such Net Proceeds shall be applied within five (5) Business Days after the Borrower reasonably determines that such Net Proceeds are no longer intended to be or cannot be so reinvested to the prepayment of the Term Loans as set forth in this Section 2.05.

(c)     [Reserved].

(d)     Subject to Section 2.05(2)(f) below, if (1) the Borrower or any Restricted Subsidiary incurs or issues any Indebtedness (A) not expressly permitted to be incurred or issued pursuant to Section 7.02(b) or (B) that constitutes Credit Agreement Refinancing Indebtedness or Refinancing Loans, the Borrower shall prepay, or cause to be prepaid, an aggregate principal amount of Term Loans of any Class or Classes (in each case, as directed by the Borrower) equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds or (2) the Borrower receives any "Declined Proceeds" (as defined in the First Lien Credit Agreement) other than in respect of Section 2.05(2)(a) thereof, the Borrower shall within five (5) Business Days after receipt of such "Declined Proceeds" (as defined in the First Lien Credit Agreement), offer to prepay, in accordance with clause (g) below, a principal amount of Term Loans and unpaid accrued interest thereon in an amount equal to 100% of such "Declined Proceeds" (as defined in the First Lien Credit Agreement) other than in respect of Section 2.05(2)(a) thereof.

(e)     Except as otherwise set forth in any Refinancing Amendment ~~or~~, Extension Amendment or Incremental Amendment (*provided*, in each case, that such amendment may not provide that such Class of Term Loans shall receive a greater than pro rata portion of mandatory prepayments pursuant to Section 2.05(2) than the Class of Term Loans refinanced, converted or extended thereby):

(i)     each prepayment of Term Loans required by Sections 2.05(2)(a) through (d) shall be applied to each Class of Term Loans then outstanding on a *pro rata* basis or a less than *pro rata* basis (but not greater than *pro rata* basis) with any other Term Loans (in each case, other than pursuant to a refinancing); and

(ii)     each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(f)     If the Borrower or any Restricted Subsidiary enters into a Specified Sale-Leaseback Transaction, which results in the receipt by the Borrower or such Restricted Subsidiary of Specified Sale-Leaseback Net Proceeds, or the Borrower or any Restricted Subsidiary enters into any Qualified Securitization Facility, which results in the receipt by the Borrower or such Restricted Subsidiary of Net Proceeds (in each case, determined after giving effect to the Transactions and without giving effect

to the last *proviso* of clause (1) of the definition of "Net Proceeds"), the Borrower shall, within three (3) Business Days after the receipt of such proceeds, prepay the Term Loans in an aggregate principal amount equal to the amount of such proceeds received.

(g)     The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (b) through (d) or (f) of this Section 2.05(2) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower. The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's prepayment notice and of such Appropriate Lender's Pro Rata Share of the prepayment or other applicable share provided for under this Agreement. Each Term Lender may reject all or a portion of its Pro Rata Share, or other applicable share provided for under this Agreement, of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (a), (b), (d)(2) or (f) of this Section 2.05(2) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York time, ~~one (1~~two (2) Business Day~~s~~ prior to the date of such prepayment. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender. If a Term Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans. Any Declined Proceeds remaining shall be retained by the Borrower (or the applicable Restricted Subsidiary) and may be applied by the Borrower or such Restricted Subsidiary in any manner not prohibited by this Agreement.

(h)     Notwithstanding any other provisions of this Section 2.05(2), (A) to the extent that any or all of the Net Proceeds of any Asset Sale by a Foreign Subsidiary giving rise to a prepayment event pursuant to Section 2.05(2)(b) or (f) (a "**Foreign Asset Sale**") or the Net Proceeds of any Casualty Event from a Foreign Subsidiary (a "**Foreign Casualty Event**"), the Specified Sale-Leaseback Net Proceeds of any Specified Sale-Leaseback Transaction by a Foreign Subsidiary (a "**Foreign Sale-Leaseback**") are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Proceeds, Specified Sale-Leaseback Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in this Section 2.05(2) but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions available under by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds or Specified Sale-Leaseback Net Proceeds is permitted under the applicable local law such repatriation will be promptly effected and an amount equal to such repatriated Net Proceeds or Excess Cash Flow will be promptly (and in any event not later than two (2) Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to this Section 2.05(2) to the extent otherwise provided herein and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all or the Net Proceeds of any Foreign Asset Sale or Foreign Casualty Event or the Specified Sale-Leaseback Net Proceeds of any Foreign Sale-Leaseback would have a material adverse tax consequence (taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Proceeds or Specified Sale-Leaseback Net Proceeds, the Net Proceeds or Specified Sale-Leaseback Net Proceeds so affected may be retained by the applicable Foreign Subsidiary.

(i)     Notwithstanding anything to the contrary set forth in any other clause in this Section 2.05, other than in the case of mandatory prepayments (x) declined by the lenders under the First Lien Credit Agreement in accordance with Section 2.05(2)(g) thereof (other than in respect of Section

2.05(2)(a) thereof) and offered to the Lenders under Section 2.05(2)(d)(2) or (y) required under Section 2.05(2)(d)(1)(B), until the Discharge of Senior Obligations (as defined in the Term Intercreditor Agreement) shall have occurred, no mandatory prepayments of Term Loans that would have otherwise been required under this <u>Section 2.05(b)</u> shall be required to be made.

(j)    <u>Interest</u>. All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon.

<span style="color:blue"><u>Section 2.06    Termination or Reduction of Commitments.</u></span>

~~(3)~~(1)    <u>Optional.</u> The Borrower may, upon written notice by the Borrower to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class, in each case without premium or penalty; *provided* that

(a)    any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, and

(b)    any such partial reduction shall be in an aggregate amount of $5.0 million or any whole multiple of $1.0 million in excess thereof or, if less, the entire amount thereof.

~~(4)~~(2)    <u>Mandatory.</u> The Closing Date Term Loan Commitment of each Lender on the Closing Date shall be automatically and permanently reduced to $0 upon the conversion of such Lender's Prepetition Second Lien Term Loans into Closing Date Term Loans pursuant to Section 2.01~~(3)(a)~~ and the Plan of Reorganization.

~~(5)~~(3)    <u>Application of Commitment Reductions.</u> Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07).

~~Section 2.06~~<span style="color:blue"><u>Section 2.07</u></span>    <u>Repayment of Loans</u>.    The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date for the Closing Date Term Loans, the aggregate principal amount of all Closing Date Term Loans outstanding on such date.

~~Section 2.07~~<span style="color:blue"><u>Section 2.08</u></span>    <u>Interest</u>.

(1)    Each Closing Date Term Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to PIK Interest of 10.00% (the "**PIK Rate**").

(2)    During the continuance of an Event of Default, the Borrower shall pay interest on all outstanding Obligations in respect of the Closing Date Term Loans at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws; *provided* that, no interest at the Default Rate shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Accrued and unpaid interest based on the Default Rate (including interest on interest) shall be due and payable upon demand.

(3)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

~~Section 2.08~~ Section 2.09        Fees. The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in the Agent Fee Letter in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

~~Section 2.09~~ Section 2.10        Computation of Interest and Fees. All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed, notwithstanding the use of the phrase "per annum" or similar phrases. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(1), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

~~Section 2.10~~ Section 2.11        Evidence of Indebtedness.

(1)        The Term Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Term Borrowings made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent, as set forth in the Register, in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Term Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Term Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(2)        [Reserved].

(3)        Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(1), and by each Lender in its account or accounts pursuant to Section 2.11(1), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

~~Section 2.11~~ Section 2.12        Payments Generally.

(1)        All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m., New York time, on the date specified herein. The Administrative Agent will promptly distribute to each Appropriate Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such

Lender's Lending Office. Any payments under this Agreement that are made later than 2:00 p.m., New York time, shall be deemed to have been made on the next succeeding Business Day (but the Administrative Agent may extend such deadline for purposes of computing interest and fees (but not beyond the end of such day) in its sole discretion whether or not such payments are in process).

(2)     If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(3)     Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date, any payment is required to be made by it to the Administrative Agent hereunder (in the case of the Borrower, for the account of any Lender hereunder or, in the case of the Lenders, for the account of the Borrower hereunder), that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(a)     if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(b)     if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount, or cause such amount to be paid, to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder. A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(3) shall be conclusive, absent manifest error.

(c)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Term Borrowing set forth in Section 4.01 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

94

(d)   The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan.

(e)   Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)   Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03 (or otherwise expressly set forth herein). If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the sum of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

~~Section 2.12~~Section 2.13          Sharing of Payments. Other than as expressly provided elsewhere herein (including with respect to any discounted prepayment of Term Loans pursuant to Section 2.05(2)(e) or 2.05(2)(g)), if any Lender of any Class shall obtain payment in respect of any principal of or interest on account of the Loans of such Class made by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (1) notify the Administrative Agent of such fact, and (2) purchase from the other Lenders such participations in the Loans of such Class made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of any principal of or interest on such Loans of such Class, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (a) the amount of such paying Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.10) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.13    [Reserved].

Section 2.14    Incremental Term Facilities.

(1)    Incremental Term Loan Request. The Borrower may at any time and from time to time, on one or more occasions, after the Closing Date, by notice to the Administrative Agent increase the aggregate principal amount of the Closing Date Term Loans (a "**Term Loan Increase**") or add one or more additional Classes of term loans under the Loan Documents (each an "**Incremental Term Facility**" and the term loans made thereunder, the "**Incremental Term Loans**").

(2)    Ranking.  Incremental Term Facilities  will  be secured by Liens over the Collateral that rank on a *pari passu* basis  with the Closing Date Term Loans and only Guarantors shall provide guarantees of Incremental Term Facilities; *provided* that any Liens that rank on a pari passu basis or junior basis to the Liens securing the Obligations will be subject to the Applicable Intercreditor Agreement.

(3)    Size. The aggregate principal amount of Incremental Term Facilities  incurred on any date will not exceed $15.0 million. Each Incremental Term Facility will be in an integral multiple of $1.0 million and in an aggregate principal amount that is not less than $10.0 million  (or such lesser minimum amount approved by the Administrative Agent in its reasonable discretion); *provided* that such amount may be less than  such  minimum amount  or  integral  multiple  amount  if  such  amount represents  all  the  remaining availability  under the limit set forth above.

(4)    Incremental Lenders. Incremental Term Facilities may be provided by any existing Lender (it  being  understood  that no existing Lender will  have an  obligation  to  make all  or any portion of any Incremental Term Loan, nor will the Borrower have any obligation to approach any existing Lender(s) to provide any Incremental Term Loan) or by any Additional Lender on terms permitted by this Section 2.14. While  existing Lenders may (but are not obligated, unless invited and so elect, to)  participate  in  any syndication of an Incremental Term Facility and may (but are not obligated, unless invited and so elect, to) become lenders with respect thereto, the existing Lenders will not have any right to participate in any syndication, and will not have any right of first refusal or other right to provide all or any portion, of any Incremental Term Facility or Incremental Term Loan except to the extent the Borrower and the arrangers thereof, if any, in their discretion, choose to invite or include any such existing Lender (which may or may not apply to all existing Lenders and may or may not be pro rata among existing Lenders). Final allocations in respect of Incremental Term Facilities will be made by the Borrower together with the arrangers thereof, if any, in their discretion, on the terms permitted by this Section 2.14.

(5)    Incremental Term Facility Amendments; Use of Proceeds. Each Incremental Term Facility will  become effective pursuant to an amendment (each, an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Person providing such Incremental Term Facility and the Administrative Agent. The Administrative Agent will  promptly notify each Lender as to the effectiveness of each Incremental Amendment. Incremental Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.14. An Incremental Amendment may (a) add "call protection" to the Closing Date Term Loans, including amendments to Section 2.18, (b) [reserved] and (c) make other amendments to the terms of the existing Closing Date Term Loans, in the case of each clause (a) and (c), so that such Incremental Term Loans and the applicable existing Closing Date Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the existing Term Lenders (as determined  in  good faith by the Borrower). Each of the parties hereto hereby agrees that, upon the effectiveness  of  any  Incremental  Amendment,  this  Agreement  and  the  other  Loan  Documents,  as applicable, will be amended to the extent necessary to reflect the existence and terms of the Incremental

Term Facility and the Incremental Term Loans evidenced thereby. The Borrower may use the proceeds of the Incremental Term Loans for any purpose not prohibited by this Agreement.

(6)    Conditions. The availability of Incremental Term Facilities under this Agreement will be subject solely to the following conditions:

(a)    No Event of Default shall have occurred and be continuing or, in the case of a Permitted Acquisition or similar committed investment, no Event of Default under Section 8.01(1) or Section 8.01(6) (with respect to the Borrower only) shall have occurred and be continuing; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default under Section 8.01(1) or Section 8.01(6) (with respect to the Borrower only) shall have occurred and be continuing; and

(b)    all representations and warranties set forth in Article V shall be true and correct in all material respects on and as of the date of incurrence of the Incremental Term Facilities except any representations and warranties which expressly relate to a given date or period shall be required only to be true and correct in all material respects as of the respective date or for the respective period, as the case may be.

(7)    Terms. Each Incremental Amendment will set forth the amount and terms of the relevant Incremental Term Facility. The terms of each Incremental Term Facility will be as agreed between the Borrower and the Persons providing such Incremental Term Loans; *provided* that:

(a)    the final maturity date of such Incremental Term Loans will be no earlier than the Latest Maturity Date of the existing Closing Date Term Loans;

(b)    the Weighted Average Life to Maturity of such Incremental Term Loans will be no shorter than the longest remaining Weighted Average Life to Maturity of the existing Closing Date Term Loans;

(c)    such Incremental Term Loans may participate on a *pro rata* basis or a less than *pro rata* basis (but not greater than a *pro rata* basis) in any mandatory repayments or prepayments of the Closing Date Term Loans (in each case, other than pursuant to a refinancing or with respect to greater than *pro rata* payments to an earlier maturing tranche) and may participate on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis in any voluntary prepayments of the Closing Date Term Loans; and

(d)    except as otherwise set forth herein, all other terms of any (i) Term Loan Increase will be on terms and pursuant to documentation applicable to the Closing Date Term Loans and (ii) any Incremental Term Facility shall be on terms and pursuant to documentation to be determined; provided that to the extent such terms and documentation are not consistent with the existing Closing Date Term Loans (except to the extent permitted by clause (8) below), they shall be reasonably satisfactory to the Administrative Agent (except for covenants or other provisions applicable only to the periods after the Latest Maturity Date of the existing Closing Date Term Loans or any Incremental Term Facility in effect at such time) (it being understood that to the extent that any financial maintenance covenant is contained in any Incremental Term Facility, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of the existing Closing Date Term Loans or any Incremental Term Facility in effect at such time).

(8)    Pricing. The interest rate, fees, original issue discount, rate floors and fees and maturity and amortization schedule for any Incremental Term Facilities will be as determined by the Borrower and the Persons providing such Incremental Term Facilities; *provided* that in the event that with respect to the existing Closing Date Term Loans, the All-In Yield applicable to any Incremental Term Loans exceeds the All-In Yield of any existing Closing Date Term Loans by more than 50 basis points, then the interest rate margins for such existing Closing Date Term Loans shall be increased to the extent necessary so that the All-In Yield of such existing Closing Date Term Loans is equal to the All-In Yield of such Incremental Term Loans *minus* 50 basis points; *provided further* that any increase in All-In Yield of the existing Closing Date Term Loans due to the increase in a Eurodollar Rate or Base Rate floor on any Incremental Term Loan shall be effected solely through an increase in any Eurodollar Rate or Base Rate floor applicable to such existing Closing Date Term Loans.

(9)    The Administrative Agent and the Lenders hereby agree that the minimum borrowing, *pro rata* borrowing and *pro rata* payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

Section 2.15    Refinancing Amendments.

(1)    Refinancing Loans. At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender, Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Term Loans then outstanding under this Agreement, in the form of Refinancing Loans or Refinancing Commitments in each case pursuant to a Refinancing Amendment.

(2)    Refinancing Amendments. The effectiveness of any Refinancing Amendment will be subject only to the satisfaction on the date thereof of such conditions precedent as may be requested by the providers of the applicable Refinancing Loans. The Administrative Agent will promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Refinancing Amendments may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate in the reasonable opinion of the Required Administrative Lenders and the Borrower, to effect the provisions of this Section 2.15 and to reflect the existence and terms of the Refinancing Loans incurred pursuant thereto (including any amendments necessary to treat the Term Loans subject thereto as Refinancing Term Loans). A Refinancing Amendment may (a) extend or add "call protection" to any existing Class of Term Loans, (b) [Reserved] and (c) make other amendments to the terms of any existing Term Loans, in the case of each clause (a), (b) and (c), so that such Refinancing Term Loans and the applicable existing Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the applicable existing Term Lenders (as determined in good faith by the Borrower). Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement and the other Loan Documents, as applicable, will be amended to the extent necessary to reflect the existence and terms of the Refinancing Loans. At the request of the Administrative Agent, the Borrower shall deliver an Officer's Certificate to the Administrative Agent, certifying that the conditions and requirements with respect to such Refinancing Loans set forth in this Section 2.15 have been met and such Refinancing Amendment is authorized under this Section 2.15 (upon which the Administrative Agent may conclusively rely without independent inquiry).

(3)    Required Consents. Any Refinancing Amendment may, without the consent of any Person other than the Administrative Agent, the Borrower and the Persons providing the applicable Refinancing Loans, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Required Administrative Lenders and the Borrower, to effect the provisions of this Section 2.15. This Section 2.15 supersedes any provision in this Agreement to the contrary (including Section 10.01).

(4)     Providers of Refinancing Loans. Refinancing Loans may be provided by any existing Lender (it being understood that no existing Lender shall have an obligation to make all or any portion of any Refinancing Loan) or by any Additional Lender on terms permitted by this Section 2.15; *provided* that the Administrative Agent shall have consented (in each case, such consent not to be unreasonably withheld, conditioned or delayed) to any such Person's providing Refinancing Loans or Refinancing Commitments if such consent would be required under Section 10.07(b)(iii) for an assignment of Loans or Commitments to such Person. For the avoidance of doubt, any Affiliated Lender that provides any Refinancing Term Loans will be subject to the limitations on Affiliated Lenders set forth in Section 10.07(h) (including the Affiliated Lender Cap).

Section 2.16     Extensions of Loans.

(1)     Extension Offers. Pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date, the Borrower may extend such Maturity Date and otherwise modify the terms of such Loans or Commitments pursuant to the terms set forth in an Extension Offer (each, an "**Extension**," and each group of Loans or Commitments so extended, as well as any Loans of the same Class not so extended, each being a "**tranche**" for purposes of this Section 2.16). Each Extension Offer will specify the minimum amount of Loans or Commitments with respect to which an Extension Offer may be accepted, which will be an integral multiple of $1.0 million and an aggregate principal amount that is not less than $10.0 million, or if less, (a) the aggregate principal amount of such Loans outstanding or (b) such lesser minimum amount as is approved by the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed. Extension Offers will be made on a *pro rata* basis to all Lenders holding Loans or Commitments of a particular Class with a like Maturity Date. If the aggregate outstanding principal amount of such Loans (calculated on the face amount thereof) or Commitments in respect of which Lenders have accepted an Extension Offer exceeds the maximum aggregate principal amount of Loans or Commitments offered to be extended pursuant to such Extension Offer, then the Loans or Commitments of such Lenders will be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer. There is no requirement that any Extension Offer or Extension Amendment (defined as follows) be subject to any "most favored nation" pricing provisions, any condition on the non-existence of any Default or Event of Default or any financial ratio tests. The terms of an Extension Offer shall be determined by the Borrower, and Extension Offers may contain one or more conditions to their effectiveness, including a condition that a minimum amount of Loans or Commitments of any or all applicable tranches be tendered.

(2)     Extension Amendments. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents (each, an "**Extension Amendment**") as may be necessary or appropriate in order to effect the provisions of this Section 2.16, establish new tranches in respect of Extended Loans and Extended Commitments and such amendments as permitted by clause (5) below as may be necessary or appropriate in the reasonable opinion of the Required Administrative Lenders and the Borrower in connection with the establishment of such Extended Loans and Extended Commitments. An Extension Amendment may (a) extend or add "call protection" to any existing Class of Term Loans, (b) amend the schedule of amortization payments relating to any existing tranche of Term Loans, including amendments to Section 2.07 (*provided* that any such amendment shall not decrease the dollar amount of any amortization payment to any Lender that would have otherwise been payable to such Lender prior to the effectiveness of the applicable Extension Amendment) and (c) make other amendments to the terms of any existing Term Loans, in the case of each clause (a), (b) and (c), so that such Extended Loans and the applicable existing Term Loans form the same Class of Term Loans; *provided* that such amendments are not adverse to the existing Term Loan Lenders (as determined in good faith by the Borrower). At the request of the Administrative Agent, the Borrower shall deliver an Officer's Certificate to the Administrative Agent, certifying that the conditions and requirements with respect to such

Extension Loans set forth in this Section 2.16 have been met and such Extension Amendment is authorized under this Section 2.16 (upon which the Administrative Agent may conclusively rely without independent inquiry). This Section 2.16 supersedes any provision(s) in Section 2.13 or 10.01 to the contrary. Except as otherwise set forth in an Extension Offer, there will be no conditions to the effectiveness of an Extension Amendment. Extensions will not constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement. Any Lender of an existing Class of Term Loans that elects not to participate in Extended Loans or Extended Commitments of such Class of Term Loans shall be referred to herein as a "**Non-Extended Lender**".

(3)     _Terms of Extension Offers and Extension Amendments_. The terms of any Extended Loans and Extended Commitments will be set forth in an Extension Offer and as agreed between the Borrower and the Extending Lenders accepting such Extension Offer; _provided_ that:

(a)   the final maturity date of such Extended Loans and Extended Commitments will be no earlier than the Latest Maturity Date applicable to the Loans or Commitments subject to such Extension Offer;

(b)   the Weighted Average Life to Maturity of any Extended Loans that are Term Loans will be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans subject to such Extension Offer;

(c)   any Extended Loans that are Term Loans may participate on a pro rata basis or a less than pro rata basis (but not greater than a pro rata basis) in any mandatory repayments or prepayments of the Term Loans (in each case, other than pursuant to a refinancing) and may participate on a pro rata basis, greater than pro rata basis or less than pro rata basis in any voluntary prepayments of the Term Loans;

(d)   such Extended Loans and Extended Commitments are not secured by any assets or property that does not constitute Collateral and may not be secured on a senior basis to the existing Term Loans;

(e)   such Extended Loans and Extended Commitments are not guaranteed by any Subsidiary of the Borrower other than a Subsidiary Guarantor; and

(f)   the covenants and events of default applicable to Extended Loans or Extended Commitments are substantially identical to, or, taken as a whole, no more favorable to the Lenders providing such Extended Loans or Extended Commitments than, those applicable to the Loans subject to such Extension Offer, as determined in good faith by a Responsible Officer of the Borrower in its reasonable judgment; _provided_ that this clause (f) will not apply:

(A)   [reserved] or

(B)   to any of the following:

(1)   terms addressed in the preceding clauses (a) through (e),

(2)   interest rate, fees, funding discounts and other pricing terms,

(3)   redemption, prepayment or other premiums,

(4)   optional redemption or prepayment terms and

100

(5)     covenants and events of default applicable only to periods after the Latest Maturity Date at the time of incurrence of such Indebtedness.

Any Extended Loans will constitute a separate tranche of Term Loans from the Term Loans held by Lenders that did not accept the applicable Extension Offer.

(4)     <u>Required Consents.</u> No consent of any Lender or any other Person will be required to effectuate any Extension, other than the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned), the Borrower and the applicable Extending Lender. The transactions contemplated by this Section 2.16 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Offer) will not require the consent of any other Lender or any other Person, and the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.16 will not apply to any of the transactions effected pursuant to this Section 2.16.

Section 2.17     <u>Defaulting Lenders.</u>

(1)     <u>Adjustments.</u> Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(a)     <u>Waivers and Amendments.</u> That Defaulting Lender's right to approve or disapprove of any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)     <u>Reallocation of Payments.</u> Any payment of principal, interest, fees or other amounts received by any Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise), shall be applied at such time or times as may be determined by such Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to ~~such~~any Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (i) such payment is a payment of the principal amount of any Loans s in respect of which that Defaulting Lender has not fully funded its appropriate share and (ii) such Loans were made at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender. Any payments, prepayments or other amounts payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

101

(2)    Defaulting Lender Cure. If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders, whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; *provided further* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    Taxes, Increased Costs Protection and Illegality Taxes.

(1)    Except as required by applicable Law, any and all payments by any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes.

(2)    If any Loan Party or any other applicable withholding agent is required by applicable Law (as determined in the good faith discretion of such Loan Party or withholding agent) to make any deduction or withholding on account of any Taxes from any sum paid or payable by any Loan Party to any Lender or Agent under any of the Loan Documents:

(a)    the applicable Loan Party shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as such Loan Party becomes aware of it;

(b)    the applicable Loan Party or other applicable withholding agent shall be entitled to make such deduction or withholding and shall pay any amounts deducted or withheld to the relevant Governmental Authority any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on the Lender or Agent) on behalf of and in the name of the Lender or Agent (as applicable);

(c)    if the Tax in question is a Non-Excluded Tax or Other Tax, the sum payable to such Lender or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding for Non-Excluded Taxes or Other Taxes (including any deductions or withholdings for Non-Excluded Taxes or Other Taxes attributable to any payments required to be made under this Section 3.01), such Lender or such Agent (as applicable) receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and

(d)    within thirty days after paying any sum from which it is required by Law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (b) above to pay, the Borrower shall deliver to the Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(3)    Status of Lender. ~~Each~~The Administrative Agent and each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the

102

Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of the Administrative Agent and such Lender, as applicable, to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to the Administrative Agent or such Lender under any Loan Document. In addition, Administrative Agent or any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not the Administrative Agent or such Lender is subject to backup withholding or information reporting requirements. Each such Lender or Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(3)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and Administrative Agent of its inability to do so.

Without limiting the foregoing:

(a)   Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(b)   Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(i)   two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(ii)   two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)   in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (A) two properly completed and duly signed certificates substantially in the form of Exhibit H (any such certificate, a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(iv)   to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed originals of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, Form W-8BEN or W-8BEN-E, as applicable, a United States Tax Compliance Certificate, Form W-9, Form W-8IMY and any other required information (or any successor forms) from each beneficial owner that would be required under this Section 3.01(3) if such beneficial owner were a Lender, as applicable (*provided* that if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such beneficial owner), or

(v)     two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding Tax on any payments to such Lender under the Loan Documents.

(c)   If a payment made to a Lender under any Loan Document would be subject to Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, the term "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(4)     In addition to the payments by a Loan Party required by Section 3.01(2), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law and as soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(5)     The Loan Parties shall, jointly and severally, indemnify a Lender or Agent (each a "**Tax Indemnitee**"), within 10 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee on or attributable to any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Administrative Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(6)     If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), then such Tax Indemnitee shall pay to the relevant Loan Party the amount of such refund, net of all out-of-pocket expenses of the Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee to the extent the Tax Indemnitee is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (6), in no event will the Tax Indemnitee be required to pay any amount to a Loan Party pursuant to this paragraph (6) the payment of which would place the Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to indemnification and giving rise to such refund had not

been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(7)     The agreements in this Section 3.01 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

(8)     For purposes of this Section, the term "Applicable Law" includes FATCA.

Section 3.02     [Reserved.]

Section 3.03     [Reserved.]

Section 3.04     Increased Cost and Reduced Return; Capital Adequacy.

(1)     Increased Costs Generally. If any Change in Law shall:

(a)   impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender; or

(b)   subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes or Other Taxes covered by Section 3.01 and any Excluded Taxes).;

and the result of any of the foregoing shall be to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(1) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(2)     Capital Requirements. If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it, to a level below that which such Lender or such Lender's holding company, as the case may be, could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the

105

Administrative Agent), the Borrower will pay to such Lender additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; *provided* that such amounts shall only be payable by the Borrower to the applicable Lender under this Section 3.04(2) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(3)     Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (1) or (2) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

Section 3.05     [Reserved~~]~~

].

Section 3.06     Matters Applicable to All Requests for Compensation.

(1)     Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

(2)     [Reserved~~]~~].

(3)     [Reserved~~]~~].

(4)     Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of Sections 3.01 or 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of Section 3.01 or 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event giving rise to such claim and of such Lender's intention to claim compensation therefor (except that, if the circumstance giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.07     Replacement of Lenders under Certain Circumstances. If (1) any Lender requests compensation under Section 3.04, (2) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (3) any Lender is a Non-Consenting Lender or Non-Extended Lender, (4) any Lender becomes a Defaulting Lender or (5) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent:

(a)   require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement (or, with respect to clause (3) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver, or amendment, as applicable) and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(i)   the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(iv);

(ii)   such Lender shall have received payment of an amount equal to the applicable outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)   such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to all, or a portion, as applicable, of such Lender's Commitment and outstanding Loans and (ii) deliver any Term Notes evidencing such Loans to the Borrower (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Term Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Term Notes shall be deemed to be canceled upon such failure;

(iv)   the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans and Commitments, except with respect to indemnification and confidentiality provisions under this Agreement, which shall survive as to such assigning Lender;

(v)   in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(vi)   such assignment does not conflict with applicable Laws; and

(vii)   the Lender that acts as an Agent cannot be replaced in its capacity as such Agent other than in accordance with Section 9.11, or

(b)   terminate the Commitment of such Lender and in the case of a Lender, repay all Obligations of the Borrower owing to such Lender relating to the Loans held by such Lender as of such termination date; *provided* that in the case of any such termination of the Commitment of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable consent, waiver or amendment of the Loan Documents and such termination shall, with respect to clause (3) above, be in respect of all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any

amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans/Commitments and (iii) the Required Lenders or Required Facility Lenders, as applicable, have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 3.08    Survival. All of the Borrower's obligations under this Article III shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

## ARTICLE IV

### Conditions Precedent to Term Borrowings

Section 4.01    Conditions to Term Borrowings on Closing Date. The obligation of each Lender to make the Closing Date Term Loans on the Closing Date is subject to satisfaction (or waiver by the Required Lenders) of the conditions set forth in Section [●]3 of the Third Amendment.

## ARTICLE V

### Representations and Warranties

The Borrower represents and warrants to the Agents and the Lenders, at the time of each Term Borrowing (solely to the extent required to be true and correct for such Term Borrowing pursuant to Article IV or Section 2.14, as applicable):

Section 5.01    Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each of its respective Restricted Subsidiaries that is a Material Subsidiary:

(1)    is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction),

(2)    has all corporate or other organizational power and authority to (a) own or lease its assets and carry on its business as currently conducted and (b) in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party,

(3)    is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business as currently conducted requires such qualification,

(4)    is in compliance with all applicable Laws, orders, writs, injunctions and orders and

(5)    has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted;

108

except in each case referred to in the preceding clauses (2)(a), (3), (4) or (5), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.02    <u>Authorization; No Contravention</u>.

(1)    The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.

(2)    None of the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party will:

(a)    contravene the terms of any of such Person's Organizational Documents;

(b)    result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 7.01) under (i) any Contractual Obligation in excess of the Threshold Amount to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan party or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject; or

(c)    violate any applicable Law;

except with respect to any breach, contravention or violation (but not creation of Liens) referred to in the preceding clauses (b) and (c), to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.03    <u>Governmental Authorization</u>. No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for:

(1)    filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties,

(2)    the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and

(3)    those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.04    <u>Binding Effect</u>. This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party hereto or thereto, as applicable. Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05     Financial Statements; No Material Adverse Effect.

(1)     The (a) audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as of the fiscal year ended February 2, 2020, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the Borrower and its consolidated Subsidiaries for such fiscal year then ended, and (b) the unaudited quarterly balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries for the fiscal quarter ended [●], October 31, 2020 (the "**Quarterly Financial Statements**"), in each case, fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the date(s) thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (i) except as otherwise expressly noted therein and (ii) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(2)     Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06     Litigation.  Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

Section 5.07     Labor Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (1) there are no strikes or other labor disputes against the Borrower or the Restricted Subsidiaries pending or, to the knowledge of the Borrower, overtly threatened in writing and (2) hours worked by and payment made based on hours worked to employees of each of the Borrower or the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

Section 5.08     Real Property Matters.

(1)     Each Loan Party and each of its respective Restricted Subsidiaries has good and valid record title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property and Space Leased Property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(2)     As of the Closing Date, Schedule 5.08(2) annexed hereto contains a true, accurate and complete list of all Owned Real Property.

(3)     As of the Closing Date, Schedule 5.08(3) annexed hereto contains a true, accurate and complete list of all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting any Leased Real Property, including reasonable detail as to lease term, extension options, rental obligations and the counterparties.  Except as specified in Schedule 5.08(3) annexed hereto, each agreement listed on Schedule 5.08(3) is in full force and effect and there is no default by any Loan Party or any Restricted Subsidiary thereunder.  No Loan Party or any Restricted Subsidiary has knowledge of any default by any other party thereto that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party, enforceable against such Loan Party in accordance with its terms, except as

110

enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(4)    As of the Closing Date, Schedule 5.08(4) annexed hereto contains a true, accurate and complete list of all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting any Space Leased Property, including reasonable detail as to lease term, extension options, rental obligations and the counterparties.  Except as specified in Schedule 5.08(4) annexed hereto, each agreement listed on Schedule 5.08(4) is in full force and effect and there is no default by any Loan Party thereunder.  No Loan Party or any Restricted Subsidiary has knowledge of any default by any other party thereto that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party or each applicable or any Restricted Subsidiary, enforceable against such Loan Party or Restricted Subsidiary in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(5)    As of the Closing Date, other than as set forth on Schedule 5.08(5) annexed hereto, there are no pending condemnation, zoning or other land use proceedings or special assessment proceedings with respect to any Real Property or the use thereof, and no Loan Party or Restricted Subsidiary has received written notice from any Governmental Authority threatening any such proceeding.  No Loan Party or Restricted Subsidiary has entered into any agreements or commitments with Governmental Authorities that (i) materially affect the operations of or the entitlements applicable to such properties, (ii) require the owner of any such property to make improvements to such property or make dedications or off-site improvements for the benefit of adjoining properties, or (iii) make additional expenditures with respect to the operation of the Real Property.

(6)    Other than as forth on Schedule 5.08(6) annexed hereto, there is no construction or tenant improvement work currently underway at any Real Property or Space Leased Property having a total cost of more than [$ $500,000 ].

(7)    Other than as forth on Schedule 5.08(7) annexed hereto, no Loan Party or Restricted Subsidiary has received written notice from any Governmental Authority asserting a violation of any Law with respect to any Real Property or Space Leased Property.

(8)    Other than as forth on Schedule 5.05(8) attached here, each Loan Party or Subsidiary that owns or leases any Real Property or Space Leased Property is current occupying and conducting business at such Real Property or Space Leased Property.

Section 5.09    Environmental Matters. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) each Loan Party and each of its Restricted Subsidiaries and their respective operations and properties is in compliance with all applicable Environmental Laws; (b) each Loan Party and each of its Restricted Subsidiaries has obtained and maintained all Environmental Permits required to conduct their operations; (c) none of the Loan Parties or any of their respective Restricted Subsidiaries has become subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim in writing or Environmental Liability; and (d) none of the Loan Parties or any of their respective Restricted Subsidiaries or, to the knowledge of the Borrower, predecessors has treated, stored, transported or Released Hazardous Materials at or from any currently or formerly owned, leased or operated real estate or facility.

Section 5.10    Taxes. Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Loan Party and each of its Restricted Subsidiaries has

111

timely filed all Tax returns and reports required to be filed, and have timely paid all Taxes (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets (whether or not shown in a Tax return), which are due and payable, except those Taxes which are being contested in good faith by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP.

There is no proposed Tax assessment, deficiency or other claim against any Loan Party or any of its Restricted Subsidiaries except (i) those being actively contested by a Loan Party or such Restricted Subsidiary in good faith and by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP or (ii) those which would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 5.11    ERISA Compliance.

(1)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(2)    ~~(a)~~ No ERISA Event has occurred or is reasonably expected to occur;

(a)    no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan;

(b)    none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan;

(c)    none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and

(d)    neither any Loan Party nor any ERISA Affiliate has been notified in writing by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent or has been determined to be in endangered or critical status and no such Multiemployer Plan is expected to be insolvent or in endangered or critical status,

except, with respect to each of the foregoing clauses of this Section 5.11(2), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(3)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, (a) each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and (b) none of Holdings, the Borrower or any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

Section 5.12    Subsidiaries.

(1)    As of the Closing Date, after giving effect to the Transactions all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable, and all Equity Interests owned by Holdings in the Borrower, and by the Borrower or any Subsidiary Guarantor in any of their respective Subsidiaries are owned free and clear of all Liens of any

112

person except (a) those Liens created under the Collateral Documents, the "Collateral Documents" (as defined in the ABL Credit Agreement) and the "Collateral Documents" (as defined in the First Lien Credit Agreement) and (b) any nonconsensual Lien that is permitted under Section 7.01.

(2)        As of the Closing Date, <u>Schedule 5.12</u> sets forth:

(a)    the name and jurisdiction of each Subsidiary,

(b)    the ownership interests of Holdings in the Borrower and of the Borrower and any Subsidiary of the Borrower in each Subsidiary, including the percentage of such ownership, and

(c)    the Equity Interests of each Subsidiary described in clause (b) that are required to be pledged on the Closing Date after giving effect to the Transactions pursuant to the Collateral and Guarantee Requirement.

Section 5.13      <u>Margin Regulations; Investment Company Act</u>.

(a)    No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)    No Loan Party is an "investment company" under the Investment Company Act of 1940.

Section 5.14      <u>Disclosure</u>. None of the written information and written data heretofore or contemporaneously furnished in writing by or on behalf of the Borrower or any Subsidiary Guarantor to any Agent or any Lender on or prior to the Closing Date in connection with the Transactions, when taken as a whole, when furnished, contains any material misstatement of fact or omits to state any material fact necessary to make such written information and written data taken as a whole, in the light of the circumstances under which it was delivered, not materially misleading (after giving effect to all modifications and supplements to such written information and written data, in each case, furnished after the date on which such written information or such written data was originally delivered and prior to the Closing Date); it being understood that for purposes of this Section 5.14, such written information and written data shall not include any projections, *pro forma* financial information, financial estimates, forecasts and forward-looking information or information of a general economic or general industry nature.

Section 5.15      <u>Intellectual Property; Licenses, etc</u>. The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, technology, software, know-how database rights and other intellectual property rights (collectively, "**IP Rights**") that to the knowledge of the Borrower are reasonably necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any Subsidiary of the Borrower as currently conducted does not infringe upon, dilute, misappropriate or violate any IP Rights held by any Person except for such infringements, dilutions, misappropriations or violations, individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Subsidiary, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

113

Section 5.16    <u>Solvency</u>. On the Closing Date after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    <u>USA PATRIOT Act; Anti-Terrorism Laws; Foreign Corrupt Practices Act</u>. To the extent applicable, Holdings, Borrower and the Restricted Subsidiaries are in compliance, in all material respects, with (i) the USA PATRIOT Act, (ii) the United States Foreign Corrupt Practices Act of 1977 (the "**FCPA**"), and (iii) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto. None of Holdings, Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer or employee of any of Holdings, the Borrower or any of the Restricted Subsidiaries, is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") ("**Sanctions**"). No proceeds of the Loans will be used by Holdings, the Borrower or any Restricted Subsidiary (a) directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business, or to obtain any improper advantage, in violation of the FCPA or (b) for the purpose of financing activities of or with any Person, that, at the time of such financing, is the subject of any Sanctions administered by OFAC.

Section 5.18    <u>Collateral Documents</u>. Except as otherwise contemplated hereby or under any other Loan Documents and subject to limitations set forth in the Collateral and Guarantee Requirement, the provisions of the Collateral Documents, together with such filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Collateral required to be delivered pursuant hereto or the applicable Collateral Documents), are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien (subject to Liens permitted by Section 7.01) with the priority set forth in the Applicable Intercreditor Agreement on all right, title and interest of the respective Loan Parties in the Collateral described therein.

Notwithstanding anything herein (including this Section 5.18) or in any other Loan Document to the contrary, no Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) any Excluded Assets.

Section 5.19    <u>Use of Proceeds</u>. The Borrower has used the proceeds of the Loans issued hereunder only in compliance with (and not in contravention of) each Loan Document.

Section 5.20    <u>Beneficial Ownership Certification</u>. As of the Closing Date, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

### ARTICLE VI

### **Affirmative Covenants**

From and after the Closing Date, so long as the Termination Conditions have not been satisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

114

Section 6.01     Financial Statements. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender each of the following:

(1)     as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or, with respect to the fiscal year of the Borrower ended [January 30, 2021], one hundred and five (105) days after the end of such fiscal year), commencing with the fiscal year ending January [30], 2021, (I) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, together with related notes thereto and management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, setting forth in each case in comparative form the figures for the previous fiscal year, in reasonable detail and all prepared in accordance with GAAP, audited and accompanied by a report and opinion of any of the "big four" accounting firms or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Required Administrative Lenders, which report and opinion (a) will be prepared in accordance with generally accepted auditing standards and (b), other than with respect to the report and opinion for fiscal year ending [January 30], 2021, will not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than such a qualification based solely on (i) an upcoming maturity of the Loans under this Agreement, the First Lien Facility or the ABL Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant hereunder or under the ABL Credit Agreement) and (II) a report setting forth in reasonable detail the portion of revenues and gross margin for such fiscal year derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement);

(2)     as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower commencing with the fiscal quarter ending [ ], May 1, 2021, (I) a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (a) condensed consolidated statement of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (b) condensed consolidated statement of cash flows for the portion of the fiscal year then ended, setting forth, in each case of the preceding clauses (a) and (b), in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, accompanied by an Officer's Certificate stating that such financial statements fairly present in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes, together with management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower and (II) a report setting forth in reasonable detail the portion of revenues and gross margin for such fiscal quarter and the portion of the fiscal year then ended derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, which shall include in comparative form (both in dollars and percentage terms, as applicable), the figures for the corresponding fiscal quarter of the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement) and the corresponding portion of the previous fiscal year (to the extent such information is provided for such previous fiscal year under this Agreement);

(3)     within ninety (90) days after the end of each fiscal year of the Borrower (or 120 days after the end of the fiscal year during which the Closing Date occurs), (a) a consolidated budget for the following fiscal year on a quarterly basis as customarily prepared by management of the Borrower for its internal use

115

(including any projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected operations or income, in each case, to the extent prepared by management of the Borrower and included in such consolidated budget) and (b) projections of the portion of revenues and gross margin derived from (1) brick and mortar store sales and (2) e-commerce sales (inclusive of drop-ship business but without providing gross margin with respect thereto) and the amount of revenues from drop-ship business, in each case, prepared on a quarterly basis, which projected financial statements shall be prepared in good faith on the basis of assumptions believed to be reasonable at the time of preparation of such projected financial statements (it being understood by the Secured Parties that any such projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and the Investors and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material);

(4)    simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(1) and 6.01(2), the related unaudited (it being understood that such information may be audited at the option of the Borrower) consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; and

Notwithstanding the foregoing, the obligations referred to in Sections 6.01(1) and 6.01(2) may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any Parent Company or (B) the Borrower's or such Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC (and the public filing of such report with the SEC shall constitute delivery under this Section 6.01); *provided* that with respect to each of the preceding clauses (A) and (B), (1) to the extent such information relates to a parent of the Borrower, if and so long as such Parent Company will have Independent Assets or Operations, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such Parent Company and its Independent Assets or Operations, on the one hand, and the information relating to the Borrower and the consolidated Restricted Subsidiaries on a stand-alone basis, on the other hand and (2) to the extent such information is in lieu of information required to be provided under Section 6.01(1) (it being understood that such information may be audited at the option of the Borrower), such materials are accompanied by a report and opinion of PricewaterhouseCoopers, LLP, KPMG LLP or any other independent registered public accounting firm of nationally recognized standing or another accounting firm reasonably acceptable to the Required Administrative Lenders, which report and opinion (x) shall be prepared in accordance with generally accepted auditing standards and (y) shall not be subject to any qualification as to the scope of such audit or be subject to any explanatory statement as to the Borrower's ability to continue as a "going concern" or like qualification (other than such a qualification based solely on (i) an upcoming maturity of the Loans under this Agreement, the First Lien Facility or the ABL Facility or (ii) any anticipated inability to satisfy any financial maintenance covenant hereunder).

Any financial statements required to be delivered pursuant to Sections 6.01(1) or 6.01(2) shall not be required to contain all purchase accounting adjustments relating to the Transactions or any other transaction(s) permitted hereunder to the extent it is not practicable to include any such adjustments in such financial statements.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP, or the respective interpretation thereof, and that such restatements will not result in a Default or an Event of Default under the Credit Documents.

Section 6.02     Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution by the Administrative Agent to each Lender:

(1)     no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(1) and (2), a duly completed Compliance Certificate signed by a Financial Officer of the Borrower;

(2)     promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(3)     promptly after the furnishing thereof, copies of any notices of default to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the First Lien Facility and/or the ABL Facility, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount (in each case, other than in connection with any board observer rights) and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(4)     together with the delivery of the Compliance Certificate with respect to the financial statements referred to in Section 6.01(1), (a) a report setting forth the information required by Sections 1(a), (e) and (f) and Section 11 of the Perfection Certificate (or confirming that there has been no change in such information since the latter of the Closing Date or the last such report) and (b) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such list or a confirmation that there is no change in such information since the later of the Closing Date and the last such list;

(5)     [reserved]; and

(6)     promptly, such additional information regarding the business and financial affairs of any Loan Party or any Material Subsidiary that is a Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request in writing from time to time.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02(2) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's (or any Parent Company's) website on the Internet at the website address listed on Schedule 10.02 hereto (or as such address may be updated from time to time in accordance with Section 10.02); or (b) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (i) upon written request by the Administrative Agent, the Borrower will deliver paper copies of such documents to the Administrative Agent for further distribution by the Administrative Agent to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents or link and, upon the Administrative Agent's request, provide to the Administrative Agent by electronic mail electronic versions

(i.e., pdf copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available to the Lenders materials or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks, DebtDomain, SyndTrak, ClearPar or another similar electronic system chosen by the Administrative Agent to be its electronic transmission system (the "**Platform**") and (b) certain of the Lenders may have personnel who do not wish to receive any information with respect to the Borrower, its Subsidiaries or their respective securities that is not Public-Side Information, and who may be engaged in investment and other market-related activities with respect to such Person's securities. The Borrower hereby agrees that (i) at the Administrative Agent's request, all Borrower Materials that are to be made available to Public Lenders will be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" will appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower will be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public-Side Information (*provided, however,* that to the extent such Borrower Materials constitute Information, they will be treated as set forth in Section 10.09); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information"; and (iv) the Administrative Agent will treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated as "Public Side Information." Notwithstanding the foregoing, (x) the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC" and (y) the following Communications shall be deemed "PUBLIC," unless the Borrower notifies the Administrative Agent promptly in writing that any such document contains material non-public information:  (1) the Loan Documents, and (2) notification of changes in the terms of the Loans.

Anything to the contrary notwithstanding, nothing in this Agreement will require Holdings, the Borrower or any Subsidiary to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.03    Notices. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent of:

(1)    the occurrence of any Default; and

(2)    (a) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (b) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or its Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (c) the occurrence of any ERISA Event that, in any such case referred to in clauses (a), (b) or (c) of this Section 6.03(2), has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (a) that such notice is being delivered pursuant to Section 6.03(1) or (2) (as applicable) and (b) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

118

Section 6.04      Payment of Obligations. Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (1) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (2) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 6.05      Preservation of Existence, etc..

(1)      Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(2)      take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, and IP Rights material to the conduct of its business,

except in the case of clauses (1) or (2) of this Section 6.05 to the extent (other than with respect to the preservation of the existence of the Borrower set forth in clause (1)) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or disposition permitted by Article VII.

Section 6.06      Maintenance of Properties. Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in reasonably good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

Section 6.07      Maintenance of Insurance.

(1)      Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed or with a Captive Insurance Subsidiary, insurance with respect to the Borrower's and the Restricted Subsidiaries' properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Collateral Agent or the Required Lenders, information presented in reasonable detail as to the insurance so carried; *provided* that notwithstanding the foregoing, in no event will the Borrower or any Restricted Subsidiary be required to obtain or maintain insurance that is more restrictive than what is consistent with past practice. Each such policy of insurance will as appropriate, (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear or (ii) in the case of each casualty insurance policy, contain an additional loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the additional loss payee thereunder; *provided* that to the extent that the requirements of this Section 6.07 are not satisfied on the Closing Date, the Borrower may satisfy such requirements within ninety (90) days of the Closing Date (or such later date as the Required Administrative Lenders may agree).

(2)      If any improved portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws, (each, a "**Flood Hazard Property**"), then the Borrower will, or will cause each Loan Party to (a) maintain, or cause to be maintained, flood insurance in an amount and otherwise sufficient to comply with all

119

applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (b) deliver to the Collateral Agent (A) evidence as to whether the community in which such Mortgaged Property is located is participating in the National Flood Insurance Program, (B) the Borrower's written acknowledgment as to the fact that such Mortgaged Property is a Flood Hazard Property and as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (C) copies of an application for a flood insurance policy plus proof of premium payment, a declaration page confirming that such flood insurance has been issued, or such other evidence of such flood insurance reasonably satisfactory to the Collateral Agent and the Required Administrative Lenders and naming the Collateral Agent as mortgagee and loss payee (the requirements of clauses (a) and (b) being the "**Flood Insurance Requirements**").

Section 6.08     Compliance with Laws. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property (including ERISA, the USA PATRIOT Act, Sanctions, OFAC and FCPA), except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

Section 6.09     Books and Records. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.10     Inspection Rights. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. For the avoidance of doubt, this Section 6.10 is subject to the last paragraph of Section 6.02. In no event shall the Administrative Agent be required to bear any cost or expense hereunder.

Section 6.11     Covenant to Guarantee Obligations and Give Security. At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent, the Collateral Agent or the Required Lenders to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(1)     (x) upon (i) the formation or acquisition of any new direct or indirect Material Domestic Subsidiary (other than any Excluded Subsidiary) by any Loan Party, (ii) the designation of any existing direct or indirect Material Domestic Subsidiary (other than any Excluded Subsidiary) as a Restricted

120

Subsidiary, (iii) any Subsidiary (other than any Excluded Subsidiary) becoming a Material Domestic Subsidiary or (iv) an Excluded Subsidiary that is a Material Domestic Subsidiary ceasing to be an Excluded Subsidiary but continuing as a Restricted Subsidiary of the Borrower, (y) upon the acquisition of any assets by the Borrower or any Subsidiary Guarantor or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(a)  within sixty (60) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Required Lenders may agree in their reasonable discretion cause such Material Domestic Subsidiary required to become a Guarantor under the Collateral and Guarantee Requirement to execute the Guaranty (or a joinder thereto) and other documentation the Collateral Agent or the Required Administrative Lenders may reasonably request from time to time in order to carry out more effectively the purposes of the Guaranty and the Collateral Documents and

(A)  within sixty (60) days) after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Subsidiary Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent supplements to the Security Agreement, a counterpart signature page to the Intercompany Subordination Agreement, Intellectual Property Security Agreements and other security agreements and documents necessary to satisfy the Collateral and Guarantee Requirement, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent and the Required Administrative Lenders (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting and perfecting Liens required by the Collateral and Guarantee Requirement;

(B)  within sixty (60) days after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and a joinder to the Intercompany Subordination Agreement substantially in the form of Annex I thereto with respect to the intercompany Indebtedness held by such Material Domestic Subsidiary;

(C)  within sixty (60) days) after such formation, acquisition or designation, take and cause (i) the applicable Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and (ii) to the extent applicable, each direct or indirect parent of such applicable Material Domestic Subsidiary, in each case, to take customary action(s) (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be necessary in the reasonable opinion of the Collateral Agent or the Required Lenders to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected (subject to Liens permitted by Section 7.01) Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law); and

121

(D)      within sixty (60) days) after the reasonable request therefor by the Collateral Agent (or such longer period as the Required Administrative Lenders may agree in their reasonable discretion), deliver to the Administrative Agent a signed copy of a customary Opinion of Counsel, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Required Administrative Lenders as to such matters set forth in this Section 6.11(1) as the Collateral Agent or the Required Administrative Lenders may reasonably request (with such opinion being consistent with the Opinion of Counsel delivered to the Collateral Agent on the Closing Date);

*provided* that actions relating to Liens on Real Property are governed by Section 6.11(2) and not this Section 6.11(1).

(2)      Real Property.

(a)      Notice.

(i)      Within sixty (60) days (or such longer period as the Required Administrative Lenders may agree in their reasonable discretion), after the formation, acquisition or designation of a Material Domestic Subsidiary that is required to become a Subsidiary Guarantor under the Collateral and Guarantee Requirement, the Borrower will, or will cause such Material Domestic Subsidiary to, furnish to the Collateral Agent a description of any Real Property owned or leased by such Material Domestic Subsidiary.

(ii)      Within sixty (60) days (or such longer period as the Required Administrative Lenders may agree in their reasonable discretion), after the acquisition of any Owned Real Property or Leased Real Property (other than any Excluded Asset(s)) by a Loan Party (other than Holdings), after the Closing Date, the Borrower will, or will cause such Loan Party to, furnish to the Collateral Agent a description of any such Owned Real Property or Leased Real Property.

(b)      Mortgages. The Borrower will, or will cause the applicable Loan Party to, provide the Collateral Agent with a Mortgage with respect to any Real Property acquired after the Closing Date, that is the subject of a notice delivered pursuant to Section 6.11(2)(a), within ninety (90) days of the acquisition, formation or designation of such Material Domestic Subsidiary or the acquisition of such Real Property (or such longer period as the Required Administrative Lenders may agree in their reasonable discretion), together with:

(i)      evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Collateral Agent or the Required Administrative Lenders may deem reasonably necessary or desirable in order to create, except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, a valid and subsisting perfected Lien on such Real Property, in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Required Administrative Lenders;

(ii)      In the case of a Leased Real Property, to the extent required by the terms of the Lease as a condition to any new Mortgage, Borrower shall use commercially reasonable efforts to obtain a Landlord Consent and Estoppel (for the avoidance of doubt, no Landlord Consent and Estoppel will be required for any Existing Mortgage, unless the terms of the applicable lease require the consent of the landlord or lessor with respect to the proposed Mortgage Amendment), unless otherwise waived by Collateral Agent in its reasonable discretion, such waiver not to be

122

unreasonably withheld; provided, that Collateral Agent shall, at the ~~request of such lessor~~Borrower's expense and the Borrower's reasonable request, and if required by such lessor in order to obtain a Landlord Consent and Estoppel, deliver to such lessor a recognition agreement in a recordable form.  Notwithstanding the foregoing, where the consent or other affirmative action of the applicable landlord is required for Borrower or the applicable Subsidiary to deliver the Landlord Consent and Estoppel, and such consent cannot be obtained after the Borrower or the applicable Subsidiary's use of commercially reasonable efforts to do so (which commercially reasonable efforts, for the avoidance of doubt, shall not require the Borrower or applicable Subsidiary to amend or otherwise modify any of the existing terms or conditions of any agreement with any landlord or pay additional economics to any landlord), the delivery of the Landlord Consent and Estoppel by the Borrower shall automatically be deemed waived ~~by Collateral Agent~~hereunder for such Leased Real Property, provided that Borrower shall provide Collateral Agent with notice within five (5) business days of Borrower's determination that a Landlord Consent and Estoppel cannot be obtained, as well as a reasonably detailed description of Borrower's efforts to obtain the Landlord Consent and Estoppel;

(iii)  fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in each applicable jurisdiction (the "**Mortgage Policies**") in form and substance, with endorsements, including zoning endorsements, available in the applicable jurisdiction and in amounts, reasonably acceptable to the Required Administrative Lenders (not to exceed the fair market value of the real properties or ground leasehold interests covered thereby), issued, coinsured and reinsured (as applicable) by title insurers reasonably acceptable to the Required Administrative Lenders, insuring the Mortgages to be valid subsisting Liens on the property or ground leasehold interests described therein, subject only to Liens permitted by Section 7.01 or such other Liens that do not have a material adverse impact on the use or value of the Mortgaged Properties, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Required Administrative Lenders may reasonably request and is available in the applicable jurisdiction and with respect to any property located in a state in which a zoning endorsement is not available, a zoning compliance letter from the applicable municipality or a zoning report from Planning and Zoning Resources Corporation (or other similar company reasonably acceptable to the Required Administrative Lenders), in each case to be reasonably satisfactory to the Required Lenders;

(iv)  customary Opinions of Counsel for the applicable Loan Parties in states in which such Real Properties are located with respect to the enforceability and perfection of the Mortgage(s) or the Mortgage Amendments, as applicable, and any related fixture filings, the authorization, execution and delivery of the Mortgages or the Mortgage Amendments, as applicable, and such other matters as the Collateral Agent or the Required Lenders may reasonably request, in form and substance reasonably satisfactory to the Collateral Agent;

(v)  American Land Title/American Congress on Surveying and Mapping surveys for each Real Property, or existing surveys together with customary no change affidavits, in each case certified to the Collateral Agent if deemed necessary by Collateral Agent or the Required Lenders in their reasonable discretion, sufficient for the title insurance company issuing a Mortgage Policy or any title date-down or modification endorsement with respect to the Existing Mortgages to remove the standard survey exception and issue standard survey related endorsements;

(vi)  a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Real Property, containing improved land addressed to the Collateral Agent and otherwise in compliance with the Flood Insurance Laws, and if any

such Real Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, the Borrower's duly executed acknowledgement of special flood hazard area status and flood disaster assistance and evidence of compliance with the Flood Insurance Requirements; and

(vii)     as promptly as practicable after the reasonable request therefor by the Collateral Agent or the Required Lenders, environmental assessment reports and reliance letters (if any) that have been prepared in connection with such acquisition, designation or formation of any Material Domestic Subsidiary or acquisition of any Real Property, or in connection with the Real Property subject to the Mortgage.

(3)     Additional Deposit Account Control Agreements.  Following the termination of the ABL Facility and the ABL Intercreditor Agreement, the Borrower shall enter into, within 90 days after the establishment of any new deposit accounts that would be or could be required to be subject to an account control agreement pursuant to the terms of the ABL Credit Agreement if it were not terminated (which, for the avoidance of doubt, shall not include any Excluded Account, deposit account control agreements with each account bank in respect of such deposit accounts in form and substance reasonably satisfactory to the AdministrativeCollateral Agent.

Notwithstanding the foregoing, until the Discharge of Senior Obligations (as defined in the Term Intercreditor Agreement) shall have occurred, any requirements under this Section 6.11 to deliver any stock and membership interest certificates to the extent certificated, instruments evidencing Indebtedness or other possessory Collateral to the Collateral Agent shall be deemed satisfied by the delivery of such Collateral to the First Lien Administrative Agent, as contemplated by the Term Intercreditor Agreement.

Section 6.12     Compliance with Environmental Laws.

(1)     Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (1) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits (including any cleanup, removal or remedial obligations) and (2) obtain and renew all Environmental Permits required to conduct its operations or in connection with its properties.

(2)     The Borrower will, or will cause the applicable Loan Party to, deliver to the Collateral Agent:

(a)     As soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Borrower or any Loan Party or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Real Property which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or with respect to any Environmental Claims which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(b)     Promptly upon the occurrence thereof, written notice describing in reasonable detail (a) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, and (b) any remedial action taken by Borrower or any Loan Party or any other Person in response to (1) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having,

124

individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(c)    As soon as practicable following the sending or receipt thereof by Borrower or any Loan Party, a copy of any and all written communications with respect to (a) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (b) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (c) any request for information from any governmental agency that suggests such agency is investigating whether Borrower or any Loan Party may be potentially responsible for any Hazardous Materials Activity.

(d)    Prompt written notice describing in reasonable detail (a) any proposed acquisition of stock, assets, or property by Borrower or any Loan Party that could reasonably be expected to (1) expose Borrower or any Loan Party to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (2) affect the ability of Borrower or any Loan Party to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (b) any proposed action to be taken by Borrower or any Loan Party to commence manufacturing or other industrial operations or to modify current operations in a manner that could reasonably be expected to subject Borrower or any Loan Party to any material additional obligations or requirements under any Environmental Laws that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)    With reasonable promptness, such other documents and information as from time to time may be reasonably requested by the Administrative Agent and or the Required Lenders in relation to any matters disclosed pursuant to this subsection 6.12.

(3)    The Borrower will, or will cause the applicable Loan Party to:

(a)    Promptly undertake, and shall cause each of its Subsidiaries promptly to undertake, any and all investigations, studies, sampling, testing, abatement, cleanup, removal, remediation or other response actions necessary to remove, remediate, clean up or abate any Hazardous Materials Activity on, under or about any Real Property that is in violation of any Environmental Laws or that presents a material risk of giving rise to an Environmental Claim.  In the event by Borrower or any Loan Party undertakes any such action with respect to any Hazardous Materials, by Borrower or such Loan Party shall conduct and complete such action in compliance with all applicable Environmental Laws and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, Borrower's or such Loan Party's liability with respect to such Hazardous Materials Activity is being contested in good faith by Borrower or such Loan Party.

(b)    Promptly take any and all actions necessary to (1) cure any material violation of applicable Environmental Laws by Borrower or any Loan Party that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (2) make an appropriate response to any Environmental Claim against Borrower or any Loan Party and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.13    Further Assurances and Post-Closing Covenant.

(1)    Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Borrower, promptly upon reasonable request from time to time by the Administrative Agent, the Collateral Agent or the Required

125

Lenders or as may be required by applicable Laws (a) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, the Collateral Agent or the Required Lenders may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents and to satisfy the Collateral and Guarantee Requirement.

(2)     As promptly as practicable, and in any event no later than (x) sixty (60) days after the Closing Date with respect to any Owned Real Property that is not an Existing Mortgaged Property and (y) ninety (90) days after the Closing Date with respect to any Leased Real Property that is not an Existing Mortgaged Property (other than Existing Mortgaged Properties where the Administrative Agent or the Required Lenders have requested that a new Mortgage be executed), or, in each case, such later date as the Required Administrative Lenders reasonably agree to in writing, including to reasonably accommodate circumstances unforeseen on the Closing Date, deliver the documents or take the actions required pursuant to sub clauses (i) through (vii) of Section 6.11(2)(b) hereof, except to the extent otherwise agreed by the Required Administrative Lenders.

Section 6.14     [Reserved].

Section 6.15     Maintenance of Ratings. Use commercially reasonable efforts to maintain (1) a public corporate credit rating (but not any specific rating) from S&P and a public corporate family rating (but not any specific rating) from Moody's, in each case in respect of the Borrower, and (2) a public rating (but not any specific rating) in respect of each Term Facility as of the Closing Date from each of S&P and Moody's.

Section 6.16     Accounting Changes. The Borrower shall, and shall cause its Restricted Subsidiaries to, maintain their fiscal year as in effect on the Closing Date; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Administrative Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.17     Nature of Business. The Borrower shall and shall cause its Restricted Subsidiaries to, engage in material line of business substantially the same as those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business(es) or any other activities that are reasonably similar, ancillary, incidental, complimentary or related to, or a reasonable extension, development or expansion of, the business conducted or proposed to be conducted by the Borrower and the Restricted Subsidiaries on the Closing Date.

Section 6.18     Designation of Subsidiaries. On and after the Closing Date, the Borrower shall not designate any Restricted Subsidiaries as Unrestricted Subsidiaries or any Unrestricted Subsidiaries as Restricted Subsidiaries.

Section 6.19     Lender Meetings. On a quarterly basis, upon reasonable request from the Required Lenders, promptly after the delivery of the information required pursuant to Section 6.01(1) and Section 6.01(2) (but no earlier than five (5) Business Days following the delivery of such financial statements), the Borrower (including, without limitation, the chief executive officer and chief financial officer of the Borrower) shall and shall cause its Restricted Subsidiaries to participate in a conference call with Lenders to discuss the financial position and results of operations of the Borrower and its Subsidiaries for the most recently ended period for which financial statements have been delivered; provided, that no such conference

126

call shall be required to the extent the requesting Lenders are Lenders (as defined in the First Lien Credit Agreement) under the First Lien Credit Agreement and such a conference call was, or shall be, held pursuant to the First Lien Credit Agreement.

### ARTICLE VII

### Negative Covenants

From and after the Closing Date and so long as the Termination Conditions are not satisfied:

Section 7.01    Liens. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien (except any Permitted Lien(s)) that secures obligations under any Indebtedness or any related guarantee of Indebtedness on any asset or property of the Borrower or any Restricted Subsidiary, or any income or profits therefrom.

The expansion of Liens by virtue of accretion or amortization of original issue discount, the payment of dividends in the form of Indebtedness, and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 7.01.

Section 7.02    Indebtedness.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(i)    create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "**incur**" and collectively, an "**incurrence**") with respect to any Indebtedness (including Acquired Indebtedness), or

(ii)    issue any shares of Disqualified Stock or permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; and

(b)    the foregoing clause (a) shall not apply to the following:

(1)    Indebtedness of the Borrower and of its Restricted Subsidiaries under the Loan Documents (including Incremental Term Loans, Refinancing Loans, Extended Loans and Replacement Loans);

(2)    Indebtedness (a) incurred pursuant to the First Lien Facility in an aggregate principal amount not to exceed the sum of (w) [$$1,122.0] million 929,968.71 (plus interest with respect thereto that is paid in-kind by increasing the outstanding principal amount thereof) plus (x) other First Lien Obligations (as defined in the First Lien Credit Agreement as in effect on the date hereof) not constituting principal and (b) consisting of "Credit Agreement Refinancing Indebtedness" (as defined in the First Lien Credit Agreement as in effect on the date hereof) and Indebtedness permitted to be incurred on a *pari passu* basis with the First Lien Facility under the First Lien Credit Agreement as in effect on the date hereof, in each case, together with any Refinancing Indebtedness in respect thereof;

(3)    the incurrence of Indebtedness by the Borrower and any Restricted Subsidiary in existence on the Closing Date listed on Schedule 7.02(3) (excluding Indebtedness described in the preceding clauses (1) and (2) and clause (25) below);

127

(4)      (a) the incurrence of Attributable Indebtedness and (b) Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock incurred or issued by the Borrower or any Restricted Subsidiary and Preferred Stock issued by any Restricted Subsidiary, to finance the purchase, lease, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or other assets, including assets that are used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate principal amount, together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts) and all other Indebtedness, Disqualified Stock or Preferred Stock incurred or issued and outstanding under this clause (4), without regard to any Indebtedness listed on Schedule 7.02(3), at such time not to exceed (x) the greater of $60.0 million and 12.0% of Adjusted EBITDA as of the most recently ended Test Period calculated giving *pro forma* effect thereto and (y) the aggregate principal amount of Attributable Indebtedness and Indebtedness described in clause (b) above, in each case outstanding on the Closing Date and any Refinancing Indebtedness of the Indebtedness referred to in this clause (4) thereof;

(5)      Indebtedness incurred by the Borrower or any Restricted Subsidiary (a) constituting reimbursement obligations with respect to letters of credit, bank guarantees, banker's acceptances, warehouse receipts, or similar instruments issued or entered into, or relating to obligations or liabilities incurred, in the ordinary course of business or consistent with industry practice, including in respect of workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, performance, completion or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or (b) as an account party in respect of letters of credit, bank guarantees or similar instruments in favor of suppliers, trade creditors or other Persons issued or incurred in the ordinary course of business or consistent with industry practice;

(6)      [reserved];

(7)      the incurrence of Indebtedness of the Borrower to a Subsidiary Guarantor (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Subsidiary Guarantor); *provided* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Subsidiary Guarantor ceasing to be a Subsidiary Guarantor or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Subsidiary Guarantor or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (7);

(8)      the incurrence of Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary (or to any Parent Company which is substantially contemporaneously transferred to the Borrower or any Restricted Subsidiary) to the extent permitted by Section 7.05; *provided* that any such Indebtedness for borrowed money incurred by a Guarantor and owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Guaranty of the Loans of such Guarantor to the extent permitted by applicable law; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any such subsequent transfer of any such Indebtedness (except to the Borrower or a Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) will be deemed, in each case, to be an incurrence of such Indebtedness (to the extent such Indebtedness is then outstanding) not permitted by this clause (8);

(9)      [reserved];

(10)      the incurrence of Hedging Obligations in the ordinary course of business (excluding Hedging Obligations entered into for speculative purposes);

(11)      the incurrence of Indebtedness in respect of self-insurance and Indebtedness in respect of performance, bid, appeal and surety bonds and performance, banker's acceptance facilities and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary or Indebtedness in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with industry practice, including those incurred to secure health, safety and environmental obligations;

(12)      the incurrence of:

(a)   [reserved]

(b)   Indebtedness or Disqualified Stock of the Borrower and Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or any Subsidiary Guarantor in an aggregate principal amount or liquidation preference that, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred or issued, as applicable, pursuant to this clause (12)(b), together with any Refinancing Indebtedness in respect thereof (excluding any Incremental Amounts), does not exceed (i) $60.0 million *plus*, without duplication, (ii) in the event of any extension, replacement, refinancing, renewal or defeasance of any such Indebtedness or Disqualified Stock, an amount equal to the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness or Disqualified Stock and any defeasance costs and any fees and expenses (including original issue discount, upfront fees or similar fees) incurred in connection with the issuance of such new Indebtedness or the extension, replacement, refunding, refinancing, renewal or defeasance of such Indebtedness or Disqualified Stock;

(13)      the incurrence by the Borrower of Indebtedness or Disqualified Stock or the incurrence by a Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock that serves to Refinance any Indebtedness permitted under clause (3) above, this clause (13) and clauses (23), (29) and (30), or any successive Refinancing Indebtedness with respect to any of the foregoing;

(14)      [reserved];

(15)      the incurrence of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with industry practice;

(16)      the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary supported by letters of credit or bank guarantees permitted hereunder, in each case, in a principal amount not in excess of the stated amount of such letters of credit or bank guarantees;

(17)      (a) the incurrence of any guarantee by the Borrower or a Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations incurred by the Borrower or such Restricted Subsidiary is permitted by this Agreement, or (b) any co-issuance by the Borrower or any Restricted Subsidiary of any Indebtedness or other obligations of the Borrower or any Restricted Subsidiary so long as the incurrence of such Indebtedness or other obligations by the Borrower or such Restricted Subsidiary was permitted hereunder; provided that the incurrence of any such guarantee or co-issuance by a Loan Party of Indebtedness or other obligations of any Non-Loan Party shall be deemed to be an Investment made under the final proviso to

129

clause (13) of the definition of "Permitted Investments" and shall be permitted to be incurred only to the extent of available capacity under such proviso at the time of such incurrence or co-issuance;

(18)    the incurrence of Indebtedness issued by the Borrower or any Restricted Subsidiary to future, present or former employees, directors, officers, members of management and consultants thereof, their respective Controlled Investment Affiliates or Immediate Family Members and permitted transferees thereof, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Company to the extent described in Section 7.05(b)(4);

(19)    customer deposits and advance payments received in the ordinary course of business or consistent with industry practice from customers for goods and services purchased in the ordinary course of business or consistent with industry practice;

(20)    the incurrence of (a) Indebtedness owed to banks and other financial institutions incurred in the ordinary course of business or consistent with industry practice in connection with ordinary banking arrangements to manage cash balances of the Borrower and its Restricted Subsidiaries and (b) Indebtedness in respect of Cash Management Services;

(21)    Indebtedness incurred by the Borrower or any Restricted Subsidiary in connection with bankers' acceptances or discounted bills of exchange, in each case incurred or undertaken in the ordinary course of business or consistent with industry practice on arm's-length commercial terms;

(22)    the incurrence of Indebtedness of the Borrower or any Restricted Subsidiary consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business or consistent with industry practice;

(23)    the incurrence of Indebtedness or Disqualified Stock by Restricted Subsidiaries of the Borrower that are not Guarantors in an amount not to exceed and together with any other Indebtedness and Disqualified Stock incurred and outstanding under this clause (23) and any outstanding Indebtedness or Disqualified Stock under clause (13) to Refinance Indebtedness initially incurred in reliance on this clause (23) (excluding any Incremental Amounts) $18.0 million;

(24)    the incurrence of Indebtedness by the Borrower or any Restricted Subsidiary undertaken in connection with cash management (including netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and related or similar services or activities) with respect to the Borrower, any Subsidiaries or any joint venture in the ordinary course of business or consistent with industry practice, including with respect to financial accommodations of the type described in the definition of Cash Management Services;

(25)    Indebtedness incurred pursuant to the ABL Facility in an aggregate principal amount not to exceed the sum of (x) the greater of $900.0 million and the Borrowing Base (as defined in the ABL Facility in effect on the date hereof) plus (y) Incremental Revolving Credit Loans (up to the amount provided, and as defined, in the ABL Facility in effect on the date hereof) plus other ABL Obligations (as defined in the ABL Facility on the date hereof) not constituting principal and, in each case, together with any Refinancing Indebtedness in respect thereof; *provided* that the Indebtedness under this clause (25) shall not be permitted to contain or include any "last out" or similar tranche or facility nor shall it be permitted to include any term loan or similar Indebtedness;

(26)    guarantees incurred in the ordinary course of business or consistent with industry practice in respect of obligations to suppliers, customers, franchisees, lessors, licensees, sub-licensees and distribution partners;

(27)     the incurrence of Indebtedness attributable to (but not incurred to finance) the exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) with respect to the Transactions or any other acquisition (by merger, consolidation or amalgamation or otherwise) in accordance with the terms hereof;

(28)     the incurrence of Indebtedness representing deferred compensation to employees of any Parent Company, the Borrower or any Restricted Subsidiary, including Indebtedness consisting of obligations under deferred compensation or any other similar arrangements incurred in connection with the Transactions, any investment or any acquisition (by merger, consolidation or amalgamation or otherwise) permitted under this Agreement;

(29)     the incurrence of Indebtedness arising out of any Specified Sale-Leaseback Transaction to the extent such Indebtedness is not incurred in contemplation of such Specified Sale-Leaseback Transaction;

(30)     -[reserved];

(31)     [reserved]; and

(32)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (1) through (31) above.

(c)     For purposes of determining compliance with this Section 7.02:

(1)     [reserved];

(2)     the Borrower is entitled to divide and classify (but, not, for the avoidance of doubt, reclassify) an item of Indebtedness, Disqualified Stock or Preferred Stock in more than one of the types of Indebtedness, Disqualified Stock or Preferred Stock described in Section 7.02(b), *provided* that all Indebtedness incurred under the Loan Documents, the First Lien Facility and the ABL Facility, and in each case, all Refinancing Indebtedness in respect thereof, will, at all times, be treated as incurred under Section 7.02(b)(1), (2) and (25), respectively;

(3)     the principal amount of Indebtedness outstanding under any clause of this Section 7.02 will be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness;

(4)     [reserved]; and

(5)     guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that are otherwise included in the determination of a particular amount of Indebtedness will not be included in the determination of such amount of Indebtedness; *provided* that the incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was incurred in compliance with this Section 7.02.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, in each case, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 7.02. Any Indebtedness incurred to refinance Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to clauses (2), (3), (4), (12), (13), (23) and (25) of Section 7.02(b) will be permitted to include additional Indebtedness,

131

Disqualified Stock or Preferred Stock incurred to pay accrued but unpaid interest and dividends and premiums, defeasance costs and fees and expenses incurred in connection with such refinancing.

For purposes of determining compliance with any Dollar denominated restriction on the incurrence of Indebtedness or issuance of Disqualified Stock or Preferred Stock, the Dollar equivalent principal amount of Indebtedness or Disqualified Stock or Preferred Stock denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness, Disqualified Stock or Preferred Stock was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness, Disqualified Stock or Preferred Stock is issued to Refinance other Indebtedness, Disqualified Stock or Preferred Stock denominated in a foreign currency, and such refinancing would cause the applicable Dollar denominated (or the applicable growth component with respect to such Basket, if greater) restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar denominated restriction will be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness, Disqualified Stock or Preferred Stock does not exceed (i) the principal amount of such Indebtedness, Disqualified Stock or Preferred Stock (as applicable) being refinanced *plus* (ii) the aggregate amount of accrued but unpaid interest, fees, underwriting discounts, defeasance costs, premiums (including tender premiums) and other costs and expenses (including OID, upfront fees or similar fees) incurred in connection with such refinancing.

The principal amount of any Indebtedness, Disqualified Stock or Preferred Stock incurred to refinance other Indebtedness, Disqualified Stock or Preferred Stock, if incurred in a different currency from the Indebtedness, Disqualified Stock or Preferred Stock, as applicable, being refinanced, will be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness or Disqualified Stock or Preferred Stock is denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date will be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.02, if any Indebtedness is refinanced in reliance on a Basket measured by reference to a percentage of Adjusted EBITDA, and such refinancing would cause the percentage of Adjusted EBITDA to be exceeded if calculated based on the Adjusted EBITDA on the date of such refinancing, such percentage of Adjusted EBITDA will not be deemed to be exceeded to the extent the principal amount of such obligations secured by such newly incurred Indebtedness does not exceed the sum of (i) the principal amount of such Indebtedness being refinanced, *plus* (ii) the related costs incurred or payable in connection with such refinancing.

Section 7.03    Fundamental Changes. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consolidate, amalgamate or merge with or into or wind up into another Person, or liquidate or dissolve or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), including by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division" under the Delaware Limited Liability Company Act, except that:

(1)    Subject to Section 3.03(a) of the Security Agreement, Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that

(a)    the Borrower shall be the continuing or surviving Person,

(b)   such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and

(c)   in the case of a merger or consolidation of Holdings with and into the Borrower,

(i)   Holdings shall not be an obligor in respect of any Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement,

(ii)   Holdings shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower,

(iii)   no Default or Event of Default exists at such time or after giving effect to such transaction and

(iv)   after giving effect to such transaction, the direct parent of the Borrower will (A) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Required Administrative Lenders and the Borrower, (B) pledge 100% of the Equity Interests of the Borrower to the Collateral Agent as Collateral to secure the Obligations in form reasonably satisfactory to the Collateral Agent, the Required Administrative Lenders and the Borrower and (C) be in compliance with Section 7.09;

(2)   (a)   any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary that is not a Loan Party,

(b)   any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary that is a Loan Party; provided that a Loan Party shall be the continuing or surviving Person;

(c)   any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States will be permitted and

(d)   any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and the Restricted Subsidiaries and is not materially disadvantageous to the Lenders;

*provided* that in the case of clauses (b) through (d) of this Section 7.03(2), (x) no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom and (y) the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor shall be a Loan Party or such disposition shall otherwise be permitted under Section 7.05 or the definition of "Permitted Investments";

(3)   any Restricted Subsidiary may dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (x) the transferee must be a Loan Party or (y) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Restricted Subsidiary which is not a Loan Party in connection with any Investment permitted hereunder;

(4)     so long as no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom, the Borrower may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) the Borrower shall be the continuing or surviving corporation or (b) if the Person formed by or surviving any such merger or consolidation is not the Borrower (or, in connection with a disposition of all or substantially all of the Borrower's assets, is the transferee of such assets) (any such Person, a **"Successor Borrower"**):

(i)     the Successor Borrower will:

(A)     be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(B)     expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, the Required Administrative Lenders and the Borrower; and

(C)     deliver to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this Section 7.03(4) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Required Administrative Lenders;

(ii)     substantially contemporaneously with such transaction (or at a later date as agreed by the Required Administrative Lenders),

(A)     each Guarantor, unless it is the other party to such merger or consolidation, will by a supplement to the Guaranty (or in another form reasonably satisfactory to the Administrative Agent, the Required Administrative Lenders and the Borrower) reaffirm its Guaranty of the Obligations (including the Successor Borrower's obligations under this Agreement),

(B)     each Loan Party, unless it is the other party to such merger or consolidation, will, by a supplement to the Security Agreement (or in another form reasonably satisfactory to the Collateral Agent and the Required Administrative Lenders), confirm its grant or pledge thereunder,

(C)     if reasonably requested by the Required Administrative Lenders, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, will, by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Collateral Agent, the Required Administrative Lenders and the Borrower), confirm that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement; and

(iii)     after giving *pro forma* effect to such incurrence, the Total Net Leverage Ratio as of the end of the most recently ended Test Period is no greater than 5.25:1.00; and

(iv)      the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Borrower required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; *provided further* that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(5)      so long as no Event of Default shall have occurred and be continuing or result therefrom; provided that in the case of a Limited Condition Acquisition, at the Borrower's option, such Event of Default may be tested in accordance with Section 1.07(8) so long as at the time of the consummation of such Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom, Holdings may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person; *provided* that (a) Holdings will be the continuing or surviving Person or (b) if:

(i)      the Person formed by or surviving any such merger or consolidation is not Holdings,

(ii)     Holdings is not the Person into which the applicable Person has been liquidated or

(iii)    in connection with a disposition of all or substantially all of Holdings' assets, the Person that is the transferee of such assets is not Holdings (any such Person described in the preceding clauses (i) through (iii), a "**Successor Holdings**"), then the Successor Holdings will:

(A)      be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia,

(B)      expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, the Required Administrative Lenders and the Borrower,

(C)      (I) expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, the Required Administrative Lenders and the Borrower and (II) pledge 100% of the Equity Interests of the Borrower to the Collateral Agent as Collateral to secure the Obligations in accordance with the Security Agreement or otherwise in form and substance reasonably satisfactory to the Collateral Agent, the Required Administrative Lenders and the Borrower; and

(D)      if requested by the Required Administrative Lenders, deliver, or cause the Borrower to deliver, to the Administrative Agent (I) an Officer's Certificate stating that such merger or consolidation or other transaction and such supplement to this Agreement or any Loan Document (as applicable) satisfies the requirements under this 7.03(5) and (II) an Opinion of Counsel including customary organization, due execution, no conflicts and enforceability opinions (similar in scope and substance to the opinions delivered to the Administrative Agent on the Closing Date) to the extent reasonably requested by the Required Administrative Lenders,

(iv)     the Administrative Agent shall have received at least three (3) Business Days prior to the such transaction all documentation and other information in respect of the Successor Holdings required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

*provided further* that if the foregoing are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement;

(6)     any Restricted Subsidiary may merge or consolidate with (or dispose of all or substantially all of its assets to) any other Person in order to effect a Permitted Investment or other investment permitted pursuant to Section 7.05; *provided* that solely in the case of a merger or consolidation involving a Loan Party and subject to Section 1.07(8) in the case of a Limited Condition Acquisition, no Event of Default shall have occurred and be continuing or result therefrom; *provided further*, that the continuing or surviving Person will be (a) the Borrower or (b) a Loan Party, in each case, which together with each of its Restricted Subsidiaries, will have complied with the applicable requirements of Section 6.11;

(7)     a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a disposition permitted pursuant to Section 7.04 (other than under clause (2)(c) of the definition of "Asset Sale");

(8)     subject to Section 3.03(a) of the Security Agreement, the Borrower may (a) convert into a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of the Borrower or the laws of a jurisdiction in the United States and (b) change its name;

(9)     the Loan Parties and the Restricted Subsidiaries may consummate the Transactions; and

(10)    the commencement of any proceedings against any Restricted Subsidiary under Debtor Relief Laws to the extent it shall not constitute an Event of Default under Section 8.01(6).

Section 7.04    Asset Sales. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, consummate any Asset Sale unless:

(1)     the Borrower or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise in connection with such Asset Sale) at least equal to the fair market value (measured at the time of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of, and

(2)     except in the case of a Permitted Asset Swap consummated in the ordinary course of business in an amount not to exceed $12.0 million, at least 75.0% of the consideration for such Asset Sale, together with all other Asset Sales since the Closing Date (on a cumulative basis), received by the Borrower or a Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that each of the following will be deemed to be cash or Cash Equivalents for purposes of this clause (2);

(a)     any liabilities (as shown on the Borrower's or any Restricted Subsidiary's most recent balance sheet or in the footnotes thereto or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or a Restricted Subsidiary's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet, as determined in good faith by the Borrower) of the Borrower or any Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Obligations, that are (i) assumed by the transferee of any such assets (or a third party in connection with such transfer) or (ii) otherwise cancelled or terminated in connection with the transaction with such transferee (other than intercompany debt owed to the Borrower or a Restricted Subsidiary);

136

(b)   any securities, notes or other obligations or assets received by the Borrower or any Restricted Subsidiary from such transferee or in connection with such Asset Sale (including earnouts and similar obligations) that are converted by the Borrower or a Restricted Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of such Asset Sale;

(c)   [reserved]; or

(d)   Indebtedness of any Restricted Subsidiary that ceases to be a Restricted Subsidiary as a result of such Asset Sale (other than intercompany debt owed to the Borrower or a Restricted Subsidiary), to the extent that the Borrower and each other Restricted Subsidiary are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Asset Sale; and

(3)   the Net Proceeds of such Asset Sale shall be applied and/or reinvested as (and to the extent) required by Section 2.05(2)(b).

To the extent any Collateral is disposed of as expressly permitted by this Section 7.04 to any Person other than a Loan Party, such Collateral shall automatically be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such disposition is permitted by this Agreement, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

In addition, none of the Borrower or any Restricted Subsidiary shall enter into any Specified Sale-Leaseback Transaction unless such Specified Sale-Leaseback Transaction is conducted as an arm's-length basis and is for fair market value of the applicable property as determined by a Responsible Officer of the Borrower in good faith.

Section 7.05   Restricted Payments.  (a)      The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, directly or indirectly:

(A)      declare or pay any dividend or make any payment or distribution on account of the Borrower's or any Restricted Subsidiary's Equity Interests (in each case, solely in such Person's capacity as holder of such Equity Interests), including any dividend or distribution payable in connection with any merger, amalgamation or consolidation, other than:

(1)      dividends, payments or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or a Parent Company or in options, warrants or other rights to purchase such Equity Interests; or

(2)      dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a wholly owned Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend, payment or distribution in accordance with its Equity Interests in such class or series of securities or such other amount to which it is entitled pursuant to the terms of such Equity Interest;

(B)      purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Borrower or any Parent Company, including in connection with any

137

merger, amalgamation or consolidation, in each case held by Persons other than the Borrower or a Restricted Subsidiary;

(C)     make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment or final maturity, any Subordinated Indebtedness, any Indebtedness secured on a junior lien basis to the Obligations or any unsecured Indebtedness for borrowed money (other than any intercompany Indebtedness among the Borrower and its Restricted Subsidiaries), in each case in excess of ~~$[6.0] million~~ $6,000,000 (collectively, "**Junior Debt**"), other than:

(i)     Indebtedness permitted under clauses (7) and (8) of Section 7.02(b); or

(ii)     the Transactions;

(D)     make any Restricted Investment;

(all such payments and other actions set forth in clauses (A) through (D) above being collectively referred to as "**Restricted Payments**");

(b)     The provisions of Section 7.05(a) will not prohibit:

(1)     the payment of any dividend or other distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or other distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or other distribution or redemption payment would have complied with the provisions of this Section 7.05;

(2)     the redemption, repurchase, defeasance, discharge, retirement or other acquisition of (i) any Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company, including any accrued and unpaid dividends thereon ("**Treasury Capital Stock**") or (ii) Junior Debt, in each case, made (x) in exchange for, or out of the proceeds of, a sale or issuance (other than to a Restricted Subsidiary) of Equity Interests of the Borrower or any Parent Company (to the extent such Equity Interests or proceeds therefrom are contributed to the Borrower) (in each case, other than Disqualified Stock) and (y) within 120 days of such sale or issuance ("**Refunding Capital Stock**"),

(a)     the declaration and payment of dividends on Treasury Capital Stock out of the proceeds of a sale or issuance (other than to a Restricted Subsidiary of the Borrower or to an employee stock ownership plan or any trust established by the Borrower or any Restricted Subsidiary) of Refunding Capital Stock made within 120 days of such sale or issuance, and

(b)     [reserved];

(3)     the principal payment on, defeasance, redemption, repurchase, exchange or other acquisition or retirement of:

(a)     Junior Debt of the Borrower or a Subsidiary Guarantor made (i) by exchange for, or out of the proceeds of the sale, issuance or incurrence of, new Junior Debt

138

of the Borrower or a Subsidiary Guarantor or Disqualified Stock of the Borrower or a Subsidiary Guarantor, (ii) within 120 days of such sale, issuance or incurrence and (iii) in each case, is Refinancing Indebtedness incurred or issued, as applicable in compliance with Section 7.02,

(b)       Disqualified Stock of the Borrower or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale, issuance or incurrence of Disqualified Stock or Junior Debt of the Borrower or a Subsidiary Guarantor, (i) made within 120 days of such sale, issuance or incurrence and (ii) ) in each case, is Refinancing Indebtedness incurred or issued, as applicable in compliance with Section 7.02,

(c)       Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor made by exchange for, or out of the proceeds of the sale or issuance of, Disqualified Stock of a Restricted Subsidiary that is not a Subsidiary Guarantor, made within 120 days of such sale or issuance that, in each case, is Refinancing Indebtedness incurred or issued, as applicable, in compliance with Section 7.02 and

(d)       any Junior Debt or Disqualified Stock that constitutes Acquired Indebtedness;

(4)       a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) (including related stock appreciation rights or similar securities) of the Borrower or any Parent Company held by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, or any equity subscription or equity holder agreement (including, for the avoidance of doubt, any principal and interest payable on any notes issued by the Borrower or any Parent Company in connection with any such repurchase, retirement or other acquisition), including any Equity Interests rolled over by management of the Borrower, any of its Subsidiaries or any Parent Company in connection with the Transactions; *provided* that the aggregate amount of Restricted Payments made under this clause (4) does not exceed $12.0 million in any fiscal year (increasing to $24.0 million following an underwritten public Equity Offering by the Borrower or any Parent Company) with unused amounts in any calendar year being carried over to the next two succeeding calendar years; *provided further* that each of the amounts in any calendar year under this clause (4) may be increased by an amount not to exceed:

(a)       the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Borrower and, to the extent contributed to the Borrower, the cash proceeds from the sale of Equity Interests of any Parent Company, in each case to any future, present or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any of its Subsidiaries or any Parent Company that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to make a Restricted Payment with the Available Amount; *plus*

(b)       the amount of any cash bonuses otherwise payable to members of management, employees, directors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof)

of the Borrower, any of its Subsidiaries or any Parent Company that are foregone in exchange for the receipt of Equity Interests of the Borrower or any Parent Company pursuant to any compensation arrangement, including any deferred compensation plan; *plus*

(c)     the cash proceeds of life insurance policies received by the Borrower or its Restricted Subsidiaries (or by any Parent Company to the extent contributed to the Borrower) after the Closing Date; *minus*

(d)     the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a), (b) and (c) of this clause (4);

*provided* that the Borrower may elect to apply all or any portion of the aggregate increase contemplated by clauses (a), (b) and (c) above in any calendar year; *provided further* that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from any future, present or former employees, directors, officers, members of management, or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary in connection with a repurchase of Equity Interests of the Borrower or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.05 or any other provision of this Agreement;

(5)     [Reserved];

(6)     [Reserved];

(7)     payments made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable by any future, present or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any Restricted Subsidiary or any Parent Company,

(a)     any repurchases or withholdings of Equity Interests in connection with the exercise of stock options, warrants or similar rights if such Equity Interests represent a portion of the exercise of, or withholding obligations with respect to, such options, warrants or similar rights or required withholding or similar taxes and

(b)     loans or advances to officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Restricted Subsidiary or any Parent Company in connection with such Person's purchase of Equity Interests of the Borrower or any Parent Company; *provided* that no cash is actually advanced pursuant to this clause (c) other than to pay taxes due in connection with such purchase, unless immediately repaid;

(8)     [reserved];

(9)     [reserved];

(10)     Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (10) not to exceed the sum of (X) [reserved] plus (Y) additional Restricted Payments made with the Available Amount; *provided* that if this clause (10) is utilized to make a Restricted Investment, the amount deemed to be utilized under this clause

140

(10) will be the amount of such Restricted Investment at any time outstanding (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent changes in value, but subject to adjustment as set forth in the definition of "Investment"); *provided further* that (other than in the case of Restricted Investments made with clause (3) of the definition of Available Amount) no Event of Default shall have occurred and be continuing or would result therefrom; and *provided further* that Restricted Payments made with clause (2) of the definition of Available Amount shall only be permitted to the extent that after giving *pro forma* effect thereto and the application of the net proceeds therefrom, the Total Net Leverage Ratio for the Test Period immediately preceding such Restricted Payment would be no greater than 2.75 to 1.00;

(11)     distributions or payments of Securitization Fees;

(12)     any Restricted Payment made in connection with the Transactions and the fees and expenses related thereto or owed to any Affiliate(s) including any payments to holders of Equity Interests of Belk in connection with, or as a result of, their exercise of appraisal rights or the settlement of any claims or actions (whether actual, contingent or potential) related to the Transactions;

(13)     [reserved];

(14)     the declaration and payment of dividends or distributions by the Borrower or any Restricted Subsidiary to, or the making of loans or advances to, the Borrower or any Parent Company in amounts required for any Parent Company to pay in each case without duplication:

(a)     franchise, excise and similar taxes and other fees, taxes and expenses required to maintain their corporate or other legal existence;

(b)     for any taxable period for which the Borrower or any of its Restricted Subsidiaries are members of a consolidated, combined, unitary or similar income tax group for U.S. federal or applicable foreign, state or local income tax purposes of which a Parent Company is the common parent (a "**Tax Group**"), to pay the portion of any U.S. federal, foreign, state and local income taxes of such Tax Group for such taxable period that are attributable to the taxable income of the Borrower and its Restricted Subsidiaries and Unrestricted Subsidiaries (net of any payments of such taxes made by the Borrower); *provided* that for each taxable period, (A) the amount of such payments made in respect of such taxable period in the aggregate will not exceed the amount that the Borrower and its Subsidiaries, as applicable, would have been required to pay as stand-alone taxpayers or a stand-alone Tax Group and (B) the amount of such payments made in respect of an Unrestricted Subsidiary will be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary for such purpose;

(c)     salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, employees, directors, officers, members of management and consultants of any Parent Company, and any payroll, social security or similar taxes thereof;

(d)     general corporate or other operating, administrative, compliance and overhead costs and expenses (including expenses relating to auditing and other accounting matters) of any Parent Company attributable to the ownership of the Borrower and its Restricted Subsidiaries;

141

(e)     fees and expenses (including ongoing compliance costs and listing expenses) related to any equity or debt offering of a Parent Company (whether or not consummated);

(f)     amounts that would be permitted to be paid directly by the Borrower or its Restricted Subsidiaries under Section 7.06(b) (other than clause 2(a) thereof);

(g)     [reserved];

(h)     [reserved];

(15)     [reserved];

(16)     cash payments, or loans, advances, dividends or distributions to any Parent Company to make payments, in lieu of issuing fractional shares in connection with share dividends, share splits, reverse share splits, mergers, consolidations, amalgamations or other business combinations and in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower, any Restricted Subsidiary or any Parent Company;

(17)     [reserved];

(18)     making payments for the benefit of the Borrower or any Restricted Subsidiary to the extent such payments could have been made by the Borrower or any Restricted Subsidiary because such payments (a) would not otherwise be Restricted Payments and (b) would be permitted by Section 7.06; and

(19)     payments and distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries taken as a whole that complies with the terms of this Agreement or any other transaction that complies with the terms of this Agreement;

(20)     [reserved];

(21)     [reserved];

(22)     [reserved]; and

(23)     [reserved];

*provided* that for purposes of clauses (7) and (14) above, taxes will include all interest and penalties with respect thereto and all additions thereto.

(c)     Notwithstanding anything to the contrary in this Section 7.05, no Investment shall be made in any Unrestricted Subsidiary after the Closing Date.

The amount of all Restricted Payments (other than cash) will be the fair market value on the date the Restricted Payment is made, or at the Borrower's election, the date a commitment is made to make such Restricted Payment, of the assets or securities proposed to be transferred or issued by the Borrower or any Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

142

For the avoidance of doubt, this Section 7.05 will not restrict the making of any AHYDO Payment with respect to, and required by the terms of, any Indebtedness of the Borrower or any Restricted Subsidiary permitted to be incurred under this Agreement.

Section 7.06      Transactions with Affiliates.

(a)     The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "**Affiliate Transaction**") involving aggregate payments or consideration in excess of $2.0 million, unless (A) such Affiliate Transaction is on terms, taken as a whole, that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained at such time in a comparable transaction by the Borrower or such Restricted Subsidiary with a Person other than an Affiliate of the Borrower on an arm's-length basis or, if in the good faith judgment of the Board of Directors no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to the Borrower or such Restricted Subsidiary from a financial point of view, and (B) the Borrower delivers to the Administrative Agent with respect to any Affiliate Transaction or series of related Affiliate Transactions requiring aggregate payments or consideration in excess of $15.0 million, a resolution adopted by the majority of the Board of Directors approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (A) above.

(b)     The foregoing restriction will not apply to the following:

(1)     (a) transactions between or among the Borrower and one or more Restricted Subsidiaries or between or among Restricted Subsidiaries or, in any case, any entity that becomes a Restricted Subsidiary as a result of such transaction and (b) any merger, consolidation or amalgamation of the Borrower and any Parent Company; *provided* that such merger, consolidation or amalgamation of the Borrower is otherwise in compliance with the terms of this Agreement and effected for a *bona fide* business purpose;

(2)     (a) Restricted Payments permitted by Section 7.05 (including any transaction specifically excluded from the definition of the term "Restricted Payments," including pursuant to the exceptions contained in the definition thereof and the parenthetical exclusions of such definition) and (b) any Permitted Investment(s) or any acquisition otherwise permitted hereunder;

(3)     so long as no Event of Default shall have occurred and be continuing or would result therefrom, the payment of management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses pursuant to the Management Services Agreement (including any unpaid management, consulting, monitoring, transaction, advisory and other fees, indemnities and expenses accrued in any prior year) and any termination fees pursuant to the Management Services Agreement as in effect on the Closing Date,

(a)     the payment of indemnification and similar amounts to, and reimbursement of expenses to, the Investors and its officers, directors, employees and Affiliates, in each case, approved by, or pursuant to arrangements approved by, the Board of Directors,

143

(b)       payments, loans, advances or guarantees (or cancellation of loans, advances or guarantees) to future, present or former employees, officers, directors, managers, consultants or independent contractors or guarantees in respect thereof for bona fide business purposes or in the ordinary course of business or consistent with industry practice,

(c)       any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company and

(d)       any payment of compensation or other employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any Parent Company;

(4)       the payment of fees and compensation paid to, and indemnities and reimbursements and employment and severance arrangements provided to, or on behalf of or for the benefit of, present, future or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) of the Borrower, any Parent Company or any Restricted Subsidiary;

(5)       [reserved];

(6)       the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any agreement as in effect as of the Closing Date, or any amendment thereto or replacement thereof (so long as any such amendment or replacement is not materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the applicable agreement as in effect on the Closing Date);

(7)       the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any equity holders agreement or the equivalent (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Closing Date and any amendment thereto and, similar agreements or arrangements that it may enter into thereafter; *provided* that the existence of, or the performance by the Borrower or any Restricted Subsidiary of obligations under any future amendment to any such existing agreement or arrangement or under any similar agreement or arrangement entered into after the Closing Date will be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement or arrangement are not otherwise materially disadvantageous in the good faith judgment of the Board of Directors to the Lenders, when taken as a whole, as compared to the original agreement or arrangement in effect on the Closing Date;

(8)       the Transactions and the payment of all fees and expenses related to the Transactions, including Transaction Expenses;

144

(9)     transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business or consistent with industry practice and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10)    the issuance, sale or transfer of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Company to any Person and the granting and performing of customary rights (including registration rights) in connection therewith, and any contribution to the capital of the Borrower;

(11)    sales of accounts receivable, or participations therein, or Securitization Assets or related assets in connection with any Qualified Securitization Facility and any other transaction effected in connection with a Qualified Securitization Facility or a financing related thereto and sales and/or other transactions of property in connection with Specified Sale-Leaseback Transactions;

(12)    [reserved];

(13)    payments with respect to Indebtedness, Disqualified Stock and other Equity Interests (and cancellation of any thereof) of the Borrower, any Parent Company and any Restricted Subsidiary and Preferred Stock (and cancellation of any thereof) of any Restricted Subsidiary to any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members or permitted transferees) of the Borrower, any of its Subsidiaries or any Parent Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any equity subscription or equity holder agreement that are, in each case, approved by the Borrower in good faith; and any employment agreements, severance arrangements, stock option plans and other compensatory arrangements (and any successor plans thereto) and any supplemental executive retirement benefit plans or arrangements with any such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members or any permitted transferees thereof) that are, in each case, approved by the Borrower in good faith;

(14)    (a) investments by Affiliates in securities of the Borrower (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Borrower or such Restricted Subsidiary generally to other investors on the same or more favorable terms and (b) payments to Affiliates in respect of securities of the Borrower or any Restricted Subsidiary contemplated in the foregoing subclause (a) or that were acquired from Persons other than the Borrower and the Restricted Subsidiaries, in each case, in accordance with the terms of such securities;

145

(15)     payments to or from, and transactions with, any joint venture or Unrestricted Subsidiary in the ordinary course of business or consistent with past practice, industry practice or industry norms (including, any cash management activities related thereto);

(16)     payments by the Borrower (and any Parent Company) and its Subsidiaries pursuant to tax sharing agreements among the Borrower (and any Parent Company) and its Subsidiaries; *provided* that in each case the amount of such payments in any taxable year does not exceed the amount that the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amount received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such taxable year were the Borrower, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any such Parent Company;

(17)     any lease entered into between the Borrower or any Restricted Subsidiary, as lessee and any Affiliate of the Borrower, as lessor, and any transaction(s) pursuant to that lease, which lease is approved by the Board of Directors or senior management of the Borrower in good faith;

(18)     IP Rights licenses in the ordinary course of business or consistent with industry practice;

(19)     the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to equity holders of the Borrower or any Parent Company pursuant to the equity holders agreement or the registration rights agreement entered into on or after the Closing Date;

(20)     transactions permitted by, and complying with, Section 7.03 solely for the purpose of (a) reorganizing to facilitate any initial public offering of securities of the Borrower or any Parent Company, (b) forming a holding company or (c) reincorporating the Borrower in a new jurisdiction;

(21)     transactions undertaken in good faith (as determined by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate) for the purposes of improving the consolidated tax efficiency of the Borrower and its Restricted Subsidiaries and not for the purpose of circumventing Articles VI and VII of this Agreement; so long as such transactions, when taken as a whole, do not result in a material adverse effect on the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, when taken as a whole, in each case, as determined in good faith by the Board of Directors or certified by senior management of the Borrower in an Officer's Certificate;

(22)     (a) transactions with a Person that is an Affiliate of the Borrower (other than an Unrestricted Subsidiary) solely because the Borrower or any Restricted Subsidiary owns, directly or indirectly, Equity Interests in such Person and (b) transactions with any Person that is an Affiliate solely because a director or officer of such Person is a director or officer of the Borrower, any Restricted Subsidiary or any Parent Company;

146

(23)    (a) pledges and other transfers of Equity Interests in Unrestricted Subsidiaries and (b) any transactions with an Affiliate in which the consideration paid consists solely of Equity Interests of the Borrower or a Parent Company;

(24)    the sale, issuance or transfer of Equity Interests (other than Disqualified Stock) of the Borrower;

(25)    investments by any Investor or Parent Company in securities of the Borrower; and

(26)    payments in respect of (a) the Obligations (or any Credit Agreement Refinancing Indebtedness) or (b) other Indebtedness of the Borrower and its Subsidiaries held by Affiliates; *provided* that such Obligations were acquired by an Affiliate of the Borrower in compliance herewith.

Section 7.07    Burdensome Agreements.

(a)    The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to, directly or indirectly, create or otherwise cause to exist or become effective any consensual encumbrance or consensual restriction (other than this Agreement or any other Loan Document) on the ability of any Restricted Subsidiary that is not a Guarantor (or, solely in the case of clause (4), that is a Subsidiary Guarantor) to:

(1)    ~~-~~(a)    pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(b)    pay any Indebtedness owed to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(2)    make loans or advances to the Borrower or to any Restricted Subsidiary that is a Guarantor;

(3)    sell, lease or transfer any of its properties or assets to the Borrower or to any Restricted Subsidiary that is a Guarantor; or

(4)    with respect to the Borrower or any Subsidiary Guarantor, (a) Guaranty the Obligations or (b) create, incur or cause to exist or become effective Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents to the extent such Lien is required to be given to the Secured Parties pursuant to the Loan Documents;

*provided* that any dividend or liquidation priority between or among classes or series of Capital Stock, and the subordination of any Obligation (including the application of any remedy bars thereto) to any other Obligation will not be deemed to constitute such an encumbrance or restriction.

(b)    Section 7.07(a) will not apply to any encumbrances or restrictions existing under or by reason of:

(a)    encumbrances or restrictions in effect on the Closing Date, including pursuant to the Loan Documents and any Hedge Agreements, Hedging Obligations and the related documentation and any definitive documentation in respect of the Indebtedness set forth on Schedule 7.02(b)(3);

(b)    the First Lien Loan Documents and the ABL Loan Documents;

(c)    Purchase Money Obligations and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) above on the property so acquired;

(d)    applicable Law or any applicable rule, regulation or order;

(e)    any agreement or other instrument of a Person, or relating to Indebtedness or Equity Interests of a Person, acquired by or merged, amalgamated or consolidated with and into the Borrower or any Restricted Subsidiary, or any other transaction entered into in connection with any such acquisition, merger, consolidation or amalgamation in existence at the time of such acquisition or at the time it merges, amalgamates or consolidates with or into the Borrower or any Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person so acquired and its Subsidiaries, or the property or assets of the Person so acquired or designated and its Subsidiaries or the property or assets so acquired or designated;

(f)    contracts or agreements for the sale or disposition of assets, including any restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(g)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business or consistent with industry practice or arising in connection with any Liens permitted by Section 7.01;

(h)    Indebtedness, Disqualified Stock or Preferred Stock of Restricted Subsidiaries that are not Guarantors permitted to be incurred subsequent to the Closing Date pursuant to Section 7.02;

(i)    provisions in joint venture agreements and other similar agreements (including equity holder agreements) relating to such joint venture or its members or entered into in the ordinary course of business or consistent with industry practice;

148

(j)      customary provisions contained in leases, sub-leases, licenses, sub-licenses, Equity Interests or similar agreements, including with respect to IP Rights and other agreements;

(k)      restrictions created in connection with any Qualified Securitization Facility that, in the good faith determination of the Board of Directors of the Borrower, are necessary or advisable to effect such Qualified Securitization Facility;

(l)      restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale or other agreement to which the Borrower or any Restricted Subsidiary is a party entered into in the ordinary course of business or consistent with industry practice; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are the subject to such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of another Restricted Subsidiary;

(m)      customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Restricted Subsidiary;

(n)      customary provisions restricting assignment of any agreement;

(o)      restrictions arising in connection with cash or other deposits permitted under Section 7.01; any other agreement or instrument governing any Indebtedness, Disqualified Stock, or Preferred Stock permitted to be incurred or issued pursuant to Section 7.02 entered into after the Closing Date that contains encumbrances and restrictions that either (i) are no more restrictive in any material respect, taken as a whole, with respect to any Restricted Subsidiary than (A) the restrictions contained in the First Lien Loan Documents as of the Closing Date or the ABL Loan Documents as of the Closing Date or (B) those encumbrances and other restrictions that are in effect on the Closing Date with respect to that Restricted Subsidiary pursuant to agreements in effect on the Closing Date, (ii) are not materially more disadvantageous, taken as a whole, to the Lenders than is customary in comparable financings for similarly situated issuers or (iii) will not materially impair the Borrower's ability to make payments on the Obligations when due, in each case in the good faith judgment of the Borrower;

(p)      (i) Indebtedness permitted to be incurred pursuant to Section 7.02(b)(4) and any Refinancing Indebtedness in respect of the foregoing and (ii) agreements entered into in connection with any Specified Sale-Leaseback Transaction or any Sale-Leaseback Transaction entered into in the ordinary course of business or consistent with industry practice;

149

       (q)      customary restrictions and conditions contained in documents relating to any Lien so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 7.07;

       (r)      [reserved];

       (s)      any encumbrances or restrictions of the type referred to in clauses (1), (2) or (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (r) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive in any material respect with respect to such encumbrance and other restrictions, taken as a whole, than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

       (t)      existing under, by reason of or with respect to Refinancing Indebtedness; *provided* that the encumbrances and restrictions contained in the agreements governing that Refinancing Indebtedness are, in the good faith judgment of the Borrower, not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced; and

       (u)      applicable law or any applicable rule, regulation or order in any jurisdiction where Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred pursuant to Section 7.02 is incurred.

       Section 7.08   <u>Modification of Terms of Subordinated Indebtedness</u>. The Borrower shall not, nor shall the Borrower permit any Restricted Subsidiary to, amend, modify or change in any manner materially adverse to the interests of the Lenders, as determined in good faith by the Borrower (on the basis of such proposed amendments, modifications or changes taken as a whole), any term or condition of any Subordinated Indebtedness having an aggregate outstanding principal amount greater than the Threshold Amount (other than as a result of any Refinancing Indebtedness in respect thereof) without the consent of the Required Administrative Lenders (which consent shall not be unreasonably withheld or delayed); *provided*, *however*, that no amendment, modification or change of any term or condition of any Subordinated Indebtedness permitted by any subordination provisions set forth in the applicable Subordinated Indebtedness or any other stand-alone subordination agreement in respect thereof and, in each case consented to by the Required Administrative Lenders shall be deemed to be materially adverse to the interests of the Lenders.

       Section 7.09   <u>Holdings</u>. Holdings will not conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto):

       (1)      the ownership or acquisition of the Capital Stock (other than Disqualified Stock) of any other Successor Holdings or the Borrower,

(2)      the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance,

(3)      to the extent applicable, participating in tax, accounting and other administrative matters as a member of the combined group of Holdings and the Borrower,

(4)      the performance of its obligations under and in connection with, and payments with respect to, the Loan Documents, the ABL Loan Documents, the First Lien Loan Documents and related documentation in respect of the foregoing and any documents relating to other Indebtedness permitted under Section 7.02 (including, for the avoidance of doubt, the incurrence of Qualified Holding Company Debt),

(5)      any public offering of its common stock or any other issuance or registration of its Capital Stock for sale or resale not prohibited by this Article VII, including the costs, fees and expenses related thereto,

(6)      repurchases of Indebtedness through open market purchases and Dutch auctions (in the case of Loans, to the extent permitted hereunder),

(7)      the incurrence of Qualified Holding Company Debt,

(8)      any transaction that Holdings is permitted to enter into or consummate under this Article VII and any transaction between or among Holdings and the Borrower or any one or more Restricted Subsidiaries permitted under this Article VII, including:

(a)    making any payment(s) or Restricted Payment(s) (i) to the extent otherwise permitted under this Section 7.09 and (ii) with any amounts received pursuant to transactions permitted under Section 7.05 (or the making of a loan to any Parent Company in lieu of any such payment(s) or Restricted Payment(s)) or holding any cash received in connection therewith pending application thereof by Holdings,

(b)    making any Investment to the extent (i) payment therefor is made solely with the Capital Stock of Holdings (other than Disqualified Stock), the proceeds of Restricted Payments received from the Borrower or proceeds of the issuance of, or contribution in respect of the, Capital Stock (other than Disqualified Stock) of Holdings and (ii) any property (including Capital Stock) acquired in connection therewith is contributed to the Borrower or a Subsidiary Guarantor (or, if otherwise permitted by Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary) or the Person formed or acquired in connection therewith is merged with the Borrower or a Subsidiary Guarantor;

(c)    guaranteeing the obligations and granting of Liens of the Borrower and its Subsidiaries to the extent such obligations are not prohibited hereunder;

(d)    incurrence of Indebtedness of Holdings representing deferred compensation to employees, consultants or independent contractors of Holdings and unsecured Indebtedness consisting of promissory notes issued by any Loan Party to future, present or former employees, directors, officers, managers, distributors or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any Subsidiary or any Parent Company to finance the retirement, acquisition, repurchase, purchase or redemption of Capital Stock of Holdings,

(e)    incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes,

(f)    providing indemnification to officers and directors and as otherwise permitted in this Article VII,

(g)    activities incidental to the consummation of the Transactions,

(h)    the making of any loan to any officers or directors contemplated by Section 7.05 or constituting a Permitted Investment, the making of any investment in the Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.05 or constituting a Permitted Investment, a Restricted Subsidiary,

(i)    making contributions to the capital of its Subsidiaries, or

(j)    making Investments in cash and Cash Equivalents.

(9)    activities incidental to the businesses or activities described in clauses (1) through (8) of this Section 7.09.

Section 7.10    Anti-Layering.  Notwithstanding anything herein to the contrary, the Borrower and the Subsidiary Guarantors shall not, directly or indirectly, incur any Indebtedness that is contractually subordinated or junior in right of payment to any other Indebtedness of such Person unless such Indebtedness is expressly subordinated in right of payment to the Loans hereunder to the extent and in the same manner as such Indebtedness is subordinated to other senior Indebtedness of such Person (it being understood and agreed that Indebtedness shall not be considered junior in right of payment solely because it is unsecured or secured by Liens junior in priority to the Liens securing the Loans); *provided* that the foregoing shall not apply to the incurrence of the Second-Out Loans (as defined in the First Lien Credit Agreement) or any other Indebtedness that is secured on a pari passu basis with the Second-Out Loans and having the same payment priority as the Second-Out Loans, in each case, that is permitted to be incurred under Section 7.02(b)(2).

(1)    Material Intellectual Property

. On and after the Closing Date, the Borrower shall not permit any IP Rights owned by the Borrower and its Restricted Subsidiaries and material to their business, taken as a whole, to be owned by any Person that is not a Loan Party.

Section 7.11    Subsidiaries. On and after the Closing Date, the Borrower shall not enter into, nor shall it permit any of its Restricted Subsidiaries to enter into any transaction, the purpose of which is primarily to release any Guaranty of the Closing Date Term Loans (or to structure any transaction to avoid providing a Guaranty of the Closing Date Term Loans by any Restricted Subsidiaries to the extent such Guaranty would have otherwise been required to be provided pursuant to the Collateral and Guaranty Requirements), it being understood and agreed that bona fide joint ventures entered into in the ordinary course of business with Persons other than Affiliates of the Borrower shall be permitted. In addition, neither the Borrower nor its Restricted Subsidiaries shall transfer any assets (by an Asset Sale or otherwise) to an Unrestricted Subsidiary after the Closing Date.

## ARTICLE VIII

### Events of Default and Remedies

Section 8.01    Events of Default. Subject to the last paragraph hereof, each of the events referred to in clauses (1) through (11) of this Section 8.01 shall constitute an "Event of Default":

152

(1)    <u>Non-Payment</u>. The Borrower fails to pay (a) when and as required to be paid herein, any amount of principal of any Loan or (b) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(2)    <u>Specific Covenants</u>. The Borrower, any other Loan Party or, in the case of Section 7.09, Holdings, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(1) or 6.05(1) (solely with respect to the Borrower, other than in a transaction permitted under Section 7.03 or 7.04) or Article VII; or

(3)    <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(1) or (2) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(4)    <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by the Borrower or any Subsidiary Guarantor herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(5)    <u>Cross-Default and Cross-Acceleration</u>. Any Loan Party or any Restricted Subsidiary (a) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (b) fails to observe or perform any other agreement or condition relating to any such Indebtedness referred to in the foregoing clause (a), or any other event occurs (other than, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of such Hedging Obligations and not as a result of any default thereunder by the Borrower, or any Subsidiary Guarantor or any Restricted Subsidiary) with respect to such Indebtedness, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that (A) such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02, (B) this clause (5)(b) shall not apply to any Indebtedness if the sole remedy of the holder thereof in the event of the nonpayment of such Indebtedness or the non-payment or non-performance of obligations related thereto is to convert such Indebtedness into Equity Interests (other than Disqualified Stock) and cash in lieu of fractional shares and (C) this clause (5)(b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided further* that an ABL Event of Default, any Event of Default (as defined in the First Lien Credit Agreement) or an event of default under any agreement in respect of other Indebtedness secured by Liens on the Collateral that rank senior in priority to the Liens on the Collateral securing the Obligations shall not constitute an Event of Default hereunder unless and until the requisite controlling (or majority) of lenders or creditors thereunder have actually declared such Indebtedness to be immediately due and payable and such declaration has not been rescinded by the requisite controlling (or majority) of lenders or creditors thereunder on or before such date; or

(6)     Insolvency Proceedings, etc. Holdings, the Borrower, any Loan Party or any Restricted Subsidiary that is a Significant Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(7)     Judgments. There is entered against any Loan Party or any Restricted Subsidiary a final judgment and order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) calendar days; or

(8)     ERISA. (a) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan, (b) the Borrower or any Subsidiary Guarantor or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan, or (c) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable Law or plan terms, except, with respect to each of the foregoing clauses of this Section 8.01(8), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

(9)     Invalidity of Loan Documents. Any material provision of the Loan Documents, taken as a whole, at any time after its execution and delivery and for any reason, other than (a) as expressly permitted by any Loan Documents (including as a result of a transaction permitted under Section 7.03 or 7.04), (b) as a result of acts or omissions by an Agent (it being understood that the foregoing exception shall not impose any obligations on any Agent exculpated under Article IX) or any Lender or (c) due to the satisfaction in full of the Termination Conditions, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or any Loan Party denies in writing that it has any or further liability or obligation under the Loan Documents, taken as a whole (other than as a result of the satisfaction of the Termination Conditions), or purports in writing to revoke or rescind the Loan Documents, taken as a whole, prior to the satisfaction of the Termination Conditions; or

(10)     Collateral Documents. Any Collateral Document with respect to a material portion of the Collateral after delivery thereof pursuant to Section 4.01, 6.11 or 6.13 for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) ceases to create a valid and perfected Lien with the priority required by the Applicable Intercreditor Agreement (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of Collateral actually delivered to it and pledged under the Collateral Documents or to file Uniform Commercial Code amendments relating to a Loan Party's change of name or jurisdiction of formation (solely to the extent that the Borrower provides the Collateral Agent written notice thereof in accordance with the Security Agreement, and the Collateral Agent and the

154

Borrower have agreed that the Collateral Agent will be responsible for filing such amendments; provided that each party to this Agreement acknowledges and agrees that the Collateral Agent and the Required Administrative Lenders may use an outside service provider for the tracking of all Uniform Commercial Code financing statements required to be filed pursuant to the Loan Documents and notification to the Collateral Agent or the Required Administrative Lenders, as the case may be, of, among other things, the upcoming lapse or expiration thereof) and continuation statements or to take any other action primarily within its control with respect to the Collateral and except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage (it being understood that the foregoing exception shall not impose any obligations on any Agent exculpated under Article IX); or

(11)    Change of Control. There occurs any Change of Control.

Section 8.02    Remedies upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent may with the consent of the Required Lenders and shall, at the request of the Required Lenders, take any or all of the following actions:

(1)    declare the Commitments of each Lender to be terminated, whereupon such Commitments will be terminated;

(2)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under any Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(3)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon ~~the filing of a petition for relief by the Borrower or~~ the occurrence of an actual or deemed entry of an order for relief, with respect to the Borrower under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"), the Commitments of each Lender will automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid will automatically become due and payable without further act of the Administrative Agent or any Lender.

Section 8.03    Application of Funds. After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), subject to the Applicable Intercreditor Agreement then in effect, any amounts received on account of the Obligations will be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and all other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III) payable to the Agents in their capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest, but including Attorney Costs payable under Sections 10.04 and 10.05 and amounts payable under Article III) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Second payable to them;

155

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the other Secured Parties on such date; and

(1)　　*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

## ARTICLE IX

### Administrative Agent, Collateral Agent and Other Agents

Section 9.01　　Appointment and Authorization of the Agents.

(1)　　Each Lender hereby irrevocably appoints Wilmington Trust, National Association, to act on its behalf as the Administrative Agent and Collateral Agent hereunder and under the other Loan Documents and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent and Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX (other than Sections 9.09, 9.10, 9.11, 9.12 and 9.16) are solely for the benefit of the Agents and the Lenders and the Borrower and the other Loan Parties shall not have rights as a third-party beneficiary of any such provision.

(2)　　Each of the Lenders hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX and Article X (including Sections 9.07, 9.08, 10.04 and 10.05, as though such co-agents, sub-agents and attorneys-in-fact were the Collateral Agent under the Loan Documents), and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent and the Collateral Agent to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including any Applicable Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders, and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the written direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

156

Section 9.02    <u>Rights as a Lender</u>. Any Lender that is also serving as an Agent (including as Administrative Agent or Collateral Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Lender (if any) serving as an Agent hereunder in its individual capacity. Any such Person serving as an Agent and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.03    <u>Exculpatory Provisions</u>. The Administrative Agent and the Collateral Agent shall not have any duties, obligations or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents. Without limiting the generality of the foregoing, an Agent (including the Administrative Agent and the Collateral Agent):

(1)    shall not be subject to any fiduciary or other implied duties or obligations, regardless of whether a Default or Event of Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" or "ad hoc group" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative or representative relationship between independent contracting parties;

(2)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(3)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, the Loan Parties, or any of their Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Affiliates in any capacity.

Neither the Agents nor any of their Related Persons shall be liable for and shall be fully protected from any action taken or not taken by it (i) with the consent, instruction, direction or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as any Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final and non-appealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default and stating that such notice is a "notice of default" is given to such Agent by the Borrower or a Lender.

157

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. The duties of the Agents shall be mechanical and administrative in nature; the Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender or the holder of any Term Note; and nothing in this Agreement or in any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, no Agent shall be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral. The actions described in items (i) through (iii) shall be the sole responsibility of the Borrower.

In no event shall any Agent be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 9.04    <u>Lack of Reliance on the Agents</u>. Independently and without reliance upon the Agents, each Lender and the holder of each Term Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings, the Borrower and the Restricted Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings, the Borrower and the Restricted Subsidiaries and, except as expressly provided in this Agreement, the Agents shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Term Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. The Agents shall not be responsible to any Lender or the holder of any Term Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Loan Document or the financial condition of the Holdings, the Borrower or any of the Restricted Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of Holdings, the Borrower or any of the Restricted Subsidiaries or the existence or possible existence of any Default or Event of Default.

Section 9.05    <u>Certain Rights of the Agents</u>. If an Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any

other Loan Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders; and such Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Term Note shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders.

Section 9.06    Reliance by the Agents. The Agents shall be entitled to rely upon, and shall be fully protected in relying upon, any note, writing, resolution, notice, statement, certificate, telex, teletype or facsimile message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that such Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Agents may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.07    Delegation of Duties. The Agents may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub agents appointed by the Agents. The Agents and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. All provisions of this Article IX and Article X (including Sections 9.07, 9.08, 10.04 and 10.05) and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and under the other Loan Documents shall apply to any such sub agent and to the Agent-Related Persons of the Agents and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent or Collateral Agent.

Section 9.08    Indemnification. Whether or not the transactions contemplated hereby are consummated, to the extent the Agents or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent or Collateral Agent) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Agents or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent or Collateral Agent) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent, the Collateral Agent or any other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent or the Collateral Agent) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; *provided* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or the Collateral Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.08 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent or the Collateral Agent, as applicable, upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery,

administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not promptly reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided further* that the failure of any Lender to indemnify or reimburse the Administrative Agent or the Collateral Agent shall not relieve any other Lender of its obligation in respect thereof. The undertaking in this Section 9.08 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent and the Collateral Agent.

Section 9.09   <u>The Agents in their Individual Capacity</u>. With respect to its obligation to make Loans under this Agreement, the Agents shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders" or any similar terms shall, unless the context clearly indicates otherwise, include the Agents in their respective individual capacities. The Agents and their affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Loan Party or any Affiliate of any Loan Party (or any Person engaged in a similar business with any Loan Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party or any Affiliate of any Loan Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

Section 9.10   <u>Holders</u>. The Administrative Agent may deem and treat the payee of any Term Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Term Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Term Note or of any Term Note or Term Notes issued in exchange therefor.

Section 9.11   <u>Resignation by the Agents</u>. The Administrative Agent and the Collateral Agent may resign from the performance of all its respective functions and duties hereunder or under the other Loan Documents at any time by giving 30 days prior written notice to the Lenders and the Borrower. If the Administrative Agent or the Collateral Agent is in material breach of its obligations hereunder, then such Agent may be removed as the Administrative Agent and/or Collateral Agent at the reasonable request of the Required Lenders. If any Agent is a Defaulting Lender, the Borrower may remove the Defaulting Lender from such role upon 15 days prior written notice to the Lenders.

Upon any such notice of resignation by, or notice of removal of, the Administrative Agent or the Collateral Agent, the Required Lenders shall appoint a successor Administrative Agent or Collateral Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (*provided* that the Borrower's approval shall not be required if an Event of Default under Section 8.01(1) or Section 8.01(6) has occurred and is continuing).

If a successor Administrative Agent or Collateral Agent shall not have been so appointed within such 30 day period, the Administrative Agent or Collateral Agent, as applicable, with the consent of the

160

Borrower (which consent shall not be unreasonably withheld or delayed, *provided* that the Borrower's consent shall not be required if an Event of Default under Section 8.01(1) or Section 8.01(6) has occurred and is continuing), shall then appoint a successor Administrative Agent or Collateral Agent, who shall serve as Administrative Agent or Collateral Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided above.

If no successor Administrative Agent or Collateral Agent has been appointed pursuant to the foregoing by the 30th day after the date such notice of resignation was given by the Administrative Agent or Collateral Agent, or such notice of removal was given by the Required Lenders or the Borrower, as applicable, such Agent's resignation shall nonetheless become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent and/or Collateral Agent, as applicable, hereunder or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided above. The retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from its respective duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and all payments, communications and determinations provided to be made by, to or through the such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided for above in this Section 9.11.

Upon the acceptance of a successor's appointment as Administrative Agent and/or Collateral Agent hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.11).

The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent and the Collateral Agent hereunder and the other Loan Documents shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent or Collateral Agent was acting as Administrative Agent and/or Collateral Agent, as applicable.

Upon a resignation of the Administrative Agent or Collateral Agent pursuant to this Section 9.11, such Agent (i) shall continue to be subject to Section 10.09 and (ii) shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this Article IX (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of the Administrative Agent or Collateral Agent, as applicable, for all of its actions and inactions while serving as the Administrative Agent or Collateral Agent.

Section 9.12    <u>Collateral Matters</u>. Each Lender irrevocably authorizes and directs the Collateral Agent to take the actions to be taken by them as set forth in Section 7.04 and 10.24.

Each Lender hereby agrees, and each holder of any Term Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Collateral Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Collateral Documents.

Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 9.12. In each case as specified in this Section 9.12, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.12.

The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 9.12, Section 10.24 or in any of the Collateral Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 9.13    [Reserved.].

Section 9.14    Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.09, 3.01, 10.04 and 10.05) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

162

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under the Loan Documents (including all amounts due under Sections 2.09, 3.01, 10.04 and 10.05).

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.15    Appointment of Supplemental Administrative Agents.

(1)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(2)    In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent or such Supplemental Administrative Agent, as the context may require.

(3)    Should any instrument in writing from any Loan Party be reasonably required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments reasonably acceptable to it promptly upon request by the Administrative Agent. In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

163

Section 9.16    Intercreditor Agreements.        Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, each Lender (and, by its acceptance of the benefits of any Collateral Document, each other Secured Party): (a) acknowledges that it has received a copy of ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, (b) consents to the subordination of Liens provided for in the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Loan Documents and the exercise of any right related to any Collateral shall be subject, in each case, to the terms of the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, (c) acknowledges that in the event of any conflict between the express terms and provisions of this Agreement or any other Loan Document, on the one hand, and of the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement, on the other hand, the terms and provisions of the ABL Intercreditor Agreement or Term Intercreditor Agreement, as the case may be, shall control, and (d) authorizes and instructs the Administrative Agent and Collateral Agent to execute the ABL Intercreditor Agreement, the Term Intercreditor Agreement or any other Applicable Intercreditor Agreement (including, in each case, any and all amendments, amendments and restatements, modifications, supplements and acknowledgements thereto permitted hereby from time to time) on behalf of such Lender, and such Lender agrees to be bound by the terms thereof.

Section 9.17    [Reserved.].

Section 9.18    Withholding Tax. To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.18. The agreements in this Section 9.18 shall survive the resignation or, replacement or removal of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

Section 9.19    No Reliance on Administrative Agent's Customer Identification Program. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Administrative Agent or Collateral Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other anti-terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any recordkeeping, (c) comparisons with

government lists, (d) customer notices; or (e) other procedures required under the CIP Regulations or such anti-terrorism Laws.

Section 9.20    Survival. The agreements in this Article IX shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

## ARTICLE X

### Miscellaneous

Section 10.01    Amendments, etc.

(1)    Except as otherwise set forth in this Agreement or in the Term Intercreditor Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (with a fully-executed copy thereof delivered to the Administrative Agent) (other than with respect to any amendment or waiver contemplated in clause (i) below), which shall only require the consent of the Required Facility Lenders under the applicable Facility or Facilities) (or by the Administrative Agent with the consent of the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)    extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or 2.08 (other than pursuant to Section 2.08(2)) or any payment of fees or premiums hereunder or under any Loan Document with respect to payments to any Lender without the written consent of such Lender, it being understood that none of the following will constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of principal, interest, fees or premiums: the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (I) of the proviso immediately succeeding clause (i) of this Section 10.01(1)) any fees or other amounts payable hereunder or under any other Loan Document to any Lender without the written consent of such Lender; *provided* that only the consent of (A) the Required Lenders shall be necessary to amend the definition of "Default Rate" and (B) the Required Lenders will be necessary to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)    except as contemplated by clause (C) in the second proviso immediately succeeding clause (i) of this Section 10.01(1), (x) change any provision of this Section 10.01 or the definition of "Required Lenders" or "Required Facility Lenders," or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender and (y) change the definition of "Pro Rata Share" without the written consent of each Lender directly and adversely affected thereby;

165

(e)   other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(f)   other than in a transaction permitted under Section 7.03 or Section 7.04, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)   change any provision requiring pro rata payments or pro rata sharing of payments, without the written consent of each Lender directly and adversely affected thereby;

(h)   [Reserved];

(i)   change any term or provision of Section 8.03, without the written consent of each Lender directly and adversely affected thereby;

(j)   amend, waive or otherwise modify any term or provision (including the availability and conditions to funding and the rate of interest applicable thereto) which directly affects Lenders of one Facility and does not directly affect Lenders under any other Facility, in each case, without the written consent of the Required Facility Lenders under such applicable Facility; or

(k)   change the definition of "Unrestricted Subsidiary" or the addition of any Unrestricted Subsidiaries after the Closing Date, without the written consent of each Lender;

*provided* that:

(I) ____ no amendment, waiver or consent shall, unless in writing and signed by the applicable Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, such Administrative Agent under this Agreement or any other Loan Document; and

(II)   Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; ——

*provided further* that notwithstanding the foregoing:

(A)   no Defaulting Lender shall have any right to approve or disapprove of any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders, the Required Lenders, the Required Facility Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders) (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders);

(B)   no Lender consent is required to effect any amendment or supplement to any Applicable Intercreditor Agreement (i) that is for the purpose of adding the holders of Credit Agreement Refinancing Indebtedness or any other Permitted Indebtedness that is secured Indebtedness (or a Debt Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of such Applicable Intercreditor Agreement, as applicable (it being understood that any such amendment, modification or supplement may make such other changes to the applicable Applicable Intercreditor Agreement as, in the good faith determination of the Required Administrative Lenders, are required to effectuate

the foregoing and provided that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by any Applicable Intercreditor Agreement; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of, or any fees or other amounts payable to, any Agent hereunder or under any other Loan Document without the prior written consent of such Agent, as applicable;

(C)     this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders;

(D)     any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section 10.01 if such Class of Lenders were the only Class of Lenders hereunder at the time;

(E)     Without limiting the scope of Section 10.01(3) below, any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency (including amendments, supplements or waivers to any of the Collateral Documents, guarantees, intercreditor agreements or related documents executed by any Loan Party or any other Subsidiary in connection with this Agreement if such amendment, supplement or waiver is delivered in order to cause such Collateral Documents, guarantees, intercreditor agreements or related documents to be consistent with this Agreement and the other Loan Documents) so long as, in each case, the Lenders shall have received at least 5 Business Days' prior written notice thereof and the Administrative Agent shall not have received, within 5 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment; *provided* that the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any such changes necessary to be made in connection with any borrowing of Incremental Term Loans, Refinancing Loans, any Extension or any borrowing of Replacement Loans and otherwise to effect the provisions of Section 2.14, 2.15 or 2.16 or the immediately succeeding paragraph of this Section 10.01, respectively; ~~and~~

(F)     the Borrower and the Collateral Agent may, without the input or consent of the other Lenders, but with the consent of the Required Administrative Lenders, (i) effect changes to any Mortgage or any other Collateral Document as may be necessary or appropriate in the opinion of the Required Administrative Lenders and (ii) effect changes to this Agreement that are necessary and appropriate to effect the offering process set forth in Section 2.05(1)(e)~~.~~; and

167

(G)     with respect to the consent of Required Lenders or Required Administrative Lenders expressly required by any Deemed Consent Provision (but not, for the avoidance of doubt, any amendment or waiver of, or consent to a departure from, any Deemed Consent Provision), the Administrative Agent or the Collateral Agent, as applicable, shall deliver any such request from the Borrower to the Lenders and, if the Lenders shall have received at least 15 Business Days' prior written notice thereof and the Administrative Agent or the Collateral Agent shall not have received, within 15 Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders or Required Administrative Lenders, as applicable, stating that the Required Lenders or Required Administrative Lenders, as applicable, object to such request, then the Required Lenders or Required Administrative Lenders, as applicable, shall be deemed to have accepted (provided, however, for the avoidance of doubt, this clause (G) shall not alter or be deemed to alter the rights, privileges, protections, immunities and indemnities granted to any Agent under this Agreement, including, without limitation, Article IX above, and the other Loan Documents).

(2)     In addition, notwithstanding anything to the contrary in this Section 10.01, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the Replacement Loans (as defined below) to permit the refinancing of all outstanding Term Loans of any Class ("**Replaced Loans**") with replacement term loans ("**Replacement Loans**") hereunder; *provided* that

(a)     the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of such Replaced Loans, *plus* accrued interest, fees, premiums (if any) and penalties thereon and fees and expenses incurred in connection with such refinancing of Replaced Loans with such Replacement Loans,

(b)     the All-In Yield with respect to such Replacement Loans (or similar interest rate spread applicable to such Replacement Loans) shall not be higher than the All-In Yield for such Replaced Loans (or similar interest rate spread applicable to such Replaced Loans) immediately prior to such refinancing,

(c)     the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Replaced Loans at the time of such refinancing; and

(d)     all other terms (other than with respect to pricing, premiums and optional prepayment or redemption terms) applicable to such Replacement Loans shall be substantially identical to, or no more favorable taken as a whole (in each case as determined by the Borrower in its reasonable judgment) to the Lenders providing such Replacement Loans than, those applicable to such Replaced Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the Latest Maturity Date of the Loans in effect immediately prior to such refinancing (*provided* that an Officer's Certificate delivered to the Administrative Agent at least 5 Business Days prior to the incurrence of such Replacement Loans, together with a reasonably detailed description of the material terms and conditions of such Replacement Loans or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this Section 10.01(2) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Required Administrative Lenders notify the Borrower and the Administrative Agent within such five 5 Business Day period that it disagrees with such determination (including a description of the basis upon which the Required Administrative Lenders disagree));

*provided further* that each amendment to this Agreement providing for Replacement Loans may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower to effect the provisions of this paragraph, and for the avoidance of doubt, this paragraph shall supersede any other provisions in this Section 10.01 to the contrary.

(3)    In addition, notwithstanding anything to the contrary in this Section 10.01,

(a)    the Guaranty, the Collateral Documents and related documents executed by Holdings, the Borrower or any Restricted Subsidiaries in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Required Administrative Lenders and may be, together with this Agreement, amended and waived with the consent of the Required Administrative Lenders and the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause the Guaranty, Collateral Documents or other document to be consistent with this Agreement and the other Loan Documents (including by adding additional parties as contemplated herein or therein) and

(b)    if the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document. Notification of such amendment shall be made by the Administrative Agent to the Lenders promptly upon such amendment becoming effective.

Section 10.02    Notices and Other Communications; Facsimile Copies.

(1)    General. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)    if to Holdings, the Borrower or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(b)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next succeeding Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (2) below shall be effective as provided in such subsection (2).

(2)     Electronic Communication. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(3)     Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next succeeding Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(4)     The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall any Agent or any of its Agent-Related Persons (collectively, the "**Agent Parties**") have any liability to any Loan Party, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or such Agent's transmission of Borrower Materials through the Internet or the Platform. Although the Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Platform is secured through a per-deal authorization method whereby each user may access the Platform only on a deal-by-deal basis, each of the Lenders and the Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agents are not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Platform, and that there are confidentiality and other risks associated with such distribution. Each of the Lenders and the Borrower hereby approves distribution of the Borrower Materials through the Platform and understands and assumes the risks of such distribution.

(5)     Change of Address. Each Loan Party and any Agent may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire

instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private-Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws. In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Loan Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

(6)     <u>Reliance by the Agents.</u> The Agents and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic notices to and other telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording. The Borrower's obligations under this Section 10.02(6) shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

Section 10.03     <u>No Waiver; Cumulative Remedies.</u> No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as such) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 10.10 (subject to the terms of Section 2.13), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided further* that if at any time there is no Person acting as Administrative Agent or Collateral Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent or Collateral Agent, as applicable, pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent

171

of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04    Costs and Expenses. The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse each Agent for all reasonable and documented out-of-pocket costs and expenses of such Agent (promptly following a written demand therefor, together with backup documentation supporting such reimbursement request) incurred in connection with the preparation, negotiation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Ballard Spahr LLP, as counsel to the Agents and, if necessary, a single local counsel in each relevant material jurisdiction, and (b) upon presentation of a summary statement, together with any supporting documentation reasonably requested by the Borrower, to pay or reimburse the Agents (taken as a whole) and the other Lenders (taken as a whole), promptly following a written demand therefor for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including (i) all Attorney Costs of one counsel to the Agents (and, if necessary, one local counsel in any relevant material jurisdiction) and (ii) all Attorney Costs of one counsel to the Lenders taken as a whole (and, if necessary, one local counsel in any relevant material jurisdiction and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)). The agreements in this Section 10.04 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document. All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05    Indemnification by the Borrower. The Borrower shall indemnify and hold harmless the Agents, each other Lender and their respective Related Persons (collectively, the "**Indemnitees**") from and against any and all losses, claims, actions, judgments, damages, liabilities or expenses (including Attorney Costs and Environmental Liabilities) to which any such Indemnitee may become subject arising out of, resulting from or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of (a) one counsel to the Agents and their Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for the Agents and their Indemnitees taken as a whole in each relevant jurisdiction) and (b) one counsel to all other Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all other Indemnitees taken as a whole in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (i) any (i) actual or threatened claim, litigation, investigation, proceeding or Environmental Liabilities relating to the Transactions or (ii) to the execution, delivery, funding, enforcement, performance and administration of this Agreement, the other Loan Documents, the Loans or the use, or proposed use of the proceeds therefrom, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation, investigation or proceeding), and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) other than with respect to the Agents and their Indemnitees, the bad faith of or a material breach of any obligations under any Loan Document by such Indemnitee or any of its Related Indemnified Persons as

172

determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent, collateral agent, or arranger or any similar role under any Loan Document and other than any claims arising out of any act or omission of the Loan Parties or any of their Affiliates) (as determined by a final, non-appealable judgment of a court of competent jurisdiction). To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that they are permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnitee), nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party for which such Indemnitee is otherwise entitled to indemnification pursuant to this Section 10.05). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this Section 10.05 shall be paid within 20 Business Days after written demand therefor. The agreements in this Section 10.05 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document. This Section 10.05 shall not apply to Taxes, except any Taxes that represent losses or damages arising from any non-Tax claim. Notwithstanding the foregoing, each Indemnitee shall be obligated to refund and return promptly any and all amounts paid by the Borrower under this Section 10.05 to such Indemnitee for any such fees, expenses or damages to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.

Section 10.06   Marshaling; Payments Set Aside. None of the Agents or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to any Agent upon demand its applicable share of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

Section 10.07   Successors and Assigns.

(a)   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither

173

Holdings nor the Borrower may, except as permitted by Section 7.03, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder (including to existing Lenders and their Affiliates) except (i) to an Eligible Assignee and (A) in the case of any Eligible Assignee that, immediately prior to or upon giving effect to such assignment, is an Affiliated Lender, in accordance with the provisions of Section 10.07(h) and (B) in the case of any Eligible Assignee that is Holdings, the Borrower or any Subsidiary thereof, in accordance with the provisions of Section 10.07(l), (ii) by way of participation in accordance with the provisions of Section 10.07(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f), or (iv) to an SPC in accordance with the provisions of Section 10.07(g) (and any other attempted assignment or transfer by any party hereto (other than the replacement of the Administrative Agent pursuant to Article IX above) shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d) and, to the extent expressly contemplated hereby, Related Persons of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders.</u> Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section 10.07, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1.0 million, unless either (x) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (y) each of the Administrative Agent and the Borrower otherwise consents; *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)    <u>Proportionate Amounts.</u> Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)    <u>Required Consents.</u> No consent shall be required for any assignment except to the extent required by Section 10.07(b)(i)(B) and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default under Section 8.01(1) or, solely

174

with respect to the Borrower, Section 8.01(6) has occurred and is continuing at the time of such assignment determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, or (2) in respect of an assignment of all or a portion of the Loans, such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that the Borrower shall be deemed to have consented to any assignment of all or a portion of the Term Loans unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice of a failure to respond to such request for assignment; *provided further* that no consent of the Borrower shall be required for an assignment of all or a portion of the Loans pursuant to Section 10.07(h) or (l); and

       (B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund with respect to a Lender; *provided* that no consent of the Administrative Agent shall be required for an assignment (i) of all or a portion of the Loans pursuant to Section 10.07(g), (h), or (l);.

       (C)      [Reserved]; and

       (D)      [Reserved].

    (iv)    <u>Assignment and Assumption.</u> The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent). Other than in the case of assignments pursuant to Section 10.07(l), the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire. Each assignee Lender shall be required to represent in the Assignment and Assumption that it is not a Disqualified Institution or an Affiliate of a Disqualified Institution.

    (v)    <u>No Assignments to Certain Persons.</u> No such assignment shall be made (A) to Holdings, the Borrower or any of its Subsidiaries except as permitted under Section 2.05(1)(e) or Section 10.07(l), (B) subject to Sections 10.07(h) and (l) below, to any Affiliate of the Borrower, (C) to a natural person or (D) to any Disqualified Institution.

This Section 10.07(b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis among such Facilities.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans in accordance with its Pro Rata Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations

of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section 10.07 (and, in the case of an Affiliated Lender or a Person that, after giving effect to such assignment, would become an Affiliated Lender, to the requirements of clause (h) of this Section 10.07), from and after the effective date specified in each Assignment and Assumption, other than in connection with an assignment pursuant to Section 10.07(l), (x) the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (y) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment), but shall in any event continue to be subject to Section 10.09. Upon request, and the surrender by the assigning Lender of its Term Note, the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(d).

(c)   The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, each Affiliated Lender Assignment and Assumption delivered to it, each notice of cancellation of any Loans delivered by the Borrower pursuant to subsections (h) or (l) below, and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans and amounts due under Section 2.03, owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 10.07(3) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations). Notwithstanding the foregoing, in no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is an Affiliated Lender, nor shall the Administrative Agent be obligated to monitor the aggregate amount of the Term Loans or Incremental Term Loans held by Affiliated Lenders.

(d)   Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any Affiliate or Subsidiary of the Borrower or a Disqualified Institution) (each, a "**Participant**") in all or a portion of such Lender's rights or obligations under this Agreement (including all or a portion of its Commitment or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such

176

a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than clauses (d) and (i) thereof) that directly affects such Participant. Subject to subsection (e) of this Section 10.07, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements of Section 3.01 (including subsections (2), (3) and (4), as applicable as though it were a Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.07. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.10 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(e)      Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and the Borrower shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary; *provided* that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of the Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or other obligations under any Loan Document) to any Person except to the extent such disclosure is necessary to establish that any such commitments, loans, letters of credit or other obligations are in registered form for U.S. federal income tax purposes. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)      Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof shall be appropriately reflected in the Participant Register. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under

177

this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)    Any Lender may at any time, assign all or a portion of its rights and obligations with respect to Loans and Commitments under this Agreement to a Person who is or will become, after such assignment, an Affiliated Lender through (x) Dutch auctions or other offers to purchase or take by assignment open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.05(1)(e) or (y) open market purchase on a non-pro rata basis, in each case subject to the following limitations:

(i)    Affiliated Lenders will not make any challenge to any Agent's or any Lender's attorney-client privilege on the basis of its status as a Lender;

(ii)    each Affiliated Lender that purchases any Loans or Commitments will clearly identify itself as an Affiliated Lender in any Affiliated Lender Assignment and Assumption executed in connection with such purchases or sales and each such Affiliated Lender Assignment and Assumption shall contain customary "big boy" representations but no requirement to make representations as to the absence of any material nonpublic information;

(iii)    as a condition to each assignment pursuant to this subsection (h), the Administrative Agent and the Borrower shall have been provided a notice in connection with each assignment to an Affiliated Lender or a Person that upon effectiveness of such assignment would constitute an Affiliated Lender pursuant to which such Affiliated Lender (in its capacity as such) shall waive any right to bring any action in connection with such Loans and Commitments against any Agent, in its capacity as such;

(iv)    the aggregate principal amount of Term Loans of any Class under this Agreement held by Affiliated Lenders at the time of any such purchase or assignment shall not exceed 25.0% of the aggregate principal amount of Term Loans of such Class outstanding at such time under this Agreement (such percentage, the "**Affiliated Lender Cap**"); *provided* that to the extent any assignment to an Affiliated Lender would result in the aggregate principal amount of all Term Loans of any Class held by Affiliated Lenders exceeding the Affiliated Lender Cap (in each case, determined at the time of purchase), the assignment of such excess amount will be void *ab initio*; and

(v)    the assigning Lender and the Affiliated Lender purchasing such Lender's Term Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit D-2 hereto (an "**Affiliated Lender Assignment and Assumption**").

Notwithstanding anything to the contrary contained herein, any Affiliated Lender that has purchased Term Loans pursuant to this subsection (h) may, in its sole discretion, contribute, directly or indirectly, the principal amount of such Term Loans or any portion thereof, *plus* all accrued and unpaid

interest thereon, to the Borrower for the purpose of cancelling and extinguishing such Term Loans. Upon the date of such contribution, assignment or transfer, (x) the aggregate outstanding principal amount of Term Loans shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (y) the Borrower shall promptly provide notice to the Administrative Agent of such contribution of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register.

Each Affiliated Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it acquires any Person who is also a Lender, and each Lender agrees to notify the Administrative Agent and the Borrower promptly (and in any event within 10 Business Days) if it becomes an Affiliated Lender. The Administrative Agent may conclusively rely upon any notice delivered pursuant to the immediately preceding sentence or pursuant to clause (v) of this subsection (h) and shall not have any liability for any losses suffered by any Person as a result of any purported assignment to or from an Affiliated Lender.

Notwithstanding anything to the contrary contained herein, (x) any Affiliated Lender shall be entitled to (a) receive information made available to any Lender holding the same Class of Term Loans as such Affiliated Lender and (b) attend all lender meetings and participate in any conference calls with the Borrower that are open to any Lender holding the same Class of Term Loans as such Affiliated Lender and (y) with respect to any amendment, modification, waiver, consent or other action that requires the consent of Required Lenders or the consent of Required Facility Lenders, all fees and other benefits made available to any consenting Lenders holding the same Class of Term Loans any Affiliated Lender shall be made available to such Affiliated Lender on a no less than pro rata basis.

(i)      Notwithstanding anything in Section 10.01 or the definition of "Required Lenders," or "Required Facility Lenders" to the contrary, for purposes of determining whether the Required Lenders and Required Facility Lenders (in respect of a Class of Term Loans) have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, or subject to Section 10.07(j), any plan of reorganization pursuant to the Bankruptcy Code, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required any Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, no Affiliated Lender shall have any right to consent (or not consent), otherwise act or direct or require any Agent or any Lender to take (or refrain from taking) any such action and:

(i)      all Term Loans held by any Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders and Required Facility Lenders (in respect of a Class of Term Loans) have taken any actions; and

(ii)      all Term Loans held by Affiliated Lenders shall be deemed to have been voted in the same proportion as non-Affiliated Lenders voting on such matter unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

(j)      Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliated Lender hereby agrees that, and each Affiliated Lender Assignment and Assumption shall provide a confirmation that, if a proceeding under any Debtor Relief Law shall be commenced by or against the Borrower or any other Loan Party at a time when such Lender is an Affiliated Lender, such Affiliated Lender irrevocably authorizes and empowers the Administrative Agent (at the direction of the Required Lenders) to vote on behalf of such Affiliated Lender with respect to the Term Loans held by such Affiliated Lender in the same proportion as non-Affiliated Lenders

voting on such matter, unless the Administrative Agent (at the direction of the Required Lenders) instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Term Loans held by it as the Administrative Agent (at the direction of the Required Lenders) directs; *provided* that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner than the proposed treatment of similar Obligations held by Term Lenders that are not Affiliated Lenders.

(k)     [Reserved].

(l)     Any Lender may, so long as no Event of Default has occurred and is continuing, at any time, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to Holdings, the Borrower or any Subsidiary of the Borrower through (x) Dutch auctions or other offers to purchase open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.05(1)(e) or (y) open market purchases on a non-pro rata basis; *provided* that:

(i)     (x) if the assignee is Holdings or a Subsidiary of the Borrower, upon such assignment, transfer or contribution, the applicable assignee shall automatically be deemed to have contributed or transferred the principal amount of such Term Loans, *plus* all accrued and unpaid interest thereon, to the Borrower; or (y) if the assignee is the Borrower (including through contribution or transfers set forth in clause (x)), (a) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Lenders shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (c) the Borrower shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(ii)    [Reserved]; and

(iii)   purchases of Term Loans pursuant to this subsection (l) may not be funded with the proceeds of ABL Loans.

(m)    Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(n)    Notwithstanding the foregoing, no Disqualified Institution that purports to become a Lender hereunder (notwithstanding the provisions of this Agreement that prohibit Disqualified Institutions from becoming Lenders) shall be entitled to any of the rights or privileges enjoyed by the

other Lenders with respect to voting, information and lender meetings. In addition, if any assignment or participation is made to any Disqualified Institution without the Borrower's express prior written consent (which consent shall state expressly that the Borrower acknowledges that the assignee Lender is a Disqualified Institution) in violation of clause (v) of Section 10.07(b), the Borrower may, in addition to any other rights and remedies that it may have against such Disqualified Institution, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) in the case of outstanding Term Loans held by Disqualified Institutions, purchase or prepay such Term Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in Section 10.07), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

(o)   No Agent shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions or otherwise take (or omit to take) any action with respect thereto. Without limiting the generality of the foregoing, no Agent shall (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution.

Section 10.08   [Reserved].

Section 10.09   Confidentiality. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, equity owners, investors, funding sources, legal counsel, independent auditors, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, with such Affiliate being responsible for such Person's compliance with this Section 10.09; provided, however, that such Agent or Lender, as applicable, shall be principally liable to the extent this Section 10.09 is violated by one or more of its Affiliates or any of its or their respective employees, directors or officers), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); provided, however, that each Agent and each Lender agrees to seek confidential treatment with respect to any such disclosure, (c) to the extent required by applicable laws or regulations or by any subpoena or otherwise as required by applicable Law or regulation or as requested by a Governmental Authority; provided that such Agent or such Lender, as applicable, agrees (x) that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (except in connection with any request as part of any audit or regulatory examination) unless such notification is prohibited by law, rule or regulation and (y) to seek confidential treatment with respect to any such disclosure, (d) to any other party hereto, (e) subject to an agreement containing provisions at least as restrictive as those of this Section 10.09, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee (or its agent) invited to be an Additional Lender or (ii) with the prior consent of the Borrower, any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any of their Subsidiaries or any of their respective obligations; provided that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, Participant or Eligible Assignee that such

181

Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to the Borrower and the Agents, including as set forth in any confidential information memorandum or other marketing materials) in accordance with the standard syndication process of the Agents or market standards for dissemination of such type of information which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information, (f) for purposes of establishing a "due diligence" defense, (g) with the consent of the Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach by any Person of this Section 10.09 or any other confidentiality provision in favor of any Loan Party, (y) becomes available to any Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent, such Lender or the applicable Affiliate to be subject to a confidentiality restriction in respect thereof in favor of Holdings, the Borrower or any Affiliate of the Borrower or (z) is independently developed by the Agents, the Lenders or their respective Affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this Section 10.09 or (i) in order to enforce its respective rights under any Loan Document in any action or proceeding.

For purposes of this Section 10.09, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary or Affiliate thereof or their respective businesses, other than any such information that is available to any Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary or Affiliate thereof after the date hereof shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 10.09 shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Agent and each Lender acknowledges that (a) the Information may include trade secrets, protected confidential information, or material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of such information and (c) it will handle such information in accordance with applicable Law, including United States Federal and state securities Laws and to preserve its trade secret or confidential character.

The respective obligations of the Agents and the Lenders under this Section 10.09 shall survive, to the extent applicable to such Person, (x) the payment in full of the Obligations and the termination of this Agreement, (y) any assignment of its rights and obligations under this Agreement and (z) the resignation or removal of any Agent.

Section 10.10   Setoff. If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party then due and payable under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in

reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender under this Section 10.10 are in addition to other rights and remedies (including other rights of setoff) that such Lender may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.11    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.12    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.13    Electronic Execution of Assignments and Certain Other Documents. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.14    Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Term Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.15    Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.16   <u>GOVERNING LAW</u>.

(a)   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

(b)   THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)   THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION 10.16. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 10.17   <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO

ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.17.

Section 10.18    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

Section 10.19    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Required Lenders.

Section 10.20    Use of Name, Logo, etc.. Each Loan Party consents to the publication in the ordinary course by any Agent of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark. Such consent shall remain effective until revoked by such Loan Party in writing to such Agent.

Section 10.21    USA PATRIOT Act. Each Lender that is subject to the USA PATRIOT Act and each Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act. The Borrower shall, promptly following a request by any Agent or any Lender, provide all documentation and other information that such Agent or Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 10.22    Service of Process. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.23    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Agents and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent and Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Agents nor any Lender has

any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Agents or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.24    Release of Collateral and Guarantee Obligations; Subordination of Liens.

(a)    The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released (i) in full, as set forth in clause (b) below, (ii) upon the sale or other transfer of such Collateral (including as part of or in connection with any other sale or other transfer permitted hereunder) to any Person other than another Loan Party, to the extent such sale, transfer or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party by a Person that is not a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guaranty (in accordance with the second succeeding sentence), (vi) as required by the Collateral Agent to effect any sale, transfer or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Collateral Documents and (vii) to the extent such Collateral otherwise becomes Excluded Assets. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents. Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guaranties upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary, or otherwise becoming an Excluded Subsidiary. The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. The Administrative Agent or the Collateral Agent, as applicable, shall, at the Borrower's expense, upon receipt of a certificate an Officer's Certificate from the Borrower certifying that the requested release is permitted under this Section 10.24, release the requested Collateral from the Liens securing the Obligations and provide the Borrower with such additional documentation as the Borrower may reasonably request to evidence such release; *provided* that such release shall be without recourse to or representation or warranty of by the Administrative Agent and the Collateral Agent. Any representation, warranty or covenant contained in any Loan Document relating to any such released Collateral or Guarantor shall no longer be deemed to be repeated.

(b)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than any contingent obligations not then due) have been paid in full and all Commitments have terminated, upon request of the Borrower, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any contingent obligations not then due. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or

returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Permitted Lien specified in clause (7) of the definition thereof securing obligations in respect of Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of Section 7.02(b) in any Collateral, and at the Borrower's expense, the Administrative Agent or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to subordinate the Lien on any Collateral to any such Permitted Lien to be senior to the Liens in favor of the Collateral Agent; *provided*, that the ~~Borrower shall have provided the~~ Administrative Agent or Collateral Agent, as applicable, ~~shall, upon receipt of a certificate from the Borrower~~ with an Officer's Certificate certifying that ~~the~~such requested ~~release is~~subordination and such requested actions are permitted under this Section 10.24~~, release~~ ; *provided, further,* that such requested actions shall not expose the Administrative Agent or the ~~requested~~ Collateral ~~from the Liens securing the Obligations and provide the Borrower with such additional documentation as the Borrower may reasonably request~~Agent to ~~evidence such release; *provided* that such release~~liability and shall be without recourse, to or representation or warranty ~~of~~by the Administrative Agent and the Collateral Agent.

(d)    Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrower's assets in a bankruptcy, foreclosure or other similar proceeding, forbear from exercising remedies upon an Event of Default, or in a bankruptcy proceeding, enter into a settlement agreement on behalf of all Lenders.

Section 10.25    [Reserved].

Section 10.26    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law). The obligations of the Borrower under this Section 10.26 shall survive the resignation, replacement, or removal of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or

discharge of all Obligations under any Loan Document, and the termination of this Agreement or any other Loan Document.

Section 10.27 <u>Amendment and Restatement</u>. On the Closing Date, the Existing Credit Agreement shall be amended, restated and superseded in ~~their~~<u>its</u> entirety by this Agreement. The parties hereto acknowledge and agree that (i) this Agreement and the other documents entered into in connection herewith do not constitute a novation or termination of the "Obligations" (as defined in the Existing Credit Agreement, as applicable) under the Existing Credit Agreement, as applicable, as in effect prior to the Closing Date, (ii) such "Obligations" are in all respects continuing (as amended and restated hereby) as indebtedness and obligations outstanding under this Agreement and (iii) all claims, actions, causes of action, suits, damages and indemnities by any Loan Party or any Agent or Lender on account of any action, breach, non-compliance or default by any Loan Party or any Agent or Lender that occurred, or any inaction by any Loan Party or any Agent or Lender that should have occurred, in each case, on or prior to the Closing Date, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, shall cease to exist and be forever waived, released and discharged to the full extent permitted by law.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

IN  WITNESS  WHEREOF,  the  parties  hereto  have  caused  this  Agreement  to  be  duly
executed as of the date first above written.

BELK, INC.,
as the Borrower


By: _____
   Name: _____
   Title: _____

_____1

BEAR PARENT INC.,
as Holdings


By: _____
      Name: _____
      Title: _____

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent and Collateral Agent

By: _____
　　　Name: _____
　　　Title: _____

3

[_____],
as Lender


By: _____
    Name: _____
Title: _____

4

[Signature Page to Amended and Restated First Lien Credit Agreement]

## **Exhibit G**

**Form of New Shareholders Agreement**

**EXECUTION VERSION**

**STOCKHOLDERS AGREEMENT**

**OF**

**FASHION HOLDINGS INTERMEDIATE, INC.**

**FEBRUARY 24, 2021**

# TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| Section 1. | | Board Rights; Approval for Certain Actions | 1 |
| | (a) | Board of Directors | 1 |
| | (b) | Initial Directors | 2 |
| | (c) | Committees | 2 |
| | (d) | Quorum | 3 |
| | (e) | Board Observers | 3 |
| | (f) | Expenses | 4 |
| | (g) | Investor Reserved Matters | 4 |
| Section 2. | | Transfers | 6 |
| | (a) | Transfer Restrictions | 6 |
| | (b) | Other Restrictions on Transfers | 6 |
| Section 3. | | Drag-Along Rights | 8 |
| | (a) | Drag-Along Right | 8 |
| | (b) | Notice | 8 |
| | (c) | Exercise | 8 |
| | (d) | Drag Sale Expenses | 9 |
| Section 4. | | Right of First Offer | 9 |
| | (a) | Right of First Offer | 9 |
| | (b) | Exercise | 10 |
| | (c) | Closing | 10 |
| | (d) | Assignment | 10 |
| | (e) | Deadline for Completion of Sale | 10 |
| Section 5. | | Tag Rights | 10 |
| | (a) | Notice | 10 |
| | (b) | Tag Right | 11 |
| | (c) | Transferring Tag Stockholder Cutback | 11 |
| | (d) | Closing | 11 |
| | (e) | Deadline for Completion of Tag Sale | 12 |
| Section 6. | | Preemptive Rights | 12 |
| | (a) | General | 12 |
| | (b) | Participation Notice | 12 |
| | (c) | Accredited Investors | 13 |
| | (d) | Offer Periods; Terms of Sale | 13 |
| | (e) | Failure to Issue Shares | 13 |
| | (f) | Closing | 13 |
| | (g) | Exceptions | 13 |

(h) Post-Issuance Notice ................................................................14

(i) Assignment ................................................................14

Section 7. Registration Rights ................................................................14

Section 8. Legend on Certificates ................................................................14

(a) Legends ................................................................14

(b) Removal of Legends ................................................................15

(c) Book-Entry Shares ................................................................15

Section 9. Duration of Agreement ................................................................15

Section 10. Information Rights ................................................................15

(a) Financial Statements and Other Information ................................................................15

(b) Confidential Information ................................................................16

Section 11. Miscellaneous ................................................................16

(a) Successors, Assigns and Transferees ................................................................16

(b) Specific Performance ................................................................17

(c) Governing Law ................................................................17

(d) Submission to Jurisdiction; Waiver of Jury Trial ................................................................17

(e) Descriptive Headings ................................................................17

(f) Notices ................................................................17

(g) Recapitalization, Exchange, Etc ................................................................18

(h) Counterparts ................................................................19

(i) Severability ................................................................19

(j) Amendment ................................................................19

(k) Tax Withholding ................................................................19

(l) Integration ................................................................19

(m) Further Assurances ................................................................19

(n) No Strict Construction ................................................................20

(o) No Third Party Beneficiaries ................................................................20

(p) No Recourse ................................................................20

(q) Construction ................................................................20

Section 12. Definitions ................................................................20

**SCHEDULES**

Schedule A -- Stockholders

**EXHIBITS**

Exhibit A -- Form of Stockholder Joinder

**FASHION HOLDINGS INTERMEDIATE, INC.**
**STOCKHOLDERS AGREEMENT**

This **STOCKHOLDERS AGREEMENT** (this "Agreement"), dated as of February 24, 2021, is by and among (i) Fashion Holdings Intermediate, Inc., a Delaware corporation (the "Company"), (ii) Fashion Holdings LLC, a Delaware limited liability company (together with its Permitted Transferees that hold Shares, the "Sponsor Investor"), and the Persons listed on Schedule A, as amended from time to time. Each of the Sponsor Investor and each Person listed on Schedule A is sometimes referred to herein as a "Stockholder" and, collectively, as the "Stockholders". The Company and the Stockholders are sometimes referred to herein individually by name or as a "Party" and, collectively, as the "Parties". The definitions of certain capitalized terms used herein are set forth in Section 12.

**RECITALS**

**WHEREAS**, the Company and the Stockholders desire to enter into this Agreement to provide for certain matters with respect to the ownership and transfer by the Stockholders of Shares owned as of the date hereof or hereafter acquired by the Stockholders.

**NOW, THEREFORE**, in consideration of the foregoing, and the mutual agreements set forth herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**Section 1.** **Board Rights; Approval for Certain Actions**

(a) Board of Directors. Each Stockholder (severally and not jointly), in its capacity as a stockholder of the Company, and the Company, shall take all Necessary Actions to cause:

(i) the board of directors of the Company (the "Board" and, each member thereof, a "Director") to be comprised of only that number of Directors necessary to give effect to the Director appointment rights set forth in Section 1(a)(ii);

(ii) the election to the Board of:

(A) that number of Directors designated by the Sponsor Investor (each, a "Sponsor Investor Designee") which, when added to the number of Sponsor Investor Designees who are then Directors and will continue to serve as Directors without regard to such Necessary Action is four, so long as the Sponsor Investor holds at least 40% of the Total Common Shares; provided, however, that if the Sponsor Investor holds less than 40% of the Total Common Shares but greater than or equal to 30% of the Total Common Shares, then the Sponsor Investor shall be entitled to designate three Directors to the Board; and provided, further, that if the Sponsor Investor holds less than 30% of the Total Common Shares but greater than or equal to 20% of the Total Common Shares, then the Sponsor Investor shall be entitled to designate two Directors to the Board; and provided, further, that if the Sponsor Investor holds less than 20% of the Total Common Shares but greater than or equal to 10% of the Total Common Shares, then the Sponsor Investor shall be entitled to designate one Director to the Board; and provided, further, that if the Sponsor Investor holds less than 10% of the Total Common Shares, then the Sponsor Investor shall not be entitled to designate any Directors to the Board;

(B) that number of Directors designated by the Blackstone Investors (each, a "Blackstone Investor Designee") which, when added to the number of Blackstone Investor

Designees who are then Directors and will continue to serve as Directors without regard to such Necessary Action, is two Directors so long as the Blackstone Investors collectively hold at least 20% of the Total Common Shares; provided, however, that if the Blackstone Investors collectively hold less than 20% of the Total Common Shares but greater than or equal to 10% of the Total Common Shares, then the Blackstone Investors shall be entitled to designate one Director to the Board; and provided, further, that if the Blackstone Investors collectively hold less than 10% of the Total Common Shares, then the Blackstone Investors shall not be entitled to designate any Directors to the Board; and

(C)     that number of Directors designated by the KKR Investors (the "KKR Investor Designee") which, when added to the number of KKR Investor Designees who are then Directors and will continue to serve as Directors without regard to such Necessary Action, is one Director so long as the KKR Investors collectively hold at least 10% of the Total Common Shares; provided, however, that if the KKR Investors collectively hold less than 10% of the Total Common Shares, then the KKR Investors shall not be entitled to designate any Directors to the Board;

(iii)     the removal from the Board (with or without cause) of any Director upon the written request to the Board of the Investor Stockholder(s) having the right to designate such Director, including the removal of the Chair (as defined below) upon the written request of the Sponsor Investor;

(iv)     upon any vacancy in the Board as a result of any individual designated by an Investor Stockholder pursuant to Section 1(a)(ii) ceasing to be a Director, whether by resignation, death, disability, disqualification or otherwise (but not as a result of the loss of a right to appoint a designee pursuant to Section 1(a)(ii) and/or the removal of a Director pursuant to Section 1(a)(v)), the election to the Board of an individual designated by such Investor Stockholder;

(v)     the removal from the Board (with or without cause) of the appropriate number of Designees of an applicable Investor Stockholder in the event that the right to designate such Designees shall have terminated under Section 1(a)(ii) (unless such number of Designees have resigned from the Board), it being understood and agreed that such Investor Stockholder shall designate for removal, and use commercially reasonable efforts to cause the removal of, such Designees as promptly as reasonably practicable following such termination; and

(vi)     the Sponsor Investor Designee so designated by the Sponsor Investor to be the Chair of the Board (the "Chair"), so long as the Sponsor Investor is entitled to designate at least one Sponsor Investor Designee pursuant to Section 1(a)(ii)(A).

(b)     Initial Directors.  The names of the individuals designated to be Directors pursuant to Section 1(a)(ii) as of the date of this Agreement are set forth in the initial corporate organizational resolutions of the Company executed and delivered as of the date hereof.

(c)     Committees.  The Board may designate one or more committees of the Board in accordance with the Company Bylaws (each, a "Board Committee").  Each such Board Committee shall be composed of one or more Directors; provided, however, that (i) a majority of the members on each such Board Committee shall be Sponsor Investor Designees, (ii) so long as at least one Blackstone Investor Designee serves on the Board, at least one Blackstone Investor Designee shall be entitled to serve as a member of such Board Committee, and (iii) so long as the KKR Investor Designee serves on the Board, such KKR Investor Designee shall be entitled to serve as a member of such Board Committee.  Notwithstanding the immediately preceding sentence, in the event that the Board authorizes a Board Committee to evaluate or

2

negotiate, or establishes a Board Committee for the purpose of evaluating or negotiating, a transaction with an Investor Stockholder or any of its Affiliates, no Designee of such Investor Stockholder shall be entitled to serve on such Board Committee.

(d)     Quorum.  The presence in person of a majority of the total number of Directors then in office will constitute a quorum for the transaction of business of the Board or a Board Committee; provided, however, that no quorum shall exist unless (i) at least one Sponsor Investor Designee is present in person, so long as the Sponsor Investor is entitled to designate at least one Sponsor Investor Designee pursuant to Section 1(a)(ii)(A), (ii) at least one Blackstone Investor Designee is present in person, so long as the Blackstone Investors are entitled to designate at least one Blackstone Investor Designee pursuant to Section 1(a)(ii)(B) and (iii) the KKR Investor Designee is present in person, so long as the KKR Investors are entitled to designate the KKR Investor Designee pursuant to Section 1(a)(ii)(C).  In the event that at least one Designee of an Investor Stockholder fails to attend two consecutive meetings of the Board or a Board Committee called and noticed in accordance with the Company Bylaws and this Agreement (such Designee, a "Non-Attending Director"), then the other Directors may provide written notice (the "Meeting Notice") to the Non-Attending Director not less than three Business Days before the date of the third consecutive meeting of the Board or Board Committee.  The Meeting Notice shall contain the date, time and agenda for the third consecutive meeting of the Board or Board Committee and shall state that the Non-Attending Director must attend such meeting or his or her presence shall not be required to constitute a quorum for such meeting.  With respect to the third consecutive meeting of the Board following the Non-Attending Director's failure to attend two consecutive meetings of the Board called and noticed in accordance with the Company Bylaws and this Agreement, the Non-Attending Director's presence shall not be required to constitute a quorum for such meeting under this Section 1(d), but not with respect to any future meeting.  For the avoidance of doubt, nothing in this Section 1(d) supersedes any provision of Section 1(g).

(e)     Board Observers.  The Sponsor Investor, the Blackstone Investors and the KKR Investors each shall have the right to appoint one observer (each, a "Board Observer") (i.e., for a total of up to three Board Observers) to attend any meetings of the Board or a Board Committee for so long as such applicable Investor Stockholder(s) has the right to designate at least one Director to the Board pursuant to Section 1(a)(ii).  No Board Observer shall have the right to vote on any matter that comes before the Board or a Board Committee.  Each Board Observer shall receive (x) copies of all meeting materials distributed to the Board or applicable Board Committee and (y) notice of each meeting or action by written consent of the Board or such Board Committee, in each case at the same time and in the same manner as such materials are distributed to or notice is given to the Board or such Board Committee.  Notwithstanding the foregoing, any meeting of the Board or Board Committee may exclude a Board Observer from access to any meeting materials or information or meeting or portion thereof or written consent if the Board or Board Committee determines, in good faith, that (i) such exclusion is reasonably necessary to protect highly confidential proprietary information of the Company or confidential proprietary information of third parties that the Company is required to hold in confidence or (ii) such access would reasonably be expected to result in a conflict of interest with the Company; provided, that such exclusion shall be limited to the portion of the meeting materials or information or meeting or written consent that is the basis for such exclusion and shall not extend to any portion of the meeting materials or information or meeting or written consent that does not involve or pertain to such exclusion.  Each Board Observer shall be entitled to indemnification by the Company and to be covered under the Company's director and officer insurance policies to the same extent as Directors as may be reasonably practicable.  As a condition to the appointment of a Board Observer, he or she must execute a confidentiality agreement with the Company in customary form with respect to the information and discussions to which the Board Observer will have access.  The names of the individuals designated to be Board Observers as of the date of this Agreement are set forth in the initial corporate organizational resolutions of the Company executed and delivered as of the date hereof.

(f)     Expenses.  The Company shall pay the reasonable and documented travel expenses (in accordance with the requirements of the Belk, Inc. travel policy for its employees) incurred by all Directors and Board Observers in connection with their attendance at meetings of the Board or any Board Committee. To the extent that an Investor Stockholder designates one or more Independent Directors to the Board (it being understood that up to all of the Designees of an Investor Stockholder may be Independent Directors), the Company shall compensate each such Independent Director for his or her service on the Board or any Board Committee in a manner and amount consistent with market practices for independent directors of similarly situated companies as determined by the Board.  For the avoidance of doubt, Board Observers will not be eligible for any compensation from the Company for their services as a Board Observer.

(g)     Investor Reserved Matters.  The Parties shall take all Necessary Actions so that the Company shall not, and shall not permit any of its Subsidiaries to, effect any of the following (each an "Investor Reserved Matter") without the prior written consent of each Investor Stockholder, so long as each such Investor Stockholder (together with its Affiliates) holds at least five percent of the Total Common Shares:

(i)     the entry into or consummation of any Company Sale;

(ii)     any acquisition of the stock or other equity securities (whether by merger, consolidation, purchase of stock or other equity securities or otherwise) or the assets (outside the ordinary course of business) of any other Person, except where the aggregate consideration (including, (x) the assumption of indebtedness for borrowed money, whether direct or indirect, (y) any deferred or contingent consideration or (z) consideration paid in the form of above-market employment or consulting agreements)  is not greater than $10,000,000 in any single transaction or series of related transactions;

(iii)     any disposition (by sale, lease or otherwise) of assets of the Company or its Subsidiaries outside the ordinary course of business, except where the aggregate consideration (including the assumption of indebtedness for borrowed money, whether direct or indirect) is not greater than $10,000,000 in any single transaction or series of related transactions;

(iv)     any issuance of additional Shares or other equity securities or securities convertible into or exchangeable or exercisable for Shares or other equity securities, except (A) in accordance with Section 6 or (B) the issuance of shares of Common Stock or Options to employees or other service providers of the Company or its Subsidiaries approved by the Board and pursuant to an Equity Incentive Plan approved in accordance with clause (ix) below;

(v)     any redemption, purchase or other acquisition (whether direct or indirect) of any Shares or other securities of the Company or its Subsidiaries except (A) for Shares or other equity securities held by the Stockholders on a *pro rata* basis (based on the number of Shares or other equity securities of the applicable class held by the Stockholders (excluding any Shares or other equity securities issued under an Equity Incentive Plan that are not fully vested or otherwise limited in their ability to participate in any such redemption, purchase or other acquisition)), (B) Shares held by an employee of the Company or its Subsidiaries upon the termination of employment pursuant to an agreement or plan previously approved by the Board or (C) debt securities of the Company or its Subsidiaries in accordance with (x) the terms of the governing agreements pursuant to which they were issued or (y) the Amended Credit Agreements; provided, however, that, in addition to the consent of the Investor Stockholders required under this Section 1(g), any such non *pro rata* redemption, purchase or other acquisition (whether direct or indirect) of any Shares or other securities of the Company or its Subsidiaries (except as otherwise expressly permitted pursuant to any of the foregoing clauses (A) through (C) immediately above) shall require the prior

4

written consent of the holders of a majority of the Total Common Shares (excluding, solely for the purpose of this proviso, Shares held by any Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares);

(vi)     the creation, incurrence or refinancing of any Indebtedness of the Company or its Subsidiaries, except (A) Indebtedness in an aggregate principal amount not in excess of $15,000,000 at any time outstanding and (B) intercompany loans solely among the Company and any Subsidiary thereof, or among any Subsidiary of the Company and another Subsidiary thereof;

(vii)     any making of any material change to the nature or scope of the business of the Company and its Subsidiaries, any exit from the line of business or any entry into any new material line of business, in each case, as compared to the business of the Company and its Subsidiaries on the date hereof;

(viii)     any making of any capital expenditures or commitments therefor in excess of $2,000,000 individually, or $8,000,000 in the aggregate, in each case, in any fiscal year and except for capital expenditures or commitments that are reflected in an applicable annual business plan and budget for the Company that has been approved by the Board;

(ix)     any adoption or termination of, or material amendment to (including any increase in the number of Shares issuable under) any Equity Incentive Plan;

(x)     any entry into any transaction, contract, agreement or arrangement, or any amendment to any transaction, contract, agreement or arrangement, between the Company or any of its Subsidiaries, on the one hand, and the Sponsor Investor or its Affiliates (other than the Company or any of its Subsidiaries), on the other hand, unless on arm's length, commercially reasonable terms and approved by a majority of the Directors (other than the Sponsor Investor Designees), other than (A) any issuance of additional Shares or other equity securities or securities convertible into or exchangeable or exercisable for Shares or other equity securities in accordance with Section 6, (B) any redemption, purchase or other acquisition of any Shares or other securities in accordance with clause (v) above, (C) the declaration or making of any dividend or distribution in accordance with clause (xii) below or (D) those transactions, contracts, agreements and arrangements expressly contemplated by each of the RSA or the Plan (including any exhibits, annexes, schedules or supplements to the RSA or the Plan);

(xi)     any entry into any amendment to the Company Charter or Company Bylaws;

(xii)     the declaration or making of any dividend or distribution made in respect of the Shares or other equity securities of the Company or its Subsidiaries, except on a *pro rata* basis to the Stockholders (based on the number of Shares or other equity securities of the applicable class held by the Stockholders (excluding any Shares or other equity securities issued under an Equity Incentive Plan that are not fully vested or otherwise limited in their ability to participate in dividends or distributions)); provided, however, that, in addition to the consent of the Investor Stockholders required under this Section 1(g), any such non *pro rata* dividend or distribution shall require the prior written consent of the holders of a majority of the Total Common Shares (excluding, solely for the purpose of this proviso, Shares held by any Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares); or

(xiii)     any entry into any agreement (whether oral or written) obligating the Company or any of its Subsidiaries to do any of the foregoing.

**Section 2.        Transfers**

(a)        <u>Transfer Restrictions</u>.  No Stockholder shall Transfer any Shares except for the following:

(i)        Transfers to a Permitted Transferee of such Stockholder; <u>provided</u>, that, in the event that a Person that acquires Common Stock as a Permitted Transferee of a Stockholder (including under <u>Section 4(d)</u> or <u>Section 6(i)</u>) (a "<u>Transferring Stockholder</u>") ceases to be a Permitted Transferee of the Transferring Stockholder, such Permitted Transferee shall, simultaneously with ceasing to be a Permitted Transferee of the initial Transferring Stockholder, Transfer all such acquired Common Stock to the Transferring Stockholder;

(ii)        Transfers to a Person (other than a Permitted Transferee); <u>provided</u>, that, if such Stockholder (together with its Affiliates) then owns at least two and one-half percent of the Total Common Shares, such Transfers must comply with and shall be subject to the provisions of <u>Section 4</u> and <u>Section 5</u>;

(iii)        Transfers made with the prior written consent of each of the Investor Stockholders;

(iv)        subject to <u>Section 1(g)(i)</u>, Transfers pursuant to a Company Sale; or

(v)        Transfers in compliance with and subject to the provisions of <u>Section 3</u>, <u>Section 4</u> and/or <u>Section 5</u>, as applicable.

(b)        <u>Other Restrictions on Transfers</u>.

(i)        In addition to the restrictions set forth elsewhere in this Agreement, except in connection with a Company Sale, any Transfer of Shares by a Stockholder to a transferee (and any assignment to a Permitted Transferee under <u>Section 4(d)</u> or <u>Section 6(i)</u>) shall be permitted only if the transferee shall agree in writing to be bound by, and comply with, the terms and conditions of this Agreement by executing a signature page in the form attached as <u>Exhibit A</u> hereto.  Upon the execution of the signature page in the form attached as <u>Exhibit A</u> hereto, such transferee shall be deemed to be a Stockholder pursuant to this Agreement.

(ii)        Notwithstanding anything to the contrary contained herein, without the prior written consent of the Board (which it may withhold in its sole discretion), no Stockholder shall Transfer any Shares to (A) any Person that the Board determines in good faith directly competes (as its primary business) in any material line of business engaged in by the Company or any of its Subsidiaries, (B) any Person that is a landlord of the Company or any of its Subsidiaries, (C) any Person that the Board determines in good faith is a material vendor of the Company or any of its Subsidiaries or (D) any controlled Affiliate of any of the Persons described in immediately foregoing clauses (A) through (C).

(iii)        Each Stockholder understands and agrees that the Shares held by such Stockholder on the date hereof have not been registered under the Securities Act or under any securities laws. No Stockholder shall, directly or indirectly, Transfer such Shares (or solicit any offers in respect of any Transfer of such Shares), except in compliance with the Securities Act, any applicable securities laws and any restrictions on Transfer contained in this Agreement.  No Stockholder shall, directly or indirectly, avoid the restrictions or obligations set forth in this <u>Section 2</u> by Transferring any Shares to any other Person and then Transferring or permitting the Transfer of such other Person in whole or in part.

(iv)     In connection with the Transfer of any Shares, the Stockholder holding such Shares will deliver at least five Business Days' prior written notice to the Company describing in reasonable detail the proposed Transfer.  Prior to recognizing the Transfer of any Shares on the books and records of the Company, the transferring Stockholder will provide the Company with a written opinion of legal counsel reasonably satisfactory to the Company (unless such legal opinion is otherwise waived, in whole or in part, in the discretion of the Board), addressed to the Company and the Company's stock transfer agent, to the effect that the proposed Transfer (A) would not violate any U.S. federal securities laws or any state or foreign or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the Shares to be Transferred, (B) would not cause the Company to be required to register in any capacity pursuant to any U.S. federal securities laws or any state or foreign or provincial securities or "blue sky" laws, including as a result of the failure to comply with the safe harbor limitation described in Section 2(b)(v) below, (C) would not impose liability or reporting obligations on the Company or any Stockholder thereof or make any of them subject to the jurisdiction of any court or governmental entity anywhere other than the states, courts and governmental entities in which the Company is then subject to such liability, reporting obligations or jurisdiction and (D) complies with the conditions contained in this Section 2, whereupon the transferring Stockholder will be entitled to Transfer such Shares in accordance with the terms of the notice given by such Stockholder and in accordance with the terms and conditions of this Agreement and the Company Constitutional Documents.

(v)     Notwithstanding any provision to the contrary in this Agreement, no Transfer of any Shares shall be permitted or recognized by the Company if and to the extent that such Transfer would cause the Company to exceed the safe harbor limitations set forth in 17 CFR Section 240.12g-1(b)(1).

(vi)     The transferor and transferee of any Shares in the Company shall be jointly and severally obligated to reimburse the Company for all reasonable and documented out-of-pocket fees and expenses paid to outside counsel by the Company for any Transfer or proposed Transfer, whether or not consummated.

(vii)     Any transferee receiving Shares in a Transfer pursuant to Section 4 or Section 5 hereof shall become a Stockholder, party to this Agreement and subject to the terms and conditions of, and be bound by and entitled to enforce, this Agreement to the same extent, and in the same capacity, as the Person that Transfers such Shares to such transferee; provided, that only a Permitted Transferee of an Investor Stockholder will be deemed to be an Investor Stockholder for purposes of this Agreement; and provided, further, that no Transfer by any holder of Shares to a Permitted Transferee shall relieve such holder of any of its obligations under this Agreement.  For the avoidance of doubt, any transferee receiving Shares in a Transfer that is not an Investor Stockholder or a Permitted Transferee of an Investor Stockholder will become a party to this Agreement without the benefit of any rights hereunder accruing to Stockholders solely in their capacity as Investor Stockholders.  Prior to the Transfer of any Shares to any transferee and as a condition thereto, each Stockholder effecting such Transfer shall (x) cause such transferee to deliver to the Company its written agreement, in form and substance reasonably satisfactory to the Company, to be bound by the terms and conditions of this Agreement, if not already bound by this Agreement, and (y) if such Transfer is to a Permitted Transferee, remain directly liable for the performance by such Permitted Transferee of all obligations of such transferee under this Agreement.

(viii)     Any attempted Transfer of Shares not in accordance with the terms of this Section 2 shall be null and void, and the Company shall not in any way give effect to any such Transfer.

Section 3.        **Drag-Along Rights**

(a)        <u>Drag-Along Right</u>.  At any time, the Board, subject to <u>Section 1(g)(i)</u>, may require each Stockholder (each, a "<u>Required Seller</u>") to participate (including by transferring its Shares) in a Company Sale to an unaffiliated third party (a "<u>Drag-Along Transferee</u>") in a *bona fide* arm's length transaction or series of related transactions (including pursuant to a stock sale, asset sale, recapitalization, tender offer, merger or other business combination transaction or otherwise) (such transaction or series of related transactions, a "<u>Drag Sale</u>") at the purchase price and upon the terms set forth in the Drag-Along Notice (as defined below).  In connection with a Drag Sale, each Required Seller shall (i) vote in favor of, and raise no objections against, such Drag Sale or act by written consent approving the same and vote in opposition of any and all other proposals that could reasonably be expected to delay or impair the consummation of such Drag Sale with respect to all Shares owned by such Required Seller, and (ii) subject to <u>Section 3(c)</u>, execute any purchase agreement, merger agreement or other agreement entered into with the purchaser with respect to such Drag Sale and any ancillary agreement with respect thereto, as necessary or reasonably required to approve and consummate the Drag Sale.  Without limiting the foregoing, if a Drag Sale requires the approval of the Stockholders, each Stockholder shall waive any applicable dissenters' rights, appraisal rights or similar rights in connection with such Drag Sale.  The consummation of a Drag Sale shall be subject to Board approval (subject to <u>Section 1(g)(i)</u>), which shall have no liability or obligation whatsoever (other than compliance with this <u>Section 3</u>) to any Required Sellers participating therein in connection with such Required Sellers' Transfer of Shares.

(b)        <u>Notice</u>.  No later than two Business Days after being instructed to do so by the Board, the Company shall provide written notice (the "<u>Drag-Along Notice</u>") of a Drag Sale to each Required Seller.  In the event that the terms and/or conditions set forth in the Drag-Along Notice are thereafter amended in any material respect, the Company shall give written notice (an "<u>Amended Drag-Along Notice</u>") of the amended terms and conditions of the proposed Transfer to each Required Seller.  Each Drag-Along Notice and Amended Drag-Along Notice shall set forth: (i) the name of the Drag-Along Transferee and the number of Shares proposed to be purchased by such Drag-Along Transferee; (ii) the proposed amount and type of consideration and the material terms and conditions of payment offered by the Drag-Along Transferee; (iii) a summary of any other material terms of the Drag Sale, including any indemnification obligations or post-closing liabilities of each Required Seller; and (iv) a copy of the primary agreements effecting such Drag Sale.  Upon the delivery of a Drag-Along Notice, no further Transfers of Shares by any Stockholder shall be permitted (including any Transfer to a Permitted Transferee) until such Drag-Along Notice is withdrawn or the Drag Sale is consummated.  The Company shall provide prompt written notice to each Required Seller of the withdrawal of such Drag-Along Notice upon the termination or other abandonment of such Drag Sale.

(c)        <u>Exercise</u>.  All Transfers of Shares to the Drag-Along Transferee pursuant to this <u>Section 3</u> shall be consummated simultaneously, unless the Board and the Drag-Along Transferee elect otherwise, on the date specified in the definitive purchase agreement pursuant to which the Drag Sale is to be consummated.  In the event that the applicable Drag Sale is not consummated within three months (as may be extended, solely to the extent reasonably necessary to obtain any Governmental Approvals, for a reasonable period of time), then the Required Sellers shall not be obligated to Transfer any Shares in connection with the Drag Sale contemplated by such applicable Drag-Along Notice.  At the closing of the Drag Sale, the Required Sellers shall deliver any stock certificates duly endorsed for transfer or with duly executed stock powers or similar instruments, or such other instrument of transfer of such Shares as may be reasonably requested by the Drag-Along Transferee and the Company.  Each Required Seller shall be entitled to receive the same form and amount (on a per-Share basis) of consideration (the "<u>Drag Share Consideration</u>"); provided, however, that (A) in the event the Drag Share Consideration includes equity or equity-linked securities, and the receipt thereof by any Required Seller would be restricted or otherwise prohibited pursuant to such Required Seller's organizational documents (as in existence at the time of

receipt of the Drag-Along Notice and as of immediately prior to the Drag Sale), the Board shall use its commercially reasonable efforts to provide such Required Seller with the opportunity to elect (in lieu thereof) either (1) to be paid an amount in cash equal to the fair market value (as determined in good faith by the Board) of such equity or equity-linked portion of the Drag Share Consideration that such Required Seller would otherwise receive in connection with the consummation of the Drag Sale (to the extent such cash is then available for such use, in the good faith discretion of the Board) or (2) to dispose of such equity or equity-linked securities to one or more third parties concurrently with the consummation of such Drag Sale; and (B) in lieu of any Drag Share Consideration payable to the other Required Sellers, any Required Seller that is a Management Stockholder may receive Drag Share Consideration in the form of rollover equity interests in the Drag-Along Transferee (or an Affiliate thereof) with a fair market value (as determined by the Board in good faith) equal to such portion of the Drag Share Consideration payable to the other Required Sellers.  To the extent that the Stockholders provide any indemnification or otherwise assume any other post-closing liabilities in connection with the Drag Sale, the Required Sellers shall have no greater proportional requirement in respect thereof than any other Required Seller, and each Required Seller shall do so (and shall share in any related escrow or holdback) severally and not jointly (and on a *pro rata* basis in accordance with the Shares being sold by each as compared to the total number of Shares being sold) and their respective potential liability thereunder shall not exceed the proceeds received as consideration for their respective Shares, except in the event of fraud perpetrated by such Required Seller.  Any indemnification or other post-closing liabilities related to the representations and warranties of a Required Seller shall (subject to the preceding sentence) be specific to the Required Seller making such representations and warranties.  Each Required Seller shall only be required to give representations and warranties in connection with a Drag Sale regarding title to Shares conveyed (free and clear of all liens and encumbrances), due authorization, legal authority and capacity to transfer its Shares and absence of conflicts arising under, or consents required under, other agreements to which such Required Seller is a party.  Each Required Seller shall be required to enter into any instrument, undertaking or obligation necessary or reasonably requested by the Board and to deliver all documents necessary or reasonably requested by the Board in connection with such Transfer in connection with this <u>Section 3</u>; <u>provided</u>, <u>however</u>, that, in connection with a Drag Sale, no Required Seller shall be required to become subject to any restrictive covenant other than customary confidentiality obligations applicable to each Required Seller and any restrictive covenant by which such Required Seller was bound immediately prior to the consummation of such Drag Sale.  Each Required Seller shall be required to transfer its Shares pursuant to a Drag Sale free and clear of all liens and encumbrances.

(d)      <u>Drag Sale Expenses</u>.  Each Required Seller shall bear its *pro rata* portion of the third-party costs and expenses incurred in by the Company connection with any Drag Sale or other transaction (pursuant to this Agreement or otherwise) in which it sells its Shares to the extent not otherwise paid by the Company for the benefit of all holders.

**Section 4.      Right of First Offer**

(a)      <u>Right of First Offer</u>.  If any Stockholder that (together with its Affiliates) holds at least two and one-half percent of the Total Common Shares as of the applicable date (a "<u>Participating Stockholder</u>") desires to Transfer any Shares to any Person (other than to a Permitted Transferee or pursuant to the provisions of <u>Section 3</u>), then such Participating Stockholder must first notify in writing the Investor Stockholders of such proposed sale (the "<u>ROFO Proposal Notice</u>"), offering each Investor Stockholder the right to purchase its respective *pro rata* portion (based on the number of Shares held by such Investor Stockholder as compared to the total number of Shares held by all Investor Stockholders) of all such Shares for the proposed purchase price for such Shares and on the other material terms specified in such written notice (the "<u>Proposal</u>").

(b)     Exercise.  Prior to the expiration of the period 10 Business Days after receipt of the ROFO Proposal Notice (the "Offer Period"), each Investor Stockholder may accept the Proposal by delivering written notice of such acceptance to the Participating Stockholder, including the number of Shares such Investor Stockholder wishes to purchase from the Participating Stockholder (an "Acceptance Notice").  The Participating Stockholder shall provide prompt written notice to each Investor Stockholder of the number of Shares each Investor Stockholder has elected to purchase pursuant to this Section 4(b).  If any Investor Stockholder does not fully subscribe for the number of Shares it is entitled to purchase pursuant to this Section 4(b), then each Investor Stockholder that fully subscribed for the number of Shares that it was entitled to purchase pursuant to this Section 4(b) shall have the right, for a period of five Business Days after receipt of such notice (the "Secondary Offer Period"), to purchase that percentage of the remaining Shares offered under the ROFO Proposal Notice equal to (i) the total number of Shares owned by such fully participating Investor Stockholder divided by (ii) the total number of Shares owned by all fully participating Investor Stockholders that elected to purchase Shares under this Section 4(b).

(c)     Closing.  The closing of the purchase of Shares under this Section 4 shall be on the later of (i) a date that is no later than 10 Business Days after the end of the Secondary Offer Period or (ii) as soon as reasonably practicable following receipt of all Governmental Approvals and any approval of the Stockholders as may be required by applicable law.  At such closing, (i) each Participating Stockholder shall only be required to give representations and warranties in connection with any Transfer made pursuant to and in accordance with this Section 4 regarding title to Shares conveyed (free and clear of all liens and encumbrances), due authorization, legal authority and capacity and absence of conflicts arising under, or consents required under, other agreements to which such Participating Stockholder is a party, and (ii) the Participating Stockholder shall deliver to the applicable Investor Stockholders any stock certificates duly endorsed for transfer or with duly executed stock powers or similar instruments, or such other instruments of transfer to such Shares as may be reasonably requested by such Investor Stockholders.

(d)     Assignment.  Subject to Section 2(b)(ii), each Investor Stockholder shall be permitted to assign its rights (in whole or in part) to purchase its *pro rata* portion of the Shares in the ROFO Proposal Notice to one or more of its Permitted Transferees.

(e)     Deadline for Completion of Sale.  The Participating Stockholder shall have 60 days following the expiration of the Offer Period (or, if applicable, the Secondary Offer Period) in which to sell to any Person (subject to the other terms and conditions of this Agreement) the Shares described in the ROFO Proposal Notice, on terms no less favorable to the Participating Stockholder (*i.e.*, a lower price per Share) than those set forth in the ROFO Proposal Notice (which such 60-day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain any Governmental Approvals and any approval of the Stockholders as may be required by applicable law).  If at the end of such period the Participating Stockholder has not completed such sale, the Participating Stockholder may not then effect a sale of such Shares subject to this Section 4 without again fully complying with the provisions of this Section 4.

**Section 5.     Tag Rights**

(a)     Notice.  In the event that any Investor Stockholder (together with its Affiliates) intends to Transfer more than five percent of the Total Common Shares to a third party (other than a Permitted Transferee and excluding any Transfer in connection with a Drag Sale) (any such Transfer, a "Tag Sale"), such Investor Stockholder and its Affiliates (collectively, the "Transferring Tag Stockholder"), shall instruct the Company to provide written notice (a "Tag Notice") to each other Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares (each, a "Tagging Investor Stockholder"), which Tag Notice must be delivered to each such other Investor Stockholder at least 10 Business Days prior to the consummation of the Tag Sale.  The Tag Notice shall contain the terms

on which the Transferring Tag Stockholder proposes to Transfer Shares, including (i) the price per Share, (ii) any indemnification to be provided by the Transferring Tag Stockholder, (iii) the form of consideration to be received in respect of the Shares, (iv) the number of Shares held by the Transferring Tag Stockholder that such Transferring Tag Stockholder desires to Transfer (the "Tag Goal"), (v) the total number of Shares then held by the Transferring Tag Stockholder and (vi) any other material terms related to the Transfer.

(b)     Tag Right.  Each Tagging Investor Stockholder shall have the right (the "Tag Right"), exercisable upon written notice to the Transferring Tag Stockholder of such Tagging Investor Stockholder's election to exercise its Tag Right, which notice shall be delivered to the Transferring Tag Stockholder within 10 Business Days of the receipt of the Tag Notice (such period, the "Tag Election Period"), to sell a number of such Tagging Investor Stockholder's Shares (such Shares, the "Tag Shares") up to its Tag Share Limit pursuant to the Tag Sale, which such number of Shares must be included in such Tagging Investor Stockholder's written notice to the Transferring Tag Stockholder.  Any Tagging Investor Stockholder that fails to exercise its Tag Right during the Tag Election Period thereby foregoes its Tag Right in respect of that Tag Notice.  Each Tagging Investor Stockholder who properly exercises its Tag Right during the Tag Election Period (each, a "Tag Seller") shall be required to participate in the Tag Sale to the extent it is consummated on the terms set forth in the Tag Notice, and shall not be permitted to revoke its Tag Right election unless the Transferring Tag Stockholder has withdrawn from the Tag Sale pursuant to Section 5(c).  Notwithstanding anything to the contrary contained herein, in the event that an Investor Stockholder has elected to purchase Shares in connection with a particular Transfer under Section 4, such Investor Stockholder may not elect to exercise the Tag Right in connection with such Transfer under this Section 5.

(c)     Transferring Tag Stockholder Cutback.  To the extent the transferee (the "Tag Buyer") of the Shares pursuant to the Tag Sale is unwilling to purchase both the Tag Goal and all of the Tag Shares of the Tag Sellers, then the Transferring Tag Stockholder may elect to either cancel such Tag Sale or allocate the maximum number of Shares that the Tag Buyer is willing to purchase *pro rata* among the Tag Sellers and the Transferring Tag Stockholder as follows: each Tag Seller and the Transferring Tag Stockholder shall be entitled to sell a number of Shares (not to exceed, for any Tag Seller, the number of Shares identified in its tag election notice) equal to the product of (i) the maximum number of Shares that the Tag Buyer is willing to purchase and (ii) a fraction (A) the numerator of which is the number of Shares owned by such Tag Seller or Transferring Tag Stockholder, and (B) the denominator of which is the total number of Shares owned by all Tag Sellers and the Transferring Tag Stockholder.  The Transferring Tag Stockholder shall use its reasonable best efforts to obtain the agreement of the Tag Buyer to the participation of the Tag Sellers in any contemplated Tag Sale and no Transferring Tag Stockholder shall Transfer any Shares to any Tag Buyer pursuant to a Tag Sale if such Tag Buyer declines to allow the participation of the Tag Sellers on the terms provided herein, unless in connection with such Tag Sale, one or more of the Transferring Tag Stockholders purchase the number of Shares from each Tag Seller that such Tag Seller would have been entitled to sell pursuant to this Section 5 at the same price and on the same terms and conditions on which such Shares would have been sold to the Tag Buyer pursuant to this Section 5.

(d)     Closing.  The closing of the Tag Sale shall be held on the later of (i) a Business Day not less than 10 nor more than 60 days after the latest of (A) the end of the Tag Election Period, (B) the end of the Offer Period under Section 4 applicable to the Transfer of the applicable Shares and (C) the end of any Secondary Offer Period under Section 4 applicable to the Transfer of the applicable Shares or (ii) as soon as reasonably practicable following receipt of all Governmental Approvals and any approval of the Stockholders as may be required by applicable law.  At the closing of the Tag Sale, the Transferring Tag Stockholder and the Tag Sellers shall deliver any stock certificates duly endorsed for transfer or with duly executed stock powers or similar instruments, or such other instruments of transfer to such Shares as may be reasonably requested by the Tag Buyer and the Company.  The consummation of such proposed Transfer shall be subject to the sole discretion of the Transferring Tag Stockholder, who shall have no liability or obligation whatsoever (other than compliance with this Section 5) to any Tagging Investor Stockholder.

11

On a per-Share basis, each Tag Seller shall receive the same amount and form of consideration, and on the same terms, as received by the Transferring Tag Stockholder.  To the extent that the Transferring Tag Stockholder and the Tag Sellers provide any indemnification or otherwise assume any other post-closing liabilities in connection with the Tag Sale, the Transferring Tag Stockholder and the Tag Sellers shall do so (and shall share in any related escrow or holdback) severally and not jointly (and on a *pro rata* basis in accordance with the Shares being sold by each as compared to the total number of Shares being sold) and their respective potential liability thereunder shall not exceed the proceeds received as consideration for their respective Shares, except in the event of fraud perpetrated by such Transferring Tag Stockholder or Tag Seller.  Any indemnification or other post-closing liabilities related to such representations and warranties shall (subject to the preceding sentence) be specific to the Tag Seller making such representations and warranties.  Each Tag Seller shall only be required to give representations and warranties in connection with a Tag Sale regarding title to Shares conveyed (free and clear of all liens and encumbrances), due authorization, legal authority and capacity and absence of conflicts arising under, or consents required under, other agreements to which such Tag Seller is a party.  The Transferring Tag Stockholder and each Tag Seller shall be required to enter into any instrument, undertaking or obligation necessary or reasonably requested and deliver all documents necessary or reasonably requested in connection with such Tag Sale; provided, however, that, in connection with a Tag Sale, no Tag Seller shall be required to become subject to any restrictive covenant other than customary confidentiality obligations and any restrictive covenant by which such Tag Seller was bound immediately prior to the consummation of such Tag Sale.  The Transferring Tag Stockholder and each Tag Seller shall be required to Transfer their respective Shares pursuant to a Tag Sale free and clear of all liens and encumbrances.

(e)     Deadline for Completion of Tag Sale.  The Transferring Tag Stockholder shall have 60 days following the latest of (i) the end of the Tag Election Period, (ii) the end of the Offer Period under Section 4 applicable to the Transfer of the applicable Shares and (iii) the end of any Secondary Offer Period under Section 4 applicable to the Transfer of the applicable Shares in which to sell the Shares described in the Tag Notice, on terms not less favorable to the Transferring Tag Stockholder (*i.e.*, a lower price per Share) than those set forth in the Tag Notice (which such 60-day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain any Governmental Approvals and any approval of the Stockholders as may be required by applicable law).  If at the end of such period the Transferring Tag Stockholder has not completed such sale, the Transferring Tag Stockholder may not then effect a sale of such Shares subject to this Section 5 without again fully complying with the provisions of this Section 5.

**Section 6.      Preemptive Rights**

(a)     General.  If at any time the Company proposes to issue any New Equity Securities (other than to the Company or a Subsidiary thereof), the Company shall give each Stockholder (other than any Management Stockholder) (each, an "Enabled Stockholder") a right (a "Preemptive Right") to purchase or subscribe for its *pro rata* portion of such New Equity Securities based on the number of Shares held by such Enabled Stockholder prior to such issuance as compared to the total outstanding Shares of the Company at such time (the "Preemptive Percentage").

(b)     Participation Notice.  At least 10 Business Days prior to the proposed date of issuance of New Equity Securities to which a Preemptive Right would apply, the Company shall deliver written notice (a "Participation Notice") to each Enabled Stockholder stating (i) its intention to issue New Equity Securities and the date (or range of dates) of such issuance, (ii) the number and type of New Equity Securities to be issued, (iii) such Enabled Stockholder's Preemptive Percentage, and (iv) the price and terms, if any, upon which it proposes to issue such New Equity Securities.

(c)      Accredited Investors.  The Preemptive Rights granted by this Section 6 shall be exercisable only by "accredited investors" as defined under Section 501 of Regulation D of the Securities Act.  In the event that exercise of an Enabled Stockholder's Preemptive Right under this Section 6 would require under applicable law the registration or qualification of such New Equity Securities or of any Person as a broker or dealer or agent with respect to such New Equity Securities where such registration or qualification is not otherwise required for the issuance, such Enabled Stockholder shall not have the right to participate in the issuance.  Without limiting the generality of the foregoing, it is understood and agreed that the Company has no obligation to effect a registration of such New Equity Securities under the Securities Act or similar state statutes.

(d)      Offer Periods; Terms of Sale.  At any time prior to the close of business on the 10th Business Day after its receipt of the Participation Notice, each Enabled Stockholder may elect to purchase or obtain, at the price and on the terms specified in the Participation Notice, up to such Enabled Stockholder's Preemptive Percentage.  The purchase or subscription by the Enabled Stockholders pursuant to this Section 6 shall be on the same price and other terms and conditions, including the date of sale or issuance, as are applicable to the purchasers or subscribers of the additional New Equity Securities whose purchases or subscriptions give rise to the Preemptive Rights (the "Purchasing Holders").

(e)      Failure to Issue Shares.  If the Company does not issue New Equity Securities on the date (or during the range of dates) proposed in the Participation Notice, then no Stockholder shall have a right to subscribe for New Equity Securities pursuant to a Preemptive Right.  The Company shall be required to issue a new Participation Notice in accordance with this Section 6 prior to issuing any New Equity Securities to which a Preemptive Right applies.

(f)      Closing.  On or before the date the Company issues the New Equity Securities to which the Preemptive Right applies, any Enabled Stockholder who exercised that right must pay for the New Equity Securities by wire transfer of immediately available funds.  If an Enabled Stockholder fails to transfer the funds on the closing date, which failure to transfer is not cured by a wire transfer of immediately available funds no later than 5:00 P.M., prevailing Eastern Time, on the following Business Day, then such Enabled Stockholder shall not be issued any New Equity Securities and shall thereafter have no Preemptive Right for such issuance.

(g)      Exceptions.

The Preemptive Rights shall not apply to:

(i)      the issuance or sale of Shares to employees (and their affiliated entities), consultants or Directors of the Company or any of its Subsidiaries pursuant to a stock option plan, restricted stock plan, stock purchase plan or any other equity incentive plan, arrangement or agreement, in each case, approved by the Board or the appropriate committee of the Board;

(ii)      the issuance of Stock upon the exercise or conversion of any Convertible Securities or exercisable Shares outstanding on the date hereof or issued after the date hereof in compliance with the provisions of this Section 6;

(iii)      the issuance of Shares as consideration for (A) any business combination or acquisition transaction involving the Company or any of its Subsidiaries or (B) any joint venture or strategic partnership entered into primarily for purposes other than raising capital, in each case, approved by the Board;

(iv)      the issuance of Shares in exchange for debt securities;

13

(v) the issuance of Shares, not in excess of five percent of the total number of issued and outstanding Shares, to lenders, bond purchasers or other financial institutions in connection with a *bona fide* financing transaction involving the Company or any of its Subsidiaries that has been approved by the Board;

(vi) the issuance of Shares pursuant to a stock split, stock dividend, combination, reorganization, recapitalization or similar event, in each case, approved by the Board; or

(vii) the issuance of Shares pursuant to an Initial Public Offering.

(h) <u>Post-Issuance Notice</u>. Notwithstanding the requirements of this <u>Section 6</u>, the Company may proceed with any issuance of New Equity Securities prior to having complied with the provisions of <u>Section 6</u>; <u>provided</u>, that the Company shall:

(i) as soon as reasonably practicable, offer in writing to each Enabled Stockholder the right to purchase from the Purchasing Holders up to such number of New Equity Securities equal to such Enabled Stockholder's Preemptive Percentage that such Enabled Stockholder would have been entitled to pursuant to <u>Section 6(d)</u> multiplied by the aggregate number of New Equity Securities issued pursuant to this <u>Section 6</u> with respect to such issuance; and

(ii) keep such offer open for a period of 20 days, during which period, each such Enabled Stockholder may accept such offer by sending a written acceptance to the Company committing to purchase up to such number of New Equity Securities offered to such Enabled Stockholder in the written offer delivered pursuant to <u>Section 6(h)(i)</u>.

(i) <u>Assignment</u>. Subject to <u>Section 2(b)(ii)</u>, each Enabled Stockholder shall be permitted to assign its rights (in whole or in part) to purchase its Preemptive Percentage of the New Equity Securities in a Participation Notice to one or more of its Permitted Transferees.

**Section 7.     Registration Rights**

In connection with an Initial Public Offering, the Company shall enter into a customary registration rights agreement with the Investor Stockholders with respect to the registration of the Company's securities in form and substance reasonably satisfactory to the Investor Stockholders.

**Section 8.     Legend on Certificates**

(a) <u>Legends</u>. To the extent applicable, each certificate representing one or more Shares held by any Stockholder shall bear each of the following legends until such time as the Shares represented thereby are no longer subject to the provisions hereof:

(i) "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii) "THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE

DISPOSED OF OR EXCHANGED UNLESS SUCH TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OR EXCHANGE COMPLIES WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, DATED AS OF FEBRUARY 24, 2021, AS AMENDED FROM TIME TO TIME, AMONG THE COMPANY AND THE STOCKHOLDERS PARTY THERETO, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

(iii)     Any legend required by the Blue Sky laws of any state to the extent such laws are applicable to the Shares represented by the certificate so legended.

(b)     Removal of Legends.  At any time after the certificates of the Company are, in accordance with Section 8(a), no longer required to be legended, any holder of a certificate legended pursuant to Section 8(a) may surrender such certificate to the Company for removal of the legend, and the Company will, without expense to such holder, duly reissue a new certificate without the legend.

(c)     Book-Entry Shares.  The Stockholders acknowledge and agree that, unless otherwise determined by the Board, the Company intends for all of the Shares to be uncertificated and held in book-entry form.  To the extent that the Shares are held in book-entry form, notwithstanding anything to the contrary contained herein:  (i) all references in this Agreement to certificates representing Shares hereunder shall instead refer to such book-entries, (ii) any requirement in this Agreement to deliver a certificate representing Shares hereunder shall instead refer to an instrument of transfer evidencing the transfer of such book-entry Shares, (iii) any legend required pursuant to this Agreement to be borne on a certificate representing Shares hereunder shall instead refer to a notation of such legend in the book entries for such Shares, and (iv) any removal of legends on certificates representing Shares hereunder shall instead refer to the removal of the applicable notation in the book entries for such Shares.

**Section 9.     Duration of Agreement**

This Agreement shall terminate and be of no further force or effect, except with respect to the provisions set forth in Sections 10(b) and 11, upon the earlier to occur of (i) a Company Sale and (ii) an Initial Public Offering.  For the avoidance of doubt, in no event shall this Agreement apply to any transferee of Shares permitted pursuant to this Agreement unless such transferee becomes a Party to this Agreement or this Agreement expressly provides that such transferee must become a Party to, and be bound by, the terms of this Agreement.

**Section 10.     Information Rights**

(a)     Financial Statements and Other Information.  Each Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares (other than any Management Stockholder) shall have the inspection rights set forth in Section 220 of the General Corporation Law of the State of Delaware and, in addition thereto, the Company shall deliver to each of the aforementioned Stockholders:

(i)     the audited financial statements described in Section 6.01(1) of the Amended First Lien Credit Agreement, to be delivered in accordance with the required delivery dates and each of the other substantive requirements set forth in Section 6.01(1) of the Amended First Lien Credit Agreement;

(ii)     the quarterly financial statements set forth in Section 6.01(2) of the Amended First Lien Credit Agreement, to be delivered in accordance with the required delivery dates and each of

the other substantive requirements set forth in Section 6.01(2) of the Amended First Lien Credit Agreement;

(iii)    as soon as reasonably practicable after it becomes available but no later than 30 days after the end of each fiscal month, a monthly financial report of the Company and its Subsidiaries in the same form and substance as the Company's standard internal monthly reporting package provided to senior management;

(iv)    the budget and projections set forth in Section 6.01(3) of the Amended First Lien Credit Agreement, to be delivered in accordance with the required delivery dates and each of the other substantive requirements set forth in Section 6.01(3) of the Amended First Lien Credit Agreement; and

(v)    upon request by such Stockholder, any additional information regarding the affairs, finances and accounts of the Company and its Subsidiaries that is reasonably required by such Stockholder in order to prepare and file tax returns in accordance with applicable laws.

(b)    <u>Confidential Information</u>.  From and after the date hereof, each Stockholder shall not directly or indirectly, disclose, reveal, divulge or communicate to any Person or use or otherwise exploit for its own benefit or for the benefit of anyone other than the Company and its Subsidiaries, any confidential information of the Company or its Subsidiaries or their business obtained pursuant to this <u>Section 10</u> or otherwise, unless (i) compelled to disclose by judicial or administrative process or by other requirements of law or governmental authorities or (ii) disclosed in an action brought by a Party in pursuit of its rights or in the exercise of its remedies hereunder; <u>provided</u>, <u>however</u>, that (A) such Stockholder may disclose such confidential information to its Affiliates and its and their respective officers, directors, agents, employees, equity owners, investors, accountants, limited partners, counsel and other representatives who need to know such confidential information for purposes of evaluating or monitoring such Stockholder's investment in the Company and who agree to be bound by the terms of this <u>Section 10(b)</u> or otherwise have a professional duty of confidentiality with respect to information received from such Stockholder, it being acknowledged and agreed by each Stockholder that such Stockholder shall be liable for any breach of this <u>Section 10</u> by any of its representatives; (B) such Stockholder may disclose such confidential information to any prospective transferee of Shares from such Stockholder in a Transfer permitted under this Agreement, as long as such prospective transferee agrees to be bound by the terms of a confidentiality or non-disclosure agreement on terms no less restrictive than this <u>Section 10(b)</u> and (C) in the event disclosure is required by applicable law, such Stockholder shall, to the extent reasonably possible, provide the Company with prompt notice of such requirement prior to making any disclosure so that the Company, at its own expense, may seek an appropriate protective order.  For purposes of this <u>Section 10(b)</u>, "confidential information" does not include, and there shall be no obligation hereunder with respect to, information that (1) is generally available to the public on the date of this Agreement or (2) becomes generally available to the public other than as a result of a disclosure not otherwise permissible hereunder.

**Section 11.    Miscellaneous**

(a)    <u>Successors, Assigns and Transferees</u>.  Except (i) as expressly provided in <u>Section 4(d)</u> and <u>Section 6(i)</u>, and (ii) for the rights, interests and obligations expressly contained herein of a Stockholder that has been transferred Shares in a Transfer made in accordance with <u>Section 2</u>, <u>Section 3</u>, <u>Section 4</u> and/or <u>Section 5</u>, neither this Agreement nor any of the rights, interests or obligations hereunder (including, for the avoidance of doubt, the rights under <u>Section 1(a)(ii)</u> and <u>Section 1(g)</u>) shall be assigned by any Party, in whole or in part, without the prior written consent of each Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares, and any attempt to make such assignment without such written consent shall be null and void.  This Agreement shall be binding upon and inure to the

16

benefit of the Parties and their respective legal representatives, heirs, legatees, successors, and permitted assigns and shall also apply to any Shares acquired by Stockholders after the date hereof.

(b)     <u>Specific Performance</u>.  Each of the Parties recognizes and acknowledges that a breach by him, her or it of any covenants or agreements contained in this Agreement will cause the other Parties to sustain irreparable harm for which they would not have an adequate remedy at law, and therefore in the event of any such breach the aggrieved Party or Parties shall, without the posting of a bond or other security (any requirement for which the Parties hereby waive), be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief, in addition to any other remedy to which he, it or they may be entitled, at law or in equity (which such other remedies shall not be prejudiced by the grant of equitable relief).  A Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement.  In the event that any action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at law.

(c)     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws, and not the law of conflicts which would result in the application of the laws of another jurisdiction, of the State of Delaware.

(d)     <u>Submission to Jurisdiction; Waiver of Jury Trial</u>.  Each of the Parties hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Chancery Court of the State of Delaware or, to the extent such court shall not have jurisdiction over the subject matter, any state or federal court sitting in New Castle County, Delaware, for any action, proceeding or investigation in any court or before any governmental authority ("<u>Litigation</u>") arising out of or relating to this Agreement (and shall not commence any Litigation relating thereto except in such court).  Service of any process, summons, notice or document by U.S. registered mail to a Party's notice address, as provided for in this Agreement, shall be effective service of process for any Litigation brought against it in any such court.  Each of the Parties hereby irrevocably and unconditionally waives any objection to the laying of venue of any Litigation arising out of this Agreement or the transactions contemplated hereby in the Chancery Court of the State of Delaware or, to the extent such court shall not have jurisdiction over the subject matter, in any state or federal court sitting in New Castle County, Delaware, and hereby further irrevocably and unconditionally waives and shall not plead or claim in any such court that any such Litigation brought in any such court has been brought in an inconvenient forum.  **Each of the Parties irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any and all rights to trial by jury in connection with any Litigation arising out of or relating to this Agreement or the transactions contemplated hereby.**

(e)     <u>Descriptive Headings</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(f)     <u>Notices</u>.  All notices, requests or consents provided for or permitted to be given under this Agreement shall be in writing and shall be given either by depositing such writing in the United States mail, addressed to the recipient, postage paid and certified with return receipt requested, or by depositing such writing with a reputable overnight courier for next day delivery, or by delivering such writing to the recipient in person, by courier or by email transmission (with electronic confirmation of transmission).  A notice, request or consent given under this Agreement shall be deemed received when actually received if personally delivered, when transmitted, if transmitted by email with electronic confirmation, the day after it is sent, if sent for next day delivery and upon receipt, if sent by mail.  All such notices, requests and consents shall be delivered as follows:

(i)     if to the Company, addressed to it at:

Fashion Holdings Intermediate, Inc.
c/o Belk, Inc.
2801 West Tyvola Road
Charlotte, North Carolina 28217
Attn:    Chief Executive Officer
Email:  lisa_harper@belk.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

Attn:    Joshua A. Sussberg, P.C.
         Steven N. Serajeddini, P.C.
         Judson A. Oswald, P.C.
         Matthew Fagen
         Yuli Wang
         Rachael Bazinski
Email:  jsussberg@kirkland.com
        steven.serajeddini@kirkland.com
        judson.oswald@kirkland.com
        matthew.fagen@kirkland.com
        yuli.wang@kirkland.com
        rachael.bazinski@kirkland.com

(ii)     if to the Sponsor Investor, addressed as follows:

Fashion Holdings LLC
c/o Sycamore Partners Management, L.P.
9 West 57th Street, 31st Floor
New York, New York 10019
Attn:    Ralph Schipani
Email:  rschipani@sycamoreexecutiveadvisors.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
885 3rd Avenue
New York, New York 10022
Attn:    Michael W. Benjamin
         Jason H. Silvera
         David A. Zaheer
Email:  michael.benjamin@lw.com
        jason.silvera@lw.com
        david.zaheer@lw.com

(iii)    if to any other Stockholder, addressed in accordance with <u>Schedule A</u>.

(g)     <u>Recapitalization, Exchange, Etc</u>.  The provisions of this Agreement shall apply, to the full extent set forth herein, with respect to any and all Shares of the Company or any successor or assign of the

Company (whether by merger, consolidation, sale of assets, conversion to a corporation or otherwise) that may be issued in respect of, in exchange for, or in substitution of, the Shares and shall be appropriately adjusted for any dividends, splits, reverse splits, combinations, recapitalizations, and the like occurring after the date hereof.

(h)     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to constitute one and the same agreement.

(i)     Severability.  If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be declared by any court of competent jurisdiction to be invalid, illegal, void or unenforceable in any respect, all other provisions of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it has been held invalid, illegal, void or unenforceable, shall nevertheless remain in full force and effect and will in no way be affected, impaired or invalidated thereby.   Upon such determination that any provision, or the application of any such provision, is invalid, illegal, void or unenforceable, the Parties shall act in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable law.

(j)     Amendment.   This Agreement may be amended, modified or extended, and the terms, conditions and provisions hereof may be waived, only by a written agreement approved by each Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares; provided, however, that (i) any such amendment, modification, extension or waiver that disproportionately and materially adversely affects the rights or obligations of any Stockholder under this Agreement as compared to any other Stockholder shall require the prior written consent of such affected Stockholder; (ii) any amendment, modification, extension or waiver with respect to any of the Investor Reserved Matters shall require the prior written consent of each Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares as of such time; (iii) without limiting the foregoing, any amendment, modification, extension or waiver of Section 1(g)(v) or Section 1(g)(xii) shall require the prior written consent of the holders of a majority of the Total Common Shares (excluding, solely for the purpose of this clause (iii), Shares held by any Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares); and (iv) any waiver of any Investor Stockholder's rights under Section 4, Section 5 or Section 6 shall require the prior written consent of such Investor Stockholder.  At any time hereafter, Persons acquiring Shares in compliance with the provisions of this Agreement may be made Parties hereto by executing a signature page in the form attached as Exhibit A hereto, which signature page shall be countersigned by the Company and shall be attached to this Agreement and become a part hereof without any further action of any other Party hereto.

(k)     Tax Withholding.  The Company shall be entitled to require payment in cash or deduction from other compensation payable to any Stockholder of any sums required by federal, state or local tax law to be withheld with respect to the issuance, vesting, exercise, repurchase or cancellation of any Shares.

(l)     Integration.  This Agreement constitutes the entire agreement among the Parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

(m)     Further Assurances.  In connection with this Agreement and the transactions contemplated thereby, each Stockholder shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

(n)     No Strict Construction.  This Agreement shall be deemed to be collectively prepared by the Parties, and no ambiguity herein shall be construed for or against any Party based upon the identity of the author of this Agreement or any provision hereof.

(o)     No Third Party Beneficiaries.  Neither this Agreement, nor any provision contained herein, shall create a third-party beneficiary relationship or otherwise confer any right, entitlement or benefit upon any Person other than the Parties to this Agreement and their permitted assigns (except for the rights of Board Observers to indemnification and director and officer insurance under Section 1(e)).

(p)     No Recourse.  Notwithstanding anything that may be expressed or implied in this Agreement, the Company and each Stockholder covenant, agree and acknowledge that no recourse under this Agreement or any document or instrument delivered in connection with this Agreement shall be had against any current or future director, officer, employee, agent, general or limited partner or member of any Stockholder or any Affiliate or assignee thereof, as such, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly acknowledged that no personal liability whatsoever shall attach to, be imposed upon or otherwise be incurred by any current or future director, officer, employee, agent, general or limited partner or member of any Stockholder or any Affiliate or assignee thereof, as such, for any obligation of any Stockholder under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

(q)     Construction.

(i)     Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; (v) the word "including" shall mean "including, without limitation", (vi) each defined term has its defined meaning throughout this Agreement, whether the definition of such term appears before or after such term is used, and (vii) the word "or" shall be disjunctive but not exclusive.

(ii)     References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto.

(iii)     References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(iv)     All references to "$" or "dollars" shall be to the lawful currency of the United States.

**Section 12.     Definitions**

(a)     As used in this Agreement, the following terms have the following meanings:

"Acceptance Notice" has the meaning set forth in Section 4(b).

"Affiliate" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the

20

management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Amended Credit Agreements" means the Amended First Lien Credit Agreement and the Amended Second Lien Credit Agreement.

"Amended Drag-Along Notice" has the meaning set forth in Section 3(b).

"Amended First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of December 10, 2015, as amended by Amendment No. 1 thereto dated as of October 29, 2019, as further amended by Amendment No. 2 thereto dated as of February 24, 2021, among Bear Parent Inc., Belk, Inc., Alter Domus (US) LLC, as administrative agent and collateral agent thereunder, and each lender from time to time a party thereto, as in effect as of the date of this Agreement.

"Amended Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of December 10, 2015, as amended by Amendment No. 1 thereto dated as of May 7, 2019, as further amended by Amended No. 2 thereto dated as of October 29, 2019, as further amended by Amendment No. 3 dated as of February 24, 2021, by and among Bear Parent, Inc., Belk, Inc., Wilmington Trust, N.A. administrative agent and collateral agent thereunder, and each lender from time to time a party thereto, as in effect as of the date of this Agreement.

"Blackstone Investor Designee" has the meaning set forth in Section 1(a)(ii)(B).

"Blackstone Investors" means GSO Beacon Holdings LP, GSO Diamond Portfolio Borrower, LLC and GSO Credit Alpha Fund LP, together with the Permitted Transferees of each of the foregoing that hold Shares.

"Board" has the meaning set forth in Section 1(a)(i).

"Board Committee" has the meaning set forth in Section 1(c).

"Board Observer" has the meaning set forth in Section 1(e).

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

"Chair" has the meaning set forth in Section 1(a)(vi).

"Change of Control" means, with regard to a Stockholder, (i) if having regard to the voting rights, rights to receive income or capital, rights to appoint directors and rights with respect to any other matter which relates to effective control of such Stockholder, any Person and any Affiliate of that Person who between them (directly or indirectly) control or beneficially own (as at the date when the relevant Stockholder is issued or acquires Shares) more than 50% of the ordinary securities or other voting, income or capital participation rights, rights to appoint directors and any other matter which relates to effective control of such Stockholder, pursuant to the consummation of any transaction or series of related transactions (whether such transaction is effected by merger, consolidation, recapitalization, sale or transfer of equity or otherwise) ceases or cease to (directly or indirectly) control or beneficially own more than 50% of such ordinary securities or other rights; (ii) if any transaction or series of related transactions is consummated pursuant to which any Person or group (other than any other Stockholder or any of their

respective Affiliates) acquires (directly or indirectly) all or substantially all of the assets of such Stockholder; or (iii) if any other transaction or arrangement is effected such that any Person and its associates (other than a Person and its associates who holds 50% or more of the voting power in the Stockholder before the transaction or arrangement is effected) (A) becomes the holder of voting power of 50% or more in such Stockholder or (B) if the Person and its associates converted all rights to acquire voting securities, assuming they were convertible at any time, would become the holder of voting power of 50% or more in such Stockholder.

"<u>Common Stock</u>" means shares of the Company's common stock, par value $0.001 per share.

"<u>Company</u>" has the meaning set forth in the preamble.

"<u>Company Bylaws</u>" means the bylaws of the Company as amended from time to time.

"<u>Company Charter</u>" means the certificate of incorporation of the Company as amended from time to time.

"<u>Company Constitutional Documents</u>" means the Company Charter and the Company Bylaws.

"<u>Company Sale</u>" means any one of the following:  (i) a change in the ownership or control of the Company effected through a transaction or series of related transactions (including by way of merger, consolidation, business combination or similar transaction involving the Company or any of its Subsidiaries) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company, any of its Subsidiaries, or the Sponsor Investor or any of its Affiliates) directly or indirectly acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act), of more than 50% of the Shares then outstanding, or of equity securities of the Company (or Options, rights or Warrants to purchase or securities convertible into or exchangeable for such equity securities) possessing more than 50% of the total combined voting power of the Shares outstanding, in either case immediately after such transaction or series of transactions; or (ii) the sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole, to any "person" (as defined above) (other than the Company, any of its Subsidiaries, or the Sponsor Investor or any of its Affiliates), other than, in the case of either of the immediately foregoing clauses (i) or (ii), any such transaction effected as part of a proceeding under Chapter 11 or Chapter 7 of the U.S. Bankruptcy Code.

"<u>Convertible Securities</u>" means any evidence of Indebtedness, shares of stock or other securities (other than Options or Warrants) which are directly or indirectly convertible into or exchangeable or exercisable for shares of Stock.

"<u>Designees</u>" means the Sponsor Investor Designees, the Blackstone Investor Designees or the KKR Investor Designee.

"<u>Director</u>" has the meaning set forth in <u>Section 1(a)(i)</u>.

"<u>Drag Sale</u>" has the meaning set forth in <u>Section 3(a)</u>.

"<u>Drag Share Consideration</u>" has the meaning set forth in <u>Section 3(c)</u>.

"<u>Drag-Along Notice</u>" has the meaning set forth in <u>Section 3(b)</u>.

"<u>Drag-Along Transferee</u>" has the meaning set forth in <u>Section 3(a)</u>.

"Enabled Stockholder" has the meaning set forth in Section 6(a).

"Equity Incentive Plans" means any management incentive equity plan adopted by the Board after the date of this Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations in effect thereunder.

"Family Group" means, for any Management Stockholder, such Management Stockholder's spouse, their respective parents, descendants of such parents (whether natural or adopted) and the spouses of such descendants.

"Governmental Approval" means, with respect to any Transfer of Shares, any consent or other action by, or filing with, any governmental authority required in connection with such Transfer and the expiration or early termination of any applicable statutory waiting period in connection with such action or filing.

"Indebtedness" of any Person means, without duplication, (i) the principal of and, accreted value, accrued and unpaid interest, prepayment premiums or penalties and fees and expenses in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations (contingent or otherwise) of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding, in each of the foregoing cases in this clause (ii), trade accounts payable incurred in the ordinary course of business); (iii) all capitalized lease obligations; (iv) all obligations of the type referred to in clauses (i) through (iii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Independent Director" means a Designee of an Investor Stockholder that is not employed by such Investor Stockholder or its Affiliates.

"Initial Public Offering" means the first underwritten public offering of Common Stock pursuant to an effective registration statement filed by the Company with the United States Securities and Exchange Commission (other than on Forms S-4 or S-8 or successors to such forms) under the Securities Act.

"Investor Reserved Matter" has the meaning set forth in Section 1(g).

"Investor Stockholders" means, collectively, the Sponsor Investor, the Blackstone Investors and the KKR Investors.

"KKR Investor Designee" has the meaning set forth in Section 1(a)(ii)(C).

"KKR Investors" means those Stockholders listed on the signature pages hereto under the caption "KKR Investors", together with the Permitted Transferees of such Stockholders that hold Shares.

"Litigation" has the meaning set forth in Section 11(d).

"Management Stockholder" means any stockholder of the Company who is (or was) an employee or service provider (whether as a consultant, advisor or otherwise) of the Company or any of its Subsidiaries

and who has executed a signature page in the form attached as <u>Exhibit A</u> hereto, together with its Permitted Transferees that hold Shares.

"<u>Meeting Notice</u>" has the meaning set forth in <u>Section 1(d)</u>.

"<u>Necessary Action</u>" means, with respect to a specified result, all actions (to the extent permitted by applicable law) necessary to cause such result, including (i) voting or providing written consent or proxy with respect to any Shares, (ii) calling and attending meetings in person or by proxy for purposes of obtaining a quorum and causing the adoption of stockholders' resolutions and amendments to the Company Constitutional Documents, (iii) executing agreements and instruments and (iv) making, or causing to be made, all filings, registrations or similar actions that are required to achieve such result.

"<u>New Equity Securities</u>" means equity securities of the Company issued after the date hereof, including any and all (i) Shares, (ii) Convertible Securities, (iii) Options, Warrants or other rights to acquire from the Company any Shares or Convertible Securities, or (iv) of the foregoing clauses (i)-(iii) of a Subsidiary of the Company.

"<u>Non-Attending Director</u>" has the meaning set forth in <u>Section 1(d)</u>.

"<u>Offer Period</u>" is defined in <u>Section 4(b)</u>.

"<u>Options</u>" means any options to subscribe for, purchase or otherwise directly acquire Stock, other than any such option held by the Company or any right to purchase Shares pursuant to this Agreement.

"<u>Participating Stockholder</u>" has the meaning set forth in <u>Section 4(a)</u>.

"<u>Participation Notice</u>" has the meaning set forth in <u>Section 6(b)</u>.

"<u>Party</u>" and "<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Permitted Transferee</u>" means (i) in the case of the Sponsor Investor, any Affiliate of, or Person managed or advised by, Sycamore Partners Management, L.P. or any equity holder of Fashion Holdings LLC as of the date of this Agreement (or any Affiliate thereof), (ii) in the case of a Blackstone Investor, any Affiliate of, or Person managed or advised by, The Blackstone Group Inc. or its Affiliates, (iii) in the case of a KKR Investor, any Affiliate of, or Person managed or advised by, KKR Credit Advisors (US) LLC or its Affiliates, (iv) in the case of any other Stockholder (other than a Management Stockholder or an Investor Stockholder), any Affiliate of, or Person managed or advised by, such Stockholder and (v) in the case of a Management Stockholder, (A) any trust the beneficiaries of which, or any corporation, limited liability company or partnership the stockholders, members or general or limited partners of which, include only members of such Management Stockholder's Family Group (or entities of which the stockholders, members or general or limited partners of which, include only members of such Management Stockholder's Family Group) receiving Shares for *bona fide* estate planning purposes, and (B) any transferee in any Transfer occurring by operation of law upon the death of such Management Stockholder.

"<u>Person</u>" includes any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"<u>Plan</u>" means the joint plan of reorganization filed by Belk, Inc. and certain of its Affiliates under Chapter 11 of the U.S. Bankruptcy Code that embodies the Restructuring Transactions (as such term is defined in the RSA).

"Preemptive Percentage" has the meaning set forth in Section 6(a).

"Preemptive Right" has the meaning set forth in Section 6(a).

"Proposal" has the meaning set forth in Section 4(a).

"Purchasing Holders" has the meaning set forth in Section 6(d).

"Required Seller" has the meaning set forth in Section 3(a).

"ROFO Proposal Notice" has the meaning set forth in Section 4(a).

"RSA" means that certain Restructuring Support Agreement, dated as of January 26, 2021, by and among the Company Parties and the Consenting Stockholders (as each such term is defined therein) party thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and including the "Restructuring Term Sheet" (as defined therein).

"Secondary Offer Period" has the meaning set forth in Section 4(b).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder.

"Shares" means (a) all shares of Stock, whenever issued, including all shares of Stock issued upon the exercise, conversion or exchange of any Options, Warrants or Convertible Securities. For the avoidance of doubt, "Shares" shall include all Shares issued to a Stockholder on or after the date hereof, which such Shares shall be subject to the rights and restrictions set forth in this Agreement. For purposes of Section 5, "Shares" shall exclude any Options, Warrants and Convertible Securities (i) that are not vested (and do not vest in connection with the Tag Sale) or (ii) that have an exercise price greater than the per share price in the Tag Sale.

"Sponsor Investor" has the meaning set forth in the preamble.

"Sponsor Investor Designee" has the meaning set forth in Section 1(a)(ii)(A).

"Stock" means Common Stock, together with any other classes or series of equity securities of the Company.

"Stockholder" and "Stockholders" has the meaning set forth in the preamble.

"Subsidiary" or "Subsidiaries" of any Person means any corporation, partnership, joint venture or other legal entity of which such Person (either alone or through or together with any other Person), owns, directly or indirectly, 50% or more of the stock or other equity interests which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

"Tag Buyer" has the meaning set forth in Section 5(c).

"Tag Election Period" has the meaning set forth in Section 5(b).

"Tag Goal" has the meaning set forth in Section 5(a).

"Tag Notice" has the meaning set forth in Section 5(a).

"Tag Right" has the meaning set forth in Section 5(b).

"Tag Sale" has the meaning set forth in Section 5(a).

"Tag Seller" has the meaning set forth in Section 5(b).

"Tag Share Limit" means the maximum number of Shares a Tag Seller may Transfer in a Tag Sale, which shall be that number of Shares equal to the product of: (i) the total Shares (of that same class and series proposed to be Transferred by the Transferring Tag Stockholder) held by such Tag Seller at the applicable time *multiplied by* (ii) a fraction, the numerator of which is the Tag Goal and the denominator of which is the total Shares (of the same class and series proposed to be Transferred by the Transferring Tag Stockholder) held by the Transferring Tag Stockholder.

"Tag Shares" has the meaning set forth in Section 5(b).

"Tagging Investor Stockholder" has the meaning set forth in Section 5(a).

"Total Common Shares" means the total number of issued and outstanding shares of Common Stock.

"Transfer" when used as a noun, shall mean any direct or indirect (including by direct or indirect Change of Control, sale of equity, merger, consolidation, amalgamation, reorganization or other similar plan or scheme, or operation of law, in each case, whether directly, or directly or indirectly of a parent, holding company, equity holder or Subsidiary, or otherwise) assignment, transfer, sale, pledge, alienation, hypothecation or other disposition or encumbrance; and, when used as a verb, shall mean to directly or indirectly (including by direct or indirect Change of Control, sale of equity, merger, consolidation, amalgamation, reorganization or other similar plan or scheme, or operation of law, in each case, whether directly, or directly or indirectly of a parent, holding company, equity holder or Subsidiary, or otherwise) assign, transfer, sell, pledge, alienate, hypothecate or otherwise dispose of or encumber.  Notwithstanding the foregoing, no assignment, transfer, sale, pledge, alienation, hypothecation or other disposition or encumbrance of any limited partnership interests or other similar non-controlling interests in: (i) a Stockholder or its parent entities that is, or is held directly or indirectly by, a private equity fund, hedge fund or similar vehicle; (ii) a pooled investment vehicle holding other material investments and which is, or is an equityholder (directly or indirectly) of, any such Stockholder; or (iii) a Stockholder that is a widely held "investment company" as defined in the Investment Company Act of 1940, as amended, or any publicly traded company whose securities are registered under the Exchange Act, in any of the cases of the aforementioned clauses (i) through (iii), inclusive, shall be deemed to be a Transfer hereunder, unless and until there has been a Change of Control of any general partner, manager or similar Person of any such entity referred to in any of the foregoing clauses (i) and (ii).

"Transferring Stockholder" has the meaning set forth in Section 2(a)(i).

"Transferring Tag Stockholder" has the meaning set forth in Section 5(a).

"Warrants" means any warrants to subscribe for, purchase or otherwise directly acquire Stock or Convertible Securities.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties have executed this Stockholders Agreement as of the date first above written.

**COMPANY**:

**FASHION HOLDINGS INTERMEDIATE INC.**

By: _____
  Name:
  Title:

**EXHIBIT A**

**SIGNATURE PAGE**
**TO THE**
**STOCKHOLDERS AGREEMENT**

By execution of this signature page, _____ hereby agrees to become a party to, be bound by the obligations of and receive the benefits of that certain Stockholders Agreement, as amended from time to time, by and among Fashion Holdings Intermediate, Inc., a Delaware corporation, and the other Parties named therein and shall be deemed to be a "Stockholder" for all purposes thereunder.

_____

By:    _____
        Name:
        Title:

Notice Address:

_____

_____

_____

Accepted:

**FASHION HOLDINGS INTERMEDIATE, INC.**

By:    _____
        Name:
        Title:

# **SCHEDULE A**

Stockholders

[Attached.]

*DRAFT SUBJECT TO REVISION*EXECUTION VERSION

<br/>
<br/>
<br/>

**STOCKHOLDERS AGREEMENT**

**OF**

**FASHION HOLDINGS INTERMEDIATE, INC.**

**FEBRUARY 24, 2021**

# TABLE OF CONTENTS

**Page**

Section 1. Board Rights; Approval for Certain Actions .................................................... 1

  (a) Board of Directors ................................................................ 1
  (b) Initial Directors ................................................................... 2
  (c) Committees ......................................................................... 2
  (d) Quorum .............................................................................. 3
  (e) Board Observers .................................................................. 3
  (f) Expenses............................................................................. 4
  (g) Investor Reserved Matters.................................................... 4

Section 2. Transfers.......................................................................... 6

  (a) Transfer Restrictions ........................................................... 6
  (b) Other Restrictions on Transfers ........................................... 6

Section 3. Drag-Along Rights .......................................................... 8

  (a) Drag-Along Right ............................................................... 8
  (b) Notice ............................................................................... 8
  (c) Exercise ............................................................................ 8
  (d) Drag Sale Expenses ............................................................ 9

Section 4. Right of First Offer ......................................................... 9

  (a) Right of First Offer ............................................................ 9
  (b) Exercise ............................................................................ 10
  (c) Closing ............................................................................. 10
  (d) Assignment ....................................................................... 10
  (e) Deadline for Completion of Sale ......................................... 10

Section 5. Tag Rights ..................................................................... 10

  (a) Notice .............................................................................. 10
  (b) Tag Right .......................................................................... 11
  (c) Transferring Tag Stockholder Cutback................................. 11
  (d) Closing ............................................................................. 11
  (e) Deadline for Completion of Tag Sale ................................... 12

Section 6. Preemptive Rights .......................................................... 12

  (a) General............................................................................. 12
  (b) Participation Notice ........................................................... 12
  (c) Accredited Investors .......................................................... 13
  (d) Offer Periods; Terms of Sale .............................................. 13
  (e) Failure to Issue Shares ...................................................... 13
  (f) Closing ............................................................................. 13
  (g) Exceptions ........................................................................ 13

(h)     Post-Issuance Notice ................................................................ 14
(i)     Assignment ................................................................................ 14

Section 7.    Registration Rights ................................................................... 14

Section 8.    Legend on Certificates ............................................................. 14

(a)    Legends .................................................................................... 14
(b)    Removal of Legends ................................................................. 15
(c)    Book-Entry Shares ................................................................... 15

Section 9.    Duration of Agreement ............................................................. 15

Section 10.   Information Rights .................................................................... 15

(a)    Financial Statements and Other Information ............................ 15
(b)    Confidential Information .......................................................... 16

Section 11.   Miscellaneous ........................................................................... 16

(a)    Successors, Assigns and Transferees ...................................... 16
(b)    Specific Performance ............................................................... 17
(c)    Governing Law......................................................................... 17
(d)    Submission to Jurisdiction; Waiver of Jury Trial..................... 17
(e)    Descriptive Headings .............................................................. 17
(f)    Notices ..................................................................................... 17
(g)    Recapitalization, Exchange, Etc .............................................. 18
(h)    Counterparts............................................................................. 19
(i)    Severability .............................................................................. 19
(j)    Amendment .............................................................................. 19
(k)    Tax Withholding ...................................................................... 19
(l)    Integration................................................................................ 19
(m)   Further Assurances .................................................................. 19
(n)    No Strict Construction ............................................................. 20
(o)    No Third Party Beneficiaries ................................................... 20
(p)    No Recourse............................................................................. 20
(q)    Construction............................................................................. 20

Section 12.   Definitions ................................................................................ 20

**SCHEDULES**

Schedule A -- Stockholders

**EXHIBITS**

Exhibit A -- Form of Stockholder Joinder

## FASHION HOLDINGS INTERMEDIATE, INC.
## STOCKHOLDERS AGREEMENT

This **STOCKHOLDERS AGREEMENT** (this "Agreement"), dated as of February 24, 2021, is by and among (i) Fashion Holdings Intermediate, Inc., a Delaware corporation (the "Company"), (ii) Fashion Holdings LLC, a Delaware limited liability company (together with its Permitted Transferees that hold Shares, the "Sponsor Investor"), and the Persons listed on Schedule A, as amended from time to time. Each of the Sponsor Investor and each Person listed on Schedule A is sometimes referred to herein as a "Stockholder" and, collectively, as the "Stockholders". The Company and the Stockholders are sometimes referred to herein individually by name or as a "Party" and, collectively, as the "Parties". The definitions of certain capitalized terms used herein are set forth in Section 12.

## RECITALS

**WHEREAS**, the Company and the Stockholders desire to enter into this Agreement to provide for certain matters with respect to the ownership and transfer by the Stockholders of Shares owned as of the date hereof or hereafter acquired by the Stockholders.

**NOW, THEREFORE**, in consideration of the foregoing, and the mutual agreements set forth herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**Section 1.**    **Board Rights; Approval for Certain Actions**

(a)    Board of Directors. Each Stockholder (severally and not jointly), in its capacity as a stockholder of the Company, and the Company, shall take all Necessary Actions to cause:

(i)    the board of directors of the Company (the "Board" and, each member thereof, a "Director") to be comprised of only that number of Directors necessary to give effect to the Director appointment rights set forth in Section 1(a)(ii);

(ii)    the election to the Board of:

(A)    that number of Directors designated by the Sponsor Investor (each, a "Sponsor Investor Designee") which, when added to the number of Sponsor Investor Designees who are then Directors and will continue to serve as Directors without regard to such Necessary Action is four, so long as the Sponsor Investor holds at least 40% of the Total Common Shares; provided, however, that if the Sponsor Investor holds less than 40% of the Total Common Shares but greater than or equal to 30% of the Total Common Shares, then the Sponsor Investor shall be entitled to designate three Directors to the Board; and provided, further, that if the Sponsor Investor holds less than 30% of the Total Common Shares but greater than or equal to 20% of the Total Common Shares, then the Sponsor Investor shall be entitled to designate two Directors to the Board; and provided, further, that if the Sponsor Investor holds less than 20% of the Total Common Shares but greater than or equal to 10% of the Total Common Shares, then the Sponsor Investor shall be entitled to designate one Director to the Board; and provided, further, that if the Sponsor Investor holds less than 10% of the Total Common Shares, then the Sponsor Investor shall not be entitled to designate any Directors to the Board;

(B)    that number of Directors designated by the Blackstone Investors (each, a "Blackstone Investor Designee") which, when added to the number of Blackstone Investor

Designees who are then Directors and will continue to serve as Directors without regard to such Necessary Action, is two Directors so long as the Blackstone Investors collectively hold at least 20% of the Total Common Shares; provided, however, that if the Blackstone Investors collectively hold less than 20% of the Total Common Shares but greater than or equal to 10% of the Total Common Shares, then the Blackstone Investors shall be entitled to designate one Director to the Board; and provided, further, that if the Blackstone Investors collectively hold less than 10% of the Total Common Shares, then the Blackstone Investors shall not be entitled to designate any Directors to the Board; and

(C)     that number of Directors designated by the KKR Investors (the "KKR Investor Designee") which, when added to the number of KKR Investor Designees who are then Directors and will continue to serve as Directors without regard to such Necessary Action, is one Director so long as the KKR Investors collectively hold at least 10% of the Total Common Shares; provided, however, that if the KKR Investors collectively hold less than 10% of the Total Common Shares, then the KKR Investors shall not be entitled to designate any Directors to the Board;

(iii)     the removal from the Board (with or without cause) of any Director upon the written request to the Board of the Investor Stockholder(s) having the right to designate such Director, including the removal of the Chair (as defined below) upon the written request of the Sponsor Investor;

(iv)     upon any vacancy in the Board as a result of any individual designated by an Investor Stockholder pursuant to Section 1(a)(ii) ceasing to be a Director, whether by resignation, death, disability, disqualification or otherwise (but not as a result of the loss of a right to appoint a designee pursuant to Section 1(a)(ii) and/or the removal of a Director pursuant to Section 1(a)(v)), the election to the Board of an individual designated by such Investor Stockholder;

(v)     the removal from the Board (with or without cause) of the appropriate number of Designees of an applicable Investor Stockholder in the event that the right to designate such Designees shall have terminated under Section 1(a)(ii) (unless such number of Designees have resigned from the Board), it being understood and agreed that such Investor Stockholder shall designate for removal, and use commercially reasonable efforts to cause the removal of, such Designees as promptly as reasonably practicable following such termination; and

(vi)     the Sponsor Investor Designee so designated by the Sponsor Investor to be the Chair of the Board (the "Chair"), so long as the Sponsor Investor is entitled to designate at least one Sponsor Investor Designee pursuant to Section 1(a)(ii)(A).

(b)     Initial Directors.  The names of the individuals designated to be Directors pursuant to Section 1(a)(ii) as of the date of this Agreement are set forth in the initial corporate organizational resolutions of the Company executed and delivered as of the date hereof.

(c)     Committees.  The Board may designate one or more committees of the Board in accordance with the Company Bylaws (each, a "Board Committee"). Each such Board Committee shall be composed of one or more Directors; provided, however, that (i) a majority of the members on each such Board Committee shall be Sponsor Investor Designees, (ii) so long as at least one Blackstone Investor Designee serves on the Board, at least one Blackstone Investor Designee shall be entitled to serve as a member of such Board Committee, and (iii) so long as the KKR Investor Designee serves on the Board, such KKR Investor Designee shall be entitled to serve as a member of such Board Committee.  Notwithstanding the immediately preceding sentence, in the event that the Board authorizes a Board Committee to evaluate or

negotiate, or establishes a Board Committee for the purpose of evaluating or negotiating, a transaction with an Investor Stockholder or any of its Affiliates, no Designee of such Investor Stockholder shall be entitled to serve on such Board Committee.

(d)     Quorum.  The presence in person of a majority of the total number of Directors then in office will constitute a quorum for the transaction of business of the Board or a Board Committee; provided, however, that no quorum shall exist unless (i) at least one Sponsor Investor Designee is present in person, so long as the Sponsor Investor is entitled to designate at least one Sponsor Investor Designee pursuant to Section 1(a)(ii)(A), (ii) at least one Blackstone Investor Designee is present in person, so long as the Blackstone Investors are entitled to designate at least one Blackstone Investor Designee pursuant to Section 1(a)(ii)(B) and (iii) the KKR Investor Designee is present in person, so long as the KKR Investors are entitled to designate the KKR Investor Designee pursuant to Section 1(a)(ii)(C).  In the event that at least one Designee of an Investor Stockholder fails to attend two consecutive meetings of the Board or a Board Committee called and noticed in accordance with the Company Bylaws and this Agreement (such Designee, a "Non-Attending Director"), then the other Directors may provide written notice (the "Meeting Notice") to the Non-Attending Director not less than three Business Days before the date of the third consecutive meeting of the Board or Board Committee.  The Meeting Notice shall contain the date, time and agenda for the third consecutive meeting of the Board or Board Committee and shall state that the Non-Attending Director must attend such meeting or his or her presence shall not be required to constitute a quorum for such meeting.  With respect to the third consecutive meeting of the Board following the Non-Attending Director's failure to attend two consecutive meetings of the Board called and noticed in accordance with the Company Bylaws and this Agreement, the Non-Attending Director's presence shall not be required to constitute a quorum for such meeting under this Section 1(d), but not with respect to any future meeting.  For the avoidance of doubt, nothing in this Section 1(d) supersedes any provision of Section 1(g).

(e)     Board Observers.  The Sponsor Investor, the Blackstone Investors and the KKR Investors each shall have the right to appoint one observer (each, a "Board Observer") (i.e., for a total of up to three Board Observers) to attend any meetings of the Board or a Board Committee for so long as such applicable Investor Stockholder(s) has the right to designate at least one Director to the Board pursuant to Section 1(a)(ii).  No Board Observer shall have the right to vote on any matter that comes before the Board or a Board Committee.  Each Board Observer shall receive (x) copies of all meeting materials distributed to the Board or applicable Board Committee and (y) notice of each meeting or action by written consent of the Board or such Board Committee, in each case at the same time and in the same manner as such materials are distributed to or notice is given to the Board or such Board Committee.  Notwithstanding the foregoing, any meeting of the Board or Board Committee may exclude a Board Observer from access to any meeting materials or information or meeting or portion thereof or written consent if the Board or Board Committee determines, in good faith, that (i) such exclusion is reasonably necessary to protect highly confidential proprietary information of the Company or confidential proprietary information of third parties that the Company is required to hold in confidence or (ii) such access would reasonably be expected to result in a conflict of interest with the Company; provided, that such exclusion shall be limited to the portion of the meeting materials or information or meeting or written consent that is the basis for such exclusion and shall not extend to any portion of the meeting materials or information or meeting or written consent that does not involve or pertain to such exclusion.  Each Board Observer shall be entitled to indemnification by the Company and to be covered under the Company's director and officer insurance policies to the same extent as Directors as may be reasonably practicable.  As a condition to the appointment of a Board Observer, he or she must execute a confidentiality agreement with the Company in customary form with respect to the information and discussions to which the Board Observer will have access.  The names of the individuals designated to be Board Observers as of the date of this Agreement are set forth in the initial corporate organizational resolutions of the Company executed and delivered as of the date hereof.

(f)     Expenses.  The Company shall pay the reasonable and documented travel expenses (in accordance with the requirements of the Belk, Inc. travel policy for its employees) incurred by all Directors and Board Observers in connection with their attendance at meetings of the Board or any Board Committee. To the extent that an Investor Stockholder designates one or more Independent Directors to the Board (it being understood that up to all of the Designees of an Investor Stockholder may be Independent Directors), the Company shall compensate each such Independent Director for his or her service on the Board or any Board Committee in a manner and amount consistent with market practices for independent directors of similarly situated companies as determined by the Board. For the avoidance of doubt, Board Observers will not be eligible for any compensation from the Company for their services as a Board Observer.

(g)     Investor Reserved Matters.  The Parties shall take all Necessary Actions so that the Company shall not, and shall not permit any of its Subsidiaries to, effect any of the following (each an "Investor Reserved Matter") without the prior written consent of each Investor Stockholder, so long as each such Investor Stockholder (together with its Affiliates) holds at least five percent of the Total Common Shares:

(i)     the entry into or consummation of any Company Sale;

(ii)     any acquisition of the stock or other equity securities (whether by merger, consolidation, purchase of stock or other equity securities or otherwise) or the assets (outside the ordinary course of business) of any other Person, except where the aggregate consideration (including, (x) the assumption of indebtedness for borrowed money, whether direct or indirect, (y) any deferred or contingent consideration or (z) consideration paid in the form of above-market employment or consulting agreements) is not greater than $10,000,000 in any single transaction or series of related transactions;

(iii)     any disposition (by sale, lease or otherwise) of assets of the Company or its Subsidiaries outside the ordinary course of business, except where the aggregate consideration (including the assumption of indebtedness for borrowed money, whether direct or indirect) is not greater than $10,000,000 in any single transaction or series of related transactions;

(iv)     any issuance of additional Shares or other equity securities or securities convertible into or exchangeable or exercisable for Shares or other equity securities, except (A) in accordance with Section 6 or (B) the issuance of shares of Common Stock or Options to employees or other service providers of the Company or its Subsidiaries approved by the Board and pursuant to an Equity Incentive Plan approved in accordance with clause (ix) below;

(v)     any redemption, purchase or other acquisition (whether direct or indirect) of any Shares or other securities of the Company or its Subsidiaries except (A) for Shares or other equity securities held by the Stockholders on a *pro rata* basis (based on the number of Shares or other equity securities of the applicable class held by the Stockholders (excluding any Shares or other equity securities issued under an Equity Incentive Plan that are not fully vested or otherwise limited in their ability to participate in any such redemption, purchase or other acquisition)), (B) Shares held by an employee of the Company or its Subsidiaries upon the termination of employment pursuant to an agreement or plan previously approved by the Board or (C) debt securities of the Company or its Subsidiaries in accordance with (x) the terms of the governing agreements pursuant to which they were issued or (y) the Amended Credit Agreements; provided, however, that, in addition to the consent of the Investor Stockholders required under this Section 1(g), any such non *pro rata* redemption, purchase or other acquisition (whether direct or indirect) of any Shares or other securities of the Company or its Subsidiaries (except as otherwise expressly permitted pursuant to any of the foregoing clauses (A) through (C) immediately above) shall require the prior

written consent of the holders of a majority of the Total Common Shares (excluding, solely for the purpose of this proviso, Shares held by any Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares);

(vi)     the creation, incurrence or refinancing of any Indebtedness of the Company or its Subsidiaries, except (A) Indebtedness in an aggregate principal amount not in excess of $15,000,000 at any time outstanding and (B) intercompany loans solely among the Company and any Subsidiary thereof, or among any Subsidiary of the Company and another Subsidiary thereof;

(vii)     any making of any material change to the nature or scope of the business of the Company and its Subsidiaries, any exit from the line of business or any entry into any new material line of business, in each case, as compared to the business of the Company and its Subsidiaries on the date hereof;

(viii)     any making of any capital expenditures or commitments therefor in excess of $2,000,000 individually, or $8,000,000 in the aggregate, in each case, in any fiscal year and except for capital expenditures or commitments that are reflected in an applicable annual business plan and budget for the Company that has been approved by the Board;

(ix)     any adoption or termination of, or material amendment to (including any increase in the number of Shares issuable under) any Equity Incentive Plan;

(x)     any entry into any transaction, contract, agreement or arrangement, or any amendment to any transaction, contract, agreement or arrangement, between the Company or any of its Subsidiaries, on the one hand, and the Sponsor Investor or its Affiliates (other than the Company or any of its Subsidiaries), on the other hand, unless on arm's length, commercially reasonable terms and approved by a majority of the Directors (other than the Sponsor Investor Designees), other than (A) any issuance of additional Shares or other equity securities or securities convertible into or exchangeable or exercisable for Shares or other equity securities in accordance with Section 6, (B) any redemption, purchase or other acquisition of any Shares or other securities in accordance with clause (v) above, (C) the declaration or making of any dividend or distribution in accordance with clause (xii) below or (D) those transactions, contracts, agreements and arrangements expressly contemplated by each of the RSA or the Plan (including any exhibits, annexes, schedules or supplements to the RSA or the Plan);

(xi)     any entry into any amendment to the Company Charter or Company Bylaws;

(xii)     the declaration or making of any dividend or distribution made in respect of the Shares or other equity securities of the Company or its Subsidiaries, except on a *pro rata* basis to the Stockholders (based on the number of Shares or other equity securities of the applicable class held by the Stockholders (excluding any Shares or other equity securities issued under an Equity Incentive Plan that are not fully vested or otherwise limited in their ability to participate in dividends or distributions)); provided, however, that, in addition to the consent of the Investor Stockholders required under this Section 1(g), any such non *pro rata* dividend or distribution shall require the prior written consent of the holders of a majority of the Total Common Shares (excluding, solely for the purpose of this proviso, Shares held by any Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares); or

(xiii)     any entry into any agreement (whether oral or written) obligating the Company or any of its Subsidiaries to do any of the foregoing.

**Section 2.**   **Transfers**

(a)   <u>Transfer Restrictions</u>.  No Stockholder shall Transfer any Shares except for the following:

(i)   Transfers to a Permitted Transferee of such Stockholder; <u>provided</u>, that, in the event that a Person that acquires Common Stock as a Permitted Transferee of a Stockholder (including under <u>Section 4(d)</u> or <u>Section 6(i)</u>) (a "<u>Transferring Stockholder</u>") ceases to be a Permitted Transferee of the Transferring Stockholder, such Permitted Transferee shall, simultaneously with ceasing to be a Permitted Transferee of the initial Transferring Stockholder, Transfer all such acquired Common Stock to the Transferring Stockholder;

(ii)   Transfers to a Person (other than a Permitted Transferee); <u>provided</u>, that, if such Stockholder (together with its Affiliates) then owns at least two and one-half percent of the Total Common Shares, such Transfers must comply with and shall be subject to the provisions of <u>Section 4</u> and <u>Section 5</u>;

(iii)   Transfers made with the prior written consent of each of the Investor Stockholders;

(iv)   subject to <u>Section 1(g)(i)</u>, Transfers pursuant to a Company Sale; or

(v)   Transfers in compliance with and subject to the provisions of <u>Section 3</u>, <u>Section 4</u> and/or <u>Section 5</u>, as applicable.

(b)   <u>Other Restrictions on Transfers</u>.

(i)   In addition to the restrictions set forth elsewhere in this Agreement, except in connection with a Company Sale, any Transfer of Shares by a Stockholder to a transferee (and any assignment to a Permitted Transferee under <u>Section 4(d)</u> or <u>Section 6(i)</u>) shall be permitted only if the transferee shall agree in writing to be bound by, and comply with, the terms and conditions of this Agreement by executing a signature page in the form attached as <u>Exhibit A</u> hereto. Upon the execution of the signature page in the form attached as <u>Exhibit A</u> hereto, such transferee shall be deemed to be a Stockholder pursuant to this Agreement.

(ii)   Notwithstanding anything to the contrary contained herein, without the prior written consent of the Board (which it may withhold in its sole discretion), no Stockholder shall Transfer any Shares to (A) any Person that the Board determines in good faith directly competes (as its primary business) in any material line of business engaged in by the Company or any of its Subsidiaries, (B) any Person that is a landlord of the Company or any of its Subsidiaries, (C) any Person that the Board determines in good faith is a material vendor of the Company or any of its Subsidiaries or (D) any controlled Affiliate of any of the Persons described in immediately foregoing clauses (A) through (C).

(iii)   Each Stockholder understands and agrees that the Shares held by such Stockholder on the date hereof have not been registered under the Securities Act or under any securities laws. No Stockholder shall, directly or indirectly, Transfer such Shares (or solicit any offers in respect of any Transfer of such Shares), except in compliance with the Securities Act, any applicable securities laws and any restrictions on Transfer contained in this Agreement. No Stockholder shall, directly or indirectly, avoid the restrictions or obligations set forth in this <u>Section 2</u> by Transferring any Shares to any other Person and then Transferring or permitting the Transfer of such other Person in whole or in part.

(iv)     In connection with the Transfer of any Shares, the Stockholder holding such Shares will deliver at least five Business Days' prior written notice to the Company describing in reasonable detail the proposed Transfer. Prior to recognizing the Transfer of any Shares on the books and records of the Company, the transferring Stockholder will provide the Company with a written opinion of legal counsel reasonably satisfactory to the Company (unless such legal opinion is otherwise waived, in whole or in part, in the discretion of the Board), addressed to the Company and the Company's stock transfer agent, to the effect that the proposed Transfer (A) would not violate any U.S. federal securities laws or any state or foreign or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the Shares to be Transferred, (B) would not cause the Company to be required to register in any capacity pursuant to any U.S. federal securities laws or any state or foreign or provincial securities or "blue sky" laws, including as a result of the failure to comply with the safe harbor limitation described in Section 2(b)(v) below, (C) would not impose liability or reporting obligations on the Company or any Stockholder thereof or make any of them subject to the jurisdiction of any court or governmental entity anywhere other than the states, courts and governmental entities in which the Company is then subject to such liability, reporting obligations or jurisdiction and (D) complies with the conditions contained in this Section 2, whereupon the transferring Stockholder will be entitled to Transfer such Shares in accordance with the terms of the notice given by such Stockholder and in accordance with the terms and conditions of this Agreement and the Company Constitutional Documents.

(v)     Notwithstanding any provision to the contrary in this Agreement, no Transfer of any Shares shall be permitted or recognized by the Company if and to the extent that such Transfer would cause the Company to exceed the safe harbor limitations set forth in 17 CFR Section 240.12g-1(b)(1).

(vi)     The transferor and transferee of any Shares in the Company shall be jointly and severally obligated to reimburse the Company for all reasonable and documented out-of-pocket fees and expenses paid to outside counsel by the Company for any Transfer or proposed Transfer, whether or not consummated.

(vii)     Any transferee receiving Shares in a Transfer pursuant to Section 4 or Section 5 hereof shall become a Stockholder, party to this Agreement and subject to the terms and conditions of, and be bound by and entitled to enforce, this Agreement to the same extent, and in the same capacity, as the Person that Transfers such Shares to such transferee; provided, that only a Permitted Transferee of an Investor Stockholder will be deemed to be an Investor Stockholder for purposes of this Agreement; and provided, further, that no Transfer by any holder of Shares to a Permitted Transferee shall relieve such holder of any of its obligations under this Agreement. For the avoidance of doubt, any transferee receiving Shares in a Transfer that is not an Investor Stockholder or a Permitted Transferee of an Investor Stockholder will become a party to this Agreement without the benefit of any rights hereunder accruing to Stockholders solely in their capacity as Investor Stockholders. Prior to the Transfer of any Shares to any transferee and as a condition thereto, each Stockholder effecting such Transfer shall (x) cause such transferee to deliver to the Company its written agreement, in form and substance reasonably satisfactory to the Company, to be bound by the terms and conditions of this Agreement, if not already bound by this Agreement, and (y) if such Transfer is to a Permitted Transferee, remain directly liable for the performance by such Permitted Transferee of all obligations of such transferee under this Agreement.

(viii)     Any attempted Transfer of Shares not in accordance with the terms of this Section 2 shall be null and void, and the Company shall not in any way give effect to any such Transfer.

## Section 3.      Drag-Along Rights

(a)      <u>Drag-Along Right</u>.  At any time, the Board, subject to <u>Section 1(g)(i)</u>, may require each Stockholder (each, a "<u>Required Seller</u>") to participate (including by transferring its Shares) in a Company Sale to an unaffiliated third party (a "<u>Drag-Along Transferee</u>") in a *bona fide* arm's length transaction or series of related transactions (including pursuant to a stock sale, asset sale, recapitalization, tender offer, merger or other business combination transaction or otherwise) (such transaction or series of related transactions, a "<u>Drag Sale</u>") at the purchase price and upon the terms set forth in the Drag-Along Notice (as defined below).  In connection with a Drag Sale, each Required Seller shall (i) vote in favor of, and raise no objections against, such Drag Sale or act by written consent approving the same and vote in opposition of any and all other proposals that could reasonably be expected to delay or impair the consummation of such Drag Sale with respect to all Shares owned by such Required Seller, and (ii) subject to <u>Section 3(c)</u>, execute any purchase agreement, merger agreement or other agreement entered into with the purchaser with respect to such Drag Sale and any ancillary agreement with respect thereto, as necessary or reasonably required to approve and consummate the Drag Sale.  Without limiting the foregoing, if a Drag Sale requires the approval of the Stockholders, each Stockholder shall waive any applicable dissenters' rights, appraisal rights or similar rights in connection with such Drag Sale.  The consummation of a Drag Sale shall be subject to Board approval (subject to <u>Section 1(g)(i)</u>), which shall have no liability or obligation whatsoever (other than compliance with this <u>Section 3</u>) to any Required Sellers participating therein in connection with such Required Sellers' Transfer of Shares.

(b)      <u>Notice</u>.  No later than two Business Days after being instructed to do so by the Board, the Company shall provide written notice (the "<u>Drag-Along Notice</u>") of a Drag Sale to each Required Seller.  In the event that the terms and/or conditions set forth in the Drag-Along Notice are thereafter amended in any material respect, the Company shall give written notice (an "<u>Amended Drag-Along Notice</u>") of the amended terms and conditions of the proposed Transfer to each Required Seller.  Each Drag-Along Notice and Amended Drag-Along Notice shall set forth: (i) the name of the Drag-Along Transferee and the number of Shares proposed to be purchased by such Drag-Along Transferee; (ii) the proposed amount and type of consideration and the material terms and conditions of payment offered by the Drag-Along Transferee; (iii) a summary of any other material terms of the Drag Sale, including any indemnification obligations or post-closing liabilities of each Required Seller; and (iv) a copy of the primary agreements effecting such Drag Sale.  Upon the delivery of a Drag-Along Notice, no further Transfers of Shares by any Stockholder shall be permitted (including any Transfer to a Permitted Transferee) until such Drag-Along Notice is withdrawn or the Drag Sale is consummated.  The Company shall provide prompt written notice to each Required Seller of the withdrawal of such Drag-Along Notice upon the termination or other abandonment of such Drag Sale.

(c)      <u>Exercise</u>.  All Transfers of Shares to the Drag-Along Transferee pursuant to this <u>Section 3</u> shall be consummated simultaneously, unless the Board and the Drag-Along Transferee elect otherwise, on the date specified in the definitive purchase agreement pursuant to which the Drag Sale is to be consummated.  In the event that the applicable Drag Sale is not consummated within three months (as may be extended, solely to the extent reasonably necessary to obtain any Governmental Approvals, for a reasonable period of time), then the Required Sellers shall not be obligated to Transfer any Shares in connection with the Drag Sale contemplated by such applicable Drag-Along Notice.  At the closing of the Drag Sale, the Required Sellers shall deliver any stock certificates duly endorsed for transfer or with duly executed stock powers or similar instruments, or such other instrument of transfer of such Shares as may be reasonably requested by the Drag-Along Transferee and the Company.  Each Required Seller shall be entitled to receive the same form and amount (on a per-Share basis) of consideration (the "<u>Drag Share Consideration</u>"); <u>provided</u>, <u>however</u>, that (A) in the event the Drag Share Consideration includes equity or equity-linked securities, and the receipt thereof by any Required Seller would be restricted or otherwise prohibited pursuant to such Required Seller's organizational documents (as in existence at the time of

receipt of the Drag-Along Notice and as of immediately prior to the Drag Sale), the Board shall use its commercially reasonable efforts to provide such Required Seller with the opportunity to elect (in lieu thereof) either (1) to be paid an amount in cash equal to the fair market value (as determined in good faith by the Board) of such equity or equity-linked portion of the Drag Share Consideration that such Required Seller would otherwise receive in connection with the consummation of the Drag Sale (to the extent such cash is then available for such use, in the good faith discretion of the Board) or (2) to dispose of such equity or equity-linked securities to one or more third parties concurrently with the consummation of such Drag Sale; and (B) in lieu of any Drag Share Consideration payable to the other Required Sellers, any Required Seller that is a Management Stockholder may receive Drag Share Consideration in the form of rollover equity interests in the Drag-Along Transferee (or an Affiliate thereof) with a fair market value (as determined by the Board in good faith) equal to such portion of the Drag Share Consideration payable to the other Required Sellers. To the extent that the Stockholders provide any indemnification or otherwise assume any other post-closing liabilities in connection with the Drag Sale, the Required Sellers shall have no greater proportional requirement in respect thereof than any other Required Seller, and each Required Seller shall do so (and shall share in any related escrow or holdback) severally and not jointly (and on a *pro rata* basis in accordance with the Shares being sold by each as compared to the total number of Shares being sold) and their respective potential liability thereunder shall not exceed the proceeds received as consideration for their respective Shares, except in the event of fraud perpetrated by such Required Seller. Any indemnification or other post-closing liabilities related to the representations and warranties of a Required Seller shall (subject to the preceding sentence) be specific to the Required Seller making such representations and warranties. Each Required Seller shall only be required to give representations and warranties in connection with a Drag Sale regarding title to Shares conveyed (free and clear of all liens and encumbrances), due authorization, legal authority and capacity to transfer its Shares and absence of conflicts arising under, or consents required under, other agreements to which such Required Seller is a party. Each Required Seller shall be required to enter into any instrument, undertaking or obligation necessary or reasonably requested by the Board and to deliver all documents necessary or reasonably requested by the Board in connection with such Transfer in connection with this <u>Section 3</u>; <u>provided</u>, <u>however</u>, that, in connection with a Drag Sale, no Required Seller shall be required to become subject to any restrictive covenant other than customary confidentiality obligations applicable to each Required Seller and any restrictive covenant by which such Required Seller was bound immediately prior to the consummation of such Drag Sale. Each Required Seller shall be required to transfer its Shares pursuant to a Drag Sale free and clear of all liens and encumbrances.

(d)　　<u>Drag Sale Expenses</u>.　Each Required Seller shall bear its *pro rata* portion of the third-party costs and expenses incurred in by the Company connection with any Drag Sale or other transaction (pursuant to this Agreement or otherwise) in which it sells its Shares to the extent not otherwise paid by the Company for the benefit of all holders.

**Section 4.　　Right of First Offer**

(a)　　<u>Right of First Offer</u>.　If any Stockholder that (together with its Affiliates) holds at least two and one-half percent of the Total Common Shares as of the applicable date (a "<u>Participating Stockholder</u>") desires to Transfer any Shares to any Person (other than to a Permitted Transferee or pursuant to the provisions of <u>Section 3</u>), then such Participating Stockholder must first notify in writing the Investor Stockholders of such proposed sale (the "<u>ROFO Proposal Notice</u>"), offering each Investor Stockholder the right to purchase its respective *pro rata* portion (based on the number of Shares held by such Investor Stockholder as compared to the total number of Shares held by all Investor Stockholders) of all such Shares for the proposed purchase price for such Shares and on the other material terms specified in such written notice (the "<u>Proposal</u>").

(b)      _Exercise_.  Prior to the expiration of the period 10 Business Days after receipt of the ROFO Proposal Notice (the "Offer Period"), each Investor Stockholder may accept the Proposal by delivering written notice of such acceptance to the Participating Stockholder, including the number of Shares such Investor Stockholder wishes to purchase from the Participating Stockholder (an "Acceptance Notice"). The Participating Stockholder shall provide prompt written notice to each Investor Stockholder of the number of Shares each Investor Stockholder has elected to purchase pursuant to this Section 4(b). If any Investor Stockholder does not fully subscribe for the number of Shares it is entitled to purchase pursuant to this Section 4(b), then each Investor Stockholder that fully subscribed for the number of Shares that it was entitled to purchase pursuant to this Section 4(b) shall have the right, for a period of five Business Days after receipt of such notice (the "Secondary Offer Period"), to purchase that percentage of the remaining Shares offered under the ROFO Proposal Notice equal to (i) the total number of Shares owned by such fully participating Investor Stockholder divided by (ii) the total number of Shares owned by all fully participating Investor Stockholders that elected to purchase Shares under this Section 4(b).

(c)      _Closing_.  The closing of the purchase of Shares under this Section 4 shall be on the later of (i) a date that is no later than 10 Business Days after the end of the Secondary Offer Period or (ii) as soon as reasonably practicable following receipt of all Governmental Approvals and any approval of the Stockholders as may be required by applicable law. At such closing, (i) each Participating Stockholder shall only be required to give representations and warranties in connection with any Transfer made pursuant to and in accordance with this Section 4 regarding title to Shares conveyed (free and clear of all liens and encumbrances), due authorization, legal authority and capacity and absence of conflicts arising under, or consents required under, other agreements to which such Participating Stockholder is a party, and (ii) the Participating Stockholder shall deliver to the applicable Investor Stockholders any stock certificates duly endorsed for transfer or with duly executed stock powers or similar instruments, or such other instruments of transfer to such Shares as may be reasonably requested by such Investor Stockholders.

(d)      _Assignment_.  Subject to Section 2(b)(ii), each Investor Stockholder shall be permitted to assign its rights (in whole or in part) to purchase its _pro rata_ portion of the Shares in the ROFO Proposal Notice to one or more of its Permitted Transferees.

(e)      _Deadline for Completion of Sale_.  The Participating Stockholder shall have 60 days following the expiration of the Offer Period (or, if applicable, the Secondary Offer Period) in which to sell to any Person (subject to the other terms and conditions of this Agreement) the Shares described in the ROFO Proposal Notice, on terms no less favorable to the Participating Stockholder (_i.e._, a lower price per Share) than those set forth in the ROFO Proposal Notice (which such 60-day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain any Governmental Approvals and any approval of the Stockholders as may be required by applicable law). If at the end of such period the Participating Stockholder has not completed such sale, the Participating Stockholder may not then effect a sale of such Shares subject to this Section 4 without again fully complying with the provisions of this Section 4.

**Section 5.      Tag Rights**

(a)      _Notice_.  In the event that any Investor Stockholder (together with its Affiliates) intends to Transfer more than five percent of the Total Common Shares to a third party (other than a Permitted Transferee and excluding any Transfer in connection with a Drag Sale) (any such Transfer, a "Tag Sale"), such Investor Stockholder and its Affiliates (collectively, the "Transferring Tag Stockholder"), shall instruct the Company to provide written notice (a "Tag Notice") to each other Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares (each, a "Tagging Investor Stockholder"), which Tag Notice must be delivered to each such other Investor Stockholder at least 10 Business Days prior to the consummation of the Tag Sale. The Tag Notice shall contain the terms

on which the Transferring Tag Stockholder proposes to Transfer Shares, including (i) the price per Share, (ii) any indemnification to be provided by the Transferring Tag Stockholder, (iii) the form of consideration to be received in respect of the Shares, (iv) the number of Shares held by the Transferring Tag Stockholder that such Transferring Tag Stockholder desires to Transfer (the "Tag Goal"), (v) the total number of Shares then held by the Transferring Tag Stockholder and (vi) any other material terms related to the Transfer.

(b)      Tag Right.  Each Tagging Investor Stockholder shall have the right (the "Tag Right"), exercisable upon written notice to the Transferring Tag Stockholder of such Tagging Investor Stockholder's election to exercise its Tag Right, which notice shall be delivered to the Transferring Tag Stockholder within 10 Business Days of the receipt of the Tag Notice (such period, the "Tag Election Period"), to sell a number of such Tagging Investor Stockholder's Shares (such Shares, the "Tag Shares") up to its Tag Share Limit pursuant to the Tag Sale, which such number of Shares must be included in such Tagging Investor Stockholder's written notice to the Transferring Tag Stockholder.  Any Tagging Investor Stockholder that fails to exercise its Tag Right during the Tag Election Period thereby foregoes its Tag Right in respect of that Tag Notice. Each Tagging Investor Stockholder who properly exercises its Tag Right during the Tag Election Period (each, a "Tag Seller") shall be required to participate in the Tag Sale to the extent it is consummated on the terms set forth in the Tag Notice, and shall not be permitted to revoke its Tag Right election unless the Transferring Tag Stockholder has withdrawn from the Tag Sale pursuant to Section 5(c). Notwithstanding anything to the contrary contained herein, in the event that an Investor Stockholder has elected to purchase Shares in connection with a particular Transfer under Section 4, such Investor Stockholder may not elect to exercise the Tag Right in connection with such Transfer under this Section 5.

(c)      Transferring Tag Stockholder Cutback.  To the extent the transferee (the "Tag Buyer") of the Shares pursuant to the Tag Sale is unwilling to purchase both the Tag Goal and all of the Tag Shares of the Tag Sellers, then the Transferring Tag Stockholder may elect to either cancel such Tag Sale or allocate the maximum number of Shares that the Tag Buyer is willing to purchase *pro rata* among the Tag Sellers and the Transferring Tag Stockholder as follows: each Tag Seller and the Transferring Tag Stockholder shall be entitled to sell a number of Shares (not to exceed, for any Tag Seller, the number of Shares identified in its tag election notice) equal to the product of (i) the maximum number of Shares that the Tag Buyer is willing to purchase and (ii) a fraction (A) the numerator of which is the number of Shares owned by such Tag Seller or Transferring Tag Stockholder, and (B) the denominator of which is the total number of Shares owned by all Tag Sellers and the Transferring Tag Stockholder.  The Transferring Tag Stockholder shall use its reasonable best efforts to obtain the agreement of the Tag Buyer to the participation of the Tag Sellers in any contemplated Tag Sale and no Transferring Tag Stockholder shall Transfer any Shares to any Tag Buyer pursuant to a Tag Sale if such Tag Buyer declines to allow the participation of the Tag Sellers on the terms provided herein, unless in connection with such Tag Sale, one or more of the Transferring Tag Stockholders purchase the number of Shares from each Tag Seller that such Tag Seller would have been entitled to sell pursuant to this Section 5 at the same price and on the same terms and conditions on which such Shares would have been sold to the Tag Buyer pursuant to this Section 5.

(d)      Closing.  The closing of the Tag Sale shall be held on the later of (i) a Business Day not less than 10 nor more than 60 days after the latest of (A) the end of the Tag Election Period, (B) the end of the Offer Period under Section 4 applicable to the Transfer of the applicable Shares and (C) the end of any Secondary Offer Period under Section 4 applicable to the Transfer of the applicable Shares or (ii) as soon as reasonably practicable following receipt of all Governmental Approvals and any approval of the Stockholders as may be required by applicable law.  At the closing of the Tag Sale, the Transferring Tag Stockholder and the Tag Sellers shall deliver any stock certificates duly endorsed for transfer or with duly executed stock powers or similar instruments, or such other instruments of transfer to such Shares as may be reasonably requested by the Tag Buyer and the Company.  The consummation of such proposed Transfer shall be subject to the sole discretion of the Transferring Tag Stockholder, who shall have no liability or obligation whatsoever (other than compliance with this Section 5) to any Tagging Investor Stockholder.

On a per-Share basis, each Tag Seller shall receive the same amount and form of consideration, and on the same terms, as received by the Transferring Tag Stockholder.  To the extent that the Transferring Tag Stockholder and the Tag Sellers provide any indemnification or otherwise assume any other post-closing liabilities in connection with the Tag Sale, the Transferring Tag Stockholder and the Tag Sellers shall do so (and shall share in any related escrow or holdback) severally and not jointly (and on a *pro rata* basis in accordance with the Shares being sold by each as compared to the total number of Shares being sold) and their respective potential liability thereunder shall not exceed the proceeds received as consideration for their respective Shares, except in the event of fraud perpetrated by such Transferring Tag Stockholder or Tag Seller.  Any indemnification or other post-closing liabilities related to such representations and warranties shall (subject to the preceding sentence) be specific to the Tag Seller making such representations and warranties.  Each Tag Seller shall only be required to give representations and warranties in connection with a Tag Sale regarding title to Shares conveyed (free and clear of all liens and encumbrances), due authorization, legal authority and capacity and absence of conflicts arising under, or consents required under, other agreements to which such Tag Seller is a party.  The Transferring Tag Stockholder and each Tag Seller shall be required to enter into any instrument, undertaking or obligation necessary or reasonably requested and deliver all documents necessary or reasonably requested in connection with such Tag Sale; provided, however, that, in connection with a Tag Sale, no Tag Seller shall be required to become subject to any restrictive covenant other than customary confidentiality obligations and any restrictive covenant by which such Tag Seller was bound immediately prior to the consummation of such Tag Sale.  The Transferring Tag Stockholder and each Tag Seller shall be required to Transfer their respective Shares pursuant to a Tag Sale free and clear of all liens and encumbrances.

(e)    Deadline for Completion of Tag Sale.  The Transferring Tag Stockholder shall have 60 days following the latest of (i) the end of the Tag Election Period, (ii) the end of the Offer Period under Section 4 applicable to the Transfer of the applicable Shares and (iii) the end of any Secondary Offer Period under Section 4 applicable to the Transfer of the applicable Shares in which to sell the Shares described in the Tag Notice, on terms not less favorable to the Transferring Tag Stockholder (*i.e.*, a lower price per Share) than those set forth in the Tag Notice (which such 60-day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain any Governmental Approvals and any approval of the Stockholders as may be required by applicable law).  If at the end of such period the Transferring Tag Stockholder has not completed such sale, the Transferring Tag Stockholder may not then effect a sale of such Shares subject to this Section 5 without again fully complying with the provisions of this Section 5.

**Section 6.    Preemptive Rights**

(a)    General.  If at any time the Company proposes to issue any New Equity Securities (other than to the Company or a Subsidiary thereof), the Company shall give each Stockholder (other than any Management Stockholder) (each, an "Enabled Stockholder") a right (a "Preemptive Right") to purchase or subscribe for its *pro rata* portion of such New Equity Securities based on the number of Shares held by such Enabled Stockholder prior to such issuance as compared to the total outstanding Shares of the Company at such time (the "Preemptive Percentage").

(b)    Participation Notice.  At least 10 Business Days prior to the proposed date of issuance of New Equity Securities to which a Preemptive Right would apply, the Company shall deliver written notice (a "Participation Notice") to each Enabled Stockholder stating (i) its intention to issue New Equity Securities and the date (or range of dates) of such issuance, (ii) the number and type of New Equity Securities to be issued, (iii) such Enabled Stockholder's Preemptive Percentage, and (iv) the price and terms, if any, upon which it proposes to issue such New Equity Securities.

(c)    Accredited Investors.  The Preemptive Rights granted by this Section 6 shall be exercisable only by "accredited investors" as defined under Section 501 of Regulation D of the Securities Act.  In the event that exercise of an Enabled Stockholder's Preemptive Right under this Section 6 would require under applicable law the registration or qualification of such New Equity Securities or of any Person as a broker or dealer or agent with respect to such New Equity Securities where such registration or qualification is not otherwise required for the issuance, such Enabled Stockholder shall not have the right to participate in the issuance.  Without limiting the generality of the foregoing, it is understood and agreed that the Company has no obligation to effect a registration of such New Equity Securities under the Securities Act or similar state statutes.

(d)    Offer Periods; Terms of Sale.  At any time prior to the close of business on the 10th Business Day after its receipt of the Participation Notice, each Enabled Stockholder may elect to purchase or obtain, at the price and on the terms specified in the Participation Notice, up to such Enabled Stockholder's Preemptive Percentage.  The purchase or subscription by the Enabled Stockholders pursuant to this Section 6 shall be on the same price and other terms and conditions, including the date of sale or issuance, as are applicable to the purchasers or subscribers of the additional New Equity Securities whose purchases or subscriptions give rise to the Preemptive Rights (the "Purchasing Holders").

(e)    Failure to Issue Shares.  If the Company does not issue New Equity Securities on the date (or during the range of dates) proposed in the Participation Notice, then no Stockholder shall have a right to subscribe for New Equity Securities pursuant to a Preemptive Right.  The Company shall be required to issue a new Participation Notice in accordance with this Section 6 prior to issuing any New Equity Securities to which a Preemptive Right applies.

(f)    Closing.  On or before the date the Company issues the New Equity Securities to which the Preemptive Right applies, any Enabled Stockholder who exercised that right must pay for the New Equity Securities by wire transfer of immediately available funds.  If an Enabled Stockholder fails to transfer the funds on the closing date, which failure to transfer is not cured by a wire transfer of immediately available funds no later than 5:00 P.M., prevailing Eastern Time, on the following Business Day, then such Enabled Stockholder shall not be issued any New Equity Securities and shall thereafter have no Preemptive Right for such issuance.

(g)    Exceptions.

The Preemptive Rights shall not apply to:

(i)    the issuance or sale of Shares to employees (and their affiliated entities), consultants or Directors of the Company or any of its Subsidiaries pursuant to a stock option plan, restricted stock plan, stock purchase plan or any other equity incentive plan, arrangement or agreement, in each case, approved by the Board or the appropriate committee of the Board;

(ii)    the issuance of Stock upon the exercise or conversion of any Convertible Securities or exercisable Shares outstanding on the date hereof or issued after the date hereof in compliance with the provisions of this Section 6;

(iii)    the issuance of Shares as consideration for (A) any business combination or acquisition transaction involving the Company or any of its Subsidiaries or (B) any joint venture or strategic partnership entered into primarily for purposes other than raising capital, in each case, approved by the Board;

(iv)    the issuance of Shares in exchange for debt securities;

13

(v)      the issuance of Shares, not in excess of five percent of the total number of issued and outstanding Shares, to lenders, bond purchasers or other financial institutions in connection with a *bona fide* financing transaction involving the Company or any of its Subsidiaries that has been approved by the Board;

(vi)      the issuance of Shares pursuant to a stock split, stock dividend, combination, reorganization, recapitalization or similar event, in each case, approved by the Board; or

(vii)      the issuance of Shares pursuant to an Initial Public Offering.

(h)      Post-Issuance Notice.  Notwithstanding the requirements of this Section 6, the Company may proceed with any issuance of New Equity Securities prior to having complied with the provisions of Section 6; provided, that the Company shall:

(i)      as soon as reasonably practicable, offer in writing to each Enabled Stockholder the right to purchase from the Purchasing Holders up to such number of New Equity Securities equal to such Enabled Stockholder's Preemptive Percentage that such Enabled Stockholder would have been entitled to pursuant to Section 6(d) multiplied by the aggregate number of New Equity Securities issued pursuant to this Section 6 with respect to such issuance; and

(ii)      keep such offer open for a period of 20 days, during which period, each such Enabled Stockholder may accept such offer by sending a written acceptance to the Company committing to purchase up to such number of New Equity Securities offered to such Enabled Stockholder in the written offer delivered pursuant to Section 6(h)(i).

(i)      Assignment.  Subject to Section 2(b)(ii), each Enabled Stockholder shall be permitted to assign its rights (in whole or in part) to purchase its Preemptive Percentage of the New Equity Securities in a Participation Notice to one or more of its Permitted Transferees.

## Section 7.      Registration Rights

In connection with an Initial Public Offering, the Company shall enter into a customary registration rights agreement with the Investor Stockholders with respect to the registration of the Company's securities in form and substance reasonably satisfactory to the Investor Stockholders.

## Section 8.      Legend on Certificates

(a)      Legends.  To the extent applicable, each certificate representing one or more Shares held by any Stockholder shall bear each of the following legends until such time as the Shares represented thereby are no longer subject to the provisions hereof:

(i)      "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii)      "THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE

DISPOSED OF OR EXCHANGED UNLESS SUCH TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OR EXCHANGE COMPLIES WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, DATED AS OF FEBRUARY 24, 2021, AS AMENDED FROM TIME TO TIME, AMONG THE COMPANY AND THE STOCKHOLDERS PARTY THERETO, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

(iii)     Any legend required by the Blue Sky laws of any state to the extent such laws are applicable to the Shares represented by the certificate so legended.

(b)     Removal of Legends.  At any time after the certificates of the Company are, in accordance with Section 8(a), no longer required to be legended, any holder of a certificate legended pursuant to Section 8(a) may surrender such certificate to the Company for removal of the legend, and the Company will, without expense to such holder, duly reissue a new certificate without the legend.

(c)     Book-Entry Shares.  The Stockholders acknowledge and agree that, unless otherwise determined by the Board, the Company intends for all of the Shares to be uncertificated and held in book-entry form.  To the extent that the Shares are held in book-entry form, notwithstanding anything to the contrary contained herein:  (i) all references in this Agreement to certificates representing Shares hereunder shall instead refer to such book-entries, (ii) any requirement in this Agreement to deliver a certificate representing Shares hereunder shall instead refer to an instrument of transfer evidencing the transfer of such book-entry Shares, (iii) any legend required pursuant to this Agreement to be borne on a certificate representing Shares hereunder shall instead refer to a notation of such legend in the book entries for such Shares, and (iv) any removal of legends on certificates representing Shares hereunder shall instead refer to the removal of the applicable notation in the book entries for such Shares.

## Section 9.     Duration of Agreement

This Agreement shall terminate and be of no further force or effect, except with respect to the provisions set forth in Sections 10(b) and 11, upon the earlier to occur of (i) a Company Sale and (ii) an Initial Public Offering.  For the avoidance of doubt, in no event shall this Agreement apply to any transferee of Shares permitted pursuant to this Agreement unless such transferee becomes a Party to this Agreement or this Agreement expressly provides that such transferee must become a Party to, and be bound by, the terms of this Agreement.

## Section 10.     Information Rights

(a)     Financial Statements and Other Information.  Each Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares (other than any Management Stockholder) shall have the inspection rights set forth in Section 220 of the General Corporation Law of the State of Delaware and, in addition thereto, the Company shall deliver to each of the aforementioned Stockholders:

(i)     the audited financial statements described in Section 6.01(1) of the Amended First Lien Credit Agreement, to be delivered in accordance with the required delivery dates and each of the other substantive requirements set forth in Section 6.01(1) of the Amended First Lien Credit Agreement;

(ii)     the quarterly financial statements set forth in Section 6.01(2) of the Amended First Lien Credit Agreement, to be delivered in accordance with the required delivery dates and each of

15

the other substantive requirements set forth in Section 6.01(2) of the Amended First Lien Credit Agreement;

(iii)    as soon as reasonably practicable after it becomes available but no later than 30 days after the end of each fiscal month, a monthly financial report of the Company and its Subsidiaries in the same form and substance as the Company's standard internal monthly reporting package provided to senior management;

(iv)    the budget and projections set forth in Section 6.01(3) of the Amended First Lien Credit Agreement, to be delivered in accordance with the required delivery dates and each of the other substantive requirements set forth in Section 6.01(3) of the Amended First Lien Credit Agreement; and

(v)    upon request by such Stockholder, any additional information regarding the affairs, finances and accounts of the Company and its Subsidiaries that is reasonably required by such Stockholder in order to prepare and file tax returns in accordance with applicable laws.

(b)    Confidential Information.  From and after the date hereof, each Stockholder shall not directly or indirectly, disclose, reveal, divulge or communicate to any Person or use or otherwise exploit for its own benefit or for the benefit of anyone other than the Company and its Subsidiaries, any confidential information of the Company or its Subsidiaries or their business obtained pursuant to this Section 10 or otherwise, unless (i) compelled to disclose by judicial or administrative process or by other requirements of law or governmental authorities or (ii) disclosed in an action brought by a Party in pursuit of its rights or in the exercise of its remedies hereunder; provided, however, that (A) such Stockholder may disclose such confidential information to its Affiliates and its and their respective officers, directors, agents, employees, equity owners, investors, accountants, limited partners, counsel and other representatives who need to know such confidential information for purposes of evaluating or monitoring such Stockholder's investment in the Company and who agree to be bound by the terms of this Section 10(b) or otherwise have a professional duty of confidentiality with respect to information received from such Stockholder, it being acknowledged and agreed by each Stockholder that such Stockholder shall be liable for any breach of this Section 10 by any of its representatives; (B) such Stockholder may disclose such confidential information to any prospective transferee of Shares from such Stockholder in a Transfer permitted under this Agreement, as long as such prospective transferee agrees to be bound by the terms of a confidentiality or non-disclosure agreement on terms no less restrictive than this Section 10(b) and (C) in the event disclosure is required by applicable law, such Stockholder shall, to the extent reasonably possible, provide the Company with prompt notice of such requirement prior to making any disclosure so that the Company, at its own expense, may seek an appropriate protective order.  For purposes of this Section 10(b), "confidential information" does not include, and there shall be no obligation hereunder with respect to, information that (1) is generally available to the public on the date of this Agreement or (2) becomes generally available to the public other than as a result of a disclosure not otherwise permissible hereunder.

**Section 11.    Miscellaneous**

(a)    Successors, Assigns and Transferees.  Except (i) as expressly provided in Section 4(d) and Section 6(i), and (ii) for the rights, interests and obligations expressly contained herein of a Stockholder that has been transferred Shares in a Transfer made in accordance with Section 2, Section 3, Section 4 and/or Section 5, neither this Agreement nor any of the rights, interests or obligations hereunder (including, for the avoidance of doubt, the rights under Section 1(a)(ii) and Section 1(g)) shall be assigned by any Party, in whole or in part, without the prior written consent of each Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares, and any attempt to make such assignment without such written consent shall be null and void.  This Agreement shall be binding upon and inure to the

benefit of the Parties and their respective legal representatives, heirs, legatees, successors, and permitted assigns and shall also apply to any Shares acquired by Stockholders after the date hereof.

(b)     Specific Performance.  Each of the Parties recognizes and acknowledges that a breach by him, her or it of any covenants or agreements contained in this Agreement will cause the other Parties to sustain irreparable harm for which they would not have an adequate remedy at law, and therefore in the event of any such breach the aggrieved Party or Parties shall, without the posting of a bond or other security (any requirement for which the Parties hereby waive), be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief, in addition to any other remedy to which he, it or they may be entitled, at law or in equity (which such other remedies shall not be prejudiced by the grant of equitable relief).  A Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement.  In the event that any action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at law.

(c)     Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws, and not the law of conflicts which would result in the application of the laws of another jurisdiction, of the State of Delaware.

(d)     Submission to Jurisdiction; Waiver of Jury Trial.  Each of the Parties hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Chancery Court of the State of Delaware or, to the extent such court shall not have jurisdiction over the subject matter, any state or federal court sitting in New Castle County, Delaware, for any action, proceeding or investigation in any court or before any governmental authority ("Litigation") arising out of or relating to this Agreement (and shall not commence any Litigation relating thereto except in such court).  Service of any process, summons, notice or document by U.S. registered mail to a Party's notice address, as provided for in this Agreement, shall be effective service of process for any Litigation brought against it in any such court.  Each of the Parties hereby irrevocably and unconditionally waives any objection to the laying of venue of any Litigation arising out of this Agreement or the transactions contemplated hereby in the Chancery Court of the State of Delaware or, to the extent such court shall not have jurisdiction over the subject matter, in any state or federal court sitting in New Castle County, Delaware, and hereby further irrevocably and unconditionally waives and shall not plead or claim in any such court that any such Litigation brought in any such court has been brought in an inconvenient forum.  **Each of the Parties irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any and all rights to trial by jury in connection with any Litigation arising out of or relating to this Agreement or the transactions contemplated hereby.**

(e)     Descriptive Headings.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(f)     Notices.  All notices, requests or consents provided for or permitted to be given under this Agreement shall be in writing and shall be given either by depositing such writing in the United States mail, addressed to the recipient, postage paid and certified with return receipt requested, or by depositing such writing with a reputable overnight courier for next day delivery, or by delivering such writing to the recipient in person, by courier or by email transmission (with electronic confirmation of transmission).  A notice, request or consent given under this Agreement shall be deemed received when actually received if personally delivered, when transmitted, if transmitted by email with electronic confirmation, the day after it is sent, if sent for next day delivery and upon receipt, if sent by mail.  All such notices, requests and consents shall be delivered as follows:

(i)     if to the Company, addressed to it at:

Fashion Holdings Intermediate, Inc.
c/o Belk, Inc.
2801 West Tyvola Road
Charlotte, North Carolina 28217
Attn:    Chief Executive Officer
Email:  lisa_harper@belk.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

Attn:    Joshua A. Sussberg, P.C.
         Steven N. Serajeddini, P.C.
         Judson A. Oswald, P.C.
         Matthew Fagen
         Yuli Wang
         Rachael Bazinski
Email:   jsussberg@kirkland.com
         steven.serajeddini@kirkland.com
         judson.oswald@kirkland.com
         matthew.fagen@kirkland.com
         yuli.wang@kirkland.com
         rachael.bazinski@kirkland.com

(ii)    if to the Sponsor Investor, addressed as follows:

Fashion Holdings LLC
c/o Sycamore Partners Management, L.P.
9 West 57th Street, 31st Floor
New York, New York 10019
Attn:    Ralph Schipani
Email:   rschipani@sycamoreexecutiveadvisors.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
885 3rd Avenue
New York, New York 10022
Attn:    Michael W. Benjamin
         Jason H. Silvera
         David A. Zaheer
Email:   michael.benjamin@lw.com
         jason.silvera@lw.com
         david.zaheer@lw.com

(iii)   if to any other Stockholder, addressed in accordance with Schedule A.

(g)    Recapitalization, Exchange, Etc. The provisions of this Agreement shall apply, to the full
extent set forth herein, with respect to any and all Shares of the Company or any successor or assign of the

Company (whether by merger, consolidation, sale of assets, conversion to a corporation or otherwise) that may be issued in respect of, in exchange for, or in substitution of, the Shares and shall be appropriately adjusted for any dividends, splits, reverse splits, combinations, recapitalizations, and the like occurring after the date hereof.

(h)   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to constitute one and the same agreement.

(i)   Severability. If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be declared by any court of competent jurisdiction to be invalid, illegal, void or unenforceable in any respect, all other provisions of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it has been held invalid, illegal, void and unenforceable, shall nevertheless remain in full force and effect and will in no way be affected, impaired or invalidated thereby. Upon such determination that any provision, or the application of any such provision, is invalid, illegal, void or unenforceable, the Parties shall act in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable law.

(j)   Amendment. This Agreement may be amended, modified or extended, and the terms, conditions and provisions hereof may be waived, only by a written agreement approved by each Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares; provided, however, that (i) any such amendment, modification, extension or waiver that disproportionately and materially adversely affects the rights or obligations of any Stockholder under this Agreement as compared to any other Stockholder shall require the prior written consent of such affected Stockholder; (ii) any amendment, modification, extension or waiver with respect to any of the Investor Reserved Matters shall require the prior written consent of each Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares as of such time; (iii) without limiting the foregoing, any amendment, modification, extension or waiver of Section 1(g)(v) or Section 1(g)(xii) shall require the prior written consent of the holders of a majority of the Total Common Shares (excluding, solely for the purpose of this clause (iii), Shares held by any Investor Stockholder that (together with its Affiliates) holds at least five percent of the Total Common Shares); and (iv) any waiver of any Investor Stockholder's rights under Section 4, Section 5 or Section 6 shall require the prior written consent of such Investor Stockholder. At any time hereafter, Persons acquiring Shares in compliance with the provisions of this Agreement may be made Parties hereto by executing a signature page in the form attached as Exhibit A hereto, which signature page shall be countersigned by the Company and shall be attached to this Agreement and become a part hereof without any further action of any other Party hereto.

(k)   Tax Withholding. The Company shall be entitled to require payment in cash or deduction from other compensation payable to any Stockholder of any sums required by federal, state or local tax law to be withheld with respect to the issuance, vesting, exercise, repurchase or cancellation of any Shares.

(l)   Integration. This Agreement constitutes the entire agreement among the Parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

(m)   Further Assurances. In connection with this Agreement and the transactions contemplated thereby, each Stockholder shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

(n)     No Strict Construction.  This Agreement shall be deemed to be collectively prepared by the Parties, and no ambiguity herein shall be construed for or against any Party based upon the identity of the author of this Agreement or any provision hereof.

(o)     No Third Party Beneficiaries.  Neither this Agreement, nor any provision contained herein, shall create a third-party beneficiary relationship or otherwise confer any right, entitlement or benefit upon any Person other than the Parties to this Agreement and their permitted assigns (except for the rights of Board Observers to indemnification and director and officer insurance under Section 1(e)).

(p)     No Recourse.  Notwithstanding anything that may be expressed or implied in this Agreement, the Company and each Stockholder covenant, agree and acknowledge that no recourse under this Agreement or any document or instrument delivered in connection with this Agreement shall be had against any current or future director, officer, employee, agent, general or limited partner or member of any Stockholder or any Affiliate or assignee thereof, as such, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly acknowledged that no personal liability whatsoever shall attach to, be imposed upon or otherwise be incurred by any current or future director, officer, employee, agent, general or limited partner or member of any Stockholder or any Affiliate or assignee thereof, as such, for any obligation of any Stockholder under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

(q)     Construction.

(i)     Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; (v) the word "including" shall mean "including, without limitation", (vi) each defined term has its defined meaning throughout this Agreement, whether the definition of such term appears before or after such term is used, and (vii) the word "or" shall be disjunctive but not exclusive.

(ii)     References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto.

(iii)     References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(iv)     All references to "$" or "dollars" shall be to the lawful currency of the United States.

## Section 12.     Definitions

(a)     As used in this Agreement, the following terms have the following meanings:

"Acceptance Notice" has the meaning set forth in Section 4(b).

"Affiliate" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the

20

management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Amended Credit Agreements" means the Amended First Lien Credit Agreement and the Amended Second Lien Credit Agreement.

"Amended Drag-Along Notice" has the meaning set forth in Section 3(b).

"Amended First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of December 10, 2015, as amended by Amendment No. 1 thereto dated as of October 29, 2019, as further amended by Amendment No. 2 thereto dated as of February 24, 2021, among Bear Parent Inc., Belk, Inc., Alter Domus (US) LLC, as administrative agent and collateral agent thereunder, and each lender from time to time a party thereto, as in effect as of the date of this Agreement.

"Amended Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of December 10, 2015, as amended by Amendment No. 1 thereto dated as of May 7, 2019, as further amended by Amended No. 2 thereto dated as of October 29, 2019, as further amended by Amendment No. 3 dated as of February 24, 2021, by and among Bear Parent, Inc., Belk, Inc., Wilmington Trust, N.A. administrative agent and collateral agent thereunder, and each lender from time to time a party thereto, as in effect as of the date of this Agreement.

"Blackstone Investor Designee" has the meaning set forth in Section 1(a)(ii)(B).

"Blackstone Investors" means GSO Beacon Holdings LP, GSO Diamond Portfolio Borrower, LLC and GSO Credit Alpha Fund LP, together with the Permitted Transferees of each of the foregoing that hold Shares.

"Board" has the meaning set forth in Section 1(a)(i).

"Board Committee" has the meaning set forth in Section 1(c).

"Board Observer" has the meaning set forth in Section 1(e).

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

"Chair" has the meaning set forth in Section 1(a)(vi).

"Change of Control" means, with regard to a Stockholder, (i) if having regard to the voting rights, rights to receive income or capital, rights to appoint directors and rights with respect to any other matter which relates to effective control of such Stockholder, any Person and any Affiliate of that Person who between them (directly or indirectly) control or beneficially own (as at the date when the relevant Stockholder is issued or acquires Shares) more than 50% of the ordinary securities or other voting, income or capital participation rights, rights to appoint directors and any other matter which relates to effective control of such Stockholder, pursuant to the consummation of any transaction or series of related transactions (whether such transaction is effected by merger, consolidation, recapitalization, sale or transfer of equity or otherwise) ceases or cease to (directly or indirectly) control or beneficially own more than 50% of such ordinary securities or other rights; (ii) if any transaction or series of related transactions is consummated pursuant to which any Person or group (other than any other Stockholder or any of their

21

respective Affiliates) acquires (directly or indirectly) all or substantially all of the assets of such Stockholder; or (iii) if any other transaction or arrangement is effected such that any Person and its associates (other than a Person and its associates who holds 50% or more of the voting power in the Stockholder before the transaction or arrangement is effected) (A) becomes the holder of voting power of 50% or more in such Stockholder or (B) if the Person and its associates converted all rights to acquire voting securities, assuming they were convertible at any time, would become the holder of voting power of 50% or more in such Stockholder.

"Common Stock" means shares of the Company's common stock, par value $0.001 per share.

"Company" has the meaning set forth in the preamble.

"Company Bylaws" means the bylaws of the Company as amended from time to time.

"Company Charter" means the certificate of incorporation of the Company as amended from time to time.

"Company Constitutional Documents" means the Company Charter and the Company Bylaws.

"Company Sale" means any one of the following:  (i) a change in the ownership or control of the Company effected through a transaction or series of related transactions (including by way of merger, consolidation, business combination or similar transaction involving the Company or any of its Subsidiaries) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company, any of its Subsidiaries, or the Sponsor Investor or any of its Affiliates) directly or indirectly acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act), of more than 50% of the Shares then outstanding, or of equity securities of the Company (or Options, rights or Warrants to purchase or securities convertible into or exchangeable for such equity securities) possessing more than 50% of the total combined voting power of the Shares outstanding, in either case immediately after such transaction or series of transactions; or (ii) the sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole, to any "person" (as defined above) (other than the Company, any of its Subsidiaries, or the Sponsor Investor or any of its Affiliates), other than, in the case of either of the immediately foregoing clauses (i) or (ii), any such transaction effected as part of a proceeding under Chapter 11 or Chapter 7 of the U.S. Bankruptcy Code.

"Convertible Securities" means any evidence of Indebtedness, shares of stock or other securities (other than Options or Warrants) which are directly or indirectly convertible into or exchangeable or exercisable for shares of Stock.

"Designees" means the Sponsor Investor Designees, the Blackstone Investor Designees or the KKR Investor Designee.

"Director" has the meaning set forth in Section 1(a)(i).

"Drag Sale" has the meaning set forth in Section 3(a).

"Drag Share Consideration" has the meaning set forth in Section 3(c).

"Drag-Along Notice" has the meaning set forth in Section 3(b).

"Drag-Along Transferee" has the meaning set forth in Section 3(a).

"Enabled Stockholder" has the meaning set forth in Section 6(a).

"Equity Incentive Plans" means any management incentive equity plan adopted by the Board after the date of this Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations in effect thereunder.

"Family Group" means, for any Management Stockholder, such Management Stockholder's spouse, their respective parents, descendants of such parents (whether natural or adopted) and the spouses of such descendants.

"Governmental Approval" means, with respect to any Transfer of Shares, any consent or other action by, or filing with, any governmental authority required in connection with such Transfer and the expiration or early termination of any applicable statutory waiting period in connection with such action or filing.

"Indebtedness" of any Person means, without duplication, (i) the principal of and, accreted value, accrued and unpaid interest, prepayment premiums or penalties and fees and expenses in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations (contingent or otherwise) of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding, in each of the foregoing cases in this clause (ii), trade accounts payable incurred in the ordinary course of business); (iii) all capitalized lease obligations; (iv) all obligations of the type referred to in clauses (i) through (iii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Independent Director" means a Designee of an Investor Stockholder that is not employed by such Investor Stockholder or its Affiliates.

"Initial Public Offering" means the first underwritten public offering of Common Stock pursuant to an effective registration statement filed by the Company with the United States Securities and Exchange Commission (other than on Forms S-4 or S-8 or successors to such forms) under the Securities Act.

"Investor Reserved Matter" has the meaning set forth in Section 1(g).

"Investor Stockholders" means, collectively, the Sponsor Investor, the Blackstone Investors and the KKR Investors.

"KKR Investor Designee" has the meaning set forth in Section 1(a)(ii)(C).

"KKR Investors" means those Stockholders listed on the signature pages hereto under the caption "KKR Investors", together with the Permitted Transferees of such Stockholders that hold Shares.

"Litigation" has the meaning set forth in Section 11(d).

"Management Stockholder" means any stockholder of the Company who is (or was) an employee or service provider (whether as a consultant, advisor or otherwise) of the Company or any of its Subsidiaries

23

and who has executed a signature page in the form attached as <u>Exhibit A</u> hereto, together with its Permitted Transferees that hold Shares.

"<u>Meeting Notice</u>" has the meaning set forth in <u>Section 1(d)</u>.

"<u>Necessary Action</u>" means, with respect to a specified result, all actions (to the extent permitted by applicable law) necessary to cause such result, including (i) voting or providing written consent or proxy with respect to any Shares, (ii) calling and attending meetings in person or by proxy for purposes of obtaining a quorum and causing the adoption of stockholders' resolutions and amendments to the Company Constitutional Documents, (iii) executing agreements and instruments and (iv) making, or causing to be made, all filings, registrations or similar actions that are required to achieve such result.

"<u>New Equity Securities</u>" means equity securities of the Company issued after the date hereof, including any and all (i) Shares, (ii) Convertible Securities, (iii) Options, Warrants or other rights to acquire from the Company any Shares or Convertible Securities, or (iv) of the foregoing clauses (i)-(iii) of a Subsidiary of the Company.

"<u>Non-Attending Director</u>" has the meaning set forth in <u>Section 1(d)</u>.

"<u>Offer Period</u>" is defined in <u>Section 4(b)</u>.

"<u>Options</u>" means any options to subscribe for, purchase or otherwise directly acquire Stock, other than any such option held by the Company or any right to purchase Shares pursuant to this Agreement.

"<u>Participating Stockholder</u>" has the meaning set forth in <u>Section 4(a)</u>.

"<u>Participation Notice</u>" has the meaning set forth in <u>Section 6(b)</u>.

"<u>Party</u>" and "<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Permitted Transferee</u>" means (i) in the case of the Sponsor Investor, any Affiliate of, or Person managed or advised by, Sycamore Partners Management, L.P. or any equity holder of Fashion Holdings LLC as of the date of this Agreement (or any Affiliate thereof), (ii) in the case of a Blackstone Investor, any Affiliate of, or Person managed or advised by, The Blackstone Group Inc. or its Affiliates, (iii) in the case of a KKR Investor, any Affiliate of, or Person managed or advised by, KKR Credit Advisors (US) LLC or its Affiliates, (iv) in the case of any other Stockholder (other than a Management Stockholder or an Investor Stockholder), any Affiliate of, or Person managed or advised by, such Stockholder and (v) in the case of a Management Stockholder, (A) any trust the beneficiaries of which, or any corporation, limited liability company or partnership the stockholders, members or general or limited partners of which, include only members of such Management Stockholder's Family Group (or entities of which the stockholders, members or general or limited partners of which, include only members of such Management Stockholder's Family Group) receiving Shares for *bona fide* estate planning purposes, and (B) any transferee in any Transfer occurring by operation of law upon the death of such Management Stockholder.

"<u>Person</u>" includes any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"<u>Plan</u>" means the joint plan of reorganization filed by Belk, Inc. and certain of its Affiliates under Chapter 11 of the U.S. Bankruptcy Code that embodies the Restructuring Transactions (as such term is defined in the RSA).

"Preemptive Percentage" has the meaning set forth in Section 6(a).

"Preemptive Right" has the meaning set forth in Section 6(a).

"Proposal" has the meaning set forth in Section 4(a).

"Purchasing Holders" has the meaning set forth in Section 6(d).

"Required Seller" has the meaning set forth in Section 3(a).

"ROFO Proposal Notice" has the meaning set forth in Section 4(a).

"RSA" means that certain Restructuring Support Agreement, dated as of January 26, 2021, by and among the Company Parties and the Consenting Stockholders (as each such term is defined therein) party thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and including the "Restructuring Term Sheet" (as defined therein).

"Secondary Offer Period" has the meaning set forth in Section 4(b).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder.

"Shares" means (a) all shares of Stock, whenever issued, including all shares of Stock issued upon the exercise, conversion or exchange of any Options, Warrants or Convertible Securities. For the avoidance of doubt, "Shares" shall include all Shares issued to a Stockholder on or after the date hereof, which such Shares shall be subject to the rights and restrictions set forth in this Agreement. For purposes of Section 5, "Shares" shall exclude any Options, Warrants and Convertible Securities (i) that are not vested (and do not vest in connection with the Tag Sale) or (ii) that have an exercise price greater than the per share price in the Tag Sale.

"Sponsor Investor" has the meaning set forth in the preamble.

"Sponsor Investor Designee" has the meaning set forth in Section 1(a)(ii)(A).

"Stock" means Common Stock, together with any other classes or series of equity securities of the Company.

"Stockholder" and "Stockholders" has the meaning set forth in the preamble.

"Subsidiary" or "Subsidiaries" of any Person means any corporation, partnership, joint venture or other legal entity of which such Person (either alone or through or together with any other Person), owns, directly or indirectly, 50% or more of the stock or other equity interests which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

"Tag Buyer" has the meaning set forth in Section 5(c).

"Tag Election Period" has the meaning set forth in Section 5(b).

"Tag Goal" has the meaning set forth in Section 5(a).

"Tag Notice" has the meaning set forth in Section 5(a).

"Tag Right" has the meaning set forth in Section 5(b).

"Tag Sale" has the meaning set forth in Section 5(a).

"Tag Seller" has the meaning set forth in Section 5(b).

"Tag Share Limit" means the maximum number of Shares a Tag Seller may Transfer in a Tag Sale, which shall be that number of Shares equal to the product of: (i) the total Shares (of that same class and series proposed to be Transferred by the Transferring Tag Stockholder) held by such Tag Seller at the applicable time *multiplied by* (ii) a fraction, the numerator of which is the Tag Goal and the denominator of which is the total Shares (of the same class and series proposed to be Transferred by the Transferring Tag Stockholder) held by the Transferring Tag Stockholder.

"Tag Shares" has the meaning set forth in Section 5(b).

"Tagging Investor Stockholder" has the meaning set forth in Section 5(a).

"Total Common Shares" means the total number of issued and outstanding shares of Common Stock.

"Transfer" when used as a noun, shall mean any direct or indirect (including by direct or indirect Change of Control, sale of equity, merger, consolidation, amalgamation, reorganization or other similar plan or scheme, or operation of law, in each case, whether directly, or directly or indirectly of a parent, holding company, equity holder or Subsidiary, or otherwise) assignment, transfer, sale, pledge, alienation, hypothecation or other disposition or encumbrance; and, when used as a verb, shall mean to directly or indirectly (including by direct or indirect Change of Control, sale of equity, merger, consolidation, amalgamation, reorganization or other similar plan or scheme, or operation of law, in each case, whether directly, or directly or indirectly of a parent, holding company, equity holder or Subsidiary, or otherwise) assign, transfer, sell, pledge, alienate, hypothecate or otherwise dispose of or encumber. Notwithstanding the foregoing, no assignment, transfer, sale, pledge, alienation, hypothecation or other disposition or encumbrance of any limited partnership interests or other similar non-controlling interests in: (i) a Stockholder or its parent entities that is, or is held directly or indirectly by, a private equity fund, hedge fund or similar vehicle; (ii) a pooled investment vehicle holding other material investments and which is, or is an equityholder (directly or indirectly) of, any such Stockholder; or (iii) a Stockholder that is a widely held "investment company" as defined in the Investment Company Act of 1940, as amended, or any publicly traded company whose securities are registered under the Exchange Act, in any of the cases of the aforementioned clauses (i) through (iii), inclusive, shall be deemed to be a Transfer hereunder, unless and until there has been a Change of Control of any general partner, manager or similar Person of any such entity referred to in any of the foregoing clauses (i) and (ii).

"Transferring Stockholder" has the meaning set forth in Section 2(a)(i).

"Transferring Tag Stockholder" has the meaning set forth in Section 5(a).

"Warrants" means any warrants to subscribe for, purchase or otherwise directly acquire Stock or Convertible Securities.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties have executed this Stockholders Agreement as of the date first above written.

**COMPANY**:

**FASHION HOLDINGS INTERMEDIATE INC.**

By: _____
     Name:
     Title:

**<u>EXHIBIT A</u>**

**SIGNATURE PAGE**
**TO THE**
**STOCKHOLDERS AGREEMENT**

By execution of this signature page, _____ hereby agrees to become a party to, be bound by the obligations of and receive the benefits of that certain Stockholders Agreement, as amended from time to time, by and among Fashion Holdings Intermediate, Inc., a Delaware corporation, and the other Parties named therein and shall be deemed to be a "Stockholder" for all purposes thereunder.

_____

By: _____
      Name:
      Title:

Notice Address:

_____

_____

_____

Accepted:

**FASHION HOLDINGS INTERMEDIATE, INC.**

By: _____
      Name:
      Title:

## **<u>SCHEDULE A</u>**

Stockholders

[Attached.]